

Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
     * Application for leave to appear pro
hoc vice for this case made by Motion on
February 11, 2008 pursuant to Local Civil
Rule 1.3(c).

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
_____X

TOM OGNIBENE, YVETTE
VELAZQUEZ BENNETT, VIVIANA
VAZQUEZ-HERNANDEZ, ROBERT
PEREZ, FRAN REITER, SHEILA
ANDERSEN-RICCI, MARTINA
FRANCA ASSOCIATES, LLC,                    C.A. No._____
REITER/BEGUN ASSOCIATES, LLC,
DENIS GITTENS, OSCAR PEREZ,                **COMPLAINT FOR DECLARATORY**
MICHELE RUSSO, THE KINGS                   **AND INJUNCTIVE RELIEF**
COUNTY COMMITTEE OF THE NEW
YORK STATE CONSERVATIVE                    **(CLASS ACTION)**
PARTY, and THE NEW YORK STATE
CONSERVATIVE PARTY,

                              *Plaintiffs,*

          -against-

**FREDERICK A.O. SCHWARZ, Jr.**, in his official capacity as Chairman of New York City's Campaign Finance Board; **DALE C. CHRISTENSEN, Jr., JOSEPH P. PARKES, S.J., KATHERYN C. PATTERSON, and MARK S. PIAZZA**, in their official capacities as Members of New York City's Campaign Finance Board; **MARK DAVIES**, in his official capacity as Executive Director of the New York City Conflicts of Interest Board; **MONICA BLUM, STEVEN ROSENFELD, ANDREW IRVING, and ANGELA M. FREYRE**, in their official capacity as Members of New York City's Board of Conflicts of Interest; and **MICHAEL MCSWEENEY**, in his official capacity as Acting City Clerk of New York City,

*Defendants.*

_____X

COMES NOW Plaintiffs Tom Ognibene, Yvette Velazquez Bennett, Viviana Vazquez-Hernandez, Robert Perez, Fran Reiter, Sheila Andersen-Ricci, Martina Franca Associates, LLC, Reiter/Begun Associates, LLC, Denis Gittens, Oscar Perez, Michele Russo, The Kings County Committee of the New York State Conservative Party, and The New York State Conservative Party and for their Complaint against Defendants state as follows:

**PRELIMINARY STATEMENT**

1.     This is a challenge to the constitutionality of certain provisions of New York City's campaign finance laws and lobby laws. Specifically, Plaintiffs claim that New York City Administrative Code sections 3-213, 3-216.1, 3-225, 3-702(3), 3-702(20), 3-703(1)(l), 3-703(1-a), 3-703(5), 3-703(6), 3-705, 3-705(7), 3-706(3), 3-709, and 3-709.5, which regulate various aspects

**COMPLAINT**                                    1

of campaign finance and place certain requirements upon lobbyists, violate the First and Fourteenth Amendments to the United States Constitution by unduly infringing upon protected political speech and association as set forth in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curium) and its progeny and also by denying equal protection of law. Plaintiffs challenge these provisions for burdening free expression and association without any compelling justification for doing so, without being narrowly tailored in doing so, for being overbroad by chilling substantially more speech than the governmental interest would allow, for being overinclusive by sweeping within their strictures constitutionally protected advocacy, for being underinclusive by failing to reach all speech that a viewpoint-neutral law would touch, and for denying the equal protection of the laws to Plaintiffs.

2.    Plaintiffs seek to have the challenged provisions declared unconstitutional on their face and as applied as violations of the First and Fourteenth Amendments. Plaintiffs also seek to have enforcement of these provisions permanently enjoined.

3.    Plaintiffs also challenge certain provisions of the campaign finance laws as impermissibly diminishing the voting strength of Hispanic-Americans and African-Americans in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq. Specifically, Plaintiffs allege that section 3-702(3) of the Code (which makes certain contributions unmatchable for public funds), section 3-703(1-a) of the Code (which reduces the contribution limit for certain citizens and entities defined as having business dealings with the city), and section 3-703(1)(l) of the Code (which prohibits contributions from LLCs, LLPs, and partnerships), significantly reduce, if not totally eliminate, the pool of Hispanic-American preferred candidates. This result impermissibly diminishes Hispanic-American voter strength, and also impedes Hispanic-American candidates from

**COMPLAINT**                    2

full participation in the political process, in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments.

4.    Plaintiffs seek to have the challenged provisions declared violations of the Voting Rights Act. Plaintiffs also seek to have enforcement of these provisions permanently enjoined.

5.    Plaintiffs ask that these issues be resolved promptly so that Plaintiffs and those similarly situated will not be chilled in their free expression and association or risk being unlawfully enjoined or found in violation of New York City campaign finance laws and lobby laws as a result of having engaged in constitutionally-protected political expression and association.

## JURISDICTION AND VENUE

6.    This action arises under 42 U.S.C. § 1983, 42 U.S.C. § 1973 et. seq., and the First and Fourteenth Amendments to the Constitution of the United States.

7.    The jurisdiction of this Court over claims arising under 42 U.S.C. § 1983 and 42 U.S.C. § 1973 is founded upon 28 U.S.C. § 1343(a). The jurisdiction over claims arising under the First and Fourteenth Amendments is founded upon 28 U.S.C. §§ 1331 and 1343(a).

8.    Venue in this district is proper under 28 U.S.C. § 1391(b) because the action involves a challenge to New York City's Administrative Code, and therefore a substantial part of the events or omissions giving rise to this claim occurred in the Southern District of New York. Venue also is proper under 28 U.S.C. § 1391(b) because Defendant Members of the Campaign Finance Board are residents of the city of New York, which is within the Southern District of New York.

## PARTIES

9.    Tom Ognibene is the former minority leader of the City Council and also a former candidate for mayor. He intends to run for City Council as a non-incumbent, nonparticipating

**COMPLAINT**                                    3

candidate in 2009. Based on his past experience as a candidate, he reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign. He intends to solicit contributions to his campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the City" by section 3-702(18) of the Code. He would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. He also would like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l).

10.     Yvette Velazquez Bennett is a Hispanic-American who is a Republican District Leader from Brooklyn and prior City Council candidate. She would like to run for office again as a participating candidate (one who participates in the public financing system), but reasonably believes that the changes imposed by LL No. 34 impedes her ability to amass the resources necessary to mount an effective campaign. Were she to run, she would solicit contributions to her campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the city" by section 3-702(18) of the Code. She would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. She also would like to have her contributions from these doing-business persons and entities to be matched with public money under the public financing program. However, the changes instituted by LL No. 34 makes these contributions unmatchable under section 3-702(3) of the Code. She would also like to be able to solicit contributions from limited liability

**COMPLAINT**                                    4

companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l). She reasonably believes that these lower contribution limits, the designation of certain contributions as unmatchable, and the prohibition against accepting contributions from LLCs, LLPs, and partnerships will prevent her from amassing the resources necessary to mount an effective campaign. Consequently, she has determined that she cannot run for office so long as these lower contribution limits remain in place. In addition, as an Hispanic-American who would like to run for office, Ms. Bennett believes that the changes to the campaign finance laws imposed by LL No. 34 violate Section 2 of the Voting Rights Act. She reasonably believes that these changes make it impossible for her and other Hispanic-American candidates like her to raise the funds necessary to mount effective, competitive campaigns for office in New York City, as they previously could do prior to the implementation of these changes. Because she reasonably believes that New York City voters engage in racial bloc voting, these changes to the campaign finance laws harm Hispanic-American voters by drastically reducing—if not completely eliminating—the pool of Hispanic-American candidates for office in New York City. This will then place Hispanic-American voters in a worse position than they were prior to the implementation of LL No. 34, in direct violation of Section 2 of the Voting Rights Act. Ms. Bennett also alleges that it is not just Hispanic-American voters who are harmed by these changes, but Hispanic-American candidates, such as herself, who are harmed as well. She asserts that since the changes brought about by LL No. 34 will make it significantly more difficult—if not completely impossible—for Hispanic-Americans such as herself to run for office, the effect of the law is to impermissibly bar Hispanic-Americans such as herself from attaining office in New York City. Ms. Bennett asserts that this impermissibly violates her personal rights under Section 2 of the Voting Rights Act. Ms. Bennett is therefore a named plaintiff

**COMPLAINT**                                    5

representing all Hispanic-Americans who would like to run for office, but believe they are impermissibly kept from doing so by the campaign finance laws in violation of Section 2 of the Voting Rights Act.

11.    Viviana Vazquez-Hernandez is a Hispanic-American who is a Republican District Leader from Brooklyn and prior City Council candidate. She would like to run for office again as a participating candidate (one who participates in the public financing system), but reasonably believes that the changes imposed by LL No. 34 impedes her ability to amass the resources necessary to mount an effective campaign. Were she to run, she would solicit contributions to her campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the city" by section 3-702(18) of the Code. She would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. She also would like to have her contributions from these doing-business persons and entities to be matched with public money under the public financing program. However, the changes instituted by LL No. 34 makes these contributions unmatchable under section 3-702(3) of the Code. She would also like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l). She reasonably believes that these lower contribution limits, the designation of certain contributions as unmatchable, and the prohibition against accepting contributions from LLCs, LLPs, and partnerships will prevent her from amassing the resources necessary to mount an effective campaign. Consequently, she has determined that she cannot run for office so long as these lower contribution limits remain in place. In addition, as an Hispanic-American who would like to run for

**COMPLAINT**                                    6

office, Ms. Vazquez-Hernandez believes that the changes to the campaign finance laws imposed by

LL No. 34 violate Section 2 of the Voting Rights Act. She reasonably believes that these changes

make it impossible for her and other Hispanic-American candidates like her to raise the funds

necessary to mount effective, competitive campaigns for office in New York City, as they previously

could do prior to the implementation of these changes. Because she reasonably believes that New

York City voters engage in racial bloc voting, these changes to the campaign finance laws harm

Hispanic-American voters by drastically reducing—if not completely eliminating—the pool of

Hispanic-American candidates for office in New York City. This will then place Hispanic-American

voters in a worse position than they were prior to the implementation of LL No. 34, in direct

violation of Section 2 of the Voting Rights Act. Ms. Vazquez-Hernandez also alleges that it is not

just Hispanic-American voters who are harmed by these changes, but Hispanic-American candidates,

such as herself, who are harmed as well. She asserts that since the changes brought about by LL No.

34 will make it significantly more difficult—if not completely impossible—for Hispanic-Americans

such as herself to run for office, the effect of the law is to impermissibly bar Hispanic-Americans

such as herself from attaining office in New York City. Ms. Vazquez-Hernandez asserts that this

impermissibly violates her personal rights under Section 2 of the Voting Rights Act. Ms.

Vazquez-Hernandez is therefore a named plaintiff representing all Hispanic-Americans who would

like to run for office, but believe they are impermissibly kept from doing so by the campaign finance

laws in violation of Section 2 of the Voting Rights Act.

    **12.**    Robert Perez is an Hispanic-American who is eligible to vote in the New York City

elections. He is the principal owner of Diamond Asphalt Corp., Inc., with an ownership stake of

more than ten percent of the company. Diamond Asphalt does construction work on city streets and

**COMPLAINT**                     7

bids for contracts valued at or above five hundred thousand dollars ($500,000). It therefore meets the definition of an entity which has business dealings with the City, as set forth in section 3-702(18)(a) of the Code. Because Mr. Perez owns more than a ten percent ownership stake of Diamond Asphalt—a company which has business dealings with the City—he meets the definition of a person who has business dealings with the City, as set forth in sections 3-702(20) and 3-703(1-a) of the Code. Mr. Perez is therefore subject to the lower contribution limits imposed by Local Law No. 34. In addition, his contributions are not matchable under section 3-702(3) of the Code. Mr. Perez intends to contribute to the candidate(s) of his choice in the upcoming New York City elections. He would like to contribute money to the candidate(s) of his choice at the higher contribution levels allowed by section 3-703(1)(f), and would do so but for the lower contribution limits imposed upon him by section 3-703(1-a). He would also like the money he contributes to the candidate(s) of his choice to be matchable to them if they choose to participate in the public funding program, so that his contributions are as valuable to the candidate(s) of his choice as are contributions from other citizens. Ethnically, Mr. Perez is an Hispanic-American. All things being equal, he would choose to vote for Hispanic-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Hispanic-American community. Mr. Perez reasonably believes that the changes instituted by LL No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to

**COMPLAINT**                                    8

campaign for office. This will place the Hispanic-American voting community in general, and him in particular, in a much weaker position than they were prior to the implementation of the changes instituted by LL No. 34, by diluting his vote and the vote of the Hispanic-American voting community. Mr. Perez reasonably believes that New York City experiences racial bloc voting; therefore, he believes that the changes instituted by LL No. 34 to New York City's Campaign Finance Law are in direct violation of Section 2 of the Voting Rights Act since those changes will act to dilute the vote of the Hispanic-American community in its ability to participate and nominate candidates for office. Mr. Perez is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

13.    Fran Reiter is eligible to vote in the New York City elections. She is a registered lobbyist, as well as a former deputy mayor and a former candidate for mayor. Ms. Reiter intends to contribute to the candidate(s) of her choice in the upcoming New York City elections. She would like to contribute money to the candidate(s) of her choice at the higher contribution levels allowed by section 3-703(1)(f) of the Code, and would do so but for the lower contribution limits imposed upon her by section 3-703(1-a) of the Code. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions are as valuable to the candidate(s) of her choice as are contributions from other citizens. However, contributions from lobbyists are not matchable under section 3-702(3)(g) of the Code.

14.    Sheila Andersen-Ricci is eligible to vote in the New York City elections. She is the spouse of a registered lobbyist. Ms. Andersen-Ricci intends to contribute to the candidate(s) of her choice in the upcoming New York City elections. She would like to contribute money to the

**COMPLAINT**                                        9

candidate(s) of her choice at the higher contribution levels allowed by section 3-703(1)(f) of the Code, and would do so but for the lower contribution limits imposed upon her by section 3-703(1-a) of the Code. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions are as valuable to the candidate(s) of her choice as are contributions from other citizens. However, contributions from lobbyists' spouses are not matchable under section 3-702(3)(g) of Code.

15. Martina Franca Associates, LLC is organized under the applicable state laws as a limited liability company. It has elected to be taxed as a partnership. Its business is the renting apartments of apartments. It would like to be able to contribute to the candidate(s) of its choice but is prohibited from doing so by section 3-703(1)(l) of the Code.

16. Reiter/Begun Associates, LLC is organized under the applicable state laws as a limited liability company. It has elected to be taxed as a partnership. Its business purpose is to provide services including, but not limited to, strategic planning and government outreach for its clients. At times, it engages in lobbying. It would like to be able to contribute to the candidate(s) of its choice but is prohibited from doing so by section 3-703(1)(l) of the Code.

17. Oscar Perez is an Hispanic-American voter who is eligible to vote in New York City elections. He intends to contribute to the candidate(s) of his choice in the upcoming New York City elections. He supports candidates and contributes to their campaigns based on whether he agrees with their positions or not, regardless of whether they choose to run as non-participating candidates. All things being equal, he would choose to vote for Hispanic-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Hispanic-American community. Mr. Perez reasonably believes that the changes instituted by LL No. 34 with regard to

**COMPLAINT**                                      10

contributions from those having business dealings with the City—both lowering the contribution limits and eliminating them from matchable contributions—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. This will place the Hispanic-American voting community in general, and him in particular, in a much weaker position than they were prior to the implementation of the changes instituted by LL No. 34, by diluting his vote and the vote of the Hispanic-American voting community. Mr. Perez reasonably believes that New York City experiences racial bloc voting; therefore, he believes that the changes instituted by LL No. 34 to New York City's Campaign Finance Law are in direct violation of Section 2 of the Voting Rights Act since those changes will act to dilute the vote of the Hispanic-American community in its ability to participate and nominate candidates for office. Mr. Perez is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

    18.    Denis Gittens is an African-American voter who is eligible to vote in New York City elections. He intends to contribute to the candidate(s) of his choice in the upcoming New York City elections. He supports candidates and contributes to their campaigns based on whether he agrees with their positions or not, regardless of whether they choose to run as non-participating candidates. All things being equal, he would choose to vote for African-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the African-American community. Mr. Gittens reasonably believes that the changes instituted by LL No. 34 with regard

**COMPLAINT**                            11

to contributions from those having business dealings with the City—both lowering the contribution limits and eliminating them from matchable contributions—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the African-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the African-American community will not have the financial resources to become candidates and to campaign for office. This will place the African-American community in general, and him in particular, in a much weaker position than they were prior to the implementation of the changes instituted by LL No. 34, by diluting his vote and the vote of the African-American voting community. Mr. Gittens reasonably believes that New York City experiences racial bloc voting; therefore, he believes that the changes instituted by LL No. 34 to New York City's Campaign Finance Law are in direct violation of Section 2 of the Voting Rights Act since those changes will act to dilute the vote of the African-American community in its ability to participate and nominate candidates for office. Mr. Gittens is therefore a named plaintiff representing all African-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

19. Michele Russo is eligible to vote in New York City elections. She is employed as the secretary of a registered lobbyist. However, she neither engages in lobbying activity, nor is she herself registered as a lobbyist. Ms. Russo intends to contribute to the candidate(s) of her choice in the upcoming New York City elections. She supports candidates and contributes to their campaigns based on whether she agrees with their positions or not, regardless of whether they choose to run as non-participating candidates. She wants to be able to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code, and would do so if allowed

**COMPLAINT**                                    12

by law. However, because she is employed by a lobbyist, she is restricted by 3-703(1-a) of the Code to the lower, business-dealings contribution levels assigned to lobbyists—even though she is not a registered lobbyist nor one who engages in lobbying activity. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions will be as valuable to the candidate(s) of her choice as are contributions from other citizens. However, contributions from lobbyists' employees such as herself are not matchable under section 3-702(3)(g) of Code.

20. The Kings County Committee of the New York State Conservative Party ("Kings County Conservative Party") seeks to place candidates from its party on the ballot for every office in the City elections. The Kings County Conservative Party therefore wants its candidates to be able to raise the money necessary to run for office. Consequently, they want their candidates to be able to accept contributions from those defined as having business dealings with the City at amounts up to the higher contribution limits previously allowed under section 3-703(1)(f) of the Code, and they also want these contributions to be matchable, as they were prior to the implementation of LL No. 34. However, those contributions are now severely limited by section 3-703(1-a) of the Code, and are no longer matchable. The Kings County Conservative Party asserts that its candidates are typically not supported by labor organizations, who may contribute at the higher, 3-703(f) levels. Rather, its candidates are more typically supported by contributors who meet the business-dealings definition. They also want their candidates to be able to receive contributions from LLCs, LLPs, and partnerships, reasonably believing that such contributions are essential to their candidates' ability to raise sufficient money to effectively campaign. They reasonably believe that the changes brought about by LL No. 34 with regard to contributions from those now defined as having business dealings

**COMPLAINT**                    13

with the City and also from LLCs, LLPs, and partnerships will make it impossible for their candidates to raise the money necessary to mount effective campaigns for office, thereby silencing their candidates' political speech.

21.    The New York State Conservative Party ("State Conservative Party") works with the Kings County Conservative Party in an effort to place candidates from its party on the ballot for every office in the City elections. The State Conservative Party therefore wants its candidates to be able to raise the money necessary to run for office. Consequently, they want their candidates to be able to accept contributions from those defined as having business dealings with the City at amounts up to the higher contribution limits previously allowed under section 3-703(f) of the Code, and they also want these contributions to be matchable, as they were prior to the implementation of LL No. 34. However, those contributions are now severely limited by section 3-703(1-a) of the Code, and are no longer matchable. The State Conservative Party asserts that its candidates are typically not supported by labor organizations, who may contribute at the higher, 3-703(f) levels. Rather, its candidates are more typically supported by contributors who meet the business-dealings definition. They also want their candidates to be able to receive contributions from LLCs, LLPs, and partnerships, reasonably believing that such contributions are essential to their candidates' ability to raise sufficient money to effectively campaign. They reasonably believe that the changes brought about by LL No. 34 with regard to contributions from those now defined as having business dealings with the City also from LLCs, LLPs, and partnerships will make it impossible for their candidates to raise the money necessary to mount effective campaigns for office, thereby silencing their candidates' political speech.

COMPLAINT                                    14

22.    **"Plaintiffs"** shall refer to all the enumerated Plaintiffs. **"Candidate Plaintiffs"** shall refer to Plaintiffs Yvette Velazquez Bennett, Tom Ognibene, and Viviana Vazquez-Hernandez. **"Participating Candidate Plaintiffs"** shall refer to Plaintiffs Yvette Velazquez Bennett and Viviana Vazquez-Hernandez. **"Non-participating Candidate Plaintiff"** shall refer to Plaintiff Tom Ognibene. **"Contributor Plaintiffs"** shall refer to Plaintiffs Sheila Andersen-Ricci, Robert Perez, Fran Reiter, Frank Ricci, Martina Franca Associates, LLC, Reiter Begun Associates, LLC, Denis Gittens, Oscar Perez, and Michele Russo. **"Business-Dealings Plaintiffs"** shall refer to Plaintiffs Sheila Andersen-Ricci, Robert Perez, Fran Reiter, Frank Ricci, Martina Franca Associates, LLC, and Reiter Begun Associates, LLC. **"Lobbyist Plaintiffs"** shall refer to Plaintiffs Reiter/Begun Associates, LLC, and Fran Reiter. **"Lobbyist's Spouse Plaintiff"** shall refer to Plaintiff Sheila Andersen-Ricci. **"Lobbyist's Employee Plaintiff"** shall refer to Plaintiff Michele Russo. **"Party Plaintiffs"** shall refer to The Kings County Committee of the New York State Conservative Party and The New York State Conservative Party. **"Hispanic-American Minority Voter Plaintiffs"** shall refer to Plaintiffs Robert Perez and Oscar Perez. **"African-American Minority Voter Plaintiff"** shall refer to Plaintiff Denis Gittens. **"Hispanic-American Minority Candidate Plaintiffs"** shall refer to Plaintiffs Yvette Velazquez Bennett and Viviana Vazquez-Hernandez. **"Hispanic-American Minority Voter Plaintiff Class"** shall refer to the class of all Hispanic-American citizens of New York City who are eligible and registered to vote, but whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws. **"African-American Minority Voter Plaintiff Class"** shall refer to the class of all African-American citizens of New York City who are eligible and registered to vote, but whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws. **"Hispanic-American Minority**

COMPLAINT                                    15

Candidate Plaintiff Class" shall refer to the class of all Hispanic-American citizens of New York

City who would like to run for office, but are unable to amass the resources necessary to mount an

effective campaign because of the challenged provisions of the campaign finance laws.

23.    Defendants New York City Campaign Finance Board Chair Frederick A. O. Schwarz,

Jr. and Board Members Dale C. Christensen, Jr., Joseph P. Parkes, S.J., Katheryn C. Patterson, and

Mark S. Piazza, are given authority by the New York City Campaign Finance Act to promulgate

rules and regulations for administering the Campaign Finance Act, investigate all matters relating

to its administration, and take all actions that are necessary and proper to enforce it. New York City

Administrative Code, § 3-708. They are being sued in their official capacities.

24.    Defendants New York City Conflicts of Interest Board Chair Mark Davies, Board

Members Monica Blum, Andrew Irving, Angela M. Freyre, and Steven Rosenfeld, and/or Acting

City Clerk Michael McSweeney have the authority to administer and enforce all provisions of the

lobby laws that are challenged by Plaintiffs. New York City Administrative Code, §§ 3-212, 3-228.

They are being sued in their official capacity.

25.    "Defendants", "City", and "government" shall refer to all of the enumerated

defendants together.

## CLASS ACTION ALLEGATIONS

26.    Hispanic-American Minority Voter Plaintiffs, African-American Minority Voter

Plaintiff, and Hispanic-American Minority Candidate Plaintiffs bring this action on their own behalf

and on behalf of all others similarly situated against the Defendants pursuant to Rule 23(a), 23(b)(1),

23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

**COMPLAINT**                                16

27.    The Hispanic-American Minority Voter Plaintiff class includes all Hispanic-American citizens and residents of New York City who are eligible and registered to vote for candidates in the nominating contests and election of 2009, and whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in violation of Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973 et seq.

28.    The African-American Minority Voter Plaintiff class includes all African-American citizens and residents of New York City who are eligible and registered to vote for candidates in the nominating contests and election of 2009, and whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in violation of Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973 et seq.

29.    The Hispanic-American Minority Candidate Plaintiff class includes all Hispanic citizens who would like to run for office in New York City, but who are impermissibly prevented by the campaign finance law from amassing the resources necessary to do so in violation of Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973 et seq.

30.    The number of all Hispanic residents of New York City whose voting strength is diminished because of the challenged provisions of the campaign finance laws is so numerous that joinder of all members is impracticable. Likewise, the number of all African-American residents of New York City whose voting strength is diminished because of the challenged provisions of the campaign finance laws is so numerous that joinder of all members is impracticable. In the same way, joinder of all members of the Hispanic-American Minority Candidate Plaintiff class is impracticable because it is impossible to say which Hispanic-American citizens might decide to run for office if they were not prevented by the campaign finance laws from amassing the necessary resources.

**COMPLAINT**                                    17

However, all Hispanic-American citizens of New York City are potentially affected, because any citizen could potentially decide to run for office. Consequently, they are so numerous that joinder of all members is impracticable.

31.    There are common questions of law and fact within each Plaintiff class. These questions include whether the challenged provisions so reduce the money available to minority candidates as to make it effectively impossible for them to run competitive races, thereby eliminating them from the pool of candidates available to protected minority voters so as to impermissibly dilute the Hispanic-American and African-American Minority Voter Plaintiff class members' voting strength by offering them less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. There is also the question of whether the Hispanic-American Minority Candidate Plaintiff class members have suffered a Voting Rights Act violation of their own.

32.    The claims of the representative Plaintiffs of each class are typical of the claims of the class as a whole. For instance, both the Hispanic-American Minority Voter Plaintiffs and the African-American Minority Voter Plaintiff allege that the result of the implementation of LL No. 34 is to impermissibly dilute their voting strength in violation of Section 2 of the Voting Rights Act. This is the same claim that the members of the respective classes make. Similarly, the Hispanic-American Minority Candidate Plaintiffs allege that they enjoy the right to have access to the political process under the Voting Rights Act, and this right has been impermissibly infringed by the changes implemented by LL No. 34. This is the same claim that the members of the Hispanic-American Minority Candidate Plaintiffs class make.

**COMPLAINT**                              18

33.     Plaintiffs can adequately and fairly represent the interests of the Plaintiff classes because those interests are substantially similar.  The Plaintiffs are not seeking monetary or other relief that would require consideration of individual circumstances.

34.     The Plaintiffs are represented by counsel who are familiar with the applicable laws, have the resources necessary to pursue this litigation, and are experienced in class action litigation and litigation regarding civil rights, including voting rights.

35.     This class action may be maintained under Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Plaintiffs, or it would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

36.     It may be maintained under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief to the class as a whole.

37.     Finally, it may be maintained under Fed. R. Civ. P. 23(b)(3) because there are questions of law and fact common to the members of the class predominate over any questions affecting only individual members; and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COMPLAINT**                                    19

## FACTS

38.    To be competitive in political races, one must achieve a certain level of name recognition, and also must amass the resources necessary to communicate one's message to the voting public.    Defendants acknowledge, "The strongest predictor of electoral success is incumbency." NEW YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON THE CAMPAIGN FINANCE PROGRAM 3 (2006). This is because incumbents already have name recognition and the public is likely to be aware of who they are and what they stand for.

39.    Those who would challenge incumbents must raise enough money to be able to communicate their message to the electorate.    In 1988, New York City determined to regulate the processes of political fundraising, and also provide public assistance to candidates who would agree to limit their spending on their campaigns.    New York City's Campaign Finance Act ("Act") was added to the New York City Charter ("Charter") and New York City Administrative Code ("Code") by Local Law No. 8 of 1988.  It is codified at chapter 46 of the Charter and title 3, ch. 7 of the Code.

40.    Since its inception, it has been amended by Local Law No. 4 of 1989, Local Law No. 69 of 1990, Local Law No. 68 of 1993, Local Law No. 37 of 1994, Local Law No. 90 of 1996, Local Law No. 27 of 1998, Local Law No. 39 of 1998, Local Law No. 48 of 1998, Local Law No. 21 of 2001, Local Law No. 12 of 2003, Local Law No. 13 of 2003, Local Law No. 43 of 2003, Local Law No. 58 of 2004, Local Law No. 59 of 2004, Local Law No. 60 of 2004, Local Law No. 105 of 2005, Local Law No. 17 of 2006, Local Law No. 23 of 2007, Local Law No. 34 of 2007, and Local Law No. 67 of 2007.

41.    In its current form, the Act establishes the New York City Campaign Finance Program ("Program"), with a fund for public financing ("Fund").  Code, § 3-709. To oversee and

COMPLAINT                                          20

administer the Program, the Act provides that there shall be a Campaign Finance Board ("Board"). This Board shall be composed of five members and shall have the "authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of" the Act ("Rules"). Code, § 3-708(1), (8). Currently, the Board is comprised of Chairman Frederick A. O. Schwarz, Jr. and Members Dale C. Christensen, Jr., Joseph P. Parkes, S.J., Katheryn C. Patterson, and Mark S. Piazza.

42.    On June 5, 2007, New York City Council Speaker Christine Quinn and Council Member (and Committee on Governmental Operations Chairman) Simcha Felder, in conjunction with Mayor Michael Bloomberg, introduced a campaign finance reform bill designated as Proposed Int. No. 586-A to further amend the Act. On July 3, 2007, Mayor Michael Bloomberg signed the bill into law as Local Law No. 34 of 2007 ("LL No. 34").

43.    On November 28, 2007, Proposed Int. No. 651-A was introduced before the City Council to address some errors in LL No. 34 and amend it because of "technical difficulties" with regard to its implementation. (COMMITTEE ON GOVERNMENTAL OPERATIONS, COMMITTEE REPORT (Dec 6, 2007)). On December 31, 2007, Mayor Bloomberg signed this bill into law as Local Law No. 67 of 2007 ("LL No. 67").

44.    Among other things LL No. 34 introduced lower contribution limits which apply to contributions from "persons" who have "business dealings with the city." Code, § 3-703(1-a).

45.    "Person" is a defined term which "shall include":

   (a)    "an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity,

**COMPLAINT**                    21

(b)    "any person employed in a senior managerial capacity regarding such entity,

or

(c)    "any person with an interest in such entity which exceeds ten percent of the

entity."

Code, §§ 3-702(20), 3-703(1-a).

46.    Specifically excluded from the definition of "person" are the following: "a

neighborhood, community or similar association consisting of local residents or homeowners

organized on a non-profit basis where such association is the applicant pursuant to subsection (3)

of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a

parent company or an affiliated company of an entity." Code, § 3-702(20).

47.    "Senior managerial capacity" (as used within the definition for "person") is also a

defined term. It "shall mean a high level supervisory capacity, either by virtue of title or duties, in

which substantial discretion and oversight is exercised over the solicitation, letting or administration

of business transactions with the city, including contracts, franchises or concessions, grants or

economic development agreements or applications for land use approvals." Code, §§ 3-702(20), 3-

703(1-a).

48.    "Business dealings with the city" is also a defined term, including eight categories

of relationships or potential relationships with the city of New York. Code, § 3-702(18)(a).

49.    **First category of "business dealings with the city:" Contracts for goods, services

or construction above a certain dollar amount.** "Business dealings with the city shall mean . . .

any contract for the procurement of goods, services or construction that is entered into or in effect

with the city of New York or any agency or entity affiliated with the city of New York and is valued

**COMPLAINT**                                22

at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter, and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith." Code, § 3-702(18)(a).

50.    The "dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code" refers to "a value that when aggregated with the values of all other such agreements with the same contractor or subcontractor and any franchises or concessions awarded to such contractor or subcontractor during the immediately preceding twelve-month period is valued at one hundred thousand dollars or more." Code, § 6-116.2(i)(3)(a).

51.    When determining the aggregate dollar value of contracts for purposes of ascertaining whether an individual or entity meets the definition of one having business dealings with the city, all contracts that are five thousand dollars or less are excluded from the calculation. Code, § 3-702(18)(a). This exclusion applies as well to the fourth and fifth category of business dealings with the city. *Id.*

52.    An "emergency contract awarded pursuant to section 315 of the charter" refers to an emergency procurement made "in the case of an unforeseen danger to life, safety, property or a necessary service." Charter, § 315.

53.    "Agency or entity affiliated with the city of New York," as used with respect to defining the people or entities who have business dealings with the city, is also a defined term. It "shall mean the city school district of the city of New York and any public authority, public benefit

**COMPLAINT**                                    23

corporation ro not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials." Code, § 3-702(18)(a). This definition applies when this term is used with respect to the other categories of business dealings with the city as well. *Id.*

54.    An individual or entity who bids or makes a proposal on a contract for the procurement of goods, services, or construction shall have business dealings with the city "from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement."  Code, § 3-702(18)(b).

55.    An individual or entity who has a contract for the procurement of goods, services or construction shall have business dealings with the city "during the term of such contract (or in the case of purchase contracts for goods, from the date of such purchase) and for twelve months thereafter." Code, § 3-702(18)(b).

56.    **Second category of "business dealings with the city:" Acquisitions or dispositions of real property.**  "Business dealings with the city shall mean . . . any acquisition or disposition of real property (other than a public auction or competitive sealed bid or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York." Code, § 3-702(18)(a).

57.    An individual or entity who proposes a lease in which the city of New York is the proposed lessee shall have business dealings with the city "from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application

**COMPLAINT**                    24

pursuant to section 197-c to a period of one year after the commencement of the lease term or after

the commencement of any renewal." Code, § 3-702(18)(b).

58.    An individual or entity who proposes to acquire an interest in real property, of which

the city or any city affiliated entity is disposing, shall have business dealings with the city "from the

date of the submission of a proposal and during the term of any agreement and one year after."

Code, § 3-702(18)(b).

59.    **Third category of "business dealings with the city:" Applications for approval**

**for certain transactions involving office space, certain land-use plans, and certain zoning**

**changes.** "Business dealings with the city shall mean . . . any application for approval sought from

the city of New York  pursuant to the provisions of section 195 of the charter, any application for

approval sought from the city of New York that has been certified pursuant to the provisions of

section 197-c of the charter, and any application for a zoning text amendment that has been certified

pursuant to section 201 of the charter; provided, however, that for purposes of this clause, with

respect to section 195 an applicant shall include the lessor of an office building or office space, and

with respect to section 197-c an applicant shall include a designated developer or sponsor of a project

for which a city agency or local development corporation is the applicant and provided, further,

however, that owner-occupants of one, two and three family homes shall not be considered

applicants pursuant to this clause." Code, § 3-702(18)(a).

60.    "The provisions of section 195 of the charter" refers to "acquisitions by the city of

office space or existing buildings for office use, whether by purchase, condemnation, exchange or

lease." Charter, § 195.

**COMPLAINT**                          25

61.     With respect to section 195, "an applicant shall include the lessor of an office building or office space." Code, § 3-702(18)(a).

62.     "The provisions of section 197-c of the charter" refers to "applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation." Charter, § 197-c.

63.     With respect to section 197-c, "an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant." Code, § 3-702(18)(a).

64.     With respect to this clause, "owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause."    Code, § 3-702(18)(a).

65.     An individual or entity who applies for approval from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter shall have business dealings with the city "from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter."  Code, § 3-702(18)(b).

66.     In the case of a decision by the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, an individual or entity who applies for approval from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter shall have business dealings with the city from "the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter." Code, § 3-702(18)(b).

**COMPLAINT**                    26

67.    In the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, an individual or entity who applies for approval from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter shall have business dealings with the city for "one hundred twenty days after expiration of the ten day period for council override pursuant to such section." Code, § 3-702(18)(b).

68.    **Fourth category of "business dealings with the city:" Certain concessions and franchises above a certain dollar amount.** "Business dealings with the city shall mean . . . any concession (other than a concession awarded through publicly-advertised competitive sealed bid) or any franchise from the city of New York or any agency or entity affiliated with the city of New York which has an estimated annual value at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code." Code, § 3-702(18)(a). Currently, this means a dollar amount greater than or equal to one hundred thousand dollars. Code, § 6-116.2(i)(3)(a).

69.    An individual or entity who bids on or makes a proposal for franchises and concessions shall have business dealings with the city "for the period from the submission of the bid or proposal until twelve months after the date of such submission." Code, § 3-702(18)(b).

70.    An individual or entity who receives a concession from the city of New York or a city-affiliated agency or entity shall have business dealings with the city "during the term of such concession and for twelve months after the end of such term." Code, § 3-702(18)(b).

71.    An individual or entity who is awarded a franchise by the city of New York or a city-affiliated agency or entity shall have business dealings with the city for "the period of one year after

**COMPLAINT**                              27

the commencement of the term of the franchise or after the commencement of any renewal." Code, § 3-702(18)(b).

72.    **Fifth category of "business dealings with the city:" Grants worth a certain amount.** "Business dealings with the city shall mean . . . any grant that is "received from the city of New York or any agency or entity affiliated with the city of New York" and "valued at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code." Code, § 3-702(18)(a). Currently, this means a dollar amount greater than or equal to one hundred thousand dollars. Code, § 6-116.2(i)(3)(a).

73.    An individual or entity who is awarded a grant from the city or a city-affiliated agency or entity shall have business dealings with the city "for one year after the grant is made." Code, § 3-702(18)(b).

74.    **Sixth category of "business dealings with the city:" Economic development agreements with the city of New York.** "Business dealings with the city shall mean . . . any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York." Code, § 3-702(18)(a).

75.    An individual or entity who enters into an economic development agreement with the city or a city-affiliated agency or entity shall have business dealings with the city "from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term." Code, § 3-702(18)(b).

76.    **Seventh category of "business dealings with the city:" Contracts for the investment of pension funds.** "Business dealings with the city shall mean . . . any contract for the

COMPLAINT                    28

investment of pension funds, including investments in a private equity firm and contracts with investment related consultants." Code, § 3-702(18)(a).

77.    An individual or entity who enters into a contract with the city or a city-affiliated agency or entity for the investment of pension funds shall have business dealings with the city "from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term." Code, § 3-702(18)(b).

78.    **Eighth category of "business dealings with the city:" Lobbyists.** "For purposes of this chapter a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York during all periods covered by a registration statement." Code, § 3-702(18)(a).

79.    The term "lobbyist," as used within the Act, is broader in scope than merely those who engage in lobbying activities. By definition, "the term 'lobbyist'" includes "the spouse or domestic partner and unemancipated children of the lobbyist." Code, § 3-702(16).  When the lobbyist is an organization, the term 'lobbyist' includes "any officer or employee" of the lobbyist "who engages in lobbying activities of the organization or is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employers." Code, § 3-702(16).

80.    The Act provides for the development of a Doing Business Database which is to be accessible to the Board and to the general public which will contain the names of all persons and/or entities who meet the definition of one having business dealings with the City. Code, § 3-702(20).

**COMPLAINT**                                29

81.    Under the provisions of the Act, candidates are classified as either "participating," "non-participating," and "limited participating." Code, §§ 3-702(1), (13), (14).

82.    Participating candidates are those candidates who meet the requirements to participate in the public funding Program and choose to do so by filing the appropriate written certification. Among other things, they are subject to both contribution limits and expenditure limits. Code, §§ 3-701(1); 3-703(f); 3-706.

83.    Non-participating candidates are those candidates who either choose not to participate in the Program or who do not meet the requirements to do so. While not subject to expenditure limits, they are subject to the contribution limits promulgated by the Act. Code, §§ 3-702(14); 3-703(f); 3-719(2). They are also subject to the same reporting requirements as are participating candidates. Code, § 3-719(1).

84.    Limited participating candidates are those candidates who file appropriate paperwork indicating their decision to file the requisite certification to be such a candidate. Code, § 3-718(1)(a). Among other things, they agree to (1) not accept contributions; (2) abide by the expenditure limits imposed on participating candidates; and (3) forego the public funds available to participating candidates. Code, §§ 3-718(c), (e), (f).

85.    The Act imposes contribution limits. It provides that the amount of money a candidate or his or her principal committee or authorized committees may accept "from any one individual, partnership, political committee, labor organization or other entity for all covered elections held in the same calendar year in which he or she is a participating candidate or a non-participating candidate," when added together, may not exceed:

(a)    For the office of mayor, public advocate, or comptroller . . . . . . . . $4,950

**COMPLAINT**                                        30

(b)    For borough president  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $3,850

(c)    For city council member  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $2,750

Code, § 3-703(f), endnote 1.

86.    The Act imposes these limits on the amount of contributions a candidate or his or her

committees may accept on candidates who choose not to participate in the Program.  Code, §§ 3-

703(f); 3-719(2).

87.    When New York City adopted its contribution limits and instituted the public funding

Program, its stated purpose was "to reduce undue influence by small concentrations of large

contributors and special interests."  COMMITTEE ON GOVERNMENTAL OPERATIONS, COMMITTEE

REPORT (June 21, 2007).

88.    Thus, New York City established that these limits are the levels at which it believes

influence occurs, or at the very least, these are the limits at which it believes unacceptable influence

occurs.  Contributions above these levels are therefore unacceptable influence, and contributions

below these levels are not influence (or, at least, are not unacceptable influence).

89.    The Act, as amended by LL No. 34 and LL No. 67, reduces the amount a candidate

or his or her principal committee may accept from those "having business dealings with the City"

as follows:

1.    For the office of mayor, public advocate or comptroller . . . . . . . . . . $400

2.    For borough president  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $320

3.    For city council member  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $250

Code, § 3-703(1-a).

**COMPLAINT**                    31

90.     The Act imposes these same lower contribution limits even when the contributor is giving to non-participating candidates or their committees. Code, § 3-719(2). These limits thus apply to contributions to all candidates, whether such candidates choose to participate in the public funding Program or not.

91.     These lower limits for contributions from individuals or entities who have business dealings with the City are less than a tenth of the contribution limit for individuals or entities who do not have business dealings with the City. Put another way, non-business-dealings individuals or entities may contribute over ten times more than business-dealings individuals or entities.

92.     An individual or entity who has business dealings with the City and who wishes to make a contribution to candidates running for mayor, public advocate, or comptroller are only allowed to contribute four hundred dollars to the candidates or their committees. That amount represents only 8.1 percent of the amount other, non-business-dealings individuals or entities may contribute. Put another way, those who do not have business dealings with the city may contribute *over twelve times* more than those who do have such dealings.

93.     An individual or entity who has business dealings with the City who wishes to make a contribution to candidates running for borough president is only allowed to contribute three hundred twenty dollars ($320) to the candidates or their committees. That amount represents just 8.3 percent of the three thousand eight hundred fifty dollars ($3,850) non-business-dealings individuals or entities may contribute. Put another way, those who do not have business dealings with the city may contribute *over twelve times* more than those who do have such dealings.

94.     An individual or entity who has business dealings with the City who wishes to make a contribution to candidates running for city council is only allowed to contribute two hundred fifty

**COMPLAINT**                                        32

dollars ($250) to the candidates or their committees. That amount represents just 9.1 percent of the two thousand seven hundred fifty dollar ($2,750) amount non-business-dealings individuals or entities may contribute. Put another way, those who do not have business dealings with the city may contribute *eleven times* more than those who do have such dealings.

95.    The text of LL No. 34 offers no justification for these lower contribution limits placed upon business-dealings individuals or entities. However, the City Council Committee on Governmental Relations issued a Report in which it stated that one of the purposes of LL No. 34 is to "reduce the appearance of influence of contributors that have business dealings with the City." (COMMITTEE ON GOVERNMENTAL OPERATIONS, COMMITTEE REPORT (June 21, 2007)).

96.    The higher, non-business dealings contribution limits set forth in section 3-703(1)(f) are indexed for inflation. Not later than March 1, 2018, the Board must adjust each of the 3-703(1)(f) contribution limits pursuant to a formula set out by the Act. Code, § 3-703(7). However, there is no corresponding requirement to index the lower, business dealings contribution limits found in section 3-703(1-a).

97.    The Act also prohibits contributions from limited liability companies, limited liability partnerships, partnerships, and corporations. Code, § 3-703(1)(l). However, the Act allows for some exceptions: "[W]here a contribution is from a contributor whose name is followed by a professional designation including but not limited to 'M.D.', 'Esq.' and 'C.P.A.' the board shall not treat such contribution as coming from a corporation, limited liability company, limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity." *Id.*

98.    The Act imposes various reporting requirements on candidates for election. Section 3-703(6) requires candidates and their committees to report, for every contribution, "the full name,

**COMPLAINT**                              33

residential address, occupation, employer, and business address" of each contributor. Code, § 3-703(6)(a). However, the occupation, employer, and business address of contributors making contributions aggregating not more than ninety-nine dollars ($99) need not be disclosed, *unless* the contributor is employed by a participating or limited participating candidate, is the spouse or domestic partner of such candidate, or is an entity in which in which an ownership interest of ten percent or more is held by such a candidate or his or her spouse or domestic partner. Code, § 3-703(6)(b)(iii).

99.    The Act includes expenditure limits above which participating and limited participating candidates and their committees may not spend. Currently, the limits are as follows:

(a)    For mayor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $6,158,000

(b)    For public advocate or comptroller . . . . . . . . . . . . . . . . . . . . . . $3,850,000

(c)    For borough president . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,386,000

(d)    For city council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $161,000

Code, § 3-706(1)(a).

100.    The Act also establishes the public financing program ("Program"), whereby candidates who choose to participate in the Program receive certain matching funds from public money. Code, § 3-705(2)(a). In order to qualify for the public matching funds available under the Program, a candidate must file the requisite paperwork to be a participating candidate and also must raise a certain amount of contributions, as follows:

(a)    For mayor, not less than two hundred fifty thousand dollars ($250,000) in

matchable contributions comprised of sums of up to one hundred seventy-five

**COMPLAINT**                                34

dollars ($175) per contributor including at least one thousand matchable contributions of ten dollars or more;

(b)    For public advocate and comptroller, not less than one hundred twenty-five thousand dollars ($125,000) in matchable contributions comprised of sums of up to one hundred seventy-five dollars ($175) per contributor including at least five hundred matchable contributions of ten dollars or more;

(c)    For borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to one hundred seventy-five dollars ($175) per contributor including at least one hundred matchable contributions of ten dollars ($10) or more from residents of the borough, or ten thousand dollars ($10,000) comprised of sums of up to one hundred seventy-five dollars ($175) per contributor, whichever is greater;

(d)    For a member of the city council, not less than five thousand dollars ($5,000) in matchable contributions comprised of sums of up to one hundred seventy-five dollars ($175) per contributor including at least seventy-five matchable contributions of ten dollars ($10) or more from residents of the district in which the seat is to be filled.

Code, § 3-703(2)(a).

101.    Defendants have stated that the purpose of the Program of public financing is to "level[] the playing field for candidates of modest means." (NEW YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON THE CAMPAIGN FINANCE PROGRAM

**COMPLAINT**                    35

5 (2006)). To achieve that purpose, the Act established the New York City Campaign Finance Fund ("Fund"), out of which the Board may make matching fund payments to participating candidates. Code, § 3-709(1). The Fund is funded through appropriations from the treasury. Code, § 3-709(2), (3).

102.    Under normal circumstances, a participating candidate who has qualified for public financing is eligible to receive six dollars ($6) for every one dollar ($1) of matchable contributions, up to one thousand fifty dollars ($1,050) in public funds per contributor. Code, § 3-705(2)(a). He or she may receive up to one-quarter of fifty-five percent of the total applicable expenditure limit for the office for which he or she is running. Code, § 3-705(7).

103.    The Act also excludes certain contributions from being counted for the matching formula. Specifically, the law provides:

The following contributions are not matchable:

     (a)     in-kind contributions of property, goods, or services;

     (b)     contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

     (c)     contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes;

     (d)     money order contributions from any one contributor that are, in the aggregate, greater than $100;

     (e)     contributions from individuals under the age of eighteen years;

**COMPLAINT**                    36

(f)     contributions from individual vendors to whom the participating candidate
        or his or her principal committee makes an expenditure, in furtherance of the
        nomination for election or election covered by the candidate's certification,
        unless such expenditure is reimbursing an advance;

(g)     contributions from lobbyists or other persons required to be included in a
        statement of registration filed pursuant to section 3-213(c)(1) or section
        3-213(d). The board shall rely on the database maintained by the city clerk
        pursuant to section 3-221 or such other information known to the board to
        determine whether a contribution is not matchable based on the contributor's
        status as a lobbyist or person required to be included in a statement of
        registration filed pursuant to section 3-213; and

(h)     contributions from contributors subject to the limitations of subdivision one-a
        of section 3-703 of this chapter (which are those defined as having business
        dealings with the City).

Code, § 3-702(3).

    **104.**    The effect of the exclusion of these contributions from the matching fund formula is
to render unmatchable, and therefore less helpful to candidates, the contributions from the Lobbyist
Plaintiffs, Lobbyist's Spouse Plaintiff, Lobbyist's Employee Plaintiff, and Business Dealings
Plaintiffs, as well as all other individuals and entities who fit within the enumerated categories.

    **105.**    The Act includes two separate provisions, however, which provide participating
candidates an increase in public funds and/or an increase in their expenditure limit when a non-

**COMPLAINT**                          37

participating opponent spends or becomes obligated to spend and/or receives in contributions an amount which, in the aggregate, exceeds a certain threshold amount. Code, §§ 3-705(7), 3-706(3).

106.    The Triggering Provision enacted by section 3-705(7) states that the maximum public fund payment for which the participating candidates are eligible will increase by four-fold, from the usual one-quarter of fifty-five percent of the total applicable expenditure limit for the office for which he or she is running, to the full fifty-five percent of the total applicable expenditure limit, when any either of the following triggering conditions is met:

(a)    The participating candidate's opponent and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office; or,

(b)    The participating candidate submits a certified statement attesting to the need and stating the reason for additional public funds. One of the qualifying reasons is that the participating candidate is opposed by a non-participating candidate who is capable of self-financing.

Code, § 3-705(7)(a), (b).

107.    There are two "triggers" non-participating candidates and their contributors need to be concerned about under section 3-706(3)'s Triggering Provision. First, when a non-participating candidate spends (or becomes obligated to spend) or receives in contributions, or both, an amount which added together exceeds fifty percent (50%) of the applicable expenditure limit for such office, two increases ensue to the participating candidate. First, the expenditure limit for participating and limited participating candidates is increased to one hundred fifty percent (150%) of the usual

**COMPLAINT**                                    38

expenditure limit for the given office. Second, the maximum amount of matching funds provided to the participating candidate is increased. Under normal circumstances, a participating candidate is eligible to receive up to one thousand fifty dollars ($1,050) in public funds per contributor, meaning that the first one hundred seventy-five dollars ($175) from each eligible contributor is fully matchable at the 6:1 ratio. When the Triggering Provision is triggered, however, the maximum amount a participating candidate is eligible to receive in matching funds increases to one thousand two hundred fifty dollars ($1,250) in public funds per contributor, up to two-thirds of the total applicable expenditure limit for that office. Code, § 3-706(3)(a)(iii). The Rules the Campaign Finance Board have promulgated state that the match shall be made at the ratio of seven dollars and fourteen cents ($7.14) for each dollar ($1) contributed, meaning that the first one hundred seventy-five dollars ($175) from each eligible contributor is fully matchable. Rule 5-01(a)(5)(iv).

**108.** The second triggering event about which non-participating candidates and their contributors must be concerned under section 3-706(3) of the Act is this: When a non-participating candidate spends (or becomes obligated to spend) or receives in contributions, or both, an amount which added together exceeds three hundred percent (300%) of the applicable expenditure limit for such office, two increases again ensue to the participating candidate. First, both participating and limited participating candidates for that office are released from any expenditure limit. Second, the maximum amount of matching funds provided to the participating candidate is increased to one thousand five hundred dollars ($1,500) per contributor, up to one hundred twenty-five percent (125%) of the total applicable expenditure limit for that office. Code, § 3-706(3)(b)(iii). The Rules the Campaign Finance Board have promulgated state that the match shall be made at the ratio of eight dollars and fifty-seven cents ($8.57) for each dollar ($1) contributed, meaning that the first one

**COMPLAINT**                    39

hundred seventy-five dollars ($175) from each eligible contributor is fully matchable.  Rule 5-01(a)(5)(viii).

109.    Thus, the amount of matching funds available to a participating candidate is as follows:

(a)    Normally, participating candidates who qualify for public financing may receive in public funds an amount that equals one-fourth of fifty-five percent of the expenditure limit for the office for which he or she is campaigning. Code, § 3-705(7).  In the case of a candidate for City Council, for example, the total public funds available would be $22,137.

(b)    Under the Triggering Provision found in section 3-705(7), the participating candidate may receive in public funds an amount that equals fifty-five percent of the expenditure limit for the office for which he or she is campaigning. Code, §§ 3-705(2), (7).  This means that the total public funds available to a candidate for City Council would increase to $88,550.  The participating candidate would be eligible to receive the extra public funds if his or her non-participating opponent spent, or raised, an amount greater than one-fifth of the expenditure limit, which would be $32,201 in the case of a candidate running for City Council.

(c)    Under the first Triggering Provision found in section 3-703(3), the participating candidate may receive in public funds an amount which equals one hundred twenty-five percent of the expenditure limit for the office for which he or she is campaigning.  Code, § 3-706(3)(a)(iii).  This means that

**COMPLAINT**                                40

the total public funds available to a candidate for City Council would increase to $107,333. The participating candidate would be eligible to receive this higher amount if his or her non-participating opponent spent, or raised, an amount greater than one-half of the expenditure limit, which would be $80,501 in the case of a candidate running for City Council.

(d)    Under the second Triggering Provision found in section 3-703(3), the participating candidate may receive in public funds an amount which equals one hundred twenty-five percent of the expenditure limit for the office for which he or she is campaigning. Code, § 3-706(3)(b)(iii). This means that the total public funds available to a candidate for City Council would increase to $201,250. The participating candidate would be eligible to receive this higher amount if his or her non-participating opponent spent, or raised, an amount greater than three times the expenditure limit.

110.    Defendants have stated that the Triggering Provision "is an attempt to ease the disadvantage Program participants . . . may face when opposed by a non-participating candidate." (New York City Campaign Finance Board, The Impact of High-Spending Non-Participants on the Campaign Finance Program 6 (2006)).

111.    The Act establishes mandatory debates, in which participating candidates are required to participate. Code, § 3-709.5(1)(a). In the case of a primary, the debate shall be among the participating candidates who are seeking nomination of the same political party. Code, § 3-709.5(1)(c). Defendants delegate authority for promulgating rules for the debates to whichever organizations are chosen to sponsor the debates. Code, § 3-709.5(4). The debate sponsors and the

**COMPLAINT**                                    41

Campaign Finance Board shall together establish "non-partisan, objective, and non-discriminatory criteria" for determining which participating candidates are eligible to take part; and, only those participating candidates who meet the established criteria may take part. Code, § 3-709.5(5)(b)(i). For each debate, the Board shall provide the sponsor with a list of all eligible participating and limited participating candidates. Code, § 3-709.5(8).

112.    Non-participating candidates, however, are not guaranteed a place in the debate, even if they meet all the "non-partisan, objective, and non-discriminatory criteria" established by the sponsors and the Board. Code, § 3-709.5(5)(b)(ii). Furthermore, the City is not required to provide the sponsor with a list of non-participating candidates who are running for office, as it is required to do for participating and limited participating candidates.

113.    New York City is subject to Section 5 of the Voting Rights Act, which requires certain "covered jurisdictions" to obtain federal approval, or "preclearance," for any changes made to their laws affecting voting. 42 U.S.C. § 1973c ("Section 5"). This preclearance may either be obtained by seeking a declarative ruling from the proper court or by receiving a determination from the Attorney General that the changes sought to be implemented do not have the affect of discriminating on the basis of race, color, or language minority status.

114.    The covered jurisdictions which are subject to Section 5 are those which had a history of discrimination or some other problem in their voting procedures. Three counties in New York City are "covered jurisdictions:" Bronx County, Kings County, and New York County.

115.    Changes requiring preclearance include, but are not limited to, changes to the methods by which officials are elected, and changes in the procedures used for administering elections. The

**COMPLAINT**                                       42

changes introduced by Local Law No. 34 of 2007 and Local Law No. 67 of 2007 fall squarely within the types of changes for which preclearance must be sought.

116.    Accordingly, New York City filed the proper request for preclearance with the Attorney General for the various changes to the campaign finance laws on or about July 13, 2007. The City made subsequent additional filings with the Attorney General throughout the remainder of 2007. Late in 2007, the Attorney General granted New York City preclearance for the changes instituted by Local Laws No. 34 and 67.

117.    In addition to Section 5 which applies only to certain jurisdictions, Section 2 of the Voting Rights Act applies nationally and prohibits any state or local government from enforcing any voting law or procedure that has a discriminatory result. 42 U.S.C. § 1973 ("Section 2"). As stated in subsection (b) of Section 2, a violation occurs when members of a protected class have less opportunity to "participate in the political process and elect representatives of their choice." Such a violation occurs regardless of whether the legislative body intended a discriminatory to occur—Congress made plain in the 1982 Amendment to Section 2 of the Voting Rights Act that a discriminatory effect is sufficient to establish a violation of Section 2.

118.    The granting of Section 5 preclearance by the Attorney General does not bar plaintiffs from asserting a Voting Rights Act challenge under Section 2. Rather, Section 5 explicitly states that "Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure." 42 U.S.C. 1973c.

**COMPLAINT**                    43

119.    In a 2003 study of the voting patterns of New York City, Dr. Lisa Handley concluded that voting patterns in New York City demonstrate racial polarization. Specifically, Dr. Handley found evidence of racial bloc voting among whites, Hispanics, and African-Americans. This racial polarization in voting means that whites generally vote as a cohesive group, as do Hispanics, as do African-Americans. DR. LISA HANDLEY, A VOTING RIGHTS ACT EVALUATION OF THE NEW YORK CITY REDISTRICTING PLAN (March 18, 2003).

120.    In addition to the Campaign Finance Act, New York City has also enacted Subchapter Two of its Administrative Code, which is titled "Regulation of Lobbying" and is codified at Code, §§ 3-211 – 3-223 ("Lobby Law"). The power to administer and enforce all provisions of the Lobby Law has been delegated to the City Clerk. Code, § 3-212(a).

121.    Among other things, the Lobby Law requires all those who meet the definition of "lobbyist," as defined in section 3-211(a) of the Act, to file various registrations with the City. Included in such registrations are the Annual Statement of Registration as set forth in section 3-213, certain Periodic Reports as set forth in section 3-216, Fundraising and Political Consulting Reports as set forth in section 3-216.1, and Annual Reports as set forth in section 3-217.

122.    On the Annual Statement of Registration, a lobbyist is required to list, among other things, the following information about himself, his family, and his employees:

> (1)    The name, home and business addresses and business telephone number of the lobbyist;
>
> (b)    The name and home and business addresses of the spouse or domestic partner of the lobbyist;

**COMPLAINT**                    44

(c)     If the lobbyist is an organization, the name, home and business addresses and business telephone number of any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization and the name and home and business addresses of the spouse or domestic partner of such officers or employees.

Code, § 3-213(c)(1).

123.    The Annual Statement must be filed on or before January 1 by those persons who have been retained, employed or designated as lobbyists on or before December 15 of the previous calendar year who reasonably anticipate that in the coming year they will expend, incur or receive combined reportable compensation and expenses in an amount in excess of two thousand dollars. Code, § 3-213(a)(2).

124.    The information supplied by the lobbyist on his or her Annual Statement of Registration is kept in electronic form in the city clerk's office and shall be available for public inspection. Code, § 3-213(b). However, the names and home addresses of employees and officers of lobbyists, and the spouses of employees and officers, are not supposed to be made available to the public. Rather, they are only to be accessed by the Board for the purpose of determining whether contributions are matchable. Code, § 3-213(c)(1).

125.    Whenever a political contribution is made by an unemancipated child of a lobbyist, an unemancipated child of a lobbyist's spouse, an unemancipated child of a lobbyist's officer or employee, or an unemancipated child of a lobbyist's employee's spouse or officer's spouse, the lobbyist is required to file an Amended Statement of Registration within forty-eight hours of the

**COMPLAINT**                        45

contribution having been made, listing the name of the child and his or her home address. Code, § 3-213(d)(2).

126.    On the Fundraising and Political Consulting Reports, the lobbyist is required to list certain information regarding fundraising and/or political activities that occurred within a designated time period. Code, § 3-216.1(a). Included in this report shall be the total dollar amount raised for each candidate for which fundraising and/or political activities were performed. Code, § 3-213(b)(4).

127.    "Fundraising activities" is a defined term, meaning "solicitation or collection of contributions for a candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council, or for the political committee of any such candidate by a lobbyist, or the solicitation or collection of contributions for any public servant who is a candidate for nomination for election, or election, to any elective office, or for the political committee of any such candidate by a lobbyist." Code, § 3-211(h).

128.    New York City has also enacted Subchapter Three of its Administrative Code, which is titled "Prohibition of Gifts By Lobbyists" and is codified at Code, §§ 3-224 – 3-228 ("Gifts Law"). This law provides in pertinent part that, "No person required to be listed on a statement of registration pursuant to section 3-213(c)(1) of subchapter 2 of this chapter shall offer or give a gift to any public servant." Code, § 3-225.

129.    For the reasons set forth in this Complaint, Plaintiffs believe that the challenged provisions are unconstitutional, facially and as applied, and cannot be legally enforced. There exists an actual, justiciable controversy among these parties as to the validity of the aforementioned provisions.

**COMPLAINT**                                        46

130.    Plaintiffs have no adequate remedy at law, and as a result of these provisions, Plaintiffs have suffered, and will continue to suffer, the irreparable loss of their First and Fourteenth Amendment rights by the unconstitutional restraint of their rights to free speech, free association, and the equal protection of the laws as guaranteed by the Constitution of the United States. The Hispanic-American Minority Voter Plaintiffs and African-American Minority Voter Plaintiffs also, in addition to these harms, will suffer the irreparable loss of their right to have their vote count as guaranteed by Section 2 of the Voting Rights Act. The classes they represent will suffer this same irreparable harm. Finally, Hispanic-American Minority Candidate Plaintiffs and the class they represent will suffer the irreparable loss of their right to participate in the political process as guaranteed by Section 2 of the Voting Rights Act.

## COUNT I

### THE CAMPAIGN FINANCE PROGRAM AS SET FORTH IN SECTIONS 3-705 AND 3-709 OF THE ACT IS UNCONSTITUTIONAL.

131.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

132.    Plaintiff Non-Participating Candidate Plaintiff is a tax-paying resident of New York city. He intends to file paperwork to run for City Council in the 2009 election. He will run as a non-participating candidate.

133.    The Act established the Fund, into which public tax dollars are appropriated, to be payed out to qualifying participating candidates as matching funds. Code, §§ 3-705; 3-709.

**COMPLAINT**                      47

134.    Non-Participating Candidate Plaintiff asserts taxpayer standing to challenge sections 3-705 and 3-709 of the Code because Defendants are using his tax dollars in ways which violate both the First and Fourteenth Amendments.

135.    In addition to having tax-payer standing to maintain this action, Non-Participating Candidate Plaintiff suffers actual, personal harm by the Program: His tax dollars will be taken by the Program and placed in the Fund to be given to his opponent, so that his opponent can use Non-Participating Candidate Plaintiff's tax dollars to defeat Non-Participating Candidate Plaintiff in their election contest. This unconstitutionally burdens Non-Participating Candidate Plaintiff's speech and associational rights under the First Amendment and unconstitutionally violates his right to equal protection under the Fourteenth Amendment.

136.    In addition, Non-Participating Candidate Plaintiff is being forced by the City to support financially the ideological and political causes of his opponents, which in actuality he does not support, but opposes. This violates the principle set forth in *Abood v. Detroit Board of Ed.*, 431 U.S. 209 (1977) and its progeny that the Constitution forbids forcing one into an ideological or political association to which he is opposed.

137.    Finally, the City impermissibly discriminates on the basis of viewpoint in awarding matching funds to participating candidates.

138.    When the State opens a forum for speech, the State cannot discriminate on the basis of viewpoint. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829–30 (1995); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392–93 (1993). Although fora are often spatial, they may also be metaphysical, such as when the State awards money to groups to help them speak or amplify their voice. *Rosenberger*, 515 U.S. at 830.

**COMPLAINT**                                    48

139.    The City discriminates on the basis of viewpoint by funding the candidacies of those who agree with public funding and choose to be part of the public funding program, to the exclusion of those who disagree with public funding and choose to opt out of the public funding program.

140.    Every other non-participating candidate for election in New York City is similarly harmed, as is every participating candidate who fails to qualify for public funding, but runs against a candidate who does so qualify.

141.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, §§ 3-705 and 3-709, facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT II

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) ARE UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.**

142.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

143.    Candidate Plaintiffs would like to be able to solicit contributions from those having business dealings with the City up to the limits imposed by section 3-703(1)(f) of the Code, instead of the limits imposed by section 3-703(1-a) of the Code.  These lower limits therefore reduce the amount of money available to Candidate Plaintiffs for the purpose of engaging in political speech, and unconstitutionally burden Candidate Plaintiffs' speech.  Candidate Plaintiffs also reasonably

**COMPLAINT**                                    49

believe that the limits imposed by section 3-703(1-a) of the Code will unconstitutionally prevent them from amassing the resources necessary to mount an effective campaign.

144.   Business-Dealings Plaintiffs intend to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of their choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, they are restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code. This is an unconstitutional burden upon their speech and association rights.

145.   Lobbyist's-Employee Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code. This is an unconstitutional burden upon her speech and association rights.

146.   Lobbyist's-Spouse Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code. This is an unconstitutional burden upon her speech and association rights.

147.   Party Plaintiffs seek to place candidates from their party on the ballot for every office in the City elections. They reasonably believe that candidates from their Parties will be unable to mount an effective campaign in part because of the lower contribution limits imposed upon those defined as having business dealings with the City. This is an unconstitutionally burden upon the speech rights of their candidates.

**COMPLAINT**                                    50

148.    "Contribution . . . limitations operate in an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curium).  As an initial matter, they must be "closely drawn" to a "sufficiently important interest," or else they abridge first amendment freedoms. *McConnell v. FEC*, 540 U.S. 93, 231 (2003); *Buckley* 424 U.S. at 25.  The only interest so far found sufficiently important to justify limits on contributions to candidates and their campaigns is the interest in preventing real or apparent corruption from large contributions. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 389 (2000).  *See also Buckley*, 424 U.S. at 25–28.  The Court utilizes a two-part test for evaluating the government's corruption interest: (1) the contribution must be *large* enough to give rise to a legitimate suspicion of corruption; and (2) there must be a bona fide "suspicion that [the] large contributions are corrupt." *Shrink PAC*, 528 U.S. at 390–91.

149.    The contribution limits imposed by section 3-703(1-a) are substantially lower than the lowest limit the Supreme Court has ever found constitutional and are not *large* enough to give rise to a legitimate suspicion of corruption.  Defendants therefore cannot meet their burden to establish the government's corruption interest.

150.    Even if there were a sufficiently important interest to justify the lower contribution limits imposed by section 3-703(1-a), the lower limits are not closely drawn and so cannot pass constitutional scrutiny. New York City established contribution limits in section 3-703(1)(f) in order to prevent corruption or the appearance of corruption.  Where the government has "manifested its judgment that the higher limitations are not unacceptably corrupting, . . . the lower limits are not closely drawn to achieve the only governmental purposes sufficient to justify regulation." *California Prolife Council PAC v. Scully*, 989 F.Supp. 1282, 1296 (E.D. Cal. 1998).  Rather, the lower limits

**COMPLAINT**                                        51

serve only to "restrict the speech of some elements of our society in order to enhance the relative voice of others," which is "wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 649 (1976) (per curium).

151.    Additionally, the lower contribution limits of section 3-703(1-a) are overinclusive because they restrict contributions which cannot be justified by the City's anti-corruption interest. This includes contributions from such people as Lobbyist's-Employee Plaintiff and others similarly situated to her, whose contributions are being impermissibly restricted. The law restricts even contributions from the family members of the employees of lobbyists and thereby restricts much more speech and associational rights than the anti-corruption interest can justify. It also restricts the speech and associational rights of many persons and entities who meet the definition of those who have business dealings with the city, yet who have never and would never give contributions in an attempt to secure a quid-pro-quo benefit. The City's anti-corruption interest cannot justify the restriction on their speech and associational rights either.

152.    The lower contribution limits of section 3-703(1-a) are also underinclusive because they fail to restrict contributions from other contributors, including labor organizations and neighborhood associations, who engage in the same types of activities as those who are defined as having business dealings with the City. When a regulation is underinclusive in this way, it makes belief that it is designed to serve proffered the anti-corruption interest "a challenge to the credulous." *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002). *See also City of LaDue v. Gilleo*, 512 U.S. 43, 52 (1994) (noting that such underinclusiveness diminishes "the credibility of the government's rationale for restricting speech in the first place.").

**COMPLAINT**                                                52

**153.** Even if the contribution limits imposed by section 3-703(1-a) were closely drawn to a sufficiently important governmental interest, they would still fail constitutional scrutiny because they "impose burdens upon First Amendment interests that (when viewed in light of the statute's legitimate objectives) are disproportionately severe." *Randall v. Sorrell,* 126 S. Ct. 2479, 2485 (2006). They both prevent candidates from amassing the resources necessary to mount an effective campaign and also magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage. The limits also are not indexed for inflation, even though the higher, non-business dealings limits set forth in section 3-703(1)(f) are adjusted periodically. Code, § 3-703(7). Thus, these limits "are too low and too strict to survive First Amendment scrutiny." *Randall,* 126 S. Ct. at 2492.

**154.** The contribution limits imposed by section 3-703(1-a) are also unconstitutionally overbroad because they burden substantially more associational and speech rights than are justified by the corruption interest. Section 3-703(1-a) reaches even the speech and associational rights of such people as far removed from business dealings with the City as a secretary of a lobbyist, the spouse of an employee of a lobbyist, and the unemancipated child of the spouse of an employee of a registered lobbyist. Section 3-703(1-a) therefore fails constitutional scrutiny.

**155.** WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

**COMPLAINT**                                       53

## COUNT III

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) UNCONSTITUTIONALLY BURDEN THE SPEECH AND ASSOCIATIONAL RIGHTS OF FAMILY MEMBERS AND EMPLOYEES OF LOBBYISTS.**

156.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

157.    Lobbyist's-Spouse Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code.

158.    She is restricted to the lower contribution limits *not* because she is a lobbyist or engages in lobbying activity, but because she is married to a lobbyist. This has the effect of telling her that she would be able to engage in political speech and association at the normal contribution limits afforded citizens under section 3-703(1)(f), but since she chose to marry someone who has chosen to be a registered lobbyist, she may only contribute at the lower levels imposed by section 3-703(1-a). This is an unconstitutional burden upon her speech and association rights.

159.    Similarly, Lobbyist's-Employee Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code.

160.    She is restricted to the lower contribution limits *not* because she is a lobbyist or engages in lobbying activity, but because she is employed by a lobbyist. This has the effect of telling her that she would be able to engage in political speech and association at the normal contribution

COMPLAINT                                    54

limits afforded citizens under section 3-703(1)(f), but since she chose to exercise her right to secure employment, she may only contribute at the lower levels imposed by section 3-703(1-a). This is an unconstitutional burden upon her speech and association rights.

161.    The contribution limits imposed by section 3-703(1-a) are also unconstitutionally overbroad because they burden substantially more associational and speech rights than are justified by the corruption interest. Section 3-703(1-a) reaches even the speech and associational rights of such people as far removed from business dealings with the City as the spouse of an employee of a lobbyist, the unemancipated children of the spouse of a lobbyist, and the unemancipated children of the spouse of an employee of a lobbyist. Section 3-703(1-a) therefore fails constitutional scrutiny.

162.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT IV

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) IMPERMISSIBLY DISCRIMINATE ON THE BASIS OF VIEWPOINT, AND SO INFRINGE RIGHTS GUARANTEED BY BOTH THE FIRST AND FOURTEENTH AMENDMENT.**

163.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**COMPLAINT**                    55

164.    The contribution limits in section 3-703(1-a) which apply to those having business dealings with the City are severely lower than the limits imposed on others who wish to contribute to candidates and their committees.

165.    Business-Dealings Plaintiffs are defined by the Act as having business dealings with the City and so are subject to these lower contribution limits.

166.    These lower limits do not restrict contributions from *all* those who engage in the activities defined as business-dealing. Rather, other organizations, such as labor organizations, as well as neighborhood, community or similar associations, are exempted from the lower contribution limits. Code, § 3-702(20). This is true even though they engage in the same types of activities, and compete for the same types of contracts, grants, and concessions from the City, as those individuals and entities which are subject to the lower contribution limits.

167.    Labor organizations have a significantly different message than do owners of businesses and members of management. Owners of businesses and members of the management of companies which have business dealings with the city, however, are subject to the lower contribution limits, while labor organizations and their officers are not.

168.    Similarly, neighborhood and community associations are formed to represent the viewpoint of their community, and they seek to advance the interests of their community's residents. Their viewpoint and message, therefore, may be different than the viewpoint and message of the business community.

169.    Defendants have offered no appropriate governmental interest which is suitably furthered by treating the speech of labor organizations and their officers differently than it treats the speech of the companies with business dealings and the members of their management. Nor has it

COMPLAINT                                    56

offered an appropriate governmental interest which is suitably furthered by treating the speech of neighborhood and community associations differently than it treats the speech of entities and persons who are subject to the business dealings contribution limits. The only basis for making the distinction is the viewpoint of the speech of the various groups. Therefore, the lower contribution limits of section 3-703(1-a) are unconstitutional viewpoint restrictions upon speech and associational rights.

170.    Even if the City could offer an appropriate governmental interest which is suitably furthered by the differentiation, there is substantially more speech and associational rights restricted under section 3-703(1-a) than the interest could possibly justify. The lower contribution limits reach even the speech and associational rights of such people as far removed from business dealings with the City as a secretary of a lobbyist, the spouse of an employee of a lobbyist, and the unemancipated child of the spouse of an employee of a registered lobbyist. Section 3-703(1-a) therefore fails constitutional scrutiny because it is unconstitutionally overbroad.

171.    The limits are also impermissible under the Fourteenth Amendment's Equal Protection clause. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curium) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918)). When the government differentiates among the speech of similarly situated individuals or entities, it must be able to state an appropriate governmental interest which is suitably furthered by the differential treatment. *Mosley*, 408 U.S. at 95. If it cannot do so, its differential treatment violates the Fourteenth Amendment's Equal Protection clause. *Id.*

**COMPLAINT**                                   57

172.    With respect to its contribution limits, the City has differentiated between the speech of labor unions and neighborhood and community associations on the one hand, and the speech of the owners of businesses and the members of management on the other. Labor unions and their officers are free to contribute at the higher limits, as are the members and officers of neighborhood and community associations. Companies with business dealings and the members of their management, however, may only contribute up to the lower limits. The City can offer no appropriate governmental interest which is suitably furthered by this differentiation and which would cure its contribution limit from running afoul of the protection afforded by the Equal Protection clause.

173.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT V

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) IMPERMISSIBLY FORCE PLAINTIFFS TO CHOOSE BETWEEN CONSTITUTIONALLY GUARANTEED RIGHTS IN VIOLATION OF THE "DOCTRINE OF UNCONSTITUTIONAL CONDITIONS."**

174.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

175.    Lobbyist Plaintiffs meet the definition of "lobbyist" as set forth in section 3-702(16) of the Code, and so are subject to the lower limits on contributions as set forth in section 3-703(1-a)

**COMPLAINT**                                    58

of the Code. They intend to contribute to candidate(s) of their choice in the upcoming New York City elections. They would like to contribute at the higher contribution limits afforded by section 3-703(1)(f) of the Code, but are prohibited from doing so. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(g) of the Code makes their contributions unmatchable.

176.    Lobbyist's-Spouse Plaintiff is the spouse of a registered lobbyist. She intends to contribute to the candidate(s) of her choice in the upcoming New York City elections, and would like to be able to do so at the higher contribution levels allowed by section 3-703(1)(f) of the Code. However, she is restricted by the lower contribution limits imposed upon her by section 3-703(1-a) of the Code. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions are as valuable to the candidate(s) of her choice as are contributions from other citizens. However, contributions from lobbyists' spouses are not matchable under section 3-702(3)(g) of Code.

177.    Lobbyist's-Employee Plaintiff is employed as the secretary of a registered lobbyist. However, she neither engages in lobbying activity, nor is she herself registered as a lobbyist. She intends to contribute to the candidate(s) of her choice in the upcoming New York City elections, and would like to be able to do so at the higher contribution levels allowed by section 3-703(1)(f) of the Code. However, she is restricted by the lower contribution limits imposed upon her by section 3-703(1-a) of the Code. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions will be as valuable to the candidate(s) of her choice as are

**COMPLAINT**                                59

contributions from other citizens. However, contributions from lobbyists' employees such as herself

are not matchable under section 3-702(3)(g) of Code.

178.    The government may not force one to give up a constitutional right in order to assert

another constitutional right. *Simmons v. United States*, 390 U.S. 377, 394 (1968). Nor may the

government condition the receipt of a benefit, such as the right to contribute at level of the higher

contribution limit found in section 3-703(1)(f), on the relinquishment of a constitutionally protected

right. *Rust v. Sullivan*, 500 U.S. 173, 196–97 (1991).

179.    The First Amendment prohibits the government from "abridging . . . the right of the

people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. The First

Amendment also prohibits the government from "abridging the freedom of speech." *Id*. Therefore,

the right to lobby the government, and the right to engage in expressive activity, are both protected

by the First Amendment. Section 3-703(1-a) forces Lobbyist Plaintiffs to choose between these

constitutionally protected rights. *Either* they may fully exercise their rights of speech and association

by contributing to the candidate(s) of their choice at the higher contribution levels afforded other

citizens by section 3-703(1)(f) of the Code, *or* they may engage in lobbying activities.

180.    Similarly, Lobbyist's-Employee Plaintiff is forced to choose between constitutionally

protected rights. *Either* she may exercise her rights of speech and association by contributing to the

candidate(s) of her choice at the higher contribution levels afforded other citizens by section 3-

703(1)(f) of the Code, *or* she may exercise her right to pursue a livelihood. This unconstitutionally

burdens her right to make political contributions.

181.    Similarly, Lobbyist's-Spouse Plaintiff is forced to choose between constitutionally

protected rights. *Either* she may exercise her rights of speech and association by contributing to the

**COMPLAINT**                                    60

candidate(s) of her choice at the higher contribution levels afforded other citizens by section 3-703(1)(f) of the Code, *or* she may exercise her right to marry the person she desires, if that person happens to be a lobbyist (as is the case for Lobbyist's-Spouse Plaintiff). This unconstitutionally burdens her right to make political contributions.

182.    Section 3-703(1-a) is also unconstitutionally overbroad in that it reaches substantially more speech than is justified by the anti-corruption interest. *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).

183.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

### COUNT VI

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) IMPERMISSIBLY BURDEN THE FIRST AMENDMENT RIGHT TO LOBBY BY IMPOSING UPON LOBBYISTS LOWER CONTRIBUTION LIMITS.**

184.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

185.    Lobbyist Plaintiffs meet the definition of "lobbyist" as set forth in section 3-702(16) of the Code, and so are subject to the lower limits on contributions as set forth in section 3-703(1-a) of the Code. They would like to contribute at the higher contribution limits afforded by section

**COMPLAINT**                                       61

3-703(1)(f) of the Code, but are prohibited from doing so. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(g) of the Code makes their contributions unmatchable.

**186.** The right to lobby the government is a First Amendment right.

**187.** Section 3-703(1-a) unconstitutionally burdens Lobbyist Plaintiffs' First Amendment right to lobby by imposing a lower contribution limit upon those who engage in this protected First Amendment activity. This burden is not narrowly tailored to a compelling governmental interest and so fails constitutional scrutiny.

**188.** Section 3-703(1-a) is also overbroad in that it unconstitutionally burdens substantially more First Amendment freedoms than is justified by the anti-corruption interest.

**189.** WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1) Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2) Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3) Grant Plaintiffs such other relief as may be just and equitable.

## COUNT VII

**THE PROHIBITION AGAINST CONTRIBUTIONS IMPOSED BY SECTION 3-703(1)(l) IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.**

**190.** Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**COMPLAINT**                    62

191.    Section 3-703(1)(l) of the Code prohibits candidates and their principal committees

or authorized committees from accepting "any contribution, loan, guarantee, or other security for

such loan from any corporation, limited liability company, limited liability partnership, or

partnership" other than one organized as a political committee. Code, § 3-703(1)(l).

192.    Plaintiffs Martina Franca Associates, LLC and Reiter/Begun Associates, LLC are

both organized under the applicable state laws as a limited liability company. Both have elected to

be taxed as a partnership. Both companies would like to make contributions to the candidate(s) of

their choice and would in fact do so, but for the prohibition against such contributions found in

section 3-703(1)(l) of the Code.    The prohibition against their contributions therefore

unconstitutionally burdens their speech and association rights.

193.    Candidate Plaintiffs would like to solicit contributions from limited liability

companies, limited liability partnerships, partnerships, and corporations so as to raise money to

engage in political speech. The prohibition against contributions imposed by section 3-703(1)(l) of

the Code thereby unconstitutionally burdens Candidate Plaintiffs' speech. Candidate Plaintiffs also

reasonably believe that the prohibition against accepting contributions from limited liability

companies, limited liability partnerships, and partnerships imposed by section 3-703(1)(l) will

prevent them from amassing the resources necessary to mount an effective campaign.

194.    The Supreme Court has recognized that "the compelling governmental interest in

preventing corruption support[s] the restriction of the influence of political war chests funneled

through the corporate form." *FEC v. National Conservative Political Action Committee*, 470 U.S.

480, 500–01 (1985). This is because state law grants corporations special advantages, such as

"favorable treatment of the accumulation and distribution of assets" which "enhance their ability to

**COMPLAINT**                              63

attract capital and deploy their resources." *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–59 (1990). However, the Court has affirmed that "the mere fact that corporations may accumulate large amounts of wealth" is not sufficient justification for restricting the ability of corporations to participate in the political process; rather, the justification comes from "the unique state-conferred corporate structure that facilitates the amassing of large treasuries." *Id*. at 660.

195.    Such justification is absent with respect to Plaintiffs Martina Franca Associates, LLC and Reiter/Begun Associates, LLC. They do not have the same "unique state-conferred corporate structure" as corporations, nor can they receive the same "favorable treatment of the accumulation and distribution of assets" as corporations. Rather, while they "may be able to amass large treasuries, they do so without the significant state-conferred advantages of the corporate structure." *Austin*, 494 U.S. at 665. Therefore, the prohibition on their contributions is not narrowly tailored because it is not closely drawn to a important interest, but is overinclusive.

196.    The prohibition on contributions imposed by section 3-703(1)(l) is also underinclusive in that it exempts contributions from doctors, lawyers, and CPAs from scrutiny to determine whether the source of the contribution is one of the prohibited business models.

197.    The prohibition on contributions imposed by section 3-703(1)(l) is also overbroad because it unconstitutionally burdens substantially more associational and speech rights than are justified by the anti-corruption interest. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

198.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-703(1)(l) facially unconstitutional and unconstitutional as applied;

**COMPLAINT**                    64

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

### COUNT VIII

**THE DESIGNATION OF SOME CONTRIBUTIONS AS "UNMATCHABLE" BY SECTION 3-702(3) IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.**

199.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

200.    Business-Dealings Plaintiffs intend to make contributions to various candidates during the 2009 election cycle. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(h) of the Code makes their contributions unmatchable. This unconstitutionally burdens their First Amendment speech and associational rights.

201.    Lobbyist Plaintiffs, Lobbyist's-Spouse Plaintiff, and Lobbyist's-Employee Plaintiff intend to make contributions to various candidates during the 2009 election cycle. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(g) of the Code makes their contributions unmatchable. This unconstitutionally burdens their First Amendment speech and associational rights.

202.    Participating Candidate Plaintiffs have previously run for election for office as participating candidates. They would like to run for office again. They reasonably believe that they

COMPLAINT                    65

would receive contributions which are treated as unmatchable under the Act. They reasonably believe that the unmatchable nature of these contributions will prevent them from amassing the resources necessary to mount an effective campaign. Consequently, they have determined that they cannot run for office so long as the prohibition against matching contributions subject to the lower contribution limits remains in place. This unconstitutionally burdens their First Amendment rights.

203. Party Plaintiffs seek to place candidates from their party on the ballot for every office in the City elections. They reasonably believe that candidates from their Parties would receive contributions which are treated as unmatchable under the Act. They reasonably believe that the effect of the unmatchable nature of these contributions will be to prevent their parties' candidates from being able to amass the resources necessary to mount an effective campaign. This unconstitutionally burdens their candidates' First Amendment speech and associational rights.

204. The Supreme Court in *Buckley v. Valeo* noted that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 649. Defendants' decision to make Plaintiff Contributors' contributions unmatchable does just that: it enhances the relative voice of other contributors by matching their contributions, and quiets the voice of Plaintiff Contributors by not matching their contributions, in violation of the First Amendment. Defendants have no sufficiently important interest which can justify this decision.

205. Furthermore, section 3-702(3) is overinclusive because it prohibits matching contributions from more contributors than any proffered interest could possibly justify. For instance, the contributions from the spouse of the secretary of a lobbyist are unmatchable, as are the

contributions from an unemancipated child of that spouse from a previous relationship. Such limits cannot be justified by the City's anti-corruption interest. They are therefore not closely drawn.

206.    Section 3-702(3) is also underinclusive because it allows the matching of contributions from other contributors, such as labor organizations and neighborhood associations, who engage in the same types of activities as those defined to have business dealings with the City.

207.    Even if the prohibition against matching contributions from the persons specified by § 3-702(3) were closely drawn to a sufficiently important governmental interest, they would still fail constitutional scrutiny because they "impose burdens upon First Amendment interests that (when viewed in light of the statute's legitimate objectives) are disproportionately severe." *Randall v. Sorrell*, 126 S. Ct. 2479, 2485 (2006). They both prevent candidates from amassing the resources necessary to mount an effective campaign and also magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage, and so "are too low and too strict to survive First Amendment scrutiny." *Randall*, 126 S. Ct. At 2492.

208.    The prohibition against matching certain contributions imposed by section 3-702(3) is also overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by the anti-corruption interest. Section 3-702(3) therefore fails constitutional scrutiny.

209.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-702(3) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

**COMPLAINT**                                67

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT IX

**THE DESIGNATION OF SOME CONTRIBUTIONS AS "UNMATCHABLE" BY SECTION 3-702(3) IMPERMISSIBLY DISCRIMINATES ON THE BASIS OF VIEWPOINT, AND SO INFRINGES RIGHTS GUARANTEED BY BOTH THE FIRST AND FOURTEENTH AMENDMENT.**

**210.**    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**211.**    Business-Dealings Plaintiffs and Lobbyist's-Employee Plaintiff are all subject to the limitations imposed by Section 3-703(1-a).  All these plaintiffs intend to make contributions to various candidates during the 2009 election cycle.  The contributions they give to the candidate(s) of their choice will be unmatchable.

**212.**    When the State opens a forum for speech, the State cannot discriminate on the basis of viewpoint. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829–30 (1995); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392–93 (1993). Although fora are often spatial, they may also be metaphysical, such as when the State awards money to groups to help them speak or amplify their voice. *Rosenberger*, 515 U.S. at 830.

**213.**    By instituting the Program providing matching funds, Defendants opened a metaphysical forum within which they must not discriminate on the basis of the message of the speaker.

**214.**    Defendants discriminate on the basis of viewpoint against Business-Dealings Plaintiffs.  Defendants amplify the speech and associational rights of contributors who are not defined as ones having business dealings with City by providing matching funds for their

**COMPLAINT**                    68

contributions, but will not provide matching funds for the contributions of Business-Dealings Plaintiffs. Yet, Defendants do not apply this rule fairly across the board, but discriminate on the basis of the message of the contributor. Some entities, such as labor organizations, are exempted from the lower contribution limits, even though they engage in the same types of activities as those individuals and entities which are subject to the lower contribution limits. Labor organizations have a significantly different message than do owners of businesses and members of management. Contributions from owners of businesses and members of the management of companies which have business dealings with the city, however, may not be matched, while contributions from labor organizations and their officers are fully matchable. The only basis for making this distinction is the viewpoint and message of the groups.

215. The prohibition against matching certain contributions imposed by section 3-702(3) is also overbroad because, even if the government were not engaging in viewpoint discrimination, the section unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by the anti-corruption interest. Section 3-702(3) therefore fails constitutional scrutiny.

216. The prohibitions against matching contributions from those defined as having business dealings with the City and the others enumerated in section 3-702(3) of the Code is also impermissible under the Fourteenth Amendment's Equal Protection clause.

217. WHEREFORE, Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-702(3) facially unconstitutional and unconstitutional as applied;

**COMPLAINT**                    69

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT X

**THE REPORTING REQUIREMENTS IMPOSED BY SECTION 3-213 ARE UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.**

218.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

219.    Lobbyist's-Employee Plaintiff is employed as the secretary of a registered lobbyist. She neither engages in lobbying activity, nor is she registered as a lobbyist.

220.    Lobbyist Plaintiffs engage in lobbying and are registered lobbyists under the applicable law.

221.    On the Annual Statement of Registration, Lobbyist Plaintiffs are required to list, among other things, the following information about himself, his family, and his employees:

(a)    The name, home and business addresses and business telephone number of the lobbyist;

(b)    The name and home and business addresses of the spouse or domestic partner of the lobbyist;

(c)    If the lobbyist is an organization, the name, home and business addresses and business telephone number of any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization

**COMPLAINT**                                    70

> and the name and home and business addresses of the spouse or domestic
>
> partner of such officers or employees.

Code, § 3-213(c)(1).

222.    Lobbyist's-Employee Plaintiff's employer must also file the Annual Statement of

Registration on or before January 1 of each calendar year. Code, § 3-213(a)(2). Because Lobbyist's-

Employee Plaintiff is employed by a registered lobbyist, her name and home address is required to

be listed. If she chooses to have a spouse or domestic partner, her spouse or domestic partner must

be listed as well.

223.    The information supplied on these Annual Statements of Registration is kept in

electronic form in the city clerk's office and is available for public inspection. Code, § 3-213(b). It

is also included in the Doing Business Database. Code, § 3-702(20). In spite of the City's pledge

that the names and home addresses of employees and officers of lobbyists, and the spouses of

employees and officers, are not supposed to be made available to the public, Lobbyist's-Employee

Plaintiff complains that being forced to supply her name and home address to the government forces

her to supply information to the government which the government does not need, and places her

at risk of her personal information being inadvertently disclosed to the public.

224.    The Supreme Court has recognized a right to associate with others free from

government scrutiny, and the government may only force the disclosure of the members of an

association when there is a compelling state interest. *NAACP v. Alabama*, 357 U.S. 449 (1958).

Similarly, Lobbyist's-Employee Plaintiff should be allowed to choose to associate for employment

purposes with a registered lobbyist with the reasonable expectation that her name and home address

will not be disclosed to the government because of that association, absent a compelling state

**COMPLAINT**                                71

interest. In the same vein, Lobbyist's-Employee Plaintiff should have the right to be married or have a domestic partner without the fear that the government will require the disclosure of her spouse or domestic partner on a lobbyist's Annual Statement of Registration.  Absent a compelling state interest, such disclosure should be unconstitutional.

225.    Even if there is a compelling state interest for some disclosure, the law is not narrowly tailored to it.  Because it requires the disclosure of even the spouse of the secretary of a lobbyist (neither of whom engage in lobbying activities), it is overinclusive.

226.    Section 3-213 also requires lobbyists to file an Amended Statement of Registration within 48 hours of any political contribution made by the unemancipated child of the lobbyist or the lobbyist's spouse or domestic partner, as well as the unemancipated children of the lobbyist's officers and employees.  The Amended Statement of Registration shall include the name of the unemancipated child, the child's home address, and the home and business addresses of the child's parent. Code, § 213(d)(2). This law unconstitutionally chills the political speech of unemancipated children and is overinclusive, as it is not closely drawn to a substantial governmental interest.

227.    Lobbyist Plaintiffs also complain that forcing them to list the names and home addresses of their officers and employees, and the names of the spouses and domestic partners of their officers and employees, forces them to participate in the violation of the listed persons' constitutional rights, and violates their own constitutional rights.  As recognized by *NAACP v. Alabama*, Lobbyist Plaintiffs have a First Amendment right to refuse to disclose their members, absent a compelling state interest. Lobbyist Plaintiffs complain that section 3-213 violates that right and forces them to disclose the names of their employees, and their employees' spouses and children.

**COMPLAINT**                    72

228.    Lobbyist Plaintiffs also complain that this requirement reaches so far that it unconstitutionally burdens their First Amendment right to lobby.  Lobbyist Plaintiffs do not challenge the requirement that they file Annual Registration Statements.  However, they do object to the requirement that, if the unemancipated child of their employee, or their employee's spouse or domestic partner makes a political contribution, within forty-eight hours they must report that fact on an Amended Registration Statement and must disclose the child's name and address.  Lobbyist Plaintiffs assert that this requirement unfairly forces them to be omniscient with regard to the political activities of their employees' children.  Such a requirement unconstitutionally burdens their First Amendment right to engage in lobbying activity.

229.    The reporting requirement imposed by section 3-213 is also unconstitutionally overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by any proffered anti-corruption interest.

230.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-213 facially unconstitutional and unconstitutional as applied;

(2)    Order the Defendants to fully expunge Lobbyist's-Employee Plaintiff's information gleaned from the Annual Registration Statement of her employer from their records, including but not limited to the entry kept in electronic form in the Office of the City Clerk as provided for by section 3-213(b) of the Code, as well as the entry kept in the Doing Business Database as provided for by section 3-702(20) of the Code,;

**COMPLAINT**                                73

(3)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(4)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XI

**THE TRIGGERING PROVISION PROVIDED BY SECTION 3-705(7) IMPERMISSIBLY CHILLS THE POLITICAL SPEECH OF CANDIDATES AND THE SPEECH AND ASSOCIATIONAL RIGHTS OF CONTRIBUTORS.**

**231.**    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**232.**    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

**233.**    Contributor Plaintiffs intend to contribute to candidates in the upcoming elections. They give financial support to candidates with whom they agree on political issues, irrespective of whether those candidates are classified as participating or non-participating candidates.

**234.**    The Triggering Provision of section 3-705(7) provides that when Non-Participating Candidate Plaintiff spends or contracts or becomes obligated to spend above a certain threshold amount, or when he raises contributions, or when he spends, or contracts or becomes obligated to spend, or both, an amount greater than one-fifth of the expenditure limit for the office for which he is running, his participating opponents will become eligible to receive *four times* the amount of public funds they would otherwise be eligible to receive. Code, § 3-705(7).

**COMPLAINT**                                    74

235.    Because Non-Participating Candidate Plaintiff will run for City Council, this means that if he raises in contributions, or spends or becomes obligated to spend, more than $32,200, his participating opponents will be able to receive four times the amount of public funds they would otherwise be eligible for. This means that they will be eligible to receive $88,550 in matching funds.

236.    The Triggering Provision of section 3-705(7) acts to chill Non-Participating Candidate Plaintiff's political speech with regard to his expenditures. He cannot spend money that he raises on his campaign without risking tripping the trigger and assisting his participating opponents. He cannot even spend his own money on his campaign without suffering that risk. This unconstitutionally chills Non-Participating Candidate Plaintiff's speech, making it impossible for him to speak without worrying about potentially assisting his opponents, and is not narrowly tailored to a compelling governmental interest.

237.    The Triggering Provision of section 3-705(7) also acts as an unconstitional expenditure limit, both on Non-Participating Candidate Plaintiff's ability to spend money that he raises from others, and also on his ability to spend his own money on his campaign. With regard to spending in general, *Buckley* taught that "The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people individually as citizens and candidates and collectively as associations and political committees who must retain control over the quantity and range of debate on public issues in a political campaign." *Buckley*, 424 U.S. at 57 (holding that a restriction on a candidate's spending on his own campaign was unconstitutional). Furthermore, "The First Amendment simply cannot tolerate . . . restriction[s] upon

**COMPLAINT**                                    75

a candidate to speak without legislative limit on behalf of his own candidacy." Therefore, "restriction[s] on a candidate's personal expenditures [are] unconstitutional." *Id.* at 54.

238.    The Triggering Provision of section 3-705(7) also burdens Contributor Plaintiffs' rights of speech and association. They cannot contribute to non-participating candidates of their choice without risking that they will inadvertently assist their chosen candidates' opponents. This unconstitutionally burdens and chills their speech and associational rights, and is not closely drawn to a sufficiently important governmental interest.

239.    The Triggering Provision of section 3-705(7) is also unconstitutionally overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by any proffered governmental interest.

240.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-705(7) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XII

## THE TRIGGERING PROVISION PROVIDED BY SECTION 3-705(7) IS IMPERMISSIBLY VAGUE.

241.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**COMPLAINT**                          76

242.    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

243.    Section 3-705(7) provides that the amount of public funds a participating candidate is eligible to receive increases when the Board determines that his or her opponent or his or her opponents authorized committees "have spent or contracted or *have obligated to spend . . .*" above a threshold amount. Code, § 3-705(7)(a). It is unclear from the Act how "have obligated to spend" differs from "contracted to spend." This section is unconstitutionally vague, leaving Non-Participating Candidate Plaintiff with no way to know when his political speech may trigger additional public funds for his opponent.

244.    Section 3-705(7)(b)(1) provides a second opportunity for a participating candidate to receive additional public money to support his or her campaign against a non-participating opponent. To qualify for this extra public money, the participating candidate must submit to the Board a certified signed statement that he or she needs additional public funds, and must demonstrate for the Board that his or her non-participating opponent has the *"ability to self finance."* Code, § 3-705(7)(b)(1). The Act does not explain what "the ability to self finance" means, or when this standard has been met. This language is unconstitutionally vague.

245.    In addition to being unconstitutionally vague, the Triggering Provision of section 3-705(7) is also unconstitutionally overbroad because it unconstitutionally burdens substantially more

**COMPLAINT**                    77

associational and speech rights than could possibly be justified by any proffered governmental interest.

246.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-705(7) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XIII

**THE TRIGGERING PROVISIONS PROVIDED BY SECTION 3-706(3) IMPERMISSIBLY CHILLS THE POLITICAL SPEECH OF CANDIDATES AND THE SPEECH AND ASSOCIATIONAL RIGHTS OF CONTRIBUTORS.**

247.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

248.    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

249.    Contributor Plaintiffs support candidates with whom they agree on political issues, irrespective of whether they are participating or non-participating candidates. They intend to contribute money to the candidate(s) of their choice in the upcoming New York City elections.

**COMPLAINT**                    78

250.   The two Triggering Provisions of section 3-706(3) provide that when Non-Participating Candidate Plaintiff spends or becomes obligated to spend above a certain threshold amount, or when he raises contributions above a certain threshold amount, his participating opponents will receive extra public funds in matching money and will also have their expenditure limits raised or even eliminated.   The threshold amount is as low as a penny over fifty percent of the applicable expenditure limit for the office.  Code, § 3-706(3).  Because Non-Participating Candidate Plaintiff intends to run for City Council, the first trigger will be tripped when he raises or spends in excess of $80,500.

251.   Under the Act, participating candidates are already eligible to receive six dollars ($6) for every one dollar ($1) of matchable contributions, up to one thousand fifty dollars ($1,050) in public funds per contributor.  Code, § 3-705(2)(a).  When the first trigger is tripped, as Non-Participating Candidate Plaintiff reasonably believes it will be, his participating opponents will be eligible to receive up to one thousand two hundred fifty dollars ($1,250) in public funds per contributor, *and* will have their expenditure limits increased to one hundred fifty percent (150%) of the usual expenditure limit for the given office.  Additionally, the total amount of public money for which his participating opponent is eligible will increase from the usual one-quarter of fifty-five percent of the applicable expenditure limit, to sixty-seven percent of the applicable expenditure limit. Code, § 3-706(3)(a)(iii).  In other words, his participating opponents will be eligible to receive $107,870 in public funds, because Non-Participating Candidate Plaintiff raised or spent $80,500.

252.   If Non-Participating Candidate Plaintiff raises or spends an amount which exceeds three times the total applicable expenditure limit for the office for which he is running, his participating opponents will be eligible to receive up to one thousand five hundred dollars ($1,500)

**COMPLAINT**                              79

in public funds per contributor, *and* will no longer be subject to expenditure limits.   Additionally, the total amount of public money for which his participating opponent is eligible will increase from the usual one-quarter of fifty-five percent of the applicable expenditure limit, to one hundred twenty-five percent of the applicable expenditure limit.  Code, § 3-706(3)(b)(iii).

253.    The Triggering Provision acts to unconstitutionally chill Non-Participating Candidate Plaintiff's political speech with regard to his expenditures.  He cannot spend money that he raises on his campaign without risking tripping the trigger and assisting his participating opponents.  He cannot even spend his own money on his campaign without suffering that risk.   This unconstitutionally chills Non-Participating Candidate Plaintiff's speech, making it impossible for him to speak without worrying about potentially assisting his opponents, and is not narrowly tailored to a compelling governmental interest.

254.    The Triggering Provision also acts as an impermissible expenditure limit, both on Non-Participating Candidate Plaintiff's ability to spend money that he raises from others, and also on his ability to spend his own money on his campaign.

255.    The Triggering Provision also acts to burden Contributor Plaintiffs' rights of speech and association.  They cannot contribute to non-participating candidates of their choice without risking that they will inadvertently assist their chosen candidates' opponents. This unconstitutionally chills their speech and associational rights, and is not closely drawn to a sufficiently important governmental interest.

256.    The Triggering Provisions of section 3-706(3) are also unconstitutionally overbroad because they unconstitutionally burden substantially more associational and speech rights than could possibly be justified by any proffered governmental interest.

**COMPLAINT**                                   80

257.    WHEREFORE, Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-706(3) facially unconstitutional and unconstitutional as applied;

    (2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

    (3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XIV

**THE TRIGGERING PROVISIONS PROVIDED BY SECTION 3-706(3) IS IMPERMISSIBLY VAGUE.**

258.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

259.    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

260.    The Triggering Provisions of Section 3-706(3) are triggered when a participating candidate's non-participating opponent and/or authorized committees "have spent or contracted or *have obligated to spend . . .*" above the applicable threshold amounts. It is unclear from the Act how "have obligated to spend" differs from "contracted to spend." This section is unconstitutionally vague, leaving Non-Participating Candidate Plaintiff with no way to know when his political speech may trigger additional public funds for his opponent.

**COMPLAINT**                    81

261.    In addition to being unconstitutionally vague, the Triggering Provisions of section 3-706(3) are also unconstitutionally overbroad because they unconstitutionally burden substantially more associational and speech rights than could possibly be justified by any proffered governmental interest.

262.    WHEREFORE, Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-706(3) facially unconstitutional and unconstitutional as applied;

    (2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

    (3)    Grant Plaintiffs such other relief as may be just and equitable.

### COUNT XV

### SECTION 3-709.5 IMPERMISSIBLY COMPELS PARTICIPATION IN PUBLIC FINANCING.

263.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

264.    Non-Participating Candidate Plaintiff intends to run for City Council as a non-incumbent, non-participating candidate in 2009. Because he is running as a challenger, it is imperative that he be able to get name recognition with voters and allow them to hear his message; for, as Defendants acknowledge, "the strongest predictor of electoral success is incumbency." NEW YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON THE CAMPAIGN FINANCE PROGRAM 3 (2006).

COMPLAINT                           82

265.    The Act establishes mandatory debates, in which participating candidates are required to participate.  Code, § 3-709.5(1)(a).  In the case of a primary, the debate shall be among the participating candidates who are seeking nomination of the same political party.  Code, § 3-709.5(1)(c).  Defendants delegate authority for promulgating rules for the debates to whichever organizations are chosen to sponsor the debates.  Code, § 3-709.5(4).  The debate sponsors and the Campaign Finance Board shall together establish "non-partisan, objective, and non-discriminatory criteria" for determining which participating candidates are eligible to take part; and, only those participating candidates who meet the established criteria may take part.  Code, § 3-709.5(5)(b)(i). For each debate, the Board shall provide the sponsor with a list of all eligible participating and limited participating candidates.  Code, § 3-709.5(8).

266.    Non-participating candidates, however, are not guaranteed a place in the debate, even if they meet all the "non-partisan, objective, and non-discriminatory criteria" established by the sponsors and the Board.  Code, § 3-709.5(5)(b)(ii).  Nor is the Board required to provide the debate sponsor with a list of non-participating candidates so as to alert the sponsor as to who the non-participating candidates are.

267.    Because Non-Participating Candidate Plaintiff intends to run for nomination for office as a non-participating candidate, he faces the danger of being excluded from the debate, even if he meets all the objective criteria.  Non-Participating Candidate Plaintiff will suffer irreparable harm if he is not allowed to participate in the debate, because the sponsored debates are one of the chief ways by which candidates get their message out to the voters and establish name recognition.  Yet, the Act provides him no assurance that he will be allowed to participate in the debate if he meets all the requirements.

**COMPLAINT**                                            83

268.    Under *Buckley*, public funding systems are unconstitutional if they are not voluntary. Yet section 3-709.5 coerces candidates, such as Non-Participating Candidate Plaintiff, to participate in the public financing Program by denying them the promise of participation in the City sponsored debates unless they choose to become participating candidates. During the primary race especially, but also during the general race as well, participation in the debates can be crucial to a candidate's ability to establish name-recognition with the electorate and communicate his message. The potential exclusion of Non-Participating Candidate Plaintiff, and the coercion it produces, unconstitutionally infringes upon Non-Participating Candidate's First Amendment freedom to choose not to participate in public financing, as explained by *Buckley*.

269.    Section 3-709.5 is also unconstitutionally overbroad because it unconstitutionally burdens substantially more First Amendment rights than could possibly be justified by any proffered governmental interest.

270.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)     Declare Code, § 3-709.5 facially unconstitutional and unconstitutional as applied;

(2)     Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)     Grant Plaintiffs such other relief as may be just and equitable.

**COMPLAINT**                    84

## COUNT XVI

### THE REPORTING REQUIREMENT IMPOSED BY SECTION 3-703(6) IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.

271.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

272.     Section 3-703(6) requires candidates and their committees to report, for every contribution, "the full name, residential address, occupation, employer, and business address" of each contributor.  Code, § 3-703(6)(a).  However, the occupation, employer, and business address of contributors making contributions aggregating not more than ninety-nine dollars ($99) need not be disclosed, *unless* the contributor is employed by a participating or limited participating candidate, is the spouse or domestic partner of such candidate, or is an entity in which in which an ownership interest of ten percent or more is held by such a candidate or his or her spouse or domestic partner. Code, § 3-703(6)(b)(iii).

273.     Non-Participating Candidate Plaintiff will run for office in the upcoming election, and will seek to raise contributions.  Participating Candidate Plaintiffs have run for election in the past and would like to run for election, but reasonably believe they are unable to mount an effective campaign because of the regulations imposed by the Act, including the reporting requirements found in section 3-703(6).  These plaintiffs reasonably believe that forcing contributors to disclose their personal and employment information discourages contributors from making contributions to their campaigns, thereby unconstitutionally burdening their First Amendment speech and associational rights.

COMPLAINT                                    85

274.    Party Plaintiffs seek to place candidates from their party on the ballot for every office in the City elections. They reasonably believe that candidates from their Parties are unable to mount an effective campaign because of the regulations imposed by the Act, including the reporting requirements found in section 3-703(6). These plaintiffs reasonably believe that forcing contributors to disclose their personal and employment information discourages contributors from making contributions to candidates from their Parties, thereby unconstitutionally burdening their candidates' First Amendment speech and associational rights.

275.    Contributor Plaintiffs intend to contribute to candidates of their choice in the upcoming election. They object, however, to the disclosure requirement found in section 3-703(6). It unconstitutionally chills their speech and associational rights and is not closely drawn to a sufficiently important government interest.   Rather, it is overinclusive in that there is no governmental interest in knowing the occupation, employer, and business address of contributors who contribute at such low levels as contemplated by the statute.

276.    The reporting requirement imposed by section 3-703(6) is also unconstitutionally overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by the anti-corruption interest.

277.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(6) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

**COMPLAINT**                          86

## COUNT XVII

## SECTIONS 3-702(3), 3-703(1-a), AND 3-703(1)(l) IMPERMISSIBLY VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT.

278.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

279.    Hispanic-American Minority Voter Plaintiffs are Hispanic-Americans who are eligible and registered to vote.  All things being equal, they would choose to vote for Hispanic-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Hispanic-American community.  They represent the Hispanic-American Minority Voter Plaintiff class whose membership is composed of all similarly situated Hispanic-Americans who are eligible and registered to vote in New York City.

280.    African-American Minority Voter Plaintiff is an African-American who is eligible and registered to vote.  All things being equal, he would choose to vote for African-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the African-American community.  He represents the African-American Minority Voter Plaintiff class whose membership is composed of all similarly situated African-Americans who are eligible and registered to vote in New York City.

281.    Hispanic-American Minority Candidate Plaintiffs are Hispanic-Americans who have previously run for election for office as participating candidates.  They would like to run for office again.  They reasonably believe that they would receive contributions subject to the lower business-dealings contribution limits, which are treated as unmatchable under the Act.  They also reasonably believe that they would have received contributions from LLCs, LLPs and partnerships, but for the

**COMPLAINT**                                87

changes instituted by LL No. 34 which makes those contributions illegal. They reasonably believe that the changes instituted by LL No. 34 with regard to contributions from those having business dealings with the City and the changes with regard to contributions from LLCs, LLPs, and partnerships will prevent them from being able to amass the resources necessary to mount an effective campaign. Consequently, they have determined that they cannot run for office so long as these changes to the law remain in force. Hispanic-American Minority Candidate Plaintiffs represent the Hispanic-American Minority Candidate Plaintiff class whose membership is composed of all similarly situated Hispanic-Americans who would like to run for office in New York City but are unable to raise the funds necessary to do so under the current campaign finance laws.

282.  Section 2 of the Voting Rights Act provides in pertinent part:

(a)  No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b)  A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than

**COMPLAINT**                                         88

other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(a), (b).

283.    The Hispanic-American and African-American Minority Voter Plaintiffs reasonably believe that New York City experiences racial bloc voting, both among whites and among Hispanic-Americans and among African-Americans, as demonstrated by Dr. Lisa Handley's 2003 study, A VOTING RIGHTS ACT EVALUATION OF THE NEW YORK CITY REDISTRICTING PLAN (March 18, 2003).

284.    Therefore, Hispanic-American Minority Voter Plaintiffs reasonably believe that New York City's Hispanic-American community is likely to vote for Hispanic-American candidates as their candidates of choice. Yet, the changes instituted by LL No. 34 with regard to contributions from those having business dealings with the City and the changes with regard to contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. This will place the Hispanic-American voting community in general, and them in particular, in a much weaker position than they were prior to the implementation of the changes instituted by LL No. 34, by diluting their vote and the vote of the Hispanic-American voting community.

285.    Similarly, African-American Minority Voter Plaintiff reasonably believes that New York City's African-American community is likely to vote for African-American candidates as their candidates of choice. Yet, the changes instituted by LL No. 34 with regard to contributions from those having business dealings with the City and the changes with regard to contributions from

**COMPLAINT**                    89

LLCs, LLPs, and partnerships will reduce or eliminate the ability of the African-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the African-American community will not have the financial resources to become candidates and to campaign for office. This will place the African-American voting community in a much weaker position than they were prior to the implementation of the changes instituted by LL No. 34, by diluting the voting strength of the African-American voting community.

286. Therefore, both the Hispanic-American and African-American Minority Voter Plaintiffs complain that the changes instituted by LL No. 34 to New York City's Campaign Finance Law—namely, sections 3-702(3), 3-703(1-a), and 3-703(1)(l) of the Code—are in direct violation of Section 2 of the Voting Rights Act. These changes will act to dilute the vote of the Hispanic-American and African-American communities and their ability to participate in the political process and nominate candidates for office.

287. Hispanic-American Minority Candidate Plaintiffs also allege that the challenged sections of the Code constitute a violation of Section 2, but under a different theory than that advanced by Minority Voter Plaintiffs. While acknowledging that most Section 2 cases involve an analysis of how the law acts to disenfranchise *voters*, Minority Candidate Plaintiffs assert that Section 2 is also violated when the law acts to foreclose minority *candidates'* access to amassing the resources necessary to run an effective campaign against their majority-race opponents. In such a situation—when the law has been changed in such a way that its effect is to bar minority *candidates* from the political process—"the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected

**COMPLAINT**                                        90

by subsection (a) of this section." 42 U.S.C. § 1973(b).  Under a totality of circumstances test, a violation of Section 2 should be found.

288.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare that the Code, §§ 3-702(3), 3-703(1-a), and 3-703(1)(l), violates Section 2 of the Voting Rights Act;

(2)    Enjoin the Defendants and all persons acting with them, from administering, implementing or enforcing the contribution limitations and prohibitions found in the challenged provisions;

(3)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 1973l(e), and any other applicable authority; and

(4)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XVIII

## THE REPORTING REQUIREMENTS IMPOSED BY SECTION 3-216.1 ARE UNCONSTITUTIONALLY VAGUE.

289.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

290.    Lobbyist Plaintiffs are required to file a Fundraising and Political Consulting Report if they engage in fundraising or political activity.  On that report, they must list "the total dollar amount raised for each candidate for which such activities were performed." Code, § 3-216.1.

291.    "Fundraising activity" is a defined term.  It means, "*solicitation* or collection of contributions for a candidate for nomination for election, or election, to the office of mayor, public

COMPLAINT                91

advocate, comptroller, borough president or member of the city council, or for the political

committee of any such candidate by a lobbyist, or the solicitation or collection of contributions for

any public servant who is a candidate for nomination for election, or election, to any elective

office, or for the political committee of any such candidate by a lobbyist." Code, § 3-211(h).

292.    It is not clear from the law what activities *solicitation* would include. The Code does

not "provide people of ordinary intelligence a reasonable opportunity to understand" what activities,

exactly, would qualify as solicitation and so must be reported. *Hill v. Colorado*, 530 U.S. 703, 732

(2000) (quoting *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999). Therefore, section 3-216.1 of the

Code is unconstitutionally vague.

293.    Because the law is vague, it is also unconstitutionally overbroad because it

unconstitutionally burdens substantially more First Amendment activity than could possibly be

justified.

294.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-216.1 facially unconstitutional and unconstitutional as

applied;

(b)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

**COMPLAINT**                                92

## COUNT XIX

## THE PROHIBITION AGAINST GIVING GIFTS IMPOSED BY SECTION 3-225 IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.

295.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

296.     Lobbyist's-Employee Plaintiff is employed as the secretary of a registered lobbyist. She neither engages in lobbying activity, nor is she registered as a lobbyist. Because the City requires that she be listed on her employer's statement of registration, she is prohibited from offering or giving any gift to any public servant. This infringes upon both her First Amendment right to free speech as well as her Fourteenth Amendment right to equal protection, without a compelling governmental interest which should require her rights to be infringed upon.

297.     Even if the government had a compelling interest to justify the Gift Law, it is overinclusive. It prohibits far more speech than can be justified, including but not limited to the speech of Lobbyist's-Employee Plaintiff and other employees of lobbyists, their spouses or domestic partners, their children, and their spouses' and domestic partners' children. The Gift Law unconstitutionally prohibits all of these people from giving gifts to public servants.

298.     The Gift Law also suffers from overbreadth, as it unconstitutionally burdens substantially more speech than could possibly be justified by the anti-corruption interest.

299.     WHEREFORE, Plaintiffs respectfully pray the Court to:

> (1)     Declare Code, § 3-225 facially unconstitutional and unconstitutional as applied;

**COMPLAINT**                                      93

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

**COMPLAINT**                                    94

Dated: February 11, 2008

Respectfully Submitted,

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
    * Application for leave to appear pro
hoc vice for this case made by Motion on
February 11, 2008 pursuant to Local Civil
Rule 1.3(c).

Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

**COMPLAINT**

95