Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
　　　* Application for leave to appear pro
hac vice for this case made by Motion on
February 11, 2008 pursuant to Local Civil
Rule 1.3(c).

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____X

**TOM OGNIBENE,** *et al.,*

　　　　　　　　　　　　　　　*Plaintiffs,*　　　**C.A. No. 08 CV 01335 (LTS) (TDK)**

　　-against-

**SCHWARZ,** *et al.,*

　　　　　　　　　　　　*Defendants.*

_____X

## DECLARATION OF CHARLES CAPETANAKIS, ESQ.

Charles Capetanakis, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

00373678

1. I am a member of Davidoff Malito & Hutcher LLP, Plaintiffs' local counsel. I respectfully submit this declaration in support of plaintiff's motion for a preliminary injunction.

2. As set out more fully in plaintiff's *Amended Complaint* and the accompanying Memorandum In Support of this motion, certain sections of New York City's *Campaign Finance Act* violates the Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution. Specifically, the Plaintiffs cannot be subjected to New York City Administrative Code §§ 3-702(3), 3-703(1)(l), and 3-703(1-a) without depriving them of their constitutional rights of free speech, association, and equal protection.

3. As explained in the accompanying Memorandum In Support, plaintiffs satisfy the requirements for preliminary injunctive relief to be granted. Plaintiffs have established that, absent relief, they will be irreparably harmed. Plaintiffs have also demonstrated a likelihood of success on the merits.

4. In the alternative, Plaintiffs meet the 'fair ground for litigation' test. They have demonstrated that this case presents sufficiently serious questions going the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in Plaintiffs' favor.

5. Last, Plaintiffs have no adequate remedy at law.

6. Because a preliminary injunction presents no monetary risks to Defendants, Plaintiffs request that bond be waived. Fed. R. Civ. P. 65(c).

7. Annexed hereto as Exhibit "A" is a true and correct copy of Plaintiff's Amended Complaint.

8. Annexed hereto as Exhibit "B" is a true and correct copy of the New York City Campaign Finance Act, codified as New York City Administrative Code §§ 3-701, et seq.

9.  Based on the foregoing, I respectfully request that the Court issue a preliminary injunction as set forth above.

10. I declare under penalty of perjury that the foregoing statements in this declaration are true and correct to the best of my knowledge, information, and belief.


Dated:  April 22, 2008.

Charles Capetanakis (CC 1120)

Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
       * Application for leave to appear pro
hac vice for this case made by Motion on
February 11, 2008 pursuant to Local Civil
Rule 1.3(c).

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

——————————————————————————————X

**TOM OGNIBENE, YVETTE
VELAZQUEZ BENNETT, VIVIANA
VAZQUEZ-HERNANDEZ, MARTIN
DILAN, MARLENE TAPPER, LEROY
COMRIE, ROBERT PEREZ, FRAN
REITER, SHEILA ANDERSEN-RICCI,
MARTINA FRANCA ASSOCIATES,
LLC, REITER/BEGUN ASSOCIATES,
LLC, DENIS GITTENS, OSCAR
PEREZ, MICHELE RUSSO, THE
KINGS COUNTY COMMITTEE OF
THE NEW YORK STATE
CONSERVATIVE PARTY, and THE
NEW YORK STATE CONSERVATIVE
PARTY,**

**C.A. No. 08 CV 01335 (LTS)**

**AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

**(CLASS ACTION)**

*Plaintiffs,*

**-against-**

**FREDERICK A.O. SCHWARZ, Jr.,** in his official capacity as Chairman of New York City's Campaign Finance Board; **DALE C. CHRISTENSEN, Jr., JOSEPH P. PARKES, S.J., KATHERYN C. PATTERSON, and MARK S. PIAZZA,** in their official capacities as Members of New York City's Campaign Finance Board; **MARK DAVIES,** in his official capacity as Executive Director of the New York City Conflicts of Interest Board; **MONICA BLUM, STEVEN ROSENFELD, ANDREW IRVING, and ANGELA M. FREYRE,** in their official capacity as Members of New York City's Board of Conflicts of Interest; and **MICHAEL MCSWEENEY,** in his official capacity as Acting City Clerk of New York City,

*Defendants.*

_____X

COMES NOW Plaintiffs Tom Ognibene, Yvette Velazquez Bennett, Viviana Vazquez-Hernandez, Martin Dilan, Marlene Tapper, Leroy Comrie, Robert Perez, Fran Reiter, Sheila Andersen-Ricci, Martina Franca Associates, LLC, Reiter/Begun Associates, LLC, Denis Gittens, Oscar Perez, Michele Russo, The Kings County Committee of the New York State Conservative Party, and The New York State Conservative Party and for their Complaint against Defendants state as follows:

**PRELIMINARY STATEMENT**

1.      This is a challenge to the constitutionality of certain provisions of New York City's campaign finance laws and lobby laws.  Specifically, Plaintiffs claim that New York City Administrative Code sections 3-213, 3-216.1, 3-225, 3-702(3), 3-702(20), 3-703(1)(l), 3-703(1-a),

**AMENDED COMPLAINT**                    1

3-703(5), 3-703(6), 3-705, 3-705(7), 3-706(3), 3-709, and 3-709.5, which regulate various aspects of campaign finance and place certain requirements upon lobbyists, violate the First and Fourteenth Amendments to the United States Constitution by unduly infringing upon protected political speech and association as set forth in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curium) and its progeny and also by denying equal protection of law. Plaintiffs challenge these provisions for burdening free expression and association without any compelling justification for doing so, without being narrowly tailored in doing so, for being overbroad by chilling substantially more speech than the governmental interest would allow, for being overinclusive by sweeping within their strictures constitutionally protected advocacy, for being underinclusive by failing to reach all speech that a viewpoint-neutral law would touch, and for denying the equal protection of the laws to Plaintiffs.

2.     Plaintiffs seek to have the challenged provisions declared unconstitutional on their face and as applied as violations of the First and Fourteenth Amendments. Plaintiffs also seek to have enforcement of these provisions permanently enjoined.

3.     Plaintiffs also challenge certain provisions of the campaign finance laws as impermissibly diminishing the voting strength of Hispanic-Americans and Black and African-Americans in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq. Specifically, Plaintiffs allege that section 3-702(3) of the Code (which makes certain contributions unmatchable for public funds), section 3-703(1-a) of the Code (which reduces the contribution limit for certain citizens and entities defined as having business dealings with the city), and section 3-703(1)(l) of the Code (which prohibits contributions from LLCs, LLPs, and partnerships), significantly reduce, if not totally eliminate, the pool of Hispanic-American and African-American preferred candidates. This result impermissibly diminishes Hispanic-American and African-

**AMENDED COMPLAINT**                2

American voter strength, and also impedes Hispanic-American and African-American candidates from full participation in the political process, in violation of Section 2 of the Voting Rights Act and the Fourteenth Amendment to the United States Constitution.

4.    Plaintiffs seek to have the challenged provisions declared violations of the Voting Rights Act. Plaintiffs also seek to have enforcement of these provisions permanently enjoined.

5.    Plaintiffs ask that these issues be resolved promptly so that Plaintiffs and those similarly situated will not be chilled in their free expression and association or risk being unlawfully enjoined or found in violation of New York City campaign finance laws and lobby laws as a result of having engaged in constitutionally-protected political expression and association.

## JURISDICTION AND VENUE

6.    This action arises under 42 U.S.C. § 1983, 42 U.S.C. § 1973 et. seq., and the First and Fourteenth Amendments to the Constitution of the United States.

7.    The jurisdiction of this Court over claims arising under 42 U.S.C. § 1983 and 42 U.S.C. § 1973 is founded upon 28 U.S.C. § 1343(a). The jurisdiction over claims arising under the First and Fourteenth Amendments is founded upon 28 U.S.C. §§ 1331 and 1343(a).

8.    Venue in this district is proper under 28 U.S.C. § 1391(b) because the action involves a challenge to New York City's Administrative Code, and therefore a substantial part of the events or omissions giving rise to this claim occurred in the Southern District of New York. Venue also is proper under 28 U.S.C. § 1391(b) because Defendant Members of the Campaign Finance Board are residents of the city of New York, which is within the Southern District of New York.

**AMENDED COMPLAINT**                    3

**PARTIES**

9.     **Tom Ognibene** is the former minority leader of the City Council and also a  former candidate for mayor.  He intends to run for City Council as a non-incumbent, nonparticipating candidate in 2009.  Based on his past experience as a candidate, he reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign. He intends to solicit contributions to his campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the City" by section 3-702(18) of the Code.  He would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code.  He also would like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l).

10.     **Yvette Velazquez Bennett** is an Hispanic-American who is eligible to vote in New York City.  She is a Republican District Leader from Brooklyn and prior City Council candidate.

(1)     **Asserting her First and Fourteenth Amendment claims.**  Ms. Bennett would like to run for office again as a participating candidate (one who participates in the public financing system), but reasonably believes that the changes imposed by Local Law No. 34 impede her ability to amass the resources necessary to mount an effective campaign.  Were she to run, she would solicit contributions to her campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the city" by  section 3-702(18) of the Code.  She would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business

**AMENDED COMPLAINT**                    4

dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. She also would like to have her contributions from these doing-business persons and entities to be matched with public money under the public financing program. However, the changes instituted by Local Law No. 34 makes these contributions unmatchable under section 3-702(3) of the Code. She would also like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l). She reasonably believes that these lower contribution limits, the designation of certain contributions as unmatchable, and the prohibition against accepting contributions from LLCs, LLPs, and partnerships will prevent her from amassing the resources necessary to mount an effective campaign. Consequently, she has determined that she cannot run for office so long as these lower contribution limits remain in place.

(2)    **Asserting her Voting Rights Act claim as a voter.** In addition, Ms. Bennett believes that the changes to the campaign finance laws imposed by Local Law No. 34 violate Section 2 of the Voting Rights Act. Ms. Bennett reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. Because she reasonably believes that New York City voters engage in racial bloc voting, these changes to the campaign finance laws harm Hispanic-American voters by drastically reducing—if not completely eliminating—the pool of Hispanic-American candidates for office in New York City. This will then

**AMENDED COMPLAINT**                    5

place Hispanic-American voters like herself in a worse position than they were prior to the implementation of Local Law No. 34, in direct violation of Section 2 of the Voting Rights Act. Ms. Bennett is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

(3)    **Asserting her Voting Rights Act claim as a candidate.**  Ms. Bennett also alleges that it is not just Hispanic-American voters who are harmed by these changes, but Hispanic-American candidates, such as herself, are harmed as well.  She asserts that since the changes brought about by Local Law No. 34 will make it significantly more difficult—if not completely impossible—for Hispanic-Americans such as herself to run for office, the effect of the law is to impermissibly bar Hispanic-Americans such as herself from attaining office in New York City.  Ms. Bennett asserts that this impermissibly violates her personal rights under Section 2 of the Voting Rights Act.  Ms. Bennett is therefore a named plaintiff representing all Hispanic-Americans who would like to run for office, but are impermissibly kept from doing so by the campaign finance laws, in violation of Section 2 of the Voting Rights Act.

11.    **Viviana Vazquez-Hernandez** is an Hispanic-American who is eligible to vote in New York City elections.  She is a Republican District Leader from Brooklyn and prior City Council candidate.

(1)    **Asserting her First and Fourteenth Amendment claims.**  Ms. Vazquez-Hernandez would like to run for office again as a participating candidate (one who participates in the public financing system), but reasonably believes that the changes imposed by Local Law No. 34 impede her ability to amass the resources necessary to mount an effective

**AMENDED COMPLAINT**                6

campaign. Were she to run, she would solicit contributions to her campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the city" by section 3-702(18) of the Code. She would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. She also would like to have her contributions from these doing-business persons and entities to be matched with public money under the public financing program. However, the changes instituted by Local Law No. 34 makes these contributions unmatchable under section 3-702(3) of the Code. She would also like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l). She reasonably believes that these lower contribution limits, the designation of certain contributions as unmatchable, and the prohibition against accepting contributions from LLCs, LLPs, and partnerships will prevent her from amassing the resources necessary to mount an effective campaign. Consequently, she has determined that she cannot run for office so long as these lower contribution limits remain in place.

(2)    **Asserting her Voting Rights Act claim as a voter.** In addition, Ms. Vazquez-Hernandez believes that the changes to the campaign finance laws imposed by Local Law No. 34 violate Section 2 of the Voting Rights Act. Mr. Vazquez-Hernandez reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process

**AMENDED COMPLAINT**                    7

and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. Because she reasonably believes that New York City voters engage in racial bloc voting, these changes to the campaign finance laws harm Hispanic-American voters by drastically reducing—if not completely eliminating—the pool of Hispanic-American candidates for office in New York City. This will then place Hispanic-American voters like herself in a worse position than they were prior to the implementation of Local Law No. 34, in direct violation of Section 2 of the Voting Rights Act. Ms. Vazquez-Hernandez is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

(3) **Asserting her Voting Rights Act claim as a candidate.** Ms. Vazquez-Hernandez also alleges that it is not just Hispanic-American voters who are harmed by these changes, but Hispanic-American candidates, such as herself, are harmed as well. She asserts that since the changes brought about by Local Law No. 34 will make it significantly more difficult—if not completely impossible—for Hispanic-Americans such as herself to run for office, the effect of the law is to impermissibly bar Hispanic-Americans such as herself from attaining office in New York City. Ms. Vazquez-Hernandez asserts that this impermissibly violates her personal rights under Section 2 of the Voting Rights Act. Ms. Vazquez-Hernandez is therefore a named plaintiff representing all Hispanic-Americans who would like to run for office, but are impermissibly kept from doing so by the campaign finance laws, in violation of Section 2 of the Voting Rights Act.

**AMENDED COMPLAINT**                              8

12.    **Martin Dilan** is an Hispanic-American who is eligible to vote in New York City elections. He is currently a State Senator, but has served previously in the City Council of New York City. He is contemplating another run for City Council in 2009 as a participating candidate.

(1)    **Asserting his First and Fourteenth Amendment claims.** Senator Dilan reasonably believes that the changes imposed by Local Law No. 34 impede his ability to amass the resources necessary to mount an effective campaign. He intends to solicit contributions to his campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the city" by section 3-702(18) of the Code. He would like to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. He also would like to have her contributions from these doing-business persons and entities to be matched with public money under the public financing program. However, the changes instituted by Local Law No. 34 makes these contributions unmatchable under section 3-702(3) of the Code. He would also like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l). He reasonably believes that these lower contribution limits, the designation of certain contributions as unmatchable, and the prohibition against accepting contributions from LLCs, LLPs, and partnerships will significantly impede his ability to amass the resources necessary to mount an effective campaign.

(2)    **Asserting his Voting Rights Act claim as a voter.** In addition, Senator Dilan believes that the changes to the campaign finance laws imposed by Local Law No. 34 violate Section 2 of the Voting Rights Act. Senator Dilan reasonably believes that the changes instituted by Local

**AMENDED COMPLAINT**                    9

Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. Because he reasonably believes that New York City voters engage in racial bloc voting, these changes to the campaign finance laws harm Hispanic-American voters by drastically reducing—if not completely eliminating—the pool of Hispanic-American candidates for office in New York City. This will then place Hispanic-American voters like himself in a worse position than they were prior to the implementation of Local Law No. 34, in direct violation of Section 2 of the Voting Rights Act. Senator Dilan is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

> (3)    **Asserting his Voting Rights Act claim as a candidate.** Senator Dilan also

alleges that it is not just Hispanic-American voters who are harmed by these changes, but Hispanic-American candidates, such as himself, are harmed as well. He asserts that since the changes brought about by Local Law No. 34 will make it significantly more difficult—if not completely impossible—for Hispanic-Americans such as himself to run for office, the effect of the law is to impermissibly bar Hispanic-Americans such as himself from attaining office in New York City. Senator Dilan asserts that this impermissibly violates his personal rights under Section 2 of the Voting Rights Act. Senator Dilan is therefore a named plaintiff representing all Hispanic-Americans

**AMENDED COMPLAINT**                    10

who would like to run for office, but are impermissibly kept from doing so by the campaign finance laws, in violation of Section 2 of the Voting Rights Act.

13.    **Marlene Tapper** is a Black woman who is eligible to vote in New York City elections. She has previously run for City Council, and would like to do so again in 2009 as a participating candidate.

(1)    **Asserting her First and Fourteenth Amendment claims.**   Ms. Tapper reasonably believes that the changes imposed by Local Law No. 34 impede her ability to amass the resources necessary to mount an effective campaign. In order to run for City Council, Ms. Tapper reasonably believes that she will need to solicit contributions to her campaign from various individuals and entities, including from individuals and entities who are classified as "having business dealings with the city" by section 3-702(18) of the Code. She wants to accept contributions from these doing-business contributors at the higher contribution level allowed those who are not defined as having business dealings with the City, but is prevented from doing so by section 3-703(1-a) of the Code. She also would like contributions from these doing-business persons and entities to be matched with public money under the public financing program. However, the changes instituted by Local Law No. 34 makes these contributions unmatchable under section 3-702(3) of the Code. She would also like to be able to solicit contributions from limited liability companies, limited liability partnerships, and partnerships, but is prevented from doing so by section 3-705(1)(l). She reasonably believes that these lower contribution limits, the designation of certain contributions as unmatchable, and the prohibition against accepting contributions from LLCs, LLPs, and partnerships will impede her ability to amass the resources necessary to mount an effective campaign.

**AMENDED COMPLAINT**                    11

(2)    **Asserting her Voting Rights Act claim as a voter.**  In addition, Ms. Tapper believes that the changes to the campaign finance laws imposed by Local Law No. 34 violate Section 2 of the Voting Rights Act. Ms. Tapper reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Black and African-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Black and African-American community will not have the financial resources to become candidates and to campaign for office.  Because she reasonably believes that New York City voters engage in racial bloc voting, these changes to the campaign finance laws harm Black and African-American voters by drastically reducing—if not completely eliminating—the pool of Black and African-American candidates for office in New York City.  This will then place Black and African-American voters in a worse position than they were prior to the implementation of Local Law No. 34, in direct violation of Section 2 of the Voting Rights Act.

(3)    **Asserting her Voting Rights Act claim as a candidate.**  Ms. Tapper also alleges that it is not just Black and African-American voters who are harmed by these changes, but Black and African-American candidates, such as herself, who are harmed as well.  She asserts that since the changes brought about by Local Law No. 34 will make it significantly more difficult—if not completely impossible—for Black and African-Americans such as herself to run for office, the effect of the law is to impermissibly bar Black and African-Americans such as herself from attaining office in New York City.  Ms. Tapper asserts that this impermissibly violates her personal rights

**AMENDED COMPLAINT**                    12

under Section 2 of the Voting Rights Act. Ms. Tapper is therefore a named plaintiff representing all

Black and African-Americans who would like to run for office, but believe they are impermissibly

kept from doing so by the campaign finance laws, in violation of Section 2 of the Voting Rights Act.

    **14.**    **Leroy Comrie** is an African-American who is eligible to vote in New York City

elections. He is currently a member of City Council, and intends to run for Queens Borough

President in 2009.

    **(1)**    **Asserting his First and Fourteenth Amendment claims.** Council Member

Comrie reasonably believes that the changes imposed by Local Law No. 34 impede his ability to

amass the resources necessary to mount an effective campaign. In order to run for Borough

President, Council Member Comrie reasonably believes that she will need to solicit contributions

to her campaign from various individuals and entities, including from individuals and entities who

are classified as "having business dealings with the city" by section 3-702(18) of the Code. He

wants to accept contributions from these doing-business contributors at the higher contribution level

allowed those who are not defined as having business dealings with the City, but is prevented from

doing so by section 3-703(1-a) of the Code. He also would like contributions from these doing-

business persons and entities to be matched with public money under the public financing program.

However, the changes instituted by Local Law No. 34 makes these contributions unmatchable under

section 3-702(3) of the Code. He would also like to be able to solicit contributions from limited

liability companies, limited liability partnerships, and partnerships, but is prevented from doing so

by section 3-705(1)(l). He reasonably believes that these lower contribution limits, the designation

of certain contributions as unmatchable, and the prohibition against accepting contributions from

**AMENDED COMPLAINT**          13

LLCs, LLPs, and partnerships will impede his ability to amass the resources necessary to mount an effective campaign.

(2)    **Asserting his Voting Rights Act claim as a voter.**  In addition, Council Member Comrie believes that the changes to the campaign finance laws imposed by Local Law No. 34 violate Section 2 of the Voting Rights Act.  Council Member Comrie reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Black and African-American community to participate in the political process and elect the community's candidates of choice.  Candidates supported by the Black and African-American community will not have the financial resources to become candidates and to campaign for office. Because he reasonably believes that New York City voters engage in racial bloc voting, these changes to the campaign finance laws harm Black and African-American voters by drastically reducing—if not completely eliminating—the pool of Black and African-American candidates for office in New York City.  This will then place Black and African-American voters in a worse position than they were prior to the implementation of Local Law No. 34, in direct violation of Section 2 of the Voting Rights Act.

(3)    **Asserting his Voting Rights Act claim as a candidate.**  Council Member Comrie also alleges that it is not just Black and African-American voters who are harmed by these changes, but Black and African-American candidates, such as himself, who are harmed as well.  He asserts that since the changes brought about by Local Law No. 34 will make it significantly more difficult—if not completely impossible—for Black and African-Americans such as himself to run

**AMENDED COMPLAINT**                    14

for office, the effect of the law is to impermissibly bar Black and African-Americans such as himself

from attaining office in New York City. Council Member Comrie asserts that this impermissibly

violates his personal rights under Section 2 of the Voting Rights Act. Council Member Comrie is

therefore a named plaintiff representing all Black and African-Americans who would like to run for

office, but believe they are impermissibly kept from doing so by the campaign finance laws, in

violation of Section 2 of the Voting Rights Act.

     **15.**     **Robert Perez** is an Hispanic-American who is eligible to vote in the New York City

elections.

     **(1)**     **Asserting his First and Fourteenth Amendment claims.**  Mr. Perez is the

principal owner of Diamond Asphalt Corp., Inc., with an ownership stake of more than ten percent

of the company. Diamond Asphalt does construction work on city streets and bids for contracts

valued at or above five hundred thousand dollars ($500,000). It therefore meets the definition of an

entity which has business dealings with the City, as set forth in section 3-702(18)(a) of the Code.

Because Mr. Perez owns more than a ten percent ownership stake of Diamond Asphalt—a company

which has business dealings with the City—he meets the definition of a person who has business

dealings with the City, as set forth in sections 3-702(20) and 3-703(1-a) of the Code. Mr. Perez is

therefore subject to the lower contribution limits imposed by Local Law No. 34. In addition, his

contributions are not matchable under section 3-702(3) of the Code. Mr. Perez intends to contribute

to the candidate(s) of his choice in the upcoming New York City elections. He would like to

contribute money to the candidate(s) of his choice at the higher contribution levels allowed by

section 3-703(1)(f), and would do so but for the lower contribution limits imposed upon him by

section 3-703(1-a). He would also like the money he contributes to the candidate(s) of his choice

**AMENDED COMPLAINT**       15

to be matchable to them if they choose to participate in the public funding program, so that his contributions are as valuable to the candidate(s) of his choice as are contributions from other citizens.

(2)    **Asserting his Voting Rights Act claim as a voter.** Ethnically, Mr. Perez is an Hispanic-American. All things being equal, he would choose to vote for Hispanic-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Hispanic-American community. Mr. Perez reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and making their contributions unmatchable—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. This will place the Hispanic-American voting community in general, and him in particular, in a much weaker position than they were prior to the implementation of the changes instituted by Local Law No. 34, by diluting his vote and the vote of the Hispanic-American voting community. Mr. Perez reasonably believes that New York City experiences racial bloc voting; therefore, he believes that the changes instituted by Local Law No. 34 to New York City's Campaign Finance Law are in direct violation of Section 2 of the Voting Rights Act since those changes will act to dilute the vote of the Hispanic-American community in its ability to participate and nominate candidates for office. Mr. Perez is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by

**AMENDED COMPLAINT**                    16

the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

16.    **Fran Reiter** is eligible to vote in the New York City elections.  She is a registered lobbyist, as well as a former deputy mayor and a former candidate for mayor.  Ms. Reiter intends to contribute to the candidate(s) of her choice in the upcoming New York City elections.  She would like to contribute money to the candidate(s) of her choice at the higher contribution levels allowed by section 3-703(1)(f) of the Code, and would do so but for the lower contribution limits imposed upon her by section 3-703(1-a) of the Code.  She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions are as valuable to the candidate(s) of her choice as are contributions from other citizens.  However, contributions from lobbyists are not matchable under section 3-702(3)(g) of the Code.

17.    **Sheila Andersen-Ricci** is eligible to vote in the New York City elections.  She is the spouse of a registered lobbyist.  However, she neither engages in lobbying activity, nor is she herself registered as a lobbyist.  Ms. Andersen-Ricci intends to contribute to the candidate(s) of her choice in the upcoming New York City elections.  She would like to contribute money to the candidate(s) of her choice at the higher contribution levels allowed by section 3-703(1)(f) of the Code, and would do so but for the lower contribution limits imposed upon her by section 3-703(1-a) of the Code.  She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions are as valuable to the candidate(s) of her choice as are contributions from other citizens.  However, contributions from lobbyists' spouses are not matchable under section 3-702(3)(g) of Code.

**AMENDED COMPLAINT**                      17

18.    **Martina Franca Associates, LLC** is organized under the applicable state laws as a limited liability company. It has elected to be taxed as a partnership. Its business is the renting of apartments. It would like to be able to contribute to the candidate(s) of its choice but is prohibited from doing so by section 3-703(1)(l) of the Code.

19.    **Reiter/Begun Associates, LLC** is organized under the applicable state laws as a limited liability company. It has elected to be taxed as a partnership. Its business purpose is to provide services including, but not limited to, strategic planning and government outreach for its clients. At times, it engages in lobbying. It would like to be able to contribute to the candidate(s) of its choice but is prohibited from doing so by section 3-703(1)(l) of the Code.

20.    **Oscar Perez** is an Hispanic-American voter who is eligible to vote in New York City elections. He intends to contribute to the candidate(s) of his choice in the upcoming New York City elections. He supports candidates and contributes to their campaigns based on whether he agrees with their positions or not, regardless of whether they choose to run as non-participating candidates. All things being equal, he would choose to vote for Hispanic-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Hispanic-American community. Mr. Perez reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and eliminating them from matchable contributions—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American community to participate in the political process and elect the community's candidates of choice. Candidates supported by the Hispanic-American community will not have the financial resources to become candidates and to campaign for office. This will place the Hispanic-American

**AMENDED COMPLAINT**                18

voting community in general, and him in particular, in a much weaker position than they were prior to the implementation of the changes instituted by Local Law No. 34, by diluting his vote and the vote of the Hispanic-American voting community.  Mr. Perez reasonably believes that New York City experiences racial bloc voting; therefore, he believes that the changes instituted by Local Law No. 34 to New York City's Campaign Finance Law are in direct violation of Section 2 of the Voting Rights Act since those changes will act to dilute the vote of the Hispanic-American community in its ability to participate and nominate candidates for office.  Mr. Perez is therefore a named plaintiff representing all Hispanic-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

21.     **Denis Gittens** is an African-American voter who is eligible to vote in New York City elections. He intends to contribute to the candidate(s) of his choice in the upcoming New York City elections. He supports candidates and contributes to their campaigns based on whether he agrees with their positions or not, regardless of whether they choose to run as non-participating candidates. All things being equal, he would choose to vote for Black and African-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Black and African-American community. Mr. Gittens reasonably believes that the changes instituted by Local Law No. 34 with regard to contributions from those having business dealings with the City—both lowering the contribution limits and eliminating them from matchable contributions—and the elimination of contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Black and African-American community to participate in the political process and elect the community's candidates of choice.  Candidates supported by the Black and African-American community will not have the financial resources to become candidates and to campaign for office.

**AMENDED COMPLAINT**                    19

This will place the Black and African-American community in general, and him in particular, in a much weaker position than they were prior to the implementation of the changes instituted by Local Law No. 34, by diluting his vote and the vote of the Black and African-American voting community. Mr. Gittens reasonably believes that New York City experiences racial bloc voting; therefore, he believes that the changes instituted by Local Law No. 34 to New York City's Campaign Finance Law are in direct violation of Section 2 of the Voting Rights Act since those changes will act to dilute the vote of the Black and African-American community in its ability to participate and nominate candidates for office. Mr. Gittens is therefore a named plaintiff representing all Black and African-American voters whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in direct violation of Section 2 of the Voting Rights Act.

22.    **Michele Russo** is eligible to vote in New York City elections. She is employed as the secretary of a registered lobbyist. However, she neither engages in lobbying activity, nor is she herself registered as a lobbyist. Ms. Russo intends to contribute to the candidate(s) of her choice in the upcoming New York City elections. She supports candidates and contributes to their campaigns based on whether she agrees with their positions or not, regardless of whether they choose to run as non-participating candidates. She wants to be able to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code, and would do so if allowed by law. However, because she is employed by a lobbyist, she is restricted by 3-703(1-a) of the Code to the lower, business-dealings contribution levels assigned to lobbyists—even though she is not a registered lobbyist nor one who engages in lobbying activity. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions will be as valuable to the candidate(s) of her choice as are contributions from other citizens. However,

**AMENDED COMPLAINT**                    20

contributions from lobbyists' employees such as herself are not matchable under section 3-702(3)(g) of Code.

23.    **The Kings County Committee of the New York State Conservative Party** ("Kings County Conservative Party") seeks to place candidates from its party on the ballot for every office in the City elections. The Kings County Conservative Party therefore wants its candidates to be able to raise the money necessary to run for office. Consequently, they want their candidates to be able to accept contributions from those defined as having business dealings with the City at amounts up to the higher contribution limits previously allowed under section 3-703(1)(f) of the Code, and they also want these contributions to be matchable, as they were prior to the implementation of Local Law No. 34. However, those contributions are now severely limited by section 3-703(1-a) of the Code, and are no longer matchable. The Kings County Conservative Party asserts that its candidates are typically not supported by labor organizations, who may contribute at the higher, section 3-703(f) levels. Rather, its candidates are more typically supported by contributors who meet the business-dealings definition. They also want their candidates to be able to receive contributions from LLCs, LLPs, and partnerships, reasonably believing that such contributions are essential to their candidates' ability to raise sufficient money to effectively campaign. They reasonably believe that the changes brought about by Local Law No. 34 with regard to contributions from those now defined as having business dealings with the City and also from LLCs, LLPs, and partnerships will make it impossible for their candidates to raise the money necessary to mount effective campaigns for office, thereby silencing their candidates' political speech.

24.    **The New York State Conservative Party** ("State Conservative Party") works with the Kings County Conservative Party in an effort to place candidates from its party on the ballot for

**AMENDED COMPLAINT**                21

every office in the City elections. The State Conservative Party therefore wants its candidates to be able to raise the money necessary to run for office. Consequently, they want their candidates to be able to accept contributions from those defined as having business dealings with the City at amounts up to the higher contribution limits previously allowed under section 3-703(f) of the Code, and they also want these contributions to be matchable, as they were prior to the implementation of Local Law No. 34. However, those contributions are now severely limited by section 3-703(1-a) of the Code, and are no longer matchable. The State Conservative Party asserts that its candidates are typically not supported by labor organizations, who may contribute at the higher, section 3-703(f) levels. Rather, its candidates are more typically supported by contributors who meet the business-dealings definition. They also want their candidates to be able to receive contributions from LLCs, LLPs, and partnerships, reasonably believing that such contributions are essential to their candidates' ability to raise sufficient money to effectively campaign. They reasonably believe that the changes brought about by Local Law No. 34 with regard to contributions from those now defined as having business dealings with the City and also from LLCs, LLPs, and partnerships will make it impossible for their candidates to raise the money necessary to mount effective campaigns for office, thereby silencing their candidates' political speech.

25. **"Plaintiffs"** shall refer to all the enumerated Plaintiffs. **"Candidate Plaintiffs"** shall refer to Plaintiffs Tom Ognibene, Yvette Velazquez Bennett, Viviana Vazquez-Hernandez, Martin Dilan, Marlene Tapper, and Leroy Comrie. **"Participating Candidate Plaintiffs"** shall refer to Plaintiffs Yvette Velazquez Bennett, Viviana Vazquez-Hernandez, Martin Dilan, and Marlene Tapper. **"Non-participating Candidate Plaintiff"** shall refer to Plaintiff Tom Ognibene. **"Contributor Plaintiffs"** shall refer to Plaintiffs Sheila Andersen-Ricci, Robert Perez, Fran Reiter,

**AMENDED COMPLAINT**                    22

Frank Ricci, Martina Franca Associates, LLC, Reiter Begun Associates, LLC, Denis Gittens, Oscar

Perez, and Michele Russo. **"Business-Dealings Plaintiffs"** shall refer to Plaintiffs Sheila

Andersen-Ricci, Robert Perez, Fran Reiter, Martina Franca Associates, LLC, and Reiter/Begun

Associates, LLC. **"Lobbyist Plaintiffs"** shall refer to Plaintiffs Reiter/Begun Associates, LLC, and

Fran Reiter. **"Lobbyist's Spouse Plaintiff"** shall refer to Plaintiff Sheila Andersen-Ricci.

**"Lobbyist's Employee Plaintiff"** shall refer to Plaintiff Michele Russo. **"Party Plaintiffs"** shall

refer to The Kings County Committee of the New York State Conservative Party and The New York

State Conservative Party. **"Hispanic-American Minority Voter Plaintiffs"** shall refer to Plaintiffs

Robert Perez, Oscar Perez, Yvette Velazquez Bennett, Viviana Vazquez-Hernandez, and Martin

Dilan. **"Black and African-American Minority Voter Plaintiffs"** shall refer to Plaintiffs Denis

Gittens, Marlene Tapper, and Leroy Comrie. **"Hispanic-American Minority Candidate**

**Plaintiffs"** shall refer to Plaintiffs Yvette Velazquez Bennett, Viviana Vazquez-Hernandez, and

Martin Dilan. **"Black and African-American Minority Candidate Plaintiffs"** shall refer to

Plaintiffs Marlene Tapper and Leroy Comrie. **"Hispanic-American Minority Voter Plaintiff**

**Class"** shall refer to the class of all Hispanic-American citizens of New York City who are eligible

and registered to vote, but whose vote is impermissibly diluted by the challenged provisions of the

campaign finance laws. This class is represented by the Hispanic-American Minority Voter

Plaintiffs. **"Black and African-American Minority Voter Plaintiff Class"** shall refer to the class

of all Black and African-American citizens of New York City who are eligible and registered to vote,

but whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws.

This class is represented by the Black and African-American Minority Voter Plaintiffs. **"Hispanic-**

**American Minority Candidate Plaintiff Class"** shall refer to the class of all Hispanic-American

**AMENDED COMPLAINT**                   23

citizens of New York City who would like to run for office, but are unable to amass the resources

necessary to mount an effective campaign because of the challenged provisions of the campaign

finance laws. This class is represented by the Hispanic-American Minority Candidate Plaintiffs.

**"Black and African-American Minority Candidate Plaintiff Class"** shall refer to the class of all

Black and African-American citizens of New York City who would like to run for office, but are

unable to amass the resources necessary to mount an effective campaign because of the challenged

provisions of the campaign finance laws. This class is represented by the Black and African-

American Minority Candidate Plaintiffs.

26.    Defendants New York City Campaign Finance Board Chair Frederick A. O. Schwarz,

Jr. and Board Members Dale C. Christensen, Jr., Joseph P. Parkes, S.J., Katheryn C. Patterson, and

Mark S. Piazza, are given authority by the New York City Campaign Finance Act to promulgate

rules and regulations for administering the Campaign Finance Act, investigate all matters relating

to its administration, and take all actions that are necessary and proper to enforce it. New York City

Administrative Code, § 3-708. They are being sued in their official capacities.

27.    Defendants New York City Conflicts of Interest Board Chair Mark Davies, Board

Members Monica Blum, Andrew Irving, Angela M. Freyre, and Steven Rosenfeld, and/or Acting

City Clerk Michael McSweeney have the authority to administer and enforce all provisions of the

lobby laws that are challenged by Plaintiffs. New York City Administrative Code, §§ 3-212, 3-228.

They are being sued in their official capacity.

28.    "Defendants", "City", and "government" shall refer to all of the enumerated

defendants together.

**AMENDED COMPLAINT**                    24

## CLASS ACTION ALLEGATIONS

29.    Hispanic-American Minority Voter Plaintiffs, Black and African-American Minority Voter Plaintiffs, Hispanic-American Minority Candidate Plaintiffs, and Black and African-American Minority Candidate Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated against the Defendants pursuant to Rule 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

30.    The Hispanic-American Minority Voter Plaintiff class includes all Hispanic-American citizens and residents of New York City who are eligible and registered to vote for candidates in the nominating contests and election of 2009, and whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in violation of Section 2 of the Voting Rights Act of 1965, as amended and codified at 42 U.S.C. § 1973 et seq.

31.    The Black and African-American Minority Voter Plaintiff class includes all Black and African-American citizens and residents of New York City who are eligible and registered to vote for candidates in the nominating contests and election of 2009, and whose vote is impermissibly diluted by the challenged provisions of the campaign finance laws in violation of Section 2 of the Voting Rights Act of 1965, as amended and codified at 42 U.S.C. § 1973 et seq.

32.    The Hispanic-American Minority Candidate Plaintiff class includes all Hispanic citizens who would like to run for office in New York City, but who are impermissibly prevented by the campaign finance law from amassing the resources necessary to do so in violation of Section 2 of the Voting Rights Act of 1965, as amended and codified at 42 U.S.C. § 1973 et seq.

33.    The Black and African-American Minority Candidate Plaintiff class includes all Black and African-American citizens who would like to run for office in New York City, but who

**AMENDED COMPLAINT**                25

are impermissibly prevented by the campaign finance law from amassing the resources necessary to

do so in violation of Section 2 of the Voting Rights Act of 1965, as amended and codified at 42

U.S.C. § 1973 et seq.

34.     The number of all Hispanic residents of New York City whose voting strength is

diminished because of the challenged provisions of the campaign finance laws is so numerous that

joinder of all members is impracticable.  In the same way, joinder of all members of the Hispanic-

American Minority Candidate Plaintiff class is impracticable because it is impossible to say which

Hispanic-American citizens might decide to run for office if they were not prevented by the

campaign finance laws from amassing the necessary resources.  However, all Hispanic-American

citizens of New York City are potentially affected, because any citizen could potentially decide to

run for office.  Consequently, the members of the Hispanic-American plaintiff classes are so

numerous that joinder of all members is impracticable.

35.     Likewise, the number of all Black and African-American residents of New York City

whose voting strength is diminished because of the challenged provisions of the campaign finance

laws is so numerous that joinder of all members is impracticable.  Similarly, joinder all members of

the Black and African-American Minority Candidate Plaintiff class is impracticable because it is

impossible to say which Black and African-American citizens might decide to run for office if they

were not prevented by the campaign finance laws from amassing the necessary resources.  However,

all Black and African-American citizens of New York City are potentially affected, because any

citizen could potentially decide to run for office.  Consequently, the members of the Black and

African-American plaintiff classes are so numerous that joinder of all members is impracticable.

**AMENDED COMPLAINT**                    26

36.    There are common questions of law and fact within each Plaintiff class. These questions include whether the challenged provisions so reduce the money available to minority candidates as to make it effectively impossible for them to run competitive races, thereby eliminating them from the pool of candidates available to protected minority voters so as to impermissibly dilute the Hispanic-American and Black and African-American Minority Voter Plaintiff class members' voting strength by offering them less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. There is also the question of whether the Hispanic-American Minority Candidate Plaintiff class members and the Black and African-American Minority Candidate Plaintiff class members have suffered a Voting Rights Act violation of their own.

37.    The claims of the representative Plaintiffs of each class are typical of the claims of the class as a whole. For instance, both the Hispanic-American Minority Voter Plaintiffs and the Black and African-American Minority Voter Plaintiff allege that the result of the implementation of Local Law No. 34 is to impermissibly dilute their voting strength in violation of Section 2 of the Voting Rights Act. This is the same claim that the members of the respective classes make. Similarly, the Hispanic-American Minority Candidate Plaintiffs and the Black and African-American Minority Candidate Plaintiffs allege that they enjoy the right to have access to the political process under the Voting Rights Act, and that this right has been impermissibly infringed by the changes implemented by Local Law No. 34. This is the same claim that the members of the respective classes make.

**AMENDED COMPLAINT**                   27

**38.**     Plaintiffs can adequately and fairly represent the interests of the Plaintiff classes because those interests are substantially similar. The Plaintiffs are not seeking monetary or other relief that would require consideration of individual circumstances.

**39.**     The Plaintiffs are represented by counsel who are familiar with the applicable laws, have the resources necessary to pursue this litigation, and are experienced in class action litigation and litigation regarding civil rights, including voting rights.

**40.**     This class action may be maintained under Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Plaintiffs, or it would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

**41.**     It may be maintained under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief to the class as a whole.

**42.**     Finally, it may be maintained under Fed. R. Civ. P. 23(b)(3) because the questions of law and fact common to the members of the class predominate over any questions affecting only individual members; and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**AMENDED COMPLAINT**                28

## FACTS

43.    To be competitive in political races, one must achieve a certain level of name recognition, and also must amass the resources necessary to communicate one's message to the voting public. Defendants thus acknowledge, "The strongest predictor of electoral success is incumbency." NEW YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON THE CAMPAIGN FINANCE PROGRAM 3 (2006). Similarly, Council Member Felder, who is Chairperson of the City Council's Committee on Governmental Relations, has admitted, "Incumbency as a rule is a great benefit." TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON GOVERNMENTAL OPERATIONS 61 (June 12, 2007). This is because incumbents already have name recognition and the public is likely to be aware of who they are and what they stand for. Those who would challenge incumbents must therefore raise enough money to be able to communicate their message to the electorate.

44.    In 1988, New York City determined to regulate the processes of political fundraising, and also provide public assistance to candidates who would agree to limit their spending on their campaigns. New York City's Campaign Finance Act ("Act") was added to the New York City Charter ("Charter") and New York City Administrative Code ("Code") by Local Law No. 8 of 1988. It is codified at chapter 46 of the Charter and title 3, ch. 7 of the Code.

45.    Since its inception, the Act has been amended by Local Law No. 4 of 1989, Local Law No. 69 of 1990, Local Law No. 68 of 1993, Local Law No. 37 of 1994, Local Law No. 90 of 1996, Local Law No. 27 of 1998, Local Law No. 39 of 1998, Local Law No. 48 of 1998, Local Law No. 21 of 2001, Local Law No. 12 of 2003, Local Law No. 13 of 2003, Local Law No. 43 of 2003, Local Law No. 58 of 2004, Local Law No. 59 of 2004, Local Law No. 60 of 2004, Local Law No.

**AMENDED COMPLAINT**                     29

105 of 2005, Local Law No. 17 of 2006, Local Law No. 23 of 2007, Local Law No. 34 of 2007, and Local Law No. 67 of 2007.

46.    In its current form, the Act establishes the New York City Campaign Finance Program ("Program"), with a fund for public financing ("Fund"). Code, § 3-709. To oversee and administer the Program, the Act provides that there shall be a Campaign Finance Board ("Board"). This Board shall be composed of five members and shall have the "authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of" the Act. Code, § 3-708(1), (8). Currently, the Board is comprised of Chairman Frederick A. O. Schwarz, Jr. and Members Dale C. Christensen, Jr., Joseph P. Parkes, S.J., Katheryn C. Patterson, and Mark S. Piazza.

47.    On June 5, 2007, New York City Council Speaker Christine Quinn and Council Member (and Committee on Governmental Operations Chairman) Simcha Felder, in conjunction with Mayor Michael Bloomberg, introduced a campaign finance reform bill designated as Proposed Int. No. 586-A to further amend the Act. On July 3, 2007, Mayor Michael Bloomberg signed the bill into law as Local Law No. 34 of 2007 ("LL No. 34").

48.    On November 28, 2007, Proposed Int. No. 651-A was introduced before the City Council to address some errors in Local Law No. 34 and amend it because of "technical difficulties" with regard to its implementation. (COMMITTEE ON GOVERNMENTAL OPERATIONS, COMMITTEE REPORT (Dec 6, 2007)). On December 31, 2007, Mayor Bloomberg signed this bill into law as Local Law No. 67 of 2007 ("LL No. 67").

49.    Among other things, LL No. 34 introduced lower contribution limits which apply to contributions from "persons" who have "business dealings with the city." Code, § 3-703(1-a).

**AMENDED COMPLAINT**                    30

**50.**    "Person" is a defined term which "shall include":

    (1)    "an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity,

    (2)    "any person employed in a senior managerial capacity regarding such entity, or

    (3)    "any person with an interest in such entity which exceeds ten percent of the entity."

Code, §§ 3-702(20), 3-703(1-a).

**51.**    Specifically excluded from the definition of "person" are the following: "a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity." Code, § 3-702(20).

**52.**    "Senior managerial capacity" (as used within the definition for "person") is also a defined term. It "shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises or concessions, grants or economic development agreements or applications for land use approvals." Code, §§ 3-702(20), 3-703(1-a).

**53.**    "Business dealings with the city" is also a defined term, including eight categories of relationships or potential relationships with the city of New York. Code, § 3-702(18)(a).

**AMENDED COMPLAINT**                          31

54.    **First category of "business dealings with the city:" Contracts for goods, services or construction above a certain dollar amount.** "Business dealings with the city shall mean . . . any contract for the procurement of goods, services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York and is valued at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter, and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith." Code, § 3-702(18)(a).

55.    The "dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code" refers to "a value that when aggregated with the values of all other such agreements with the same contractor or subcontractor and any franchises or concessions awarded to such contractor or subcontractor during the immediately preceding twelve-month period is valued at one hundred thousand dollars or more." Code, § 6-116.2(i)(3)(a).

56.    When determining the aggregate dollar value of contracts for purposes of ascertaining whether an individual or entity meets the definition of one having business dealings with the city, all contracts that are five thousand dollars or less are excluded from the calculation. Code, § 3-702(18)(a). This exclusion applies as well to the fourth and fifth category of business dealings with the city. *Id.*

**AMENDED COMPLAINT**                    32

57.    An "emergency contract awarded pursuant to section 315 of the charter" refers to an emergency procurement made "in the case of an unforeseen danger to life, safety, property or a necessary service." Charter, § 315.

58.    "Agency or entity affiliated with the city of New York," as used with respect to defining the people or entities who have business dealings with the city, is also a defined term.  It "shall mean the city school district of the city of New York and any public authority, public benefit corporation ro not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials." Code, § 3-702(18)(a).  This definition applies when this term is used with respect to the other categories of business dealings with the city as well. *Id.*

59.    An individual or entity who bids or makes a proposal on a contract for the procurement of goods, services, or construction shall have business dealings with the city "from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement."  Code, § 3-702(18)(b).

60.    An individual or entity who has a contract for the procurement of goods, services or construction shall have business dealings with the city "during the term of such contract (or in the case of purchase contracts for goods, from the date of such purchase) and for twelve months thereafter." Code, § 3-702(18)(b).

61.    **Second category of "business dealings with the city:" Acquisitions or dispositions of real property.** "Business dealings with the city shall mean . . . any acquisition or disposition of real property (other than a public auction or competitive sealed bid or the acquisition of property

**AMENDED COMPLAINT**                    33

pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York." Code, § 3-702(18)(a).

62.    An individual or entity who proposes a lease in which the city of New York is the proposed lessee shall have business dealings with the city "from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal." Code, § 3-702(18)(b).

63.    An individual or entity who proposes to acquire an interest in real property, of which the city or any city affiliated entity is disposing, shall have business dealings with the city "from the date of the submission of a proposal and during the term of any agreement and one year after." Code, § 3-702(18)(b).

64.    **Third category of "business dealings with the city:" Applications for approval for certain transactions involving office space, certain land-use plans, and certain zoning changes.** "Business dealings with the city shall mean . . . any application for approval sought from the city of New York  pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter, and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter; provided, however, that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further,

**AMENDED COMPLAINT**                    34

however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause." Code, § 3-702(18)(a).

65.    "The provisions of section 195 of the charter" refers to "acquisitions by the city of office space or existing buildings for office use, whether by purchase, condemnation, exchange or lease." Charter, § 195.

66.    With respect to section 195, "an applicant shall include the lessor of an office building or office space." Code, § 3-702(18)(a).

67.    "The provisions of section 197-c of the charter" refers to "applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation." Charter, § 197-c.

68.    With respect to section 197-c, "an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant." Code, § 3-702(18)(a).

69.    With respect to this clause, "owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause." Code, § 3-702(18)(a).

70.    An individual or entity who applies for approval from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter shall have business dealings with the city "from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter." Code, § 3-702(18)(b).

71.    In the case of a decision by the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, an individual

**AMENDED COMPLAINT**                    35

or entity who applies for approval from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter shall have business dealings with the city from "the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter." Code, § 3-702(18)(b).

72.    In the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, an individual or entity who applies for approval from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter shall have business dealings with the city for "one hundred twenty days after expiration of the ten day period for council override pursuant to such section." Code, § 3-702(18)(b).

73.    **Fourth category of "business dealings with the city:" Certain concessions and franchises above a certain dollar amount.** "Business dealings with the city shall mean . . . any concession (other than a concession awarded through publicly-advertised competitive sealed bid) or any franchise from the city of New York or any agency or entity affiliated with the city of New York which has an estimated annual value at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code." Code, § 3-702(18)(a). Currently, this means a dollar amount greater than or equal to one hundred thousand dollars. Code, § 6-116.2(i)(3)(a).

74.    An individual or entity who bids on or makes a proposal for franchises and concessions shall have business dealings with the city "for the period from the submission of the bid or proposal until twelve months after the date of such submission." Code, § 3-702(18)(b).

**AMENDED COMPLAINT**                    36

75.    An individual or entity who receives a concession from the city of New York or a city-affiliated agency or entity shall have business dealings with the city "during the term of such concession and for twelve months after the end of such term." Code, § 3-702(18)(b).

76.    An individual or entity who is awarded a franchise by the city of New York or a city-affiliated agency or entity shall have business dealings with the city for "the period of one year after the commencement of the term of the franchise or after the commencement of any renewal." Code, § 3-702(18)(b).

77.    **Fifth category of "business dealings with the city:" Grants worth a certain amount.** "Business dealings with the city shall mean . . . any grant that is "received from the city of New York or any agency or entity affiliated with the city of New York" and "valued at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code." Code, § 3-702(18)(a). Currently, this means a dollar amount greater than or equal to one hundred thousand dollars. Code, § 6-116.2(i)(3)(a).

78.    An individual or entity who is awarded a grant from the city or a city-affiliated agency or entity shall have business dealings with the city "for one year after the grant is made." Code, § 3-702(18)(b).

79.    **Sixth category of "business dealings with the city:" Economic development agreements with the city of New York.** "Business dealings with the city shall mean . . . any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York." Code, § 3-702(18)(a).

80.    An individual or entity who enters into an economic development agreement with the city or a city-affiliated agency or entity shall have business dealings with the city "from the

**AMENDED COMPLAINT**                    37

submission of an application for such agreement and during the term of such agreement and for one year after the end of such term." Code, § 3-702(18)(b).

81.    **Seventh category of "business dealings with the city:" Contracts for the investment of pension funds.** "Business dealings with the city shall mean . . . any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants." Code, § 3-702(18)(a).

82.    An individual or entity who enters into a contract with the city or a city-affiliated agency or entity for the investment of pension funds shall have business dealings with the city "from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term." Code, § 3-702(18)(b).

83.    **Eighth category of "business dealings with the city:" Lobbyists.** "For purposes of this chapter a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York during all periods covered by a registration statement." Code, § 3-702(18)(a).

84.    The term "lobbyist," as used within the Act, is broader in scope than merely those who engage in lobbying activities. By definition, "the term 'lobbyist'" includes "the spouse or domestic partner and unemancipated children of the lobbyist." Code, § 3-702(16). When the lobbyist is an organization, the term 'lobbyist' includes "any officer or employee" of the lobbyist "who engages in lobbying activities of the organization or is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employers." Code, § 3-702(16).

**AMENDED COMPLAINT**                    38

85.    Labor organizations are notably absent from the categories of persons or entities who are defined as having business dealings with the city and so are subject to the lower contribution limits. In fact, the Act makes plain that labor organizations may contribute to candidates up to the higher, non-business dealing contribution limits. Code, § 3-703(f). Furthermore, the Act provides that "contributions made by different labor organizations shall not be aggregated or treated as contributions from a single contributor for purposes of the contribution limit" so long as they "make contributions from different accounts, maintain separate accounts with different signatories, do not share a majority of members of their governing boards, and do not share a majority fo the officers of their governing boards." *Id.*

86.    Unlike the contributions from persons or entities defined by the Act as having business dealings with the city, contributions from labor organizations and their officers and members are fully matchable for public financing purposes. Code, § 3-703(3).

87.    Prior to enacting Local Law No. 34, the City Council's Committee on Governmental Operations held two hearings at which various citizens and interested parties testified regarding their opinion of Local Law No. 34. Several of those who testified voiced concern about the exclusion of labor organizations from the group of those who have business dealings with the city.

88.    Council Member Ignizio made a statement to the members of the Committee during the June 12, 2007 hearing. He said:

> I have less of a question, if you will, and more of a statement both for
> the Committee that I would like to encourage, and that is the
> inclusion of all interest groups in this City, that being unions. I don't
> question anyone's intention of this bill . . . . But I do question the

**AMENDED COMPLAINT**                    39

precedent we're setting. The precedent we're setting is for one who

wishes to petition their government, a form of running for office, we

are separating one's speech from one others. If I decide I want to be,

or Joe from Astoria, Queens, wants to be . . . Mr. Anti-union, and he

wants to run because he believes, I don't agree, but he believes that

unions are hurting the City of New York, and he wants to run as that

candidate. Well, Sally, who is also running in Astoria, she is running

as the union-backed candidate. My understanding, and as the union

exclusion here, government, for the first time that I know, is taking

a situation saying that one's voice is not equal to the other's voice in

terms of campaign contributions from those entities, and I think it's

fundamentally unjust.

TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON GOVERNMENTAL OPERATIONS 30–31 (June

12, 2007). Council Member Ignizio further opined, "[W]hen you're dealing with something as

fundamental as elections, and as fundamental as someone's right to participate, petition their

government as they see fit, we ought not put confines on speech. I believe that's what we're doing

here." *Id.* at 31. He called on the Council "to include all interest groups in this City and to have the

establishment of this bill really work on all facets of people who are trying to petition their

government and make sure their petitioning is done on an equal basis, and not one speech being

squelched at the expense of another." *Id.* at 32. Council Member Ignizio concluded his remarks by

calling the exclusion of labor unions from the definition of those who have business dealings with

the city "an extremely serious omission," and advising that "it ought to be revisited." *Id.*

**AMENDED COMPLAINT**                    40

**89.**     Similarly, Council Member Vallone expressed his concern:

> I'm concerned because I have yet to receive an answer to the question
>
> that sits in the room like an 800-pound gorilla, and that's basically
>
> why aren't all groups who lobby the City Council for money included
>
> in this bill? If you limit half the playing field, and in the case, the
>
> paying field, you've necessarily created an uneven playing field.

TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON GOVERNMENTAL OPERATIONS 31–32 (June
21, 2007).

**90.**     Doug Israel, the Director of Public Policy and Advocacy for Citizens Union testified
that his group encouraged the City to "ensure that an even hand is being applied and review other
institutional contributions like those from unions." TRANSCRIPT OF THE MINUTES OF THE
COMMITTEE ON GOVERNMENTAL OPERATIONS 70 (June 12, 2007).

**91.**     In spite of these concerns, labor unions were excluded by the Act from the group of
persons or entities who have business dealings with the City.

**92.**     The Act provides for the development of a Doing Business Database which is to be
accessible to the Board and to the general public which will contain the names of all persons and/or
entities who meet the definition of one having business dealings with the City. Code, § 3-702(20).

**93.**     Under the provisions of the Act, candidates are classified as either "participating,"
"non-participating," or "limited participating." Code, §§ 3-702(1), (13), (14).

**94.**     Participating candidates are those candidates who meet the requirements to participate
in the public funding Program and choose to do so by filing the appropriate written certification.

**AMENDED COMPLAINT**                    41

Among other things, they are subject to both contribution limits and expenditure limits. Code, §§ 3-701(1); 3-703(f); 3-706.

94. **95.** Non-participating candidates are those candidates who either choose not to participate in the Program or who do not meet the requirements to do so. While not subject to expenditure limits, they are subject to the contribution limits promulgated by the Act. Code, §§ 3-702(14); 3-703(f); 3-719(2). They are also subject to the same reporting requirements as are participating candidates. Code, § 3-719(1).

**96.** Limited participating candidates are those candidates who file appropriate paperwork indicating their decision to file the requisite certification to be such a candidate. Code, § 3-718(1)(a). Among other things, they agree that they will (1) not accept contributions; (2) abide by the expenditure limits imposed on participating candidates; and (3) forego the public funds available to participating candidates. Code, §§ 3-718(c), (e), (f).

**97.** The Act imposes contribution limits. It provides that the amount of money a candidate or his or her principal committee or authorized committees may accept "from any one individual, partnership, political committee, labor organization or other entity for all covered elections held in the same calendar year in which he or she is a participating candidate or a non-participating candidate," when added together, may not exceed:

| | | |
|---|---|---|
| (1) | For the office of mayor, public advocate, or comptroller . . . . . . . . | $4,950 |
| (2) | For borough president . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,850 |
| (3) | For city council member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,750 |

Code, § 3-703(f), endnote 1.

**AMENDED COMPLAINT**              42

**98.**    The Act imposes these limits on the amount of contributions a candidate or his or her committees may accept on candidates who choose not to participate in the Program.  Code, §§ 3-703(f); 3-719(2).

**99.**    When New York City adopted its contribution limits and instituted the public funding Program, its stated purpose was "to reduce undue influence by small concentrations of large contributors and special interests."  COMMITTEE ON GOVERNMENTAL OPERATIONS, COMMITTEE REPORT (June 21, 2007).

**100.**    Thus, New York City established that these limits are the levels at which it believes influence occurs, or at the very least, these are the limits at which it believes unacceptable influence occurs.  Contributions above these levels are therefore unacceptable influence, and contributions below these levels are not influence (or, at least, are not unacceptable influence).

**101.**    The Act, as amended by LL No. 34 and LL No. 67, reduces the amount a candidate or his or her principal committee may accept from those "having business dealings with the City" as follows:

    1.    For the office of mayor, public advocate or comptroller . . . . . . . . . . $400

    2.    For borough president . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $320

    3.    For city council member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $250

Code, § 3-703(1-a).

**102.**    The Act imposes these same lower contribution limits even when the contributor is giving to non-participating candidates or their committees.  Code, § 3-719(2).  These limits thus apply to contributions to all candidates, whether such candidates choose to participate in the public funding Program or not.

**AMENDED COMPLAINT**                          43

**103.**     These lower limits for contributions from individuals or entities who have business dealings with the City are less than a tenth of the contribution limit for individuals or entities who do not have business dealings with the City. Put another way, non-business-dealings individuals or entities may contribute over ten times more than business-dealings individuals or entities.

**104.**     An individual or entity who has business dealings with the City and who wishes to make a contribution to candidates running for mayor, public advocate, or comptroller are only allowed to contribute four hundred dollars to the candidates or their committees. That amount represents only 8.1 percent of the amount other, non-business-dealings individuals or entities may contribute. Put another way, those who do not have business dealings with the city may contribute *over twelve times* more than those who do have such dealings.

**105.**     An individual or entity who has business dealings with the City who wishes to make a contribution to candidates running for borough president is only allowed to contribute three hundred twenty dollars ($320) to the candidates or their committees. That amount represents just 8.3 percent of the three thousand eight hundred fifty dollars ($3,850) non-business-dealings individuals or entities may contribute. Put another way, those who do not have business dealings with the city may contribute *over twelve times* more than those who do have such dealings.

**106.**     An individual or entity who has business dealings with the City who wishes to make a contribution to candidates running for city council is only allowed to contribute two hundred fifty dollars ($250) to the candidates or their committees. That amount represents just 9.1 percent of the two thousand seven hundred fifty dollar ($2,750) amount non-business-dealings individuals or entities may contribute. Put another way, those who do not have business dealings with the city may contribute *eleven times* more than those who do have such dealings.

**AMENDED COMPLAINT**                          44

107.    The text of LL No. 34 offers no justification for these lower contribution limits placed upon business-dealings individuals or entities.    However, the City Council Committee on Governmental Relations issued a Report in which it stated that one of the purposes of LL No. 34 is to "reduce the appearance of influence of contributors that have business dealings with the City." COMMITTEE ON GOVERNMENTAL OPERATIONS, COMMITTEE REPORT (June 21, 2007).

108.    The higher, non-business dealings contribution limits set forth in section 3-703(1)(f) are indexed for inflation.    Not later than March 1, 2018, the Board must adjust each of the 3-703(1)(f) contribution limits pursuant to a formula set out by the Act.    Code, § 3-703(7).    However, there is no corresponding requirement to index the lower, business dealings contribution limits found in section 3-703(1-a).

109.    The Act also prohibits contributions from limited liability companies, limited liability partnerships, partnerships, and corporations.    Code, § 3-703(1)(l).    However, the Act allows for some exceptions: "[W]here a contribution is from a contributor whose name is followed by a professional designation including but not limited to 'M.D.', 'Esq.' and 'C.P.A.' the board shall not treat such contribution as coming from a corporation, limited liability company, limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity." *Id.*

110.    The Act imposes various reporting requirements on candidates for election.    Section 3-703(6) requires candidates and their committees to report, for every contribution, "the full name, residential address, occupation, employer, and business address" of each contributor.    Code, § 3-703(6)(a).    However, the occupation, employer, and business address of contributors making contributions aggregating not more than ninety-nine dollars ($99) need not be disclosed, *unless* the contributor is employed by a participating or limited participating candidate, is the spouse or

**AMENDED COMPLAINT**                45

domestic partner of such candidate, or is an entity in which in which an ownership interest of ten percent or more is held by such a candidate or his or her spouse or domestic partner. Code, § 3-703(6)(b)(iii).

111.    The Act includes expenditure limits above which participating and limited participating candidates and their committees may not spend. Currently, the limits are as follows:

    (1)    For mayor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $6,158,000

    (2)    For public advocate or comptroller . . . . . . . . . . . . . . . . . . . . . $3,850,000

    (3)    For borough president . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,386,000

    (4)    For city council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $161,000

Code, § 3-706(1)(a).

112.    The Act also establishes the public financing program ("Program"), whereby candidates who choose to participate in the Program receive certain matching funds from public money. Code, § 3-705(2)(a). In order to qualify for the public matching funds available under the Program, a candidate must file the requisite paperwork to be a participating candidate and also must raise a certain amount of contributions, as follows:

    (1)    For mayor, not less than two hundred fifty thousand dollars ($250,000) in matchable contributions comprised of sums of up to one hundred seventy-five dollars ($175) per contributor including at least one thousand matchable contributions of ten dollars or more;

    (2)    For public advocate and comptroller, not less than one hundred twenty-five thousand dollars ($125,000) in matchable contributions comprised of sums

**AMENDED COMPLAINT**                46

of up to one hundred seventy-five dollars ($175) per contributor including at least five hundred matchable contributions of ten dollars or more;

(3)     For borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to one hundred seventy-five dollars ($175) per contributor including at least one hundred matchable contributions of ten dollars ($10) or more from residents of the borough, or ten thousand dollars ($10,000) comprised of sums of up to one hundred seventy-five dollars ($175) per contributor, whichever is greater;

(4)     For a member of the city council, not less than five thousand dollars ($5,000) in matchable contributions comprised of sums of up to one hundred seventy-five dollars ($175) per contributor including at least seventy-five matchable contributions of ten dollars ($10) or more from residents of the district in which the seat is to be filled.

Code, § 3-703(2)(a).

**113.**    Defendants have stated that the purpose of the Program of public financing is to "level[] the playing field for candidates of modest means." (NEW YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON THE CAMPAIGN FINANCE PROGRAM 5 (2006)). To achieve that purpose, the Act established the New York City Campaign Finance Fund ("Fund"), out of which the Board may make matching fund payments to participating candidates. Code, § 3-709(1). The Fund is funded through appropriations from the treasury. Code, § 3-709(2), (3).

**AMENDED COMPLAINT**                         47

114.    Under normal circumstances, a participating candidate who has qualified for public financing is eligible to receive six dollars ($6) for every one dollar ($1) of matchable contributions, up to one thousand fifty dollars ($1,050) in public funds per contributor. Code, § 3-705(2)(a). He or she may receive up to one-quarter of fifty-five percent of the total applicable expenditure limit for the office for which he or she is running. Code, § 3-705(7).

115.    The Act also excludes certain contributions from being counted for the matching formula. Specifically, the law provides:

The following contributions are not matchable:

(a)    in-kind contributions of property, goods, or services;

(b)    contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(3)    contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes;

(d)    money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e)    contributions from individuals under the age of eighteen years;

(f)    contributions from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance;

**AMENDED COMPLAINT**                48

(g)     contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1) or section 3-213(d). The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213; and

(h)     contributions from contributors subject to the limitations of subdivision one-a of section 3-703 of this chapter (which are those defined as having business dealings with the City).

Code, § 3-702(3).

**116.**    The effect of the exclusion of these contributions from the matching fund formula is to render unmatchable, and therefore less helpful to candidates, the contributions from the Lobbyist Plaintiffs, Lobbyist's Spouse Plaintiff, Lobbyist's Employee Plaintiff, and Business Dealings Plaintiffs, as well as all other individuals and entities who fit within the enumerated categories.

**117.**    The Act includes two separate provisions, however, which provide participating candidates an increase in public funds and/or an increase in their expenditure limit when a non-participating opponent spends or becomes obligated to spend and/or receives in contributions an amount which, in the aggregate, exceeds a certain threshold amount. Code, §§ 3-705(7), 3-706(3).

**118.**    The Triggering Provision enacted by section 3-705(7) states that the maximum public fund payment for which the participating candidates are eligible will increase by four-fold, from the usual one-quarter of fifty-five percent of the total applicable expenditure limit for the office for

**AMENDED COMPLAINT**                    49

which he or she is running, to the full fifty-five percent of the total applicable expenditure limit, when either of the following triggering conditions is met:

> (1)    The participating candidate's opponent and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office; or,

> (2)    The participating candidate submits a certified statement attesting to the need and stating the reason for additional public funds. One of the qualifying reasons is that the participating candidate is opposed by a non-participating candidate who is capable of self-financing.

Code, § 3-705(7)(a), (b).

**119.**    There are two "triggers" non-participating candidates and their contributors need to be concerned about under section 3-706(3)'s Triggering Provision. First, when a non-participating candidate spends (or becomes obligated to spend) or receives in contributions, or both, an amount which added together exceeds fifty percent (50%) of the applicable expenditure limit for such office, two increases ensue to the participating candidate. First, the expenditure limit for participating and limited participating candidates is increased to one hundred fifty percent (150%) of the usual expenditure limit for the given office. Second, the maximum amount of matching funds provided to the participating candidate is increased. Under normal circumstances, a participating candidate is eligible to receive up to one thousand fifty dollars ($1,050) in public funds per contributor, meaning that the first one hundred seventy-five dollars ($175) from each eligible contributor is fully matchable at the 6:1 ratio. When the Triggering Provision is triggered, however, the maximum

**AMENDED COMPLAINT**                    50

amount a participating candidate is eligible to receive in matching funds increases to one thousand two hundred fifty dollars ($1,250) in public funds per contributor, up to two-thirds of the total applicable expenditure limit for that office. Code, § 3-706(3)(a)(iii). The Rules the Campaign Finance Board have promulgated state that the match shall be made at the ratio of seven dollars and fourteen cents ($7.14) for each dollar ($1) contributed, meaning that the first one hundred seventy-five dollars ($175) from each eligible contributor is fully matchable. Rule 5-01(a)(5)(iv).

120.    The second triggering event about which non-participating candidates and their contributors must be concerned under section 3-706(3) of the Act is this: When a non-participating candidate spends (or becomes obligated to spend) or receives in contributions, or both, an amount which added together exceeds three hundred percent (300%) of the applicable expenditure limit for such office, two increases again ensue to the participating candidate. First, both participating and limited participating candidates for that office are released from any expenditure limit. Second, the maximum amount of matching funds provided to the participating candidate is increased to one thousand five hundred dollars ($1,500) per contributor, up to one hundred twenty-five percent (125%) of the total applicable expenditure limit for that office. Code, § 3-706(3)(b)(iii). The Rules the Campaign Finance Board have promulgated state that the match shall be made at the ratio of eight dollars and fifty-seven cents ($8.57) for each dollar ($1) contributed, meaning that the first one hundred seventy-five dollars ($175) from each eligible contributor is fully matchable. Rule 5-01(a)(5)(viii).

121.    Thus, the amount of matching funds available to a participating candidate is as follows:

AMENDED COMPLAINT                    51

(1)     Normally, participating candidates who qualify for public financing may

        receive in public funds an amount that equals one-fourth of fifty-five percent

        of the expenditure limit for the office for which he or she is campaigning.

        Code, § 3-705(7). In the case of a candidate for City Council, for example,

        the total public funds available would be $22,137.

(2)     Under the Triggering Provision found in section 3-705(7), the participating

        candidate may receive in public funds an amount that equals fifty-five percent

        of the expenditure limit for the office for which he or she is campaigning.

        Code, §§ 3-705(2), (7). This means that the total public funds available to a

        candidate for City Council would increase to $88,550. The participating

        candidate would be eligible to receive the extra public funds if his or her non-

        participating opponent spent, or raised, an amount greater than one-fifth of

        the expenditure limit, which would be $32,201 in the case of a candidate

        running for City Council.

(3)     Under the first Triggering Provision found in section 3-703(3), the

        participating candidate may receive in public funds an amount which equals

        one hundred twenty-five percent of the expenditure limit for the office for

        which he or she is campaigning. Code, § 3-706(3)(a)(iii). This means that

        the total public funds available to a candidate for City Council would increase

        to $107,333. The participating candidate would be eligible to receive this

        higher amount if his or her non-participating opponent spent, or raised, an

**AMENDED COMPLAINT**                    52

amount greater than one-half of the expenditure limit, which would be $80,501 in the case of a candidate running for City Council.

(4)     Under the second Triggering Provision found in section 3-703(3), the participating candidate may receive in public funds an amount which equals one hundred twenty-five percent of the expenditure limit for the office for which he or she is campaigning. Code, § 3-706(3)(b)(iii). This means that the total public funds available to a candidate for City Council would increase to $201,250. The participating candidate would be eligible to receive this higher amount if his or her non-participating opponent spent, or raised, an amount greater than three times the expenditure limit.

**122.**   Defendants have stated that the Triggering Provision "is an attempt to ease the disadvantage Program participants . . . may face when opposed by a non-participating candidate." (NEW YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON THE CAMPAIGN FINANCE PROGRAM 6 (2006)).

**123.**   The Act establishes mandatory debates, in which participating candidates are required to participate. Code, § 3-709.5(1)(a). In the case of a primary, the debate shall be among the participating candidates who are seeking nomination of the same political party. Code, § 3-709.5(1)(c). Defendants delegate authority for promulgating rules for the debates to whichever organizations are chosen to sponsor the debates. Code, § 3-709.5(4). The debate sponsors and the Campaign Finance Board shall together establish "non-partisan, objective, and non-discriminatory criteria" for determining which participating candidates are eligible to take part; and, only those participating candidates who meet the established criteria may take part. Code, § 3-709.5(5)(b)(i).

**AMENDED COMPLAINT**                    53

For each debate, the Board shall provide the sponsor with a list of all eligible participating and limited participating candidates. Code, § 3-709.5(8).

124.    Non-participating candidates, however, are not guaranteed a place in the debate, even if they meet all the "non-partisan, objective, and non-discriminatory criteria" established by the sponsors and the Board. Code, § 3-709.5(5)(b)(ii). Furthermore, the City is not required to provide the sponsor with a list of non-participating candidates who are running for office, as it is required to do for participating and limited participating candidates.

125.    New York City is subject to Section 5 of the Voting Rights Act, which requires certain "covered jurisdictions" to obtain federal approval, or "preclearance," for any changes made to their laws affecting voting. 42 U.S.C. § 1973c ("Section 5"). This preclearance may either be obtained by seeking a declarative ruling from the proper court or by receiving a determination from the Attorney General that the changes sought to be implemented do not have the affect of discriminating on the basis of race, color, or language minority status.

126.    The covered jurisdictions which are subject to Section 5 are those which had a history of discrimination or some other problem in their voting procedures. Three counties in New York City are "covered jurisdictions:" Bronx County, Kings County, and New York County.

127.    Changes requiring preclearance include, but are not limited to, changes to the methods by which officials are elected, and changes in the procedures used for administering elections. The changes introduced by Local Law No. 34 of 2007 and Local Law No. 67 of 2007 fall squarely within the types of changes for which preclearance must be sought.

128.    Accordingly, New York City filed the proper request for preclearance with the Attorney General for the various changes to the campaign finance laws on or about July 13, 2007.

**AMENDED COMPLAINT**                54

The City made subsequent additional filings with the Attorney General throughout the remainder of 2007. Late in 2007, the Attorney General granted New York City preclearance for the changes instituted by Local Laws No. 34 and 67.

129.    In addition to Section 5 which applies only to certain jurisdictions, Section 2 of the Voting Rights Act applies nationally and prohibits any state or local government from enforcing any voting law or procedure that has a discriminatory result. 42 U.S.C. § 1973 ("Section 2"). As stated in subsection (b) of Section 2, a violation occurs when members of a protected class have less opportunity to "participate in the political process and elect representatives of their choice." Such a violation occurs regardless of whether the legislative body intended the law to be discriminatory—Congress made plain in the 1982 Amendment to the Voting Rights Act that a discriminatory *effect* is sufficient to establish a violation of Section 2. Legislative intent is therefore immaterial to the analysis.

130.    The granting of Section 5 preclearance by the Attorney General does not bar plaintiffs from asserting a Voting Rights Act challenge under Section 2. Rather, Section 5 explicitly states that "Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure." 42 U.S.C. 1973c.

131.    In a 2003 study of the voting patterns of New York City, Dr. Lisa Handley concluded that voting patterns in New York City demonstrate racial polarization. Specifically, Dr. Handley found evidence of racial bloc voting among whites, Hispanics, and Black and African-Americans. This racial polarization in voting means that whites generally vote as a cohesive group, as do

**AMENDED COMPLAINT**                    55

Hispanics, as do Black and African-Americans. DR. LISA HANDLEY, A VOTING RIGHTS ACT EVALUATION OF THE NEW YORK CITY REDISTRICTING PLAN (March 18, 2003).

**132.**    In addition to the Campaign Finance Act, New York City has also enacted Subchapter Two of its Administrative Code, which is titled "Regulation of Lobbying" and is codified at Code, §§ 3-211 – 3-223 ("Lobby Law"). The power to administer and enforce all provisions of the Lobby Law has been delegated to the City Clerk. Code, § 3-212(a).

**133.**    Among other things, the Lobby Law requires all those who meet the definition of "lobbyist," as defined in section 3-211(a) of the Act, to file various registrations with the City. Included in such registrations are the Annual Statement of Registration as set forth in section 3-213, certain Periodic Reports as set forth in section 3-216, Fundraising and Political Consulting Reports as set forth in section 3-216.1, and Annual Reports as set forth in section 3-217.

**134.**    On the Annual Statement of Registration, a lobbyist is required to list, among other things, the following information about himself, his family, and his employees:

> (1)    The name, home and business addresses and business telephone number of the lobbyist;
>
> (2)    The name and home and business addresses of the spouse or domestic partner of the lobbyist;
>
> (3)    If the lobbyist is an organization, the name, home and business addresses and business telephone number of any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization

**AMENDED COMPLAINT**                    56

and the name and home and business addresses of the spouse or domestic

partner of such officers or employees.

Code, § 3-213(c)(1).

**135.** The Annual Statement must be filed on or before January 1 by those persons who have been retained, employed or designated as lobbyists on or before December 15 of the previous calendar year who reasonably anticipate that in the coming year they will expend, incur or receive combined reportable compensation and expenses in an amount in excess of two thousand dollars. Code, § 3-213(a)(2).

**136.** The information supplied by the lobbyist on his or her Annual Statement of Registration is kept in electronic form in the city clerk's office and shall be available for public inspection. Code, § 3-213(b). However, the names and home addresses of employees and officers of lobbyists, and the spouses of employees and officers, are not supposed to be made available to the public. Rather, they are only to be accessed by the Board for the purpose of determining whether contributions are matchable. Code, § 3-213(c)(1).

**137.** Whenever a political contribution is made by an unemancipated child of a lobbyist, an unemancipated child of a lobbyist's spouse, an unemancipated child of a lobbyist's officer or employee, or an unemancipated child of a lobbyist's employee's spouse or officer's spouse, the lobbyist is required to file an Amended Statement of Registration within forty-eight hours of the contribution having been made, listing the name of the child and his or her home address. Code, § 3-213(d)(2).

**138.** On the Fundraising and Political Consulting Reports, the lobbyist is required to list certain information regarding fundraising and/or political activities that occurred within a designated

**AMENDED COMPLAINT**                 57

time period. Code, § 3-216.1(a). Included in this report shall be the total dollar amount raised for each candidate for which fundraising and/or political activities were performed. Code, § 3-213(b)(4).

139.    "Fundraising activities" is a defined term, meaning "solicitation or collection of contributions for a candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council, or for the political committee of any such candidate by a lobbyist, or the solicitation or collection of contributions for any public servant who is a candidate for nomination for election, or election, to any elective office, or for the political committee of any such candidate by a lobbyist." Code, § 3-211(h).

140.    New York City has also enacted Subchapter Three of its Administrative Code, which is titled "Prohibition of Gifts By Lobbyists" and is codified at Code, §§ 3-224 – 3-228 ("Gifts Law"). This law provides in pertinent part that, "No person required to be listed on a statement of registration pursuant to section 3-213(c)(1) of subchapter 2 of this chapter shall offer or give a gift to any public servant." Code, § 3-225.

141.    For the reasons set forth in this Complaint, Plaintiffs believe that the challenged provisions are unconstitutional, facially and as applied, and cannot be legally enforced. There exists an actual, justiciable controversy among these parties as to the validity of the aforementioned provisions.

142.    Plaintiffs have no adequate remedy at law, and as a result of these provisions, Plaintiffs have suffered, and will continue to suffer, the irreparable loss of their First and Fourteenth Amendment rights by the unconstitutional restraint of their rights to free speech, free association, and the equal protection of the laws as guaranteed by the Constitution of the United States. The

**AMENDED COMPLAINT**                    58

Hispanic-American Minority Voter Plaintiffs and Black and African-American Minority Voter Plaintiffs also, in addition to these harms, will suffer the irreparable loss of their right to have their vote count as guaranteed by Section 2 of the Voting Rights Act. The classes they represent will suffer this same irreparable harm. Finally, Hispanic-American Minority Candidate Plaintiffs and Black and African-American Minority Candidate Plaintiffs, and the classes they represent, will suffer the irreparable loss of their right to participate in the political process as guaranteed by Section 2 of the Voting Rights Act.

## COUNT I

### THE CAMPAIGN FINANCE PROGRAM AS SET FORTH IN SECTIONS 3-705 AND 3-709 OF THE ACT IS UNCONSTITUTIONAL.

**143.** Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**144.** Non-Participating Candidate Plaintiff is a tax-paying resident of New York City. He intends to run for City Council in the 2009 election as a non-participating candidate.

**145.** The Act established the Fund, into which public tax dollars are appropriated, to be payed out to qualifying participating candidates as matching funds. Code, §§ 3-705; 3-709.

**146.** Non-Participating Candidate Plaintiff asserts taxpayer standing to challenge sections 3-705 and 3-709 of the Code because Defendants are using his tax dollars in ways which violate both the First and Fourteenth Amendments.

**147.** In addition to having tax-payer standing to maintain this action, Non-Participating Candidate Plaintiff suffers actual, personal harm by the Program: His tax dollars will be taken by the Program and placed in the Fund to be given to his opponent, so that his opponent can use Non-

**AMENDED COMPLAINT** 59

Participating Candidate Plaintiff's tax dollars to defeat Non-Participating Candidate Plaintiff in their election contest. This unconstitutionally burdens Non-Participating Candidate Plaintiff's speech and associational rights under the First Amendment and unconstitutionally violates his right to equal protection under the Fourteenth Amendment.

148.    In addition, Non-Participating Candidate Plaintiff is being forced by the City to support financially the ideological and political causes of his opponents, which in actuality he does not support, but opposes. This violates the principle set forth in *Abood v. Detroit Board of Ed.*, 431 U.S. 209 (1977) and its progeny that the Constitution forbids forcing one into an ideological or political association to which he is opposed.

149.    Finally, the City impermissibly discriminates on the basis of viewpoint in awarding matching funds to participating candidates.

150.    When the State opens a forum for speech, the State cannot discriminate on the basis of viewpoint. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829–30 (1995); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392–93 (1993). Although fora are often spatial, they may also be metaphysical, such as when the State awards money to groups to help them speak or amplify their voice. *Rosenberger*, 515 U.S. at 830.

151.    The City discriminates on the basis of viewpoint by funding the candidacies of those who agree with public funding and choose to be part of the public funding program, to the exclusion of those who disagree with public funding and choose to opt out of the public funding program.

152.    Every other non-participating candidate for election in New York City is similarly harmed, as is every participating candidate who fails to qualify for public funding, but runs against a candidate who does so qualify.

**AMENDED COMPLAINT**                    60

153.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, §§ 3-705 and 3-709, facially unconstitutional and
unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,
pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT II

## THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) ARE UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.

154.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in
all of the preceding paragraphs.

155.    Candidate Plaintiffs would like to be able to solicit contributions from those having
business dealings with the City up to the limits imposed by section 3-703(1)(f) of the Code, instead
of the limits imposed by section 3-703(1-a) of the Code. These lower limits therefore reduce the
amount of money available to Candidate Plaintiffs for the purpose of engaging in political speech,
and unconstitutionally burden Candidate Plaintiffs' speech. Candidate Plaintiffs also reasonably
believe that the limits imposed by section 3-703(1-a) of the Code will unconstitutionally prevent
them from amassing the resources necessary to mount an effective campaign.

156.    Business-Dealings Plaintiffs intend to contribute to candidates during the 2009
election cycle, and would like to contribute to the candidate(s) of their choice at the higher
contribution limits allowed by section 3-703(1)(f) of the Code. Instead, they are restricted to the

**AMENDED COMPLAINT**                    61

lower contribution limits imposed by section 3-703(1-a) of the Code. This is an unconstitutional burden upon their speech and association rights.

157.    Lobbyist's-Employee Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code. This is an unconstitutional burden upon her speech and association rights.

158.    Lobbyist's-Spouse Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code. This is an unconstitutional burden upon her speech and association rights.

159.    Party Plaintiffs seek to place candidates from their party on the ballot for every office in the City elections. They reasonably believe that candidates from their Parties will be unable to mount an effective campaign in significant part because of the lower contribution limits imposed upon those defined as having business dealings with the City. This unconstitutionally burdens Party Plaintiffs' First Amendment right to engage in political speech. Party Plaintiffs engage in such speech by communicating their political views through the political speech of their candidates, which they will be unable to do if their candidates cannot raise adequate funds to campaign for office as a result of the new, lower contribution limits.

160.    "Contribution . . . limitations operate in an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curium). As an initial matter,

**AMENDED COMPLAINT**                    62

they must be "closely drawn" to a "sufficiently important interest," or else they abridge first amendment freedoms. *McConnell v. FEC*, 540 U.S. 93, 231 (2003); *Buckley* 424 U.S. at 25. The only interest so far found sufficiently important to justify limits on contributions to candidates and their campaigns is the interest in preventing real or apparent corruption from large contributions. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 389 (2000). *See also Buckley*, 424 U.S. at 25–28. The Court utilizes a two-part test for evaluating the government's corruption interest: (1) the contribution must be *large* enough to give rise to a legitimate suspicion of corruption; and (2) there must be a bona fide "suspicion that [the] large contributions are corrupt." *Shrink PAC*, 528 U.S. at 390–91.

161.    The contribution limits imposed by section 3-703(1-a) are substantially lower than the lowest limit the Supreme Court has ever found constitutional and are not *large* enough to give rise to a legitimate suspicion of corruption. Defendants therefore cannot meet their burden to establish the government's corruption interest.

162.    Even if there were a sufficiently important interest to justify the lower contribution limits imposed by section 3-703(1-a), the lower limits are not closely drawn and so cannot pass constitutional scrutiny. New York City established contribution limits in section 3-703(1)(f) in order to prevent corruption or the appearance of corruption. Where the government has "manifested its judgment that the higher limitations are not unacceptably corrupting, . . . the lower limits are not closely drawn to achieve the only governmental purposes sufficient to justify regulation." *California Prolife Council PAC v. Scully*, 989 F.Supp. 1282, 1296 (E.D. Cal. 1998). Rather, the lower limits serve only to "restrict the speech of some elements of our society in order to enhance the relative

**AMENDED COMPLAINT**                    63

voice of others," which is "wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1,

649 (1976) (per curium).

    **163.**    Additionally, the lower contribution limits of section 3-703(1-a) are overinclusive

because they restrict contributions which cannot be justified by the City's anti-corruption interest.

This includes contributions from such people as Lobbyist's-Employee Plaintiff and others similarly

situated to her, whose contributions are being impermissibly restricted. The law restricts even

contributions from the family members of the employees of lobbyists and thereby restricts much

more speech and associational rights than the anti-corruption interest can justify. It also restricts the

speech and associational rights of many persons and entities who meet the definition of those who

have business dealings with the city, yet who have never and would never give contributions in an

attempt to secure a quid-pro-quo benefit. The City's anti-corruption interest cannot justify the

restriction on their speech and associational rights either.

    **164.**    The lower contribution limits of section 3-703(1-a) are also underinclusive because

they fail to restrict contributions from other contributors, including labor organizations and

neighborhood associations, who engage in the same types of activities as those who are defined as

having business dealings with the City. When a regulation is underinclusive in this way, it makes

belief that it is designed to serve the proffered anti-corruption interest "a challenge to the credulous."

*Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002). *See also City of LaDue v.*

*Gilleo*, 512 U.S. 43, 52 (1994) (noting that such underinclusiveness diminishes "the credibility of

the government's rationale for restricting speech in the first place.").

    **165.**    Even if the contribution limits imposed by section 3-703(1-a) were closely drawn to

a sufficiently important governmental interest, they would still fail constitutional scrutiny because

**AMENDED COMPLAINT**         64

they "impose burdens upon First Amendment interests that (when viewed in light of the statute's legitimate objectives) are disproportionately severe." *Randall v. Sorrell*, 126 S. Ct. 2479, 2485 (2006). They both prevent candidates from amassing the resources necessary to mount an effective campaign and also magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage. The limits also are not indexed for inflation, even though the higher, non-business dealings limits set forth in section 3-703(1)(f) are adjusted periodically. Code, § 3-703(7). Thus, these limits "are too low and too strict to survive First Amendment scrutiny." *Randall*, 126 S. Ct. at 2492.

166.    The contribution limits imposed by section 3-703(1-a) are also unconstitutionally overbroad because they burden substantially more associational and speech rights than are justified by the corruption interest. Section 3-703(1-a) reaches even the speech and associational rights of such people as far removed from business dealings with the City as a secretary of a lobbyist, the spouse of an employee of a lobbyist, and the unemancipated child of the spouse of an employee of a lobbyist. Section 3-703(1-a) therefore fails constitutional scrutiny.

167.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

**AMENDED COMPLAINT**                65

## COUNT III

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) UNCONSTITUTIONALLY BURDEN THE SPEECH AND ASSOCIATIONAL RIGHTS OF FAMILY MEMBERS AND EMPLOYEES OF LOBBYISTS.**

168.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

169.    Lobbyist's-Spouse Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code.

170.    She is restricted to the lower contribution limits *not* because she is a lobbyist or engages in lobbying activity, but because she is married to a lobbyist. This has the effect of telling her that she would be able to engage in political speech and association at the normal contribution limits afforded citizens under section 3-703(1)(f), but since she chose to marry someone who has chosen to be a registered lobbyist, she may only contribute at the lower levels imposed by section 3-703(1-a). This is an unconstitutional burden upon her speech and association rights.

171.    Similarly, Lobbyist's-Employee Plaintiff intends to contribute to candidates during the 2009 election cycle, and would like to contribute to the candidate(s) of her choice at the higher contribution limits allowed by section 3-703(1)(f) of the Code. Instead, she is restricted to the lower contribution limits imposed by section 3-703(1-a) of the Code.

172.    She is restricted to the lower contribution limits *not* because she is a lobbyist or engages in lobbying activity, but because she is employed by a lobbyist. This has the effect of telling her that she would be able to engage in political speech and association at the normal contribution

**AMENDED COMPLAINT**                    66

limits afforded citizens under section 3-703(1)(f), but since she chose to exercise her right to secure

employment, she may only contribute at the lower levels imposed by section 3-703(1-a). This is an

unconstitutional burden upon her speech and association rights.

173.    The contribution limits imposed by section 3-703(1-a) are also unconstitutionally

overbroad because they burden substantially more associational and speech rights than are justified

by the corruption interest. Section 3-703(1-a) reaches even the speech and associational rights of

such people as far removed from business dealings with the City as the spouse of an employee of a

lobbyist, the unemancipated children of the spouse of a lobbyist, and the unemancipated children of

the spouse of an employee of a lobbyist. Section 3-703(1-a) therefore fails constitutional scrutiny.

174.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as

applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT IV

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) IMPERMISSIBLY DISCRIMINATE ON THE BASIS OF VIEWPOINT, AND SO INFRINGE RIGHTS GUARANTEED BY BOTH THE FIRST AND FOURTEENTH AMENDMENT.**

175.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all

of the preceding paragraphs.

**AMENDED COMPLAINT**                    67

176.    The contribution limits in section 3-703(1-a) which apply to those having business dealings with the City are severely lower than the limits imposed on others who wish to contribute to candidates and their committees.

177.    Business-Dealings Plaintiffs are defined by the Act as having business dealings with the City and so are subject to these lower contribution limits.

178.    These lower limits do not restrict contributions from *all* those who engage in the activities defined as business-dealing.  Rather, other organizations, such as labor organizations, as well as neighborhood, community or similar associations, are exempted from the lower contribution limits.  Code, § 3-702(20).  This is true even though they engage in the same types of activities, and compete for the same types of contracts, grants, and concessions from the City, as those individuals and entities which are subject to the lower contribution limits.

179.    Labor organizations have a significantly different message than do owners of businesses and members of management.  Owners of businesses and members of the management of companies which have business dealings with the city, however, are subject to the lower contribution limits, while labor organizations and their officers are not.

180.    Similarly, neighborhood and community associations are formed to represent the viewpoint of their community, and they seek to advance the interests of their community's residents.  Their viewpoint and message will at times be different than the viewpoint and message of the business community.

181.    Defendants have offered no appropriate governmental interest which is suitably furthered by treating the speech of labor organizations and their officers differently than it treats the speech of companies with business dealings and the members of their management.  Nor has it

**AMENDED COMPLAINT**                    68

offered an appropriate governmental interest which is suitably furthered by treating the speech of

neighborhood and community associations differently than it treats the speech of entities and persons

who are subject to the business dealings contribution limits. The only basis for making the

distinction is the viewpoint of the speech of the various groups. Therefore, the lower contribution

limits of section 3-703(1-a) are unconstitutional viewpoint restrictions upon speech and associational

rights.

**182.** Even if the City could offer an appropriate governmental interest which is suitably

furthered by the differentiation, there is substantially more speech and associational rights restricted

under section 3-703(1-a) than the interest could possibly justify. The lower contribution limits reach

even the speech and associational rights of such people as far removed from business dealings with

the City as a secretary of a lobbyist, the spouse of an employee of a lobbyist, and the unemancipated

child of the spouse of an employee of a registered lobbyist. Section 3-703(1-a) therefore fails

constitutional scrutiny because it is unconstitutionally overbroad.

**183.** The limits are also impermissible under the Fourteenth Amendment's Equal

Protection clause. "The purpose of the equal protection clause of the Fourteenth Amendment is to

secure every person within the State's jurisdiction against intentional and arbitrary discrimination."

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curium) (quoting *Sioux City Bridge*

*Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (quoting *Sunday Lake Iron Co. v. Township of*

*Wakefield*, 247 U.S. 350, 352 (1918)). When the government differentiates among the speech of

similarly situated individuals or entities, it must be able to state an appropriate governmental interest

which is suitably furthered by the differential treatment. *Mosley*, 408 U.S. at 95. If it cannot do so,

its differential treatment violates the Fourteenth Amendment's Equal Protection clause. *Id.*

**AMENDED COMPLAINT**                    69

184.    With respect to its contribution limits, the City has differentiated between the speech of labor unions and neighborhood and community associations on the one hand, and the speech of the owners of businesses and the members of management on the other.  Labor unions and their officers are free to contribute at the higher limits, as are the members and officers of neighborhood and community associations.  Companies with business dealings and the members of their management, however, may only contribute up to the lower limits.  The City can offer no appropriate governmental interest which is suitably furthered by this differentiation and which would cure its contribution limit from running afoul of the protection afforded by the Equal Protection clause.

185.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT V

**THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) IMPERMISSIBLY FORCE PLAINTIFFS TO CHOOSE BETWEEN CONSTITUTIONALLY GUARANTEED RIGHTS IN VIOLATION OF THE "DOCTRINE OF UNCONSTITUTIONAL CONDITIONS."**

186.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

187.    Lobbyist Plaintiffs meet the definition of "lobbyist" as set forth in section 3-702(16) of the Code, and so are subject to the lower limits on contributions as set forth in section 3-703(1-a)

**AMENDED COMPLAINT**                70

of the Code. They intend to contribute to candidate(s) of their choice in the upcoming New York City elections. They would like to contribute at the higher contribution limits afforded by section 3-703(1)(f) of the Code, but are prohibited from doing so. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(g) of the Code makes their contributions unmatchable.

188.    Lobbyist's-Spouse Plaintiff is the spouse of a registered lobbyist. She intends to contribute to the candidate(s) of her choice in the upcoming New York City elections, and would like to be able to do so at the higher contribution levels allowed by section 3-703(1)(f) of the Code. However, she is restricted by the lower contribution limits imposed upon her by section 3-703(1-a) of the Code. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions are as valuable to the candidate(s) of her choice as are contributions from other citizens. However, contributions from lobbyists' spouses are not matchable under section 3-702(3)(g) of Code.

189.    Lobbyist's-Employee Plaintiff is employed as the secretary of a registered lobbyist. However, she neither engages in lobbying activity, nor is she herself registered as a lobbyist. She intends to contribute to the candidate(s) of her choice in the upcoming New York City elections, and would like to be able to do so at the higher contribution levels allowed by section 3-703(1)(f) of the Code. However, she is restricted by the lower contribution limits imposed upon her by section 3-703(1-a) of the Code. She would also like for her contributions to the candidate(s) of her choice to be matchable, so that her contributions will be as valuable to the candidate(s) of her choice as are

**AMENDED COMPLAINT**                    71

contributions from other citizens. However, contributions from lobbyists' employees such as herself are not matchable under section 3-702(3)(g) of Code.

190.    The government may not force one to give up a constitutional right in order to assert another constitutional right. *Simmons v. United States*, 390 U.S. 377, 394 (1968). Nor may the government condition the receipt of a benefit, such as the right to contribute up to the amount set by the higher contribution limits found in section 3-703(1)(f), on the relinquishment of a constitutionally protected right. *Rust v. Sullivan*, 500 U.S. 173, 196–97 (1991).

191.    The First Amendment prohibits the government from "abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. The First Amendment also prohibits the government from "abridging the freedom of speech." *Id*. Therefore, the right to lobby the government, and the right to engage in expressive activity, are both protected by the First Amendment. Section 3-703(1-a) forces Lobbyist Plaintiffs to choose between these constitutionally protected rights. *Either* they may fully exercise their rights of speech and association by contributing to the candidate(s) of their choice at the higher contribution levels afforded other citizens by section 3-703(1)(f) of the Code, *or* they may engage in lobbying activities.

192.    Similarly, Lobbyist's-Employee Plaintiff is forced to choose between constitutionally protected rights. *Either* she may exercise her rights of speech and association by contributing to the candidate(s) of her choice at the higher contribution levels afforded other citizens by section 3-703(1)(f) of the Code, *or* she may exercise her right to pursue a livelihood. This unconstitutionally burdens her right to make political contributions.

193.    Similarly, Lobbyist's-Spouse Plaintiff is forced to choose between constitutionally protected rights. *Either* she may exercise her rights of speech and association by contributing to the

**AMENDED COMPLAINT**                    72

candidate(s) of her choice at the higher contribution levels afforded other citizens by section 3-703(1)(f) of the Code, *or* she may exercise her right to marry the person she desires, if that person happens to be a lobbyist (as is the case for Lobbyist's-Spouse Plaintiff). This unconstitutionally burdens her right to make political contributions.

194.    Section 3-703(1-a) is also unconstitutionally overbroad in that it reaches substantially more speech than is justified by the anti-corruption interest. *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).

195.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

    (2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

    (3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT VI

### THE CONTRIBUTION LIMITS IMPOSED BY SECTION 3-703(1-a) IMPERMISSIBLY BURDEN THE FIRST AMENDMENT RIGHT TO LOBBY BY IMPOSING UPON LOBBYISTS LOWER CONTRIBUTION LIMITS.

196.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

197.    Lobbyist Plaintiffs meet the definition of "lobbyist" as set forth in section 3-702(16) of the Code, and so are subject to the lower limits on contributions as set forth in section 3-703(1-a) of the Code. They would like to contribute at the higher contribution limits afforded by section

**AMENDED COMPLAINT**                73

3-703(1)(f) of the Code, but are prohibited from doing so. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(g) of the Code makes their contributions unmatchable.

**198.** The right to lobby the government is a First Amendment right.

**199.** Section 3-703(1-a) unconstitutionally burdens Lobbyist Plaintiffs' First Amendment right to lobby by imposing a lower contribution limit upon those who engage in this protected First Amendment activity. This burden is not narrowly tailored to a compelling governmental interest and so fails constitutional scrutiny.

**200.** Section 3-703(1-a) is also overbroad in that it unconstitionally burdens substantially more First Amendment freedoms than is justified by the anti-corruption interest.

**201.** WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1) Declare Code, § 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2) Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3) Grant Plaintiffs such other relief as may be just and equitable.

## COUNT VII

### THE PROHIBITION AGAINST CONTRIBUTIONS IMPOSED BY SECTION 3-703(1)(l) IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.

**202.** Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**AMENDED COMPLAINT**                     74

203.     Section 3-703(1)(l) of the Code prohibits candidates and their principal committees or authorized committees from accepting "any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership, or partnership" other than one organized as a political committee. Code, § 3-703(1)(l).

204.     Plaintiffs Martina Franca Associates, LLC and Reiter/Begun Associates, LLC are both organized under the applicable state laws as a limited liability company. Both have elected to be taxed as a partnership. Both companies would like to make contributions to the candidate(s) of their choice and would in fact do so, but for the prohibition against such contributions found in section 3-703(1)(l) of the Code.     The prohibition against their contributions therefore unconstitutionally burdens their speech and association rights.

205.     Candidate Plaintiffs would like to solicit contributions from limited liability companies, limited liability partnerships, partnerships, and corporations so as to raise money to engage in political speech. The prohibition against contributions imposed by section 3-703(1)(l) of the Code thereby unconstitutionally burdens Candidate Plaintiffs' speech. Candidate Plaintiffs also reasonably believe that the prohibition against accepting contributions from limited liability companies, limited liability partnerships, and partnerships imposed by section 3-703(1)(l) will prevent them from amassing the resources necessary to mount an effective campaign.

206.     The Supreme Court has recognized that "the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form." *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 500–01 (1985). This is because state law grants corporations special advantages, such as "favorable treatment of the accumulation and distribution of assets" which "enhance their ability to

**AMENDED COMPLAINT**                    75

attract capital and deploy their resources." *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–59 (1990). However, the Court has affirmed that "the mere fact that corporations may accumulate large amounts of wealth" is not sufficient justification for restricting the ability of corporations to participate in the political process; rather, the justification comes from "the unique state-conferred corporate structure that facilitates the amassing of large treasuries." *Id.* at 660.

207.    Such justification is absent with respect to Plaintiffs Martina Franca Associates, LLC and Reiter/Begun Associates, LLC. They do not have the same "unique state-conferred corporate structure" as corporations, nor can they receive the same "favorable treatment of the accumulation and distribution of assets" as corporations. Rather, while they "may be able to amass large treasuries, they do so without the significant state-conferred advantages of the corporate structure." *Austin*, 494 U.S. at 665. Therefore, section 3-703(1)(l) is not narrowly tailored because it is not closely drawn to a sufficiently important interest, but is overinclusive.

208.    The prohibition on contributions imposed by section 3-703(1)(l) is also underinclusive in that it exempts contributions from doctors, lawyers, and CPAs from scrutiny to determine whether the source of the contribution is one of the prohibited business models.

209.    The prohibition on contributions imposed by section 3-703(1)(l) is also overbroad because it unconstitutionally burdens substantially more associational and speech rights than are justified by the anti-corruption interest. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

210.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(1)(l) facially unconstitutional and unconstitutional as applied;

**AMENDED COMPLAINT**                76

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT VIII

**THE DESIGNATION OF SOME CONTRIBUTIONS AS "UNMATCHABLE" BY SECTION 3-702(3) IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.**

**211.**    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**212.**    Business-Dealings Plaintiffs intend to make contributions to various candidates during the 2009 election cycle. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(h) of the Code makes their contributions unmatchable. This unconstitutionally burdens their First Amendment speech and associational rights.

**213.**    Lobbyist Plaintiffs, Lobbyist's-Spouse Plaintiff, and Lobbyist's-Employee Plaintiff intend to make contributions to various candidates during the 2009 election cycle. They would also like their contributions to be matchable if given to participating candidates, so that their contributions will be as helpful to the candidates of their choice as are the contributions of other citizens. However, section 3-702(3)(g) of the Code makes their contributions unmatchable. This unconstitutionally burdens their First Amendment speech and associational rights.

**214.**    Participating Candidate Plaintiffs have previously run for election for office as participating candidates. They would like to run for office again. They reasonably believe that they

**AMENDED COMPLAINT**                77

would receive contributions which are treated as unmatchable under the Act. They reasonably believe that the unmatchable nature of these contributions will prevent them from amassing the resources necessary to mount an effective campaign. Consequently, they have determined that they cannot run for office so long as the prohibition against matching contributions subject to the lower contribution limits remains in place. This unconstitutionally burdens their First Amendment rights.

215.    Plaintiffs Bennett and Vazquez-Hernandez, both of whom are part of the group of plaintiffs identified as "Participating Candidate Plaintiffs," reasonably believe that they will not receive significant financial support from labor unions.

216.    Party Plaintiffs seek to place candidates from their party on the ballot for every office in the City elections. They reasonably believe that some of their candidates will run as participating candidates who would receive contributions which are treated as unmatchable under the Act. They reasonably believe that the effect of the unmatchable nature of these contributions will be to prevent their parties' candidates from being able to amass the resources necessary to mount an effective campaign. This unconstitutionally burdens their candidates' First Amendment speech and associational rights. It also unconstitutionally burdens Party Plaintiffs' First Amendment speech right to engage in political speech. Party Plaintiffs communicate their parties' message through the speech of their candidates. Thus, if the effect of the Act is to keep their candidates from amassing the resources necessary to mount effective campaigns, the Act unconstitutionally burdens Party Plaintiffs' speech.

217.    The Supreme Court in *Buckley v. Valeo* noted that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 649. Defendants' decision to make

**AMENDED COMPLAINT**                 78

Plaintiff Contributors' contributions unmatchable does just that: it enhances the relative voice of other contributors by matching their contributions, and quiets the voice of Plaintiff Contributors by not matching their contributions, in violation of the First Amendment. Defendants have no sufficiently important interest which can justify this decision.

218.    Defendants' decision to make contributions from persons or entities defined as having business dealings with the City unmatchable, while choosing to match contributions from labor unions and their officers and members, also works to enhance the political speech of candidates who are supported by unions by providing them with matching dollars, thereby helping them to 'shout' over the speech of candidates who are supported by business interests, such as Plaintiffs Bennett and Vazquez-Hernandez.

219.    Furthermore, section 3-702(3) is overinclusive because it prohibits matching contributions from more contributors than any proffered interest could possibly justify. For instance, the contributions from the spouse of the secretary of a lobbyist are unmatchable, as are the contributions from an unemancipated child of that spouse from a previous relationship. Such limits cannot be justified by the City's anti-corruption interest. They are therefore not closely drawn.

220.    Section 3-702(3) is also underinclusive because it allows the matching of contributions from other contributors, such as labor organizations and neighborhood associations, who engage in the same types of activities as those defined to have business dealings with the City.

221.    Even if the prohibition against matching contributions from the persons specified by § 3-702(3) were closely drawn to a sufficiently important governmental interest, they would still fail constitutional scrutiny because they "impose burdens upon First Amendment interests that (when viewed in light of the statute's legitimate objectives) are disproportionately severe." *Randall v.*

**AMENDED COMPLAINT**                    79

*Sorrell*, 126 S. Ct. 2479, 2485 (2006). They both prevent candidates from amassing the resources necessary to mount an effective campaign and also magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage, and so "are too low and too strict to survive First Amendment scrutiny." *Randall*, 126 S. Ct. At 2492.

222.    The prohibition against matching certain contributions imposed by section 3-702(3) is also overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by the anti-corruption interest. Section 3-702(3) therefore fails constitutional scrutiny.

223.    WHEREFORE, the Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-702(3) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT IX

**THE DESIGNATION OF SOME CONTRIBUTIONS AS "UNMATCHABLE" BY SECTION 3-702(3) IMPERMISSIBLY DISCRIMINATES ON THE BASIS OF VIEWPOINT, AND SO INFRINGES RIGHTS GUARANTEED BY BOTH THE FIRST AND FOURTEENTH AMENDMENT.**

224.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

225.    Business-Dealings Plaintiffs and Lobbyist's-Employee Plaintiff are all subject to the limitations imposed by Section 3-703(1-a). All these plaintiffs intend to make contributions to

**AMENDED COMPLAINT**                    80

various candidates during the 2009 election cycle. The contributions they give to the candidate(s) of their choice will be unmatchable. Code, § 3-702(3).

226.    When the State opens a forum for speech, the State cannot discriminate on the basis of viewpoint. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829–30 (1995); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392–93 (1993). Although fora are often spatial, they may also be metaphysical, such as when the State awards money to groups to help them speak or amplify their voice. *Rosenberger*, 515 U.S. at 830.

227.    By instituting the Program providing matching funds, Defendants opened a metaphysical forum within which they must not discriminate on the basis of the message of the speaker.

228.    Defendants discriminate on the basis of viewpoint against Business-Dealings Plaintiffs. Defendants amplify the speech and associational rights of contributors who are not defined as ones having business dealings with City by providing matching funds for their contributions, but will not provide matching funds for the contributions of Business-Dealings Plaintiffs. Yet, Defendants do not apply this rule fairly across the board, but discriminate on the basis of the message of the contributor. Some entities, such as labor organizations, are exempted from the lower contribution limits, even though they engage in the same types of activities as those individuals and entities which are subject to the lower contribution limits. Labor organizations have a significantly different message than do owners of businesses and members of management. Contributions from owners of businesses and members of the management of companies which have business dealings with the city, however, may not be matched, while contributions from labor

**AMENDED COMPLAINT**                81

organizations and their officers are fully matchable.   The only basis for making this distinction is the viewpoint and message of the groups.

    **229.**    The prohibition against matching certain contributions imposed by section 3-702(3) is also overbroad because, even if the government were not engaging in viewpoint discrimination, the section unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by the anti-corruption interest.  Section 3-702(3) therefore fails constitutional scrutiny.

    **230.**    The prohibitions against matching contributions from those defined as having business dealings with the City and the others enumerated in section 3-702(3) of the Code is also impermissible under the Fourteenth Amendment's Equal Protection clause.

    **231.**    WHEREFORE, Plaintiffs respectfully pray the Court to:

    (1)   Declare Code, § 3-702(3) facially unconstitutional and unconstitutional as applied;

    (2)   Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

    (3)   Grant Plaintiffs such other relief as may be just and equitable.

**COUNT X**

**THE REPORTING REQUIREMENTS IMPOSED BY SECTION 3-213 ARE UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.**

    **232.**    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**AMENDED COMPLAINT**       82

233.    Lobbyist's-Employee Plaintiff is employed as the secretary of a registered lobbyist. She neither engages in lobbying activity, nor is she registered as a lobbyist.

234.    Lobbyist Plaintiffs engage in lobbying and are registered lobbyists under the applicable law.

235.    On the Annual Statement of Registration, Lobbyist Plaintiffs are required to list, among other things, the following information about themselves, their families, and their employees:

   (a)    The name, home and business addresses and business telephone number of the lobbyist;

   (2)    The name and home and business addresses of the spouse or domestic partner of the lobbyist;

   (3)    If the lobbyist is an organization, the name, home and business addresses and business telephone number of any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization and the name and home and business addresses of the spouse or domestic partner of such officers or employees.

Code, § 3-213(c)(1).

236.    Lobbyist's-Employee Plaintiff's employer must also file the Annual Statement of Registration on or before January 1 of each calendar year. Code, § 3-213(a)(2). Because Lobbyist's-Employee Plaintiff is employed by a registered lobbyist, her name and home address is required to be listed. If she chooses to have a spouse or domestic partner, her spouse or domestic partner must be listed as well.

**AMENDED COMPLAINT**                83

237.    The information supplied on these Annual Statements of Registration is kept in electronic form in the city clerk's office and is available for public inspection. Code, § 3-213(b). It is also included in the Doing Business Database. Code, § 3-702(20). In spite of the City's pledge that the names and home addresses of employees and officers of lobbyists, and the spouses of employees and officers, are not supposed to be made available to the public, Lobbyist's-Employee Plaintiff complains that being forced to supply her name and home address to the government forces her to supply information to the government which the government does not need, and places her at risk of her personal information being inadvertently disclosed to the public.

238.    The Supreme Court has recognized a right to associate with others free from government scrutiny, and the government may only force the disclosure of the members of an association when there is a compelling state interest. *NAACP v. Alabama*, 357 U.S. 449 (1958). Similarly, Lobbyist's-Employee Plaintiff should be allowed to choose to associate for employment purposes with a registered lobbyist with the reasonable expectation that her name and home address will not be disclosed to the government because of that association, absent a compelling state interest. In the same vein, Lobbyist's-Employee Plaintiff should have the right to be married or have a domestic partner without the fear that the government will require the disclosure of her spouse or domestic partner on a lobbyist's Annual Statement of Registration. Such disclosure burdens the first amendment rights of Lobbyist's-Employee Plaintiff. Absent a compelling state interest, such disclosure should be unconstitutional.

239.    Even if there is a compelling state interest for some disclosure, the law is not narrowly tailored. Because it requires the disclosure of such persons as the spouse of a lobbyist's employee,

**AMENDED COMPLAINT**                          84

even when neither the employee nor the employee's spouse engages in lobbying activities, it is overinclusive.

240.    Section 3-213 also requires lobbyists to file an Amended Statement of Registration within 48 hours of any political contribution made by the unemancipated child of the lobbyist or the lobbyist's spouse or domestic partner, as well as the unemancipated children of the lobbyist's officers and employees. The Amended Statement of Registration shall include the name of the unemancipated child, the child's home address, and the home and business addresses of the child's parent. Code, § 213(d)(2). This law unconstitutionally chills the political speech of unemancipated children and is overinclusive, as it is not closely drawn to a substantial governmental interest.

241.    Lobbyist Plaintiffs also complain that forcing them to list the names and home addresses of their officers and employees, and the names of the spouses and domestic partners of their officers and employees, forces them to participate in the violation of the listed persons' constitutional rights, and violates their own constitutional rights. As recognized by *NAACP v. Alabama*, Lobbyist Plaintiffs have a First Amendment right to refuse to disclose their members, absent a compelling state interest. Lobbyist Plaintiffs complain that section 3-213 violates that right and forces them to disclose the names of their employees, and their employees' spouses and children.

242.    Lobbyist Plaintiffs also complain that this requirement reaches so far that it unconstitutionally burdens their First Amendment right to lobby. Lobbyist Plaintiffs do not challenge the requirement that they file Annual Registration Statements. However, they do object to the requirement that if a political contribution is made by the unemancipated child of their employee, the unemancipated child of their employee's spouse, or the unemancipated child of their employee's domestic partner, they must file an Amended Registration Statement to report that

**AMENDED COMPLAINT**                    85

contribution within forty-eight hours of the time it was made, and also must disclose the child's name and address. Lobbyist Plaintiffs assert that this requirement unfairly forces them to be omniscient with regard to the political activities of their employees' children. Such a requirement unconstitutionally burdens their First Amendment right to engage in lobbying activity.

243.    The reporting requirement imposed by section 3-213 is also unconstitutionally overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by any proffered anti-corruption interest.

244.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-213 facially unconstitutional and unconstitutional as applied;

(2)    Order the Defendants to fully expunge Lobbyist's-Employee Plaintiff's information gleaned from the Annual Registration Statement of her employer from their records, including but not limited to the entry kept in electronic form in the Office of the City Clerk as provided for by section 3-213(b) of the Code, as well as the entry kept in the Doing Business Database as provided for by section 3-702(20) of the Code,;

(3)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(4)    Grant Plaintiffs such other relief as may be just and equitable.

**AMENDED COMPLAINT**                86

## COUNT XI

### THE TRIGGERING PROVISION PROVIDED BY SECTION 3-705(7) IMPERMISSIBLY CHILLS THE POLITICAL SPEECH OF CANDIDATES AND THE SPEECH AND ASSOCIATIONAL RIGHTS OF CONTRIBUTORS.

245.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

246.    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

247.    Contributor Plaintiffs intend to contribute to candidates in the upcoming elections. They give financial support to candidates with whom they agree on political issues, irrespective of whether those candidates are classified as participating or non-participating candidates.

248.    The Triggering Provision of section 3-705(7) provides that when Non-Participating Candidate Plaintiff raises contributions, or when he spends, or contracts or becomes obligated to spend, or both, an amount greater than one-fifth of the expenditure limit for the office for which he is running, his participating opponents will become eligible to receive *four times* the amount of public funds they would otherwise be eligible to receive. Code, § 3-705(7).

249.    Because Non-Participating Candidate Plaintiff will run for City Council, this means that if he raises in contributions, or spends or becomes obligated to spend, more than $32,200, his participating opponents will be able to receive four times the amount of public funds they would otherwise be eligible for. This means that they will be eligible to receive $88,550 in matching funds.

**AMENDED COMPLAINT**                            87

**250.**    The Triggering Provision of section 3-705(7) acts to chill Non-Participating Candidate Plaintiff's political speech with regard to his expenditures. He cannot spend money that he raises on his campaign without risking tripping the trigger and assisting his participating opponents. He cannot even spend his own money on his campaign without suffering that risk. This unconstitutionally chills Non-Participating Candidate Plaintiff's speech, making it impossible for him to speak without worrying about potentially assisting his opponents, and is not narrowly tailored to a compelling governmental interest.

**251.**    The Triggering Provision of section 3-705(7) also acts as an unconstitutional expenditure limit, both on Non-Participating Candidate Plaintiff's ability to spend money that he raises from others, and also on his ability to spend his own money on his campaign. With regard to spending in general, *Buckley* taught that "The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people individually as citizens and candidates and collectively as associations and political committees who must retain control over the quantity and range of debate on public issues in a political campaign." *Buckley*, 424 U.S. at 57 (holding that a restriction on a candidate's spending on his own campaign was unconstitutional). Furthermore, "The First Amendment simply cannot tolerate . . . restriction[s] upon a candidate to speak without legislative limit on behalf of his own candidacy." Therefore, "restriction[s] on a candidate's personal expenditures [are] unconstitutional." *Id.* at 54.

**252.**    The Triggering Provision of section 3-705(7) also burdens Contributor Plaintiffs' rights of speech and association. They cannot contribute to non-participating candidates of their choice without risking that they will inadvertently assist their chosen candidates' opponents. This

**AMENDED COMPLAINT**                    88

unconstitutionally burdens and chills their speech and associational rights, and is not closely drawn

to a sufficiently important governmental interest.

253.    The Triggering Provision of section 3-705(7) is also unconstitutionally overbroad

because it unconstitutionally burdens substantially more associational and speech rights than could

possibly be justified by any proffered governmental interest.

254.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-705(7) facially unconstitutional and unconstitutional as

applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

<u>COUNT XII</u>

**THE TRIGGERING PROVISION PROVIDED BY SECTION 3-705(7) IS IMPERMISSIBLY VAGUE.**

255.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all

of the preceding paragraphs.

256.    Non-Participating Candidate Plaintiff will register to run for office for City Council

in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not

elect to participate in public financing, but will run as a non-participating candidate. He will seek

contributions from contributors, and reasonably believes that he will be able to raise in excess of one

hundred thousand dollars ($100,000) in support of his campaign.

**AMENDED COMPLAINT**                    89

257. Section 3-705(7) provides that the amount of public funds a participating candidate is eligible to receive increases when the Board determines that his or her opponent or his or her opponents authorized committees "have spent or contracted or *have obligated to spend . . .*" above a threshold amount. Code, § 3-705(7)(a). It is unclear from the Act how "have obligated to spend" differs from "contracted to spend." This section is unconstitutionally vague, leaving Non-Participating Candidate Plaintiff with no way to know when his political speech may trigger additional public funds for his opponent.

258. Section 3-705(7)(b)(1) provides a second opportunity for a participating candidate to receive additional public money to support his or her campaign against a non-participating opponent. To qualify for this extra public money, the participating candidate must submit to the Board a certified signed statement that he or she needs additional public funds, and must demonstrate for the Board that his or her non-participating opponent has the *"ability to self finance."* Code, § 3-705(7)(b)(1). The Act does not explain what "the ability to self finance" means, or when this standard has been met. This language is unconstitutionally vague.

259. In addition to being unconstitutionally vague, the Triggering Provision of section 3-705(7) is also unconstitutionally overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by any proffered governmental interest.

260. WHEREFORE, Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-705(7) facially unconstitutional and unconstitutional as applied;

**AMENDED COMPLAINT**        90

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XIII

### THE TRIGGERING PROVISIONS PROVIDED BY SECTION 3-706(3) IMPERMISSIBLY CHILLS THE POLITICAL SPEECH OF CANDIDATES AND THE SPEECH AND ASSOCIATIONAL RIGHTS OF CONTRIBUTORS.

**261.**    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**262.**    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

**263.**    Contributor Plaintiffs support candidates with whom they agree on political issues, irrespective of whether they are participating or non-participating candidates. They intend to contribute money to the candidate(s) of their choice in the upcoming New York City elections.

**264.**    The two Triggering Provisions of section 3-706(3) provide that when Non-Participating Candidate Plaintiff spends or becomes obligated to spend above a certain threshold amount, or when he raises contributions above a certain threshold amount, his participating opponents will receive extra public funds in matching money and will also have their expenditure limits raised or even eliminated. The threshold amount is as low as a penny over fifty percent of the applicable expenditure limit for the office. Code, § 3-706(3). Because Non-Participating

**AMENDED COMPLAINT**                91

Candidate Plaintiff intends to run for City Council, the first trigger will be tripped when he raises or spends in excess of $80,500.

265.    Under the Act, participating candidates are already eligible to receive six dollars ($6) for every one dollar ($1) of matchable contributions, up to one thousand fifty dollars ($1,050) in public funds per contributor.  Code, § 3-705(2)(a).  When the first trigger is tripped, as Non-Participating Candidate Plaintiff reasonably believes it will be, his participating opponents will be eligible to receive up to one thousand two hundred fifty dollars ($1,250) in public funds per contributor, *and* will have their expenditure limits increased to one hundred fifty percent (150%) of the usual expenditure limit for the given office.  Additionally, the total amount of public money for which his participating opponent is eligible will increase from the usual one-quarter of fifty-five percent of the applicable expenditure limit, to sixty-seven percent of the applicable expenditure limit.  Code, § 3-706(3)(a)(iii).  In other words, his participating opponents will be eligible to receive $107,870 in public funds, because Non-Participating Candidate Plaintiff raised or spent $80,500.

266.    If Non-Participating Candidate Plaintiff raises or spends an amount which exceeds three times the total applicable expenditure limit for the office for which he is running, his participating opponents will be eligible to receive up to one thousand five hundred dollars ($1,500) in public funds per contributor, *and* will no longer be subject to expenditure limits.  Additionally, the total amount of public money for which his participating opponent is eligible will increase from the usual one-quarter of fifty-five percent of the applicable expenditure limit, to one hundred twenty-five percent of the applicable expenditure limit.  Code, § 3-706(3)(b)(iii).

267.    The Triggering Provision acts to unconstitutionally chill Non-Participating Candidate Plaintiff's political speech with regard to his expenditures.  He cannot spend money that he raises

**AMENDED COMPLAINT**                    92

on his campaign without risking tripping the trigger and assisting his participating opponents. He cannot even spend his own money on his campaign without suffering that risk. This unconstitutionally chills Non-Participating Candidate Plaintiff's speech, making it impossible for him to speak without worrying about potentially assisting his opponents, and is not narrowly tailored to a compelling governmental interest.

268.    The Triggering Provision also acts as an impermissible expenditure limit, both on Non-Participating Candidate Plaintiff's ability to spend money that he raises from others, and also on his ability to spend his own money on his campaign.

269.    The Triggering Provision also acts to burden Contributor Plaintiffs' rights of speech and association. They cannot contribute to non-participating candidates of their choice without risking that they will inadvertently assist their chosen candidates' opponents. This unconstitutionally chills their speech and associational rights, and is not closely drawn to a sufficiently important governmental interest.

270.    The Triggering Provisions of section 3-706(3) are also unconstitutionally overbroad because they unconstitutionally burden substantially more associational and speech rights than could possibly be justified by any proffered governmental interest.

271.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-706(3) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

**AMENDED COMPLAINT**                                93

## COUNT XIV

### THE TRIGGERING PROVISIONS PROVIDED BY SECTION 3-706(3) IS IMPERMISSIBLY VAGUE.

272.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

273.    Non-Participating Candidate Plaintiff will register to run for office for City Council in the 2009 election. He does not currently hold office, and so will run as a challenger. He will not elect to participate in public financing, but will run as a non-participating candidate. He will seek contributions from contributors, and reasonably believes that he will be able to raise in excess of one hundred thousand dollars ($100,000) in support of his campaign.

274.    The Triggering Provisions of Section 3-706(3) are triggered when a participating candidate's non-participating opponent and/or authorized committees "have spent or contracted or *have obligated to spend* . . ." above the applicable threshold amounts. It is unclear from the Act how "have obligated to spend" differs from "contracted to spend." This section is unconstitutionally vague, leaving Non-Participating Candidate Plaintiff with no way to know when his political speech may trigger additional public funds for his opponent.

275.    In addition to being unconstitutionally vague, the Triggering Provisions of section 3-706(3) are also unconstitutionally overbroad because they unconstitutionally burden substantially more associational and speech rights than could possibly be justified by any proffered governmental interest.

276.    WHEREFORE, Plaintiffs respectfully pray the Court to:

**AMENDED COMPLAINT**                94

(1)     Declare Code, § 3-706(3) facially unconstitutional and unconstitutional as

applied;

(2)     Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)     Grant Plaintiffs such other relief as may be just and equitable.

**COUNT XV**

## SECTION 3-709.5 IMPERMISSIBLY COMPELS PARTICIPATION IN PUBLIC FINANCING.

**277.**     Plaintiffs re-allege and incorporate by reference all of the allegations contained in all

of the preceding paragraphs.

**278.**     Non-Participating Candidate Plaintiff intends to run for City Council as a non-

incumbent, non-participating candidate in 2009.  Because he is running as a challenger, it is

imperative that he be able to get name recognition with voters and allow them to hear his message;

for, as Defendants acknowledge, "the strongest predictor of electoral success is incumbency." NEW

YORK CITY CAMPAIGN FINANCE BOARD, THE IMPACT OF HIGH-SPENDING NON-PARTICIPANTS ON

THE CAMPAIGN FINANCE PROGRAM 3 (2006).

**279.**     The Act establishes mandatory debates, in which participating candidates are required

to participate.  Code, § 3-709.5(1)(a).  In the case of a primary, the debate shall be among the

participating candidates who are seeking nomination of the same political party.  Code, § 3-

709.5(1)(c).  Defendants delegate authority for promulgating rules for the debates to whichever

organizations are chosen to sponsor the debates.  Code, § 3-709.5(4).  The debate sponsors and the

Campaign Finance Board shall together establish "non-partisan, objective, and non-discriminatory

**AMENDED COMPLAINT**                    95

criteria" for determining which participating candidates are eligible to take part; and, only those participating candidates who meet the established criteria may take part. Code, § 3-709.5(5)(b)(i). For each debate, the Board shall provide the sponsor with a list of all eligible participating and limited participating candidates. Code, § 3-709.5(8).

280.    Non-participating candidates, however, are not guaranteed a place in the debate, even if they meet all the "non-partisan, objective, and non-discriminatory criteria" established by the sponsors and the Board. Code, § 3-709.5(5)(b)(ii). Nor is the Board required to provide the debate sponsor with a list of non-participating candidates so as to alert the sponsor as to who the non-participating candidates are.

281.    Because Non-Participating Candidate Plaintiff intends to run for nomination for office as a non-participating candidate, he faces the danger of being excluded from the debate, even if he meets all the objective criteria. Non-Participating Candidate Plaintiff will suffer irreparable harm if he is not allowed to participate in the debate, because the sponsored debates are one of the chief ways by which candidates get their message out to the voters and establish name recognition. Yet, the Act provides him no assurance that he will be allowed to participate in the debate if he meets all the requirements.

282.    Under *Buckley*, public funding systems are unconstitutional if they are not voluntary. Yet section 3-709.5 coerces candidates, such as Non-Participating Candidate Plaintiff, to participate in the public financing Program by denying them the promise of participation in the City sponsored debates unless they choose to become participating candidates. During the primary race especially, but also during the general race as well, participation in the debates can be crucial to a candidate's ability to establish name-recognition with the electorate and communicate his message. The

**AMENDED COMPLAINT**                96

potential exclusion of Non-Participating Candidate Plaintiff, and the coercion it produces, unconstitutionally infringes upon Non-Participating Candidate's First Amendment freedom to choose not to participate in public financing, as explained by *Buckley*.

**283.** Section 3-709.5 is also unconstitutionally overbroad because it unconstitutionally burdens substantially more First Amendment rights than could possibly be justified by any proffered governmental interest.

**284.** WHEREFORE, Plaintiffs respectfully pray the Court to:

    (1)    Declare Code, § 3-709.5 facially unconstitutional and unconstitutional as applied;

    (2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

    (3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XVI

### THE REPORTING REQUIREMENT IMPOSED BY SECTION 3-703(6) IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.

**285.** Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**286.** Section 3-703(6) requires candidates and their committees to report, for every contribution, "the full name, residential address, occupation, employer, and business address" of each contributor. Code, § 3-703(6)(a). However, the occupation, employer, and business address of contributors making contributions aggregating not more than ninety-nine dollars ($99) need not be disclosed, *unless* the contributor is employed by a participating or limited participating candidate,

**AMENDED COMPLAINT**           97

is the spouse or domestic partner of such candidate, or is an entity in which in which an ownership interest of ten percent or more is held by such a candidate or his or her spouse or domestic partner. Code, § 3-703(6)(b)(iii).

287.    Non-Participating Candidate Plaintiff will run for office in the upcoming election, and will seek to raise contributions. Participating Candidate Plaintiffs have run for election in the past and would like to run for election, but reasonably believe they are unable to mount an effective campaign because of the regulations imposed by the Act, including the reporting requirements found in section 3-703(6). These plaintiffs reasonably believe that forcing contributors to disclose their personal and employment information discourages contributors from making contributions to their campaigns, thereby unconstitutionally burdening their First Amendment speech and associational rights.

288.    Party Plaintiffs seek to place candidates from their party on the ballot for every office in the City elections. They reasonably believe that candidates from their Parties are unable to mount an effective campaign because of the regulations imposed by the Act, including the reporting requirements found in section 3-703(6). These plaintiffs reasonably believe that forcing contributors to disclose their personal and employment information discourages contributors from making contributions to candidates from their Parties. This unconstitutionally burdens Party Plaintiffs' First Amendment right to engage in political speech. Party Plaintiffs engage in such speech by communicating their political views through the political speech of their candidates, which they will be unable to do if their candidates cannot raise adequate funds to campaign for office as a result of the new, lower contribution limits.

**AMENDED COMPLAINT**                    98

289.    Contributor Plaintiffs intend to contribute to candidates of their choice in the upcoming election. They object, however, to the disclosure requirement found in section 3-703(6). It unconstitutionally chills their speech and associational rights and is not closely drawn to a sufficiently important government interest.    Rather, it is overinclusive in that there is no governmental interest in knowing the occupation, employer, and business address of contributors who contribute at such low levels as contemplated by the statute.

290.    The reporting requirement imposed by section 3-703(6) is also unconstitutionally overbroad because it unconstitutionally burdens substantially more associational and speech rights than could possibly be justified by the anti-corruption interest.

291.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-703(6) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XVII

**SECTIONS 3-702(3), 3-703(1-a), AND 3-703(1)(l) IMPERMISSIBLY VIOLATE THE RIGHTS OF PROTECTED MINORITY VOTERS UNDER SECTION 2 OF THE VOTING RIGHTS ACT, AND ALSO UNCONSTITUTIONALLY INFRINGE UPON THEIR FOURTEENTH AMENDMENT RIGHTS.**

292.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**AMENDED COMPLAINT**                           99

293.    Hispanic-American Minority Voter Plaintiffs are Hispanic-Americans who are eligible and registered to vote. All things being equal, they would choose to vote for Hispanic-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Hispanic-American community. They represent the Hispanic-American Minority Voter Plaintiff class whose membership is composed of all similarly situated Hispanic-Americans who are eligible and registered to vote in New York City.

294.    Black and African-American Minority Voter Plaintiffs are Black and African-Americans who are eligible and registered to vote. All things being equal, they would choose to vote for Black and African-American candidates, believing them likely to be sympathetic and responsive to the needs and concerns of the Black and African-American community. They represent the Black and African-American Minority Voter Plaintiff class whose membership is composed of all similarly situated Black and African-Americans who are eligible and registered to vote in New York City.

295.    Section 2 of the Voting Rights Act provides in pertinent part:

(1)    No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(2)    A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally

**AMENDED COMPLAINT**                    100

open to participation by members of a class of citizens protected by

subsection (a) of this section in that its members have less opportunity than

other members of the electorate to participate in the political process and to

elect representatives of their choice.

42 U.S.C. § 1973(a), (b).

**296.**    The Hispanic-American and Black and African-American Minority Voter Plaintiffs

reasonably believe that New York City experiences racial bloc voting, among Whites and among

Hispanic-Americans and among Black and African-Americans, as demonstrated by Dr. Lisa

Handley's 2003 study, A VOTING RIGHTS ACT EVALUATION OF THE NEW YORK CITY REDISTRICTING

PLAN (March 18, 2003).

**297.**    Therefore, Hispanic-American Minority Voter Plaintiffs reasonably believe that New

York City's Hispanic-American community is likely to vote for Hispanic-American candidates as

their candidates of choice.  Yet, the changes instituted by LL No. 34 with regard to contributions

from those having business dealings with the City and the changes with regard to contributions from

LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Hispanic-American

community to participate in the political process and elect the community's candidates of choice.

Candidates supported by the Hispanic-American community will not have the financial resources

to become candidates and to campaign for office.  This will place the Hispanic-American voting

community in general, and them in particular, in a much weaker position than they were prior to the

implementation of the changes instituted by LL No. 34, by diluting their vote and the vote of the

Hispanic-American voting community.

**AMENDED COMPLAINT**                101

298.    Similarly, Black and African-American Minority Voter Plaintiffs reasonably believe that New York City's Black and African-American community is likely to vote for Black and African-American candidates as their candidates of choice.  Yet, the changes instituted by LL No. 34 with regard to contributions from those having business dealings with the City and the changes with regard to contributions from LLCs, LLPs, and partnerships will reduce or eliminate the ability of the Black and African-American community to participate in the political process and elect the community's candidates of choice.  Candidates supported by the Black and African-American community will not have the financial resources to become candidates and to campaign for office. This will place the Black and African-American voting community in a much weaker position than they were prior to the implementation of the changes instituted by LL No. 34, by diluting the voting strength of the Black and African-American voting community.

299.    Therefore, both the Hispanic-American and the Black and African-American Minority Voter Plaintiffs complain that the changes instituted by LL No. 34 to New York City's Campaign Finance Law—namely, sections 3-702(3), 3-703(1-a), and 3-703(1)(l) of the Code—are in direct violation of Section 2 of the Voting Rights Act.  These changes will act to dilute the vote of the Hispanic-American and the Black and African-American communities, thereby impeding their ability to participate in the political process and nominate candidates for office.

300.    Hispanic-American and Black and African American Minority Voter Plaintiffs also complain that sections 3-702(3), 3-703(1-a), and 3-703(1)(l) of the Code also unconstitutionally violates their Fourteenth Amendment guarantee of equal protection by placing them in a worse position than other citizens.

301.    WHEREFORE, Plaintiffs respectfully pray the Court to:

**AMENDED COMPLAINT**                    102

(1)    Declare that the Code, §§ 3-702(3), 3-703(1-a), and 3-703(1)(l), violates

Section 2 of the Voting Rights Act and the Fourteenth Amendment;

(2)    Enjoin the Defendants and all persons acting with them, from administering,

implementing or enforcing the contribution limitations and prohibitions

found in the challenged provisions;

(3)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees,

pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 1973l(e), and any other applicable

authority; and

(4)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XVIII

**SECTIONS 3-702(3), 3-703(1-a), AND 3-703(1)(l) IMPERMISSIBLY VIOLATE THE RIGHTS OF PROTECTED MINORITY CANDIDATES UNDER SECTION 2 OF THE VOTING RIGHTS ACT, AND ALSO UNCONSTITUTIONALLY INFRINGE UPON THEIR FOURTEENTH AMENDMENT RIGHTS.**

**302.**    Plaintiffs re-allege and incorporate by reference all of the allegations contained in

all of the preceding paragraphs.

**303.**    Hispanic-American Minority Candidate Plaintiffs would like to run for office in

New York City. They reasonably believe that they would receive contributions subject to the lower

business-dealings contribution limits, which are treated as unmatchable under the Act. They also

reasonably believe that they would have received contributions from LLCs, LLPs and partnerships,

but for the changes instituted by LL No. 34 which makes those contributions illegal. They

reasonably believe that the changes instituted by LL No. 34 with regard to contributions from those

having business dealings with the City and the changes with regard to contributions from LLCs,

**AMENDED COMPLAINT**                    103

LLPs, and partnerships will impede their ability to amass the resources necessary to mount an effective campaign. Hispanic-American Minority Candidate Plaintiffs represent the Hispanic-American Minority Candidate Plaintiff class whose membership is composed of all similarly situated Hispanic-Americans who would like to run for office in New York City but are unable to raise the funds necessary to do so under the current campaign finance laws.

304.    Black and African-American Minority Candidate Plaintiffs would like to run for office in New York City. They reasonably believe that they would receive contributions subject to the lower business-dealings contribution limits, which are treated as unmatchable under the Act. They also reasonably believe that they would have received contributions from LLCs, LLPs and partnerships, but for the changes instituted by LL No. 34 which makes those contributions illegal. They reasonably believe that the changes instituted by LL No. 34 with regard to contributions from those having business dealings with the City and the changes with regard to contributions from LLCs, LLPs, and partnerships will prevent them from being able to amass the resources necessary to mount an effective campaign. Black and African-American Minority Candidate Plaintiffs represent the Black and African-American Minority Candidate Plaintiff class whose membership is composed of all similarly situated Black and African-Americans who would like to run for office in New York City but are unable to raise the funds necessary to do so under the current campaign finance laws.

305.    Hispanic-American Minority Candidate Plaintiffs and Black and African-American Minority Candidate Plaintiffs also allege that the challenged sections of the Code constitute a violation of Section 2, but under a different theory than that advanced by the Minority Voter Plaintiffs. While acknowledging that most Section 2 cases involve an analysis of how the law acts

**AMENDED COMPLAINT**                    104

to disenfranchise *voters*, Minority Candidate Plaintiffs assert that Section 2 is also violated when the law acts to foreclose minority *candidates*' access to amassing the resources necessary to run an effective campaign against their majority-race opponents. In such a situation—when the law has been changed in such a way that its effect is to bar minority *candidates* from the political process—"the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section." 42 U.S.C. § 1973(b). Under a totality of circumstances test, a violation of Section 2 should be found.

306.    Hispanic-American Minority Candidate Plaintiffs and Black and African-American Minority Candidate Plaintiffs also complain that sections 3-702(3), 3-703(1-a), and 3-703(1)(l) of the Code also unconstitutionally violates their Fourteenth Amendment guarantee of equal protection by placing them in a worse position than other citizens who run for office.

307.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare that the Code, §§ 3-702(3), 3-703(1-a), and 3-703(1)(l), violates Section 2 of the Voting Rights Act and the Fourteenth Amendment;

(2)    Enjoin the Defendants and all persons acting with them, from administering, implementing or enforcing the contribution limitations and prohibitions found in the challenged provisions;

(3)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 1973l(e), and any other applicable authority; and

(4)    Grant Plaintiffs such other relief as may be just and equitable.

**AMENDED COMPLAINT**                         105

## COUNT XIX

### THE REPORTING REQUIREMENTS IMPOSED BY SECTION 3-216.1 ARE UNCONSTITUTIONALLY VAGUE.

**308.** Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**309.** Lobbyist Plaintiffs are required to file a Fundraising and Political Consulting Report if they engage in fundraising or political activity. On that report, they must list "the total dollar amount raised for each candidate for which such activities were performed." Code, § 3-216.1.

**310.** "Fundraising activity" is a defined term. It means, "*solicitation* or collection of contributions for a candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council, or for the political committee of any such candidate by a lobbyist, or the solicitation or collection of contributions for any public servant who is a candidate for nomination for election, or election, to any elective office, or for the political committee of any such candidate by a lobbyist." Code, § 3-211(h).

**311.** It is not clear from the law what activities *solicitation* would include. The Code does not "provide people of ordinary intelligence a reasonable opportunity to understand" what activities, exactly, would qualify as solicitation and so must be reported. *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (quoting *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999). Therefore, section 3-216.1 of the Code is unconstitutionally vague.

**312.** Because the law is vague, it is also unconstitutionally overbroad because it unconstitutionally burdens substantially more First Amendment activity than could possibly be justified.

**AMENDED COMPLAINT**                    106

313.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-216.1 facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## COUNT XX

### THE PROHIBITION AGAINST GIVING GIFTS IMPOSED BY SECTION 3-225 IS UNCONSTITUTIONAL BOTH FACIALLY AND AS APPLIED.

314.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

315.    Lobbyist's-Employee Plaintiff is employed as the secretary of a registered lobbyist. She neither engages in lobbying activity, nor is she registered as a lobbyist. Because the City requires that she be listed on her employer's statement of registration, she is prohibited from offering or giving any gift to any public servant. This infringes upon both her First Amendment right to free speech as well as her Fourteenth Amendment right to equal protection, without a compelling governmental interest which should require her rights to be infringed upon.

316.    Even if the government had a compelling interest to justify the Gift Law, it is overinclusive. It prohibits far more speech than can be justified, including but not limited to the speech of Lobbyist's-Employee Plaintiff and other employees of lobbyists, their spouses or domestic partners, their children, and their spouses' and domestic partners' children. The Gift Law unconstitutionally prohibits all of these people from giving gifts to public servants.

**AMENDED COMPLAINT**                    107

317.    The Gift Law also suffers from overbreadth, as it unconstitutionally burdens substantially more speech than could possibly be justified by the anti-corruption interest.

318.    WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, § 3-225 facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

Dated: February 27, 2008                              Respectfully Submitted,

Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
    * Application for leave to appear pro hoc vice for this case made by Motion on February 11, 2008 pursuant to Local Civil Rule 1.3(c).

**AMENDED COMPLAINT**                    108

 New York City Campaign Finance Board

# Campaign Finance Act

**New York City Campaign Finance Act**

NEW YORK CITY CHARTER CHAPTER 46 (relevant sections), and CHAPTER 49, SECTION 1136.1

Last amended by Local Laws Nos. 34 and 67 of 2007.

This document is the New York City Campaign Finance Board's compilation of the New York City Campaign Finance Act, Administrative Code of the City of New York §§3-701, *et seq.*, New York City Charter Chapter 46 (relevant sections), and Chapter 49, §1136.1.

NEW YORK CITY CAMPAIGN FINANCE BOARD
January 1, 2008

---

**New York City Administrative Code (Title 3, Chapter 7)**
§3-701   Short title
§3-702   Definitions
     1.  "participating candidate"
     2.  "principal committee"
     3.  "matchable contribution"
     4.  "qualified campaign expenditure"
     5.  "fund"
     6.  "threshold for eligibility"
     7.  "authorized committee"
     8.  "contribution"
     9.  "transfer"
     10. "covered election"
     11. "political committee"
     12. "intermediary"
     13. "limited participating candidate"
     14. "non-participating candidate"
     15. "labor organization"
     16. "lobbyist"
     17. "lobbying" or "lobbying activities"
     18. "business dealings with the city"
     19. "economic development agreement"
     20. "doing business database"
     21. "expenditure" and "campaign expenditure"
§3-703   Eligibility and other requirements
§3-704   Qualified campaign expenditures
§3-705   Optional public financing
§3-706   Expenditures limitations; additional financing and limits

§3-707    Voluntary registration by political committees
§3-708    Campaign finance board
§3-709    New York city campaign finance fund
§3-709.5 Mandatory debates
§3-710    Examinations and audits; repayments
§3-710.5 Findings of violation or infraction; adjudications; final determinations
§3-711    Penalties
§3-712    Campaigns for office not subject to this chapter
§3-713    Reports
§3-714    Construction
§3-715    Joint campaign activities
§3-716    Application of the contribution and expenditure limitations to certain political activities
§3-717    Expired
§3-718    Limited Participation
§3-719    Obligations of non-participating candidates
§3-720    Tolling of time for notice of alleged violations and/or notice of repayment of public funds

New York City Administrative Code (Title 3, Chapter 8)
§3-801 Transition and inauguration donations and expenses
§3-802 Penalties

### New York City Administrative Code Title 3, Chapter 7

(added by Local Law No. 8 of 1988, and amended by Local Law No. 4 of 1989, Local Law No. 69 of 1990, Local Law No. 68 of 1993, Local Law No. 37 of 1994, Local Law No. 90 of 1996, Local Law No. 27 of 1998, Local Law No. 39 of 1998, Local Law No. 48 of 1998, Local Law No. 21 of 2001, Local Law No. 12 of 2003, Local Law No. 13 of 2003, Local Law No. 43 of 2003, Local Law No. 58 of 2004, Local Law No. 59 of 2004, Local Law No. 60 of 2004, Local Law No. 105 of 2005, Local Law No. 17 of 2006, Local Law No. 23 of 2007, Local Law No. 34 of 2007, and Local Law No. 67 of 2007.)

### CAMPAIGN FINANCING

**§3-701 Short title.**
This chapter shall be known as the "New York City campaign finance act."

**§3-702 Definitions.**
For the purposes of this chapter, the following terms shall have the following meanings:

1. The term "participating candidate" shall mean any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council who files a written certification pursuant to section 3-703 of this chapter.

2. The term "principal committee" shall mean the authorized committee designated by a candidate pursuant to paragraph (e) of subdivision 1 of section 3-703 or paragraph (a) of subdivision one of section 3-718 of this chapter.

3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution. The following contributions are not matchable:

    (a) in-kind contributions of property, goods, or services;

    (b) contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

    (c) contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes;

    (d) money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e) contributions from individuals under the age of eighteen years;

(f) contributions from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance;

(g) contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1) or section 3-213(d). The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213; and

(h) contributions from contributors subject to the limitations of subdivision one-a of section 3-703 of this chapter.

4. The term "qualified campaign expenditure" shall mean an expenditure for which public funds may be used.

5. The term "fund" shall mean the New York city election campaign finance fund.

6. The term "threshold for eligibility" shall mean the total amount of matchable contributions that a participating candidate and his or her principal committee must receive in order for such candidate to qualify for optional public financing pursuant to this chapter.

7. The term "authorized committee" shall mean a political committee which has been authorized by one or more candidates to aid or take part in the elections of such candidate or candidates and which has filed a statement that such candidate or candidates have authorized such political committee pursuant to section 14-112 of the election law.

8. The term "contribution" shall mean: (a) any gift, subscription, advance, or deposit of money or any thing of value, made in connection with the nomination for election, or election, of any candidate; (b) any funds received by a political committee from another political committee to the extent such funds do not constitute a transfer; (c) any payment, by any person other than a candidate or a political committee authorized by the candidate, made in connection with the nomination for election, or election, of any candidate, including but not limited to compensation for the personal services of any individual which are rendered in connection with a candidate's election or nomination without charge; provided however, that none of the foregoing shall be deemed a contribution if it is made, taken or performed by a person or a political committee independent of the candidate or his or her agents or political committees authorized by such candidate pursuant to section 14-112 of the New York state election law. For purposes of this subdivision, the term "independent of the candidate or his or her agents or political committees authorized by such candidate pursuant to section 14-112 of the New York state election law" shall mean that the candidate or his or her agents or political committees so authorized by such candidate did not authorize, request, suggest, foster or cooperate in any such activity; and provided further, that the term "contribution" shall not include:

(i) the value of services provided without compensation by individuals who volunteer a portion or all of their time on behalf of a candidate or political committee,

(ii) the use of real or personal property and the cost of invitations, food and beverages voluntarily provided by an individual to a candidate or political committee on the individual's residential premises for candidate-related activities to the extent such services do not exceed five hundred dollars in value, and

(iii) the travel expenses of any individual who on his or her own behalf volunteers his or her personal services to any candidate or political committee to the extent such expenses are unreimbursed and do not exceed five hundred dollars in value.

A loan made to a participating candidate or his or her principal committee, or a non-participating candidate or his or her authorized committees other than in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the first covered election in which such candidate is governed by this chapter following the date of the loan, a contribution by the lender. A loan made to a participating candidate or his or her principal committee, or a non-participating candidate or his or her authorized committees in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the first covered election in which the candidate is governed by this chapter following the date of the loan, a contribution by the obligor on the loan and by any other person endorsing, cosigning, guaranteeing, collateralizing or otherwise providing security for the loan.

9. The term "transfer" shall mean any exchange of funds or any thing of value between political committees authorized by the same candidate pursuant to section 14-112 of the election law and taking part solely in his or her campaign.

10. The term "covered election" shall mean any primary, run-off primary, special, run-off special, or general election for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council.

11. The term "political committee" shall mean any corporation aiding or promoting and any committee, political club or combination of one or more persons operating or cooperating to aid or to promote the success or defeat of a political party or principle, or to aid or take part in the election or defeat of a candidate for public office or to aid or take part in the election or defeat of a candidate for nomination at a primary election or convention, including all proceedings prior to such primary election, or of a candidate for any party position voted for at a primary election, or to aid or defeat the nomination by petition of an independent candidate for public office; but nothing in this chapter shall apply to any committee or organization for the discussion or advancement of political questions or principles without connection with any vote. "Political committee" shall include any party committee or constituted committee, as such committees are defined in article fourteen of the election law.

12. The term "intermediary" shall mean an individual, corporation, partnership, political committee, employee organization or other entity which, (i) other than in the regular course of business as a postal, delivery or messenger service, delivers any contribution from another person or entity to a candidate or authorized committee; or (ii) solicits contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee. For purposes of clause (ii) of this subdivision only persons clearly identified as the solicitor of a contribution to the candidate or his or her authorized committee shall be presumed to be known to such candidate or his or her authorized committee. "Intermediary" shall not include spouses, domestic partners, parents, children or siblings of the person making such contribution, or any fundraising agent, as such term is defined in the rules of the board or any hosts of a campaign sponsored fundraising event paid for in whole or in part by the campaign. Where there are multiple individual hosts for a non-campaign sponsored event, the hosts shall designate one such host as the intermediary.

13. The term "limited participating candidate" shall mean a candidate who meets the requirements of paragraph (a) of subdivision one of section 3-718 of this chapter.

14. The term "non-participating candidate" shall mean any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council who does not file a written certification pursuant to section 3-703 or meet the requirements of paragraph (a) of subdivision one of section 3-718 of this chapter, or who has, or the authorized committees of such candidate have, made expenditures in furtherance of the nomination for election or election to an office covered by this chapter.

15. The term "labor organization" shall mean any organization including any local, state, district council, joint council or national organization which exists and is constituted for the purpose, in whole or in part, of collective bargaining, or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection. For purposes of this section a labor organization shall also include any political committee it has established pursuant to state or federal law.

16. The term "lobbyist" shall mean a lobbyist as defined in subdivision (a) of section 3-211 of this title and the spouse or domestic partner and unemancipated children of the lobbyist, and if the lobbyist is an organization, the term "lobbyist" shall mean only that division of the organization that engages in lobbying activities and any officer or employee of such lobbyist who engages in lobbying activities of the organization or is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees.

17. The term "lobbying" or "lobbying activities" shall mean lobbying and lobbying activities as defined in section 3-211 of this title.

18. (a) The term "business dealings with the city" shall mean (i) any contract (other than an emergency contract or a contract procured through publicly-advertised competitive sealed bidding) which is for the procurement of goods, services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York and is valued at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or, with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter, and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; or (ii) any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii) any application for approval sought from the city of New York pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter, and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter; provided, however, that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further, however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) any concession (other than a concession awarded through publicly-advertised competitive sealed bid) or any franchise from the city of New York or any agency or entity affiliated with the city of New York which has an estimated annual value at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code; or (v) any grant that is valued at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York; or (vii) any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants. In addition, for purposes of this chapter a lobbyist as defined in section 3-211 of this title

shall be deemed to be engaged in business dealings with the city of New York during such period, as provided by a registration statement. For purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions, franchises and grants that are five thousand dollars or less in value shall be excluded from any calculation as to whether a contract, concession, franchise or grant is a business dealing with the city. For purposes of clauses (ii) and (iii) of this subdivision, the department of city planning, in consultation with the board, may promulgate rules to require the submission by applicants to the city of information necessary to implement the requirements of subdivisions 1-a and 1-b of section 3-703 of this chapter as they relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion in the doing business database established pursuant to subdivision 20 of this section. For purposes of this subdivision, "agency or entity affiliated with the city of New York" shall mean the city school district of the city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials. The department of housing preservation and development shall promulgate rules setting forth which categories of actions, transactions and agreements providing affordable housing shall and shall not constitute business dealings with the city of New York for purposes of this subdivision. The department shall consider the significance of the affordable housing program and the degree of discretion by city officials in determining which actions, transactions and agreements shall and shall not constitute such business dealings. Notwithstanding any provision of this subdivision, a housing assistance payment contract between a landlord and the department of housing preservation and development or the New York city housing authority relating to the provision of rent subsidies pursuant to Section 8 of the United States Housing Act of 1937, 42 USC 1437 et., seq., shall not constitute business dealings with the city of New York for the purposes of this subdivision.

(b) Business dealings with the city as defined in this subdivision shall be as follows: for purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the procurement of goods, services, or construction shall only constitute business dealings with the city of New York for the period from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract (or in the case of purchase contracts for goods, from the date of such purchase) and for twelve months thereafter, provided, however that where such contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the date of adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in which the city of New York is the proposed lessee shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and, where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business dealings with the city from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter or, in the case of a decision of the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section; for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of New York for the period from the submission of the bid or proposal until twelve months after the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.

(c) Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or construction or who has submitted bids or proposals for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a determination that said person should not be included in the database. The city chief procurement officer may promulgate rules for a process by which a person, as defined by subdivision 20 of section 3-702, may apply to the city chief procurement officer for a waiver from inclusion in the doing business database as defined by such subdivision in instances in which such person is providing essential goods, services or construction such as those necessary for security or other essential government operations. Such rules shall provide that the city chief procurement officer shall transmit to the board a copy of any application for a waiver and any such waiver may not be granted prior to the expiration of ten days from the date such application is received by the board. Such rules shall also provide that any such waiver may be granted only after substantial efforts have been made by the city chief procurement officer to obtain the information required by this law. Such rules shall also provide that the city chief procurement officer may grant the waiver only upon a

finding that it is in the best interests of the city, which finding shall only be made upon a determination that (i) there is a compelling need to obtain such essential goods, services or construction from the person seeking the exemption and (ii) no other reasonable alternative exists in light of such considerations as cost, uniqueness and the critical nature of such goods, services or construction to the accomplishment of the purchasing agency's mission. Such rules may also provide that a waiver may be granted when a person is doing business with the city by virtue of the city's exercise of its powers of eminent domain. Any grant of waiver shall be posted on the city's and the board's website in locations that are accessible by the public.

(d) A person, as defined by subdivision 20 of section 3-702, shall be considered to have business dealings with the city as of the date the person's name is entered in the doing business database, as such date is indicated in such database, or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.

19. The term "economic development agreement" means any contract or agreement in which financial incentives including, but not limited to, tax incentives, payments in lieu of taxes and financing are offered in return for the development, attraction or retention of business; provided, however that no financial incentives which are given to a person who qualifies for such incentive by operation of law shall be deemed to be pursuant to an economic development agreement for purposes of this chapter.

20. The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however, that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city. Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than once a month. Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city. For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity, provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals.

21. (a) For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the
terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter. There shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however, that the presumptions contained in this subdivision shall not apply to an expenditure to a person or entity associated with the candidate; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure. For purposes of this subdivision a person or entity associated with a candidate shall include the candidate's spouse, domestic partner, child, parent, or sibling or a person or entity with whom or with which the candidate has a business or other financial relationship:

(1) Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

(2) Contributions to candidates and political committees subject to the provisions of section 3-705(8);

(3) Community events including, but not limited to, events hosted by civic and neighborhood associations; provided, however, that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

(4) Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

(5) Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however, that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

(6) Legal defense of a non-criminal matter arising out of a political campaign;

(7) Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election,

in the case of a candidate who was not opposed in a primary election;

(8) A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

(9) Payment of non-criminal penalties or fines arising out of a political campaign;

(10) Costs incurred in demonstrating eligibility for the ballot or public funds payments or defending against a claim that public funds must be repaid; and

(11) Food and beverages provided to campaign workers and volunteers.

(b) Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign. Expenditures not in furtherance of a political campaign for elective office include the following:

(1) Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

(2) Any residential or household items, supplies or expenditures;

(3) Clothing, haircuts and other personal grooming;

(4) Funeral, cremation or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

(5) Automobile purchases;

(6) Tuition payments and childcare costs;

(7) Dues, fees or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

(8) Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

(9) Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the candidate benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

(10) Gifts, except for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.

Return to Top | Return to The Program and the Law

**§3-703 Eligibility and other requirements.**
1. To be eligible for optional public financing under this chapter, a candidate for nomination for election or election must:

(a) meet all the requirements of law to have his or her name on the ballot;

(b) be a candidate for mayor, public advocate, comptroller, borough president or member of the city council in a primary, special, or general election and meet the threshold for eligibility set forth in subdivision two of this section;

(c) choose to participate in the public funding provisions of this chapter, by filing a written certification in such form as may be prescribed by the campaign finance board, which sets forth his or her acceptance of and agreement to comply with the terms and conditions for the provision of such funds. The deadline for filing such certification for a primary and general election shall be:

(i) the tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however, that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

(ii) the thirtieth day after a special election is held to fill a vacancy for the office sought by the candidate;

whichever is later. The deadline for filing such certification for a special election to fill a vacancy shall be on the seventh day after the

proclamation of such special election. A certification may be filed on or before the seventh day after the occurrence of an extraordinary circumstance in an election, as declared by the campaign finance board, following the receipt and review of a petition submitted by a candidate in such election. For purposes of this paragraph, an "extraordinary circumstance" shall include the death of a candidate in the election, the resignation or removal of the person holding the office sought, and the submission to the board of a written declaration by an officeholder that terminates his or her campaign for reelection;

(d) obtain and furnish to the campaign finance board and his or her principal committee or authorized committees must obtain and furnish to the board any information it may request relating to his or her campaign expenditures or contributions and furnish such documentation and other proof of compliance with this chapter as may be requested by such board, provided, however, that the board shall accept such required documentation through an electronically scanned transmission;

(e) notify the board in the candidate's written certification as to: (i) the existence of each authorized committee authorized by such candidate that has not been terminated, (ii) whether any such committee also has been authorized by any other candidate, and (iii) if the candidate has authorized more than one authorized committee, which authorized committee has been designated by the candidate as the candidate's principal committee for the election(s) covered by the candidate's certification; provided, that such principal committee (i) shall be the only committee authorized by such candidate to aid or otherwise take part in the election(s) covered by the candidate's certification, (ii) shall not be an authorized committee of any other candidate, and (iii) shall not have been authorized or otherwise active for any election prior to the election(s) covered by the candidate's certification. The use of an entity other than the designated principal committee to aid or otherwise take part in the election(s) covered by the candidate's certification shall be a violation of this section and shall trigger the application to such entity of all provisions of this chapter governing principal committees;

(f) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution or contributions from any one individual, partnership, political committee, labor organization or other entity for all covered elections held in the same calendar year in which he or she is a participating candidate or a non-participating candidate which in the aggregate: (i) for the office of mayor, public advocate or comptroller shall exceed four thousand five hundred dollars, or (ii) for borough president, shall exceed three thousand five hundred dollars, or (iii) for member of the city council, shall exceed two thousand five hundred dollars; provided that a participating candidate and his or her principal committee or a non-participating candidate and his or her authorized committees may accept additional contributions which do not exceed one half the amount of the applicable limitation for any run-off primary election, additional day for voting held pursuant to section 3-108 of the New York state election law, special election to fill a vacancy, run-off special election to fill a vacancy, delayed or otherwise postponed election, or election held pursuant to court order which is a covered election and in which the candidate seeks nomination for election or election; and provided further that for the purposes of this paragraph, contributions made by different labor organizations shall not be aggregated or treated as contributions from a single contributor for purposes of the contribution limit that is set forth in this paragraph if those labor organizations make contributions from different accounts, maintain separate accounts with different signatories, do not share a majority of members of their governing boards, and do not share a majority of the officers of their governing boards; and provided further that if state law prescribes a contribution limitation of a lesser amount, this paragraph shall not be deemed to authorize acceptance of a contribution in excess of such lesser amount. The maximum contributions set forth in this paragraph shall be adjusted in accordance with subdivision seven of this section;[i]

(g) maintain and his or her principal committee or authorized committees must maintain such records of receipts and expenditures for a covered election as required by the board;

(h) not make expenditures from or use his or her personal funds or property or the personal funds or property jointly held with his or her spouse, domestic partner, or unemancipated children in connection with his or her nomination for election or election except as a contribution to his or her principal committee in an amount that does not exceed three times the maximum contribution amount applicable pursuant to paragraph (f) of this subdivision. Such candidate shall not make expenditures from or use other personal funds or property of his or her spouse, domestic partner or unemancipated children in connection with his or her nomination for election or election; provided that this paragraph shall not be construed to limit contributions by persons other than the candidate;

(i) not make and his or her principal committee must not make expenditures which in the aggregate exceed the applicable expenditure limitations set forth in section 3-706;

(j) meet the threshold for eligibility set forth in subdivision two of this section;

(k) not accept and his or her principal committee must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any political committee for all covered elections held in the same calendar year in which he or she is a participating candidate, except as is otherwise provided for contributions by political committees pursuant to section 3-707 of this chapter; and

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership or partnership, other than a corporation, limited liability company, limited liability partnership or partnership that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, provided, however, that where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a

corporation, limited liability company, limited liability partnership or partnership in the absence of clause indicia that such contribution is from such an entity;

(m) fulfill the requirements of section 12-110 of the administrative code of the city of New York, including payment of any penalties as determined by the conflicts of interest board.

(i) The conflicts of interest board shall provide a participating candidate with a receipt indicating proof of compliance with section 12-110 of the administrative code of the city of New York in such form as the conflicts of interest board shall determine. Such receipt as provided by the conflicts of interest board shall indicate the time and date of filing of the financial disclosure report.

(ii) A participating candidate shall provide the campaign finance board with the receipt provided by the conflicts of interest board pursuant to subparagraph (i) of this paragraph, in such form and manner as the campaign finance board shall require, by the last business day of July in the year of the covered election, or such other later date as the campaign finance board shall provide by rule, except that in a special election to fill a vacancy the deadline for filing such receipt shall be established by campaign finance board rule.

(iii) A participating candidate who fails to adhere to the requirements of subparagraph (ii) of this paragraph may thereafter satisfy the requirements of this paragraph by submitting a receipt in accordance with subparagraph (i) of this paragraph at such times and in such manner as provided by campaign finance board rule. The campaign finance board shall thereafter allow the participating candidate to make a claim for public funds upon satisfying the requirements of this paragraph and all other applicable law, rules and regulations; provided, however that a receipt that is not filed timely pursuant to subparagraph (ii) of this paragraph may result in a delay of any payment of public funds by the board; and

(n) satisfy any claim made by the board for the payment of civil penalties or repayment of public funds that remains outstanding against such candidate or his or her principal committee or an authorized committee of such candidate from a prior covered election, if (i) the candidate had written notice of such potential claim and ineligibility to receive public funds prior to filing a written certification for the current covered election pursuant to paragraph (c) of this subdivision, or (ii) in the event no such timely notice has been given pursuant to subparagraph (i), the candidate has been given an opportunity to present to the board reasons he or she should be eligible to receive public funds.

(o) agree that expenditures by his or her principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election shall be subject to the contribution and expenditure limitations applicable in such covered election.

1-a. Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may not accept, either directly or by transfer, any contribution or contributions for a covered election in which he or she is a participating candidate from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for all covered elections in the same calendar year exceeds: (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; and (iii) for member of the city council two hundred fifty dollars; provided that a participating candidate or his or her principal committee may accept additional contributions which do not exceed one half the amount of the applicable limitation for any run-off primary election, additional day for voting held pursuant to section 3-108 of the New York state election law, special election to fill a vacancy, run-off special election to fill a vacancy, delayed or otherwise postponed election, or election held pursuant to court order which is a covered election and in which the candidate seeks nomination for election or election. Any contribution made pursuant to this section shall not be a matchable contribution. For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual and entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each

contribution to the board on or before the filing deadline that is in accordance with the board rules. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines. If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation provided, however, that no such contribution shall be matchable. Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor. No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein. Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds. For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements, and applications for land use approvals. Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

2.  (a) The threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, shall be in the case of:

          (i) mayor, not less than two hundred fifty thousand dollars in matchable contributions comprised of sums of up to one hundred seventy-five dollars per contributor including at least one thousand matchable contributions of ten dollars or more;

          (ii) public advocate and comptroller, not less than one hundred twenty-five thousand dollars in matchable contributions comprised of sums of up to one hundred seventy-five dollars per contributor including at least five hundred matchable contributions of ten dollars or more;

          (iii) borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to one hundred seventy-five dollars per contributor including at least one hundred matchable contributions of ten dollars or more from residents of the borough, or ten thousand dollars comprised of sums of up to one hundred seventy-five dollars per contributor, whichever is greater;

          (iv) member of the city council, not less than five thousand dollars in matchable contributions comprised of sums of up to one hundred seventy-five dollars per contributor including at least seventy-five matchable contributions of ten dollars or more from residents of the district in which the seat is to be filled.

(b) Any participating candidate meeting the threshold for eligibility in a primary election for one of the foregoing offices shall be deemed to have met the threshold for eligibility for such office in any other election, other than a special election to fill a vacancy, held in the same calendar year.

3. In order to be eligible to receive public funds in a primary election a participating candidate must agree that in the event he or she is a candidate for such office in any other election held in the same calendar year, other than a special election to fill a vacancy, that he or she will be bound in each such other election by the eligibility requirements and all other provisions of this chapter.

4. Candidates who are contested in a primary election for nomination for election to office and who do not file a written certification pursuant to paragraph (c) of subdivision one of this section shall not be eligible for public funds for any election to such office held in the same calendar year other than a special election to fill a vacancy.

5. Participating candidates who are seeking nomination or election exclusively as write-in candidates, who are unopposed in a covered election, or who are opposed in a covered election only by candidates seeking nomination or election exclusively as write-in candidates, shall not be eligible to receive public funds for such election.

6.  (a) Each participating or limited participating candidate and his or her principal committee, and each non-participating candidate and his or her authorized committees shall report to the board every contribution, loan, guarantee, or other security for such loan received by the candidate and such committee, the full name, residential address, occupation, employer, and business address of each contributor, lender, guarantor, or provider of security and of each person or entity which is the intermediary for such contribution, loan,

subject to section 3-706. Disclosure reports shall be submitted at such times and in such form as the board shall require and shall be clearly legible.

(b) Notwithstanding paragraph (a) above:

(i) an intermediary need not be reported for any contribution to a participating or limited participating candidate and his or her principal committee or a non-participating candidate and his or her authorized committees that was collected from a contributor in connection with a party or other candidate-related event held at the residence of the person delivering the contribution, unless the expenses of such events at such residence for such candidate exceed five hundred dollars for a covered election or the aggregate contributions received from that contributor at such events exceed five hundred dollars;

(ii) contributions aggregating not more than ninety-nine dollars from any one contributor for all covered elections held in a single calendar year or for a special election need not be separately itemized in disclosure reports submitted to the board on behalf of a participating, limited participating or non-participating candidate and his or her principal committee or authorized committees, provided, however, that contributions which are not itemized shall not be matchable;

(iii) the treasurer of the principal committee need not collect or disclose the occupation, employer, and business address of any contributor making contributions aggregating not more than ninety-nine dollars for all covered elections held in a single calendar year or for a special election; provided, however, such occupation, employer, and business address shall be disclosed if such contributors are employees of a participating or limited participating candidate or the spouse or domestic partner of such candidate or an entity in which such candidate, spouse or domestic partner has an ownership interest of ten percent or more or a management position, including, but not limited to, being an officer, director or trustee; and

(iv) disclosure reports, other than reports required to be filed every six months in accordance with the schedule specified by the New York state board of elections, need not be submitted on behalf of a participating or limited participating candidate and his or her principal committee or a non-participating candidate and his or her authorized committees if the cumulative amount of contributions and loans accepted by such candidate and committee following the period covered in the last disclosure report submitted to the campaign finance board on behalf of such candidate is less than two thousand dollars or such higher amount as may be determined by the campaign finance board, provided, however, that disclosure reports shall be submitted on behalf of a participating or limited participating candidate and his or her principal committee or a non-participating candidate and his or her authorized committees if that candidate and his or her committee have made expenditures in excess of forty-five percent of the expenditure limitation applicable to participating and limited participating candidates under section 3-706. The campaign finance board shall make available to the public a copy of disclosure reports within two business days after they are accepted by the board.

6a. Any rules promulgated by the board to require that disclosure reports submitted pursuant to this chapter be submitted in an electronic format shall provide exemptions for small campaigns, as defined by board rules, and for other campaigns that demonstrate that submission in an electronic format would pose a substantial hardship.

7. Not later than the first day of March in the year two thousand eighteen and every fourth year thereafter the campaign finance board shall (i) determine the percentage difference between the average over a calendar year of the consumer price index for the metropolitan New York-New Jersey region published by the United States bureau of labor statistics for the twelve months preceding the beginning of such calendar year and the average over the calendar year two thousand fifteen of such consumer price index; (ii) adjust each maximum contribution applicable pursuant to paragraph (f) of subdivision one of this section by the amount of such percentage difference to the nearest fifty dollars; and (iii) publish such adjusted maximum contribution in the City Record. Such adjusted maximum contribution shall be in effect for any election held before the next such adjustment.

8. If a participating or limited participating candidate and his or her principal committee or a non-participating candidate and his or her authorized committees demonstrate to the board that a political committee has not accepted contributions, loans, or other receipts or made expenditures or transfers in a covered election, and represent that such committee will not accept contributions, loans, or other receipts or make expenditures or transfers in a covered election, the participating or limited participating candidate and his or her principal committee or non-participating candidate and his or her authorized committees may submit to the board legible copies of financial disclosure reports, required to be filed with the city or state board of elections, for such committees in lieu of the disclosure report form designated by the board for purposes of subdivision six of this section.

9. No political committee authorized by a participating, limited participating or non-participating candidate for a covered election may be authorized to aid or take part in the elections of more than one candidate.

10. All receipts accepted by a participating or limited participating candidate and his or her principal committee shall be deposited in an account of the principal committee. All receipts accepted by a non-participating candidate and his or her authorized committees shall be deposited in an account of the authorized committees. The treasurer of the principal committee or authorized committee shall be responsible for making such deposits. All deposits shall be made within ten business days of receipt; provided, however, that deposits of contributions made in the form of checks received by

a participating, limited participating or non-participating candidate and his or her committees for the office of city council more than one year before the first covered election for which such candidate is seeking nomination or election may be made within twenty business days of receipt. Each disclosure report filed pursuant to subdivision six of this section shall include the date of receipt of each contribution accepted.

11. Regardless whether a participating candidate demonstrates eligibility for optional public financing under this chapter, a participating candidate and his or her principal committee are nonetheless required to abide by the requirements of paragraphs (d), (e), (f), (g), (h), (i), (k) and (l) of subdivision one of this section.

12.  (a) Each participating candidate or limited participating candidate for nomination for election,
    or election, or the principal committee of such candidate, shall submit, in a contemporaneous manner, the disclosure reports required pursuant to this chapter, filed in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements, and such other disclosure reports as the rules of the board may require, in order for any contributions received during the periods covered by such reports and prior to the last date upon which such candidate may file a certification pursuant to paragraph (c) of subdivision one of this section to qualify as matchable contributions.

    (b) The board shall review each disclosure report timely submitted by a candidate prior to the last date upon which such candidate may file a certification pursuant to paragraph (c) of subdivision one of this section, or subdivision one of section 3-718, and issue to the candidate a review before the next disclosure report is due. Such review shall inform the candidate of relevant questions the board has concerning the candidate's: (i) compliance with requirements of this chapter and of the rules issued by the board; and (ii) qualification for receiving public funds pursuant to this chapter. In the course of this review, the board shall give candidates an opportunity to respond to and correct potential violations, before the deadline for filing a certification pursuant to paragraph (c) of this subdivision one of this section, or subdivision one of section 3-718, and give candidates an opportunity to address questions the board has concerning their matchable contribution claims or other issues concerning eligibility for receiving public funds pursuant to this chapter; provided, however, this paragraph shall not apply to the last required disclosure report before the deadline for filing a certification pursuant to paragraph (c) of subdivision one of this section or subdivision one of section 3-718. Nothing in this paragraph shall preclude the board from subsequently reviewing such disclosure reports and taking any action otherwise authorized under this chapter.

13. Candidates who file a certification pursuant to subdivision one of this section shall not be eligible to file a certification pursuant to section 3-718, and candidates who file a certification pursuant to section 3-718 shall not be eligible to file a certification pursuant to subdivision one of this section.

14.  (a) Transfers that a principal committee receives from a political committee (other than another
    principal committee) at any time during an election cycle shall:

        (i) be attributed to previous contributions in accordance with the duly promulgated rules of the campaign finance board applicable to such transfer or use;

        (ii) exclude an amount equal to the total of:

            (A) such previous contributions, or portions thereof, that violate the limitations, restrictions, or prohibitions of the charter and this chapter applicable in the covered election for which the principal committee is designated; and

            (B) such previous contributions, or portions thereof, for which the principal committee has not obtained and submitted to the board, prior to receipt of the transfer, evidence of the contributor's intent to designate the contribution for such covered election, and any other record, as determined by the rules of the board; and

        (iii) not be matchable.

    (b) Each transfer, the contributions to which the transfer is attributed, and all expenditures made in connection with such contributions shall be reported to the board in the next disclosure report due pursuant to this section 3-703 after the transfer is received. These expenditures shall, at a minimum, include all expenditures made by the political committee making the transfer during the election cycle of the covered election. The board shall issue instructions defining the circumstances in which such disclosure reports shall also include additional expenditures made by other political committees authorized by the participating candidate that originally received such contributions and additional expenditures made prior to such election cycle. Such expenditures shall be applied to the expenditure limit applicable under 3-706.

    (c) Participating candidates shall have the burden of demonstrating that expenditures reported pursuant to paragraph (b) of this subdivision are not subject to the expenditure limit applicable under section 3-706 and are not a basis for reducing public funds payments pursuant to subdivision eight of section 3-705 of this chapter.

    (d) Nothing in this subdivision is intended to modify or supersede any federal law that prohibits or otherwise restricts the use of campaign or donated funds by political committees, candidates or federal officeholders.

15. Participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign shall be required to attend a training provided by the campaign finance board concerning compliance with the requirements of the campaign finance program and use of the campaign finance program software.

Return to Top | Return to The Program and the Law

**§3-704 Qualified campaign expenditures.**

1. Public funds provided under the provisions of this chapter may be used only for expenditures by a principal committee to further the participating candidate's nomination for election or election, either in a special election fill a vacancy, or during the calendar year in which the primary or general election in which the candidate is seeking nomination for election or election is held.

2. Such public funds may not be used for:

(a) an expenditure in violation of any law;

(b) payments made to the candidate or a spouse, domestic partner, child, grandchild, parent, grandparent, brother or sister of the candidate or spouse or domestic partner of such child, grandchild, parent, grandparent, brother or sister, or to a business entity in which the candidate or any such person has a ten percent or greater ownership interest;

(c) payments in excess of the fair market value of services, materials, facilities or other things of value received in exchange;

(d) (i) any expenditure made after the candidate has been finally disqualified or had his or her petitions finally declared invalid by the New York city board of elections or a court of competent jurisdiction, except that such expenditures may be made:

(A) as otherwise permitted pursuant to subdivision seven of section 3-709 of this chapter, or

(B) for a different covered election, other than a special election to fill a vacancy, held later in the same calendar year in which the candidate seeks election for the same office; provided, however, that public funds originally received for a special election to fill a vacancy may not be retained for expenditure in any other election;

(ii) any expenditure made after the only remaining opponent of the candidate has been finally disqualified or had his or her petitions declared invalid by the New York city board of elections or a court of competent jurisdiction, except that such expenditures may be made for a different covered election, other than a special election to fill a vacancy, held later in the same calendar year in which the candidate seeks election for the same office; provided, however, that public funds originally received for a special election to fill a vacancy may not be retained for expenditure in any other election;

(e) payments in cash;

(f) any contribution, transfer, or loan made to another candidate or political committee;

(g) gifts, except brochures, buttons, signs and other printed campaign material;

(h) any expenditures to challenge or defend the validity of petitions of designation or nomination, or of certificates of nomination, acceptance, authorization, declination, or substitution, and expenses related to the canvassing of election results, made pursuant to subdivision four of section 3-706;

(i) an expenditure made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, other than expenditures made also to further the participating candidate's nomination for election or election;

(j) payment of any penalty or fine imposed pursuant to federal, state or local law; or

(k) payments made through advances, except in the case of individual purchases in excess of two hundred fifty dollars.

Return to Top | Return to The Program and the Law

**§3-705 Optional public financing.**

Each participating candidate for nomination for election or election in a covered election may obtain payment to his or her principal committee from public funds for qualified campaign expenditures, in accordance with the provisions of this chapter, and subject to appropriation.

1. No such public funds shall be paid to a principal committee unless the board determines that the participating candidate has met the eligibility requirements of this chapter. Payment shall not exceed the amounts specified in this chapter, and shall be made only in accordance with the provisions of this chapter. Such payment may be made only to the participating candidate's principal committee. No public funds shall be used except as reimbursement or payment for qualified campaign expenditures actually and lawfully incurred or to repay loans used to pay qualified campaign expenditures.

2.  (a) If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred twenty-two dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

    (b) Except as otherwise provided in subdivision three of section 3-706, in no case shall the principal committee of a participating candidate receive public funds pursuant to paragraph (a) above in excess of an amount equal to fifty-five percent of the expenditure limitation provided in subdivision one of section 3-706 for the office for which such candidate seeks nomination for election or election.

    (c) No funds shall be provided pursuant to this subdivision with respect to any covered election specified in subdivision five of this section.

3. A participating candidate seeking or obtaining nomination for election by more than one party shall be deemed one candidate, and shall not receive additional public funds or be authorized to accept contributions in excess of the maximum contribution applicable pursuant to paragraph (f) of subdivision one of section 3-703 or make additional expenditures by reason of such candidate seeking or obtaining nomination for election by more than one party. Subdivision five of section 3-703 shall not be applicable to such a candidate who is opposed for the nomination of at least one party in a primary election. The elimination of the expenditure limitations and qualification for additional matching funds provided in subdivision three of section 3-706 shall not be applicable to such a candidate who is opposed for the nomination of at least one party solely by participating candidates.

4. The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election. The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election. For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the event that the board denies such petition then it shall immediately notify the candidate of his or her right to bring a special proceeding pursuant to article 78 of the civil practice law and rules.

5.  (a) Notwithstanding any other provision of this chapter, a participating candidate in a run-off primary election held pursuant to section 6-162 of the New York state election law or a run-off special election to fill a vacancy shall obtain prompt payment for qualified campaign expenditures in an amount equal to twenty-five cents for each one dollar of public funds paid pursuant to this chapter to the candidate's principal committee for the preceding election.

    (b) The board shall promulgate rules to provide for the prompt issuance of additional public funds to eligible participating candidates for qualified campaign expenditures in the case of an additional day for voting held pursuant to section 3-108 of the New York state election law, an election held pursuant to court order, or a delayed or otherwise postponed election.

    (c) Except as provided for by this subdivision and any rules promulgated hereby, no public funds shall be provided to any candidate for any run-off primary election, run-off special election to fill a vacancy, additional day for voting, election held pursuant to court order, or delayed or otherwise postponed election.

6. Notwithstanding any other provision of this chapter to the contrary, to protect the public fund from disproportionately large payments when the number of voters eligible to vote in a primary election is small, the board shall adopt rules setting a reduced maximum primary election public funds payment for participating candidates on the ballot in one or more primary elections in which the number of persons eligible to vote for party nominees total fewer than such number as shall be specified by the board in such rules, if any. Any such rules shall not apply to participating candidates opposed in a primary election by one of more participating candidates who are not subject to such reduced maximum primary election public funds payment or by a non-participating candidate who makes expenditures in excess of a specified amount for such primary election, as determined by the board.

7. Notwithstanding any provision of this section to the contrary, the amount of public funds payable to a participating candidate on the ballot in any covered election shall not exceed one quarter of the maximum public funds payment otherwise applicable under subdivision two of this section, unless:

    (a) the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount

which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

(b) the participating candidate has submitted a certified signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website. Such statement must certify that (i) one or more of the following conditions apply and (ii) such condition or conditions reasonably demonstrate the need for such public funds, and the participating candidate must provide documentation demonstrating the existence of such condition or conditions:

(1) the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2) the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election. For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name on television or radio in the area of the covered election or in print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however, that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4) the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar to the candidate's so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child holds or has held elective office in an area encompassing all or part of the area of the covered election in the past ten years.

The board shall be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and shall post such certified statements and supporting documentation on its website.

(c) the participating candidate is opposed in a primary or special election for an office for which no incumbent is seeking re-election.

If any of the conditions described in paragraph (a), (b), or (c) occur in such election, the board shall pay any and all additional public funds due to the participating candidate up to the maximum total payment applicable in such election under subdivisions two or six of this section or subdivision three of section 3-706 of this chapter.

8. Contributions by a principal committee of a participating candidate to other political committees shall not be a basis for reducing public funds payments, provided that: (a) such principal committee has received contributions (other than matchable contributions) that, in the aggregate, exceed the total of such contributions to other political committees and (b) such contributions in the aggregate do not exceed:

(i) three thousand dollars, if such principal committee is the principal committee of a participating candidate seeking nomination for election or election to the office of member of the city council;

(ii) five thousand dollars, if such principal committee is the principal committee of a participating candidate seeking nomination for election or election to the office of borough president; and

(iii) ten thousand dollars, if such principal committee is the principal committee of a participating candidate seeking nomination for election or election to a city-wide office.

9. If a participating candidate endorses or publicly supports his or her opponent for election, such candidate shall not be eligible for public funds.

10. A participating candidate who loses in the primary election but remains on the ballot for the general election must certify to the board before receiving public funds that he or she will actively campaign for office; such campaign activity shall include, but not be limited to, raising and spending funds, seeking endorsements, and broadly soliciting votes.

Return to Top | Return to The Program and the Law

**§3-706 Expenditures limitations; additional financing and limits.**

1. The following limitations apply to all expenditures made by a candidate and his or her principal committee on or after the first day of January preceding the election for which such candidate chooses to participate in the public funding provisions of this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast on or after such date:

(a) Except as provided in paragraph (b) of this subdivision, in each primary election, in each special election to fill a vacancy, and in each general election, expenditures by a participating candidate or a limited participating candidate and his or her principal committee for one of the following offices shall not exceed the following amounts:

| | |
|---|---|
| mayor: | $ 6,158,000 |
| public advocate or comptroller: | $ 3,850,000 |
| borough president: | $ 1,386,000 |
| member of the city council: | $   161,000 |

(b) (i) The expenditure limitation in a run-off primary election held pursuant to section 6-162
of the New York state election law or a run-off special election held to fill a vacancy shall be one half the amount of the applicable limitation provided for an election for such office pursuant to the provisions of paragraph (a) of this subdivision.

(ii) The board shall promulgate rules to provide for a separate expenditure limit applicable to campaign expenditures for an additional day for voting held pursuant to section 3-108 of the New York state election law, an election held pursuant to court order, or a delayed or otherwise postponed election.

(c) Expenditures by participating or limited participating candidates in a primary election made prior to or on the date of such primary election shall be deemed to have been made for such primary election.

(d) The campaign finance board shall, pursuant to section 3-713, submit a report to the mayor and the council on or before September first, nineteen hundred ninety, containing its recommendations whether the expenditure limitations provided by this subdivision should be modified. Such report shall set forth the amount of, and reasons for, any modifications it recommends.

(e) Not later than the first day of March in the year two thousand ten and every fourth year thereafter the campaign finance board shall (i) determine the percentage difference between the average over a calendar year of the consumer price index for the metropolitan New York-New Jersey region published by the United States bureau of labor statistics for the twelve months preceding the beginning of such calendar year and the average over the calendar year two thousand seven of such consumer price index; (ii) adjust each expenditure limitation applicable either pursuant to this subdivision or subdivision 2 of this section by the amount of such percentage difference to the nearest thousand dollars; and (iii) publish such adjusted expenditure limitation in the City Record. Such adjusted expenditure limitation shall be in effect for any election held before the next such adjustment.

Return to Top | Return to The Program and the Law

2. The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years. Such expenditures by a participating or limited participating candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

| | |
|---|---|
| mayor, public advocate or comptroller: | $ 290,000 |
| borough president: | $ 129,000 |
| member of the city council: | $  40,000 |

2a.  (a) If the expenditures made by a candidate and his or her principal committee subject to the

subdivision one of this section, which next covers the amount of the expenditure limitation which next applies under this subdivision, such candidate or his or her principal committee shall not be ineligible to receive public funding for qualified campaign expenditures or be in violation of this chapter by reason of exceeding such limitation unless the amount by which such expenditures exceed such limitation is in excess of the expenditure limitation which next applies to such candidate or his or her principal committee pursuant to subdivision one of this section; and further provided that the amount of the expenditure limitation which next applies to such candidate or his or her principal committee, pursuant to subdivision one of this section, shall be reduced by the amount by which the expenditure limitation applicable under subdivision two of this section is exceeded.

(b) Nothing contained in paragraph (a) of this subdivision shall:

(i) operate to increase or decrease the amount of public funds that may be received pursuant to section 3-705 by the principal committee;

(ii) affect the expenditure limitation set forth in paragraph (b) of subdivision one of this section; or

(iii) affect the expenditure limitation set forth in paragraph (a) of subdivision one of this section for purposes of the application of subdivision three of this section.

3.   (a) If any candidate in any covered election chooses not to file a certification as a participating or limited participating candidate pursuant to this chapter, and where the campaign finance board has determined that such candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds half the applicable expenditure limit for such office fixed by subdivision one of this section, then:

(i) such expenditure limit applicable to participating candidates and limited participating candidates in such election for such office shall be increased to one hundred fifty percent of such limit; and

(ii) the principal committees of such participating candidates shall receive payment for qualified campaign expenditures of five dollars for each one dollar of matchable contributions, up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of a special election); provided, however, that (A) participating candidates in a run-off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provided for such office in subdivision one of this section.

(iii) for elections occurring after January first, two thousand eight, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run-off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provided for such office in subdivision one of this section.

(b) If any candidate in any covered election chooses not to file a certification as a participating or limited participating candidate pursuant to this chapter, and where the campaign finance board has determined that such candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds three times the applicable expenditure limit for such office fixed by subdivision one of this section, then:

(i) such expenditure limit shall no longer apply to participating candidates and limited participating candidates in such election for such office; and

(ii) the principal committees of such participating candidates shall receive payment for qualified campaign expenditures of six dollars for each one dollar of matchable contributions, up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of a special election); provided, however, that (A) participating candidates in a run-off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding one hundred twenty-five percent of the expenditure limitation provided for such office in subdivision one of this section.

(iii) for elections occurring after January first, two thousand eight, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election);

provided in subdivision five of section 3-705 and shall not receive any additional public funds pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding one hundred twenty-five percent of the expenditure limitation provided for such office in subdivision one of this section.

4.    (a) Expenditures made for the purpose of: (i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status, (ii) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or recanvassing of election results, and (iii) expenses related to the post-election audit shall not be limited by the expenditure limitations of this section.

(b) A participating candidate shall be required to provide detailed documentation substantiating all exempt expenditure claims made pursuant to this subdivision.

Return to Top | Return to The Program and the Law

## §3-707 Voluntary registration by political committees.

1. Participating committees may accept contributions from political committees that choose to register with the board, as provided in this section. The board shall issue rules providing for such registration. Such contributions may not exceed the amount applicable under paragraph (f) of subdivision one of section 3-703 of this chapter. The board shall regularly publish a cumulative list of political committees that have registered, including on the internet and in periodic mailings to candidates.

2. It is the responsibility of the participating candidate to determine whether he or she may accept a contribution pursuant to this section. A participating candidate who receives a contribution from a political committee that has not registered with the board prior to making the contribution shall either return the contribution to the contributor or pay to the fund an amount equal to the amount of the contribution, unless the political committee registers with the board within ten days after the publication of the next subsequent list of registered political committees by the board following the date the contribution is received.

Return to Top | Return to The Program and the Law

## §3-708 Campaign finance board.

1. There shall be a campaign finance board consisting of five members. Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker. The members shall first be appointed to serve as follows:

    (a) one member appointed by the speaker for a term of one year;

    (b) one member appointed by the mayor for a term of two years.

    (c) one member appointed by the speaker for a term of three years;

    (d) one member appointed by the mayor for a term of four years; and

    (e) the chairperson for a term of five years.

Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment. In case of a vacancy in the office of a member, a member shall be appointed to serve for the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. In the case of a vacancy in the office of a member for which a member is holding over after expiration of the term for which the member was appointed, an appointment to such office made after June 1 in a year in which covered elections are scheduled shall not take effect prior to December 1 of that calendar year. Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to paragraph (f) of subdivision one of section 3-703. No member shall serve as an officer of a political party or be a candidate or participate in any capacity in a campaign by a candidate for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 and the employees of such lobbyists shall not be eligible to be members of the board. In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be

required to undergo training developed pursuant to paragraph 14 of subdivision a of section 1052 of the charter.

2. The members of the board shall be compensated at the rate of one hundred dollars per calendar day when performing the work of the board.

3. The board may employ necessary staff, including an executive director and a counsel, and make necessary expenditures subject to appropriation. The board may employ such staff, including legal and accounting staff, as are necessary for providing technical assistance to candidates and prospective candidates in covered elections, for the purpose of promoting understanding of, participation in, and compliance with the requirements of the provisions of this chapter.

4. No member of the campaign finance board shall be removed from office except for cause and upon notice and hearing.

5. The board shall have the power to investigate all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and for such purposes shall have the power to require the attendance and examine and take the testimony under oath of such persons as it shall deem necessary and to require the production of books, accounts, papers and other evidence relative to such investigation.

6. The board shall publicize, as it deems appropriate, the names of candidates for nomination or election to the offices of mayor, public advocate, comptroller, borough president, or city council who violate any of the provisions of this chapter.

7.    (a) The board shall render advisory opinions with respect to questions arising under this chapter upon the written request of a candidate, an officer of a political committee or member of the public, or upon its own initiative. The board shall promulgate rules regarding reasonable times to respond to such requests. The board shall make public the questions of interpretation for which advisory opinions will be considered by the board and its advisory opinions, including by publication on its internet website.

   (b) The board shall develop a program for informing candidates and the public as to the purpose and effect of the provisions of this chapter. The board shall prepare and make available educational materials, including compliance manuals and summaries and explanations of the purposes and provisions of this chapter. These materials shall be prepared in plain language. The board shall prepare and make available materials, including, to the extent feasible, computer software, to facilitate the task of compliance with the disclosure and record-keeping requirements of this chapter. When disclosure reports are generated by use of the board's disclosure software, the board shall provide an opportunity for candidates to test their electronic filings on any of the three business days prior to the deadline for the filing of such disclosure reports. Any disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005.

8. The board shall have the authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of this chapter. The board shall promulgate regulations concerning the form in which contributions and expenditures are to be reported, the periods during which such reports must be filed and the verification required. The board shall require the filing of reports of contributions and expenditures for purposes of determining compliance with paragraph (f) of subdivision one of section 3-703, section 3-706, subdivision 1-a of section 3-703, section 3-718, and section 3-719, in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements.

9. The board shall develop a computer data base that shall contain all information necessary for the proper administration of this chapter including information on contributions to and expenditures by candidates and their authorized committees and distributions of moneys from the campaign finance fund. Such data base shall be accessible to the public.

10. The Board shall have the authority to implement any system established for the regulation of inauguration and transition donations and expenditures including the promulgation of rules and regulations and the imposition of any penalties related thereto, as required by local law. The specific powers enumerated in subdivisions 5, 6, 7, 8, 9 and 11 of this section, for purposes of this chapter, shall also be applicable in full for purposes of such chapter 8.

11. The board may take such other actions as are necessary and proper to carry out the purposes of this chapter.

§3-709 New York city campaign finance fund.
1. There is hereby established a special fund, to be known as the New York city campaign finance fund. The moneys in such fund may be expended by the campaign finance board only as payments for participating candidates in accordance with the provisions of this chapter.

2. The fund shall be kept separate and shall be credited with all sums appropriated therefore, any donations received pursuant to subdivision nine of this section and all earnings accruing on such funds.

3. As soon as practicable in the year nineteen hundred eighty-eight and in time for inclusion in the executive expense budget in every year thereafter, and at such other times as the board shall deem necessary, the board shall submit its estimate of the amount of public funds which will be necessary to provide candidates sufficient financing for elections in the next year in which elections are scheduled pursuant to the charter and for elections to

fill vacancies to be held and make such other determinations and reserve such estimated amounts at such time or times as to assure that such amounts as shall be necessary may be appropriated in full by the beginning of the fiscal year prior to that in which elections are scheduled pursuant to the charter and that additional amounts may be appropriated as necessary.

4. The moneys in such fund shall be paid to participating candidates by the board upon its certification that such candidates qualify for such funds.

5. No moneys shall be paid to participating candidates in a primary election any earlier than two weeks after the last day to file designating petitions for such primary election.

6.   (a) No moneys shall be paid to participating candidates in a run-off primary election held
     pursuant to section 6-162 of the election law or in a general election any earlier than the day after the day of the primary election held to nominate candidates for such election.

     (b) No moneys shall be paid to participating candidates in a run-off special election held to fill a vacancy any earlier than the day after the day of the special election for which such run-off special election is held.

7. No moneys shall be paid to any participating candidate who has been finally disqualified or whose designating or nominating petitions have been finally declared invalid by the New York city board of elections or a court of competent jurisdiction. Any payment from the fund in the possession of such a candidate or his or her principal committee on the date of such final disqualification or invalidation may not thereafter be expended for any purpose except the payment of liabilities incurred in qualified campaign expenditures before such date and shall be promptly repaid to the fund.

8. Prior to the first distribution of public funds to candidates in any election, the board shall make a determination whether the moneys in the fund are sufficient to provide all candidates the amounts they may receive pursuant to this chapter for all elections to be held during the calendar year for which such determination is made. Such determination shall be published in the City Record, together with information supporting such determination.

9. The board shall be empowered to accept donations to be credited to the fund. The board may devise such methods of soliciting and collecting donations as it may deem feasible and appropriate.

### §3-709.5 Mandatory debates.

1.   (a) In any year in which a primary, general or special election is to be held, any participating candidate
     and any limited participating candidate for nomination or election to a city-wide office shall participate in either of the two pre-election debates, or both, held pursuant to this section for which he or she is eligible and is required to debate pursuant to this section. A participating candidate or limited participating candidate for nomination or election to a city-wide office is eligible to participate in a debate for each election in which he or she is on the ballot if he or she has met such criteria for participation as shall be specified in any agreement between the debate sponsor and the board.

     (b) In any year in which a run-off primary or run-off special election to fill a vacancy for a city-wide office is held, any participating candidate and any limited participating candidate for nomination or election to such city-wide office who is on the ballot shall participate in one run-off election debate.

     (c) In the case of a primary, the debate shall be among participating candidates and limited participating candidates seeking nomination of the same political party who meet the requirements provided in paragraph (a) of this subdivision. If there is no contested primary for an office in a political party then no debate for that party's nomination shall be held pursuant to this section.

     (d) Each debate held pursuant to this section shall be at least one hour's duration.

2. For purposes of this section, a "debate" shall mean the moderated reciprocal discussion of issues among candidates on the ballot for the same office.

3. The campaign finance board shall select one or more sponsors for each debate required pursuant to this section. For primary, general and special elections, the second debate shall be a debate among the leading contenders for the office, as described in paragraph (b) of subdivision five of this section.

4. Organizations which are not affiliated with any political party or with any holder of or candidate for public office, which have not endorsed any candidate in the pending primary, special, general, or run-off election for the city-wide office shall be eligible to sponsor one or more of the required debates. The rules for conducting such debates shall be solely the responsibility of the organizations selected but shall not be made final without consultation with the campaign finance board. The organizations selected shall be responsible for choosing the date, time and location of the debates.

5. Written applications by organizations to sponsor a debate shall be submitted to the campaign finance board on a form provided by the board not later than a date chosen by the board in any year in which an election is held for city-wide offices.

(a) The written application shall:

(i) demonstrate that the organization and any proposed co-sponsor meet the criteria of subdivision four of this section;

(ii) specify the election and office for which the organization seeks to sponsor the debate;

(iii) set forth the date, time, duration, and location of the debate and the specific and exclusive circumstances under which the date or time may be changed, together with a provision for when the rescheduled debate would be held;

(iv) provide a detailed description of the format and ground rules for the debate;

(v) verify that the staging, promotion, and coverage of the debate shall be in conformance with all applicable laws;

(vi) include an agreement to indemnify the city for any liability arising from the acts or omissions of the sponsor; and

(vii) set forth plans for publicity and for broadcast and other media coverage for the debate; and

(viii) set forth the criteria for determining which candidates are eligible to participate in each debate the organization seeks to sponsor, in accordance with paragraph (b) of this subdivision.

(b) (i) Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, (I) spent, contracted, or obligated to spend, and (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held contained in subdivision two of section 3-703; provided, however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703; provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board. Nothing in this provision is intended to limit the debates to the two major political parties.

(ii) If a debate sponsor has determined that a non-participating candidate has met all the non-partisan, objective, and non-discriminatory criteria applicable to participating candidates or limited participating candidates for access to any of the primary, general, or special election debates, the sponsor may invite that candidate to participate in such debate. In the case of a run-off primary election or a run-off special election, the sponsor may invite a non participating candidate to participate in such debate. However, if a non-participating candidate does not accept such invitation to debate or does not appear at such debate, the debate shall go forward as scheduled; provided, however, if there is only one participating candidate or limited participating candidate participating in any such debate, such debate shall be canceled.

6. Prior to choosing a sponsor, the board shall provide for the receipt of comments from interested persons regarding the qualifications of potential sponsors. The board shall consider and give substantial weight to such comments submitted by candidates.

7. Based upon the criteria in subdivision four above and any comments received pursuant to subdivision six above, the board shall select the organization or organizations to sponsor the debates and shall provide written notification to the organization or organizations so selected. In addition to the sufficiency of the application, the board shall consider the applicant's ability to reach a wide audience and present a fair and impartial debate. The board may accept an application subject to modifications as it deems appropriate and as are acceptable to the sponsor.

8. For all debates, the board shall provide each debate sponsor it has selected with a list of participating candidates and limited participating candidates who are eligible to be considered to participate in such debates.

9. If a candidate fails to participate in any debate required under this section before an election, the candidate shall be liable for return of any public matching funds previously received pursuant to the certification filed by the candidate in connection with the election for which such debate is held, shall be ineligible to receive any further matching funds for that election, and may be subject to a civil penalty pursuant to section 3-711. For purposes of this subdivision, each primary, general, special or run-off election shall be considered a separate election.

10. Following the submission of a petition on behalf of the candidate and a hearing before the board, the sanction or sanctions provided in subdivision nine of this section applicable to a candidate for failure to participate in any debate as required under this section may be waived upon a determination by the board that the failure to participate in the debate occurred under circumstances beyond the control of the candidate and of such nature that a reasonable person would find the failure justifiable or excusable.

11. Nothing contained in this section shall preclude any candidate from agreeing to participate in any number of additional debates between any and all candidates for a city wide office, including non-participating candidates or limited participating candidates. These debates need not be held under guidelines or the purview of the campaign finance board.

12. The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate held pursuant to this section 3-709.5.

Return to Top | Return to The Program and the Law

### §3-710 Examinations and audits; repayments.

1. The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code. The board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall promulgate rules regarding what documentation is sufficient in demonstrating financial activity. These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, provided that:

(a) Any draft audit, the subject of which is a participating, limited participating or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races, and (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

(b) The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, within (i) fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races, and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate within (i) sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races, and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.

(c) Any advice provided by board staff to participating, limited participating, or non-participating candidate with regard to an action shall be presumptive evidence that such action, if taken in reliance on such advice, should not be subject to a penalty or repayment obligation where such candidate or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, describing the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

(d) Notwithstanding the provisions of paragraphs a and b of this subdivision, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (i) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested; and (ii) the commencement of the tolling period pursuant to this section. If a committee has responded to a request for information made by board auditors but such response is inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days until an adequate response is provided, provided that the committee has received timely written notice of: (i) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested; (ii) the commencement of the tolling period pursuant to this section; and (iii) the detailed reasons why the original response was inadequate.

(e) Notwithstanding any provision of law to the contrary, the deadlines provided in paragraphs a and b of this subdivision for the completion

criminal activity, or activity that may constitute a breach of certification pursuant to rules of the board or potential significant violations of the limits set forth in section 3-706.

(f) Notwithstanding any provision of the law to the contrary, the deadlines provided in paragraphs a and b of this subdivision for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with paragraphs a and b.

2.   (a) If the board determines that any portion of the payment made to the principal committee of a
participating candidate from the fund was in excess of the aggregate amount of payments which such candidate was eligible to receive pursuant to this chapter, it shall notify such committee and such committee shall pay to the board an amount equal to the amount of excess payments.

(b) If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such candidate and committee of the amount so disqualified and such candidate and committee shall pay to the board an amount equal to such disqualified amount; provided, however, that in considering whether or not a participating candidate shall be required to pay to the board such amount or an amount less than the entire disqualified amount, the board shall act in accordance with the following: (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; and (ii) where there is an absence of credible documentation for each qualified campaign expenditure, the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

(c) If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election. No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

3. If a participating candidate whose principal committee has received public funds is disqualified by a court of competent jurisdiction on the grounds that such candidate committed fraudulent acts in order to obtain a place on the ballot and such decision is not reversed, such candidate and his or her principal committee shall pay to the board an amount equal to the total of public funds received by such principal committee.

4. No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to all of the requirements of subdivision one of this section, and an opportunity to appear before the board. Any such repayment claim shall be based on a final determination issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee. Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination.

Return to Top | Return to The Program and the Law

**§3-710.5 Findings of violation or infraction; adjudications; final determinations.**

(i) The board shall determine whether a participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

(ii) (a) The board shall give written notice and the opportunity to appear before the board to any
participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction, before assessing any penalty for such action. Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit required pursuant to subdivision one of section 3-710. In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election, in the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit. Alleged violations and proposed penalties shall be subject to resolution by adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature of such pre-election adjudications. The board

(b) The board shall include in every final determination: (i) notice of the respondent's right to bring a special proceeding challenging the board's final determination in New York State supreme court pursuant to article 78 of the civil practice law and rules; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law and rules.

### §3-711 Penalties.

1. Any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees that fail to file in a timely manner a statement or record required to be filed by this chapter or the rules of the board in implementation thereof or that violate any other provision of this chapter or rule promulgated thereunder, including any provision of section 3-709.5, and any committee treasurer or any other agent of a participating, limited participating or non-participating candidate who commits such a violation or infraction, shall be subject to a civil penalty in an amount not in excess of ten thousand dollars. The board shall publish a schedule of civil penalties for common infractions and violations, including examples of aggravating and mitigating circumstances that may be taken into account by the board in assessing such penalties. This schedule shall reflect that infractions are less serious failures to comply with the provisions of this chapter.[2]

2. (a) In addition to the penalties provided in subdivision one of this section, if the aggregate amount of expenditures by a participating or limited participating candidate and such candidate's principal committee exceed the expenditure limitations contained in this chapter, such candidate and principal committee shall be subject to a civil penalty in an amount not to exceed three times the sum by which such expenditures exceed the applicable expenditure limitation;

(b) In addition to the penalties provided in subdivision one of this section, a participating candidate or his or her principal committee, that have been found by the board to have violated a provision of this chapter by failing to provide any response to a draft audit report sent to the candidate after the election by the board pursuant to section 3-710 of this chapter, shall be subject to a civil penalty for such violation of up to ten percent of the total public funds received by such candidate.

3. The intentional or knowing furnishing of any false or fictitious evidence, books or information to the board under this chapter, or the inclusion in any evidence, books, or information so furnished of a misrepresentation of a material fact, or the falsifying or concealment of any evidence, books, or information relevant to any audit by the board or the intentional or knowing violation of any other provision of this chapter shall be punishable as a class A misdemeanor in addition to any other penalty as may be provided under law, including subdivision one of this section. The board shall assess penalties for such conduct and seek to recover any public funds obtained.

4. Notwithstanding any provision of law to the contrary, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who commits any violation of this chapter or any rules promulgated hereunder and who takes all steps necessary to correct such violation prior to receiving written notice from the board of the existence of the potential violation shall not be subject to any penalty for such violation.

Return to Top | Return to The Program and the Law

### §3-712 Campaigns for office not subject to this chapter.

Contributions, loans, guarantees and other security for such loans used and expenditures made toward the payment of liabilities incurred by a candidate in an election held prior to the effective date of this section or in a campaign for public office other than one covered by this chapter, shall not be subject to the requirements and limitations of this chapter.

### §3-713 Reports.

1. The campaign finance board shall review and evaluate the effect of this chapter upon the conduct of election campaigns in the city and shall submit a report to the mayor and the city council on or before September first, nineteen hundred ninety, and every fourth year thereafter, and at any other time upon the request of the mayor or the city council and at such other times as the board deems appropriate, containing:

(a) the number and names of candidates qualifying for and choosing to receive public funds pursuant to this chapter, and of candidates failing to qualify or otherwise not choosing to receive such funds, in each election during the four preceding calendar years;

(b) the amount of public funds provided to the principal committee of each candidate pursuant to this chapter and the contributions received and expenditures made by each such candidate and the principal committee of such candidate, in each election during the four preceding calendar years;

(c) the number and names of candidates filing a certification pursuant to section 3-718 of this chapter in each election during the

four preceding calendar years, together with the expenditures made by each such candidate and the principal committees of such candidate in each such election;

(d) the number and names of non-participating candidates in each election during the four preceding calendar years, together with the expenditures made by each such candidate and the authorized committees of such candidate in each such election;

(e) recommendations as to whether the provisions of this chapter governing maximum contribution amounts, thresholds for eligibility and expenditure limitations should be amended and setting forth the amount of, and reasons for, any amendments it recommends;

(f) analysis of the effect of this chapter on political campaigns, including its effect on the sources and amounts of private financing, the level of campaign expenditures, voter participation, the number of candidates and the candidates' ability to campaign effectively for public office;

(g) a review of the procedures utilized in providing public funds to candidates; and

(h) such recommendations for changes in this chapter as it deems appropriate.

2. For the report submitted in the year nineteen hundred ninety, the board also shall review any contributions made to candidates and authorized committees prior to the effective date of this chapter which exceed the amount of the maximum contribution applicable pursuant to paragraph (f) of subdivision one of section 3-703 and report as to whether such contributions were returned, expended or otherwise used and the purposes of such expenditures or other uses.

§3-714 Construction.
Nothing in this chapter shall be construed to prohibit the making or receipt of contributions to the extent permitted by the election law or to permit the making or receipt of contributions otherwise prohibited.

Return to Top | Return to The Program and the Law

§3-715 Joint campaign activities.
Nothing in this chapter shall be construed to restrict candidates from authorizing expenditures for joint campaign materials and other joint campaign activities, provided that the benefit each candidate derives from the joint material or activity is proportionally equivalent to the expenditures authorized by such candidate.

§3-716 Application of the contribution and expenditure limitations to certain political activities.
1. Nothing in this chapter shall be construed to restrict candidates or their agents from making appearances at events sponsored or paid for by persons, political committees, or other entities that are not in any way affiliated with such candidate or any agent of such candidate. The costs of such events shall not be considered contributions to or expenditures by such a candidate pursuant to this chapter solely because such an appearance is made; provided that this subdivision shall not apply to any event in relation to which contributions are solicited on behalf of such candidate.

2. The following activities in support of other candidates by a participating, limited participating or non-participating candidate or his or her principal committee shall not be considered contributions to or expenditures by such participating, limited participating or non-participating candidate or his or her principal committee, except to the extent such activities are paid for by such candidate or his or her principal committee for a covered election:

(a) The act alone of endorsing or appearing with another candidate for public office, party nomination or party position.

(b) The insubstantial communication of such endorsement or appearance described in paragraph (a), such as where the participating, limited participating or non-participating candidate's name is one of several names appearing on the communication and is of equivalent prominence as the other names.

(c) Fundraising assistance to another candidate in the form of written communications that do not promote the participating, limited participating or non-participating candidate, such as the appearance of the participating, limited participating or non-participating candidate's name or signature on a letter soliciting funds for another candidate or the appearance of such participating, limited participating or non-participating candidate's name on fundraising material where such participating, limited participating or non-participating candidate's name appears alone or with other names and is of (d) A typical communication by a political club to its members, which includes the name of a participating, limited participating or non-participating candidate, provided that such candidate is already a member of the political club, the political club has fewer than 500 members, and the communication does not solicit funds on behalf of or otherwise promote such candidate's campaign for a covered election.

3. The communication of an endorsement or appearance which is not insubstantial under paragraph (b) of subdivision two, fundraising assistance

which is a condition under paragraph (d) of subdivision two, or a certification that a communication meets the requirement of paragraph (d) of subdivision two, shall be contributions to and expenditures by the participating, limited participating or non-participating candidate. Among the factors the board shall consider in determining the value of the contribution to and expenditure by the participating, limited participating or non-participating candidate are the following factors:

(a) the focus of the communication;

(b) the geographical distribution or location of the communication;

(c) the subject matter of the communication;

(d) the references to the participating, limited participating or non-participating candidate or the participating, limited participating or non-participating candidate's appearances in the communication;

(e) the relative prominence of a participating, limited participating or non-participating candidate's references or appearances in the communication, including the size and location of such references and any photographs of the participating, limited participating or non-participating candidate; and

(f) the timing of the communication.

Return to Top | Return to The Program and the Law

§3-717. Expired.

§3-718. Limited Participation.
1. Requirements.

(a) To be a limited participating candidate, a candidate for nomination for election or election must:

(i) be a candidate for mayor, public advocate, comptroller, borough president or member of the city council in a primary, special, or general election;

(ii) not have filed a certification pursuant to section 3-703 for the election or elections for which he or she seeks to file a certification pursuant hereto; and

(iii) (A) file a written certification in such form as may be prescribed by the campaign finance board, which sets forth his or her acceptance of and agreement to comply with the terms and conditions of this section and the rules promulgated hereby, which includes an affirmation that the candidate has a sufficient amount of personal funds to fund his or her campaign; and

(B) the deadline for filing such certification for a primary, general, or special election shall be the deadline date for filing written certifications pursuant to section 3-703(1)(c) by candidates seeking nomination for election or election to the same office in the same calendar year as candidates seeking to file a certification pursuant to this subparagraph, and the provisions of such section 3-703(1)(c) relating to the occurrence of an "extraordinary circumstance" shall apply to limited participating candidates; and

(iv) notify the board in the candidate's written certification as to: (1) the existence of each authorized committee authorized by such candidate that has not been terminated, (2) whether any such committee also has been authorized by any other candidate, and (3) if the candidate has authorized more than one authorized committee, which authorized committee has been designated by the candidate as the candidate's principal committee for the election(s) covered by the candidate's certification; provided, that such principal committee (a) shall be the only committee authorized by such candidate to aid or otherwise take part in the election(s) covered by the candidate's certification, (b) shall not be an authorized committee of any other candidate, and (c) shall not have been authorized or otherwise active for any election prior to the election(s) covered by the candidate's certification. The use of an entity other than the designated principal committee to aid or otherwise take part in the election(s) covered by the candidate's certification shall be a violation of this section and shall trigger the application to such entity of all provisions of this chapter governing principal committees. [3]

(b) A limited participating candidate and his or her principal committee shall comply with the provisions of paragraphs (d), (e), (g), (i), and (o) of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter. [4]

(c) A limited participating candidate and his or her principal committee shall not accept, at any time before or after the filing of a certification pursuant to paragraph (a) of this subdivision, either directly or by transfer, any monetary or in-kind contribution, or any loan, guarantee, or other security for such loan made in connection with such candidate's nomination for election or election, except

as monetary contributions from the candidate to his or her principal committee need not exceed the candidate's personal funds, in-kind contributions made by the candidate to his or her principal committee, and advances received pursuant to subparagraph (d) of this paragraph.

(d) A limited participating candidate and his or her principal committee shall make expenditures in furtherance of the election(s) for which the candidate has filed a certification pursuant to paragraph (a) of this subdivision, whether before or after the filing of such certification, only with contributions received pursuant to subparagraph (c) of this paragraph and, to the extent permitted by rule promulgated by the board pursuant hereto, advances by the limited participating candidate.

(e) A limited participating candidate, together with his or her principal committee, shall not make expenditures which in the aggregate exceed the applicable expenditure limitations set forth in section 3-706.

(f) Neither a limited participating candidate nor an authorized committee of a limited participating candidate shall be eligible to receive public funds pursuant to section 3-705.

(g) If a limited participating candidate is a candidate for the same office for which he or she filed a certification pursuant to paragraph (a) of this subdivision in any other election held in the same calendar year as the election for which such candidate filed such certification, other than a special election to fill a vacancy, he or she shall be bound in each such other election by the provisions of this section.

(h) A candidate who files a certification pursuant to paragraph (a) of this subsection shall not be eligible to file a certification pursuant to section 3-703.

(i) Notwithstanding any limitations in this chapter, a limited participating candidate may contribute to his or her own nomination for election or election with his or her personal funds or property, in-kind contributions made by the candidate to his or her authorized committees with the candidate's personal funds or property, and advances made by the limited participating candidate with the candidate's personal funds or property. A candidate's personal funds or property shall include his or her funds or property jointly held with his or her spouse, domestic partner, or unemancipated children, but shall not include other personal funds or property of his or her spouse, domestic partner or unemancipated children.

Return to Top | Return to The Program and the Law

§3-719. Obligations of non-participating candidates.
1. Disclosure requirements of non-participating candidates.

(a) A non-participating candidate shall notify the board in such form as may be prescribed by the board as to: (i) the existence of each committee authorized by such candidate that has not been terminated, and (ii) whether any such committee also has been authorized by any other candidate.

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall comply with the same requirements as a participating candidate who files a certification pursuant to paragraph (c) of subdivision one of section 3-703 of this chapter as provided in paragraphs (d) and (g) of such subdivision, subdivision one-b of section 3-703, and subdivisions six, six-a and eight of section 3-703 of this chapter.

(c) A non-participating candidate and his or her authorized committee shall submit the disclosure reports required pursuant to this chapter, filed in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements, and such other disclosure reports as the rules of the board may require.

(d) Neither a non-participating candidate nor an authorized committee of a non-participating candidate shall be eligible to receive public funds pursuant to section 3-705.

2. Contribution limitations of non-participating candidates.

(a) A non-participating candidate shall notify the board in such form as may be prescribed by the board as to: (i) the existence of each committee authorized by such candidate that has not been terminated, and (ii) whether any such committee also has been authorized by any other candidate.

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall only accept contributions as limited by the provisions of paragraphs (f) and (l) of subdivision one of section 3-703, subdivision 1-a of section 3-703, and subdivision ten of section 3-703 of this chapter. Notwithstanding any contribution limitations in paragraphs (f) and (h) of subdivision one of section 3-703 and subdivision 1-a of section 3-703, a non-participating candidate may contribute to his or her own nomination for election or election with his or her personal funds or property, in-kind contributions made by the candidate to his or her authorized committees with the candidate's personal

funds or property, and advances or loans made by the non-participating candidate with the candidate's personal funds or property. A candidate's personal funds or property shall include his or her funds or property jointly held with his or her spouse, domestic partner, or unemancipated children.

(c) Neither a non-participating candidate nor an authorized committee of a non-participating candidate shall be eligible to receive public funds pursuant to section 3-705.

**§3-720. Tolling of time for notice of alleged violations and/or notice of repayment of public funds.**
If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

---

### New York City Administrative Code Title 3, Chapter 8

(added by Local Law No. 39 of 1998 and amended by Local Law No. 58 of 2004)

### TRANSITION AND INAUGURATION DONATIONS AND EXPENDITURES

**§3-801. Transition and inauguration donations and expenses.**
1. Candidates elected to the office of mayor, public advocate, comptroller, borough president, or member of the city council may authorize one or more entities, other than a political committee, for the purpose of accepting donations and loans, and for making expenditures, for transition or inauguration into office. Such donations and loans may not be accepted and such expenditures may not be made on behalf of the candidate prior to the registration with the campaign finance board of each such entity. The campaign finance board shall promulgate rules to establish the time and manner for such registration.

2. Candidates elected to the office of mayor, public advocate, comptroller, borough president, or member of the city council, and the entities they authorize pursuant to subdivision one of this section, shall:

(a) not use funds accepted by a political committee authorized by the candidate for any election to make expenditures for transition or inauguration into office, and shall not transfer funds from a political committee to an entity the candidate is required to register pursuant to subdivision one of this section;

(b) not accept any donation or donations of money, goods, or services from any individual, political committee, employee organization, or entity which in the aggregate exceeds:

(i) four thousand five hundred dollars, in the case of a candidate elected to the office of mayor, public advocate, or comptroller;

(ii) three thousand five hundred dollars, in the case of a candidate elected to the office of borough president; or

(iii) two thousand five hundred dollars, in the case of a candidate elected to the office of member of the city council;

(c) not incur any liabilities after January thirty-first in the year following the election, nor accept any donations after all liabilities are paid; and

(d) not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation to a transition or inauguration entity authorized pursuant to subdivision one of this section made by a natural person who has business dealings with the city where such donation is from the candidate-elect or from the candidate-elect's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

Return to Top | Return to The Program and the Law

3. Donations that do not exceed the limitations set forth in paragraph (b) of subdivision 2 of this section may be accepted only from political committees that register with the campaign finance board, as shall be provided for in rules issued by such board. Any donation accepted from a political committee that has not registered with the board prior to making the donation must be returned to the political committee. However, a subsequent donation may be accepted if such political committee registers with the board in accordance with the rules issued by the board.

4. To the extent not repaid by the date of the candidate's inauguration into office, a loan received by such entity shall be deemed a donation subject to the limits and restrictions set forth in paragraph (b) of subdivision 2 and subdivision 3 of this section.

5.     (a) Each transition and inauguration entity authorized pursuant to subdivision one of this section shall report to the campaign finance board every donation of money, goods, or services, and every loan, it receives, the full name, residential address, occupation, employer, and business address of each individual, corporation, partnership, political committee, employee organization or other entity making or serving as the intermediary for such donation or loan, and every expenditure it makes.

(b) Donations aggregating not more than ninety-nine dollars from any one donor need not be separately itemized in disclosure reports submitted to the campaign finance board. The treasurer of such entity need not collect or disclose the occupation, employer, or business address of any donor making donations aggregating not more than ninety-nine dollars.

(c) Disclosure reports shall be submitted at such times and in such form as the campaign finance board shall require and shall be clearly legible. The campaign finance board shall make available to the public a copy of these disclosure reports within two business days after they are accepted by the campaign finance board.

6. The final disclosure report submitted by such entity shall set forth the disposition of any funds remaining after all liabilities are paid, after which the entity shall be terminated. If an entity has funds remaining after all liabilities have been paid, it shall return those funds to one or more of the entity's donors, or if that is impracticable, to the New York city election campaign finance fund.

7. Entities required to be registered pursuant to subdivision one of this section shall not incur liabilities for purposes other than transition or inauguration into office.

8. This section shall apply to every candidate elected to the office of mayor, public advocate, comptroller, borough president, or member of the city council, regardless whether such candidate filed a written certification pursuant to section 3-703 of this code.

9. For purposes of this chapter, the terms "intermediary" and "political committee" shall have such meanings as are set forth in section 3-702 of this code.

10. Notwithstanding any restriction in this section, a candidate may self-fund his or her own entity.

§3-802. Penalties.
1. Any candidate whose transition or inauguration entity fails to file in a timely manner a statement or record required to be filed by this chapter or the rules of the board in implementation thereof or who violates any other provisions of the chapter or rules promulgated thereunder, and any transition or inauguration entity treasurer or any other agent of the candidate who commits such a violation, shall be subject to a civil penalty in an amount not in excess of ten thousand dollars.

2. In addition to the penalties provided in subdivision one of this section, if the amount of a donation to the candidate's transition or inauguration entity exceeds the limitations contained in this chapter such candidate, such entity shall be subject to a civil penalty in an amount not to exceed three times the sum by which such donation exceeds the applicable donation limitation.

3. The intentional or knowing furnishing of any false or fictitious evidence, books, or information to the board under this chapter, or the inclusion of any evidence, books, or information so furnished of a misrepresentation of a material fact, or the intentional or knowing violation of any other provision of this chapter shall be punishable as a class A misdemeanor in addition to any other penalty as may be provided under law.

Return to Top | Return to The Program and the Law

ENDNOTES
[1] Pursuant to Administrative Code §3-703(7), these contribution limits were increased in 2002 to reflect changes in the Consumer Price Index. Currently, these amounts are: for mayor, public advocate, or comptroller, $4,950; for borough president, $3,850; and for City Council member, $2,750.

This language represents a reconciliation of language included in Local Law No. 58 of 2004, Local Law No. 59 of 2004, and Local Law No. 60 of 2004. Local Law No. 58 of 2004 includes the following language:

> Any participating or limited participating candidate whose principal committee fails to file in a timely manner a statement or record required to be filed by this chapter or the rules of the board in implementation thereof or who commits a violation or infraction of any other provision of this chapter or rule promulgated thereunder, including any provision of section 3-709.5, and any principal committee treasurer or any other agent of a participating or limited participating candidate who commits such a violation or infraction, shall be subject to a civil penalty in an amount not in excess of ten thousand dollars.

Local Law No. 59 of 2004 and Local Law No. 60 of 2004 include the following language:

> Any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees that fail to file in a timely manner a statement or record required to be filed by this chapter or the rules of the board in implementation thereof or that violate any other provision of this chapter or rule promulgated thereunder, and any committee treasurer or any other agent of a participating, limited participating or non-participating candidate who commits such a violation or infraction, shall be subject to a civil penalty in an amount not in excess of ten thousand dollars.

[3] This language represents a reconciliation of minor inconsistencies in language included in Local Law No. 58 of 2004, Local Law No. 59 of 2004, and Local Law No. 60 of 2004.

[4] This language represents a reconciliation of language included in Local Law No. 58 of 2004, Local Law No. 59 of 2004, and Local Law No. 60 of 2004. Local Law Nos. 58 and 60 of 2004 include the following language:

> A limited participating candidate and his or her principal committee shall comply with the provisions of paragraphs (d), (e), (g), and (i) of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter.

Local Law No. 59 of 2004 includes the following language:

> A limited participating candidate, and the authorized committees of such a limited participating candidate, shall comply with the provisions of paragraphs (d), (e), (g), and (i) of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter.

Return to Top | Return to The Program and the Law

©2008 NYC Campaign Finance Board \ Privacy Statement \ Accessibility       site search

