UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
TOM OGNIBENE, *et al.*,

|  |  |  |
|---|---|---|
|  | Plaintiffs, | **DECLARATION OF** |
| - against - |  | **JONATHAN PINES** |
| FREDERICK A. O. SCHWARTZ, JR., *et al.*, |  |  |
|  | Defendants. | 08 CV 01335 (LTS) (TDK) |

------------------------------------------------------------------------ x

**JONATHAN PINES**, an attorney duly admitted to practice law declares under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an Assistant Corporation Counsel in the Office of the Corporation Counsel, assigned to represent the defendants in this matter.

2.      I make this declaration in opposition to plaintiffs' motion for a preliminary injunction and in support of defendants' cross-motion for summary judgment.

3.      Attached to this declaration as Pines Exhibit A is the official text of Local Law 34, approved on July 3, 2007.

4.      Attached to this declaration as Pines Exhibit B is the official text of Local Law 67, approved on December 31, 2007.

5.      Attached to this declaration as Pines Exhibit C is the official text of Local Law 15, approved on June 13, 2006.

6.      Attached to this declaration as Pines Exhibit D is the official text of Local Law 16, approved on June 13, 2006.

7.    Attached to this declaration as Pines Exhibit E is the official text of Local Law 17, approved on June 13, 2006.

8.    Attached to this declaration as Pines Exhibit F is the Report of the New York City Charter Revision Commission, dated August 20, 1998.

9.    Attached to this declaration as Pines Exhibit G is the full text of Int. No. 586.  Legislation pending in the Council is called an "Introduction," often abbreviated to "Intro" or "Int.", and is assigned a number.  When an Introduction is signed by the Mayor, it becomes a Local Law and is assigned a new number.  *See* City Council webpage at http://www.council.nyc.gov/html/about/about.shtml (last visited on August 4, 2008).

10.    Attached to this declaration as Pines Exhibit H is the Report of the Governmental Affairs Division on Int. No. 586.

11.    Attached to this declaration as Pines Exhibit I is the Transcript of the Minutes of the Committee on Governmental Operations regarding Int. No. 586, dated June 12, 2007.

12.    Attached to this declaration as Pines Exhibit J is the written testimony submitted to the City Council regarding Int. No. 586, dated June 12, 2007.

13.    Attached to this declaration as Pines Exhibit K is the full text of proposed Int. No. 586-A.

14.    Attached to this declaration as Pines Exhibit L is the Report of the Governmental Affairs Division on proposed Int. No. 586-A.

15.    Attached to this declaration as Pines Exhibit M is that portion of the Transcript of the Minutes of the Committee on Governmental Operations as pertains to proposed Int. No. 586-A, held on June 21, 2007.

16.     Attached to this declaration as Pines Exhibit N is the written testimony submitted to the City Council regarding proposed Int. No. 586-A (referred to in some documents as "Intro. 586-A" and occasionally without the appended "A"), dated June 21, 2007.

17.     Attached to this declaration as Pines Exhibit O is that portion of the Transcript of the Stated Council Meeting as pertains to proposed Int. No. 586-A, held on June 27, 2007.

18.     Attached to this declaration as Pines Exhibit P is the that portion of the Transcript of the Public Hearing on Proposed Local Laws as pertains to proposed Int. No. 586-A, held on July 3, 2007.

19.     Attached to this declaration as Pines Exhibit Q is the full text of Int. No. 651.

20.     Attached to this declaration as Pines Exhibit R is the full text of proposed Int. No. 651-A.

21.     Attached to this declaration as Pines Exhibit S is the Report of the Governmental Affairs Division on proposed Int. No. 651-A.

22.     Attached to this declaration as Pines Exhibit T is that portion of the Transcript of the Minutes of the Committee on Governmental Operations as pertains to proposed Int. No. 651-A, held on December 6, 2007.

23.     Attached to this declaration as Pines Exhibit U is the written testimony submitted to the City Council regarding Int. No. 651, dated December 6, 2007.

24.     Attached to this declaration as Pines Exhibit V is the second Report of the Governmental Affairs Division on proposed Int. No. 651-A.

25.      Attached to this declaration as Pines Exhibit W is that portion of the Transcript of the Minutes of the Committee on Governmental Operations as pertains to proposed Int. No. 651-A, held on December 18, 2007.

26.      Attached to this declaration as Pines Exhibit X is the written testimony submitted to the City Council regarding proposed Int. No. 651-A, dated December 18, 2007.

27.      Attached to this declaration as Pines Exhibit Y is that portion of the Transcript of the Stated Council Meeting as pertains to proposed Int. No. 651-A, held on December 19, 2007.

28.      Attached to this declaration as Pines Exhibit Z is the full text of Int. No. 192.

29.      Attached to this declaration as Pines Exhibit AA is the Report of the Governmental Affairs Division on Int. Nos. 190, 191, and 192.

30.      Attached to this declaration as Pines Exhibit BB is the Transcript of the Minutes of the Committee on Governmental Operations regarding Int. Nos. 190, 191, and 192, held on April 4, 2006.

31.      Attached to this declaration as Pines Exhibit CC is the full text of proposed Int. No. 192-A.

32.      Attached to this declaration as Pines Exhibit DD is the Report of the Governmental Affairs Division on proposed Int. Nos. 190-A, 191-A, and 192-A.

33.      Attached to this declaration as Pines Exhibit EE is the Transcript of the Minutes of the Committee on Governmental Operations regarding Int. Nos. 190-A, 191-A, and 192-A, held on May 24, 2006.

34.    Attached to this declaration as Pines Exhibit FF is that portion of the Transcript of the Stated Council Meeting as pertains to proposed Int. Nos. 190-A, 191-A, and 192-A, held on May 24, 2006.

35.    Attached to this declaration as Pines Exhibit GG are pages excerpted from the Deposition of plaintiff Shelia Anderson-Ricci, dated June 18, 2008.

36.    Attached to this declaration as Pines Exhibit HH are pages excerpted from the Deposition of plaintiff Yvette Velazquez Bennett, dated June 19, 2008.

37.    Attached to this declaration as Pines Exhibit II are pages excerpted from the Deposition of plaintiff Martin Malave Dilan, dated June 20, 2008.

38.    Attached to this declaration as Pines Exhibit JJ are pages excerpted from the Deposition of plaintiff Tom Ognibene, dated June 17, 2008.

39.    Attached to this declaration as Pines Exhibit KK are pages excerpted from the Deposition of plaintiff Robert Perez, dated June 17, 2008.

40.    Attached to this declaration as Pines Exhibit LL are pages excerpted from the Deposition of plaintiff Fran Reiter, dated June 19, 2008.

41.    Attached to this declaration as Pines Exhibit MM are pages excerpted from the Deposition of plaintiff Michele Russo, dated June 19, 2008.

42.    Attached to this declaration as Pines Exhibit NN are pages excerpted from the Deposition of plaintiff Marlene Tapper, dated June 18, 2008.

43.    Attached to this declaration as Pines Exhibit OO are pages excerpted from the Deposition of plaintiff Viviana Vazquez-Hernandez, dated June 20, 2008.

44.    Attached to this declaration as Pines Exhibit PP is an article from the Queens Chronicle regarding Tom Ognibene, dated July 31, 2008.

45.    Appended under this declaration are the declarations of Peri Horowitz, Director of Special Compliance and Policy Assurance for the New York City Campaign Finance Board, dated August 4, 2008, with exhibits designated Horowitz Exhibits A-D attached thereto; David Karnovsky, General Counsel at the Department of City Planning for the City of New York, dated August 4, 2008; Amy Loprest, Executive Director of the New York City Campaign Finance Board, dated August 4, 2008, with exhibits designated Loprest Exhibits A-B attached thereto; Jesse Schaffer, Director of the Doing Business Accountability Project at the Mayor's Office of Contract Services, dated August 4, 2008, with an exhibit designated Schaffer Exhibit A attached thereto; Marla G. Simpson, Director of the Mayor's Office of Contract Services and the City Chief Procurement Officer, dated August 4, 2008; and Arnie Wolsky, Deputy Counsel to the City Clerk and Director of the Lobbying Bureau in the New York City Clerk's Office, dated August 4, 2008, with an exhibit designated Wolsky Exhibit A attached thereto.

Dated:    New York, New York
          August 4, 2008

                                             Jonathan Pines



**Please Use This Form for Filing your Local Law with the Secretary of State)**

Text of law should be given as amended.  Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

County of  New York
City of  New York

Local Law No. _____34_____ of the year 2007

By The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo Jackson, Garodnick, Gentile, Gerson, Gioia, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia, Reyna, Seabrook, Stewart, Vacca, Weprin, White Jr., Liu, Mendez and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor)

A Local Law to amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1.   Subdivision 3 of section 3-702 of the administrative code of the city of New York, as amended by local law number 17 for the year 2006, is amended, and three new subdivisions 18, 19 and 20 are added, to read as follows:

3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a

contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution.  The following contributions are not matchable:

(a)    in-kind contributions of property, goods, or services;

(b)    contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(c)    contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or similar drawing for valuable prizes;

(d)    money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e)    contributions from individuals under the age of eighteen years;

(f)    contributions  from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance; [and]

(g)    contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1) or section 3-213-d.  The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213[.]; and

(h)    contributions from contributors subject to the limitations of subdivision one-a of section 3-703 of this chapter.

18.    a.  The term "business dealings with the city" shall mean (i) any contract for the procurement of goods or services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York (other than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than  the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code, or for construction totaling not more than five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter), and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; (ii) any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii) any application for approval sought from the city of New York  pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter,  and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter;  provided, however that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c

an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further, however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) one or more concessions (other than concessions awarded through competitive sealed bid) or franchises from the city of New York or any agency or entity affiliated with the city of New York with estimated aggregate payments to the city of more than  the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code per fiscal year; or (v) one or more grants totaling not more than the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code,  received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York; or (vii) any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants.  In addition, for purposes of this chapter a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York during all periods covered by a registration statement.   For purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions, franchises and grants that are five thousand dollars or less in value shall be excluded from any calculation as to whether a contract, concession, franchise or grant is a business dealing with the city.  For purposes of clauses (ii) and (iii) of this subdivision, the department of city planning, in consultation with the board, may promulgate rules to  require the submission by applicants to the city of information necessary to implement the requirements of subdivisions 1-a and 1-b of section 3-703 of



this chapter as they relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion in the doing business database established pursuant to subdivision (20) of this section.  For purposes of this subdivision, actions, transactions, and agreements for the purpose of providing affordable housing pursuant to the Private Housing Finance Law or the General Municipal Law or any other city, state or federal program, including but not limited to actions, transactions and agreements for such purposes which involve land dispositions, loans, grants, real property tax exemptions, zoning bonuses, low income housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of residents or on the rents or other charges to be paid by such residents, shall not constitute business dealings with the city of New York.  For purposes of this subdivision, "agency or entity affiliated with the city of New York" shall mean the city school district of the city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials.

b.  Business dealings with the city as defined in this subdivision shall be limited as follows:  for purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the procurement of goods, services, or construction shall only constitute business dealings with the city of New York for the period from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract and for twelve months after the end of such term, provided, however that where such contract

award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in which the city of New York is the proposed  lessee, shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business dealing with the city from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter or in the case of a decision of the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to



subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section; for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of New York for the period from the submission of the bid or proposal until twelve months after the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.

c.     Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or construction or who has submitted bids or proposals

for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a determination that said person should not be included in the database.

d.    A person, as defined by subdivision 20 of section 3-702, shall be considered to have business dealings with the city as of the date the person's name is entered in the doing business database, as such date is indicated in such database or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.

19.    The term "economic development agreement" means any contract or agreement in which financial incentives including, but not limited to, tax incentives, payments in lieu of taxes and financing are offered in return for the development, attraction or retention of business; provided, however that no financial incentives which are given to a person who qualifies for such incentive by operation of law shall be deemed to be pursuant to an economic development agreement for purposes of this chapter.

20.    The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business



dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city. Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than once a month. Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city. For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city.

§2. Section 3-703 of the administrative code of the city of New York is amended by adding two new subdivisions 1-a and 1-b to read as follows:

1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may accept, either directly or by transfer, a contribution or contributions for a covered election from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for such election does not exceed:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; (iii) for member of the city council two hundred fifty dollars.  Any contribution made pursuant to this section shall not be a matchable contribution.  For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such

participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings.  Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate."  Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule.  The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such

subdivision.  Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines.  If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation provided, however, that no such contribution shall be matchable.  Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor.  No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein.  Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds.  For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer  of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an

interest in an entity, which exceeds ten percent of the entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city. Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

§3.    Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 12 for the year 2003, is amended to read as follows:

(i) the [first] tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4.    Section 3-705 is amended by adding two new subdivisions 9 and 10 to read as follows:

9.    If a participating candidate endorses or publicly supports his or her opponent for election, such candidate shall not be eligible for public funds.

10.    Participating candidates who lose in the primary election but remain on the ballot for the general election must certify to the board that they will actively campaign for office by including, but not limited to, raising and spending funds, seeking endorsements and broadly soliciting votes before receiving public funds.

§5.  Paragraph (d) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 59 for the year 2004, is amended to read as follows:

(d) obtain and furnish to the campaign finance board and his or her principal committee or authorized committees must obtain and furnish to the board any information it may request relating to his or her campaign expenditures or contributions and furnish such documentation and other proof of compliance with this chapter as may be requested by such board, provided, however, that the board shall accept such required documentation through an electronically scanned transmission;

§6. Section 3-703 of the administrative code of the city of New York is amended by adding a new subdivision 15 to read as follows:

15.  Participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign shall be required to attend a training provided by the campaign finance board concerning compliance with the requirements of the campaign finance program and use of the campaign finance program software.

§7. Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:

4.  The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates

until the final pre-election payment for any given election. <u>The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election. For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the event that the board denies such petition then it shall immediately notify the candidate of its right to appeal to appeal pursuant to article 78 of the civil practice law and rules.</u>

§8. Subdivision 8 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws numbered 58, 59 and 60 for the year 2004, is amended to read as follows:

8. The board shall have the authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of this chapter. The board shall promulgate regulations concerning the form in which contributions and expenditures are to be reported, the periods during which such reports must be filed and the verification required. The board shall require the filing of reports of contributions and expenditures for purposes of determining compliance with paragraph (f) of subdivision one of section 3-703, section 3-706, <u>subdivision 1-a of section 3-703,</u> section 3-718, and section 3-719 in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements.

§9.  Paragraphs (a) and (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as added by local law 58 for the year 2004, are amended, and a new subdivision 12 is added to read as follows:

(a)  The written application shall:

(i)      demonstrate that the organization and any proposed co-sponsor meet the criteria of subdivision four of this section;

(ii)     specify the election and office for which the organization seeks to sponsor the debate;

(iii)    set forth the date, time, duration, and location of the debate and the specific and exclusive circumstances under which the date or time may be changed, together with a provision for when the rescheduled debate would be held;

(iv)     provide a detailed description of the format and ground rules for the debate;

(v)      verify that the staging, promotion, and coverage of the debate shall be in conformance with all applicable laws;

(vi)     include an agreement to indemnify the city for any liability arising from the acts or omissions of the sponsor; and

(vii)    set forth plans for publicity and for broadcast and other media coverage for the debate; and

(viii) set forth the criteria for determining which candidates are eligible to participate in each debate the organization seeks to sponsor, in accordance with paragraph (b) of this subdivision.

(b)    (i)       Except as otherwise provided in subparagraph (ii) below,

each debate for a primary, general or special election shall include

only those participating candidates or limited participating

candidates the sponsor of each such debate has determined meet

the non-partisan, objective, and non-discriminatory criteria set

forth in any agreement between the sponsor and the board;

provided, however, that the criteria for the first debate for a

primary, general, or special election shall provide, among other

criteria, (A) that a participating candidate shall be eligible to

participate in such debate if he or she has, by the last filing date

prior to such debate, [either] (I) spent, contracted, or obligated to

spend, [or] and (II) received in contributions, an amount equal to

or more than twenty percent of the threshold for eligibility for

public funding applicable to participating candidates contained in

subdivision two of section 3-703, and (B) that a limited

participating candidate shall be eligible to participate in such

debate if he or she has, by the last filing date prior to such debate,

spent, contracted, or obligated to spend, an amount equal to or

more than twenty percent of the threshold for eligibility for public

funding applicable to participating candidates seeking the office

for which such debate is being held contained in subdivision two

of section 3-703; provided however, that for the purpose of

determining whether a candidate has met the financial criteria to be

eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703; provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board.  Nothing in this provision is intended to limit the debates to the two major political parties.

(ii)      If a debate sponsor has determined that a non-participating candidate has met all the non-partisan, objective, and non-discriminatory criteria applicable to participating candidates or limited participating candidates for access to any of the primary, general, or special election debates, the sponsor may invite that candidate to participate in such debate.  In the case of a run-off primary election or a run-off special election, the sponsor may invite a non-participating candidate to participate in such debate. However, if a non-participating candidate does not accept such invitation to debate or does not appear at such debate, the debate

shall go forward as scheduled; provided, however, if there is only

one participating candidate or limited participating candidate

participating in any such debate, [upon agreement by the debate

sponsor, the board and the potential debater,] such debate [may]

shall be canceled.

12.  The city of New York shall indemnify each sponsor for any liability of such

sponsor arising out of the acts or omissions of the city of New York in connection with

the selection of candidates for participation in any debate, held pursuant to this section 3-

709.5.

§10.  Paragraph b of subdivision 2 of section 3-710 of the administrative code of

the city of New York, as amended by local law 69 for the year 1990, is amended to read

as follows:

b.  If the board determines that any portion of the payment made to a principal

committee of a participating candidate from the fund was used for purposes other than

qualified campaign expenditures, it shall notify such candidate and committee of the

amount so disqualified and such candidate and committee shall pay to the board an

amount equal to such disqualified amount; provided, however that in considering whether

or not a participating candidate shall be required to pay to the board such amount or an

~~amountless~~amount less than the entire disqualified amount, the board shall act in

accordance with the following:  (i) where credible documentation supporting each

qualified campaign expenditure exists but is incomplete, the board shall not impose such

liability for such expenditure; (ii) where there is an absence of credible documentation for

each qualified campaign expenditure,  the board may impose liability upon a showing

that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

§11.  Paragraph b of subdivision 1 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall comply with the same requirements as a participating candidate who files a certification pursuant to paragraph (c) of subdivision one of section 3-703 of this chapter as provided in paragraphs (d) and (g) of such subdivision, subdivision one-b of section 3-703,  and subdivisions six, six-a and eight of section 3-703 of this chapter.

§12.  Paragraph b of subdivision 2 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall only accept contributions as limited by the provisions of paragraphs (f) and (l) of subdivision one of section 3-703, [and] subdivision 1-a of section 3-703, and subdivision ten of section 3-703 of this chapter. Notwithstanding any contribution limitations in paragraphs (f) and (h) of subdivision one of section 3-703 and subdivision 1-a of section 3-703, a non-participating candidate may contribute to his or her own nomination for election or election with his or her personal funds or property, in-kind contributions made by the candidate to his or her authorized committees with the

candidate's personal funds or property, and advances or loans made by the non-participating candidate with the candidate's personal funds or property. A candidate's personal funds or property shall include his or her funds or property jointly held with his or her spouse, domestic partner, or unemancipated children.

§13.  Paragraph 1 of subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended to read as follows:

§ 1052.  Campaign finance board. a. 1. There shall be a campaign finance board consisting of five members.  Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker.  The members shall first be appointed to serve as follows:

(a)  one member appointed by the speaker for a term of one year;

(b)  one member appointed by the mayor for a term of two years;

(c)  one member appointed by the speaker for a term of three years;

(d)  one member appointed by the mayor for a term of four years; and

(e)  the chairperson for a term of five years.

Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment. Upon expiration of the term of a member, if the mayor or the speaker, as appropriate, shall fail to appoint a member within

one hundred twenty days of the expiration of such term, the member whose term has expired shall be deemed appointed for an additional term of five years, provided, however, that if the expiration of such term occurs in a year in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, the member whose term has expired shall be deemed appointed for an additional term of five years if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of the expiration of such term. In case of a vacancy in the office of a member, a member shall be appointed to serve the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. If the mayor or the speaker, as appropriate, shall fail to appoint a member within one hundred eighty days of such vacancy, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, provided, however, that if such vacancy occurs in a year, or within ninety days prior to a year, in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of such vacancy. Except for the chairperson, such member shall not be enrolled in the same political party as the other member appointed by the official who failed to so appoint. Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president, or member of the council which in the aggregate are in excess of the

maximum contribution applicable to such office pursuant to any local law establishing a voluntary system of campaign finance reform.  No member shall serve as an officer of a political party, or be a candidate, or participate in any capacity in a campaign by a candidate, for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council.  Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 of the administrative code and the employees of such lobbyists shall not be eligible to be members of the board.  In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be required to undergo training developed pursuant to paragraph 14 of this section.

§14.  Subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended by adding a new paragraph 14 to read as follows:

14   a.   The council and the mayor, in conjunction with the campaign finance board, shall develop a curriculum to be used to train members of the campaign finance board and staff.  Such curriculum shall include the issues and problems confronted by campaigns for covered office and how the application and enforcement of the city's campaign finance laws impacts these campaigns.

§15. Paragraph 5 of subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended to read as follows:

5.  The board shall have the power to investigate all matters relating to the performance of its functions and any other matter relating to the proper administration of any voluntary system of campaign finance reform established by local law and for such purposes shall have the power to require the attendance and examine and take the testimony under oath of such persons as it shall deem necessary and to require the production of books, accounts, papers and other evidence relative to such investigation. Notwithstanding any other provision of law, the investigative and adjudicatory powers and functions of the staff to the board shall be separate and no staff member of the board shall perform both investigative and adjudicatory tasks or functions.

§16.  Subdivision 12 of section 3-702 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:

12.  The term "intermediary" shall mean an individual, corporation, partnership, political committee, employee organization or other entity which, (i) other than in the regular course of business as a postal, delivery or messenger service, delivers any contribution from another person or entity to a candidate or other authorized committee; or (ii) solicits contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee.  For purposes of clause (ii) of this subdivision only persons clearly identified as the solicitor of a contribution to the candidate or his or her authorized committee shall be presumed to be known to such candidate or his or her authorized committee.  "Intermediary" shall not include spouses, domestic partners, parents, children or siblings of the person making such contribution, or any fundraising agent, as such term is defined in the rules of the board or any hosts of a campaign sponsored fundraising event paid for in whole or in part

by the campaign.   Where there are multiple individual hosts for a non-campaign

sponsored event, the hosts shall designate one such host as the intermediary.

§17.    Section 3-702 of the administrative code of the city of New York is amended by adding a new subdivision 19 to read as follows:

19.    a.  For purposes of campaigns that accept public funds pursuant to section

3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include

all payments and liabilities in furtherance of a political campaign for covered office,

including, but not limited to, all qualified campaign expenditures and expenditures

subject to or exempt from the expenditure limitations of this chapter pursuant to sections

3-706 and 3-712.  In addition, there shall be a rebuttable presumption that the following

expenditures are in furtherance of a political campaign for elective office; provided,

however that the presumptions contained in this subdivision shall not apply to an

expenditure made when the expenditure is to a person or entity associated with the

candidate making such expenditure or on whose behalf such candidate's committee made

such expenditure; and provided further that in rebutting any such presumption the

campaign finance board may consider factors including the timing of the expenditure and

whether the campaign had an unusually high amount of spending on a particular type of

expenditure.  For purposes of this subdivision a person or entity associated with a

candidate includes a spouse, domestic partner, child, parent,sibling,or a person with

whom the candidate has a business or other financial relationship:

1.    Contributions to charitable organizations designated as 501(c)(3)

organizations pursuant to the internal revenue code;

2.    Contributions to candidates and political committees subject to the

provisions of section 3-705(8);

3.    Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

4.    Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

5.    Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

6.    Legal defense of a non-criminal matter arising out of a political campaign;

7.    Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

8.    A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

9.    Payment of non-criminal penalties or fines arising out of a political campaign;

10.    Costs incurred in demonstrating eligibility for the ballot, public funds payments or defending against a claim that public funds must be repaid;

11.    Food and beverages provided to campaign workers and volunteers; and

b.  Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign.  Expenditures not in furtherance of a political campaign for elective office include the following:

1       Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate, or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

2.       Any residential, or household items, supplies or expenditures;

3.       Clothing, haircuts and other personal grooming;

4.       Funeral, cremation, or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

5.       Automobile purchases;

6.       Tuition payments, childcare costs;

7.       Dues, fees, or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

8.       Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

9.       Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

<u>10.    Gifts, except  for brochures, buttons, signs and other campaign materials</u>
<u>and token gifts valued at not more than fifty dollars that are for the purpose of expressing</u>
<u>gratitude, condolences or congratulations.</u>

§18. Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of
the city of New York, as separately amended by local laws 58 and 60 for the year 2004, is
amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must
not accept, either directly or by transfer, any contribution, loan, guarantee, or other
security for such loan from any corporation, <u>limited liability company, limited liability</u>
<u>partnership, or partnership</u> other than a corporation<u>, limited liability company, limited</u>
<u>liability partnership, or partnership</u> that is a political committee as defined in subdivision
eleven of section 3-702 of this chapter, for all covered elections held in the same calendar
year in which he or she is a participating or non-participating candidate<u>, provided,</u>
<u>however, that where a contribution is from a contributor whose  name is followed by a</u>
<u>professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the</u>
<u>board shall not treat such contribution as coming from a corporation, limited liability</u>
<u>company or limited liability partnership or partnership in the absence of further indicia</u>
<u>that such contribution is from such an entity;</u>

§19.  Subdivision 1 of section 3-703 of the administrative code of the city of New
York is amended by adding a new paragraph (o) to read as follows:

<u>(o) agree that expenditures by his or her principal committee for the purpose of</u>
<u>advocating a vote for or against a proposal on the ballot in an election that is also a</u>

covered election shall be subject to the contribution and expenditure limitations applicable in such covered election.

§20.  Paragraphs (g) and (h) of subdivision 2 of section 3-704 of the administrative code of the city of New York, paragraph (g) as added by local law 60 for the year 1990 and paragraph (h) as amended by local law 12 for the year 2003, are amended, and new paragraphs (i), (j) and (k) are added to such section to read as follows:

(g)  gifts, except brochures, buttons, signs and other printed campaign material; [or]

(h)  any expenditure to challenge or defend the validity of petitions of designation or nomination, or of certificates of nomination, acceptance, authorization, declination, or substitution, and expenses related to the canvassing of election results, made pursuant to subdivision four of section 3-706[.];

(i) an expenditure made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, other than expenditures made also to further the participating candidate's nomination for election or election;

(j) payment of any penalty or fine imposed pursuant to federal, state or local law;

(k) payments made through advances, except in the case of individual purchases in excess of two hundred fifty dollars.

§21.  Paragraph (a) of subdivision (2) of section 3-705 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:  If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of [four] six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars

in public funds per contributor (or up to five hundred <u>twenty-five</u> dollars in public funds

per contributor in the case of a special election), obtained and reported to the campaign

finance board in accordance with the provisions of this chapter.

§22.  Paragraph a of subdivision (7) of section 3-705 is REPEALED and

paragraph c of subdivision (7) of section 3-705 of the administrative code of the city of

New York, as added by local law 12 for the year 2003, is amended to read as follows:

(c) the participating candidate has submitted  a <u>certified</u> signed statement

attesting to the need and stating the reason for additional public funds in such election, in

which case the board shall publish such statement at the time such additional public funds

are paid, including on the board's internet website.  <u>Such statement must certify that (i)</u>

<u>one or more of the following conditions applies and provide documentation in support of</u>

<u>such condition and (ii) that such condition or conditions reasonably demonstrates the</u>

<u>need for such public funds.</u>

<u>(1)  the participating candidate is opposed by (i) a non-participating candidate</u>

<u>or (ii) a limited participating candidate, and provides a factual basis with supporting</u>

<u>documentation of such candidate's ability to self finance;</u>

<u>(2)  the participating candidate is opposed by a candidate who has received (i)</u>

<u>the endorsement of a citywide or statewide elected official or a federal elected official</u>

<u>representing all or a portion of the area covered by the election; (ii) two or more</u>

<u>endorsements from other city elected officials who represent all or a part of the area</u>

<u>covered by the election; or (iii) endorsements of one or more membership organizations</u>

<u>with a membership of over 250 members;</u>

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name in television, radio or print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4)  the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child hold or have held elective office in an area encompassing all or part of the area that is the subject of the current election in the past ten years.

The board shall be authorized to verify the truthfulness of any certified

statement submitted pursuant to this paragraph and of any supporting documentation and

shall post such certifications and supporting documentation on its website.

(d)  the participating candidate is opposed in a primary or special election for an

office for which no incumbent is seeking re-election.

If any of the conditions described in paragraphs (a), (b), [or] (c) or (d)

occur in such election, the board shall pay any and all additional public funds due

to the participating candidate up to the maximum total payment applicable in such

election under subdivisions two or six of this section or subdivision three of

section 3-706 of this chapter.

§23.  Subdivisions 1, 2 and 4 of section 3-706 of the administrative code of the

city of New York, as added by local law 58 for the year 2004, are amended to read as

follows:

1.  The following limitations apply to all expenditures made by a candidate and

his or her principal committee on or after the first day of January preceding the election

for which such candidate chooses to participate in the public funding provisions of this

chapter and to expenditures made at any time prior to such date for services, materials,

facilities, advertising or other things of value received, rendered, published, distributed or

broadcast on or after such date:

(a)    Except as provided in paragraph (b) of this subdivision, in each primary

election, in each special election to fill a vacancy, and in each general election,

expenditures by a participating candidate or a limited participating candidate and his or

her principal committee for one of the following offices shall not exceed the following amounts:

| | |
|---|---|
| mayor: | [$4,000,000] $6,157,600 |
| public advocate or comptroller: | [$2,500,000] $3,849,575 |
| borough president: | [$900,000] $1,385,675 |
| member of the city council: | [$105,000] $161,250 |

(b)  (i)  The expenditure limitation in a run-off primary election held pursuant to section 6-162 of the New York state election law or a run-off special election held to fill a vacancy shall be one half the amount of the applicable limitation provided for an election for such office pursuant to the provisions of paragraph (a) of this subdivision.

(ii)  The board shall promulgate rules to provide for a separate expenditure limit applicable to campaign expenditures for an additional day for voting held pursuant to section 3-108 of the New York state election law, an election held pursuant to court order, or a delayed or otherwise postponed election.

(c)  Expenditures by participating or limited participating candidates in a primary election made prior to or on the date of such primary election shall be deemed to have been made for such primary election.

(d)  The campaign finance board shall, pursuant to section 3-713, submit a report to the mayor and the council on or before September first, nineteen hundred ninety, containing its recommendations whether the

expenditure limitations provided by this subdivision should be modified. Such report shall set forth the amount of, and reasons for, any modifications it recommends.

(e)    Not later than the first day of March in the year two thousand [eighteen] ten and every fourth year thereafter the campaign finance board shall (i) determine the percentage difference between the average over a calendar year of the consumer price index for the metropolitan New York-New Jersey region published by the United States bureau of labor statistics for the twelve months preceding the beginning of such calendar year and the average over the calendar year two thousand [fifteen] seven of such consumer price index; (ii) adjust each expenditure limitation applicable either pursuant to this subdivision or subdivision 2 of this section by the amount of such percentage difference to the nearest thousand dollars; and (iii) publish such adjusted expenditure limitation in the City Record. Such adjusted expenditure limitation shall be in effect for any election held before the next such adjustment.

2.  The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years.  Such expenditures by a participating or limited participating

candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

mayor, public advocate or comptroller:     [$270,000] $290,250

borough president:     [$120,000] $129,000

member of the city council:     [$40,000] $43,000

4.     (a) Expenditures made for the purpose of [complying with the provisions of this chapter or the election law, including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures,]: (i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or  with respect to election law or other law or regulation governing candidate or political committee activity or ballot status, (ii) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results, and (iii) expenses related to the post-election audit shall not be limited by the expenditure limitations of this section.

(b)     [In reviewing claims that expenditures are exempt from expenditure limitations by reason of paragraph (a) of this subdivision, the board shall not require the participating candidate or principal committee to provide detailed documentation substantiating such exempt expenditure claims unless the board has reason to believe that expenditures have been erroneously or falsely claimed to be exempt in disclosure reports.

(c) Notwithstanding paragraph (b) above, a] A participating candidate shall be required to provide detailed documentation substantiating all exempt expenditure claims made pursuant to this subdivision [if the aggregate exempt expenditure claims made by the participating candidate exceed an amount equal to seven and one-half percent of the participating candidate's applicable expenditure limitation].

§24.  Subdivision 1 of section 3-708 of the administrative code of the city of New York, as amended by local law 48 for the year 1998, is amended to read as follows:

1. There shall be a campaign finance board consisting of five members. Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker. The members shall first be appointed to serve as follows:

(a) one member appointed by the speaker for a term of one year;

(b) one member appointed by the mayor for a term of two years.

(c) one member appointed by the speaker for a term of three years;

(d) one member appointed by the mayor for a term of four years; and

(e) the chairperson for a term of five years.

(b) Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment.

In case of a vacancy in the office of a member, a member shall be appointed to serve for

the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. In the case of a vacancy in the office of a member for which a member is holding over after expiration of the term for which the member was appointed, an appointment to such office made after June 1 in a year in which covered elections are scheduled shall not take effect prior to December 1 of that calendar year. Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to paragraph (f) of subdivision one of section 3-703. No member shall serve as an officer of a political party or be a candidate or participate in any capacity in a campaign by a candidate for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 and the employees of such lobbyists shall not be eligible to be members of the board.  In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be required to undergo training developed pursuant to paragraph 14 of subdivision a of section 1052 of the charter.

§25.  Paragraph (b) of subdivision 7 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws 58. 59. and 60 for the year 2004, is amended to read as follows:

(b) The board shall develop a program for informing candidates and the public as to the purpose and effect of the provisions of this chapter. The board shall prepare and make available educational materials, including compliance manuals and summaries and explanations of the purposes and provisions of this chapter. These materials shall be prepared in plain language. The board shall prepare and make available materials, including, to the extent feasible, computer software, to facilitate the task of compliance with the disclosure and record-keeping requirements of this chapter. When disclosure reports are generated by use of the board's disclosure software, the board shall provide an opportunity for candidates to test their electronic filings on any of the three business days prior to the deadline for the filing of such disclosure reports. Any disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005.

§26. Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York, as separately amended by local laws 58, 59 and 60 for the year 2004, is amended to read as follows:

§ 3-710 Examinations and audits; repayments. 1. The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code. The board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall issue rules regarding what documentation is sufficient in demonstrating financial activity. These audit and examination powers extend to all participating candidates, limited participating

candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, provided that:

a. Any draft audit, the subject of which is a participating, limited participating, or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating, or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races; and  (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, (i) within fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races; and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time.  Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate (i) within sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races; and (ii) eighteen months after the submission of the final disclosure report for the covered

election for citywide races, unless the subject of such audit consents in writing to a longer period of time.  Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.

c. Any advice provided by board staff to participating, limited participating, or non-participating candidates with regard to an action shall be presumptive evidence that such action taken in reliance on such advice should not be subject to a penalty or repayment obligation where such candidate, or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, that describes the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

d.  Notwithstanding the provisions of paragraphs a and b of this section, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received

timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section. If a committee has responded to a request for information made by board auditors but such response is inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days until an adequate response is provided, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, (b) the commencement of the tolling period pursuant to this section and (c) the detailed reasons why the original response was inadequate.

e. Notwithstanding any provision of law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall not apply in cases where the audit raises issues involving potential campaign-related fraud, potential other criminal activity, activity that may constitute a breach of certification pursuant to rules of the board, or potential significant violations of the limits set forth in section 3-706.

f. Notwithstanding any provision of the law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with provisions a and b.

§27.  Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 69 for the year 1990, is amended to read as follows:

2. (c) (i)  If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election. [Such reimbursement shall be made not later than ten days after all liabilities have been paid and in any event, not later than either the closing date of the final disclosure report, or the day on which the campaign finance board issues its final audit report for such participating committee, for such covered election, as shall be set forth in rules promulgated by the campaign finance board.]  No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§28.  Section 3-710 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

4. (a) No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to the all of the requirements of subdivision one of this section, and a reasonable opportunity to appear before the board.  Any such repayment claim shall be based on a final determination to be issued by the board following an adjudication

before the board consistent with the procedures set forth in section 1046 of the charter underline unless such procedures are waived by the candidate or principal committee.  Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination.

§29.  Section 3-710.5 of the administrative code of the city of New York, as separately amended by local laws 58, 59 and 60 for the year 2004 is hereby amended to read as follows:

§ 3-710.5 Findings of violation [or] infraction; adjudications; or final determinations.  (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

 (ii) The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction before assessing any penalty for such action.  Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit

required pursuant to subdivision one of section 3-710.  In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election in the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit.  Alleged violations and proposed penalties shall be subject to resolution by adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature of such pre-election adjudications.  The board shall issue a final determination within thirty days of the conclusion of the adjudication proceeding.

(b) The board shall include in every final determination: (i) notice of the respondents' right to bring a special proceeding challenging the board's final determination in New York State supreme court brought pursuant to article 78 of the civil practice law; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law.

§30.  Section 3-711 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

4.  Notwithstanding any provision of law, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who commit any violation of this chapter or any rules promulgated hereunder and who take all steps necessary to correct such violation prior to receiving notice from the board of the

existence of the potential violation pursuant to section 3-710.5 shall not be subject to any penalty for such violation.

§ 31. Paragraph (b) of subdivision 1 of section 3-718 of the administrative code of the city of New York, as separately added by local laws 58, 59 and 60 for the year 2004, is amended to read as follows:

(b) A limited participating candidate and his or her principal committee shall comply with the provisions of paragraphs (d), (e), (g), [and] (i), and (o) of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter.

§32.  Chapter 7 of title 3 of the administrative code of the city of New York is amended by adding a new section 3-720 to read as follows:

§3-720.  Tolling of time for notice of violations or penalties..  If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

§33.  Paragraphs (b) and (c) of subdivision 2 of section 3-801 of the administrative code of the city of New York, paragraph (b) as amended by and paragraph (c) as added

by local law 58 for the year 2004, are amended, and a new paragraph (d) is added to read as follows:

(b) not accept any donation or donations of money, goods, or services from any individual, [corporation, partnership,] political committee, employee organization, or entity which in the aggregate exceeds:

(i) four thousand five hundred dollars, in the case of a candidate elected to the office of mayor, public advocate, or comptroller;

(ii) three thousand five hundred dollars, in the case of a candidate elected to the office of borough president; or

(iii) two thousand five hundred dollars, in the case of a candidate elected to the office of member of the city council; [and]

(c) not incur any liabilities after January thirty-first in the year following the election, nor accept any donations after all liabilities are paid[.];and

(d)  not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city to a transition or inaugural committee where such donation is from the candidate-elect, or from the candidate-elect's parent,  spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§34. Paragraph a of subdivision 3 of section 3-706 is amended by adding a new subparagraph (iii) to read as follows:

(iii) with regard to contributions raised on or after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provide for such  office in subdivision one of this section.

§35.  Paragraph b of subdivision 3 of section 3-706 is amended by adding a new subparagraph (iii) to read as follows:

(iii) with regard to contributions raised on or after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A)

<u>participating candidates in a run off election shall receive public funds for such election</u>

<u>pursuant to subdivision five of section 3-705 and shall not receive any additional public</u>

<u>funds pursuant to this section, and (B) in no case shall a principal committee receive in</u>

<u>public funds an amount exceeding two-thirds of the expenditure limitation provide for</u>

<u>such  office in subdivision one of this section.</u>

§36.  Each city agency with which any person who has business dealings with the city conducts such business shall, provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that rules shall not be provided to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section twenty-six of this local law.


§37. Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows:  (i) all of the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief

financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) all of the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of entities that have submitted bids seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, applications for approvals sought pursuant to the provisions of section 195 or certified pursuant to section 197-c of the New York city charter shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with such a real property transaction or land use approval pursuant to clause (ii) of paragraph (a) of subdivision 18

of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (v) all of the provisions of this local law concerning any bid or proposal for a franchise or concession shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database includes, available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of entities with a bid or a proposal for such a franchise or concession; (vi) all of the provisions of this local law concerning a recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in

an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is a recipient of a grant pursuant to clause (v) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) all of the provisions of this local law concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (viii) all of the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and

contracts with investment related consultants pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and (ix) all of the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through (viii) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the Mayor and the Council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the Mayor and the Council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that



names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i) and (iv) shall be six months from the effective date of this local law; the deadline for certification of this section in relation to clauses (ii), (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be sixteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§38.  Sections twenty-one,thirty-fourand thirty-five of this local law shall take effect thirty days after the campaign finance board and department of information technology and telecommunications have certified to the mayor and council one component of the doing business database pursuant to section thirty-seven of this local law.

§39.  With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database.  Such report shall contain the status of each of the components enumerated in clauses (i) through (viii) of section thirty-three of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law.  If such proposals are submitted by the board, and

such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect. Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§40. The mayor, the council and the campaign finance board shall form a task force to study the feasibility of including spouses, domestic partners, and unemancipated children in the restrictions on contributions from persons doing business with the city.

§41. Sections three through seven, nine, ten, thirteen through twenty, and twenty-two through thirty-three thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date.

**THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s:**

I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on _____ June 27, 2007 _____ and approved by the Mayor on _____ July 3, 2007 _____.

VICTOR L. ROBLES, City Clerk of the Council.

**Michael McSweeney**
**1st Deputy & Acting City Clerk**

**Please Use This Form for Filing your Local Law with the Secretary of State)**

Text of law should be given as amended. Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

County of     New York
City of       New York

Local Law No. _____67_____ of the year 2007

Introduced by Council Members Felder and Sears (by request of the Mayor)

A Local Law to amend the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1.   Subdivisions 18 and 20 of section 3-702 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, are amended to read as follows:

18.  a.  The term "business dealings with the city" shall mean (i) any contract (other than an emergency contract or a contract procured through publicly-advertised competitive sealed bidding) which is for the procurement of goods, [or] services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York [(other than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than] and is valued at or above the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or, [for construction totaling not more than] with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the

charter[)], and shall include any contract for the underwriting of the debt of the city of

New York or any agency or entity affiliated with the city of New York and the retention

of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith;

or (ii) any acquisition or disposition of real property (other than a public auction or

competitive sealed bid transaction or the acquisition of property pursuant to the

department of environmental protection watershed land acquisition program) with the

city of New York or any agency or entity affiliated with the city of New York; or (iii) any

application for approval sought from the city of New York  pursuant to the provisions of

section 195 of the charter, any application for approval sought from the city of New York

that has been certified pursuant to the provisions of section 197-c of the charter,  and any

application for a zoning text amendment that has been certified pursuant to section 201 of

the charter;  provided, however, that for purposes of this clause, with respect to section

195 an applicant shall include the lessor of an office building or office space, and with

respect to section 197-c an applicant shall include a designated developer or sponsor of a

project for which a city agency or local development corporation is the applicant and

provided, further, however, that owner-occupants of one, two and three family homes

shall not be considered applicants pursuant to this clause; or (iv) [one or more

concessions] any concession (other than [concessions] a concession awarded through

publicly-advertised competitive sealed bid) or [franchises] any franchise from the city of

New York or any agency or entity affiliated with the city of New York [with] which has

an estimated [aggregate payments to the city of more than] annual value at or above the

dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph

(3) of subdivision i of section 6-116.2 of the administrative code [per fiscal year]; or (v)

[one or more grants totaling not more than] <u>any grant that is valued at or above</u> the dollar

value [set forth] <u>defined</u> in [section 6-116.2(i)(3)(a)] <u>subparagraph (a) of paragraph (3) of</u>

<u>subdivision i of section 6-116.2</u> of the administrative code,  received from the city of

New York or any agency or entity affiliated with the city of New York; or (vi) any

economic development agreement entered into or in effect with the city of New York or

any agency or entity affiliated with the city of New York; or (vii) any contract for the

investment of pension funds, including investments in a private equity firm and contracts

with investment related consultants.  In addition, for purposes of this chapter a lobbyist as

defined in section 3-211 of this title shall be deemed to be engaged in business dealings

with the city of New York during all periods covered by a registration statement.  For

purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions,

franchises and grants that are five thousand dollars or less in value shall be excluded from

any calculation as to whether a contract, concession, franchise or grant is a business

dealing with the city.  For purposes of clauses (ii) and (iii) of this subdivision, the

department of city planning, in consultation with the board, may promulgate rules to

require the submission by applicants to the city of information necessary to implement

the requirements of subdivisions 1-a and 1-b of section 3-703 of this chapter as they

relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion

in the doing business database established pursuant to subdivision [(20)] <u>20</u> of this

section.  [For purposes of this subdivision, actions, transactions, and agreements for the

purpose of providing affordable housing pursuant to the Private Housing Finance Law or

the General Municipal Law or any other city, state or federal program, including but not

limited to actions, transactions and agreements for such purposes which involve land

dispositions, loans, grants, real property tax exemptions, zoning bonuses, low income

housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of

residents or on the rents or other charges to be paid by such residents, shall not constitute

business dealings with the city of New York.]   For purposes of this subdivision, "agency

or entity affiliated with the city of New York" shall mean the city school district of the

city of New York and any public authority, public benefit corporation or not for profit

corporation, the majority of whose board members are officials of the city of New York

or are appointed by such officials. The department of housing preservation and

development shall promulgate rules setting forth which categories of actions, transactions

and agreements providing affordable housing shall and shall not constitute business

dealings with the city of New York for purposes of this subdivision. The department

shall consider the significance of the affordable housing program and the degree of

discretion by city officials in determining which actions, transactions and agreements

shall and shall not constitute such business dealings. Notwithstanding any provision of

this subdivision, a housing assistance payment contract between a landlord and the

department of housing preservation and development or the New York city housing

authority relating to the provision of rent subsidies pursuant to Section 8 of the United

States Housing Act of 1937, 42 USC 1437 et., seq., shall not constitute business dealings

with the city of New York for the purposes of this subdivision.

    b. Business dealings with the city as defined in this subdivision shall be [limited]

as follows:  for purposes of clause (i) of paragraph (a) of this subdivision, bids or

proposals on contracts for the procurement of goods, services, or construction shall only

constitute business dealings with the city of New York for the period from the later of the

submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract (or in the case of purchase contracts for goods, from the date of such purchase) and for twelve months [after the end of such term] thereafter, provided, however that where such contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the date of adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in which the city of New York is the proposed lessee[,] shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and, where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business [dealing] dealings with the city from the date of the certification of such application to the date that is one hundred twenty days after the

date of filing by the council with the mayor of its action pursuant to subdivision e of

section 197-d of the charter or, in the case of a decision of the city planning commission

for which the council takes no action pursuant to paragraph (3) of subdivision (b) of

section 197-d of the charter, the date which is twenty days following the filing of such

decision with the council pursuant to subdivision a of section 197-d of the charter,

provided, however, that in the case of a disapproval of a council action by the mayor

pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred

twenty days after expiration of the ten day period for council override pursuant to such

section;  for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals

for franchises and concessions shall only constitute business dealings with the city of

New York for the period from the submission of the bid or proposal until twelve months

after the date of such submission, concessions shall only constitute business dealings with

the city of New York during the term of such concession and for twelve months after the

end of such term, and franchises shall only constitute business dealings with the city of

New York for the period of one year after the commencement of the term of the franchise

or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of

this subdivision, grants shall constitute business dealings with the city of New York for

one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this

subdivision, economic development agreements shall  constitute business dealings with

the city from the submission of an application for such agreement and during the term of

such agreement and for one year after the end of such term; and for purposes of clause

(vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds,

including the investments in a private equity firm and contracts with investment related

consultants shall constitute business dealings with the city from the time of presentation

of investment opportunity or the submission of a proposal, whichever is earlier, and

during the term of such contract and for twelve months after the end of such term.

c.     Notwithstanding anything in this subdivision, a person, as defined by

subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the

procurement of goods, services or construction or who has submitted bids or proposals

for franchises or concessions that are no longer being considered for an award or a person

who for any other reason believes he or she should not be on the database may apply to

the city chief procurement officer or other person designated by the mayor for removal

from the doing business database and shall be removed from the database upon a

determination that said person should not be included in the database.   The city chief

procurement officer may promulgate rules for a process by which a person, as defined by

subdivision 20 of section 3-702, may apply to the city chief procurement officer for a

waiver from inclusion in the doing business database as defined by such subdivision in

instances in which such person is providing essential goods, services or construction such

as those necessary for security or other essential government operations.  Such rules shall

provide that the city chief procurement officer shall transmit to the board a copy of any

application for a waiver and any such waiver may not be granted prior to the expiration of

ten days from the date such application is received by the board.  Such rules shall also

provide that any such waiver may be granted only after substantial efforts have been

made by the city chief procurement officer to obtain the information required by this law.

Such rules shall also provide that the city chief procurement officer may grant the waiver

only upon a finding that it is in the best interests of the city, which finding shall only be

made upon a determination that (i) there is a compelling need to obtain such essential goods, services or construction from the person seeking the exemption and (ii) no other reasonable alternative exists in light of such considerations as cost, uniqueness and the critical nature of such goods, services or construction to the accomplishment of the purchasing agency's mission. Such rules may also provide that a waiver may be granted when a person is doing business with the city by virtue of the city's exercise of its powers of eminent domain. Any grant of a waiver shall be posted on the city's and the board's website in locations that are accessible by the public.

     d.    A person, as defined by subdivision 20 of section 3-702, shall be considered to have business dealings with the city as of the date the person's name is entered in the doing business database, as such date is indicated in such database, or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.

     20.    The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however, that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city. Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness;

provided, however, that in no event shall such database be updated less frequently than once a month. Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city. For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity, provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals.

§2. Subdivisions 1-a and 1-b of section 3-703 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may not accept, either directly or by transfer, [a] any contribution or contributions for a covered election in which he or she is a participating candidate from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for [such election does not exceed] all covered elections in the same calendar year exceeds:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; and (iii) for member of the city council two hundred fifty dollars; provided that a participating candidate or his or her principal committee may accept additional contributions which do not exceed one half the amount of the applicable limitation for any run-off primary election, additional day for voting held pursuant to section 3-108 of the New York state election law, special election to fill a vacancy, run-off special election to fill a vacancy, delayed or otherwise postponed election, or election held pursuant to court order which is a covered election and in which the candidate seeks nomination for election or election.  Any contribution made pursuant to this section shall not be a matchable contribution.  For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is

exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor,

comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines. If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation, provided, however, that no such contribution shall be matchable. Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor. No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein. Failure to return such excess amount in accordance with

the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds.  For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer  of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements, and applications for land use approvals.  Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

§3.  Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:
(i) the tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however, that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4.  Subdivision 10 of section 3-705 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

10. [Participating candidates] A participating candidate who [lose] loses in the primary election but [remain] remains on the ballot for the general election must certify to the board before receiving public funds that [they] he or she will actively campaign for office; [by including,] such campaign activity shall include, but not be limited to, raising and spending funds, seeking endorsements, and broadly soliciting votes [before receiving public funds].

§5. Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

4.    The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election.  The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election.  For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any  non-payment.  The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition.  In the event that the board denies such petition then it shall immediately notify the candidate of [its] his or her right to [appeal to appeal] bring a special proceeding pursuant to article 78 of the civil practice law and rules.

§6.  Subparagraph (i) of paragraph (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, and subdivision 12 of section 3-709.5 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

(b)(i)    Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, (I) spent, contracted, or obligated to spend, and (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held contained in subdivision two of section 3-703; provided, however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the

threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703; provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board.  Nothing in this provision is intended to limit the debates to the two major political parties.

12.  The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate[,] held pursuant to this section 3-709.5.

§7.  Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

b.  If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such candidate and committee of the amount so disqualified and such candidate and committee shall pay to the board an amount equal to such disqualified amount; provided, however, that in considering whether or not a participating candidate shall be required to pay to the board such amount or an [amountless] amount less than the entire disqualified amount, the board shall act in accordance with the following:  (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such

liability for such expenditure; and (ii) where there is an absence of credible documentation for each [qualified campaign] qualified campaign expenditure, the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

§8. Subdivision 19 of section 3-702 of the administrative code of the city of New York, as added by section 17 of local law 34 for the year 2007, is renumbered as subdivision 21 and amended to read as follows:

[19] 21. a. For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter [pursuant to sections 3-706 and 3-712. In addition, there]. There shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however, that the presumptions contained in this subdivision shall not apply to an expenditure [made when the expenditure is] to a person or entity associated with the candidate [making such expenditure or on whose behalf such candidate's committee made such expenditure]; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure. For purposes of this subdivision a person or entity associated with a candidate [includes] shall include the candidate's spouse, domestic partner, child, parent,

or sibling[,] or a person or entity with whom or with which the candidate has a business

or other financial relationship:

1.    Contributions to charitable organizations designated as 501(c)(3)

organizations pursuant to the internal revenue code;

2.    Contributions to candidates and political committees subject to the

provisions of section 3-705(8);

3.    Community events including, but not limited to, events hosted by civic

[associations] and neighborhood [association] associations; provided, however, that this

presumption shall not apply to sporting events, concerts, theater or other entertainment

events which shall be subject to the provisions of paragraph b;

4.    Ballot proposal advocacy where there are indicia that the expenditure

relates to the candidate;

5.    Travel related solely and exclusively to a political campaign for a covered

office or the holding of public office; provided, however, that any travel not related solely

and exclusively to a political campaign or the holding of public office shall be subject to

the provisions of paragraph b;

6.    Legal defense of a non-criminal matter arising out of a political campaign;

7.    Computer hardware, software and other office technology purchased more

than two weeks before the date of a primary election, in the case of a candidate who is

opposed in the primary election, or two weeks before the date of a general election, in the

case of a candidate who was not opposed in a primary election;

8.    A post-election event for staff, volunteers and/or supporters held within

thirty days of the election;

9.     Payment of non-criminal penalties or fines arising out of a political campaign;

10.     Costs incurred in demonstrating eligibility for the ballot[,] or public funds payments or defending against a claim that public funds must be repaid; and

11.     Food and beverages provided to campaign workers and volunteers[; and].

b.  Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign.  Expenditures not in furtherance of a political campaign for elective office include the following:

1.     Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate[,] or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

2.     Any residential[,] or household items, supplies or expenditures;

3.     Clothing, haircuts and other personal grooming;

4.     Funeral, cremation[,] or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

5.     Automobile purchases;

6.     Tuition payments[,]and childcare costs;

7.     Dues, fees[,] or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

8.     Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

9.    Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the [person] candidate benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

10.    Gifts, except for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.

§9. Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership[,] or partnership, other than a corporation, limited liability company, limited liability partnership[,] or partnership that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, provided, however, that where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited

liability company [or], limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity;

§10. Paragraph (j) of subdivision 2 of section 3-704 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(j) payment of any penalty or fine imposed pursuant to federal, state or local law; or

§11.  Paragraph (a) of subdivision 2 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)  If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred [twenty-five] twenty-two dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

§12.  Subdivision 7 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

7. Notwithstanding any provision of this section to the contrary, the amount of public funds payable a participating candidate on the ballot in any covered election shall not exceed one quarter of the maximum public funds payment otherwise applicable under subdivision two of this section, unless:

[(b)](a) the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

[(c)](b) the participating candidate has submitted a certified signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website. Such statement must certify that (i) one or more of the following conditions [applies and provide documentation in support of such condition] apply and (ii) [that] such condition or conditions reasonably [demonstrates] demonstrate the need for such public funds[.], and the participating candidate must provide documentation demonstrating the existence of such condition or conditions:

(1) the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2) the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area

covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election. For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name [in] <u>on</u> television[,] <u>or</u> radio <u>in the area of the covered election</u> or <u>in</u> print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however, that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4) the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar <u>to the candidate's</u> so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child [hold or have held] <u>holds or has held</u> elective

office in an area encompassing all or part of the area [that is the subject] of the [current] covered election in the past ten years.

The board shall be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and shall post such [certifications] certified statements and supporting documentation on its website.

[(d)](c) the participating candidate is opposed in a primary or special election for an office for which no incumbent is seeking re-election.

If any of the conditions described in paragraphs (a), (b), or (c) [or (d)] occur in such election, the board shall pay any and all additional public funds due to the participating candidate up to the maximum total payment applicable in such election under subdivisions two or six of this section or subdivision three of section 3-706 of this chapter.

§13.  Paragraph (a) of subdivision 1 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)      Except as provided in paragraph (b) of this subdivision, in each primary election, in each special election to fill a vacancy, and in each general election, expenditures by a participating candidate or a limited participating candidate and his or her principal committee for one of the following offices shall not exceed the following amounts:

|  |  |
|---|---|
| mayor: | [$6,157,600] $6,158,000 |
| public advocate or comptroller: | [$3,849,575] $3,850,000 |

borough president:                    [$1,385,675] $1,386,000

member of the city council:           [$161,250] $161,000

§14.  Subdivision 2 of section 3-706 of the administrative code of the city of New

York, as amended by local law 34 for the year 2007, is amended to read as follows:

2.  The following limitations apply to all expenditures made by a participating or

limited participating candidate and his or her principal committee in the three calendar

years preceding the year of the election for which such candidate chooses to file a

certification as a participating or limited participating candidate pursuant to this chapter

and to expenditures made at any time prior to such date for services, materials, facilities,

advertising or other things of value received, rendered, published, distributed or broadcast

in such calendar years.   Such expenditures by a participating or limited participating

candidate for one of the following offices and his or her principal committee shall not

exceed the following amounts:

mayor, public advocate or comptroller:     [$290,250] $290,000

borough president:                         $129,000

member of the city council:                $43,000

§15.  Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative
code of the city of New York, as amended by local law 34 for the year 2007, is amended
to read as follows:
1.  The campaign finance board is hereby empowered to audit and examine all
matters relating to the performance of its functions and any other matter relating to the
proper administration of this chapter and of chapter 8 of title 3 of this code.  The board
shall conduct its campaign audits in accordance with generally accepted government
auditing standards, and shall [issue] promulgate rules regarding what documentation is
sufficient in demonstrating financial activity. These audit and examination powers extend
to all participating candidates, limited participating candidates, and non-participating
candidates, and the principal and authorized committees of all participating, limited
participating, and non-participating candidates, provided that:

a. Any draft audit, the subject of which is a participating, limited participating[,] or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating[,] or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races[;], and  (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, within (i) [within] fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate within (i) [within] sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time.  Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a

notice of repayment of public funds, such notice or notices shall include all potential

penalties and/or repayment obligations and a notice of a candidate's right to a hearing

pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to

the candidate according to the deadlines applicable to final audits as set forth in this

paragraph.

c. Any advice provided by board staff to a participating, limited participating, or
non-participating [candidates] candidate with regard to an action shall be presumptive
evidence that such action, if taken in reliance on such advice, should not be subject to a
penalty or repayment obligation where such candidate[,] or such candidate's committee
has confirmed such advice in a writing to such board staff by registered or certified mail
to the correct address, or by electronic or facsimile transmission with evidence of receipt,
[that describes] describing the action to be taken pursuant to the advice given and the
board or its staff has not responded to such written confirmation within seven business
days disavowing or altering such advice, provided that the board's response shall be by
registered or certified mail to the correct address, or by electronic or facsimile
transmission with evidence of receipt.

d. Notwithstanding the provisions of paragraphs a and b of this [section]

subdivision, if a committee has failed to respond to a request for information made by

board auditors during the post-election audit process, the time period for completing the

draft and final audits shall be tolled and extended by the number of days by which the

committee has exceeded the original deadline for a response, provided that the committee

has received timely written notice of: [(a)](i) the original deadline to provide the

information, which shall not have been less than thirty days from the date such

information was requested[,]; and [(b)](ii) the commencement of the tolling period

pursuant to this section.  If a committee has responded to a request for information made

by board auditors but such response is  inadequate, the time period for completing the

draft and final audits shall be tolled and extended by the number of days until an adequate

response is provided, provided that the committee has received timely written notice of:

[(a)](i) the original deadline to provide the information, which shall not have been less

than thirty days from the date such information was requested[,]; [(b)](ii) the
commencement of the tolling period pursuant to this section; and [(c)](iii) the detailed
reasons why the original response was inadequate.

e. Notwithstanding any provision of law to the contrary, the deadlines provided
in [subdivisions] paragraphs a and b of this [section] subdivision for the completion of
draft and final audits shall not apply in cases where the audit raises issues involving
potential campaign-related fraud, potential other criminal activity, or activity that may
constitute a breach of certification pursuant to rules of the board[,] or potential significant
violations of the limits set forth in section 3-706.

f. Notwithstanding any provision of the law to the contrary, the deadlines
provided in [subdivisions] paragraphs a and b of this [section] subdivision for the
completion of draft and final audits shall not apply in the event that board operations are
interrupted due to a catastrophic emergency such as a natural disaster or criminal event,
provided that once board operations resume, the board shall within two weeks announce
new deadlines for the completion of draft and final audits consistent with [provisions]
paragraphs a and b.

§16. Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of
the city of New York, as amended by local law 34 for the year 2007, is amended to read
as follows:

2. (c)[ (i)]  If the total of contributions, other receipts, and payments from the fund
received by a participating candidate and his or her principal committee exceed the total
campaign expenditures of such candidate and committee for all covered elections held in
the same calendar year or for a special election to fill a vacancy such candidate and

committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election. No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§17. Subdivision 4 of section 3-710 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4. [[(a)]] No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to [the] all of the requirements of subdivision one of this section, and [a reasonable] an opportunity to appear before the board. Any such repayment claim shall be based on a final determination [to be] issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee. Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination[.].

§18. Section 3-710.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

§ 3-710.5 Findings of violation or infraction; adjudications; [or] final determinations. (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules

defining infractions, and such definitions shall include, but not be limited to, failures to

comply with the provisions of this chapter or the rules promulgated hereunder that are

limited and non-repetitive.

(ii)(a) The board shall give written notice and the opportunity to appear before the

board to any participating, limited participating or non-participating candidate, his or her

principal committee, authorized committee, committee treasurer or any other agent of

such candidate, if the board has reason to believe that such has committed a violation or

infraction before assessing any penalty for such action.  Any such written notice of

alleged violations shall be issued in a timely manner pursuant to all of the requirements

of subdivision one of section 3-710 and shall precede the issuance of the final audit

required pursuant to subdivision one of section 3-710.  In the case of a written notice

issued prior to the date of a covered election, or after the date of a covered election in[

]the case of a notice regarding an alleged failure to respond to a request for audit

documentation, such notice may be issued prior to the issuance of a draft audit.  Alleged

violations and proposed penalties shall be subject to resolution by adjudication before the

board consistent with the procedures of section 1046 of the charter, unless such

procedures are waived by the candidate or principal committee; provided, however, that

in the case of adjudications conducted prior to the date of a covered election, the board

shall use the procedures of section 1046 of the charter only to the extent practicable,

given the expedited nature of such pre-election adjudications.  The board shall issue a

final determination within thirty days of the conclusion of the adjudication proceeding.

(b) The board shall include in every final determination: (i) notice of the

[respondents'] respondent's right to bring a special proceeding challenging the board's

final determination in New York State supreme court [brought] pursuant to article 78 of

the civil practice law and rules; and (ii) notice of the commencement of the four-month

period during which such a special proceeding may be brought pursuant to article 2 of the

civil practice law and rules.

§19.  Subdivision 4 of section 3-711 of the administrative code of the city of New
York, as added by local law 34 for the year 2007, is amended to read as follows:
4.  Notwithstanding any provision of law to the contrary, any participating or
limited participating candidate and his or her principal committee or any non-
participating candidate and his or her authorized committees or any other person who
[commit] commits any violation of this chapter or any rules promulgated hereunder and
who [take] takes all steps necessary to correct such violation prior to receiving written
notice from the board of the existence of the potential violation [pursuant to section 3-
710.5] shall not be subject to any penalty for such violation.
§20.  Section 3-720 of the administrative code of the city of New York, as added by

local law 34 for the year 2007, is amended to read as follows:

§3-720.  Tolling of time for notice of alleged violations [or penalties.] and/or

notice of repayment of public funds.  If a committee has failed to respond to a request for

information made by board auditors or has inadequately responded during the post-

election audit process and the board has satisfied the provisions of subdivision 1 of

section 3-710, the time period for serving notice shall be tolled and extended by the

number of days by which the committee has exceeded the original deadline for a

response, provided that the committee has received timely written notice of: (a) the

original deadline to provide the information, which shall not have been less than thirty

days from the date such information was requested, and (b) the commencement of the

tolling period pursuant to this section.

§21.  Paragraph (d) of subdivision 2 of section 3-801 of the administrative code of the

city of New York, as added by local law 34 for the year 2007, is amended to read as

follows:

(d)  not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation to a transition or inauguration entity authorized pursuant to subdivision one of this section made by a natural person who has business dealings with the city [to a transition or inaugural committee] where such donation is from the candidate-elect[,] or from the candidate-elect's parent,  spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§22.  Subparagraph (iii) of paragraph a of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

**(iii)  [with regard to contributions raised on or]  for elections occurring after January first, two thousand eight [for elections occurring after such date], the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case**

**of special election); provided, however, that (A) participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation [provide] <u>provided</u> for such  office in subdivision one of this section.**

§23.  Subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, is to read as follows:

(iii) [with regard to contributions raised on or]<u> for elections occurring</u> after January first, two thousand eight [for elections occurring after such date], the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A)<u> </u>participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding [two-thirds]<u> one</u>

hundred twenty-five percent of the expenditure limitation [provide]provided for such office in subdivision one of this section.

§24. Paragraph (a) of subdivision 2 of section 3-703 of the administrative code of the city of New York, as amended by local law 58 of the year 2004, is amended to read as follows:

(a) The threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, shall be in the case of:

(i)  mayor, not less than two hundred fifty thousand dollars in matchable contributions comprised of sums up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least one thousand matchable contributions of ten dollars or more;

(ii) public advocate and comptroller, not less than one hundred twenty-five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least five hundred matchable contributions of ten dollars or more;

(iii) borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least one hundred matchable contributions of ten dollars or more from residents of the borough, or ten thousand dollars comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor, whichever is greater.

(iv) member of the city council, not less than five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least seventy-five matchable contributions of ten dollars or more from residents of the district in which the seat is to be filled.

§25. Section 38 of local law 34 for the year 2007 is REPEALED, section 39 of local law 34 for the year 2007 is renumbered section 38, and sections 36, 37, and 38 of local law 34 for the year 2007 are amended to read as follows:

§36. Each city agency with which any person who has business dealings with the city conducts such business shall[,] provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that the rules shall not be [provided] applied to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section [twenty-six] thirty-seven of this local law.

§37. Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows:  (i) [all of] the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and

telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] and persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding] of an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) [all of] the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction, and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, and persons with an interest in an entity which exceeds ten percent of the entity that has submitted a bid or proposal seeking such a contract, and persons employed in a senior managerial capacity of [entities that have submitted bids] any entity holding such a contract or that has submitted a bid or proposal seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, [applications for approvals] any application for approval sought pursuant to the provisions of section 195 [or] of the charter, any application for approval sought from the city of New York that has been

certified pursuant to section 197-c of the [New York city] charter <u>and any application for</u> <u>a zoning text amendment that has been certified pursuant to section 201 of the charter</u> shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with [a real property transaction or land use approval] <u>an acquisition or disposition of real</u> <u>property or an application for approval sought pursuant to the provisions of section 195</u> <u>of the charter, any application for approval sought from the city of New York that has</u> <u>been certified pursuant to section 197-c of the charter and any application for a zoning</u> <u>text amendment that has been certified pursuant to section 201 of the charter</u> pursuant to [clause] <u>clauses</u> (ii) <u>and (iii)</u> of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] <u>and</u> persons with an interest in an entity which exceeds ten percent of the entity [and persons employed in a senior managerial capacity regarding an entity] with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of

the code as added by section one of this local law; (v) [all of] the provisions of this local law concerning any bid or proposal for a franchise or concession, and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law, shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database [includes,] identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, and persons with an interest in an entity which exceeds ten percent of the entity that has submitted a bid or proposal seeking such a franchise or concession, and persons employed in a senior managerial capacity [of entities with] with respect to any entity holding such a franchise or concession or that has submitted a bid or a proposal for such a franchise or concession; (vi) [all of] the provisions of this local law concerning a recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is a recipient of a grant pursuant to clause (v) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) [all of] the provisions of this local law

concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law;  (viii) [all of] the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants  pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and (ix) [all of] the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance

board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through [(viii)] (ix) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the [Mayor]mayor and the [Council]council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the [Mayor]mayor and the [Council]council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i), [and] (iv), and (ix) shall be six months from the effective date of this local law; the

deadline for certification of this section in relation to clauses (ii), (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be sixteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§[39] 38. With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database. Such report shall contain the status of each of the components enumerated in clauses (i) through [(viii)] (ix) of section [thirty-three] thirty-seven of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law. If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect. Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§26.  Section forty of local law 34 for the year 2007 is renumbered section 39 and section forty-one of local law 34 for the year 2007 is renumbered and amended to read as follows:

[§41] §40.  Sections three through seven, nine, ten, thirteen through [twenty, and twenty-two through thirty-three] thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date and shall be applicable to all public funds claims for elections held on or after such effective date, regardless of whether the claim for public funds was submitted prior to the effective date.

§ 27.  This local law shall take effect immediately.


**THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s:**

**I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on _____December 19, 2007_____ and approved by the Mayor on _____December 31, 2007_____.**

**Michael McSweeney, First Deputy City Clerk**
**Acting City Clerk of the Council.**

Please Use This Form for Filing your Local Law with the Secretary of State)

Text of law should be given as amended. Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

County of     New York
City of     New York

Local Law No. _____ *15* _____ of the year 2006

By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Dickens, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, Nelson, Palma, Weprin, White Jr., Liu, Vacca, Gennaro, Gentile, Jackson and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor)

A Local Law to amend the administrative code of the city of New York in relation to the reporting of lobbyist activities and the enforcement of the lobbying law.

Be it enacted by the Council as follows:

Section 1. Section 3-211 of the administrative code of the city of New York is amended by adding new subdivisions (g) through (i) to read as follows:

(g) The term "public servant" shall mean a public servant as defined in subdivision nineteen of section two thousand six hundred one of the charter.

(h) The term "fundraising activities" shall mean solicitation or collection of contributions for a candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council, or for the political committee of any such candidate by a lobbyist, or the solicitation or collection of contributions for any public servant who is a candidate for nomination for election, or election, to any elective office, or for the political committee of any such candidate by a lobbyist. For purposes of this subchapter, the term "contribution" shall

have the meaning set forth in subdivision eight of section 3-702 of the administrative code, and the term "political committee" shall have the meaning set forth in subdivision eleven of such section. The term "lobbyist" shall mean a lobbyist as defined in subdivision (a) of this section and the spouse or domestic partner and unemancipated children of the lobbyist, and if the lobbyist is an organization, the term "lobbyist" shall mean only that division of the organization that engages in lobbying activities and any officer or employee of such lobbyist who engages in lobbying activities of the organization or is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees.

(i) The term "political consulting activities" shall mean the activities of a lobbyist who for compensation by or on behalf of the candidate or elected official, as applicable, (i) participates in the campaign of any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council by providing political advice, or (ii) participates in the campaign of any public servant who is a candidate for nomination for election, or election, to any elective office by providing political advice, or (iii) provides political advice to the mayor, public advocate, comptroller, borough president or member of the city council.

§2. Section 3-212 of the administrative code of the city of New York, as amended by local law number 67 for the year 1993, is amended to read as follows:

§3-212 Powers and duties of the city clerk. (a) In addition to any other powers and duties specified by law, the city clerk shall have the power and duty to administer and enforce all the provisions of this subchapter, subpoena witnesses and records, issue

advisory opinions to those under its jurisdiction, conduct any investigation <u>and audits</u> necessary to carry out the provisions of this subchapter, prepare uniform forms for the statements and reports required by this subchapter and promulgate such rules as he or she deems necessary for the proper administration of this subchapter.

<u>(b) In addition to any audits required to enforce the provisions of this subchapter, the city clerk shall conduct random audits of the statements and reports required to be filed by lobbyists and clients pursuant to this subchapter. The city clerk shall select statements and reports for random audit in a manner pursuant to which the identity of any particular lobbyist or client whose statements or reports are selected for audit is unknown to the city clerk. In conducting such random audits, the city clerk shall require the production of such witnesses and records as may have been relevant to the preparation of the statements or reports audited.</u>

<u>(c) The city clerk shall prepare and post on the internet an annual report relating to the administration and enforcement of the provisions of this subchapter. Such report shall contain information regarding (i) the number of complaints received from the public and the disposition of such complaints; (ii) the number and amount of civil penalties imposed pursuant to subdivisions (a), (b), (c) and (d) of section 3-223 of this subchapter; (iii) the number and duration of orders issued pursuant to subdivision (a) of section 3-223 of this subchapter; (iv)  the number of random audits conducted by the clerk and outcomes thereof; (v) compliance programs developed and implemented for lobbyists and clients; and (vi) such other information and analysis as the city clerk deems appropriate. Such report shall be posted on the internet no later than March first of each year and shall contain information relating to the preceding calendar year.</u>

(d) The city clerk shall, as soon as practicable after the issuance of an order pursuant to subdivision (a) of section 3-223 of this subchapter or imposition of a civil penalty pursuant to subdivision (a), (b), (c) or (d) of section 3-223 of this subchapter, post on the internet information identifying the lobbyist or client who committed the violation that resulted in the issuance of such order or imposition of such penalty, the provision of law violated, the duration of such order or the amount of such penalty.

(e) Twenty-four months after the effective date of the section of the local law that added this subdivision, the mayor and the city council shall jointly appoint a commission to review and evaluate the activities and performance of the city clerk in implementing the provisions of this subchapter. Within six months of such appointment the commission shall report to the mayor and city council on its review and evaluation which report shall include any administrative and legislative recommendations on strengthening the administration and enforcement of this subchapter, as well as whether the commission would recommend raising the dollar threshold for the filing of a statement of registration. The commission shall be comprised of five members and the mayor and the city council shall jointly designate a chair from among the members.

§3. Subdivision (b) of section 3-213 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, is amended to read as follows:

(b) Such statements of registration shall be kept [on file for a period of five years] in electronic form in the office of the city clerk and shall be [open to] available for public inspection [during such period].

§4. Paragraph 1 of subdivision (c) of section 3-213 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, is amended to read as follows:

(1) the name, address and telephone number of the lobbyist <u>and the spouse or domestic partner and unemancipated children of the lobbyist, and if the lobbyist is an organization the names, addresses and telephone numbers of any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees, provided that the addresses and telephone numbers of spouses, domestic partners and unemancipated children shall be not be made available to the public but may be accessed by the campaign finance board for the sole purpose of determining whether a campaign contribution is matchable pursuant to section 3-702</u>;

§5. Paragraph 5 of subdivision (c) of section 3-213 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, is amended to read as follows:

(5) a description of the [general] subject or subjects on which the lobbyist is lobbying or expects to lobby<u>, including information sufficient to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which the lobbyist is lobbying or expects to lobby</u>;

§6. Section 3-215 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, is amended to read as follows:

§3-215[.] Termination of retainer, employment or designation. Upon the termination of a lobbyist's retainer, employment or designation, such lobbyist and the client on whose behalf such service has been rendered shall both give written notice to the city clerk  within thirty days after the lobbyist ceases the activity that required such lobbyist to file a  statement of registration; however, such lobbyist shall nevertheless comply with the reporting requirements of section 3-216.1 of this subchapter and the reporting requirements for the last periodic reporting period up to the date such activity has ceased as required by this subchapter and both such parties shall each file the annual report required by section 3-217 of this subchapter. The city clerk shall enter notice of such termination in the appropriate monthly registration docket required by section 3-214 of this subchapter.

§7. Paragraph 1 of subdivision (a) of section 3-216 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, is amended to read as follows:

(1) any lobbyist required to file a statement of registration pursuant to section 3-213 of this subchapter who in any lobbying year expends, receives or incurs combined reportable compensation and expenses in an amount in excess of two thousand dollars, as provided in paragraph five of subdivision (b) of this section, for the purpose of lobbying, shall file with the city clerk a first periodic written report, on forms supplied by the city clerk, which to the extent practicable shall be identical in form to the periodic reporting forms used by the New York Temporary State Commission on Lobbying, by the fifteenth day next succeeding the end of the reporting period on which the cumulative total for such lobbying year equaled such sum. Such reporting periods shall be the period from

January first to March thirty-first, April first to May thirty-first, June first to September thirtieth, and October first to December thirty-first[.], or such other dates as the city clerk shall designate by rule to conform the periodic reporting periods with the periodic reporting periods of the New York Temporary State Commission on Lobbying.

§8. Paragraph 3 of subdivision (b) of section 3-216 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, is amended to read as follows:

(3) a description of the [general] subject or subjects on which the lobbyist has lobbied, including information sufficient to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which the lobbyist has lobbied;

§9. Paragraph 2 of subdivision (d) of section 3-216 of the administrative code of the city of New York, as amended by local law number 67 for the year 1993, is amended to read as follows:

(2) Such periodic reports shall be kept [on file] in electronic form in the office of the city clerk [for five years] and shall be [open to] available for public inspection [during such time].

§10. Subchapter 2 of chapter 2 of title 3 of the administrative code of the city of New York is amended by adding a new section 3-216.1 to read as follows:

§3-216.1 Fundraising and political consulting reports.

(a) Any lobbyist required to file a statement of registration pursuant to section 3-213 of this subchapter who in any calendar year to which the statement of registration relates, or in the six months preceding such calendar year, engages in fundraising or

political consulting activities shall file with the city clerk, on forms supplied by the city clerk, a fundraising and/or political consulting report. Such report shall be filed in accordance with the schedule applicable to the filing of periodic reports, provided that the first fundraising and/or political consulting report filed in any calendar year shall include information on fundraising and/or political consulting activities that occurred in any period beginning six months preceding the calendar year to which the statement of registration relates through the end of the reporting period for which the report is filed, to the extent such information has not been reported in a fundraising and/or political consulting report filed in the preceding calendar year. Each subsequent fundraising and/or political consulting report filed in or with respect to the calendar year to which the statement of registration relates shall include information on fundraising and/or political consulting activities that occurred since the end of the reporting period for which the previous report was filed through the end of the reporting period for which the current report is filed. Such activities shall be reported whether they are conducted directly by the lobbyist, or through any other entity of which such lobbyist is a principal. Such fundraising and/or political consulting reports shall be filed not later than the fifteenth day next succeeding the end of such reporting period.

(b) Such fundraising and/or political consulting report shall contain:

(1) the name, address and telephone number of the lobbyist and the individuals employed by the lobbyist engaged in such fundraising and/or political consulting activities;

(2) the name, address and telephone number of the candidate, public servant, or elected official to whom or on whose behalf the lobbyist provided fundraising and/or political consulting services;

(3)    (i) the compensation paid or owed to the lobbyist for such fundraising and/or political consulting activities.

(ii) a list of all persons or entities with whom the lobbyist contracted for the purpose of providing fundraising and/or political consulting services;

(4) in the case of fundraising activities, the total dollar amount raised for each candidate for which such activities were performed.

(c) All such fundraising and/or political consulting reports shall be subject to review by the city clerk.

(d) Such fundraising and/or political consulting reports shall be kept in electronic form in the office of the city clerk and shall be available for public inspection.

§11. Subdivision (b) of section 3-217 of the administrative code of the city of New York, as amended by local law number 67 for the year 1993, is amended to read as follows:

(b) Such report pursuant to paragraph one of subdivision (a) of this section shall be filed with the city clerk, on forms supplied by the city clerk, by the fifteenth day of January next following the year for which such report is made and shall contain on an annual cumulative basis all the information required in periodic reports by section 3-216 of this subchapter and all the information required in fundraising and/or political consulting reports by section 3-216.1 of this subchapter.

§12. Paragraphs 3 and 4 of subdivision (c) of section 3-217 of the administrative code of the city of New York, as added by local law number 14 for the year 1986, are amended to read as follows:

(3) a description of the [general] subject or subjects on which each lobbyist retained, employed or designated by such client has lobbied, including information sufficient to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which each lobbyist retained, employed or designated by such client has lobbied;

(4) the person or agency before which such [client] lobbyist has lobbied;

§13. Paragraph 2 of subdivision (d) of section 3-217 of the administrative code of the city of New York, as amended by local law number 67 for the year 1993, is amended to read as follows:

(2) Such annual reports shall be kept [on file] in electronic form in the office of the city clerk [for a period of five years] and shall be [open to] available for public inspection [during such period].

§14. Section 3-221 of the administrative code of the city of New York, as amended by local law number 67 for the year 1993, is amended to read as follows:

§3-221 Filing of statements and reports. Any statement or report required by this subchapter [may be filed with the city clerk either in person or by mail] shall be filed by electronic transmission in a standard format as required by the city clerk. [It shall be deemed properly filed by mail when deposited in an official depository under the exclusive care and custody of the United States Postal Service, properly addressed in a post-paid wrapper. In the event it is not received, such statement shall be promptly filed

upon notice from the city clerk of its non-receipt.] <u>Statements, reports, dockets and any other information required to be kept on file in the office of the city clerk for public inspection pursuant to this subchapter shall be kept in a computerized database and shall be posted on the internet as soon as practicable.</u>

§15. Section 3-223 of the administrative code of the city of New York, as amended by local law number 67 for the year 1993, is amended to read as follows:

§3-223 Penalties. (a) Except as provided for in subdivision (b) of this section, any person or organization who knowingly and wilfully violates any provision of this subchapter shall be guilty of a class A misdemeanor. In addition to such criminal penalties, said person or organization shall be subject to a civil penalty, in an amount not to exceed [fifteen] <u>thirty</u> thousand dollars, to be assessed by the city clerk, or an order to cease all lobbying activities subject to the jurisdiction of the city clerk for a period of time as determined by said clerk not to exceed sixty days, or both such civil penalty and order.

(b) Any person or organization who violates a cease and desist order of the city clerk issued under subdivision a of this section or enters into a contingency agreement or accepts or pays any contingency fees as proscribed in section 3-218 of this subchapter, shall be guilty of a class A misdemeanor. In addition to such criminal penalties, said person or organization shall be subject to a civil penalty, in an amount not to exceed [fifteen] <u>thirty</u> thousand dollars, to be assessed by the city clerk.

(c) <u>The city clerk shall designate by rule penalties for late filing of any statement or report required by this subchapter, which shall conform with the schedule established by the New York Temporary State Commission on Lobbying for such charges.</u>

Following a failure to make and file any such statement or report [required by this subchapter], the city clerk shall notify the person or organization of such fact by certified mail that such filing must be made within fourteen business days of the date of mailing of such notice. The failure to file any statement or report within such time shall constitute a class A misdemeanor. In addition to such criminal and late penalties, said person or organization shall be subject to a civil penalty, in an amount not to exceed [ten] twenty thousand dollars, to be assessed by the city clerk. For the purposes of this subdivision, the chief administrative officer of any organization required to file a statement or report shall be the person responsible for making and filing such statement or report unless some other person prior to the due date thereof has been duly designated to make and file such statement or report.

(d) Any person or organization who violates any provision of this subchapter not punishable under subdivisions [a, b or c] (a), (b) or (c) of this section shall be subject to a civil penalty, in an amount not to exceed [ten] twenty thousand dollars, to be assessed by the city clerk.

(e) Any civil penalty to be assessed under subdivision [d] (d) of this section, or any order issued under subdivision [a] (a) of this section, may only be imposed or issued after written notice of violation and the expiration of fourteen business days from the date of mailing of such notice. If such violation is cured within such fourteen-day period, then such civil penalty or order shall not be imposed or issued.

(f) The amount of any assessment made or duration of order issued pursuant to this section shall be determined only after a hearing at which the party shall be entitled to

appear and be heard. Any assessment imposed under this section may be recovered in an action brought by the corporation counsel.

(g) The city clerk shall be charged with the duty of reviewing all statements and reports required under this subchapter for violations, and it shall be his duty, if he deems such to be willful, to report such determination to the [appropriate authority for criminal prosecution] department of investigation.  Where the city clerk receives a report or otherwise suspects that a criminal violation of law, other than a violation of this subchapter, has been or may have been committed, the city clerk shall report any information relating thereto to the department of investigation.

(h) The department of investigation shall provide assistance to the city clerk for the purpose of training personnel who are responsible for the administration and enforcement of the provisions of this subchapter. The city clerk shall develop compliance programs for lobbyists and clients.

§16. If any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected.

§17. This local law shall take effect on the one hundred eightieth day after its enactment, provided, however, that sections three, nine, eleven, thirteen and fourteen of this local law shall take effect one year after the enactment of this local law, and provided, further, that, upon enactment of this local law, the relevant city agencies shall

take all necessary steps, including but not limited to the promulgation of forms and rules,

to ensure the prompt implementation of this local law upon its effective date.

**THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s:**

      I hereby certify that the foregoing is a true copy of a local law of The City of New York,

passed by the Council on ......May 24, 2006.................. and approved by the Mayor

on ......June 13, 2006......

                                        **VICTOR L. ROBLES, City Clerk of the Council.**

Please Use This Form for Filing your Local Law with the Secretary of State)

Text of law should be given as amended.  Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

County of    New York
City of      New York

Local Law No._____ _/_6_____of the year 2006

By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, Nelson, Palma, Weprin, White Jr., Liu, Vacca, Gennaro, Gentile, Jackson and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor)

A Local Law to amend the administrative code of the city of New York and the New York city charter, in relation to gifts by lobbyists.

Be it enacted by the Council as follows:

Section 1. Chapter two of title three of the administrative code of the city of New York is amended by adding a new subchapter 3 to read as follows:

Subchapter 3

Prohibition of Gifts by Lobbyists

§3-224 Definitions. Whenever used in this subchapter, the term "public servant" shall mean a public servant as defined in subdivision nineteen of section two thousand six hundred one of the charter.

§3-225 Prohibition of gifts. No person required to be listed on a statement of registration pursuant to section 3-213(c)(1) of subchapter 2 of this chapter shall offer or give a gift to any public servant.

§3-226 Enforcement. Complaints alleging violations of this subchapter shall be made, received, investigated and adjudicated in a manner consistent with investigations

and adjudications of conflicts of interest pursuant to chapters sixty-eight and thirty-four of the charter.

§3-227 Penalties. Any person required to be listed on the statement of registration pursuant to section 3-213(c)(1) that knowingly and willfully violates any provision of this subchapter shall be subject to a civil penalty, which for the first offense shall be not less than two thousand five hundred dollars and not more than five thousand dollars, for the second offense not less than five thousand dollars and not more than fifteen thousand dollars, and for the third and subsequent offenses not less than fifteen thousand dollars and not more than thirty thousand dollars.  In addition to such civil penalties, for the second and subsequent offenses a person required to be listed on the statement of registration pursuant to section 3-213(c)(1) that knowingly and willfully violates the provisions of this subchapter shall also be guilty of a class A misdemeanor.

§3-228 Rulemaking. The conflicts of interest board, in consultation with the clerk, shall adopt such rules as necessary to ensure the implementation of this subchapter, including rules defining prohibited gifts and exceptions including *de minimis* gifts, such as pens and mugs, gifts that public servants may accept as gifts to the city and gifts from family members and close personal friends on family or social occasions, and to the extent practicable, such rules shall be promulgated in a manner consistent with the rules and advisory opinions of such board governing the receipt of valuable gifts by public servants.

§2. Chapter 68 of the New York city charter is amended by adding a new section 2607 to read as follows:

§2607. Gifts by lobbyists. Complaints made pursuant to subchapter three of chapter two of title three of the administrative code shall be made, received, investigated and adjudicated in a manner consistent with investigations and adjudications of conflicts of interest pursuant to this chapter and chapter thirty-four.

§3. If any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected.

§4. This local law shall take effect on the one hundred eightieth day after it shall have become a law provided that, upon enactment of this local law, the relevant city agencies shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date.

**THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s:**

I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on ...... May 24, 2006 ...... and approved by the Mayor on ...... June 13, 2006 ......

**VICTOR L. ROBLES, City Clerk of the Council.**

**Please Use This Form for Filing your Local Law with the Secretary of State)**

Text of law should be given as amended.  Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

County of     New York
City of       New York

Local Law No._____*17*_____ of the year 2006

By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, McMahon, Nelson, Palma, Weprin, White Jr., Liu, Vacca, Jackson, Gentile, Gennaro and The Public Advocate (Ms. Gotbaum)  (in conjunction with the Mayor)

A Local Law to amend the administrative code of the city of New York, in relation to campaign contributions by lobbyists.

Be it enacted by the Council as follows:

Section 1. Subdivision 3 of section 3-702 of the administrative code of the city of New York, as amended by local law number 58 for the year 2004, is amended, and new subdivisions 16 and 17 are added to such section to read as follows:

3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a

contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution. The following contributions are not matchable:

(a) in-kind contributions of property, goods, or services;

(b) contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(c) contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes;

(d) money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e) contributions from individuals under the age of eighteen years; [and]

(f) contributions from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance; and

(g) contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1). The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213.

16. The term "lobbyist" shall mean a lobbyist as defined in subdivision (a) of section 3-211 of this title and the spouse or domestic partner and unemancipated children

of the lobbyist, and if the lobbyist is an organization, the term "lobbyist" shall mean only that division of the organization that engages in lobbying activities and any officer or employee of such lobbyist who engages in lobbying activities of the organization or is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees.

17. The term "lobbying" or "lobbying activities" shall mean lobbying and lobbying activities as defined in section 3-211 of this title.

§2. If any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected.

§3. This local law shall take effect immediately and shall be applicable to all public funds claims for elections held on or after the effective date, regardless of whether the claim for public funds was submitted prior to the effective date.

**THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s:**

I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on ............ May 24 2006 ............ and approved by the Mayor on ......... June 13 2006 ...

VICTOR L. ROBLES, City Clerk of the Council.



# REPORT OF THE
# NEW YORK CITY
# CHARTER REVISION COMMISSION

August 20, 1998

TABLE OF CONTENTS

I.    THE CHARTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II.   THE 1998 CHARTER REVISION COMMISSION . . . . . . . . . . . . . .    3

III.  THE CAMPAIGN FINANCE REFORM PROPOSAL . . . . . . . . . . . .    7

IV.   OTHER PROPOSALS CONSIDERED BY THE COMMISSION . . .   24

V.    REVIEW OF OTHER AREAS OF THE CHARTER . . . . . . . . . . . . .   31

EXHIBITS:
      A:    Sources
      B:    Charter Amendment & Ballot Question
      C:    Regulation of Corporate Contributions
      D:    Regulation of Contributions by Businesses that do business with
           the Government
      E:    Report on Nonpartisan Elections

## TABLE OF CONTENTS

I.    THE CHARTER .................................................    1

II.    THE 1998 CHARTER REVISION COMMISSION ......................    3

            Public Hearings and Public Meetings ...........................    5

III.    THE CAMPAIGN FINANCE REFORM PROPOSAL ...................    7

    A.    The Existing Campaign Finance System .....................    7
    B.    The Proposal .............................................    10
        1.)    Independence of the Board  ..............................    13
        2.)    Prohibit Corporate Contributions  .......................    15
        3.)    Regulation of Campaign Contributions by Those
             Who Do Business With the City .........................    17
        4.)    Regulation of "Soft Money" ..............................    22

IV.    OTHER PROPOSALS CONSIDERED BY THE COMMISSION ....    24

    A.    Nonpartisan Elections ..................................    24
    B.    Full-time Council ......................................    27

V.    REVIEW OF OTHER AREAS OF THE CHARTER ...................    31

    •   ULURP..................................................    31
    •   Procurement and Franchises ...........................    33
    •   Office of the Public Advocate ..........................    35
    •   Independent Budget Office ............................    36
    •   Size of Council Districts ...............................    36
    •   Budget Process ........................................    37

EXHIBIT A:   Sources
EXHIBIT B:   Charter Amendment & Ballot Question
EXHIBIT C:   Regulation of Corporate Contributions
EXHIBIT D:   Regulation of Businesses that do Business with the Government
EXHIBIT E:   Report on Nonpartisan Elections

## I.    THE CHARTER

The New York City Charter is the basic document that defines the organization, power, functions and essential procedures of City government. The Charter sets forth the structure of local government in broad strokes while leaving the details of operation to local law and rule-making by City agencies.

In 1989, the Charter underwent a major overhaul in response to the United States Supreme Court decision in *Morris v. Board of Estimate*, which required the City to eliminate the Board of Estimate as a governmental body.  Given the scope of the recent changes to the Charter, the 1998 Charter Revision Commission limited itself to consideration of proposals to improve governmental operations in those areas where experience had shown the new Charter was not working effectively.

Under New York State law, Charter revision may occur as an ongoing process.  Individual subjects or sections of the Charter can be considered for amendment and a limited number of revisions presented to the voters each year. This approach works well to address technical issues, such as those in the campaign finance chapter, and was used by the 1988 Charter Revision Commission to propose the original Charter chapter on campaign finance reform.

The 1998 Charter Revision Commission has also adopted this approach. After reviewing the Charter as a whole, the Commission decided to present limited revisions for voter approval in 1998, while developing additional proposals for consideration in 1999. This report discusses the Charter revisions proposed by the Commission in 1998, as well as the proposals the Commission plans to study for potential submission in 1999.

## II.    THE 1998 CHARTER REVISION COMMISSION

Mayor Rudolph W. Giuliani appointed the 1998 Charter Revision Commission on June 5, 1998, pursuant to Municipal Home Rule Law §36. The Mayor named as members of the Commission:

- Peter J. Powers, Chairman.  Chairman of High View Capital.  First Deputy Mayor of the City of New York, January 1994 – August 1996;

- Paul A. Crotty, Vice Chairman.  Group President – New York/Connecticut, Bell Atlantic.  Corporation Counsel of the City of New York, January 1994 – November 1997.  Commissioner, New York City Department of Housing Preservation and Development, 1986 – 1988.  Commissioner, New York City Department of Finance, 1984 – 1986;

- Amalia Victoria Betanzos.  President of Wildcat Service Corporation and Chair of the New York City Commission on the Status of Women;

- Abraham Biderman.  Executive Vice President of Lipper & Company, LP. Commissioner, New York City Department of Housing Preservation and Development, 1988 – 1989.  Commissioner, New York City Department of Finance, 1986 – 1987;

- Monsignor Harry J. Byrne.  Pastor Emeritus of Epiphany Church in Manhattan.  Vice President, Ronald McDonald House of New York City. Member, New York City Rent Guidelines Board, 1978 – 1982;

- The Reverend Michel J. Faulkner.  Senior Minister, Central Baptist Church. Member, Task Force on New York City Police and Community Relations;

- Vincent A. Marchiselli.  Chairman, New York City Civil Service Commission. Member, New York State Assembly, 1974 – 1984;

- Benito Romano.  Member, Willkie Farr & Gallagher.  Former U.S. Attorney for the Southern District of New York.  Acting Chair, New York City Conflicts of Interest Board.  Chairman, Puerto Rican Legal Defense and Education Fund;

- Herbert Rubin.  Senior Partner, Herzfeld and Rubin.  Member of Judicial Screening Committees for U.S. Senator Daniel P. Moynihan and Mayor Giuliani;

- Mary Crisalli Sansone.  Founder, Congress of Italian-American Organizations;

- Spiros A. Tsimbinos.  Attorney in New York State for 29 years.  Former President, Queens County Bar Association;

- Howard Wilson.  Partner, Rosenman and Colin LLP.  Commissioner, New York City Department of Investigation, 1994 – 1996.  Chair, Board of Trustees, New York City School Construction Authority.

The Mayor requested the members of the Commission to consider five issues:

- Whether New York City should adopt nonpartisan elections;

- Whether further campaign finance reform, including a ban on corporate contributions, is needed;

- Whether the land use review process could be streamlined while maintaining appropriate community input;

- Whether the rules governing procurement of goods and services could be improved;

- Whether City offices function effectively.

Under the State law governing Charter revision commissions, the Commission was also responsible for reviewing the Charter generally and determining whether other changes should be made.

**<u>Public Hearings and Public Meetings</u>**

To solicit the widest possible public input, the Commission held a series of five public hearings, one in each borough, before it developed formal proposals. The Commission distributed notices of the hearings and of the topics in which it was most interested to over three thousand civic organizations and interested individuals.  Notice of the hearings was also published in newspapers, on the Commission's internet site and in the City Record.  In every notice, the Commission encouraged public participation through written and oral testimony.

During the initial round of public hearings, many speakers voiced concern that the Commission would not be able to spend enough time reviewing proposals before offering Charter amendments. The Commission was sensitive to this concern and voted unanimously to focus its work on three areas for possible Charter amendments on the November 1998 ballot: campaign finance reform, nonpartisan elections, and a full-time City Council. The Commissioners also voted unanimously to continue working on proposals in other areas, but to make no recommendations for change in the current election year.

The Commission then held three public meetings with the subject matter limited to the topics the Commission was studying for the current year.  At each meeting, a panel of experts on the subject addressed the Commission, answered questions from the Commissioners and debated one another's ideas.

After meeting with the invited experts, the Commission met again on August 4, 1998, to decide whether to propose a Charter amendment on any of these three subject matter areas. The Commission determined that it would propose one Charter amendment for the 1998 ballot, on the subject of campaign finance reform. The Commission discussed and refined the campaign finance reform proposal at three public meetings and two public hearings. On August 20, 1998, the Commission voted to recommend the campaign finance reform Charter amendment to the voters.

III.    THE CAMPAIGN FINANCE REFORM PROPOSAL

New York City's efforts to reform the campaign finance system through Charter revision extend back to 1986.  Over the past twelve years, through several administrations and three Charter revision commissions, the City has engaged legislators, good government groups, election reform experts and the public in a dialogue on the subject.  As with all questions of political reform, any apparent resolution, or endpoint in the dialogue, is merely a stopping ground for reflection.    The work of the previous commissions marks the substantive beginnings of the current Commission's proposal.

The Commission's work on campaign finance reform sought to remove the influence of special interests in the election process and to improve the campaign system.  The Commission was committed to the idea that every New Yorker should be an equal player in municipal politics.  In the area of campaign finance, the Commission proposed three measures to "level the playing field" in City campaigns:  prohibit corporate contributions, rout out contributions that raise the appearance of corruption, and, to the extent possible, eliminate "soft money".

A.    <u>The Existing Campaign Finance System</u>

In 1988, the Charter Revision Commission proposed establishing a campaign finance program, the first of its kind, in the City Charter.  The Commission did not propose detailed technical reform measures because the

7

City Council had enacted legislation establishing a voluntary campaign finance program.[1]

Instead, the 1988 Charter Revision Commission proposed Charter amendments to resolve problems not addressed by existing law. The 1988 Commission articulated four guiding principles to promote integrity in the electoral process:

- Election to municipal office should not require great personal wealth or access to large campaign contributors.

- Campaign contributions should be limited because of the potential that large contributors can have undue influence in the governmental decision-making process.

- There should be reasonable limitations on the costs of running for public office and on the amount that may be spent on election campaigns.

- City government should encourage broad public participation in the funding of municipal election campaigns.

The 1988 Commission proposed a ballot question on campaign finance, in part to "encourage the Council and the Campaign Finance Board to close loopholes in the law."[2] The Commission proposed that the Campaign Finance Board be

---

[1] The Act consisted of a program including contribution limits, expenditure limits, public disclosure of campaign finances, and the provision of public matching funds to qualified candidates choosing to join the voluntary program. The legislation met with mixed praise. Good government groups applauded the fixed limits on campaign contributions and expenditures, partial public funding of City election campaigns and the newly established nonpartisan campaign finance board. In contrast, the provisions allowing corporate campaign contributions and loans were sharply criticized.

[2] Report of the New York City Charter Revision Commission: December 1986 – November 1988, vol. 1, 44.

made a Charter agency, that the Board be directed to operate in a strictly nonpartisan manner, that the integrity of the public fund from which amounts are disbursed to candidates be protected, and that the Board promote voter education.  The voters approved these Charter amendments in November 1988.

The Campaign Finance Board has administered the system in an independent, nonpartisan fashion for ten years. The approach of the voluntary Campaign Finance Program ("the Program"), as administered by the Board, has resulted in effective limits on the amount of contributions, meaningful restraints on spending, disclosure of campaign finance information, financial support of candidates, and voter education.  Further improvements in these areas have been proposed and the Commission determined that it should leave these issues to the legislative process.

The Commission focused its work on problems that would likely never be resolved without Charter amendment.  It identified three areas that the existing system has not adequately addressed: corporate contributions, unregulated campaign spending (known as "soft money") and contributions by those who do business with the City ("pay to play" contributions).  In addition, the Campaign Finance Board is vulnerable to political pressures through the uncertainty of the budget process and through unfilled Board appointments.  The 1998 Charter Revision Commission adopted a ballot proposal to address all these problems.

The Commission also considered the timing of its proposal. The Campaign Finance Board works on a four-year election cycle and it will need substantial lead time to implement Charter amendments. Further, some candidates planning to run for municipal office in 2001 have already begun fundraising. If the new restrictions are to apply to donations to the 2001 campaigns, candidates and donors would have to be aware of them at an early stage. The Commission considered that a vote on the Charter amendments in 1998 would give the Board, candidates and donors sufficient time to comply with the new requirements while preparing for the 2001 election. The Commission thus determined that it would be better to propose the campaign finance Charter amendments this year.

## B.    The Proposal

After studying a range of materials and reports gathered by staff on the subject of campaign finance reform,[3] on July 28, 1998, the Commission heard testimony from a panel of campaign finance experts.[4]  On August 4, 1998, the Commission met and approved a preliminary proposal to achieve three goals: protect the independence of the Campaign Finance Board, prohibit candidates from accepting contributions from a person or entity that does business or seeks

---

[3] A bibliography of materials reviewed by the Commission is attached as Exhibit A.

[4] The panel included Nicole Gordon, Executive Director of the Campaign Finance Board, Richard Schrader, Director of Citizen Action's Clean Money/Clean Elections campaign, Nancy Northup, an attorney with the Brennan Center for Justice at New York University Law School, Betty Lugo, a candidate who ran for election to the City Council under the current campaign finance system, and Lawrence Mandelker, an experienced election lawyer.

to do business with the City and eliminate the influence of "soft money" in election campaigns for City offices.  The proposal delegated to the Campaign Finance Board the authority to adopt such rules as are necessary to implement the Charter amendment.  In so doing, the proposal directed the Board to consider and balance criteria including the integrity of the campaign finance program, incentives to candidates to participate in the program, the costs to the public of the program and maintenance of a reasonable balance between the program's burdens and incentives.  The proposal called for the Campaign Finance Board to submit rules for public notice and comment by June 30, 1999 and to adopt rules as soon as practicable thereafter.

The proposal was distributed to media outlets, elected officials, civic organizations and others who had expressed an interest in campaign finance issues. It was also published on the Commission's Internet site.   In each instance, the Commission solicited comment on the proposal.  Between August 4 and August 20, 1998, the Commission held two public hearings and received written comments on the proposal.  In addition, individual Commissioners held informal meetings with knowledgeable parties.  Of particular importance, the Commission solicited the technical input of the Campaign Finance Board.

On August 18, 1998, the Commission met and discussed revisions to its proposal.   Some Commissioners and many commentators had expressed concern over the sweeping scope of a ban on contributions by anyone doing business with the City.  They pointed to problems of interpretation that could not be easily resolved through a Charter amendment.

Other Commissioners continued to believe that campaign donations by those who do business with the City should be banned under all circumstances. Some of the Commissioners supported a proposal to require disclosure of donations by those doing business with the City, before directly regulating the donations.

Early in the Commission's process many commentators and some Commissioners suggested that the Commission should propose an outright ban on corporate contributions because corporations should have no role in financing election campaigns. After the Commission circulated its initial proposal to ban contributions by persons and entities doing business with the City, many commentators suggested that the same effect could be achieved by prohibiting corporate contributions, without the administrative difficulties presented by the Commission's original proposal. The Commissioners continued to believe it was important to regulate contributions by those who do business with the City but, after discussion, decided to recommend that corporate contributions be prohibited as well.

The Commissioners directed that a Charter amendment be drafted to reflect this discussion and distributed to interested parties. The proposal would include four elements.[5]

First, ensure the Board a full complement of members and protect the Board's budget from the political process.

Second, prohibit corporate contributions.

---

[5] The Charter language and ballot question are attached as Exhibit B.

Third, require disclosure of campaign contributions by persons or entities doing business with the City; and direct the Campaign Finance Board to study such contributions and issue necessary regulations.

Fourth, require the Campaign Finance Board to promulgate such rules as it deems necessary to eliminate "soft money" in election campaigns in New York City.

### 1) Independence of the Board

The nonpartisan character of the Board is essential to its credibility, and the Commission determined that Charter provisions concerning the manner of appointments to the Board were necessary to insulate the Board's activities from the partisan political pressures of any given moment. With only five members, the Board needs a full complement to ensure a quorum and to maintain the ability to break tie votes. Further, because the Charter requires that the Mayor's and the Speaker's appointments be from two different political parties, the participation of all five appointed members gives credibility to its decisions and processes. Unfortunately, since becoming a Charter agency in 1988, the Board has operated without a full complement of appointed members for long periods of time.[6] In addition, because a Board member who serves past his or her term functions as an "at-will" appointee, the Commission determined that such an appointee could be vulnerable to political pressure from the appointing authorities.

---

[6] In particular, the Speaker of the Council has not named a non-Democratic appointee since 1994.

To address these concerns, the Commission proposed that:

- Any vacancy unfilled by an appointing authority (either the Mayor or the Speaker) for a period of 180 days shall be filled by appointment of the Board.

- Any Board member serving past his or her term shall be automatically re-appointed if the appointing authority has not acted, after notice, within 120 days of the end of the Board member's term.

- In a City election year, these appointments occur after 90 days.

The Commission specifically intended to retain the current requirement that the appointing authorities (the Mayor and the Speaker of the Council) each appoint two members from different political parties.

The other major area where the current Charter leaves the Board vulnerable to political pressure is in the adoption of its budget and, specifically, the budget for the Voter Guide. To insulate the Board from this pressure, the Commission proposed that:

- The Board shall submit to the Mayor an itemized estimate of the financial needs of the Board for the ensuing fiscal year. The Mayor shall include such estimates in the Executive Budget without revision, but with such recommendations as the Mayor may deem proper.

- The Charter provisions applicable to the establishment of the Council's budget shall then govern the Board's budget.

- Each time the Board must publish a Voter Guide, if the Board believes it has insufficient funds to produce the Guide, the Office of Management and Budget shall, after consultation with the Board, set aside a reasonable amount to publish and distribute the Voter Guide.

## 2) Prohibit Corporate Contributions

The Commission considered that corporate contributions were inherently problematic and should be banned outright from the City system. There are obvious inequalities that result from a system that allows corporations to pour money into political campaigns. The bedrock principle of one-person, one-vote is explicitly based on the idea that one person's vote should count the same as any other person's vote. Allowing corporations to contribute to candidates serves to undermine this fundamental value of our electoral system.

Unlike most individual contributions, corporate contributions as a class erode confidence in the democratic process. Corporations have financial, not ideological, reasons to participate in the political process. Corporate contributions increase pubic cynicism by contributing to the appearance that economically powerful groups can better influence politicians than the citizenry as a whole. To the extent politicians take positions to ensure corporate donations, those contributions impair the ability of a public official to make independent political judgments.

The United States Supreme Court in *Austin v. Michigan State Chamber of Commerce*,[7] recognized that corporate contributions function precisely in this manner. The Court noted that the unique legal and economic characteristics of corporations require regulation of their political expenditures to avoid corruption or the appearance of corruption:

> State law grants corporations special advantages – such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets – that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use resources amassed in the economic market place to obtain an unfair advantage in the political marketplace....
>
> The resources in the treasury of a business corporation...are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas.[8]

The Court noted the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and have little or no correlation to the public's support for the corporation's political ideas." *Id.* at 660. Corporate expenditures, the United State Supreme Court found, pose the danger of corruption in this broader sense.

On the federal level, corporate contributions have been prohibited since Congress first banned them in 1907. More than half the states have enacted bans on direct corporate contributions to candidates and most other states limit

---

[7] 494 U.S. 652 (1990).

[8] 494 U.S. at 658 – 59 (internal quotation marks and footnotes omitted).

corporate contributions in some way.[9]  There is growing evidence that the flow of funds in City elections is too dependent on large corporate contributions.  Of the money raised in 1997 by candidates participating in the City's program, 27 percent came from corporate contributions.[10]  The Commission determined that a ban on this kind of spending of corporate wealth in New York City is necessary to enhance participation and equality in City elections.

Under the Commission's proposal, no candidate participating in the Campaign Finance Program will be permitted to accept corporate contributions.  The Campaign Finance Board will be given rule-making authority to implement the ban.

## 3) Regulation of Campaign Contributions by Those who Do Business With the City

Despite the considerable strides of the New York City Campaign Finance Program, the City has not addressed the problem of campaign contributions that are made (or perceived to have been made) to influence elected officials.  A flat prohibition on corporate contributions is a step toward solving this problem, but the Commission was still concerned that other types of campaign donations would be used to exercise undue influence over candidates.  Therefore, the Commission proposed that contributions by anyone – associations, partnerships or individuals – who does business with the City should be subject to regulation.

---

[9] A chart describing how the states regulate corporate campaign contributions is annexed as Exhibit C.  New York State does not prohibit corporate contributions.

[10] New York Times, April 18, 1998, Sec. B, page 1.

Most private money contributed to election campaigns is "interested" in at least one of three ways:

- the interest in securing access to, or influence over, the elected official;

- the interest in promoting candidates who are likely to vote in ways that are consistent with the donor's self interest;

- the interest in promoting candidates who espouse philosophies that are consistent with the donor's.

It is difficult to characterize definitively whether contributions fall into one category or another. The donor who contributes equally to both sides of a race is probably advancing the first interest. The donor who contributes to members of a legislative committee that regulates the donor's industry is likely advancing at least the second interest, if not the first as well. An organization that has a position on an issue and contributes to a candidate that advocates the same position may be furthering the third interest. Because it is impossible to ascertain the motive of the contributor, it is equally difficult to know which of the interests described above a donor intends to further.

Regardless of the donor's motive, the Commission identified those donations that appear to further the first type of "interest" as inherently harmful. First, there is the opportunity for corruption on the part of public officials who accept campaign contributions from those whose business interests can be affected by that official's discretionary decisions, whether that decision is the favorable negotiation of a contract or the exercise of a legislative vote. Second,

even where no corruption is evident, donations that are made to secure influence over public officials erode public trust and confidence in government.[11]

The Commission identified several categories of campaign contributions that, at a minimum, create the perception that those donors have the opportunity and desire to exercise undue influence over elected officials. The most obvious categories of donations that create this perception are donations by City contractors and others doing business with the City. The news is replete with stories raising questions about donations by contractors to candidates for office at all levels of government and in all political parties. Commission staff collected a sampling of over fifty such incidents in New York State between 1994 and 1998 alone. Similarly, donations by registered lobbyists and their principals can create the appearance of an attempt to purchase influence. These donations can be made directly to the candidate, or to the candidate's political committee or political action committee.

Generally there is no evidence that these campaign contributions actually influence the award of a particular contract or passage of a bill. The contributions appear to be consistent with current law, which does not prohibit contributions by entities doing business with the government. There is, however, no doubt that these contributions have a negative impact on the public because they promote the perception that one must "pay to play."

---

[11] The Commission recognized that the mere size of a contribution might be correlated with how effectively the interest of the donor will be advanced. Indeed, some have argued that all private donations are "interested" and that the undue influence of such donations will not be eliminated unless campaigns are completely financed with public funds and private contributions are eliminated entirely. In New York City, through contribution limits and public funding for candidates, the campaign finance system has taken steps to limit the potentially superior influence of those with access to greater wealth.

In framing its proposal, the Commission considered the growing body of regulatory restrictions from around the country that address this kind of interested donation. A survey of some of the jurisdictions with these regulations is attached as Exhibit D.

The Commission also considered the many helpful comments it received on its original proposal. The final proposal specifically addresses the concern raised by many that too broad a ban on donations by persons doing business with the City could drive candidates out of the voluntary Campaign Finance Program. Since the City has never collected this information, the Commission decided that the concerns raised about the effect of a ban could not be adequately addressed. Therefore, the Commission determined that the first necessary step was to require disclosure of the donors to participating campaigns who do business with the City. City agencies can aid in the information gathering process by identifying for the Board the persons and entities they do business with. Once the data is collected and freely available to the public, it will be easier to project the likely impact of regulating those donors.

The proposal grants the Board substantive rule-making authority. The Commissioners specifically intended that the Board's regulatory authority encompass the authority to ban donations from certain classes of people or entities who do business with the City, and to expand on the initial prohibition as warranted by experience. The Commissioners were aware that the City Program's success thus far was in large part due to incremental steps taken after thorough study by the Campaign Finance Board. Therefore, they decided against imposing a flat prohibition on donations by persons doing business with

the City in the Charter itself.  Instead, the Board is empowered to prohibit such donations, entirely or in part, and to establish other restrictions as it deems appropriate after thorough study of the disclosure data.

The Charter amendment provides that the Board be guided by certain factors in promulgating rules: the effectiveness of the system, its cost and the maintenance of a reasonable balance between the burdens and incentives of the system.  The Board may choose to begin regulating the more easily identifiable type of contributions and move on after the impact of the new regulations is studied.  The Board will have the discretion to exclude small contributions, small campaigns or small businesses from regulatory coverage.  The Commission intended that these choices be made carefully, based on the factors spelled out in the Charter amendment, in order to preserve the integrity of the Program as a whole. Therefore, the Commission decided that the Board should be given continuing substantive rule-making authority to regulate donations to participating campaigns by persons or entities doing business with the City.  The Commission also proposed that the Board's initial rule-making authority in this area supersede any inconsistent existing local law. The Commission considered this a necessary protection from political pressures to dilute prohibitions on accepting campaign contributions from persons or entities doing business with the City.    The Commission recognized, however, that the City Council could always override a misguided Board regulation through the normal legislative process.

### 4) Regulation of "Soft Money"

The Commission recognized that "soft money" undermines the effectiveness of the City's voluntary Campaign Finance Program because it is not subject to the rigorous public scrutiny and controls of funds that are regulated by the Campaign Finance Board. "Soft money" refers to any political contribution that is not regulated under the existing campaign finance scheme. Typical examples of soft money involve contributions to political parties, or unregulated expenditures by individuals and independent groups on behalf of, or against, a candidate.

The Campaign Finance Board addressed the problem of soft money in a 1995 report entitled "Party Favors", which examined the impact of political party spending in covered campaigns and recommended changes to City and State law. As a result, in 1996, the Board adopted Rule 1-08(f)(4) on independent expenditures which, in effect, establishes a rebuttable presumption that party spending on behalf of that party's nominee is not independent.

The Commission questioned whether the Board had taken every action legally and constitutionally possible to regulate soft money.[12] The Commission recognized that the City could not address the State Legislature's failure to lower the $69,900 per year cap on donations to political parties or to cap the unlimited donations to parties for "housekeeping" at the State level. The Commission was

---

[12] For example, under existing regulations, party spending for generic ballot advocacy purposes is not considered an in-kind contribution to a participating candidate unless it is demonstrated that the candidate cooperated in the effort and that it was intended for the benefit of that candidate. The Commission believes that the Board should revisit this and similar questions.

concerned, however, that restricting direct campaign donations, such as a ban on corporate contributions, would result in more soft money to distort the regulatory framework. In light of these serious concerns, the Commission determined that the Charter should be amended to grant the Board substantive rule-making authority over soft money and direct that the Board issue all legally permissible additional regulations to minimize the influence of soft money in City elections.

Accordingly, the Commission proposal would amend the Charter to require that the Campaign Finance Board promulgate whatever regulations it deems necessary to further regulate spending that supports candidates in elections without being directly attributable to the candidate's campaign. This delegation of substantive rule-making authority would supersede existing local law.

After discussion of this revised proposal, the Commissioners voted unanimously to reconvene on August 20, 1998 and consider Charter language to carry out these aims.

On August 20, 1998, the Commission unanimously decided to recommend to the voters that the Charter be amended to: (1) prohibit corporate contributions, (2) require disclosure and regulation of contributions by persons doing business with the City and regulation of "soft money", (3) protect the Campaign Finance Board's budget and (4) allow the Campaign Finance Board to fill vacancies when appointments are not timely made.

# IV.    OTHER PROPOSALS CONSIDERED BY THE COMMISSION

The Commission debated whether to propose two other changes to the form of City government for the November 1998 ballot: nonpartisan elections and a full-time City Council.   Ultimately, the Commission decided that while both proposals had considerable merit, they required more research and consideration before a proposal on either subject could be recommended to the voters.  Accordingly, the Commission voted to continue work on both issues but against presenting any ballot question on the issues to the voters in 1998.

## A.    Nonpartisan Elections

The Commission studied at length whether to require that candidates for Citywide office be elected on a nonpartisan basis.[13]  In nonpartisan elections, candidates would be selected independent of the party nominating process and listed on the ballot without party labels.  The Commission considered that voter turnout has been low and that nonpartisan elections might increase voter participation since all voters would be able to select the finalists who would run in the general election.

---

[13] The Commission's report on nonpartisan elections is attached as Exhibit E.

The Commission reviewed the experience of other cities and noted that the overwhelming majority of municipalities throughout the United States conduct nonpartisan elections. Nonpartisan elections exist in New York City as well; the Charter was amended in 1988 to provide for nonpartisan vacancy elections for City Council and Borough President, and State law provides for nonpartisan school board elections.

Staff reported to the Commission that the City had the legal authority under State law to adopt nonpartisan elections and the Commission retained a voting rights consultant, Professor Allan J. Lichtman, who preliminarily concluded that switching to nonpartisan elections would not violate the Voting Rights Act.

Academic experts consulted by the Commission had divergent views on nonpartisan elections. Studies have shown that nonpartisan elections can encourage some trends that Commissioners would not support – lower voter turnout and an increase in ethnic bloc voting – but Commissioners believed that this would not necessarily be the case in New York City, in part because practical experience shows that minority candidates are more likely to be elected in nonpartisan than in partisan systems. Professor Lichtman informed the Commission that in the fifty largest cities in the country, no city without a Black or Hispanic majority population that uses partisan elections currently has a minority mayor while 28% of such nonpartisan cities have minority mayors.

The Commission consulted party leaders who made clear their view that this would be an undesirable change, and that the parties serve a legitimate and important role in New York City politics. Certainly New York City's experience with nonpartisan school board elections was sufficiently mixed to raise doubts concerning whether nonpartisan elections would be effective in New York City, although Commissioners questioned whether that experience could be applied to citywide races.

The Commission also identified a number of important technical questions that would have to be resolved before New York City could implement nonpartisan elections.

These included:

1. How should candidates advance to the general election?

   In most jurisdictions, a nonpartisan primary is followed by a general election in which the top two primary vote recipients face off. Because of New York City's diversity, such a scheme may not be appropriate here.

2. What should the ballot look like?

   The Commission would have to specify the ballot format by Charter amendment and it would have to make sure that it has chosen the simplest and clearest format so that voter confusion could be avoided.

3. How can the Board of Elections conduct a nonpartisan primary concurrently with a partisan primary?

The "lock-out" mechanism on the current mechanical voting machines would make it difficult for all voters to participate in the nonpartisan portion of the primary and then limit party voters to participation in the appropriate party primary.

Ultimately, the Commission concluded that it needed substantially more study before a nonpartisan elections proposal could be framed. Further, the Commission determined that there needed to be a vigorous public debate of the advantages and disadvantages of nonpartisan elections before the voters would be able to make an educated decision on such a major change. Therefore, the Commissioners voted unanimously to continue to study the subject and to defer making any proposal on the subject for one year.

### B.    **Full-time Council**

The Commission devoted significant attention to a proposal to change the status of the New York City Council from a part-time to a full-time legislative body. Under the current Charter, Council members are permitted to hold private employment, but must comply with conflicts of interest requirements. The proposal before the Commission would have amended Charter § 1100 to require that Council members devote full-time to Council service.

The Commissioners in favor of the proposal identified reasons to support the change.  Of most importance was the Council's enhanced role in governing the City.  With the elimination of the Board of Estimate under the 1989 Charter, the City Council gained authority over the budget and was given substantial new responsibilities in the areas of zoning, land use, and franchises.  Commissioners noted that the Council has over time increasingly exercised its powers under the Charter, for instance by enacting its own budget.  Commissioners doubted whether the Council could fully assert its authority while its members held outside jobs.

The Commissioners were also concerned that, as term limits take effect after the municipal election of 2001, much of the Council's institutional knowledge will be lost.  It is likely that Council staff and the bureaucracy of City government will gain significant power and policy influence at the expense of the people's representatives, simply because they will know more about how the City operates.  Full-time Council members would likely be more able to assert control from staff more quickly than members who remain preoccupied with outside jobs.

Commissioners were also concerned about the appearance of conflicts of interest that can arise when Council members practice law, work in private business, or operate non-profit organizations in addition to their legislative positions.  While Council members are subject to the conflicts of interest provisions of the Charter, their part-time status raises questions as to whether they can maintain objectivity in setting legislative priorities and budgetary allocations while their business and professional interests can easily be linked to their civic duties.  Commissioners also questioned whether part-time Council

employment might give the appearance that members neglect their legislative workload.

The Commissioners compared the Council to legislatures in other large cities. Among the six U.S. cities with a population over one million that have a Mayor/Council form of government, New York City, Chicago, and Houston have part-time status for their municipal legislators, while Los Angeles, Philadelphia, and Detroit have full-time legislative bodies. Currently, the 51 members of the Council are paid an annual salary of $70,500 and most receive additional special stipends, with the average stipend at $9,500. The base pay leaves Council members the sixth highest paid municipal legislative body, full-time or part-time.

Some Commissioners proposed that if the Council were to be made full-time, the districts should be redrawn to make the Council a smaller body. Those Commissioners contended that the two proposals should be coupled since a full-time Council member would have more time for constituent service and could handle the demands of a larger district.

Other Commissioners questioned the need for the proposal, arguing that part-time work helps Council members keep in touch with the concerns of their constituencies and gives valuable "real world" experience to political decision making. They questioned the quality of candidates that would be attracted to a full-time Council. It was also noted that legislative bodies with more responsibility than the City Council operate on a part-time basis.

Even many of the Commissioners who favored the proposal supported deferring the issue because the change would not take effect until the 2001 election. Therefore, they contended that the Commission had the time to engage in the additional public discussion and debate that was warranted for a proposal to fundamentally redefine the City's legislative branch of government. Accordingly, the Commission voted by 8 to 4 to defer development of a ballot question on this subject.

## V.     REVIEW OF OTHER AREAS OF THE CHARTER

Although they made no recommendations for change to be put before the voters in the current year other than campaign finance reform, Commissioners identified many other areas of the Charter where further study is warranted. Individual commissioners studied proposals for Charter amendment and prepared recommendations to the Commission as a whole.  The Commissioners discussed these proposals at a meeting on July 16, 1998.

- ULURP

The Commissioners reviewed Section 197-c of the Charter, the Uniform Land Use Review Process ("ULURP").  Several Commissioners met with elected officials, present and former City employees who implement ULURP, and members of the public who have participated in ULURP.  In addition, at the public hearings the Commissioners heard a number of comments on the subject of ULURP.

Although dissatisfaction with ULURP was palpable, there was no consensus on what needs to be done.  Those concerned with the changes development brings to neighborhoods argued strongly for more localized control, taking power away from the Department of City Planning and the City Council. Those concerned with encouraging economic development argued for a simplified and shortened review process.  Those concerned with unpredictable outcomes argued for eliminating the City Council's authority over specific site

decisions. Others felt that the Council's administrative power was an important avenue for stopping unpopular projects.

ULURP was added to the Charter by the 1975 Charter Revision Commission. When the Charter was revised in 1989 to eliminate the Board of Estimate, the City Council was given the Board's ULURP powers. The Council's role became a hybrid of legislative and administrative functions. Some Commissioners recommended that the Commission revisit the question of whether it was appropriate for the City Council to exercise both legislative and administrative power in ULURP. They suggested that the Council retain legislative authority, including the power to create rules of general applicability affecting the City, while administrative authority, which applies general rules to specific projects, would be transferred to the City Planning Commission. This would speed up ULURP review and make it more predictable, while retaining community input through the Community Boards, Borough Presidents and Borough Boards. At least one Commissioner, however, strongly urged that the Council retain an administrative role in ULURP because Council members are more attuned to the important issues in their districts.

There were less controversial proposals for changes to ULURP as well, including the removal of minor changes in street grade from the ULURP review process, but these were difficult to consider apart from the rethinking of the ULURP process as a whole.

Commissioners differed in their views on the need for ULURP changes. Two Commissioners favored a significantly longer study period before making recommendations to the voters. One Commissioner favored leaving ULURP untouched. All the Commissioners agreed, however, that the issues were complex and required more study and evaluation before a recommendation could be made. Accordingly, at the July 16, 1998 Commission meeting, the Commissioners voted unanimously to defer making any proposal to amend Charter § 197-c but directed the Commission staff to continue its study of the issues.

■ Procurement and Franchises

The Commission also studied Chapter 13 of the Charter concerning procurement of goods and services and Chapter 14 concerning franchises. Many of the Commissioners had experience in public service and were interested in simplifying and improving the procurement process.

At meetings with City contracting officials and experts in governmental procurement, there was intense dissatisfaction with the City's system of procuring goods and services. Many City administrators felt that the system led to low quality purchases and many providers felt the system was unduly complex. Almost all commentators agreed the system was economically irrational.

Many of the problems identified in City contracting, however, do not originate entirely in the Charter. They are either based on the State law requirement under General Municipal Law §103 that purchases be made from the lowest responsible bidder, or were derived from City's Procurement Policy Board Rules, which could simply be amended by rule-making. Therefore, while some possible changes to the Charter could be identified, such as proposals to simplify the process for determining whether a bidder is responsible and for clarifying the Comptroller's role in contract registration, more study was required before a package of beneficial amendments could be developed for public consideration.

The Charter provisions concerning franchises were substantially revised by the 1989 Charter Revision Commission. The current franchise provisions were criticized by public officials at the public hearings who argued that the Charter should be amended to decentralize control over franchises, thereby removing the City Council's franchise power. Other experts offered proposals to simplify the process. The Commissioners determined that this topic required a more thorough consideration of how the system currently operates in order to identify deficiencies and possible improvements.

Therefore, the Commission unanimously decided it could make no recommendation to the voters on procurement and franchises for November 1998, and deferred the two subjects for further study.

- **Office of the Public Advocate**

The Commission considered amending Charter § 24 to eliminate the Office of the Public Advocate. The Public Advocate, formerly known as the Council President, had been retained by the 1989 Charter Revision Commission by a split vote, even though the Office had lost its substantive powers with the elimination of the Board of Estimate. Today, the Public Advocate's few remaining functions duplicate those of other elected officials and City agencies.

Nonetheless, a number of people testified at the public hearings in favor of retaining the Public Advocate. The office seems to be functioning well for some New Yorkers who could not otherwise find help in resolving bureaucratic problems. The Public Advocate's election by a citywide electorate apparently strengthens the office's ability to help individual citizens resolve problems that are perhaps unsolvable by a City Council member representing a smaller district. Even though research had found no other city or state in the United States with a similar elected official, it may be that New York City's size and complexity requires more ombudsman-type help than anywhere else. The Commission therefore unanimously resolved at the July 16, 1998 meeting to continue studying whether the City Council or another City official or agency could be as effective a trouble shooter for New Yorkers.

- <u>Independent Budget Office</u>

The Commission reviewed Chapter 11 of the Charter and considered whether the Independent Budget Office ("IBO") should be eliminated or revised. The IBO was established in the 1989 Charter, and had only been fully functional for two years at the time the 1998 Commission was established. The IBO was modeled on the Congressional Budget Office, an independent nonpartisan body. The IBO was criticized by some as being the creature of advocacy groups, rather than truly independent. Those critics proposed that the IBO's functions could be transferred to the Office of the Comptroller, who, as an official elected by the entire City, would be equally responsive to all segments of the public. Others argued, however, that political figures who disagree with the policy proposals of the Mayor and Council majority needed the IBO to serve as an authoritative source of information on budget issues.

Because the IBO had not been operational long enough to draw a reasoned conclusion concerning its value, the Commissioners unanimously agreed to defer proposing any changes to the IBO, pending further study.

- <u>Size of Council Districts</u>

Some Commissioners argued strongly that the Commission should propose a Charter amendment to reduce the size of the City Council from the present 51 districts. Such small districts, it was suggested, make it difficult for Council members to concentrate on the needs of the City as a whole and leave the Council too large a body to foster collegiality. The point was also raised that

if the Commission were to recommend a full-time Council, the districts could be made larger because the members would have more time to devote to constituency service.

The Commissioners unanimously voted to study the issue in conjunction with the full-time Council question, with a view to a possible proposal for the ballot in 1999.

- Budget Process

Because the Charter Revision Commission had been appointed during a time of disagreement between the Mayor and the City Council over budgetary powers, numerous proposals to revise the Charter provisions on budgeting had been suggested. The budget process had been changed substantially by the 1989 Charter Revision Commission; with the elimination of the Board of Estimate the Council had been given new powers over the budget and the Mayor's role had been altered as well. Until this year, the Council had exercised its budgetary powers only gingerly, and the existing Charter language had yet to be fully clarified by experience. Accordingly, the Commissioners did not frame a proposal on the issue, and did not vote to continue to study the subject.

# EXHIBIT  A

## SOURCES

# SOURCES

## Books

Malbin, Michael J., and Thomas L. Gais. <u>The Day After Reform: Sobering Campaign Finance Lessons from the American States</u>. (Albany, NY: The Rockefeller Institute Press, 1998)

New York City Campaign Finance Board. <u>Campaign Finance Handbook</u>. (New York, NY: New York City Campaign Finance Board, 1997)

Rosenkranz, E. Joshua. <u>Buckley Stops Here: Loosening the Judicial Stranglehold on Campaign Finance Reform</u>. (New York, NY: The Century Foundation Press, 1998)

## Papers, Testimony, and Articles

Brennan Center for Justice at New York University School of Law. "Selected Clippings." Compiled June 1998.

Center for Responsive Politics. "Roundup of State Campaign Finance Reform Ballot Initiatives." Available at http://www.crp.org/state/round.html, November 1996.

Center for Responsive Politics. "Campaign Finance Reform: Look Beyond the Beltway for Answers." Available at http://www.crp.org/reform/belt.html, November 1996.

Center for Responsive Politics. "Proposals for Reforming Campaign Finance." Available at http://www.crp.org/reform/finance1.html, November 1996.

City Council Committee on Governmental Operations, Hearing on Intro 92, New York City Council, 1998. Testimony of Michael A. Cardozo, President, Association of the Bar of the City of New York, 25 February 1998.

City Council Committee on Governmental Operations, Hearing on Intro 92, New York City Council, 1998. Testimony of Gene Russianoff, Senior Attorney and Neal Rosenstein, Government Reform Coordinator of New York Public Interest Research Group, 25 February 1998.

City Council Committee on Governmental Operations, Hearing on Intro 92, New York City Council, 1998. Testimony of Joseph A. O'Hare, S.J., Chairman, New York City Campaign Finance Board, 25 February 1998.

Friedlander, Jeffrey D., Stephen E. Louis, and Laurence D. Laufer. "The New York City Campaign Finance Act." *Hofstra Law Review* 16(2):343-359, 1988.

Laufer, Laurence. "New York's Campaign Finance Program for the 1997 City Elections: A Look Ahead." *City Law* 2(5): 101-105, October/November 1996.

Moramarco, Glenn. "Regulating Electioneering: Distinguishing Between 'Express Advocacy' & 'Issue Advocacy' " Paper, *Campaign Finance Reform Series*, Brennan Center for Justice at New York University School of Law, 1997.

National Civic League. "National Report on Local Campaign Finance Reform: Preliminary Findings." A study by the National Civic League's New Politics Program, 1997.

New York City Campaign Finance Board. "Bundles of Trouble?" Report issued June 1996.

New York City Campaign Finance Board. "New York City Campaign Finance Board Rules." Booklet, issued 26 November 1997. Campaign Finance Board Rules are codified in Chapter 52 of the official compilation of the Rules of the City of New York (Lenz&Reiker, Inc., 1991).

New York City Campaign Finance Board. "Friends in Need: Joint Independent Spending by Candidates." Report issued January 1997.

New York City Campaign Finance Board. "New York City Campaign Finance Board Legislative Proposals." Available at http://www.cfb.nyc.ny.us, Report issued 1998.

New York City Campaign Finance Board. "On the Road to Reform: Campaign Finance in the 1993 New York City Elections." Volume I and II, Report issued September 1994.

New York City Campaign Finance Board. "Party Favors." Report issued January 1995.

New York City Campaign Finance Board. "Proposals for State Legislation: Disclosure and Contribution Limit." Report issued March 1998.

New York City Campaign Finance Board. "The Debate Debate." Report issued June 1994.

New York City Charter Revision Commission, Public Forum on Campaign Finance. Testimony of Nicole A. Gordon, Executive Director, New York City Campaign Finance Board, 28 July 1998.

New York City Charter Revision Commission, Public Forum on Campaign Finance. Testimony of Richard Schrader, Campaign Manager, Clean Money, Clean Elections/ New York City Director, Citizen Action of New York, 28 July 1998.

New York City Charter Revision Commission. "Report of the New York City Charter Revision Commission." Volume 1, March 1990.

Neuborne, Burt. "A Survey of Existing Efforts to Reform the Campaign Finance System." Paper, *Campaign Finance Reform Series*, Brennan Center for Justice at New York University School of Law, 1997.

Neuborne, Burt. "Campaign Finance Reform and the Constitution: A Critical Look at Buckley V. Valeo." Paper, *Campaign Finance Reform Series*, Brennan Center for Justice at New York University School of Law, 1997.

Neuborne, Burt. "The Values of Campaign Finance Reform." Paper, *Campaign Finance Reform Series*, Brennan Center for Justice at New York University School of Law, 1997.

Russianoff, Gene. "Charter Revision Revs Up." *City Law* 4(1): 1-5, January/February 1998.

Special Committee on Election Law. "Towards a Level playing Field – A Pragmatic Approach to Public Campaign Financing." Report issued April 1997.

Weine, Kenneth. "The Flow of Money in Congressional Elections." Paper, *Campaign Finance Reform Series*, Brennan Center for Justice at New York University School of Law, 1997.

**Press Releases and Correspondence**

Clean Money, Clean Elections/NY at Citizen Action of New York. Memorandum Re: Possible Campaign Finance Reform Initiatives, 8 July 1998.

Common Cause/NY. "Statement on City Council Campaign Finance Legislation." 2 July 1998.

Council of the City of New York, Office of Communications. "Vallone/Green Join Good Government Groups on Campaign Reform Package." 2 July 1998

New York Public Interest Research Group. "Statement on City Council Campaign Finance Legislation." 2 July 1998.

Schrader, Richard and Richard Kirsch. Clean Money, Clean Elections/NY at Citizen Action of New York. Correspondence to Elizabeth St. Clair Re: CMCE Proposal, 17 June 1998.

Schrader, Richard and Richard Kirsch. Clean Money, Clean Elections/NY at Citizen Action of New York. Memorandum Re: Proposed New York City Charter Amendment on Campaign Finance Reform, 28 May 1998.

Staff. "Summary of Senator John McCain's (R-AZ) Campaign Finance Proposals." September 1997-February 1998.

# EXHIBIT  B

## CHARTER AMENDMENT
## &
## BALLOT QUESTION

1    Section 1.  Paragraph 1 of subdivision a of section

2    1052 of the charter, as amended by local law number 68 for

3    the year 1993, is amended to read as follows:

4        1. There shall be a campaign finance board consisting

5    of five members.   Two members of the board shall be

6    appointed by the mayor, provided that not more than one

7    such member shall be enrolled in any one political party,

8    and two members shall be appointed by the speaker of the

9    council, provided that not more than one such member shall

10   be enrolled in any one political party, and one member, who

11   shall be the chairperson, shall be appointed by the mayor

12   after consultation with the speaker.   The members shall

13   first be appointed to serve as follows:

14       (a)  one member appointed by the speaker for a term of

15           one year;

16       (b)  one member appointed by the mayor for a term of

17           two years;

18       (c)  one member appointed by the speaker for a term of

19           three years;

20       (d)  one member appointed by the mayor for a term of

21           four years; and

22       (e)  the chairperson for a term of five years.

23   Each term shall commence on April first, nineteen

24   hundred eighty-eight.   Thereafter, each member shall be

1  appointed for a term of five years by the mayor or the

2  speaker, according to the original manner of appointment.

3  Upon expiration of the term of a member, if the mayor or

4  the speaker, as appropriate, shall fail to appoint a member

5  within one hundred twenty days of the expiration of such

6  term, the member whose term has expired shall be deemed

7  appointed for an additional term of five years, provided,

8  however, that if the expiration of such term occurs in a

9  year in which elections, except special elections, covered

10  by the voluntary system of campaign finance reform are

11  scheduled, the member whose term has expired shall be

12  deemed appointed for an additional term of five years if

13  the mayor or the speaker, as appropriate, shall fail to

14  appoint a member within ninety days of the expiration of

15  such term.  In case of a vacancy in the office of a member,

16  a member shall be appointed to serve for the remainder of

17  the unexpired term by the mayor or the speaker, according

18  to the original manner of appointment.  If the mayor or the

19  speaker, as appropriate, shall fail to appoint a member

20  within one hundred eighty days of such vacancy, then a

21  member shall be appointed by the board to serve for the

22  remainder of the unexpired term, if additional time remains

23  in such term, provided, however, that if such vacancy

24  occurs in a year, or within ninety days prior to a year, in

1  which elections, except special elections, covered by the
2  voluntary system of campaign finance reform are scheduled,
3  then a member shall be appointed by the board to serve for
4  the remainder of the unexpired term, if additional time
5  remains in such term, if the mayor or the speaker, as
6  appropriate, shall fail to appoint a member within ninety
7  days of such vacancy.  Except for the chairperson, such
8  member shall not be enrolled in the same political party as
9  the other member appointed by the official who failed to so
10  appoint.  Each member shall be a resident of the city,
11  registered to vote therein.  Each member shall agree not to
12  make contributions to any candidate for nomination for
13  election, or election, to the office of mayor, public
14  advocate, comptroller, borough president, or member of the
15  council which in the aggregate are in excess of the maximum
16  contribution applicable to such office pursuant to any
17  local law establishing a voluntary system of campaign
18  finance reform.  No member shall serve as an officer of a
19  political party, or be a candidate, or participate in any
20  capacity in a campaign by a candidate, for nomination for
21  election or election to the office of mayor, public
22  advocate, comptroller, borough president or member of the
23  city council.  Officers and employees of the city or any
24  city agency, lobbyists required to file a statement of

1    registration under section 3-213 of the administrative code

2    and the employees of such lobbyists shall not be eligible

3    to be members of the board.

4       § 2. Subdivision a of section 1052 of the charter is

5    amended by adding a new paragraph 11 to read as follows:

6       11. a. The board shall require that candidates

7    participating in the voluntary system of campaign finance

8    reform or candidates who otherwise file disclosure reports

9    with the board shall disclose to the board the acceptance

10    of campaign contributions from individuals and entities

11    doing business with the city. The board shall promulgate

12    such rules as it deems necessary to implement and

13    administer this provision and provide that information

14    regarding such contributions shall be accessible to the

15    public. The board shall also promulgate such rules as it

16    deems necessary to regulate the acceptance by candidates

17    participating in the voluntary system of campaign finance

18    reform of campaign contributions from individuals and

19    entities doing business with the city, including rules that

20    determine which business dealings shall be covered by such

21    rules. Elected officials, city agencies, boards and

22    commissions, including the mayor, comptroller, public

23    advocate, borough presidents, the city council and members

24    of the city council shall cooperate with the board to

1   provide to the board such information about such

2   individuals and entities as the board shall require.

3      b. The board shall promulgate such rules as it deems

4   necessary to attribute expenditures that indirectly assist

5   or benefit a candidate participating in the voluntary

6   system of campaign finance reform as in-kind contributions

7   to such candidate.

8      c. In promulgating rules pursuant to this paragraph,

9   the board shall consider the following criteria: (1) the

10   effectiveness of the voluntary system of campaign finance

11   reform, (2) the costs of such system, (3) the maintenance

12   of a reasonable balance between the burdens of such system

13   and the incentives to candidates to participate in such

14   system.

15      d. Any rules promulgated pursuant to this paragraph

16   shall apply only with respect to nomination for election,

17   or election, to the office of mayor, public advocate,

18   comptroller, borough president, or member of the city

19   council.

20      e. Proposed rules promulgated pursuant to this

21   paragraph shall be published in accordance with subdivision

22   b of section one thousand forty-three of this charter no

23   later than December thirty-first, nineteen hundred ninety-

24   nine. Final rules promulgated pursuant to this paragraph

1  shall be adopted in accordance with such section as soon as

2  practicable thereafter.  Final rules adopted in the initial

3  promulgation of rules pursuant to this paragraph shall

4  supersede any inconsistent provisions of the administrative

5  code that are in effect on the effective date of such final

6  rules.

7      § 3.   Subdivision a of section 1052 of the charter is

8  amended by adding a new paragraph 12 to read as follows:

9      12.   Notwithstanding any other provision of law, the

10  board shall prohibit candidates participating in the

11  voluntary system of campaign finance reform from accepting,

12  either directly or indirectly, a campaign contribution,

13  loan, guarantee or other security for such loan, from any

14  corporation.  The board shall promulgate such rules as it

15  deems necessary to implement and administer this provision.

16      § 4.   Subdivision b of section 1052 of the charter, as

17  amended by local law number 68 for the year 1993, is

18  amended to read as follows:

19      b.  The board shall take such actions as it deems

20  necessary and appropriate to improve public awareness of

21  the candidates, proposals or referenda in all elections in

22  which there are contested elections for the offices of

23  mayor, public advocate, borough presidents, comptroller, or

24  city council or ballot proposals or referenda pursuant to

1   this charter or the municipal home rule law, including but

2   not necessarily limited to the publication of a non-

3   partisan, impartial voters guide providing information on

4   candidates, ballot proposals and referenda, and the

5   distribution of one copy of such guide to each household in

6   which there is at least one registered voter eligible to

7   vote in the election involved. <u>In any year in which the</u>

8   <u>board publishes a voters guide, if the board determines</u>

9   <u>that the amount of money in its budget is insufficient or</u>

10   <u>likely to be insufficient for the publication and</u>

11   <u>distribution of the voters guide, it shall report such</u>

12   <u>determination to the director of the office of management</u>

13   <u>and budget, who, after consultation with the board, shall,</u>

14   <u>without an appropriation, transfer to the board a</u>

15   <u>reasonable amount, as the director shall determine, to</u>

16   <u>cover the cost of publishing and distributing the voters</u>

17   <u>guide.</u>

18     § 5. Section 1052 of the charter is amended by adding

19   a new subdivision c to read as follows:

20     <u>c. The board shall, not later than March tenth of</u>

21   <u>each year, approve and submit to the mayor detailed</u>

22   <u>itemized estimates of the financial needs of the campaign</u>

23   <u>finance board for the ensuing fiscal year. Such estimates</u>

24   <u>shall be comprised of at least one personal service unit of</u>

7

1  appropriation and at least one other than personal service
2  unit of appropriation. The mayor shall include such
3  estimates in the executive budget without revision, but
4  with such recommendations as the mayor may deem proper.
5  Upon inclusion in the executive budget, the budget
6  submitted by the campaign finance board shall be adopted
7  pursuant to such provisions of chapter ten of this charter
8  as are applicable to the operating budget of the council.

9      § 6.  Section 1152 of the charter is amended by adding
10  a new subdivision g to read as follows:

11      g.  The amendments to the charter approved by the
12  electors on November third, nineteen hundred ninety-eight
13  shall take effect on the first day of January, nineteen
14  hundred ninety-nine, and thereafter shall control as
15  provided in respect to all the powers, functions and duties
16  of all officers, agencies and employees, except as further
17  specifically provided in other sections of this charter.

# BALLOT QUESTION

Proposal Recommended by the

New York City Charter Revision Commission

dated August 20, 1998

## Question 1 – Campaign Finance Reform

Shall the changes relating to the voluntary campaign finance system, including (1) prohibiting corporate contributions, (2) requiring disclosure and regulation of contributions by those doing business with the City of New York and regulation of indirect campaign expenditures, (3) establishing a special budget process for the Campaign Finance Board, and (4) establishing a procedure for filling vacancies on the Campaign Finance Board, proposed as amendments to Chapter 46 of the City Charter, be adopted?

# EXHIBIT  C

## REGULATION OF CORPORATE CONTRIBUTIONS

# Regulation of Corporate Contributions

| STATE | TYPE OF RESTRICTION |
|---|---|
| Alabama | Limited to $500 to any candidate, political committee, or political party per election. |
| Alaska | Limited to $1,000 per office per year<br><br>Corporations and their subsidiaries collectively limited to $1,000 for a single candidate |
| Arizona | Prohibited |
| Arkansas | Limited to $1,000 per candidate per election |
| California | Limits of $1,000 per candidate per special election or special runoff election only.<br><br>Certain jurisdictions have local limits on contributions to candidates. |
| Colorado | Unlimited |
| Connecticut | Prohibited |
| Delaware | Limited to $1,200 per statewide candidate per election, and $600 per non-statewide candidate per election. |
| District of Columbia | Limited to an aggregate of $600 per election and $100 for Mayor; $100 for council chair; $100 for council member-at-large; $50 for council member from a district or board of education member-at-large; $50 for board of education member from a district or party official; and $25 for a neighborhood advisory committee member |
| Florida | Limited to $500 per candidate |
| Georgia | Limited to $5,000 in the aggregate to statewide candidates in an election year, and $1,000 in the aggregate in a non-election year.<br><br>Limited to $2,000 in the aggregate to general assembly and other candidates in an election year, and $1,000 in the aggregate in a non-election year. |
| Hawaii | Limited to $1,000 in any election period |
| Idaho | Unlimited |
| Illinois | Unlimited |
| Indiana | Limited to aggregates of $5,000 for statewide candidates; $5,000 for state party central committees; $6,000 for other offices; $4,000 for state legislative caucuses; and $2,000 for other party committees |
| Iowa | Prohibited |
| Kansas | Limited to $2,000 per statewide candidate per election; $1,000 per election for state seats; $500 per election for house seats, local office, district judge, district magistrate judge, district attorney, and state school board |
| Kentucky | Prohibited |
| Louisiana | Limited to $5,000 for major office candidates, $2,500 for district office |

1

| | |
|---|---|
| | candidates, and $1,000 for any other offices, per candidate, per election. During any 4-year period, may not contribute more than $100,000 to any political committee other than a candidate committee. |
| Maine | |
| Maryland | Limited to $5,000 per candidate per election |
| Massachusetts | Limited to aggregate of $10,000 per 4-year election cycle and $4,000 per candidate or political committee |
| Michigan | Prohibited |
| Minnesota | Prohibited for candidate elections |
| Mississippi | Prohibited |
| Missouri | Limited to $1,000 per candidate per election |
| Montana | Unlimited |
| Nebraska | Prohibited |
| | State, statewide, and legislative candidates are limited to maximum amount of aggregate contributions in election years that may be accepted from independent committees; businesses (including corporations); labor unions; industry, trade, or professional associations; and political parties: Gov- $750,000; Secretary of State, Treasurer, Attorney General, Auditor of Public Accounts - $75,000; legislature, public service Commission, Board of Regents of University of Nebraska & State Bd. Of Education - $25,000 |
| Nevada | Statewide office: $10,000 per election cycle City, county, state, or judicial office: $10,000 per election cycle |
| New Hampshire | Prohibited |
| New Jersey | Limited to $1,5000 per non-governor candidate per primary or general election; $1,800 per governor candidate per primary or general election; $25,000 to political party state committee or county committee or legislative leadership committee per year; $5,000 to municipal party committee per year. Unlimited to political committee or continuing political committee. |
| New Mexico | Unlimited |
| New York | Same maximum aggregate limit per office and per party committee or constituted committee per calendar year as individuals, but limited to an aggregate of $5,000 in political contributions and expenditures per calendar year. |
| North Carolina | Prohibited |
| North Dakota | Prohibited |
| Ohio | Prohibited |
| Oklahoma | Prohibited |
| Oregon | Corporation, professional corporation, or nonprofit corporation may not make contributions directly or indirectly from treasury funds to any candidate or non-measure political committee |
| Pennsylvania | Prohibited |
| Rhode Island | Prohibited |
| South Carolina | Limited to $3,5000 per statewide candidate per election; $1,000 per other candidate per election; $3,500 per committee per calendar year. |

| | |
|---|---|
| | Corporation or corporate committee may solicit contributions to the corporation or corporate committee only from shareholders, employees, and families. |
| South Dakota | Prohibited |
| Tennessee | Prohibited |
| Texas | Unlimited to political parties except during 60 days before election, and to political committees to support or oppose a measure. |
| Utah | Unlimited |
| Vermont | Limited to $1,000 per candidate or committee per election |
| Virginia | Unlimited |
| Washington | Contributions per election to state office candidates limited to $500 for state legislative office candidate and $1,000 for state executive office candidate. Aggregate contributions within 21 days of a general election may not exceed $5,000 for a campaign for other than statewide office. Aggregate contributions in calendar year to each political party state organization and to each major party county central committee or legislative district committee limited to $2,500 and to a caucus of the state legislature limited to $500. |
| West Virginia | Prohibited |
| Wisconsin | Prohibited, except concerning a referendum |
| Wyoming | Prohibited |

Source: Campaign Finance Law 96, Federal Election Commission

# EXHIBIT  D

## REGULATION OF BUSINESSES THAT DO BUSINESS WITH THE GOVERNMENT

# Regulation of Contributions by Businesses that do Business with the Government

## Federal

- <u>Federal Government</u>: Prohibits anyone who contracts with the United States or any of its departments or agencies (to provide personal services, furnish any materials, supplies or equipment, or to sell any land or building to the United States), from contributing or soliciting any contributions or promising to make a contribution to any political party, committee or candidate for federal office.

- <u>Municipal Securities Review Board/Securities Exchange Commission (Rule G-37)</u>: Prohibits municipal securities brokers and dealers from engaging in municipal securities business with the issuers of the securities for a two year period after a broker or dealer has made a contribution (over $250 per official per election) to an official of the issuer.

## States and Localities

- <u>State of California</u>: Members of the California Public Employees' Retirement System Board may not receive campaign contributions from contractors or investment firms.

- <u>State of Connecticut</u>: Prohibits the state treasurer from doing business with any investment, legal and/or bonding entity that contributed to the state treasurer's election or reelection either directly, through a PAC, or through an individual who is an owner of or employed by such entity as a manager, officer, director, partner, or employee with managerial and/or discretionary responsibilities to invest.

- <u>State of Georgia</u>: Prohibits regulated entities (or PACs acting on their behalf) from making contributions to the executive officer (or a candidate for such executive office) regulating such entity.

- <u>State of Kentucky</u>: Prohibits the awarding of a non-bid contract by an elected official or his or her appointee to any entity whose officers or employees, or the spouses of officers or employees, knowingly contributed $5,000 or more to the elected official.

- <u>State of Michigan</u>: Michigan Casino Gambling Law prohibits casino suppliers and suppliers of non-gaming services (and their key employees and spouses and children) with contracts worth more than $200,000 a year from giving campaign contributions to state and local politicians one year before they apply for a casino license.

- State of New Mexico: Prohibits an elected state official, public officer or employee working at a regulatory office, or a candidate for such regulatory office, from soliciting funds from an entity (or its officer or employees) that is directly regulated by the office.

- State of Oklahoma: Prohibits banks from making political contributions.

- State of South Carolina: No person who has been awarded a contract with the state or any of its political subdivisions (other than a contract awarded through competitive bidding practices) may make a contribution to a public official after the awarding of such contract.

- State of West Virginia: Prohibits a contractor with the state or its subdivisions from making a contribution to any political party, committee or candidate for public office during the period of contract negotiations or contract performance.

- City of Alta, Utah: A candidate for public office voluntarily commits to refusing donations from corporations, developers, PACs, unions and other entities that face a substantial likelihood of having matters under consideration by the town during the upcoming four years.

- City of Chula Vista, California: Prohibits members of council from participating in making or influencing a decision involving a license, permit, or other entitlement for use pending before the city, if councilmembers accepted a contribution of $1,000 or more during the last four years.

- City of Costa Mesa, California: Disqualifies members of council from votes where a conflict of interest exists. A conflict of interest includes any campaign contribution of $250 or more from a contributor in the twelve-month interval prior to the date on which the decision involving the contributor is made.

- City of Gardena, California: Prohibits persons contracting with the city from making any contribution to a candidate or committee at any time between the commencement of negotiations for and during (1) the completion of the performance under, or (2) the termination of negotiations for such contract, whichever occurs later.

- City of Los Angeles, California: No company that does business or seeks to do business with the Los Angeles Metropolitan Transit Authority (MTA) can make a contribution in excess of $10 to a member of the MTA's board of directors, or its employees or to members of their immediate families.

- City of Modesto, California: Prohibits members of council from making, participating in the making, or using their official position to influence a government decision in which they or a major campaign contributor (contributed $1,000 aggregate over four years) have a financial interest.

2

- <u>City of Oakland, California</u>: City contractors where such contract requires approval of the city council, are prohibited from contributing to political campaigns during the period between commencement of negotiations and either the completion of, or the termination of, negotiations for such contract.

- <u>City of San Diego, California</u>: County elected officials may not receive gifts or campaign contributions from registered lobbyists.

- <u>City of San Francisco, California</u>: City contractors where such contract requires approval of the city council, are prohibited from contributing to political campaigns during the period between commencement of negotiations and either the completion of, or the termination of, negotiations for such contract.

- <u>City of San Jose, California</u>: Cardroom owners or key employees are prohibited from contributing to candidates. Lobbyists are also prohibited from contributing to candidates.

- <u>City of Santa Ana, California</u>: The mayor and members of council are prohibited from participating in decisions if it is reasonably foreseeable that the decision will have a material financial effect on a recent major campaign contributor ($250 over last year).

- <u>City of Scotts Valley, California</u>: Contributions by city contractors whose contract value exceeds $5,000 are prohibited to members of the city council or their committees, during the time between commencement of negotiations and either the completion of performance or the termination of negotiations for such contract, whichever occurs later.

- <u>City of Westminster, Colorado</u>: Acceptance by a city councillor, his or her family or political organization of a contribution of $100 or more from any individual creates a conflict of interest with regard to that councillor's vote on any issue or mater coming before the council involving a benefit to the contributor.

# EXHIBIT  E

REPORT ON NONPARTISAN ELECTIONS

# EXHIBIT E

**THE STAFF REPORT OF THE
CHARTER REVISION COMMISSION
ON NONPARTISAN ELECTIONS
IS AVAILABLE SEPARATELY.**

Int. No. 586

By The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo, Jackson, Garodnick, Gentile, Gerson, Gioia, Gonzalez, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia Jr., Reyna, Seabrook, Sears, Stewart, Vacca, Weprin, White Jr., Liu and Mendez (in conjunction with the Mayor)

A Local Law to amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1.   Subdivision 3 of section 3-702 of the administrative code of the city of New York, as amended by local law number 12 for the year 2003, is amended, and two new subdivisions 18, 19 and 20 are added, to read as follows:

3.   The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution.  The following contributions are not matchable:

(a)        in-kind contributions of property, goods, or services;

(b)    contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(c)    contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or similar drawing for valuable prizes;

(d)    money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e)    contributions from individuals under the age of eighteen years:

(f)    contributions  from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance: [and]

(g)    contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1).  The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213[.]; and

(f)    contributions provided for in subdivision one-a of section 3-703 of this chapter.

18.    The term "business dealings with the city" shall mean (i) any contract for the procurement of goods or services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York (other

than a contract procured through competitive sealed bidding or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than one hundred thousand dollars or for capital projects totaling not more than one million dollars, entered into or in effect within the past twelve months), including any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith and any contract for the related to the investment or consulting services of a private equity firm; (ii) any real property transaction (other than a public auction or competitive sealed bid transaction) with the city of New York or any agency or entity affiliated with the city of New York, provided, however that in the case of leases in which the city of New York or any agency or entity affiliated with the city of New York is the lessee, the lessor shall only be deemed to be doing business for a period of one year after the commencement of the lease term; or (iii) any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter; provided, however that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) any concession or franchise from the city of New York or any agency or entity affiliated with the city of New York with payments to the city of more than one hundred thousand dollars per year; or (v) one or more grants totaling more than one hundred thousand dollars,  received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York.   For purposes of clause (i) bids on contracts for the procurement

of goods, services, or construction shall constitute business dealings with the city of New York for the period from the submission of the bid until the contract is awarded; and for purposes of clause (iv), bids for franchises and concessions shall constitute business dealings with the city of New York for the period from the submission of the bid until the contract is awarded.   For purposes of clause (iii) of this subdivision, the department of city planning, in consultation with the board, may promulgate rules to provide that certain beneficiaries of applications for approval certified pursuant to section 197-c of the charter shall be deemed to be applicants for purposes of the provisions of this subdivision; provided, however that such rules shall not deem owner-occupants of one, two and three family homes to be applicants.  In addition, a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York. For purposes of this subdivision, "agency or entity affiliated with the city of New York" shall mean the city school district of the city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose members are officials of the city of New York or are appointed by such officials.

19.   The term "economic development agreement" means any contract or agreement in which financial incentives including, but not limited to, tax incentives, payments in lieu of taxes and financing are offered in return for the development, attraction or retention of business; provided, however that no financial incentives which are given to a person who qualifies for such incentive by operation of law shall be deemed to be pursuant to an economic development agreement for purposes of this subchapter.

20.   The term "doing business database" means a computerized database accessible to the board that contains the names of all persons who have business dealings with the city; provided, however that for purposes of this subchapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city.  Such database shall be developed, maintained and updated by the Mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than once a month.  Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city.   For purposes of this definition, the term "person" shall include an entity that has or within the past twelve months (or in the case of an application for land use approval, one hundred and twenty days) has had business dealings with the city, any officer of such entity, any person employed in a managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity.

§2. Section 3-703 of the administrative code of the city of New York is amended by adding two new subdivisions 1-a and 1-b to read as follows:

1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may accept, either directly or by transfer, a contribution or contributions for a covered election from a natural person who has or within the past twelve months (or in the case of an application for land use approval,

within one hundred and twenty days from the date of final action on such application) has had business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for such election does not exceed:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; (iii) for member of the city council two hundred fifty dollars.  Any contribution made pursuant to this section shall not be a matchable contribution.  For purposes of this subdivision, "person" shall include any officer of an entity which has or within the past twelve months has had business dealings with the city, any person employed in a managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which discretion is exercised over the solicitation, letting or management of any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city.  Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of

every individual or entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has or within the past twelve months has had business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting

deadlines.  If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1a of section 3-703 of this subchapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation provided, however, that no such contribution shall be matchable.  Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor.  No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein.  Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds.  For purposes of this section, "individual" shall include any officer of an entity, any person in a managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity.  Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

b.  Notwithstanding  any  other  provision  of  law,  in  making  information  on campaign contributions relating to persons or entities with business dealings with the city publicly  available,  the  campaign  finance  board  shall  not  disclose  that  any  specific contributor  is  the  spouse,  domestic   partner  or  unemancipated  child  of  a  person  with business dealings with the city.

§3    Subparagraph  (i)  of  paragraph  c  of  subdivision  1  of  section  3-703  of  the administrative code of the city of New York is amended to read as follows:

(i) the [first] tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4. Section 3-703 of the administrative code of the city of New York is amended by adding a new subdivision 15 to read as follows:

15.  Participating candidates, their campaign managers, treasurers or persons with significant  managerial  control  over  a  campaign  shall  be  required  to  attend  a  training provided by the campaign finance board concerning compliance with the requirements of the campaign finance program and use of the campaign finance program software.

§5. Subdivision 4 of section 3-705 of the administrative code of the city of New York, is amended to read as follows:

4.  The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six  of section 3-709; provided, however, that the board

shall withhold up to five percent of all public funds payments  to  participating candidates until the final pre-election payment for any given election.  The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election.  For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any determination of non-payment. The board shall provide candidates with a process by which they may petition the board for reconsideration of any such non-payment determination and such determination shall occur within five business days of the filing of such petition.  In the event that the board denies such petition then it shall immediately notify the candidate of its right to appeal to appeal pursuant to article 78 of the civil practice law and rules.

§6. Subdivision 8 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws numbered 58, 59 and 60 for the year 2004, is amended to read as follows:

8.   The board shall have the authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of this chapter.  The board shall promulgate regulations concerning the form in which contributions and expenditures are to be reported, the periods during which such reports must be filed and the verification required.  The board shall require the filing of reports of contributions and expenditures for purposes of determining compliance with paragraph (f) of subdivision one of section 3-703, section 3-706, subdivision 1-a of section 3-703, section 3-718, and section 3-719 in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements.

§7.  Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York as amended by local law 69 for the year 1990 is amended to read as follows:

b.  If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such <u>candidate and</u> committee of the amount so disqualified and such <u>candidate and</u> committee shall pay to the board an amount equal to such disqualified amount; <u>provided, however that in considering whether or not a participating candidate shall be required to pay to the board such amount or an amount lesser than the entire excess, the board shall act in accordance with the following: (i) where credible documentation supporting each expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; (ii) where there is an absence of credible documentation for each expenditure,  the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.</u>

§8.  Paragraph b of subdivision 1 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall comply with the same requirements as a participating candidate who files a certification pursuant to paragraph (c) of subdivision one of section

3-703 of this chapter as provided in paragraphs (d) and (g) of such subdivision,

subdivision one-b of section 3-703, and subdivisions six, six-a and eight of section 3-703

of this chapter.

§9.  Paragraph b of subdivision 2 of section 3-719 of the administrative code of

the city of New York, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-

participating candidate, shall only accept contributions as limited by the provisions of

paragraphs (f) and (l) of subdivision one of section 3-703, [and] subdivision 1-a of

section 3-703, and subdivision ten of section 3-703 of this chapter. Notwithstanding any

contribution limitations in paragraphs (f) and (h) of subdivision one of section 3-703 and

subdivision 1-a of section 3-703, a non-participating candidate may contribute to his or

her own nomination for election or election with his or her personal funds or property, in-

kind contributions made by the candidate to his or her authorized committees with the

candidate's personal funds or property, and advances or loans made by the non-

participating candidate with the candidate's personal funds or property. A candidate's

personal funds or property shall include his or her funds or property jointly held with his

or her spouse, domestic partner, or unemancipated children.

§10.  Paragraph 1 of subdivision a of section 1052 of chapter 46 of the New York

city charter, as amended by vote of the electors of the city of New York at a general

election held on November 3, 1998, is amended to read as follows:

§ 1052. Campaign finance board. a. 1. There shall be a campaign finance board

consisting of five members.  Two members of the board shall be appointed by the mayor,

provided that not more than one such member shall be enrolled in any one political party,

and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker.  The members shall first be appointed to serve as follows:

     (a)  one member appointed by the speaker for a term of one year;

     (b)  one member appointed by the mayor for a term of two years;

     (c)  one member appointed by the speaker for a term of three years;

     (d)  one member appointed by the mayor for a term of four years; and

     (e)  the chairperson for a term of five years.

Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment. Upon expiration of the term of a member, if the mayor or the speaker, as appropriate, shall fail to appoint a member within one hundred twenty days of the expiration of such term, the member whose term has expired shall be deemed appointed for an additional term of five years, provided, however, that if the expiration of such term occurs in a year in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, the member whose term has expired shall be deemed appointed for an additional term of five years if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of the expiration of such term.  In case of a vacancy in the office of a member, a member shall be appointed to serve the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment.  If the mayor or the speaker, as appropriate, shall fail to appoint a member

within one hundred eighty days of such vacancy, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, provided, however, that if such vacancy occurs in a year, or within ninety days prior to a year, in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of such vacancy.  Except for the chairperson, such member shall not be enrolled in the same political party as the other member appointed by the official who failed to so appoint.  Each member shall be a resident of the city, registered to vote therein.   Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president, or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to any local law establishing a voluntary system of campaign finance reform.  No member shall serve as an officer of a political party, or be a candidate, or participate in any capacity in a campaign by a candidate, for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council.  Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 of the administrative code and the employees of such lobbyists shall not be eligible to be members of the board.  In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall

be required to undergo training developed pursuant to paragraph 13 of this section.

§11.  Subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended by adding a new paragraph 14 to read as follows:

14   a.  The council and the mayor, in conjunction with the campaign finance board, shall develop a curriculum to be used to train members of the campaign finance board and staff.  Such curriculum shall include the issues and problems confronted by campaigns for covered office and how the application and enforcement of the city's campaign finance laws impacts these campaigns.

§12. Paragraph 5 subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended as follows:

5.   The board shall have the power to investigate all matters relating to the performance of its functions and any other matter relating to the proper administration of any voluntary system of campaign finance reform established by local law and for such purposes shall have the power to require the attendance and examine and take the testimony under oath of such persons as it shall deem necessary and to require the production of books, accounts, papers and other evidence relative to such investigation. Notwithstanding any other provision of law, the investigative and adjudicatory powers and functions of the staff to the board shall be separate and no staff member of the board shall perform both investigative and adjudicatory tasks or functions.

§13.  Subdivision 12 of section 3-702 of the administrative code of the city of New York is amended to read as follows:

12.  The term "intermediary" shall mean an individual, corporation, partnership, political committee, employee organization or other entity which, (i) other than in the regular course of business as a postal, delivery or messenger service, delivers any contribution from another person or entity to a candidate or other authorized committee; or (ii) solicits contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee.  For purposes of clause (ii) of this subdivision only persons clearly identified as the solicitor of a contribution to the candidate or his or her authorized committee shall be presumed to be known to such candidate or his or her authorized committee.  "Intermediary" shall not include spouses, domestic partners, parents, children or siblings of the person making such contribution, or any fundraising agent, as such term is defined in the rules of the board or any hosts of a campaign sponsored fundraising event.   Where there are multiple individual hosts for a non-campaign sponsored event, the hosts shall designate one such host as the intermediary.

§14.   Section 3-702 of the administrative code of the city of New York is amended by adding a new subdivision 19 to read as follows:

19.     a.  For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures.  In addition, there shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however that the presumptions contained in this subdivision shall not apply to an expenditure made when the expenditure is to a person or entity associated with the candidate making such expenditure or on whose behalf such candidate's committee made such expenditure; and provided further that in rebutting any such presumption the campaign finance board may consider factors

including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure.  For purposes of this subdivision a person or entity associated with a candidate includes a spouse, domestic partner, child parent or sibling; a person with whom the candidate has a business or other financial relationship:

(a) Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

(b) Contributions to candidates, registered political committees subject to the provisions of section 3-705(8);

(c) Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

(d) Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

(e)  Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

(f)  Legal defense of a non-criminal matter arising out of political campaign;

(g) Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is

opposed in the primary election, or two weeks before the date of a general

election, in the case of a candidate who was not opposed in a primary election;

(h)    A post-election event for staff, volunteers and/or supporters held within thirty

days of the election;

(i)    Payment of non-criminal penalties or fines arising out of a political campaign;

(j)    Costs incurred in demonstrating eligibility for the ballot, public funds payments or

defending against claim that public funds must be repaid; and

b.  Campaign funds shall not be converted by any person to a personal use which is

unrelated to a political campaign.  Expenditures not in furtherance of a political campaign

for elective office include the following:

(1)    Expenditures to defray the normal living expenses of the candidate,

immediate family of the candidate, or any other individual except for the provision of

such expenses for professional staff as part of a compensation package;

(2)    Any residential, or household items, supplies or expenditures;

(3)    Clothing, haircuts and other personal grooming;

(4)    Funeral, cremation, or burial expenses including any expenses related to a

death within a candidate's or officeholder's family;

(5)    Automobile purchases;

(6)    Tuition payments, childcare costs

(7)    Dues, fees, or gratuities at a country club, health club, recreational facility

or other nonpolitical organization unless part of a specific fundraising

event that takes place on the organization's premises;

(8)     Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity

(9)     Expenditures for non-campaign related travel, food, drink or entertainment; If a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses

(10)    Gifts, except brochures, buttons, signs and other campaign materials.

§15. Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York is amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership, or partnership other than a corporation, limited liability company, limited liability partnership, or partnership that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, provided, however, that where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability

19

company or partnership in the absence of further indicia that such contribution is from such an entity;

§16.  Subdivision 1 of section 3-703 of the administrative code of the city of New York is amended by adding a new paragraph (o) to read as follows:

(o) agree that expenditures by his or her principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election shall be subject to the contribution and expenditure limitations applicable in such covered election.

§17.  Subdivision 2 of section 3-704 of the administrative code of the city of New York is amended by adding two new paragraphs (i) and (j) to read as follows:

(i) an expenditure made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, other than expenditures made also to further the participating candidate's nomination for election or election; and

(j) payment of any penalty or fine imposed pursuant to federal, state or local law.

§18.  Paragraph (a) of subdivision (2) of section 3-705 of the administrative code of the city of New York is amended to read as follows:

(a) If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of [four] six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred twenty-five dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

§19.  Paragraph a of subdivision (7) of section 3-705 is REPEALED and paragraph c of subdivision (7) of section 3-705 of the administrative code of the city of New York is amended to read as follows:

(c) the participating candidate has submitted  a <u>certified</u> signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website.  <u>Such statement must certify that (i)</u> <u>one or more of the following conditions applies and provide documentation in support of</u> <u>such condition and (ii) that such condition or conditions reasonably demonstrates the</u> <u>need for such public funds.</u>

<u>(1)  the participating candidate is opposed by (i) a non-participating candidate</u> <u>or (ii) a limited participating candidate, and provides a factual basis with supporting</u> <u>documentation of such candidate's ability to self finance;</u>

<u>(2)  the participating candidate is opposed by a candidate who has received (i)</u> <u>the endorsement of a citywide or statewide elected official or a federal elected official</u> <u>representing all or a portion of the area covered by the election; (iii) two or more</u> <u>endorsements from other city elected officials who represent all or a part of the area</u> <u>covered by the election; or (iv) endorsements of one or more membership organizations</u> <u>with a membership of over 250 members</u>**;**

<u>(3) the participating candidate is opposed by a candidate who has had</u> <u>significant media exposure in the twelve months preceding the election.  For purposes of</u> <u>this paragraph, significant media exposure shall mean appearance of the opponent or his</u> <u>or her name in television, radio or print media in general circulation in the area of the</u>

covered election at least twelve times in the year preceding the covered election;
provided, however that the listing of names of candidates or potential candidates for a
covered election without additional information concerning the opponent shall not
constitute an appearance for purposes of this paragraph;

(4)  the participating candidate is opposed by a candidate who has received
twenty-five percent or more of the vote in an election for public office in an area
encompassing all or part of the area that is the subject of the current election in the last
eight years preceding the election;

(6) the participating candidate is opposed by a candidate whose name is
substantially similar so as to result in confusion among voters, as determined by the
board;

(7) the participating candidate in a city council or borough-wide race is opposed
by a candidate who is a chairman or president of a community board or district manager
of a community board; or

(8) the participating candidate is opposed by a candidate whose spouse,
domestic partner, sibling, parent or child hold or have held elective office in an area
encompassing all or part of the area that is the subject of the current election in the past
ten years.

The board shall be authorized to verify the truthfulness of any certified
statement submitted pursuant to this paragraph and of any supporting documentation and
shall post such certifications and supporting documentation on its website.

(d)  the participating candidate is opposed in a primary or special election for an
office for which there is no incumbent.

If any of the conditions described in paragraphs (a), (b), [or] (c) or (d) occur in such election, the board shall pay any and all additional public funds due to the participating candidate up to the maximum total payment applicable in such election under subdivisions two or six of this section or subdivision three of section 3-706 of this chapter.

§20.  Subdivisions 1, 2 and 4 of section 3-706 of the administrative code of the city of New York are amended to read as follows:

1.  The following limitations apply to all expenditures made by a candidate and his or her principal committee on or after the first day of January preceding the election for which such candidate chooses to participate in the public funding provisions of this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast on or after such date:

> (a)    Except as provided in paragraph (b) of this subdivision, in each primary election, in each special election to fill a vacancy, and in each general election, expenditures by a participating candidate or a limited participating candidate and his or her principal committee for one of the following offices shall not exceed the following amounts:

> mayor:                              [$4,000,000] $6,157,600

> public advocate or comptroller:    [$2,500,000] $3,849,575

> borough president:                  [$900,000] $1,385,675

> member of the city council:         [$105,000] $161,250

(b)    (i)    The expenditure limitation in a run-off primary election held pursuant to section 6-162 of the New York state election law or a run-off special election held to fill a vacancy shall be one half the amount of the applicable limitation provided for an election for such office pursuant to the provisions of paragraph (a) of this subdivision.

(ii)    The board shall promulgate rules to provide for a separate expenditure limit applicable to campaign expenditures for an additional day for voting held pursuant to section 3-108 of the New York state election law, an election held pursuant to court order, or a delayed or otherwise postponed election.

(c)    Expenditures by participating or limited participating candidates in a primary election made prior to or on the date of such primary election shall be deemed to have been made for such primary election.

(d)    The campaign finance board shall, pursuant to section 3-713, submit a report to the mayor and the council on or before September first, nineteen hundred ninety, containing its recommendations whether the expenditure limitations provided by this subdivision should be modified. Such report shall set forth the amount of, and reasons for, any modifications it recommends.

(e)    Not later than the first day of March in the year two thousand [eighteen] ten and every fourth year thereafter the campaign finance board shall (i) determine the percentage difference between the average over a

calendar year of the consumer price index for the metropolitan New York-New Jersey region published by the United States bureau of labor statistics for the twelve months preceding the beginning of such calendar year and the average over the calendar year two thousand [fifteen] seven of such consumer price index; (ii) adjust each expenditure limitation applicable either pursuant to this subdivision or subdivision 2 of this section by the amount of such percentage difference to the nearest thousand dollars; and (iii) publish such adjusted expenditure limitation in the City Record.  Such adjusted expenditure limitation shall be in effect for any election held before the next such adjustment.

2.  The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years.  Such expenditures by a participating or limited participating candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

mayor, public advocate or comptroller:       [$270,000] $290,250

borough president:                           [$120,000] $129,000

member of the city council:                  [$40,000] $43,000

4.     (a) Expenditures made for the purpose of [complying with the provisions of this chapter or the election law, including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures,]**: (i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status**, (ii) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results, shall not be limited by the expenditure limitations of this section **and (iii) expenses related to the post-election audit**.

(b)     [In reviewing claims that expenditures are exempt from expenditure limitations by reason of paragraph (a) of this subdivision, the board shall not require the participating candidate or principal committee to provide detailed documentation substantiating such exempt expenditure claims unless the board has reason to believe that expenditures have been erroneously or falsely claimed to be exempt in disclosure reports.

(c) Notwithstanding paragraph (b) above, a] **A** participating candidate shall be required to provide detailed documentation substantiating all exempt expenditure claims made pursuant to this subdivision [if the aggregate exempt expenditure claims made by the participating candidate exceed an amount equal to seven and one-half percent of the participating candidate's applicable expenditure limitation].

§21.  Subdivision 1 of section 3-708 of the administrative code of the city of New York is amended to read as follows:

1. There shall be a campaign finance board consisting of five members. Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker. The members shall first be appointed to serve as follows:

    (a)  one member appointed by the speaker for a term of one year;

    (b)  one member appointed by the mayor for a term of two years.

    (c)  one member appointed by the speaker for a term of three years;

    (d)  one member appointed by the mayor for a term of four years; and

    (e)  the chairperson for a term of five years.

  (b)  Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment.

In case of a vacancy in the office of a member, a member shall be appointed to serve for the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. In the case of a vacancy in the office of a member for which a member is holding over after expiration of the term for which the member was appointed, an appointment to such office made after June 1 in a year in which covered elections are scheduled shall not take effect prior to December 1 of that calendar year.

Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to paragraph (f) of subdivision one of section 3-703. No member shall serve as an officer of a political party or be a candidate or participate in any capacity in a campaign by a candidate for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 and the employees of such lobbyists shall not be eligible to be members of the board.  In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board, shall be required to undergo training developed pursuant to paragraph 13 of section 1052 of the charter.

§22.  Paragraph (b) of subdivision 7 of section 3-708 of the administrative code of the city of New York is amended to read as follows:

(b) The board shall develop a program for informing candidates and the public as to the purpose and effect of the provisions of this chapter.  The board shall prepare and make available educational materials, including compliance manuals and summaries and explanations of the purposes and provisions of this chapter.  These materials shall be prepared in plain language.  The board shall prepare and make available materials, including, to the extent feasible, computer software, to facilitate the task of compliance

with the disclosure and record-keeping requirements of this chapter.  When disclosure reports are generated by use of the board's disclosure software, the board shall provide an opportunity for candidates to test their electronic filings on any of the three business days prior to the deadline for the filing of such disclosure reports.  Any disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005.

§23.  Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York is amended to read as follows:

§ 3-710 Examinations and audits; repayments. 1.  The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code.  The board shall conduct its campaign audits in accordance with generally accepted government auditing standard. These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, provided that:

a. any draft audit, the subject of which is a participating, limited participating, or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating, or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure for the covered

election for city council races and borough-wide races; and  (ii) ten months after the submission of the final disclosure for the covered election for citywide races;

b. The campaign finance board shall provide each candidate a final draft audit, which shall contain the final resolution of all issues raised in the draft audit; provided, however that where such final draft audit contains notice of violations and  recommended penalties, such notice shall be provided pursuant to the requirements of section 1046 of the charter.  Such final draft audit and any such accompanying notice shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer have completed audit training provided by the campaign finance board, (i) within fourteen months after the covered election, for city council races and borough-wide races; and (ii) sixteen months after the submission of the final disclosure for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time.  Where such candidate or such candidate's campaign manager or treasurer have not completed audit training provided by the campaign finance board, such final draft audit and any such accompanying notice shall be provided to such candidate (i) within sixteen months after the covered election, for city council races and borough-wide races; and (ii) eighteen months after the submission of the final disclosure for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time.

c. any advice provided by board staff to participating, limited participating, or non-participating candidates with regard to an action shall be presumptive evidence that such action taken in reliance on such advice is lawful where such candidate, or such candidate's committee has confirmed such advice in a writing to such board staff by

registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, that describes the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice.

e.  Notwithstanding the provisions of paragraphs a and b of this section, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.  If a committee has responded to a request for information made by board auditors but such response is inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, (b) the commencement of the tolling period pursuant to this section and (c) the detailed reasons why the original response was inadequate.

f.  notwithstanding any provision of law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall apply in all cases except the following: cases involving potential violation of the limits set forth

in section 3-706, campaign-related fraud, other criminal issues, or issues that may constitute a breach of certification pursuant to rule 2-02 of the campaign finance board.

§24.  Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York is amended to read as follows:

2. (c) (i)  If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election. [Such reimbursement shall be made not later than ten days after all liabilities have been paid and in any event, not later than either the closing date of the final disclosure report, or the day on which the campaign finance board issues its final audit report for such participating committee, for such covered election, as shall be set forth in rules promulgated by the campaign finance board.]  No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§25.  Section 3-710 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

4. (a) No claim for the repayment of public funds shall be made against any candidate or committee without prior written notice to such candidate or committee and a reasonable opportunity to be heard.  Pursuant to paragraph (ii) of subdivision (a) of section 3-710.5 of this chapter, such repayment claims shall be subject to resolution by

adjudication before the campaign finance board in accordance with the applicable procedures of section 1046 of the charter, unless waived by the candidate or principal committee. Claims for the repayment of public funds shall be made within thirty days of such determination only where such determination is made pursuant to a notice of violations and recommended penalties accompanying a timely issued final draft audit following a timely issued draft audit.

§26.  Section 3-710.5 of the administrative code of the city of New York is hereby amended to read as follows:

§ 3-710.5  Findings of violation [or] infraction; adjudications; or final determinations.  (a) (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. Such determination shall only be made pursuant to a notice of violations and recommended penalties accompanying a timely issued final draft audit following a timely issued draft audit.  The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

 (ii) The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or

infraction before assessing any penalty for such action.  Such written notice shall accompany the draft final written audit required pursuant to subdivision one of section 3-710.  Such allegations of violation and proposed penalties shall be subject to resolution by adjudication before the board pursuant to the applicable provisions of section 1046 of the charter, unless waived by the candidate or principal committee.

(b)  The board shall make its final determination within thirty days after the conclusion of the hearing.  With its final determination, the board shall provide the candidate with a final audit and any notice claiming repayment of public funds issued pursuant to section 3-710 of this chapter.

(c)  The board shall include in every final determination: (i) notice of the respondents' right to bring a special proceeding challenging the board's final determination in New York State supreme court brought pursuant to article 78 of the civil practice law; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law.

§27.  Section 3-711 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

4.  Notwithstanding any provision of law, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees who commit any violation of this chapter or any rules promulgated hereunder and who take all steps necessary to correct such violation prior to the issuance of a notice of a potential violation by the board shall not be subject to any penalty for such corrected violation.

§ 28. Paragraph (b) of subdivision 1 of section 3-718 of the administrative code of the city of New York is amended to read as follows:

(b) A limited participating candidate and his or her principal committee shall comply with the provisions of paragraphs (d), (e), (g), [and] (i), and (o) of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter.

§29.  Chapter 7 of title 3 of the administrative code of the city of New York is amended by adding a new section 3-720 to read as follows:

§3-720.  Service of timely notice;.  1.  Any notice alleging a violation or proposing a penalty, or both, issued pursuant to section 3-710.5 of this chapter must accompany the draft final written audit required pursuant to subdivision one of section 3-710.

2.  Notwithstanding the provisions of this section, if a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of paragraph (e) of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

§30.  Paragraphs (b) and (c) of subdivision 2 of section 3-801 of the administrative code of the city of New York are amended, and a new paragraph (d) is added to read as follows:

35

(b) not accept any donation or donations of money, goods, or services from any individual, [corporation, partnership,] political committee, employee organization, or entity which in the aggregate exceeds:

(i) four thousand five hundred dollars, in the case of a candidate elected to the office of mayor, public advocate, or comptroller;

(ii) three thousand five hundred dollars, in the case of a candidate elected to the office of borough president; or

(iii) two thousand five hundred dollars, in the case of a candidate elected to the office of member of the city council; [and]

(c) not incur any liabilities after January thirty-first in the year following the election, nor accept any donations after all liabilities are paid[.];and

(d)  not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city to transition or inaugural committee where such donation is from the candidate-elect, or  from the parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§31. Each city agency with which any person who has business dealings with the city conducts such business shall, at the campaign finance board's request, provide appropriate assistance to the board in developing the doing business data base required pursuant to this local law. Each city agency with which any person who has business

dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that rules shall not be provided to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section twenty-six of this local law.

§32. Sections one, two, six, eight, nine, thirty-one, thirty-three and thirty-four of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows:  (i) all of the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity regarding an entity with a city contract pursuant to clause (i) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) all of the provisions of this local law concerning any bid for a contract for the procurement of goods, services or construction shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity of entities that have submitted bids seeking such a contract; (iii) the provisions of this local law concerning real property transactions or land use

approvals certified pursuant to section 197-c of the New York city charter shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity of an entity with such a real property transaction or land use approval pursuant to clause (ii) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity regarding an entity with a city franchise or concession pursuant to clause (iv) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (v) all of the provisions of this local law concerning any for a franchise or concession that is pending or that has been made shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database includes, officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity of entities with a bid for such a franchise or concession; (vi) all of the provisions of this local law concerning a recipient of a grant shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business

database that identifies officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity regarding an entity that is a recipient of a grant pursuant to clause (v) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) all of the provisions of this local law concerning a party to an economic development agreement shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity regarding an entity that is a party to an economic development agreement pursuant to clause (vi) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (viii) all of the provisions of this local law concerning lobbyists shall take effect sixty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board may certify any component of the doing business database enumerated in clauses (i) through (viii) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the

contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the Mayor and the Council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the Mayor and the Council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i), (iv) and (viii) shall be six months from the effective date of this local law; the deadline for certification of this section in relation to clauses (ii), (v), (vi) and (vii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be eighteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before November 1, 2008 may not be certified until on or after November 30, 2009.

§33.  Twenty-four months after the enactment of this local law, the campaign finance board shall submit a report to the council on the status of the doing business database.  Such report shall contain the status of each of the components enumerated in clauses (i) through (viii) of section thirty-two of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification.  The campaign finance board shall provide

the council and the mayor with The campaign finance board shall also provide the council with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law.   If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect.   Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§34. The mayor, the council and the campaign finance board shall form a task force to study the feasibility of including spouses, domestic partners, and unemancipated children in the restrictions on contributions from persons doing business with the city.

§35.  Sections three, four, five, seven, and ten through thirty of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date.

DeNora M. Johnson, Esq.
Counsel to the Committee

Israel Rodriguez
Policy Analyst

Corinne Rivers
Policy Intern

Aaron Walker
Policy Intern



## THE COUNCIL

### REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION

Robert Newman, Legislative Director

Alix Pustilnik, Deputy Director, Governmental Affairs

### COMMITTEE ON GOVERNMENTAL OPERATIONS

Hon. Simcha Felder – Chair

| | |
|---|---|
| **INT. NO. 586-2007:** | By The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo, Jackson, Garodnick, Gentile, Gerson, Gioia, Gonzalez, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia Jr., Reyna, Seabrook, Sears, Stewart, Vacca, Weprin, White Jr., Liu and Mendez (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance. |

## I.    **INTRODUCTION**

On Tuesday, June 12, 2007, the Committee on Governmental Operations, chaired by Council Member Simcha Felder, will consider Introduction Number 586-2007 (the "bill"), the comprehensive campaign finance reform bill introduced by Council Speaker Christine Quinn and Chairman Simcha Felder in conjunction with Mayor Michael Bloomberg.  The bill would amend and add certain sections of the New York city charter ("Charter) and the administrative code of the city of New York ("Code") in relation to campaign finance to accomplish three goals:  (1) protect candidates by improving fairness, timeliness and responsiveness of the New York City Campaign Finance Board ("Board") and its staff; (2) make all rules clear, consistent and fair so candidates can easily comply with the New York City Campaign Finance Act ("Act") and the New York City Campaign Finance Program ("Program"); and (3) reduce the appearance of undue influence associated with contributions from those doing business with the City.

Specifically, the bill would:  (1) establish clear, hard deadlines for the completion of Board audits and fair procedures for candidates challenging Board determinations; (2) reduce the contribution limits for persons doing business with the city; (3) ban contributions from business entities, such as limited liability companies and partnerships; (4) expand the definition of intermediary; (5) rein in matching funds in non-competitive elections; and (6) encourage smaller contributions and provide a greater voice to everyday New Yorkers by implementing a 6-to-1 public matching fund ratio for contributions up to $175.

Those invited to testify at this hearing include the Administration, Board, good government and advocacy groups, election attorneys and other interested parties.

## II.    **BACKGROUND**

The Program was established in 1988 to increase participation in the electoral process

regardless of access to wealth, and to reduce undue influence by small concentrations of large contributors and special interests.[1]   Since the Program's inception, it has proven to be a successful campaign finance program and a model for the nation.

Pursuant to Charter section 1052, the Board is composed of five members,[2] who are responsible for administering the Program in accordance with the Act, which is contained in Chapter 7 of Title 3 of the Code.  The Board's powers are enumerated in subdivisions (5) through (12) of section 1052 of the Charter and throughout the Act.  The Board's powers include, among other things, the power "to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code."[3]

## III.    ENCOURAGE PARTICIPATION AND FAIRNESS

In order to encourage participation and fairness, the bill seeks to:  (i) improve due process for candidates in Board adjudications; (ii) establish audit safeguards and deadlines for ordering the return of public funds; (iii) increase the matchability of smaller contributions; and (iv) protect candidates in numerous other ways.

### A.  Due Process in Adjudications

Currently, when the Board issues a determination that public funds must be repaid, a candidate may not be aware of his or her ability to appear before the Board and be heard regarding the determination, and if they do choose to appeal, the process of doing so may be unclear, and can involve ex parte communication between Board staff, who serve an investigatory role, and the Board members themselves, who should be considering impartially

---

[1] *See* Proceedings of the Council of the City of N.Y., Int. No. 906-A of 1987, enacted as Local Law 8 of 1988 (codified as N.Y.C. Charter, ch. 46 and N.Y.C. Admin. Code, title 3, ch. 7).
[2]*See* New York City Charter §1052 (2005).

3

the charges.

Section twenty-five of the bill would remedy part of this problem by specifying that the Board cannot issue a claim for repayment of public funds against any candidate or authorized committee without prior written notice to such candidate or committee and a reasonable opportunity to be heard by the Board.

Further, in order to ensure that the Board's conduct of hearings conforms with the due process protections afforded by the Citywide Administrative Procedure Act ("CAPA") as codified in chapter 45 of the Charter[4], section twenty-five of the bill would require that all repayment claims must be adjudicated before the Board in accordance with CAPA, unless the candidate waives the conduct of a formal hearing. Also, the Board would have to adjudicate all claims for the repayment of public funds within thirty days of its issuance of a notice of violations and recommended penalties, which would accompany a final audit.

Section twelve of the bill would ensure the Board's compliance with CAPA by creating a necessary firewall between the investigative and adjudicatory powers and functions of the Board's staff and requiring that such divisions of the Board's staff must be separate and no staff member of the Board shall perform both investigative and adjudicatory tasks or functions.

### B.  Audit Safeguards & Deadlines for Returning Public Funds

According to the Board, as of February 26, 2007, approximately thirteen months from the final disclosure report due after the 2005 general election, the Board had completed only 53% of the 200 outstanding final audits.[5]  Further, as of May 10, 2007, the Board had only completed

---

[3]*See* Administrative Code of the City of New York §3-710(1) (2005).
[4] *See generally,* chapter 46 of the charter (2007).
[5] *See* Proceedings of the Council of the City of N.Y., transcript of Governmental Operations Committee hearing February 26, 2007.

65% of the outstanding 200 final audits from the 2005 election cycle.[6]  To the extent candidates are complying in a timely manner with Board requests for documents necessary to complete the audit in a timely manner, this lack of a deadline for completing Board audits is unacceptable because it does not provide candidates with closure about the audits from the previous election cycle in a reasonable time.

The bill would address this issue by amending several provisions of the Act and creating new provisions to impose obligations on the Board and candidates to reduce the time it takes the Board to complete audits.  The Board would also be required to provide candidates with timely resolution of repayment obligations and violations, if any, regarding past election cycles.  In creating such standards it is important to ensure that the Board may still fully audit campaigns to ensure compliance with the Act and recoup public funds in cases of violation.

First, in order to ensure that Board audits are compliant with the standards applied to other governmental audits, which could also reduce the time necessary to complete audits of campaigns. The bill would require the Board to conduct audits of campaigns in accordance with generally accepted government auditing standard ("GAGAS").  Some of the requirements of GAGAS as published by the United States General Accounting Office are:

1.  Audit organizations performing audits in accordance with GAGAS must have an external peer review of their auditing practices at least once every three years by reviewers independent of the audit organization.

2.  Auditors using GAGAS need to maintain their professional competence through continuing professional education by completing at least 80 hours of continuing

---

[6] *See* Proceedings of the Council of the City of N.Y., transcript of Governmental Operations Committee hearing May 10, 2007.

professional education every 2 years.

3.    Each audit organization performing audits using GAGAS should have an appropriate internal quality control system to ensure compliance with GAGAS.

4.    Auditors should use a sample of expenses as documented by reasonable documentation to determine if further investigation of a category of expenses is warranted.[7]

Second, the bill would establish firm deadlines by which the Board must complete draft audits for participating, limiting participating, or non-participating candidates, which would be:

1. For City Council and borough wide races – eight months after the submission of the final disclosure for the covered election

2. For citywide races – ten months after the submission of the final disclosure for the covered election for citywide races.

If the candidate or their campaign manager participates in the Board's audit training, then the Board must complete the final audit for such participating, limited participating and non-participating candidate within the following timeframes, unless the subject of the audit consents to a longer period of time in writing:

1. For City Council and borough-wide races – fourteen months after the final disclosure for the covered election; and

2. For citywide races – sixteen months after the submission of the final disclosure for the covered election.

However, if the candidate or their committee does not participate in audit trainings, the final audit timeframe would be extended by an additional two months.   Further, if a committee fails

---

[7] *See generally,* United States General Accounting Office, *Government Auditing Standards 2003 Revision*

to respond to the Board's request for additional information during the post-election audit process, the Board's time for completing the draft and final audits would be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, so long as "the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section."  In cases where the candidate or committee has provided Board auditors with an inadequate documentation relating to the post-election audit, "the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, (b) the commencement of the tolling period pursuant to this section and (c) the detailed reasons why the original response was inadequate."  Finally, the aforementioned deadlines for the Board's completion of draft and final audits would not apply in cases involving potential violation of the expenditure limits contained in the Act, alleged campaign-related fraud, other criminal issues, or issues that may constitute a breach of certification Board rules.

The final audit would have to include the final resolution of all issues raised in the draft audit, except that where such final audit contains notice of violations and recommended penalties, the Board would also have to provide notice of a hearing in accordance with the requirements of CAPA.

Third, section twenty-six of the bill would require that if the Board determines that a participating candidate or his or her principal committee has committed a violation or infraction

of the Act or Board rules, "[s]uch determination shall only be made pursuant to a notice of violation and recommended penalties accompanying a timely issued final audit following a timely issued draft audit." The Act currently requires the Board to provide the candidate written notice and the opportunity to appear before the Board before assessing any penalty for such action.[8]    Section twenty-six of the bill would require that the Board send the candidate/committees formal notice of such right to appear before the Board when the Board sends the candidate or principal committee the final audit, unless such formal hearing is waived by the candidate or principal committee.

If the Board conducts a hearing regarding such allegations of violation and proposed penalties, the board must make its final determination within thirty days after the conclusion of the hearing. The final determination must provide the candidate with a final audit and any notice claiming repayment of public funds.    In addition, the Board must include in every final determination: "(i) notice of the respondents' right to bring a special proceeding challenging the board's final determination in New York State supreme court brought pursuant to article 78 of the civil practice law and rules; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law and rules."

Fourth, in order to provide campaigns with timely resolution with respect to any potential violations issued pursuant to section 3-710.5 of the Act, section twenty-nine of the bill would add a requirement that any notice of violation or recommended penalties issued to a candidate must accompany the final audit.    But, if a candidate or committee has failed to respond to a request for information made by Board auditors or has inadequately responded during the post-

---

[8] *See* Administrative Code §3-710.5 (2007).

8

election audit process, the Board's time for service notice would "be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response," so long as "the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section."

Finally, section 3-710 of the Act requires a candidate to use any excess funds to reimburse the campaign finance fund not later than ten days after all liabilities have been paid.[9] Section twenty-four would remove the requirement that such reimbursement must be made "not later than ten days after all liabilities have been paid and in any event, not later than either the closing date of the final disclosure report, or the day on which the campaign finance board issues its final audit report for such participating committee, for such covered election, as shall be set forth in rules promulgated by the campaign finance board." However, removing this specific payment date would not mean that candidates would not be responsible for reimbursing the campaign finance fund.

### C.  Increase Matchability of Smaller Contributions

Currently if a participating candidate meets the requisite threshold for eligibility, the participant will receive "payment for qualified campaign expenditures of four dollars for each one dollar of matchable contributions, up to one thousand dollars in public funds per contributor…"[10] However, statistics show that small contributions from everyday New Yorkers are the majority of political donors.[11]  In attempting to eliminate the appearance of undue influence associated with contributions from "doing business" persons, and to equalize the voice of everyday New Yorkers in

---

[9] *See* Administrative Code §3-710(2)(c)
[10] *See* Administrative Code §3-705(2)(a) (2007).
[11] *See*, New York City Campaign Finance Board, Public Dollars for the Public Good: A Report on the 2005

9

the political process, it is necessary to ensure that smaller contributions from average New Yorkers are important to candidates and to encourage candidates to seek those contributions. It is also important to ensure that candidates from less affluent districts throughout the city still have access to sufficient funding to run successful campaigns and are not discouraged from participating in the Program.

One way the bill would address these goals would be to increase the matchability ratio for smaller contributions of up to one hundred seventy five dollars. Section eighteen of the bill would amend the Act to provide that if the participating candidate meets the eligibility threshold, the principal committee would receive payment for qualified expenditures of "six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred twenty-five dollars in public funds per contributor in the case of a special election)." Under the six to one matching ratio, the maximum matchable portion of the contribution would remain close to the current maximum of one thousand dollars; however, smaller contributions would earn a higher matching rate, which would incentivize such smaller contributions. While the full fiscal impact of this change is still being analyzed, it does not seem to be a substantial additional cost to the Program.

### D.  Other Candidate Protections

The Act currently requires that candidates that seek to participate in the Program must file a certification of intention to abide by the Act and Board Rules by the first day of June in the year of the covered election, or such other date as the Board shall provide by rule.[12]  However, there is no provision in the Act that permits a candidate that has filed a certification to subsequently rescind such certification and withdraw from the Program (and the necessity of

---

Elections at page 40 (September 1, 2006) [hereinafter Report].
[12] *See* Administrative Code §3-703(1)(c)(i) (2007).

complying with the stricter rules for participating candidates) because the candidate has determined he/she faces no opponent or decides that he/she will not need public funding.

Section three of the bill would address this problem in two ways. First, it would extend the deadline by which a candidate has to file a certification of intention to participate in the Program to June tenth of the year of the covered election. This would allow candidates to determine whether they face a challenger in petitioning. Second, to the extent a candidate files a certification in advance of the June tenth deadline, such candidate can rescind such certification in writing to the Board on or before such date. Both of these amendments would permit candidates to have more time to determine the competitive nature of their race and whether participating in the Program and accepting public funding is necessary.

Expenditures in the final days preceding an election can be the most crucial to a campaign and the ability to budget properly and have final resolution about the amount of public funds that a participating candidate is entitled to and will receive is a vital part of that equation. Section five of the bill would attempt to provide campaigns with more clarity about whether they will receive public funds and establish a fairer system for challenging the Board's determination of non-payment of public funds.

Specifically, subdivision four of section 3-705 of the Act would be amended to require the Board to: (1) schedule at least three dates for the payment of public funds to eligible participating candidates in the thirty days prior to the covered election; and (2) issue a written final determination specifying the basis for any decision of non-payment of public funds to which the candidate believes he/she is entitled. Further, the bill would require the Board to allow candidates to petition the Board for reconsideration of any such non-payment determination, which shall occur within five business days of the filing of such petition. If the Board denies the

participating candidate's petition, the Board must "immediately notify the candidate of its right to appeal to appeal pursuant to article 78 of the civil practice law and rules."

The bill would encourage candidates to be diligent and correct any errors they have made prior to submitting filings to the Board and protect candidates from punishment for such diligence by providing that if a candidate commits a violation of the Act or Board rules and takes all steps necessary to correct such violation prior to the issuance of a notice of a potential violation by the Board, the Board may not subject the candidate to any penalty for such self-corrected violation.

Each participating candidate is assigned a Board staff person, also known as a candidate service liaison ("CSL"), to assist the campaign with questions relating to compliance with the Program. However, candidates have often complained that the CSLs provide contradictory advice or incorrect advice, which the campaign may rely on and that may subsequently subject the campaign to penalty for following such advice. It is important that the Board is not discouraged from providing oral, informal advice to campaigns and is not be obligated to put all advice provided to campaigns in an official advisory opinion because that would be too burdensome. Campaigns, however, must be able to reasonably rely on oral advice provided by CSLs. The bill would protect both of these interests by specifying that if a CSL gives a candidate an oral opinion and the candidate confirms such opinion in writing to the CSL (via registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt) describing the action to be taken and the advice provided by the CSL and the Board or its staff does not respond to such writing within seven days disavowing or altering such advice, the candidate's reliance on the CSL's advice is lawful.

In order to make it easier for campaigns to comply with the disclosure requirements of

the Act and the New York State Election Law, section twenty-two of the bill would require that "[a]ny disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005".

Section four of the bill would require that participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign attend a training provided by the Board explaining how to comply with the requirements of the Program and use of the Program software. Requiring such training would enable campaigns to be more familiar with the Board's practices and policies and make compliance easier.

### E.  Exempt Expenditures

Currently, the law provides that expenditures to comply with the Act or state election law, "including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures, and expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing of election results" are exempt from expenditure limits.[13]  Since the list of exempt expenditures included broad categories, such as general compliance costs and costs relating to petition expenditures, it caused a lack of clarity for campaigns about whether the Board would ultimately determine that certain expenditures made by the campaign were not exempt expenditures.  Further, it has allowed some candidates with an ability to raise additional funds outside the cap to do so, and claim as exempt, expenditures their opponent, who may not have the same ability to raise outside the expenditure limit, cannot make.

---

[13] *See* Administrative Code §3-706(4).

Therefore, section twenty of the bill would amend paragraph (a) of subdivision four of section 3-706 to narrow the definition of what constitutes a permissible exempt expenditure to:

> (i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or  with respect to election law or other law or regulation governing candidate or political committee activity or ballot status,

> (ii) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results, shall not be limited by the expenditure limitations of this section, and

> (iii) expenses related to the post-election audit.

It is not intended that exempting "expenses related to the post-election audit," however, would permit campaigns to continue to include all compliance related expenditures as exempt.  Instead campaigns would be permitted to exempt solely those expenditures related directly to a campaign's preparation for a post-election Board audit.

The Act provides that if a candidate spends less than seven and one-half percent in exempt expenditures then the candidate/committee is not required to provide detailed documentation of such exempt expenditures ("safe-harbor").[14]  Since the bill would severely reduce permissible exempt expenditures, it is important to ensure that campaigns would be able to pay for all expenditures that were previously, but will no longer be, considered exempt, for example general petitioning costs.  Section twenty of the bill would amend subdivisions one and two of section 3-706 to increase the applicable expenditure limits by the safe-harbor amount for participants and limited participants in the primary and general elections and in the three years preceding the election. Candidates would be required to submit to the Board detailed documentation for all exempt expenditures regardless of what percentage of the campaign's

expenditures is claimed as exempt.

### F.  Requirements for the Board

When the Board hears a case or issues a determination affecting a campaign, it is important

for the legitimacy of the process that the Board members understand the complexities of

elections and how the requirements of the Act and the Program affect campaigns, especially

during peak times in the election cycle.  The bill would provide Board members with this

essential knowledge in two ways.  First, sections nine and twenty one, which are identical

sections of the bill that amend the Charter and the Code, respectively, would require that when

the mayor and the speaker make appointments to the Board, they "shall consider campaign

experience in general and particularly campaign experience with the New York city campaign

finance system."

In addition, members of the Board and staff would be required to undergo training.  The

mayor and the council, in conjunction with the Board, would develop the training to include the

issues and problems confronted by campaigns for covered office and how the application and

enforcement of the Act impacts these campaigns.

### IV.   CLARIFICATION AND SIMPLIFICATION  OF THE PROGRAM

The bill would clarify and simplify the Program in several ways. Specifically, by: (i)

improving the definition of "non-competitive elections;" (ii) specifying permissible campaign

expenditures; (iii) creating standards for candidate liability; and (iv) clarifying among other

things, the definition of intermediary.

### A.  Non-Competitive Elections & Statement of Need

Under the Act, a participating candidate on the ballot in the covered election is only

eligible to receive one quarter (or 25%) of the maximum public funds payment, unless the

---

[14] *Id.*

participating candidate can demonstrate:

> (a) the participating candidate is opposed by another participating candidate who has qualified to receive public funds in such election; or
>
> (b) the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount, which in the aggregate, exceeds one-fifth (or twenty percent) of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or
>
> (c) the participating candidate has submitted a signed statement ("Statement of Need") attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time of such additional public funds are paid, including on the board's internet website.[15]

However, candidates have submitted the Statement of Need in cases where there may have been no real need or in the converse not submitted the Statement of Need in elections that were legitimately competitive. Either way, the issue has been subject to public scrutiny and editorial boards, good government groups and the Board have called for stricter standards for receipt of the public funds in so called "non-competitive elections."[16]  Unfortunately, the question of when elections are competitive and therefore should trigger public financing is a difficult issue to address legislatively. While it is important to protect the public fisc from paying public funds to "frivolous" campaigns, it is also important to acknowledge that elections may be made competitive based on more than just the spending of an opponent.

The first way that the bill would address this issue is by repealing paragraph (a) of subdivision 7 of section 3-705 and removing the automatic trigger of full public funds for a participating candidate in the case where such participating candidate's opponent has qualified for public funds.

---

[15] *See* Administrative Code §3-706(7)(2007).
[16] See Report at p. 131.

Secondly, the bill would strengthen the requirements for what the candidate must attest to in the Statement of Need in order to trigger the full public funding for which the candidate is eligible.  The candidate would be required to submit a *certified* signed statement indicating such need and certifying that:  (i) one or more of the following conditions applies and provide documentation supporting the applicability of such condition; and (ii) such condition or conditions reasonably demonstrates the need for such public funds.  The conditions that the participating candidate would be required to demonstrate are:

(1)  the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2)  the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (iii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iv) endorsements of one or more membership organizations with a membership of over 250 members**;**

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name in television, radio or print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4)  the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child hold or have held elective office in an area encompassing all or part of the area that is the subject of the current election in the past ten years.

Upon the submission of the such Statement of Need to the Board, the Board would be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and shall post such certifications and supporting documentation on its website.

The bill would also provide that any primary or special election for which there is no incumbent would be deemed competitive for purposes of triggering full public funding under the Act.

### B.  Permissible Expenditures for Private & Public Money

In order to qualify for public funds, a participating candidate must meet a threshold of eligibility in a primary or general election, or special election to fill a vacancy.[17]  However, the law is currently silent on how authorized committees may permissibly spend their privately raised campaign funds.  If the Board determines that an expenditure was non-campaign related, it could result in an obligation to repay public funds under the Act.[18]  Board advisory opinions have attempted to clarify permissible expenditures for the privately raised money, however, the substantial amount of time it takes the Board to issue such advisory opinions and the lack of clarify of such opinions can be troublesome to a campaign in the final days before an election.

Section fourteen of the bill, therefore, would insert necessary clarity in the Act for campaigns that accept public funds by defining "expenditure" or "campaign expenditure" to "include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures."  Further, there would be a

---

[17] *See* Administrative Code §3-703(2)(a) (2007).

*rebuttable presumption* that the list of "expenditures" or "campaign expenditures" is "in furtherance of a political campaign for elective office."  However, the presumption that the expenditure is valid would not apply "to an expenditure made when the expenditure is to a person or entity associated with the candidate making such expenditure or on whose behalf such candidate's committee made such expenditure." A person or entity associated with the candidate would include "a spouse, domestic partner, child parent or sibling; a person with whom the candidate has a business or other financial relationship."  The Board would also be able to rebut such presumption by considering factors including "the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure."

The bill enumerates the following expenditures as presumptively valid:

(a) Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

(b) Contributions to candidates, registered political committees subject to the provisions of section 3-705(8);

(c) Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

(d) Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

(e) Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

(f) Legal defense of a non-criminal matter arising out of political campaign;

(g) Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a

---

[18] *See* Administrative Code §3-710 (2007).

candidate who was not opposed in a primary election;

(h) A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

(i) Payment of non-criminal penalties or fines arising out of a political campaign; and

(j) Costs incurred in demonstrating eligibility for the ballot, public funds payments or defending against claim that public funds must be repaid.

The bill also would clarify that participants, limited participants and non-participants cannot convert campaign funds to a personal use, which is unrelated to a political campaign, and the following expenditures would not be in furtherance of a political campaign for elective office:

(1) Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate, or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

(2) Any residential, or household items, supplies or expenditures;

(3) Clothing, haircuts and other personal grooming;

(4) Funeral, cremation, or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

(5) Automobile purchases;

(6) Tuition payments, childcare costs;

(7) Dues, fees, or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

(8) Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

(9) Expenditures for non-campaign related travel, food, drink or entertainment; If a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

(10)    Gifts, except brochures, buttons, signs and other campaign materials.

Section sixteen of the bill would clarify that participating candidates must agree that expenditures for purposes of "advocating a vote for or against a proposal on the ballot in an election that is also a covered election shall be subject to the contribution and expenditure limitations applicable in such covered election."  Section twenty-eight of the bill would make sure that this requirement is applicable to limited participating requirements by including such provisions in section 3-718 of the Act.

Section seventeen of the bill would add two new paragraphs to subdivision 2 of section 3-704 of the Act to specify that public funds may not be used for:

> an expenditure made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, other than expenditures made also to further the participating candidate's nomination for election or election; and payment of any penalty or fine imposed pursuant to federal, state or local law.

### C.  Candidate Liability for Repayment of Public Funds

Currently, pursuant to section 3-710(2)(b) of the Act, candidates are not held personally liable for repaying public funds in cases where the Board determines that "any portion of the payment made to a principal committee of a participating candidate from the [New York City election campaign finance] fund was used for purposes other than qualified expenditures."[19]  In those cases, "[the Board] it shall notify such committee of the amount so disqualified and such *committee shall pay to the board an amount equal to such disqualified amount" (emphasis added)*.[20]  The candidate may, however, be subject to a civil penalty up to $10,000 for such violation of the Act.[21]  However, when a candidate decides to participate in the Program, the

---

[19]*See* Administrative Code §3-710(2)(b) (2007).
[20] *See* Administrative Code §3-710(2)(b)(2007).
[21] *See* Administrative Code §3-711 (2007).

Board requires that the candidate and the treasurer sign a certification that includes provisions that a candidate can be held personally liable for repaying public funds that the Board determines were not spent for purposes of qualified expenditures pursuant to sections 3-710 and 3-711 of the Act.[22]

Edwin Ortiz, a participating candidate, challenged the Board's authority to hold participating candidates personally liable pursuant to section 3-710(2)(b) of the Act.[23] The Supreme Court, New York County, held in favor of the Board and awarded a judgment. Ortiz and other defendants appealed this decision to the New York State Appellate Division for the First Department, which in overturning the lower court decision took the opportunity to call on the City Council to address the apparent loophole in the law regarding candidate liability.[24]

The bill would address this issue in section seven of the bill to provide for participating candidate personal liability for repaying public funds not spent on qualified expenditures. "[W]here there is an absence of credible documentation for each expenditure, the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls." However, "where credible documentation supporting each expenditure exists but is incomplete." This provision would balance two very important concerns: (1) that the public fisc be protected to ensure that when participating candidates impermissibly spend public funds there is a way to recoup such impermissibly spent public funds; and (2) that participating candidates not be discouraged from participating in the Program for fear that they will be held

---

[22] See administrative code §3-703(1)(c)(2007); see also Board Handbook available at www.nyccfb.info
[23] See Ortiz decision 2006 NY Slip Op 09532 (December 12, 2006) at page 1.
[24] Id. at 4.

personally liable for repaying public funds if they make an honest mistake or rely on information provided to them by Board staff.

The bill, however, would not provide for treasurer liability because treasurers are often volunteers that assist a campaign due to a relationship with the participating candidate. If liability were extended to them, we fear it would discourage treasurers from volunteering for such campaigns.

### D. Definition of Intermediary

Section thirteen of the bill would amend subdivision twelve of section 3-702 to expand the definition of intermediary. Currently, participating or limited participating and non-participating candidates must report contributions to the Board that were **delivered** through an intermediary.[25] The Act defines an intermediary as "an individual, corporation, partnership, political committee, employee organization or other entity which, other than in the regular course of business as a postal, delivery or messenger services, delivers any contribution from another person or entity or other authorized committee."[26] However, under the current definition, unless the intermediary actually delivers the contribution to the candidate or political committee, the campaign does not have to disclose that the person is an intermediary.

The bill would expand the definition of intermediary to cover the aforementioned persons that "solicit contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee." The candidate or authorized committee would be presumed to know that a person was a solicitor of the contribution if this information was clearly identified to the candidate or his or her authorized committee. This expansion of the definition would ensure that the law covers scenarios such as when a person

---

[25] See administrative code §3-702(12).

solicits contributions, but does not personally deliver such solicited contributions.   The bill would also "hosts of a campaign sponsored fundraising event" to the exemptions already in the law so that they would not be included in the definition of intermediary.   The bill would also clarify that for non-campaign sponsored fundraising events, if there are multiple individual hosts, the hosts must only designate one such host as the intermediary.

## V.    REDUCE APPEARANCE OF UNDUE INFLUENCE

The bill would reduce the appearance of undue influence associated with certain contributions in several ways:  (i) regulate contributions from those with business dealings with the City; (ii) ban contributions from businesses such as LLCs and partnerships; and (iii) conform the rules for transition and inaugural entities (TIE) to those of campaign committees.

### A.  Contributions from those Doing Business with the City

Charter section 1052(11)(a) authorizes the Board to issue rules regulating contributions "from individuals and entities doing business with the city, including rules that determine which business dealings shall be covered by such rules."[27]   In studying this issue, the Board issued a report in 2006 titled "Interim Report of the New York City Campaign Finance Board on 'Doing Business' Contributions" ("Doing Business Report").[28] Based on the Board's analysis of contribution information available via the VENDEX and lobbying databases, the Doing Business Report concluded that contributions from those doing business with the City accounted for at least twenty percent of all contributions in the 2001 and 2005 cycles.

While there is nothing intrinsically wrong with contributions from those doing business with the City, the ability of such individuals to contribute could create a perception, regardless of

---

[26] Id.
[27] See charter §1052(11)(a) (2007).
[28] See generally, Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions, dated June 19, 2006.

whether such perception is accurate, that such individuals have a higher level of access to the City's elected officials.   It is important to eradicate this perception and reduce the appearance of undue influence associated with contributions from individuals doing business with the City.

Section two of the bill would accomplish this goal by adding two new subdivisions to section 3-703, 1-a and 1-b to regulate contributions from those with business dealings with the city."  Subdivision 1-a of section 3-703 would provide that  "a participating candidate or his or her principal committee may accept, either directly or by transfer, a contribution or contributions for a covered election from a natural person who has or within the past twelve months (or in the case of an application for land use approval within one hundred and twenty days from the date of the final action on such application) has had business dealings with the city…if the aggregate of such contributions to such candidate from such person for such election does not exceed:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred dollars; (iii) for city council two hundred fifty dollars."   Such contributions would not be matchable with public funds.  For purposes of this subdivision the persons that would be covered by the above contribution limits would include "any officer of an entity which has or within the past twelve months has had any business dealings with the city, any person employed in a managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity."  However, such contribution limits would not "apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage."

25

Sections eight and nine of the bill would amend paragraph (b) of subdivision 1 of section 3-719 and paragraph (b) of subdivision 2 of section 3-719 of the Act, respectively, to require that the restrictions on accepting contributions from those with "business dealings with the city" also apply to non-participating candidates.  It is vital to the Program that the restrictions on accepting contributions from those with "business dealings with the city" apply in the same manner to participants and non-participants to ensure that there is a level playing field.  Thus, to the extent that such restrictions did not apply to non-participants in the Program, such restrictions would not apply to participants in the Program.

Section one of the bill defines "business dealings with the city" to mean:

(i) any contract for the procurement of goods or services or construction, with the city or any agency or entity affiliated with the city (other than a competitively sealed bid contract), entered into in the last twelve months totaling more than one hundred thousand dollars, or for capital projects totaling at least one million dollars, including any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith and any contract for the related to the investment or consulting services of a private equity firm;

(ii) any real property transaction (other than a public auction or competitive sealed bid transaction) with the city of New York or any agency or entity affiliated with the city of New York, provided, however that in the case of leases in which the city of New York or any agency or entity affiliated with the city of New York is the lessee, the lessor shall only be deemed to be doing business for a period of one year after the commencement of the lease term; or

(iii) any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter; provided, however that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or

(iv) any concession or franchise from the city of New York or any agency or entity affiliated with the city of New York with payments to the city of more than one hundred thousand dollars per year,  or

(v) one or more grants totaling more than one hundred thousand dollars received from the city of New York; or

(vi) any economic development agreement entered into or in effect with the city of New York, as such term is defined in section one of the bill which creates a new subdivision nineteen of section 3-702.

Section one of the bill defines "business dealings with the city" to include "capital projects totaling at least one million dollars." It is the intent of the Council that the threshold for capital projects would be five hundred thousand dollars. The Council intends to amend the bill to reflect this.

Section one of the bill also defines the "doing business database" to mean "a computerized database accessible to the board that contains the names of all persons who have business dealings with the city," except such components of the database that the Board has not yet certified as complete pursuant to section thirty-two of the bill. The Mayor would be required to develop, maintain and update such database at least once monthly to ensure its accuracy and completeness.

Section two of the bill also requires candidates to ask each contributor on a contribution card, the form of which would be developed by the Board, whether such contributor etc. "has or within the past twelve months has had business dealings with the city," and if so, indicate the applicable contribution limits as specified by section two of the bill. The candidate would be required to keep a record of such inquiry and response in its records and report each contribution to the Board at the next required filing. The Board would be required to check each contribution against the doing business database and notify the committee within twenty days of the reporting of such contribution if a contribution exceeds the doing business contribution limitation. In the six weeks preceding the election, the Board would be required to issue such response to the candidate within three business days. However, if the Board does not notify the candidate of such excess contribution in such timeframe, then "any such contribution shall be deemed valid

for purposes of such limitation provided, however, that no such contribution shall be matchable."

If the Board notifies a candidate of a doing business contribution, the candidate would have twenty days to return the amount in excess of the contribution limits applicable to persons with "business dealings with the city."  However, no violation or penalty would issue to a candidate if such excess amount was postmarked or delivered within such twenty-day period.

The candidate's failure to return such excess contribution would not result in "the board withholding public funds for which the participating candidate's principal committee is otherwise eligible."  However, the Board would be permitted to "deduct an amount equal to the total unreturned contributions in excess of the doing business limitations" from such payment of public funds.

Section six of the bill authorizes the Board to issue rules to implement the doing business restrictions contained in section two of the bill.

Section thirty-one of the bill provides that each city agency having business dealings with campaign contributors shall at the Board's request, provide appropriate assistance to the Board in developing the doing business database and in publicizing the bill and the rules of the Board in connection with doing business contributions.  However, the Board would not be responsible for distributing rules regarding categories that of doing business activities that have not yet been certified as complete.

Section thirty-three of the bill specifies that twenty-four months after the enactment of the bill, the Board "shall submit a report to the council on the status of the doing business database."  The report must contain the status of each of the doing business database components enumerated in clauses (i) through (viii) of section thirty-two of the bill and whether each such component has been certified.  For those components that have not been certified, if any, the

report must state the status of the development of each such component and the expected timeline for such component's certification.

Moreover, the Board would be required to provide "the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of the bill." If the Board submits its proposals to the council and the council accepts the proposals, or if the council fails to take action on such proposals within sixty days, such proposals would take effect.

Section thirty-four of the bill would require the mayor, the council and the Board to develop a task force "to study the feasibility of including spouses, domestic partners, and unemancipated children in the restrictions on contributions from persons doing business with the city."

### B. Organizational Contributions & Permissible Contributors

The Act prohibits participants and non-participants from accepting corporate contributions.[29] However, there is a loophole in the law that permits similarly structured business entities, such as limited liability companies ("LLC"), limited liability partnerships ("LLP") and partnerships are still permitted to contribute up to the full contribution limit. Although contributions from these entities are not matchable with public funds,[30] permitting these business entities to contribute has been a way to subvert the contribution limits because the Board rules only require that organizational contributions be attributed to the partner or owners where the contribution is greater than two thousand five hundred dollars.[31]

Section fifteen of the bill would close this loophole by expressly preventing LLCs, LLPs

---

[29] See administrative code section 3-703(1)(l) (2007).
[30] *See* Administrative Code §3-702(3) (2007).
[31] *See* 52 RCNY 1-04 (2007).

and partnerships from making contributions to participating or non-participating candidates from the business entity itself. This restriction would not prevent an individual owner of an LLC, LLP or partnership from making a contribution in his or her individual name.

Section fifteen of the bill would also clarify that "where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company or partnership in the absence of further indicia that such contribution is from such an entity."

### C. Contributions to Transition and Inaugural Entities

Under the Act, TIEs are permitted to accept contributions from corporations although campaign committees are not permitted to do so.[32] The bill would rectify this problem and create a standard that is clear and consistent for both campaign committees and TIEs by banning corporate contributions to TIEs and clarifying that TIEs cannot accept contributions from LLCs, LLPs partnerships, and persons doing business with the city except for "any donation made by a natural person who has business dealings with the city to transition or inaugural committee where such donation is from the candidate-elect, or from the parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage."

### VI.    EFFECTIVE DATE PROVISIONS

Section thirty-two of the bill provides that all of the restrictions on contributions from those doing business with the city contained in sections one, two, six, nine, thirty-one, thirty-three and thirty-four of the bill would become effective sixty days after the Board and the Department of Information Technology and Telecommunications ("DOITT") certify to the

---

[32] *See* Administrative Code §3-801(2)(b) (2007).

mayor and the council that the doing business database identifies "officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity regarding such entity" for each category of doing business activities as previously enumerated.[33] The Board may certify that any component of the doing business database is complete "when it has determined that each component identifies such persons with reasonable completeness and accuracy."

Once the Board makes such a certification, DOITT must immediately provide to the mayor and the council a report containing "an analysis of the steps taken to compile the component of the database certified" and the Board must provide a report with "an analysis of the steps taken to ensure and test for reasonable completeness and accuracy." "Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed."

Section thirty-two also mandates firm deadlines by which components of the doing business database must be certified.  Specifically, the deadline for certification with respect to clauses:

> (i) the holding of contracts for the procurement of goods, services or construction;
> (iv) franchises and concessions; and
> (viii) lobbyists

shall be six months from the effective date of the bill.

The deadline for certification with respect to clauses:

> (ii) any bid for a contract for the procurement of goods, services or construction;
> (v) a franchise or concession that is pending or that has been made;
> (vi) recipients of a grant; and
> (vii) party to an economic development agreement.

---

[33] *See* supra section 5A of this paper and supporting text for further specification on doing business categories.

shall be one year from the effective date of the bill.

The bill currently provides that the deadline for certification with respect to clause (iii) the provisions of this local law concerning real property transactions or land use approvals certified pursuant to section 197-c of the New York city charter would be eighteen months from the effective date of the law.

In order to ensure that the bill would not take effect too close to the 2009 elections and cause unnecessary chaos in the Program, if any component of the doing business database has not been certified on or before November 1, 2008, it may not be certified until on or after November 30, 2009.  However, it is the intent of the Council that every component of the doing business database be operative for the 2009 election cycle.  Therefore, the Council intends to amend the deadlines for certification of the real property transactions or land use approvals component of the database and the final date by which any component of the doing business database can be certified for applicability during the 2009 election cycle to reflect such intention.


Section thirty-five of the bill outlines that sections three, four, five, seven, and ten through thirty, provisions not relating to those in the doing business database, of the bill would take effect on January 1, 2008; "provided, however, that such sections shall apply only to elections held on or after such effective date."

1

2  CITY COUNCIL

3
   CITY OF NEW YORK
4  ------------------------------x
5
   THE TRANSCRIPT OF THE MINUTES
6
              of the
7
   COMMITTEE ON GOVERNMENTAL
8  OPERATIONS

9  ------------------------------x

10
                  June 12, 2007
11                Start:  10:15 a.m.
                  Recess: 11:55 a.m.
12
                  City Hall
13                Committee Room
                  New York, New York
14

15      B E F O R E:

16          SIMCHA FELDER
                          Chairperson,
17

18          COUNCIL MEMBERS:   Joseph Addabbo
                               Erik Dilan
19                             Domenic Recchia
                               Larry Seabrook
20                             Peter Vallone, Jr.
                               Inez Dickens
21                             Vincent Ignizio
                               Jessica Lappin
22                             Melinda Katz

23

24      LEGAL-EASE COURT REPORTING SERVICES, INC.
                17 Battery Place -  Suite 1308
25              New York, New York 10004
                    (800) 756-3410

2

```
 1

 2  A P P E A R A N C E S

 3
    Maura Keaney
 4  Deputy Chief of Staff
    Council of the City of New York
 5
    Anthony W. Crowell
 6  Counselor to Mayor Michael Bloomberg

 7  Frank Barry
    Policy Advisor
 8  Office of the Mayor

 9  Marla Simpson
    Director
10  Mayor's Office of Contract Services

11  Amy Loprest
    Executive Director
12  NYC Campaign Finance Board

13  Carole Campolo
    Deputy Executive Director
14  NYC Campaign Finance Board

15  Sue Ellen Dodell
    General Counsel
16  NYC Campaign Finance Board

17  Neal Rosenstein
    Government Reform Coordinator
18  New York Public Interest Research Group

19  Doug Israel
    Director of Public Policy and Advocacy
20  Citizens Union

21  Megan Quattlebaum
    Associate Director
22  Common Cause/NY

23  Dan Jacoby

24  Merle McEldowney

25
```

3

1

2  A P P E A R A N C E S (CONTINUED)

3
    Ciara Torres-Spelliscy
4  Counsel, Democracy Program
    Brennan Center for Justice
5  NYU School of Law

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2             CHAIRPERSON FELDER: Good morning. I

3  apologize for being late. As you know, there is

4  another hearing across the hall, and there are

5  budget negotiations going on, so we usually start

6  very punctually, for those of you who frequent these

7  meetings, and I do apologize for starting 15 minutes

8  late, but we will make up the time.

9             Good morning, and welcome to this

10  hearing of the Committee on Governmental Operations.

11  I am Simcha Chair -- I am Simcha Felder. It's after

12  a night of graduations. I'm not talking about other

13  graduations, I'm talking my childrens. Thank God

14  we're celebrating four graduations this season. My

15  son, my daughter, who is in college. I'm just

16  getting off on a tangent for the reporters. Our

17  22-year-old daughter graduated her special ed

18  program. Thank you. And our son, high school, and my

19  13-year-old graduated elementary school and my

20  six-year-old graduated from pre-school,

21  kindergarten. And it cost me a lot of money last

22  night. If there are any more, you'll have to ask my

23  wife. I don't know anything about it.

24             All right. Good morning, and welcome

25  to the hearing of the Committee of Government

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   Operations. I am Simcha Felder, Chair of the

 3   Committee, and I am joined by my colleagues,

 4   Councilman Peter Vallone, Jr., Councilman Vincent

 5   Ignizio, Council Member Inez Dickens, and Council

 6   Member Erik Dilan. Thank you very much for being

 7   here during this busy season.

 8                   I would also like to acknowledge the

 9   Committee staff that has diligently prepared for

10   today's hearing. To my left is DeNora Johnson, the

11   Counsel to the Committee on Government Operations.

12   Israel Rodriguez, the Policy Analyst to the

13   Committee, and my Legislative Aide, Michael

14   Cassatano. I'm delighted that as a result of the

15   significance of this legislation we have the

16   distinct honor of having the Speaker's Deputy Chief

17   of Staff, Maura Keaney, sitting here right to my

18   right this morning. And it is indeed an honor, a

19   great honor.

20                   And last two summers interns with the

21   Government Affairs Division, Corinne Rivers. Where

22   is Corrine? When she comes back, we must embarrass

23   her, make sure. And Aaron Walker, he is also making

24   copies. Okay, remind me.

25                   Today the Committee will consider
```

6

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Intro. 586, the Campaign Finance Reform Legislation

3  introduced by the Speaker and the Mayor. As I've

4  indicated during the press conference for this bill,

5  the Speaker and the Mayor have shown tremendous

6  leadership in crafting campaign finance reform

7  legislation that is practical and effective. The

8  bill would bring further transparency to the program

9  without erecting ominous barriers to entry to

10  citizens who want to run for office.

11          The Mayor, the Speaker and their

12  staff should be commended for their work. Over the

13  past six months, six plus months, to draft such a

14  comprehensive set of Campaign Finance Reforms.

15  Specifically, I'd like to thank, if not thank again,

16  Maura Keaney, who is here, Rob Newman and James

17  Caras. The attorneys who are not here right now. And

18  DeNora Johnson, from the Speaker's staff, for their

19  diligence and meeting with all stakeholders,

20  including the Board, Administration, Council

21  members, other elected officials, lawyers,

22  collection lawyers, good government groups, to

23  obtain their feedback and input on these proposals

24  with the intent of introducing and ultimately

25  passing legislation that truly encourages candidates

7

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    to run for elected office, and to participate in the

3    program.

4                    I'm going off on a tangent for a

5    moment. I just want to say, to my recollection,

6    first of all we've been joined by Councilman

7    Addabbo, who is here, and Councilman Recchia, who

8    has joined us, as well. I just want to say, it is my

9    recollection, at least as long as I have been in

10   office, I don't think that there has been more time

11   spent by the Speaker's staff, working with each

12   individual member, you know, discussing the issues

13   and working together with the Administration. I may

14   have a bias because this is my Committee, but I

15   believe what I said is true. The only thing that I

16   can think of that more time is spent of, maybe in a

17   concentrated form, is the budget. But I don't think

18   there has been, or maybe the Waste Management Plan

19   maybe had, you know, maybe a good competition. But I

20   can't think certainly of many more issues that have

21   had more time invested, and rightfully so, to make

22   sure that everyone involved gets a chance to say

23   what they have to say and have an impact on this

24   legislation. So, it is really very, very, it just

25   feels great to be a part of this.

8

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    New York City Campaign Finance Reform

3    Program was established, established approximately

4    20 years ago, to increase participation in the

5    electoral process, regardless of access to wealth

6    and to reduce undue influence by small

7    concentrations of large contributions and special

8    interests.

9                    Since the program's inception, it has

10   proven to be a successful Campaign Finance Program,

11   and more importantly, a model for the nation. I

12   might say, from my own experience, I have

13   participated once and I didn't participate another

14   time. So, I think that this is true. Despite my not

15   participating one time, I think it is true that it's

16   a wonderful piece of legislation.

17                    The Council has consistently worked

18   to address issues raised with the program and ensure

19   that it continues to keep the reputation as a model

20   campaign financing system for the nation and the

21   bill that the Committee is considering today

22   continues that tradition.

23                    Briefly the bill would amend and add

24   certain sections to the Charter, the City's Code:

25                    1) To establish clear, hard deadlines

9

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  for the completion of the Board audits, and fair

3  procedures for candidates to challenge Board

4  determinations.

5              2) Reduce the contribution limits for

6  persons doing business with the City.

7              3) Ban contributions from business

8  entities, such as limited liability companies and

9  partnerships.

10             4) Rein in matching funds and

11  non-competitive elections; and

12             5) Encourage smaller contributions

13  and provide a greater voice to average New Yorkers

14  by implementing a six to one public matching fund

15  ratio for contributions up to $175.

16             Just to note, that means the 250 is

17  out. Some people have asked. So for those of you

18  that are actually listening to what I'm saying, even

19  though it's from prepared remarks before a hearing,

20  which most people don't listen to. That is an

21  important point. The 175 eliminates the 250.

22             Before I call the first witness from

23  the Administration, as was mentioned at previous

24  hearings, I know that the issue of campaign finance

25  is an issue of great importance to all Council

10

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   members, and all of the City's elected officials and

3   all of you, obviously by the turnout that's here.

4                  If there are any chairs that are

5   available, are there any chairs, you may want to sit

6   down. Sergeant-At-Arms, can we bring in more chairs,

7   because we don't want people to be upset with this

8   legislation because they didn't have a seat. Thank

9   you very much.

10                 If there is anyone that wants to

11  testify at today's hearings, it is my policy in this

12  Committee, and I hope that other of my colleagues

13  will follow suit. That you must sign up with the

14  Sergeant-At-Arms within the next 15 minutes,

15  otherwise, you will not be permitted to testify. So,

16  if you don't sign up within the next 15 minutes, it

17  means you're not interested or you didn't come on

18  time. Unless you previously expressed to the

19  Committee staff that you were going to be late.

20                 Before I introduce Anthony Crowell

21  from the Administration to come forward with his

22  testimony, I just want to highlight one other item

23  that was not mentioned in the past, that I think I

24  believe is very important, not only because it was

25  my idea, but because I think it is important. The

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   fact that the Campaign Finance Board together with

3   the Administration and the City Council have decided

4   to implement stricter auditing procedures by

5   applying what we commonly known as GAGAs, which is

6   Government Accepted Generally Auditing principles,

7   so that the audits that will be done will follow

8   what audit procedures normally take place, and

9   Security Exchange Commission, Internal Revenue

10  Service, and certain portions, and that I think

11  should be consistent with any government agency

12  that's doing audits, but certainly one that is

13  doling out public money, so I want to commend

14  everyone for that as well.

15              With that, I ask you, Mr. Crowell, to

16  start your testimony.

17              MR. CROWELL: Good morning, Chairman

18  Felder and members of the Government Operations

19  Committee. My name is Anthony Crowell, and I'm

20  Counselor to Mayor Michael Bloomberg. I thank you

21  for the opportunity to testify today on Intro. 586,

22  a bill to limit so-called pay-to-play contributions

23  to candidates for municipal elected office from

24  those doing business with the City.

25              With me today are Frank Barry, Policy

12

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Advisor in the Mayor's Office, and Marla Simpson,

3   Director of the Mayor's Office of Contract Services.

4               Indeed, the Administration strongly

5   supports this bill which is the culmination of nine

6   years of complex discussions on this topic by City

7   Government, beginning with the approval of a 1998

8   Charter referendum, which called for disclosure and

9   regulation of campaign contributions from those who

10  do business with the City.

11              Today's partnership between the

12  Administration and Council on this bill will result

13  in a cutting-edge municipal reform, building on the

14  success of our partnership last year, when we

15  reformed the City's lobbying law, including

16  exempting campaign contributions by lobbyists from

17  receiving matching funds.

18              In drafting the provisions of this

19  bill, the Mayor's and Council's staffs have

20  collaborated closely with the Law Department, the

21  Campaign Finance Board, and the City's good

22  government groups, to develop what we believe

23  represents the country's strongest and most vigorous

24  Campaign Finance Law. The primary reason that the

25  Campaign Finance Program was adopted 19 years ago

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  was to reduce corruption and diminish the influence

3  that special interests hold over candidates and

4  elected officials who seek contributions from them.

5  Yet, as the approval of the 1998 Charter Revision

6  indicated, the City's electorate supports further

7  restrictions on the various types of campaign

8  contributions that created a conflict of interest,

9  or at least the appearance thereof. This bill

10  addresses those issues and creates a more

11  transparent, fair and open campaign finance system.

12  And while we have tried to address as many of these

13  issues as possible, we do recognize that this

14  program will further evolve, and thus as the Mayor

15  stated repeatedly through this process, we cannot

16  let the perfect be the enemy of the good.

17                    Up front, I would like to state that

18  in drafting this bill, we have worked to ensure that

19  it will withstand any legal challenge. Our proposal

20  builds on existing campaign finance legislation, and

21  aims specifically to limit the amount of money that

22  can be contributed by people who do business with

23  the City. It is a bill to combat "pay-to-play" and

24  improve public confidence that the government's

25  decisions are made wholly on the merits and not

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  political favoritism. As the Law Department has

3  stated publicly, the bill was carefully drafted in

4  light of applicable Supreme Court precedent, and we

5  are confident it is constitutional. To be clear, and

6  to address questions raised about this bill since

7  last Tuesday's announcement, our proposal is very

8  different from the Vermont law that was struck down

9  by the U.S. Supreme Court last year. That law set

10  low, across-the-board contribution limits and

11  attempted to restrict overall candidate spending.

12  Our bill, focused on pay-to-play, is clearly

13  different and in no way imposes any such new

14  expenditure limits.

15              Now let me turn to one of the main

16  functions of this bill, the Doing Business

17  Contribution Limitations. The new law will

18  significantly limit donations from those who do

19  business with New York City, including individuals

20  and entities with contracts, concessions and

21  franchises or grants valued at or greater than

22  $100,000, including Land Use applicants, as well as

23  parties to discretionary economic development

24  agreements, and private equity and other investment

25  firms. The existing ban on corporate contributions

15

1 COMMITTEE ON GOVERNMENTAL OPERATIONS

2 will be widened to include Limited Liability

3 Companies, known as LLCs, Limited Liability

4 Partnerships, LLPs, and other forms of

5 non-incorporated businesses.

6           These limitations would also apply

7 generally to contributions made to transition and

8 inaugural entities. This bill also introduces strict

9 contribution caps on these individuals doing

10 business with the City: $250 for Council races, $320

11 for borough-wide races and $400 for City-wide races,

12 and none of these contributions will be eligible for

13 matching funds. This will ensure that taxpayer money

14 is not used to supplement an entity or individual

15 attempting to influence government decision-making

16 through their campaign contributions.

17           Database Development. In order to

18 implement the "doing business" restrictions, the

19 development of a dynamic doing business database to

20 serve as a ready check on campaign contributors is

21 at the crux of an effective program aimed at

22 deterring pay-to-play. To implement today's reforms,

23 such a database will be created jointly by the

24 Mayor's Office of Contract Services and the

25 Department of Information Technology and

16

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Telecommunications, and made accessible to the

3    Campaign Finance Board and the public, to identify

4    all of those that fall under the definition of doing

5    business. Because of the tight time frames involved

6    in implementing this system, Ms. Simpson and her

7    staff, along with DOITT, have already begun

8    discussions about developing the database when the

9    bill is passed.

10              I'd also like to address some other

11   reforms that this bill covers. In addition to

12   addressing pay-to-play contributions, the Mayor and

13   Council also took the opportunity to introduce other

14   reforms in this bill designed to open up

15   participation in the electoral process and to

16   enhance the efficiency of the campaign finance

17   system, including proposing changes to the structure

18   of the CFB matching funds program, addressing the

19   longstanding problems with non-competitive

20   elections, and proposing internal reforms at the CFB

21   concerning audits and adjudications.

22              First, changes to matching funds.

23   Contributions by ordinary citizens, who often give

24   smaller campaign donations, will be given much more

25   weight now with an increase in matching funds from

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  4-1 to 6-1 for the first $175 donated to a campaign.

3  Thus, for someone who wanted to give $175

4  contribution, instead of it being matched to the 4-1

5  rate for a total contribution value of $875, the

6  contribution would now be worth $1,225. This amount

7  is practically the same amount a candidate can now

8  raise under the current matching formula.

9                    Accordingly, this change empowers

10  citizens and will aid many candidates in being more

11  competitive, because these lower value contributions

12  will now be more meaningful to the overall impact

13  individuals can have on a candidate's race.

14                    Also, this bill will broaden the

15  definition of an intermediary, also known as a

16  bundler, to include anyone who solicits a

17  contribution for a campaign. Under the current

18  system, only those from outside of a candidate's

19  campaign who receives and delivers contributions on

20  behalf of the campaign are considered

21  intermediaries.

22                    This proposed amendment would now

23  require that those who solicit contributions will

24  also be listed as intermediaries, which will ensure

25  that campaigns disclose those who act as such,

18

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  regardless of whether such agents personally deliver

3  the checks. This reform will close the loophole in

4  the current disclosure process and allow the public

5  to see the variety of relationships between

6  intermediaries and candidates.

7          Also, the bill addresses reining in

8  matching funds for non-competitive elections.

9  Non-competitive elections in which candidates

10 running against nominal opposition receive public

11 matching funds that are often cited as an example of

12 wasteful spending. Currently, in such instances

13 where their opponent has spent less than 20 percent

14 of the expenditure limit, a candidate only has to

15 submit a statement of need with no other

16 documentation to receive full public financing.

17          The new proposal establishes clear

18 criteria that must be met in order for a race to be

19 deemed competitive. Those would include receiving

20 significant endorsements, or having name recognition

21 documented from previous races or significant media

22 exposure. A candidate would need to prove that his

23 or her opponent meets one of these criteria to

24 qualify the race as competitive, and to merit the

25 release of public matching funds. The proposal also

19

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  eliminates the automatic trigger for public funds

3  that results when a candidate's opponent receives

4  public funds.

5           The bill also makes amendments to the

6  definitions of what campaign funds can and cannot be

7  used for. By outlining with clarity what is not

8  acceptable, any gray area that has existed will be

9  eliminated, and donors can be assured that all their

10  contributions will be spent appropriately without

11  benefitting the candidate personally.

12           And finally, I'd like to note some

13  improvements that the bill aims to make in terms of

14  the Campaign Finance Board's internal operations.

15           The bill also takes these steps to

16  improve CFB's auditing procedures, making them more

17  efficient and comprehensive and to bolster the

18  fairness of the adjudicative process by establishing

19  new procedures.

20           The Administration and the Speaker

21  have taken seriously concerns from candidates about

22  the auditing and adjudicative procedures of the CFB,

23  and we believe the changes will make the system more

24  efficient and fair.

25           Indeed, the Campaign Finance Program,

20

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   like many other reform initiatives, will always be a

3   work-in-progress. However, the proposed bill

4   represents a new era in transparency and openness

5   that enhances New York City's position as the

6   vanguard of elections and government reform.

7          The Mayor is pleased to stand

8   shoulder to shoulder with Speaker Quinn, Chairman

9   Felder, and the rest of the City Council in enacting

10   and implementing this important legislation.

11          Thank you, and we would be happy to

12   answer any questions you may have.

13          CHAIRPERSON FELDER: Thank you very

14   much for your testimony. Thank you very much. And I

15   just wanted to clarify on page four, this has

16   nothing to do with my being the only CPA in the

17   Council, but for people who are reading the

18   testimony, I just wanted to clarify, is that on the

19   top of page four, you said the 4-1 rate, instead of

20   it being matched 4-1, for total contribution value

21   of 875, I don't think that that's correct.

22          In other words, under the old system,

23   someone who wanted to give $175 contribution,

24   instead of it being matched at 4-1 -- he is right on

25   that, that's setting me up. But the next thing was

21

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  my own observation, the 1,225. I just want to make

3  sure that people, I should say, understand that this

4  is the total including the basic contribution. In

5  other words, if somebody gives $175 and it is

6  matched six times, you add the six times, plus the

7  base contribution, to get the figure. So, it wasn't

8  a mistake. I apologize. It's not the first time

9  they're out to get me.

10              In any case, Councilman Recchia,

11  please.

12              COUNCIL MEMBER RECCHIA: Yes. Good

13  morning. I have some questions regarding the bill.

14              First, in regards to not having a

15  competitive race, what does it mean, you know,

16  significant media exposure, or significant

17  endorsements? Because right now you feel you do have

18  a competitive race, you fill out a letter and you

19  get your matching funds. Will you no longer have

20  that process?

21              MR. CROWELL: That process is being

22  modified and strengthened. And, so, under the bill,

23  I believe significant media exposure is defined as

24  12 appearances in the media, over the course of the

25  election, and so it would change the current process

22

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  where right now you merely need to submit a

3  statement of need and you get all of your funds.

4  Through this process you would need to effectively

5  provide documentation, showing how you meet one of

6  these criteria, in this case the media appearances,

7  and you would submit that to the CFB who would

8  verify its accuracy in effect that you do in effect

9  meet one of these categories.

10           COUNCIL MEMBER RECCHIA: Because if

11  you have a candidate that goes out ringing doorbells

12  and doing other, you know, canvasing and everything,

13  that's, you know -- who is the Campaign Finance

14  Board to determine if we have a significant race or

15  not? And you know, you're sitting here in Manhattan,

16  you're not in my district, to know if I have a

17  serious race or not, and I could go there and tell

18  you I have a serious race, just because there's not

19  articles or there's not, you know, recognition. I

20  mean, I have a problem with this part of it.

21           MR. CROWELL: I think you might agree,

22  Councilman, that in the past we've had issues with

23  public funds going to races where there did not, in

24  fact, exist serious competition. And, so, what we've

25  been trying to do in working with the Council, is to

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   structure criteria that is fair, but also flexible

3   enough that captures the different types of

4   categories that would effectively show that you have

5   some level of -- you know, that you're organized and

6   that you have some level of a serious campaign.

7              And, so, the different categories are

8   endorsements, they're media appearances, and in

9   addition to that there is, of course, the

10  fundraising trigger.

11             COUNCIL MEMBER RECCHIA: Let me tell

12  you about a situation that takes place and has

13  happened, is that a candidate applies for matching

14  funds, the candidate does not do anything until two

15  weeks before the election, they submit all their

16  money and you get bombarded and he comes strong.

17  Here you think you don't have a race, all right?

18  Now, you're fighting with Campaign Finance Board two

19  weeks before to get your money and you have an

20  issue. Because this has happened. I mean, you know,

21  this has taken place.

22             MR. BARRY: Well, I don't know the

23  specific instance you're referring to, but we've

24  looked back at the last several election cycles, and

25  we have, I don't think, come up with a single real

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  instance where a candidate has not hit, you know,

3  the current threshold of 20 percent.

4           Right now, if your opponent raises 20

5  percent of the spending limit, that effectively

6  allows you to collect full public financing. But if

7  they have raised less than 20 percent of the

8  spending limit, then you are only allowed to get 20

9  percent of your public funds. And you know, finding

10  examples where someone has raised that little money

11  and still runs a very serious campaign are few and

12  far between, whereas there are many examples that we

13  can find where candidates received the full amount

14  of public financing, but they didn't actually face a

15  serious opponent.

16           COUNCIL MEMBER RECCHIA: But you don't

17  know that until after the election, and to put an

18  elected official in jeopardy just because you don't

19  think it's a serious race, I think that's extremely,

20  extremely prejudicial, I think the Campaign Finance

21  Board is deciding on who is going to be getting

22  money, who is going to get elected. And I think most

23  of all, what you really need to do here, which is

24  nowhere in this bill, is to give a candidate who

25  wants to run for office, saying if you want matching

```
 1    COMMITTEE ON GOVERNMENTAL OPERATIONS

 2    funds, you have to have all your money in by a month

 3    before the election, not a week before the election

 4    or four days before the election, so they could

 5    bombard you. That's what has happened to me, twice.

 6    And every time I complained about it, no one did

 7    anything about it. And you want to talk about races?

 8    Many times, in two of my races, they said I don't

 9    have a serious opponent. All right? Yet, I had to

10    fight to get it, and before you know it, the

11    candidate was out there, they didn't do anything

12    until two weeks before the election. I think

13    somewhere in the bill there should be a rule that

14    says if you want matching funds, you have to have

15    all your matching funds in a month before the

16    election. Why give someone a week before to get all

17    his matching funds in and get money?

18              MR. BARRY: Well, that's an issue we

19    could certainly look at. I think that cuts both

20    ways, though, in that you would be preventing likely

21    challengers who have been struggling to raise money

22    and who have raised the money --

23              COUNCIL MEMBER RECCHIA: It's either

24    that or --

25              MR. BARRY: -- Much needed funds
```

26

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    before an election. So, it does cut both ways. But

3    that is a separate issue from the issue that we're

4    trying to get at, which is preventing the waste and

5    abuse of public funds in non-competitive races. And

6    I don't want to comment specifically on your races,

7    because I know that you have had competitive races

8    in the past.

9                    CHAIRPERSON FELDER: Can I please

10   interrupt both of you?

11                   I just want to make sure it's okay.

12   Can I interrupt both of you for a moment, please?

13                   COUNCIL MEMBER RECCHIA: Yes.

14                   CHAIRPERSON FELDER: I'd like to ask

15   Maura Keaney, the Speaker's Chief of Staff, to

16   clarify this issue, which may help.

17                   MS. KEANEY: Since my boss, the actual

18   Chief of Staff, is sitting to my left, I do want to

19   clarify that I'm Deputy Chief of Staff.

20                   I think there is two sort of pieces

21   in the legislation that would address some of the

22   concerns that Council Member Recchia is raising. One

23   is on the question of how a competitive race is

24   determined, in fact, the CFB will not be given

25   discretion in determining whether a race is

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  competitive or not. And when they testify I'm sure

3  they can address this, but Board staff and Board

4  members felt strongly that they should not be in the

5  position of making that decision because sitting in

6  their office in Lower Manhattan, they might not know

7  what was happening in Coney Island or in the Bronx

8  or in any number of competitive races around the

9  City.

10            Secondly, on the question of when a

11  final determination is made on matching funds, we

12  heard from a number of Council members and other

13  candidates who had participated in the system about

14  a concern, and as I think Frank said, it can cut

15  both ways about making sure there is clarity for

16  candidates, whether or not they'll get matching

17  funds, and frankly, for their opponents, whether or

18  not they'll be facing someone that has that matching

19  funds to finance them.

20            So, the legislation puts in an

21  additional final payment date, probably about three

22  weeks before the election, at which time if the

23  candidate is denied public matching funds, they can

24  use that as a final determination and go to court,

25  and it also gives a greater degree of clarity to

28

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  their opponent about whether they would be facing

3  someone that is well funded and has those matching

4  funds or not.

5           CHAIRPERSON FELDER: Councilman

6  Recchia, it's back to you.

7           COUNCIL MEMBER RECCHIA: I'll hold my

8  questions. I'll give someone else a chance.

9           CHAIRPERSON FELDER: Okay, thank you

10  very much.

11           I want to recognize Council Member

12  Lappin and ask Council Member Dickens, who has a

13  question.

14           COUNCIL MEMBER DICKENS: Thank you so

15  much, Mr. Chair.

16           Good morning. What exceptions are

17  there to doing business with the City, such as a

18  one- to three-family homeowner, or Section 8

19  contract holder of a multiple dwelling, such as

20  J-51, Land Use items, other Land Use items that are

21  small?

22           MR. CROWELL: The list isn't

23  enumerated in the bill, but what you've identified

24  would be the exceptions. And as we are looking at

25  how to implement this, we're very cognizant of the

```
 1  COMMITTEE ON GOVERNMENTAL OPERATIONS

 2  variety of programs and where things would fall,

 3  given the requirements that we've put into the bill.

 4              So, things like that, a Land Use

 5  applicant, for instance, looking for something to do

 6  with a single-family or a one- to three-family home,

 7  that would not be subject to "doing business"

 8  restrictions, we're obviously trying to capture our

 9  big developers, with significant Land Use

10  determinations that need to be made in terms of

11  those developments.

12              COUNCIL MEMBER DICKENS: So, is it my

13  understanding that if you have a multiple dwelling,

14  and you have Section 8 contracts that permits

15  affordable housing, which is what the City and our

16  Mayor encourages, then there would be a cap of

17  100,000, or that's an exemption? I want to be clear

18  so I understand.

19              MR. CROWELL: I think those would be

20  subject to -- no, those would be exempt from the

21  bill.

22              COUNCIL MEMBER DICKENS: Without a

23  cap; is that my understanding of your testimony?

24              MR. CROWELL: Correct. Correct.

25              COUNCIL MEMBER DICKENS: And what
```

30

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  about other applications, such as J-51?

3            MR. CROWELL: No, those are exempt as

4  well. So, it would be J-51 and just broad categories

5  of the affordable housing program, Section HA 51.

6            COUNCIL MEMBER DICKENS: Thank you.

7            CHAIRPERSON FELDER: Mr. Crowell, can

8  you bring the mike closer to your mouth? We want to

9  hear you clearly.

10            MR. CROWELL: Okay.

11            CHAIRPERSON FELDER: Thank you.

12            Council Member Ignizio.

13            COUNCIL MEMBER IGNIZIO: Thank you

14  very much. Thank you, all. I have less of a

15  question, if you will, and more of a statement both

16  for the Committee that I would like to encourage,

17  and that is the inclusion of all interest groups in

18  this City, that being unions. I don't question

19  anyone's intention of this bill, not the

20  Administration, not the Speaker, and not the

21  interest groups that are involved. But I do question

22  the precedent we're setting. The precedent we're

23  setting is for one who wishes to petition their

24  government, a form of running for office, we are

25  separating one's speech from one others. If I decide

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  I want to be, or Joe from Astoria, Queens, wants to

3  be -- pardon me, Peter. Joe, I said. From Astoria,

4  Queens, wants to be Mr. Anti-union, and he wants to

5  run because he believes, I don't agree, but he

6  believes that unions are hurting the City of New

7  York, and he wants to run as that candidate. Well,

8  Sally, who is also running in Astoria, she is

9  running as the union-backed candidate. My

10  understanding, and as the union exclusion here,

11  government, for the first time that I know, is

12  taking a situation saying that one's voice is not

13  equal to the other's voice in terms of campaign

14  contributions from those entities, and I think it's

15  fundamentally unjust.

16                I read the Mayor's reports, I read

17  people's comments about how the good is not the

18  enemy with the perfect -- I appreciate those

19  comments, but when you're dealing with something as

20  fundamental as elections, and as fundamental as

21  someone's right to participate, petition their

22  government as they see fit, we ought not put

23  confines on speech. I believe that's what we're

24  doing here. You may differ. I appreciate the

25  differences, and I would hope that the Governmental

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Operations Committee would consider forwarding an

3    amendment to include all interest groups in this

4    City and to have the establishment of this bill

5    really work on all facets of people who are trying

6    to petition their government and make sure their

7    petitioning is done on an equal basis, and not one

8    speech being squelched at the expense of another.

9    So, I recognize that it's a lofty goal I'm trying to

10   achieve, and I recognize from media reports that it

11   is a non-starter, is one of the quotes I read, but,

12   you know, when you're dealing with something as

13   fundamental as elections and people who seek to

14   petition their government, a form of elected

15   offices, I think it's an extremely serious omission,

16   and it ought be revisited. So, thank you very much.

17              CHAIRPERSON FELDER: Thank you,

18   Council Member.

19              We've been joined by the two

20   attorneys who weren't here earlier who worked on

21   this diligently, Robert Newman, and James Caras, who

22   are standing in the corner to the left. Over there.

23   Thank you.

24              Council Member Addabbo.

25              COUNCIL MEMBER ADDABBO: Thank you,

33

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Mr. Chairman. Let me thank your staff, and obviously

3   the attorneys who worked on this bill and the

4   countless hours of time put into it and the efforts

5   of the Administration for this encompassing bill. As

6   with any bill that we speak about, especially this

7   one, enforcement, or implementation becomes an

8   issue. In speaking to my colleagues, a lot of the

9   concerns you discuss is is this bill able to be

10  implemented? Are you, and this is a question I hope

11  I have the opportunity to ask the Campaign Finance

12  Board as well, but now with the Administration here,

13  are you confident that this bill can be implemented

14  to its full capacity, that we should not have any

15  problems with the terms of the bill as we go forward

16  in its implementation and enforcement? Do we have

17  enough staffing? Is it well funded?

18              MR. CROWELL: Well, I'll speak

19  generally to the issue, and then I'll allow Marla

20  Simpson, to my right, to speak more specifically as

21  to how her office, which is specifically charged

22  with database development, plans to undertake this

23  work.

24              Certainly we are making resources

25  fully available to ensure that the proper database

34

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  development can take place. Ms. Simpson and her

3  staff, along with Department of Information,

4  Technology and Telecommunications, and in addition

5  in consultation with Council staff and agency staff,

6  we're doing a full assessment of exactly all of the

7  pieces that need to be put in place, where they are

8  right now, where new pieces need to be developed, in

9  order to create a dynamic database, in order to

10  implement the program. So, the information is

11  available to ensure that those who do do business

12  with the City and are covered by the limitations in

13  the bill are readily identifiable for all the

14  appropriate parties, CFB and the public, and that

15  they're delivered in a timely manner and updated

16  once the program is implemented to ensure that the

17  administration of matching funds and financing in

18  general is done correctly.

19          Marla.

20          MS. SIMPSON: Thank you.

21          Council Member, a substantial portion

22  of the "doing business" data exists in the City's

23  records already because of the existence of the

24  Vendex statute and the Vendex process. So, for

25  example, all of the Mayoral agencies, and including

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  several of the agencies that are not otherwise

3  governed by the Procurement Policy Board rules, such

4  as the Department of Education, or NYCHA, all of

5  these agencies routinely collect information on, for

6  example, the top officers of each entity that does

7  business with the City as a contract or concession,

8  so the initial task will be to simply create a

9  comprehensive database that includes all of the

10  agencies in one place, as opposed to scattered

11  around as they are now.

12          That is a task that is significant

13  but is clearly achievable within the time frames

14  that we're talking about, and we've already begun

15  speaking with both the procurement and technology

16  staffs of those agencies so that we'll be ready for

17  that task.

18          The second part of database

19  development, is that we will be collecting really

20  for the first time comprehensive data at the

21  proposal process. As you know, the bill does not

22  cover competitive sealed bids, which is a

23  significant part of the volume, but it does cover

24  RFPs or other types of discretionary selection

25  processes. Normally the Vendex type of disclosure

36

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   doesn't happen at the proposal stage so we only have

3   that data for winners, not for the losers. We will

4   be developing a process through the use of language

5   in our RFPs that will allow us to collect

6   information on the proposers. That is the data that

7   Mr. Crowell referred to as being a dynamic creation

8   of a database, because we will be collecting that

9   information prospectively. We won't have that

10  information obviously on contracts that are already

11  in place. We will only have that as we solicit new

12  contracts.

13              And then, lastly, the third category

14  is senior managers, within the different vendors

15  that we do business with. Again, that's not data

16  that is typically collected in Vendex. That's new

17  data that we'll have to develop, and so we'll be

18  creating data collection for that process as well,

19  and we will be doing that prospectively as we move

20  forward.

21              COUNCIL MEMBER ADDABBO: This is a

22  follow-up question, and I guess a point of

23  clarification. Presupposing we vote on it here, it's

24  approved, goes to the Council, approved; upon the

25  Mayor's signature, when does this intro or the local

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  law, when would it be effective?

3            MR. CROWELL: Well, there are varying

4  implementation dates, but for instance, in terms of

5  the "doing business" database and it's availability

6  to apply to the 2009 election, the first

7  implementation date would be January 1st, roughly

8  January 1st, 2008.

9            MS. SIMPSON: Roughly. The law would

10 have to be signed by the Mayor and then published,

11 them there's an effective date, and then we measure

12 six months from that date, and that's the point by

13 which we would aim to have the first part of the

14 "doing business" database certified.

15            COUNCIL MEMBER ADDABBO: Again, with

16 the work that needs to be done with the database, I

17 understand the bill would take effect, January 1st,

18 2008 and elections after that.

19            MR. CROWELL: Assuming, hypothetically

20 speaking, if you did something by July or whatever,

21 it's six months from that date. But say you did

22 something by July, then it would be January. So,

23 it's six months. It's a six-month window.

24            COUNCIL MEMBER ADDABBO: So there is a

25 period of time in order for you to get the database

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  all --

3            MR. CROWELL: Sure. And that's why

4  we're taking steps right now.

5            MS. SIMPSON: And it rolls out in

6  categories. Other parts of the database, for

7  example, the Land Use part of the database would

8  roll out later, I think the time frame there is 18

9  months. It's set out by category in terms of how the

10  City would accumulate the data presented in a way

11  that the CFB could evaluate and then there would be

12  a certification that the database was ready.

13            COUNCIL MEMBER ADDABBO: Thank you

14  very much. Thank you, Mr. Chair.

15            CHAIRPERSON FELDER: Council Member

16  Vallone.

17            COUNCIL MEMBER VALLONE: Let me first

18  clarify, it was Joe from Queens. Joe from Astoria.

19  Joe from Astoria.

20            Talking about what Domenic Recchia

21  said, I think you're both right. I think you made it

22  abundantly clear that there are elected officials

23  who abuse the system and took money in joke races

24  and took taxpayer money that they should never have

25  received. And that needs to be stopped. And I also

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    think Domenic Recchia is right where we know a lot

3    better than the Campaign Finance Board knows, as to

4    whether or not it's going to be a competitive race

5    or not. So, here's my potential solution, I

6    discussed this with Council Member staff. If an

7    elected official, a Council Member or whatever,

8    thinks that they are truly in a competitive race,

9    despite what the Campaign Finance Board says, and

10   takes the taxpayer money, and then winds up with

11   over a certain percentage of the vote, say 80

12   percent, then that money would be denied them in the

13   future. Not that they would have to pay it back,

14   because it could have been just a miscalculation,

15   and I'm not sure that's even possible. But when they

16   run again, that would be taxpayer money that would

17   be denied them in the future, if they decided to

18   take it in that sham of a race that they took it in.

19   I don't know, do you have any opinion on that?

20              MR. BARRY: Well, it's an interesting

21   idea. I think one of the immediate problems that

22   jump up is what if that candidate doesn't run again,

23   and then there is no consequences for having taken

24   money in a sham race?

25              COUNCIL MEMBER VALLONE: That's true.

40

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    I mean, obviously, as many said, "perfect can't be

3    the enemy of the good," and you can't foresee that,

4    but I don't think anybody knows for sure whether

5    they'll be running again, and I think it would be a

6    huge deterrent on someone taking taxpayer money, if

7    they truly did not believe they were going to be in

8    a competitive race. So, I don't think anybody knows

9    what's going to happen down the road, but that is

10   something I don't think anybody could do anything

11   about. Any other thoughts on that?

12              MR. BARRY: I think it's an

13   interesting idea and we should consider it.

14              COUNCIL MEMBER VALLONE: Let me ask

15   you, I have so many questions on this, but I'm not

16   going to be going into them today, because my staff

17   has been, Council staff has been extremely helpful,

18   and I know that you will discuss this with me at any

19   time, but I do want to place on the record your

20   position on whether or not the CFB had legal

21   authority to act in this area had we not?

22              MR. CROWELL: Whether the CFB had

23   legal authority to regulate doing business? Well, as

24   someone who has worked at numerous Charter Revision

25   Commissions and was a City Attorney in the legal

41

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Counsel Division of the Law Department, it has been

3   the City's position, that yes, indeed, the CFB did

4   have the authority to regulate in this area, and it

5   was given express grant of authority by the Charter

6   Revision of 1998.

7              COUNCIL MEMBER VALLONE: I that's an

8   important point, and I think our Council agrees with

9   that, and clearly there are improvements that I

10  think can be made, but people need to realize that

11  we are the legislative body and it's our duty to

12  act, especially when we're informed that there is

13  going to be action, if we didn't. And I think this

14  is the way to get it done for the legislative

15  process, as opposed to through mandates by an

16  agency. So, as good as that agency usually is, this

17  is just the way that it should be done in a

18  democracy. So, I don't think that's a point that's

19  been made. I just wanted to get your opinion on

20  that. So, thank you. I'll ask you the other

21  questions down the road.

22              Thank you, Mr. Chair.

23              CHAIRPERSON FELDER: We've been joined

24  by Council Member Larry Seabrook, and Council Member

25  Lappin has a question.

42

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2            COUNCIL MEMBER LAPPIN: Thank you, Mr.

3  Chairman.

4            I want to start by saying I'm proud

5  to be a co-sponsor of this bill, and I know a lot of

6  work on both the Administration's and the Council

7  side went into drafting this document that's before

8  us today.

9            I wanted to ask a specific question

10  about the audit process, something that is more

11  nitty-gritty, but I think important, and I want to

12  confirm that it's included in here. Will campaigns

13  be able to electronically submit copies of receipts

14  and expenditures and cancelled checks?

15            MR. CROWELL: Yes, I don't think

16  that's expressly outlined in the bill, but I think

17  that's probably a question that is best for the

18  Campaign Finance Board who is going to be testifying

19  here as well, because how they plan to implement the

20  provisions that are in the bill I think would speak

21  exactly to that issue, and it's a very important and

22  good question.

23            COUNCIL MEMBER LAPPIN: Okay, thanks.

24            I may not be able to be here when the

25  Campaign Finance Board testifies, so, if you would

43

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  be willing to ask that question, I would appreciate

3  that.

4           CHAIRPERSON FELDER: That's addressed

5  in the bill. I think it's addressed in the bill.

6           COUNCIL MEMBER LAPPIN: Okay.

7           CHAIRPERSON FELDER: And I think that

8  what they said was right. Mr. Crowell, I have

9  confidence, was correct on this response.

10           So, I'm not going to ask them again,

11  even though you asked me, okay?

12           MR. BARRY: It gives the CFE the

13  authority to figure out a way to do it.

14           CHAIRPERSON FELDER: Thank you very

15  much for raising it.

16           Council Member Dickens.

17           COUNCIL MEMBER DICKENS: Thank you so

18  much, Mr. Chair.

19           I just had one small question, and I

20  want to acknowledge the work of Jim Caras and Rob

21  Newman, for all their work, for answering all of the

22  Council's questions and my 101 questions and

23  demands. But there's one thing that worries me,

24  that's about the database, the question about that.

25  Because anyone in this room who has had anything,

44

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   any requests that they had to do to a City agency

 3   knows the convoluted, confused answers that you get

 4   where the records are lost, can't be found, they're

 5   incorrect, obsolete. Having said that, what is to

 6   make my colleagues feel that this database is going

 7   to be any better than any of the other City

 8   agencies' responses to questions that the citizens

 9   have where your records, because of Administration,

10   and of course, the Campaign Finance Board's

11   maintenance of it, what makes us think it's going to

12   be any more accurate and current than any other City

13   agency's records that usually is not, whether we're

14   looking for a birth certificate, death certificate,

15   or copies of legal records that you can't get?

16             MS. SIMPSON: Council member, the root

17   data for what will comprise the "doing business"

18   database comes from the City's Financial Management

19   System, which is, quite frankly, our accounting

20   books, and therefore, it's the same data that OMB

21   relies on, the Comptroller relies on. Literally

22   every time an agency makes a purchase, the system

23   has to confirm that we have the money in the budget

24   as appropriated and it's in the right account. It's

25   an extraordinarily detailed financial database, and
```

45

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    it is accurate within a 24-hour window all the time.

3    It pretty much has to be, otherwise we would be in

4    violation of numerous state and local laws. It's the

5    database by which we ascertain that we have the

6    money to pay our bills. So, particularly since here,

7    in order to know whether something belongs in the

8    data, the "doing business" database or not, we don't

9    really have to know that question down to the penny

10   in most cases. We only need to know whether it's in

11   a category that is covered, or its exempt, and we

12   need to know whether it's over the dollar threshold,

13   which in most cases is $100,000, or not. And that

14   level of accuracy, I hope as a taxpayer, I can be

15   confident that our financial system is definitely

16   accurate within that broad parameter.

17                   COUNCIL MEMBER DICKENS: Thank you so

18   much for your answer. As a taxpayer, I wish that I

19   had that kind of level of confidence. But thank you.

20                   CHAIRPERSON FELDER: Before we let you

21   go I just want to add a few points that I think that

22   were not mentioned. First of all, in terms of the

23   system, there's a film that some of you may be aware

24   of, Ocean 13, that just came out, if you're

25   determined to beat the system, I don't think there

46

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  is any system that cannot be beaten. But the purpose

3  of this legislation is to try to make things

4  significantly better for candidates, you know, to

5  keep us all honest. Candidates, people contributing,

6  and so on and so forth, and government in general.

7  And I think towards that, this is an extraordinary

8  goal, that has been from its outset has been done I

9  think in the best way possible, and that's with the

10  months, really ongoing months of discussions, with

11  everyone and anyone that has an interest in the

12  legislation, to those that don't like the

13  legislation, as well. So the final product takes a

14  lot of that into consideration. I think that is very

15  important when we think about it.

16            The point that Council Member Dickens

17  mentioned about the reliability of the database,

18  this bill isn't purely to destroy and hamper the

19  candidacy of people who are trying to run for

20  office. I would say just the opposite. It's supposed

21  to make it easier, purer and much more clearer. So,

22  that in the case, for example, with the database, if

23  somebody looks at that database on June 13th or June

24  12th and sees a list, that list at that date is what

25  we will take as record. You will be able to download

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   that list, you will be able to say that on June

3   12th, your database said that Felder and Company or

4   Felder Partnership, or whatever it is that's

5   excluded, did not exist, even if on June 13th they

6   were listed, you will not be responsible or held

7   liable in any way for taking a contribution. You did

8   the best you could with the information you had.

9               So, I think that that is not a

10  perfect system, but it's certainly good in that it

11  says that as information is put forth, you are

12  responsible or if you don't check the information,

13  they can check back to that date, and you'll see

14  whether it was on there or not. And I think that

15  that will help a lot.

16              Council Member Dickens, do you have

17  other questions?

18              COUNCIL MEMBER DICKENS: Thank you.

19  Bear with me and I just wanted to, I was remiss

20  because I didn't thank our attorney DeNora Johnson,

21  for the hard work that she put in and the many

22  hours, and late hours that she put in on working on

23  this. And our Chair, because I'm concerned as to

24  whether the Simcha Felder Shoe Company can give a

25  donation or not.

48

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2                CHAIRPERSON FELDER: Whether I can

3   give you a donation?

4                COUNCIL MEMBER DICKENS: The Simcha

5   Felder Shoe Company.

6                CHAIRPERSON FELDER: I'm not concerned

7   at all. I want to give you a donation.

8                Any other questions? Seeing none, I

9   thank you, Mr. Crowell, very much, and your

10  colleagues for being here this morning.

11               MR. CROWELL: You're welcome.

12               CHAIRPERSON FELDER: Next we're going

13  to hear from the Campaign Finance Board, Amy Loprest

14  and Carole Campolo and Sue Ellen Dodell. I don't see

15  her. Oh, she's sitting on the other side. For those

16  that are standing, at a minimum, you can sit down

17  until this panel finishes and then they'll come back

18  to claim their seats, but in the meanwhile you can

19  sit down for awhile, certainly.

20               Whenever you're ready. Identify

21  yourself, and we'll move forward.

22               MS. LOPREST: Good morning, Chairman

23  Felder, Committee Members. I'm Amy Loprest,

24  Executive Director of the New York City Campaign

25  Finance Board. With me are Deputy Executive Director

49

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Carole Campolo, on my right, and General Counsel Sue

3   Ellen Dodell, to my left. I'm here to testify on

4   Intro. No. 586. I would like, first I would like to

5   congratulate the City Council and the Mayor for

6   reaching agreement on legislation that has the

7   potential to transform the relationship between

8   money and politics in New York City. We are pleased

9   to have been able to inform these negotiations with

10  the practical lessons of two decades successfully

11  administering the program.

12          While it's true there are significant

13  challenges ahead in implementing pay-to-play

14  restrictions under consideration, the Board has

15  always believed those limits should have the force

16  of law if they're to be effective.

17          We are confident that with continued

18  cooperation among the Campaign Finance Board, City

19  Hall and the responsible agencies, the databases

20  that the bill envisions will be created in a timely

21  fashion and this reform will succeed.

22          Intro. No. 586 contains several other

23  provisions that could help advance some of the

24  program's underlying goals. One central aim of the

25  program is to amplify the voice of small donors in

50

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   New York City's political system. Lowering the

3   contribution amount eligible for matching funds from

4   250 to 175 dollars should encourage candidates to

5   focus even more attention on ordinary New Yorkers

6   who lack the means to make large contributions to

7   political campaigns.

8              The proposed ban on contribution from

9   LLCs and partnerships is a positive step towards

10  eliminating all organizational contributions as the

11  Board has recommended since the creation of the

12  program.

13             The new, more inclusive definition of

14  intermediaries will help the Board provide New

15  Yorkers with more complete disclosure of those

16  interests funding campaigns for City office, and the

17  provisions meant to limit the amount of matching

18  funds provided to participating candidates with

19  nominal opposition should provide taxpayers with

20  greater protection against the waste of public

21  resources.

22             As I'm sure you're aware, other parts

23  of the bill, especially the proposed deadlines for

24  CFB audits will require significant changes in the

25  way the Board operates. We have already begun a

51

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   thorough evaluation of our audit procedures, which

3   we will continue in conjunction with completing the

4   last of the audits from the 2005 election cycle.

5                   In order to enable the Campaign

6   Finance Board to hold all candidates for covered

7   offices to the highest standard of integrity, the

8   law-makers who created the Board gave it a certain

9   measure of independence from the political process.

10  Subsequent City Councils have found it appropriate

11  to respect the independence of the agency that

12  regulates them in their roles as candidates as City

13  office. Despite our reservations about any

14  legislative intrusion into the Board's

15  administration of the Campaign Finance Act, we are

16  supporting Intro. 586 because we are confident we

17  will be able to meet the Board's mandates without

18  sacrificing the independence of the Board or the

19  quality of our work.

20                  We have communicated a statement of

21  the Board's revised fiscal needs for Fiscal Year

22  2008 to the Mayor and the Speaker of the City

23  Council, and we will further assess staffing and

24  funding levels for the years to come, in light of

25  the bills requirements.

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2            We appreciate the Council's

3  commitment to provide the resources the Board will

4  need to meet these new mandates, while making it

5  possible for the Board to protect the public's

6  investment in the political process with the same

7  diligence New York City taxpayers have come to

8  expect, since the program was created almost 20

9  years ago.

10           There are some outstanding technical

11  issues with this legislation, which are working with

12  Council staff to resolve. These include some

13  recommended improvements to the debate program, and

14  providing for bonus payments to candidates facing

15  high-spending non-participants. I, too, would like

16  to thank the Council staff who worked so hard on

17  this legislation, Maura Keaney, Rob Newman, DeNora

18  Johnson and Jim Caras, and the staff members from

19  the Mayor's Office, Anthony Crowell, Frank Barry and

20  Patrick Wehle. I'd like to thank you for the

21  opportunity to testify, and I look forward to

22  answering any questions you may have.

23           CHAIRPERSON FELDER: Thank you very

24  much, and we thank you, obviously. You were included

25  in my opening statement. All the parties. With the

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   budget you just mentioned about the requests for

 3   whatever more money you're going to be able to

 4   implement this, how much more money are you asking

 5   for?

 6                   MS. LOPREST: For Fiscal Year 2008, we

 7   have made a request for an additional $270,000.

 8                   CHAIRPERSON FELDER: For $270,000,

 9   you're going to be able to, because it's an off-year

10   sort of?

11                   MS. LOPREST: It's just for this

12   fiscal year because most of the provisions that take

13   place in this fiscal year involve the doing business

14   regulations.

15                   CHAIRPERSON FELDER: And then the

16   following year what do you anticipate?

17                   MS. LOPREST: We're looking into that,

18   and we have to, when the bill is finalized and

19   passed, we'll have to evaluate our future needs.

20   Certainly it will require some additional staffing,

21   particularly audit staff, as we've talked about in

22   the past. Some legal staff, people to do additional

23   training, and additional space to put those people

24   in.

25                   CHAIRPERSON FELDER: So, how much more
```

54

```
1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   money is it going to be?

3              MS. LOPREST: We haven't worked out an

4   exact number.

5              CHAIRPERSON FELDER: About. You have

6   no idea?

7              MS. LOPREST: Really, I don't have any

8   idea.

9              CHAIRPERSON FELDER: Okay.

10             What did you want to say?

11             MS. CAMPOLO: I was going to say --

12             CHAIRPERSON FELDER: Could you please

13  identify yourself.

14             MS. CAMPOLO: Carole Campolo. That's

15  for the Fiscal 2009. So we will do an extensive

16  evaluation of any of the fiscal impact needs that

17  we're going to need.

18             CHAIRPERSON FELDER: But you would

19  have to hire these people way before. Right? You're

20  not going to throw them into the fire, right? You

21  have to train them and hire them early enough.

22             MS. CAMPOLO: Right. Fiscal 2009 will

23  begin a year from now. So, if we had the money in

24  that budget, ostensibly we'd be able to start hiring

25  people July 1st, 2008.
```

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2              CHAIRPERSON FELDER: So, back to this

3   year. You anticipate being able to use $270,000?

4   Because I know you don't want to ask for more money

5   than you need. You believe that you'll be able to

6   use that money?

7              MS. LOPREST: Yes. It's basically some

8   additional staff, and some increase in our computer

9   capacity and some additional training.

10             CHAIRPERSON FELDER: Do you believe

11  that the auditors you have are getting paid enough?

12             MS. LOPREST: We've done a thorough

13  review and I think we've communicated with you that

14  we've looked at the salary levels in other City

15  agencies for audit staff and our audit salaries are

16  commensurate with that funding.

17             CHAIRPERSON FELDER: Understood. Now,

18  with this ongoing thing about certain years being

19  very busy and certain years being extremely quiet,

20  you know, how are you going to handle that in terms

21  of your increasing your budget significantly for

22  2009, that will require additional manpower, right?

23  So, the computers, all of that, that hopefully

24  doesn't go bad. But the other stuff, how are you

25  going to operate this system, because you have, you

56

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  know, in a normal business, let's say June is

3  wedding season, a caterer will have maybe students,

4  others that are finished with their finals, they'll

5  buy a temporary staff, hopefully do a good job. You

6  can't afford to do that? How are you going to deal

7  with this?

8              MS. LOPREST: What the Board has

9  traditionally done is evaluate whether or not we

10 could use seasonals to accomplish some of the

11 staffing needs for the period of the election, and

12 then downsize, you know, kept our permanent

13 headcount relatively constant. That's one of the

14 issues that we will have to evaluate, basically, you

15 know, coming up with the timing of staff and making

16 sure that people are on staff, being able to train

17 and also being able to complete the jobs, and that's

18 one of the things we will have to review.

19             CHAIRPERSON FELDER: Okay, I'm asking

20 you a hodge-podge of questions. So, who audits the

21 Campaign Finance Board at this time.

22             MS. LOPREST: The Comptroller's Office

23 has the authority to audit the Campaign Finance

24 Board.

25             CHAIRPERSON FELDER: Do you feel that

57

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    it's appropriate for the Comptroller to audit the

3    Campaign Finance Board since you have to give --

4    hypothetically, let's say Simcha Felder was running

5    for Comptroller, right? It wouldn't make sense,

6    really, for -- and hypothetically, if he won the

7    election, it wouldn't make sense really for him to

8    audit you.

9                    Do you have any comments about that?

10                   MS. LOPREST: The Comptroller has in

11   the past conducted audits of our contracting

12   procedures, and we did hire an outside audit firm

13   before the 2001 election to conduct a comprehensive

14   audit of how we had administered the public fund.

15   With the new provisions about GAGAs, you referred to

16   them as "gagas," but one of the provisions would be

17   that we would undergo peer review and so the Board

18   would undertake a contract from an outside law firm

19   to do that peer review.

20                   CHAIRPERSON FELDER: So, I'm

21   highlighting that again, because that's very

22   important to me, and I'm happy you mentioned that.

23                   I think that the audits, unrelated to

24   this legislation, sort of, you know, somewhat

25   affected, that under the generally accepted

58

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   government auditing standards, which you will be

 3   applying, which is certainly a stricter, even more

 4   improved as it is now, which, you know, we have a

 5   lot of problems with you, candidates find your

 6   audits very strict now, but I think this is a good

 7   thing. I'm just mentioning I think it's important to

 8   follow up with that, nothing related to legislation,

 9   to make sure that whoever does the audit has nothing

10   to do with getting money from you.

11              Council Member Dickens, you had a

12   question?

13              COUNCIL MEMBER DICKENS: Yes. Thank

14   you so much.

15              Director Amy Loprest?

16              MS. LOPREST: Yes.

17              COUNCIL MEMBER DICKENS: I wanted to

18   make sure I had it correct. And the Deputy, Carole

19   Campolo, have either one of you or the General

20   Counsel, is it Dodell?

21              MS. DODELL: Yes.

22              COUNCIL MEMBER DICKENS: How are you?

23   Have any of you ever been a candidate?

24              MS. LOPREST: I've never been a

25   candidate for elective office, no.
```

59

```
1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2               COUNCIL MEMBER DICKENS: Have any of

3   you been a campaign treasurer for a candidate?

4               MS. LOPREST: No.

5               COUNCIL MEMBER DICKENS: Have any of

6   you been a candidate fundraiser?

7               MS. LOPREST: No.

8               COUNCIL MEMBER DICKENS: Intermediary

9   or bundler?

10              MS. LOPREST: No.

11              COUNCIL MEMBER DICKENS: Thank you.

12              CHAIRPERSON FELDER: Thank you.

13              Back to the discussion that took

14  place when the Administration was here about the

15  non-competitive elections; how do you feel about

16  that? And whether you should be involved, shouldn't

17  be involved?

18              MS. LOPREST: I think the proposed

19  legislation strikes a good balance between -- by

20  giving it an objective monetary threshold, which

21  existed in the current law, in addition to seven

22  criterion by which a candidate could demonstrate

23  that a person is a serious opponent without having

24  the 20 percent financial level.

25              The Board, the candidates would be
```

60

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   required to provide evidence or documentation that

3   they met one of these seven criteria when they

4   submitted their letter and the Board would verify

5   that evidence. We wouldn't be making a determination

6   about whether a person was significant if these --

7   just for example, one of the things is that you have

8   received the endorsement of a Citywide/Statewide or

9   a federal elected official, representing all or a

10  portion of the area covered by your election, we

11  would just verify that, you know, we sent this

12  endorsement letter, yes, that person is an elected

13  official, then you map that criteria. You know, that

14  would be the Board's role in that, and the other

15  side would be the financial criteria which would be

16  judged based on the financial disclosure filed by

17  your opponent.

18              CHAIRPERSON FELDER: Do you think that

19  the legislation helps or hurts incumbents?

20              MS. LOPREST: I mean, that's a very

21  hard question.

22              CHAIRPERSON FELDER: That's why I

23  asked it.

24              MS. LOPREST: I think that political

25  scientists would tell you that being an incumbent is

61

 1  COMMITTEE ON GOVERNMENTAL OPERATIONS

 2  probably the single best predictor of winning an

 3  election. I really haven't, I don't have an answer

 4  to that question about whether this particular

 5  legislation has an effect one way or the other.

 6              I would say the overall purpose of

 7  the program is to help people who are small

 8  grassroot candidates run for office when they

 9  otherwise would not be financially able to do that.

10  And the increase in the matching fund from six to

11  one to $175, does bolster that purpose of the

12  program.

13              CHAIRPERSON FELDER: You didn't ask

14  me, because it's not your place, but I'll make

15  believe you asked me what's your opinion, Chair? And

16  I'm telling you that I think that it puts incumbents

17  at a greater disadvantage than they had before.

18  Incumbency as a rule is a great benefit. If you

19  asked an incumbent, elected officials whether they

20  liked the new legislation or they prefer to have it

21  the old way, I think most would say we liked it the

22  way it was a lot better. And the reason I raise that

23  is not to make myself or my colleagues look bad, but

24  rather to compliment my colleagues, not myself but

25  compliment my colleagues for their courage to be a

```
1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   part of this legislation, that in essence diminishes

3   the advantage that incumbents have and it makes it,

4   you know, it creates a much greater, you know, a

5   level playing field for everyone.

6              So, since you didn't say that, I'm

7   saying that, and I think that's to be true.

8              One last thing I just wanted to

9   mention is the issue with regard to candidates

10  complaining about not being able to get answers

11  quickly, on issues, you know, especially during

12  season, you know, you've worked out together with

13  the Administration some sort of process where they

14  can send you a question of some sort. Can you

15  elaborate on that?

16             MS. LOPREST: I believe that was your

17  suggestion, Council Member Felder.

18             CHAIRPERSON FELDER: Well, that's

19  again why I asked you.

20             MS. LOPREST: That the candidates will

21  be able to, as it could now, but if it's in the

22  legislation, if the candidates have a conversation

23  with the unit that we have set up that deals with

24  answering the questions from the candidates, they

25  can talk to our candidates services liaison, and
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  after the conversation, confirm what their

3  understanding through an e-mail or writing or some

4  other type of writing facts or whatever. And the

5  staff would have seven days to say, no, that's not

6  what we told you, or it's a misunderstanding, or

7  else the candidate could take that written advice

8  and rely on it about any detriment to them.

9          CHAIRPERSON FELDER: And finally,

10  would you say without any exception that this

11  Campaign Finance Reform is clearly the best in the

12  country after it passes? I mean the strictest in the

13  country? Is that true or not?

14          MS. LOPREST: I think this program

15  right now is the best in the country, the Campaign

16  Finance Program, and I think that this makes

17  improvements to that program.

18          CHAIRPERSON FELDER: You mean we were

19  the best already.

20          MS. LOPREST: Yes.

21          CHAIRPERSON FELDER: Okay, but now

22  we're going to be super, the best-est, right? Okay,

23  I want to thank you. We're taking exactly a

24  two-minute break and at 11:30 on this clock we will

25  continue.

64

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2                   And let me just ask the next -- thank

3   you very much for coming. I ask the next panel,

4   Ciara Torres-Spelliscy, Neal Rosenstein from NYPIRG,

5   Douglas Israel from Citizens Union, and Megan

6   Quattlebaum.

7                   We originally had four on this panel,

8   but since you're six people, you know, we made it

9   even three and three. So, I don't know who we

10  excluded, but it was randomly, whoever was the

11  fourth person that's not there. I'm ready whenever

12  you are. Just identify yourself, and you can decide

13  on your own which ever one wants to speak first.

14                  MR. ROSENSTEIN: Good morning. My name

15  is Neal Rosenstein, I'm Government Reform

16  Coordinator for NYPIRG. We support Intro. 586, and

17  we encourage its enactment.

18                  We believe this legislation will

19  strengthen the City's Campaign Finance Program,

20  among its many improvements, putting the cap of $250

21  to $400 on contributions to any City candidate by a

22  broad range of individuals doing business and

23  seeking favors from the City, whether in the program

24  or out, making those contributions unmatcheable,

25  broadening the definition of intermediaries to

65

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  include not only those delivering contributions, but

3  those soliciting them, providing an incentive for

4  taking smaller matches, as was mentioned previously,

5  and prohibiting contributions from LLCs and LLPs.

6              I'd like to make three points about

7  the legislation. First, we greatly appreciate the

8  outreach by the City and the Council in formulating

9  this legislation. We feel our suggestions were

10  seriously considered and a number incorporated into

11  the bill.

12             We'd like to thank Maura Keaney, Rob

13  Newman, DeNora Johnson, Jim Caras on the Council

14  staff, Anthony Crowell, Frank Barry and Patrick

15  Wehle, who negotiated the bill for the City

16  Administration.

17             We would also like to express our

18  special appreciation to Committee Chair Simcha

19  Felder. You've continued 19 years of tradition by

20  your predecessors, all of who strengthened the

21  Campaign Finance Program through their leadership

22  and political savvy.

23             Second, this legislation calls for

24  certifying complete and accurate databases of

25  individuals with applicants or bids for contracts

66

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  above $100,000, City Land Use, those doing business

3  with the City. This will be very challenging, as our

4  experience with the smaller lobbyist database has

5  already shown.

6                We feel any certification date that

7  goes into the '08/'09 election cycle would be

8  unfair, and we would support postponing database use

9  until after the election as the legislation mandates

10  if things drag out.

11                NYPIRG is counting on the City and

12  Council to provide both the Campaign Finance Board

13  and DoITT with the financial resources they need to

14  achieve these mandates in a timely manner.

15                Third, if the legislation is struck

16  down by the courts for candidates not participating

17  in the Campaign Finance Program, we support not

18  applying those restrictions to candidates who are

19  participants in the program. That's because if only

20  participants were limited in taking "doing business"

21  contributions, this would seriously discourage

22  candidates from entering the program all together.

23                On a final note, the City's Campaign

24  Finance Program has been improved after each

25  election cycle. NYPIRG will continue to urge for

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  improvements in the future.

3            These include lowering overall

4  contribution limits, further restrictions on the

5  source of contributions, and addressing the problem

6  of wealthy candidates who are able to self-finance

7  their own campaigns and dramatically outspending

8  opponents.

9            Thank you.

10            CHAIRPERSON FELDER: Thank you very

11  much. I just want to mention that Corinne Rivers --

12  is she here? Can she stand up? Where is she? Can she

13  stand up, please. I want to thank you. She wasn't

14  here earlier. She's one of some interns that work

15  with the Government Affairs Division.

16            Next speaker.

17            MR. ISRAEL: Good afternoon, Mr.

18  Chairman, members of the Governmental Operations

19  Committee. I am Doug Israel, Director of Public

20  Policy and Advocacy for Citizens Union, a century

21  old good government organization committed to

22  ensuring fair and competitive elections.

23            CU has actively supported the

24  enactment of legislation aimed at reducing the

25  reality and appearance of pay-to-play whereby large

68

```
1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    contributors to candidates either gain or suffer

3    from the perception of special access and influence

4    over the political process.

5                   We are pleased that the City has

6    moved one step closer to making this a reality.

7                   In addition to our support of pay to

8    play legislation, Citizens Union has consistently

9    advocated for changes to the City's Campaign Finance

10   Program to ensure its relevance and effectiveness by

11   adapting to changing times and making it more

12   appealing and easier for candidates to participate

13   and comply with the programs requirements.

14                  Introduction 586 strengthens the

15   City's model campaign finance program in all these

16   ways. While there will always be ways that the City

17   can improve the program, Citizens Union strongly

18   supports the introduced legislation, and commends

19   the Committee on Governmental Operations, the Mayor,

20   the Speaker and the Campaign Finance Board, and

21   their respective staffs for their collective

22   abilities and leadership in reaching a vitally

23   important agreement on how best to improve a program

24   that has been essential to supporting viable

25   candidates and ensuring clean campaigns and
```

69

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    providing more competitive elections in the City.

3                      Specifically I'd like to thank

4    Chairman Felder, Speaker Quinn, Deputy Chief of

5    Staff Maura Keaney, Legislative Director Rob Newman,

6    Deputy Counsel Jim Caras and Committee Counsel

7    DeNora Johnson for all of your hard and thoughtful

8    work on this issue.

9                      On the second side of my testimony

10   I've listed eight elements that Citizens Union

11   supports in this bill, and as Neal Rosenstein

12   mentioned, a lot of them are here on paper, I will

13   not go through a lot of them individually, but you

14   know that you have our full support of Intro. 586.

15   I'm just going to conclude with the final here. We

16   are pleased that the Council, in crafting

17   improvements to the administration of the program

18   and enforcement of the law consulted with the

19   Campaign Finance Board to ensure that their

20   authority and prerogative were respected and

21   maintained, and therefore we support the

22   administrative changes that have been proposed.

23                      While we offer our strong support for

24   the bill, there are several issues that may require

25   us to provide continued review and thought to ensure

70

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   the program's ongoing success.

3               The City needs to monitor closely the

4   impact of the new caps on pay-to-play contributions,

5   to ensure that it does not result in unintended

6   consequences of unwittingly denying worthy

7   candidates, particularly those for Borough and

8   Citywide offices, enough legitimate dollars from

9   civic-minded individuals who also do business with

10  the City.

11              Additionally, as the City moves to

12  limit further institutional contributions in the

13  form of LLCs, the City needs to ensure that an even

14  hand is being applied and review other institutional

15  contributions like those from unions. While there

16  may be compelling and supportable reasons for union

17  contributions to be handled differently from other

18  contributions, the City should engage in a public

19  discussion of the pros and cons of that issue. And,

20  finally, while we recognize this bill is not the

21  place to tackle this issue, the Campaign Finance

22  Program is challenged with finding a way to address

23  the disparity that exists for candidates

24  participating in the program who face a well-funded

25  or self-funded opponent. This has been an issue in

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  past Mayoral races and will most likely be so in the

3  future. The Campaign Finance Board has proposed

4  several smart measures in the past, and hearings

5  should be held on this topic to address the issue

6  moving forward.

7              Again, thank you for this

8  opportunity, and we would like to offer our support

9  for Intro. 586. Thank you.

10             MS. QUATTLEBAUM: Good morning. I am

11  Megan Quattlebaum, the Associate Director of Common

12  Cause/New York. We want to thank, first of all,

13  Chairman Felder, and the members of the Governmental

14  Operations Committee for giving us the opportunity

15  to present testimony here today.

16             In sum, we support Intro. 586 and we

17  urge its enactment by the Council. We want to echo

18  our colleagues' appreciation of the consideration

19  that Council and Mayoral staff gave to input

20  provided by Common Cause New York and other Civic

21  Groups for our public testimony on the issue of

22  doing business, and when asked for our opinions or

23  suggestions on the legislation.

24             In particular, I want to again echo

25  the thanks given to Maura Keaney, Rob Newman, DeNora

72

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Johnson and Jim Caras, Counsel, as well as Anthony

3   Crowell, Frank Barry and Patrick Wehle at the City

4   Administration.

5            And we want to again offer special

6   thanks to Chairman Felder of this Committee for his

7   leadership on this issue. I echo the sentiments that

8   the Council Member raised, that it is hard for

9   sitting law makers to pass reforms that affect their

10  own ability to run campaigns, that's a very

11  difficult thing to ask sitting law makers to do, and

12  we appreciate the courage and the leadership and the

13  forward thinking that it requires.

14           We want to also highlight some of

15  the, we think most positive aspects of this intro,

16  which we again generally support. We support the new

17  pay-to-play reforms, the broadened definition of

18  intermediary, the new 6-1 match for contributions of

19  $175 or less, the prohibition on contributions from

20  LLCs, et cetera.

21           I want to again echo the fact that we

22  believe that should this law ever be struck down as

23  it applies to candidates not participating in the

24  City's public financing program, we believe that it

25  should also not be applied to participants, and on a

73

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   second technical note, we want to emphasize that we

3   appreciate the fact that an effort is being made to

4   set a date by which the databases must be certified

5   if the legislation is to go into effect for the 2009

6   elections. We support that effort because we feel

7   that it is unfair to have rules change in mid-stream

8   or in the height of an election season.

9                   We don't disagree with any aspect of

10  Intro. 586, however, there are two issues that we

11  hope were kept on the table for future

12  consideration, one is continued lowering of

13  contribution limits across the board, and the second

14  is a ban which we have long supported on our

15  organization contributions. But in sum, we support

16  this legislation and hope those issues will be kept

17  on the table for the future.

18                  CHAIRPERSON FELDER: Thank you very

19  much. I'll just ask a general question. I know that

20  the good government groups and people who work for

21  you are in fact very sincere about what you do, but

22  there are no restrictions on good government groups,

23  in terms of your contributions for candidates; is

24  that true?

25                  MR. ROSENSTEIN: Probably all

74

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   registered lobbyists.

 3              MS. QUATTLEBAUM: Lobbyists.

 4              CHAIRPERSON FELDER: Right, that's a

 5   good point.

 6              MR. ISRAEL: And as such there are

 7   other limitations.

 8              CHAIRPERSON FELDER: I just wanted to

 9   make sure that you were included.

10              MR. ROSENSTEIN: No, well, for me it's

11   great for 20 years, NYPIRG, because we work on

12   government election issues, we have a great excuse

13   when candidates ask us for money, we say, oh, no, we

14   can't show favoritisms. There may not be a legal

15   one, but we create one.

16              CHAIRPERSON FELDER: Do you get any

17   money from the City?

18              MR. ROSENSTEIN: We do not.

19              CHAIRPERSON FELDER: What about you?

20              MR. ISRAEL: No.

21              CHAIRPERSON FELDER: What about you?

22              MS. QUATTLEBAUM: No.

23              CHAIRPERSON FELDER: Very good. Thank

24   you very, very much for being here.

25              And the last panel we have is Dan
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Jacoby. I'm going to try to read this. Can you help

3  me, Merle? This is not a common Jewish name. How do

4  you pronounce this? You live in Borough Park, right?

5              MS. McELDOWNEY: No.

6              CHAIRPERSON FELDER: And, finally,

7  Ciara Torres-Spelliscy, was that right? Okay, Ciara,

8  I'm sorry.

9              Okay, ready when you are. Who is

10 first? And if you have prepared testimony, copies of

11 it, if you can give it to the -- did you give it to

12 the Sergeant-At-Arms? Thank you very much. We're

13 ready.

14             MR. JACOBY: Hi. My name is Dan

15 Jacoby. I'm with Democracy for New York City. Intro.

16 586 tries to correct many flaws in the current

17 campaign finance system. These corrections look good

18 on paper, but they are based on a fundamentally

19 flawed concept that the system itself is a good one.

20             Campaign spending continues to rise

21 at an enormous rate, and in the few cases where the

22 largest fundraiser does not win, matching funds are

23 not the reason why. The system fails to limit

24 spending, and it fails to level the playing field.

25             I have attached a section-by-section

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  analysis of the bill, and have highlighted those

3  components that don't work. I will briefly mention

4  two major items.

5              1) Trying to limit contributions from

6  people doing business with the City has three

7  problems. First, there are several loopholes.

8  Second, City contractors will still find ways to

9  funnel money to the candidates of their choice. I've

10  already thought of several possibilities. And third,

11  this creates a new bureaucracy with more headaches

12  and compliance costs for candidates. As a result,

13  those who can raise more money will gain a further

14  advantage.

15              2) The changes to the matching fund

16  ratio, combined with lower caps, also look good on

17  paper. But candidates will still go after large

18  contributions, and those donors will still be the

19  most valued, both before and after the election. In

20  addition, the 55 percent matching fund ceiling

21  ensures that candidates will still need to raise

22  ever larger amounts of money in order to compete.

23              This bill was crafted by serious,

24  intelligent and thoughtful people who are,

25  unfortunately, too invested in the current paradigm

77

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  to be effective. This bill will not make a

3  significant difference, and in some ways will be a

4  step backward. Think McKane Feingold.

5              The real solution lies not in this

6  system, but in a clean money, clean election system

7  of full public funding. It is working now in Maine

8  and Arizona and starting up in Connecticut. It is

9  the system Governor Spitzer said should be the

10  ultimate goal of campaign finance reform. A clean

11  money bill will soon be introduced into the City

12  Council. I urge you to pass it. Thank you.

13              CHAIRPERSON FELDER: Excuse me. You

14  said you enclosed testimony from somebody who was

15  not here?

16              MR. JACOBY: Yes.

17              CHAIRPERSON FELDER: Do we have that?

18  Okay, thank you very much.

19              MS. McELDOWNEY: Hello. My name is

20  Merle McEldowney. Most voters believe that the

21  influence of money on politicians keeps us from

22  having a decent health insurance program, fairer

23  rent laws, an effective Landmarks Commission, and

24  development that cares about the needs of the people

25  who live in New York's neighborhoods, instead of the

78

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   needs of developers.

3            Twenty years ago, the City Council

4   attempted to solve this problem, with what was haled

5   as a model Campaign Finance Law. It's turned out to

6   be flawed, complicated and bureaucratic. It hasn't

7   lowered the influence of big contributors. It is

8   difficult to administer and time consuming. It's so

9   complicated that it regularly keeps people from

10  running for office.

11           The proposed fix to this law,

12  however, is merely a series of new rules, new

13  reporting requirements, and new complications. It

14  doesn't prevent lobbyists or contractors from

15  fundraising, it doesn't prevent bundling, and it

16  does not simplify reporting procedures, it's just

17  making them more complicated.

18           There's a better system. A full

19  public funding system known as "Clean Money, Clean

20  Elections." My thought is that you've probably heard

21  about it before, as Mr. Jacoby just mentioned, that

22  it exists in other places in this country.

23           There's arguments against a full

24  public funding system for elections. One is that

25  it's too expensive. But how much money are we going

79

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    to be spending on matching funds?

3              How much money is spent when you add

4    the cost of compliance, your new computer system and

5    the bureaucrats to enforce this? And bottom line,

6    how much money is spent in the end in giving big

7    donors and fund raisers special breaks in budget

8    line items?

9              The other purely political argument

10   against a full public funding system for elections

11   is that it can't be enacted. It's said that it can't

12   be enacted by people who are elected under the old

13   system. I believe that most City Council people know

14   that this would be a better system. I believe that

15   most City Council people, when they first ran for

16   public office, would have loved a system of public

17   financing. I believe that it could work in New York

18   City. And I believe that it's up to the City Council

19   to take some brave steps. Creating new rules to make

20   a complicated system even more complicated is not a

21   fix that we all know. It is a fundamental problem.

22   Candidates should not be raising money.

23             My real question is why is the full

24   public funding system not even debated by the City

25   Council? Why are we still putting cosmetic patches

80

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    on a system that you know does not work? I don't

3    understand it. Joe Bruno does not live in New York

4    City. It would seem to me that we could have a real

5    debate about real public financing in New York City.

6              Thank you.

7              MS. TORRES-SPELLISCY: Good morning.

8    My name is Ciara Torres-Spelliscy. I'm an attorney

9    at the Brennan Center for Justice at NYU School of

10   Law. I work in the democracy program on Campaign

11   Finance. I wanted to thank you for your leadership

12   in public financing. I will focus my remarks on the

13   pay-to-play restrictions, in Intro. 586. One, as

14   presently drafted, the bill provides low limits for

15   lobbyists and City contractors who give to

16   participating candidates, and this is a good first

17   step in getting special interests money out of the

18   City elections. But I encourage you to expand these

19   lower limits to all candidates, whether

20   participating or non-participating. And, two, the

21   Campaign Finance Board is barred from matching

22   contributions that come from lobbyists and state

23   contractors. This is a sound way to protect the

24   public fisc, as well as to reduce the influence of

25   special interests. The Supreme Court has yet to rule

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   on pay-to-play, but the court has been supportive of

3   public financing as a way to prevent corruption, and

4   the appearance of corruption, and the support is

5   also supportive of contribution limits, so long as

6   they are no so low that a challenger could not mount

7   a meaningful challenge to an incumbent.

8                    Lower courts have held that narrow

9   pay-to-play regulations are constitutional, and that

10  broader bands are either constitutional or

11  unconstitutional based on the facts of the case.

12  Here you are likely to be on the constitutional side

13  for two reasons: One, you're not instituting a ban,

14  which puts you in good stead, and even if you did

15  put in a total ban on, for instance, lobbyist

16  contributions during a legislative session, those

17  have been upheld as constitutional. And, two, being

18  part of a public financing system gives you more

19  leeway and latitude to design a system that's

20  functional. Thank you.

21                   CHAIRPERSON FELDER: Thank you very

22  much for being here.

23                   I just want to comment that in your

24  testimony on page three, the fourth paragraph

25  towards the end, you say "We encourage the Council

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   to consider those lower limits for lobbyists and

3   City contractors to all candidates not just

4   participating candidates to reduce the influence of

5   special interests in the City." I think that that

6   applies. I think that that applies now.

7                MS. TORRES-SPELLISCY: I would

8   double-check your drafting, because, you know, the

9   way I read it, it looked like it says participating,

10  and not --

11               CHAIRPERSON FELDER: Okay. DeNora

12  Johnson, the legal counsel.

13               MS. JOHNSON: I would just point out I

14  guess, and I can get the exact section for you off

15  the record, there are references that the sections

16  that apply to the non-participants, which are

17  Section 3719 of the Act, reference back to the

18  "doing business" restrictions to apply to

19  non-participants as well.

20               MS. TORRES-SPELLISCY: Very good.

21               CHAIRPERSON FELDER: I thank everybody

22  for being here today. And with that, the hearing is

23  closed.

24               (Hearing concluded at 11:55 a.m.)

25

83

```
 1
 2                CERTIFICATION
 3
 4
 5    STATE OF NEW YORK    )
 6    COUNTY OF NEW YORK   )
 7
 8
 9                I, CINDY MILLELOT, a Certified
10    Shorthand Reporter, do hereby certify that the
11    foregoing is a true and accurate transcript of the
12    within proceeding.
13                I further certify that I am not
14    related to any of the parties to this action by
15    blood or marriage, and that I am in no way
16    interested in the outcome of this matter.
17                IN WITNESS WHEREOF, I have hereunto
18    set my hand this 12th day of June 2007.
19
20
21
22
23                ----------------------
24                CINDY MILLELOT, CSR.
25
```

84

```
 1
 2              C E R T I F I C A T I O N
 3
 4
 5
 6
 7
 8
 9          I, CINDY MILLELOT, a Certified Shorthand
10   Reporter and a Notary Public in and for the State of
11   New York, do hereby certify the aforesaid to be a
12   true and accurate copy of the transcription of the
13   audio tapes of this hearing.
14
15
16
17
18
19
20
21
22
23
24              ------------------------
                CINDY MILLELOT, CSR.
25
```

Merle McEldowney
2166 Broadway
New York, NY 10024
212-933-0290

Oral testimony on
Intro 586-2007
June 12, 2007

Most voters think that the influence of money on politicians keeps us from having a decent health insurance program, fairer rent laws, an effective landmarks commission, and development that cares less about developers than with the needs of the people who live in New York's neighborhoods.

Twenty years ago the City Council attempted to solve this problem with what appeared to be a model campaign finance law. It has turned out to be flawed, complicated and bureaucratic. It has not lowered the influence of big contributors. It is difficult to administer and time consuming. It is so complicated that it keeps people from running for office.

The proposed "fix" to this law, however, is merely a series of new rules, new reporting requirements, and new complications. It does not prevent lobbyists and contractors from fundraising. It does not prevent any kind of bundling. It does not simplify reporting procedures; it complicates them.

There is a better system, a full public funding system known as "Clean Money, Clean Elections." My guess is, most of the people in this room know that there are places in this country where full public funding works, such as Maine and Arizona.

The two arguments against having "Clean Money, Clean Elections" in New York City are as flawed as the current system.

One that it is too expensive – but how much money is spent on matching funds now? How much money is spent when you add the costs for compliance and bureaucrats to enforce the system? How much money is spent giving big donors and fundraisers special breaks and budget line items?

The other purely political argument is that it will never be enacted by people who were elected under the old system. I believe that most of you would like this to happen, that most of you do not want to spend time raising money, but would rather be listening to voters and doing the work of government.

"Clean Money, Clean Elections" is working in other places. I believe it will work in New York City. And I know, as every person in this room should know, that however well meaning it may be, no matching fund system can work. Creating new rules to make the current system more complicated will not fix what we all know is the fundamental problem – candidates should not be raising money.

My real question is, why is this not even debated by the Council? Why are you putting cosmetic patches on a system that you know does not work? Why is this Council not even discussing a better way?

Dan Jacoby
47-48 43 St., Woodside, NY 11377
917-667-2756
www.danjacoby.com

Oral testimony on Intro 586-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
June 12, 2007

Intro 586 tries to correct many flaws in the current campaign finance system. These "corrections" look good on paper, but they are based on a fundamentally flawed concept – that the system itself is a good one.

Campaign spending continues to rise at an enormous rate, and in the few cases where the largest fundraiser does not win, matching funds are not the reason why. The system fails to limit spending, and it fails to level the playing field.

I have attached a section-by-section analysis of the bill, and have highlighted those components that don't work. I will briefly mention two major items.

1) Trying to limit contributions from people doing business with the city has three problems. First, there are several loopholes. Second, city contractors will still find ways to funnel money to the candidates of their choice; I've already thought of several possibilities. Third, this creates a new bureaucracy, with more headaches and compliance costs for candidates. As a result, those who can raise more money will gain a further advantage.

2) The changes to the matching fund ratio, combined with lower caps, also look good on paper. But candidates will still go after large contributions, and those donors will still be the most valued, both before and after the election. In addition, the 55% matching fund ceiling ensures that candidates will still need to raise ever-larger amounts of money in order to compete.

This bill was crafted by serious, intelligent, thoughtful people who are, unfortunately, invested in the current paradigm. This bill will not make a significant difference, and will in some ways be a step backward. Think McCain-Feingold.

The real solution lies not in this system, but in a "Clean Money, Clean Elections" system of full public funding. It is working now in Maine and Arizona, and is starting up in Connecticut. It is the system Governor Spitzer said should be the "ultimate goal" of campaign finance reform. A "Clean Money" bill will soon be introduced into the City Council; I urge you to pass it.

Marjorie Gersten
50 Willow Street
Brooklyn, NY 11201
718-624-8384

᠊OR THE RECORD

Written testimony on
Intro 586-2007
June 12, 2007

The campaign finance bill currently being considered is clearly the result of a lot of thoughtful, hard work on the part of many different people. Unfortunately, however, all the work is based on the assumption that the current matching fund system is, in the words of several current and former elected officials, the "best" in the country. As a result, this bill fails to take into account the real problems with this, or any, matching fund campaign finance system.

The current system fails to lower, or even limit, campaign spending. The cost of campaigning has more than doubled in twelve years, after adjusting for inflation. Several people have already raised over one million dollars for the next election that is over two years away. They will almost certainly choose not to participate in the system, and unless the spending limits are significantly raised, fewer and fewer candidates will decline to participate with each election cycle.

The current system also fails to level the playing field. In the vast majority of elections, the candidate who raises the most money wins. When this is not the case, matching funds do not make the difference; instead, non-monetary factors come into play. The reason, in hindsight, is clear. Since a candidate must raise money in order to receive matching funds, those who can raise the most money generally qualify for the most public funding.

Matching fund systems have been in place in New York City for nearly twenty years, and nationally for over thirty years. In that time, it has become obvious that we need to replace it with something that can work. Fortunately, such a replacement is already available; it is the "Clean Money, Clean Elections" (CMCE) system of full public funding. CMCE is already working in Maine and Arizona as well as parts of several other states, and it is beginning to work in Connecticut. In Albany, Governor Spitzer is set to submit a CMCE bill to the state legislature.

Under CMCE, there are no major campaign contributions, only very small contributions from constituents. There are no conflicts of interest, and no special access for lobbyists or others doing business with the city. And it works. The "Maine Rx" program that will soon cover everyone in Maine for prescription drugs is an example of the kind of progress that can only be made when real campaign finance reform is in place.

New York City has been in the forefront of aggressive campaign finance laws, and we should return to that position. We should consider, and adopt a CMCE system.

Thank you.

# Campaign Finance Reform in New York City, 2007 Edition
## *An Analysis of Intro 586-2007*

### Introduction

On June 4, 2007, Speaker Christine Quinn submitted Intro 586, "in relation to campaign finance," to the New York City Council. This bill makes many changes to the campaign finance laws of New York City in an attempt to fix a system deemed by its supporters as "the best" campaign finance system in the country. Rather than fix, or even significantly improve, the current system, however, this bill not only creates as many problems as it solves, but also highlights the problems with all matching fund systems, problems that may not be solvable within such a system.

The changes made to the system fall into seven main categories. In the order in which the changes are addressed in the bill, they are:

1. Limiting contributions, and matching fund availability for contributions, from people doing a significant amount of business with New York City;

2. Making clarifications to the functions of the Campaign Finance Board (CFB), first in the City Charter, and later in the City Administrative Code;

3. Some minor tightening of existing limitations;

4. Changing the formula for determining matching funds and the conditions under which full matching funds are distributed;

5. Updating the spending limits to account for inflation;

6. Adjustments to the process for resolving disputes between candidates and the CFB; and

7. Apply new limitations to Transition and Inauguration (TIA) committees.

## Part 1.   Limiting contributions from people doing business with the City

This bill requires the CFB to create and maintain a new database of those people who own, run, or manage companies that do significant amounts of business with the city, in order to limit those people's ability to contribute to candidates' campaigns. Additionally, such campaign contributions will not be eligible for matching funds.

The idea is campaign contributions from people doing business with the city give the appearance, if not the actual fact, of bribes. Last year, the City Council denied matching funds for contributions for lobbyists; this is the logical next step. There are, however, two problems with this attempt to limit the monetary influence of lobbyists and people who get city contracts.

The first problem is that lobbyists and contractors can still gather campaign contributions from others and "bundle" them. Those bundled contributions would not be as limited as direct contributions, and they would still qualify for matching funds. The City Council refrained from attempting to limit such "bundling," although this bill does try to strengthen the definition of an "intermediary" (the person doing the bundling). The reason is that any attempt to limit bundling, or even to require that all intermediaries be publicly identified, is doomed; there is no practical, effective way to enforce such an attempt. As a result, lobbyists and contractors can continue to bundle contributions from friends (and even co-workers who are not required to be in the new database), and gain the same influence they do now.

The second problem is that this attempt to tighten the rules creates new bureaucratic nightmares. The CFB must maintain a brand new, ever-shifting database, and candidates must search that database every time they receive a contribution. For candidates, this means higher "compliance costs" – money spent to ensure that the campaign follows the rules. Compliance costs are exempt from spending limits, so candidates who can raise more money will gain a further advantage. *This result is the exact opposite of the intent of the proposed legislation.*

## Part 2.   Making clarifications to the functions of the CFB

The purpose of this part of the legislation, sections 10-12 and 21-22, is to ensure that the CFB can carry out its functions. This is another step in a long-running attempt to improve the workings of the oversight agency, will not hurt, and may make things better. *This part of the legislation has no direct effect on campaigns.*

### Part 3.   Some minor tightening of existing limitations

This part of the bill covers sections 13-17, and does several things. It clarifies the definition of an intermediary; lists types of campaign expenses that are, and are not, allowed; expands the prohibition on contributions from corporations to include other types of businesses; and deals with expenditures on issues not directly related to the election of the candidate.

These sections will have only a minor effect on campaigns. The current prohibition on accepting contributions from corporations, for example, has been touted as a major item, but it makes little difference in the "real world." Adding other types of businesses to this list will be equally ineffective.

***These sections will have little effect on campaigns.***

### Part 4.   Changing the formula for determining matching funds and the conditions under which full matching funds are distributed

This part of the bill covers sections 18 and 19. Section 18 raises the ratio at which matching funds are distributed from 4-1 to 6-1, but lowers the maximum amount of a contribution that is eligible for matching funds from $250 to $175.  Section 19 alters the conditions under which matching funds can be temporarily withheld.

By raising the matching fund ratio but lowering the ceiling for matching fund eligibility, the end result will be only a small change in matching funds available. Furthermore, since few contributors give at least $175 but less than $250, there is no reason to expect a measurable effect as a result of this change.

Section 19 is very poorly written. It repeals a simple, straightforward rule and replaces it with a far more complex rule, and fails to rename the paragraphs after the repealed paragraph.

***This part of the bill will not lower the advantage of large contributions and access to large contributors, and will create new headaches for some candidates.***

### Part 5.  Updating the spending limits to account for inflation

Despite the apparently enormous increase in spending limits enumerated in Section 20, the actual increase from 2005 limits will only be 7.5%, in line with inflation. The difference is that the CFB has been making those increases all along, even though they may not have been explicitly authorized to do so. This section raises spending limits in line with inflation, and explicitly grants the CFB the power to continue that process after each four-year cycle.

*This part of the bill does exactly what it intends to do, but will have little effect on campaigns.*

### Part 6.  Adjustments to the process for resolving disputes between candidates and the CFB

Sections 22-29 attempt to diminish the adversarial atmosphere that exists between the CFB and candidates who inadvertently run afoul of campaign finance laws and regulations.

*This part of the bill may or may not accomplish its objective, but will have little or no effect on campaigns.*

### Part 7.  Apply new limitations to Transition and Inauguration (TIA) committees

This part of the bill applies contribution limitations for people doing business with the city to committees created by election winners to cover their transition and inauguration costs. *This part of the bill will have no effect on campaigns*, and since it continues to allow newly elected officials to receive contributions, *this part of the bill also continues the corruptive influence of money on elected officials.*

### Section 1:

This section modifies and adds definitions for the purpose of ensuring that everyone knows what is meant by certain terms. Most of this section focuses on the meaning of "doing business" with the city. *It should be noted that there are several loopholes for those doing business with the city. They are:*

- Any contracts procured through a sealed bidding process;
- A monetary floor – anyone providing goods and/or services totaling less than one hundred thousand dollars, or contracting for capital projects totaling less than one million dollars, is exempt;
- Anyone with a long-term lease that has been in operation for over a year;
- Anyone who pays New York City more than one hundred thousand dollars a year for a franchise or concession.

These loopholes are large enough to drive a matchable contribution through.

### Section 2:

This section provides much smaller limitations on campaign contributions from people officially listed as "doing business with" the city, denying matching funds for such contributions, and setting forth rules and procedures for enforcement.

*Another loophole is added in this section.* Only officers and managers of companies doing business with the city are covered; other employees are exempt.

### Section 3:

This section delays the deadline by which time a candidate must decide whether to apply for matching funds. *This gives candidates longer to determine whether they can raise enough money to opt out of the system.*

### Section 4:

This section requires that anyone dealing with campaign finance for a campaign attend a training program. *This acknowledges that the system is extremely complicated.*

### Section 5:

This section requires the CFB to make matching funds available more readily in the month leading up to election day.

### Section 6:

This section is housekeeping; it gives the CFB power to enforce the new rules.

### Section 7:

This section gives candidates some leeway if they spend matching funds for purposes other than those allowed by law.

### Section 8:

This is another housekeeping section, similar to section 6.

### Section 9:

This is another housekeeping section, similar to section 6.

### Section 10:

This section alters the City Charter to require CFB board members to undergo a training session.

### Section 11:

This section alters the City Charter to call on the mayor and the CFB to develop a training curriculum for CFB board members and staff.

### Section 12:

This section alters the City Charter to separate the investigative and adjudicatory powers of CFB.

### Section 13:

This section adds to the definition of "intermediary".

### Section 14:

This section defines "expenditure" and "campaign expenditure" and lists a number of specific campaign expenditures that shall be considered to be legitimate.

*There is a numbering error here.* This section claims to add a new "subdivision 19" to section 3-702 of the administrative code of New York City, but Section 4 of the bill also adds a new subdivision 19 – this section should add a new "subdivision 21."

### Section 15:

This section adds other business entities to the list of entities (currently numbering one – corporations) not allowed to contribute to campaigns.

### Section 16:

This section makes any campaign spending on a particular issue subject to campaign spending limitations.

### Section 17:

This section adds to the list of items for which matching funds may not be used.

### Section 18:

This section changes the ratio for receiving matching funds from 4:1 to 6:1, and lowers the ceiling for matchable contributions from $250 to $175.

The theory is that this will raise the value of smaller contributions. It looks good on paper, but a deeper understanding of fundraising reveals that large contributions will still be just as sought after, and just as valuable to campaigns. *Smaller contributions will result in larger matching funds, but since victorious candidates tend to have larger average donations, this probably won't make any real difference.*

### Section 19:

This section changes the thresholds for receiving the full matching funds for which a candidate qualifies. It removes the automatic threshold for candidates opposed by other qualifying candidates. It also creates a list of conditions, any one of which would serve as the threshold.

*This section makes it more difficult for a candidate to receive the full matching funds for which the candidate nominally qualifies.*

### Section 20:

This section raises the campaign spending limits for participating candidates by 7.5% over the 2005 limits, roughly in line with inflation. It also loosens the regulations requiring candidates to prove that certain expenditures are exempt from spending limits.

*Because several presumptive candidates for citywide office have already raised over one million dollars with the election still over two years away, the limitations will not be high enough to keep them in the program.*

### Section 21:

This section requires CFB board members to undergo a training session, in line with Section 10's alteration of the City Charter.

### Section 22:

This section calls on the mayor and the CFB to develop a training curriculum for CFB board members and staff, in line with Section 11's alteration of the City Charter.

### Section 23:

This section tightens the rules for CFB audits, *making it more difficult to obtain repayments from candidates to fail to follow the rules.*

### Section 24:

This section simplifies the rule for repayment of excess matching funds distributed to participating candidates.

**Section 25:**

This section clarifies the procedure for repayment of excess public matching funds distributed to participating candidates.

**Section 26:**

This section *lengthens the procedure for determining whether a candidate or candidate's agent has violated campaign finance rules.*

**Section 27:**

*This section gives candidates who violate campaign finance rules an opportunity to avoid paying penalties.*

**Section 28:**

This is another housekeeping section, similar to section 6.

**Section 29:**

This section clarifies procedures for informing a candidate that campaign finance rules may have been violated.

**Section 30:**

This section bans contributions from certain business entities to Transition and Inauguration committees.

**Section 31:**

This section requires city agencies to assist the CFB in creating the database of people doing business with the city.

**Section 32:**

This section determines when various sections of this bill take effect.

## Conclusion

This bill fails to limit the influence of money on politics, and also fails to level the playing field between candidates who can raise large sums of money from many contributors and those who can't. In fact, in some areas, this bill actually has the opposite effect; it tilts the playing field, giving extra advantages to candidates with access to lots of money.

Most of this legislation has little or no effect on campaigns at all, and does very little to improve a system that doesn't work. Almost every election for offices covered by the city's matching fund system is won by the candidate who raises the most money, and those few exceptions to that rule have other, non-monetary reasons for their victory. In other words, matching funds never make a real difference.

In addition, campaigns have become increasingly expensive over time. According to the CFB report on the 2005 election, City Council races more than doubled in cost, in real, inflation-adjusted dollars, between 1993 and 2005. In 2009, it's a safe bet that nearly all the major candidates for citywide offices will opt out of the system, as they will be able to raise and spend more than participating candidates will be limited to spending.

The only true solution to the goals of leveling the playing field, limiting campaign spending, and simplifying the system is a full public funding system, such as the one known generally as "Clean Money, Clean Elections" (CMCE). This system, which is already a tremendous success in Maine and Arizona and now being implemented in Connecticut, also has the support of Governor Spitzer and Lieutenant Governor Paterson.

A CMCE bill will soon be introduced in the City Council. As it will not take effect until after the 2009 elections, it will not impact Intro 586. Whether the City Council passes Intro 586 or not, it does not fix the system because the system is irreparably broken. Only a full public funding system, such as CMCE, can truly fix the system.

# BRENNAN
# CENTER
# FOR JUSTICE

Brennan Center for Justice
at New York University School of Law

161 Avenue of the Americas
12th Floor
New York, New York 10013
212.998.6730  Fax 212.995.4550
www.brennancenter.org

**Testimony of Ciara Torres-Spelliscy**
*Counsel, Democracy Program*
*Brennan Center for Justice at NYU School of Law*

**On Campaign Finance Reform**

*Presented to the*

**Governmental Operations Committee**
**of the New York City Council**

**June 12, 2007**

On behalf of the Brennan Center for Justice at NYU School of Law, I would like to thank you for inviting me to testify about Int. No. 586 and for holding this hearing today.

The Brennan Center is a nonpartisan think tank and legal advocacy organization that focuses on democracy and justice, including issues pertaining to campaign finance and the preservation of fair and impartial courts.  Our remarks here focus briefly on some of the constitutional issues related to public financing.  For a more detailed analysis of these constitutional issues, we refer you to our 200-page treatise, *Writing Reform: A Guide to Drafting State & Local Campaign Finance Laws*, which you may download chapter-by-chapter at http://www.brennancenter.org/subpage.asp?key=38&tier3_key=10340. For specific questions, please feel free to contact Ciara Torres-Spelliscy at 212-998-6025.

The Center's Democracy Program has been working in the area of campaign finance reform on the federal, state, and local levels since its inception in 1995.  The Center was part of the legal defense team in *McConnell v. FEC*, 540 U.S. 93 (2003), in which the U.S. Supreme Court upheld virtually all of the key provisions of the federal Bipartisan Campaign Reform Act of 2002.  Center attorneys have also successfully defended public funding systems throughout the country, including as lead counsel for intervenors in *Association of American Physicians & Surgeons v. Brewer*, 2007 WL 1366077 (9th Cir. 2007) (affirming dismissal of complaint against Arizona's public funding program); *Daggett v. Commission on Governmental Ethics & Election Practices*, 205 F.3d 445 (1st Cir. 2000) (upholding Maine's full public financing system); and *Jackson v. Leake*, 2006 WL 4091233 (E.D.N.C. 2006) (denying plaintiffs' motion for preliminary injunction against North Carolina's public financing system for appellate judicial elections), No. 5:06-CV-324-BR. (E.D.N.C. Mar. 30, 2007) (granting motion to dismiss the complaint), *appeal filed* (4th Cir. April 30, 2007).  Presently, the Brennan Center is assisting the State of Connecticut in defending its public financing system enacted in 2005.  *Green Party of Connecticut v. Garfield*, 3:06 CV 01030 (D. Conn. filed July 6, 2006).  In addition to litigation assistance, the Center provides legal counseling, legislative drafting assistance, and

policy analysis to citizens and elected officials who are interested in promoting campaign finance bills or initiatives.

The Brennan Center would like to commend the New York City Council for being a leader in the realm of campaign finance reform by providing the citizens of New York with a dynamic public matching funds system for candidates who run for office in the City which encourages them to seek support from smaller donors.

We applaud your effort to prevent the undue influence of lobbyists[1] and city contractors on political decision-making. Such provisions are commonly known as "pay-to-play" regulations, because they seek to prevent deals whereby contributors "pay" officials for the opportunity to "play" with the government. Like other restrictions on campaign contributions, these regulations have been subject to First Amendment scrutiny.

The U.S. Supreme Court has not addressed the constitutionality of pay-to-play contribution restrictions, although it has upheld low contribution limits, even for ordinary members of the general public, who do not pose the heightened threat of corruption that lobbyists and city contractors do. *Shrink Missouri*, 528 U.S. 377 (upholding $1,000 contribution limit for statewide office).[2] Moreover, no other courts whose rulings are binding on New York City have issued opinions on the constitutionality of pay-to-play contribution limits. Consequently, any court considering the City's provisions will likely look to other jurisdictions for guidance.

Courts throughout the nation have recognized that political contributions by lobbyists, government contractors, or highly regulated industries pose severe risks of corruption and have upheld pay-to-play regulations. *See, e.g., Blount v. SEC*, 61 F.3d 938, 944-48 (D.C. Cir. 1995); *Institute of Gov'tal Advocates v. Fair Political Practices Comm'n*, 164 F. Supp. 2d 1183, 1189 (E.D. Cal. 2001) (upholding ban on contributions by lobbyist to offices for which lobbyist is registered to lobby); *Casino Ass'n of Louisiana v. State*, 820 So. 2d 494 (La. 2002) (upholding ban on contributions from riverboat and land-based casinos), *cert. denied*, 529 U.S. 1109 (2003); *Gwinn v. State Ethics Comm'n*, 426 S.E.2d 890 (Ga. 1993) (upholding ban on contributions by insurance companies to candidates for Commissioner of Insurance); *Soto v.*

---

[1] The Supreme Court recognized over fifty years ago that lobbyists can be subject to special regulations because of their influence on the legislative process. *U.S. v. Harriss*, 347 U.S. 612 (1954) (upholding disclosure requirements for federal lobbyists). The Court described modem legislative process in the following way:

> Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. *Otherwise the voices of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal.*

*U.S. v. Harriss*, 347 U.S. 612, 625 (1954) (emphasis added). The Court concluded that Congress could require disclosures from federal lobbyists in part because Congress had the "power of self-protection." *Id.*

[2] However, in 2006 the Supreme Court made it clear that there could be contribution limits that were too low if they prevented challengers from mounting effective campaigns against incumbent officeholders. *Randall v. Sorrell*, 126 S. Ct. 2479, 2482-83 (2006).

*State*, 565 A.2d 1088 (N.J. Super. Ct. App. Div. 1989) (upholding ban on political contributions from casino employees); *Schiller Park Colonial Inn, Inc. v. Berz*, 349 N.E.2d 61 (Ill. 1976) (upholding ban on contributions from members of liquor industry). But these courts sustained pay-to-play restrictions only after examining the factual basis for them and determining that they were carefully designed to further an important government interest. *See, e.g., Blount*, 61 F.3d at 943; *Institute of Gov'tal Advocates*, 164 F. Supp. at 1189.[3]

Whether a court will uphold a particular "pay to play" restriction as constitutional depends upon the reach of the restriction and the grounds for imposing it. While narrow pay-to-play regulations like those proposed by New York City are generally upheld, *see, e.g., Blount*, 61 F.3d at 944-48, court decisions on broader pay-to-play regulations (including bans) have been mixed, depending on the courts' judgments about whether the broader restrictions were necessary to address the potential for corruption. *Compare Fair Political Practices Comm'n v. Superior Ct.*, 25 Cal. 3d 33, 45 (1979) (noting the importance of ridding the political system of corruption but nonetheless striking down as overbroad a state law that banned all contributions from lobbyists), *with Casino Ass'n of Louisiana*, 820 So. 2d 494 (upholding a broad ban on contributions from riverboat and land-based casinos).

A court adjudicating a challenge to New York City's proposed pay-to-play restrictions, which restrict contributions from a wide range of donors to candidates for many offices, would consider whether the reach of those provisions is necessary to address the reality and appearance of corruption in the City. It will be particularly important to have legislative findings supporting such restrictions, which could include references to any recent experience with campaign finance and corruption scandals.

As currently drafted, Int. No. 586 would limit the amount of contributions that a lobbyist or a city contractor could give to participating candidates to roughly 10% of the contribution limit which would otherwise apply. Int. No. 586 §2 (1-a). These lower limits allow lobbyists and contractors to indicate their financial support for candidates of their choice, thereby preserving their associational rights under the First Amendment. We encourage the Council to consider expanding these lower limits for lobbyists and city contractors to all candidates (not just participating candidates) to reduce the influence of special interests in the City.

Int. No. 586 also bars the City Campaign Finance Board from matching funds that come from a lobbyist or a city contractor. Int. No. 586 §1(3)(g). This provision protects the public fisc by providing matching funds only to contributions from individuals free of conflicts of interest. Both aspects (lower contribution limits and the lack of public matching funds for contributions from lobbyists and city contractors) appear to be within the permissible restrictions that the City may place on candidates participating in the City's public financing system.

---

[3] Courts considering pay-to-play restrictions have applied varying levels of constitutional scrutiny in analyzing the statutes. Some have held that the government must show that the restriction furthers a "compelling" interest, *see, e.g., Gwinn*, 426 S.E.2d at 892, while others have held that it must show an "important" or "substantial" interest, *see, e.g., Institute of Gov'tal Advocates*, 164 F. Supp. at 1194; *Casino Ass'n of Louisiana*, 820 So. 2d 504. Similarly, some have held that the statute must be "narrowly tailored" to further the government interest, *see, e.g. Institute of Gov'tal Advocates*, 164 F. Supp. at 1194; *Gwinn*, 426 S.E.2d at 892, while others have held that the statute must be "closely drawn," or something similar, to further the interest, *see, e.g. Casino Ass'n of Louisiana*, 820 So. 2d at 504.



**Citizens Union Testimony**

*Introduction 586:*

*A local law to amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance.*

Delivered by Doug Israel, Director of Public Policy and Advocacy

to the Committee on Governmental Operations

June 12, 2007

---

Good Afternoon Chairman Felder and members of the Governmental Operations Committee. I am Doug Israel, Director of Public Policy and Advocacy for Citizens Union, a century old good-government organization committed to ensuring fair and competitive elections. Citizens Union has long been a supporter of the city's campaign finance program since its inception in 1988. Even more so, Citizens Union has supported the notion that ensuring a level playing field for candidates competing for office and limiting the role that money plays in elections and politics are two of the cornerstones of a healthy and participatory democracy. We have actively supported the enactment of legislation aimed at reducing the reality and appearance of "pay-to-play" whereby large contributors to candidates either gain or suffer from the perception of special access and influence over the political process. We are pleased that the city has moved one step closer to making this a reality.

In addition to our support of "pay-to-play" legislation, Citizens Union has consistently advocated for changes to the city's campaign finance program to ensure its relevance and effectiveness by adapting to changing times and making it more appealing and easier for candidates to participate and comply with the program's requirements.

Introduction 586 strengthens the city' model campaign finance program in all of these ways. While there will always be ways that the city can improve the program, Citizens Union strongly supports the introduced legislation and commends the Committee on Governmental Operations, the Mayor, the Speaker and the Campaign Finance Board, and their respective staffs for their collective abilities and leadership in reaching a vitally important agreement on how best to improve a program that has been essential to supporting viable candidates, ensuring clean campaigns, and providing more competitive elections in our city. We specifically want to thank you, Chairman Felder, Speaker Quinn, Deputy Chief of Staff Maura Keaney, Legislative Director Rob Newman, Deputy Counsel Jim Karas, and Committee Counsel DeNora Johnson for all of our innovative thinking and hard work on behalf of New Yorkers and in support of the public interest.

Citizens Union of the City of New York
299 Broadway, Suite 700  New York, NY  10007-1976
phone 212-227-0342 • fax 212-227-0345 • citizens@citizensunion.org • www.citizensunion.org
Richard J. Davis, Chair • Dick Dadey, Executive Director

Specifically, Citizens Union supports the following modifications to the city's model campaign finance program:

1) restricting the level of contributions from those "doing business with the city," making those contributions non-matchable under the campaign finance program and creating appropriate databases for the city to track these entities and individuals;

2) broadening the definition of a fundraising intermediary, or "bundler," to include anyone who solicits a contribution for a campaign. Under the current system, only those outside a campaign who receive and deliver contributions on behalf of the campaign are considered intermediaries. This reform requires that those who *solicit* contributions are also listed as bundlers;

3) giving small contributors a greater say in the process of electing our local representatives by creating a six-to-one match for contributions of $175 or less which will increase the importance and value of small contributions;

4) expanding the existing ban on corporate contributions to include limited liability companies (LLCs), limited liability partnerships (LLPs) and other forms of non-incorporated businesses;

5) closing the loophole that allowed contributors to give above the limit contributions to transition and inaugural committees;

6) clarifying the definition of permissible and impermissible campaign expenses;

7) streamlining the audit process to provide candidates with more timely audits;

8) making it more difficult for incumbents to receive matching funds in noncompetitive elections.

We are pleased that the Council in crafting improvements to the administration of the program and enforcement of the law consulted with the Campaign Finance Board to ensure that their authority and prerogative were respected and maintained, and therefore support the administrative changes that have been proposed.

While we offer our strong support today for the bill, there are also several issues that may require us to provide continued review and thought to ensure the program's ongoing success.

The city needs to monitor closely the impact of the new caps on pay-to-play contributions to ensure that it does not result in unintended consequences of unwittingly denying worthy candidates, particularly those for borough and citywide offices, enough legitimate dollars from civic minded individuals who also do business with the city.

Additionally, as the city moves to limit further institutional contributions in the form of LLCs, the city needs to ensure that an even hand is being applied and review other institutional contributions like those from unions. While there may be compelling and supportable reasons for union contributions to be handled differently from other contributions, the city should engage in a public discussion on the pros and cons of that issue.

Finally, while we recognize that this bill is not the place to tackle this issue, the campaign finance program is challenged with finding a way to address the disparity that exists for candidates participating in the program who face a well-funded or self-funded opponent. This has been an issue in past mayoral races and will most likely be in the future as well. The campaign finance board has proposed some smart measures in the past and hearings should be held on this topic to address this issue moving forward.

Thank you for the opportunity to provide testimony today and for all the work that has been put in to date to craft this legislation. It is encouraging to see the city government, including the Council, approach this issue in such an inclusive and thoughtful manner.



*New York*
# COMMON CAUSE
*Holding Power Accountable*

Testimony of
**Megan Quattlebaum**
**Associate Director of Common Cause/NY**
before the
**New York City Council Governmental Operations Committee**
Hearing on
**Intro 586**
**To amend the New York city charter and the administrative code of the city of New York, in**
**relation to campaign finance**
**June 12, 2007**

Good morning Chairman Felder and members of the Governmental Operations Committee and thank you for inviting us to present testimony here today.

Common Cause/NY supports Intro 586, and we urge its enactment by the Council. I want to note at the outset that Common Cause/NY greatly appreciates the consideration given by the City and the Council to the input of civic groups, including our own. We feel that the suggestions we have offered in public hearings on the issue of "doing business" and when asked for comment by Council and Mayoral staff were thoughtfully and respectfully considered, and we appreciate the hard work that went into crafting this difficult and important legislation.

In particular, we would like to thank Council staff Maura Keaney, Rob Newman, DeNora Johnson and Jim Caras, and Anthony Crowell, Frank Barry and Patrick Wehle with the City Administration, all of whom spent very long hours crafting this reform. We would also like to express our special appreciation to Government Operations Committee Chair Simcha Felder, who today follows in the footsteps of his predecessors and continues a 19-year tradition of strengthening the campaign finance program through his leadership on this committee.

We believe that the legislation will strengthen New York City's landmark campaign finance program by, among other things:

1) Putting a cap of $250 to $400 on contributions to any city candidate by a broad range of individuals who are determined to be "doing business" with and seeking favors from the City of New York;

2) Making those "doing business" contributions non-matchable under the public financing program;

3) Broadening the definition of "intermediaries" to include not only those delivering contributions, but also those soliciting them;

4) Creating a six-to-one public funds match for contributions of $175 or less (as opposed to the current four-to-one match for contributions up to $250). While this does not substantially increase the amount of public funds expended (the maximum will rise from $1,000 per contributor to $1,050 per

contributor) we believe that it will have the effect of further incentivize the soliciting of small dollar contributions by candidates;

5) Prohibiting contributions from LLC's and LLP's;

6) Limiting contributions for transition and inaugural expenses; and

7) making it clearer what are permissible and impermissible expenses by enacting what we believe is a very strong and clear prohibition on the conversion of campaign funds to personal uses.

In all of these ways, the legislation before you today strengthens our city's landmark campaign finance program and protects it for future generations of citizens and public servants. In passing these reforms, this Council and Mayor will prove themselves to be forward-thinking guardians and supporters of this important city program.

On a technical note, we would like to say that we strongly agree with the point made in the committee report that if the portion of this legislation that pertains to "doing business" contributions should at any point be struck down by the courts as applied to candidates not participating in the city's public financing program, it should also not be applied to participants. As we have emphasized at numerous previous hearings on the topic, we strongly feel that if these limitations only apply to participants in the public financing program, it will provide a strong disincentive to other candidates from entering the program.

In addition, we do want to note that the strong new rules and prohibitions laid out in the "doing business" portion of the bill represent the beginning but not the end of reform. Difficulties remain in implementing these provisions. The legislation calls for "certifying" by November 2008 that "complete and accurate" data bases of individuals with applications or bids for contracts (above $100,000); land use matters; economic development incentives; concessions and franchises; and leases. This will be challenging, as the recent experience with a much smaller lobbyists' data base shows. We agree with the November deadline. Any certification date that went into Mayoral 2008-2009 election cycle would be unfair. If such deadline proves impossible to make, than we support certifying data bases after November 2009, as the legislation mandates.

Before I conclude, I also think it is important to highlight some reforms not included in this bill, but which Common Cause/NY hopes will remain on the table for future consideration:

1) We are disappointed that the current bill does not extend the ban on organizational contributions to unions, and we hope to see this matter taken up at a future date;

2) We still believe that it is sensible to consider lowering contribution limits for city races across the board. An individual may still give more ($4,950) to a candidate for Mayor than they are legally allowed to give to a candidate for President of the United States ($4,600) over the course of the primary and general elections. Lowering contribution limits across the board helps to limit concerns that campaign donors are able to garner access or influence through their donations, regardless of whether or not they fall under the "doing business" definition.

We hope that this strong bill will serve as a positive example to members of the state legislature in Albany, who we very much hope will pass similarly forward-thinking campaign finance reforms before the end of session.

Again, thank you for your time and we are happy to answer any questions you may have.



**NYPIRG**

N E W   Y O R K
PUBLIC INTEREST
RESEARCH GROUP

Testimony
of
NEAL ROSENSTEIN AND GENE RUSSIANOFF
Government Reform Coordinator and Senior Attorney
NEW YORK PUBLIC INTEREST RESEARCH GROUP (NYPIRG)
before the
NEW YORK CITY COUNCIL COMMITTEE ON GOVERNMENT OPERATIONS
hearing on the
INTRO 586 (CAMPAIGN FINANCE)
City Hall
June 12, 2007

The New York Public Interest Research Group, Inc. (NYPIRG) supports Intro 586, which extensively amends the city's landmark campaign finance program.  We urge its enactment.

We believe this legislation will strengthen the campaign finance program.   It will do this by:

   1) putting a cap of $250 to $400 on contributions to any city candidate by a broad range of individuals "doing business" and seeking favors from the City of New York;

   2) making those contributions non-matchable;

   3) broadening the definition of "intermediaries" to include not only those delivering contributions, but also those soliciting them;

   4) providing an incentive for taking smaller matches by creating a six-to-one match for contributions of $175 or less;

   5) prohibiting contributions from LLC's and LLP's;

   6) limiting contributions for transition and inaugural expenses; and

   7) making it clearer what are permissible and impermissible expenses.

Page Two–NYPIRG

We would like to make three points about the legislation.

First, we greatly appreciate the outreach by the City and the Council to civic groups in formulating this legislation. We feel our suggestions were seriously considered and a number incorporated into the legislation before you. NYPIRG would like to thank Maura Keaney, Rob Newman, DeNora Johnson and Jim Caras on City Council staff and Anthony Crowell, Frank Barry, and Patrick Wehle who negotiated the bill for the City Administration.

NYPIRG would also like to express our special appreciation to Government Operations Committee Chair Simcha Felder. He has continued a 19-year tradition by his predecessors, all of whom strengthened the campaign finance program through their leadership and political savvy.

Second, we feel it right to note the difficulties that are before the City in implementing the "doing business" provisions of the legislation. The legislation calls for "certifying" by November 2008 with "complete and accurate" data bases of individuals with applications or bids for contracts (above $100,000); land use matters; economic development incentives; concessions and franchises; and leases. This will be challenging, as the recent experience with a much smaller lobbyists database shows. We agree with the November deadline. Any certification date that went into Mayoral 2008-2009 election cycle would be unfair. It such a date proves impossible to make, than we support certifying data bases after November 2009, as the legislation mandates. NYPIRG is counting on the City and the Council to provide both the Campaign Finance Board and DOITT with the financial resources they need to achieve the new mandates under the legislation.

Third, if the legislation is struck down by the courts for candidates not participating in the program, we support not applying the "doing business" provisions of the law to participants. That's because if only participants were limited in taking "doing business" contributions, this would seriously discourage candidates from entering the program. This point is made in the committee report.

One final note: While the campaign finance legislation has been improved after each election cycle, as a civic group there are changes we will continue to urge when the program is considered after the next legislative cycle. These include: lowering overall contribution limits; restricting union contributions as are corporate and partnership contributions; and further addressing the problem of wealthy candidates self financing their own campaigns and dramatically outspending participants.



**TESTIMONY OF ANTHONY W. CROWELL, COUNSELOR TO THE MAYOR,
BEFORE THE NEW YORK CITY COUNCIL COMMITTEE ON
GOVERNMENT OPERATIONS**

**JUNE 12, 2007**

Good morning Chairman Felder and members of the Government Operations Committee. My name is Anthony Crowell, and I am Counselor to Mayor Michael R. Bloomberg. I thank you for the opportunity to testify today on Intro. 586, a bill to limit so called pay-to-play contributions to candidates for municipal elected office from those doing business with the City. With me today are Frank Barry, a policy advisor in the Mayor's Office, and Marla Simpson, Director of the Mayor's Office of Contract Services.

Indeed, the Administration strongly supports Intro. 586, which is the culmination of nine years of complex discussions on this topic by City government, beginning with the approval of a 1998 Charter referendum which called for disclosure and regulation of campaign contributions from those who do business with the City. Today's partnership between the Administration and Council on this bill will result in a cutting-edge municipal reform, building on the success of our partnership last year when we reformed the City's lobbying law, including exempting campaign contributions by lobbyists from receiving matching funds.

In drafting the provisions of this bill, the Mayor's and Council's staffs have collaborated closely with the Law Department, the Campaign Finance Board, and the City's good government groups to develop what we believe represents the country's strongest and most vigorous campaign finance law. The primary reason that the Campaign Finance Program was adopted 19 years ago was to reduce corruption and

diminish the influence that special interests hold over candidates and elected officials who seek campaign contributions from them. Yet, as the approval of the 1998 Charter revision indicated, the City's electorate supports further restrictions on the various types of campaign contributions that created a conflict of interest, or at least the appearance thereof. This bill addresses those issues and creates a more transparent, fair and open campaign finance system. And while we have tried to address as many of these issues as possible, we do recognize that this program will further evolve, and thus as the Mayor has stated repeatedly through this process, we cannot let the perfect be the enemy of the good.

Up front, I would like to state that, in drafting this bill, we have worked to ensure that it will withstand any legal challenge. Our proposal builds on existing campaign finance legislation, and aims specifically to limit the amount of money that can be contributed by people who do business with the City. It is a bill to combat "pay-to-play" and improve public confidence that the government's decisions are made wholly on the merits and not political favoritism. As the Law Department has stated publicly, the bill was carefully drafted in light of applicable Supreme Court precedent, and we are confident it is constitutional. To be clear, and to address questions raised about this bill since last Tuesday's announcement, our proposal is very different from the Vermont law that was struck down by the U.S. Supreme Court last year. That law set low, across-the-board contribution limits and attempted to restrict overall candidate spending. Our bill, focused on pay-to-play, is clearly different and in no way imposes any such new expenditure limits.

**Doing Business Contribution Limitations**

The new law will significantly limit donations from those who do business with New York City, including individuals and entities with City contracts, concessions, and franchises, or grants valued at or greater than $100,000; land use applicants; parties to discretionary economic development agreements, and private equity and other investment firms. The existing ban on corporate contributions will be widened to include Limited Liability Companies (LLCs), Limited Liability Partnerships (LLPs) and other forms of

non-incorporated businesses. These limitations would also apply generally to contributions made to transition and inaugural entities. This bill also introduces strict contribution caps on these individuals doing business with the City: $250 for Council races, $320 for borough-wide races and $400 for city wide races, and none of these contributions will be eligible for matching funds. This will ensure that taxpayer money is not used to supplement an entity or individual attempting to influence government decision making through their campaign contributions.

### Database Development

The development of a dynamic doing business database to serve as a ready check on campaign contributors is at the crux of an effective campaign finance program aimed at deterring pay-to-play. To implement today's reforms, such a database will be created jointly by the Mayor's Office of Contract Services (MOCS) and the Department of Information Technology and Telecommunication (DOITT), and made accessible to the Campaign Finance Board and the public, to identify all those that fall under the definition of doing business. Because of the tight timeframes involved in implementing this system, Ms. Simpson and her staff, along with DOITT, have already begun discussions about developing the database when the bill is passed.

### OTHER REFORMS

In addition, to addressing pay-to-play contributions, the Mayor and Council also took the opportunity to introduce other reforms in this bill designed to open up participation in the electoral process and to enhance the efficiency of the campaign finance system, including proposing changes to the structure of the CFB matching funds program, addressing the longstanding problems with non-competitive elections, and proposing internal reforms at the CFB concerning audits and adjudications.

### Changes to Matching Funds

Contributions by ordinary citizens, who often give smaller campaign donations will be given much more weight now with an increase in matching funds from 4-1 to 6-1 for the first $175 donated to a campaign. Thus, for someone who wanted to give $175

3

contribution, instead of it being matched at the 4 - 1 rate for a total contribution value of $875, the contribution would now be worth $1,225. This amount is practically the same amount a candidate can now receive under the current matching formula. Accordingly, this change empowers citizens and will aid many candidates in being more competitive because these lower value contributions will now be more meaningful to the overall impact individuals can have on a candidate's race.

### Disclosure of Intermediaries

The bill also broadens the definition of an intermediary, also known as bundlers, to include anyone who solicits a contribution for a campaign. Under the current system, only those from outside of a candidate's campaign who receives and delivers contributions on behalf of the campaign are considered intermediaries. This proposed amendment would now require that those who solicit contributions also be listed as intermediaries, which will ensure that campaigns disclose those who act as such regardless of whether such agents personally deliver the checks. This reform will close the loophole in the current disclosure process and allow the public to see the variety of relationships between intermediaries and candidates.

### Reining In Matching Funds for Noncompetitive Elections

Non-competitive elections in which candidates running against nominal opposition receive public matching funds are often cited as an example of wasteful spending. Currently, in such instances where their opponent has spent less than 20% of the expenditure limit, a candidate only has to submit a statement of need with no other documentation to receive full public financing. The new proposal establishes clear criteria that must be met in order for a race to be deemed competitive. Those would include receiving significant endorsements, or having name recognition documented from previous races or significant media exposure. A candidate would need to prove that his or her opponent meets one of these criteria to qualify the race as competitive and to merit the release of public matching funds. The proposal also eliminates the automatic trigger for public funds that results when a candidate's opponent receives public funds.

4

**Establishes Definition for Allowable Campaign Expenditures**

This bill also makes amendments to the definitions of what campaign funds can and cannot be used for. By outlining with clarity what is not acceptable, any gray area that has existed will be eliminated, and donors can be assured that all their contributions will be spent appropriately without benefiting a candidate personally.

**Improving the Campaign Finance Board's Operations**

This bill also takes steps to improve the CFB's auditing procedures, making them more efficient and comprehensive, and bolsters the fairness of the adjudicative process by establishing new procedures. The Administration and the Speaker have taken seriously concerns from candidates about the auditing and adjudicative procedures of the CFB and we believe the changes will make the system more efficient and fair.

Indeed, the campaign finance program, like many other reform initiatives, will always be a work in progress. However, the proposed bill represents a new era in transparency and openness that enhances New York City's position as the vanguard of elections and government reform. The Mayor is pleased to stand shoulder to shoulder with Speaker Quinn, Chairman Felder, and the rest of the City Council in enacting and implementing this important legislation.

Thank you and we would be happy to answer any questions you may have.

# New York City Campaign Finance Board

40 Rector Street, 7th Floor, New York, NY 10006
tel. 212.306.7100    fax 212.306.7143
www.nyccfb.info    info@nyccfb.info

**Testimony of Amy Loprest, Executive Director**
**New York City Campaign Finance Board**

**City Council Committee on Governmental Operations**
**June 12, 2007**

Good morning, Chairman Felder, and Committee members. I am Amy Loprest, Executive Director of the New York City Campaign Finance Board (CFB). With me are Deputy Executive Director Carole Campolo and General Counsel Sue Ellen Dodell. I am here to testify on Intro No. 568.

First, I would like to congratulate the City Council and the Mayor for reaching agreement on legislation that has the potential to transform the relationship between money and politics in New York City.

We are pleased to have been able to inform these negotiations with the practical lessons of two decades successfully administering the Program. While it's true there are significant challenges ahead in implementing the "pay-to-play" restrictions under consideration, the Board has always believed those limits should have the force of law if they are to be effective. We're confident that with continued cooperation among the Campaign Finance Board, City Hall, and the responsible agencies, the databases that the bill envisions will be created in a timely fashion, and this reform will succeed.

Intro No. 568 contains several other provisions that could help advance some of the Program's underlying goals. One central aim of the Program is to amplify the voice of small donors in New York City's political system; lowering the contribution amount eligible for matching funds from $250 to $175 should encourage candidates to focus even

1

more attention on ordinary New Yorkers who lack the means to make large contributions to political campaigns.

The proposed ban on contributions from LLCs and partnerships is a positive step towards eliminating all organizational contributions, as the Board has recommended since the creation of the Program. The new, more inclusive definition of intermediaries will help the Board provide New Yorkers with more complete disclosure of those interests funding campaigns for City office. And the provisions meant to limit the amount of matching funds provided to participating candidates with nominal opposition should provide taxpayers with greater protection against the waste of public resources.

* * *

As I'm sure you are aware, other parts of the bill—especially the proposed deadlines for CFB audits—will require significant changes in the way the Board operates. We have already begun a thorough evaluation of our audit procedures, which we will continue in conjunction with completing the last of the audits from the 2005 election cycle.

In order to enable the Campaign Finance Board to hold all candidates for covered offices to the highest standard of integrity, the lawmakers who created the Board gave it a certain measure of independence from the political process. Subsequent City Councils have found it appropriate to respect the independence of the agency that regulates them in their role as candidates for City office.

Despite our reservations about any legislative intrusion into the Board's administration of the Campaign Finance Act, we are supporting Intro. No. 568 because we are confident we will meet the bill's mandates without sacrificing the independence of the Board or the quality of our work.

We have communicated a statement of the Board's revised fiscal needs for FY2008 to the Mayor and the Speaker of the Council, and we will further assess our staffing and

funding levels for the years to come in light of the bill's requirements. We appreciate the Council's commitment to provide the resources the Board will need to meet these new mandates while making it possible for the Board to protect the public's investment in the political process with the same diligence New York City taxpayers have come to expect since the Program was created almost twenty years ago.

There are some outstanding technical issues with this legislation we are working with Council staff to resolve. These include some recommended improvements to the debate program, and providing for bonus payments to candidates facing high-spending non-participants.

Thank you for the opportunity to testify, and we look forward to answering any questions you may have.

Proposed Int. No. 586-A

By The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo Jackson, Garodnick, Gentile, Gerson, Gioia, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia, Reyna, Seabrook, Stewart, Vacca, Weprin, White Jr., Liu and Mendez (in conjunction with the Mayor)

A LOCAL LAW

To amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1.   Subdivision 3 of section 3-702 of the administrative code of the city of New York, as amended by local law number 17 for the year 2006, is amended, and three new subdivisions 18, 19 and 20 are added, to read as follows:

3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution.  The following contributions are not matchable:

(a)       in-kind contributions of property, goods, or services;

(b)    contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(c)    contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or similar drawing for valuable prizes;

(d)    money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e)    contributions from individuals under the age of eighteen years;

(f)    contributions  from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance; [and]

(g)    contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1) or section 3-213-d.  The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213[.]; and

(h)    contributions from contributors subject to the limitations of subdivision one-a of section 3-703 of this chapter.

18.    a. The term "business dealings with the city" shall mean (i) any contract for the procurement of goods or services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York (other

than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code, or for construction totaling not more than five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter), and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; (ii) any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii) any application for approval sought from the city of New York pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter, and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter; provided, however that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further, however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) one or more concessions (other than concessions awarded through competitive sealed bid) or franchises from the city of New

3

York or any agency or entity affiliated with the city of New York with estimated aggregate payments to the city of more than the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code per fiscal year; or (v) one or more grants totaling not more than the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code, received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York; or (vii) any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants. In addition, for purposes of this chapter a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York during all periods covered by a registration statement. For purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions, franchises and grants that are five thousand dollars or less in value shall be excluded from any calculation as to whether a contract, concession, franchise or grant is a business dealing with the city. For purposes of clauses (ii) and (iii) of this subdivision, the department of city planning, in consultation with the board, may promulgate rules to require the submission by applicants to the city of information necessary to implement the requirements of subdivisions 1-a and 1-b of section 3-703 of this chapter as they relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion in the doing business database established pursuant to subdivision (20) of this section. For purposes of this subdivision, actions, transactions, and agreements for the purpose of providing affordable housing pursuant to the Private Housing Finance Law or the General Municipal Law or any other city, state or federal

program, including but not limited to actions, transactions and agreements for such purposes which involve land dispositions, loans, grants, real property tax exemptions, zoning bonuses, low income housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of residents or on the rents or other charges to be paid by such residents, shall not constitute business dealings with the city of New York. For purposes of this subdivision, "agency or entity affiliated with the city of New York" shall mean the city school district of the city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials.

b. Business dealings with the city as defined in this subdivision shall be limited as follows: for purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the procurement of goods, services, or construction shall only constitute business dealings with the city of New York for the period from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract and for twelve months after the end of such term, provided, however that where such contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in

which the city of New York is the proposed lessee, shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business dealing with the city from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter or in the case of a decision of the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section; for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of New York for the period from the submission of the bid or proposal until twelve months after

the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall  constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.

     c.    Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or construction or who has submitted bids or proposals for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a determination that said person should not be included in the database.

d.    A person, as defined by subdivision 20 of section 3-702, shall be considered to have business dealings with the city as of the date the person's name is entered in the doing business database, as such date is indicated in such database or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.

19.    The term "economic development agreement" means any contract or agreement in which financial incentives including, but not limited to, tax incentives, payments in lieu of taxes and financing are offered in return for the development, attraction or retention of business; provided, however that no financial incentives which are given to a person who qualifies for such incentive by operation of law shall be deemed to be pursuant to an economic development agreement for purposes of this chapter.

20.    The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city. Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than

once a month.  Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city.  For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection  (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city.

§2. Section 3-703 of the administrative code of the city of New York is amended by adding two new subdivisions 1-a and 1-b to read as follows:

1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may accept, either directly or by transfer, a contribution or contributions for a covered election from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section

3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for such election does not exceed:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; (iii) for member of the city council two hundred fifty dollars.  Any contribution made pursuant to this section shall not be a matchable contribution.  For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a

question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines. If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any

such contribution shall be deemed valid for purposes of such limitation provided, however, that no such contribution shall be matchable. Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor. No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein. Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds. For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city. Notwithstanding any other provision of this section, no participating

candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

§3.    Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 12 for the year 2003, is amended to read as follows:

(i) the [first] tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4.    Section 3-705 is amended by adding two new subdivisions 9 and 10 to read as follows:

9.    If a participating candidate endorses or publicly supports his or her opponent for election, such candidate shall not be eligible for public funds.

10.    Participating candidates who lose in the primary election but remain on the ballot for the general election must certify to the board that they will actively campaign for office by including, but not limited to, raising and spending funds, seeking endorsements and broadly soliciting votes before receiving public funds.

§5. Paragraph (d) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 59 for the year 2004, is amended to read as follows:

(d) obtain and furnish to the campaign finance board and his or her principal committee or authorized committees must obtain and furnish to the board any information it may request relating to his or her campaign expenditures or contributions

and furnish such documentation and other proof of compliance with this chapter as may be requested by such board, provided, however, that the board shall accept such required documentation through an electronically scanned transmission;

§6. Section 3-703 of the administrative code of the city of New York is amended by adding a new subdivision 15 to read as follows:

15. Participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign shall be required to attend a training provided by the campaign finance board concerning compliance with the requirements of the campaign finance program and use of the campaign finance program software.

§7. Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:

4. The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election. The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election. For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the

event that the board denies such petition then it shall immediately notify the candidate of its right to appeal to appeal pursuant to article 78 of the civil practice law and rules.

§8. Subdivision 8 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws numbered 58, 59 and 60 for the year 2004, is amended to read as follows:

8. The board shall have the authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of this chapter. The board shall promulgate regulations concerning the form in which contributions and expenditures are to be reported, the periods during which such reports must be filed and the verification required. The board shall require the filing of reports of contributions and expenditures for purposes of determining compliance with paragraph (f) of subdivision one of section 3-703, section 3-706, subdivision 1-a of section 3-703, section 3-718, and section 3-719 in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements.

§9. Paragraphs (a) and (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as added by local law 58 for the year 2004, are amended, and a new subdivision 12 is added to read as follows:

(a) The written application shall:

(i) demonstrate that the organization and any proposed co-sponsor meet the criteria of subdivision four of this section;

(ii) specify the election and office for which the organization seeks to sponsor the debate;

15

(iii)    set forth the date, time, duration, and location of the debate and the specific and exclusive circumstances under which the date or time may be changed, together with a provision for when the rescheduled debate would be held;

(iv)    provide a detailed description of the format and ground rules for the debate;

(v)    verify that the staging, promotion, and coverage of the debate shall be in conformance with all applicable laws;

(vi)    include an agreement to indemnify the city for any liability arising from the acts or omissions of the sponsor; and

(vii)    set forth plans for publicity and for broadcast and other media coverage for the debate; and

(viii) set forth the criteria for determining which candidates are eligible to participate in each debate the organization seeks to sponsor, in accordance with paragraph (b) of this subdivision.

(b)    (i)    Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other

criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, [either] (I) spent, contracted, or obligated to spend, [or] <u>and</u> (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held contained in subdivision two of section 3-703; <u>provided however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703;</u> provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has

also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board. Nothing in this provision is intended to limit the debates to the two major political parties.

(ii)     If a debate sponsor has determined that a non-participating candidate has met all the non-partisan, objective, and non-discriminatory criteria applicable to participating candidates or limited participating candidates for access to any of the primary, general, or special election debates, the sponsor may invite that candidate to participate in such debate. In the case of a run-off primary election or a run-off special election, the sponsor may invite a non-participating candidate to participate in such debate. However, if a non-participating candidate does not accept such invitation to debate or does not appear at such debate, the debate shall go forward as scheduled; provided, however, if there is only one participating candidate or limited participating candidate participating in any such debate, [upon agreement by the debate sponsor, the board and the potential debater,] such debate [may] shall be canceled.

12.  The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with

the selection of candidates for participation in any debate, held pursuant to this section 3-709.5.

§10.  Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 69 for the year 1990, is amended to read as follows:

b.  If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such candidate and committee of the amount so disqualified and such candidate and committee shall pay to the board an amount equal to such disqualified amount; provided, however that in considering whether or not a participating candidate shall be required to pay to the board such amount or an amount less than the entire disqualified amount, the board shall act in accordance with the following:  (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; (ii) where there is an absence of credible documentation for each qualified campaign expenditure,  the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

§11.  Paragraph b of subdivision 1 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall comply with the same requirements as a participating candidate who files a certification pursuant to paragraph (c) of subdivision one of section 3-703 of this chapter as provided in paragraphs (d) and (g) of such subdivision, subdivision one-b of section 3-703, and subdivisions six, six-a and eight of section 3-703 of this chapter.

§12.  Paragraph b of subdivision 2 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall only accept contributions as limited by the provisions of paragraphs (f) and (l) of subdivision one of section 3-703, [and] subdivision 1-a of section 3-703, and subdivision ten of section 3-703 of this chapter. Notwithstanding any contribution limitations in paragraphs (f) and (h) of subdivision one of section 3-703 and subdivision 1-a of section 3-703, a non-participating candidate may contribute to his or her own nomination for election or election with his or her personal funds or property, in-kind contributions made by the candidate to his or her authorized committees with the candidate's personal funds or property, and advances or loans made by the non-participating candidate with the candidate's personal funds or property. A candidate's personal funds or property shall include his or her funds or property jointly held with his or her spouse, domestic partner, or unemancipated children.

§13.  Paragraph 1 of subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended to read as follows:

§ 1052. Campaign finance board. a. 1. There shall be a campaign finance board consisting of five members.  Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker.  The members shall first be appointed to serve as follows:

(a) one member appointed by the speaker for a term of one year;

(b) one member appointed by the mayor for a term of two years;

(c) one member appointed by the speaker for a term of three years;

(d) one member appointed by the mayor for a term of four years; and

(e) the chairperson for a term of five years.

Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment. Upon expiration of the term of a member, if the mayor or the speaker, as appropriate, shall fail to appoint a member within one hundred twenty days of the expiration of such term, the member whose term has expired shall be deemed appointed for an additional term of five years, provided, however, that if the expiration of such term occurs in a year in which elections, except special elections, covered by the voluntary system of campaign finance reform are

21

scheduled, the member whose term has expired shall be deemed appointed for an additional term of five years if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of the expiration of such term. In case of a vacancy in the office of a member, a member shall be appointed to serve the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. If the mayor or the speaker, as appropriate, shall fail to appoint a member within one hundred eighty days of such vacancy, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, provided, however, that if such vacancy occurs in a year, or within ninety days prior to a year, in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of such vacancy. Except for the chairperson, such member shall not be enrolled in the same political party as the other member appointed by the official who failed to so appoint. Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president, or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to any local law establishing a voluntary system of campaign finance reform. No member shall serve as an officer of a political party, or be a candidate, or participate in any capacity in a campaign by a candidate, for nomination for election or election to the office of mayor, public advocate,

comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 of the administrative code and the employees of such lobbyists shall not be eligible to be members of the board. In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be required to undergo training developed pursuant to paragraph 14 of this section.

§14. Subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended by adding a new paragraph 14 to read as follows:

14 a. The council and the mayor, in conjunction with the campaign finance board, shall develop a curriculum to be used to train members of the campaign finance board and staff. Such curriculum shall include the issues and problems confronted by campaigns for covered office and how the application and enforcement of the city's campaign finance laws impacts these campaigns.

§15. Paragraph 5 of subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended to read as follows:

5. The board shall have the power to investigate all matters relating to the performance of its functions and any other matter relating to the proper administration of any voluntary system of campaign finance reform established by local law and for such purposes shall have the power to require the attendance and examine and take the testimony under oath of such persons as it shall deem necessary and to require the production of books, accounts, papers and other evidence relative to such investigation.

Notwithstanding any other provision of law, the investigative and adjudicatory powers and functions of the staff to the board shall be separate and no staff member of the board shall perform both investigative and adjudicatory tasks or functions.

§16.  Subdivision 12 of section 3-702 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:

12.  The term "intermediary" shall mean an individual, corporation, partnership, political committee, employee organization or other entity which, (i) other than in the regular course of business as a postal, delivery or messenger service, delivers any contribution from another person or entity to a candidate or other authorized committee; or (ii) solicits contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee. For purposes of clause (ii) of this subdivision only persons clearly identified as the solicitor of a contribution to the candidate or his or her authorized committee shall be presumed to be known to such candidate or his or her authorized committee. "Intermediary" shall not include spouses, domestic partners, parents, children or siblings of the person making such contribution, or any fundraising agent, as such term is defined in the rules of the board or any hosts of a campaign sponsored fundraising event paid for in whole or in part by the campaign.  Where there are multiple individual hosts for a non-campaign sponsored event, the hosts shall designate one such host as the intermediary.

§17.  Section 3-702 of the administrative code of the city of New York is amended by adding a new subdivision 19 to read as follows:

19.   a. For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter pursuant to sections 3-706 and 3-712. In addition, there shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however that the presumptions contained in this subdivision shall not apply to an expenditure made when the expenditure is to a person or entity associated with the candidate making such expenditure or on whose behalf such candidate's committee made such expenditure; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure. For purposes of this subdivision a person or entity associated with a candidate includes a spouse, domestic partner, child, parent, sibling, or a person with whom the candidate has a business or other financial relationship:

1.   Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

2.   Contributions to candidates and political committees subject to the provisions of section 3-705(8);

3.   Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall

not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

    4.    Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

    5.    Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

    6.    Legal defense of a non-criminal matter arising out of a political campaign;

    7.    Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

    8.    A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

    9.    Payment of non-criminal penalties or fines arising out of a political campaign;

    10.    Costs incurred in demonstrating eligibility for the ballot, public funds payments or defending against a claim that public funds must be repaid;

    11.    Food and beverages provided to campaign workers and volunteers; and

    b. Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign. Expenditures not in furtherance of a political campaign for elective office include the following:

1      Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate, or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

2.      Any residential, or household items, supplies or expenditures;

3.      Clothing, haircuts and other personal grooming;

4.      Funeral, cremation, or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

5.      Automobile purchases;

6.      Tuition payments, childcare costs;

7.      Dues, fees, or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

8.      Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

9.      Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

10.      Gifts, except for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.

§18. Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as separately amended by local laws 58 and 60 for the year 2004, is amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, <u>limited liability company, limited liability partnership, or partnership</u> other than a corporation<u>, limited liability company, limited liability partnership, or partnership</u> that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate<u>, provided, however, that where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company or limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity</u>;

§19. Subdivision 1 of section 3-703 of the administrative code of the city of New York is amended by adding a new paragraph (o) to read as follows:

<u>(o) agree that expenditures by his or her principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election shall be subject to the contribution and expenditure limitations applicable in such covered election.</u>

§20. Paragraphs (g) and (h) of subdivision 2 of section 3-704 of the administrative code of the city of New York, paragraph (g) as added by local law 60 for

the year 1990 and paragraph (h) as amended by local law 12 for the year 2003, are

amended, and new paragraphs (i), (j) and (k) are added to such section to read as follows:

(g) gifts, except brochures, buttons, signs and other printed campaign material;

[or]

(h) any expenditure to challenge or defend the validity of petitions of designation

or nomination, or of certificates of nomination, acceptance, authorization, declination, or

substitution, and expenses related to the canvassing of election results, made pursuant to

subdivision four of section 3-706[.];

(i) an expenditure made primarily for the purpose of expressly advocating a vote

for or against a ballot proposal, other than expenditures made also to further the

participating candidate's nomination for election or election;

(j) payment of any penalty or fine imposed pursuant to federal, state or local law;

(k) payments made through advances, except in the case of individual purchases

in excess of two hundred fifty dollars.

§21.  Paragraph (a) of subdivision (2) of section 3-705 of the administrative code

of the city of New York, as amended by local law 58 for the year 2004, is amended to

read as follows:  If the threshold for eligibility is met, the participating candidate's

principal committee shall receive payment for qualified campaign expenditures of [four]

six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars

in public funds per contributor (or up to five hundred twenty-five dollars in public funds

per contributor in the case of a special election), obtained and reported to the campaign

finance board in accordance with the provisions of this chapter.

§22.  Paragraph a of subdivision (7) of section 3-705 is REPEALED and paragraph c of subdivision (7) of section 3-705 of the administrative code of the city of New York, as added by local law 12 for the year 2003, is amended to read as follows:

(c) the participating candidate has submitted  a certified signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website.  Such statement must certify that (i) one or more of the following conditions applies and provide documentation in support of such condition and (ii) that such condition or conditions reasonably demonstrates the need for such public funds.

(1)  the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2)  the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name in television, radio or print media in general circulation in the area of the

covered election at least twelve times in the year preceding the covered election;
provided, however that the listing of names of candidates or potential candidates for a
covered election without additional information concerning the opponent shall not
constitute an appearance for purposes of this paragraph;

    (4)  the participating candidate is opposed by a candidate who has received
twenty-five percent or more of the vote in an election for public office in an area
encompassing all or part of the area that is the subject of the current election in the last
eight years preceding the election;

    (5) the participating candidate is opposed by a candidate whose name is
substantially similar so as to result in confusion among voters, as determined by the
board;

    (6) the participating candidate in a city council or borough-wide race is opposed
by a candidate who is a chairman or president of a community board or district manager
of a community board; or

    (7) the participating candidate is opposed by a candidate whose spouse,
domestic partner, sibling, parent or child hold or have held elective office in an area
encompassing all or part of the area that is the subject of the current election in the past
ten years.

    The board shall be authorized to verify the truthfulness of any certified
statement submitted pursuant to this paragraph and of any supporting documentation and
shall post such certifications and supporting documentation on its website.

    (d)  the participating candidate is opposed in a primary or special election for an
office for which no incumbent is seeking re-election.

If any of the conditions described in paragraphs (a), (b), [or] (c) or (d)
occur in such election, the board shall pay any and all additional public funds due
to the participating candidate up to the maximum total payment applicable in such
election under subdivisions two or six of this section or subdivision three of
section 3-706 of this chapter.

§23.   Subdivisions 1, 2 and 4 of section 3-706 of the administrative code of the
city of New York, as added by local law 58 for the year 2004, are amended to read as
follows:

1.  The following limitations apply to all expenditures made by a candidate and
his or her principal committee on or after the first day of January preceding the election
for which such candidate chooses to participate in the public funding provisions of this
chapter and to expenditures made at any time prior to such date for services, materials,
facilities, advertising or other things of value received, rendered, published, distributed or
broadcast on or after such date:

(a)     Except as provided in paragraph (b) of this subdivision, in each
primary election, in each special election to fill a vacancy, and in each
general election, expenditures by a participating candidate or a limited
participating candidate and his or her principal committee for one of the
following offices shall not exceed the following amounts:

| | |
|---|---|
| mayor: | [$4,000,000] $6,157,600 |
| public advocate or comptroller: | [$2,500,000] $3,849,575 |
| borough president: | [$900,000] $1,385,675 |
| member of the city council: | [$105,000] $161,250 |

32

(b)    (i)    The expenditure limitation in a run-off primary election held pursuant to section 6-162 of the New York state election law or a run-off special election held to fill a vacancy shall be one half the amount of the applicable limitation provided for an election for such office pursuant to the provisions of paragraph (a) of this subdivision.

(ii)    The board shall promulgate rules to provide for a separate expenditure limit applicable to campaign expenditures for an additional day for voting held pursuant to section 3-108 of the New York state election law, an election held pursuant to court order, or a delayed or otherwise postponed election.

(c)    Expenditures by participating or limited participating candidates in a primary election made prior to or on the date of such primary election shall be deemed to have been made for such primary election.

(d)    The campaign finance board shall, pursuant to section 3-713, submit a report to the mayor and the council on or before September first, nineteen hundred ninety, containing its recommendations whether the expenditure limitations provided by this subdivision should be modified. Such report shall set forth the amount of, and reasons for, any modifications it recommends.

(e)    Not later than the first day of March in the year two thousand [eighteen] ten and every fourth year thereafter the campaign finance board shall (i) determine the percentage difference between the average over a

calendar year of the consumer price index for the metropolitan New York-New Jersey region published by the United States bureau of labor statistics for the twelve months preceding the beginning of such calendar year and the average over the calendar year two thousand [fifteen] seven of such consumer price index; (ii) adjust each expenditure limitation applicable either pursuant to this subdivision or subdivision 2 of this section by the amount of such percentage difference to the nearest thousand dollars; and (iii) publish such adjusted expenditure limitation in the City Record. Such adjusted expenditure limitation shall be in effect for any election held before the next such adjustment.

2. The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years. Such expenditures by a participating or limited participating candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

| | |
|---|---|
| mayor, public advocate or comptroller: | [$270,000] $290,250 |
| borough president: | [$120,000] $129,000 |
| member of the city council: | [$40,000] $43,000 |

4.    (a) Expenditures made for the purpose of [complying with the provisions of this chapter or the election law, including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures,]: (i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status, (ii) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results, and (iii) expenses related to the post-election audit shall not be limited by the expenditure limitations of this section.

(b)    [In reviewing claims that expenditures are exempt from expenditure limitations by reason of paragraph (a) of this subdivision, the board shall not require the participating candidate or principal committee to provide detailed documentation substantiating such exempt expenditure claims unless the board has reason to believe that expenditures have been erroneously or falsely claimed to be exempt in disclosure reports.

(c) Notwithstanding paragraph (b) above, a] A participating candidate shall be required to provide detailed documentation substantiating all exempt expenditure claims made pursuant to this subdivision [if the aggregate exempt expenditure claims made by the participating candidate exceed an amount equal to seven and one-half percent of the participating candidate's applicable expenditure limitation].

35

§24. Subdivision 1 of section 3-708 of the administrative code of the city of New York, as amended by local law 48 for the year 1998, is amended to read as follows:

1. There shall be a campaign finance board consisting of five members. Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker. The members shall first be appointed to serve as follows:

   (a) one member appointed by the speaker for a term of one year;

   (b) one member appointed by the mayor for a term of two years.

   (c) one member appointed by the speaker for a term of three years;

   (d) one member appointed by the mayor for a term of four years; and

   (e) the chairperson for a term of five years.

(b) Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment.

In case of a vacancy in the office of a member, a member shall be appointed to serve for the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. In the case of a vacancy in the office of a member for which a member is holding over after expiration of the term for which the member was appointed, an appointment to such office made after June 1 in a year in which covered elections are scheduled shall not take effect prior to December 1 of that calendar year.

Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to paragraph (f) of subdivision one of section 3-703. No member shall serve as an officer of a political party or be a candidate or participate in any capacity in a campaign by a candidate for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 and the employees of such lobbyists shall not be eligible to be members of the board.  In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be required to undergo training developed pursuant to paragraph 14 of subdivision a of section 1052 of the charter.

§25. Paragraph (b) of subdivision 7 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws 58. 59. and 60 for the year 2004, is amended to read as follows:

(b) The board shall develop a program for informing candidates and the public as to the purpose and effect of the provisions of this chapter. The board shall prepare and make available educational materials, including compliance manuals and summaries and explanations of the purposes and provisions of this chapter. These materials shall be prepared in plain language. The board shall prepare and make available materials,

including, to the extent feasible, computer software, to facilitate the task of compliance with the disclosure and record-keeping requirements of this chapter. When disclosure reports are generated by use of the board's disclosure software, the board shall provide an opportunity for candidates to test their electronic filings on any of the three business days prior to the deadline for the filing of such disclosure reports. Any disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005.

§26. Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York, as separately amended by local laws 58, 59 and 60 for the year 2004, is amended to read as follows:

§ 3-710 Examinations and audits; repayments. 1. The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code. The board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall issue rules regarding what documentation is sufficient in demonstrating financial activity. These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, provided that:

a. Any draft audit, the subject of which is a participating, limited participating, or non-participating candidate, or the principal and/or authorized committees of any

participating, limited participating, or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races; and (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, (i) within fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races; and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate (i) within sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races; and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to

section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.

c. Any advice provided by board staff to participating, limited participating, or non-participating candidates with regard to an action shall be presumptive evidence that such action taken in reliance on such advice should not be subject to a penalty or repayment obligation where such candidate, or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, that describes the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

d. Notwithstanding the provisions of paragraphs a and b of this section, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section. If a committee has responded to a request for information made by board auditors but such response is inadequate, the time period for completing the draft and final audits shall be tolled and

extended by the number of days until an adequate response is provided, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, (b) the commencement of the tolling period pursuant to this section and (c) the detailed reasons why the original response was inadequate.

e.  Notwithstanding any provision of law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall not apply in cases where the audit raises issues involving potential campaign-related fraud, potential other criminal activity, activity that may constitute a breach of certification pursuant to rules of the board, or potential significant violations of the limits set forth in section 3-706.

f.  Notwithstanding any provision of the law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with provisions a and b.

§27.  Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 69 for the year 1990, is amended to read as follows:

2. (c) (i)  If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in

the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election. [Such reimbursement shall be made not later than ten days after all liabilities have been paid and in any event, not later than either the closing date of the final disclosure report, or the day on which the campaign finance board issues its final audit report for such participating committee, for such covered election, as shall be set forth in rules promulgated by the campaign finance board.] No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§28.   Section 3-710 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

4. (a) No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to the all of the requirements of subdivision one of this section, and a reasonable opportunity to appear before the board. Any such repayment claim shall be based on a final determination to be issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee. Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination.

§29. Section 3-710.5 of the administrative code of the city of New York, as separately amended by local laws 58, 59 and 60 for the year 2004 is hereby amended to read as follows:

§ 3-710.5 Findings of violation [or] infraction; adjudications; or final determinations. (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

(ii) The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction before assessing any penalty for such action. Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit required pursuant to subdivision one of section 3-710. In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election in the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit.

Alleged violations and proposed penalties shall be subject to resolution by adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature of such pre-election adjudications. The board shall issue a final determination within thirty days of the conclusion of the adjudication proceeding.

(b) The board shall include in every final determination: (i) notice of the respondents' right to bring a special proceeding challenging the board's final determination in New York State supreme court brought pursuant to article 78 of the civil practice law; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law.

§30.   Section 3-711 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

4.   Notwithstanding any provision of law, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who commit any violation of this chapter or any rules promulgated hereunder and who take all steps necessary to correct such violation prior to receiving notice from the board of the existence of the potential violation pursuant to section 3-710.5 shall not be subject to any penalty for such violation.

§ 31. Paragraph (b) of subdivision 1 of section 3-718 of the administrative code of

the city of New York, as separately added by local laws 58, 59 and 60 for the year 2004, is amended to read as follows:

(b) A limited participating candidate and his or her principal committee shall comply with the provisions of paragraphs (d), (e), (g), [and] (i), and (o) of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter.

§32.  Chapter 7 of title 3 of the administrative code of the city of New York is amended by adding a new section 3-720 to read as follows:

§3-720.  Tolling of time for notice of violations or penalties..  If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

§33.  Paragraphs (b) and (c) of subdivision 2 of section 3-801 of the administrative code of the city of New York, paragraph (b) as amended by and paragraph (c) as added by local law 58 for the year 2004, are amended, and a new paragraph (d) is added to read as follows:

(b) not accept any donation or donations of money, goods, or services from any individual, [corporation, partnership,] political committee, employee organization, or entity which in the aggregate exceeds:

(i) four thousand five hundred dollars, in the case of a candidate elected to the office of mayor, public advocate, or comptroller;

(ii) three thousand five hundred dollars, in the case of a candidate elected to the office of borough president; or

(iii) two thousand five hundred dollars, in the case of a candidate elected to the office of member of the city council; [and]

(c) not incur any liabilities after January thirty-first in the year following the election, nor accept any donations after all liabilities are paid[.];and

(d) not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city to a transition or inaugural committee where such donation is from the candidate-elect, or from the candidate-elect's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§34. Paragraph a of subdivision 3 of section 3-706 is amended by adding a new subparagraph (iii) to read as follows:

(iii) with regard to contributions raised on or after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provide for such office in subdivision one of this section.

§35. Paragraph b of subdivision 3 of section 3-706 is amended by adding a new subparagraph (iii) to read as follows:

(iii) with regard to contributions raised on or after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public

<u>funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provide for such office in subdivision one of this section.</u>

§36. Each city agency with which any person who has business dealings with the city conducts such business shall, provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that rules shall not be provided to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section twenty-six of this local law.

§37. Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows: (i) all of the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and

persons employed in a senior managerial capacity regarding an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) all of the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of entities that have submitted bids seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, applications for approvals sought pursuant to the provisions of section 195 or certified pursuant to section 197-c of the New York city charter shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with such a real property transaction or land use approval pursuant to clause (ii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after

the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (v) all of the provisions of this local law concerning any bid or proposal for a franchise or concession shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database includes, available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of entities with a bid or a proposal for such a franchise or concession; (vi) all of the provisions of this local law concerning a recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is a recipient of a grant pursuant to clause (v)

of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) all of the provisions of this local law concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law;  (viii) all of the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants  pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and

(ix) all of the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through (viii) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the Mayor and the Council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the Mayor and the Council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i) and (iv) shall be six months from the

effective date of this local law; the deadline for certification of this section in relation to clauses (ii), (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be sixteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§38.  Sections twenty-one,thirty-fourand thirty-five of this local law shall take effect thirty days after the campaign finance board and department of information technology and telecommunications have certified to the mayor and council one component of the doing business database pursuant to section thirty-seven of this local law.

§39.  With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database.  Such report shall contain the status of each of the components enumerated in clauses (i) through (viii) of section thirty-three of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law.  If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect.  Rejection of such proposals

by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§40. The mayor, the council and the campaign finance board shall form a task force to study the feasibility of including spouses, domestic partners, and unemancipated children in the restrictions on contributions from persons doing business with the city.

§41. Sections three through seven, nine, ten, thirteen through twenty, and twenty-two through thirty-three thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date.

James W. Caras, Esq.
Deputy General Counsel

DeNora M. Johnson, Esq.
Counsel to the Committee

Israel Rodriguez
Policy Analyst

Corinne Rivers
Policy Intern

Andrew Grossman
Finance Division

Scott Crowley
Finance Division



## THE COUNCIL

### REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION

Robert Newman, Legislative Director

Alix Pustilnik, Deputy Director, Governmental Affairs

### COMMITTEE ON GOVERNMENTAL OPERATIONS

Hon. Simcha Felder – Chair

| | |
|---|---|
| **PROPOSED**<br>**INT. NO. 586-A:** | By The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo, Jackson, Garodnick, Gentile, Gerson, Gioia, Gonzalez, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia Jr., Reyna, Seabrook, Sears, Stewart, Vacca, Weprin, White Jr., Liu and Mendez (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance. |

I.    **INTRODUCTION**

On Thursday, June 21, 2007, the Committee on Governmental Operations, chaired by Council Member Simcha Felder, will consider Proposed Int. No. 587-A ("proposed bill"), the comprehensive campaign finance reform bill introduced by Council Speaker Christine Quinn and Chairman Simcha Felder in conjunction with Mayor Michael Bloomberg.  Proposed Int. No. 586-A would amend and add certain sections of the New York city charter ("Charter) and the administrative code of the city of New York ("Code") in relation to campaign finance to accomplish three goals:  (1) reduce the appearance of influence of contributors that have business dealings with the City; (2) promote participation in the New York City Campaign Finance Program ("Program") by making compliance with the New York City Campaign Finance Act ("Act") less complicated; and (3) protect candidates by improving fairness, timeliness and responsiveness of the New York.  Specifically, Proposed Int. No. 586-A would: (1) reduce the contribution limits for persons doing business with the city and encourage smaller contributions and provide a greater voice to everyday New Yorkers by implementing a 6-to-1 public matching fund ratio for contributions up to $175; (2) establish clear, hard deadlines for the completion of Board audits and fair procedures for candidates to challenge Board determinations; (3) ban contributions from business entities, such as limited liability companies and partnerships; (4) expand the definition of intermediary; and (5) rein in the use of matching funds in non-competitive elections.

The Committee held a hearing on Int. No. 586, a prior version of Proposed Int. No. 586-A, on June 12, 2007**.**  As a result of testimony received at the June 12th hearing and further review of the proposals, Int. 586 was amended to further strengthen and clarify the proposals.

Those invited to testify at this hearing include representatives from the Bloomberg

administration, the Board, good government and advocacy groups, election attorneys and other interested parties.

## II.    BACKGROUND

The Campaign Finance Program was established in 1988 to increase participation in the electoral process regardless of access to wealth, and to reduce undue influence by small concentrations of large contributors and special interests.[1]  Since the Program's inception, it has proved to be a successful campaign finance program and a model for the nation.

Pursuant to Charter section 1052, the Campaign Finance Board is composed of five members,[2] who are responsible for administering the Program in accordance with the Act, which is contained in Chapter 7 of Title 3 of the Code.  The Board's powers are enumerated in subdivisions (5) through (12) of section 1052 of the Charter and throughout the Act.  The Board's powers include, among other things, the power "to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code."[3]

## III.    REDUCE APPEARANCE OF UNDUE INFLUENCE IN THE POLITICAL PROCESS

The proposed bill would help to reduce influence associated with certain contributions in several ways including:  (i) regulating contributions from those with business dealings with the City; (ii) banning contributions from businesses such as LLCs and partnerships; and (iii) conforming the rules for transition and inaugural entities (TIE) to those of campaign committees.

---

[1] *See* Proceedings of the Council of the City of N.Y., Int. No. 906-A of 1987, enacted as Local Law 8 of 1988 (codified as N.Y.C. Charter, ch. 46 and N.Y.C. Admin. Code, title 3, ch. 7).
[2] *See* New York City Charter §1052 (2005).

### A.  Contributions from those Doing Business with the City

Charter section 1052(11)(a), which was added by referendum in 1998, authorizes the

Board to issue rules regulating contributions "from individuals and entities doing business with

the city, including rules that determine which business dealings shall be covered by such rules."[4]

In studying this issue, the Board issued a report in 2006 titled "Interim Report of the New York

City Campaign Finance Board on Doing Business Contributions" ("Doing Business Report").[5]

The report concluded that based on limited information available from the VENDEX and

lobbying databases that contributions from only those two categories of entities doing business

with the City accounted for at least twenty percent of all contributions in the 2001 and 2005

cycles.

While there is nothing intrinsically wrong with contributions from those doing business

with the City, the ability of such individuals to contribute could create a perception, regardless of

whether such perception is accurate, that such individuals have a higher level of access to the

City's elected officials.   It is the goal of this law to eradicate this perception.

Int. No. 586 outlined the definition of "business dealings with the City" to include:

> (i) any contract for the procurement of goods or services or construction, with the city or
> any agency or entity affiliated with the city (other than a competitively sealed bid
> contract), entered into in the last twelve months totaling more than one hundred thousand
> dollars, or for capital projects totaling at least one million dollars, including any contract
> for the underwriting of the debt of the city of New York or any agency or entity affiliated
> with the city of New York and the retention of any bond counsel, disclosure counsel or
> underwriter's counsel in connection therewith and any contract for the related to the
> investment or consulting services of a private equity firm;

> (ii) any real property transaction (other than a public auction or competitive sealed bid
> transaction) with the city of New York or any agency or entity affiliated with the city of
> New York, provided, however that in the case of leases in which the city of New York or

---

[3]*See* Administrative Code of the City of New York §3-710(1) (2005).
[4] See charter §1052(11)(a) (2007).
[5]*See generally,* Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions,
dated June 19, 2006.

any agency or entity affiliated with the city of New York is the lessee, the lessor shall only be deemed to be doing business for a period of one year after the commencement of the lease term; or

(iii) any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter; provided, however that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or

(iv) any concession or franchise from the city of New York or any agency or entity affiliated with the city of New York with payments to the city of more than one hundred thousand dollars per year,  or

(v) one or more grants totaling more than one hundred thousand dollars received from the city of New York; or

(vi) any economic development agreement entered into or in effect with the city of New York, as such term is defined in section one of the bill which creates a new subdivision nineteen of section 3-702.

Proposed Int. No. 586-A would clarify the definition of "business dealings with the city"

as including:

- Construction contracts totaling five hundred thousand dollars or more;
- An emergency contract awarded pursuant to the emergency procurement procedures enumerated in Charter §315;
- For land use items:
    - ❖ Any application for approval sought from the city of New York for the acquisition of office space pursuant to Charter §195;
        - ▪ In this case, the applicant would be considered to be  "the lessor of an office building or office space."
    - ❖ Any application for a zoning text amendment that has been certified as provided for in Charter §201.

Proposed Int. No. 586-A would also clarify that the definition of "business dealings with the

city" would mean:

- Only concessions other than those awarded through competitive sealed bid;

- All contracts, concessions, franchises and grants that total less than five thousand dollars

    in value would be excluded from any calculation to determine if the one hundred

    thousand dollar threshold for inclusion as a "business dealing with the city" has been

satisfied.

Proposed Int. No. 586-A would include a definition for applicant for purposes of Charter

§197-c.  An "applicant" would include "a designated developer or sponsor of a project for which

a city agency or local development corporation is the applicant."   This amendment would ensure

that in cases where the City or "agency or entity affiliated with the city of New York" applies on

behalf of another entity that is not affiliated with the City because the City also has an interest in

such land use application that these persons would be included in the doing business database

and be subject to the contribution limits for those with "business dealings with the city".

Proposed Int. No. 586-A would exempt persons with contracts to provide affordable housing

pursuant to the Private Housing Finance Law or the General Municipal Law or any other city,

state or federal program from the definition of business dealings with the City.  For example, the

exemption would cover individuals with real property tax exemptions, zoning bonuses, low

income housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of

residents or on the rents or other charges to be paid by such resident.  This exemption was

included because to the extent the federal, state or local law requires individuals to engage in

these types of conduct or provides an incentive for acting in a particular fashion it is impractical

to consider these persons to be doing business with the City.

Proposed Int. No. 586-A would clarify the length of time a person or entity would be

considered to have "business dealings with the city":

| Type of Business Dealings with the City | Period of Coverage |
|---|---|
| Bids or proposals on contracts for the procurement of goods, services, construction, franchises or concessions | From the later of the submission of the bid/proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement.  An unsuccessful bidder would also be able to |

| | have his/her name removed from the database after losing a bid immediately upon request |
|---|---|
| Contracts for the procurement of goods, services or construction | During the term of such contract and for twelve months after the end of such term.<br><br>Except that if a contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, the contract would only constitute business dealings with the city upon the adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract |
| Leases in which the city of New York is the proposed lessee | A period one year after the commencement of the lease term or after the commencement of any renewal |
| City or any city affiliated entity is disposing of any real property interest | From the date of the submission of a proposal and during the term of any agreement and one year after |
| Applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases | From the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action; or<br><br>In the case of a decision of the city planning commission for which the council takes no action, the date which is twenty days following the filing of such decision with the council, provided, however, that in the case of a disapproval of a council action by the mayor, the date would be one hundred twenty days after expiration of the ten day period for council override under the Charter. |
| Concessions | During the term of such concession and for twelve months after the end of such term |
| Franchises | For the period of one year after the commencement of the term of the franchise or after the commencement of any renewal |
| Grants | For one year after the grant is made |
| Economic development agreements | From the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term |
| Contracts for the investment of pension | From the time of presentation of investment |

| funds, including the investments in a private equity firm and contracts with investment related consultants | opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term |
| --- | --- |
| | |

Proposed Int. No. 586-A would no longer use the term "officer" to refer to those individuals that would be included in the "doing business database." Instead, the definition of a "person" would include any chief executive officer ("CEO"), chief financial officer ("CFO") and/or chief operating officer ("COO") of such entity or persons serving in an equivalent capacity; any person employed in a senior managerial capacity regarding such entity; or any person with an interest in such entity that exceeds ten percent of the entity. If an entity does not have a specific person with the title CEO, CFO and/or COO, this definition would also cover those persons listed on VENDEX as performing those roles. While, the Council does not intend to cover board members of for profit or not-for-profit entities, if a board member(s) is listed on the VENDEX form because he or she acts in a CEO, CFO or COO capacity then that board member(s) would be covered. Further, the term "entity" with respect to the definition of a "person" outlined above would not include "neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis…"

Proposed Int. No. 586-A would require the mayor to develop and maintain a computerized "doing business database" that would be accessible to the Board. The Board and the Department of Information Technology and Telecommunications ("DOITT") would be required to certify that each category of "business dealings with the City" is reasonably accurate and complete before the specific category would become effective. Once the specific category

becomes effective, the mayor would be required to update the doing business database at least once monthly to ensure its accuracy and completeness.

Proposed Int. No. 586-A would set clear timelines for when a "person" would be deemed to be in the doing business database and create a process by which a person in the doing business database would be able petition to be removed from the database.   Specifically, a "person" would be considered to be in the doing business database from the date the person's name was entered into the database, as indicated by the earlier date of the date indicated in the database or the date the actual business dealings with the city began. However, the date that the person with business dealings with the city began cannot be any earlier than thirty days before the date such person was added to the database.  A "person" would be able to apply to the chief procurement officer (or other person designated by the Mayor to handle such requests) for removal from the doing business database in the event that person no longer has business dealings with the City.

Proposed Int. No. 586-A would specify that a participating candidate for election would only be permitted to accept contributions from persons with "business dealings with the city" in the amount of four hundred dollars for the office of mayor, public advocate or comptroller; in the amount of three hundred twenty dollars for the office of borough president; and two hundred fifty dollars for the office of city council.   Additionally, these contributions would not be matchable with public funds.  Further, while these contribution limits would not apply to any contribution made by a natural person who has "business dealings with the city" if the participating candidate is the contributor, or where the participating candidate's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage makes the contribution, Proposed Int. No. 586-A would require the mayor, the council and the Board to develop a task force to study whether spouses, domestic partners, and

unemancipated children should be included in the restrictions on contributions from persons with "business dealings with the city."

Most importantly, the proposed bill would also apply the restrictions on accepting contributions from those with "business dealings with the city" to non-participating candidates. It is vital to the Program that the restrictions on accepting contributions from those with "business dealings with the city" apply in the same manner to participants and non-participants to ensure that there is a level playing field.  Thus, to the extent that such restrictions did not apply to non-participants in the Program, such restrictions would not apply to participants in the Program.       Proposed Int. No. 586-A would require candidates to ask each contributor on a contribution card whether such contributor has business dealings with the city, and if so, that the contributor can only contribute up to the limits specified above.  The candidate would be required to keep a copy of the contribution card for their records and report each contribution to the Board at the next required filing.  The Board would be responsible for checking each contribution against the doing business database and notifying the committee within twenty days of the reporting of such contribution if a contribution exceeds the doing business contribution limitation.  However, in the six weeks preceding the election, the Board would be required to issue a response about the status of the contribution within three business days.  But, if the Board does not notify the candidate of such excess contribution in the specified timeframe, then the contribution would be deemed valid, but not be matchable.

If the Board notifies a candidate of a doing business contribution, the candidate would have twenty days to return the amount in excess of the contribution limits applicable to persons with "business dealings with the city."  However, no violation or penalty would issue to a candidate if such excess amount was postmarked or delivered within such twenty-day period.

The candidate's failure to return such excess contribution would not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible. However, the Board would be permitted to deduct an amount equal to the total unreturned contributions in excess of the doing business limitations from the public funds payment.

The Board would be authorized to issue rules to implement the doing business restrictions in the proposed bill and each city agency having business dealings with campaign contributors would be required to provide assistance to the Board in developing the doing business database and in publicizing the bill and the rules of the Board in connection with doing business contributions. However, the Board would not be responsible for distributing rules regarding categories of doing business activities that have not yet been certified as complete.

Proposed Int. No. 586-A would amend the requirement in Int. 586 that the Board issue a report to the Council twenty-four months after the enactment of the proposed bill regarding the status of the doing business database. In order to avoid the Board being required to issue a report on the status of the doing business database in the heat of the 2009 election cycle, the proposed bill would require the doing business report to be submitted to the Council at the same time that the Board submits its Charter mandated post-election report for the 2009 election cycle.

The proposed bill would still require that the report contain the status of each of the "business dealings with the city" categories and whether each such component has been certified. For those components that have not been certified, if any, the report must state the status of the development of each such component and the expected timeline for such component's certification. Moreover, the Board would be required to provide the council and

11

the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of the proposed bill.  If the Board submits its proposals to the council and the council accepts the proposals, or if the council fails to take action on such proposals within sixty days, such proposals would take effect.

### B.  Organizational Contributions & Permissible Contributors

The Act prohibits participants and non-participants from accepting corporate contributions.[6]  However, the law currently permits similarly structured business entities, such as limited liability companies ("LLC"), limited liability partnerships ("LLP") and partnerships are still permitted to contribute up to the full contribution limit. Although contributions from these entities are not matchable with public funds,[7] permitting these business entities to contribute has been a way to subvert the contribution limits because the Board rules only require that organizational contributions be attributed to the partner or owners where the contribution is greater than two thousand five hundred dollars.[8]

Proposed Int. No. 586-A would express prohibit LLCs, LLPs and partnerships from making contributions to participating or non-participating candidates from the business entity itself.  This restriction would not, however, prevent an individual owner of an LLC, LLP or partnership from making a contribution in his or her individual name.  The proposed bill would also clarify that if a contribution is from a contributor whose name is followed by a professional designation such as "M.D.", "Esq." and "C.P.A.," the board would not be permitted to treat that

---

[6] See administrative code section 3-703(1)(l) (2007).
[7] *See* Administrative Code §3-702(3) (2007).
[8] *See* 52 RCNY 1-04 (2007).

contribution as coming from a corporation, LLC, LLP or partnership in the absence of further indicia that the contribution is one of these entities.

### C.  Contributions to Transition and Inaugural Entities

Under the Act, TIEs are permitted to accept contributions from corporations although campaign committees are not permitted to do so.[9]  Proposed Int. No. 586 create a clear and consistent standard regarding permissible contributions for both campaign committees and TIEs by banning corporate contributions to TIEs and clarifying that TIEs cannot accept contributions from LLCs, LLPs, partnerships, and persons with "business dealings with the city," except if the contribution is from the candidate-elect, or the candidate-elect's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

### IV.    ENCOURAGE PARTICIPATION AND FAIRNESS

In order to encourage participation in the Program and fairness for participants, Proposed Int. No. 586-A would:  (i) improve due process for candidates in Board adjudications; (ii) establish audit safeguards and deadlines for ordering the return of public funds; (iii) increase the matchability of smaller contributions; and (iv) protect candidates in numerous other ways.

### A.  Due Process in Adjudications

Currently, when the Board issues a determination that public funds must be repaid, a candidate may not be aware of his or her ability to appear before the Board and be heard regarding the determination, and if they do choose to appeal, the process of doing so may be unclear, and can involve ex parte communication between Board staff, who serve an investigatory role, and the Board members themselves, who should be considering impartially the charges.

---

[9] *See* Administrative Code §3-801(2)(b) (2007).

13

Proposed Int. No. 586-A would remedy part of this problem by specifying that the Board cannot issue a claim for repayment of public funds against any candidate or authorized committee without prior written notice to such candidate or committee and a reasonable opportunity to be heard by the Board. Further, in order to ensure that the Board's conduct of hearings conforms with the due process protections afforded by the Citywide Administrative Procedure Act ("CAPA") as codified in chapter 45 of the Charter[10], the bill would require that all repayment claims must be adjudicated before the Board in accordance with CAPA, unless the candidate waives the conduct of a formal hearing.

The proposed bill would ensure the Board's compliance with CAPA by creating a necessary firewall between the investigative and adjudicatory powers and functions of the Board's staff and requiring that such divisions of the Board's staff must be separate and no staff member of the Board shall perform both investigative and adjudicatory tasks or functions.

### B.  Audit Safeguards & Deadlines for Returning Public Funds

According to the Board, as of February 26, 2007, approximately thirteen months from the final disclosure report due after the 2005 general election, the Board had completed only 53% of the 200 outstanding final audits.[11]  Further, as of May 10, 2007, the Board had only completed 65% of the outstanding 200 final audits from the 2005 election cycle.[12]  To the extent candidates are complying in a timely manner with Board requests for documents necessary to complete the audit in a timely manner, this lack of a deadline for completing Board audits does not provide candidates with closure about the audits from the previous election cycle in a reasonable time.

---

[10] *See generally,* chapter 46 of the charter (2007).
[11] *See* Proceedings of the Council of the City of N.Y., transcript of Governmental Operations Committee hearing February 26, 2007.
[12] *See* Proceedings of the Council of the City of N.Y., transcript of Governmental Operations Committee hearing May 10, 2007.

Proposed Int. No. 586-A would address this issue by amending several provisions of the Act and creating new provisions to impose obligations on the Board and candidates to reduce the duration of the Board's audits.  In addition, the Board would be required to provide candidates with timely resolution of repayment obligations and violations, if any, regarding past election cycles.  In creating such standards it is important to ensure that the Board may still fully audit campaigns to ensure compliance with the Act and recoup public funds when appropriate.

First, in order to ensure that Board audits are compliant with the standards applied to other governmental audits, the proposed bill would require the Board to conduct audits of campaigns in accordance with generally accepted government auditing standard ("GAGAS").  Some of the requirements of GAGAS as published by the United States General Accounting Office are:

1.    Audit organizations performing audits in accordance with GAGAS must have an external peer review of their auditing practices at least once every three years by reviewers independent of the audit organization.

2.    Auditors using GAGAS need to maintain their professional competence through continuing professional education by completing at least 80 hours of continuing professional education every 2 years.

3.    Each audit organization performing audits using GAGAS should have an appropriate internal quality control system to ensure compliance with GAGAS.

4.    Auditors should use a sample of expenses as documented by reasonable documentation to determine if further investigation of a category of expenses is warranted.[13]

_____

[13] *See generally,* United States General Accounting Office, *Government Auditing Standards 2003 Revision*

Proposed Int. No. 586-A would also require the Board to issue rules explaining what documentation would be sufficient to demonstrate a candidate's financial activity. This provision would provide clarity to campaigns that have had problems in the past documenting expenditures to the Board's satisfaction by making the Board provide examples of how to properly document expenditures.

The proposed bill would establish firm deadlines by which the Board must complete draft audits for participating, limiting participating, or non-participating candidates, which would be:

1. For City Council and borough wide races – eight months after the submission of the final disclosure for the covered election

2. For citywide races – ten months after the submission of the final disclosure for the covered election for citywide races.

If the candidate or their campaign manager participates in the Board's audit training, then the Board must complete the final audit for such participating, limited participating and non-participating candidate within the following timeframes, unless the subject of the audit consents to a longer period of time in writing:

1. For City Council and borough-wide races – fourteen months after the final disclosure for the covered election; and

2. For citywide races – sixteen months after the submission of the final disclosure for the covered election.

If the candidate or their committee does not participate in audit trainings, the final audit timeframe would be extended by an additional two months. If a committee fails to respond to the Board's request for additional information during the post-election audit process, the Board's time for completing the draft and final audits would be tolled and extended by the number of

days by which the committee has exceeded the original deadline for a response, so long as the committee has received timely written notice of the original deadline to provide the information, and the commencement of the tolling period pursuant to the bill.   In cases where the candidate or committee has provided Board auditors with inadequate documentation relating to the post-election audit, as long as the Board notified the candidate of the original deadline for providing the documentation, the start of the tolling period and the reasons why the documentation submitted was inadequate, then the Board's time for completing the draft and final audits would also be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response. Finally, the aforementioned deadlines for the Board's completion of draft and final audits would not apply in cases involving significant potential violation of the expenditure limits contained in the Act, alleged campaign-related fraud, other criminal issues, or issues that may constitute a breach of certification Board rules.   The proposed bill would include that if the Board's operations were interrupted due to a catastrophic emergency such as a natural disaster or criminal event, the Board would not have to comply with the firm deadlines for the completion of draft and final audits.

The final audit would have to include the final resolution of all issues raised in the draft audit, except that where such final audit contains notice of violations and recommended penalties, the Board would also have to provide notice of a hearing in accordance with the requirements of CAPA.

The proposed bill would require that if the Board determines that a participating candidate or his or her principal committee has committed a violation or infraction of the Act or Board rules, in most cases, the Board must issue written notice of such alleged violations before the final audit is issued. Further, the Board must provide a candidate with an opportunity to

appear before the Board and have a CAPA type hearing to contest such alleged violations and proposed penalties.   Proposed Int. No. 586-A would require that when the Board sends the candidate or principal committee the final audit, the Board must also send the candidate/committee formal notice of such right to appear before the Board, unless the candidate or principal committee waives the formal hearing.

If the Board conducts a hearing regarding such allegations of violation and proposed penalties, the board must make its final determination within thirty days after the conclusion of the hearing.   The final determination must provide the candidate with a final audit and any notice claiming repayment of public funds.   In addition, the Board would have to include in every final determination notice of the respondents' right to bring a special proceeding pursuant to Article 78 of the civil practice law and rules ("CPLR") and notice of the start of the four-month period for filing for a special proceeding pursuant to article 2 of the CPLR.

In order to provide campaigns with timely resolution with respect to any potential violations issued pursuant to section 3-710.5 of the Act, the proposed bill would add a requirement that any notice of violation or recommended penalties issued to a candidate must accompany the final audit.   But, if a candidate or committee has failed to respond to a request for information made by Board auditors or has inadequately responded during the post-election audit process, the Board's time for service notice would be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, so long as the committee received notice of the original deadline for submitting the information to the Board and the start of this tolling period.

Finally, section 3-710 of the Act requires a candidate to use any excess funds to

reimburse the campaign finance fund not later than ten days after all liabilities have been paid.[14] Proposed Int. No. 586-A would remove the specific date by which payments must be made. However, it is not intended that by removing the specific date for repayment would mean that candidates would not be responsible for reimbursing the campaign finance fund.

### C.  Increase Matchability of Smaller Contributions

Currently if a participating candidate meets the requisite threshold for eligibility, the participant will receive "payment for qualified campaign expenditures of four dollars for each one dollar of matchable contributions, up to one thousand dollars in public funds per contributor…"[15] Statistics show, however that small contributions from everyday New Yorkers are the majority of political donors.[16]  In attempting to eliminate the appearance of undue influence associated with contributions from "doing business" persons, and to equalize the voice of everyday New Yorkers in the political process, it is necessary to ensure that smaller contributions from average New Yorkers are important to candidates and to encourage candidates to seek those contributions.  It is also important to ensure that candidates from less affluent districts throughout the city still have access to sufficient funding to run successful campaigns and are not discouraged from participating in the Program.

Proposed Int. No. 586-A would address this goal by increasing the matchability ratio for smaller contributions of up to one hundred seventy five dollars.  The proposed bill would amend the Act to provide that if the participating candidate meets the eligibility threshold, the principal committee would receive payment for qualified expenditures of "six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up

---

[14] *See* Administrative Code §3-710(2)(c)
[15] *See* Administrative Code §3-705(2)(a) (2007).
[16] *See*, New York City Campaign Finance Board, Public Dollars for the Public Good: A Report on the 2005

to five hundred twenty-five dollars in public funds per contributor in the case of a special

election)." Under the six to one matching ratio, the maximum matchable portion of the

contribution would remain close to the current maximum of one thousand dollars; however,

smaller contributions would earn a higher matching rate, which would incentivize such smaller

contributions.  While the full fiscal impact of this change is still being analyzed, it does not seem

to be a substantial additional cost to the Program.

Proposed Int. No. 586-A would require the Board to promulgate rules regarding the bonus

match pursuant to section 3-706 of the Code.  In issuing such rules, the Board must ensure that

they maintain the current maximum amount of public funds payable in both situations where the

participating candidate's opponent exceeds the cap.  Authorizing the Board to issue rules

regarding the matching formula in bonus match situations ensures that any time the standard

ratio for matching funds is changed legislatively that the calculation of the correct multiple for

the bonus match is obtained without affecting the dollar amount of the bonus match.

### D.  Other Candidate Protections

The Act currently requires that candidates that seek to participate in the Program must

file a certification of intention to abide by the Act and Board Rules by the first day of June in the

year of the covered election, or such other date as the Board shall provide by rule.[17]  However,

there is no provision in the Act that permits a candidate that has filed a certification to

subsequently rescind such certification and withdraw from the Program (and the necessity of

complying with the stricter rules for participating candidates) because the candidate has

determined he/she faces no opponent or decides that he/she will not need public funding.

Proposed Int. No. 586-A would address this problem in two ways.  First, it would extend

---

Elections at page 40 (September 1, 2006) [hereinafter Report].
[17] *See* Administrative Code §3-703(1)(c)(i) (2007).

the deadline by which a candidate has to file a certification of intention to participate in the

Program to June tenth of the year of the covered election. This would allow candidates to

determine whether they face a challenger during the petitioning process. Second, to the extent a

candidate files a certification in advance of the June tenth deadline, the candidate would be

permitted to rescind such certification in writing to the Board on or before June 10th.  Both of

these amendments would permit candidates to have more time to determine the competitive

nature of their race and whether participating in the Program and accepting public funding is

necessary.

Expenditures in the final days preceding an election can be the most crucial to a

campaign and the ability to budget properly and have final resolution about the amount of public

funds that a participating candidate is entitled to and will receive is a vital part of that equation.

The proposed bill would attempt to provide campaigns with more clarity about whether they will

receive public funds and establish a fairer and more expedited system for challenging the

Board's determination of non-payment of public funds.

Specifically, subdivision four of section 3-705 of the Act would be amended to require

the Board to: (1) schedule at least three dates for the payment of public funds to eligible

participating candidates in the thirty days prior to the covered election; and (2) issue a written

final determination specifying the basis for any decision of non-payment of public funds to

which the candidate believes he/she is entitled. Further, Proposed Int. No. 586-A would require

the Board to allow candidates to petition the Board for reconsideration of any such non-payment

determination, which shall occur within five business days of the filing of such petition.   If the

Board denies the participating candidate's petition, the Board would have to provide candidates

of their right to challenge the Board's final determination via a CPLR Article 78 proceeding

The proposed bill would encourage candidates to be diligent and quickly correct any errors they have made and protects candidates from punishment for honest mistakes by providing that if a candidate commits a violation of the Act or Board rules but corrects such violation prior to notification by the board of a potential violation, the Board may not subject the candidate to any penalty for such self-corrected violation.

Each participating candidate is assigned a Board staff person, also known as a candidate service liaison ("CSL"), to assist the campaign with questions relating to compliance with the Program.  However, candidates have often complained that the CSLs provide contradictory advice or incorrect advice, which the campaign may rely on and that may subsequently subject the campaign to penalty for following such advice.  It is important that the Board is not discouraged from providing oral, informal advice to campaigns and is not be obligated to put all advice provided to campaigns in an official advisory opinion because that would be too burdensome.  Campaigns, however, must be able to reasonably rely on oral advice provided by CSLs.  Proposed Int. No. 586-A would protect both of these interests by specifying that if a CSL gives a candidate an oral opinion and the candidate confirms such opinion in writing to the CSL (via registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt) describing the action to be taken and the advice provided by the CSL and the Board or its staff does not respond to such writing within seven days disavowing or altering such advice, the candidate's reliance on the CSL's advice is lawful.  Proposed Int. No. 586-A would make clear if the Board decides to disavow or alter the advice in the candidate's confirmatory writing, the Board must do so in a writing to the candidate in one of the ways described for the candidate to send the writing confirming the oral advice, i.e., by registered or certified mail to the correct address or by electronic or facsimile with evidence of receipt.

In order to make it easier for campaigns to comply with the disclosure requirements of the Act and state election law, the proposed bill would require any disclosure software that the Board issues after January 1, 2008 must permit candidates to meet any disclosure obligations under the Act and state election law.

Proposed Int. No. 586-A would require that participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign attend a training provided by the Board explaining how to comply with the requirements of the Program and use of the Program software. Requiring such training would enable campaigns to be more familiar with the Board's practices and policies and make compliance easier.

Finally, Proposed Int. No. 586-A would add a new section to the bill to require the Board to accept electronically scanned copies of documents from candidates, which would make it easier for campaigns to submit required documentation to the Board more quickly and efficiently.

### E. Exempt Expenditures

Currently, the law provides that expenditures to comply with the Act or state election law, "including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures, and expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing of election results" are exempt from expenditure limits.[18] Since the list of exempt expenditures included broad categories, such as general compliance costs and costs relating to petition expenditures, it caused a lack of clarity for campaigns about whether the Board would ultimately determine that certain expenditures made by the campaign were not exempt expenditures.

---

[18] *See* Administrative Code §3-706(4).

The proposed bill would eliminate all exempt expenditures except for the costs of bringing or defending any action to determine a candidate's or political committee's compliance with the requirements of the Act, election law, or other law governing candidates or political committees; expenses to challenge or defend the validity of petitions for certification to the ballot; and expenses related to the post-election audit. The purpose of this provision is to eliminate any confusion about what expenditures are exempt. For example, under the current law, candidates can claim compliance costs and petitioning costs as exempt. However, the Council has heard reports that the Board in applying the law has offered inconsistent rulings that have caused uncertainty for campaigns making it difficult to be able to budget and spend effectively. Indeed, currently, in an attempt to avoid this uncertainty, the Board allows campaigns to claim up to seven and a half percent of the applicable expenditure limit as exempt without requiring documentation. [19]  The proposed bill would take a different approach by eliminating exempt expenditures altogether (except for those specified above) and increasing the applicable expenditure limits by the current safe-harbor amount of seven and a half percent.

It is not intended that by keeping exempt "bringing or defending any action" or "expenses related to the post-election audit," however, would permit campaigns to continue to include all compliance related expenditures as exempt. Instead campaigns would be permitted to exempt solely those expenditures related directly to a campaign's preparation for a post-election Board audit or bringing of an action, as the case may be.

## F.  Requirements for the Board

When the Board hears a case or issues a determination affecting a campaign, it is important for the legitimacy of the process that the Board members understand the complexities of

---

[19] *Id.*

elections and how the requirements of the Act and the Program affect campaigns, especially during peak times in the election cycle.  Proposed Int. No. 586-A would provide Board members with this essential knowledge in two ways.  First, to specify that when the mayor and the speaker make appointments to the Board, they should consider experience campaign experience, in particular with the Program.   In addition, members of the Board and staff would be required to undergo training, which would be developed by the mayor and the council, in conjunction with the Board.  The training would include the issues and problems confronted by campaigns for covered office and how the application and enforcement of the Act impacts these campaigns.

**V.    CLARIFICATION AND SIMPLIFICATION OF THE PROGRAM**

Proposed Int. No. 586-A would clarify and simplify the Program in several ways.  Specifically, by: (i) improving the definition of "non-competitive elections;" (ii) specifying permissible campaign expenditures; (ii) creating standards for candidate liability; and (iii) clarifying, among other things, the definition of intermediary.

**A.  Non-Competitive Elections & Statement of Need**

Under the Act, a participating candidate on the ballot in a covered election is only eligible to receive one quarter (or 25%) of the maximum public funds payment, unless the participating candidate can demonstrate:

> (a) the participating candidate is opposed by another participating candidate who has qualified to receive public funds in such election; or

> (b) the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount, which in the aggregate, exceeds one-fifth (or twenty percent) of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

> (c) the participating candidate has submitted a signed statement ("Statement of Need") attesting to the need and stating the reason for additional public funds in such election, in

25

which case the board shall publish such statement at the time of such additional public funds are paid, including on the board's internet website.[20]

However, candidates have submitted the Statement of Need in cases where there may have been no real need or in the converse not submitted the Statement of Need in elections that were legitimately competitive. Either way, the issue has been subject to public scrutiny and editorial boards, good government groups and the Board have called for stricter standards for receipt of the public funds in so called "non-competitive elections."[21]  Unfortunately, the question of when elections are competitive and therefore should trigger public financing is a difficult issue to address legislatively. While it is important to protect the public fisc from paying public funds to "frivolous" campaigns, it is also important to acknowledge that elections may be made competitive based on more than just the spending of an opponent.

The first way that Proposed Int. No. 586-A would address this issue is by repealing paragraph (a) of subdivision 7 of section 3-705 and removing the automatic trigger of full public funds for a participating candidate in the case where such participating candidate's opponent has qualified for public funds.

Secondly, the proposed bill would strengthen the requirements for what the candidate must attest to in the Statement of Need in order to trigger the full public funding for which the candidate is eligible.  The candidate would be required to submit a *certified* signed statement indicating such need and certifying that:  (i) one or more of the following conditions applies and provide documentation supporting the applicability of such condition; and (ii) such condition or conditions reasonably demonstrates the need for such public funds.  The conditions that the participating candidate would be required to demonstrate are:

---

[20] *See* Administrative Code §3-706(7)(2007).
[21] See Report at p. 131.

(1)  the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2)  the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members**;**

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name in television, radio or print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4)  the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child hold or have held elective office in an area encompassing all or part of the area that is the subject of the current election in the past ten years.

Upon the submission of the such Statement of Need to the Board, the Board would be permitted to verify the truthfulness of the certified statement submitted and of any supporting documentation and would be permitted to post the certification and supporting documentation on its website.

Third, Proposed Int. No. 586-A would provide that any primary or special election for

which there is no incumbent would be deemed competitive for purposes of triggering full public funding under the Act.

Finally, the proposed bill would strengthen the provisions in Int. No. 586 regarding non-competitive elections by providing that if a participating candidate endorses or publicly supports his or her opponent for election, the participating candidate would not be eligible for public funds.  Further, if a participating candidate loses a primary election, but remains on the ballot for general election, before the participating candidate would be eligible for pubic funds, he or she would be required to certify to the Board that the candidate will actively campaign for office.

### B.  Permissible Expenditures for Private & Public Money

In order to qualify for public funds, a participating candidate must meet a threshold of eligibility in a primary or general election, or special election to fill a vacancy.[22]  However, the law is currently silent on how authorized committees may permissibly spend their privately raised campaign funds.  If the Board determines that an expenditure was non-campaign related, it could result in an obligation to repay public funds under the Act.[23]  Board advisory opinions have attempted to clarify permissible expenditures for the privately raised money, however, the substantial amount of time it takes the Board to issue such advisory opinions and the lack of clarify of such opinions can be troublesome to a campaign in the final days before an election.

Proposed Int. No. 586-A, therefore, would insert necessary clarity in the Act for campaigns that accept public funds by defining "expenditure" or "campaign expenditure" to include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures.  In addition, Proposed Int. No.

---

[22] *See* Administrative Code §3-703(2)(a) (2007).

586-A would add that it would be permissible to spend privately raised campaign funds on exempt expenditures as defined in the Act.

There would be a *rebuttable presumption*, however, that the list of "expenditures" or "campaign expenditures" is in furtherance of a political campaign for elective office (emphasis added). The presumption that the expenditure is valid could be rebutted if it was made to a person or entity associated with the candidate making such expenditure or on whose behalf such candidate's committee made such expenditure. A person or entity associated with the candidate would be defined as "a spouse, domestic partner, child parent or sibling; a person with whom the candidate has a business or other financial relationship." In addition, the Board could rebut the presumption by looking at factors such as the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure.

Int. No. 586 enumerated that the following expenditures would be presumptively valid:

1.   Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

2.   Contributions to candidates, registered political committees subject to the provisions of section 3-705(8);

3.   Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

4.   Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

5.   Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

6.   Legal defense of a non-criminal matter arising out of political campaign;

---

[23] *See* Administrative Code §3-710 (2007).

7.  Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

8.  A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

9.  Payment of non-criminal penalties or fines arising out of a political campaign; and

10. Costs incurred in demonstrating eligibility for the ballot, public funds payments or defending against claim that public funds must be repaid.

Proposed Int. No. 586-A would clarify that, subject to the provisions of the Act, it would be permissible for a candidate who accepts public funds to spend privately raised money on contributions to candidates and all political committees, not just those *registered* with the Board as previously specified in Int. No. 586 (emphasis added).  This amendment was made to ensure that a campaign would be able to make political contributions to any campaign committee, not solely those that are registered with the Board.  The proposed bill would also specify that food and beverages provided to campaign workers and volunteers would be permissible campaign expenditures.

Int. No. 586 provided that participants, limited participants and non-participants cannot convert campaign funds to a personal use, which is unrelated to a political campaign, and the following expenditures would not be in furtherance of a political campaign for elective office:

(1)    Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate, or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

(2)    Any residential, or household items, supplies or expenditures;

(3)    Clothing, haircuts and other personal grooming;

(4)    Funeral, cremation, or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

    (5)      Automobile purchases;

    (6)      Tuition payments, childcare costs;

    (7)      Dues, fees, or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

    (8)      Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

    (9)      Expenditures for non-campaign related travel, food, drink or entertainment; If a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

    (10)    Gifts, except brochures, buttons, signs and other campaign materials.

Proposed Int. No. 586-A would create an exception from gifts being treated as impermissible campaign expenditures to permit gifts costing less than fifty dollars in value given in expression of gratitude, condolences, or congratulations because it is reasonable to permit candidates to send flowers or other nominal gifts to thank campaign volunteers etc. or to show sympathy on certain occasions.

The proposed bill would require participating and limited participating candidates to agree that expenditures for purposes of ballot proposal advocacy would be subject to contribution and expenditure limits.

Int. No. 586 specified that it would be impermissible to use public funds for ballot proposal advocacy, unless it furthers the candidate's nomination for election, and payment of any penalty or fine under federal, state or local law.  Proposed Int. No. 586-A would also add that it would be impermissible to spend public funds on payments made through advances, except for individual purchases totaling two hundred fifty dollars or more. Currently, the Board does not permit public

funds to be used on payments made through advances.  Permitting participating candidates to use public funds for advances in excess of two hundred fifty dollars would loosen this prohibition while avoiding the problems that have occurred with participating candidates being unable to provide sufficient documentation to the Board to substantiate smaller advance payments.

### C.  Candidate Liability for Repayment of Public Funds

Currently, pursuant to section 3-710(2)(b) of the Act, candidates are not held personally liable for repaying public funds in cases where the Board determines that "any portion of the payment made to a principal committee of a participating candidate from the [New York City election campaign finance] fund was used for purposes other than qualified expenditures."[24]  In those cases, "[the Board] it shall notify such committee of the amount so disqualified and such *committee* shall pay to the board an amount equal to such disqualified amount" *(emphasis added)*.[25]  The candidate may, however, be subject to a civil penalty up to $10,000 for such violation of the Act.[26]

The bill would provide for participating candidate personal liability for repaying public funds not spent on qualified expenditures, in cases where the candidate has not submitted any credible documentation to the Board for each expenditure, if the Board can demonstrate that there was no credible documentation because the candidate lacked adequate controls including, but not limited to trained staff, internal procedures, to follow the Board's published guidelines and procedures to follow standard financial controls.  Conversely, however, if the candidate has documentation supporting expenditures, but the Board determines the documentation is *incomplete*, the Board would not be permitted to seek personal liability against the candidate

---

[24]*See* Administrative Code §3-710(2)(b) (2007).
[25] *See* Administrative Code §3-710(2)(b)(2007).
[26] *See* Administrative Code §3-711 (2007).

(emphasis added).  This provision would balance two very important concerns:  (1) that the public fisc be protected to ensure that when participating candidates impermissibly spend public funds there is a way to recoup such impermissibly spent public funds; and (2) that participating candidates not be discouraged from participating in the Program for fear that they will be held personally liable for repaying public funds if they make an honest mistake or rely on information provided to them by Board staff.

The bill, however, would not provide for treasurer liability because treasurers are often volunteers that assist a campaign due to a relationship with the participating candidate.  If liability were extended to them, the Council fears that it would discourage treasurers from volunteering for campaigns.  It is, however, not the Council's intent that this bill diminish any of the other provisions of the act that provide for candidate liability.

### D.  Definition of Intermediary

Proposed Int. No. 586-A would amend subdivision twelve of section 3-702 to expand the definition of intermediary.  Currently, participating or limited participating and non-participating candidates must report contributions to the Board that were **delivered** through an intermediary (emphasis added).[27]  The Act defines an intermediary as "an individual, corporation, partnership, political committee, employee organization or other entity which, other than in the regular course of business as a postal, delivery or messenger services, delivers any contribution from another person or entity or other authorized committee."[28] However, under the current definition, unless the intermediary actually delivers the contribution to the candidate or political committee, the campaign does not have to disclose that the person is an intermediary.

The bill would expand the definition of intermediary to cover the aforementioned persons

---

[27] See administrative code §3-702(12).

that "solicit contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee." The candidate or authorized committee would be presumed to know that a person was a solicitor of the contribution if this information was clearly identified to the candidate or his or her authorized committee. This expansion of the definition would ensure that the Act covers scenarios such as when a person solicits contributions, but does not personally deliver such solicited contributions. The bill would also add "hosts of a campaign sponsored fundraising event" to the exemptions already in the Act so that they would not be included in the definition of intermediary. Finally, the bill would clarify that for non-campaign sponsored fundraising events, if there are multiple individual hosts, the hosts must only designate one such host as the intermediary for reporting purposes.

### E. Debates

Proposed Int. No. 586-A would amend the Act to tighten the standards for participation in debates. As an incentive to being a debate sponsor, the City would agree to indemnify each debate sponsor for any liability of the sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate.

Further, Proposed Int. No. 586-A would tighten the criteria that must be satisfied in order for a candidate to participate in a debate. Currently, the Act allows that a candidate can qualify to participate in a debate if the candidate raises or spends (or has raised or spent) twenty percent of the expenditure limit.[29] However, sometimes candidates meet this requirement by loaning themselves the money or via other means that do not conform to the Act's intent. The proposed bill would require that candidates must have raised **and** spent the twenty percent threshold

---

[28] Id.
[29] See administrative code §3-705(5) (2007).

(emphasis added). Additionally, only contributions raised and spent in compliance with the Act would count towards satisfying the debate eligibility threshold, which would mean for example that corporate contributions would not count towards meeting the threshold. Finally, the proposed bill would remove the requirement that the Board, the debate sponsor and the potential debater must all agree to cancel the debate.[30] Instead, if there were only one participating or limited participating candidate in the debate, the Board would cancel the debate.

## VI.    EFFECTIVE DATE PROVISIONS

Proposed Int. No. 586-A provides that all of the restrictions on contributions from those with "business dealings with the city" would become effective for each component of business with the City (e.g. contract holders, contract bidders, land use applicants) thirty days after the Board and DOITT certify to the mayor and the council that the doing business database identifies CEOs, CFOs and/or COOs or other persons serving in a similar capacity, persons with a ten percent or greater interest in an entity or persons employed in a senior managerial capacity within each of those doing business categories.[31] The Board would be permitted to certify that any component of the doing business database is complete when it has determined that each component identifies such persons with reasonable completeness and accuracy.

Once the Board certifies a component, DOITT must immediately provide to the mayor and the council a report analyzing the steps taken to compile the component of the database certified and the Board must provide a report with an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. The report would also need to specify the process by which DOITT and the Board would update the doing business database and ensure that names of persons no longer doing business with the city are removed.

---

[30] See administrative code §3-709.5 (2007).

Proposed Int. No. 586-A would amend the firm deadlines by which components of the doing business database must be certified. Specifically, the deadline for certification with respect to clauses:

> (i) the holding of contracts for the procurement of goods, services or construction;
> (iv) franchises and concessions; and

would be six months from the effective date of the bill.

The deadline for certification with respect to clauses:

(ii) any bid or proposal for a contract for the procurement of goods, services or construction;
(v) any bid or proposal for a franchise or concession;
(vi) recipients of a grant;
(vii) party to an economic development agreement; and
(viii) a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants.

would be one year from the effective date of the bill.

The deadline for certification with respect to clause (iii) acquisition or disposition of real property, applications for approvals sought pursuant to the provisions of section 195 of the Charter or certified pursuant to section 197-c of the Charter would be sixteen months from the effective date of the bill.

In order to ensure that the proposed bill would not take effect too close to the 2009 elections and cause unnecessary chaos in the Program, if any component of the doing business database has not been certified on or before December 1, 2008 it would not be permitted to be certified until on or after November 30, 2009. The inclusion of firm deadlines for the certification of the components of the doing business database and a date by which no further components would be certified would ensure that a new component would not become effective too close to the 2009 elections and cause unnecessary chaos in the Program.

---

[31] *See* supra section 3A of this paper and supporting text for further specification on doing business categories.

1

2    CITY COUNCIL

3
     CITY OF NEW YORK
4
     ------------------------------x
5
     THE TRANSCRIPT OF THE MINUTES
6
                of the
7
     COMMITTEE ON GOVERNMENTAL
8    OPERATIONS

9    ------------------------------x

10
                         June 21, 2007
11                       Start:  1:30 p.m.
                         Recess: 2:45 p.m.
12
                         City Hall
13                       Council Chamber
                         New York, New York
14

15       B E F O R E:

16           SIMCHA FELDER
                              Chairperson,
17

18           COUNCIL MEMBERS:   Joseph Addabbo
                                Erik Dilan
19                              Domenic Recchia
                                Larry Seabrook
20                              Peter Vallone, Jr.
                                James Vacca
21                              Tony Avella
                                Gale Brewer
22

23

24       LEGAL-EASE COURT REPORTING SERVICES, INC.
                17 Battery Place -  Suite 1308
25              New York, New York 10004
                     (800) 756-3410

2

1

2  A P P E A R A N C E S

3
     Amy Loprest
4  Executive Director
     Campaign Finance Board
5
     Edith Prentiss
6  1st Vice President
     Disabled in Action
7
     Elizabeth Sperber
8  Democracy Matters

9  Abhishek Mistry
     Organizer
10  Democracy for New York City

11  Edward Hartzog
     Executive Director
12  New Democratic Majority

13  Dan Jacoby
     Organizer
14  Democracy for New York City

15  Adrienne Kivelson
     City Affairs Chair and Election Specialist
16  The League of Women Voters

17  Heather Taylor
     Citizens' Campaign
18
     Isaac Sasson
19  President
     Holly Civic Association
20
     Linda Eskenas
21  Four Borough Neighborhood Preservation Alliance
     Corp.
22
     Michael Freedman-Schapp
23  Senior Policy Associate
     New York Industrial Retention Network
24

25

3

```
 1

 2  A P P E A R A N C E S  (CONTINUED)

 3
    Ed Jaworski
 4  Executive Vice President
    Madison-Marine-Homecrest Civic Association
 5
    Kathy Jaworski
 6  Corresponding Secretary
    Madison-Marine-Homecrest Civic Association
 7
    Robert Furman
 8  Chairman
    Four Borough Neighborhood Preservation Alliance
 9
    Mary Ann H. McGowan
10  Clove Lake Civic Association

11  Walter Mugdan
    President
12  Westmoreland Association

13  Daniel McCalla
    Four Borough Neighborhood Preservation Alliance
14

15

16

17

18

19

20

21

22

23

24

25
```

4

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2              CHAIRPERSON FELDER: Good afternoon.

3   I apologize for being late, those of you who were

4   here at 1 o'clock and saw that we were here at 1

5   o'clock, as well.  So I'm apologizing because it's

6   my responsibility that this hearing is starting

7   late, but not for not being here on time.  That was

8   a deep thought.  I will talk about it later.

9              I want to introduce my colleagues who

10  are here today.  We have, from my left, Council

11  Member Vacca, Council Member Vallone, Council Member

12  Brewer, Council Member Dickens and Council Member

13  Seabrook.

14              Today we're going to be addressing

15  three Intros., and we're going to deal first with

16  the Intro. No. 263, which relates to Campaign

17  Finance Law, and after that, we will address 262 and

18  proposed Intro. 586A.  In the meantime, I will call

19  up Amy Loprest from the Campaign Finance Division

20  and Carole Campolo, and anybody else that wishes to

21  come up with you.

22              Is anyone else coming up?  There is

23  no one else there that works with you that wants

24  some attention?  Okay.

25              Now that I've stalled all that time,

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  I have to stall additional time.  So I just figure

3  at least we'll be able to start as soon as they're

4  here.

5           Is there anyone in the audience that

6  has anything they want to talk about?

7           So I have been given permission to

8  start.  I just want to introduce Mora Keeney

9  (phonetic), the Deputy Chief of Staff, and thank her

10  in advance for all the work and effort and energy

11  that she has put into this bill.  I thank you for

12  being here to make sure that I do the right thing,

13  and Mike Cassatano (phonetic), my Legislative Aide,

14  Communications Director, who does that on a regular

15  basis, make sure that I do the right thing.

16           Before we go into the hearing,

17  Council Member Seabrook who has been sick in bed for

18  a number of days, we dragged him out of bed for

19  these important votes, and we'd like to give you

20  permission to vote and go home and get better.

21           COUNCIL CLERK: Intro. 262, 263 and

22  586A, Council Member Seabrook.

23           COUNCIL MEMBER SEABROOK: Yes, to be

24  excused, explain my vote and thank you very much,

25  and I'm going to vote and leave. I'd like to be

6

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  recorded yes on 586A, and no on 262, and no on 263,

3  Mr. Chairman.

4              CHAIRPERSON FELDER: Thank you very

5  much, and we all hope and pray you feel better soon,

6  so you can stay for all the Committee meetings.

7  Okay?  Whenever you're ready.

8              MS. LOPREST: Just to clarify, 586A is

9  the Campaign Finance Act, correct?  Okay.

10              Good morning, Chairman Felder and

11  Committee members. I am Amy Loprest, Executive

12  Director of the New York City Campaign Finance

13  Board.  With me is Deputy Executive Director Carole

14  Campolo.  I am here to testify on Intro. No. 586A.

15  As I expressed to this Committee previously, we are

16  pleased to have taken part in the process that

17  produced this important legislation.  In my

18  testimony today, I would like to focus on some

19  issues that were not fully addressed in our last

20  appearance before this Committee.  This legislation,

21  as amended, will require the Board to accept certain

22  documentation through an electronically scanned

23  transmission. While accepting these documents

24  electronically has been a goal of the Board, there

25  is no protocol currently in place to do so.  In

7

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   response to this legislation, the Board will be

3   drafting new rules over the next several months to

4   meet each of its administrative mandates.  Those new

5   rules will define a format and a method for

6   electronic submissions meant to ensure the

7   legibility and authenticity of documents received in

8   this manner, and campaigns interested in submitting

9   backup documentation to the Board electronically

10  will be guided by those rules.

11              In our previous testimony, we spoke

12  briefly about the budgetary impact of this new

13  legislation.  Since then, we have prepared a

14  conservative estimate of the resources that will be

15  necessary to meet the bill's new administrative

16  mandates.  We are estimating that these mandates

17  would require approximately a 50 percent increase in

18  the Board's budget.  The largest part of this

19  increase is for new staff and additional space to

20  house those staff.  The need for additional space is

21  especially critical in order to ensure this

22  legislation is implemented for the 2009 election, as

23  the Council intends, and that process must begin

24  immediately.

25              We are anticipating assistance from

8

```
 1  COMMITTEE ON GOVERNMENTAL OPERATIONS

 2  both the Council and the Administration in procuring

 3  the resources necessary to implement this

 4  legislation once it becomes law.

 5              I'd like to thank both the Council

 6  and the Administration in adopting, in the current

 7  Fiscal Year 2008 Budget, the additional resources

 8  that we had requested based on the Intro.

 9              You have also asked a series of

10  questions about the Board's application of current

11  law.  We have addressed those questions in a letter

12  which is attached to this testimony and has been

13  submitted to you for the record.

14              Thank you for the opportunity to

15  testify today, and I look forward to answering any

16  questions you may have.

17              CHAIRPERSON FELDER: Do any of my

18  colleagues have any questions?  Council Member

19  Vacca.

20              Let me introduce Council Member

21  Addabbo, who should be back shortly.  Thank you.

22              COUNCIL MEMBER VACCA: Can you please

23  let me know what is your current budget?

24              MS. LOPREST: Our current budget is

25  about $9.8 million.
```

9

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2                   COUNCIL MEMBER VACCA: Does that

3   reflect the additions that the Council made?

4                   MS. LOPREST: Yes, for 2008.

5                   COUNCIL MEMBER VACCA: For 2008?

6                   MS. LOPREST: Yes.

7                   COUNCIL MEMBER VACCA: So you're at

8   9.8?

9                   MS. LOPREST: Yes.

10                   COUNCIL MEMBER VACCA: So you are

11  requesting an increase of 50 percent?

12                   MS. LOPREST: This is a conservative

13  estimate.  I mean, when we submit our budget next

14  year, and the year after, we will be revising and

15  making assessments.  As we begin to implement the

16  changes in the law, we'll probably have a better,

17  more precise number, but that's the most

18  conservative budget estimate.

19                   COUNCIL MEMBER VACCA: The

20  conservative estimate would be at least 50 percent

21  beyond your $9.8 million budget, and that would be

22  for Fiscal Year 2009?

23                   MS. LOPREST: Yes.

24                   COUNCIL MEMBER VACCA: So it's not a

25  request for this year.

10

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2              MS. LOPREST: It's not a request for

 3   this year.

 4              COUNCIL MEMBER VACCA: Okay.  Thank

 5   you.

 6              MS. LOPREST: And just to clarify,

 7   Council Member Vacca, when I say conservative, I

 8   mean in a budget term that means the high end, not a

 9   low end.  I mean, that's the upper  -- conservative

10   for budgeting is the worst case scenario.

11              COUNCIL MEMBER VACCA: I understand.

12   Thank you.  I needed that.  I appreciate that.

13   Thank you.

14              CHAIRPERSON FELDER: Do any other

15   members have any questions?  Seeing none, I thank

16   you very much for being here and for working

17   together with us on this monumental piece of

18   legislation.

19              MS. LOPREST: Okay.  Thank you very

20   much.

21              CHAIRPERSON FELDER: The next panel --

22   and I'm going to ask for the Sergeant-at-Arms if you

23   could please help us out, as you always do -- we

24   need three more chairs at the witness table, please.

25              So we have Edith Prentiss, Marc
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Crawford Leavitt, Dan Jacoby, Abhishek Mistry  --

3  Did I pronounce that correctly? Abhishek.  I should

4  be able to do that  --  Elizabeth Sperber and Edward

5  A. Hartzog.   What's the last name?

6             MR. HARTZOG: Hartzog.

7             CHAIRPERSON FELDER:  Okay. I'm

8  trying.

9             First of all, Sergeant-at-Arms,

10  please set the timer for two minutes.  I should do

11  it.  I mess this up all the time. I'm sorry.

12             Second of all, anybody who is here

13  who has not signed up, the 15-minute rule from the

14  time the hearing starts, in this Committee if you

15  don't sign up within 15 minutes from the time the

16  hearing begins, you lose your opportunity to speak.

17  You have another six minutes.  We started about

18  1:30.  If there is anyone here that wants to testify

19  that didn't fill out one of these slips should see

20  the Sergeant-at-Arms and he's sitting right over

21  there.

22             Finally, for those that are

23  testifying, this is very important, I don't want to

24  seem rude, but I'm not going to allow you to repeat

25  the same things over and over again.  So I would

12

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   just appreciate, and I think it's for the benefit of

 3   everybody, that I am going to try to listen to what

 4   you say, and you should try to listen to what the

 5   people testifying before you say.  You can say I

 6   agree with or disagree and then add whatever is new.

 7   Okay?  You can start in any order you like.  Thank

 8   you.

 9              MS. PRENTISS: Hello.  My name is

10   Edith Prentiss. I'm the 1st VP of Disabled in

11   Action, and the President of the 504 Democratic

12   Club.  In New York City, despite the numerous

13   attempts to reorganize and limit campaign spending,

14   there has never been a successful attempt to change

15   the way in which campaigns are done. The bottom line

16   is the person who gets the most money, spends the

17   most money and is likely to win.

18              I'd like to address the issue of

19   campaign finance --

20              CHAIRPERSON FELDER: I just want for

21   the record, you did speak for 16 seconds, but I

22   wasn't listening to you, so we are starting from the

23   beginning.

24              MS. PRENTISS: Okay.  Start from the

25   beginning.
```

13

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                CHAIRPERSON FELDER: Okay.  Ready.

3                MS. PRENTISS: My name is Edith

4    Prentiss.  I'm the 1st VP of Disabled in Action and

5    the President of 504 Democratic Club.  I would like

6    to speak about campaign finance from the unique

7    perspective of disabled New Yorkers.

8                Disabled New Yorkers are involved in

9    a number of issues.  We're very good at screening

10   candidates.  We are your footworkers often, but

11   we're not affluent. We're not members.  Even if your

12   events were accessible, we're not likely going to be

13   paying $200, $500, whatever, to attend.

14                I'd like to address four items that

15   specifically show the lack of impact of poorer New

16   Yorkers.  DRIE, Disabled Renters' Increase

17   Exemption, is competing with the big money of

18   developers, landlords, et cetera.  Do we have ever

19   any hope of that rent being frozen parity to

20   seniors?  Seniors have a much greater block than we

21   do.

22                EPIC, the expansion of EPIC, we're

23   competing with other groups that want to see the

24   money that is being saved in the Medicaid at the

25   Albany level that would like those monies to go into

14

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    other programs.  We are a very low priority.

3              Visitability, we feel that

4    visitability is very simple, very easy, make places

5    accessible.  We'd like to visit with our families as

6    well.

7              The Taxis for All, need I say more?

8    That's the City Council level and the City level.

9    Will we ever see accessible taxis in our lifetime?

10   Hey, we got green ones.

11             I think that people with disabilities

12   are unlikely to attend your events.  We are your

13   workers.  We feel that the only way in which we will

14   have an equal and appropriate influence is if there

15   were total overhaul of the campaign finance system.

16   We need to look at smaller donations.  We need to

17   look at better matches. We need to look at a whole

18   lot of other things.  We also need to hold

19   politicians to their word.  Thank you.

20             CHAIRPERSON FELDER: Thank you very

21   much.  Next.

22             MS. SPERBER: Hi.  My name is

23   Elizabeth Sperber.  I'm a resident of the Lower East

24   Side and a member of Democracy Matters and a

25   volunteer with Citizen Action.  Thank you for having

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   us.

3               I want to take this opportunity to

4   stress to you the reasons why I and many other young

5   active people believe that full public, full public

6   financing of elections must become the norm for our

7   nation and why we, therefore, think that New York

8   City should take this opportunity to help lead the

9   way.

10              Campaign finance reform is

11  fundamentally a values issues.  Imagine a system

12  where anyone can run if they can build a base in

13  their district.  If you can build that base, you can

14  run for office and you can win.  Now imagine a world

15  where legislators have nothing to do but represent

16  their own constituents.  The elected representative

17  is accountable only to the constituents of his or

18  her district.  These are values that are

19  non-partisan.  It's not about big government or

20  small government, but who's government.

21              Partial public funding, the system we

22  now have, does not, in the end, address these

23  fundamental issues.  Instead of eliminating the

24  influence of the wealthy few, and the special

25  interests, the current system merely subsidizes

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   elite private dollars with public dollars.  It's the

 3   worst of both worlds.

 4                  For this reason, the current partial

 5   public funding system has not substantially

 6   increased voter confidence or participation.

 7   Instead, it punishes the candidates who opt in by

 8   forcing them to deal with the nightmare of the

 9   Campaign Finance Board while still having to dial

10   for dollars.  These candidates should not be

11   punished.  They should be rewarded with a fully

12   functional full public financing system.

13                  Some critics of fully voter-owned

14   elections write it off saying that money is the

15   mother's milk of politics.  That may be the case,

16   but we want it to be our money, the constituents'

17   money, in small amounts and fair proportions that

18   fund our government, not special interests and the

19   wealthy few, who in this system can effectively buy

20   seats and legislation.

21                  In other words, we don't want to

22   lower the ceiling of contributions  --  Okay.  Thank

23   you.

24                  MR. MISTRY: Finish your sentence.

25                  MS. SPERBER: We don't want to lower
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  the ceiling for folks who want to go the private

3  funding route.  We want to raise the floor so that

4  candidates who don't come from wealth, or choose to

5  put their money where their mouth is and endorse

6  democratic ideals, can have a raised floor and

7  participate in elections. Thank you.

8            MR. MISTRY: Thank you.  My name is

9  Abhishek Mistry. I'm an Organizer for Democracy for

10  New York City.  I applaud the City Council for

11  attacking the important issue of election reform,

12  and I want to thank you for having me testify.

13            Unfortunately, matching funds simply

14  cannot address many of the problems with our current

15  election system.  The idea behind matching funds is

16  to allow candidates raising small dollar amounts to

17  compete with candidates who are able to raise larger

18  sums.  Leveling the field, however, is not without

19  sizable difficulty.  Consider a City Council race

20  where one candidate raises money by soliciting

21  $2,750 donations, the current maximum. Under a 4:1

22  matching ratio, any competitor soliciting $100

23  donations, must raise more than five donations to

24  rival a single donation of $2,750.  Smaller

25  candidates are able to compete. However, they must

18

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  spend a much greater amount of time fundraising.

3              This is the fundamental and critical

4  flaw of matching funds.  The system merely

5  encourages candidates to spend more time

6  fundraising.  Instead of serving the public, all

7  candidates are forced to spend much of their time

8  serving those with $100 checks.

9              Fortunately, these is an elegant

10  practical solution that eliminates these

11  difficulties, Clean money, Clean Elections.

12  Candidates would be forced only to raise a small sum

13  of money to show they have a base of support.  After

14  this start-up task, however, candidates will be free

15  to use their time to exercise democracy by talking

16  and listening to voters.  Perhaps more importantly,

17  incumbents will be able to focus on legislating and

18  governing without the worry of how they will finance

19  their next election campaign.

20              I urge the Council to implement Clean

21  Money, Clean Elections immediately.

22              MR. HARTZOG: Mr. Chairman, my name is

23  Ed Hartzog. I'm the Executive Director of New

24  Democratic Majority, a grassroots organization here

25  in the City.  Thank you for allowing me to come here

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  today and testify before you.  I want to start by

3  applauding your desire and efforts to improve the

4  City's campaign finance system by increasing the

5  amount of matching funds from 4:1 to 6:1, this bill

6  will benefit those candidates who are unable to tap

7  into vast amounts of personal wealth or networks of

8  well- heeled friends and associates.  Together with

9  increased spending limits for local and City- wide

10  offices, Intro. 586 theoretically creates an

11  opportunity for greater participation in the system.

12              As an activist, attorney and former

13  Congressional staff member, I can attest to the

14  benefits of more participation in the system.

15  Certainly, it engenders greater confidence in the

16  system, which is also the purpose of the bill's

17  limitation on the amount of money people doing

18  business with the City can contribute.

19              Notwithstanding its potential for

20  creating greater participation and confidence in the

21  system, the bill does not eliminate the need for you

22  and your colleagues, along with potential

23  challengers, to spend countless hours raising funds

24  when you would rather be using that time for your

25  constituents. Moreover, this bill creates another

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    level of bureaucracy that imposes costs on the

3    system and individual candidates.

4                    Thus, to build on the Committee's

5    policy objectives of greater participation, reducing

6    the appearance of impropriety and/or conflicts of

7    interest, and increasing confidence in the system, I

8    respectfully suggest the Committee and the Council

9    consider the adoption of a complete publicly funded

10   campaign system separate from what my colleagues

11   here have spoken of, but completely publicly funded

12   system.

13                   Such a system would eliminate the

14   need for fundraising, reduce costs, both for the

15   City and individuals candidates, remove the stigma

16   of money in politics and create an environment where

17   campaigns more closely resemble what once was

18   described as a crucible of ideas.  Until such a

19   system is adopted, I would like to suggest that the

20   Committee consider amending the current bill's

21   contribution limits to reflect those of federal

22   campaigns, that is limiting it to $2,300 dollars.

23                   I hope the Committee and the Council

24   will continue their efforts to improve the current

25   system and encourage the consideration adoption of a

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  complete publicly funded campaign finance system.

3  Thank you.

4          MR. JACOBY: Just so you know, Marc

5  Leavitt had to go file some papers.  He's not back.

6  Oh well.  I'm Dan Jacoby.  I'm an Organizer at

7  Democracy for New York City.  I want to talk about a

8  loophole in the current bill that not a lot of

9  people are mentioning.

10          A hundred years ago, the first

11  campaign finance law was passed.  It was the Tillman

12  Act.  Teddy Roosevelt pushed it through Congress and

13  it supposedly banned corporate contributions. All

14  the corporations did was give big bonuses to top

15  management and they funneled it in.  That was the

16  first loophole.  Ever since then, there have been

17  loopholes.

18          The current bill supposedly limits,

19  very strictly, campaign contributions from people

20  doing business with the City, but what it doesn't do

21  is limit those contributions from subcontractors.

22  So I think you're going to find a lot of contractors

23  who have lots of business will start setting up

24  little subcontractors, putting their staff in there,

25  and that's how they're going to funnel it through.

22

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    Basically, what it means is every

3    time you try and tighten the current system, and you

4    know, you look at it.  It is clearly the most

5    creative and thoughtful system in the country as far

6    as matching funds go, but there is always the

7    loophole. There's always a way around it.  There's

8    always a way to render it ineffective, which is why

9    I, along with a number of other people, are pushing

10   for a full public funding system.  It's simpler.

11   You don't have to deal with the craziness that is

12   necessary of the Campaign Finance Board's

13   regulations, and it would truly level the playing

14   field.

15                    I want to thank you again for holding

16   this hearing.

17                    CHAIRPERSON FELDER: Do any of my

18   colleagues have any questions?  Then I thank you

19   very much.

20                    The last panel for this, we call up

21   two people, Adrienne Kivelson from the League of

22   Women Voters, and Heather Taylor from Citizens'

23   Campaign.  You can start whenever you're ready.

24                    MS. KIVELSON: Good afternoon Chairman

25   Felder and members of the Committee.  My name is

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Adrienne Kivelson, and I am the City Affairs Chair

3    and Election Specialist of the New York City League

4    of Women Voters.  I want to thank you for continuing

5    efforts to enhance and improve New York City's

6    innovative campaign finance law.

7                    We are particularly pleased with this

8    bill because participating candidates are going to

9    receive more training and be given clearer

10   definitions of what is and what is not acceptable in

11   terms of contributions and expenditures.  We are

12   also happy to see defined time frames and firm

13   deadlines for Campaign Board actions, reports and

14   audits, as well as the additional due process

15   proceedings.

16                   We hear complaints from first- time

17   candidates that the system is just too complicated,

18   that one mistake in accepting an ineligible check

19   results in the freezing of public funds at the

20   height of the campaign.  This is just a small issue,

21   but it's an example of what is happening and what

22   has happened with the bill. It's good to see that

23   Section 2.1b addresses this issue.  Hopefully the

24   revised provisions will produce a program which is

25   more clear, fair and easily accessible for first-

24

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   time candidates.

3           Of course, these provisions will

4   require a larger and more specialized staff for the

5   Campaign Finance Board, which we trust is achievable

6   since the bill was developed as a collaboration of

7   the Council and the Administration.

8           I'm just going to go to one other

9   point that I want to get to before my time is up.

10  The most far reaching aspect of the bill is the cap

11  on contributions from a broad range of people doing

12  business with the City.

13          We're concerned that the creation,

14  maintenance and reliance on the proposed database

15  could overwhelm and undermine the Campaign Finance

16  program.  We understand it's going to be based on

17  the current Vendex system which lists City

18  contractors.  We've spent years trying to look at

19  Vendex and understand it, and we still have had

20  difficulty with it.  So we're concerned that we're

21  putting in place something that is so complicated

22  that it may, in fact, undermine the very system we

23  are trying to strengthen.

24          We're very happy to hear that if this

25  is not in place by 2009, it will be reviewed.  We

25

```
 1  COMMITTEE ON GOVERNMENTAL OPERATIONS

 2  hope that if it is not in place, we will not make

 3  any attempt to use it for the 2009 election.

 4            Thank you.  I'd be happy to answer

 5  any questions.

 6            CHAIRPERSON FELDER: I just want to

 7  mention that what you just said is so, that unless

 8  the system is in place, we can't impose anything on

 9  anyone unless they have something that they can rely

10  on.

11            MS. KIVELSON: We understand that.

12  We're just concerned that we put something in place

13  that is really not necessarily going to work and not

14  where we should put our emphasis at this time.

15            CHAIRPERSON FELDER: Do you have an

16  alternative suggestion?

17            MS. KIVELSON: Well at some point,

18  we'd like to see full disclosure, which we've always

19  supported, and at some point, we should start

20  considering the issue of full public financing, but

21  the system has been in place for so many years.

22  We've always supported the system.  We're big

23  supporters of Campaign Finance, but in reading the

24  expectations for this database, and our experience

25  with other databases in the City that have tried to
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  do similar things, we don't want to lose the

3  wonderful things that the Campaign Finance program

4  has done by putting to many eggs into that basket.

5                CHAIRPERSON FELDER: Thank you.  Next,

6  please.

7                MS. TAYLOR: Good afternoon Chairman

8  Felder and members of the Committee.  My name is

9  Heather Taylor.  I'm with the Citizens' Campaign.  I

10  want to thank you for this opportunity to testify.

11                CHAIRPERSON FELDER: Bring the mic a

12  little closer please.

13                MS. TAYLOR: Sorry.  Thank you for the

14  opportunity to speak on this bill, and we applaud

15  Mayor Bloomberg and Council President Quinn for

16  spearheading this legislation.

17                Over and across the Hudson, New

18  Jersey has already adopted its own version of this

19  bill, most often called pay- to- play reform.  The

20  law regulates the awarding of government contracts

21  rather than a broad ban on contribution.  This is

22  both constitutionally sound and effective.

23                The bill specifically, in New Jersey,

24  limits contributions by those seeking or performing

25  government contracts. The law is regulated by the

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Department of Treasury, rather than an election

3    monitoring board, and contractors who violate the

4    law are found in breach of contract.

5              The loss of the government contract

6    is an important component of the law because it

7    deters those who would want to pay to- play from

8    doing so because it is a huge monetary loss to the

9    company rather than a fine which could be a slap on

10   the wrist. Since 2004, when this was adopted, we

11   have seen that contributions by contractors has

12   significantly been reduced.

13             Just a couple of recommendations to

14   this law.  First we recommend that the bill apply

15   the same kind of restrictions to the contractor, and

16   in doing so that a contractor, if they violate the

17   law and do try to circumvent it, they'd be found in

18   breach of contract and precluded from entering into

19   future contracts for a period of up to four years.

20             Finally, we recommend that, in the

21   regulation, it doesn't just have the limitations go

22   prior to contract until it's awarded, but also there

23   is a period post- award of the contract where the

24   contribution restrictions would also be applied

25   because that is also a sensitive time.  Once someone

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  get a contract, there is no more competition, and

3  there is room for change orders and other abuses of

4  the system.  Thank you.

5             CHAIRPERSON FELDER: Do any of my

6  colleagues have any questions?  Council Member

7  Brewer.

8             COUNCIL MEMBER BREWER: I'll be very

9  quick. Adrienne, I agree with you.  I think that as

10  Chair of the Technology, I see a lot of discussions

11  regarding databases, even today, earlier at a

12  hearing, problems between two agencies.  So we'll

13  see how it goes.

14             I do believe in public financing.  I

15  do think this is a greatly worded bill.  I think

16  it's complicated, and I think it's going to be good

17  for lawyers and accountants.  I know we have to try.

18             If you try public financing, a lot of

19  politicians just love raising money, and so they'll

20  be upset that they can't have a fundraiser.  So

21  there is some very interesting nuances to all of

22  this.

23             Thank you for your testimony.

24             CHAIRPERSON FELDER: Do any of my

25  colleagues have any other questions?  I want to

29

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    welcome Councilman Dominic Recchia, who has been

3    saving, and savoring maybe, all the cultural

4    institutions in the City during this tough budget

5    season.

6              I just wanted to ask you, those

7    recommendations that you made, are those in place in

8    New Jersey?

9              MS. TAYLOR: Yes, they are.

10             CHAIRPERSON FELDER: Okay.  What about

11   all the other stuff that we've put into this bill?

12   Have you read the bill?  Have you had a chance to

13   read through it?

14             MS. TAYLOR: I have.  We support the

15   bill.

16             CHAIRPERSON FELDER: So, no.  I just

17   want to ask you whether those other restrictions are

18   in place in New Jersey, the issues with land use,

19   the issues regarding all the other stuff?

20             MS. TAYLOR: We are working towards

21   regulating the land use.  We've been able to that at

22   the municipal level, but not for state.

23             CHAIRPERSON FELDER: So you would

24   agree  --  I'm leading you  --  You would agree that

25   this bill is much better than the one you have in

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  New Jersey.  Right?

3              MS. TAYLOR:  --  With a couple of the

4  changes I recommended, yes.  I think it's important

5  to regulate the contractors because that's really

6  key to this being enforced.

7              CHAIRPERSON FELDER: You know we don't

8  to talk too much.  We're politicians.  It's a better

9  bill than the one you have in New Jersey, yes or no?

10   As it exists, is this bill better than the one you

11  have in New Jersey?

12             MS. TAYLOR: It's comparable.

13             CHAIRPERSON FELDER: I don't think  --

14   Sergeant- at Arms, will you carry this witness out

15  of the room?  Thank you very much for your

16  testimony.

17             MS. TAYLOR: Thank you.

18             CHAIRPERSON FELDER: We are unable to

19  vote on this. You ready?  Okay.  Everyone has what

20  they need?  Yes.  All right. Ready to call a roll.

21  That's what you're supposed to do.  Go ahead.

22             I want to revise what I said earlier.

23  We are voting now on the Campaign Finance Bill

24  586-A.  After that vote, we are going to hear

25  Councilman Avella's bills 262 and 263.  So let's

 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   vote on 586-A.

 3                   COUNCIL CLERK: Council Member Felder.

 4                   CHAIRPERSON FELDER: I recommend a yes

 5   vote, and I vote yes.

 6                   COUNCIL CLERK: Addabbo.

 7                   COUNCIL MEMBER ADDABBO: Yes.

 8                   COUNCIL CLERK: Dilan.

 9                   COUNCIL MEMBER DILAN: No.

10                   COUNCIL CLERK: Recchia.

11                   COUNCIL MEMBER RECCHIA: Yes.

12                   COUNCIL CLERK: Vallone.

13                   COUNCIL MEMBER VALLONE: May I be

14   excused to explain my vote?

15                   CHAIRPERSON FELDER: Please.

16                   COUNCIL MEMBER VALLONE: I think this

17   is a good bill for the reasons we just heard about.

18   Regulating people and groups that stand to benefit

19   financially from dealings with the City Council is a

20   good thing.  However, I'm concerned because I have

21   yet to receive an answer to the question that sits

22   in the room like an 800-pound gorilla, and that's

23   basically why aren't all groups who lobby the City

24   Council for money included in this bill?  If you

25   limit half the playing field, and in the case, the

32

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    paying field, you've necessarily created an uneven

3    playing field.

4                    Again, I have that concern and I hope

5    to address that concern down the line, but as I

6    said, this bill does many good things.  For example,

7    something that nobody has spoken about is treasurer

8    liability, which exists right now.  Right now, your

9    treasurer can make a mistake and be personally

10   liable for it.  It's almost impossible to get

11   somebody if it's not your brother, or somebody like

12   that, to be your treasurer if they are going to have

13   to pay if they make a mistake.  This bill eliminates

14   that, and it's something I work with more about and

15   I'm happy they put that in here.

16                    Many of the fines that this bill

17   takes away, like that one, it may seem on its face

18   to help us, or be self-serving, but it's not true.

19   It actually hurts us because we're the incumbents.

20   If we get fined, we can pay.  We have campaign

21   committees to do that.  It's the people who run

22   against us who get fined and don't win who are going

23   to be in big trouble.  So we, by taking these

24   measures, we actually hurt ourselves.

25                    Again, I think this bill does a lot

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    of good things. I do have that concern. So I'm

3    going to vote aye.

4                    COUNCIL CLERK: Dickens.

5                    COUNCIL MEMBER DICKENS: Aye.

6                    COUNCIL CLERK: By a vote of six in

7    the affirmative, and one in the negative, no

8    abstentions, item is adopted.

9                    CHAIRPERSON FELDER: Thank you very

10   much. Now we will go to the second item on the

11   agenda, and I just wanted to, even though Councilman

12   Dilan voted, I didn't have a chance to welcome him.

13   Welcome, Councilman Dilan.

14                   Good afternoon, and welcome to this

15   hearing of the Committee on Governmental Operations.

16   I am Simcha Felder, Chair of the Committee, and,

17   again, I'd like to introduce my colleagues who are

18   here. From the left, Councilman Vacca, Councilman

19   Recchia, Councilman Vallone, Jr., Council Member

20   Brewer, Council Member Erik Dilan, Council Member

21   Dickens, Council Member Addabbo, and Councilman

22   Avella.

23                   Councilman Avella, do you want to

24   come here? It's your bill.

25                   I'd like to acknowledge the Committee

Edith Prentiss
President, 504 Democratic Club
917-733-3794
president@the504dems.org

Oral testimony on Intro 586-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
June 21, 2007

I am Edith Prentiss, 1st Vice President of Disabled In Action, President of the 504 Democratic Club, and a member of the Disabilities Network of New York City. I would like to thank the Committee on Government Operations and especially Chairman Simcha Felder for the opportunity to express my opinion on Intro 586 – Campaign Finance Reform.

In New York City, numerous attempts to limit campaign spending and lower the influence of money on politics have failed. From 1993 to 2005 the cost of running for City Council more than doubled, after adjusting for inflation. This is a greater increase in campaign spending than on the federal level. Matching funds have failed because you have to raise money to qualify for matching funds.

Despite the City Council and the Campaign Finance Board's best efforts, the main requirement for winning an election in New York City is still a well-stocked war chest. Candidates must be out their soliciting lots of large donations. Candidates spend the bulk of their time raising money, before during and after their race. The only real reform solution is a full public funding system, known generally as "Clean Money, Clean Elections" which has been implemented is several states.

I'd like to address the need for better and wider Campaign Finance reform from the perspective of people with disabilities. I'd particularly like to address several issues very important to our community and how campaign finance reform would move our agenda.

DRIE (Disabled Renters' Rent Increase Exemption) parity to SCRIE (Senior Citizen Rent Increase Exemption) – Background: Despite many previous attempts to expand SCRIE to younger disabled renters, we have historically been blocked by New York City mayors. In 2005 DRIE finally passed in Albany, but with a financial eligibility of $8,000 less. Accepting such a disparity was based upon the belief that DRIE would be introduced in 2006 for full parity. I can only assume we are competing with the real estate interest as well as the Mayor's misguided belief that this would be an incredibly expensive program.

EPIC expansion to younger disabled New Yorkers – Background: Despite many previous attempts to include people with disabilities in EPIC, we've always been told it is too expensive or it is not our year. We are competing with the pharmaceutical industry, which makes a lot more money off us than they would if we were included in EPIC with its discounts. Rumor has it that we are competing with AARP who has opposed any expansion to include younger New Yorkers. We're also competing with other, better funded, groups who want the available funds to go to their client populations.

Visitability – Background: The concept is that residences should have minimal accessibility features so that people with disabilities can visit. The real estate industry certainly opposes having to make their building accessible. Just look at the proposed changes in Intro 578 to see competing interests.

People with disabilities are not likely to be attending the expensive campaign events, even if they were accessible. We are not forming PACs or LLCs to bundle donations, and we are not sponsoring events. Rather, we're working on your campaigns, handing out literature and making phone calls. While those activities are important, I doubt they mean as much as money.

504 screens candidates on a variety of issues important to our community. It is amazing how many people profess their belief in accessible taxis, EPIC expansion, DRIE parity and Visitability but can't remember a thing six months later.

Its time we keep elected officials to their election promises.



CITIZENS CAMPAIGN
www.JoinTheCampaign.com

June 21, 2007

**Testimony given by Heather Taylor to the
Committee on Government Operations on proposed Int. No. 586**

Council Chairman Simcha Felder &
Members of the Committee on Government Operations:

Thank you very much for the opportunity to submit comments on proposed **Int. No. 586**, a campaign finance reform bill which limits contributions by those "doing business" with New York City. We applaud Mayor Bloomberg for spearheading this important effort and Council President Quinn for sponsoring this legislation.

I represent the Citizens' Campaign, a non-partisan organization which develops innovative reform solutions and promotes citizen leadership. Across the Hudson we have had success at regulating pay-to-play. At the State and local level, government officials have adopted significant reforms that ban contributions by those who are involved in government contracting.

For too long at the National, State, and local level "pay to play" has been business as usual. Government contractors pony up large campaign contributions and then are rewarded with lucrative government contracts. This pay-to-play game results in higher costs and poor performance.

In 2004 New Jersey implemented the strongest pay-to-play law in the nation. The law regulates the awarding of government contracts rather than an across the board ban on contributions. This is both constitutionally sound and effective. Specifically, New Jersey's pay-to-play law limits political contributions by those seeking or performing government contract. The law is regulated by the Department of Treasury, and contractors who violate the law could be found in breach of contract or even barred from receiving future contracts. The loss of government contracts and possible disbarment is a much more severe penalty than a monetary fine which often amounts to a slap on the wrist. Since New Jersey's law went into effect, newspaper reports have found that the breach of contract enforcement mechanism is quite effective. Contractors' have significantly reduced their political contributions so as to not run afoul of the law and possible lose lucrative government contracts.

A similar law was adopted in Philadelphia, where it recently weathered its first test and yielded positive results in this May's primary election. According to the Philadelphia Inquirer, rather than relying on massive political war chests filled with contractor's contributions, candidates solicited more modest donations from ordinary citizens and participated in more grassroots campaigning to get their message out.

Both New Jersey and Philadelphia follow the framework established by the Securities and Exchange Commissions Rule G-37, which bans contributions by municipal underwriters before and after the award of the contract.

Our recommendation is that New York follow the New Jersey model which ties contribution restrictions to the award of the contract.

Second, the proposed regulation should include campaign restrictions after the award of the contract. This is critical because after a contract is awarded there is no competition and there are opportunities for change orders.

Finally, we recommend that those "doing business" who violate the law or who circumvent through intermediaries are precluded from receiving contracts or found in breach of contract. This is a stronger and stricter means of enforcing the campaign finance bill's goal.

Thank you for the opportunity to speak today. I hope you will take my recommendations into consideration.



# New York City Campaign Finance Board

40 Rector Street, 7th Floor, New York, NY 10006
tel. 212.306.7100      fax 212.306.7143
www.nyccfb.info      info@nyccfb.info

**Testimony of Amy Loprest, Executive Director**
**New York City Campaign Finance Board**

**City Council Committee on Governmental Operations**
**June 12, 2007**

Good morning, Chairman Felder and committee members. I am Amy Loprest, Executive Director of the New York City Campaign Finance Board. With me is Deputy Executive Director Carole Campolo. I am here today to testify on Intro No. 586-A.

As I've expressed to this committee previously, we are pleased to have taken part in the process that produced this important legislation. Placing strict, low limits on contributions from individuals and entities doing business with City government will help renew the faith and trust New Yorkers place in their elected leaders.

We've also congratulated the Council for helping further emphasize the role of the average individual New York City contributor in election campaigns, a central goal of the Campaign Finance Program. At last week's hearing, we also expressed some concern about the sections of the bill that may intrude upon our administration of the law.

However, in my testimony today I would like to focus on some issues that were not fully addressed in our last appearance before this Committee.

The legislation as amended will require the Board to accept certain documentation through an "electronically scanned transmission." While accepting these documents electronically has been a goal of the Board, there is no protocol currently in place to do so.

1

In response to this legislation, the Board will be drafting new rules over the next several months to meet each of its administrative mandates. Those new rules will define a format and method for electronic submissions meant to ensure the legibility and authenticity of documents received in this manner, and campaigns interested in submitting backup documents to the Board electronically will need to be guided by those rules.

In our previous testimony, we spoke briefly about the budgetary impact of this new legislation. Since then, we have prepared a conservative estimate of the resources that will be necessary to meet the bill's new administrative mandates. We are estimating these mandates would require a 50 percent increase in the Board's budget. The largest part of this increase is for new staff and additional space to house those staff. The need for additional space is especially critical in order to ensure the legislation is implemented for the 2009 election as the Council intends, and that process must begin immediately. We are anticipating assistance from both the Council and the Administration in procuring the resources necessary to implement this legislation once it becomes law.

You also have asked a series of questions about the Board's application of current law. We have addressed those questions in a letter which is attached and submitted for the record.

Thank you for the opportunity to testify today, and I look forward to answering any questions you might have.

2



**New York City
Campaign Finance Board**

40 Rector Street, New York, NY 10006
tel.   212.306.7100
fax   212.306.7143
www.nyccfb.info

Frederick A.O. Schwarz, Jr.
Chairman

Dale C. Christensen, Jr.
Joseph P. Parkes, S. J.
Katheryn C. Patterson
Mark S. Piazza
Members

Amy M. Loprest
Executive Director

Carole Campolo
Deputy Executive Director

Sue Ellen Dodell
General Counsel

June 21, 2007

Honorable Simcha Felder
Chair, Committee on Governmental Operations
New York City Council
City Hall
New York, NY 10007

Dear Chairman Felder:

I have received your questions regarding the Campaign Finance Board's implementation of the Campaign Finance Act and the guidance the Board provides to candidates.

The Board takes seriously its obligation to ensure that candidates understand the requirements of the Campaign Finance Program.  To that end, the Board created a Candidate Services Unit to provide training, answer candidates' questions, and develop a handbook.  The handbook and training give plain-language guidance concerning disclosure, recordkeeping, the audit process, penalties, and other Program requirements. The Board also provides campaigns with C-SMART software.  C-SMART enables campaigns to file their disclosure statements with the Board as well as with the New York City and State Boards of Elections.  C-SMART contains many features to alert campaigns to possible compliance problems before they submit their statements.

The handbook contains sample forms for documenting transactions, a list of the types of expenditures for which public funds may be used, and answers to the most common compliance questions. The handbook also contains the Board's guidelines for accepting matchable contributions by credit card, including those received over the internet.  To assist with complying with those guidelines, the Candidate Services staff offers to test and review campaign websites to prevent compliance problems before they occur.  The handbook is distributed to all candidates and is available on the Board's website.  As it does after each election, the Board is reviewing and redesigning both the handbook and C-SMART for the 2009 elections to address feedback from campaigns. The Board's rules, advisory opinions, and the Campaign Finance Act are available on the Board's website.

In addition, the Board publishes penalty guidelines for the most common violations on its website.[1]  The staff uses these guidelines to make penalty recommendations to the Board.  To maintain consistency in its application of the law, the Board takes these guidelines into account when making its penalty determinations.  The Board also considers specific facts and circumstances before assessing penalties.

To maintain its independence and nonpartisan culture, Board members and staff are governed by ethical guidelines above and beyond the requirements of Chapter 68 of the New York City Charter.  The Ethical Guidelines are re-adopted each time a new member of the Board is appointed; and are an appendix to the Board's rules.[2]  The Ethical Guidelines cover issues of political conduct, recusal, and disclosure.

With regard to the application of the expenditure limits to candidates who have a second committee for another election, Board Rule 1-08 (c) sets forth the presumptions for attributing expenditures to an election.  The basic presumption is that an expenditure is for the first election following the day it is made.  For local and state elections, expenditures made before the January 12 following an election are presumed to be made for the preceding election.[3]  Candidates have the burden of demonstrating that expenditures made during the election cycle by committees not involved in the covered election were not made in connection with that covered election.[4]  For example, candidates can and have demonstrated that an expenditure is not for a covered election based on:

- the subject matter of the expenditure, such as literature solely relating to the candidate's election for another office;
- the geographic distribution of the expenditure; and
- the past practices of the other committee, such as documentation showing that substantially similar expenditures have been routinely made by the other committee.[5]

I have identified to Council staff certain issues in Intro. 586-A which I understand will be corrected by technical amendment after the bill is enacted.  If you have any other questions on these or other topics, please feel free to contact me.

Sincerely,

Amy Loprest

---

[1] While these guidelines are part of the handbook, they are also presented separately on the website.
[2] The Board re-adopted the Ethical Guidelines on June 14, 2007 upon the appointment of Father Joseph Parkes, S.J.
[3] Board Rule 1-08(c)(1).  For candidates for federal office, expenditures made prior to the January 1 after the election are presumed to be made for the preceding election.
[4] Board Rule 1-08(c)(3).
[5] The Board will shortly be issuing an Advisory Opinion in response to a request from Congressman Anthony Weiner relating to the expenditure presumptions.

**Marjorie Gersten**
50 Willow St., Brooklyn, NY
718-624-8384

Written testimony on Intro 586-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
June 21, 2007

Campaign finance laws seek to reduce the influence of money on politics. To this end, they have two specific goals: Limit campaign spending, and level the playing field between those who can raise lots of money and those who can't.

The city's attempt to limit spending has been a dismal failure. According to the CFB, spending on City Council races more than doubled, in real dollars, over just twelve years. In 2009 it's a safe bet that most candidates for citywide office and many candidates for City Council will opt out of the system. The spending limits that participation in the system requires will simply be too low, as candidates will be able to raise more money on their own. The only way to keep candidates in the system is by drastically raising the spending limits, which defeats the purpose.

Matching funds also do not level the playing field, and in hindsight the reason is clear. Since a candidate needs to raise money in order to get matching funds, those who raise more money generally qualify for more matching funds. Fundraising laggards never catch up. Even if two candidates raise or receive enough money to spend at the limit, the candidate who has to work harder to raise the money naturally spends less time campaigning and is at a serious disadvantage.

Overwhelmingly, the candidate who raises the most money wins the election. When this is not the case, the winner is always one of the top fundraisers, and the reason for that candidate's victory has nothing to do with money. In short, matching funds never, ever make the difference.

The only solution lies in a full public funding, "Clean Money, Clean Elections" system that will be introduced into the City Council soon. I urge the Council to pass that bill.

**Dan Jacoby**
47-48 43 St., Woodside, NY 11377
917-667-2756
www.danjacoby.com

Oral testimony on Intro 586-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
June 21, 2007

One major problem with Intro 586 that isn't getting a lot of attention is the fact that one of its main provisions, limiting contributions from people doing business with the city, will have virtually no effect – certainly not during the current election cycle, and possibly not ever.

Under the bill, the campaign finance board and the department of information technology must create eight separate databases, each covering some aspect of "doing business with the city." Until each database is completed, nobody in it is limited. After each database is completed, those donors will still have two additional months to make their contributions.

In addition, while there are theoretical deadlines for completing these databases, they are not firm. Any database not finished by November 1ˢᵗ of next year won't be in place for the 2009 election at all.

This means that candidates have plenty of time to solicit, and receive, contributions from people doing business with the city before this bill takes effect.

But there is a larger loophole not mentioned in the bill, a loophole that renders much of this effort irrelevant. When a contractor subcontracts out the work, the subcontractors and their employees are not limited. This loophole and its variants have been used since the very beginning to get around campaign finance limitations; it will certainly be used again.

All you are really doing with this part of the bill is to make a complicated system even more complicated, without truly solving the problem. The real solution is the "Clean Money, Clean Elections" system of full public funding. It is simple and effective, it will be introduced soon, and I recommend that the City Council adopt it.



**THE LEAGUE OF WOMEN VOTERS** OF THE CITY OF NEW YORK
45 EAST 33rd STREET, NEW YORK, NY 10016
PHONE: 212.725.3541 • FAX: 212.725.3443
WWW.LWVNYC.ORG • OFFICE@LWVNYC.ORG

## TESTIMONY IN SUPPORT OF INTRODUCTION 586

**A Local Law to amend the New York City charter and the administrative code of the city of New York, in relation to campaign finance**

**Delivered by Adrienne Kivelson, City Affairs Chair
to the Committee on Governmental Operations**

**June 21, 2007**

Good Afternoon Chairman Felder and members of the Committee. My name is Adrienne Kivelson and I am the City Affairs Chair and Elections Specialist of the League of Women Voters of the City of New York. On behalf of the League I want to thank you for your continuing efforts to enhance and improve New York City's innovative campaign finance program. We also want to commend the collaborative process which resulted in Intro 586. It is heartening to see the Council, the Administration and the Campaign Finance Board work together and welcome input from the public and civic community on such important legislation

As early supporters of the program and staunch advocates of participatory democracy we are encouraged to see that the proposals in 586 are formulated to produce a more level playing field for all candidates and to eliminate the "pay to play" atmosphere associated with too many political campaigns.

We are particularly pleased that participating candidates will receive more training and be given clearer definitions of what is and what is not acceptable in terms of contributions and expenditures. We are also happy to see defined time frames and firm deadlines for Campaign Finance Board actions, reports and audits as well as additional due process protections.

We often hear complaints from first-time candidates that the system is just too complicated; that one mistake in accepting an ineligible check results in the freezing of public funds at the height of the campaign. This is just one small aspect of the program, but it produced recurrent complaints. It was good to see that Section 2.1b.addresses this issue. Failure to return an excess contribution in the last weeks of the campaign will no longer result in the Board withholding public funds for which the participating candidate's principal committee is otherwise eligible. Hopefully, the proposed revisions will produce a program which is more clear, fair and easily accessible for first-time candidates. Of course, these new provisions will require a larger and more specialized staff for the Campaign Finance Board, which we trust is achievable since the bill was developed as a collaboration of the Council and the administration.

We approve of the reduction in maximum contributions and the inducement for participating candidates to seek out smaller contributions from local donors. Expanding the ban on corporate contributions to include limited liability companies (LLCs) and limited liability partnerships (LLPs) and more clearly defining intermediaries are other important features of the bill. We trust that these contribution limitations will be applied to and enforced for non-participating candidates, as well. If this does not happen then we will have anything but a level playing field.

Another positive component of the bill is the criteria for determining which races are non-competitive so that those candidates do not receive unneeded matching funds.

The most far-reaching aspect of the bill is the cap on contributions from a broad range of people "doing business with the city" and making those contributions unmatchable. While we wholeheartedly support ending "pay to play" -- the perception or reality of campaign contributions leveraging favors and influence -- we are concerned that the creation, maintenance and reliance on the proposed database could overwhelm and undermine the entire Campaign Finance program. We understand that it will be based on the current Vendex system which lists city contractors. We are not even sure that Vendex includes all of the categories specified in this bill. In any case, it took years and years to get Vendex up and working. We are pleased to see that this aspect of the law will not become operative for the 2009 election if the database is not operational by November 2008.

While Intro 586 proposes the most comprehensive overhaul of the Campaign Finance Program in its nineteen-year history, in all likelihood we will be back here next year and the year after that talking about the need for more changes; perhaps a different match or a review of other institutional contributions, like those from unions. Monitoring the caps on contributions will be necessary on an ongoing basis to assure that they are appropriate and adequate, as will review of the efficacy of the database. Each time changes are proposed or enacted, care must be taken to assure that the system is not administratively burdensome or too complicated to attract the diversity of candidates for whom it was designed. Over the long term we may want to consider full public financing where candidates will no longer seek contributions and "pay to play" will no longer be a factor.

This year the League of Women Voters is offering a 12-hour course on 'How to Run for Public Office in New York City'. The course is funded by the New York Community Trust and offered at one community college in each borough. Campaign finance is an integral component, and Amy Loprest, the Board's Executive Director is a presenter at each college. Interest in and response to the course has exceeded all expectations. There is no doubt that without the promise of assistance from the Campaign Finance Program, few of these bright, young, energetic and dedicated citizens of every race, ethnicity and neighborhood would have been able to consider public service and public office.

The League of Women Voters supports 586 because we believe it improves this important program and makes it possible for more New Yorkers to consider running for public office.

**Remarks of MARC CRAWFORD LEAVITT at the 6/21/07 Hearing of the
City Council of NY Government Operations Committee
Regarding "Clean Money, Clean Elections" legislation**

Good afternoon. My name is Marc Crawford Leavitt. I am a homeowner in Queens, a lawyer, and a citizen who volunteers with several civic, social service and academic organizations. I am also a political satirist. One of my parodies to the tune of *"I Write the Songs,"* popularized by Barry Manilow, starts:

> *I've been alive forever,    and I wrote the very first laws.*
> *I have the might    and the power to enforce them*
> *        I AM MONEY,    AND I WRITE THE LAWS!*

Another of my satires about the 2001 mayoral election is not intended to specifically criticize our Mayor, who I generally feel has been doing a very good job, but to deplore the current national reality where it seems that to run credibly for high office you have to be a multi-millionaire, a celebrity, or a hereditary politician (and Arnold Schwarzeneger is all 3!). It parodies *"A Hundred Bottles of Beer on the Wall..."*:

> *A hundred dollars per vote at the polls,    a hundred dollars per vote,*
> *To make sure the Democrats happen to fall,    a hundred dollars per vote at the*
> *polls...*    (spoken:  Keep singing for four more years).

In my law firm of Leavitt, Kerson & Duane (that's John Duane, brother of Tom), four of our current or former members have held elective office, and I myself served a 3-year sentence on Community School Board 30 in Queens from 1980 to 1983. Our service to clients does not include being paid as lobbyists.

In the early 1980s, I was part of team of pro-bono attorneys in a federal civil rights ballot access case representing an insurgent candidate against the Donald Manes political machine and the powers-that-be *(Weiss et al v. Feigenbaum, Manes, etc al, 558 F. Supp 265, EDNY 1982).* The Aaron Weiss case exposed many wrongful practices that were impediments to democratic elections and improved the ballot access process.

I have also been a Trustee of the City Club of New York, the esteemed non-partisan good government group responsible for numerous initiatives over the decades which we now take for granted, such as the ballot brochure mailed to all voters listing each candidate and their qualifications (which deserves much broader distribution). Back in the 70s, public campaign matching funds was just an idea discussed at the Club's own Governmental Operations Committee led by the late Saul Hoberman and Sidney Dean.

But now we are in the 21st century. Money is still the mother's milk of politics, but media and communications plays a bigger part than ever. Our City has the most aggressive matching funds program the nation, and that's terrific. The Clean Money, Clean Elections system is the next generation of improving our democratic system, and I support the concept. I also ask the committee to consider further steps.

New York City cannot mandate free public TV time. The argument that the airwaves belong to the public and therefore should be used on some regular basis to be available both for public service and to help voters decide among candidates is obviously a national issue. But

the City Council could lead the way with an advocacy statement for our congressional delegation and two innovative concepts:

**1.      Free print ads on mass transit vehicles for bona fide candidates.**

**2.      Prime-time TV purchased by the City and made available at no charge in regularly scheduled time slots to bona fide candidates.**

Here's some brief arithmetic on how it might work.  51 Councilmembers + the Mayor, Comptroller and Public Advocate + 5 Boro Presidents + 5 District Attorneys = 64 offices. Assume 5 primary candidates for each office = 320.  Assume each candidate gets two 5-minute time slots for a total of 3,200 minutes or about 54 hours.  Divide that into the 6 weeks prior to the election for 9 hours each week, 3 hours on each on three weekday nights on different TV channels.  Fine-tuning of the program could save money by boro-specific broadcasts on cable TV.

Provide a free technical crew to help candidates produce their time slots and mass transit ads.

Advertise the TV time slots to the public so the citizenry gets used to the idea of consistently scheduled election information as the years go by.

Duplicate the process for the general election assuming only two candidates for each of 64 offices, so we need only 1,280 minutes or about 22 hours.

I don't know the cost of 76 hours of TV time per election cycle, but I am certain that the result would be major improvements in the awareness and involvement of our citizens and in the democratic process in general.

Thank you.

Marc Crawford Leavitt
Leavitt, Kerson & Duane
45-29 47th Street
Woodside, NY 11377                    99 Park Avenue
718-729-0986                          New York, NY 10016
marcleavitt@nyc.rr.com                212-973-9339

**Abhishek Mistry**
341 W. 45ᵗʰ St. #103, NYC 10036
212-757-1827
amistry@stern.nyu.edu

Oral testimony on Intro 586-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
June 21, 2007

I applaud the city council for attacking the important issue of election reform. Unfortunately, matching funds simply cannot address many of the problems with our current election system.

The idea behind matching funds is to allow candidates raising small dollar amounts to compete with candidates who are able to raise larger sums. Leveling the field, however, is not without sizeable difficulty. Consider a city council race where one candidate raises money by soliciting $2,750 donations, the current maximum. Under a 4:1 matching ratio, any competitor soliciting $100 donations must raise more than five donations to rival a single donation of $2,750. Smaller candidates are able to compete; however, they must spend a much greater amount of time fundraising.

This is the fundamental and critical flaw of matching funds. The system merely encourages candidates to spend more time fundraising. Instead of serving the public, all candidates are forced to spend much of their time serving those with $100 checks.

Fortunately, there is an elegant, practical solution that eliminates these difficulties: "Clean Money Clean Elections." Candidates would be forced only to raise a small sum of money to show they have a base of support. After this startup task, however, candidates will be free to use their time to exercise democracy by talking and listening to voters. Perhaps more importantly, incumbents will be able to focus on legislating and governing without the worry of how they will finance their next election campaign. I urge the council to implement "Clean Money Clean Elections" immediately.

Elizabeth Sperber
2 Clinton St. 4C
New York, N.Y. 10002
401-374-7396

Oral testimony on Intro 586-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
June 21, 2007

I want to take this opportunity to stress to you the reasons why I believe full public financing of elections must become the norm in our nation, and why, therefore, New York City should help lead the way.

This is fundamentally a values issue: Imagine a system where anyone can run if they can build a base in their district. If you can build that base, you can run for office – and you can win. Now imagine a world where legislators had nothing to do but represent their own constituents. The job of the elected representative would be simply to represent their district. These values are non-partisan: it's not about "big" government or "small" government, but WHOSE government?

Partial public funding systems do not, in the end, address these basic values. Instead of eliminating the influence of the wealthy few and the special interests, the current system merely subsidizes elite monies with public dollars. It has not substantially increased voter confidence or voter participation. Instead, it has punished the candidates who have "opted in" by forcing them to deal with the nightmare of the Campaign Finance Board. These candidates should not be punished; they should be rewarded with a fully functional, full public financing option.

Some critics of fully voter-owned elections write us off, saying that, "Money is the mother's milk of politics." In other words, you can't eliminate the influence of money no matter what you do.

If that is the case, we want it to be our money – the constituents' money, in small amounts and fair proportions, that runs our government, not special interests and the wealthy few. I urge you to embrace the "Clean Money, Clean Elections" bill that will be introduced into the City Council soon.

Thank you for your time.

## Testimony of Edward A. Hartzog - Re: Intro. 586 for
## the New York City Council Committee on Governmental Operations
## Simcha Felder, Chairman – June 21, 2007

Mr. Chairman, members of the Committee - thank you for giving me this opportunity to speak with you regarding Intro 586.

I want to start by applauding your desire and efforts to improve the City's campaign finance system.  By increasing the amount of matching funds - from 4:1 to 6:1 – this bill will benefit those candidates who are unable to tap into vast amounts of personal wealth, or networks of well-heeled friends and associates.  Together with increased spending limits – for local and citywide offices – Intro 586 theoretically creates an opportunity for greater participation in the system.

As an activist, attorney and former Congressional staff member, I can attest to the benefits of more participation in the system.  Certainly it engenders greater confidence in the system – which is also the purpose of the bill's limitation on the amount of money people doing business with the City can contribute.

Notwithstanding its potential for creating greater participation and confidence in the system, the bill does not eliminate the need for you and your colleagues, along with potential challengers, to spend countless hours raising funds – when you would rather be using that time for your constituents.  Moreover, this bill creates another level of bureaucracy that imposes costs on the system and individual candidates.

Thus, to build on the Committee's policy objectives of greater participation, reducing the appearance of impropriety and/or conflicts of interest, and increasing confidence in the system – I respectfully suggest that the Committee and the Council consider the adoption of a complete publicly funded campaign system.

Such a system would eliminate the need for fundraising, reduce costs – both for the City and individual candidates, help remove the stigma of money and politics and create an environment where campaigns more closely resemble what once was described as a crucible of ideas.  Until such a system is adopted, I would like to suggest that the Committee consider amending the current bill's contribution limits to reflect those of federal campaigns – i.e., $2,300.

I hope that the Committee and Council will continue in their efforts to improve the current system and encourage the consideration and adoption of a complete publicly funded campaign finance system.  Thank you.

1

1

2    CITY COUNCIL

3

CITY OF NEW YORK

4

-------------------------------x

5

THE TRANSCRIPT OF THE MINUTES

6

            of the

7

RECESSED STATED MEETING OF

8        JUNE 15, 2007
              Held On

9        JUNE 27, 2007

10   -------------------------------x

11

12                    June 27, 2007
                      Start:  2:14 p.m.

13                    Recess: 4:06 p.m.

14                    City Hall
                      Council Chambers

15                    New York, New York

16

17        B E F O R E:

18            BETSY GOTBAUM
                   Public Advocate

19

20        COUNCIL MEMBERS:   Speaker Christine Quinn
                             Joseph Addabbo
                             Maria Arroyo

21                           Tony Avella
                             Charles Barron

22                           Gale Brewer
                             Leroy Comrie

23

24        LEGAL-EASE COURT REPORTING SERVICES, INC.
                   17 Battery Place -  Suite 1308

25                 New York, New York 10004
                        800-756-3410

2

```
 1

 2   A P P E A R A N C E S  (CONTINUED)

 3
              COUNCIL MEMBERS:
 4                        Bill DeBlasio
                          Inez Dickens
 5                        Erik Martin-Dilan
                          Matthew Eugene
 6                        Simcha Felder
                          Lewis Fidler
 7                        Helen Foster
                          Dennis Gallagher
 8                        Daniel Garodnick
                          James Gennaro
 9                        Vincent Gentile
                          Alan Gerson
10                        Eric Gioia
                          Sara Gonzalez
11                        Vincent Ignizio
                          Robert Jackson
12                        Letitia James
                          Melinda Katz
13                        G. Oliver Koppell
                          Jessica Lappin
14                        Miguel Martinez
                          Michael McMahon
15                        Darlene Mealy
                          Rosie Mendez
16                        Hiram Monserrate
                          Michael Nelson
17                        James Oddo
                          Annabel Palma
18                        Domenic Recchia
                          Diana Reyna
19                        Joel Rivera
                          James Sanders
20                        Larry Seabrook
                          Helen Sears
21                        Kendall Stewart
                          James Vacca
22                        Peter Vallone, Jr.
                          Albert Vann
23                        Melissa Mark Viverito
                          David Weprin
24                        David Yassky

25
```

3

1

2  A P P E A R A N C E S  (CONTINUED)

3

                STAFF:        Victor Robles
4                             City Clerk

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   STATED COUNCIL MEETING

 2                   (No response.)

 3                   CITY CLERK ROBLES: Yassky.

 4                   COUNCIL MEMBER YASSKY: Here.

 5                   CITY CLERK ROBLES: Oddo.

 6                   COUNCIL MEMBER ODDO: Here.

 7                   CITY CLERK ROBLES: Rivera.

 8                   COUNCIL MEMBER RIVERA: Here.

 9                   CITY CLERK ROBLES: Speaker Quinn.

10                   SPEAKER QUINN: Here.

11                   CITY CLERK ROBLES: We have a quorum,

12   Ma'am.

13                   PUBLIC ADVOCATE GOTBAUM: We have a

14   quorum. Now we will adjourn the recessed meeting,

15   and the Stated Meeting of June 27th will now begin.

16                   Roll call.

17                   CITY CLERK ROBLES: Addabbo.

18                   COUNCIL MEMBER ADDABBO: Here.

19                   CITY CLERK ROBLES: Arroyo.

20                   COUNCIL MEMBER ARROYO: Here.

21                   CITY CLERK ROBLES: Avella.

22                   COUNCIL MEMBER AVELLA: Here.

23                   CITY CLERK ROBLES: Baez.

24                   (No response.)

25                   CITY CLERK ROBLES: Barron.
```

28

```
 1   STATED COUNCIL MEETING

 2                    COUNCIL MEMBER BARRON: Here.

 3                    CITY CLERK ROBLES: Brewer.

 4                    COUNCIL MEMBER BREWER: Here.

 5                    CITY CLERK ROBLES: Comrie.

 6                    COUNCIL MEMBER COMRIE: Here.

 7                    CITY CLERK ROBLES: DeBlasio.

 8                    COUNCIL MEMBER DEBLASIO: Here.

 9                    CITY CLERK ROBLES: Dickens.

10                    COUNCIL MEMBER DICKENS: Here.

11                    CITY CLERK ROBLES: Dilan.

12                    COUNCIL MEMBER DILAN: Here.

13                    CITY CLERK ROBLES: Eugene.

14                    COUNCIL MEMBER EUGENE: Here.

15                    CITY CLERK ROBLES: Felder.

16                    COUNCIL MEMBER FELDER: Yes.

17                    CITY CLERK ROBLES: Fidler.

18                    COUNCIL MEMBER FIDLER: Still here.

19                    CITY CLERK ROBLES: Foster.

20                    COUNCIL MEMBER FOSTER: Here.

21                    CITY CLERK ROBLES: Gallagher.

22                    COUNCIL MEMBER GALLAGHER: Here.

23                    CITY CLERK ROBLES: Garodnick.

24                    COUNCIL MEMBER GARODNICK: Here.

25                    CITY CLERK ROBLES: Gennaro.
```

```
 1   STATED COUNCIL MEETING

 2                    COUNCIL MEMBER GENNARO: Here.

 3                    CITY CLERK ROBLES: Gentile.

 4                    COUNCIL MEMBER GENTILE: Here.

 5                    CITY CLERK ROBLES: Gerson.

 6                    COUNCIL MEMBER GERSON: Here.

 7                    CITY CLERK ROBLES: Eugene.

 8                    COUNCIL MEMBER EUGENE: Here.

 9                    CITY CLERK ROBLES: Gioia.

10                    COUNCIL MEMBER GIOIA: Yes.

11                    CITY CLERK ROBLES: Gonzalez.

12                    COUNCIL MEMBER GONZALEZ: Here.

13                    CITY CLERK ROBLES: Ignizio.

14                    COUNCIL MEMBER IGNIZIO: Here.

15                    CITY CLERK ROBLES: Jackson.

16                    COUNCIL MEMBER JACKSON: Here.

17                    CITY CLERK ROBLES: James.

18                    COUNCIL MEMBER JAMES: Here.

19                    CITY CLERK ROBLES: Katz.

20                    COUNCIL MEMBER KATZ: Here.

21                    CITY CLERK ROBLES: Koppell.

22                    COUNCIL MEMBER KOPPELL: Here.

23                    CITY CLERK ROBLES: Lappin.

24                    COUNCIL MEMBER LAPPIN: Here.

25                    CITY CLERK ROBLES: Liu.
```

30

```
 1   STATED COUNCIL MEETING

 2                   (No response.)

 3                   CITY CLERK ROBLES: Mark-Viverito.

 4                   COUNCIL MEMBER MARK-VIVERITO: Here.

 5                   CITY CLERK ROBLES: Martinez.

 6                   COUNCIL MEMBER MARTINEZ: Here.

 7                   CITY CLERK ROBLES: McMahon.

 8                   COUNCIL MEMBER McMAHON: Here.

 9                   CITY CLERK ROBLES: Mealy.

10                   COUNCIL MEMBER MEALY: Here.

11                   CITY CLERK ROBLES: Mendez.

12                   COUNCIL MEMBER MENDEZ: Yes.

13                   CITY CLERK ROBLES: Monserrate.

14                   COUNCIL MEMBER MONSERRATE: Aye on

15   all, and I request unanimous consent to --

16                   CITY CLERK ROBLES: This is a roll

17   call, sir. It's not a roll call, it's attendance.

18                   COUNCIL MEMBER MONSERRATE: Well, I'm

19   here. If you didn't know that.

20                   CITY CLERK ROBLES: Nelson.

21                   COUNCIL MEMBER NELSON: Here.

22                   CITY CLERK ROBLES: Palma.

23                   COUNCIL MEMBER PALMA: Here.

24                   CITY CLERK ROBLES: Recchia.

25                   COUNCIL MEMBER RECCHIA: Here.
```

.

```
 1   STATED COUNCIL MEETING

 2                 CITY CLERK ROBLES: Reyna.

 3                 COUNCIL MEMBER REYNA: Here.

 4                 CITY CLERK ROBLES: Sanders.

 5                 COUNCIL MEMBER SANDERS: Here.

 6                 CITY CLERK ROBLES: Lappin.

 7                 COUNCIL MEMBER LAPPIN: Here.

 8                 CITY CLERK ROBLES: Seabrook.

 9                 COUNCIL MEMBER SEABROOK: Here.

10                 CITY CLERK ROBLES: Sears.

11                 COUNCIL MEMBER SEARS: Here.

12                 CITY CLERK ROBLES: Stewart.

13                 COUNCIL MEMBER STEWART: Here.

14                 CITY CLERK ROBLES: Vacca.

15                 COUNCIL MEMBER VACCA: Here.

16                 CITY CLERK ROBLES: Vallone.

17                 COUNCIL MEMBER VALLONE: Here.

18                 CITY CLERK ROBLES: Vann.

19                 COUNCIL MEMBER VANN: Here.

20                 CITY CLERK ROBLES: Weprin.

21                 COUNCIL MEMBER WEPRIN: Here.

22                 CITY CLERK ROBLES: White.

23                 (No response.)

24                 CITY CLERK ROBLES: Gentile.

25                 COUNCIL MEMBER GENTILE: Here.
```

14                    COUNCIL CLERK: Vacca.

15                    COUNCIL MEMBER VACCA: Aye.

16                    COUNCIL CLERK: Vallone.

17                    COUNCIL MEMBER VALLONE: Aye.

18                    COUNCIL CLERK: Vann.

19                    COUNCIL MEMBER VANN: Aye.

20                    COUNCIL CLERK: Weprin.

21                    COUNCIL MEMBER WEPRIN: Aye.

22                    COUNCIL CLERK: Yassky.

23                    (No response.)

24                    COUNCIL CLERK: Oddo.

25                    COUNCIL MEMBER ODDO: Yes.




                                                    44


1   STATED COUNCIL MEETING

2                    COUNCIL CLERK: Rivera.

3                    COUNCIL MEMBER RIVERA:  Yes.

4                    COUNCIL CLERK: Speaker Quinn.

5                    SPEAKER QUINN: Yes.

6                    PUBLIC ADVOCATE GOTBAUM: Today's Land

7   Use Call-Ups were adopted by a vote of 46 in the

8   affirmative, zero negative.

9                    Communication from the Speaker.

10                   SPEAKER QUINN: Thank you. We are

11  voting on a number of important matters today, which

12  as Council Member McMahon of Staten Island said in

13  our pre-stated press conference, they range from

14  large important pieces of governmental reform, two

15  pieces of legislation which might seem smaller but

16  deal with very important quality of life matters

17  that we hope will make people's lives better in our

18  five boroughs. And I think it's a credit to the

19  breadth and depth of this institution that we're

20  taking up so many seemingly different items in one

21  Stated Council Meeting. And it is noteworthy that it

22  is the Stated Council Meeting following the one

23  where we pass the budget. This is an institution

24  that is clearly always at work on a number of

25  different levels.

45

1  STATED COUNCIL MEETING

2                First, we're passing a piece of

3  legislation today that is a major piece of Campaign

4  Finance Reform. It is a bill that when it goes into

5  effect, I believe will make New York City's Campaign

6  Finance Law the Gold Standard of Campaign Finance

7  Laws anywhere in the Country. It will make New York

8  City not a City with a perfect law, but with a law

9  that has gone tremendous, tremendous yards, to limit

10  the influence of those who do business with the City

11  of New York, a City where a law would have taken a

12    tremendous step forward to encourage people to

13    contribute to the process by making small donations,

14    through changing the public match to one that even

15    more incentivizes small contributions. And I hope

16    this law will also make the City of New York a City

17    whose Campaign Finance Law is one that is fair to

18    participants and one that is truly user friendly.

19              When we pass this bill and the Mayor

20    signs it into law, we will take an important step

21    forward for good government, and an important step

22    forward of sending a message to the residents of

23    five boroughs that we work for them first and

24    foremost.

25              There is a lot of folks who worked

46

1    STATED COUNCIL MEETING

2    long and hard to get us to this point today. The

3    most important of which we'll hear from in a second,

4    who is the Chair of our Government Operations

5    Committee, Simcha Felder. He and his staffperson

6    Mike have worked long and hard on this bill and I

7    want to thank both of them.

8              I also want to thank all of the staff

9    of the Council and the Speaker's Office who have

10    worked on this legislation, DeNora Johnson, the

11  Counsel to the Gov Ops Committee, Rob Newman, our

12  Legislative Director, Jim Caras, our Deputy General

13  Counsel, and Mora Keeney, my Deputy Chief of Staff.

14  All of them have worked very hard, and I think all

15  of my colleagues will agree, the staff was not

16  necessarily able to address every concern a Council

17  member raised, but there isn't one concern that was

18  raised which was not heard, vetted, and attempted to

19  be solved by the staff. They took every concern a

20  Council Member raised seriously, and did their best

21  to try to find an answer to that concern.

22          I also want to thank Mayor Bloomberg,

23  Eddie Batista, and everyone in the Legislative shop,

24  also everybody in Deputy Mayor Schueller's shop, for

25  all of the work that they put into this piece of

47

1   STATED COUNCIL MEETING

2   legislation. I want to thank everyone on the staff

3   of the Campaign Finance Board, and the members of

4   the Campaign Finance Board. They put a tremendous

5   number of hours into this piece of legislation. I

6   also want to thank our partners in this effort,

7   Citizens' Union, Common Cause, and NYPIRG. I think

8   it is a very significant day when you have a bill

9   that will be supported by the majority of the New

10  York City Council, supported by Mayor Bloomberg,

11  supported by the Campaign Finance Board staff, and

12  Board members and by the three leading good

13  government groups in the City of New York. This is a

14  day where we take a step forward for good,

15  transparent, public-focused government in our five

16  boroughs. And I now want to call on the Chair of our

17  Gov Ops Committee, and again thank him, Council

18  Member Simcha Felder.

19              COUNCIL MEMBER FELDER: Thank you very

20  much.

21              Recently I met an older constituent

22  in my district and I said that we were going to be

23  passing a Campaign Finance Reform Bill today, and he

24  said that's wonderful, it's about time you lowered

25  taxes.

48

1  STATED COUNCIL MEETING

2              Most people in the City I would say

3  really don't understand the depth of what we're

4  about to do. However, I would say despite that this

5  is the people's bill. This is the people's bill. New

6  Yorkers have savvy and they're very demanding and we

7  know that if you ask the average person in the City

8  about government they demand the best, they demand

9  accountability, they demand transparency in

10  government, but it's rare, very rare that you find

11  that government is committed to taking the

12  initiative to further those causes.

13        So, I think that this bill does just

14  that. I want to thank and congratulate the Speaker

15  for having the courage to push forward this reform

16  and my colleagues who will be voting on this bill as

17  well. I thank you for voting on this very important

18  bill and I urge everyone to vote yes.

19        SPEAKER QUINN: Thank you, again,

20  Chairperson Felder.

21        Next we are voting on another small

22  matter, an overhaul of our Building Code in the City

23  of New York, and this matter is so significant, we

24  haven't updated the Building Code since 1968 but it

25  is so significant it has brought a surprise special

49

1  STATED COUNCIL MEETING

2  guest appearance to the City Council of our former

3  Housing and Building Chair who started this effort,

4  Madeline Provenzano of the Bronx.

5        When I said Madeline, or Chairperson

6  Provenzano, started this effort, that speaks to the

7  fact that the effort to redraft the City's Building

24  Member Brewer. And that concludes Communication from

25  the Speaker.

62

1  STATED COUNCIL MEETING

2           PUBLIC ADVOCATE GOTBAUM: Discussion

3  of General Orders.

4           Council Member Barron.

5           COUNCIL MEMBER BARRON: Thank you very

6  much, Madam Chair.

7           I just want to rise to say that while

8  we are working on reform of Campaign Finance, I

9  think this would be good for insurgence and for

10  limiting business, or those who do business with the

11  City and lobbyists, and their contributions. But I

12  must say, honesty compels me to say that the Mayor

13  of all people, he should be the last person telling

14  us that we should limit contribution to our

15  campaign, especially when he spends an obscene

16  amount of money to buy a Mayoral election and hides

17  behind the First Amendment. So, I think we need to

18  do something and Campaign Finance cannot allow the

19  rich, the billionaires, the millionaires, to spend

20  obscene amounts of money on elections and then tell

21  us that we need to limit contributions from those

22  who want to participate in elections.

23          I think it's good to get business out

24  of given money and people who have connections to

25  those who do contracts with the City. I understand

                                    63

1  STATED COUNCIL MEETING

2  the conflict of interest, but we have to do

3  something about the fact that someone can spend so

4  much money on an election and hide behind the First

5  Amendment and then champion reform in campaign

6  finance, and I think it's hypocritical. So, I don't

7  think we should be thanking the Mayor, we should be

8  highlighting that hypocrisy as we go about to reform

9  Campaign Finance. Thank you very much. And I ask

10  unanimous consent to vote aye on all General Order

11  items.

12          PUBLIC ADVOCATE GOTBAUM: So ordered.

13          Council Member Dickens.

14          COUNCIL MEMBER DICKENS: Thank you,

15  Madam Public Advocate. I ask my colleagues, and I

16  thank also Chair Reyna of Rules, on the appointment

17  that we voted on this morning for Roberta

18  Washington.

19          Mrs. Washington is a constituent in

20  my district. She also owns a small architectural

21  firm located on 125th Street where she employs a few

22    people from the community, providing employment.

23            I have been one of the people that

24    has complained about the diversity issue at

25    Landmarks Preservation Commission, and although I

64

1    STATED COUNCIL MEETING

2    recognize the important work that they do, and I

3    applaud Chair Tierney for all of the hard work that

4    he has done throughout all of the boroughs,

5    particularly involved in Harlem, then I am glad to

6    see that this appointment is being done and I ask my

7    colleagues to please support Mrs. Roberta Washington

8    as she embarks on this new, new part of her life.

9    Thank you.

10            PUBLIC ADVOCATE GOTBAUM: Council

11    Member Garodnick.

12            COUNCIL MEMBER GARODNICK: Thank you,

13    Madam Public Advocate.

14            Good afternoon. I rise today in

15    support of Intro. 586-A, which is the Campaign

16    Finance Reform. I urge my colleagues to vote yes on

17    this legislation. I think this is an important law.

18    It's a strong law. It does a number of things that

19    are worthy of our support, including providing

20    additional protections for candidates, setting time

21    frames for audits, deadlines, for return of public

22    funding, more ability to rely on the opinions from

23    the Campaign Finance Board's candidate liaisons, but

24    also very significantly, it makes important changes

25    to the contribution rules, limiting the potential

65

1    STATED COUNCIL MEETING

2    influence of those doing business with the City of

3    New York, and reducing any appearance, conflicts,

4    and it strengthens the voice of individual New

5    Yorkers who want to participate by creating

6    incentives for smaller donations.

7            This legislation, I believe, will

8    continue to make New York City a leader in campaign

9    finance reform and the campaign finance system. It

10   will set the right example for the State of New York

11   and for the rest of the country. I wanted to

12   congratulate the Government Operations Chair Simcha

13   Felder and, of course, Speaker Quinn and their

14   staffs for so much work that went into putting

15   together this legislation, and I encourage my

16   colleagues to vote yes on this. Thank you.

17           PUBLIC ADVOCATE GOTBAUM: Council

18   Member Koppell.

19           COUNCIL MEMBER KOPPELL: I have been a

20    lifelong advocate of Campaign Finance Reform and I

21    wish I could support this bill. I want to say to the

22    Speaker I understand that she puts it forward in

23    good faith, and in an attempt to reform this system

24    properly. However, in order for a campaign finance

25    system to work, it's got to facilitate realistic

                                                    66

1    STATED COUNCIL MEETING

2    campaigns. Right now we have a situation nationally

3    where Hillary Clinton and others have opted out of

4    campaign finance reform because the rules are so

5    tight they don't permit raising enough money to run

6    an effective campaign.

7                    This proposal, unfortunately, is

8    unfair. It's unfair to candidates, especially to

9    candidates from poor and minority districts who will

10   find it very difficult to raise enough money to run

11   especially for races beyond the Council race, for

12   Mayor or Public Advocate or Comptroller or Borough

13   President. I am perhaps the only person in this

14   house who has run for a broad race. I ran for

15   Statewide Office twice. I know how hard it is to

16   raise money. It's also unfair because it creates a

17   morass. It's extremely difficult to determine who

18   can and cannot contribute. There are all kinds of

19  inconsistencies. You can contribute if you get

20  permits to do low-income housing, but you can't

21  contribute if you get permits to do other housing.

22  You can contribute if you're the spouse of someone

23  doing business with the City, but you can't

24  contribute if you're the spouse of a lobbyist. It's

25  all kinds of time limits and different provisions

67

1  STATED COUNCIL MEETING

2  that apply to different people who do business in

3  different ways.

4           Campaigns will be stuck in a morass

5  and City agencies that will have to keep databases

6  going on a daily basis because people will be doing

7  business one day and not business the other day.

8           In addition, it is unfair to

9  thousands of citizens, who want to participate in

10  the political process, that because they have a Land

11  Use Application pending in the Bronx, they can't

12  contribute to the Queens Borough President.

13           We are disenfranchising, in a sense,

14  so many people. This bill violates equal protection,

15  in my view. In my view, this bill makes it more

16  difficult to run, not easier to run. We have the

17  best Campaign Finance Law in the country right now

18  with matching funds. This makes it worse.

19            PUBLIC ADVOCATE GOTBAUM: Thank you,

20  Council member.

21            Council Member Ignizio.

22            COUNCIL MEMBER IGNIZIO: Thank you

23  very much. I rise here not to question anyone's

24  intention. As it was said, I believe the Speaker and

25  I believe the sponsor of the legislation, the

68

1   STATED COUNCIL MEETING

2   Chairman of the Committee mean well in this

3   legislation. However, as my colleague said, this

4   bill does a lot of good things. It's not what's in

5   the bill, it's what's not in the bill. The fact that

6   we're leaving out interest groups, unions in this

7   particular case at the expense of the rest of the

8   City, is questionable at best. I believe that we

9   ought to treat people and ought to treat groups

10  equally. This bill, in my view, is a violation of

11  the 14th Amendment. This bill, in my opinion, does

12  not go far enough if you're actually seeking to get

13  influence and people who seek to question and lobby

14  local officials. This bill is one which has some

15  great points to it, as was pointed out by my

16  colleague, but the part that I don't think is being

17  sufficiently addressed is the fact that people who

18  wish to petition their government in opposition to

19  one, someone else, government is determining which

20  speech ought be heard louder. It's never been done

21  before. It shouldn't be done here. It's a

22  fundamental violation of a right of free speech, as

23  well as freedom of association.

24          This bill, as I said, while good

25  intentioned, ought be amended. It ought to include

                                                  69

1  STATED COUNCIL MEETING

2  all interest groups, and it ought to create a level

3  playing field for anyone who seeks to petition their

4  government. What we have done here is we have told

5  someone if you have one voice and are speaking on

6  one issue, that is heard louder than if you're

7  speaking on another. It's fundamentally unjust for

8  those who want to take a dissenting opinion at times

9  and I think it ought be amended and include all

10  interest groups that have business with the City of

11  New York.

12          PUBLIC ADVOCATE GOTBAUM: Council

13  Member McMahon.

14          COUNCIL MEMBER McMAHON: Thank you,

15  Madam Public Advocate.

14  his community was right, the issue was whether or

15  not they had a right to convince the Landmarks

16  Preservation Commission that they were right and now

17  it may be too late. And I think that's something

18  that we really need to drive home. I think that the

19  Landmarks Preservation Commission needs to address

20  that issue right now, in fairness to the

21  Councilman's district, and were it not for Mr.

22  Tierney's reputation, I would be voting no. But I

23  hope they will redress that immediately.

24              PUBLIC ADVOCATE GOTBAUM: Council

25  Member DeBlasio.


                                72


1  STATED COUNCIL MEETING

2              COUNCIL MEMBER DeBLASIO: Thank you,

3  Madam Public Advocate.

4              I want to first very quickly say that

5  I appreciate Council Member Fidler's point and

6  Council Member Gentile's point, and I'm having my

7  frustrations, too, about the unworkable time lines

8  at Landmarks Preservation. So, I agree with respect

9  to Mr. Tierney, but I think we all need to see that

10  entity act in concert with communities and the

11  realities on the ground more frequently.

12              I want to take us back for a moment

13    to the Campaign Finance Bill. I respect my

14    colleagues Council Members Ignizio and Koppell very

15    much. I disagree strongly with the analysis. I think

16    this bill went through a tremendously careful

17    process, and given the difficulty of the subject

18    matter, we came out with a number of very acceptable

19    and positive compromises to get reform. I think

20    we're not talking enough about the fact that there

21    will be more matching funds for small contributions

22    which is a fundamental progressive reform. I think

23    we're not talking enough about the fact that the

24    taxpayers do better here, because we are ending a

25    practice of which we no longer have to come to grips

73

1    STATED COUNCIL MEETING

2    with of no longer funding truly non-competitive

3    elections. We have a much better process in this

4    bill for determining when there is truly a

5    competitive election that deserves matching funds

6    and when there isn't and I'm proud to have been part

7    of the discussions that led to that. But most

8    importantly, I'm very troubled by the attack on

9    contributions by working people through the labor

10    movement. There is no parallel between the work of

11    the labor movement, organizations that represent

12  working people, and their economic interests and the

13  realities of their lives. There is no parallel

14  between that and contributions from private entities

15  that are focused on profit. And I really think we

16  have to stop allowing the debate to make a parallel

17  where there is no parallel. The labor unions in this

18  City need the ability to express the point of view

19  of working people, of hundreds of thousands of

20  working people. It is an important part of

21  democracy. It should not be held back or repressed

22  in any way, and I think this bill truly strikes the

23  right balance for reform.

24              Thank you.

25              PUBLIC ADVOCATE GOTBAUM: Anybody


                                              74


1   STATED COUNCIL MEETING

2   else?

3               I'd like to now introduce the interns

4   from the Public Advocate's Office. Would you stand

5   up, please, all of you? Where are you? There you

6   are. The backbone of the office. Thank you, all.

7               Sorry, Miguel. Miguel Martinez.

8               COUNCIL MEMBER MARTINEZ: I just

9   wanted to remind the Speaker that my daughter goes

10  to Beacon.

11                    PUBLIC ADVOCATE GOTBAUM: She said it

12   already.

13                    Report of Special Committees.

14                    COUNCIL CLERK: None.

15                    PUBLIC ADVOCATE GOTBAUM: Reports of

16   Standing Committees.

17                    COUNCIL CLERK: Report of the

18   Committee on Consumer Affairs.

19                    Intro. 577-A. Billiards and pocket

20   billiard rooms.

21                    SPEAKER QUINN: Amended and coupled on

22   General Orders.

23                    COUNCIL CLERK: Report of the

24   Committee on Governmental Operations. Intro. 586-A.

25   Campaign Finance.


                                                    75


1    STATED COUNCIL MEETING

2                     SPEAKER QUINN: Amended and coupled on

3    General Orders.

4                     COUNCIL CLERK: Report of the

5    Committee on Housing and Buildings.

6                     Intro. 578-A. City Construction

7    Codes.

8                     SPEAKER QUINN: Amended and coupled on

9    General Orders.

7              COUNCIL CLERK: Report of the

8   Committee on State and Federal Legislation.

9              Preconsidered Reso 931. Catastrophic

10  insurance.

11             SPEAKER QUINN: Referred to the

12  Committee on State and Federal Legislation.

13             PUBLIC ADVOCATE GOTBAUM: General

14  Order Calendar.

15             COUNCIL CLERK: Resolution appointing

16  various persons Commissioner of Deeds.

17             SPEAKER QUINN: Coupled on General

18  Orders.

19             At this point I ask for a roll call

20  on all matters that have been coupled on the General

21  Order Calendar, please, Madam Public Advocate.

22             COUNCIL CLERK: Addabbo.

23             COUNCIL MEMBER ADDABBO: Aye on all.

24             COUNCIL CLERK: Arroyo.

25             (No response.)

79

1   STATED COUNCIL MEETING

2              COUNCIL CLERK: Avella.

3              COUNCIL MEMBER AVELLA: Aye.

4              COUNCIL CLERK: Brewer.

5              COUNCIL MEMBER BREWER: I want to vote

6  aye on all items. I just want to mention, regarding

7  the Campaign Finance, I certainly want to

8  congratulate the staff. Every small item mentioned

9  by Council members was taken into consideration, and

10  added or amended to be relevant to the legislation.

11          I do think that it is complicated,

12  and I do think that down the road public financing

13  in total makes sense. I know the staff was kind

14  enough to give us some numbers, 2001, 42 million was

15  approximate cost of the Campaign Finance Law at that

16  time, and a rough estimate of public financing would

17  have been 100 million. So, there is a cost

18  difference, although attorneys, CPAs, et cetera, are

19  not taken into consideration in that number.

20          So, I certainly vote aye. I know that

21  public financing means that we will not ever have

22  the fund, if we were to ever have it, of having a

23  fundraiser. And some Council members and some

24  elected officials just love raising money.

25          But I do think it's the way down the

80

1  STATED COUNCIL MEETING

2  road to think about elections in this country. I

3  vote aye.

4          COUNCIL CLERK: Comrie.

5                    COUNCIL MEMBER COMRIE: Aye on all.

6                    COUNCIL CLERK: DeBlasio.

7                    COUNCIL MEMBER DEBLASIO: Aye on all.

8                    COUNCIL CLERK: Dickens.

9                    COUNCIL MEMBER DICKENS: Permission to

10   explain my vote, please?

11                    PUBLIC ADVOCATE GOTBAUM: So ordered.

12                    COUNCIL MEMBER DICKENS: Intro 105-A,

13   I recognize that there needs to be some regulations

14   concerning the clothes bins; however, I do have some

15   concerns and reservations as how it will impact on

16   churches and synagogues that are in my community,

17   who do not have, have not been afforded extra land

18   that they can set the bins upon.

19                    In addition, people in my community

20   use the clothes, it's much needed, that come out of

21   those bins, and it's an easy access for those of us

22   that want to donate clothes to put them.

23                    And I do applaud Council Member

24   McMahon for taking the initiative to see to it that

25   some regulation is put in place about them, but I do

                                                    81

1    STATED COUNCIL MEETING

2    have some serious concerns as it will impact upon

3    the people of my district, and upon the churches and

4  synagogues, because we're not afforded in Manhattan

5  the extra land.

6                    So, aye on all, except no on Intro.

7  105-A.

8                    COUNCIL CLERK: Dilan.

9                    COUNCIL MEMBER DILAN: Madam Public

10  Advocate, may I have a brief moment to explain my

11  vote?

12                    PUBLIC ADVOCATE GOTBAUM: So ordered.

13                    COUNCIL MEMBER DILAN: I want to start

14  off by congratulating a constituent of mine, Julie

15  Dent, for being appointed today as a member of the

16  Board of Elections as a Commissioner.

17                    I especially want to thank the

18  Speaker for her patience on that issue. Just keep in

19  mind, Madam Speaker, that your patience was noted by

20  the Brooklyn Delegation, but Julie Dent is a worthy

21  appointee and she'll serve the Board of Elections

22  and the City well in that current role. So, I want

23  to say congratulations to Julie. And I also want to

24  thank again the Buildings Commissioner Patricia

25  Lancaster from the Building Code. From my

82

1  STATED COUNCIL MEETING

2  understanding she's in the balcony now. So, to Ms.

3    Lancaster, thank you.

4            And Madam Advocate, I want to vote

5    aye on all items, except for Intro. 586-A, which is

6    the Campaign Finance Bill, which I vote no.

7            COUNCIL CLERK: Eugene.

8            COUNCIL MEMBER EUGENE: Aye.

9            COUNCIL CLERK: Felder.

10            COUNCIL MEMBER FELDER: Yes.

11            COUNCIL CLERK: Fidler.

12            COUNCIL MEMBER FIDLER: Madam Public

13    Advocate, may I be briefly excused to explain my

14    vote?

15            PUBLIC ADVOCATE GOTBAUM: So ordered.

16            COUNCIL MEMBER FIDLER: On the

17    Campaign Finance Board Bill, first I want to say, I

18    want to congratulate and thank both the Speaker and

19    Chairman Felder for really an extraordinary process.

20    I can't begin to tell you how many times I was

21    contacted about the concerns that I have on this

22    area, and really it was an amazing example of

23    democracy.

24            As far as the substance of the bill

25    is concerned and the process, I'm not a big fan of

83

1    STATED COUNCIL MEETING

2    our current Campaign Finance System. I'm not a big

3    fan of the current Campaign Finance Board and the

4    way that they conduct their business. This bill

5    corrects a lot of things that are wrong. It leaves

6    some of the things that are wrong that are status

7    quo, and it doesn't address some other problems and

8    it creates a couple of other additional problems.

9    But by and large, it's my view that it does improve

10   a system that is very much in need of improvement.

11              As reluctant as I am to say this, I'm

12   not sure if he's still in the room, Council Member

13   Barron's point is very, very well taken. I realize

14   the Supreme Court probably stands in our way, but so

15   long as billionaires get to play this game

16   differently than the common folk, and the system is

17   unaffected by that, we can't pass this bill in that

18   vacuum and not consider it.

19              But this bill does make things better

20   than they were before this bill, and acknowledging

21   that, I vote aye on all.

22              COUNCIL CLERK: Foster.

23              COUNCIL MEMBER FOSTER: May I be

24   excused to explain my vote?

25              PUBLIC ADVOCATE GOTBAUM: So ordered.

1    STATED COUNCIL MEETING

2              COUNCIL MEMBER FOSTER: Thank you.

3              In terms of the Campaign Finance

4    Bill, I know that a lot of work was put into it, and

5    I'd like to thank DeNora Johnson for answering my

6    questions and speaking with me about the bill. My

7    concern is that once the people in the game change

8    the rules change. And I think that this does not go

9    far enough to assist candidates. I think in some

10   ways it prevents candidates from low-income

11   communities from running.

12             I never cease to marvel at the fact

13   that when you seem to get more black and Latino and

14   people of color in a certain game of politics, then

15   we find the need to change and make different

16   regulations. And to agree with Council Member Fidler

17   and Barron, we are setting the way, we are paving

18   the way for wealthier candidates to continue to buy

19   elections like we're seeing with this Mayor.

20             That having been said, with quite a

21   bit of hesitancy, I vote aye on all, and really do

22   believe that we're going to be looking at this

23   again, because we're not there and we haven't fixed

24   the problem.

25             Thank you.

1    STATED COUNCIL MEETING

2                    COUNCIL CLERK: Garodnick.

3                    COUNCIL MEMBER GARODNICK: Aye.

4                    COUNCIL CLERK: Gennaro.

5                    COUNCIL MEMBER GENNARO: Yes.

6                    COUNCIL CLERK: Gentile.

7                    COUNCIL MEMBER GENTILE: May I be

8    excused to explain my vote, please?

9                    PUBLIC ADVOCATE GOTBAUM: So ordered.

10                    COUNCIL MEMBER GENTILE: Thank you. I

11   vote aye on all, except for M 641 and Reso 952, I

12   vote no for the reasons I stated during the hearing

13   this morning on the nomination of Robert Tierney. I

14   believe just for the disregard he has shown the

15   Bayridge, disregard he has shown me, I don't think

16   he merits from our part of the woods in New York

17   City, our part of New York City a yes vote. And so I

18   thank Councilman Fidler for his words of

19   encouragement and concern, and I vote no on M 641,

20   and Reso 952.

21                    COUNCIL CLERK: Gerson.

22                    COUNCIL MEMBER GERSON: Aye on all.

23   And with permission of my colleagues, Madam Public

24   Advocate, aye on all Land Use Call-Ups.

25                    PUBLIC ADVOCATE GOTBAUM: So ordered.

```
 1   STATED COUNCIL MEETING

 2                 COUNCIL CLERK: Gioia.

 3                 COUNCIL MEMBER GIOIA: Yes.

 4                 COUNCIL CLERK: Gonzalez.

 5                 COUNCIL MEMBER GONZALEZ: Aye on all.

 6                 COUNCIL CLERK: Ignizio.

 7                 COUNCIL MEMBER IGNIZIO: No on Land

 8   Use 464 and 465, and no on 586-A; aye on all others.

 9                 COUNCIL CLERK: Jackson.

10                 COUNCIL MEMBER JACKSON: Aye on all.

11                 COUNCIL CLERK: James.

12                 COUNCIL MEMBER JAMES: May I be

13   excused to explain my vote?

14                 PUBLIC ADVOCATE GOTBAUM: So ordered.

15                 COUNCIL MEMBER JAMES: First let me

16   congratulate Commissioner for all of the great work

17   that he has done in my district, for paying great

18   attention to my district and for landmarking several

19   buildings in my district and for expanding the

20   landmark designation. I thank him and I look forward

21   to working with him in the future.

22                 Let me also thank Commissioner

23   Lancaster, with regards to the Building Code and

24   remind her about the building in my district, 163

25   Washington Avenue, that I'm sure Department of
```

87

1   STATED COUNCIL MEETING

2   Buildings knows much about. An 18-story building on

3   a brownstone block, abutting buildings that date

4   back to the late 1800s, it's totally inconsistent

5   and out of character with the community.

6              With respect to campaign finance,

7   obviously I support the bill and hope that one day

8   we will be expanding campaign finance to include

9   judges. We really need to include judges in the

10  Campaign Finance Law.

11             And with respect to the accessible

12  collection bins, let me congratulate the Chair, and

13  add that they have been an attractive nuisance in my

14  community. A nuisance that has attracted drug

15  dealers where they stash their drugs, where homeless

16  have, unfortunately, been sleeping, and where a

17  significant number of people, unfortunately, have

18  been using it for refuge of all kinds. I vote aye on

19  all.

20             COUNCIL CLERK: Katz.

21             COUNCIL MEMBER KATZ: Madam Public

22  Advocate, to explain my vote?

23             Madam Public Advocate, to explain my

24  vote?

25             PUBLIC ADVOCATE GOTBAUM: So ordered.

88

1  STATED COUNCIL MEETING

2                COUNCIL MEMBER KATZ: I, like Oliver

3  Koppell, have run on very different levels of

4  government. I have run State races, I have run

5  congressional races, and I have had the honor of

6  running for the Council. All through each of the

7  elections that I have had, I have been an avid, avid

8  proponent of campaign finance. I believe that

9  campaign finance is an important part of our

10  government. I believe I spend too much time trying

11  to raise money, but it's an unfortunate part of the

12  system that now exists.

13                The problem I have is exactly the way

14  Council Member Barron, Councilman Foster and

15  Councilman Fidler discussed, which is that I believe

16  this is setting up for rich candidates to win. They

17  can spend all they want. And I understand the First

18  Amendment arguments, but it does leave some of us to

19  a disadvantage.

20                I do believe also there is going to

21  be constitutional issues with this bill, and I think

22  that the spirit of this legislation, however, is

23  good. The spirit of this legislation, through the

24  Speaker and through all of the staff that I have had

25  an inordinate amount of arguments with, I believe

89

1   STATED COUNCIL MEETING

2   every single one of them are trying to do the right

3   thing. The problem is that as we move forward, I

4   think what we're trying to achieve is equitable

5   elections, people that are able to run on even

6   playing fields.

7              I have grave concerns as to whether

8   or not this will accomplish that.

9              I do believe, however, as an advocate

10  for public financing over the last 13 years of my

11  career, it has been good to get the discussion out

12  there, and like my colleague, Council Member Foster,

13  I do hope that as we move on over the next year or

14  two and we are still in office, that we look to see

15  the pluses and the minuses of the legislation that

16  we're passing today. Because I do believe there are

17  some good things in here, and maybe there's some

18  things we want to address again before we leave

19  office.

20             With that, I vote aye.

21             COUNCIL CLERK: Koppell.

22             COUNCIL MEMBER KOPPELL: May I be

23  excused from voting and explain my vote?

24             PUBLIC ADVOCATE GOTBAUM: So ordered.

25                    COUNCIL MEMBER KOPPELL: Without

                                                        90

 1  STATED COUNCIL MEETING

 2  belaboring the campaign finance issue, the problem

 3  here is exactly the one raised by Council Member

 4  Katz and Felder and Barron, in fact, and that is

 5  whereas we restrict contributions to candidates who

 6  don't have private wealth, we can't restrict private

 7  wealth, and so we create unfortunately an uneven

 8  playing field. If we could create a completely even

 9  playing field, I could support this legislation.

10  Given the situation we face, we are assisting rich

11  candidates and making poorer candidates, putting

12  them at a grave disadvantage, while of course,

13  disenfranchising people as I said.

14              Let me change the subject and say

15  that Robert Tierney was extremely helpful in

16  connection with Landmark issues in my community. I'm

17  delighted that he's going to continue to serve on

18  the Landmark Commission, and I vote to support his

19  selection enthusiastically.

20              I also will say to members of the

21  disabled community, that I am concerned about their

22  concern about the new Building Code, and will work

23  with them to seek to see if some of their deeply

24    held concerns can be addressed.

25              I know the Speaker's Office will help

91

1    STATED COUNCIL MEETING

2    me on that. They've indicated that they will, if we

3    can deal with those issues, we will. So, Madam

4    Public Advocate, I wish to vote no on 586-A. I wish

5    to abstain on Introduction 578-A and Resolution 932.

6    And with those exceptions, I vote aye on all the

7    other items on the General Order Calendar. Thank

8    you.

9              COUNCIL CLERK: Mark-Viverito.

10             COUNCIL MEMBER MARK-VIVERITO: Aye on

11    all.

12             COUNCIL CLERK: Martinez.

13             COUNCIL MEMBER MARTINEZ: Madam Public

14    Advocate, may I be excused to explain my vote?

15             PUBLIC ADVOCATE GOTBAUM: So ordered.

16             COUNCIL MEMBER MARTINEZ: I will be

17    voting aye on all items, but with some reservation

18    as to Intro. 586-A. When we spoke of Campaign

19    Finance many years ago, we spoke about a system that

20    will help minority candidates that do not have

21    access to wealth in their community to run or raise

22    the amount of monies needed, because unfortunately,

23  you need the money to run campaigns; however, this
24  bill does have great things that will bring a system
25  of justice when dealing with campaign finance where

92

1  STATED COUNCIL MEETING
2  individuals will now have greater protection. But
3  when it comes to the issue of regulating the way
4  monies are raised for some but not for others that
5  do have the wealth, it is of great concern to me.
6  And I wanted to put on the record the fact that even
7  though this bill does have good and great things
8  that protect candidates and makes the Board more
9  accountable, in terms of responding to candidates
10  and ensuring the rights of those candidates that are
11  now going to be treated as individuals with rights,
12  not as individuals that are subject to whatever
13  rules and procedures that the Board comes up with. I
14  do have great concern in terms of the limits that
15  are being put for individuals who raise the monies
16  needed to run an efficient and an effective
17  campaign. I do agree with my colleagues that this
18  bill, we'll be looking at it again, in terms of
19  making it more equitable, and regulating those that
20  do not need to raise funds to run campaigns, as
21  opposed to those that do have to go out there and

22  raise monies to run the campaigns.

23          Having said that, I will be voting

24  aye and I do want to acknowledge the work of the

25  staff in putting this bill together. I know I sat on

93

1  STATED COUNCIL MEETING

2  several occasions with the staff and received

3  several calls from the staff regarding this bill,

4  and I think the work that they did to ensure that

5  many of the concerns that I brought up and other

6  members brought up were addressed in the bill.

7  Having said that, I thank the staff and I vote aye

8  on all.

9          COUNCIL CLERK: McMahon.

10          COUNCIL MEMBER McMAHON: I request

11  leave to explain my vote, Madam Public Advocate.

12          PUBLIC ADVOCATE GOTBAUM: So ordered.

13          COUNCIL MEMBER McMAHON: With regard

14  to the Campaign Finance Reform Bill, if you think in

15  the broader context of the discussions that are

16  raging in our country now in Washington and Albany

17  and other State capitals throughout the land, and

18  the overall gridlock and inability to address

19  campaign financing, and to make our elections more

20  fair, more rationable, more equitable, and more

21    accessible, we see failure across the board.

22                    In Washington they fiddle while the

23    whole election system burns. The same could be said

24    for Albany as well. And while they say "we can't, we

25    can't," we, the little City Council here in New

94

1    STATED COUNCIL MEETING

2    York, the Little Engine That Could says "we think we

3    can, we think we can," and we can and we will.

4                    This bill may not be perfect. It

5    certainly isn't. But we, as a legislative body, are

6    in the process of limiting our access as candidates

7    of this or future offices, and that's a good thing,

8    and that's something that I'm very proud of and I

9    think it's something that we should all be very

10   proud of.

11                   With regards to Robert Tierney, as

12   Chairman for the Landmarks Preservation Commission,

13   I regret that my colleague Vincent Gentile has not

14   had a great experience with his office, but if we

15   think within which world he operates, with the

16   limited staff, with commissioners who are not paid,

17   with the demands that are put on that office, the

18   debate should not be the integrity and ability and

19   dedication of Robert Tierney, because I think that's

20    above reproach and I will proudly vote for his

21    reappointment, but we need to talk about the

22    Commission itself and how we can enhance it, make it

23    stronger, and make it more able to do the things

24    that we wanted to do to preserve historic buildings

25    and neighborhoods in our district.

95

1    STATED COUNCIL MEETING

2                 So, I, therefore, for the reasons

3    stated herein, vote aye on all.

4                 COUNCIL CLERK: Mealy.

5                 COUNCIL MEMBER MEALY: Aye on all.

6                 COUNCIL CLERK: Mendez.

7                 COUNCIL MEMBER MENDEZ: Aye on all.

8                 COUNCIL CLERK: Palma.

9                 COUNCIL MEMBER PALMA: Aye on all.

10               COUNCIL CLERK: Recchia.

11               COUNCIL MEMBER RECCHIA: Aye on all.

12               COUNCIL CLERK: Reyna.

13               COUNCIL MEMBER REYNA: Aye on all.

14               COUNCIL CLERK: Sanders.

15               COUNCIL MEMBER SANDERS: Permission to

16    explain my vote?

17               PUBLIC ADVOCATE GOTBAUM: So ordered.

18               COUNCIL MEMBER SANDERS: Thank you.

19          First, let me congratulate all who
20  have earnestly worked on Intro. 586-A. There are
21  some good things about this bill that needs to be
22  said, but I, too, have grave concerns about this
23  bill.
24          My concerns are that I am afraid that
25  it will handicap candidates from working class, and

96

1  STATED COUNCIL MEETING
2  from communities of color to participate in this
3  system. I truly fear that we're going to get the
4  opposite of what we're trying to do, that we're
5  going to get fewer people from those communities
6  that instead, only those who can self-finance, or
7  those from communities where they can go next door
8  and get a check for $2,750 or whatever the amount
9  is. There are communities in New York City where one
10  can go to any apartment next door, any house and
11  they can get these type of checks. Other communities
12  are not like that, and we haven't taken that into
13  account enough.
14          We have made some movement, and I'm
15  glad of that. I've been one of the leading forces in
16  pushing for that, but I don't think that we have
17  gotten to that point.

18          I can only conclude with the words of

19   the Supreme Court from their statement on Monday on

20   a similar issue, and I'm afraid this one may go

21   there also, after all was said and done, when they

22   took their statement, they said enough is enough.

23   And I trust that we can heed their wise counsel.

24          With that, I have great concerns but

25   I am voting aye on this bill.


                                                    97

1   STATED COUNCIL MEETING

2          COUNCIL CLERK: Seabrook.

3          COUNCIL MEMBER SEABROOK: Aye on all.

4          COUNCIL CLERK: Sears.

5          COUNCIL MEMBER SEARS: Aye.

6          COUNCIL CLERK: Stewart.

7          COUNCIL MEMBER STEWART: First I'd

8   like to congratulate Julie Dent, and I vote aye on

9   all.

10          COUNCIL CLERK: Vacca.

11          COUNCIL MEMBER VACCA: Aye on all.

12          COUNCIL CLERK: Vallone.

13          COUNCIL MEMBER VALLONE: May I be

14   briefly excused?

15          PUBLIC ADVOCATE GOTBAUM: So ordered.

16          COUNCIL MEMBER VALLONE: Thank you.

17            I share the concerns of Oliver

18  Koppell, that this bill may be too complicated, and

19  especially of Council Member Ignizio, that this bill

20  doesn't go far enough. I, too, believe that we are

21  only regulating half the playing field.

22            What's left unsaid so far, though, is

23  that if we had not acted, the CFB would have. They

24  are mandated by the Charter and given the power to

25  regulate persons who have business dealings with the

98

1  STATED COUNCIL MEETING

2  City.

3            I don't think anybody wanted the CFB

4  to come up with the rules that we're coming up with

5  today. They would have eliminated all contributions

6  basically, and they would have left out the good

7  things that this bill does, like eliminate treasure

8  liability, like put time limits on audits and things

9  like that.

10            So, I do have concerns about this

11  bill. As I said, I don't believe it's perfect. It is

12  a good bill, though, and the fact that it was

13  shepherded through Committee by Chair Felder and

14  that it was the brain child of Speaker Quinn, both

15  of whom I trust immensely when it comes to all

16  things ethical, lead me to vote aye for this bill

17  and all others.

18              COUNCIL CLERK: Vann.

19              COUNCIL MEMBER VANN: Aye.

20              COUNCIL CLERK: Weprin.

21              COUNCIL MEMBER WEPRIN: Aye on all.

22              COUNCIL CLERK: Yassky.

23              COUNCIL MEMBER YASSKY: I request

24  permission also to vote on the recessed vote and the

25  Land Use Call-Ups.

99

1  STATED COUNCIL MEETING

2              PUBLIC ADVOCATE GOTBAUM: So ordered.

3              COUNCIL MEMBER YASSKY: I vote aye on

4  those and aye on the coupled General Orders as well.

5              COUNCIL CLERK: Oddo.

6              COUNCIL MEMBER ODDO: No on Intro.

7  586-A and yes on all others.

8              COUNCIL CLERK: Rivera.

9              COUNCIL MEMBER RIVERA:  I vote aye.

10              COUNCIL CLERK: Speaker Quinn.

11              SPEAKER QUINN: I vote aye. Just as I

12  vote aye, I want to just make a quick announcement.

13  We are getting reports of some level of blackouts in

14  different parts of the City at the moment, some

15  parts of the Bronx and perhaps some parts of

16  Northern Manhattan. We do not have all of the

17  information. We do not know how significant this is.

18  We don't really have a sense yet of how severe the

19  problem is, how wide spread or if in fact there is a

20  blackout, how long it will take to get the lights

21  back up and power back on in those areas.

22              I'd ask my colleagues if they could,

23  following the Stated, just gather in the lounge and

24  we will try to get somebody from the Deputy Mayor's

25  Office or Office of Emergency Management to brief us

100

1  STATED COUNCIL MEETING

2  on what they know at the moment, and we will set up

3  a protocol of who in your office we should be

4  working with as we get more information on this.

5              So, if I could ask folks to do that

6  in the lounge following this meeting, I did have

7  some meetings scheduled with members immediately

8  following the meeting, so I'm going to ask for their

9  deference in potentially rescheduling those or

10  pushing those back.

11             Thank you all very much, and I vote

12  aye.

13             PUBLIC ADVOCATE GOTBAUM: All items on

14    today's General Order calendar were adopted by a

15    vote of 48 in the affirmative, zero negative, zero

16    abstentions, with the exception of 641 and Reso 952,

17    which is adopted by 47 in the affirmative, one

18    negative and zero abstentions, and Intro. 586-A,

19    which is adopted by a vote of 44 in the affirmative,

20    four negative and zero abstentions. And Land Use 464

21    and 465, which is adopted by a vote of 47 in the

22    affirmative, one negative, zero abstentions, and

23    Intro. 105-A, which is adopted by a vote of 47 in

24    the affirmative, one negative, zero abstentions, and

25    Intro. 578-A, which is adopted by a vote of 47 in

101

1    STATED COUNCIL MEETING

2    the affirmative, one abstention. And preconsidered

3    Reso 932, which is adopted by a vote of 47 in the

4    affirmative, zero negative and one abstention.

5                The revised Land Use Call-Up vote is

6    48 in the affirmative, zero negative.

7                Since there are no resolutions, let's

8    move on to the General Discussion.

9                Councilman Gennaro.

10               Excuse me, I missed the Introduction

11    and Reading of Bills.

12               SPEAKER QUINN: All bills are referred

13   to committees as indicated.

14                    PUBLIC ADVOCATE GOTBAUM: Thank you.

15   Since there are no resolutions, we will move now on

16   to the Discussion.

17                    Council Member Gennaro.

18                    COUNCIL MEMBER GENNARO: Thank you,

19   Madam Public Advocate.

20                    I just want to call my colleagues'

21   attention to Reso 933 and Intro. 594.

22                    PUBLIC ADVOCATE GOTBAUM: Quiet,

23   please.

24                    COUNCIL MEMBER GENNARO: First, Reso

25   933. Council Member Weprin and I are introducing

102

1    STATED COUNCIL MEETING

2    Reso 933 that calls upon the Bloomberg

3    Administration to renegotiate the City's lease with

4    the New York City Water Board for the water supply

5    and water treatment system to end once and for all

6    the Water Board's so-called rental payment to the

7    City's general fund.

8                    Some of my colleagues may be aware

9    that scores of millions of dollars every year go

10   from the water rate payers to the City's general

11   fund.

0001
                                    1521 Local Laws 070307.txt
   1      MAYOR'S OFFICE OF CITY LEGISLATIVE AFFAIRS
   2                    CITY OF NEW YORK
   3
   4
   5
   6
   7                      PUBLIC HEARING
   8                          ON
   9                  PROPOSED LOCAL LAWS
  10
  11
  12            INTRODUCTORY NUMBER 586-A
  13
  14
  15
  16                      CITY HALL
  17                      Blue Room
  18                  New York, New York
  19
  20                      Tuesday,
  21                    July 3, 2007
  22                     9:10 a.m.
  23
  24
  25
0002
   1
   2
   3              P R O C E E D I N G S
   4          MAYOR BLOOMBERG:    The next bill before us
   5     today is Introductory Number 586-A, sponsored in
   6     conjunction with the Administration by Speaker Quinn
   7     and Council Members Felder, Rivera, Comrie, Fidler,
   8     deBlasio, Dickens, Arroyo, Jackson, Garodnick, Gentile,
   9     Gerson, Gioia, James, Lappin, Mark-Viverito, McMahon,
  10     Nelson, Recchia, Reyna, Seabrook, Stewart, Vacca,
  11     Weprin, White, Liu, and Mendez.
  12              This bill will strengthen the City's
  13     landmark Campaign Finance Program by placing strict
  14     restrictions on what are called "pay-to-play"
  15     contributors -- the practice of giving large campaign
  16     contributions in order to influence government.
  17              The Campaign Finance Program was adopted
  18     in 1988 to reduce corruption and diminish the influence
  19     that special interests wield in city government.   The
  20     law has been enhanced several times since 1988, and in
  21     1998, voters passed a referendum requiring candidates
  22     to disclose, and allowing the Campaign Finance Board to
  23     restrict, "pay-to-play" contributions.
  24              Introductory Number 578-A will finally
  25     fulfill the voters' mandate by requiring the disclosure
0003
   1     of contributions from those who do business with the
   2     City, reduce the amounts that candidates may accept
   3     from such contributors, and eliminate public matching
   4     funds for such contributions.   These new provisions
   5     will strengthen the integrity of City government and
   6     enhance its transparency -- two critically important
   7     goals of our Administration.
   8              The bill will also enhance the value of
   9     smaller contributions made by everyday New Yorkers by
  10     modifying the public matching funds formula, raising
         the matching rate from four-to-one to six-to-one and
         allowing the amount that may be matched from -- and
                          Page 1

1521 Local Laws 070307.txt
11  lowering the amount that may be matched from $250 to
12  $175.  At the same time, the bill would help reduce
13  waste by setting strengthening standards designed to
14  prevent the distribution of matching funds to
15  candidates who face nominal opponents.
16          In addition, the bill establishes clear
17  deadlines for the completion of Campaign Finance Board
18  audits and fair procedures for candidates who -- to
19  challenge Board determinations; closes loopholes in the
20  ban on corporate contributions by also including
21  limited liability companies and partnerships; and
22  improves public disclosures by expanding the definition
23  of an intermediary -- a person, also known as a
24  "bundler," who solicits contributions for a campaign.
25          All campaign reforms must be viewed as a
0004
1   work in progress, and certainly the City's campaign
2   finance program is no exception.  This bill is a major
3   advance for the program, particularly the "pay-to-play"
4   restrictions.  No other city or state in the nation has
5   attempted such an ambitious undertaking, and we
6   recognize that the databases required to enforce the
7   law will be both difficult to build and, like all
8   complex databases, imperfect.  But, as I have said, we
9   cannot let the perfect be the enemy of the good.  The
10  voters demanded that we act back in 1998 to create a
11  more transparent government that is less susceptible to
12  corruption and improper influence, and that is exactly
13  what we are doing.
14          And, I would like to thank my staff,
15  particularly Deputy Mayor Ed Skyler, Haeda Mihaltses,
16  Anthony Crowell, Patrick Wehle, Frank Barry, as well as
17  Marla Simpson, Director of the Mayor's Office of
18  Contract Services, and Steve Louis of the Law
19  Department, for their work on this bill.  I would also
20  like to thank Speaker Quinn, Chair Felder, and the
21  Council and its staff for their work and approval of
22  this legislation.
23          Let me just repeat the part that I think
24  is most important.  Anybody that thinks this is perfect
25  or is going to be easy to administer is just wrong.
0005
1   This is a complex thing.  Are we where we would like to
2   be?  I think, personally, I would like to have done
3   some other things, and included others, but this is the
4   -- a major step.  It's a step that, as I said in my
5   remarks, no other municipality, as far as we know,
6   had had the courage to take, and don't let the perfect
7   stop the good.  We are going in the right direction and
8   that's exactly what we should be doing, and it doesn't
9   preclude you us from coming back and doing other
10  things.
11          Madam speaker, do you want to --
12          SPEAKER QUINN:   Thank you.
13          MAYOR BLOOMBERG:   -- have something to
14  say?
15          SPEAKER QUINN:   Well, I want to join with
16  the Mayor in thanking all of the staff people who
17  worked on this important piece of legislation.  I want
18  to in particular thank my legislative director, Rob
19  Newman, and his son, Elijah, who is with us today, and
20  also Jim Karas [phonetic] and Denora Johnson
21  [phonetic], who worked very hard on this bill.  I also
                        Page 2

1521 Local Laws 070307.txt

22  want to thank Deputy Mayor Skyler, and Haeda Mihaltses,
23  and Anthony Crowell, for their work on this bill.
24  Also, Amy Loprest, and everyone else at the Campaign
25  Finance Board, the staff and the members of Board, and
0006
1  also our partners in this  effort -- Citizens' Union,
2  NYPIRG, and Common Cause.
3        You know, this law, after the Mayor signs
4  it today, I believe will give New York City really the
5  gold standard of campaign finance law anywhere in the
6  country.  And, we had, you know, three goals when we
7  set out on this effort:
8        One, as the Mayor said, to come up with
9  the strongest system possible to limit the perception
10  of influence by those who are trying -- who do or are
11  trying to do business with the City of New York, as it
12  relates to their campaign contributions.  And, some may
13  make suggestions of other things we can do, and that's
14  fine.  But, the truth is there is no city or state in
15  the country, once this law goes into effect, that will
16  have a system as strict and as restrictive as this law
17  will be, as it relates to those who are doing business
18  with the City and their ability to give contributions.
19  And, there is no other locality or state that has any
20  system that will be nearly as transparent as this.
21        But, we also wanted to make the system
22  more user-friendly, because we need to make sure --
23  recognize that the way the system works is for people
24  to be a part of it.  And, I think we took some
25  important steps forward to make this system better and
0007
1  more user-friendly.
2        And, we also took important steps forward
3  to protect the public dollar.  These are public monies
4  that go to candidates, and you need to make sure, to
5  the best degree possible, they go to races which are
6  actually competitive.  And, I think we took major steps
7  forward in that area.
8        And, I think this is really another
9  example of when the City Council, the Mayor, and the
10  advocacy communities work together, you can come up
11  with laws that will make this City a better place, and
12  make this government a stronger and more ethical
13  government.
14        And, this is a bill of which I am
15  immensely, immensely proud, and very happy the Mayor is
16  signing into law today.
17        MAYOR BLOOMBERG:   And, I think you should
18  be.  And, let me just add one other thing.
19        Obviously, there's been some press that
20  said that unions should have been included in this
21  bill, and maybe they should have, but we negotiated the
22  best bill that we could come to an agreement on.
23        But, let me also point out that the most
24  important thing in giving good government, I've always
25  thought, is not the restrictions on what you can do,
0008
1  but the public's ability to know who is doing what.
2  It's the disclosure part.  And then, the public can
3  make their decision whether they think it's appropriate
4  conduct or not.  But, if they don't have the knowledge,
5  then all else really is meaningless.
6        And, at least in the case of the unions,

Page 3

1521 Local Laws 070307.txt

```
 7  you clearly know who they are, and where they are
 8  coming from, and what they want. So, my personal
 9  opinion is that they should have been included in this,
10  but we couldn't get that done, but I don't think that
11  it's quite the calamitous, end the world, not fair
12  thing that some of the editorialists have written
13  about, simply because you do know, in the case of the
14  unions, what their objectives are and what business
15  they do with the city.
16            And, in the case of the private sector --
17  suppliers to the City, contractors with the City -- it
18  is not quite so clear. And, this does strengthen that.
19  And --
20
21            SPEAKER QUINN:  I forgot one thing.
22            MAYOR BLOOMBERG:  Yeah?
23            SPEAKER QUINN:  It was easy to forget to
24  thank Simcha, because this bill is about ethics, and
25  earlier today he was stealing pens, so I was not --
              (Laughter.)
0009
 1
 2            SPEAKER QUINN:  But, it was nonetheless
 3
 4  transparent.
 5            COUNCILMAN FELDER:  But, it was
 6            SPEAKER QUINN:  It was transparent.
 7            (Laughter.)
 8            MAYOR BLOOMBERG:  Anybody that knows
    Simcha.
 9
10            SPEAKER QUINN:  But it was, nonetheless, a
11  very significant oversight not to thank Chairperson
12  Felder and his staff, in particular Mike. I also
13  forgot to thank my Deputy Chief of Staff, Maura Keeney
14  [phonetic], but Simcha really is somebody who --
15            COUNCILMAN FELDER:  Denora.
16            SPEAKER QUINN:  What?  I did thank
17  Denora, yes, but I forgot you, not her.
18            (Laughter.)
19            SPEAKER QUINN:  But Simcha, in all
20  seriousness, he and his staff have worked very, very
21  hard on this bill. They gave it their utmost
22  attention. And, this bill is really a lot better
23  because of the contributions of Chairperson Felder.
24            And, he took some of his extensive outside
25  experience, as an accountant in doing auditing, and
    brought it to the bill, and I think we will have a
0010
 1  better auditing function now because of Simcha's input
 2  into the bill. So, thank you, Chairperson.
 3            MAYOR BLOOMBERG:  Okay. Any other City
 4  Council people who would like to add anything?
 5            In the audience, we have a number of
 6  people who have signed up. First is Dick Dadey of
 7  Citizens' Union.
 8            MR. DADEY:  Good morning, Mr. Mayor.
 9            I am Dick Dadey, Executive Director of
10  Citizens' Union, and I am here to support the bill and
11  I urge you to sign it into law.
12            It is an historic bill that strengthens an
13  already heralded campaign finance program here in the
14  City that is a model to the country. And, we were
15  proud to be a part of the very collaborative process.
16            The content is great, but what was also
17  great about it was the way in which you and Council
```

Page 4

1521 Local Laws 070307.txt

18  Speaker Quinn reached out with your staffs to work with
19  the good government groups in trying fashion the best
20  possible bill.
21
22            We are pleased to see that the value and
23  importance of small gifts is being strengthened. We're
24  very pleased with the disclosure and the transparency
25  improvements that are being made to this bill. We're
0011    also pleased with the "pay-to-play" restrictions and
1   look forward to working with you in further improving
2   the campaign finance program.
3            But, I congratulate everyone here today
4   for doing a truly wonderful thing on behalf of the
5   citizens of the City.
6
7            MAYOR BLOOMBERG:  Dick, thank you.
8            And, I think it is fair to say that
9   Citizens' Union has been one of the major forces behind
10  improving city government for as long as I've know
11  them.
12            Neal Rosenstein, New York's Public
13  Interest Research Group.
14            It's Rosenstein, right?
15            MR. ROSENSTEIN:  Rosenstein, but that's
16  the family, Your Honor.
17            (Laughter.)
18            MAYOR BLOOMBERG:  Steen.  We actually
19  have two people that are friends of mine, brothers.
20  One is a "steen" and one is a "stein" --
21            MR. ROSENSTEIN:  I'm on the "stein" side.
22            MAYOR BLOOMBERG:  -- and we could never
23  figure out how we introduce the two brothers.  I try to
24  go back and forth.
25            MR. ROSENSTEIN:  As I said, my name is
0012    Neal Rosenstein.  I am the Government Reform
1   Coordinator with NYPIRG.
2            And, we also are here to urge the Mayor to
3   sign Intro 586 into law.  It significantly strengthens
4   the landmark program that we have in this City.
5            And, I'd also repeat what our colleague
6   Dick Dadey said, that we really appreciate the contact
7   with the City, as well as the Council made in trying to
8   craft this legislation and taking our input very
9   seriously into that process.
10            The "pay-to-play" restrictions, as you
11  aptly put, are fantastic.  They're among the best in
12  the country.  And, they're certainly something which we
13  wish could be on the state level, as well.
14            The increase in small contributions and
15  their importance in matching funds, we also think will
16  help lessen folks' dependence on special interest
17  money.  And, it's a great process.
18            And, I would like to say a lot of people
19  in this room were around when the program was first
20  passed.  Some of you weren't.  I was around, and a lot
21  of the criticisms you hear that this bill isn't
22  perfect, or it's not including such and such, or it
23  doesn't do such and such, that's been the case all
24  through the process of the campaign finance program.
25            And successive City Administrations, and Mayors, and
0013    Councils have taken a look at those problems, and they
1   have improved the campaign finance program after each
2            Page 5

1521 Local Laws 070307.txt

3  of those elections.  We look forward to them doing that
4  in the future, because this certainly, as you said,
5  isn't perfect, but we would say it's very, very good,
6  and it's something which we urge you to sign into law
7  today.
8
9        MAYOR BLOOMBERG: Thank you.
10       Amy Loprest, the Executive Director, New
11  York City Campaign Finance Board.  Amy?
12       MS. LOPREST:  Thank you.
13       First of all, I just want to echo the
14  sentiments of the Mayor and Speaker Quinn, thanking
15  all those who worked so hard on this piece of
16  legislation, all the members of the Administration
17  staff, the City Council staff, and my own staff, and
18  our Board members, who also worked very hard on this
19  legislation.
20       Placing low strict limits on contributions
21  from those who do business with the City is an
22  important step in renewing New Yorkers' faith and trust
23  in their elected officials.
24       Now that the law is passed, as the Mayor
25  said, it's time to get to work.  The bill -- the law
0014
1  places serious challenges in getting it implemented for
2  the 2009 election.
3       We are confident that with the continued
4  cooperation between the Board, the City Council, the
5  Mayor's Office, and those in the agencies responsible
6  for developing the databases, we will be able to enact
7  and enforce the "pay-to-play" restrictions for the 2009
8  elections.
9       In addition, as has been alluded to, the
10  law places several new restrictions or administrative
11  challenges on the Board, and we are confident that we
12  will be able to meet those new challenges without
13  sacrificing the dedication to protecting the taxpayers
14  that the City has come to expect from the Board.
15       Again, thank you for having us be a part
16  of this process.
17       MAYOR BLOOMBERG: Amy, thank you.
18       And the last one, Joseph Garber.
19       MR. GARBER:   Good morning, Mayor
20  Bloomberg, Speaker Quinn, Commissioners present,
21  members of the Council, members of the public.
22       My name is Joseph Garber.  I am the
23  Corresponding Secretary of the Civil Service Merit
24  Council, a good government group that supports the
25  signing of Intro 586-A.
0015
1       This fifty-four page bill is very well
2  technically detailed written.  It is -- took a lot of
3  hard work.
4       I am very impressed that it covered such
5  instances that a loan is treated -- is not treated as a
6  matched -- matching contribution.  This -- once the
7  bill is signed, the Conflict of Interest Board will
8  have a lot of job training all City employees at
9  various levels on the implication of this bill in their
10  day-to-day operations.
11       So please, Mr. Mayor, please sign this
12  bill, and thank you.
13       MAYOR BLOOMBERG: Thank you.
         Would anybody else like to add anything?
                    Page 6

```
                                1521 Local Laws 070307.txt
14
15            If not, I'll sign the bill.
16            [Mayor Bloomberg signing bill.]
17            MAYOR BLOOMBERG: This is what I do all
18    day.
19            (Laughter.)
20            MAYOR BLOOMBERG:    Okay, you can start
21    giving these out.
22            It really is historic, that bill.  It's
23    quite something.
24                        *  *  *  *  *
25
0016
1
2
3                 C E R T I F I C A T E
4
5             I, June Accornero, do hereby certify that
6    I typed the preceding transcript of a portion of the
7    Public Hearing on Proposed Local Laws, conducted on
8    Tuesday, July 3, 2007, at New York, New York, and that
9    this is an accurate transcript of what happened at that
10   time and place, to the best of my ability.
11
12
13
14                        June Accornero
15
16
17
18
19
20
21
22
23
24
25
```