UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
TOM OGNIBENE, *et al.*,

<div style="text-align:center">Plaintiffs,</div>

**DECLARATION OF**
**JONATHAN PINES**

- against -

FREDERICK A. O. SCHWARTZ, JR., *et al.*,

08 CV 01335 (LTS) (TDK)

<div style="text-align:center">Defendants.</div>

------------------------------------------------------------------------ x

**JONATHAN PINES**, an attorney duly admitted to practice law declares under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an Assistant Corporation Counsel in the Office of the Corporation Counsel, assigned to represent the defendants in this matter.

2.      I make this declaration in opposition to plaintiffs' motion for a preliminary injunction and in support of defendants' cross-motion for summary judgment.

3.      Attached to this declaration as Pines Exhibit A is the official text of Local Law 34, approved on July 3, 2007.

4.      Attached to this declaration as Pines Exhibit B is the official text of Local Law 67, approved on December 31, 2007.

5.      Attached to this declaration as Pines Exhibit C is the official text of Local Law 15, approved on June 13, 2006.

6.      Attached to this declaration as Pines Exhibit D is the official text of Local Law 16, approved on June 13, 2006.

7.    Attached to this declaration as Pines Exhibit E is the official text of Local Law 17, approved on June 13, 2006.

8.    Attached to this declaration as Pines Exhibit F is the Report of the New York City Charter Revision Commission, dated August 20, 1998.

9.    Attached to this declaration as Pines Exhibit G is the full text of Int. No. 586.  Legislation pending in the Council is called an "Introduction," often abbreviated to "Intro" or "Int.", and is assigned a number.  When an Introduction is signed by the Mayor, it becomes a Local Law and is assigned a new number.  *See* City Council webpage at http://www.council.nyc.gov/html/about/about.shtml (last visited on August 4, 2008).

10.    Attached to this declaration as Pines Exhibit H is the Report of the Governmental Affairs Division on Int. No. 586.

11.    Attached to this declaration as Pines Exhibit I is the Transcript of the Minutes of the Committee on Governmental Operations regarding Int. No. 586, dated June 12, 2007.

12.    Attached to this declaration as Pines Exhibit J is the written testimony submitted to the City Council regarding Int. No. 586, dated June 12, 2007.

13.    Attached to this declaration as Pines Exhibit K is the full text of proposed Int. No. 586-A.

14.    Attached to this declaration as Pines Exhibit L is the Report of the Governmental Affairs Division on proposed Int. No. 586-A.

15.    Attached to this declaration as Pines Exhibit M is that portion of the Transcript of the Minutes of the Committee on Governmental Operations as pertains to proposed Int. No. 586-A, held on June 21, 2007.

16.     Attached to this declaration as Pines Exhibit N is the written testimony submitted to the City Council regarding proposed Int. No. 586-A (referred to in some documents as "Intro. 586-A" and occasionally without the appended "A"), dated June 21, 2007.

17.     Attached to this declaration as Pines Exhibit O  is that portion of the Transcript of the Stated Council Meeting as pertains to proposed Int. No. 586-A, held on June 27, 2007.

18.     Attached to this declaration as Pines Exhibit P is the that portion of the Transcript of the Public Hearing on Proposed Local Laws as pertains to proposed Int. No. 586-A, held on July 3, 2007.

19.     Attached to this declaration as Pines Exhibit Q is the full text of Int. No. 651.

20.     Attached to this declaration as Pines Exhibit R is the full text of proposed Int. No. 651-A.

21.     Attached to this declaration as Pines Exhibit S is the Report of the Governmental Affairs Division on proposed Int. No. 651-A.

22.     Attached to this declaration as Pines Exhibit T is that portion of the Transcript of the Minutes of the Committee on Governmental Operations as pertains to proposed Int. No. 651-A, held on December 6, 2007.

23.     Attached to this declaration as Pines Exhibit U is the written testimony submitted to the City Council regarding Int. No. 651, dated December 6, 2007.

24.     Attached to this declaration as Pines Exhibit V is the second Report of the Governmental Affairs Division on proposed Int. No. 651-A.

25.    Attached to this declaration as Pines Exhibit W is that portion of the Transcript of the Minutes of the Committee on Governmental Operations as pertains to proposed Int. No. 651-A, held on December 18, 2007.

26.    Attached to this declaration as Pines Exhibit X is the written testimony submitted to the City Council regarding proposed Int. No. 651-A, dated December 18, 2007.

27.    Attached to this declaration as Pines Exhibit Y is that portion of the Transcript of the Stated Council Meeting as pertains to proposed Int. No. 651-A, held on December 19, 2007.

28.    Attached to this declaration as Pines Exhibit Z is the full text of Int. No. 192.

29.    Attached to this declaration as Pines Exhibit AA is the Report of the Governmental Affairs Division on Int. Nos. 190, 191, and 192.

30.    Attached to this declaration as Pines Exhibit BB is the Transcript of the Minutes of the Committee on Governmental Operations regarding Int. Nos. 190, 191, and 192, held on April 4, 2006.

31.    Attached to this declaration as Pines Exhibit CC is the full text of proposed Int. No. 192-A.

32.    Attached to this declaration as Pines Exhibit DD is the Report of the Governmental Affairs Division on proposed Int. Nos. 190-A, 191-A, and 192-A.

33.    Attached to this declaration as Pines Exhibit EE is the Transcript of the Minutes of the Committee on Governmental Operations regarding Int. Nos. 190-A, 191-A, and 192-A, held on May 24, 2006.

34.    Attached to this declaration as Pines Exhibit FF is that portion of the Transcript of the Stated Council Meeting as pertains to proposed Int. Nos. 190-A, 191-A, and 192-A, held on May 24, 2006.

35.    Attached to this declaration as Pines Exhibit GG are pages excerpted from the Deposition of plaintiff Shelia Anderson-Ricci, dated June 18, 2008.

36.    Attached to this declaration as Pines Exhibit HH are pages excerpted from the Deposition of plaintiff Yvette Velazquez Bennett, dated June 19, 2008.

37.    Attached to this declaration as Pines Exhibit II are pages excerpted from the Deposition of plaintiff Martin Malave Dilan, dated June 20, 2008.

38.    Attached to this declaration as Pines Exhibit JJ are pages excerpted from the Deposition of plaintiff Tom Ognibene, dated June 17, 2008.

39.    Attached to this declaration as Pines Exhibit KK are pages excerpted from the Deposition of plaintiff Robert Perez, dated June 17, 2008.

40.    Attached to this declaration as Pines Exhibit LL are pages excerpted from the Deposition of plaintiff Fran Reiter, dated June 19, 2008.

41.    Attached to this declaration as Pines Exhibit MM are pages excerpted from the Deposition of plaintiff Michele Russo, dated June 19, 2008.

42.    Attached to this declaration as Pines Exhibit NN are pages excerpted from the Deposition of plaintiff Marlene Tapper, dated June 18, 2008.

43.    Attached to this declaration as Pines Exhibit OO are pages excerpted from the Deposition of plaintiff Viviana Vazquez-Hernandez, dated June 20, 2008.

44.    Attached to this declaration as Pines Exhibit PP is an article from the Queens Chronicle regarding Tom Ognibene, dated July 31, 2008.

45.    Appended under this declaration are the declarations of Peri Horowitz, Director of Special Compliance and Policy Assurance for the New York City Campaign Finance Board, dated August 4, 2008, with exhibits designated Horowitz Exhibits A-D attached thereto; David Karnovsky, General Counsel at the Department of City Planning for the City of New York, dated August 4, 2008;  Amy Loprest, Executive Director of the New York City Campaign Finance Board, dated August 4, 2008, with exhibits designated Loprest Exhibits A-B attached thereto;  Jesse Schaffer, Director of the Doing Business Accountability Project at the Mayor's Office of Contract Services, dated August 4, 2008, with an exhibit designated Schaffer Exhibit A attached thereto;  Marla G. Simpson, Director of the Mayor's Office of Contract Services and the City Chief Procurement Officer, dated August 4, 2008;  and Arnie Wolsky, Deputy Counsel to the City Clerk and Director of the Lobbying Bureau in the New York City Clerk's Office, dated August 4, 2008, with an exhibit designated Wolsky Exhibit A attached thereto.

Dated:    New York, New York
          August 4, 2008


                                        Jonathan Pines

Int. No. 651

By Council Member Felder (by request of the Mayor)

A Local Law to amend the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1.   Subdivisions 18 and 20 of section 3-702 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, are amended to read as follows:

18.   a.   The term "business dealings with the city" shall mean (i) any contract (other than an emergency contract or a contract procured through publicly-advertised competitive sealed bidding) which is for the procurement of goods, [or] services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York [(other than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than] and is valued at or above  the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or, [for construction totaling not more than] with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter[)], and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; or (ii) any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the

department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii) any application for approval sought from the city of New York  pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter,  and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter;  provided, however, that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further, however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) [one or more concessions] any concession (other than [concessions] a concession awarded through publicly-advertised competitive sealed bid) or [franchises] any franchise from the city of New York or any agency or entity affiliated with the city of New York [with] which has an estimated [aggregate payments to the city of more than] annual value at or above the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code [per fiscal year]; or (v) [one or more grants totaling not more than] any grant that is valued at or above the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code,  received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or

any agency or entity affiliated with the city of New York; or (vii) any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants.  In addition, for purposes of this chapter a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York during all periods covered by a registration statement.   For purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions, franchises and grants that are five thousand dollars or less in value shall be excluded from any calculation as to whether a contract, concession, franchise or grant is a business dealing with the city.  For purposes of clauses (ii) and (iii) of this subdivision, the department of city planning, in consultation with the board, may promulgate rules to require the submission by applicants to the city of information necessary to implement the requirements of subdivisions 1-a and 1-b of section 3-703 of this chapter as they relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion in the doing business database established pursuant to subdivision [(20)]_20 of this section.  [For purposes of this subdivision, actions, transactions, and agreements for the purpose of providing affordable housing pursuant to the Private Housing Finance Law or the General Municipal Law or any other city, state or federal program, including but not limited to actions, transactions and agreements for such purposes which involve land dispositions, loans, grants, real property tax exemptions, zoning bonuses, low income housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of residents or on the rents or other charges to be paid by such residents, shall not constitute business dealings with the city of New York.]   For purposes of this subdivision, "agency or entity affiliated with the city of New York" shall mean the city school district of the

3

city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials.  <u>For purposes of this subdivision, the department of housing preservation and development shall promulgate rules setting forth which actions, transactions and agreements for the purpose of providing affordable housing shall constitute business dealings with the city of New York; provided, however, that such rules shall provide that only those actions, transactions and agreements for the purpose of providing affordable housing which involve the exercise of substantial discretion by one or more city officials shall constitute business dealings with the city of New York.</u>

b.  Business dealings with the city as defined in this subdivision shall be limited as follows:  for purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the procurement of goods, services, or construction shall only constitute business dealings with the city of New York for the period from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract <u>(or in the case of purchase contracts for goods, from the date of such purchase)</u> and for twelve months [after the end of such term]<u> thereafter</u>, provided, however that where such contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the <u>date of</u> adoption of the budget in which the appropriation of such contract is included until twelve months after the end of

the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in which the city of New York is the proposed  lessee[,] shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and, where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business [dealing] dealings with the city from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter or, in the case of a decision of the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section;  for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of

New York for the period from the submission of the bid or proposal until twelve months after the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall  constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.

c.    Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or construction or who has submitted bids or proposals for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a

determination that said person should not be included in the database.   The city chief
procurement officer may promulgate rules for a process by which a person, as defined by
subdivision 20 of section 3-702, may apply to the city chief procurement officer for a
waiver from inclusion in the doing business database as defined by such subdivision in
instances in which such person is providing essential goods, services or construction such
as those necessary for security or other essential government operations.  Such rules shall
provide that the city chief procurement officer shall transmit to the board a copy of any
application for a waiver and any such waiver may not be granted prior to the expiration of
ten days from the date such application is received by the board.  Such rules shall also
provide that any such waiver may be granted only after substantial efforts have been
made by the city chief procurement officer to obtain the information required by this law.
Such rules shall also provide that the city chief procurement officer may grant the waiver
only upon a finding that it is in the best interests of the city, which finding shall only be
made upon a determination that (i) there is a compelling need to obtain such essential
goods, services or construction from the person seeking the exemption and (ii) no other
reasonable alternative exists in light of such considerations as cost, uniqueness and the
critical nature of such goods, services or construction to the accomplishment of the
purchasing agency's mission.  Such rules may also provide that a waiver may be granted
when a person is doing business with the city by virtue of the city's exercise of its powers
of eminent domain.  Any grant of a waiver shall be posted on the city's and the board's
website in locations that are accessible by the public.

      d.     A person, as defined by subdivision 20 of section 3-702, shall be considered
to have business dealings with the city as of the date the person's name is entered in the

doing business database, as such date is indicated in such database, or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.

20.     The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however, that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city.  Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than once a month.  Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city.  For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity, provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or

homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals.

§2. Subdivisions 1-a and 1-b of section 3-703 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may not accept, either directly or by transfer, [a] any contribution or contributions for a covered election in which he or she is a participating candidate from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for [such election does not exceed] all covered elections in the same calendar year exceeds:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; and (iii) for member of the city council two hundred fifty dollars.  Any contribution made pursuant to this section shall not be a

matchable contribution.  For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other

entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines. If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation, provided, however, that no such contribution shall be matchable. Such principal committee shall

have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor.  No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein.  Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds.  For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer  of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements, and applications for land use approvals.  Notwithstanding any other provision of this section,

no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

§3.  Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(i) the tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however, that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4.  Subdivision 10 of section 3-705 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

10.    [Participating candidates] A participating candidate who [lose] loses in the primary election but [remain] remains on the ballot for the general election must certify to the board before receiving public funds that [they] he or she will actively campaign for office; [by including,] such campaign activity shall include, but not be limited to, raising and spending funds, seeking endorsements, and broadly soliciting votes [before receiving public funds].

§5.  Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

4.   The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board

13

shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election. The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election. For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the event that the board denies such petition then it shall immediately notify the candidate of [its] his or her right to [appeal to appeal] bring a special proceeding pursuant to article 78 of the civil practice law and rules.

§6. Subparagraph (i) of paragraph (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, and subdivision 12 of section 3-709.5 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

(b)(i)    Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, (I) spent, contracted, or obligated to

14

spend, and (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held contained in subdivision two of section 3-703; provided, however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703; provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board.  Nothing in this provision is intended to limit the debates to the two major political parties.

12.  The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate[,] held pursuant to this section 3-709.5.

§7.  Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

b.  If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such candidate and committee of the amount so disqualified and such candidate and committee shall pay to the board an amount equal to such disqualified amount; provided, however, that in considering whether or not a participating candidate shall be required to pay to the board such amount or an [amountless] amount less than the entire disqualified amount, the board shall act in accordance with the following:  (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; and (ii) where there is an absence of credible documentation for each [qualified_campaign] qualified campaign expenditure,  the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

§8.  Subdivision 19 of section 3-702 of the administrative code of the city of New York, as added by section 17 of local law 34 for the year 2007, is renumbered as subdivision 21 and amended to read as follows:

[19] 21.  a.  For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall

include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter [pursuant to sections 3-706 and 3-712.  In addition, there]. There shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however, that the presumptions contained in this subdivision shall not apply to an expenditure [made when the expenditure is] to a person or entity associated with the candidate [making such expenditure or on whose behalf such candidate's committee made such expenditure]; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure.  For purposes of this subdivision a person or entity associated with a candidate [includes] shall include the candidate's spouse, domestic partner, child, parent, or sibling[,] or a person or entity with whom or with which the candidate has a business or other financial relationship:

1.      Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

2.      Contributions to candidates and political committees subject to the provisions of section 3-705(8);

3.      Community events including, but not limited to, events hosted by civic [associations] and neighborhood [association] associations; provided, however, that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

4.      Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

5.      Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however, that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

6.      Legal defense of a non-criminal matter arising out of a political campaign;

7.      Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

8.      A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

9.      Payment of non-criminal penalties or fines arising out of a political campaign;

10.     Costs incurred in demonstrating eligibility for the ballot[,] or public funds payments or defending against a claim that public funds must be repaid; and

11.     Food and beverages provided to campaign workers and volunteers[; and].

b.  Campaign funds shall not be converted by any person to a personal use which is unrelated to a [political campaign] candidate's nomination for election or election. Expenditures not in furtherance of a political campaign for elective office include the following:

1.      Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate[,] or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

2.      Any residential[,] or household items, supplies or expenditures;

3.      Clothing, haircuts and other personal grooming;

4.      Funeral, cremation[,] or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

5.      Automobile purchases;

6.      Tuition payments[,]and childcare costs;

7.      Dues, fees[,] or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

8.      Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

9.      Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the [person] candidate benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

10.     Gifts, except  for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.

§9.  Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership[,] or partnership, other than a corporation, limited liability company, limited liability partnership[,] or partnership that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, provided, however, that where a contribution is from a contributor whose  name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company [or], limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity;

§10. Paragraph (j) of subdivision 2 of section 3-704 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(j) payment of any penalty or fine imposed pursuant to federal, state or local law; or

§11.  Paragraph (a) of subdivision 2 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)  If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred [twenty-five] twenty-two dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

§12.  Subdivision 7 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

7. Notwithstanding any provision of this section to the contrary, the amount of public funds payable a participating candidate on the ballot in any covered election shall not exceed one quarter of the maximum public funds payment otherwise applicable under subdivision two of this section, unless:

[(b)](a)  the participating candidate  is  opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

[(c)](b) the participating candidate has submitted a certified signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website.  Such statement must certify that (i) one or more of the following conditions [applies and provide documentation in support of

such condition] <u>apply</u> and (ii) [that] such condition or conditions reasonably [demonstrates] <u>demonstrate</u> the need for such public funds[.]<u>, and the participating candidate must provide documentation demonstrating the existence of such condition or conditions:</u>

(1)  the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2)  the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3)  the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name [in] <u>on</u> television[,] <u>or</u> radio <u>in the area of the covered election</u> or <u>in</u> print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however<u>,</u> that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4)   the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar to the candidate's so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child [hold or have held] holds or has held elective office in an area encompassing all or part of the area [that is the subject] of the [current] covered election in the past ten years.

The board shall be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and shall post such [certifications] certified statements and supporting documentation on its website.

[(d)](c)   the participating candidate is opposed in a primary or special election for an office for which no incumbent is seeking re-election.

If any of the conditions described in paragraphs (a), (b), or (c) [or (d)] occur in such election, the board shall pay any and all additional public funds due to the participating candidate up to the maximum total payment applicable in such election

under subdivisions two or six of this section or subdivision three of section 3-706 of this chapter.

§13.  Paragraph (a) of subdivision 1 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)    Except as provided in paragraph (b) of this subdivision, in each primary election, in each special election to fill a vacancy, and in each general election, expenditures by a participating candidate or a limited participating candidate and his or her principal committee for one of the following offices shall not exceed the following amounts:

| | |
|---|---|
| mayor: | [$6,157,600] $6,158,000 |
| public advocate or comptroller: | [$3,849,575] $3,850,000 |
| borough president: | [$1,385,675] $1,386,000 |
| member of the city council: | [$161,250] $161,000 |

§14.  Subdivision 2 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

2.  The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years.  Such expenditures by a participating or limited participating

candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

mayor, public advocate or comptroller:     [$290,250] $290,000

borough president:                         $129,000

member of the city council:                $43,000

§15.  Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

1.  The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code.  The board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall [issue] promulgate rules regarding what documentation is sufficient in demonstrating financial activity. These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, provided that:

a. Any draft audit, the subject of which is a participating, limited participating[,] or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating[,] or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races[;], and  (ii) ten months after the

submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, within (i) [within] fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate within (i) [within] sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.

26

c. Any advice provided by board staff to <u>a</u> participating, limited participating, or non-participating [candidates] <u>candidate</u> with regard to an action shall be presumptive evidence that such action<u>, if</u> taken in reliance on such advice<u>,</u> should not be subject to a penalty or repayment obligation where such candidate[,] or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, [that describes] <u>describing</u> the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

d.   Notwithstanding the provisions of paragraphs a and b of this [section] <u>subdivision</u>, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: [(a)]<u>(i)</u> the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested[,]<u>;</u> and [(b)]<u>(ii)</u> the commencement of the tolling period pursuant to this section.  If a committee has responded to a request for information made by board auditors but such response is  inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days until an adequate response is provided, provided that the committee has received timely written notice of:

[(a)]<u>(i)</u> the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested[,]<u>;</u> [(b)]<u>(ii)</u> the commencement of the tolling period pursuant to this section<u>;</u> and [(c)]<u>(iii)</u> the detailed reasons why the original response was inadequate.

e.  Notwithstanding any provision of law to the contrary, the deadlines provided in [subdivisions] <u>paragraphs</u> a and b of this [section] <u>subdivision</u> for the completion of draft and final audits shall not apply in cases where the audit raises issues involving potential campaign-related fraud, potential other criminal activity,<u> or</u> activity that may constitute a breach of certification pursuant to rules of the board[,] or potential significant violations of the limits set forth in section 3-706.

f.  Notwithstanding any provision of the law to the contrary, the deadlines provided in [subdivisions] <u>paragraphs</u> a and b of this [section] <u>subdivision</u> for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with [provisions] <u>paragraphs</u> a and b.

§16. Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

2. (c)[ <u>(i)</u>]  If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in

the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election.  No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§17.  Subdivision 4 of section 3-710 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4. [[(a)]] No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to [the] all of the requirements of subdivision one of this section, and [a reasonable] an opportunity to appear before the board.  Any such repayment claim shall be based on a final determination [to be] issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee.  Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination[.].

§18.  Section 3-710.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

§ 3-710.5 Findings of violation or infraction; adjudications; [or] final determinations.  (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil

penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

(ii)(a) The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction before assessing any penalty for such action. Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit required pursuant to subdivision one of section 3-710. In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election in[ ]the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit. Alleged violations and proposed penalties shall be subject to resolution by adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature of such pre-election adjudications. The board shall issue a final determination within thirty days of the conclusion of the adjudication proceeding.

(b) The board shall include in every final determination: (i) notice of the [respondents'] respondent's right to bring a special proceeding challenging the board's final determination in New York State supreme court [brought] pursuant to article 78 of the civil practice law and rules; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law and rules.

§19.  Subdivision 4 of section 3-711 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4.  Notwithstanding any provision of law to the contrary, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who [commit] commits any violation of this chapter or any rules promulgated hereunder and who [take] takes all steps necessary to correct such violation prior to receiving written notice from the board of the existence of the potential violation [pursuant to section 3-710.5] shall not be subject to any penalty for such violation.

§20.  Section 3-720 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

§3-720.  Tolling of time for notice of alleged violations [or penalties.] and/or notice of repayment of public funds.  If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a

response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

§21.  Paragraph (d) of subdivision 2 of section 3-801 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(d)  not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation to a transition or inauguration entity authorized pursuant to subdivision one of this section made by a natural person who has business dealings with the city [to a transition or inaugural committee] where such donation is from the candidate-elect[,] or from the candidate-elect's parent,  spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§22.  Subparagraph (iii) of paragraph a of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(iii)  [with regard to contributions raised on or] for elections occurring after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such

participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation [provide] provided for such  office in subdivision one of this section.

§23.  Subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, is to read as follows:

(iii) [with regard to contributions raised on or] for elections occurring after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a

principal committee receive in public funds an amount exceeding [two-thirds] one hundred twenty-five percent of the expenditure limitation [provide]provided for such office in subdivision one of this section.

§24.  Paragraph (a) of subdivision 2 of section 3-703 of the administrative code of the city of New York, as amended by local law 58 of the year 2004, is amended to read as follows:

(a) The threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, shall be in the case of:

(i)   mayor, not less than two hundred fifty thousand dollars in matchable contributions comprised of sums up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least one thousand matchable contributions of ten dollars or more;

(ii) public advocate and comptroller, not less than one hundred twenty-five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least five hundred matchable contributions of ten dollars or more;

(iii) borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least one hundred matchable contributions of ten dollars or more from residents of the borough, or ten thousand dollars comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor, whichever is greater.

(iv) member of the city council, not less than five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least seventy-five matchable contributions of ten dollars or more from residents of the district in which the seat is to be filled.

§25. Section 38 of local law 34 for the year 2007 is REPEALED, section 39 of local law 34 for the year 2007 is renumbered section 38, and sections 36, 37, and 38 of local law 34 for the year 2007 are amended to read as follows:

§36.  Each city agency with which any person who has business dealings with the city conducts such business shall[,] provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that the rules shall not be [provided] applied to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section [twenty-six] thirty-seven of this local law.

§37.  Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows:  (i) [all of] the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and

telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] and persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding] of an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) [all of] the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction, and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, and persons with an interest in an entity which exceeds ten percent of the entity that has submitted a bid or proposal seeking such a contract, and persons employed in a senior managerial capacity of [entities that have submitted bids] any entity holding such a contract or that has submitted a bid or proposal seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, [applications for approvals] any application for approval sought pursuant to the provisions of section 195 [or] of the charter, any application for approval sought from the city of New York that has been

certified pursuant to section 197-c of the [New York city] charter <u>and any application for</u> <u>a zoning text amendment that has been certified pursuant to section 201 of the charter</u> shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with [a real property transaction or land use approval] <u>an acquisition or disposition of real</u> <u>property or an application for approval sought pursuant to the provisions of section 195</u> <u>of the charter, any application for approval sought from the city of New York that has</u> <u>been certified pursuant to section 197-c of the charter and any application for a zoning</u> <u>text amendment that has been certified pursuant to section 201 of the charter</u> pursuant to [clause] <u>clauses</u> (ii) <u>and (iii)</u> of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] <u>and</u> persons with an interest in an entity which exceeds ten percent of the entity [and persons employed in a senior managerial capacity regarding an entity] with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of

the code as added by section one of this local law; (v) [all of] the provisions of this local law concerning any bid or proposal for a franchise or concession, and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law, shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database [includes,] identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, and persons with an interest in an entity which exceeds ten percent of the entity that has submitted a bid or proposal seeking such a franchise or concession, and persons employed in a senior managerial capacity [of entities with] with respect to any entity holding such a franchise or concession or that has submitted a bid or a proposal for such a franchise or concession; (vi) [all of] the provisions of this local law concerning a recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is a recipient of a grant pursuant to clause (v) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) [all of] the provisions of this local law

concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law;  (viii) [all of] the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants  pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and (ix) [all of] the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance

board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through [(viii)] (ix) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the [Mayor]mayor and the [Council]council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the [Mayor]mayor and the [Council]council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i), [and] (iv), and (ix) shall be six months from the effective date of this local law; the

deadline for certification of this section in relation to clauses (ii),  (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be sixteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§[39] 38.  With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database.  Such report shall contain the status of each of the components enumerated in clauses (i) through [(viii)] (ix) of section [thirty-three] thirty-seven of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law.  If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect.  Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§26.  Section forty of local law 34 for the year 2007 is renumbered section 39 and section forty-one of local law 34 for the year 2007 is renumbered and amended to read as follows:

[§41] §40.  Sections three through seven, nine, ten, thirteen through [twenty, and twenty-two through thirty-three] thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date and shall be applicable to all public funds claims for elections held on or after such effective date, regardless of whether the claim for public funds was submitted prior to the effective date.

§ 27.  This local law shall take effect immediately.

Proposed Int. No. 651-A

By Council Member Felder (by request of the Mayor)

A Local Law to amend the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1.  Subdivisions 18 and 20 of section 3-702 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, are amended to read as follows:

18.  a.  The term "business dealings with the city" shall mean (i) any contract (other than an emergency contract or a contract procured through publicly-advertised competitive sealed bidding) which is for the procurement of goods, [or] services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York [(other than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than] and is valued at or above  the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or, [for construction totaling not more than] with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter[)], and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; or (ii) any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the

department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii) any application for approval sought from the city of New York  pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter,  and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter;  provided, however, that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further, however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) [one or more concessions] any concession (other than [concessions] a concession awarded through publicly-advertised competitive sealed bid) or [franchises] any franchise from the city of New York or any agency or entity affiliated with the city of New York [with] which has an estimated [aggregate payments to the city of more than] annual value at or above the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code [per fiscal year]; or (v) [one or more grants totaling not more than] any grant that is valued at or above the dollar value [set forth] defined in [section 6-116.2(i)(3)(a)] subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code,  received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or

any agency or entity affiliated with the city of New York; or (vii) any contract for the

investment of pension funds, including investments in a private equity firm and contracts

with investment related consultants.  In addition, for purposes of this chapter a lobbyist as

defined in section 3-211 of this title shall be deemed to be engaged in business dealings

with the city of New York during all periods covered by a registration statement.   For

purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions,

franchises and grants that are five thousand dollars or less in value shall be excluded from

any calculation as to whether a contract, concession, franchise or grant is a business

dealing with the city.  For purposes of clauses (ii) and (iii) of this subdivision, the

department of city planning, in consultation with the board, may promulgate rules to

require the submission by applicants to the city of information necessary to implement

the requirements of subdivisions 1-a and 1-b of section 3-703 of this chapter as they

relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion

in the doing business database established pursuant to subdivision [(20)] 20 of this

section.  [For purposes of this subdivision, actions, transactions, and agreements for the

purpose of providing affordable housing pursuant to the Private Housing Finance Law or

the General Municipal Law or any other city, state or federal program, including but not

limited to actions, transactions and agreements for such purposes which involve land

dispositions, loans, grants, real property tax exemptions, zoning bonuses, low income

housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of

residents or on the rents or other charges to be paid by such residents, shall not constitute

business dealings with the city of New York.]   For purposes of this subdivision, "agency

or entity affiliated with the city of New York" shall mean the city school district of the

city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials. <u>For purposes of this subdivision, the department of housing preservation and development shall promulgate rules setting forth which actions, transactions and agreements for the purpose of providing affordable housing shall constitute business dealings with the city of New York; provided, however, that such rules shall provide that only those actions, transactions and agreements for the purpose of providing affordable housing which involve the exercise of substantial discretion by one or more city officials shall constitute business dealings with the city of New York. Notwithstanding any provision of this subdivision, a housing assistance payment contract between a landlord and the department of housing preservation and development or the New York city housing authority relating to the provision of rent subsidies pursuant to Section 8 of the United States Housing Act of 1937, 42 USC 1437 et., seq., shall not constitute business dealings with the city of New York for the purposes of this subdivision.</u>

b.  Business dealings with the city as defined in this subdivision shall be [limited] as follows:  for purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the procurement of goods, services, or construction shall only constitute business dealings with the city of New York for the period from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract <u>(or in the</u>

case of purchase contracts for goods, from the date of such purchase) and for twelve

months [after the end of such term] thereafter, provided, however that where such

contract award is made from a line item appropriation and/or discretionary funds made by

an elected official other than the mayor or the comptroller, such contract shall only

constitute business dealings with the city from the date of adoption of the budget in

which the appropriation of such contract is included until twelve months after the end of

the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision,

leases in which the city of New York is the proposed  lessee[,] shall only constitute

business dealings with the city from the date the application for acquisition is filed

pursuant to section 195 or the date of the certification of such application pursuant to

section 197-c to a period of one year after the commencement of the lease term or after

the commencement of any renewal and, where the city or any city affiliated entity is

disposing of any real property interest, shall only constitute business dealings with the

city from the date of the submission of a proposal and during the term of any agreement

and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision,

applications for approval sought from the city of New York pursuant to the provisions of

sections 197-c or 201 of the charter, except for applications for leases as described in

clause (ii), shall only constitute business [dealing] dealings with the city from the date of

the certification of such application to the date that is one hundred twenty days after the

date of filing by the council with the mayor of its action pursuant to subdivision e of

section 197-d of the charter or, in the case of a decision of the city planning commission

for which the council takes no action pursuant to paragraph (3) of subdivision (b) of

section 197-d of the charter, the date which is twenty days following the filing of such

decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section;  for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of New York for the period from the submission of the bid or proposal until twelve months after the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall  constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.

c.    Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or construction or who has submitted bids or proposals for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a determination that said person should not be included in the database.    The city chief procurement officer may promulgate rules for a process by which a person, as defined by subdivision 20 of section 3-702, may apply to the city chief procurement officer for a waiver from inclusion in the doing business database as defined by such subdivision in instances in which such person is providing essential goods, services or construction such as those necessary for security or other essential government operations.  Such rules shall provide that the city chief procurement officer shall transmit to the board a copy of any application for a waiver and any such waiver may not be granted prior to the expiration of ten days from the date such application is received by the board.  Such rules shall also provide that any such waiver may be granted only after substantial efforts have been made by the city chief procurement officer to obtain the information required by this law. Such rules shall also provide that the city chief procurement officer may grant the waiver only upon a finding that it is in the best interests of the city, which finding shall only be made upon a determination that (i) there is a compelling need to obtain such essential goods, services or construction from the person seeking the exemption and (ii) no other reasonable alternative exists in light of such considerations as cost, uniqueness and the

critical nature of such goods, services or construction to the accomplishment of the
purchasing agency's mission.  Such rules may also provide that a waiver may be granted
when a person is doing business with the city by virtue of the city's exercise of its powers
of eminent domain.  Any grant of a waiver shall be posted on the city's and the board's
website in locations that are accessible by the public.

       d.     A person, as defined by subdivision 20 of section 3-702, shall be considered
to have business dealings with the city as of the date the person's name is entered in the
doing business database, as such date is indicated in such database, or the date the person
began doing business with the city, as such date is indicated in such database, whichever
is earlier, except that the date on which the person is considered doing business with the
city shall not be earlier than thirty days before the date the person's name is entered into
such database.

       20.    The term "doing business database" means a computerized database
accessible to the board that contains the names of persons who have business dealings
with the city; provided, however, that for purposes of this chapter the doing business
database shall not be required to contain the names of any person whose business
dealings with the city are solely of a type for which the board has not certified that such
database includes the names of those persons engaged in such type of business dealings
with the city.  Such database shall be developed, maintained and updated by the office of
the mayor in a manner so as to ensure its reasonable accuracy and completeness;
provided, however, that in no event shall such database be updated less frequently than
once a month.  Such computerized database shall contain a function to enable members
of the public to determine if a given person is in the database because such person has

business dealings with the city.  For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity, provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection  (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals.

§2. Subdivisions 1-a  and 1-b of section 3-703 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended  to read as follows:

1-a.     Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may not accept, either directly or by transfer, [a] any contribution or contributions for a covered election in which he or she is a

participating candidate from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for [such election does not exceed] all covered elections in the same calendar year exceeds:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; and (iii) for member of the city council two hundred fifty dollars.  Any contribution made pursuant to this section shall not be a matchable contribution.  For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such

participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such

subdivision.  Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines.  If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation, provided, however, that no such contribution shall be matchable.  Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor.  No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein.  Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds.  For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer  of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an

interest in an entity, which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements, and applications for land use approvals.  Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

§3.  Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(i) the tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however, that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4.  Subdivision 10 of section 3-705 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

10.    [Participating candidates] A participating candidate who [lose] loses in the primary election but [remain] remains on the ballot for the general election must certify to the board before receiving public funds that [they] he or she will actively campaign for office; [by including,] such campaign activity shall include, but not be limited to, raising

and spending funds, seeking endorsements, and broadly soliciting votes [before receiving public funds].

§5. Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

4. The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election. The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election. For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the event that the board denies such petition then it shall immediately notify the candidate of [its] his or her right to [appeal to appeal] bring a special proceeding pursuant to article 78 of the civil practice law and rules.

§6. Subparagraph (i) of paragraph (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, and subdivision 12 of section 3-709.5 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

14

(b)(i)   Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, (I) spent, contracted, or obligated to spend, and (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held contained in subdivision two of section 3-703; provided, however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703; provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading

contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board. Nothing in this provision is intended to limit the debates to the two major political parties.

12. The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate[,] held pursuant to this section 3-709.5.

§7. Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

b. If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such candidate and committee of the amount so disqualified and such candidate and committee shall pay to the board an amount equal to such disqualified amount; provided, however, that in considering whether or not a participating candidate shall be required to pay to the board such amount or an [amountless] amount less than the entire disqualified amount, the board shall act in accordance with the following: (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; and (ii) where there is an absence of credible documentation for each [qualified_campaign] qualified campaign expenditure, the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to

trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

§8.  Subdivision 19 of section 3-702 of the administrative code of the city of New York, as added by section 17 of local law 34 for the year 2007, is renumbered as subdivision 21 and amended to read as follows:

[19] 21.  a.  For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter [pursuant to sections 3-706 and 3-712.  In addition, there]. There shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however, that the presumptions contained in this subdivision shall not apply to an expenditure [made when the expenditure is] to a person or entity associated with the candidate [making such expenditure or on whose behalf such candidate's committee made such expenditure]; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure.  For purposes of this subdivision a person or entity associated with a candidate [includes] shall include the candidate's spouse, domestic partner, child, parent, or sibling[,] or a person or entity with whom or with which the candidate has a business or other financial relationship:

1.    Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

2.    Contributions to candidates and political committees subject to the provisions of section 3-705(8);

3.    Community events including, but not limited to, events hosted by civic [associations] and neighborhood [association] <u>associations</u>; provided, however, that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

4.    Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

5.    Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however, that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

6.    Legal defense of a non-criminal matter arising out of a political campaign;

7.    Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

8.    A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

9.    Payment of non-criminal penalties or fines arising out of a political campaign;

10.     Costs incurred in demonstrating eligibility for the ballot[,] or public funds payments or defending against a claim that public funds must be repaid; and

11.     Food and beverages provided to campaign workers and volunteers[; and].

b.  Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign.  Expenditures not in furtherance of a political campaign for elective office include the following:

1.     Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate[,] or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

2.     Any residential[,] or household items, supplies or expenditures;

3.     Clothing, haircuts and other personal grooming;

4.     Funeral, cremation[,] or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

5.     Automobile purchases;

6.     Tuition payments[,]and childcare costs;

7.     Dues, fees[,] or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

8.     Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

9.     Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses

that result from the personal activities shall be considered for personal use unless the [person] <u>candidate</u> benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

    10.    Gifts, except  for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.

    §9.  Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

    (l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership[,] or partnership<u>,</u> other than a corporation, limited liability company, limited liability partnership[,] or partnership that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, provided, however, that where a contribution is from a contributor whose  name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company [or]<u>,</u> limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity;

§10. Paragraph (j) of subdivision 2 of section 3-704 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(j) payment of any penalty or fine imposed pursuant to federal, state or local law; or

§11.  Paragraph (a) of subdivision 2 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)  If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred [twenty-five] twenty-two dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

§12.  Subdivision 7 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

7. Notwithstanding any provision of this section to the contrary, the amount of public funds payable a participating candidate on the ballot in any covered election shall not exceed one quarter of the maximum public funds payment otherwise applicable under subdivision two of this section, unless:

[(b)](a) the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an

amount which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

[(c)](b) the participating candidate has submitted a certified signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website.  Such statement must certify that (i) one or more of the following conditions [applies and provide documentation in support of such condition] apply and (ii) [that] such condition or conditions reasonably [demonstrates] demonstrate the need for such public funds[.], and the participating candidate must provide documentation demonstrating the existence of such condition or conditions:

(1)  the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2)  the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of

this paragraph, significant media exposure shall mean appearance of the opponent or his or her name [in] on television[,] or radio in the area of the covered election or in print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however, that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4)   the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar to the candidate's so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child [hold or have held] holds or has held elective office in an area encompassing all or part of the area [that is the subject] of the [current] covered election in the past ten years.

The board shall be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and

shall post such [certifications] <u>certified statements</u> and supporting documentation on its website.

[(d)]<u>(c)</u>  the participating candidate is opposed in a primary or special election for an office for which no incumbent is see<u>k</u>ing re-election.

If any of the conditions described in paragraphs (a), (b), <u>or</u> (c) [or (d)] occur in such election, the board shall pay any and all additional public funds due to the participating candidate up to the maximum total payment applicable in such election under subdivisions two or six of this section or subdivision three of section 3-706 of this chapter.

§13.  Paragraph (a) of subdivision 1 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)    Except as provided in paragraph (b) of this subdivision, in each primary election, in each special election to fill a vacancy, and in each general election, expenditures by a participating candidate or a limited participating candidate and his or her principal committee for one of the following offices shall not exceed the following amounts:

| | |
|---|---|
| mayor: | [$6,157,600] <u>$6,158,000</u> |
| public advocate or comptroller: | [$3,849,575] <u>$3,850,000</u> |
| borough president: | [$1,385,675] <u>$1,386,000</u> |
| member of the city council: | [$161,250] <u>$161,000</u> |

§14.  Subdivision 2 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

2.  The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years.  Such expenditures by a participating or limited participating candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

| | |
|---|---|
| mayor, public advocate or comptroller: | [$290,250] $290,000 |
| borough president: | $129,000 |
| member of the city council: | $43,000 |

§15.  Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

1.  The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code.  The board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall [issue] promulgate rules regarding what documentation is sufficient in demonstrating financial activity. These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited

25

participating, and non-participating candidates, provided that:

a. Any draft audit, the subject of which is a participating, limited participating[,] or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating[,] or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races[;], and  (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, within (i) [within] fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate within (i) [within] sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time.  Provided, however, that where the issuance of such

26

final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.

c. Any advice provided by board staff to <u>a</u> participating, limited participating, or non-participating [candidates] <u>candidate</u> with regard to an action shall be presumptive evidence that such action<u>, if</u> taken in reliance on such advice<u>,</u> should not be subject to a penalty or repayment obligation where such candidate[,] or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, [that describes] <u>describing</u> the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

d. Notwithstanding the provisions of paragraphs a and b of this [section] <u>subdivision</u>, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: [(a)]<u>(i)</u> the original deadline to provide the

information, which shall not have been less than thirty days from the date such information was requested[,]; and [(b)](ii) the commencement of the tolling period pursuant to this section.  If a committee has responded to a request for information made by board auditors but such response is  inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days until an adequate response is provided, provided that the committee has received timely written notice of: [(a)](i) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested[,]; [(b)](ii) the commencement of the tolling period pursuant to this section; and [(c)](iii) the detailed reasons why the original response was inadequate.

e.  Notwithstanding any provision of law to the contrary, the deadlines provided in [subdivisions] paragraphs a and b of this [section] subdivision for the completion of draft and final audits shall not apply in cases where the audit raises issues involving potential campaign-related fraud, potential other criminal activity, or activity that may constitute a breach of certification pursuant to rules of the board[,] or potential significant violations of the limits set forth in section 3-706.

f.  Notwithstanding any provision of the law to the contrary, the deadlines provided in [subdivisions] paragraphs a and b of this [section] subdivision for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with [provisions] paragraphs a and b.

§16. Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

2. (c)[ (i)]  If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election.  No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§17.  Subdivision 4 of section 3-710 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4. [[(a)]] No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to [the] all of the requirements of subdivision one of this section, and [a reasonable] an opportunity to appear before the board.  Any such repayment claim shall be based on a final determination [to be] issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee.  Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination[.].

29

§18.  Section 3-710.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

§ 3-710.5 Findings of violation or infraction; adjudications; [or] final determinations.  (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

(ii)(a) The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction before assessing any penalty for such action.  Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit required pursuant to subdivision one of section 3-710.  In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election in[ ]the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit.  Alleged violations and proposed penalties shall be subject to resolution by

adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature of such pre-election adjudications. The board shall issue a final determination within thirty days of the conclusion of the adjudication proceeding.

(b) The board shall include in every final determination: (i) notice of the [respondents'] respondent's right to bring a special proceeding challenging the board's final determination in New York State supreme court [brought] pursuant to article 78 of the civil practice law and rules; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law and rules.

§19.  Subdivision 4 of section 3-711 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4.   Notwithstanding any provision of law to the contrary, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who [commit] commits any violation of this chapter or any rules promulgated hereunder and who [take] takes all steps necessary to correct such violation prior to receiving written notice from the board of the existence of the potential violation [pursuant to section 3-710.5] shall not be subject to any penalty for such violation.

31

§20. Section 3-720 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

§3-720. Tolling of time for notice of <u>alleged</u> violations [or penalties.] <u>and/or notice of repayment of public funds</u>. If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

§21. Paragraph (d) of subdivision 2 of section 3-801 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(d) not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation <u>to a transition or inauguration entity authorized pursuant to subdivision one of this section</u> made by a natural person who has business dealings with the city [to a transition or inaugural committee] where such donation is from the candidate-elect[,] or

from the candidate-elect's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§22.  Subparagraph (iii) of paragraph a of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(iii) [with regard to contributions raised on or] for elections occurring after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation [provide] provided for such  office in subdivision one of this section.

§23.  Subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, is to read as follows:

(iii) [with regard to contributions raised on or] for elections occurring after January first, two thousand eight for elections occurring after such date, the campaign

finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding [two-thirds] one hundred twenty-five percent of the expenditure limitation [provide]provided for such office in subdivision one of this section.

§24. Paragraph (a) of subdivision 2 of section 3-703 of the administrative code of the city of New York, as amended by local law 58 of the year 2004, is amended to read as follows:

(a) The threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, shall be in the case of:

(i) mayor, not less than two hundred fifty thousand dollars in matchable contributions comprised of sums up to [two hundred fifty]one hundred seventy-five dollars per contributor including at least one thousand matchable contributions of ten dollars or more;

(ii) public advocate and comptroller, not less than one hundred twenty-five thousand dollars in matchable contributions comprised of sums of up to [two hundred

fifty]<u>one hundred seventy-five</u> dollars per contributor including at least five hundred matchable contributions of ten dollars or more;

(iii) borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to [two hundred fifty]<u>one hundred seventy-five</u> dollars per contributor including at least one hundred matchable contributions of ten dollars or more from residents of the borough, or ten thousand dollars comprised of sums of up to [two hundred fifty]<u>one hundred seventy-five</u> dollars per contributor, whichever is greater.

(iv) member of the city council, not less than five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]<u>one hundred seventy-five</u> dollars per contributor including at least seventy-five matchable contributions of ten dollars or more from residents of the district in which the seat is to be filled.

§25. Section 38 of local law 34 for the year 2007 is REPEALED, section 39 of local law 34 for the year 2007 is renumbered section 38, and sections 36, 37, and 38 of local law 34 for the year 2007 are amended to read as follows:

§36. Each city agency with which any person who has business dealings with the city conducts such business shall[,] provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business

dealings with the city; provided, however, that the rules shall not be [provided] applied to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section [twenty-six] thirty-seven of this local law.

§37.  Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows:  (i) [all of] the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] and persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding] of an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) [all of] the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction, and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available

information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, <u>and</u> persons with an interest in an entity which exceeds ten percent of the entity <u>that has submitted a bid or proposal seeking such a contract,</u> and persons employed in a senior managerial capacity of [entities that have submitted bids] <u>any entity holding such a contract or that has submitted a bid or proposal</u> seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, [applications for approvals] <u>any application for approval</u> sought pursuant to the provisions of section 195 [or] <u>of the charter, any application for approval sought from the city of New York that has been</u> certified pursuant to section 197-c of the [New York city] charter <u>and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter</u> shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with [a real property transaction or land use approval] <u>an acquisition or disposition of real property or an application for approval sought pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to section 197-c of the charter and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter</u> pursuant to [clause] <u>clauses</u> (ii) <u>and (iii)</u> of paragraph (a) of subdivision 18 of section 3-702 of the

code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] and persons with an interest in an entity which exceeds ten percent of the entity [and persons employed in a senior managerial capacity regarding an entity] with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (v) [all of] the provisions of this local law concerning any bid or proposal for a franchise or concession, and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law, shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database [includes,] identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, and persons with an interest in an entity which exceeds ten percent of the entity that has submitted a bid or proposal seeking such a franchise or concession, and persons employed in a senior managerial capacity [of entities with] with respect to any entity holding such a franchise or concession or that has submitted a bid or a proposal for such a franchise or concession; (vi) [all of] the provisions of this local law concerning a

recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is a recipient of a grant pursuant to clause (v) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) [all of] the provisions of this local law concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law;  (viii) [all of] the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business

database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] with respect to any entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants  pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and (ix) [all of] the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through [(viii)] (ix) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and

telecommunications shall provide to the [Mayor]mayor and the [Council]council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the [Mayor]mayor and the [Council]council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i), [and] (iv), and (ix) shall be six months from the effective date of this local law; the deadline for certification of this section in relation to clauses (ii),  (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be sixteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§[39] 38.  With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database.  Such report shall contain the status of each of the components enumerated in clauses (i) through [(viii)] (ix) of section [thirty-three] thirty-seven of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of

transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law.  If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect.  Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§26.  Section forty of local law 34 for the year 2007 is renumbered section 39 and section forty-one of local law 34 for the year 2007 is renumbered and amended to read as follows:

[§41] §40.  Sections three through seven, nine, ten, thirteen through [twenty, and twenty-two through thirty-three] thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date and shall be applicable to all public funds claims for elections held on or after such effective date, regardless of whether the claim for public funds was submitted prior to the effective date.

§ 27.  This local law shall take effect immediately.

James W. Caras, Esq.
Deputy General Counsel

Israel Rodriguez
Policy Analyst

Scott Crowley
Finance Division

DeNora Getachew
Counsel to Committee

Andrew Grossman
Finance Division



## THE COUNCIL

### REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION
ROBERT NEWMAN, LEGISLATIVE DIRECTOR
ALIX PUSTILNIK, DEPUTY DIRECTOR, GOVERNMENTAL AFFAIRS

### COMMITTEE ON GOVERNMENTAL OPERATIONS

HON. SIMCHA FELDER – CHAIR

**PROPOSED**
**INT. NO.  651-A:**          By Council Member Felder (by request of the Mayor)

**TITLE:**          A Local Law to amend the administrative code of the city of New York, in relation to campaign finance.

December 6, 2007
16th Floor Hearing Room

I. **INTRODUCTION**

On Thursday, December 6, 2007, the Committee on Governmental Operations, chaired by

Council Member Simcha Felder, will consider Proposed Int. No. 651-A ("bill"), a bill to amend

the administrative code of the City of New York ("Code"), in relation to campaign finance.  In

June 2007, this Committee considered and passed Proposed Int. No. 586-A, which made various

structural and procedural changes to the New York city charter and the administrative code of

the city of New York to further strengthen New York City's campaign finance system.  Mayor

Bloomberg signed Proposed Int. No. 586-A into law on July 3, 2007 as Local Law 34 of 2007

("Law").

In order to address some of the inadvertent errors in the Law, the Committee is

considering the bill, which would amend the Campaign Finance Act ("Act") to ensure that: (i)

the contribution limits applicable to those doing business with the city apply for an entire

election cycle, meaning a primary and general election, and not for each election; (ii) the new

matching level of 6:1 up to $175 will be retroactively applied from the start of the current

election cycle (January 2006); (iii) the exemption from the doing business restrictions for

affordable housing developers would only apply to landlords accepting Section 8 and those

providers of affordable housing whose selection for benefits do not involve significant discretion

by the department of housing preservation and development or other City agencies in awarding a

benefit; and to (iv) clarify some of the Law's provisions.

In addition, the Administration has experienced some technical difficulties with the Law.

Accordingly, the Administration is requesting amendments to the Law to:  (i) delay the

application of the doing business contribution cap on those who act in a "senior managerial

2

capacity" until July 2008 because they are experiencing difficulty in obtaining this information from current City contractors and franchise and concession holders; (ii) create a mechanism to waive compliance with the "business dealings with the City" requirements in cases where a vendor refuses to disclose Vendex information, but the City needs to contract for goods, services or construction in emergency situations, for security-related reasons or goods, services or construction essential to government operations; and (iii) exempt those whose property is being taken by the City via eminent domain from the doing business contribution limits.

Those invited to testify at this hearing include representatives from the Bloomberg administration, the New York City Campaign Finance Board ("Board"), good government and advocacy groups, election attorneys and other interested parties.

## II.    <u>BACKGROUND</u>

The Campaign Finance Program was established in 1988 to increase participation in the electoral process regardless of access to wealth, and to reduce undue influence by small concentrations of large contributors and special interests.[1]   Since the Program's inception, it has proved to be a successful campaign finance program and a model for the nation.

Pursuant to Charter section 1052, the Campaign Finance Board is composed of five members,[2] who are responsible for administering the Program in accordance with the Act, which is contained in Chapter 7 of Title 3 of the Code.   The Board's powers are enumerated in subdivisions (5) through (12) of section 1052 of the Charter and throughout the Act.   The Board's powers include, among other things, the power "to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of

---

[1] *See* Proceedings of the Council of the City of N.Y., Int. No. 906-A of 1987, enacted as Local Law 8 of 1988 (codified as N.Y.C. Charter, ch. 46 and N.Y.C. Admin. Code, title 3, ch. 7).

[2] *See* New York City Charter §1052 (2005).

chapter 8 of title 3 of this code."[3]

### III.    PROPOSED INT. NO. 651-A

Section one of the bill would amend the definition of "business dealings with the city" contained in subdivision 18 of section 3-702 of the Act to clarify some of its provisions and exempt certain activity from the definition.  Specifically, the bill would clarify that for purposes of the definition of "business dealings with the city," an "emergency contract or a contract procured through publicly-advertised competitive sealed bidding" would not be included in contracts covered by this definition.

In addition, the bill would clarify that certain actions, transactions and agreements to provide affordable housing are not "business dealings with the city."  Specifically, the bill would clarify that the exemption from the doing business restrictions for affordable housing developers applies to landlords accepting Section 8.  In addition, the bill would provide the department of housing preservation and development with the authority to promulgate rules defining which actions, transactions and agreements for the purpose of providing affordable housing would constitute business dealings with the City provided that "only those actions, transactions, and agreements for the purpose of providing affordable housing that involve the exercise of substantial discretion by one or more city officials shall constitute business dealings with the city of New York."

Section one of the bill would also clarify that for purposes of determining the term of the business dealings with the city with respect to contracts, in the case of "purchase contracts for goods," the term shall be one year from the date of such purchase.

Post-enactment of the Law, the Administration raised concerns about the City's ability to

---

[3]*See* Administrative Code of the City of New York §3-710(1) (2005).

procure essential goods, services or construction such as those necessary for security or other essential government operations in cases where a vendor refuses to comply with the requirements of Vendex necessary to include such person in the doing business database. To address this concern, the Administration recommended an amendment to the Law permitting the city chief procurement officer to promulgate rules to create a process by which a person "may apply to the city chief procurement officer for a waiver from inclusion in the doing business database." Such rules would require the city chief procurement officer to "transmit to the board a copy of any application for a waiver." Further, the bill would provide that any such waiver could not be granted until the expiration of ten days from the date such application is received by the board. The bill would also require that a "waiver may be granted only after substantial efforts have been made by the chief procurement officer to obtain the information required by this law" and upon a finding that it is in the best interests of the City, which shall be based on a determination that "(i) there is a compelling need to obtain such essential goods, services or construction from the person seeking the exemption and (ii) no other reasonable alternative exists in light of such considerations as cost, uniqueness and the critical nature of such goods, services or construction to the accomplishment of the purchasing agency's mission." The bill would provide that such "a waiver may be granted when a person is doing business with the city by virtue of the city's exercise of its powers of eminent domain." Finally, the bill would require that the grant of a waiver be posted on the City's and the Board's website in publicly accessible locations.

Section one of the bill would also amend subdivision 20 of section 3-702 of the Act to clarify that the phrase "senior managerial capacity" means a "high level supervisory capacity...in which substantial discretion and oversight is exercised over the solicitation, letting

or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals."

Section two of the bill would amend subdivision 1-a of section 3-703 to clarify the permissible contribution limits that participating candidates may accept from those with business dealings with the City.  The Law provided that participating candidates would be permitted to accept contributions from those with business dealing with the city for "such election."  This drafting inaccuracy would have permitted a participating candidate for city council to accept two contributions totaling two hundred and fifty dollars each from a person with business dealings with the city, one for the primary election and another for the general election.  This was not the intent of the drafters in negotiating and drafting the Law.  This amendment would correct this error and ensure that similar to the limits applicable to non-doing business contributions, a candidate may only accept the applicable contribution limit from a person with business dealings with the city for "all covered elections held in the same calendar year."

Section two of the bill would also amend subdivisions 1-a and 1-b of section 3-703 of the Act to clarify that for purposes of those subdivisions the phrase "senior managerial capacity" means a "high level supervisory capacity…in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals."

Sections three through ten of the bill would amend various sections of the Law to address minor technical and grammatical errors to make the language clearer.

Section eleven of the bill would amend paragraph (a) of subdivision 2 of section 3-705 of the Act to adjust the maximum matching funds claim per contributor that a participating

candidate would receive for each matchable contribution in the case of a special elections to five hundred twenty-two dollars.  The purpose of this amendment is to ensure that the Board's software is able to process these matching claims and that campaigns solicit contributions in whole dollar increments.

Section twelve of the bill would amend subdivision seven of section 3-705 of the Act to make minor technical and grammatical changes to the provisions regarding any participating candidate's signed statement attesting to the need for additional public funds.

Sections thirteen and fourteen of the bill would amend paragraph (a) of subdivision 1 of section 3-706 of the Act to round the expenditure limits applicable to each primary election, special election to fill a vacancy, and general election to the nearest thousand, which is the way the cost of living adjustment is applied to the expenditure limits and the way the Board has historically treated increases in the expenditure limits.

Sections fifteen through twenty-one of the bill would amend various sections of the Law to address minor technical and grammatical errors to make the language clearer.

Sections twenty-two and twenty-three of  the bill would amend subparagraph (iii) of paragraph a of subdivision 3 of section 3-706 and subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 to clarify that the Law's bonus match provisions are applicable to elections occurring after January 1, 2008 regardless of when the underlying contribution was raised.  Section twenty-three of the bill would correct a drafting error in the Law by amending subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 to ensure that in cases where a participating candidate's opponent spent, contracted or has obligated to spend, or has received in loans or contributions, or both, three times more than the applicable expenditure limit, the principal committee would receive public funds in an amount not to exceed <u>one hundred twenty-</u>

<u>five percent</u> of the expenditure limitation for such office.  The Law, in error, specified that a participating candidate would receive public funds in an amount not to exceed two-thirds of the expenditure limit, however the two-thirds limit is applicable in cases where a participating candidate's opponent has spent, contracted or has obligated to spend, or has received in loans or contributions, or both, an amount that exceeds half the applicable expenditure limit.

Section twenty-four of the bill would amend paragraph (a) of subdivision 2 of section 3-703 of the Act to change the threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, to mirror the new maximum matching fund claim of one hundred seventy-five dollars.  Accordingly, in order for a participating candidate to qualify to receive public funds the participating candidate would be required to raise the specified number of contributions (applicable to the office that the participating candidate is seeking) from the specified number of contributors in denominations of one hundred seventy-five dollars, not two hundred fifty dollars.

Section twenty-five of the bill would amend the Law's effective date provisions in several respects.  First, this section of the bill would repeal section thirty-eight of the Law, which mandated that the new 6:1 matching ratio not take effect until thirty days after the first component of the doing business database was certified.   Instead, section twenty-six of this bill would amend section forty-one of the Law by renumbering it section forty and require that the sections of the Law relating to the new matching provisions take effect on January 1, 2008, "for all elections held on or after such effective date and shall be applicable to all public funds claims for elections held on or after such effective date, regardless of whether the claim for public fund was submitted prior to the effective date."

Second, at the request of the Administration, section twenty-five of this bill would delay

8

the implementation of the "senior managerial capacity" components of the doing business database with respect to a city contract or a city franchise or concession until the second phase of implementation of the doing business database – one year from the effective date of the Law.

Third, section twenty-five of this bill would address an error in the Law with respect to the deadline for certification of the lobbyist component of the doing business database. Although it was intended that the deadline for certification of the lobbyist component of the doing business database would be six months from the effective date of the Law, in error, this language was not included. Accordingly, section twenty-five of this bill would specify that the deadline for certification of the lobbyist component of the doing business database would be six months from the enactment of the Law.

Fourth, section twenty-five of the bill would make various other technical and grammatical amendments to the Law to clarify the language and numbering of the sections.

Finally, section twenty-seven of the bill states that the bill would become effective immediately.

1

2   CITY COUNCIL

3

CITY OF NEW YORK

4

-------------------------------x

5

THE TRANSCRIPT OF THE MINUTES

6

       of the

7

COMMITTEE ON GOVERNMENTAL

8   OPERATIONS

9   -------------------------------x

10           December 6, 2007
         Start:  10:05 a.m.

11           Recess: 11:07 a.m.

12           City Hall
         Council Chambers

13           New York, New York

14

     B E F O R E:

15

       SIMCHA FELDER

16               Chairperson,

17

       COUNCIL MEMBERS:   Joseph Addabbo

18                  Erik Martin Dilan
                Larry Seabrook

19                  Peter Vallone, Jr.
                Gale Brewer

20

21

22

23

24     LEGAL-EASE COURT REPORTING SERVICES, INC.
        17 Battery Place -  Suite 1308

25          New York, New York 10004
           (800) 756-3410

```
 1

 2   A P P E A R A N C E S

 3

     Amy Loprest
 4   Executive Director
     NYC Campaign Finance Board
 5
     Shauna Denkensohn
 6   Deputy Executive Director
     NYC Campaign Finance Board
 7
     Sue Ellen Dodell
 8   General Counsel
     NYC Campaign Finance Board
 9
     Marla Simpson
10   Director
     Mayor's Office of Contract Services
11
     Jessie Shaeffer
12   Project Director
     Doing Business Accountability Project
13   Mayor's Office of Contract Services

14   Rachael Fauss
     Policy and Research Associate
15   Citizens Union

16   Dan Jacoby
     Democracy for New York City
17

18

19

20

21

22

23

24

25
```

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2            CHAIRPERSON FELDER: Good morning, and

 3   welcome to this hearing on the Committee on

 4   Governmental Operations. I am Simcha Felder, Chair

 5   of the Committee, and I am joined by DeNora

 6   Getachew, the Counsel to the Committee, who is

 7   standing under the clock, and Israel Rodriguez, who

 8   is across the street hanging up a sign to make sure

 9   that no one else remains there and comes here,

10   Policy Analyst to the Committee, and also to my

11   right is my Communications Director Eric Quo.

12            Today the Committee will consider two

13   bills of which I am the prime sponsor. Intro. No.

14   4643, and proposed Intro. No. 6518. First proposed

15   Intro. No. 651-A. This is a bill that was introduced

16   by request of the Mayor, which would amend the

17   Administrative Code of the City of New York with

18   respect to campaign finance.

19            Specifically this bill would make

20   various substantive and technical amendments to the

21   Campaign Finance Reform Bill passed by this

22   Committee in June of this year to clarify the law

23   and ensure: 1) that the contribution limits

24   applicable to those doing business with the City

25   apply for the entire election cycle. In fact, it
```

4

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   makes sense.

 3                Some times laws don't make sense,

 4   this one makes sense. That should be consistent and

 5   that the matching contribution should be consistent.

 6   And that clearly, I would say, was the intent of the

 7   law certainly. Unfortunately, we didn't get the

 8   language down exactly then but we're going to fix it

 9   now.

10                Two, the matching level of six to

11   one, up to $175 would be retroactively applied from

12   the start of the current election cycle. And, again,

13   that makes sense, it's consistent. Three of the

14   exemptions from doing business restrictions from the

15   doing business restrictions for affordable housing

16   developers would only apply to those developers who

17   participate in an as-of-right nondiscretionary

18   affordable housing program, or those which do not

19   involve significant discretion by HPD or other City

20   agencies in awarding a benefit.

21                This bill has additional provisions,

22   included specifically at the request of the Mayor.

23   Given that representatives of the Administration are

24   here with us today, I will defer any further

25   explanation -- I will defer any other further
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  explanation of these provisions and the reasons that

3  the Administration feels that they are necessary to

4  their testimony, which we will hear momentarily.

5           After hearing testimony regarding

6  proposed Intro. No. 651-A, the Committee will hear

7  testimony on Intro. No. 643, which I also sponsored.

8           Intro. No. 643 would amend the City

9  Administrative Procedure Act, also known as CAPA,

10  require that agencies electronically transmit copies

11  of proposed rules in a timely manner.

12           While this bill is not as technical

13  in nature or nearly as long as the Campaign Finance

14  Bill, it is an important bill for this Committee to

15  consider, because it would notify and it would

16  modify the existing CAPA notice requirements to

17  ensure that the Council and other interested parties

18  receive notice of agencies' proposed rules in a

19  timely and efficient manner.

20           Currently CAPA requires agencies to

21  provide notice of proposed rules to the Council, the

22  Corporation Counsel, each Council member, the chairs

23  of all community boards, the news media and civic

24  organizations. Unfortunately, however, very often

25  these parties do not receive the required notice

6

```
1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   until the commencement, after the commencement on

3   the comment period on the proposed rule. This does

4   not, and I emphasize, this does not conform with the

5   purpose of CAPA which is to ensure that these

6   parties would be able to meaningfully participate in

7   the agencies' rule-making process. If it's almost

8   over, there is no point. It's done. It's a done

9   deal.

10              Intro. No. 643 would remedy this

11  problem by mandating that agencies electronically

12  submit, you know, copies, transmit copies of a

13  proposed rule and an adopted emergency rule to the

14  Council and the parties mentioned earlier, no later

15  than when the agency transmits the proposed rules or

16  adopted emergency to the City Record for publication

17  as required by CAPA. And if it can get done for the

18  City Record, it shouldn't be that difficult to

19  notify the other parties that are supposed to be

20  notified.

21              Before we begin today's formal

22  hearing, I'd like to emphasize that it is my policy

23  as Chair of the Governmental Operations Committee to

24  ensure that my hearings begin on time, and I

25  apologize for starting five, seven minutes late. And
```

7

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   therefore, it is my rule that only those individuals

3   that sign up to testify within the first 15 minutes

4   of the start of this hearing will be permitted to

5   testify.

6              Additionally, I ask witnesses to

7   refrain from repeating points made by previous

8   witnesses. If someone has adequately made the point

9   that you wish to make, it will suffice to note your

10  agreement, or you could say that something like if I

11  had only asked you to testify first, you would have

12  been able to make the point first and now it's not

13  fair, something like that, but no one wants to hear

14  the same thing twice.

15             And with that, before I call the

16  witnesses, I just want to mention that somebody

17  questioned whether I have the authority to have this

18  rule that is not in place in most of the Committees.

19  We did some research and I thought it was a good

20  question.

21             We did some research and in fact,

22  under the rules the Chair of the Committee is not

23  obligated to allow anybody to testify. So, I don't

24  think it's a deep Talmudic deduction to say that if

25  I'm not obligated to allow anybody to testify, I

8

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    certainly don't have to allow somebody to testify if

3    they come late. I just don't think it's fair to the

4    people who are here. And if somebody is interested,

5    they should make it here on time.

6              That doesn't mean to say that if

7    somebody comes in and says they were held up in

8    traffic or they call in advance and say they'd like

9    to testify but they can't make it til an hour into

10   the meeting, we will accommodate anybody, you know,

11   try to accommodate anybody. The purpose is so that

12   if this Committee is called Government Operations

13   and we can't run this Committee efficiently, then

14   what am I doing here?

15             The first witness is Amy Loprest from

16   -- no, my mistake. I'm sorry. The first witness is

17   Amy Loprest. And as usual, if you can identify

18   yourself and if you're willing to say good morning,

19   that's also fine. Whoever else answers any questions

20   should identify themselves.

21             MS. LOPREST: Good morning, Chairman

22   Felder and Committee members -- oh, no Committee

23   members here yet. I am Amy Loprest, the Executive

24   Director of the New York City Campaign Finance

25   Board. With me is our newly appointed Deputy

9

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Executive Director, Shauna Denkensohn. Ms.

3    Denkensohn has taken over for Carole Campolo, who

4    recently retired. Also with me is General Counsel

5    Sue Ellen Dodell. I am here to testify today on

6    Intro. No. 651-A.

7              We would like to thank the Council

8    and the Council staff for soliciting our

9    participation and feedback throughout the entire

10   legislative process. We believe Intro. No. 651-A

11   will largely resolve the technical problems

12   contained in Local Law 34.

13             We have in the past raised concerns

14   about Local Law 34's treatment of so-called exempt

15   expenditures which Intro. No. 651-A will not change.

16             In the interest of providing clarity

17   and simplicity to the law, in its latest

18   post-election report the Board recommended

19   eliminating most of these exemptions, specifically

20   the blanket exemptions for petitioning and

21   compliance. To compensate, and ensure campaigns

22   could continue to make reasonable and necessary

23   expenditures on compliance and other hard-to-predict

24   expenses within the spending limits, we recommended

25   increasing the limit by a modest amount.

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2              The Council agreed with our

3  recommendation in substance, and responded by

4  including provisions in Local Law 34 that we believe

5  narrow these exemptions substantially. At the same

6  time, the law increased the spending limits by

7  roughly 7.5 percent, which is a greater proportion

8  than the typical campaign has claimed as exempt.

9              The Board believes the language of

10  Local Law 34, regarding the new exemptions does not

11  provide the level of clarity we sought, particularly

12  with regard to expenses for the post-election audit.

13  However, the Committee report for Local Law 34

14  reflects our shared understanding on this point.

15              To clarify, post-election spending

16  has never counted towards the limit. The

17  post-election audit begins after the election, and

18  expenditures made to prepare the response have

19  therefore been and will continue to be exempt from

20  the spending limits.

21              As in the past, the Board will

22  construe the exemptions contained in Local Law 34

23  narrowly to ensure that no participating campaign is

24  allowed to gain an unfair advantage by conducting

25  activities beyond what is allowed under the spending

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   limits.

 3            The Board will promulgate rules

 4   reflecting our common understanding of the law's

 5   intent as well as the need to provide campaigns with

 6   clear guidance.

 7            We are pleased to report that much

 8   progress has been made towards the implementation of

 9   those sections of Local Law 34 dealing with persons

10   and entities doing business with the City, and I

11   believe you will hear more about this from the

12   Administration.

13            The CFB staff is working closely with

14   the Mayor's Office of Contract Services and DoITT to

15   meet the law's deadline for completion of the first

16   phase of the unified doing business database. A

17   meeting of the Board has been scheduled for January

18   3rd, 2008, the certification date contemplated in

19   the law, and the Board anticipates issuing its

20   certification report in conjunction with that

21   meeting. Groundwork is also being laid for the

22   subsequent phases of the doing business database.

23            We are also happy to announce that

24   the CFB staff has completed a redesign of our

25   Candidate Software, C-SMART, for the 2009 election.
```

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Several enhancements to the software were added in

3    response to comments made by candidates after the

4    2005 election.

5              The new version of the software

6    allows candidates to synchronize their disclosure

7    and write checks with widely used bookkeeping

8    applications QuickBooks and Microsoft Money, and

9    gives them the ability to import records from other

10   sources, such as contributions received through a

11   campaign website.

12             The new software also contains a

13   fundraising module that will help candidates better

14   manage their tracking of contributor information,

15   and can easily produce and print letters to campaign

16   contributors. It has a new, modern look and feel

17   that should be more user-friendly and easier on the

18   eye.

19             We have initiated a pilot program

20   with seven currently active 2009 campaigns to test

21   the new software for the January 15th, 2008 filing.

22             Despite the complexity of the new

23   law, we are working very hard to make compliance as

24   simple as possible for all candidates. As you know,

25   the CFB is preparing to expand our staff to meet the

13

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    new and significant mandates contained in Local Law

3    34. We are pleased to have the continued support of

4    the Council as we structure our agency to implement

5    those important reforms.

6                    Thank you for the opportunity to

7    testify today, and I look forward to answering any

8    questions you may have.

9                    CHAIRPERSON FELDER: Thank you very

10   much.

11                   I have to step across to vote and

12   Councilman Addabbo will be chairing the meeting.

13   Thank you.

14                   ACTING CHAIRPERSON ADDABBO: Good

15   morning, everyone. Thanks to Chair Felder for

16   putting me in this situation here.

17                   Again, I want to thank you very much

18   for your time and testimony. What cost of savings

19   will CFB encounter by going from the four-to-one

20   matching to the six-to-one, as far as you know?

21                   MS. LOPREST: Well, it will probably

22   be about the same, because the total amount per

23   claim is about the same amount. So, there is not

24   going to be a cost savings for public funds because

25   each claim will be worth basically the same amount,

14

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  four-to-one to 250, six-to-one to 175. The amount of

3  matching funds for each claim is about the same.

4              ACTING CHAIRPERSON ADDABBO: Do you

5  see that same answer five, ten, 15 years from now?

6  Again, do you see a change possibly in the future?

7              MS. LOPREST: I mean, it's hard to

8  predict. Obviously when the matching rate when from

9  one-to-one to 1,000 to four-to-one to 250, in fairly

10  short order the most common or the most frequent

11  contribution size went to $250. So, I anticipate

12  that that same event will happen with the change to

13  the maximum claim being 175 that in short order the

14  most frequent contribution size will be 175. But

15  it's hard to predict the future. But after, as you

16  know, after each election cycle the law contemplates

17  that the Board reviews the entire, how the law

18  worked for the entire election cycle, and makes

19  recommendations for change, and that, the cost

20  increase and the cost in public funds is one of the

21  things that's always tracked in that report.

22              ACTING CHAIRPERSON ADDABBO: You

23  mentioned it just a second ago, do you feel that

24  this kind of review is a healthy discussion to have,

25  is a good thing to have to review certain, even the

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   four-to-one and six-to-one, in other words, do you

3   think this is a healthy discussion to have and to

4   make these reviews perodically?

5              MS. LOPREST: Yes. I think it's

6   probably one of the great points of the Campaign

7   Finance Act is that they put into this law this

8   mandated periodic review. I think that's great.

9              ACTING CHAIRPERSON ADDABBO: And

10  again, we all agree with the mandates, correct?

11             MS. LOPREST: Yes.

12             ACTING CHAIRPERSON ADDABBO: Okay. Any

13  other questions from my colleagues? We have been

14  joined by Council Member Larry Seabrook. Mr.

15  Seabrook. And Council Member Dilan is entering the

16  Chambers. Don't be shy. All you need is a chair to

17  switch, right? And we've been rejoined by Council

18  Member Simcha Felder, our Chair. Thank God.

19             CHAIRPERSON FELDER: Are you concerned

20  at all about the Administration's request for an

21  extension on the implementation of the date for

22  doing business component related to senior

23  managements' capacity?

24             MS. LOPREST: No. I mean, as I've

25  said, we've been working very closely with the

 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   people from MOCs and from DoITT and, you know, they

 3   have been working very, very hard on meeting the

 4   obligations and I'm sure that Marla Simpson will

 5   talk about what they've been doing. But they have

 6   been working very hard and that's, you know, one

 7   small component of the database. So, a great

 8   majority of the information will be available at the

 9   first phase.

10              CHAIRPERSON FELDER: And finally, the

11   Administration recommended a waiver process, for

12   compliance with doing business requirements for

13   those vendors that refuse to comply with Vendex, but

14   that the City needs to contract with the vendor for

15   goods, services or construction emergency situations

16   for security-related reasons or goods, services or

17   construction essential to government operations; are

18   you concerned about this waiver?

19              MS. LOPREST: I'm not sure what is

20   contemplated. I look forward to hearing more of the

21   testimony about what they're contemplating in this

22   waiver process.

23              You know, this is the advantage where

24   I went first and I haven't heard her testimony. So,

25   I don't know, and we don't really have any comments

17

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  about it.

3               CHAIRPERSON FELDER: So the last

4  question I asked, you don't have an answer yet?

5               MS. LOPREST: In Local Law 34 there

6  was a waiver always and I think that this, I mean

7  the way I read it, flushes out how it will be

8  applied. I mean, it depends on -- I mean, I will

9  listen to what Marla has to say about that, but --

10              CHAIRPERSON FELDER: Okay, you know

11 what? Since you're going to be here listening,

12 DeNora, I think we should give the Chair Amy

13 Loprest, you know, we'll give you an opportunity to

14 come back to testify on this question once they're

15 done, okay?

16              MS. LOPREST: Okay.

17              CHAIRPERSON FELDER: Thank you very

18 much for your testimony.

19              We're now going to hear from Marla

20 Simpson, the Director of the Mayor's Office of

21 Contract Services.

22              MS. SIMPSON: Good morning. Thank you,

23 Mr. Chair. I am Marla Simpson. I am the Director of

24 the Mayor's Office of Contract Services and the

25 City's Chief Procurement Officer. I want to

18

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   apologize that I am not yet joined by Anthony

3   Crowell, Counselor to the Mayor. We are hopeful that

4   he will be available very soon. He has been

5   unavoidably detained with the Mayor.

6                   I am very delighted to have the

7   opportunity today to testify before this Committee

8   to discuss the various amendments that we have

9   proposed for the City's landmark Pay to Play

10  legislation, which was Local Law 34 of 2007.

11                  Local Law 34, passed by the Council

12  and signed by the Mayor in July of this year, as you

13  know mandates the creation of a doing business

14  database containing the names of entities and people

15  who are considered to be doing business with the

16  City for purposes of enforcing the new limitations

17  on campaign contributions.

18                  My office, the Mayor's Office of

19  Contract Services, or MOCs, was given the primary

20  responsibility to gather and process the information

21  required to be contained in the database.

22                  Local Law 34 is to be implemented in

23  three phases, corresponding to different types of

24  transactions that are considered business dealings

25  with the City.

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2           At the start of each phase, as noted

3  in the prior testimony, the Department of

4  Information, Technology and Telecommunications,

5  DoITT, and the Campaign Finance Board, must certify

6  that the database for that particular phase is

7  reasonably complete so that the law can be enforced.

8           I am pleased to report that we are

9  well on our way to completing the database for Phase

10  1 of the law, which commences on January 3rd of

11  2008, and will cover current City contracts,

12  franchises and concessions.

13           In order to create that initial

14  database, MOCs formed and staffed a new unit, the

15  Doing Business Accountability Project. I'm joined

16  here today by Jessie Shaffer, who is the Project

17  Director for the DBA Project, as we call it.

18           In the past five months, the DBA

19  Project has processed more than 300,000 procurements

20  from 186 agencies that are covered by Local Law 34.

21  I will note that as City Chief Procurement Officer,

22  this is a very exciting development, in and of

23  itself, since we have never before had comprehensive

24  data on so broad an array of agencies.

25           In addition, the DBA project has

20

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   identified 3,500 vendors that will be considered as

3   doing business with the City as of that January 3rd

4   Phase 1 target date, and the project has sent

5   mailings to all of those 3,500 vendors to confirm or

6   obtain the names of their principal officers, owners

7   and senior managers.

8               As of yesterday, we have received

9   replies from 1,759 or approximately 50 percent of

10  the 3,500 letters mailed. About three-quarters of

11  those were already registered with their data on the

12  City's Vendex database. The letters that we sent

13  them simply asked them to confirm the Officer and

14  owner names that we had in Vendex, and informed them

15  that in the absence of a reply we would use the

16  Vendex data and then in addition asked for new

17  information concerning the names of their senior

18  managers, which do not exist in our Vendex system.

19              For about 25 percent of the 3,500

20  vendors covered by Local Law 34, they are not

21  already registered in Vendex so we sent letters

22  requesting that they supply all of the necessary

23  printable information.

24              Throughout December we will continue

25  to mail to those vendors and to place follow-up

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   calls to any who have not yet responded. As a result

3   of our efforts to date, we now have information on

4   the principal owners and officers, either from

5   Vendex or from the mailing for more than 87 percent

6   of the vendors. We expect the number to exceed 92

7   percent by the end of December. Considering that at

8   this point we have no real enforcement mechanism

9   because the law has not yet gone into effect, we are

10  very pleased with the data collection result thus

11  far, and we believe we will attain the reasonably

12  complete standard for most categories of vendors and

13  principals.

14          For the narrow category of senior

15  managers who have historically not been listed in

16  Vendex, we are not likely to meet the January 3rd

17  target date for substantial completeness. Although,

18  and let me be clear, we are well underway, thus far

19  our mailings and phone calls have yielded

20  approximately 40 percent of the needed data and we

21  are working to secure the remaining 60 percent as

22  rapidly as possible.

23          As you know, Local Law 34 was drafted

24  with a phased approach. The inclusion of the names

25  of entities and principals who do business with --

22

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    who seek business from the City, those who proposes

3    but may not actually be awarded a contract, does not

4    occur until July 3rd. The main reason for that delay

5    was the recognition at the outset, at the time we

6    drafted Local Law 34 in conjunction with the

7    Council, that the City has no preexisting sources of

8    data such as Vendex, to obtain information on the

9    principals of unsuccessful proposers. Instead we

10   must collect that proposer information from scratch.

11              To do that, we need to incorporate a

12   request for such information into our contract

13   solicitation process, so that proposers will have to

14   supply it up front in order to have their proposals

15   considered.

16              The DBA project, working closely with

17   the City's Law Department, has already begun

18   modifying all City agency solicitations for that

19   purpose, so that when July 3rd rolls around, we will

20   be able to supply a reasonably complete database on

21   this point, as well.

22              For the same reasons that Local Law

23   34 has a delayed effectiveness date for proposers,

24   Intro. 651 is now before you seeking to amend the

25   requirement for senior manager data. Just as the

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  City has no preexisting source of data for the names

3  of the principals of unsuccessful proposers, so, too

4  we have no source for the names of senior managers.

5          Although we did not initially

6  recognize how much of the process of setting up the

7  database would be hampered by the fact that senior

8  managers are not listed in Vendex, we now believe

9  that it is important to make this amendment to the

10  Local Law 34 schedule so that manager data would be

11  available in Phase 2 as of July 3rd, rather than

12  January 3rd.

13          We are nonetheless confident that

14  even without the senior manager data, the January

15  3rd version of the database will still contain

16  information plainly sufficient to meet Local Law

17  34's ambitious goal of curbing Pay to Play practices

18  by those who do business with the City, if for no

19  other reason than it will contain the names of the

20  entities, officers and owners to whom all of the

21  senior managers report.

22          During Phase 1, MOCs will be able to

23  compel all of the entities that are newly awarded

24  contract franchises and concessions to provide all

25  the required information, including the names of

24

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   their manager.

 3              Thus, for the awards that are made

 4   from January 3rd on, we anticipate a much higher

 5   compliance rate. As no new awards will be processed

 6   without complete Local Law 34 data.

 7              Meanwhile, we will continue to pursue

 8   the senior manager information for vendors holding

 9   contracts that were awarded before January 3rd, and

10   we are confident that with those added months we can

11   move the completion rate for the pre-existing

12   vendors to an acceptable level.

13              Another amendment included in Intro.

14   651 that I'd like to discuss this morning is the one

15   that would allow the City Chief Procurement Officer

16   to promulgate rules to permit in certain narrow

17   circumstances the compliance with Local Law 34 to be

18   waived. Before any such waiver would be considered,

19   MOCs would have to show that we have already made

20   substantial efforts to obtain full compliance with

21   the required disclosures. But if those efforts prove

22   fruitless, the City must retain a mechanism to allow

23   agencies to make essential purchases.

24              As the amendment provides, a waiver

25   could only be granted upon a finding both that the
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  agency had a compelling need for the purchase and

3  that it had no reasonable alternative.

4          Waiver applications would be reported

5  to the Campaign Finance Board at least ten days

6  prior to any action to grant or deny them, and any

7  entity that eventually received a waiver would be

8  listed on both the MOCs and CFB websites so that the

9  public would be aware of the possibility that

10  contributions by individuals affiliated by those

11  vendors would continue, or could continue to be

12  made.

13          The Vendex Statute contains a similar

14  authorization, authorizing the procurement policy

15  board or the PPB to establish a rules-based waiver

16  process for Vendex.

17          The PPB exercised that authority more

18  than a decade ago upon notice to the Council as

19  required by the Vendex Statute. From time to time,

20  as City Chief Procurement Officer I now grant Vendex

21  waivers under those PPB rules. The waiver provisions

22  for Vendex are very rarely invoked and the parallel

23  waiver process that's been proposed for Local Law 34

24  data, is even more narrowly drawn and much more

25  transparent.

26

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2                I'll give an example of a

 3   circumstance that might support a waiver. If we have

 4   a situation where an agency needs to make a purchase

 5   that is critical to public health or safety and has

 6   only a sole source vendor as their option, and

 7   particularly when that entity, that sole source, is

 8   a privately held company that is not required to

 9   disclose its ownership in any other context. We

10   could find that such an entity may readily give us

11   the information on who its senior managers and

12   officers are, but might resist supplying ownership

13   data because that would make non-public information

14   accessible to the public.

15                On occasion, that has arisen in

16   Vendex when a foreign entity holds all or partial

17   ownership of a US-based subsidiary, but it should be

18   noted that citizens from foreign entities are

19   otherwise barred from making campaign contributions.

20                Another example that is specifically

21   listed in 651 would be for entities whose inclusion

22   in the database results from the City's exercise of

23   eminent domain, inasmuch as their status as an

24   entity doing business with the City is not voluntary

25   on their part, they may well not cooperate our
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  efforts to collect their data. That said, I must

3  emphasize that all of our vendor contacts to date,

4  and as you heard earlier, we have had thousands of

5  vendor contacts, have not yielded any instances of

6  outright refusal to provide the necessary data.

7           Based on our experience with Vendex,

8  which requests much more intrusive information on

9  vendors and their principals, while we view the

10  waiver provisions included in Intro. 651 as

11  essential, we do not expect to invoke them on more

12  than a handful of occasions.

13           As I noted earlier, we are confident

14  that with these amendments the doing business

15  database will be certified by January 3rd and New

16  York City's model campaign finance law will have

17  been made even stronger.

18           Thank you, and I welcome any

19  questions you may have at this time.

20           CHAIRPERSON FELDER: Thank you. And I

21  want to welcome our technology czar, Council Member

22  Gale Brewer.

23           Councilman Joseph Addabbo has a

24  question.

25           COUNCIL MEMBER ADDABBO: Thank you,

28

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   Mr. Chair. I thank your Committee for having this

 3   hearing today. Thank you very much for having you

 4   here as well for your testimony. It's a lot of work,

 5   you know, obviously implementing what we need to do,

 6   and this is a lot of work as explained in your

 7   testimony.

 8                  Do you see the need for requesting

 9   any extensions of time to getting all of the data

10   and implement what we need to do?

11                  MS. SIMPSON: Other than as proposed

12   in 651 for one small category of data, no.

13   Absolutely not.

14                  COUNCIL MEMBER ADDABBO: Adequate

15   staff? You're adequately staffed to gain all the

16   information?

17                  MS. SIMPSON: Yes, sir. The Mayor has

18   taken great pains to make sure that this project is

19   adequately staffed and we're moving gangbusters

20   toward collection of all of that data.

21                  COUNCIL MEMBER ADDABBO: Was staff

22   recently hired over the past year and a half?

23                  MS. SIMPSON: Oh, absolutely, yes.

24   Staff was hired specifically for this project.

25                  COUNCIL MEMBER ADDABBO: Do you know
```

29

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    how much? How many personnel?

3            MS. SIMPSON: To date we have the

4    Project Director, three analysts and I believe, in

5    terms of data entry staff that are fully committed

6    to the project, three, with a fourth in process and

7    the resources of my office, which I have several

8    other large administrative data entry staffs in my

9    office and on a swing basis we've made many other

10   data entry people available.

11           COUNCIL MEMBER ADDABBO: Do you

12   foresee additional hirings in the future, near

13   future?

14           MS. SIMPSON: We have some other slots

15   that are budgeted, and we intend to continue to hire

16   on an as-needed basis.

17           I must emphasize, though, that the

18   issue that's reflected in Intro. 651 is not impacted

19   at all by the staffing level because it really has

20   to do with the actions by the vendors, not our own

21   actions. We've succeeded in getting multiple

22   mailings to the vendors, there is no question that

23   they've received the information, and we have made

24   multiple rounds of phone calls to track down

25   follow-up information, and we have a hot line that

30

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    the vendors can call us. And, so, again, we don't

3    have an issue from a staffing standpoint on

4    completion. It's more of a change in terms of the

5    expectation or the culture for the vendors

6    themselves. They're very used to seeing the City's

7    Vendex forms and while the form for this law is

8    much, much shorter and much less detailed, many

9    vendors who get a form in the mail from the City

10   think that it must just be some new version of

11   Vendex.

12            So, we have to get out there and make

13   it understood by the vendors that this is an

14   additional separate form that we're asking them to

15   reply to.

16            We made it as easy as possible. The

17   form is prepopulated so that all the data that we

18   have on Vendex is shown to the vendor so they don't

19   have to fill in duplicate data that we already have

20   and they're simply asked to confirm yes or no are

21   these names correct, have they changed? And they

22   give us the changes and we input the changes.

23            COUNCIL MEMBER ADDABBO: Ms. Simpson,

24   I thank you very much for the update, and I look

25   forward to a periodic update as we have you come

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   before this Committee in the future.

 3                MS. SIMPSON: We would be happy to do

 4   that.

 5                COUNCIL MEMBER ADDABBO: Thank you.

 6                Thank you, Mr. Chair.

 7                CHAIRPERSON FELDER: Thank you.

 8                Council Member Brewer.

 9                COUNCIL MEMBER BREWER: Thank you. So,

10   I'll call Jessie, Jessie, Jessie.

11                What is the way in which it's

12   updated? In other words, as you know, I have a lot

13   of my own less complicated databases but I have a

14   lot of them. How do you update it? What is the

15   responsibility for the vendor and for the City?

16                MS. SIMPSON: What we are doing will

17   serve two issues in terms of updating, and let me

18   make sure I address what your concern is. One issue

19   is as the transactions themselves change, and there

20   we draw, Jessie would probably know more accurately,

21   but we draw a majority of the data from the City's

22   Financial Management System, and for those agencies

23   that are not on the Financial Management System,

24   we're establishing with DoITT's help separate

25   pipelines to get those updates on at least a monthly
```

32

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   basis, as Local Law 34 requires.

3            Now, since we haven't yet hit the

4   January 3rd date, that monthly update process hasn't

5   occurred yet, because we're basically working now on

6   those contracts that were awarded say for the past,

7   you know, whatever it is, decade or more and that

8   happen to be open and that will be open still on

9   January 3rd. So, we have a known universe that we're

10  working with now and our goal is to merge the data

11  from all of the different sources where it lives to

12  put it into a single database, the doing business

13  database.

14           When a principal or an owner or an

15  officer or a manager changes in an individual

16  vendor, we're also establishing a process for those

17  kinds of updates.

18           Much like happens with Vendex, the

19  critical time frame when you ask that question is

20  when the actual item is coming through the process.

21  So, for Phase 1, when we're dealing with only

22  awards, we will update that information prior to the

23  completion of the award process, for most agencies

24  that means the contract is being registered by the

25  City's Comptroller, so right before registration,

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   that would be updated. The proposal, it would be

3   done at the time of proposal, but that doesn't kick

4   in until Phase 2 in July.

5           COUNCIL MEMBER BREWER: Okay. There is

6   a question here you may have answered about

7   affordable housing exemptions, did you already

8   discuss that?

9           MS. SIMPSON: I did not. That is one

10  of the topics that Anthony Crowell has been more

11  involved in than I. But go ahead and ask the

12  question and I will either know the answer or I will

13  get you the answer.

14          COUNCIL MEMBER BREWER: Well, the

15  answer (sic) is has the exemption that is contained

16  in the bill different from the law passed in June?

17  And then what types of actions are covered?

18          MS. SIMPSON: Primarily, as I

19  understand the distinction, the distinction is that

20  for those types of affordable housing transactions

21  where discretion, substantial discretion is at

22  stake, those transactions would be covered. Whereas,

23  the transactions that are basically

24  non-discretionary or predominantly non-discretionary

25  would be taken out of -- much as competitive-sealed

34

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    bids are already taken out of the law.

3                In terms of what the distinction is,

4    Jess, do you want to comment on that?

5                MR. SHAEFFER: The original bill

6    listed --

7                COUNCIL MEMBER BREWER: You have to

8    say who you are, Jessie.

9                MR. SHAEFFER: I'm Jessie Shaeffer.

10   I'm the Project Director for the Doing Business

11   Accountability Project.

12               The original bill listed very

13   specific exemptions. It detailed quite a large

14   number of them. The amendment authorizes HPD to

15   establish, to promulgate rules, plays out that the

16   intent of those rules is to make sure, as Marla just

17   said, that only discretionary, significant

18   discretionary items in the area of affordable

19   housing are included and the others are excluded.

20               COUNCIL MEMBER BREWER: I kind of

21   understand. I just hope that people in the field

22   understand. So, I guess that's part of education.

23               MS. SIMPSON: And also part of the

24   CAPA process. We'd be I think very interested in

25   working with not only the City Council but housing

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    organizations and advocates during the CAPA process,

3    because there will be rules generated by HPD and we

4    need to get the word out on how those, and let them

5    comment at that time.

6                    COUNCIL MEMBER BREWER: Okay, thank

7    you, Mr. Chair.

8                    CHAIRPERSON FELDER: How many vendors

9    during the past fiscal year would you say were

10   non-compliant with the Vendex requirements that fit

11   into the exception you mentioned?

12                   MS. SIMPSON: Under a dozen. Perhaps

13   about five.

14                   CHAIRPERSON FELDER: And the whole

15   universe is?

16                   MS. SIMPSON: Oh, in terms of Vendex

17   waivers?

18                   Roughly, yes, there are some standard

19   waivers that have been issued for many years for,

20   for example, not-for-profits that are controlled by

21   the City. Technically an organization like the

22   Brooklyn Navy Yard or EDC are technically shown in

23   the City system as vendors, and so, absent a waiver,

24   they would all be required and their boards would be

25   required to do Vendex.

36

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2           Since we have all the information

3   that Vendex would give us on all of those board

4   members who are City officials anyway, there's been

5   some standing waivers for City not-for-profits for

6   many years. When you take those out of the mix, my

7   guess is we do, again, somewhere between three and

8   ten per year, tops.

9           Oh, out of how many vendors? Again, I

10  don't recall the exact number of open contract

11  vendors at any one time. It's somewhere in the

12  neighborhood of eight- or nine-thousand, I think.

13          And the numbers that I know from the

14  Vendex system, again, just to go back to my

15  testimony, we've never before had, prior to Local

16  Law 34, we have never had cumulative numbers that

17  included such entities as the Housing Authority,

18  HHC, SCA, the Department of Ed. Our numbers in the

19  past have been just the agencies that are subject to

20  the PPB rules, and that's 45 Mayoral agencies.

21          We're now looking at data from 186.

22  So, again, the number of vendors that are out there

23  are probably higher than I'm used to reporting when

24  I report on just the PPB agencies.

25          CHAIRPERSON FELDER: In terms of the

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  practical effect, would that mean they have a waiver

3  but they would still be obligated under the law in

4  terms of the contribution restrictions, but you just

5  couldn't include them into the database, or they

6  would just be exempt?

7            MS. SIMPSON: Again, going back to my

8  hypothetical of the company that doesn't want to

9  disclose owners, and I think of all of the

10  circumstances that we face, the one that's the most

11  likely to happen will be a privately held company

12  that objects to making a disclosure of its

13  ownership.

14            What will happen there is you will

15  have the name of the entity, you will probably, and

16  you will certainly have senior managers, because in

17  order to do a contract with us, we have to know who

18  their senior manager is, and you will probably have

19  the officers, because typically we will organize a

20  US or a New York-based subsidiary and we will have

21  the officers' names. So, you will know most of the

22  people who could conceivably make contributions that

23  would influence the process and they will be on the

24  database, and the name of the company will be on the

25  database, and then if we give them a waiver for the

38

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS
 2   disclosure of owners, there will be a posted entry
 3   on our website that says, you know, in effect,
 4   attention world, here is a company that did not
 5   disclose its owners.
 6                 So, you would have the tools if you
 7   were a member of the public, investigator of some
 8   sort, a reporter, or you could begin to pursue,
 9   okay, are we suddenly getting a donation that might
10   be affiliated with that company from the owners who
11   we don't know who their names are. I mean, there
12   would be some basis to guess at least, but they
13   would be restricted as the people that they
14   disclose, and that would always include the
15   managers, because it's not possible to get a
16   contract with the City without knowing the managers.
17                 CHAIRPERSON FELDER: But even those
18   that were not disclosed would be obligated under the
19   law. The same restrictions would exist, we just
20   don't have that information.
21                 MS. SIMPSON: That's right. So, again
22   --
23                 CHAIRPERSON FELDER: I'm being a
24   little picky, because there is a distinction between
25   us not being able to force them to give us the
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  information --

3            MS. SIMPSON: Right.

4            CHAIRPERSON FELDER: -- And if somehow

5  we're able to get the information, whether they

6  know, even if we don't know who they are, whether

7  they know that they are not permitted?

8            MS. SIMPSON: I don't know, and I

9  guess I will defer again to the Campaign Finance

10  Board. I know we're adding some reference to the

11  contributor card?

12            CHAIRPERSON FELDER: If you could

13  approach the bench, and speak into the mic. No, you

14  don't have to bend down, sit down.

15            MS. LOPREST: No, it's okay.

16            CHAIRPERSON FELDER: No, no, no, no.

17  Not in my house. Sit down.

18            MS. LOPREST: Actually, this is an

19  interesting question and I think we would have to

20  look into it, whether or not, I will have to look at

21  how the law is drafted, about the contribution

22  limits, whether or not it applies only to people who

23  are in the doing business database, so once people

24  are waived from being in the database, then they are

25  waived from all the requirements, or whether you're

40

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   bound by all the requirements, you're just waived

 3   from being in the database, and I don't know, I

 4   would have to review the language of the law to

 5   understand whether which scenario would apply.

 6              CHAIRPERSON FELDER: So, now that

 7   you're here I would ask you, if you do your research

 8   and in fact find out that it's only those that are

 9   on the database, how would you feel to the proposal?

10              MS. LOPREST: Well, I mean, as I said,

11   I mean as Ms. Simpson described, the waiver process

12   seems very narrowly drawn, you know, appears will be

13   very rarely -- whether it's rarely applied. You

14   know, there is significant public disclosure of the

15   people who get the waiver both on the MOCs website

16   and on the CFB's website, and, you know, as I spoke

17   about with Councilman Addabbo, you know, this law,

18   the doing business law, has its own special review

19   process for after the election, and this is one of

20   the issues. If the waiver number is much higher than

21   MOCs traditional experience with Vendex waivers,

22   then that would be something that would be commented

23   on, I think we would have to wait and see.

24              The way the law, the Intro. 651-A

25   reads, it's that these people are applying for a
```

41

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   waiver from inclusion in the doing business

3   database. Again, that doesn't fully answer the

4   question about whether being waived from inclusion

5   in the doing business database waives you from the

6   contribution limits, and we'll look into that and

7   get back to you.

8            CHAIRPERSON FELDER: Because I would

9   just say, if it doesn't waive that party, then it's

10  less of an issue. But if it does waive that party, I

11  know that's not the intent but it almost seems as

12  though somebody -- the City is stuck in needing

13  services that they can't get elsewhere and as a

14  result of that then everything is okay. That doesn't

15  make much sense. If, in fact, it's the other way

16  around, then we understand that the City needed the

17  services, you know, they can't get the information,

18  but people know that whether we have the information

19  now, maybe we could get the information later, and

20  if you're in violation of the law, you know, in some

21  way, ultimately you know things may not be good.

22          MS. LOPREST: Well, as you know, I

23  mean the Campaign Finance Board only has

24  jurisdiction over the candidates, and the only

25  sanction that we could possibly impose is a sanction

42

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    on someone, you know, a contribution from someone

3    who otherwise is prohibited. But I mean, we will

4    look into the particular question about whether or

5    not, you know, if you're waived from it being in the

6    database, whether or not that means you're waived

7    from the contribution prohibitions in the law.

8            CHAIRPERSON FELDER: I think I would

9    appreciate it very much, because I think it's very,

10   very important. We certainly don't want to have

11   situations where people are faced, even if it's not

12   the candidates, faced with a problem that they never

13   anticipated. You know, one way or the other it

14   should just be clear.

15           MS. SIMPSON: We will look at this

16   more closely, but in Section 2 of the bill it does

17   appear that the language on barring the contribution

18   applies to anyone who is doing business, who is

19   defined as doing business. It doesn't appear to be

20   linked to the actual inclusion in the database. So,

21   if that individual said on a card that they were

22   doing business, then that contribution would not be

23   matchable. And if they were asked the question on

24   the card and didn't tell the truth, then at least in

25   theory that could come out in a later investigation

43

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   or audit.

3                CHAIRPERSON FELDER: That would seem

4   to be very consistent and make a lot more sense and

5   solve a lot of problems.

6                Now that you're there, if you could

7   respond to the question that I had asked you

8   earlier, now that you've heard the testimony?

9                MS. LOPREST: Well, my answer is very

10  similar to what was just said, is that I think that,

11  you know, based on the testimony that, you know,

12  this waiver provision is very narrowly drawn, it's

13  going to be rarely applied, that there is

14  significant public disclosure of those who have the

15  waiver both on the CFB and MOCs' websites and that

16  there is a review process for the entire law

17  contemplated in Local Law 34. I think that there is

18  -- you know, really this waiver process is not

19  really a problem.

20               CHAIRPERSON FELDER: Thank you very

21  much, and thank you for your testimony.

22               Now, Ms. Simpson, you said that Mr.

23  Crowell couldn't make it but he has some written

24  testimony?

25               MS. SIMPSON: No, he was going to be

44

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  available for questions and answers. The testimony

3  is solely mine, and I do apologize again that he has

4  been unavoidably detained.

5           CHAIRPERSON FELDER: We're not going

6  to close the hearing until he comes, because I know

7  that he'll be disappointed, all right?

8           MS. SIMPSON: I will let him know, and

9  I will let the Sergeant-At-Arms know if it's going

10  to be a delay that's inordinate.

11           CHAIRPERSON FELDER: No, the

12  Sergeant-At-Arms for us.

13           MS. SIMPSON: Okay.

14           CHAIRPERSON FELDER: You work with

15  him.

16           MS. SIMPSON: Okay.

17           CHAIRPERSON FELDER: Tell him that

18  we're going to wait here til --

19           MS. SIMPSON: You're going to wait

20  here, okay.

21           CHAIRPERSON FELDER: Til Passover, if

22  necessary.

23           Thank you for your testimony.

24           MS. SIMPSON: Thank you.

25           CHAIRPERSON FELDER: We've been joined

45

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   by Council Member Peter Vallone, Jr.

 3              I'd like to call Rachael Fauss from

 4   Citizens Union and Dan Jacoby from Democracy for New

 5   York City to testify.

 6              So the way we're going to do this, I

 7   see that Ms. Fauss is testifying about two items, so

 8   we're going to first do all the testimony on the

 9   Campaign Finance.

10              MS. FAUSS: Sure.

11              CHAIRPERSON FELDER: All right? And

12   then you'll have an opportunity to testify on the

13   others. And I want to thank the Campaign Finance

14   Board for coming. I appreciate it very much. And for

15   making sure that somebody on your staff remains.

16              You can begin.

17              MS. FAUSS: Thank you.

18              Good morning, Chair Felder, and

19   members of the Governmental Operations Committee. My

20   name is Rachael Fauss and I am the Policy and

21   Research Associate of Citizens' Union of the City of

22   New York, an independent non-partisan civic

23   organization of New Yorkers who promote good

24   government and advance political reform in our City

25   and State. In appearing before you today, Citizens'
```

46

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Union expresses support for the Intro that makes

3   necessary technical changes to the reform law passed

4   earlier this year to strengthen the Campaign Finance

5   Program, largely by increasing the importance of

6   smaller donors and limiting the influence in

7   elections of those who do business with the City.

8                   We find no problem with the

9   clarification and tightening of the law that these

10  changes represent. In restricting the practice of

11  Pay To Play, Citizens' Union wants to ensure that it

12  is sound and enforceable and doesn't place undue and

13  unnecessary burdens on the City's oversight role and

14  unintentionally restrict from those who do business

15  with the City as a matter of obligation through

16  various programs, specifically the development of

17  affordable housing.

18                  We urge the Council to pass this

19  intro.

20                  Okay, I'm going to move on to our

21  testimony on the other matter at this point.

22                  CHAIRPERSON FELDER: We will hear from

23  Mr. Jacoby --

24                  MS. FAUSS: Okay. Sorry, I

25  misunderstood. Okay.

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2          CHAIRPERSON FELDER: Mr. Jacoby.

3          MR. JACOBY: Thank you. My name is Dan

4    Jacoby. I'm with Democracy for New York City. Intro.

5    586, which is now Local Law 34, was very hastily

6    written, swiftly passed, people didn't get a real

7    chance to figure out what it all said, and as a

8    result we've got 651, most of which just cleans up

9    the language and technical problems, and you've

10   talked about it. And if that's all 651 were, I would

11   urge swift passage, no problem. But there are

12   substantial changes in the law made by 651 and I

13   think we can tell from the testimony from the CFB

14   and from the Chief Procurement Officer that we're

15   not all certain exactly what those changes are and

16   how they would affect the law. So, I think that we

17   might want to slow down a little bit on that part of

18   it, maybe split it out, whatever you find best,

19   until we really understand what it is we're passing.

20          In addition, I want to stress that

21   these attempts to lower the influence of the big

22   money special interest, what they've been calling

23   "Pay To Play," it's not really going to work. First

24   of all, more money, far more money comes through

25   bundling then directly from people doing business

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  with the City. And I'm referring to an actual CFB

3  report issued a year and a half ago on the doing

4  business contributions.

5          The other thing is that there is

6  always loopholes, and one example is a 100-year-old

7  loophole and that's that employees, the senior

8  management and other people will funnel their

9  contributions to lower level employees. It's been

10  going on for 100 years, since the passage of the

11  Tilman Act. There is nothing new there. It's still

12  going on. It's very difficult to ferret out. It's

13  almost impossible to catch, and it gets around the

14  very thing you're trying to stop here with both

15  Local Law 34 and Intro. 651. My point is it's not

16  going to work. And it's well intentioned, it's well

17  thought out, but it's not going to work.

18          The real thing we need to do is pass

19  something that's simpler, it's effective, that is

20  working, and that's the Clean Money Clean Election

21  system that's working in Maine, it's working in

22  Arizona, it's significantly reducing the power of

23  the rich lobbyists and special interests, it's a

24  much simpler system to follow. There will be a bill

25  introduced as soon as we can get it finished and I

49

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    urge its swift passage.

3                Thank you.

4                CHAIRPERSON FELDER: Mr. Jacoby,

5    what's your solution to the bundling law?

6                MR. JACOBY: Well, I don't think there

7    is one. And I think that's why both 586 and 651

8    simply don't try, because how can you? You've got

9    reporting requirements and you're trying to tighten

10   them and everybody is trying to tighten the

11   reporting requirements, but the fact is people get

12   around it. You've got the House Party exemption, for

13   example. It's easy to get around any kind of

14   requirement.

15               CHAIRPERSON FELDER: Mr. Jacoby, do

16   you know of any localities that have implemented

17   your suggestions?

18               MR. JACOBY: Yes, the states of Maine

19   and Arizona.

20               CHAIRPERSON FELDER: I'm talking about

21   localities.

22               MR. JACOBY: Portland Oregon,

23   Albuquerque New Mexico.

24               CHAIRPERSON FELDER: Okay. Any others?

25               MR. JACOBY: There are other places

50

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  that have implemented some portion of it. They've

3  been going back and forth for some elections and

4  others, but those are the main places.

5              CHAIRPERSON FELDER: Well, it seems

6  clear that with your diligence that Governor Spitzer

7  is going to pass this legislation that you're

8  suggesting.

9              MR. JACOBY: We hope so.

10             CHAIRPERSON FELDER: So, we don't want

11 to waste City money by doing it twice.

12             MR. JACOBY: Well, the Governor's plan

13 will only work for State elections. It won't affect

14 City elections.

15             CHAIRPERSON FELDER: Oh, I see. So, in

16 other words, you would like New York City to be

17 like, what did you say those two towns?

18             MR. JACOBY: Albuquerque and Portland,

19 yes. Well, actually we'd be bigger and therefore

20 more well known.

21             CHAIRPERSON FELDER: Okay.

22             How much would it cost the City to do

23 this?

24             MR. JACOBY: I don't think anybody has

25 done an exact figure. My best estimate so far is it

51

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   would probably come out to about, maybe as much as

3   $10 million a year --

4              CHAIRPERSON FELDER: No.

5              MR. JACOBY: Over what we're spending

6   already.

7              CHAIRPERSON FELDER: So how much?

8              MR. JACOBY: Over about 40 million per

9   four-year cycle over what we're spending already on

10  the matching fund system.

11             I should point out, though, that when

12  you look at what's going on, for example, in

13  Arizona, where they're realizing now a great deal

14  more revenue from their annual land sales because

15  the lobbyists who used to drive the prices down no

16  longer have the power. So, Arizona is realizing a

17  great deal of extra revenue. There is other

18  expenditures they don't have to make because they

19  don't have to deal with the special interests who

20  contribute to lots of campaigns.

21             CHAIRPERSON FELDER: All right. Well,

22  I appreciate your testimony, and I think that some

23  believe term limits was a good thing or a bad thing.

24  Term limits will ensure that your suggestion, if and

25  when it gets done, will have to be handled by the

52

```
 1  COMMITTEE ON GOVERNMENTAL OPERATIONS

 2  next City Council because it involves a lot of work.

 3  But we appreciate your comments.

 4              MR. JACOBY: Thank you, Mr. Chairman.

 5              CHAIRPERSON FELDER: And if the

 6  Citizens' Union wishes to testify on the other item,

 7  we would be very happy.

 8              MS. FAUSS: Thank you.

 9              The other item is on requiring all

10  City agencies to electronically transmit copies of

11  proposals in a timely manner, as you know. And in

12  appearing before you today we also support Intro.

13  643. We believe that it will improve communication

14  about an awareness of rules proposed --

15              CHAIRPERSON FELDER: Could I interrupt

16  you, please, for a moment?

17              MS. FAUSS: Sure.

18              CHAIRPERSON FELDER: I've been told

19  that I messed up again.

20              So, I just for the record want to say

21  that the testimony that we're about to hear relates

22  to Intro. 643, so that transcripts will show that.

23              MS. FAUSS: Thank you.

24              CHAIRPERSON FELDER: I apologize.

25              MS. FAUSS: No problem.
```



**OFFICE OF THE MAYOR**
**OFFICE OF CONTRACT SERVICES**
Marla G. Simpson, *Director*

**DOING BUSINESS ACCOUNTABILITY PROJECT**
253 Broadway – 9th Floor
New York, NY 10007
(212) 788-8104        Fax (212) 312-0993

**Testimony of Marla G. Simpson, City Chief Procurement Officer and
Director, Mayor's Office of Contract Services, Before the City Council
Committee on Government Operations: Int. 651 of 2007**

**December 6, 2007**

Good morning. I am Marla Simpson and I am Director of the Mayor's Office of Contract Services ("MOCS") and the City's Chief Procurement Officer. I am joined here by Anthony Crowell, Counselor to the Mayor. We thank you for the opportunity to appear today to discuss the Intro 651, a set of necessary amendments to the City's landmark "Pay to Play" legislation, Local Law 34 of 2007.

Local Law 34 (LL 34), passed by the Council and signed by the Mayor in July of this year, mandates the creation of a *Doing Business Database*, containing the names of entities and people considered to be doing business with the City, for the purpose of enforcing new limitations on campaign contributions. The Mayor's Office of Contract Services (MOCS) was given the primary responsibility to gather and process the information required to be contained in the Database.

LL 34 is to be implemented in three phases, corresponding to different types of transactions that are considered business dealings with the City. At the start of each phase, the Department of Information Technology and Telecommunications (DOITT) and the Campaign Finance Board (CFB) must certify that the database for that phase is "reasonably complete" so that that the law can be enforced.

I'm pleased to report that we are well on our way to completing such a Database for phase one of the Law, commencing on January 3, 2008, which covers current City contracts, franchises and concessions. In order to create the initial Database, MOCS formed and staffed a new unit, the Doing Business Accountability Project. In the past five months the DBA Project:

- Processed more than 300,000 procurements from the 186 City agencies covered by LL 34;

- Identified 3,500 vendors that will be doing business with the City as of January 3rd; and

- Sent mailings to all those vendors to confirm or obtain the names of their principal officers, owners and senior managers.

As of yesterday, we have received replies from 1,759, or 50% of the 3,500 letters mailed. Approximately three-quarters of these vendors were already registered in the City's VENDEX database. The letters we sent those vendors simply asked for confirmation of the officer and owner names in VENDEX, and informed them that in the absence of a reply we would use the VENDEX data. The letters also asked for new information, i.e., the names of senior managers, which we do not have in our VENDEX system. For the 25% of vendors covered by LL 34 that are not already registered in VENDEX, we sent letters requesting that they supply all of the necessary principal information. Throughout December, we will continue to mail and place follow-up calls to all vendors that have not yet responded.

As a result of these efforts, we now have information on principal officers and owners, either from VENDEX or from the mailing, for more than 87% of all vendors. We expect this number to exceed 92% by the end of December. Considering that at this point we have no real enforcement mechanism, because the law has not yet gone into effect, we are very pleased with this result, and believe we will attain the "reasonably complete" standard for most categories of vendors and principals. Regarding the narrow category of "senior managers," who have historically not been listed in VENDEX, we are not likely to meet our target of January 3rd for substantial completeness. Although, let me be clear that we are well underway, thus far our mailings and phone calls have yielded approximately 40% of the needed data, and we are working to secure the remaining 60% of the information for this category as quickly as possible.

As you know, LL 34 was drafted with a phased approach. The inclusion of the names of entities and principals who seek business from the City – i.e., those who propose but may not be awarded contracts – does not occur until July 3rd. The main reason for that delay was the recognition, at the time

2

LL 34 was drafted, that the City has no pre-existing sources of data, such as VENDEX, on the principals of such unsuccessful proposers. Instead, we must collect those names from scratch. To do that, we need to incorporate a request for such information into our contract solicitation process – so that proposers will have to supply it up front, in order to be considered. The DBA Project, working closely with the Law Department, has already begun modifying City agencies' solicitations for that purpose, so that when July 3rd rolls around, we will be able to supply a "reasonably complete" database on this point, as well.

For the same reasons that LL 34 has a delayed effectiveness on proposer information, Int. 651 is now before you, seeking to amend the requirement for senior manager data. Just as the City has no pre-existing source of data for the names of the principals of unsuccessful proposers, so too, we have no source for the names of senior managers. Although we did not initially recognize how much the process of setting up the database would be hampered by the fact that senior managers are not listed in VENDEX, we now believe that it is important to make this amendment to the LL 34 schedule, so that manager data would be made available in phase two, as of July 3rd, rather than January 3rd. We are nonetheless confident that, even without the senior manager data, the January 3rd version of the database will still contain information plainly sufficient to meet LL 34's ambitious goal of curbing "Pay to Play" practices by those who do business with the City, if for no other reason than that it will contain the names of the entities, officers and owners to whom all of the senior managers report.

During phase one, MOCS will be able to compel all of the entities that are newly awarded contracts, franchises and concessions to provide all of the required information, including the names of their senior managers. Thus, for awards that are made from January 3rd on we anticipate a much higher compliance rate, as no new awards will be processed without obtaining complete data for LL 34. Meanwhile, we will continue to pursue the senior manager information from vendors holding contracts awarded prior to January 3rd, and we are confident that with those added months, we can move the completion rate for those pre-existing vendors to an acceptable level.

3

Another amendment included in Int. 651 that I'd like to mention this morning, is one that would allow the City Chief Procurement Officer to promulgate rules that would permit, in certain narrow circumstances, compliance with LL 34 to be waived. Before any such waiver, MOCS would have to show that we had made substantial efforts to obtain full compliance with LL 34's required disclosures. But if such efforts prove fruitless, the City must retain a mechanism to allow agencies to make essential purchases. As the amendment provides, a waiver could only be granted upon finding both that the agency had a compelling need for the purchase, and that no reasonable alternative existed. Waiver applications would be reported to Campaign Finance Board (CFB) at least ten days prior to any action to grant or deny them, and any entity receiving a waiver would be listed on both the MOCS and CFB websites so that the public would be aware of the possibility that contributions could continue to be made by such vendors.

The VENDEX statute contains a similar authorization to the Procurement Policy Board (PPB) for a rules-based waiver process. The PPB exercised that authority more than a decade ago, upon notice to the Council as required by the VENDEX statute. From time-to-time, I now grant VENDEX waivers under those rules. These VENDEX waiver provisions are rarely invoked, and the parallel waiver process anticipated for LL 34 data is even more narrowly drawn and more transparent.

An example of a circumstance that might support a waiver could be where an agency needs to make a purchase critical to public safety or health from a sole source vendor, particularly when that entity is privately held and not required to disclose its ownership in any other context. While such an entity may readily supply information on its senior managers or officers, it might resist supplying ownership data, when such information would then become accessible to the public. On occasion, this arises when there is a foreign entity that holds all or partial ownership of a U.S.-based subsidiary, but it should be noted that such citizens from such foreign entities are otherwise barred from making campaign contributions. Another example, specifically listed in Int. 651, would be for entities whose inclusion in the database results from the City's exercise of its eminent domain powers; inasmuch as their status as an entity doing business with the City is not voluntary, they may well not cooperate with our efforts to collect data. That

4

said, I must emphasize that our vendor contacts to date have not yielded any instances of outright refusal to provide the necessary data. Based on our experience with VENDEX, which requests much more intrusive information on vendors and their principals, while we view the waiver provisions of Int. 651 as essential, we do not expect to invoke them on more than a handful of occasions.

As I noted earlier, we are confident that, with these amendments, the *Doing Business Database* will be certified by January 3rd, and that New York City's model campaign finance law will have been made even stronger.

Thank you. Mr. Crowell and I welcome any questions that you may have at this time.



# New York City Campaign Finance Board

40 Rector Street, 7th Floor, New York, NY 10006
tel. 212.306.7100    fax 212.306.7143
www.nyccfb.info    info@nyccfb.info

**Testimony of Amy Loprest, Executive Director**
**New York City Campaign Finance Board**
**on Intro. No. 651**

**City Council Committee on Governmental Operations**
**December 6, 2007**

Good morning, Chairman Felder and committee members. I am Amy Loprest, Executive Director of the New York City Campaign Finance Board. With me is our newly appointed Deputy Executive Director, Shauna Denkensohn. Ms. Denkensohn has taken over for Carole Campolo, who recently retired. Also with me is General Counsel Sue Ellen Dodell. I am here today to testify on Intro No. 651.

We would like to thank the Council and Council staff for soliciting our participation and feedback throughout the entire legislative process. We believe Intro. No. 651 will largely resolve the technical problems contained in Local Law 34.

## Exempt Expenditures

We have, in the past, raised concerns about is Local Law 34's treatment of so-called "exempt expenditures," which Intro. No. 651 will not change.

When candidates join the Campaign Finance Program, they agree to limit their overall spending as a condition of seeking public funds. Limits on the amount each campaign may spend reduce the need for candidates to engage in a never-ending chase for the large contributions that fuel the perception of corruption. The spending limit is one of the chief benefits the public receives for the investment of taxpayer dollars in the political process.

Historically, certain types of spending have not been counted against the spending limits. Over successive elections, however, a growing number of campaigns have claimed growing amounts and proportions of exempt spending. When a campaign's exempt claims have exceeded the law's "safe harbor" of 7.5 percent of total spending, the CFB has always scrutinized its spending closely.

In the interest of providing clarity and simplicity to the law, in its latest post-election report the Board recommended eliminating most of these exemptions—specifically the blanket exemptions for petitioning and compliance. To compensate, and ensure campaigns could continue to make reasonable and necessary expenditures on compliance and other hard-to-predict expenses within the spending limits, we recommended increasing the limit by a modest amount.

- 1 -

The Council agreed with our recommendation in substance, and responded by including provisions in Local Law 34 that we believe narrow these exemptions substantially. At the same time, the law increased the spending limits by roughly 7.5 percent, which is a greater proportion than the typical campaign has claimed as exempt.

The Board believes the language of Local Law 34 regarding the new exemptions does not provide the level of clarity we sought—particularly with regard to expenses for the post-election audit. However, the committee report for Local Law 34 reflects our shared understanding on this point:

> It is not intended that exempting "expenses related to the post-election audit," however, would permit campaigns to continue to include all compliance related expenditures as exempt. Instead campaigns would be permitted to exempt solely those expenditures related directly to a campaign's preparation for a post-election Board audit. (Committee on Governmental Operations Report on Intro. No. 586-2007, p. 14)

To clarify, post-election spending has never counted towards the limit. The post-election audit begins after the election, and expenditures made to prepare the response have therefore been and will continue to be exempt from the spending limits.

As in the past, the Board will construe the exemptions contained in Local Law 34 narrowly to ensure that no participating campaign is allowed to gain an unfair advantage by conducting activities beyond what is allowed under the spending limits. The Board will promulgate rules reflecting our common understanding of the law's intent as well as the need to provide campaigns with clear guidance.

## Doing Business

We are pleased to report that much progress has been made towards implementation of those sections of Local Law 34 dealing with persons and entities doing business with the City.

CFB staff is working closely with the Mayor's Office of Contract Services and DoITT to meet the law's deadline for completion of the first phase of the unified doing business database. A meeting of the Board has been scheduled for January 3, 2008, the certification date contemplated in the law, and the Board anticipates issuing its certification report in conjunction with that meeting. Groundwork is also being laid for the subsequent phases of the doing business database.

## C-SMART

We are also happy to announce that the CFB staff has completed a redesign of our Candidate Software for Managing and Reporting Transactions (C-SMART) for the 2009 election. Several enhancements to the software were added in response to comments made by candidates after the 2005 election.

The new version of the software allows candidates to synchronize their disclosure and write checks with widely-used bookkeeping applications QuickBooks and Microsoft Money, and gives them the ability to import records from other sources, such as contributions received through a campaign web site. The new software also contains a fundraising module that will help candidates better manage their tracking of contributor information, and can easily produce and print letters to campaign contributors. It has a new, modern look and feel that should be more user-friendly and easier on the eye.

We have initiated a pilot program with seven currently active 2009 campaigns to test the new software for the January 15, 2008 filing. The candidates involved in this testing phase are a true cross-section, including four current members of the Council, as well as large and small campaigns from every borough and every covered office. We look forward to hearing feedback from all those who have agreed to take part so that we may perform any necessary fixes to C-SMART and introduce it to all candidates over the next few months.

Despite the complexity of the new law, we are working very hard to make compliance as simple as possible for all candidates. As you know, the CFB is preparing to expand our staff to meet the new and significant mandates contained in Local Law 34. We are pleased to have the continued support of the Council as we structure our agency to implement these important reforms.

Thank you for the opportunity to testify today, and we look forward to answering any questions you may have.

Dan Jacoby
47-48 43 St., Woodside, NY 11377
917-667-2756
www.danjacoby.com

Oral testimony on Intro 651-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
December 6, 2007

Intro 651 is necessary because Intro 586 was so hastily, and therefore somewhat sloppily, written and too swiftly passed, before anyone had a real chance to understand just what it said and what it meant. Most of 651 is about correcting the resulting flaws. It, too, appears headed for swift passage, and with all due respect to those who put this bill together such swift passage would be a mistake.

Yes, this bill does an excellent job of cleaning up language. If that were all that 651 did, I would heartily recommend swift passage. But this bill has new aspects to it that need careful inspection and serious debate. Specifically, sections 1 and 2 of this bill make significant changes in who does and does not meet the requirements for inclusion in the new "doing business with" databases.

Once again, I stress that the continued attempt to lower the influence of big-money special interests (or at least the "appearance" of influence) is doomed. First, far more money comes in through bundlers who do business with the city than directly from those doing business themselves[1], and neither 586 nor 651 restrict bundling. Second, it doesn't take a topflight lawyer to find loopholes in this system; anyone who bothers to look up the history of campaign finance in this country can find and exploit them.

For example, people in the database can funnel their contributions through lower-level employees in their companies. It happens, and has happened for 100 years, since the passage of the Tillman Act in 1907.

I close by reiterating what I said in June: The real solution lies not in tinkering with the current failed system, but in a "Clean Money, Clean Elections" method of full public funding. It is working now in Maine and Arizona, and is starting up in Connecticut. It is the system Governor Spitzer said should be the "ultimate goal" of campaign finance reform[2]. A Clean Money bill will be introduced into the City Council as soon as possible; I urge you to pass it.

---

[1] Interim Report of the NYC Campaign Finance Board on "Doing Business" Contributions, June 19, 2006, available online at http://www.nyccfb.info/PDF/publications/doing_business_white_paper.pdf.

[2] Governor Spitzer's 2007 State of the State address, "One New York," delivered January 3, 2007, available online at http://www.ny.gov/keydocs/NYS-SoS-2007.pdf.



**TESTIMONY OF
CITIZENS UNION OF THE CITY OF NEW YORK
ON CHANGES TO THE CITY'S CAMPAIGN FINANCE LAW**

### Before the New York City Council
### Committee on Governmental Operations
### DECEMBER 6, 2007

Good Morning, Chair Felder, members of the Government Operations Committee, and other members of the City Council. My name is Rachael Fauss, and I am the policy and research associate of Citizens Union of the City of New York, an independent, non-partisan, civic organization of New Yorkers who promote good government and advance political reform in our city and state. For more than a century, Citizens Union has served as a watchdog for the public interest and an advocate for the common good.

In appearing before you today, Citizens Union expresses support for the Intro that makes necessary technical changes to the reform law passed earlier this year that strengthened the campaign finance program, largely by increasing the importance of smaller donors and limiting the influence in elections of those who do business with the city.

We find no problem with the clarification and tightening of the law that these changes represent. In restricting the practice of pay to play, Citizens Union wants to ensure that it is sound and enforceable, and doesn't place undue and unnecessary burdens on the city's oversight role, and unintentionally restrict from those who do business with the city as a matter of obligation through various programs, specifically the development of affordable housing.

We urge the Council to pass this Intro.

Chair Felder and other members of the City Council, Citizens Union thanks you for holding this important hearing and for making it possible for us to express our views.

Citizens Union of the City of New York
299 Broadway, Suite 700 New York, NY 10007-1976
phone 212-227-0342 • fax 212-227-0345 • citizens@citizensunion.org • www.citizensunion.org
Richard J. Davis, Chair • Dick Dadey, Executive Director

James W. Caras, Esq.                        DeNora Getachew
Deputy General Counsel                      Counsel to Committee

Israel Rodriguez                           Andrew Grossman
Policy Analyst                             Finance Division

Scott Crowley
Finance Division



**THE COUNCIL**

**REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION**

ROBERT NEWMAN, LEGISLATIVE DIRECTOR

ALIX PUSTILNIK, DEPUTY DIRECTOR, GOVERNMENTAL AFFAIRS

**COMMITTEE ON GOVERNMENTAL OPERATIONS**

HON. SIMCHA FELDER – CHAIR

**PROPOSED**
**INT. NO.  651-A:**          By Council Member Felder (by request of the Mayor)

**TITLE:**                     A Local Law to amend the administrative code of the city of New
                              York, in relation to campaign finance.

December 18, 2007
Committee Room

I.    **INTRODUCTION**

On Tuesday, December 18, 2007, the Committee on Governmental Operations, chaired by Council Member Simcha Felder, will consider Proposed Int. No. 651-A ("proposed bill"), a proposed bill to amend the administrative code of the City of New York ("Code"), in relation to campaign finance.  The Committee conducted a hearing on a prior version of this bill on Thursday, December 6, 2007, during which the Committee received testimony from the Administration, the New York City Campaign Finance Board  ("Board"), good government and advocacy groups and members of the public.  Based on testimony received at that hearing and further review of the proposals, Proposed Int. No. 651-A was amended to further strengthen and clarify the proposals.

In June 2007, this Committee considered and passed Proposed Int. No. 586-A, which made various structural and procedural changes to the New York city charter and the administrative code of the city of New York to further strengthen New York City's campaign finance system.  Mayor Bloomberg signed Proposed Int. No. 586-A into law on July 3, 2007 as Local Law 34 of 2007 ("Law").

In order to address some of the inadvertent errors in the Law, the Committee is considering the proposed bill, which would amend the Campaign Finance Act ("Act") to ensure that: (i) the contribution limits applicable to those doing business with the city apply for an entire election cycle, meaning a primary and general election, and not for each election; (ii) the new matching level of 6:1 up to $175 will be retroactively applied to all matchable contributions raised for the current election; (iii) during special and run-off elections those that are doing business with the City may only give one-half of the applicable doing business contribution limit; (iv) the exemption from the doing business restrictions for affordable housing developers

would only apply to landlords accepting Section 8.  In addition, the bill would authorize the department of housing preservation and development ("HPD") to consider the significance of the affordable housing program and the degree of discretion by city officials in determining which actions, transactions and agreements shall and shall not constitute such business dealings; and to (v) clarify some of the Law's provisions.

In addition, the Administration has experienced some technical difficulties with the Law. Accordingly, the Administration is requesting amendments to the Law to:  (i) delay the application of the doing business contribution cap on those who act in a "senior managerial capacity" until July 2008 because they are experiencing difficulty in obtaining this information from current City contractors and franchise and concession holders; (ii) create a mechanism to waive compliance with the "business dealings with the City" requirements in cases where a vendor refuses to disclose Vendex information, but the City needs to contract for goods, services or construction in emergency situations, for security-related reasons or goods, services or construction essential to government operations; and (iii) exempt those whose property is being taken by the City via eminent domain from the doing business contribution limits.

## II.    <u>BACKGROUND</u>

The Campaign Finance Program was established in 1988 to increase participation in the electoral process regardless of access to wealth, and to reduce undue influence by small concentrations of large contributors and special interests.[1]  Since the Program's inception, it has proved to be a successful campaign finance program and a model for the nation.

Pursuant to Charter section 1052, the Campaign Finance Board is composed of five

---

[1] *See* Proceedings of the Council of the City of N.Y., Int. No. 906-A of 1987, enacted as Local Law 8 of 1988 (codified as N.Y.C. Charter, ch. 46 and N.Y.C. Admin. Code, title 3, ch. 7).

members,[2] who are responsible for administering the Program in accordance with the Act, which is contained in Chapter 7 of Title 3 of the Code. The Board's powers are enumerated in subdivisions (5) through (12) of section 1052 of the Charter and throughout the Act. The Board's powers include, among other things, the power "to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code."[3]

## III.    PROPOSED INT. NO. 651-A

Section one of the proposed bill would amend the definition of "business dealings with the city" contained in subdivision 18 of section 3-702 of the Act to clarify some of its provisions and exempt certain activity from the definition. Specifically, the bill would clarify that for purposes of the definition of "business dealings with the city," an "emergency contract or a contract procured through publicly-advertised competitive sealed bidding" would not be included in contracts covered by this definition.

In addition, the proposed bill would clarify that certain actions, transactions and agreements to provide affordable housing are not "business dealings with the city." Specifically, the proposed bill would clarify that the exemption from the doing business restrictions for affordable housing developers applies to landlords accepting Section 8. In addition, the proposed bill would authorize HPD to consider the significance of the affordable housing program and the degree of discretion by city officials in determining which actions, transactions and agreements shall and shall not constitute such business dealings. The purpose of this amendment is to ensure HPD's rules applicable to those who provide affordable housing clearly

---

[2] *See* New York City Charter §1052 (2005).
[3] *See* Administrative Code of the City of New York §3-710(1) (2005).

delineate who would be and would not be considered doing business with the City.

Section one of the proposed bill would also clarify that for purposes of determining the term of the business dealings with the city with respect to contracts, in the case of "purchase contracts for goods," the term shall be one year from the date of such purchase.

Post-enactment of the Law, the Administration raised concerns about the City's ability to procure essential goods, services or construction such as those necessary for security or other essential government operations in cases where a vendor refuses to comply with the requirements of Vendex necessary to include such person in the doing business database. To address this concern, the Administration recommended an amendment to the Law permitting the city chief procurement officer to promulgate rules to create a process by which a person "may apply to the city chief procurement officer for a waiver from inclusion in the doing business database." Such rules would require the city chief procurement officer to "transmit to the board a copy of any application for a waiver." Further, the proposed bill would provide that any such waiver could not be granted until the expiration of ten days from the date such application is received by the board. The proposed bill would also require that a "waiver may be granted only after substantial efforts have been made by the chief procurement officer to obtain the information required by this law" and upon a finding that it is in the best interests of the City, which shall be based on a determination that "(i) there is a compelling need to obtain such essential goods, services or construction from the person seeking the exemption and (ii) no other reasonable alternative exists in light of such considerations as cost, uniqueness and the critical nature of such goods, services or construction to the accomplishment of the purchasing agency's mission." The proposed bill would provide that such "a waiver may be granted when a person is doing business with the city by virtue of the city's exercise of its powers of eminent domain."

Finally, the proposed bill would require that the grant of a waiver be posted on the City's and the Board's website in publicly accessible locations.

Section one of the proposed bill would also amend subdivision 20 of section 3-702 of the Act to clarify that the phrase "senior managerial capacity" means a "high level supervisory capacity…in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals."

Section two of the proposed bill would amend subdivision 1-a of section 3-703 to clarify the permissible contribution limits that participating candidates may accept from those with business dealings with the City.  The Law provided that participating candidates would be permitted to accept contributions from those with business dealing with the city for "such election."  This drafting inaccuracy would have permitted a participating candidate for city council to accept two contributions totaling two hundred and fifty dollars each from a person with business dealings with the city, one for the primary election and another for the general election.  This was not the intent of the drafters in negotiating and drafting the Law.  This amendment would correct this error and ensure that similar to the limits applicable to non-doing business contributions, a candidate may only accept the applicable contribution limit from a person with business dealings with the city for "all covered elections held in the same calendar year."

In addition, section two of the proposed bill would specify that in cases of a run-off primary, additional day for voting pursuant to state election law, special election to fill a vacancy, run-off special election to fill a vacancy, delayed or otherwise postponed election, or election held pursuant to court order which is a covered election and in which the candidate

seeks nomination for election or election the candidate may only accept one-half of the applicable doing business contribution limit. This amendment ensures that the doing business contribution limits applies in the same manner as the non-doing business contribution limits in a run-off election, special election to fill a vacancy, etc.

Section two of the proposed bill would also amend subdivisions 1-a and 1-b of section 3-703 of the Act to clarify that for purposes of those subdivisions the phrase "senior managerial capacity" means a "<u>high level</u> supervisory capacity…in which substantial discretion and <u>oversight</u> is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals."

Sections three through ten of the proposed bill would amend various sections of the Law to address minor technical and grammatical errors to make the language clearer.

Section eleven of the proposed bill would amend paragraph (a) of subdivision 2 of section 3-705 of the Act to adjust the maximum matching funds claim per contributor that a participating candidate would receive for each matchable contribution in the case of a special elections to five hundred twenty-two dollars. The purpose of this amendment is to ensure that the Board's software is able to process these matching claims and that campaigns solicit contributions in whole dollar increments.

Section twelve of the proposed bill would amend subdivision seven of section 3-705 of the Act to make minor technical and grammatical changes to the provisions regarding any participating candidate's signed statement attesting to the need for additional public funds.

Sections thirteen and fourteen of the proposed bill would amend paragraph (a) of subdivision 1 of section 3-706 of the Act to round the expenditure limits applicable to each

primary election, special election to fill a vacancy, and general election to the nearest thousand, which is the way the cost of living adjustment is applied to the expenditure limits and the way the Board has historically treated increases in the expenditure limits.

Sections fifteen through twenty-one of the proposed bill would amend various sections of the Law to address minor technical and grammatical errors to make the language clearer.

Sections twenty-two and twenty-three of the proposed bill would amend subparagraph (iii) of paragraph a of subdivision 3 of section 3-706 and subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 to clarify that the Law's bonus match provisions are applicable to elections occurring after January 1, 2008 regardless of when the underlying contribution was raised. Section twenty-three of the proposed bill would correct a drafting error in the Law by amending subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 to ensure that in cases where a participating candidate's opponent spent, contracted or has obligated to spend, or has received in loans or contributions, or both, three times more than the applicable expenditure limit, the principal committee would receive public funds in an amount not to exceed one hundred twenty-five percent of the expenditure limitation for such office. The Law, in error, specified that a participating candidate would receive public funds in an amount not to exceed two-thirds of the expenditure limit, however the two-thirds limit is applicable in cases where a participating candidate's opponent has spent, contracted or has obligated to spend, or has received in loans or contributions, or both, an amount that exceeds half the applicable expenditure limit.

Section twenty-four of the proposed bill would amend paragraph (a) of subdivision 2 of section 3-703 of the Act to change the threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, to

mirror the new maximum matching fund claim of one hundred seventy-five dollars. Accordingly, in order for a participating candidate to qualify to receive public funds the participating candidate would be required to raise the specified number of contributions (applicable to the office that the participating candidate is seeking) from the specified number of contributors in denominations of one hundred seventy-five dollars, not two hundred fifty dollars. Thus, beginning on the effective date of this local law, matchable contributions comprised of sums of up to one hundred seventy five dollars or less will count towards the eligibility threshold in the law.

Section twenty-five of the proposed bill would amend the Law's effective date provisions in several respects.  First, this section of the proposed bill would repeal section thirty-eight of the Law, which mandated that the new 6:1 matching ratio not take effect until thirty days after the first component of the doing business database was certified.   Instead, section twenty-six of the proposed bill would amend section forty-one of the Law by renumbering it section forty and require that the sections of the Law relating to the new matching provisions take effect on January 1, 2008, "for all elections held on or after such effective date and shall be applicable to all public funds claims for elections held on or after such effective date, regardless of whether the claim for public fund was submitted prior to the effective date."

Second, at the request of the Administration, section twenty-five of the proposed bill would delay the implementation of the "senior managerial capacity" components of the doing business database with respect to a city contract or a city franchise or concession until the second phase of implementation of the doing business database – one year from the effective date of the Law.   Third, section twenty-five of the proposed bill would address an error in the Law with respect to the deadline for certification of the lobbyist component of the doing business database.

Although it was intended that the deadline for certification of the lobbyist component of the doing business database would be six months from the effective date of the Law, in error, this language was not included.  Accordingly, section twenty-five of this bill would specify that the deadline for certification of the lobbyist component of the doing business database would be six months from the enactment of the Law.

Fourth, section twenty-five of the proposed bill would make various other technical and grammatical amendments to the Law to clarify the language and numbering of the sections.

Finally, section twenty-seven of the proposed bill states that the bill would become effective immediately.

1

2    CITY COUNCIL

3
     CITY OF NEW YORK
4    -------------------------------x
5
     THE TRANSCRIPT OF THE MINUTES
6
                 of the
7
     COMMITTEE ON CIVIL RIGHTS
8    (Held Jointly With)
     COMMITTEE ON GOVERNMENTAL
9    OPERATIONS

10   -------------------------------x

11
                     December 18, 2007
12                   Start:  1:16 p.m.
                     Recess: 2:55 p.m.
13
                     City Hall
14                   Committee Room
                     New York, New York
15

16       B E F O R E:

17           LARRY SEABROOK
                 Chairperson, Civil Rights Committee
18
             SIMCHA FELDER
19               Chairperson, Governmental
                 Operations Committee
20

21

22

23

24       LEGAL-EASE COURT REPORTING SERVICES, INC.
             17 Battery Place -  Suite 1308
25           New York, New York 10004
                 (800) 756-3410

2

```
 1

 2   A P P E A R A N C E S

 3   COUNCIL MEMBERS:

 4
     Michael Nelson
 5   Hiram Monserrate
     Darlene Mealy
 6   Matthew Eugene
     Joseph Addabbo
 7   Erik Dilan
     Domenic Recchia
 8   Inez Dickens
     Peter Vallone, Jr.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1

2    A P P E A R A N C E S  (CONTINUED)

3
     Dr. Jeffrey F. Kraus
4    Chairman
     NYC Voter Assistance Commission
5
     Jane Kalmus
6    Vice Chair
     NYC Voter Assistance Commission
7
     Onida Coward Mayers
8    Executive Director/Coordinator
     NYC Voter Assistance Commission
9
     Gene Borsh
10   Director
     Civic and Voter Education Initiative
11   for Russian American New Yorkers

12   Barbara Zucker
     Vice President for Public Policy
13   Women's City Club of New York

14   Margaret Chen
     Research Associate, Democracy Program
15   Brennan Center for Justice at NYU School of Law

16

17

18

19

20

21

22

23

24

25
```

4

```
 1   CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

 2               CHAIRPERSON FELDER: Okay, good

 3   afternoon, ladies and gentlemen. There is a very

 4   important meeting taking place across the street at

 5   250 Broadway. The Co-Chair of this meeting, Council

 6   Member Larry Seabrook, should be here any moment,

 7   but in order not to keep you waiting, I'm going to

 8   read my opening statement which Council Member

 9   Seabrook can look at, if he so wishes, a little

10   later on.

11               Good afternoon, and welcome to this

12   joint hearing of the Committees on Governmental

13   Operations and Civil Rights. I am Simcha Felder,

14   Chair of the Committee on Governmental Operations,

15   and I am joined by my colleague, Council Member Inez

16   Dickens.

17               I want to take a moment to apologize

18   for the last-minute location change of today's

19   hearing, which is in order to meet an accessibility

20   concern that could not be met at the hearing's

21   original location across the street.

22               I would like to acknowledge the staff

23   of the Committees and thank them for all their hard

24   work in preparing for today's joint hearing.

25               First, with the Committee on
```

5

 1   CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

 2   Governmental Operations, to my left is DeNora

 3   Getachew, the Counsel to the Committee. And to her

 4   left is Michael Cassatano, my Legislative Aid.

 5                   The Committee's Policy Analyst,

 6   Israel Rodriguez, could not attend this hearing

 7   because he is participating in another hearing with

 8   the Contracts Committee.

 9                   With the Committee on Civil Rights, I

10   will introduce them, I'm sure Council Member

11   Seabrook will introduce them again. Damien Butvick?

12                   MR. BUTVICK: Butvick.

13                   CHAIRPERSON FELDER: Sorry. I'll do it

14   again. Damien Butvick, Policy Analyst to the Civil

15   Rights Committee.

16                   First the Committee on Govermmental

17   Operations will vote on proposed Intro. No. 651-A,

18   which is a bill that I introduced by request of the

19   Mayor.

20                   This bill would amend the

21   Administrative Code of the City of New York with

22   respect to campaign finance. Specifically, this bill

23   would make various substantive and technical

24   amendments to the Campaign Finance Reform Bill

25   passed by the Committee in June of this year to

6

```
 1   CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

 2   clarify the law and ensure that:

 3              (1) the contribution limits

 4   applicable to those doing business with the City

 5   apply for the entire election cycle.

 6              (2) the new matching level of

 7   six-to-one up to $175 would be retroactively applied

 8   from the start of the current election cycle; and

 9              (3) that the exemption from doing

10   business restrictions for affordable housing

11   developers would not only -- would only apply, I'm

12   sorry, would only apply to those developers who

13   participate in as-of-right non-discretionary and

14   affordable housing programs, or those which do not

15   involve significant discretion by HPD and other City

16   agencies in awarding a benefit.

17              This bill also includes the following

18   provisions included specifically at the request of

19   the Mayor:

20              (1) delay of the application of doing

21   business contribution cap on those who act in a

22   senior managerial capacity in July 2008, because

23   they are experiencing difficulty in obtaining this

24   information from current City contractors and

25   franchise and concession holders.
```

1  CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2              (2) create a mechanism to waive

3  compliance with the business dealings with the City

4  requirements in cases where a vendor refuses to

5  disclose Vendex information, but the City needs to

6  contract with the vendor in emergency situations for

7  security-related reasons, or goods or services

8  essential to government operations; and

9              (3) exempt those whose property is

10  being taken by the City by eminent domain from the

11  doing business contribution limits.

12              Based on the Fiscal Impact Statement

13  provided to the Committee by the Finance Division,

14  the bill would not have any fiscal impact on the

15  City.

16              After the Committee voted on proposed

17  Intro. No. 651-A, the Committees on Civil Rights and

18  Government Operations will conduct a joint oversight

19  hearing on the New York City Voter Assistance

20  Commission that worked to increase voter

21  registration across New York City, across New York

22  City and its diverse communities.

23              The Commission is comprised of 16

24  members and a coordinator and minimal staff who are

25  responsible for encouraging and facilitating voter

8

1  CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2  registration, voter participation by all residents

3  in the City who are eligible to vote, carry out that

4  mission. The Commission conducts voter registration

5  events throughout the City.

6              In particular, September 2006, the

7  Commission conducted its first annual Voter

8  Awareness Month and conducted voter registration

9  drives and voter awareness events throughout the

10 five boroughs.

11             This year Voter Awareness Month took

12 place during October in partnership with the City

13 University of New York and featured events

14 throughout the City, many of which took place on

15 CUNY campuses.

16             I had the pleasure of attending and

17 participating at one of the VAC events at the Marks

18 Jewish Community House in Bensonhurst, which is

19 located just outside my district and serves people

20 of all backgrounds from my district and throughout

21 South Brooklyn.

22             The event was a registration drive

23 for new American citizens born in the former Soviet

24 Union and is an example of how VAC has found success

25 in maximizing its limited budget by forging

9

1    CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2    partnerships with existing community organizations.

3              Speaker Quinn and I recently made an

4    effort to build on that model by inviting Council

5    members to enlist community organizations in their

6    own districts to work with VAC in preparing

7    registration drives in advance of the upcoming

8    January 12th, 2008 registration deadline for the

9    February 5th, 2008 primary, residential primaries in

10   New York City.

11             The Committees look forward to

12   learning more about the Commission's work and

13   hearing testimony from the Commission, good

14   government and advocacy groups, and members of the

15   public about what can be done to increase voter

16   registration and participation throughout the City.

17             Before we begin the formal testimony,

18   I have to make one or two comments. First of all, I

19   think we're going to have to start the Civil Rights

20   portion of the hearing that involves the Civil

21   Rights Chairman who we are delighted has come.

22             So, before we begin the formal

23   testimony, I'd like to emphasize that it is my

24   policy as Chair of the Governmental Operations

25   Committee to ensure that the hearings begin on time

10

1    CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2    and therefore it is my rule that only those

3    individuals that sign up to testify within the first

4    15 minutes of the start of the hearing will be

5    permitted to testify. So, you have 15 minutes from

6    20 after, which according to my calculations is

7    1:35. And if you're not sure whether you want to

8    testify, you should sign up and then withdraw it.

9    But if you think you might, please sign up.

10                And I just, for those of you who may

11   have read something about my rules, I want to go on

12   the record as saying that I did research again for

13   the second time to find out that according to the

14   rules of the Council, whether it's nice or not,

15   according to the rules of the Council, we're not

16   obligated to take any testimony whatsoever. That

17   doesn't mean that I'm God's gift to mankind by

18   allowing to take testimony, I think it's important

19   to take testimony, but I find nothing wrong, and I

20   will continue to impose this rule and I think it

21   would be a wonderful thing if this rule may spread

22   throughout this entire City Council so that meetings

23   maybe would be in a much more structured fashion and

24   start on time. So, I don't have any problem with it.

25                And two, I feel very strongly that if

11

```
 1  CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES
 2  somebody comes on time to a hearing, they should not
 3  have to sit through listening to somebody else's
 4  testimony who comes an hour and a half later, even
 5  if he was the Commissioner of Parks, an hour and a
 6  half later to hear somebody say something that might
 7  have been said four other times.
 8              So, with all due respect, I think
 9  that the rule is a good one, and for the next two
10  years, at least, in this Committee we will continue
11  to impose this rule.
12              After that, I won't be in this job, I
13  will be in another job, God willing. So, that's one.
14              Additionally, witnesses, I asking you
15  to refrain from repeated points that are made by
16  previous witnesses. If somebody adequately made the
17  point, it's fair to say that you either agree or
18  disagree, and if you have something to add, that
19  will be great.
20              Before we continue, we just want to
21  recognize Council Member Erik Dilan, who joined us,
22  and Council Member Vallone who joined, Peter
23  Vallone, Jr., who joined us.
24              All right, so we're going to take the
25  vote now on 651-A.
```

```
 1   CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

 2                    COUNCIL CLERK: Council Member Felder.

 3                    COUNCIL MEMBER FELDER: Yes.

 4                    COUNCIL CLERK: Dilan.

 5                    COUNCIL MEMBER DILAN: I vote no.

 6                    COUNCIL CLERK: Vallone.

 7                    COUNCIL MEMBER VALLONE: I'm going to

 8   pass. I need to read this.

 9                    COUNCIL CLERK: Dickens.

10                    COUNCIL MEMBER DICKENS: Yes.

11                    COUNCIL CLERK: Seabrook.

12                    CHAIRPERSON SEABROOK: I vote aye.

13                    COUNCIL CLERK: Council Member

14   Vallone.

15                    COUNCIL MEMBER VALLONE: I need to

16   read this.

17                    COUNCIL CLERK: Okay.

18                    CHAIRPERSON FELDER: I want to thank

19   all of the members for being here and I'm turning

20   the mic. over to the esteemed Chair of the Civil

21   Rights Committee, Council Member Larry Seabrook.

22                    CHAIRPERSON SEABROOK: Good afternoon,

23   Mr. Chairman. And I certainly want to thank you and

24   I certainly want to apologize for being late, but

25   that's the scheduling that we have. It's been a
```

13

1    CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2    little crazy.

3                    But anyway, my name is Council Member

4    Larry Seabrook. I Chair the New York City Council

5    Committee on Civil Rights.

6                    I'd like to begin by acknowledging my

7    Co-Chair at today's hearing, Council Member Simcha

8    Felder, and by thanking him for bringing attention

9    to this important matter.

10                    Our country has a long and shameful

11    record of systematically disenfranchising people of

12    color, from poll taxes, to literacy tests,

13    institutionalized discrimination at the voting booth

14    has left an unfortunate legacy that continues to

15    strive to this day.

16                    In this last presidential election,

17    just 44 percent of registered African-Americans

18    voted, along with 31 percent of Latino Americans and

19    26 percent of Asian Americans.

20                    Registration rates among these

21    communities are equally abysmal, with 51 percent of

22    eligible African-Americans registered, along with 38

23    percent of Latin Americans and 31 percent of Asian

24    Americans.

25                    The federal, State and local

14

1  CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2  governments have made several attempts to increase

3  voter registration in these communities. They are

4  woefully inadequate.

5              Failure to reach out to and mobilize

6  communities of color further perpetuates their

7  under-representation and the public's fear. If the

8  government is sincere in its desire to empower all

9  communities, then it must take bolder steps to

10 involve its constituents in the electoral process.

11             As Chair of the Committee on Civil

12 Rights, I'm looking forward to hearing today's

13 testimony and to taking a closer look at the

14 operation of the Voter Assistance Commission.

15             I'd like to thank everyone for coming

16 out today and for joining this exceedingly important

17 dialogue.

18             I would now like to give the floor

19 back to my distinguished colleague, Chair of the

20 Committee on Governmental Operation, Council Member

21 Simcha Felder.

22             And our first panel of witnesses will

23 be Commissioner Jane Kalmus, Jeffrey Kraus, Onida

24 Coward Mayers.

25             COUNCIL CLERK: The Committee on

1  CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2  Governmental Operations. Introduction 651-A. Council

3  Member Vallone.

4           COUNCIL MEMBER VALLONE: I vote aye.

5           COUNCIL CLERK: By a vote of four in

6  the affirmative, one in the negative and no

7  abstentions, the item is adopted.

8           Council members, please sign the

9  Committee report.

10          DR. KRAUS: Good afternoon,

11  Chairpersons Felder and Seabrook, and members of the

12  Government Operations and Civil Rights Committees of

13  the New York City Council.

14          I am Jeffrey Kraus, Chairperson of

15  the New York City Voter Assistance Commission.

16          I am joined this afternoon by Vice

17  Chair Jane Kalmus, who has been a member of the

18  Commission since its inception, and Onida Coward

19  Mayers, who is our Executive Director.

20          We are here today to inform you about

21  the Commission's activities and to answer your

22  questions. According to the New York City Charter

23  the role of the Voter Assistance Commission is to

24  encourage and facilitate voter registration and

25  voting by all eligible citizens residing in New York

```
 1   CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES
 2                  Also, attached you will find a whole
 3   description of all of the events, the number of
 4   calls that come into VAC, the 3-1-1 calls. You'll
 5   also find all of the media, the hits on our website,
 6   and participation of our Commissioners and
 7   representatives.
 8                  I thank you.
 9                  CHAIRPERSON SEABROOK: Thank you very
10   much. I just want to introduce some of the members
11   who came in. We have Councilwoman Darlene Mealy from
12   Brooklyn, who is a member of this Committee.
13   Councilman Domenic Recchia from Brooklyn. And
14   Committee member Council Member Mike Nelson from
15   Brooklyn, as well.
16                  We just have to take a vote for a
17   minute.
18                  COUNCIL CLERK: Introduction 651-A.
19                  Council Member Recchia.
20                  COUNCIL MEMBER RECCHIA: Aye.
21                  COUNCIL CLERK: The vote now stands at
22   five in the affirmative, zero in the negative --
23   excuse me. Five in the affirmative, one in the
24   negative, zero abstentions.
25                  CHAIRPERSON SEABROOK: Chairman
```

1  CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

2                      You mentioned young people. Young

3  people historically have been less likely to vote.

4  It goes back to the ratification of the 26th

5  Amendment. It seems as one grows older and one picks

6  up the responsibilities of a house and a mortgage

7  and having to pay taxes and things like that, that

8  these people who at 18, 19 and 20 didn't see the

9  reason to vote, when they get 35, 40 and 45 suddenly

10  see the need. And I would suspect that that will be

11  the case with this younger generation as well.

12                      CHAIRPERSON FELDER: I don't want to

13  belabor it. I just want to say --

14                      DR. KRAUS: It's one of the reasons

15  we've targeted the youth.

16                      CHAIRPERSON FELDER: All I'm saying to

17  you is that it's my impression, and maybe, as you

18  said, when you get older, maybe sometimes things

19  seem bleaker about the younger kids, but it seems to

20  me that things have gotten worse than they used to

21  be in terms of young people, that even if it was

22  never good about young people registered to vote.

23                      Before we continue, with your

24  permission I want to just digress again for a moment

25  to allow Council Member Addabbo, who joined us, to

35

```
 1   CIVIL RIGHTS AND GOVERNMENTAL OPERATIONS COMMITTEES

 2   vote on the earlier items.

 3                  COUNCIL CLERK: Introduction 651-A.

 4                  Council Member Addabbo.

 5                  COUNCIL MEMBER ADDABBO: I vote aye.

 6                  COUNCIL CLERK: The final vote on

 7   Governmental Operations is now six in the

 8   affirmative, one in the negative and zero

 9   abstentions. Thank you.

10                  CHAIRPERSON SEABROOK: Dr. Kraus, just

11   a couple of questions.

12                  DR. KRAUS: Sure.

13                  CHAIRPERSON SEABROOK: In line with

14   what the Councilman raised. What is the total budget

15   of VAC? What is the budget?

16                  DR. KRAUS: I think you know that

17   number, right?

18                  175.

19                  CHAIRPERSON SEABROOK: What?

20                  DR. KRAUS: 175,000.

21                  CHAIRPERSON SEABROOK: 175,000. And

22   none of this is for advertising?

23                  DR. KRAUS: That's correct.

24                  CHAIRPERSON SEABROOK: And in reaching

25   those voters, it's the Daily News that provides this
```

Dan Jacoby
47-48 43 St., Woodside, NY 11377
917-667-2756
www.danjacoby.com

Oral testimony on Intro 651a-2007
City Council Governmental Operations Committee
Simcha Felder, Chair
December 18, 2007

## FOR THE RECORD

Last week I suggested that the City Council not pass this bill as quickly as the previous campaign finance bill was passed in June. I expressed concern that there could be elements of the bill that were not as they seemed. Since then, I have discovered that there is at least one glaring problem with the current bill.

The section dealing with eminent domain was written with the idea that people whose "business" with the city consists of having their property seized through the city's use of eminent domain should not have insult added to injury by having their names placed in the "doing business" database. Unfortunately, because this bill is being rushed through, the language could just as easily be interpreted to grant a waiver from the database for those who receive the seized land.

Chances are that won't happen, but if this bill is passed the law will make it possible. The real question is, what other potential time bombs are hidden in the recesses of this complex legislation? We don't know, but if the bill passes as it is currently written, we will certainly find out the hard way.

One definition of insanity is doing the same thing over and over, and expecting different results. Six months ago, this Council passed a campaign finance bill far too quickly, and it turned out to be full of problems. Now the Council is poised to do the same thing over again. What will we be dealing with six months from now?

I urge this committee to stop the insanity. Do not vote on this bill until we have a full opportunity to figure out exactly what's in it. If you must vote on this bill now, I urge you to vote "no."

1

1

2   CITY COUNCIL

3
CITY OF NEW YORK
4   -------------------------------x
5
THE TRANSCRIPT OF THE MINUTES
6           of the
7
STATED COUNCIL MEETING
8   -------------------------------x
9

10
                    December 19, 2007
11                  Start:  4:37 p.m.
                    Recess: 5:55 p.m.
12
                    City Hall
13                  Council Chambers
                    New York, New York
14

15      B E F O R E:

16          BETSY GOTBAUM
                    Public Advocate
17

18          COUNCIL MEMBERS:   Speaker Christine Quinn
                               Joseph Addabbo
19                             Maria Arroyo
                               Tony Avella
20                             Charles Barron
                               Gale Brewer
21                             Leroy Comrie

22

23

24          LEGAL-EASE COURT REPORTING SERVICES, INC.
                    17 Battery Place -  Suite 1308
25                  New York, New York 10004
                        800-756-3410

2

```
 1

 2    A P P E A R A N C E S  (CONTINUED)

 3

            COUNCIL MEMBERS:
 4
                        Inez Dickens
 5                      Erik Martin-Dilan
                        Matthew Eugene
 6                      Simcha Felder
                        Lewis Fidler
 7                      Helen Foster
                        Dennis Gallagher
 8                      Daniel Garodnick
                        James Gennaro
 9                      Vincent Gentile
                        Alan Gerson
10                      Eric Gioia
                        Sara Gonzalez
11                      Vincent Ignizio
                        Robert Jackson
12                      Letitia James
                        Melinda Katz
13                      G. Oliver Koppell
                        Jessica Lappin
14                      John Liu
                        Miguel Martinez
15                      Darlene Mealy
                        Rosie Mendez
16                      Hiram Monserrate
                        Michael Nelson
17                      James Oddo
                        Annabel Palma
18                      Domenic Recchia
                        Joel Rivera
19                      Larry Seabrook
                        Helen Sears
20                      Kendall Stewart
                        James Vacca
21                      Peter Vallone, Jr.
                        Albert Vann
22                      Melissa Mark-Viverito
                        David Weprin
23                      Thomas White
                        David Yassky
24

25
```

3

1

2  A P P E A R A N C E S  (CONTINUED)

3

          STAFF:      Billy Martin
4                         Council Clerk

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

20          Be it known, that the Council of the

21    City of New York most gratefully honors Hassan

22    Askari, for his bravery on December 7, 2007.

23          Christine C. Quinn, Speaker for the

24    Entire Council; Council Member Michael Nelson,

25    Brooklyn; Council Member Eric Gioia, Queens; Council

9

1    STATED COUNCIL MEETING

2    Member Lew Fidler, Brooklyn; Council Member Domenic

3    Recchia, Brooklyn; Council Member Simcha Felder,

4    Brooklyn.

5          SPEAKER QUINN: Thank you all very

6    much.

7          PUBLIC ADVOCATE GOTBAUM: I call

8    together the Stated Meeting of December 19th, 2007.

9    All rise.

10          (Pledge of Allegiance.)

11          PUBLIC ADVOCATE GOTBAUM: Thank you

12    very much.

13          Roll call. Quiet, please.

14          COUNCIL CLERK: Addabbo.

15          COUNCIL MEMBER ADDABBO: Here.

16          COUNCIL CLERK: Arroyo.

17          COUNCIL MEMBER ARROYO: Here.

18          COUNCIL CLERK: Avella.

19              COUNCIL MEMBER AVELLA: Here.

20              COUNCIL CLERK: Baez.

21              (No response.)

22              COUNCIL CLERK: Barron.

23              COUNCIL MEMBER BARRON: Here.

24              COUNCIL CLERK: Brewer.

25              COUNCIL MEMBER BREWER: Here.

                                        10

1   STATED COUNCIL MEETING

2               COUNCIL CLERK: Comrie.

3               COUNCIL MEMBER COMRIE: Here.

4               COUNCIL CLERK: DeBlasio.

5               (No response.)

6               COUNCIL CLERK: Dickens.

7               COUNCIL MEMBER DICKENS: Here.

8               COUNCIL CLERK: Dilan.

9               COUNCIL MEMBER DILAN: Here.

10              COUNCIL CLERK: Eugene.

11              COUNCIL MEMBER EUGENE: Here.

12              COUNCIL CLERK: Felder.

13              COUNCIL MEMBER FELDER: Yes.

14              COUNCIL CLERK: Fidler.

15              COUNCIL MEMBER FIDLER: Still here.

16              COUNCIL CLERK: Foster.

17              COUNCIL MEMBER FOSTER: Here.

18                    COUNCIL CLERK: Gallagher.

19                    COUNCIL MEMBER GALLAGHER: Here.

20                    COUNCIL CLERK: Garodnick.

21                    COUNCIL MEMBER GARODNICK: Here.

22                    COUNCIL CLERK: Gennaro.

23                    COUNCIL MEMBER GENNARO: Here.

24                    COUNCIL CLERK: Gentile.

25                    COUNCIL MEMBER GENTILE: Here.

                                                    11

1  STATED COUNCIL MEETING

2                    COUNCIL CLERK: Gerson.

3                    (No response.)

4                    COUNCIL CLERK: Gioia.

5                    COUNCIL MEMBER GIOIA: Here.

6                    COUNCIL CLERK: Gonzalez.

7                    COUNCIL MEMBER GONZALEZ: Here.

8                    COUNCIL CLERK: Ignizio.

9                    COUNCIL MEMBER IGNIZIO: Here.

10                    COUNCIL CLERK: Jackson.

11                    COUNCIL MEMBER JACKSON: Here.

12                    COUNCIL CLERK: James.

13                    COUNCIL MEMBER JAMES: Here.

14                    COUNCIL CLERK: Katz.

15                    COUNCIL MEMBER KATZ: Here.

16                    COUNCIL CLERK: Koppell.

17          COUNCIL MEMBER KOPPELL: Here.

18          COUNCIL CLERK: Lappin.

19          COUNCIL MEMBER LAPPIN: Here.

20          COUNCIL CLERK: Liu.

21          COUNCIL MEMBER LIU: Here.

22          COUNCIL CLERK: Mark-Viverito.

23          COUNCIL MEMBER MARK-VIVERITO: Here.

24          COUNCIL CLERK: Martinez.

25          COUNCIL MEMBER MARTINEZ: Here.

12

1   STATED COUNCIL MEETING

2          COUNCIL CLERK: McMahon.

3          (No response.)

4          COUNCIL CLERK: Mealy.

5          COUNCIL MEMBER MEALY: Here.

6          COUNCIL CLERK: Mendez.

7          COUNCIL MEMBER MENDEZ: Here.

8          COUNCIL CLERK: Monserrate.

9          COUNCIL MEMBER MONSERRATE: Here.

10          COUNCIL CLERK: Nelson.

11          COUNCIL MEMBER NELSON: Here.

12          COUNCIL CLERK: Palma.

13          COUNCIL MEMBER PALMA: Here.

14          COUNCIL CLERK: Recchia.

15          COUNCIL MEMBER RECCHIA: Here.

16              COUNCIL CLERK: Reyna.

17              (No response.)

18              COUNCIL CLERK: Sanders.

19              (No response.)

20              COUNCIL CLERK: Seabrook.

21              COUNCIL MEMBER SEABROOK: Here.

22              COUNCIL CLERK: Sears.

23              COUNCIL MEMBER SEARS: Here.

24              COUNCIL CLERK: Stewart.

25              COUNCIL MEMBER STEWART: Present.

13

1   STATED COUNCIL MEETING

2               COUNCIL CLERK: Vacca.

3               COUNCIL MEMBER VACCA: Here.

4               COUNCIL CLERK: Vallone.

5               COUNCIL MEMBER VALLONE: Here.

6               COUNCIL CLERK: Vann.

7               COUNCIL MEMBER VANN: Here.

8               COUNCIL CLERK: Weprin.

9               COUNCIL MEMBER WEPRIN: Here.

10              COUNCIL CLERK: White.

11              COUNCIL MEMBER WHITE: Here.

12              COUNCIL CLERK: Yassky.

13              COUNCIL MEMBER YASSKY: Here.

14              COUNCIL CLERK: Oddo.

15          COUNCIL MEMBER ODDO: Here.

16          COUNCIL CLERK: Rivera.

17          COUNCIL MEMBER RIVERA: Here.

18          COUNCIL CLERK: Speaker Quinn.

19          SPEAKER QUINN: Here.

20          PUBLIC ADVOCATE GOTBAUM: We have a

21   quorum.

22          Invocation will be done by Reverend

23   Sheldon Williams.

24          All rise.

25          REVEREND WILLIAMS: Let us pray.

14

1   STATED COUNCIL MEETING

2          Our Father and our God, we thank You

3   and we praise You for this day. We thank You and we

4   praise You for another opportunity to come and to

5   meet together as one.

6          We just pray that You would be with

7   all of these Council members, Lord; that you would

8   bless them in a special way and help them, give them

9   the wisdom and knowledge necessary to make the

10   decisions that need to be made.

11          We also pray that You would bless

12   their constituents and all of those who they

13   represent; help them to be blessed by their efforts,

```
 9              COUNCIL CLERK: Preconsidered LU 641

10  and Reso 1192. Report of Housing Program.

11              SPEAKER QUINN: Coupled on General

12  Orders.

13              COUNCIL CLERK: Report of the

14  Committee on Governmental Operations.

15              Intro. 651-A. Campaign Finance.

16              SPEAKER QUINN: Amended and coupled on

17  General Orders.

18              COUNCIL CLERK: Report of the

19  Committee on Housing and Buildings.

20              Intro. 613-A. Use of explosives.

21              SPEAKER QUINN: Amended and coupled on

22  General Orders.

23              COUNCIL CLERK: Report of the

24  Committee on Land Use.

25              LU 563 and Reso 1193, through LU 594
```

```
                                              49
```

```
 1  STATED COUNCIL MEETING

 2  and Reso 1195, on page six, UDAAPs and ULURPs.

 3              SPEAKER QUINN: Coupled on General

 4  Orders.

 5              COUNCIL CLERK: LU 616 and Reso 1196,

 6  and 619 and Reso 1197, in rem actions.

 7              SPEAKER QUINN: Coupled on General
```

8   Orders.

9                    COUNCIL CLERK: LU 619 and Reso 1198.

10  UDAAP, Manhattan.

11                   SPEAKER QUINN: Coupled on General

12  Orders.

13                   COUNCIL CLERK: LU 628 and Reso 1199.

14  Enclosed sidewalk cafe.

15                   SPEAKER QUINN: Coupled on General

16  Orders.

17                   COUNCIL CLERK: LU 632 and Reso 1200,

18  through LU 635 and Reso 1202. Various ULURPS.

19                   SPEAKER QUINN: Coupled on General

20  Orders.

21                   COUNCIL CLERK: Report of the

22  Committee on Public Safety.

23                   Intro. 562-A, public lewdness.

24                   SPEAKER QUINN: Amended and coupled on

25  General Orders.


                                                50

1   STATED COUNCIL MEETING

2                    COUNCIL CLERK: Report of the

3   Committee on Rules, Privileges and Elections.

4                    M 854 and Reso 1203. Approving the

5   appointment of Shirley McRae, City Planning

6   Commission.

7                    SPEAKER QUINN: Coupled on General

8    Orders.

9                    DEPUTY MAJORITY LEADER COMRIE:

10   General Order Calendar.

11                   COUNCIL CLERK: Resolution appointing

12   various persons Commissioner of Deeds.

13                   SPEAKER QUINN: Coupled on General

14   Orders.

15                   At this point I ask for a roll call

16   on all items that have been coupled on the General

17   Order Calendar, please.

18                   COUNCIL CLERK: Addabbo.

19                   COUNCIL MEMBER ADDABBO: Aye.

20                   COUNCIL CLERK: Arroyo.

21                   COUNCIL MEMBER ARROYO: Aye.

22                   COUNCIL CLERK: Avella.

23                   COUNCIL MEMBER AVELLA: Aye on

24   everything, except Land Use No. 634 and Reso 1201;

25   and Land Use No. 635, Reso 1202, I vote no.

51

1    STATED COUNCIL MEETING

2                    COUNCIL CLERK: Baez.

3                    (No response.)

4                    COUNCIL CLERK: Barron.

5                    COUNCIL MEMBER BARRON: I vote aye on

6  all items, except for Land Use Reso 634 -- I mean,

7  LU 634 and Reso 1201, Columbia, and LU 635 and Reso

8  1202, also Columbia, I vote no.

9              COUNCIL CLERK: Brewer.

10             COUNCIL MEMBER BREWER: I just want to

11  explain a couple of things, if I can.

12             One is that regarding that Columbia

13  vote, I know that there was much discussion today. I

14  know these sponsors had to move quickly, but I just

15  want to say that as somebody who tries to get as

16  much information as possible without much

17  information, I wish I could have had a little bit

18  more time to be able to listen to the back and forth

19  that Democratic Caucus usually provides.

20             Number two, I want to thank the

21  Borough President, because he did have a very good

22  discussion.

23             And number three, having both the

24  Time Warner Center and 50 years ago Lincoln Center

25  in my district, the job situation is such that at

52

1  STATED COUNCIL MEETING

2  the beginning there are wonderful jobs, but somebody

3  has to pay a whole lot of attention to make sure

4  that the community continues to get those jobs. And

5   I know that eminent domain is a real challenge.

6                   I want to thank Jordy Reyes, Home

7   Block of Board 9 (phonetic). I can't talk much more.

8   I vote aye, but with much concern. Thank you.

9                   COUNCIL CLERK: Comrie.

10                  COUNCIL MEMBER COMRIE: Aye on all.

11                  COUNCIL CLERK: DeBlasio.

12                  COUNCIL MEMBER DEBLASIO: I would like

13  to ask unanimous consent to vote on all Land Use

14  Call-Ups. I vote aye on all Land Use Call-Ups. Aye

15  on all coupled General Order matters, and I would

16  like to wish everyone very happy holidays.

17                  DEPUTY MAJORITY LEADER COMRIE: So

18  ordered.

19                  COUNCIL CLERK: Dickens.

20                  COUNCIL MEMBER DICKENS: Aye on all.

21                  COUNCIL CLERK: Dilan.

22                  COUNCIL MEMBER DILAN: The proper

23  title for you today, sir, is Mr. President Pro-Tem.

24                  May I have a brief moment to explain

25  my vote?

1   STATED COUNCIL MEETING

2                   DEPUTY MAJORITY LEADER COMRIE: Yes,

3   you may.

4                    COUNCIL MEMBER DILAN: Just very

5    briefly, I would like to congratulate my colleague,

6    Melissa Mark-Viverito on her first bill, the

7    blasting bill. And on the 197-A, I'm very conflicted

8    but in the end the constituents of Harlem sent to

9    this institution Robert Jackson and Inez Dickens, I

10   trust their judgment and their decision so that

11   leans me to stick with them, so I vote aye on all,

12   except for Intro. 651-A, which I vote no. Thank you.

13                   COUNCIL CLERK: Eugene.

14                   COUNCIL MEMBER EUGENE: Aye.

15                   COUNCIL CLERK: Felder.

16                   COUNCIL MEMBER FELDER: Yes.

17                   COUNCIL CLERK: Fidler.

18                   COUNCIL MEMBER FIDLER: Pass.

19                   COUNCIL CLERK: Foster.

20                   COUNCIL MEMBER FOSTER: May I be

21   excused to explain my vote? Yes? Thank you.

22                   DEPUTY MAJORITY LEADER COMRIE: Yes.

23   Yes. I'm sorry.

24                   COUNCIL MEMBER FOSTER: Okay. Yes,

25   thank you.

54

1    STATED COUNCIL MEETING

2                    Having been familiar with an

3   organization that has been unfriendly towards a

4   community and then once they want something makes

5   all the promises in the world, I'm always suspect.

6   But in deference to Council Member Dickens, who I

7   spoke to, I am voting aye on all, except Land Use

8   634 and Reso 1201, and Land Use 635 and Reso 1202,

9   of which I abstain, because if it's not good enough

10   for my community when I voted against an

11   organization doing what they'd like and giving us

12   crumbs, then I don't think I'm in a position to say

13   yes for another community.

14           COUNCIL CLERK: Gallagher.

15           COUNCIL MEMBER GALLAGHER: Aye on all.

16           COUNCIL CLERK: Garodnick.

17           COUNCIL MEMBER GARODNICK: Aye.

18           COUNCIL CLERK: Gennaro.

19           COUNCIL MEMBER GENNARO: Yes.

20           COUNCIL CLERK: Gentile.

21           COUNCIL MEMBER GENTILE: Aye.

22           COUNCIL CLERK: Gerson.

23           COUNCIL MEMBER GERSON: May I be

24   excused to explain my vote, Mr. Acting Public

25   Advocate?

55

1  STATED COUNCIL MEETING

2    DEPUTY MAJORITY LEADER COMRIE: Yes.

3 Yes.

4    COUNCIL MEMBER GERSON: Thank you very

5 much.

6    I vote aye on all, but as a Council

7 Member who represents some of our City's other

8 finest institutions of highest learning, which have

9 had and will have numerous Land Use issues before

10 this body, though I'm a proud graduate of the one

11 whose application is before us today, but I feel

12 compelled to make the point that while voting aye, I

13 do not look to this vote as precedent setting with

14 respect to any other communities or any other

15 institutions, but rather as an acknowledgment that

16 under the very able leadership of our colleagues,

17 Council Member Dickens and Jackson, the particulars,

18 and with the able leadership of our Land Use Chair,

19 Melinda Katz, the particulars of this application

20 and the specifics have been worked out to the

21 satisfaction of the specific needs and interests of

22 the impacted community, and therefore, this should

23 be viewed as a singular approval which does not set

24 a precedent going forward.

25    As I said, I vote aye on all. Thank

```
 1  STATED COUNCIL MEETING

 2  you.

 3              COUNCIL CLERK: Gioia.

 4              COUNCIL MEMBER GIOIA: I'd like to

 5  vote yes on all, with the exceptions of Land Use 634

 6  and Reso 1201, and Land Use 635 and Reso 1202, on

 7  which I abstain. I'd like to wish everyone a very

 8  happy and blessed holiday and Happy New Year, Mr.

 9  President Pro-tem. Thank you.

10              COUNCIL CLERK: Gonzalez.

11              COUNCIL MEMBER GONZALEZ: Aye on all.

12              COUNCIL CLERK: Ignizio.

13              COUNCIL MEMBER IGNIZIO: No on 651-A;

14  no on 634 and companion Resolution 1201; no on 635

15  and companion Resolution 1202. And a happy holidays

16  to all.

17              COUNCIL CLERK: Jackson.

18              COUNCIL MEMBER JACKSON: Aye on all.

19              COUNCIL CLERK: James.

20              COUNCIL MEMBER JAMES: May I be

21  excused to explain my vote?

22              DEPUTY MAJORITY LEADER RIVERA: Yes.

23              COUNCIL MEMBER JAMES: According to a

24  recent newspaper today, two more members of the West

25  Harlem Local Development Corporation quit, a Board
```

1  STATED COUNCIL MEETING

2  chosen to represent the community in talks with

3  Columbia, they quit in protest over the rushed

4  process.

5              Last month three LDC Board members

6  resigned in order to criticize the secret

7  negotiations, which they say were designed to buy

8  the community's acquiescence.

9              This process has minimized the

10  community's 197-A plan and the input of Manhattan's

11  Community Board 9.

12              We need to support and put forward

13  community planning. We need to stop making a mockery

14  of the City Charter and our Community Boards.

15              Columbia University's proposed

16  rezoning will forever, forever change the character

17  of that community.

18              Columbia University has an obligation

19  to develop and expand in a manner that is

20  compatible, with the interest of West Harlem, such

21  is not the case today.

22              And lastly, from Queens to Brooklyn,

23  from the proposed Atlantic Yards to Coney Island,

24  and West Harlem today is just yet another example of

25  the threat and/or, I would argue, the abuse of

58

1  STATED COUNCIL MEETING

2  eminent domain. Your house today, my house tomorrow.

3  Your business is not your own. This is the Columbia

4  University -- excuse me. The Columbia University and

5  the community would be much better served were they

6  to integrate rather than dominate, swallow,

7  subjugate or control the neighboring community.

8               And, so, I say, let the market

9  control, let them negotiate with residents, let them

10  negotiate with businesses, without the undue

11  influence, the undue pressure of

12  government-sponsored threats, politely referred to

13  as "eminent domain."

14               And I say to the residents, don't

15  worry, you'll join Brooklyn and we'll see them in

16  court.

17               I vote yes on everything; and I vote

18  no on Reso 634, LU 634, Reso 1201; LU 635, Reso

19  1202, on those I vote no. Everything else, I vote

20  aye.

21               I congratulate Shirley McRae today on

22  her appointment to the Planning Board, and I just

23  want to thank this Speaker and all the staff for

24  working with us with respect to the lien sales. I

25  was glad we were able to negotiate out those

59

1    STATED COUNCIL MEETING

2    homeowners who are low income and senior citizens.

3                    I thank you very much, and everyone

4    have a happy holiday.

5                    DEPUTY MAJORITY LEADER COMRIE: Quiet,

6    please. Quiet, please.

7                    COUNCIL CLERK: Katz. Council Member

8    Katz.

9                    COUNCIL MEMBER KATZ: Aye on all.

10                   COUNCIL CLERK: Koppell.

11                   COUNCIL MEMBER KOPPELL: On 651-A I

12   vote no; on 613-A, I abstain. On all other matters

13   on the General Order calendar, I vote aye.

14                   COUNCIL CLERK: Lappin.

15                   COUNCIL MEMBER LAPPIN: With a big

16   congratulations to Council Member Mark-Viverito, I

17   vote yes.

18                   COUNCIL CLERK: Liu.

19                   COUNCIL MEMBER LIU: Yes.

20                   COUNCIL CLERK: Mark-Viverito.

21                   COUNCIL MEMBER MARK-VIVERITO: Could I

22   please be excused to explain my vote?

23                   DEPUTY MAJORITY LEADER COMRIE: Yes.

24                   COUNCIL MEMBER MARK-VIVERITO: Being

25   an alum of Columbia University, I'm quite familiar

60

1  STATED COUNCIL MEETING

2  with the fact that they don't have a very good

3  reputation in the community.

4           Having said that, I do have complete

5  confidence and faith in the time and the effort that

6  have been put in by our two colleagues, and out of

7  respect for those efforts, I will vote aye on this

8  project.

9           So, having said that, I vote aye on

10  all.

11           COUNCIL CLERK: Mealy.

12           (No response.)

13           COUNCIL CLERK: Mendez.

14           COUNCIL MEMBER MENDEZ: I vote aye on

15  all, and I abstain on Land Use matters 634 and 635

16  and Reso 1201 and 1202.

17           COUNCIL CLERK: Monserrate.

18           COUNCIL MEMBER MONSERRATE: Yes, I

19  vote no on 651-A, and I abstain on LU 632, 634, 635

20  and the accompanying resolutions, and I vote

21  affirmative on the rest.

22           COUNCIL CLERK: Palma.

23           COUNCIL MEMBER PALMA: Aye.

24           COUNCIL CLERK: Council Member Liu.

25                COUNCIL MEMBER LIU: I apologize, I

61

1  STATED COUNCIL MEETING

2  request unanimous consent to vote yes on all Land

3  Use Call-Ups.

4                DEPUTY MAJORITY LEADER COMRIE: So

5  ordered.

6                COUNCIL MEMBER LIU: I vote aye on all

7  Land Use Call-Ups.

8                COUNCIL CLERK: Recchia.

9                COUNCIL MEMBER RECCHIA: Aye.

10                COUNCIL CLERK: Seabrook.

11                COUNCIL MEMBER SEABROOK: Aye.

12                COUNCIL CLERK: Stewart.

13                COUNCIL MEMBER STEWART: With

14  congratulations to Jackson and Dickens, I vote aye

15  on all.

16                COUNCIL CLERK: Vacca.

17                COUNCIL MEMBER VACCA: Aye on all.

18                COUNCIL CLERK: Vallone.

19                COUNCIL MEMBER VALLONE: May I be

20  temporarily excused, Mr. Grand --

21                DEPUTY MAJORITY LEADER COMRIE: So

22  ordered.

23                COUNCIL MEMBER VALLONE: Thank you.

24          I, too, have some serious problems

25   with the way eminent domain was used in this matter,


                                        62


1    STATED COUNCIL MEETING

2    but out of deference to Council Members Jackson,

3    Dickens and Katz, I will abstain on 634, Land Use

4    635 and Resos 1201, 1202; and vote aye on the rest.

5    Thank you.

6               COUNCIL CLERK: Vann.

7               COUNCIL MEMBER VANN: May I be excused

8    to explain my vote?

9               DEPUTY MAJORITY LEADER COMRIE: Sure.

10              COUNCIL MEMBER VANN: Yes, I had to

11   leave the room for a moment and I was unclear to

12   whether or not 656 had been coupled on General

13   Orders. It has been? It has been.

14              Having said that, I'd like to be

15   recorded in the no in Intro. 656. I'm under the

16   impression that my community which is really

17   overwhelmed with predatory lenders, that many of our

18   two- and three- and four-family homes, the

19   homeowners are really overwhelmed in trying to meet

20   their payments, having averted the lien sale, which

21   is why many of them got involved in predatory

22   lending in the first place, and, so, they're having

23  a very difficult time trying to maintain their

24  houses with the existing revenue that they have, and

25  information from those who are developing homes in

63

1  STATED COUNCIL MEETING

2  the community indicate that any additional lien,

3  water lien or any other additional lien, including

4  increased fuel costs, will be devastating. So, to

5  protect my community as best I can, I vote no on

6  Intro. 656.

7                To support, I vote aye on the other

8  items. Thank you.

9                COUNCIL CLERK: Weprin.

10                COUNCIL MEMBER WEPRIN: Aye on all.

11                COUNCIL CLERK: White.

12                COUNCIL MEMBER WHITE: May I request

13  unanimous consent to vote on all Land Use items?

14                DEPUTY MAJORITY LEADER COMRIE: So

15  ordered.

16                COUNCIL MEMBER WHITE: I abstain on LU

17  632 and its companion Resolution 1200. I abstain

18  from LU 634, Resolution 1201; and I abstain from LU

19  635 and Reso -- oh -- and I abstain on 635 and Reso

20  1202, and I vote aye on all coupled General Orders.

21                COUNCIL CLERK: Yassky.

22          COUNCIL MEMBER YASSKY: I vote aye on

23  all. I just want to say on the Columbia item, you

24  know, I congratulate my colleagues, Council Member

25  Dickens and Jackson and of course the Speaker --

64

1  STATED COUNCIL MEETING

2          DEPUTY MAJORITY LEADER COMRIE: Quiet,

3  please. Quiet, please.

4          COUNCIL MEMBER YASSKY: -- And the

5  Land Use Chair.

6          DEPUTY MAJORITY LEADER COMRIE: I know

7  it's late but he needs to be heard.

8          COUNCIL MEMBER YASSKY: I do need to

9  be heard. Thank you, Mr. Chair.

10          And the product I think is excellent

11  for the City to have Columbia be able to grow.

12          I just do want to register my

13  concerns for future things with the process of

14  community benefits agreements, kind of replacing

15  ULURPs. And I understand that here the Council and

16  the Speaker I think played an extremely useful role

17  in pushing this process forward, but I think that we

18  as an institution should think through whether

19  that's a good way to go, because I do worry about

20  it, replacing what is a very solid Land Use process

21  and for future items, so I just want to register

22  that concern. And as well, with having kind of a

23  threat of eminent domain being used by, you know, to

24  push something forward, I'd like to see that in the

25  future the Administration very, very much more

65

1  STATED COUNCIL MEETING

2  reluctant to start with that.

3             So, I just want to register those

4  items. And I want to, on the water lien side, I just

5  want to thank the Speaker and the Finance Chair and

6  Mike Keogh, the Finance Director, for, particularly

7  for including the provision about relief from lien

8  sales for low-income seniors. I think that will

9  prove to be very important to some very distressed

10  folks. So, I just want to thank them for doing that.

11  Thank you.

12             COUNCIL CLERK: Fidler.

13             COUNCIL MEMBER FIDLER: I know it's

14  late, and the amount of greenhouse gases that have

15  been emitted in this room already is extraordinary,

16  but I do have to ask permission to explain my vote?

17             DEPUTY MAJORITY LEADER COMRIE: So

18  ordered.

19             COUNCIL MEMBER FIDLER: First, I want

20  to say that the Land Use planning and policy aspects

21  of the Columbia project I believe are all good, and

22  the work that's been done by the Speaker, Council

23  Members Jackson, Dickens and Katz is extraordinary.

24           But for reasons that haven't been

25  discussed yet on this floor today, and as a matter

                                                    66

1  STATED COUNCIL MEETING

2  of very, very deep conscience, I cannot vote for it.

3           Some people believe that a college

4  campus is a place where there should be an open and

5  free discourse of all ideas. I don't exactly agree

6  with that.

7           I think a college campus is a place

8  where we pursue the highest ideals, and the best

9  ideas, and when it comes to that test, Columbia

10  University has failed miserably.

11           They have invited to their campus a

12  hate monger, a homophobe, a Holocaust denier, and

13  they have given him a platform of credibility that I

14  think is shameful. And I take that in the context,

15  as some of us remember four years ago being

16  approached by Columbia University students in

17  Project David, who felt that as students in the

18  Middle East Studies Department at Columbia, they

19  could not freely express their support for Israel

20  without being discriminated against, and denied

21  their academic freedom, and in an action that could

22  only put the capital Hu in Hutspa, Columbia

23  self-investigated, self-exonerated, and issued the

24  report during a recess period when the students who

25  were the victims were not on campus or in town. I am

67

1   STATED COUNCIL MEETING

2   voting yes on all coupled General Orders, other than

3   Land Use 634 and 635, Resos 1201 and 1202, on which

4   I vote no. And I cast those votes for the students

5   in Project David, I cast those votes for academic

6   freedom, I cast those votes for the shackled women

7   in Iran, for the closeted, fearful gay people in

8   Iran, for people who oppose the politics of hate and

9   terror, for people who abhor tyranny and for people

10  who adore human rights.

11              I thank you for your indulgence, and

12  I vote no on those items.

13              COUNCIL CLERK: Oddo.

14              COUNCIL MEMBER ODDO: May I have two

15  minutes to sort of reminisce?

16              DEPUTY MAJORITY LEADER COMRIE: So

17  ordered.

18                COUNCIL MEMBER ODDO: I'm glad I'm

19  following Council Member Fidler, because as you

20  know, he's one of my best friends in this body and

21  I'm proud of what he just said.

22                This summer will be my 20th

23  anniversary of graduating Fordham University, and 20

24  years is a long time, but I remember as it was

25  yesterday, and I remember how quickly it went. And

68

1  STATED COUNCIL MEETING

2  for those of us who were term limited and leaving

3  this body in two years, today is sort of like the

4  last exam of second semester of sophomore year. We

5  have two more years of the privilege of being in

6  this body and working together, and today I think

7  was a good day for this body. The debate, the lively

8  debate, even when it got a little excitable, I

9  enjoyed it. And I just say to all my colleagues in

10  this festive time of year, we have two more years to

11  do what's right by this City, two more years to do

12  what we think is right in our hearts, and two more

13  years to hopefully have some fun together. I will be

14  voting no on Intro 651-A, yes on all others.

15                Have a happy holiday and a Merry

16  Christmas and God bless all of you.

17            COUNCIL CLERK: Speaker Quinn.

18            SPEAKER QUINN: Yes on all. And I just

19   want to remind folks that the Council's holiday

20   party is starting in 15 minutes. Starting in 15

21   minutes over at the Surrogates Court House, so I

22   would urge everyone to head over there as soon as we

23   wrap things up here, and a happy holidays and happy

24   New Year to all.

25            DEPUTY MAJORITY LEADER COMRIE:

69

1    STATED COUNCIL MEETING

2    Members, we still have a resolution to vote on, so

3    please bear with us while we do the tally. Quiet in

4    the room, please. We still have another item of

5    business to vote on.

6            Okay, quiet, please.

7            All items on today's General Order

8    calendar were adopted by a vote of 46 in the

9    affirmative, zero in the negative, zero extensions;

10   with the exception of Intro. 651-A, which was

11   adopted by a vote of 41 affirmative, five negative

12   and zero abstentions; Intro. 656, which was adopted

13   by a vote of 45 affirmative, one negative, zero

14   abstentions; Intro. 613-A, which was adopted by a

15   vote of 45 affirmative, zero negative, one

16  abstention; Land Use 632 and Resolution 1200, which

17  was adopted by a vote of 44 affirmative, zero

18  negative, two abstentions; and Land Use 634,

19  Resolution 1201, and Land Use 635, Resolution 1202,

20  which was adopted by 35 affirmative, five negative

21  and six abstentions.

22           Revised Land Use Call-Up vote is 45

23  affirmative and zero negatives -- 46 affirmative and

24  zero negative.

25           Introduction and Reading of Bills.


                                              70

1   STATED COUNCIL MEETING

2            SPEAKER QUINN: All bills are referred

3   to committees as indicated on the agenda.

4            DEPUTY MAJORITY LEADER COMRIE: We

5   have a resolution.

6            Quiet, please.

7            Discussion of Resolutions.

8            No. Seeing no discussions --

9            (Outburst in audience.)

10           DEPUTY MAJORITY LEADER COMRIE: Quiet,

11  please. Quiet, please. Quiet, please. Can we just

12  let them out? Quiet, please.

13           SPEAKER QUINN: Get quiet in the

14  Chambers.

1
2
Int. No. 192

3    By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Fidler,
4    Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, McMahon, Nelson,
5    Palma, Weprin, White Jr., Liu, Vacca and The Public Advocate (Ms. Gotbaum)  (in conjunction
6    with the Mayor)
7
8    A Local Law to amend the administrative code of the city of New York in relation to campaign
9    contributions by lobbyists.
10
11   Be it enacted by the Council as follows:
12
13          Section one. Section 3-219 of the administrative code of the city of New York is

14   amended by adding a new subdivision h to read as follows:

15          h. To provide the statement identifying his or her status as a lobbyist to a participating

16   candidate pursuant to subdivision one of section 3-720 of the administrative code.

17          §2. Subdivision 3 of section 3-702 of the administrative code of the city of New York, as

18   amended by local law number 58 for the year 2004, is amended, and new subdivisions 16 and 17

19   are added to such section to read as follows:

20          3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or

21   (iii) a portion of a contribution or contributions, not greater than the applicable contribution

22   limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections

23   held in the same calendar year, made by a natural person resident in the city of New York to a

24   participating candidate which has been reported in full to the campaign finance board in

25   accordance with subdivision six of section 3-703 by the candidate's principal committee and has

26   been contributed on or before December thirty-first in the year of such election that may be

27   matched by public funds in accordance with the provisions of this chapter. Any contribution,

28   contributions, or a portion of a contribution determined to be invalid for matching funds by the

- 1 -

1    board may not be treated as a matchable contribution for any purpose. A loan may not be treated

2    as a matchable contribution. The following contributions are not matchable:

3        (a) in-kind contributions of property, goods, or services;

4        (b) contributions in the form of the purchase price paid for an item with significant

5    intrinsic and enduring value;

6        (c) contributions in the form of the purchase price paid for or otherwise induced by a

7    chance to participate in a raffle, lottery, or a similar drawing for valuable prizes;

8        (d) money order contributions from any one contributor that are, in the aggregate, greater

9    than $100;

10       (e) contributions from individuals under the age of eighteen years; [and]

11       (f) contributions from individual vendors to whom the participating candidate or his or

12   her principal committee makes an expenditure, in furtherance of the nomination for election or

13   election covered by the candidate's certification, unless such expenditure is reimbursing an

14   advance; and

15       (g) contributions from a lobbyist or person affiliated with a lobbyist.

16       16. The term "lobbyist" shall mean a lobbyist as defined in section 3-211 of this title. For

17   the purposes of this subchapter, when a lobbyist is a person, the term "person affiliated with a

18   lobbyist" shall mean the spouse or domestic partner and unemancipated children of a lobbyist.

19   When a lobbyist is an organization, the term "lobbyist" shall mean only that division of the

20   organization that engages in any lobbying activities or whose employment relates to the lobbying

21   activities of the organization and the term "person affiliated with a lobbyist" shall mean any

22   officer or employee of such lobbyist who engages in any lobbying activities or who is employed

1    in an organization's division that engages in lobbying activities of the organization and the

2    spouse or domestic partner and unemancipated children of such officers or employees.

3    　　17. The term "lobbying" or "lobbying activities" shall mean lobbying and lobbying

4    activities as defined in section 3-211 of this title.

5    　　§3. Paragraph (a) of subdivision 6 of section 3-703 of the administrative code of the city

6    of New York, as amended by local law numbers 58 and 59 for the year 2004, is amended to read

7    as follows:

8    　　(a) Each participating or limited participating candidate and his or her principal

9    committee, and each non-participating candidate and his or her authorized committees shall

10    report to the board every contribution, loan, guarantee, or other security for such loan received

11    by the candidate and such committee, the full name, residential address, occupation, employer,

12    and business address of each contributor, lender, guarantor, or provider of security and of each

13    person or entity which is the intermediary for such contribution, loan, guarantee, or other

14    security for such loan, whether such contributor, lender, guarantor, or provider of security

15    reported they were a lobbyist or a person affiliated with a lobbyist during the calendar year in

16    which the contribution or loan was made, and every expenditure made by the candidate and such

17    committee, including expenditures not subject to section 3-706.  Disclosure reports shall be

18    submitted at such times and in such form as the board shall require and shall be clearly legible.

19    　　§4. Subdivision 8 of section 3-708 of the administrative code of the city of New York, as

20    amended by local law number 60 for the year 2004, is amended to read as follows:

21    　　8. The board shall have the authority to promulgate such rules and regulations and

22    provide such forms as it deems necessary for the administration of this chapter. The board shall

23    promulgate regulations concerning the form in which contributions and expenditures are to be

1   reported, the periods during which such reports must be filed and the verification required. The

2   board shall require the filing of reports of contributions and expenditures for purposes of

3   determining compliance with paragraph (f) of subdivision one of section 3-703, section 3-706,

4   [and] section 3-718, [and] section 3-719, and section 3-720 in accordance with the schedule

5   specified by the state board of elections for the filing of campaign receipt and expenditure

6   statements.

7       §5. Subdivision 2 of section 3-710 of the administrative code of the city of New York is

8   amended by adding a new paragraph (d) to read as follows:

9       (d) Notwithstanding any other provision of law, rule or regulation, a participant or his or

10   her principal committee shall not be required to repay to the board any public matching funds

11   that were paid to the participant or his or her principal committee by the board based on

12   contributions from a lobbyist or person affiliated with a lobbyist.  Such payment may only be

13   deducted by the board from a subsequent payment, if any.

14       §6. Chapter 7 of title 3 of the administrative code of the city of New York is amended by

15   adding a new section 3-720 to read as follows:

16       §3-720 Lobbyists. 1. Each participating candidate and his or her principal committee

17   shall obtain from every contributor, lender, guarantor, or provider of security providing a

18   contribution or loan, or guarantee or other security for such loan, a statement, in a form

19   prescribed by the campaign finance board, as to whether such contributor, lender, guarantor, or

20   provider of security was a lobbyist or a person affiliated with a lobbyist during the calendar year

21   in which such contribution or loan was made. The board may provide that such information be

22   provided on the same form providing information as to the contributor's residence and

23   employment. The failure of a contributor to identify himself or herself as a lobbyist or a person

- 4 -

1    affiliated with a lobbyist, or the unintentional submission by a candidate for matching funds of a

2    contribution by a lobbyist or a person affiliated with a lobbyist, shall not result in any civil

3    penalty being assessed against a candidate or principal committee. The city clerk shall, at the

4    board's request, provide appropriate assistance to the board in determining whether a lobbyist or

5    person affiliated with a lobbyist has complied with the requirements of this section.

6         2. The board shall make available to the public, no less than quarterly and on at least a

7    monthly basis during the five months preceding the general election for city offices and on at

8    least a weekly basis during the month preceding the primary election for such offices and the

9    month preceding the general election, information relating to lobbyists and persons affiliated

10   with lobbyists that has been ascertained by the board pursuant to this section or subdivision six

11   of section 3-703 of this chapter. Such information shall be organized in a clear and

12   understandable format, and shall be as current as may be practicable.

13        §7. If any provision of this local law, or any amendments thereto, shall be held invalid or

14   ineffective in whole or in part or inapplicable to any person or situation, such holding shall not

15   affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall

16   nevertheless be separately and fully effective and the application of any such provision to other

17   persons or situations shall not be affected.

18        §8. This local law shall take effect on the ninetieth day after it shall have become a law

19   and shall be applicable to all receipts, expenditures, and public funds claims for elections held

20   after such effective date provided that, upon enactment of this local law, the relevant city

21   agencies shall take all necessary steps, including but not limited to the promulgation of forms

22   and rules, to ensure the prompt implementation of this local law upon its effective date.

23

DeNora M. Johnson

Sheila Horgan
Legislative Policy Analyst



## THE COUNCIL

## REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION
Robert Newman, Legislative Director

## COMMITTEE ON GOVERNMENTAL OPERATIONS
Simcha Felder, Chair

April 3, 2006

| | |
|---|---|
| **INT. NO. 190:** | By The Speaker (Council Member Quinn) (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York in relation to the reporting of lobbyist activities and the enforcement of the lobbying law. |
| **INT. NO. 191:** | By The Speaker (Council Member Quinn) (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York and the New York city charter, in relation to gifts by lobbyists. |
| **INT.NO. 192:** | By The Speaker (Council Member Quinn) (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York in relation to campaign contributions by lobbyists. |

I.    **Lobbying Reform Background**

Lobbying scandals on the federal and state level, such as the Jack Abramoff lobbying scandal in 2005 ("Abramoff scandal"), have reduced the public's trust in its elected officials. The Abramoff scandal involved allegations that lobbyists illegally gave federal legislators gifts and made campaign donations in return for votes or support of legislation.[1] While the legislators argued there was no undue influence as a result of these gifts, these accusations raised serious questions of impropriety.

With the Abramoff scandal as a backdrop, City Council Speaker Christine Quinn and Mayor Michael Bloomberg introduced legislation to reform the city's lobbying laws. The proposed reforms seek to reduce the impact of lobbying culture and special interests in City Hall and strengthen the integrity, transparency and accessibility of city government for its constituents.[2]

II.    **New York City Lobbying Laws**

Under the current New York City lobbying laws, which are contained in subchapter 2 of chapter 2 of title 3 of the administrative code of the city of New York ("administrative code"), the city clerk is responsible for enforcing compliance with the requirements of the lobbying laws.[3] One of the city clerk's responsibilities is to keep statements of registration filed annually

---

[1] *See* http://en.wikipedia.org/wiki/Abramoff-Reed_Indian_Gambling_Scandal
[2] *See* Press Release, The Council of the City of New York, Office of Communications, Speaker Quinn & Mayor Bloomberg Introduce Lobbying Reforms; Speaker Presents Rules Changes Establishing Parameters for Lobbyists' Access to Council Members (Feb.16, 2006) (available at: http://www.nyccouncil.info/pdf_files/reports/02-16_06_loybbyrform.pdf); see also Press Release, Office of the Mayor, Mayor Bloomberg and Speaker Quinn Unveil Comprehensive and Groundbreaking Reform Package of Lobbying Reform (Feb. 16, 2006) (available at: http://www.nyc.gov).
[3] Administrative Code §3-212

by lobbyists open to public inspection for a period of five years.[4]  The lobbyists' annual

statement of registration must include:

> (1) the name, address and telephone number of the lobbyist; (2) the name, address and telephone number of the client by whom or on whose behalf the lobbyist is retained, employed or designated; (3) if such lobbyist is retained or employed pursuant to a written agreement of retainer or employment, a copy of such shall also be attached and if such retainer or employment is oral, a statement of the substance thereof; (4) a written authorization from the client by whom the lobbyist is authorized to lobby, unless such lobbyist has filed a written agreement of retainer or employment pursuant to paragraph three of this subdivision; (5) a description of the general subject or subjects on which the lobbyist is lobbying or expects to lobby; (6) the name of the person or agency before which the lobbyist is lobbying or expects to lobby; and (7) if the lobbyist has a financial interest in the client, direct or indirect, information as to the extent of such interest and the date on which it was acquired.[5]

Lobbyists are also required to report to the city clerk within thirty days after the lobbyist

terminates the retainer, employment or designation for which a statement of registration was

filed.[6]

Further, pursuant to administrative code section 3-216, if a lobbyist "in any lobbying year

expends, receives or incurs combined reportable compensation and expenses in an amount in

excess of two thousand dollars"[7] then the lobbyist must file a first periodic report with the city

clerk by "the fifteenth day next succeeding the end of the reporting period on which the

cumulative total for such lobbying year equalled such sum."[8]  Additionally, any lobbyist that

files a periodic report must subsequently file with the city clerk "a periodic report for each

reporting period that such person expends, receives or incurs combined reportable compensation

---

[4] Administrative Code §3-213(a) & (b)
[5] Administrative Code §3-213(c)
[6] Administrative Code §3-215
[7] Administrative Code §3-216(a)(1)
[8] Administrative Code §3-216(a)(1)

and expenses in an amount in excess of five hundred dollars for the purposes of lobbying during such reporting period."[9]   The periodic report must include:

> (1) the name, address and telephone number of the lobbyist; (2) the name, address and telephone number of the client by whom or on whose behalf the lobbyist is retained, employed or designated; (3) a description of the general subject or subjects on which the lobbyist has lobbied; (4) the person or agency before which the lobbyist has lobbied; (5) (i) the compensation paid or owed to the lobbyist, and any expenses expended, received or incurred by the lobbyist for the purpose of lobbying. (ii) expenses required to be reported pursuant to subparagraph (i) of this paragraph shall be listed in the aggregate if seventy-five dollars or less and if more than seventy-five dollars such expenses shall be detailed as to amount, to whom paid, and for what purpose; and where such expense is more than seventy-five dollars on behalf of any one person, the name of such person shall be listed. (iii) for the purpose of this paragraph, expenses shall not include: (A) personal sustenance, lodging and travel disbursements of such lobbyist; (B) expenses, not in excess of five hundred dollars in any one calendar year, directly incurred for the printing or other means of reproduction or mailing of letters, memoranda or other written communications. (iv) expenses paid or incurred for salaries other than that of the lobbyist shall be listed in the aggregate. (v) expenses of more than fifty dollars shall be paid by check or substantiated by receipts."[10]

The city clerk is required to keep the periodic reports on file and open to public inspection for five years.[11]

Under the lobbying laws, "every lobbyist required to file a statement of registration pursuant to section 3-213 of this subchapter or any client retaining, employing or designating a lobbyist or lobbyists, if during the year such client expended, received or incurred an amount in excess of two thousand dollars of combined reportable compensation or expenses, as provided in paragraph five of subdivision (c) of this section, for the purposes of lobbying," is also required to file an annual report.[12]   The annual report must be filed with the city clerk "by the fifteenth day of January next following the year for which such report is made and shall contain on an annual cumulative basis all the information required in periodic reports by section 3-216 of this

---

[9] Administrative Code §3-216(a)(2)
[10] Administrative Code §3-216(a)(2)(b)
[11] Administrative Code §3-216(d)(2)
[12] Administrative Code§3-217(a)(1) & (2)

subchapter."[13] The annual report must contain the same information as contained in the periodic report.[14] Further, any statement or report that must be filed under subchapter 2 may be filed in person with the clerk or done by mail.[15]

Section 3-223 outlines the penalties for violation of subchapter 2.[16] First, a person or organization is guilty of a class A misdemeanor if he or she knowingly or willfully violates any provision of subchapter 2.[17] The person or organization will also be "subject to a civil penalty, in an amount not to exceed fifteen thousand dollars, to be assessed by the city clerk, or an order to cease all lobbying activities subject to the jurisdiction of the city clerk for a period of time as determined by said clerk not to exceed sixty days, or both such civil penalty and order." [18] Second, if a person or organization "violates a cease and desist order of the city clerk issued under subdivision (a) or enters into a contingency agreement or accepts or pays any contingency fees as proscribed in section 3-218 of this subchapter, shall be guilty of a class A misdemeanor."[19] Also, the person or organization could be subject to a civil penalty "in an amount not to exceed fifteen thousand dollars, to be assessed by the city clerk."[20] Third, if a person or organization fails to file a statement or report after notification by the city clerk it "shall constitute a class A misdemeanor."[21] Additionally, the person or organization may be subject to a civil penalty of up to ten thousand dollars.[22] Fourth, if a person or organization violates any provision of subchapter 2 not punishable under subdivisions a, b, or c of section 3-223 then such person shall be subject to the imposition, by the city clerk, of a civil penalty of up

---

[13] Administrative Code §3-712(b)
[14] See supra footnote 8 and supporting text
[15] Administrative Code §3-221
[16] Administrative Code §3-223
[17] Administrative Code §3-223(a)
[18] Id.
[19] Administrative Code §3-223(b)
[20] Id.
[21] Administrative Code §3-223(c)
[22] Id.

to ten thousand dollars.[23]  However, under section 3-223(e), the city clerk cannot assess any penalty for violation of subdivision a, b, c, or d until 14 days after written notice of the violation is given.[24]

## III.  New York City Conflict of Interest and Campaign Financing Laws

Under New York city laws governing conflicts of interest, it is impermissible for a public servant to accept any "valuable gift, as defined by rule of the [Conflicts of Interest] board, from any person or firm which such public servant knows is or intends to become engaged in business dealings with the city, except that nothing contained herein shall prohibit a public servant from accepting a gift which is customary on family and social occasions."[25]  The Conflicts of Interest Board ("COIB") has defined a "valuable gift" as "any gift to a public servant which has a value of $50.00 or more, whether in the form of money, service, loan, travel, entertainment, hospitality, thing or promise, or in any other form."[26]

Under the New York City campaign finance act, a candidate may be eligible for optional public financing if they meet certain requirements.[27]  Once the candidate for nomination for election or election has met the requirements contained in section 3-703 of the administrative code, the next inquiry is whether the contribution received can be matched under the program with public funds.[28]  In order to obtain campaign finance matching funds, a gift must be matchable.[29] Under the administrative code, loans and the following list are not matchable contributions:

(a) in-kind contributions of property, goods, or services; (b) contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value; (c)

---

[23] Administrative Code §3-223(d)
[24] Administrative Code §3-223(e)
[25] New York city charter §2604(b)(5)
[26] 53 RCNY § 1-01 (title 53 - rules of the city of new york §1-01).
[27] Administrative Code §3-703
[28] Administrative Code §3-702(3)
[29] Id.

contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes; (d) money order contributions from any one contributor that are, in the aggregate, greater than $100; and (e) contributions from individuals under the age of eighteen years.[30]

Under the campaign financing program, each participating, limited participating, or non-participating candidate and his or her principal committee must complete a disclosure report about all "contribution, loan, guarantee, or other security for such loan received by the candidate and such committee..."[31] Finally, the campaign finance board has responsibility for promulgating rules and regulations and providing necessary forms to implement the program.[32]

## IV.    Provisions of Int. No. 190

Int. No. 190 would make various structural and procedural changes to the city's lobbying laws, which if implemented would:  (1) expand lobbyists' disclosure requirements, (2) create a stronger enforcement mechanism with the city clerk, (3) double the applicable fines for violation of the law, and (4) create a commission to review the law's efficacy and to make recommendations on ways to strengthen or improve it.

Accordingly, the bill begins by adding subdivisions (g) through (i) to section 3-211 of the administrative code.  Subdivision (g) defines a "public servant" "as defined in subdivision nineteen of section two thousand six hundred one of the charter."  Pursuant to subdivision 19 of section 2601 of the charter of the city of New York ("charter"), a public servant means "all officials, officers and employees of the city, including members of community boards and members of advisory committees, except unpaid members of advisory committees shall not be public servants."[33]  By adopting the definition contained in Chapter 68 governing Conflicts of

---

[30] Id.
[31] Administrative Code §3-703(a)
[32] Administrative Code §3-708(8)
[33] New York city charter §2601

Interest, the legislation creates uniformity under the law regarding the classification of a public servant.

"Fundraising activities" means the "solicitation or collection of contributions for a candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council, or for the political committee of any such candidate by a lobbyist, or the solicitation or collection of contributions for any public servant who is a candidate for nomination for election, or election, to any elective office, or for the political committee of any such candidate by a lobbyist." The definition further sets forth that "[f]or purposes of this subchapter, the term 'contribution' shall have the meaning set forth in subdivision eight of section 3-702 of the administrative code, and the term 'political committee' shall have the meaning set forth in subdivision eleven of such section." Additionally, if the lobbyist is an organization, then "lobbyist" means the particular "division of the organization that engages in any lobbying activities or whose employment relates to the lobbying activities of the organization."

"Political consulting activities" is defined as "the activities of a lobbyist who for compensation (i) participates in the campaign of any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the city council by providing political advice, or (ii) participates in the campaign of any public servant who is a candidate for nomination for election, or election, to any elective office by providing political advice, or (iii) provides political advice to the mayor, public advocate, comptroller, borough president or member of the city council."

Section two of the bill amends section 3-212 of the administrative code, as amended by local law number 67 for the year 1993, by increasing the duties and powers of the city clerk as

8

defined in subdivision (a) to include conducting "any investigation and audits necessary to carry out the provisions of this subchapter."

Int. No. 190 adds subdivision (b) to section 3-212 of the administrative code, which sets forth that the city clerk "[i]n addition to any audits required to enforce the provisions of this subchapter, the city clerk shall conduct random audits of the statements and reports required to be filed by lobbyists and clients pursuant to this subchapter." Subdivision (b) also requires that the city clerk shall "select statements and reports for random audit in a manner pursuant to which the identity of any particular lobbyist or client whose statements or reports are selected for audit is unknown to the city clerk." The city clerk in conducting the required random audits "shall require the production of such witnesses and records as may have been relevant to the preparation of the statements or reports audited."

Subdivision (c) requires the city clerk to prepare and post annual reports relating to the administration and enforcement of the provisions of this subchapter on the internet. The required report must contain information regarding:

> (i) the number of complaints received from the public and the disposition of such complaints; (ii) the number and amount of civil penalties imposed pursuant to subdivisions (a), (b), (c) and (d) of section 3-223 of this subchapter; (iii) the number and duration of orders issued pursuant to subdivision (a) of section 3-223 of this subchapter; (iv) the number of random audits conducted by the clerk and outcomes thereof; (v) compliance programs developed and implemented for lobbyists and clients; and (vi) such other information and analysis as the city clerk deems appropriate.

Finally, pursuant to subdivision (c), each year by March first, the city clerk must post the report containing information relating to the preceding calendar year on the internet.

Subdivision (d) requires the city clerk to "as soon as practicable after the issuance of an order pursuant to subdivision (a) of section 3-223 of this subchapter or imposition of a civil penalty pursuant to subdivision (a), (b), (c) or (d) of section 3-223 of this subchapter, post on the

internet information identifying the lobbyist or client who committed the violation that resulted in the issuance of such order or imposition of such penalty, the provision of law violated, the duration of such order or the amount of such penalty."

Subdivision (e) places responsibility on the mayor and the city council to jointly appoint a commission twenty-four months after the effective date of the legislation "to review and evaluate the activities and performance of the city clerk in implementing the provisions of this subchapter." The commission will be comprised of five members with the mayor and the city council jointly designating a chair from among the members of the commission.  Within six months of the commission's appointment, the commission must give a report to the mayor and city council "on its review and evaluation which report shall include any administrative and legislative recommendations on strengthening the administration and enforcement of this subchapter."

Section three of Int. No. 190 amends subdivision (b) of section 3-213 of the administrative code, as added by local law number 14 for the year 1986, to require that all statements of registration must be kept available in electronic form in the office of the city clerk for inspection by the public.

Section four of the bill amends paragraph 5 of subdivision (c) of section 3-213 of the administrative code, as added by local law number 14 for the year 1986, to include "information sufficient to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which the lobbyist is lobbying or expects to lobby" in the list of items that lobbyists must report in their statement of registration.

Section five of Int. No. 190 amends section 3-215 of the administrative code, as added by local law number 14 for the year 1986, to require that the lobbyist must still comply with the reporting requirements in section 3-216.1 of subchapter 2 of the administrative code, despite the termination of a lobbyist's retainer.

Section six of Int. No. 190 revises paragraph (3) of subdivision (b) of section 3-216 of the administrative code, as added by local law number 14 for the year 1986, to expand the periodic reporting requirements, with respect to the subject(s) lobbied, to include "information sufficient to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which the lobbyist has lobbied."

Section seven of Int. No. 190 amends paragraph 2 of subdivision (d) of section 3-216 of the administrative code, as amended by local law number 67 for the year 1993, which outlines how the city clerk must store periodic reports. Under the bill, the city clerk would be required to keep periodic reports, in the city clerk's office, available for public inspection in electronic form.

Section eight of the bill adds a new section 3-216.1, titled "fundraising and political consulting reports," to subchapter 2 of chapter 2 of title 3 of the administrative code. Subdivision (a) of section 3-216.1 sets forth that "any lobbyist required to file a statement of registration pursuant to section 3-213 of this subchapter who in any calendar year to which the statement of registration relates, or in the six months preceding such calendar year, engages in fundraising or political consulting activities shall file with the city clerk, on forms supplied by the city clerk, a fundraising and/or political consulting report." Further, subdivision (a) sets forth that the report

> shall be filed in accordance with the schedule applicable to the filing of periodic reports, provided that the first fundraising and/or political consulting report filed in any calendar year shall include information on fundraising and/or political consulting activities that occurred in any period beginning six months preceding the calendar year to which the statement of registration relates through the end of the reporting period for which the

report is filed, to the extent such information has not been reported in a fundraising and/or political consulting report filed in the preceding calendar year.

In addition, pursuant to subdivision (a), "[e]ach subsequent fundraising and/or political consulting report filed in or with respect to the calendar year to which the statement of registration relates shall include information on fundraising and/or political consulting activities that occurred since the end of the reporting period for which the previous report was filed through the end of the reporting period for which the current report is filed." The fundraising and/or political consulting activities must be reported, "whether they are conducted directly by the lobbyist, or through any other entity of which such lobbyist is a principal." Finally, under subdivision (a) the fundraising and/or political consulting reports must be filed no later "than fifteenth day next succeeding the end of such reporting period."

Pursuant to subdivision (b) of section 3-216.1 the fundraising and/or political consulting report shall contain:

(1) the name, address and telephone number of the lobbyist and the individuals employed by the lobbyist engaged in such fundraising and/or political consulting activities; (2) the name, address and telephone number of the candidate, public servant, or elected official to whom or on whose behalf the lobbyist provided fundraising and/or political consulting services; (3) (i) the compensation paid or owed to the lobbyist for such fundraising and/or political consulting activities, and any expenses expended, received or incurred by the lobbyist for the purpose of providing fundraising and/or political consulting services; (ii) Expenses required to be reported pursuant to subparagraph (i) of this paragraph shall be listed in the aggregate if seventy-five dollars or less and if more than seventy-five dollars such expenses shall be detailed as to amount, to whom paid, and for what purpose; and where such expense is more than seventy-five dollars on behalf of any one person, the name of such person shall be listed; and (4) in the case of fundraising activities, the total dollar amount raised for each candidate for which such activities were performed.

Subdivision (c) of section 3-216.1 sets forth that all fundraising and/or political consulting reports "shall be subject to review by the city clerk."

Subdivision (d) of section 3-216.1 requires the city clerk keep all fundraising and/or political consulting reports available in electronic form in the office of the city clerk for inspection by the public.

Section nine of Int. No. 190 amends subdivision (b) of section 3-217 of the administrative code, as amended by local law number 67 for the year 1993, to add the requirement that the annual report required to be filed under paragraph one of subdivision (a) must also include "all information required in fundraising and/or political consulting reports by section 3-216.1 of this subchapter."

Section ten of the legislation amends paragraph 3 of subdivision (c) of section 3-217 of the administrative code, as added by local law number 14 for the year 1986, relating to annual reporting by lobbyists. Pursuant to the proposed changes, in the description of the subject(s) on which each lobbyist is retained, employed or designated by such client has been lobbied, the lobbyist must further include "information sufficient to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which each lobbyist retained, employed or designated by such client has lobbied."

Section eleven of Int. No. 190 amends paragraph 2 of subdivision (d) of section 3-217 of the administrative code, as amended by local law number 67 of the year 1993, to require that the city clerk keep all annual reports available in electronic form in the clerk's office for public inspection.

Section twelve of the legislation amends section 3-221 of the administrative code, as amended by local law number 67 for the year 1993. The bill would require that any statements or reports that are required to be filed must be filed "by electronic transmission in a standard

form as required by the city clerk." Further, section 3-221 sets forth that that "[s]tatements, reports, dockets and any other information required to be kept on file in the office of the city clerk for public inspection pursuant to this subchapter shall be kept in a computerized database and shall be posted on the internet as soon as practicable."

Section thirteen of Int. No. 190 amends section 3-223 of the administrative code, as amended by local law number 67 for the year 1993, to increase the penalties for violations of subdivisions (a), (b), (c), or (d). The amendments to subdivisions (a) and (b) increase the penalty for violations to thirty thousand dollars, and the amendments to subdivisions (c) and (d) increase the penalty for violations to twenty thousand dollars.

Additionally, section thirteen of the bill amends subdivision (g) of section 3-221 of the administrative code to authorize the city clerk to report two types of violations to the department of investigation for further review. The first type of violation that the city clerk can refer to the department of investigation is when the city clerk deems it is a willful violation of subchapter 2. The second type of violation is when the city clerk "receives a report or otherwise suspects that a criminal violation of law, other than a violation of this subchapter, has been or may have been committed."

Finally, section thirteen of Int. No. 190 adds subdivision (h) to Section 3-221 of the administrative code, to require the department of investigation to provide assistance to the city clerk for the "purpose of training personnel who are responsible for the administration and enforcement of the provisions of this subchapter." Further, subdivision (h) sets forth that the "city clerk shall develop compliance programs for lobbyists and clients."

The severability clause of the bill reads that if "any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any

person or situation, such holding shall not affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected."

The effective date clause of the bill indicates that the "local law shall take effect on the ninetieth day after it shall have become a law provided that, upon enactment of this local law, the relevant city agencies shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date and provided further that section twelve of this local law shall take effect one year after it shall have become a law and provided further that any provisions of this local law that require the city clerk to post information on the internet or keep information in a computerized database or in electronic form shall take effect one year after it shall have become a law."

## V.    Provisions of Int. No. 191

Int. No. 191 adds a new subchapter 3 to chapter 2 of title 3 of the administrative code, which among other things prohibits all gifts by lobbyists to public servants.

Accordingly, subchapter 3 begins in section 3-224 by defining two key terms, "lobbyist" and "public servant." A "lobbyist" is defined as "a lobbyist as defined in subdivision (a) of section 3-211 of subchapter two of this chapter or any person engaged in lobbying or lobbying activities as defined in subdivision (c) of section 3-211 of subchapter two of this chapter." Subdivision (c) of section 3-211 defines a lobbyist as "every person or organization retained, employed or designated by any client to engage in lobbying."[34] The definition further sets forth that the term "lobbyist" does not include "any officer or employee of the city of New York, the

---

[34] Administrative Code §3-211(a)

State of New York, any political subdivision of the State, or any public corporation, agency or commission, or the United States when discharging his or her official duties."[35]

A "public servant" is defined as "a public servant as defined in subdivision nineteen of section two thousand six hundred one of the charter."[36]

Section 3-225 prohibits lobbyists from offering or giving a gift to any public servant.

Section 3-226 outlines the provisions for enforcement of subchapter 3. Specifically, section 3-226 sets forth that complaints alleging violations of subchapter 3 "shall be made, received, investigated and adjudicated in a manner consistent with investigations and adjudications of conflicts of interest pursuant to chapters sixty-eight and thirty-four of the charter."

Section 3-227 sets forth that "[a]ny person or organization who knowingly and willfully violates any provision of this subchapter shall be guilty of a class A misdemeanor." Moreover, pursuant to section 3-227, "[i]n addition to such criminal penalties, said person or organization shall be subject to a civil penalty, in an amount not to exceed thirty thousand dollars."

Section 3-228 authorizes the COIB to "adopt such rules as necessary to ensure the implementation of this subchapter, including rules defining prohibited gifts, and exceptions to the prohibition on offering and receiving gifts." In addition, section 3-228 authorizes the COIB to promulgate such rules "to the extent practicable, in a manner consistent with rules and advisory opinions of such board governing receipt of valuable gifts by public servants."

Section two of Int. No. 191 amends the city charter by adding a new section 2607, which sets forth that "[c]omplaints made pursuant to subchapter three of chapter two of title three of the administrative code shall be made, received, investigated and adjudicated in a manner consistent

---

[35] Id.
[36] See supra footnote 33 and supporting text for definition.

16

with investigations and adjudications of conflicts of interest pursuant to this chapter and chapter thirty-four."

The severability clause of the bill reads that if "any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected."

The effective date clause of the bill indicates that the "local law shall take effect on the one hundred eightieth day after it shall have become a law provided that, upon enactment of this local law, the relevant city agencies shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date."

## VI.    Provisions of Int. No. 192

Int. No. 192 amends the administrative code to strengthen the campaign finance system by prohibiting voluntary participants in the campaign finance program from receiving public matching funds for contributions by lobbyists.

Section one of the bill adds subdivision h to section 3-219 of the administrative code, which sets forth that lobbyists will also be obligated to "provide the statement identifying his or her status as a lobbyist to a participating candidate pursuant to subdivision one of section 3-720 of the administrative code."

Section two of the bill adds paragraph (g) to subdivision 3 of section 3-702 of the administrative code, as amended by local law number 58 for the year 2004, to include

"contributions from a lobbyist or a person affiliated with a lobbyist" in the list of contributions that are not matchable.

Section two of Int. No. 192 also adds new subdivisions 16 and 17.  Subdivision 16 defines the term "lobbyist" as a "lobbyist" as defined in section 3-211.[37]  In addition, the section distinguishes that if a person is the "lobbyist" then the "person affiliated with a lobbyist" means "the spouse or domestic partner and unemancipated children of a lobbyist."  Further, if the "lobbyist" is an organization, then "lobbyist" means "only that division of the organization that engages in any lobbying activities or whose employment relates to the lobbying activities of the organization."  In the context of an organization as a "lobbyist", the term "person affiliated with a lobbyist" means "any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees."

Subdivision 17 defines "lobbying" or "lobbying activities" as those terms are "defined in section 3-211 of this title." Section 3-211 defines "lobbying" or "lobbying activities" as:

> (i) the passage or defeat of any local law or resolution by the city council, (ii) the approval or disapproval of any local law or resolution by the mayor, (iii) any determination made by an elected city official or an officer or employee of the city with respect to the procurement of goods, services or construction, including the preparation of contract specifications, or the solicitation, award or administration of a contract, or with respect thee solicitation, award or administration of a grant, loan, or agreement involving the disbursement of public monies, (iv) any determination made by the mayor, the city council, the city planning commission, a borough president, a borough board or a community board with respect to zoning or the use, development or improvement of real property subject to city regulation, (v) any determination made by an elected city official or an officer or employee of the city with respect to the terms of the acquisition or disposition by the city of any interest in real property, with respect to a license or permit for the use of real property of or by the city, or with respect to a franchise, concession or revocable consent, (vi) the adoption, amendment or rejection by an agency of any rule

---

[37] See supra footnotes 34 & 35 and supporting text for definitions.

having the force and effect of law, (vii) the outcome of any rate making proceeding before an agency, or (viii) any determination of a board or commission.

Section three amends paragraph (a) of subdivision 6 of section 3-703 of the administrative code, as amended by local law number 58 and 59 for the year 2004, to include a requirement that each participating or limited participating candidate and his or her principal committee provide information regarding "whether such contributor, lender, guarantor, or provider of security reported they were a lobbyist or a person affiliated with a lobbyist during the calendar year in which the contribution or loan was made."

Section four amends subdivision 8 of section 3-708 of the administrative code, as amended by local law number 60 for the year 2004, to add section 3-720 to the list of sections "the board shall require the filing of reports or contributions and expenditures...in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements."

Section five adds paragraph (d) to subdivision 2 of section 3-710 of the administrative code, which sets forth that "[n]otwithstanding any other provision of law, rule or regulation, a participant or his or her principal committee shall not be required to repay to the board any public matching funds that were paid to the participant or his or her principal committee by the board based on contributions from a lobbyist or person affiliated with a lobbyist." In addition, paragraph (d) outlines that "[s]uch payment may only be deducted by the board from a subsequent payment, if any."

Section six adds section 3-720 to chapter 7 of title 3 of the administrative code. Subdivision 1 of section 3-720 sets forth that "[e]ach participating candidate and his or her principal committee shall obtain from every contributor, lender, guarantor, or provider of security providing a contribution or loan, or guarantee or other security for such loan, a

statement, in a form prescribed by the campaign finance board, as to whether such contributor, lender, guarantor, or provider of security was a lobbyist or a person affiliated with a lobbyist during the calendar year in which such contribution or loan was made." Further, the board maintains discretion to prescribe "such information be provided on the same form providing information as to the contributor's residence and employment." If a contributor fails to identify himself or herself as lobbyist or lobbyist's affiliate, or if a candidate unintentionally submits a matching fund request for a contribution by a lobbyist or a lobbyist's affiliate, it "shall not result in any civil penalty being assessed against a candidate or principal committee." Subdivision 1 also sets forth that the "city clerk shall, at the board's request, provide appropriate assistance to the board in determining whether a lobbyist or person affiliated with a lobbyist has complied with the requirements of this section."

Subdivision two of section 3-720 outlines the board's publication requirements. Specifically, the "board shall make available to the public, no less than quarterly and on at least a monthly basis during the five months preceding the general election for city offices and on at least a weekly basis during the month preceding the primary election for such offices and the month preceding the general election, information relating to lobbyists and persons affiliated with lobbyists that has been ascertained by the board pursuant to this section or subdivision six of section 3-703 of this chapter." This subdivision further requires that this information must be organized "in a clear and understandable format and shall be as current as practicable."

The severability clause of the bill reads that if "any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate the remainder of this local

law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected."

The effective date clause of the bill indicates that the "local law shall take effect on the ninetieth day after it shall have become a law and shall be applicable to all receipts, expenditures, and public funds claims for elections held after such effective date provided that, upon enactment of this local law, the relevant city agencies shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date."

1

2    CITY COUNCIL

3
     CITY OF NEW YORK
4
     -------------------------------x
5
     THE TRANSCRIPT OF THE MINUTES
6
                 of the
7
     COMMITTEE ON GOVERNMENTAL OPERATIONS
8
     -------------------------------x
9

10                   April 4, 2006
                     Start:  1:06 p.m.
11                   Recess: 3:50 p.m.

12                   City Hall
                     Committee Room
13                   New York, New York

14
          B E F O R E:
15
                 SIMCHA FELDER
16                               Chairperson,

17
                 COUNCIL MEMBERS:   Joseph Addabbo
18                                  Erik Dilan
                                    Domenic Recchia
19                                  Larry Seabrook
                                    Peter Vallone, Jr.
20                                  Inez Dickens
                                    James Oddo
21                                  David Yassky
                                    Speaker Quinn
22

23

24        LEGAL-EASE COURT REPORTING SERVICES, INC.
               17 Battery Place -  Suite 1308
25             New York, New York 10004
                    (800) 756-3410

2

1

2  A P P E A R A N C E S

3
   Anthony Crowell
4  Council to the Mayor of New York City

5  Frank Barry
   Senior Policy and Communications Advisor
6  New York City Mayor's Office

7  Michael Davies
   Executive Director
8  New York City Conflicts of Interest Board

9  Emmannuel Michalos
   Director of Finance
10 New York City Clerk's Office

11 Nicole Gordon
   Executive Director
12 New York City Campaign Finance Board

13 Dick Daley
   Executive Director
14 Citizens Union
   New York City, NY
15
   Douglas Israel
16 Public Policy and Advocacy Director
   Citizens Union
17 New York City, NY

18 Megan Quattlebaum
   Associate Director
19 CommonCause
   New York City, NY
20
   Gene Russianoff
21 Senior Attorney
   New York Public Interest Research Group
22 New York City, NY

23 Peter J. Kiernan
   Chair, New York City Affairs Committee
24 New York City Bar Association

25

3

```
 1

 2   A P P E A R A N C E S (CONTINUED)

 3
     Chad Marlow
 4   Executive Principal Advocate
     The Public Advocacy Group
 5   New York City, NY

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2           CHAIRPERSON FELDER: Sorry for the

3   delay.  It's because we had to wait for the

4   Administration.  You will have to respond to those

5   accusations in a few minutes.

6           Before anything, I'd like to

7   introduce my colleagues.  On my right, Council

8   Member Inez Dickens.  And Council Member Joseph

9   Addabbo.  I thank you both for being here on time,

10  which is very rare.  Not of both of you.  But of the

11  City Council, of itself.  On my right, my immediate

12  right, is the Counsel for the Government Operations

13  Committee, DeNora Johnson, also known as the Boss.

14  And if anybody here has any questions regarding the

15  Committee, they should direct them directly to Ms.

16  Johnson.  And you can always call me, but if you

17  want to know what's going on, you should speak to

18  DeNora.  And on my left, Mike Katzitanos (phonetic)

19   -- got it right?  -- Who is my legislative aide.

20  Also here is Robert Newman,  -- should I introduce

21  you?  Robert Newman, who is the Legislative Director

22  for the City Council.  I thank you all for coming

23  here today.

24           I also would like to just mention an

25  appreciation, and I don't do it often enough, the

5

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Sergeant- at- Arms, who are here with us, who will

3    keep this place running smoothly and really deserve

4    more appreciation than they get.

5                    All right.  Good afternoon, and

6    welcome to this hearing.  That's why you're the

7    Boss.  You see?  I also want to introduce Council

8    Member Peter Vallone, Jr., who just joined us.

9                    The Committee will hear comments

10   today on Intros. 190, 191, and 192, which make up

11   the comprehensive lobbying reform plan proposed by

12   the Speaker in conjunction with the Mayor. Briefly,

13   the bills would, one, strengthen the mechanism for

14   monitoring and enforcing compliance with the City's

15   lobbying laws. Two, increase lobbyists reporting

16   requirements under the law.  And prohibit gifts by

17   lobbyists to government officials.  And finally,

18   four, prohibit voluntary participants of the

19   Campaign Finance Program from receiving public

20   matching funds for contributions by lobbyists.

21                   The Committee looks forward to

22   hearing from witnesses and listening to their

23   testimony about these bills. Ultimately, the

24   Committee's goal is to receive a deeper

25   understanding of the bills, and obtain constructive

6

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   feedback about the substance of the bills, so that

3   we can ensure that the legislation, which as finally

4   passed, is as cohesive and comprehensive as

5   possible.

6                   As a member of the Council, I am

7   proud to witness such a collaboration between the

8   Speaker and the Mayor.  For any of you who have been

9   living in New York City for a while, you would

10  understand how wonderful that statement is.  It

11  ticked me pink, if I can say that, when I was

12  reading the bills, and it said in the bill, "I, the

13  Speaker, Council Member Quinn, in conjunction with

14  the Mayor...".  That's something that we didn't see

15  a lot of.  So that's wonderful.  And I applaud them

16  both for their joint efforts, and I hope that this

17  legislation will herald a mew level of transparency

18  and efficiency within City government.

19                  Before we begin the formal testimony,

20  I just wanted to just also introduce our Policy

21  Analyst for the Government Operations Committee, who

22  is on my right, behind Council Member Inez Dickens,

23  Sheila Horgan.

24                  And now, I just also want to mention,

25  if anybody in the audience intends to testify, they

7

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   should see one of the Sergeant- at- Arms in the back

3   and make sure you fill out one of the forms.  The

4   rule in this Committee, and I hope it is one that

5   will spread in other Committees, is that unless you

6   fill out a form, within 15 minutes of the beginning

7   of the hearing, I will not hear your testimony.

8   Unless there's some response to something else.

9   Because I don't think it's fair for the people who

10  are here, including myself, to have to listen to

11  testimony of anybody that comes two hours late, and

12  you know, sort of didn't want to wait on line.  So I

13  don't know whether you like that or not, but that's

14  for another hearing we could have about that.  But

15  if you intend to testify today, or if you have any

16  thought of testifying, you should fill out a form

17  and then you can always say, no, I don't want to do

18  it.  But if in an hour, you decide you suddenly want

19  to testify, we're not going to hear the testimony.

20            Having been as gracious as that, I'd

21  like to ask the Administration to begin their

22  testimony.  Please identify yourself for the record.

23            MR. CROWELL: Good afternoon Chairman

24  Felder, and members of the Committee.  Thank you for

25   the opportunity to appear before you today.  My name

8

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   is Anthony Crowell and I'm Counselor to Mayor

3   Michael R. Bloomberg.  With me today is my

4   colleague, Frank Barry, Senior Policy and

5   Communication Advisor in the Mayor's Office.  I will

6   testify on Intros. 190 and 191, and Frank will

7   testify on Intro. 192.

8                    First, I want to begin by applauding

9   the members of the Council for joining with the

10  Bloomberg Administration to take up the important

11  issue of lobbying reform, and issue that cuts to the

12  heart of government integrity.  In his State of the

13  City speech, Mayor Bloomberg made lobbying reform

14  and important priority for 2006.  And he was pleased

15  that Speaker Quinn and the Council responded so

16  quickly, bringing additional ideas to the table that

17  have strengthened this legislative package.

18                    Lobbying activity in New York City

19  has more than doubled over the last five years.  And

20  concerns have grown about the influence lobbyists

21  wield.  Indeed, is easy to understand why many

22  citizens believe that lobbyists get preferential

23  treatment, and certainly the recent scandals in

24    Washington D.C. have only reinforced public cynicism

25    about government.  To counter this trend, it is not

9

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    enough for government officials to proclaim our

3    personal integrity.  We must work to strengthen the

4    integrity of government itself, and raise the

5    standards by which we are bound.

6              Over the past six weeks, the

7    Bloomberg Administration and City Council have taken

8    up that work.  And now, with the help from the

9    public and civic groups, we look forward to passing

10    legislation that raises the bar for all of City

11    government.

12              Let me begin by discussing Intro.

13    190, which would achieve two important goals:

14    Broadening disclosure, and establishing an effective

15    enforcement apparatus.  The latter being the key to

16    the entire legislative package.

17              Intro. 190 would broaden disclosure

18    by requiring lobbyists to report their activities

19    with far more specificity. Currently, lobbyists are

20    required to disclose the issues on which they are

21    lobbying.  And many lobbyists fully comply.  But too

22    often, some lobbyists ignore this requirement,

23    providing only the most general description, or no

24  information at all.  Under Intro. 190, lobbyists

25  would be required to identify specific bills,

10

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  resolutions, rules, regulations, or other matters on

3  which they are lobbying.

4          In addition, the bill would broaden

5  disclosure in the area of political consulting and

6  fund raising.  Increasingly, over the last several

7  years, lobbying organizations have branched into the

8  world of political consulting, and vice versa.  At

9  the Conflicts of Interest Board's recent hearings on

10  this growing industry, many civic groups raised a

11  number of concerns about this trend, including that

12  consultants might use their relationships with

13  elected officials to lobby for special interests,

14  and that consultants or fund raisers might offer

15  elected officials reduced rates in order to expand

16  their lobbying practices.

17          While the imposition of restrictions

18  on the relationships between lobbyists and their

19  clients is an open question, it is clear that the

20  public has a right to know more about how those

21  relationships are structured.  Intro. 190, by

22  requiring that lobbyists who also serve as

23    consultants or fund raisers disclose these

24    activities, will pull back the blinds and allow

25    sunlight to shine on these relationships and their

11

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    financial implications.  To be clear, this will not

3    impose any additional burdens on lobbyists.  It will

4    merely require them to disclose additional

5    information in order to improve government

6    transparency.

7                    For instance, if an elected official

8    or other government employee hires a lobbyist

9    consultant to conduct a poll, the campaign committee

10    that pays for the poll must disclose that payment to

11    the Campaign Finance Board.  Under Intro. 190, the

12    lobbyists too, would be required to disclose those

13    total payments to the City Clerk.  Similarly, if a

14    government employee's campaign committee hires a

15    lobbyist to raise campaign contributions, the

16    campaign must disclose that payment to the Campaign

17    Finance Board as it must disclose the name of any

18    individual who serves as a fund raising agent or

19    intermediary.  Otherwise known as a bundler.

20                    Intro. 190 would merely require

21    lobbyists what is required of candidates, public

22    disclosure of these activities, in this case, to the

23  City Clerk.  The value of this disclosure will be to

24  significantly enhance access to this data by making

25  it available in one central location.  And making it

12

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  far easier to draw connections between lobbyists'

3  activities and the public policies they are

4  attempting to influence.  A citizen who searches the

5  CFB's database, for instance, does not know which

6  consultants and fund raisers also serve as

7  lobbyists.  Nor which public policies and officials

8  those lobbyists are attempting to influence.  Under

9  Intro. 190, citizens can go to the Clerk's website

10  and easily obtain all of this information.

11              Indeed, Intro. 190 will make all

12  information far more easily accessible by requiring

13  that all quarterly and annual reports be submitted

14  electronically, and placed on the Internet in real

15  time for the public, including law enforcement

16  agencies and the press to see.  It is important to

17  note too, that the City Clerk's website will be

18  overhauled, including the creation of a new domain

19  name and home page, to make clear that lobbying

20  regulation, and not just the issuance of marriage

21  licenses, is one of the core functions and

22   responsibilities of the Clerk's Office.

23                    Now, let me turn to the critically

24   enforcement provisions of Intro. 190.  Never before

25   has there been the political will to enforce the

13

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    lobbying law.  And never before has the Office of

3    the City Clerk been given the resources and support

4    structures to do it.  As a result, the Clerk's

5    Office has functioned as little more than a

6    repository for lobbying records, not an enforcement

7    agency.  Mayor Bloomberg and Speaker Quinn have made

8    clear that this is now going to change.  To that

9    end, let me address the suggestion that the new laws

10   should be enforced by an agency other than the

11   Office of the City Clerk, which is understandable,

12   given the history of non- enforcement.

13                    The administration of the lobbying

14   law, including provisions for its enforcement, which

15   includes subpoena power, is placed by local law in

16   the Office of the City Clerk, a unit of the City

17   Council.  As a result, the idea that the lobbying

18   laws administration be moved out of the Clerk's

19   Office, and thus, out of the Council, would be a

20   curtailment of the Council's jurisdiction, which

21   could only be achieved locally by voter referendum.

22  Instead of undertaking a lengthy referendum process

23  for critical reforms that could be potentially

24  defeated at the ballot box, the Mayor and Speaker

25  committed to immediate reforms by ensuring that the

14

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Clerk's Office has a sufficient number of

3  investigators to be trained by the Department of

4  Investigation, to perform the lobbying laws audit

5  and enforcement functions.  The Clerk's Office is

6  also required to take appropriate steps to educate

7  those lobbyists about how to comply with the

8  requirements of the lobbying law.

9          The new investigative unit would not

10  only have the authority and resources to review all

11  lobbyist filing under the lobbying law, but the unit

12  would also be required to conduct random audits of

13  lobbyists' statements and reports each year.  Any

14  findings of criminal activity by the Clerk's Office

15  would be required to be reported immediately to DOI.

16  Likewise, reports of, or suspected criminal activity

17  must also be reported to DOI immediately.  At all

18  times, DOI would be able to use its plenary

19  oversight and investigative powers found in existing

20  law to deal with issues of public corruption that

21  may arise in the context of the lobbying law.  In

22  addition, fines for lobbying law violations would be

23  doubled, and there would be immediate penalties for

24  lateness in filing quarterly or annual reports.

25              Citizens have a right to demand that

15

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  any lobbying laws on the books are strictly

3  enforced.  Yet for too long, the enforcement

4  apparatus within New York City's lobbying law has

5  been collecting dust.  Intro. 190 sends a clear

6  message to lobbyists that it is not business as

7  usual at the Clerk's Office.

8              The bill's enforcement mandate also

9  places additional public reporting requirements on

10  the City Clerk, who would be required to post

11  information about orders and findings of a

12  violation, or the imposition of a fine against a

13  lobbyist on the Internet, along with any other

14  pertinent information.  Further, the Clerk would

15  publish a report annually that contains information

16  about the number of complaints received and their

17  disposition, the number and duration of orders

18  issued, the number and amount of civil penalties

19  imposed, the number of random audits conducted, and

20  their outcomes, and compliance programs developed

21    and implemented.

22                    Finally, to ensure that the reforms

23    are meeting their promise, and to create a process

24    for strengthening them, the Mayor and Council will

25    be required to jointly appoint a five- member

16

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Commission 24 months after the reforms are enacted,

3    to review the success of their implementation.  The

4    Commission will make appropriate administrative and

5    legislative recommendations on strengthening the

6    enforcement of the lobbying law.

7                    Now, I will turn to Intro. 191, which

8    is built on the very basic idea that citizens have a

9    right to expect that their elected officials are not

10   being influenced by gifts from lobbyists. The bill

11   would ban lobbyists from giving gifts to all public

12   employees.  From top to bottom.  That means, if

13   lobbyists take government employees to lunch, they

14   must split the bill.  If lobbyists offer them

15   tickets to professional sporting events or

16   performances, City workers must pay their own way.

17   And if lobbyists provide them with gifts of value,

18   City workers must provide full payment.

19                    The bill directs the Conflicts of

20  Interest Board, also known as COIB, the agency

21  currently charged with enforcing prohibitions on the

22  receipt of gifts by public servants, to adopt rules

23  defining prohibiting gifts by lobbyists, including

24  exceptions.  And to do so in a manner consistent

25  with current guidelines followed by public servants.


17

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2

3               When considering limited exceptions,

4   we recommend that the COIB, for example, consider

5   the extent to which it would be appropriate for

6   government employees to participate in a widely

7   attended event, hosted by an organization that may

8   be a registered lobbyist, when the event is focused

9   on important issues of public policy related to

10  their official duties.  Our goal is not to squelch

11  communication between lobbyists and government

12  employees. But to eliminate any unfair advantages,

13  real or perceived, that lobbyists may gain by

14  offering gifts to government employees.

15              The procedure for reporting

16  violations of the lobbyists gift ban would mirror

17  those presently in place for reporting violations of

18  the Conflicts of Interest Law.  And finally, I note

19  that we are mindful of the additional

20  responsibilities that these reforms would place on

21  the Conflicts of Interest Board, and the

22  Administration and Council staff have recognized the

23  need to ensure that appropriate resources are

24  available for these and other core agency functions

25  of COIB to be carried out.

18

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2           Now, I would ask my colleague, Frank

3  Barry to discuss Intro. 192.

4           MR. BARRY: Good afternoon Chairman

5  Felder and members of the Committee.  Thanks for

6  having us here today.  My name, again, is Frank

7  Barry.  And I am the Senior Policy and

8  Communications Advisor in the Office of the Mayor.

9  As you know, I formerly worked for several years at

10  the City's Campaign Finance Board, and over the

11  years, I've continued to study the performance of

12  the City's matching funds program.

13           All reform programs are works in

14  progress, whose long- term success relies on elected

15  officials to make needed adjustments.  The City

16  Council has strengthened the Campaign Finance Act a

17  number of times since its inception in 1988, and

18  over the years, public funding formulas have grown

19  increasingly generous.  As this has happened, the

20  importance of adopting appropriate controls and

21  safeguards to prevent waste and abuse has become

22  ever more important.

23            The primary purpose of the Campaign

24  Finance Program, as you know, is to encourage

25  grassroots fund raising and diminish the influence

19

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  of special interests.  In recent years, however, as

3  lobbying activity has exploded in New York City, the

4  Campaign Finance Program has become a boon to

5  lobbyists.  Providing $1,000 in public matching

6  funds for every $250 contribution from a lobbyists,

7  has the effect of rewarding lobbyists by magnifying

8  the value of their contributions, which is directly

9  opposite the program's purpose.

10            Citizens have a right to expect that

11  their tax dollars will not be used to match campaign

12  contributions from lobbyists.  In fact, it is likely

13  that most New Yorkers would be unpleasantly

14  surprised to learn that their tax dollars have been

15  benefiting lobbyists for more than 15 years.

16            Intro. 192 will eliminate a long-

17  standing perversion of the Campaign Finance Act, by

18  making ineligible for matching funds contributions

19  from registered lobbyists and person affiliated with

20  lobbyists, including spouses, domestic partners, and

21  any co workers who engage in lobbying activity, or

22  who are employed in an organization's lobbying

23  division.  Mayor Bloomberg and Speaker Quinn have

24  rightly recognized that meaningful enforcement of a

25  ban on matching funds for lobbyists must include

20

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  those persons affiliated with lobbyists.

3           There are two primary means by which

4  the CFB will be able to determine whether an

5  individual meets this definition of a lobbyists.

6  First, the CFB will have access to the City Clerk's

7  online database of lobbyists, from which it will be

8  able to cross reference contributors.  And

9  Campaigns, too, I should note, will have access to

10 this public data.  And second, contributors will be

11 required to disclose whether or not they are

12 registered as lobbyists, or meet the definition

13 outlined above of a person affiliated with a

14 lobbyists.

15          The legislation takes great care to

16 make it as easy as possible for campaigns to collect

17 and submit this information, by expressly

18    contemplating that campaigns will be able to obtain

19    such information on the CFB's contribution card.

20    Indeed, the CFB recommends that campaigns collect

21    contribution cards for all contributions, and that

22    campaigns include contribution cards in all fund

23    raising mailings.  Intro. 190 would simply require

24    contributors to disclose, in addition to their home

25    address and the address of their employer, whether

21

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    or not they meet the definition of a lobbyists.

3              We understand that complying with the

4    Campaign Finance Act can be a burdensome process,

5    and we agree the reporting requirements should be

6    structured in the simplest manner possible. Under

7    this bill, it will be no more difficult to collect

8    lobbying information than it is to collect

9    information about a contributor's employer.  And by

10   taking this one small extra step, we will ensure

11   that taxpayer funds are not spent to subsidize and

12   enhance campaign contributions from lobbyists and

13   those affiliated with lobbyists. At the same time,

14   the Campaign Finance Program will remain, by far,

15   the most generous public financing program of any

16   city or state in the nation.

17              In sum, Intros. 190, 191 and 192 take

18    important steps to strengthen public confidence in

19    government, improve the transparency and integrity

20    of the political process, put teeth into the

21    lobbying law to ensure that it is enforced, and

22    advance the Campaign Finance Program's mission of

23    reducing the influence of special interests.

24              We applaud the Council for taking up

25    these important bills.  We expect that the

                                                    22

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    thoughtful consideration of the Campaign Finance

3    Board, civic groups, and others during this public

4    hearing process will further strengthen these bills,

5    and we look forward to working with you to passing

6    them into law, and seeing that they are successfully

7    implemented.

8              Thank you, and we would be pleased to

9    answer any questions you may have.

10              CHAIRPERSON FELDER: Thank you very

11    much.  We've been joined by Council Member Domenic

12    Recchia, and Council Member Eric Dilan.  Council

13    Member Peter Vallone Jr.  Councilman Addabbo please.

14              COUNCIL MEMBER ADDABBO: Thank you Mr.

15    Chair.  And to the Administration, I thank you very

16    much for being here today.  It appears to be the

17  first step of a very important issue.

18              Mr. Crowell, on your statement, on

19  your statement, third paragraph down, you said,

20   "lobbying activity in New York City has doubled

21  over the past five years".  How is that measured?

22  What measuring techniques did you use to measure how

23  it's doubled over the past five years?

24              MR. CROWELL: It's measured by the

25  lobbying activity that's reported to the City Clerk,

23

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  in terms of the dollar amount spent on lobbying.

3  Each year, as you know, the Clerk publishes and

4  annual report, and I think the number of five years

5  ago was something in the vicinity of $14 million.

6  And it's now in the vicinity of $33 or $34 million.

7              COUNCIL MEMBER ADDABBO: In that

8  reporting done by lobbyists, correct?

9              MR. CROWELL: That's right.

10              COUNCIL MEMBER ADDABBO: Because you

11  had mentioned, that some lobbyists ignore that

12  reporting.  Currently, obviously, tough to enforce.

13  What are the penalties for not reporting?

14              MR. CROWELL: Well, there are

15  penalties written into the law for non- reporting

16  and non- compliance.  But the reality is that the

17  Clerk has never imposed, to the best of our

18  knowledge, any penalties for non- compliance.  And

19  so, really, the heart of this effort is to create

20  and enforcement mechanism with not just penalties in

21  the law, but penalties that will be imposed for non

22  compliance.

23              COUNCIL MEMBER ADDABBO: And as you

24  move into, like you said, the enforcement aspect of

25  it, Intro. 190, 191, 192, a lot of emphasis is put

                                                        24

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  on City Clerk's Office and Conflicts of Interests

3  Board.  Currently, they're  --  I'm going to guess

4   -- not sufficiently staffed to implement these

5  three Intros.  If not, what are we looking at as

6  additional staffing levels and the cost of which may

7  be incurred by the implementation of Intro. 190, 191

8  and 192.

9              MR. CROWELL: Right.  Well for the

10  Clerk's Office, there are currently is not an

11  investigative unit, so that would be required.  And

12  investigative unit would need to be staffed.

13              In terms of the number of

14  investigators, we were going to be working with the

15  Council staff to help determine that. Obviously, it

16    would be a handful of investigators, and working

17    with DOI, who would be responsible for training

18    them, just to make sure that the sufficient number

19    given, the scope of what's being required.  In

20    addition, I would think that the Conflicts of

21    Interest Board will need to have additional

22    enforcement staff or enhanced, certain aspects of

23    their enforcement staff now.  And we'll be reviewing

24    that as well, in the next month, to ensure that

25    everything would be ready for the FY 2007 budget.


                                                        25


1     COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    COUNCIL MEMBER ADDABBO: Just so I

3     know, we are currently unaware, it's to be

4     determined, how much staffing levels, how much cost,

5     at this point, correct?

6                    MR. CROWELL: Right.  In any event, I

7     don't think the costs will be substantial, given

8     what we are trying to achieve.  So it would actually

9     be relatively low costs for an enormous gain in the

10    level of transparency that will be achieved with

11    this program.

12                   COUNCIL MEMBER ADDABBO: And if I may,

13    again, the generalities of saying an enormous gain,

14    do we have any specific number of goal that you're

15    looking to save the taxpayers through the matching

16  funds, I suppose.  But do you have a goal that

17  you're looking to save in dollar amounts, when

18  implementing these three Intros?

19              MR. CROWELL: No.  There certainly

20  wouldn't be that there's a goal to save.  It would

21  be, you know, the real savings is in  --  really,

22  you can't put a value on public integrity,

23  therefore, I mean, public integrity is the ultimate

24  gain, so obviously, we're not  --  this is by no

25  means a budget saving mechanism.


                                        26

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2              COUNCIL MEMBER ADDABBO: Respectfully,

3  again, when you said enormous gain, I thought you

4  had something in mind.

5              MR. CROWELL: Oh no.  Gain in terms of

6  public integrity.

7              COUNCIL MEMBER ADDABBO: Okay.

8              MR. CROWELL: And that is the single

9  focus of this bill.

10             COUNCIL MEMBER ADDABBO: Just

11  checking.  Thank you Mr. Chair.  Thank you.

12             CHAIRPERSON FELDER: Do any colleagues

13  have any other questions?  Councilman Vallone.

14             COUNCIL MEMBER VALLONE: Thank you Mr.

15   Chair.  I think most of my questions would be more

16   appropriate for Conflicts of Interests or CFB.  But,

17   while drafting this legislation, it's very important

18   that we establish what our intent is.  We cannot

19   leave this up to boards, or Clerk's Office to

20   interpret our intent. Because we've seen the

21   problems we've run into numerous occasions with CFB

22   and other agencies, in trying to interpret what we

23   said. Sometimes very clearly said, and sometimes

24   left nebulous.

25                    So therefore, when you state in your

27

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    testimony that it's gifts of value.  What do you  --

3     I guess Council Members, or any other person who

4    works for the City can't accept a gift of value from

5    a lobbyist.  What do you envision that to mean?

6                    MR. CROWELL: Well, as you said, the

7    Conflicts of Interest Board would be the entity most

8    appropriate to answer the question, since the rule-

9    making authority on those provisions is going to be

10   given to them.

11                   COUNCIL MEMBER VALLONE: That is what

12   I did not want to happen.  And I want to make sure

13   that we have  --  that our intent is clear here.

14   Because I will not pass a bill that prevents me from

15  taking a tee shirt at a breakfast.  And becoming a

16  criminal if I do that, and losing my job.  I will

17  not do that.  I need to make sure that it is in

18  writing, and it is clear, what we intend, if we pass

19  this kind of legislation.  So I want to know what

20  your opinion is on what it should be.

21              MR. CROWELL: Sure.  And I'm going to

22  address it head on.  We wrote into the bill,

23  provisions that would require the Conflicts of

24  Interest Board to promulgate them both in a manner

25  consistent to the way that they've promulgated rules

28

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  and issued advisory opinions on receipt of gifts by

3  public servants.  What we're doing here is, --  the

4  flip side of this is about what lobbyists can give

5  to public servants, and what the Conflicts of

6  Interest Board has in place now is, how public

7  servants can receive gifts, or accept gifts.  So,

8  for instance, what one might envision is something

9  like the State Lobbying Commission has put out is

10  that events, for instance, are widely attended, like

11  a legislative breakfast, and somebody gets a coffee

12  or a bagel, I would imagine that that is probably

13  something the Conflicts of Interest Board would look

14    at as something that would not necessarily be a

15    prohibited receipt of something from a lobbyist

16    organization.

17              And also, perhaps, there's something

18    like a tee shirt, or a mug, or something that would

19    be given as  --  that's given widely, or widely

20    distributed, that is of the minimalist value, that

21    would be something that is not --  would not be

22    regulated here.  I think what we're really focusing

23    on, instead of those widely attended events where

24    there's a clear public purpose, and public policy

25    issues are being discussed, is when there is

29

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    intimate occasions, where a lobbyist and a Council

3    Member, or a lobbyist and an Administration official

4    go out for dinner, or have a one- on- one, or a two-

5    on- one kind of exchange of ideas of information and

6    there's a unique level of access that's being

7    granted by the government official.  That's really

8    the heart of the aim here.  So not to cut off

9    legislative breakfasts, where actually, it's for the

10    benefit of the City.

11              COUNCIL MEMBER VALLONE: I don't

12    disagree with that, but again, I'm not going to

13    leave that up to interpretation. Because too many of

14  us have been fined for technicalities, which were

15  never intended to be enforced by the City Council

16  when we passed legislation.

17            For example, we have Lobbying Day

18  here at City Hall, where many of us sit in our 250

19  offices and every different group from New Yorkers

20  for Parks, and you name it, will come through and

21  lobby us.  And perhaps drop off a pen, or a hat, or

22  a poster, or something of that nature.  And I'm not

23  going to sit there and try to figure out what's the

24  minimis, what's of value?  Is this a public event?

25  Or am I going to jail?  It's just not something I

30

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  need to do as a public official.  So we need to make

3  sure that this is delineated in the law that we

4  pass.

5            But I will ask questions down the

6  line about this. So thank you.

7            I also should disclose, I guess, that

8  a relative of mine, some of you may know, is in the

9  lobbying business now, so it might make birthdays

10  around the house a little bit complicated. But I

11  probably should say that on the record.

12            CHAIRPERSON FELDER: That's how we fix

13  it in Borough Hall.  I want to introduce Council

14  Member Larry Seabrook, who has joined us.  And

15  Councilman Domenic Recchia.  Did you have a

16  question?

17              COUNCIL MEMBER RECCHIA: I have lots

18  of questions. I could sit here for hours.  I think

19  the bill, the way it's written today, it needs a lot

20  of clarification.  It's way too broad.  Right now,

21  the way this bill is written, my colleagues and I

22  are being set up for failure.  We're being set up to

23  get indicted.  We're being set up to being sent up

24  the river.  I am telling you the truth.  The way

25  this bill is written, okay?  I can't even be caught

                                                    31

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  in the coffee shop with anybody.  Have a cup of

3  coffee.  If someone sends flowers to my office  --

4  and let me tell you something.  I represent a lot of

5  senior citizens.  They come in, they love me. They

6  bring me flowers.  I'm supposed to say, no, I can't

7  take it anymore.  It's way too broad.  There's a lot

8  of things in here that needs clarification.

9              I could just go on, but I could sit

10  down and really go into this, because this is really

11  being set up for my colleagues and I.  And we have

12  to really straighten out.  Listen, I'm not against

13  reform.  I'm not against, you know, changing things.

14  Because I believe as time goes on, you have to

15  change with the times.  I'm not against that.  But

16  I'm just trying to say, is that we're not here to

17  give Campaign Finance Board free reign to go after

18  lobbyists either.  And then they come after us.

19  It's bad enough we have a problem with Campaign

20  Finance Board.

21              But, I mean, it's just way too broad.

22    I really think that there has to be a lot of

23  clarifications.  And when I hear you say, well, we

24  could leave it up to Conflicts of Interest Board,

25  well they might mean this, or they might mean that

32

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  this is the minimis.  You know what?  I've seen too

3  many people get hurt by that.  And I really think

4  that a lot of things have to be clarified.  And we

5  need to go into this in greater detail.

6              I don't even know where to begin.  I

7  could just go through this bill and just show you

8  things that have to be clarified.  Go ahead.

9              MR. CROWELL: Let me try and break

10  down some of what you're discussing, because I have

11  to respectfully disagree.  We've spent a lot of time

12    trying to craft this in a way that is manageable,

13    and that can be easily understood.

14              So let me explain two things.  One

15    thing there may be some confusion about is, you have

16    Chapter 68 of the Charter now, which is the Conflict

17    of Interest Law, which is what covers your activity

18    now as a public servant, and contains specific

19    prohibitions on acceptance of gifts.  Right now, you

20    can't accept any gifts with a value more than $50.

21    That's the rule that applies to a Council Member

22    currently.  However,   --  I don't want to get to

23    the idea of coffee and flowers.  However the

24    conflicts for  -- and we'll have to look at that in

25    light of the lobbying law, but what this does, is

33

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    about the lobbyist.  It puts an affirmative

3    obligation on the lobbyist not to give gifts of

4    value that are going to be defined by the Conflicts

5    of Interest Board to you.  So it's more about what a

6    lobbyist can and can't do, in terms of giving

7    things.

8              In terms of a senior citizen who may

9    want to give you flowers, we're really talking about

10    registered lobbyists.  So if the senior citizen is

11    actually a registered lobbyist, and meets the

12    definition of a registered lobbyist, or a person who

13    is required to register as a lobbyist, then they

14    wouldn't be able to give.  And that's their duty,

15    not to give you.

16              Same thing as a cup of coffee.  If

17    somebody from the community buys you a cup of

18    coffee, and they're not a registered lobbyist,

19    that's a different issue, and your behavior would be

20    governed by Chapter 68.  But if it's a registered

21    lobbyist who wants to take you out to the W Hotel

22    for martinis, that's a different story.  And that

23    would have to be broken down.

24              So I think that there will be clear

25    lines drawn. And I agree that there's going to have

                                                    34

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    to be careful steps taken in drawing those lines.

3    But we've accounted for that in the structures that

4    are in the bill.

5              COUNCIL MEMBER RECCHIA: So what we're

6    discussing, if I'm hearing you correctly, these

7    bills pertain only to lobbyists. What lobbyists can

8    and cannot do.

9              MR. CROWELL: Correct.

10             COUNCIL MEMBER RECCHIA: Okay.  Then,

11    -- I understand that.  But I still have some

12    problems with this.

13                MR. CROWELL: Sure.

14                COUNCIL MEMBER RECCHIA: I mean, we

15    could sit down and go over with you certain things.

16    But I just want to read, in one part of this, in

17    192, if you look on your testimony, page seven.  On

18    the first paragraph, one, two, three, four, the

19    fifth line down.  It says, "...lobbying activity or

20    who are employed in organizations lobbying

21    division...".  Okay?  That is just and example,

22    okay?  Or who are employed in an organization's

23    lobbying division.  That is so broad.  What happens

24    if a group, of people in a group of a not- for-

25    profit.  Or lets say, the Zoo.  They send people

                                                        35

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    down here to lobby for them.  Okay?  And then they

3    go to a fund raiser for an elected official.  Okay?

4    Are they considered now a lobbying?  Or you know, or

5    employed in an organization's lobbying division.  I

6    mean, that's not what's clear.  What's a lobbying

7    division?

8                I mean, many organizations don't have

9    lobbying divisions.  They have people that work for

10    them who are, you know, in government operations, or

11   government what ever you want to call it, but they

12   come down here, yes.  Do they do a form of lobbying?

13   Do you want to call it that?  Yes.  Does that

14   pertain to them?

15              MR. CROWELL: I think this provision

16   is intended to capture the  --  as you say, a lot of

17   lobbyists wouldn't necessarily have a specific

18   lobbying division.  But there are plenty of

19   lobbyists who do.  And so, this provision is

20   intended to capture those lobbying organizations

21   that are probably not the Zoo. But who are

22   professional lobbying organizations, or a wing of a

23   large organization that has a professional lobbying

24   operation, and would have people who may not be

25   registered as lobbyist, but whose duties and

36

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   employment do substantially relate to lobbying work.

3

4              COUNCIL MEMBER RECCHIA: I don't want

5   to take up time here, but I have some other points

6   that I think  --  you could disagree  --  that need

7   clarification.  Because there's some language that I

8   would like to be stuck in there.  Just to clarify

9   things.  And there's other parts and that, but I

10  don't want to take up  --  one other part.  Is that

11  you want the Department of Investigation to look

12  after, to see if the lobbyists are complying or not

13  complying.  Is that correct?

14              MR. CROWELL: No.  What the bill

15  contemplates is that there will be a separate unit

16  of investigators in the Clerk's Office who are

17  responsible, who have the primary responsibility of

18  making sure that there are  --  they're is

19  compliance with filing of registration, filing of

20  quarterly and annual reports by lobbyists.  And

21  making sure the information is complete and

22  accurate.  And those are investigators who will be

23  staffed at the Clerk's Office.  They will be

24  initially trained by DOI.  But they will not be

25  supervised by DOI.

                                                37

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2              COUNCIL MEMBER RECCHIA: They'll be

3  supervised by the Clerk's Office.

4              MR. CROWELL: Correct.

5              COUNCIL MEMBER RECCHIA: All right.

6  So the Clerk would be hiring them to their job.  So

7  we'd be increasing the --

8              MR. CROWELL: Head count at the

9  Clerk's Office.

10                    COUNCIL MEMBER RECCHIA: Right.  The

11   budget of the Clerk's Office.  Okay.

12                    I don't want to take up any more

13   time.  I could ask a lot more questions.  But I

14   would  --  let me get everything together first, sit

15   down with you and let me clarify it.

16                    CHAIRPERSON FELDER: Council Member

17   Dickens.

18                    COUNCIL MEMBER DICKENS: Thank you so

19   much Mr. Chairman.  And thank you Attorney Crowell

20   and Mr. Barry, for your testimony.

21                    I want to go back just a second to

22   the legislative breakfast that you referred to.

23   That my colleague was talking about with the bagel.

24   What if that included ham, eggs, and grits? You

25   know, that extended it a little bit.  But seriously,

38

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   presently, and I'm referring directly to your

3   testimony on page three, Mr. Crowell, presently, is

4   it not a requirement that if accepting matching

5   funds all dispersement, whether to a lobbyist or

6   whomever, any dispersement must be disclosed.  And

7   therefore, open to public scrutiny?  And if not,

8   though, if not accepting matching funds, there is no

9   disclosure whatsoever?  Am I correct in that?

10              MR. CROWELL: No.  I think what you're

11  saying is someone who is not accepting matching

12  funds, are they still required to disclose their

13  expenditures.  And the answer to that is yes.  In

14  fact, under the law that the Council passed last

15  year, or two years ago, all candidates are required

16  to disclose their contributions and expenditures to

17  Campaign Finance Board.

18              COUNCIL MEMBER DICKENS: Okay then the

19  Intro. 190 really doesn't do anything to enhance

20  that, on disclosure.  Because you already have to

21  disclose it in any case.  Is that right?

22              MR. CROWELL: That's right.  The

23  candidates are disclosing it to the Campaign Finance

24  Board.  What 190 is doing is requiring the lobbyist

25  to disclose that information to the City Clerk.


                                         39


1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2               COUNCIL MEMBER DICKENS: Because this

3   says if an elected official hires a lobbyist that

4   pays for the polls, then they must disclose  --

5   the "they", I thought this read  --  maybe I didn't

6   read it right  --  that the elected official then

7   must disclose the payment to CFB.  That's not what

8   this says?  No?

9           MR. CROWELL: It is current law that

10    any expenditure by a campaign committee is required

11    to be disclosed to the CFB. And this would not

12    effect that at tall.  It would only effect what a

13    lobbyist is required to disclose to the City Clerk.

14           COUNCIL MEMBER DICKENS: Because I was

15    just --

16           MR. CROWELL: I'm sorry of that's

17    confusing, because it --

18           COUNCIL MEMBER DICKENS: Yes, it is.

19           MR. CROWELL: In other words, Council

20    Members only report to CF --  a candidate, let's

21    say a Council Member for the purposes of this

22    discussion, would report to CFB.  Lobbyists would

23    report to the Clerk on things that are connected to

24    those campaign contributions.

25           COUNCIL MEMBER DICKENS: All right.

40

1     COMMITTEE ON GOVERNMENTAL OPERATIONS

2     Now what about advocacy groups that are not

3     lobbyists, registered as lobbyist, but they are

4     lobbying on behalf of whatever it is?  And

5     frequently, maybe do a better job than some

6     lobbyists.  Now what  --  they frequently come to

7     our offices, and they bring cups and tee shirts, and

8   caps, and some other things.  And they give them to

9   everybody. Now, does that constitute a gift?  Even

10  though and advocacy group is not a registered

11  lobbyist?

12              MR. CROWELL: No.  It would be subject

13  to the current law on the $50 limit, but this

14  legislation would not effect any gifts given by non-

15  lobbyists.  Such as not- for- profit organizations,

16  things like that.  That are not  --

17              COUNCIL MEMBER DICKENS: So not- for-

18  profits although they do lobby, are not in this?

19              MR. CROWELL: That's right, unless

20  they are registered as lobbyist.

21              COUNCIL MEMBER DICKENS: All right.

22  But I'm now talking about they're not registered.

23              MR. CROWELL: That's right.  You're

24  correct.

25              COUNCIL MEMBER DICKENS: All right.


                                              41


1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Okay, you've answered my question.  Oh, one other

3   thing I just had a question about.  Approximately

4   how much do you think that all of these three Intros

5   on public matching funds for lobbyists gifts, how

6   much would that save the taxpayers?

7              MR. CROWELL: On the reduction of the

8   public matching funds to contributions from

9   lobbyists?  For the last election, it would probably

10  be in the vicinity of I would say several hundred

11  thousand to a half a million dollars.

12          COUNCIL MEMBER DICKENS: Several

13  hundred thousand?

14          MR. CROWELL: Right.  Approximately

15  half a million dollars.

16          COUNCIL MEMBER DICKENS: God, who was

17  that that got a half a million?  Thank you so much.

18          CHAIRPERSON FELDER: That's good.  Two

19  of them? Let's just shut it off.  Thank you.

20          So I just want to continue on some of

21  the questioning that was raised earlier.  First of

22  all, on the item  -- well, we've been joined by the

23  Speaker of the City Council.

24          SPEAKER QUINN: Were you just in the

25  middle of a very pressing, threatening question,

                                                    42

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   that I should let you finish?

3           CHAIRPERSON FELDER: Yes.

4           SPEAKER QUINN: Go ahead.

5           Well, I just wanted to stop by the

6   Committee hearing for a couple of minutes.  One, to

7    thank the Chair for moving so quickly on these

8    items.  Also to thank the Committee members for

9    their consideration.  And to thank the Mayor's

10   Office for working with us on this package of

11   lobbying reform.  I think, as we know, the Mayor and

12   I announced the five- pronged lobbying reform

13   package a month or so ago.  From the Council's

14   perspective, there's two initial steps we're taking.

15     One, with this package of the three bills today.

16   Second, we're also in the process of drafting pieces

17   of legislation that will be referred to our Rules

18   Committee for some internal operational changes in

19   access to the Floor Act, as to different parts of

20   the Council side of the bill to kind of restrict

21   lobbying access, and some other matters.  And we're

22   hoping to be able to, with input from the Good

23   Government Community and others, introduce those

24   into the Council in the near future as well.

25                    But I think, you know, sadly, you


                                                43


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    only have to open up the paper on any given day,

3    including this morning, and see the problems that

4    can be caused when there's inappropriate

5    interactions between elected officials and

6    lobbyists.  You know, and we need to, in this

7  discussion and debate, be careful that we don't

8  characterize all lobbyists with the same brush.  You

9  know, lobbying is a good profession, and an

10  appropriate way for entities and organizations to

11  get their opinions and voice heard in City

12  government.  But we need to make sure, one, that New

13  Yorkers know that to speak to the Council or to the

14  Mayor, you don't have to have a lobbyist.  That you

15  can come and speak to us directly.  And that we make

16  it very clear that we have the strongest possible

17  set of rules and regulations around lobbying, so

18  there will never be either the reality or even the

19  perception that one, because of a lobbyist, they may

20  have had hired had greater access or ability to

21  influence government.

22              And you know, thankfully, in the City

23  of New York, we don't have any scandals like the

24  ones they're presently suffering in Washington.

25  Which is exactly why, in the Council, myself and the

44

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Mayor wanted to do this plan early.  Because we

3  wanted to send a message that we are never going to

4  let that happen in the City of New York, and that

5  through this five- pronged plan, the little

6   blathering part should be omitted from any record

7   that's being taken by the press, this five- prong

8   plan, we are taking a very important initial step

9   forward in making sure that we have that

10  infrastructure and set of rules and regulations in

11  place to make sure we never have such a scandal.

12              But more importantly, that New

13  Yorkers know we're here to serve them.  That they

14  are our main priority, and that we're setting up

15  government to serve people's interest, and hear the

16  people's voice in the people's house, as opposed to

17  lobbyists voice being the loudest ones that we hear.

18              I want to thank, in addition, the

19  numerous Good Governments groups, Citizens Union,

20  NYPIRG, and others who helped us with input on

21  today's bills.  And you know, this is a very

22  important step forward, but hopefully, will not be

23  the last.  And that as we implement these

24  initiatives, and continue in conversations on how to

25  make New York City the leader in ethical government,

45

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   that we my have other ideas from the Good Government

3   community, or from elected officials about how we

4   could even do more.  That is certainly what we want

5   to continue to do, because i think it would really

6  be great if someday, we heard in other parts of the

7  country, that they said, "We're modeling our ethics

8  and lobbying laws on what they did in New York

9  City".  And really be a leader on this.

10           So thank you again to the Chair, who

11  is one heck of an ethical guy, and to the Mayor, for

12  his work.  And really, the Mayor's staff for all of

13  their work on this with our staff, particularly Rob

14  Newman and Jim Karas who did a tremendous amount of

15  work on this.

16           I'll give it back to you.

17           CHAIRPERSON FELDER: Thank you.  Thank

18  you very much.

19           I don't like to argue in public about

20  ethical things.  You know, about your saying

21   "ethical guy".  I don't want the press to start

22  badgering me now.

23           SPEAKER QUINN: For proof?

24           CHAIRPERSON FELDER: Yes.  Anyway,

25  getting back to some of the comments you made


                                                    46


1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  earlier, you sort of described the legislation as

3  the flip side of what we are compelled to do as

4  candidates.  And if that's the case, I don't

5  understand why the $50 gift rule would not be in

6  place for the lobbyists as well.  I don't understand

7  why you're making it confusing.  Now, let me just

8  say, that any elected official that can be bought

9  for $50 is out of his mind.  Fifty dollars.  It's

10  just not worth it.  I can tell you that.  Fifty

11  dollars.  You don't buy an elected official for $50.

12  And if somebody is trying to do it, they deserve to

13  go to jail for that.

14           But I don't understand why you're not

15  leaving the same rules that are in place for the

16  elected officials for the gifts as for the

17  lobbyists.  It makes perfect sense to me that if the

18  elected official is not allowed to take more than a

19  $50 gift from anyone,  --  I mean, how many  --  let

20  me then ask you.  How many $50 gifts do you think

21  the lobbyists are giving us?

22           MR. CROWELL: I think the answer is a

23  legal one. What we had worked on as a policy matter

24  was a gift ban, banning gifts by lobbyists to public

25  servants, to public officials.  What the Conflicts

47

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  of Interest Law has in it right now, the $50 rule is

3  something that is promulgated by rule, authorized by

4  the Charter, but promulgated by rule.

 5                 To make any changes to that rule

 6    would require the Conflicts of Interest Board to

 7    promulgate a new rule.  Either setting the value at

 8    zero, at five dollars, whatever it may be. But it is

 9    not something that you can do by legislation,

10    because that provision of the Charter that

11    authorizes those rules can only be amended by

12    referendum.  So it's a highly technical issue, but

13    again, that's the reason why the legislation is

14    structured the way it's structured, and the

15    Conflicts of Interest Board has authority to look at

16    the rule to make sure that things make sense before

17    they are implemented.  And so that's the short and

18    the long  --

19                 CHAIRPERSON FELDER: So let me make

20    sure that I was listening carefully to what you

21    said.  If I understood you correctly, your response

22    to me was that if you could, you would change the

23    $50 gift rule, even for the elected officials.  But

24    since it's so complicated, you can't change that.

25    And if you can't change that, we'll leave that, but

48

 1    COMMITTEE ON GOVERNMENTAL OPERATIONS

 2    we'll change whatever we can. Is that true?  Or not?

 3                 MR. CROWELL: I'm not saying that as a

4   policy matter, we're looking to zero out that.  What

5   we're trying to do is  --  I think whatever you're

6   trying to do here is to strike the proper balance

7   and try and deter improper influence on government

8   officials, while not making something so unduly

9   restrictive and unreasonable that government can't

10  function.

11          So I think the Conflicts of Interest

12  Board has to look at its authority, and look at the

13  rule, and look at the rule in particular in relation

14  to the lobbying law and the new gift ban

15  prohibitions that are being proposed.

16          CHAIRPERSON FELDER: You're a very

17  nice man.  You know.  But you didn't answer my

18  question.  I mean that seriously. Is that  --  the

19  reason I'm belaboring the issue is because of some

20  of the questions that my colleagues raised.  And

21  we're not dying to get $49.99 gifts.  That's not

22  what the purpose of the discussion is.  I think the

23  purpose of the discussion and the theme of what's

24  going on here is that in your quest or in the quest

25  of trying to retain as you said, integrity, above

49

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   all, you're taking  --  maybe --  I'm questioning

3   this, because that's the purpose of the hearing, is

4   whether you're taking things out of control.  And

5   if, under the law now, and elected official is

6   allowed to accept an under $50 gift, it may make

7   sense  --  don't answer me, please, because I'll

8   fight with you the rest of the afternoon  --  it may

9   make sense that the law should remain the same for

10  the lobbyists. That they can, you know, as Council

11  Member Dickens said, maybe for a breakfast that

12  you're having with somebody, instead of just having

13  cream cheese and a bagel and paying for it yourself,

14  maybe they could stick, not ham, but lochs into the

15  bagel.  Okay?  That will be another $1.50 or

16  something like that.  Do you understand? That's the

17  discussion.  That's question number one.

18              Question number two I have for you

19  is, the Clerk himself, is he subject to the same

20  restrictions?  No, I'm serious.

21              MR. CROWELL: The Clerk is subject to

22  --

23              CHAIRPERSON FELDER: To the new law

24  that we are going to be  --  he's a public figure

25  right?

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2               MR. CROWELL: Of course.  The Clerk is

3    --

4                CHAIRPERSON FELDER: So who is going

5    to be watching the Clerk?  Who is going to be

6    investigating the Clerk?  Because you are going to

7    allocate manpower to the Clerk's Office to make sure

8    that elected officials are doing what they're

9    supposed to do. I should say lobbyists.  But it

10   would not be right  --  I'm sure Mr. Robles would

11   say to you, that he cannot watch himself, right? He

12   can't be his own auditor.  So who is going to be

13   watching the Clerk?

14               MR. CROWELL: That wouldn't change, in

15   any event, in terms of who is watching the Clerk

16   currently.  And that would be the Department of

17   Investigation.  You also have your own rules and

18   ethics procedures internal to the Council, so what

19   is currently in place  --

20               CHAIRPERSON FELDER: But when I'm

21   talking about the lobbyists giving gifts  --

22               MR. CROWELL: And I'm talking about

23   that.  In terms of the lobbyists giving the gifts to

24   the Clerk, complaints would be made to DOI,

25   complaints would be made to  --

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                CHAIRPERSON FELDER: They could not be

3    made to the Clerk, obviously.

4                    MR. CROWELL: But really, on gift ban

5    violations, complaints are supposed to be made to

6    DOI or  --  and as well, the Conflicts of Interest

7    Board with DOI investigates, and then would

8    administer and enforce the provisions of the gift

9    ban.  So the Clerk is really not involved in as much

10   as the gift ban is concerned.

11                   CHAIRPERSON FELDER: Good.  That was

12   just to distract you, that question.  State

13   jurisdiction.  Does the State have any laws that are

14   similar to the ones that you're proposing?

15                   MR. CROWELL: The State currently has

16   a lobbying law that sets  --  that requires

17   registration and filings as well.  And also has a

18   gift ban limit of $75 in any one year.

19                   CHAIRPERSON FELDER: For lobbyists.

20                   MR. CROWELL: For lobbyists, yes.

21                   CHAIRPERSON FELDER: So did you

22   consider, when you did  --  I know we want to be

23   better than everybody else, but I assume that you

24   reviewed the laws that the State has in place

25   regarding lobbyists.

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2            MR. CROWELL: I'm very thorough with

3    my work, as are your attorneys in the Council.

4            CHAIRPERSON FELDER: Excellent.  So I

5    would just like, I would like to ask, as a courtesy,

6    if you could provide to us, or if the staff, Robert,

7    maybe if we can get to the members, a detailed grid

8    as to the differences between the State lobbying

9    laws and the proposals that you're making.  And how

10    that would change.            You know, if there are

11    any differences  -- obviously, there are, you just

12    said there are, because under State lobbying law,

13    you said that they can give a $75 gift.

14            MR. CROWELL: Our lobbying laws --

15            CHAIRPERSON FELDER: A year.

16            MR. CROWELL: --  Are consistent with

17    the State provisions, except that we have a gift

18    ban, whereas public servants can accept up to $75.

19    Or lobbyists can give up to $75 in aggregate in a

20    year.

21            CHAIRPERSON FELDER: Right.

22            MR. CROWELL: It's wholly consistent,

23    it's just that we have a lower threshold in terms of

24    what can be given.

25            CHAIRPERSON FELDER: So that's the

53

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    only difference.

3                MR. CROWELL: That's essentially the

4    only difference.

5                CHAIRPERSON FELDER: Okay.  So under

6    the State law, you can take  --  lobbyists can give

7    a $75 gift a year, which is the equivalent of about

8    30 bagels, right?  That's what it really is.  I

9    mean, you know, this sounds funny, but I think that

10   the purpose of the State law, there's some sense to

11   it.  What they're saying is, don't get bogged down

12   with stupidity.  If somebody has a coffee, or

13   something like that, even if they had 25 coffees a

14   year, it's no big deal.  But maybe otherwise it is.

15               MR. CROWELL: I believe our local law

16   is probably  -- it's perhaps in some ways stricter.

17   I think it would be better to have a side- by- side

18   analysis, rather than hashing out point by point

19   here.  But I think that you'll find that what we're

20   trying to achieve here is monumental in terms of

21   State and City regulations. But it is consistent in

22   terms of the application of the State lobby and law

23   to municipal officials.

24               MR. BARRY: If I could just jump in

25   Councilman, I do want to emphasize too, that the

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  intent, and we can work together to make this

3  clearer, but the intent is not to prohibit a Council

4  Member from attending a legislative breakfast and

5  having that bagel.  As these events are widely

6  attended, and things that get into the principle of

7  lively attended events, we are not attempting to

8  diminish conversations between lobbyists and public

9  officials. We are attempting to make sure that there

10  is no undue influence brought to bear.

11          CHAIRPERSON FELDER: Let me make

12  something clear, and I think I'll just echo some of

13  what my colleagues have said.  I think that none of

14  us are stupid enough to come to a public hearing and

15  say that we'd love to get all the money in the

16  world.  And we don't care about integrity or ethics.

17  I think that that would be stupid.  What did you

18  say?  True, but stupid.  Okay.  Stupid.  But at the

19  same time, some of discussion that's taking place is

20  trying to come up with actually with ways to prevent

21  lobbyists from having undue influence, but at the

22  same time, come up with restrictions that make

23  sense.  That's what the discussion is all about.

24          I have a bunch of questions that

25  Councilman Recchia has passed me.  I'll just add one

```
 1   COMMITTEE ON GOVERNMENTAL OPERATIONS
 2   more question.  But in all seriousness, I think many
 3   of us have  --  are very much in favor of the theme
 4   of what we're trying to do.  But I think we have
 5   some questions.  I just would like to ask you one
 6   other question that seems sort of perplexing to me.
 7   Because under one of the new laws, you say that the
 8   matching funds would be limited to $250.  I'm sorry,
 9   that would be eliminated.  The $250  --  any
10   matching money would be eliminated from lobbyists.
11   Am I right?
12                 MR. CROWELL: Right.
13                 CHAIRPERSON FELDER: Let me revise
14   that.  That any contributions by lobbyists would not
15   be matched with any campaign or public funds.
16   Right?  Campaign Finance funds.
17                 MR. CROWELL: Correct.
18                 CHAIRPERSON FELDER: So I could make
19   the argument that you are encouraging lobbyists to
20   contribute more money. Because in the old days,
21   assuming I'm a lobbyists, right?  And in the old
22   days, I could go ahead and give you, you, you're the
23   candidate, if I'm the lobbyist.  I give you $250, I
24   did great. Right?  I contribute $1,000.  That's a
25   great deal.  Now, you tell me that I can't get
```

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  matched money.  So you know what I have to do?  I

3  have to shell out a lot of money myself.  Maybe

4  $2,000 or $2,500 or $2,750.  And I'll bill it to my

5  client, that's not the issue. But you are in

6  essence, maybe, causing lobbyists to have more

7  influence, because you are preventing them from

8  gaining whatever little influence they gain by

9  giving a smaller contribution.

10              MR. CROWELL: Well, I think the

11  response is two part here.  One is that lobbyists

12  are already giving very large contributions.  So for

13  instance, a lobbyists who gives the maximum amount,

14  gets a $1,000 tacked on to that.  So, the law is

15  certainly preventing that from happening.

16              Two, a lobbyist who gives a small

17  contribution and gets say, $250, and an extra

18  $1,0000 gets kicked into that.  The effect to the

19  candidate is the same, in that it's a $1,250 gift

20  from the lobbyists, effectively.  So the value to

21  the candidate is a $1,250 gift.

22              CHAIRPERSON FELDER: Okay.  Did you

23  ever run for public office?

24              MR. CROWELL: I have not, no.

25              CHAIRPERSON FELDER: All right, so let

57

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  me teach you something.  Somebody giving a candidate

3  $250 contribution, which is matched, is not the same

4  as somebody shelling out $1,000 bucks. It's not.

5  You know, it's just not.  So whatever influence you

6  think it delivers, and again, I'm not  --

7            MR. CROWELL: I agree with you.  But

8  that's because the $1,000 would end up being a value

9  of $2,250.  In other words, the candidate, I would

10  imagine, you know, candidates need to raise money.

11  They want to raise as much money as possible.  So

12  they will always look more favorably on larger

13  contributions than smaller ones.  That' said, you

14  know, a $1,000 from a lobbyist is still a $1,000

15  from a lobbyist.

16            CHAIRPERSON FELDER: You'll never run

17  for public office.  Because let me tell you

18  something.  I have a warped mind. But in this

19  certain part of my brain is straight about what

20  contributions mean.  And if a lobbyist shells out of

21  his pocket $2,750, even if it's not matched at all,

22  that means a lot more to me than a lobbyist giving

23  me a $250 contribution or three lobbyists that are

24  matched.  I don't participate in the program

25  anymore.  So for the media, don't write about Felder

58

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   telling you how much money I'd like to get from

3   lobbyists.  Or what I'd rather get.  But I would

4   just again, recommend that this is something that

5   you should look at, because it may not be really

6   accomplishing what you're trying to accomplish.  If

7   the thrust of it is to save money for Campaign

8   Finance I agree with you.  But if the goal is to try

9   to limit the amount of influence that lobbyists

10  have, you may not be accomplishing that.  That's

11  all.

12              MR. CROWELL: Okay. I think the flip

13  side to the argument is also the idea that I think

14  the public would expect their tax dollars are not

15  going to match a lot of these contributions.  And I

16  think that expectation is both a reasonable one, and

17  one that we ought to address.  Because I think it's

18   -- fairly or unfairly, lobbyists have a certain

19  public reputation, and I don't think it's one that

20  people would like to know that they're shelling out

21  hundreds of thousands of dollars to support.

22              CHAIRPERSON FELDER: I'm not debating

23  that with you. I would just say that that would be

24  the argument.  That's the argument.  In my mind.  If

25  the argument is to save the City money, taxpayers

59

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   money, that's another story.  But if the discussion

3   which you had earlier sort of also discussed the

4   fact that it would limit the influence, I don't

5   believe that's true.

6                   Councilman Dilan.

7                   COUNCIL MEMBER DILAN: Thank you Mr.

8   Chair.  I didn't intent to ask a question or speak,

9   but I think you've touched on something that was a

10  concern for me in this bill.  And it is regarding a

11  lobbyist's right as a citizen of this City, to give

12  a personal contribution.  And I want to hear your

13  response to that. And in my opinion, just as a New

14  Yorker, as an individual, if a lobbyist, or a person

15  who is not allowed to make a matchable $250

16  contribution, you would then   --  you would create

17  a different playing field in the effect that say the

18  average person in my district, when they give me a

19  $250 contribution, that is matchable. Their rights,

20  as a New Yorker,  --  the rights of New Yorkers

21  should all be the same, in essence.  So if a

22  lobbyist gives me a personal $250 check, he should

23  have the same rights as anybody else within the City

24  of New York.

25                   And I just wanted to get your

60

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   opinion, because just as a person, if they're not

3   allowed to have the same rights as any other New

4   Yorker, I think there we're making a mistake.

5                    Now, in terms of the pack money and

6   all the other items, naturally, that's not

7   matchable.  And I could see how some concerns could

8   be raised there.  But just in terms of balance in

9   keeping all rights of New Yorkers at least on the

10  same playing field, what are your thoughts in that

11  regard?

12                   MR. CROWELL: Well, I think that first

13  off, we're not stopping anyone from making a

14  campaign contribution.  So I think out of the gate,

15  we have a level playing field.  That anyone who

16  wants to express themselves through a contribution

17  to a candidate can do so automatically.  And for a

18  dollar amount that they, you know, that they choose.

19    However, in as much as the matchability of

20  someone's contribution, that is not a right that

21  belongs to a citizen.  It is a benefit of a

22  participation in a voluntary campaign finance

23  program.  And so, we must not  --

24                   COUNCIL MEMBER DILAN: It's not the

25  right of a citizen, under the law, the Campaign

61

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Finance Law, that it's not their right to I guess

3  basically weigh in, in a campaign, and either way

4  that they wanted to, you think it's not their right

5  to contribute their money in compliance with the

6  program that the City created?  That's not their

7  right to fund and give this money to people?

8            MR. CROWELL: The citizen is not  --

9  the citizen, to the extent that they want to support

10  a candidate who is otherwise not self funded, has no

11    --  there's no right that obtains to a citizen,

12  just because the candidate that they are

13  contributing to is a voluntary participant in the

14  City's Finance Program.  The Campaign Finance

15  Program is something that is about the candidate.

16  It's about public integrity.  And that's the goal,

17  to ensure that there is an opportunity for

18  candidates to run a race and to have matchability of

19  campaign funds so they can run that race.

20            But there's no inherent right in any

21  individual citizen that their campaign contribution

22  be matched.  Quite honestly, there are many

23  candidates who receive campaign contributions who

24  don't participate in the Campaign Finance Program at

25  all.  And so, they're not going to be matched.

62

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2              But the idea is that in terms of a

3   level playing field, we are in no way impairing any

4   individual from giving to a campaign.  And that's

5   the threshold test.  Whether or not the candidates

6   that they're giving to is in the Campaign Finance

7   Program or not is not material to the rights that

8   those citizens have to express themselves through a

9   campaign contribution.

10             COUNCIL MEMBER DILAN: I think there's

11  a little bit of unfairness there, but the reason why

12  I'm not worried about it that much is because

13  lobbyists in general don't give too many personal

14  checks.  So it's not much of an issue.

15             But I just think just from a basic

16  fairness standpoint, I think that all New Yorkers

17  should have the same rights, no matter what it is,

18  and I think, under this circumstance, you may be

19  putting someone who is a lobbyists and a New York

20  City resident, you may be putting them in a

21  situation where their $250 contribution isn't

22  treated the same as any other New Yorker's $250

23  contribution.  So I just wanted you guys to take a

24  look at that, and take that under consideration.

25  Thank you Mr. Chair.

63

```
1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2               CHAIRPERSON FELDER: Thank you.

3   Council Member Recchia.  I just want to remind my

4   colleagues that we have the Conflicts of Interest

5   Board here, as well as Campaign Finance Board.  And

6   a lot of other people.  Good Government groups, who

7   we'd like to ask questions as well

8               COUNCIL MEMBER RECCHIA: One quick

9   question.

10              CHAIRPERSON FELDER: Okay.

11              COUNCIL MEMBER RECCHIA: On the filing

12  that the lobbyists do, is it the form that they have

13  to file with the City, is that the same form they

14  file with the State?

15              MR. CROWELL: The idea will be that

16  the forms will be as "synced up" so to speak, as

17  possible.  But there will be additional reporting

18  requirements on the City forms that are not required

19  on the State forms.  For instance, the bill provides

20  for disclosure of fund raising and consulting

21  activities.  That is not required by the State.  So

22  to the extent possible, the forms will be as close

23  to the State forms as possible, but there will need

24  to be additional pieces of paper, or computer
```

25  screens for additional information.


                                        64


1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2            COUNCIL MEMBER RECCHIA: Okay. So

3  basically, it's going to be basically the same form

4  with just maybe one, two, three, or four more pages

5  that we're going to be adding on for additional

6  information that we want.

7            MR. CROWELL: Correct.

8            COUNCIL MEMBER RECCHIA: Okay.

9            CHAIRPERSON FELDER: Council Member

10  Seabrook, please.

11            COUNCIL MEMBER SEABROOK: Thank you

12  Mr. Chairman. Just a couple of questions as it

13  relates to the investigative arm. How does a

14  complaint becomes a part of the Clerk's Office and

15  goes for an investigation?  Is this by audit only?

16  Or any John Q. Citizen can say, "I saw a Councilman

17  and a lobbyist eating lunch". Now, who paid half, or

18  did they pay half?  Or how is that done? What

19  triggers off the investigation?  How  --

20            MR. CROWELL: Well, I think that is a

21  complaint that would be made to the Department of

22  Investigation.  Conflicts of Interest Board would

23  have jurisdiction over the enforcement of that.  But

24  they would have to review it to see if there's any

25    merit to it.  And the nature of the complaint.

65

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    I would say, with any other

3    complaint, where there's an issue of public

4    integrity at stake.  So in that respect, it doesn't

5    change.

6                    COUNCIL MEMBER SEABROOK: No, but I'm

7    saying, John Q. Citizen see you sitting in the

8    restaurant says, well, I'm going to file a

9    complaint, because I saw them sitting there, and

10   obviously, they had a meal, and I want to find out,

11   did he pay half.  So these complaints, once they are

12   there, it triggers off an investigation, I would

13   assume.

14                   MR. CROWELL: Well, I would think it

15   would depend on the nature of the allegations in the

16   complaints as to whether the enforcement body that

17   it was reported to would actually do an

18   investigation, or how they would handle it.  And I

19   think that they're going to have to contemplate how

20   they would do it.  I think you could ask the

21   Conflicts of Interest Board right now how they do it

22   in the context of seeing a public servant and

23   somebody else, and they thought perhaps that someone

24 else took a public servant out for lunch,  How would

25 they decide whether or not the $50 rule was violated

66

1 COMMITTEE ON GOVERNMENTAL OPERATIONS

2 or not.  And the process won't be any different,

3 from my understanding.  But I certainly don't want

4 to speak for the Department of Investigation or the

5 Conflicts of Interest Board.

6              COUNCIL MEMBER SEABROOK: No, but I'm

7 just saying, that here's an issue about a cup of

8 coffee, about flowers, et cetera.  And so these

9 complaints, and they could be complaints but never

10 confirmed, and it stays as part of a record that an

11 investigation has taken place and a part of an audit

12 and a report that's going to be issued to say well,

13 this person was investigated, it's  --  go ahead.

14              MR. CROWELL: Well, I think, here

15 you're talking about the gift ban prohibition, which

16 is something that is not going to be administered or

17 enforced by the Clerk.  The Clerk's investigators

18 are going to do investigations and audits of what's

19 filed and the scope of what has been filed.

20              COUNCIL MEMBER SEABROOK: Okay.

21              MR. CROWELL: That's one thing.  But

22 the standard process for investigating conflicts of

23 interest is what's going to take place right now in

24    terms of the gift ban.  So there's no new process

25    that will likely be, you know, designed, with the

67

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    exception of the fact that DOI and COIB are going to

3    have a new responsibility.  And will have to decide,

4    you know, the way they're way they're going to do

5    it.  But I think it's going to be the same process,

6    in general.  So I think it's best to ask COIB and

7    DOI if they anticipate that there's going to be any

8    change in the process by which they're going to

9    review a complaint.  And my guess is probably, there

10   wouldn't be any significant change.

11                COUNCIL MEMBER SEABROOK: Thank you

12   Mr. Chair.

13                CHAIRPERSON FELDER: Thank you very

14   much.  I just want to  --  before we say good bye

15    --  I mean, you could stay here the rest of the

16   afternoon, and you may  --  is that I want to

17   clarify, again, that the questioning I believe, by

18   my colleagues and myself, is focused on trying to

19   make sense and trying to make this work.  Because

20   really most of the restrictions that you're talking

21   about are on the lobbyist, I should say all of them

22   are on the lobbyist rather than the candidates or

23  elected officials.  But we still, believe it or not,

24  want to try to make sure that this works, you know,

25  works well.  So that's the questioning.  And I thank

68

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  you both for coming.

3               Do you have anything else you want to

4  say before you leave?

5               MR. CROWELL: No.  Thank you.

6               CHAIRPERSON FELDER: Okay.  You're

7  welcome.

8               The next panel will be Wayne  --  is

9  it Harley? From New York City Conflicts of Interest

10  Board.  And Mark Davies, from the New York City

11  Conflicts of Interest Board.

12               Are they distributing your testimony?

13               MR. DAVIES: They're distributing a

14  summary of my testimony, yes.

15               CHAIRPERSON FELDER: How many pages is

16  it?

17               MR. DAVIES: They're distributing one

18  page.

19               CHAIRPERSON FELDER: Excellent.  You

20  may begin.

21               MR. DAVIES: My testimony will be

22  about four minutes.

23            CHAIRPERSON FELDER: I don't mind, I'm

24   just suggesting that the way I prefer running my

25   Committee hearings is that instead of spending a lot


                                    69


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    of time repeating what was said, if you can

3    highlight and emphasize those areas that you differ.

4    Because if you agree with everything that was said,

5    you could say, you know, I agree with everything

6    that was said except.  But I'm not interested in

7    hearing  --  and I'm sure you're not interested in

8    hearing yourself repeat what was said.

9            MR. DAVIES: No, I don't have anything

10   that would be repetitious, I don't believe.

11            CHAIRPERSON FELDER: Thank you very

12   much.  You may go ahead.

13            MR. DAVIES: So Mr. Chair, members of

14   the Council, my name is Mark Davies.  I'm the

15   Executive Director of the New York City Conflicts of

16   Interest Board.  And I have with me, Wayne Hawley,

17   or General Counsel and Deputy Executive Director.

18   As well as behind me, Felicia Minnon (phonetic) who

19   is our Director of Financial Disclosure.

20            I've been asked to testify on this

21   lobbying package, consisting of Intro. 190, 191, and

22  192.  I will not address Intro. 190, the City Clerk

23  piece, nor 192, the Campaign Finance Board piece.

24  But will limit my remarks to Intro. 191, which is

25  the COIB piece, involving gifts by lobbyists.

70

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2              The Conflicts Board believes that

3  Intro. 191 is a clear step in the right direction,

4  and applauds the Speaker and the Mayor for

5  introducing this, and also for consulting with us

6  during the drafting process.  The Board, thus, has

7  no objection to the enactment of Intro. 191,

8  provided that certain clarifications are made.

9  Either my amendment or by legislative history, and

10  further provided that certain concerns of the Board

11  are addressed.  I will first discuss the

12  clarifications and then the concerns.

13              The clarifications, and these are

14  summarized there on that page, are first of all, the

15  definition of lobbyist.  We understand that the

16  definition of a lobbyist is broader  --  that the

17  definition in 3- 224(a) is broader than the

18  definition of a lobbyist in 3- 211(a).  Because it

19  would include not only persons or organizations

20  acting on behalf of the client, but also the clients

21  themselves, when they engage in lobbying activities

22    on their own behalf.

23              This means that the Board may impose

24    fines up to $30,000 per violation on persons who

25    give gifts in violation of the law, even if the

71

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    person is not required to register as a lobbyist,

3    provided they fulfill the definition of lobbyist in

4    the definition section.

5              Note, however, that Section 224(a) does

6    require one change.  The words "or organization"

7    must be added after any person.  Otherwise, one

8    might argue that the only clients included within

9    the definition are individuals, and not

10   organizations.  And that is because the distinction

11   is made in the law because persons and

12   organizations.

13              Secondly, Section 3- 226,

14   Enforcement, and 3- 227, Penalties.  Under Chapter

15   68, the Board may begin an enforcement proceeding on

16   its own initiative and need not wait for a

17   complaint. We understand that the cross- reference

18   to Chapter 68 in the law would include this same

19   authority.  We further understand that the

20   enforcement provisions in Intro. 191 authorize the

21  Board to impose a maximum fine of $30,000 on the

22  gift giver, although under Chapter 68, the Board may

23  impose a maximum fine of only $10,000 on the public

24  servant gift receiver.

25                    Thirdly, Legal Advice and Training


                                                72

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Education. Although the bill does not specifically

3  mention the COIB providing legal advice or training

4  and education to those persons subject to this law,

5  we understand that the COIB is fully authorized and

6  obligated to provide such advice and training.

7  Otherwise, those persons subject to the law would be

8  compelled to act at their peril.

9                    We further understand that the COIB,

10  in interpreting this law, including the definition

11  of lobbyists in Intro. 191, will not, in any way, be

12  bound by interpretations promulgated either by the

13  City Clerk or by the CFB.  Although the Board will,

14  of course, seek to adopt consistent interpretations

15  if the Board concludes that the interpretations by

16  the City Clerk or the CFB is incorrect, the Board is

17  fully free, under this legislation, to adopt its own

18  interpretation.

19                    Fourth, Intro. 191 contains no

20  confidentiality provisions.  We understand, however,

21    that the records of the Board relating to lobbyists

22    will be fully protected by the confidentiality

23    provisions in Chapter 68, Charter Section 2603(k). And

24    then second, we have two concerns.  Although Intro.

25    191 grants new enforcement powers to the Board by

73

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    incorporating Chapter 68 in regard to enforcement,

3    it would require the DOI, a Mayoral agency,

4    investigate violations of the gift ban involving

5    non- mayoral elected officials, even in the midst of

6    an election campaign, when allegations of such

7    violations are most likely to arise.

8                   I would simply like to note this, in

9    this regard. Among the 50 largest cities in the

10   United States, New York City is the only city that

11   has given its Ethics Board enforcement power, but

12   not the power to investigate violations of the law.

13   And that is true even in those cities that have an

14   addition to an Ethics Board, also a separate

15   Inspector General, or auditor, or Department of

16   Investigation.

17                   The Board's continuing concern over

18   its lack of investigative authority is thus

19   exacerbated by Intro. 191.  We are not requesting

20    that the bill be amended at this time to address

21    this concern.  We understand that it would require a

22    referendum. But we do wish to note, for the record,

23    our continuing concern in this regard.

24              And then finally, our second concern.

25      Gifts are perhaps the most difficult subtle, and

                                                    74

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    complex issue faced by ethics boards.  If enacted,

3    this proposed law will impose substantial additional

4    work on the Board.  At a time when, because of past

5    budget cuts, staff cuts, and an overwhelming

6    increase in its work load, the Board staff is barely

7    keeping afloat in fulfilling its mandate under

8    Chapter 68, to educate, advise, and enforce

9    regarding the existing provisions of Chapter 68.

10   For example, in enforcement, the number of

11   complaints since 2001, has tripled with no increase

12   in enforcement staff.  The number of telephone

13   requests for advice, which provide the first line of

14   defense against conflicts of interests, but which

15   requires substantial attorney time, has increased 77

16   percent, since 2001, with no increase in legal

17   advice staff.

18              For these reasons, it is absolutely

19   necessary that the enactment of the bill be

20  accompanied by significant additional resources for

21  the Board.  Otherwise the imposition of these new

22  responsibilities upon the Board and its staff by

23  enactment of Intro. 191 appears very problematical.

24              And then finally, if I could just

25  address two issues that were raised in the hearing

75

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  before.  First of all, there may be a little

3  confusion here.  Because Intro. 191, as I read it,

4  has no impact whatsoever on the gifts that you, as

5  Council Members can receive.  None.  You are, and

6  remain, subject only to Chapter 68, and the gift ban

7  in 2604 (b)5.  And pursuant to that, we have adopted

8  our gift rule.  The gift rule works very well, I

9  believe. It is complicated, unfortunately.  It

10  almost has to be, but it works well.  You've been

11  subject to it for years.  I certainly do not

12  contemplate any change in that rule.  However, we

13  have to be, I believe, consistent with lobbyists and

14  public servants.  We can't say that a lobbyist can

15  give a $75 gift, but you can only receive $50.

16  That's just  --  we're setting you up for

17  violations.

18                  Therefore, if it is the intent of the

19    Council that you wish to have a gift rule for

20    lobbyist that is less than $%0, you have to specify

21    that in recent legislative history.  Because we have

22    to know if you want us to lower the $50 limit.

23              And then secondly, was the issue

24    about  --  I believe that Council Member Seabrook

25    raised, that what about if someone sees a lobbyist

76

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    and Council Member in a restaurant, eating lunch

3    together, and they file a complaint.  Let me just

4    address that for a moment, the way it works.  First

5    of all, we received last year, 2005, 370 complaints.

6      We referred, of those, 110 to the Department of

7    Investigation.  So less than a third of the

8    complaints we receive actually go anywhere at all.

9    The case you've mentioned, if that's the only thing

10    that happened, there would be no referral, which

11    simply, there's no reason to refer it.  There's no

12    credible basis for a violation.  If, on the other

13    hand, this is in the Four Seasons, and the person

14    that comes forward says, "You know, I saw a Council

15    Member eating dinner with a lobbyist, and the only

16    person that handed over a credit card was the

17    lobbyist", that goes to investigation.  Because

18    there you've got a credible basis for a complaint.

19            I have no further testimony.

20    Obviously, any questions that either I, or Mr.

21    Hawley, or Ms. Minnon can answer, we'd be happy to

22    do so.

23            CHAIRPERSON FELDER: Thank you very

24    much.

25            Council Member Addabbo.


                                                77


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2            COUNCIL MEMBER ADDABBO: Thank you Mr.

3    Chair.  I appreciate your calling for the need for

4    additional clarification and specificity with

5    regards to language.  I think that's something that

6    we all ask for at this panel, so thank you very

7    much.

8            Along the lines of the question I had

9    with the prior panel, from the Administration, the

10   need for additional staff.  You currently have how

11   many investigators?

12           MR. DAVIES: We have no investigators.

13    DOI is our statutory investigator.  We have none.

14           COUNCIL MEMBER ADDABBO: Okay.

15           MR. DAVIES: As this is written, we

16   would not do the investigation.  The investigation

17   would be done by DOI.  We would, however, need

18   additional staff to address all the other issues.

19   The prosecutorial Enforcement side and the Legal

20   Advice side.

21              COUNCIL MEMBER ADDABBO: What are the

22   numbers in your staff right now?

23              MR. DAVIES: Right now we have a total

24   of  -- an authorized head count of 19.  In Legal

25   Advice, we have only three attorneys.  In

78

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Enforcement, we have only four attorneys.  And as I

3   say, they're barely afloat in both of those units.

4   We cannot take on anything additional.  At all, at

5   this point, without more staff. We need one more  --

6   we need a Deputy Director in the Enforcement unit,

7   which we lost a while ago.  For other reasons.  And

8   also, we would need one junior attorney in the Legal

9   Advice unit.  So together, you're talking about

10   roughly, well, certainly under $200,000.  Probably

11   about $175,000 something like that or $160,000,

12   $175,000.

13              COUNCIL MEMBER ADDABBO: Thank you

14   very much.  Thank you Mr. Chair.

15              CHAIRPERSON FELDER: Just to go a

16   little bit along that, is that I would ask of there

17    --  is there still anyone from the Administration

18  in the room?  No?  Well, in any case, I would like

19  to ask you know, if we can make sure, that also,

20  before the next hearing that we have, to get very

21  specifically what the commitment is going to be in

22  terms of the budget, for the agencies that are going

23  to be impacted.  And how many additional people

24  they're going to have.  Because we don't want to

25  just enact legislation and then have them come back

79

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  and say they can't  -- you know, every agency sort

3  of comes back when we ask them, do you need more

4  money?  None of the agencies can say that we need

5  more money.  Because then they get into trouble.  So

6  they usually say -  in the testimony  --  Mr.

7  Newman, the General Legislative Director here, it

8  shows that in the City's testimony, they do make a

9  general statement about ensuring that appropriate

10  resources are available.  But since we have

11  confidence in the Administration, but we want to

12  make sure that you, in fact, get the money and the

13  people you need, I think that it's incumbent upon

14  us, before we pass this bill, to get that commitment

15  in writing for the agencies that will be impacted.

16                   Do any of my colleagues have any

17  questions?

18              Thank you very much.

19              MR. DAVIES: Thank you.

20              CHAIRPERSON FELDER: Emmanuel

21  Michalos, from the Clerk's Office, the City Clerk's

22  Office.  Do you have testimony? How long is it?

23              MR. MICHALOS: Six or seven pages.

24              CHAIRPERSON FELDER: Okay.  So I'm

25  going to ask you to gather your thoughts for a


                                                80


1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  minute, and I'm going to ask you not to read your

3  testimony.  I would rather you highlight those

4  portions of the hearing so far that you either

5  disagree with or have not been covered.  Is that

6  okay?

7              MR. MICHALOS: Right.  I'll discuss

8  Intro. 190.

9              CHAIRPERSON FELDER: Whatever you

10  want.  I'm just saying, if you can limit your

11  testimony to those areas either that you disagree

12  with, you know, somebody said something you disagree

13  with, or something that wasn't covered yet.  I know

14  I'm throwing you for a loop, but it's better that

15  way.

16              MR. MICHALOS: I'm going directly to

17    Intro. 190.

18                CHAIRPERSON FELDER: Thank you.  And

19    just identify yourself for the record.

20                MR. MICHALOS: My name is Emmanuel

21    Michalos.  I'm the Director of Finance for the City

22    Clerk's Office.  I'm here to deliver testimony on

23    behalf of Victor L. Robles, City Clerk, and Clerk of

24    the Council, with respect to Intro. 190.

25                Now, the Intro. 190 proposes to add

81

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    to the duties of the City Clerk two significant

3    tasks: One is the requirement that random audits be

4    conducted on statements and reports filed by

5    lobbyists; and two, the collection and storage of

6    quarterly filings of fund raising/ political

7    consulting reports from lobbyists who engage in such

8    activities.  The City Clerk is required to post by

9    March 1, an annual report on the Internet,

10    indicating, among other things, the number of

11    reports received, and resolution thereof, the number

12    of random audits, and the outcomes and the number

13    and amount of civil penalties imposed.

14                There is also a requirement for the

15    fund raising/political consulting reports to be kept

16  electronic form.

17              In addition, Intro. 190 makes clear

18  that all lobbyists reports are to be stored in

19  electronic form and that all filings are to be

20  electronic.  There is no longer any provision for

21  in- person or mail filing.

22              Intro. 190 also increases the

23  penalties on lobbyists not in compliance, authorizes

24  the City Clerk to report to the Department of

25  Investigation any criminal violations of the law,

82

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   not violations of the lobbying law, by lobbyists,

3   and authorizes DOI to train City Clerk personnel as

4   necessary.

5               Our office is now in the process of

6   formerly requesting an increase in our personal

7   services budget for the hiring of additional

8   personnel and corresponding head count increase to

9   ensure that we have the capacity to carry out the

10  provisions of this legislation.  The request seeks

11  to add four employees to our staff, with the

12  appropriate computer and legal background.  We will

13  also seek additional funds in other than personal

14  services budget to acquire necessary computer

15  equipment to facilitate the conversion from paper-

16    based system to a computer based system.

17              The City Clerk appreciates the

18    support of the Council and the Mayor to allocate

19    additional resources necessary to effectively carry

20    our new mandate.

21              In conclusion, the City Clerk would

22    like to thank all of you for the opportunity to

23    participate in this proceeding. I look forward to

24    your questions and to your input regarding Intro.

25    190.

                                                83

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2              CHAIRPERSON FELDER: Thank you very

3    much.  Again, I would like for the City Clerk to

4    make a  --  to give us, on record officially, in

5    writing, exactly what they anticipate it will cost,

6    and you know, what the manpower necessary to be able

7    to carry out the provisions of this law.  Not at

8    this time, but at a future, to provide that to this

9    Committee.

10              MR. MICHALOS: We will do so.

11              CHAIRPERSON FELDER: Thank you very

12    much.

13              The other question  --  I have just a

14    few quick questions.  To your knowledge, are there

15  lobbyists that consistently do not comply with the

16  provisions that exist now?

17            MR. MICHALOS: We've had times where

18  we've had to issue warnings by certified mail that

19  they have not filed.  And once we do that, they do

20  respond.  We haven't had to issue penalties, so they

21  will respond to the certified mail.

22            CHAIRPERSON FELDER: How many times do

23  you warn somebody?

24            MR. MICHALOS: I wouldn't think  --

25  two, three times.  I wouldn't go past that.

84

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2            CHAIRPERSON FELDER: You mean like

3  after the third time, --

4            MR. MICHALOS: If they don't respond

5   --

6            CHAIRPERSON FELDER: If they don't get

7  it.  But does it ever happen, that you warn somebody

8  six times?

9            MR. MICHALOS: No.

10            CHAIRPERSON FELDER: No.  Okay.  You

11  mean, like after the third time, you know it's not

12  going to help?  Or you just don't do it.

13            MR. MICHALOS: No, no.  Everybody has

14  to register.

15                    CHAIRPERSON FELDER: But in other

16    words, after three warnings, they comply.

17                    MR. MICHALOS: They understand that

18    they have to comply.

19                    CHAIRPERSON FELDER: Okay.  So under

20    the law, you only have to warn them once.  But you

21    warn them three times now, right?

22                    MR. MICHALOS: Well, I've heard of

23    occasions where they do two, three times.  But they

24    were responsive.

25                    CHAIRPERSON FELDER: Right.  The point

                                        85

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    that I'm trying to make has less to do with the City

3    Clerk, but rather to do with the legislation.

4    Again, is that if we're going to spend  -- the

5    legislation costs the City money as well.  And just

6    to make bills to make us look good, that's not the

7    purpose of a bill.  Or it shouldn't be, anyway.  So

8    all I'm saying is, that I think it should be clear

9    that if we are going to enact new legislation,

10    lobbyists, if under the law, they're supposed to get

11    one warning, that's all they're going to be getting.

12     They're not going to be getting two warnings, or

13    three warnings by the City Clerk.  Is that true?

14          MR. MICHALOS: Yes.  Now that they

15 have stiffer penalties, they will respond.

16          CHAIRPERSON FELDER: Okay.  But I'll

17 just ask the question one more time.  And I'm not

18 trying to trick you.  I'm just trying to make a

19 point, and the point is, that if we are trying to be

20 strict, and strict means instituting through

21 legislation, a variety of new impositions on

22 lobbyists, that means that the City Clerk, under the

23 law, is supposed to warn the lobbyists once now. And

24 the City Clerk doesn't have the leisure to decide

25 whether they should give somebody two or three

86

1 COMMITTEE ON GOVERNMENTAL OPERATIONS

2 chances.  All I'm saying, suggesting is that the

3 atmosphere around the lobbyists laws has to be

4 consistent.  If we're going to implement more

5 restrictions, that means that it has to go all the

6 way through.  And the City Clerk can't decide to

7 give somebody a break.  Not saying they do now, but

8 if under the law, you're supposed to warn somebody

9 once, then that's going to be it.  Because if we're

10 saying lobbyists can't give anybody gifts, that's

11 it.  You know, I think that's clear.

12          MR. MICHALOS: They will receive one

13 warning.

14                CHAIRPERSON FELDER: I think that's

15  the story.  And we're going to get from you, the

16  details in terms of the costs that you need, the

17  manpower and the money.  I thank you for coming

18  today.

19                MR. MICHALOS: Thank you.

20                CHAIRPERSON FELDER: Do you have  --

21  I want to recognize Councilman David Yassky, who

22  just joined us.  And at the same time, call Nicole

23  Gordon, from the Campaign Finance Board, with Carole

24  Campolo, Sue Ellen Dodell, no, that's not right.

25                MS. GORDON: It's Carole Campolo and


                                87


1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   Sue Ellen Dodell.

3                CHAIRPERSON FELDER: No, it looked

4   like a Hebrew "i" in it, and I couldn't read it.

5   Carole  --  it is an "i" right? But it's almost

6   pronounced the same way in Hebrew.  Carole Campolo,

7   okay.  And again, I would just ask that rather  --

8   you know, I think it's much more productive  --

9   rather than discussing everything over again, to

10  please get to the heart of anything you disagree

11  with or anything that hadn't been said.  And I would

12  appreciate that.

13                    MS. GORDON: There are just two or

14    three points that I think would be helpful for us to

15    make here, and just preliminary to that, I would

16    like to say that we've had very productive

17    conversations with Mr. Newman.  And I know Ms.

18    Johnson has been helpful, and we look forward to

19    continuing to work with them. Because some of the

20    things that I would go into detail with, I'm going

21    to put to the side, knowing that these are issues

22    that we're going to try to work together on.

23                    But I would like to raise a couple of

24    larger issues, which I think echo some of the

25    concerns that some of the Council Members described.


                                    88


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    Number one, we believe that there is

3    a much simpler way to deal with this issue, assuming

4    that the Council wants to go forward, and take

5    matching funds out of the equation, when lobbyists

6    contributions are involved.  We believe that the

7    burden could be taken away from the candidates, and

8    away from contributors generally, who some of whom

9    may not know anything about what lobbyists do, or

10   may wonder whether they fall within a definition

11   that's in a contribution card.

12                    We believe that the way that this can

13  be handled is, as long as the City Clerk database of

14  lobbyists is up to date, and state- of- the- art,

15  and lobbyists are required to include information on

16  that form, you can target your questioning and

17  investigation just to that information and avoid the

18  burden on campaigns, the burden on the average

19  contributor, and just use that database, have the

20  Campaign Finance Board database speak to the

21  database at the City Clerk's Office, and handle it

22  without all this extra demand.                    And

23  incidentally, that would go to your other question

24  about the demands on our agency, because obviously,

25  if we don't have to spend a lot of time educating

89

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  candidates, if we don't have to have new

3  contribution cards, if we don't have to deal with

4  worried contributors, and look at documentation, and

5  so on.  If we can be using an electronic means for

6  doing this, we believe that would be a much more

7  effective and less- burdensome way to proceed.

8                    And as part dealing with the entire

9  area of how to deal with contributions from those

10  who do business with the City, of whom lobbyists are

11  one subset, in general, we would urge that the

12    Council always take what we call the SEC approach.

13    The SEC tells brokerage firms, if you guys make

14    contributions over $250 to people, or if you make

15    any contributions to people that you don't have a

16    right to vote for, you can't do business with that

17    jurisdiction.  The burden is placed on the person

18    who wants to do business with the City.  Not on the

19    candidate.  Not on the average contributor.

20              So that would be my number one

21    message to you, that I hope you can take into

22    account.  And incidentally, the SEC approach is the

23    same approach that's adopted for doing business

24    contributions in New Jersey and Connecticut.  And a

25    lot of other places.


                                          90


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2              Secondly, we do believe that a lot of

3    your members raised important questions, questions

4    that anyone looking into this area would want to

5    raise about what the factual record is, what level

6    of problem this is.  Perhaps even the question

7    whether contribution limits, as you were suggesting,

8    are still and issue, as opposed to the amount of

9    matching, and whether there will be a consequence

10    that is different from what is expected here.

11              Our board has, for some time now, and

12    we will be closing this up in the next couple of

13    months, doing a broad study of doing business

14    contributions, including lobbyists contributions,

15    and we think the wisest course would be to delay at

16    least 192, for long enough for you to have the

17    benefit of our factual record and thinking on this,

18    so that doing business areas in general are treated

19    consistently and fairly, and in proportion to what

20    they mean in the public record.

21                    And in that respect, I would just

22    point out that for example, we have very

23    preliminarily, because this legislation came to us,

24    taken a very quick look  --  I don't want to suggest

25    that it's final at all  --  but we took a very

91

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    preliminary look at what we thought we could figure

3    out about lobbyists contributions.  And it does not

4    seem that the number of contributors who also are

5    lobbyists is a very large number.  Where lobbyists

6    may be having more influence on campaigns is through

7    fund raising and through being intermediaries.  Now

8    that does suggest again, that maybe a factual record

9    that's developed in a little more detail would be

10    helpful to the Council as it considers what to go

11    forward with.

12                    In my testimony, which I hope you all

13    read, but I'm not going to take up your time with

14    the details, a lot of my comments would be mute if

15    you would take this other approach of going through

16    the databases rather than asking the campaigns and

17    the contributors to bear the burden of compliance.

18    But nonetheless, I do want to emphasize, whatever

19    you want our board to police, should be mirrored by

20    the information you're asking the lobbyists to give

21    to the City Clerk's Office.  Right now, there is not

22    a complete congruence.  This is something we've

23    raised, and we know that the Council staff is

24    prepared to work with us on that.

25                    Another kind of question that was

                                                            92

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    raised that also has to do with this question of

3    evaluating the meaning of this.  We do have some

4    potential questions about things like, this current

5    version of the legislation appears to regulate

6    secretaries of people who do lobbying, and their

7    spouses.  It does not regulate partners in law

8    firms, where some are lobbyists and others don't

9    lobby.  And those kinds of very deep questions just

10    might warrant your attention.

11                    If you do go forward with the bill as

12   written, then we would urge a lot of technical but

13   also serious changes.  For example, we don't believe

14   that enforcement should depend upon if information

15   comes in after the fact, after matching funds have

16   been given out, we do believe, in any event, that

17   that should be recoverable by the City.  And should

18   not turn on either intent or on the timing in which

19   that is discovered.

20                    And I think beyond that, I think

21   beyond that I would just answer any questions you

22   have.  But I would hope that someone --  that you

23   will review the testimony as written.

24                    CHAIRPERSON FELDER: Councilman

25   Yassky.


                                                      93


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    COUNCIL MEMBER YASSKY: Thank you

3    Chair Felder.  And first, let me just say  --  I

4    know I'm not a member of this Committee, so I really

5    appreciate your indulging me in participating here.

6    This is an appropriate time to be here, I guess,

7    because of the appearance of Nicole Gordon.

8                    I just wanted to tell you and the

9    other members of the Committee, first of all, I

10   strongly do support the package of bills that you're

11   hearing today.  And I hope that you will move on

12   them speedily.  Because I think they are very much

13   worthwhile.

14              Indeed, I think there are

15   opportunities to go further.  And Nicole mentioned

16   some of these, or really one of the area that I want

17   to focus on, which is the ability of lobbyists to

18   raise money for candidates.  For incumbency

19   particularly.  I think that the Committee should

20   consider prohibiting altogether, lobbyists from

21   serving as intermediaries.  And I'm curious  --  I

22   know that that was on the Campaign Finance Board

23   considered, ultimately did not do.  May I ask for

24   feedback on that?

25              Can you tell me, Nicole, what was the

                              94

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   process there?

3              MS. GORDON: Well actually, the Board

4   is only now going to be concluding its study of the

5   whole subject area of doing business and has never

6   taken a position about that.  And I did not mean, by

7   my pointing out that anomaly, to suggest that the

8   Board has a particular position on it, but just to

9   suggest that a full record before the Council, that

10  as best we can assemble it, which explains how many

11  contributions, what percentage come from lobbyists,

12  as far as we're able to tell that, how much money

13  gets raised through intermediaries or through fund

14  raising by lobbyists. That that kind of information

15  might alter one's view about which area should be

16  targeted.  What the most important ones are, or

17  whether many need to be targeted.  Or you know, one

18  could, I suppose also reasonably conclude, none at

19  all.

20          I'm just  --  our board has not come

21  to any conclusions about those substantive issues,

22  because our board is still conducting its doing

23  business study.

24          COUNCIL MEMBER YASSKY: Okay.  Well

25  look.  I was curious  --  maybe I've been

95

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  misunderstood, or didn't fully understand what your

3   --  what the history was there.  But I do want to

4   --  I'd like to just put out there, I think that

5  this Committee should, or the Council should,

6  consider really going further.  And prohibiting

7  lobbyists from acting as intermediaries. It's been

8  suggested to me that there are first amendment

9   issues there, and you know, you're kind of

10  interfering with people's right to support

11  candidates that they choose.  It seems to me that

12  when you're talking about a registered lobbyists,

13  who is in the business of seeking government action

14  on items, then, I think that  --  you know, Buckley

15  against Valeo (phonetic) the case that started this

16  all here, strongly says that when you're  --  when

17  the government is acting to forestall potential

18  conflicts of interest, you really have a lot more

19  leeway there.  In the campaign finance area.  And I

20  believe it would be constitutional to do it.

21              At the very least, you could deny

22  matching funds not just to contributions from

23  lobbyists themselves, but for any contribution for

24  which a lobbyist is an intermediary.  In other

25  words, if you allow a lobbyist to collect you know,

96

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   and deliver, ten $250 checks, then that's $10,000 as

3   opposed to really, $12,500 as opposed to $2,500.

4   And I think that we ought to  --  we ought to be

5   concerned about lobbyists delivering bundles of

6   contributions.

7               So I hope the Committee will consider

8   those ideas as you move forward on this legislation.

9     Thank you Chair Felder.

10          CHAIRPERSON FELDER: Thank you.

11          I have mixed feelings about what

12   Council Member Yassky said.  Only because I think

13   that at the same time that it's important to add

14   some of the restrictions that we're trying to

15   impose, to make things purer, I think if somebody is

16   intent  -- you know, if the intent is there, it's

17   not difficult to  --  you know, it's not that much

18   more difficult to get around what Council Member

19   Yassky refers to as bundling ten checks and

20   prohibiting matching funds for all of them.  So if

21   anyone has any sense, so you tell the ten people,

22   please send in your contributions on your own. And

23   that's not bundling.  And whoever is doing the

24   lobbying, if they have any sense, they come to an

25   elected official and say, by the way, guess what?

97

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   You know, there are ten people who live on my block

3   who love you.  And they send you $250 contribution.

4          So I'm not sure.  I'm not, you know,

5   in the quest to try to make things perfect,

6   sometimes we encourage people to do more and more of

7   that which is not.  There needs to do something, I

8    agree.  I'm not sure that what you're suggesting

9    will necessarily help.  I think it will just make

10   the lobbyists have to work a little harder to avoid

11   being in violation of the law.

12              Do you want to respond?

13              MS. GORDON: Well just on that point

14   about the intermediaries.  Right now, the way the

15   law is drafted, it does not even require a lobbyist

16   who is an intermediary, but happens not to have made

17   his or her own contributions, to be disclosed.  So

18   there are some wrinkles and things, which I know,

19   are just going to be cleaned up in the process, as

20   this goes forward.

21              And I did also want to say, you know,

22   having part of my written testimony, I did not want

23   to fail to note that our board does believe that

24   this whole area of doing business contributions

25   including lobbyists, is a very difficult and

98

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    important area, and that both the appearance and the

3    reality must be addressed.  And the board is working

4    very hard to make intelligent recommendations to you

5    about it.

6              So the board does applaud the Council

7    for undertaking this study.  And looks forward to

8   working closely with you to do the best we all can

9   in perfecting an approach.

10              CHAIRPERSON FELDER: Thank you very

11  much.

12              Okay, thank you very much.  We have

13  two panels that we're going to be calling up.  Is

14  there anyone that has submitted a sheet early, early

15  on that's in opposition to these bills?  I just, for

16  the record, find it amazing that no one is here to

17  testify in opposition to any of the bills.  Which is

18   --  I'm doing a great job on that?  Okay.  No,

19  I'll tell you why I find it very, very, very, very,

20  entertaining.  Because to me, what it really is

21  saying is that we do have to do something to make

22  things better. -  You're scaring me Robert, move

23  away.  Okay.  We do have to do some sort of

24  legislation to improve things.  But for anyone to

25  think that business as usual, in terms of lobbying,

99

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   is not going to continue to exist in one way or

3   another, the proof of that is that there's no one

4   here to testify in opposition.  And when no one is

5   testifying in opposition is proof that the people

6   who are doing this business are qualified to do what

7   they do best, which is lobby and raise the money,

8   you know, and we have to still, there is a reason to

9   do what we're talking about, to send a message that

10  things maybe aren't as easily done as possible.  But

11  I still would have been nice to hear from somebody

12  who thought that maybe something a little off with

13  this bill, other than the Council Members.

14              You're still threatening me you know.

15    Okay.  So we're going to do two panels of four

16  each.  We have Megan Quattlebaum.  Okay.  Common

17  Cause.  Dick Dadey,  Citizens' Union. Douglas

18  Israel, Citizens Union.  And  --  okay, so we'll put

19  five. Gene Russianoff. And I have NYPIRG.  And Ms.

20  Adrian Kimmelson (phonetic).

21              I'm going to ask   --  we need one

22  more chair, I think.  Can one of the Sergeant- at-

23  Arms?  If not, I'll get it. Here, we could take one

24  of the chairs here.  So I just want to again    --

25  you're welcome.  I just want to say, whether it's

100

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Citizens Union or all the other wonderful agencies

3  that are here, I would ask you not to read your

4  testimony.  Because no one is interested in hearing

5  it.  What we are interested in hearing from you is

6  again, anything that you either disagree with,

7    anything that was said so far, not anything that

8    will be said, anything that was said so far, to

9    either disagree, or anything that was not addressed,

10   to address it.  And I would ask Dick Dadey, will be

11   our first witness.

12               MR. DADEY: Good afternoon Council

13   Member Felder and members of the Committee.  Thank

14   you for this opportunity to testify.  I'm here with

15   my colleague at Citizens Union, Doug Israel, who

16   will give us some portion of this.  We will keep our

17   comments to focus along the lines that you have

18   suggested.  You know, I do want to thank the

19   Speaker, the City Council, and the Mayor in taking

20   this very positive step forward for the City of New

21   York and its citizens in addressing these issues.

22   And join in applauding their proactive and

23   cooperative effort.

24               The City of New York is fortunate

25   that no major lobbying scandal has recently beset

                                                      101

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    City government.  But then again, the registration

3    and reporting of lobbying activity has been done

4    strictly on an honor basis.  To the best of our

5    knowledge, no one who has not been registered to

6  lobby, but should be, has been called to task, and

7  told to register.  And no one who has been

8  registered for the past five years, has ever been

9  fined or penalized, if ever.  So who really knows

10  what is going on out there in the influencing of our

11  government.  We do know this: Many who should be

12  registered are not.  Because there is confusion over

13  the requirement to lobby and there is no enforcement

14  of the law requiring them to lobby.  One only needs

15  to go to the steps of City Hall during budget season

16  and see the number of advocates and lobbyists who

17  are there to get a slice of the pie, and the check

18  the City Clerk's Office to see that many are not

19  registered to lobby.

20          Or only one need go to a Community

21  Board meeting and see the number of developers who

22  are either not registered to lobby, or not fully

23  reporting their lobbying activity.  Or one only need

24  know that there are countless meetings among clients

25  and their retained lawyers and City officials, over

102

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  an important economic development project, and

3  realize that neither the client nor the lawyer is a

4  registered lobbyist.  Hiding behind the cloak of

5  attorney/client privilege.

6                   We do not necessarily assign blame

7    for these lapses to the parties involved, though

8    they do need to bear the responsibility.  But

9    rather, to the failure of government to adequately

10   enforce the existing law, and sufficiently inform

11   those who lobby about the law's registration and

12   reporting requirements.

13                   We agree with many of the provisions

14   that have been laid out here in these important

15   pieces of legislation.  We do have some concerns and

16   recommendations on improvements.  And we're going to

17   quickly hit the highlights here.

18                   The definition of lobbyist and

19   political consultants must be made clearer, so that

20   there is no misunderstanding moving forth, as to who

21   falls into these categories.  And that those who are

22   required to file are absolutely clear that it is

23   their responsibility to do so.  We believe that many

24   who read the current definition of lobbying believe

25   that it does not apply to their activity with

103

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    government.  And therefore, decide not to register.

3                   Earlier, someone from the City

4    Clerk's Office was talking about the fact that they

5    have full compliance.  Well, they have full

6    compliance with only those who are registered to

7    lobby. Not with those who are not registered.  And

8    they make no attempt to register those who are not

9    registered.  And that is a major failing of the City

10   Clerk's Office.

11            We believe in more clear and more

12   explicit definition of lobbying should be proposed

13   to unregistered lobbyists who read the section of

14   the law, and then realize they need to register.

15   For instance, many who seek City funds during the

16   budget process are not required to lobby because the

17   definition does not say "budget".  Few know that the

18   City budget actually is considered an intro, if you

19   even know what that means.

20            The City Clerk, due to a lack of

21   resources, or a clear mandate for action has not

22   lived up to the task of enforcing lobbying

23   violations in the past.  One only need look at how

24   citizens find out about lobbying information on the

25   web, and realize the lack of importance the City

104

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Clerk places upon his authority to enforce the

3    current law.  For those seeking lobbying

4    information, one has to strangely go to

5    www.marriagebureau.com.

6              Therefore, we are concerned about

7    investing greater enforcement authority in the hands

8    of the City Clerk, without at least more resources,

9    a greater appreciation by the current City Clerk for

10   his responsibilities to enforce the law, and greater

11   oversight of the Clerk's enforcement.

12             We had trouble that it's also the

13   Clerk, who is appointed by the Council, to enforce

14   the law which holds much sway over the decisions by

15   the Council.  It is too circular a relationship, and

16   not nearly independent enough.  We believe that a

17   truly independent body is what is needed in order to

18   enforce the lobbying law, and see that it is

19   appropriately enforced.

20             That said, we also recognize that it

21   would probably require a Charter amendment in order

22   for such a new entity to be charged with such

23   authority.  We ask the Mayor and the Speaker to put

24   this on the list of things to do.

25             And I'm going to ask my colleague at

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    Citizens Union, Doug Israel, to make the final

3    points.

4                    MR. ISRAEL: Thank you.  My name is

5    Doug Israel, and I'm the Public Policy and Advocacy

6    Director for Citizens Union. And I'd just like to

7    add three other suggestions to strengthen the bills.

8

9                    Building on the line of questioning

10   from Council Member Yassky, I'd like to reiterate,

11   and add some figures to the fire.  The proposals,

12   while effectively limiting matching funds for

13   contributions from registered lobbyists, does

14   nothing to limit matching funds for contributions

15   that have been bundled by a lobbyist as an

16   intermediary.  The bundling of funds to candidates

17   each election season represents hundreds of

18   thousands of dollars. It is not uncommon for an

19   intermediary to bundle between $100,000 and $150,000

20   for a candidate over an election cycle.  And a good

21   portion of these funds qualify as matching.  A

22   preliminary guess on my part is about 15 to 20

23   percent of the funds that are bundled are actually

24   matchable.  Because many of them are above $250.

25                    A quick analysis by Citizens Union,

106

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    which is not available yet, reveals that, of all the

3    top ten lobbying firms, based on their revenue,

4    every single one of them had an employee that

5    bundled campaign contributions from 2001 to 2005.

6    The City should examine the appropriateness of

7    whether these funds should be matchable, something

8    that we are currently examining as well.

9              The second point I'd like to add is

10   the bills do not address "pay to play" activities

11   that are part and parcel of the larger issue of how

12   political support in a form of contributions

13   influences legislation and the awarding of

14   contracts.  The City must ensure that those who have

15   business with the City are not exerting undue

16   influence over the process by way of campaign

17   contributions, to political committees of those in a

18   position to affect decision making.

19             And finally, we ask that the

20   legislation be amended to see that the reporting

21   requirements and forms are similar in substance and

22   timing to those at the State level.  Curiously, the

23   City Clerk's filing deadlines quarterly, but the

24   second quarter is only two months long, ending on

25   May 31st, and the third quarter is four months long,

107

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    ending on September 30th.  Having the local report

3    occur bi- monthly would be an easier way for local

4    lobbyists to comply, since they also have to report

5    back to the State.

6              And finally, on behalf of Citizens

7    Union, I would like to thank you for the opportunity

8    to testify today.  Intros. 190, 191, and 192 present

9    an opportunity to help ensure that the political

10   process is less encumbered by the influence of

11   special interests.  And that our elected officials

12   are shielded from the corrupting influence of money

13   and politics.  While the ability to lobby

14   legislators is an important part of our democratic

15   process, it is imperative that we ensure that all

16   New Yorkers have this opportunity for their voice to

17   be heard, and the influence of those with deep

18   pockets does not steamroll the voice of average New

19   Yorkers.

20             We believe the proposed legislation

21   could help ensure that the under- represented and

22   those without connections, where the funds to gain

23   access are not shut out of the process.

24             We urge the Council to consider the

25   testimony that our organization, and the other

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    groups have given here today, and we stand ready to

3   continue to work in a deliberative and open process

4   to help strengthen the legislation.  Thank you.

5                CHAIRPERSON FELDER: Thank you.  Mr.

6   Russianoff.  No problem.

7                MS. QUATTLEBAUM: We'll be extremely

8   brief.

9                CHAIRPERSON FELDER: You can take as

10  much time as you want, as long as you're saying

11  something new.  That's all.  We're here the whole

12  day.  Council Member Vallone said he has nothing

13  else to do.  And Council Member --

14               MS. QUATTLEBAUM: All right. Well,

15  again, I'm Megan Quattlebaum.  I'm the Associate

16  Director of Common Cause, New York. And like our

17  colleagues at Citizens Union, both Common Cause and

18  NYPIRG support Intros. 190, 191, and 192.  And while

19  I do think that clearly, from some of the testimony

20  we've seen here today, there can be perhaps things

21  done to make the laws more effective, and more

22  enforceable.  I just want to be clear that in

23  spirit, while there may not have been scandals here

24  in New York City, perhaps at all, but certainly not

25  on the scale of what we've seen in Washington, or

109

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2    even closer to home, in Albany.  There are some real

3    problems that we're addressing with this

4    legislation.  First and foremost, as Dick Dadey,

5    from Citizens Union talked about, enforcement by the

6    City Clerk, even of the existing lobby law has not

7    been adequate.  I think we've had a real "cop on the

8    beat" in Albany.  We've had someone in the form of

9    the State Temporary Commission on Lobbying, who has

10   really been watching out for what lobbyists are

11   doing on the State level.  But in our opinion, the

12   City Clerk hasn't even exercised his limited

13   enforcement capacities of the existing, current

14   laws.

15              So we do think that one great thing

16   about Intro. 190 is it beefs up those enforcement

17   capacities of the City Clerk. We'd also note that

18   there have been arguments made that the City Clerk

19   doesn't have tools and resources needed to do the

20   job of enforcement.  And we think the bill, this

21   current bill, has a couple of provisions that

22   address that issue, including training of Clerk

23   staff by the Department of Investigation, and the

24   joint Council Mayoral Commission, that will

25   ultimately review the enforcement, and really have a

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2    track record at that point to see how the City Clerk

3    is doing, and perhaps offer further improvements.

4                    But I mean, from the small to the

5    large, I think, as Dick mentioned, one thing you can

6    look at to see what the limitations of enforcement

7    have been, are how many lobbyists are out there who

8    are not registered, and possibly should be.

9                    And another really important

10   comparison, I think, is what's been happening in the

11   City versus what's been happening on the State

12   level.  And for violations large and small, on the

13   State level, if you do not file your registration,

14   or your bi- monthly report, and you are supposed to,

15   you'll be fined $25 dollars a day. It's not clear to

16   me that much at all will happen to you if you don't

17   file a report that you're supposed to file with the

18   Clerk.

19                    Secondly, I just want to say that

20   while there may be certain reasonable exceptions, I

21   think the members of both of our organizations and

22   members of the public see no reason why a lobbyist

23   should be able to give a gift to a lawmaker, or why

24   a lobbyist contribution should be matched by public

25   funds.

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2              So I think we're addressing  --

3   again, there may not be a scandal that we're

4   addressing, but we are addressing some real problems

5   that exist with the status quo.

6              I do want to mention one other thing,

7   which is that we do think that serious work still

8   needs to be done to level the playing field.  Our

9   colleagues at CU and the folks from the Campaign

10  Finance Board have mentioned that the issue of those

11  doing business with the City is broader than just

12  lobbyists who do business with the City.  We have

13  testified at the Campaign Finance Board's hearing

14  once on this topic.  We strongly encourage the

15  Council to continue looking at those issues.  And we

16  specifically support trying to actually limit

17  contributions from those who do business with the

18  City, not just prevent them from being matched with

19  public funds.

20             So, we encourage an approach like the

21  one mentioned by Nicole Gordon, that places the

22  burden on the person who wants to do business with

23  the City, rather than the candidate.  But we do

24  think that this is something that needs further work

25  and exploration.

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2              MR. RUSSIANOFF: Good afternoon Mr.

3    Chairman.  I'm Gene Russianoff, with the New York

4    Public Interest Research Group. On page two of my

5    testimony, we in Common Cause have three specific

6    recommendations that we would like to see considered

7    in amending the legislation.  Now they've been

8    touched on before, but we think they're important to

9    emphasize.

10             The first one is like the Campaign

11   Finance Board and the Citizens Union, we believe

12   that if contributions are bundled by lobbyists as

13   intermediaries, those should not be matched either.

14   I heard the colloquy between yourself and Council

15   Member Yassky, and there always is a concern about

16   driving contributions underground.  But the way we

17   see lobbyists flaunt their access and their power is

18   by constantly intermediating and being kind of the

19   collector of contributions, a nice term for it.  And

20   so we would like to see serious consideration given

21   to that.

22             And then, we also think the law

23   should be made easier for candidates to comply, by

24   placing more responsibility on the City to help

25   them.  And right now, the law asks candidates,

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Council Members, and their opponents, to put all

3  sorts of information on the bottom of the

4  contribution card.  It's almost like a Miranda

5  warning.  And extremely small fraction of the

6  contributors are going to be lobbyists.  So it's a

7  lot of space taken up for limited  --  Gordon said,

8  what we would urge is that the City Clerk compile a

9  list from time to time, specifically enumerated in

10  the law.  And it's kind of like a safe harbor

11  provision.  If you're a contributor that's on this

12  list, by a civil program, or eyesight, you can

13  determine whether you've been given a illegal

14  contribution.  Otherwise, you're going to have to

15  sit down with the database for the lobbyists run by

16  the City Clerk, and I wish you good luck, it's

17  really hard.

18              And so, I think the regulatory scheme

19  in the bill doesn't make sense, and is unfair to the

20  candidates.

21              And then finally, the law's

22  definition of political consulting activities, it

23  requires certain lobbyists who conduct political

24  consulting activities to report them, which we think

25  is a good thing.  However, the way the law reads,

114

```
 1  COMMITTEE ON GOVERNMENTAL OPERATIONS

 2  it's "the activities of a lobbyist who, for

 3  compensation, provides political advice to the

 4  Mayor, Public Advocate, Comptroller, Borough

 5  President, or a Member of the Council...".  Well,

 6  you know, we provide political advice for

 7  compensation.  I'm sure you would be happy to take

 8  some. I think it's just a mistake in the drafting

 9  that it doesn't attribute the compensation to the

10  candidate or committee, or people affiliated with

11  the candidate.  So I think that's a technical issue

12  that needs to be worked out.

13            And then just lastly, we definitely

14  join with our colleagues in trying to simplify the

15  form.  We're registered lobbyists.  We have two

16  separate reportings.  Almost, you turn around and

17  there's another reporting.  And it doesn't make

18  sense. The State is doing a very good job, in our

19  opinion, of monitoring the lobbying activities, and

20  so, to the extent that it's possible, it should be

21  the same form.  If the City needs an addendum,

22  that's fine.  But I'd like to see the same time

23  schedule and attached to our testimony is a copy of

24  the State Boards's form.  Thank you very much.

25            CHAIRPERSON FELDER: You have to go to
```

115

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   the Marriage Bureau section of the website to get

3   lobbying information?

4              MR. RUSSIANOFF: The exact website is

5   www.nycmarriagebureau.com/lobbyist.  And I think

6   what this evidences, among other things, is that the

7   City Clerk did not do this lobbying data form.  It

8   was done by the Department of Information Technology

9   and Telecommunications.  But it is true. You have to

10  go to marriage bureau.com

11             CHAIRPERSON FELDER: And how did you

12  find that out?

13             MR. ISREAL: It give you Google on New

14  York City lobbying.  That's the website that pops

15  up.  And you have to actually go through three

16  different pages to actually get to the page inside

17  that site.

18             MR. RUSSIANOFF: And what I did, I

19  innocently visited the City Clerk's website, and I

20  couldn't figure it out.  So I called someone at the

21  Clerk's Office who said, well, scroll down to the

22  very bottom of the page, and where it says more

23  information about lobbyists, click there.  And

24  amazingly enough, that's where this huge database is

25  hidden.  And the attorney said something to me like,

116

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2    I thought we had it fixed already.

3            CHAIRPERSON FELDER: There's a joke in

4   there about marriage somewhere, but I'll leave it up

5   to you to find that one.

6            Okay, thanks for your testimony.

7            I was very interested in some of the

8   stuff that you echoed from Campaign Finance Board.

9   Especially the issues of matching the databases.

10  Because some of the timing issues are also

11  interesting.  If some of the reports that are going

12  to have to be filed by the lobbyists, for example,

13  if a lobbyists puts down certain information, what

14  they believe to be so, and a candidate, for example,

15  if we don't get the reports with enough time, in

16  theory, a lobbyist can put something down, thinking

17  like well, if I'm not sure, okay, so this was X, Y,

18  and Z.  Right?  And the candidate files their own

19  report, doesn't reflect it, and then you have  --

20  obviously, there's going to be a conflict.  You

21  know. And it's something that has to be straightened

22  out.   So with the issues that were mentioned about

23  matching, that I think Nicole Gordon had mentioned?

24  I think  --  I imagine that would really take care

25  of that problem without wasting a lot of money.  And

117

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  especially of the dates should coincide, as well.

3  It doesn't make sense that they should be on

4  different dates.

5            MR. RUSSIANOFF: Like you, we want a

6  law that's enforceable, and workable, and not an

7  unfair burden on the candidate, or the lobbyists.

8  Again, some of the provisions will affect us.  I

9  think there's a larger issue here.  The City has

10  maintained for quite some time that the scheme that

11  New Jersey and Connecticut and the SEC have, won't

12  work in the City.  And that's the scheme where the

13  City is required to keep a list of who is doing

14  business with it.  And then, if you give a

15  contribution, and you are doing business with the

16  City, or are a lobbyist, under the scheme we favor,

17  you would be debarred from doing business with the

18  City.  We wouldn't slap the candidate for taking a

19  contribution. Because you know, thousands of

20  entities do business with the City. And then if you

21  add their spouses or their unemancipated children --

22    So in any event, we want to workable scheme.

23            CHAIRPERSON FELDER: I'm still harping

24  on the same issue, so because some of  --  again, in

25  the quest to try to make this pure, it almost seems

118

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  that we can come up with a lot more.  So in theory,

3  if I were the Chair of the Landmarks Committee,

4  which I'm not anymore, and there were issues that

5  were coming in front of a Landmarks Committee, by

6  somebody who owns a home there, you know. Some of

7  the issues that were raised earlier  --  I'm only

8  posing this because the public interests groups I'd

9  like to hear, just briefly.  The general issues of

10  buying, if you want to call it that, of buying

11  things.  You know, lobbyists are in the business to

12  try to get influence on issues.  But people, whether

13  they're individuals or otherwise, also have

14  sometimes, and have become, you know, large

15  influence peddlers, whether it's development and

16  otherwise, and the  --  I don't know where it's

17  going to stop. That's you know  --  and I'm not

18  saying it should.  Should not stop, I mean.  I just

19  don't know   --  you know, I guess we have to try to

20  do better, which is the goal.  But there's a lot

21  going on, and I don't know how much of an affect you

22  know, really, other than sending a message, which is

23  important in of itself, there's no question that the

24  bills are very important.  And they send a message.

25  But in terms of fixing the system, or the way it

119

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  works, or the way it doesn't work.  I'm not sure.

3            MS. QUATTLEBAUM: Well, if I might

4  again raise this one issue.  I mean, I think even if

5  we were to enforce the current lobby law

6  effectively, we would have made a step forward.  I

7  mean, I think there are issues of, as Dick said,

8  people who should be registered not being

9  registered, and not being compelled to register by

10  anyone.  And also, I think you know, there may be

11  issues beyond that, of there being no fine in

12  current law, or in fact, in these proposals, for

13  failing to filing a report on time. So very little

14  to compel you to do that.  And then sort of lack of

15  clarity about what's being reported on the City

16  form.  I mean, again, I think that there's more we

17  can do.  But what I think this will do, is

18  substantially improve disclosure of lobbying

19  activities in the City of New York, and bring it

20  closer to being on par with what happens in New York

21  State.  And the reason that that happens is not by

22  the good graces of lobbyists, it's because there is

23  an effective law, and there is a real cop on the

24  beat.  And we know, we're lobbyists.  On the State

25  level, if you do not file as you are supposed to

120

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   file, there are reasonable, I think, consequences.

3   But that's just not true right now in the City.

4                   So I think there are some larger

5   questions here. But in terms of addressing your

6   concern of what difference this will really make,

7   that is one difference this will really make. And I

8   think it's an important one.

9                   CHAIRPERSON FELDER: Council Member

10  Dickens.

11                  COUNCIL MEMBER DICKENS: Thank you so

12  much Mr. Chairman.  Thank you for your testimony.

13                  Can you just tell me, have you done a

14  budget to tell me about what the cost would be to

15  put in these additional provisions?  What would be

16  the cost to the City for putting all of this in

17  place, say with COIB, what would be the additional

18  cost? You don't have to break it down.

19                  MR. RUSSIANOFF: You know, what I can

20  say is the Campaign Finance Board and the Conflicts

21  of Interest Board testified here, and they're in the

22  process of preparing budgets. They know far more

23  than we do about their needs, and they know far more

24  about reviewing agency requests than we do.  So the

25  bottom line is that both agencies will need

                                            121

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  additional resources, and certainly, the City Clerk

3  will.

4                    COUNCIL MEMBER DICKENS: Thank you.

5                    MR. DADEY: Mr. Chair, if I could just

6  further respond to your question, and build upon the

7  answer provided by Megan.  You know, this law would

8  not affect those who are average citizens who are

9  volunteers, who are involved in their neighborhood

10  associations, who are involved in their block

11  associations.  And participate in government by just

12  communicating with a legislator. You know, in order

13  to  --  when you earn $2,000 within a calendar year

14  as a lobbyist, you must be required to register.  So

15  you know, a you know, --  having a --  treating a

16  Council Member to you know, a pot luck dinner, at a

17  block association annual event, would not be covered

18  under this law.  It would not try to limit or

19  provide any kind of oversight for that legitimate

20  activity by citizens. It's really when those people

21  who are receiving compensation from the not- for-

22  profits, or from the lobbying firms, that we want to

23  make sure there's greater oversight.

24                    COUNCIL MEMBER DICKENS: Dick, my

25  question wasn't about that really.  Mine was about

122

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  --

3            MR. DADEY: No, I was answering his

4  question earlier.

5            COUNCIL MEMBER DICKENS: All right.

6  Thank you.

7            CHAIRPERSON FELDER: I just want to

8  make something clear that was stated earlier, I

9  think by Conflicts of Interest Board, is that the

10  issues that relate to the laws that the elected

11  officials, in terms of gifts, $50 gifts, or the

12  hypothetical of an elected official going out for

13  dinner, for a $55 dinner  --  I'm sorry, for a $49

14  dinner, with somebody who is a lobbyist, in essence,

15  under the law, the elected official would not be

16  violating anything.  And the lobbyist would.  Is

17  that true?

18            MR. DADEY: As I understand it, the

19  current law prohibits gifts over $50. But if this

20  lobbying law goes through, the revisions would ban

21  the lobbyists from making any contribution.

22            CHAIRPERSON FELDER: I understand

23  that.

24                MR. DADEY: But if you're not a

25    lobbyist, you know, a registered lobbyist, I mean,


                                              123


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    you'd still  --  you cannot provide --  I mean, you

3    could give a gift, but the elected official cannot

4    receive a gift from a non- lobbyist in excess of

5    $50.

6                CHAIRPERSON FELDER: That's not the

7    point that I'm making.  I think the point that I'm

8    making is that in essence, under this law, if it

9    goes into effect, we could have a situation where an

10   elected official is in compliance with the law, for

11   taking a $49 dinner.  Or a $49 gift.  And the person

12   who is sitting down, the lobbyist, is in violation

13   of the law, because they're not allowed to give

14   anything.  Is that true?  I mean, I know that they

15   talked about it before, but I think  --  that's not

16   true?  I'll have the Conflicts of Interest Board

17   come up later.

18                MR. RUSSIANOFF: I thought what they

19   testified was that they would impose the regulation

20   based on the intent of the Council, who zeroed out

21   lobbyist gifts.

22                CHAIRPERSON FELDER: To zero out   --

23   which means?

24                    MR. RUSSIANOFF: That a lobbyist

25    couldn't give a Council Member  --  you as a public

124

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    servant, would be violating the rules of the

3    Conflicts of Interest Board if you accepted a

4    contribution of $49.

5                    CHAIRPERSON FELDER: But there is no

6    such legislation, right?  That's part of the

7    problem.

8                    MR. RUSSIANOFF: I think you need a

9    referendum to make this kind of change, but the

10    board can do it if you give it the regulatory

11    authority, which I think is there in the intent of

12    the law.

13                    CHAIRPERSON FELDER: All right, we'll

14    talk about it later.  Thank you very, very much.

15                    Okay.  You know what?  We will,  --

16    if the Conflicts of Interests Board is willing to

17    come up for a moment, I would appreciate it.  I

18    think my colleagues as well.  To clarify this issue.

19     And I thank you for remaining all this time.

20                    MR. DAVIES: I think  --

21                    CHAIRPERSON FELDER: Could you

22    identify yourself again for the record?

23            MR. DAVIES: I'm sorry.  Mark Davies,

24  Executive Director of New York City Conflicts of

25  Interest Board.  And with me is Wayne Hawley, our

125

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Deputy Executive Director and General Counsel.

3            Currently, the law is this.  Chapter

4  68 of the City Charter prohibits acceptance of

5  valuable gifts from persons doing business with the

6  City.  Valuable gifts, under the Charter, is to be

7  defined by the Conflicts of Interest Board.

8  Conflicts of Interest Board has defined valuable

9  gifts as $50 or more, with a number of exceptions.

10  And that regulates only public servants. Not

11  lobbyists.

12            This bill regulates only lobbyists,

13  not public servants.  And it does not say  --  it

14  just says gifts.  And it leaves it to the Conflicts

15  of Interest Board  --  we understand to determine

16  what that means.  So unless it is the Council's

17  intent that you intend to zero out gifts by

18  lobbyists, otherwise, I think we would want a

19  consistent definition.  We would not want to have

20  the situation that you mentioned.  That's exactly

21  what we want to avoid.

22            COUNCIL MEMBER VALLONE: What do we do

23    to make sure that that occurs?

24                MR. DAVIES: I think you only have to

25    put it on the record.  I don't think we need an

126

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    amendment.  As I said, there's a number of points

3    that I made  --  I just want it in the record, that

4    is enough, we believe, to protect us against law

5    suits, of someone sues and says, well that's not

6    what the lobby agent says, oh yes it is, that was in

7    the legislative history.

8                If you could just put it in the

9    testimony, and make it clear, this is what the

10   Council says, is that it doesn't mean to zero out

11   lobbyist, it means that the Conflicts Board will set

12   what is a "gift" number one.  And number two, that

13   it is, as the statute does say, at our request, by

14   the way, the statute does say that we should attempt

15   to be consistent in adopting rules under this new

16   legislation, and our existing rules under Chapter

17   68.

18                COUNCIL MEMBER VALLONE: I would like

19   to make sure that this is in the record before we

20   vote on this.  I don't know how that happens.

21   Because we don't have the authority to speak for the

22    Council.  So I'm going to have to leave that up to

23    the esteemed Chair to figure that dilemma out.

24              CHAIRPERSON FELDER: I agree entirely

25    with my colleague.  And with you.  And it just

127

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    doesn't make sense.  It's not fair.  Unless it's

3    clear, I think something has to be done.  But again,

4    who has jurisdiction?  In other words, if we wanted

5    to --  it's clear that unless  --  there are two

6    alternatives.  One is to say lobbyists can give a

7    maximum of $50 to elected officials, which would be

8    consistent one way.  Or, if we're saying they're not

9    permitted to give anything at all, who has

10    jurisdiction to legislate that the elected officials

11    are not allowed  --  how does that get done?  I

12    don't understand.

13              MR. DAVIES: Well, it would have to be

14    done  -- except for a Charter referendum  --  it

15    would have to be done by the Board.  I mean, the

16    Board, in theory, could say, no, we're going to drop

17    the $50 down to zero dollars.

18              CHAIRPERSON FELDER: But you would

19    want to hear from us, in essence, saying, look,

20    instead of doing a referendum, we're telling you

21    that we want you to drop it down to zero.

22          MR. DAVIES: Yes, because if you don't

23 say anything, I think the inclination would be to

24 interpret the lobbying law consistent with our

25 existing rule.


                                            128


1 COMMITTEE ON GOVERNMENTAL OPERATIONS

2          CHAIRPERSON FELDER: Which means that

3 a lobbyist would be able to give a $50 gift.

4          MR. DAVIES: Right.  If you don't

5 intent that, then-

6          CHAIRPERSON FELDER: Then that has to

7 be made clear. Thank you very much.  Thank you.

8          Our final panel, Ms. Adrian Kivelson,

9 Marjorie Kellershay (phonetic), I'm sorry.  Peter J.

10 Kiernan, and Chad Marlow.

11          I would just ask you, the same thing

12 I said before. If you have anything new to add, or

13 to disagree about what was said, that's great.  If

14 you just agree with everything, then you could just

15 say, I agree.  Which ever one of you wants to start

16 first, please go ahead.

17          MR. KIERNAN: Thank you Mr. Chairman.

18 My name is Peter Kiernan.  I am the Chairman of the

19 New York City Affairs Committee of the City Bar

20 Association, and I'm speaking on behalf of the City

21  Bar Association.  I would just make a couple of

22  points, if I may.

23             Firstly, I just want to put on the

24  record that the New York City Bar Association

25  supports the aims of this lobbying reform package.


                                                    129


1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  We do so because of the widespread perception that

3  lobbying activities involve the giving of gifts and

4  the excessive contributions, and that has a

5  corrosive affect on our system of participatory,

6  representative government.  However, as has been

7  said by several people today, they don't have any

8  scandals on the record.  As the Campaign Finance

9  Board pointed out, we don't really have a database.

10  And the Bar Association believe that the perception

11  of wrong doing is much greater than the actual

12  reality.

13             Secondly, one of the members raised

14  the point about every New Yorker having the same

15  rights.  And with respect to the question of whether

16  a lobbyist's contribution should be matched, I would

17  say that the Bar Association has not completed a

18  constitutional law analysis of that.  But asks, is

19  there a constitutional distinction between a

20  lobbyist's contribution and that of an non-

21  lobbyist?  Where one is matched by public funds and

22  the other is not.  And the same comment would go to

23  those that would say that any fund raising by

24  lobbyists, the products of that should not be

25  matched.  We would have the same concerns with

130

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  respect to that, but we haven't completed the

3  analysis.  We hope that we will do so, but we hope

4  that the Council here does that same.

5                Just lastly, I think it's important

6  to point out that a lobbyist has a right to lobby.

7  And the right to lobby is an essential aspect of

8  represental (sic) government.  It is

9  constitutionally protected as core political speech.

10    So any restrictions that would be placed on those

11  rights, would have to be consistent with First

12  Amendment principles, and an example of that would

13  be that it could not be vague.  And I think we've

14  had lots of points raised today about the vagueness

15  of some of the provisions in these bills.  And so we

16  would add a cautionary note with respect to that.

17                I guess the very final comment I

18  would make is that lawyers are used to dealing with

19  the record.  And as has been pointed out here, we

20  don't really have a record.  There is a perception

21  of abuse, and there is a need, I believe, as the

22  very first witness testified, to get out in front on

23  this, and we support that.  However, there is action

24  also at the federal level and at the State level,

25  and there, they do have a record of abuse. And

131

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  luckily, we don't have a record here.  And so, the

3  Council was advised, I believe by the Campaign

4  Finance Board, perhaps to delay somewhat until a

5  database is assembled.  I think the Bar Association

6  would associate itself with that recommendation.

7  Thank you.

8          MR. MARLOW: Thank you Mr. Chairman,

9  and members of the Committee.  My name is Chad

10  Marlow.  I'm an attorney and an Executive Principal

11  Advocate at the Public Advocacy Group.  And as part

12  of my work, I am a private lobbyists.  I guess that

13  makes me the only one to show up today.

14          Mr. Chairman, you made actually, a

15  comment earlier that you were surprised not to see

16  any negative cards in that stack.  To the opposite,

17  I'm not surprised in the least. Considering that

18  lobbyists are all around the halls of City Hall, I

19  find it interesting, but quite telling, that I'm the

20  only one who managed to make it into this Committee

21  today.  And I think there's a reason for that.  I'd

22  like to go into that with you.

23          But I would like to clarify one

24  statement that's gone over and over again today,

25  which I think is important that it be clarified.  A

132

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  lot of people have said that we have had abuses of

3  lobbying laws in Washington and Albany, but not New

4  York City.  And I think technically, that's correct.

5   But I think that there is a large amount of legal

6  abuse of the lobbying system that's going on in New

7  York City.  And I think that part of the reason that

8  this Committee is meeting is to make sure that

9  current lobbying laws are followed.  But another

10  reason that they are meeting, which is equally

11  important, is to create more and better laws to stem

12  what currently is legal abuse of the lobbying

13  system.  And I applaud the Committee, the Mayor, and

14  the Speaker, on taking such a proactive stance

15  before the Jack Abramoff of New York City shows up

16  on the scene.  Because I think this Committee knows

17  he is out there. There is no question about it.  And

18  it's not just one person, either.

19                    I want to talk to you about why I

20    have shown up today, and how I feel I represent

21    certain lobbyists in the City, but not others.  It's

22    interesting to note that the term "lobbying" dates

23    back to the practice of cornering legislators in

24    their hotel lobbies, when they would come to and

25    from legislatures.  And at that time, all that

133

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    lobbying entailed, it wasn't necessarily money

3    involved, or knowing someone in particular, it was

4    just anyone got there, cornered them and had a

5    moment to make a very good, concise argument.  And

6    that is lobbying in its purest form.  That doesn't

7    exist today, nor could it.

8                    But I think that the concept of

9    having lobbying  -- the purpose of lobbying being to

10    inform members of the Council to make meritorious

11    arguments upon which they can make what is the best

12    decision for the City and their constituents, that

13    is the proper purpose of lobbyists.

14                    Now, there are two kinds of

15    lobbyists.  In the former category, which myself

16    and my firm falls, are the ones who again, focus on

17    the merits of our arguments and what we do.  When I

18    go in to lobby a Council Member, and colleagues like

19    myself go into lobby a Council Member, what we try

20    to do is do the very best research, the very best

21    analysis possible, and provide that to the Council

22    Member, on which they can themselves, make reasoned,

23    intelligent judgements, and rely upon the quality of

24    the work that we're doing.

25                    What is beautiful about the process,


                                                    134


1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    which is very similar to the litigation system in

3    the law is, if you have two people on equal sides of

4    the issue putting in the same effort, and the same

5    quality, and presenting tremendous arguments and

6    data, the City Council Member is empowered to make

7    the most intelligent decision possible.  Good

8    lobbyists, and quite frankly, the smartest, the

9    best, the brightest, and the most ethical lobbyists

10   practice that way, and the reason they do is because

11   they can. They have the ability to present that kind

12   of information, and that's what we rely on.

13                    There is, of course, another type of

14   lobbyists.  And it is the lobbyist into which the

15   Jack Abranoffs of the world fall. And they're not

16   all to the extent that Mr. Abramoff is, in terms of

17   violating the law.  But what they do, is they

18    attempt to influence the actions of the City

19    Council, not based on the merits of their arguments,

20    but instead, upon who they know, the money they

21    have, and the connections that they have.  This is

22    the great perversion of lobbying.

23             And lobbyists who fall in the

24    category that I do, which is to present meritorious

25    arguments to the Council, want to see this Council

135

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    do everything in its power to stop these people from

3    abusing what lobbying is.  And it is a helpful,

4    integral part of government.

5             And so, I encourage the Council  --

6    and that's what I want to talk about today, in terms

7    of what the Council can specifically do to close

8    these loopholes.

9             CHAIRPERSON FELDER: Excuse me for a

10    minute.  In addition to whatever you said so far, I

11    want you to limit your remarks to the bills.  So if

12    you have anything that you disagree with, or to add

13    to the bills specifically, that we talked about,

14    that's what we'd like to hear.

15             MR. MARLOW: Yes, Mr. Chairman.  Well

16    then let me go immediately to Intro. 190.

17    Obviously, Intro. 190 is the bill that's focused on

18  greater enforcement of the present lobbying laws.

19  And I think, as we all know, the failing in the

20  lobbying laws comes not in lobbyists disobeying the

21  laws, but in them finding the loopholes.  To me the

22  most obvious loophole that is brought up this

23  evening, is by allowing lobbyists to engage in fund

24  raising activities, as my own Council Member, David

25  Yassky, said a little bit earlier on.  But there has

136

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  been much made about allowing lobbyists to be

3  political consultants.  That's a similar skill with

4  which I personally don't have a problem.  There's

5  also political consultants being fund raisers.

6  Which is also, I think, part and parcel, and that's

7  okay.  But when you have lobbyists people that

8  participate as fund raisers, I think you get very,

9  very close to the area of what could be a bribe,

10  until the two areas, I think 190 should be amended

11  to prohibit, is lobbyists from holding fund raising

12  events of any kind, and lobbyists from participating

13  in bundling.  There are two important reforms that

14  are holes that 190 fails to cover.

15                    In terms of 191, I think the Council,

16  and in particular, Council Member Vallone, has hit

17  upon the weakness in "gift".  I would strongly

18  encourage this Committee not to leave that decision

19  up to legislative history.  I think any lawyer, and

20  certainly the Bar Association would tell you,

21  legislative history is a very weak area on which to

22  make a legal argument.  It can certainly be cornered

23  as the statement of one member, and not necessarily

24  the opinion of the entire Council.  I think it's

25  incumbent upon this Committee, having identified

137

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  this weakness, to identify the term "gift".  What I

3  would suggest, and I think your point as a fanatic

4  of bagel and lochs, that your comments absolutely

5  hit home with me, I think that be it $15, $20, or

6  $25 as a limit, per day, would eliminate a lot of

7  that grey area that would create enormous

8  enforcement obligations and costs, where you really

9  don't need them.

10              It's also important when I say to

11  have it done a day, as something we've learned up in

12  Albany, you don't want a lobbyist taking out a

13  Council Member and calling a $20 appetizer, a $20

14  meal, a $20 dessert three separate contributions.

15  So I would personally suggest a limit of $20 per

16  day, from a lobbyist to a Council Member.  I cannot,

17    in my mind, imagine a single Council Member being

18    swayed by a $20 gift, away from the needs of his

19    constituents.

20            Finally, I want to talk about two

21    other major loopholes that I think need to be

22    closed.   The first, which I deem to be probably the

23    most egregious loophole, and I don't feel that the

24    Council can make any strides towards lobbying reform

25    unless it closes, is the practice of allowing close

138

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2    relatives of members of the Council to lobby the

3    members.  I do want to make one distinguishing

4    point, which is not in my testimony, and I'm

5    embarrassed to overlook it, and it actually involves

6    Mr. Vallone. I think there should be an exception to

7    that for people who were formerly members of the

8    City Council, or elected officials, because clearly,

9    their influence is not based upon their connection

10    to a son or a daughter who is a member of the

11    Council.  But if you're going to prohibit direct

12    bribes to elected officials, what sense does it make

13    to allow them to give thousands of dollars a month

14    to a close family member, and call it lobbying fees?

15    It is one of those perfect loopholes that

16    lobbyists will take advantage of.  And I think you

17    can look through the registered lobbyists in New

18    York, and Albany, and Washington, and see this occur

19    time and time again. And to overlook it in favor of

20    whether a gift be $20 or $50 to me, seems a little

21    peculiar.

22                 And I should certainly say that there

23    should be no grandfathering.  If something is wrong

24    now, which it is, current people practicing it

25    should not be given a free ride.


                                                        139

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                 And the other thing, I'll conclude on

3    this, is that there has to be legislation along with

4    these reforms that prohibits individuals from

5    getting greater access to members of the Council

6    than they would on the merits of their argument, by

7    hiring former employees.  I think that is another

8    practice.  I think the number one lobbyist in the

9    entire State is a former employee of the Speaker.  I

10    think that this occurs throughout the City, and I

11    think there should be a 30- month limitation.  You

12    must wait 30 months, two and a half years from when

13    you leave government service, until you can come

14    back and lobby a member.

15                 And again, although this may not sit

16  well, it may not sit well with the Council to cut

17  out their family members, and the Council to cut out

18  their staff, serious lobbying reform requires tough

19  decisions, and as a member of the lobbying industry

20  who wants to clean up my industry, I am asking the

21  Council for its help.  Because without you, we

22  cannot weed out the bad- doers who undermine my

23  profession.  I thank you for your time.

24              CHAIRPERSON FELDER: Thank you.  Do

25  you have any questions?  I'm just curious.  Does


                                                    140


1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  your firm spend any money on elected officials?

3              MR. MARLOW: As a policy, we do not.

4  No.

5              CHAIRPERSON FELDER: Do you spend any

6  money on elected officials.  Not as a policy.

7              MR. MARLOW: You mean donations?

8              CHAIRPERSON FELDER: Yes.

9              MR. MARLOW: No.  We've never done it.

10              CHAIRPERSON FELDER: Your firm doesn't

11  contribute.

12              MR. MARLOW: Never done it.

13              CHAIRPERSON FELDER: Do any of your

14  relatives or lawyers' relatives?

15                    MR. MARLOW: My mother lives in West

16   Hampton, so no. My brothers, no.

17                    CHAIRPERSON FELDER: I'm saying

18   generally.

19                    MR. MARLOW: No. I have no distant

20   relatives --

21                    CHAIRPERSON FELDER: You didn't hear

22   what I said.  I asked you whether you think it's

23   possible that any of the lawyers at your firm, or

24   any relatives, that contribute money to elected

25   officials.

141

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                     MR. MARLOW: No.  But we have a small

3    firm.  Your point is well taken, if it's a large

4    firm.

5                     CHAIRPERSON FELDER: Okay.

6                     MR. MARLOW: But I think it's a little

7    different. I'm not talking about  --  I'm talking

8    about the definition of lobbyist, allowing lobbyists

9    at all to include someone who is paid to lobby a

10   close relative in the Council, be it a brother,

11   sister, father or daughter, uncle, aunt, a first-

12   generation removed relative.  I think that that's

13   something you can easily find out, whether or not

14   you know, the Councilwoman's brother, which I don't

15  believe she has one, she might, so I'm not referring

16  to him, is actually lobbying the Council.

17            CHAIRPERSON FELDER: Which

18  Councilwoman are you referring to?

19            MR. MARLOW: I'm sorry.  My former

20  Councilman, the Speaker, Christine Quinn.  I don't

21  know if she has a brother.

22            CHAIRPERSON FELDER: I know.

23            MR. MARLOW: But there are examples in

24  this Council, of members who have family members,

25  and I'm not talking about the former Speaker

                                                    142

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Vallone, who I think should be an exception, because

3  he clearly has his own merits and skills, and he's

4  not using his son in the Council right now to gain

5  access.  But there are other members who have

6  brothers, sisters, fathers, uncles, who lobby them

7  and I really think that that's a black eye on this

8  Council and on my profession.

9            CHAIRPERSON FELDER: Well, in terms of

10  the black eye, you know what?  I thank you for your

11  testimony.

12            MR. MARLOW: Okay.  Thank you.

13            CHAIRPERSON FELDER: Okay?  The

14    hearing is closed. And thank you for coming.

15                    (Hearing concluded at 3:50 p.m.)

16

17

18

19

20

21

22

23

24

25

143

1

2                    CERTIFICATION

3

4

5    STATE OF NEW YORK    )

6    COUNTY OF NEW YORK   )

7

8

9                    I, JOAN GARCIA, do hereby certify

10    that the foregoing is a true and accurate transcript

11    of the within proceeding.

12                    I further certify that I am not

13    related to any of the parties to this action by

```
14   blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto

17   set my hand this 4th day of April 2006.

18

19

20

21

22

23

24              ----------------------

25                   JOAN GARCIA
```

144

```
1

2        C E R T I F I C A T I O N

3

4

5

6

7

8

9        I, JOAN GARCIA, do hereby certify the

10  aforesaid to be a true and accurate copy of the

11  transcription of the audio tapes of this hearing.

12
```

13

14

15

16

17

18

19

20

21

22          ------------------------

23              JOAN GARCIA

24

25

Proposed Int. No. 192-A

By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, McMahon, Nelson, Palma, Weprin, White Jr., Liu, Vacca and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor)

A LOCAL LAW

To amend the administrative code of the city of New York, in relation to campaign contributions by lobbyists.

Be it enacted by the Council as follows:

Section 1. Subdivision 3 of section 3-702 of the administrative code of the city of New York, as amended by local law number 58 for the year 2004, is amended, and new subdivisions 16 and 17 are added to such section to read as follows:

3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution. The following contributions are not matchable:

(a) in-kind contributions of property, goods, or services;

- 1 -

(b) contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(c) contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes;

(d) money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e) contributions from individuals under the age of eighteen years; [and]

(f) contributions from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance; and

(g) contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1). The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213.

16. The term "lobbyist" shall mean a lobbyist as defined in subdivision (a) of section 3-211 of this title and the spouse or domestic partner and unemancipated children of the lobbyist, and if the lobbyist is an organization, the term "lobbyist" shall mean only that division of the organization that engages in lobbying activities and any officer or employee of such lobbyist who engages in lobbying activities of the organization or is employed in an organization's

division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees.

17. The term "lobbying" or "lobbying activities" shall mean lobbying and lobbying activities as defined in section 3-211 of this title.

§2. If any provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected.

§3. This local law shall take effect immediately and shall be applicable to all public funds claims for elections held on or after the effective date, regardless of whether the claim for public funds was submitted prior to the effective date.

DJ
5/16/06

DeNora M. Johnson
Legislative Counsel

Sheila Horgan
Legislative Policy Analyst



**THE COUNCIL**

**REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION**
Robert Newman, Legislative Director

**COMMITTEE ON GOVERNMENTAL OPERATIONS**
Simcha Felder, Chair

May 24, 2006

| | |
|---|---|
| **PROPOSED**<br>**INT. NO.  190-A:** | By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Dickens, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, Nelson, Palma, Weprin, White Jr., Liu, Vacca and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York, in relation to the reporting of lobbyist activities and the enforcement of the lobbying law. |
| **PROPOSED**<br>**INT. NO.  191-A:** | By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, Nelson, Palma, Weprin, White Jr., Liu, Vacca and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York and the New York city charter, in relation to gifts by lobbyists. |
| **PROPOSED**<br>**INT.NO. 192-A:** | By The Speaker (Council Member Quinn) and Council Members Arroyo, Avella, Brewer, Fidler, Garodnick, Gonzalez, James, Koppell, Lappin, Mark-Viverito, Martinez, McMahon, Nelson, Palma, Weprin, White Jr., Liu, Vacca and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York, in relation to campaign contributions by lobbyists. |

## I.    <u>Introduction</u>

On April 24, 2006, the Committee on Governmental Operations, chaired by Council Member Simcha Felder, will vote on Proposed Int. Nos. 190-A, 191-A and 192-A.  Proposed Int. Nos. 190-A, 191-A and 192-A would make amendments to various sections of the New York city charter and the administrative code of the city of New York which would:  (1) create a mandatory electronic filing system for lobbyists; (2) require full lobbyist disclosure of all fundraising and consulting activities; (3) strengthen enforcement and penalties for violations of the lobbying law; (4) ban all gifts from lobbyists to city officials; and (5) prevent lobbyists' contributions from being matched with public funds.  The Committee held a hearing on a prior version of these bills on April 4, 2006**.**

## II.    <u>Lobbying Reform Background</u>

Lobbying scandals on the federal and state level, such as the Jack Abramoff lobbying scandal in 2005 ("Abramoff scandal"), have reduced the public's trust in its elected officials. The Abramoff scandal involved allegations that lobbyists illegally gave federal legislators gifts and made campaign donations in return for votes or support of legislation.[1] While the legislators argued there was no undue influence as a result of these gifts, these accusations raised serious questions of impropriety.

With the Abramoff scandal as a backdrop, City Council Speaker Christine Quinn and Mayor Michael Bloomberg introduced legislation to reform the city's lobbying laws.  The proposed reforms seek to reduce the impact of lobbying culture and special interests in City Hall and strengthen the integrity, transparency and accessibility of city government for its constituents.[2]

---

[1] *See* http://en.wikipedia.org/wiki/Abramoff-Reed_Indian_Gambling_Scandal
[2] *See* Press Release, The Council of the City of New York, Office of Communications, Speaker Quinn & Mayor

III.     <u>**New York City Lobbying Laws**</u>

Under the current New York City lobbying laws, which are contained in subchapter 2 of

chapter 2 of title 3 of the administrative code of the city of New York ("administrative code"),

the city clerk is responsible for enforcing compliance with the requirements of the lobbying

laws.[3]  One of the city clerk's responsibilities is to keep statements of registration filed annually

by lobbyists open to public inspection for a period of five years.[4]  The lobbyists' annual

statement of registration must include:

> (1) the name, address and telephone number of the lobbyist; (2) the name, address and
> telephone number of the client by whom or on whose behalf the lobbyist is retained,
> employed or designated; (3) if such lobbyist is retained or employed pursuant to a written
> agreement of retainer or employment, a copy of such shall also be attached and if such
> retainer or employment is oral, a statement of the substance thereof; (4) a written
> authorization from the client by whom the lobbyist is authorized to lobby, unless such
> lobbyist has filed a written agreement of retainer or employment pursuant to paragraph
> three of this subdivision; (5) a description of the general subject or subjects on which the
> lobbyist is lobbying or expects to lobby; (6) the name of the person or agency before which
> the lobbyist is lobbying or expects to lobby; and (7) if the lobbyist has a financial interest
> in the client, direct or indirect, information as to the extent of such interest and the date on
> which it was acquired.[5]

Lobbyists are also required to report to the city clerk within thirty days after the lobbyist

terminates the retainer, employment or designation for which a statement of registration was

filed.[6]

Further, pursuant to administrative code section 3-216, if a lobbyist "in any lobbying year

expends, receives or incurs combined reportable compensation and expenses in an amount in

---

Bloomberg Introduce Lobbying Reforms; Speaker Presents Rules Changes Establishing Parameters for Lobbyists'
Access to Council Members (Feb.16, 2006) (available at: http://www.nyccouncil.info/pdf_files/reports/02-
16_06_loybbyrform.pdf); see also Press Release, Office of the Mayor, Mayor Bloomberg and Speaker Quinn Unveil
Comprehensive and Groundbreaking Reform Package of Lobbying Reform (Feb. 16, 2006) (available at:
http://www.nyc.gov).
[3] Administrative Code §3-212
[4] Administrative Code §3-213(a) & (b)
[5] Administrative Code §3-213(c)
[6] Administrative Code §3-215

excess of two thousand dollars"[7] then the lobbyist must file a first periodic report with the city

clerk by "the fifteenth day next succeeding the end of the reporting period on which the

cumulative total for such lobbying year equalled such sum."[8]  Additionally, any lobbyist that

files a periodic report must subsequently file with the city clerk "a periodic report for each

reporting period that such person expends, receives or incurs combined reportable compensation

and expenses in an amount in excess of five hundred dollars for the purposes of lobbying during

such reporting period."[9]   The periodic report must include:

> (1) the name, address and telephone number of the lobbyist; (2) the name, address and
> telephone number of the client by whom or on whose behalf the lobbyist is retained,
> employed or designated; (3) a description of the general subject or subjects on which the
> lobbyist has lobbied; (4) the person or agency before which the lobbyist has lobbied; (5) (i)
> the compensation paid or owed to the lobbyist, and any expenses expended, received or
> incurred by the lobbyist for the purpose of lobbying. (ii) expenses required to be reported
> pursuant to subparagraph (i) of this paragraph shall be listed in the aggregate if seventy-
> five dollars or less and if more than seventy-five dollars such expenses shall be detailed as
> to amount, to whom paid, and for what purpose; and where such expense is more than
> seventy-five dollars on behalf of any one person, the name of such person shall be listed.
> (iii) for the purpose of this paragraph, expenses shall not include: (A) personal sustenance,
> lodging and travel disbursements of such lobbyist; (B) expenses, not in excess of five
> hundred dollars in any one calendar year, directly incurred for the printing or other means
> of reproduction or mailing of letters, memoranda or other written communications. (iv)
> expenses paid or incurred for salaries other than that of the lobbyist shall be listed in the
> aggregate. (v) expenses of more than fifty dollars shall be paid by check or substantiated by
> receipts."[10]

The city clerk is required to keep the periodic reports on file and open to public inspection for

five years.[11]

Under the lobbying laws,  "every lobbyist required to file a statement of registration

pursuant to section 3-213 of this subchapter or any client retaining, employing or designating a

lobbyist or lobbyists, if during the year such client expended, received or incurred an amount in

---

[7] Administrative Code §3-216(a)(1)
[8] Administrative Code §3-216(a)(1)
[9] Administrative Code §3-216(a)(2)
[10] Administrative Code §3-216(a)(2)(b)
[11] Administrative Code §3-216(d)(2)

excess of two thousand dollars of combined reportable compensation or expenses, as provided in paragraph five of subdivision (c) of this section, for the purposes of lobbying," is also required to file an annual report.[12]  The annual report must be filed with the city clerk "by the fifteenth day of January next following the year for which such report is made and shall contain on an annual cumulative basis all the information required in periodic reports by section 3-216 of this subchapter."[13]  The annual report must contain the same information as contained in the periodic report.[14] Further, any statement or report that must be filed under subchapter 2 may be filed in person with the clerk or done by mail.[15]

Section 3-223 outlines the penalties for violation of subchapter 2.[16]  First, a person or organization is guilty of a class A misdemeanor if he or she knowingly or willfully violates any provision of subchapter 2.[17]  The person or organization will also be "subject to a civil penalty, in an amount not to exceed fifteen thousand dollars, to be assessed by the city clerk, or an order to cease all lobbying activities subject to the jurisdiction of the city clerk for a period of time as determined by said clerk not to exceed sixty days, or both such civil penalty and order." [18] Second, if a person or organization "violates a cease and desist order of the city clerk issued under subdivision (a) or enters into a contingency agreement or accepts or pays any contingency fees as proscribed in section 3-218 of this subchapter, shall be guilty of a class A misdemeanor."[19]  Also, the person or organization could be subject to a civil penalty "in an amount not to exceed fifteen thousand dollars, to be assessed by the city clerk."[20]  Third, if a

---

[12] Administrative Code§3-217(a)(1) & (2)
[13] Administrative Code §3-712(b)
[14] See supra footnote 8 and supporting text
[15] Administrative Code §3-221
[16] Administrative Code §3-223
[17] Administrative Code §3-223(a)
[18] Id.
[19] Administrative Code §3-223(b)
[20] Id.

person or organization fails to file a statement or report after notification by the city clerk it

"shall constitute a class A misdemeanor."[21]   Additionally, the person or organization may be

subject to a civil penalty of up to ten thousand dollars.[22]   Fourth, if a person or organization

violates any provision of subchapter 2 not punishable under subdivisions a, b, or c of section 3-

223 then such person shall be subject to the imposition, by the city clerk, of a civil penalty of up

to ten thousand dollars.[23]   However, under section 3-223(e), the city clerk cannot assess any

penalty for violation of subdivision a, b, c, or d until 14 days after written notice of the violation

is given.[24]

## IV.    New York City Conflict of Interest and Campaign Financing Laws

Under New York city laws governing conflicts of interest, it is impermissible for a public

servant to accept any "valuable gift, as defined by rule of the [Conflicts of Interest] board, from

any person or firm which such public servant knows is or intends to become engaged in business

dealings with the city, except that nothing contained herein shall prohibit a public servant from

accepting a gift which is customary on family and social occasions."[25]   The Conflicts of Interest

Board ("COIB") has defined a "valuable gift" as "any gift to a public servant which has a value

of $50.00 or more, whether in the form of money, service, loan, travel, entertainment, hospitality,

thing or promise, or in any other form."[26]

Under the New York City campaign finance act, a candidate may be eligible for optional

public financing if they meet certain requirements.[27]   Once the candidate for nomination for

election or election has met the requirements contained in section 3-703 of the administrative

---

[21] Administrative Code §3-223(c)
[22] Id.
[23] Administrative Code §3-223(d)
[24] Administrative Code §3-223(e)
[25] New York city charter §2604(b)(5)
[26] 53 RCNY § 1-01 (title 53 - rules of the city of new york §1-01).
[27] Administrative Code §3-703

code, the next inquiry is whether the contribution received can be matched under the program with public funds.[28]   In order to obtain campaign finance matching funds, a gift must be matchable.[29] Under the administrative code, loans and the following contributions are not matchable:

> (a) in-kind contributions of property, goods, or services; (b) contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value; (c) contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes; (d) money order contributions from any one contributor that are, in the aggregate, greater than $100; and (e) contributions from individuals under the age of eighteen years.[30]

Under the campaign financing program, each participating, limited participating, or non-participating candidate and his or her principal committee must complete a disclosure report about all "contribution, loan, guarantee, or other security for such loan received by the candidate and such committee…"[31] Finally, the campaign finance board has responsibility for promulgating rules and regulations and providing necessary forms to implement the program.[32]

## V.    Provisions of Proposed Int. No. 190-A

Proposed Int. No. 190-A would make various structural and procedural changes to the city's lobbying laws, which if implemented would among other things:  (1) create a stronger enforcement mechanism with the Office of the City Clerk ("Clerk"), (2) broaden lobbyists' disclosure requirements and (3) create a commission to review the law's efficacy and to make recommendations on ways to strengthen or improve the law.

The Clerk currently has authority to administer and enforce the lobbying laws, however, the Clerk has not effectively enforced the lobbying laws. Instead the Clerk's office has served as a

---

[28] Administrative Code §3-702(3)
[29] Id.
[30] Id.
[31] Administrative Code §3-703(a)
[32] Administrative Code §3-708(8)

mere storehouse for lobbyist information. Proposed Int. No. 190-A seeks to redress this problem by enhancing the enforcement powers of the Clerk's office by equipping the Clerk's office with in-house investigators, trained by the Department of Investigation ("DOI"). Under the proposed bill, the investigators at the clerk's office would not only be responsible for reviewing all of the lobbyists' filings currently required by the lobbying law, i.e., statements of registration, periodic reports, and annual reports, but would also be responsible for conducting random audits of these statements and reports.

Proposed Int. No. 190-A further enhances the Clerk's enforcement powers by increasing the fines applicable for violation of the lobbying laws. The proposed bill would increase the penalty for willful violations of the lobbying laws or violations of a Clerk's order to cease and desist from fifteen thousand dollars to thirty thousand dollars. Further, if a lobbyist does not timely file a statement or report required under the law, in addition to the criminal penalties that may be assessed, the lobbyist would be subject to daily penalties for the first fourteen days of delinquency. The Clerk would conform, by rule, the amount of the daily penalties to the fees assessed by the New York Temporary State Commission. Under the current lobbying law, the Clerk may also assess civil penalties against a lobbyist that fails to file any statement or report.[33] Proposed Int. No. 190-A would increase the civil penalty for failure to submit statements or reports, as well as for violations that do not fit within the aforementioned categories, from the current maximum fine of ten thousand dollars to a maximum fine of twenty thousand dollars.

Proposed Int. No. 190-A would also substantially increase the Clerk's public reporting requirements. Specifically, the City Clerk would be required to post annually on the internet a report detailing the number of complaints received from the public and the disposition of such complaints, the number and amount of civil penalties imposed, the number and duration of

---

[33] *See supra* notes 22, 23 and 24, and accompanying text.

orders issued, the number of random audits conducted by the clerk and outcomes of the audits, and compliance programs developed and implemented for lobbyists by the Clerk.  In addition, each time an order or civil penalty is issued, the Clerk would be required to post information on the internet identifying the lobbyist or client who committed the violation, the specific provision of law violated and the duration of the order or amount of the penalty.  Further, the proposed bill would also increase the public's access to lobbying information by requiring that all statements and reports required to be filed by lobbyists with the Clerk be filed electronically and placed on the internet by the Clerk in a timely manner.  These activities will accomplish the goals of the Speaker and the Mayor in proposing these reforms by making lobbying activity in City Hall more transparent.

A. **Amendments to Reporting Requirements**

Proposed Int. No. 190-A would require lobbyists to include their name, address and telephone number and the names, addresses and telephone numbers of their spouse or domestic partner and unemancipated children, if the lobbyist is an individual, in their statement of registration.  In addition, if the entire entity is a lobbying business such as a lobbying firm, then it would be required to include the names, addresses and telephone numbers of all of its officers and employees.  Finally, if an organization has a government affairs or lobbying division, the statement of registration would have to include the names of the employees or members of that division of the organization.  Spouses and domestic partners as well as unemancipated children of such officers and employees required to be listed in the statement of registration must also be provided.

Under the current lobbying laws, lobbyists are required to disclose information regarding the subjects they lobby or expect to lobby in their periodic and annual reports.  In practice,

however, lobbyists do not comply with this requirement and most provide generic responses, such as lobbied about "public policy." Proposed Int. No. 190-A attempts to deter this practice by expanding lobbyists' disclosure requirements and making the reporting requirements much more specific.   In particular, under the proposed bill, lobbyists would be required to "include additional information to identify the local law or resolution, procurement, real property, rule, rate making proceeding, determination of a board or commission, or other matter on which the lobbyist is lobbying or expects to lobby."

The proposed bill would also create a new reporting requirement for lobbyists to cover instances where a lobbyist acts in the dual capacities of lobbyist as well as fundraiser and/or political consultant for a candidate.  Proposed Int. No. 190-A would require that "any lobbyist required to file a statement of registration pursuant to section 3-213 of this subchapter who in any calendar year to which the statement of registration relates, or in the six months preceding such calendar year, engages in fundraising or political consulting activities shall file with the city clerk, on forms supplied by the city clerk, a fundraising and/or political consulting report."  The lobbyist would file the fundraising and/or political consulting reports on the same period schedule as the periodic reports are filed, except that the "first fundraising and/or political consulting report filed in any calendar year shall include information on fundraising and/or political consulting activities that occurred in any period beginning six months preceding the calendar year to which the statement of registration relates through the end of the reporting period for which the report is filed, to the extent such information has not been reported in a fundraising and/or political consulting report filed in the preceding calendar year. Each subsequent fundraising and/or political consulting report filed in or with respect to the calendar year to which the statement of registration relates shall include information on fundraising and/or

political consulting activities that occurred since the end of the reporting period for which the previous report was filed through the end of the reporting period for which the current report is filed." The fundraising and/or political consulting activities must be reported, "whether they are conducted directly by the lobbyist, or through any other entity of which such lobbyist is a principal."

The intent of this provision is to ensure that lobbyists who are paid by candidates or on behalf of candidates by their campaign committees must report their dual roles. Employees of good government or other organizations who lobby and may provide political advice to candidates, but are paid by their employer, would not be required to make this filing.

The fundraising and/or political consulting report would contain the following information:

(1) the name, address and telephone number of the lobbyist and the individuals employed by the lobbyist engaged in such fundraising and/or political consulting activities; (2) the name, address and telephone number of the candidate, public servant, or elected official to whom or on whose behalf the lobbyist provided fundraising and/or political consulting services; (3) (i) the compensation paid or owed to the lobbyist for such fundraising and/or political consulting activities, and any expenses expended, received or incurred by the lobbyist for the purpose of providing fundraising and/or political consulting services; (ii) Expenses required to be reported pursuant to subparagraph (i) of this paragraph shall be listed in the aggregate if seventy-five dollars or less and if more than seventy-five dollars such expenses shall be detailed as to amount, to whom paid, and for what purpose; and where such expense is more than seventy-five dollars on behalf of any one person, the name of such person shall be listed; and (4) in the case of fundraising activities, the total dollar amount raised for each candidate for which such activities were performed.

Finally, the Clerk would be required to keep all fundraising and/or political consulting reports available in electronic form for inspection by the public.

In order to ensure that the city's lobbying reporting process is as streamlined as possible, the proposed bill would require the Clerk to adopt rules to conform the reporting periods and

reporting forms, to the extent practicable, to those used by the New York Temporary State Lobbying Commission.

### B.  Implementation Commission

Finally, to ensure compliance with the reforms in the legislation, the proposed bill would require the mayor and the city council to jointly appoint a five-member commission, within twenty-four months of the enactment of Proposed Int. No. 190-A, to review whether the legislation has been effectively implemented. Within six months of the commission's appointment, the commission would be required to give a report to the mayor and city council about its administrative and legislative recommendations for strengthening the administration and enforcement of the law and whether the commission would recommend raising the dollar threshold for the filing of a statement of registration.

Proposed Int. No. 190-A would become effective in two stages.  The provisions contained in sections three, nine, ten, eleven, thirteen and fourteen of the law would become effective one year after the law is enacted and the remaining sections would become effective on the one hundred eightieth day after the law's enactment.  The bifurcated enactment clause provides for additional time (one year) to the Clerk and other agencies to implement the provisions of the proposed bill that deal with the creation of electronic systems   The increased penalties, additional dual-role reporting by lobbyists and more specific reporting requirements would take effect six months after the law's effective date.

## VI.    Provisions of Proposed Int. No. 191-A

Proposed Int. No. 191-A adds a new subchapter 3 to chapter 2 of title 3 of the administrative code, which would prohibits gifts by lobbyists to public servants.

Section one of the bill, which creates a new section 3-225 of the administrative code, prohibits lobbyists from offering or giving a gift to any public servant.  Unlike the current Conflicts of Interest provisions which prohibit public servants from accepting "valuable gift[s]" defined as  "any gift to a public servant which has a value of $50.00 or more…" Int. No. 191-A's ban on gifts from lobbyists applies only to the lobbyist.

Further, section one of the bill, which creates a section 3-228 of administrative code, authorizes COIB to consult with the Clerk to promulgate rules to ensure that the law is implemented, "including rules defining prohibited gifts, and exceptions to the prohibition on offering and receiving gifts…which to the extent practicable, shall be promulgated by COIB in a manner consistent with its rules and advisory opinions governing receipt of valuable gifts by public servants."  The introduced version of the bill was amended to give further parameters to COIB about exceptions to the lobbyist gift-giving ban.  This is done for "*de minimis* gifts," such as pens, mugs and t-shirts, gifts from family members and close personal friends on family or social occasions,[34] and those items such as invitations to events that are currently considered by the COIB to be gifts to the City that a public servant may accept in his or her official capacity.

COIB would be responsible for receiving, investigating and adjudicating any alleged violations of these new provisions, as well as all existing provisions, and they will do so in the same manner as they currently investigate and adjudicate conflicts of interest pursuant to section sixty-eight and thirty-four of the charter.  In the event that COIB finds a violation of these provisions, if the person or organization knowingly and willfully violated the provisions they "shall be guilty of a class A misdemeanor.  In addition to such criminal penalties, said person or

---

[34] Id.

organization shall be subject to a civil penalty, in an amount not to exceed thirty thousand dollars."

Proposed Int. No. 191-A would become effective "on the one hundred eightieth day after it shall have become a law provided that, upon enactment of this local law, the relevant city agencies shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date."

## VII.    Provisions of Proposed Int. No. 192-A

Proposed Int. No. 192-A amends the administrative code to strengthen the campaign finance system by prohibiting voluntary participants in the campaign finance program from receiving public matching funds for contributions by lobbyists and their spouses, domestic partners and unemancipated children.  Proposed Int. No. 192-A was amended to remove the onus from the candidate to determine if a contributor was a lobbyist and therefore the contribution could not be submitted to the CFB for public matching funds.  Under the amended legislation, the CFB is responsible for determining the matchability of lobbyist's contributions – the candidate is not.

Proposed Int. No. 192-A shifts the responsibility for determining whether a contribution is from a lobbyist and therefore not matchable to the CFB.  In determining whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213 of the administrative code (or a spouse, domestic partner or unemancipated child of such person), the CFB shall "rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board."  Pursuant to Proposed Int. No. 190-A, a lobbyist would be required to include their name, address and telephone number, if the lobbyist is an individual, as well as the

name, address and telephone number of their spouse or domestic partner and unemancipated children in their statement of registration. The address and telephone numbers of spouses, domestic partners and unemancipated children would not be made available to the public. Further, if the lobbyist is an organization, the lobbyist must include "the names, addresses and telephone numbers of any officer or employee of such lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees," in their statement of registration. When the statement of registration is electronically submitted to the Clerk's office and the Clerk's database is operational, the CFB will access the Clerk's database for purposes of determining if a contribution is not matchable because the contribution was from a lobbyist.

Proposed Int. No. 192-A would become effective immediately and would be applicable to all public funds claims for elections held after the effective date. Although the CFB would rely on the database created by the Clerk's office to determine if a contribution is not macthable, by making the law effective immediately, it ensures that all lobbyist contributions submitted to the CFB before the next election are still considered not matchable under the law.

1

2  CITY COUNCIL

3
   CITY OF NEW YORK
4
   -------------------------------x
5
   THE TRANSCRIPT OF THE MINUTES
6
             of the
7
   COMMITTEE ON GOVERNMENTAL
8  OPERATIONS

9  -------------------------------x

10
                   May 24, 2006
11                 Start:  10:00 a.m.
                   Recess: 10:25 a.m.
12
                   City Hall
13                 Council Chambers
                   New York, New York
14

15     B E F O R E:

16          SIMCHA FELDER
                             Chairperson,
17

18          COUNCIL MEMBERS:   Joseph Addabbo
                               Larry Seabrook
19                             Peter Vallone, Jr.
                               Inez Dickens
20

21

22

23

24     LEGAL-EASE COURT REPORTING SERVICES, INC.
              17 Battery Place -  Suite 1308
25            New York, New York 10004
                  (800) 756-3410

2

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2                CHAIRPERSON FELDER: Good morning, and

3   welcome to the hearing on the Committee on

4   Governmental Operations. I am Simcha Felder, Chair

5   of the Committee, and I am joined by my colleagues,

6   Council Member Dickens, Councilman Addabbo,

7   Councilman Seabrook and Councilman Vallone.

8                Today the Committee will vote on

9   proposed Intro. No. 190-A and proposed Intro. 191-A

10  and proposed Intro. No. 192-A, which make up the

11  comprehensive lobbying reform plan proposed by the

12  Speaker in conjunction with the Mayor.

13               The Committee held a hearing on a

14  prior version of these bills April 4th, 2006. I'd

15  like to thank the Administration, City agency

16  advocacy groups and other interested parties

17  regarding the testimony at the hearing.

18               Briefly, very briefly, the proposed

19  bills would strengthen the mechanism for monitoring

20  and enforcing compliance for the City's lobbying

21  laws, increase lobbyists' reporting requirements

22  under the law, prohibit gifts by lobbyists-- I'm

23  trying, honest -- to City officials, and prohibit

24  voluntary participants of the Campaign Finance

25  Program from receiving public matching funds for

3

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  contributions made by a lobbyist or other parties

3  required to be included in a lobbyist statement of

4  registration.

5              Again, I'd like to applaud the

6  Speaker and the Mayor for their joint efforts, and

7  hope the legislation will inherit a new level of

8  transparency and efficiency within City government.

9  The amendments to this legislation have clarified --

10  I want to let her vote. It's not right.

11              We will be voting on three items

12  today, Intros No. 190-A, 191-A and 192-A in one

13  vote, similar to the vote at the Stated Meetings.

14              I will finish my comprehensive

15  statement that was prepared by the most wonderful

16  Counsel in the Council, DeNora Johnson, but first as

17  a matter of courtesy to Council Member Dickens, who

18  has her own Committee to start, we will allow her to

19  vote at this point.

20              COUNCIL MEMBER DICKENS: Thank you so

21  much, Mr. Chair. And aye on all.

22              CHAIRPERSON FELDER: Is there anyone

23  else? Okay, so I'll finish this.

24              The amendments to the legislation

25  have clarified issues raised at the previous hearing

4

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   by my colleagues and witnesses. Specifically with

3   respect to the intent of the lobbyist gift ban, and

4   proposed 191 and the matching contribution provision

5   contained in proposed in Intro. No. 192-A. At the

6   present moment, a just wonderful all-around guy,

7   right? Andy Grossman. Did I say it right? A

8   wonderful all-around guy, is handing out the fiscal

9   impact statement, which shows that there is

10  absolutely no cost to the City. Believe it or not.

11  That's not true. 192-A has a $500,000 savings.

12  That's what we like doing in this Committee, saving

13  the City money.

14              In addition, the bill was thoroughly

15  analyzed in comparison with the recent guidelines

16  issued by the New York Temporary State Lobbying

17  Commission, to ensure that the bill was in sync with

18  the State rules.

19              For further clarification of the

20  substantive changes to the bill, I refer you to

21  consult the briefing report prepared by the Counsel

22  to the Committee. All of my colleagues should have

23  received a copy of the Fiscal Impact Statements,

24  diligently prepared by the Finance Division for each

25  of the three bills.

5

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2              I have been informed that fiscal

3  impact for proposed Intros No. 190, 191-A, are

4  negligible, but 192-A is not negligible at all,

5  since we're going to be saving $500,000 that should

6  be used to increase the salaries of Council members.

7  However, if you need more specific details, I would

8  suggest that you consult the fiscal impact

9  statements.

10             Finally, for purpose of the vote

11  today, we will couple the vote on proposed Intros

12  190-A, 191-A, 192-A in one vote, similar to the vote

13  at the Stated Meeting.

14             With that said, the Counsel to this

15  Committee, DeNora Johnson, who has done a wonderful

16  job all the time, I can't say enough, even though

17  some of my colleagues do not like me praising the

18  counsel, has to read something into the record.

19             MS. JOHNSON: I'm going to read into

20  the record a letter that was sent to the Chair of

21  the Committee Simcha Felder from the Campaign

22  Finance Board in regards to Intro. 192-A.

23             Dear Chairman Felder, I am writing to

24  express the Campaign Finance Board's appreciation

25  for the Council's revisions and clarifications of

6

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  Intro. 192-A in response to testimony offered on

3  April 4th, 2006. We believe these revisions

4  significantly strengthen the legislation.

5              As I stated on behalf of the Board in

6  that testimony, the original version of Intro. 192

7  would have required all candidates to ask all

8  contributors whether they were registered lobbyists,

9  and we believe would have added to a candidate's

10 compliance burden unnecessarily.

11             It was the Board's view that the

12 burden should not be placed on candidates to collect

13 or report to the Board whether their contributors

14 are registered lobbyists, and the Board applauds the

15 changes in the final version of this legislation,

16 which will increase the public disclosure regarding

17 the sources of Campaign contributions and permit

18 implementation of the law's new restrictions without

19 burdening candidates with additional compliance

20 requirements.

21             The Board will be using the

22 electronic database to be established by the City

23 Clerk to enforce the legislation and to ensure that

24 contributions from registered lobbyists to

25  participants in the Campaign Finance Program are not

7

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2  matched with public funds, as directed in the

3  legislation.

4                    The benefit of the revised

5  legislation is that it creates an enforcement

6  mechanism that will not require candidates to

7  collect or report additional information to the

8  Board in their disclosure statements and/or C-Smart

9  reporting.

10                    The Board would be pleased to provide

11  any further assistance on this matter, if the

12  Council would find this helpful.

13                    Sincerely, Nicole A. Gordon.

14                    CHAIRPERSON FELDER: Thank you very

15  much.

16                    Do any of my colleagues have any

17  questions before we vote? Seeing none, let's call

18  the vote on this, please.

19                    MS. JOHNSON: Felder.

20                    CHAIRPERSON FELDER: Yes.

21                    MS. JOHNSON: Addabbo.

22                    COUNCIL MEMBER ADDABBO: Mr. Chair,

23  may I have a moment to explain my vote?

24                    CHAIRPERSON FELDER: More than that.

25                    COUNCIL MEMBER ADDABBO: Actually,

                                                    8

1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2   shorter than you, though.

3                    CHAIRPERSON FELDER: No, more than

4   that.

5                    COUNCIL MEMBER ADDABBO: I'm good.

6                    Mr. Chair, thank you very much. And I

7   do want to commend the staff for, again, doing these

8   three intros and the time they have put into this

9   issue. I believe that a good working relationship

10  between the City Council and lobbyists have been

11  proven to be beneficial to the City residents, so we

12  do have some good work relationships, but there are

13  issues, I am sure.

14                   While I do vote yes for all three

15  intros, I do have concerns regarding definitions of

16  certain words and the control that the City Council

17  has with this legislation and with this issue, and I

18  like the fact that the City Council does have

19  control and hopefully retains that control.

20                   So, again, while I do vote yes for

21  all three, I'd like to state for the record my

22  concerns and, again, hopefully reevaluate these

23  pieces of legislation in the future.

```
24              Thank you very much.

25              CHAIRPERSON FELDER: Thank you.
```

                                                9

```
1   COMMITTEE ON GOVERNMENTAL OPERATIONS

2               MS. JOHNSON: Dilan.

3               (No response.)

4               MS. JOHNSON: Recchia.

5               (No response.)

6               MS. JOHNSON: Seabrook.

7               COUNCIL MEMBER SEABROOK: Mr.

8   Chairman, the opportunity to explain my vote?

9               CHAIRPERSON FELDER: I'm sorry. Yes.

10              COUNCIL MEMBER SEABROOK: Great.

11              After looking at some of the changes

12  that have actually taken place within the bill --

13              CHAIRPERSON FELDER: Yes, the Counsel

14  said, you're allowed to speak.

15              COUNCIL MEMBER SEABROOK: Okay, thank

16  you very much.

17              CHAIRPERSON FELDER: She's not telling

18  you what to say.

19              COUNCIL MEMBER SEABROOK: Okay. Thank

20  you very much, Mr. Chairman.

21              After careful consideration and

22  looking at the changes that have taken place, in

23  particular that over-burden that would have allowed
```

24   candidates to have the responsibility of the

25   reporting, therefore, I vote aye on all and would


                                                    10


 1   COMMITTEE ON GOVERNMENTAL OPERATIONS

 2   like to be placed on the bill, all of the bills

 3   that's there.

 4                    CHAIRPERSON FELDER: Thank you.

 5                    COUNCIL CLERK: Vallone.

 6                    COUNCIL MEMBER VALLONE: May I also

 7   have a chance to explain my vote?

 8                    CHAIRPERSON FELDER: Absolutely.

 9                    COUNCIL MEMBER VALLONE: I would like

10   to be associated with the remarks of Council Member

11   Addabbo, so as not to repeat myself.

12                    I also had many concerns about this

13   bill, "had" many concerns, which were addressed by

14   the Chair and the staff and taken care of, and I

15   would like to thank them for the hard work involved

16   here. The first version of this bill I think would

17   have prevented my father from giving me a birthday

18   present, which obviously I don't think was the

19   intent here. Maybe it was, I don't know, but thanks

20   for taking care of that.

21                    But, again, many of my concerns have

22   been taken care of. I still have some initial

23    concerns, as Joe Addabbo said, but I think overall

24    this is a good bill, and I'm pleased to vote aye.

25                    CHAIRPERSON FELDER: Thank you.



                                                        11

1    COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    We're going to vote again because the

3    clerk has to record the votes, right? So, I just

4    want to say that I agree with the comments that were

5    made, as well. I think they're very, very important.

6    And some of the changes that were made, as a direct

7    result of the input of Council members, have

8    improved this bill dramatically. Although it's not

9    perfect, I think we will revisit it in the near

10    future to see what can be done to improve it

11    further.

12                    So, we're going to vote again, ready?

13    Or I should say we're going to vote.

14                    COUNCIL CLERK: Felder.

15                    CHAIRPERSON FELDER: Aye.

16                    COUNCIL CLERK: Addabbo.

17                    COUNCIL MEMBER ADDABBO: Aye.

18                    COUNCIL CLERK: Seabrook.

19                    COUNCIL MEMBER SEABROOK: Aye on all.

20                    COUNCIL CLERK: Vallone.

21                    COUNCIL MEMBER VALLONE: Aye.

22                    COUNCIL CLERK: By a vote of five in

23  the affirmative, no negative and no abstentions, the

24  items are adopted.

25                    Please sign the reports.

                                                    12

1  COMMITTEE ON GOVERNMENTAL OPERATIONS

2                    CHAIRPERSON FELDER: Thank you very

3  much. That concludes today's meeting, and I

4  appreciate very much members being here on time. So,

5  thank you very much for coming on time.

6                    (Hearing concluded at 10:25 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

1

2                  CERTIFICATION

3

4

5     STATE OF NEW YORK    )

6     COUNTY OF NEW YORK   )

7

8

9                  I, CINDY MILLELOT, a Certified

10    Shorthand Reporter, do hereby certify that the

11    foregoing is a true and accurate transcript of the

12    within proceeding.

13                  I further certify that I am not

14    related to any of the parties to this action by

15    blood or marriage, and that I am in no way

16    interested in the outcome of this matter.

17                  IN WITNESS WHEREOF, I have hereunto

18    set my hand this 24th day of May 2006.

19

20

21

```
22

23
                        ----------------------
24                      CINDY MILLELOT, CSR.

25
```

14

```
1

2              C E R T I F I C A T I O N

3

4

5

6

7

8

9          I, CINDY MILLELOT, a Certified Shorthand

10   Reporter and a Notary Public in and for the State of

11   New York, do hereby certify the aforesaid to be a

12   true and accurate copy of the transcription of the

13   audio tapes of this hearing.

14

15

16

17

18

19

20
```

21

22

23

24                    ------------------------
                      CINDY MILLELOT, CSR.
25

1

1

2   CITY COUNCIL

3
    CITY OF NEW YORK
4
    ------------------------------x
5
    THE TRANSCRIPT OF THE MINUTES
6
            of the
7
    STATED COUNCIL MEETING
8
    ------------------------------x
9

10
                    May 24, 2006
11                  Start:  2:34 p.m.
                    Recess: 5:15 p.m.
12
                    City Hall
13                  Council Chambers
                    New York, New York
14

15      B E F O R E:

16          BETSY GOTBAUM
                    Public Advocate
17

18          COUNCIL MEMBERS:  Speaker Christine Quinn
                              Joseph Addabbo
19                            Maria Arroyo
                              Tony Avella
20                            Maria Baez
                              Charles Barron
21                            Gale Brewer
                              Yvette Clarke
22                            Leroy Comrie

23

24          LEGAL-EASE COURT REPORTING SERVICES, INC.
                    17 Battery Place -  Suite 1308
25                  New York, New York 10004
                          800-756-3410

2

```
 1

 2   A P P E A R A N C E S  (CONTINUED)

 3

           COUNCIL MEMBERS:
 4                          Bill DeBlasio
                            Inez Dickens
 5                          Erik Martin-Dilan
                            Simcha Felder
 6                          Lewis Fidler
                            Helen Foster
 7                          Daniel Garodnick
                            James Gennaro
 8                          Vincent Gentile
                            Alan Gerson
 9                          Eric Gioia
                            Sara Gonzalez
10                          Robert Jackson
                            Letitia James
11                          Melinda Katz
                            G. Oliver Koppell
12                          Andrew Lanza
                            Jessica Lappin
13                          John Liu
                            Michael McMahon
14                          Darlene Mealy
                            Rosie Mendez
15                          Hiram Monserrate
                            Michael Nelson
16                          James Oddo
                            Annabel Palma
17                          Domenic Recchia
                            Diana Reyna
18                          Joel Rivera
                            James Sanders
19                          Larry Seabrook
                            Helen Sears
20                          Kendall Stewart
                            James Vacca
21                          Peter Vallone, Jr.
                            Albert Vann
22                          Melissa Mark Viverito
                            David Weprin
23                          Thomas White
                            David Yassky
24

25
```

21     PUBLIC ADVOCATE GOTBAUM: Meeting of

22 May 24th will finally come to order.

23     All rise.

24     Pledge of Allegiance.

25     (Pledge of Allegiance.)


            15


1 STATED COUNCIL MEETING

2     PUBLIC ADVOCATE GOTBAUM: Roll call.

3     CITY CLERK: Addabbo.

4     COUNCIL MEMBER ADDABBO: Here.

5     CITY CLERK: Arroyo.

6     COUNCIL MEMBER ARROYO: Here.

7     CITY CLERK: Avella.

8     COUNCIL MEMBER AVELLA: Here.

9     CITY CLERK: Baez.

10     COUNCIL MEMBER BAEZ: Here.

11     CITY CLERK: Barron.

12     COUNCIL MEMBER BARRON: Here.

13     CITY CLERK: Brewer.

14     COUNCIL MEMBER BREWER: Here.

15     CITY CLERK: Clarke.

16     COUNCIL MEMBER CLARKE: Here.

17     CITY CLERK: Comrie.

18     COUNCIL MEMBER COMRIE: Here.

19     CITY CLERK: DeBlasio.

20     COUNCIL MEMBER DEBLASIO: Here.

```
21                CITY CLERK: Dickens.

22                COUNCIL MEMBER DICKENS: Here.

23                CITY CLERK: Dilan.

24                COUNCIL MEMBER DILAN: Here.

25                CITY CLERK: Felder.
```

                                                    16

```
 1   STATED COUNCIL MEETING

 2                COUNCIL MEMBER FELDER: Here.

 3                CITY CLERK: Fidler.

 4                COUNCIL MEMBER FIDLER: Here.

 5                CITY CLERK: Foster.

 6                COUNCIL MEMBER FOSTER: Here.

 7                CITY CLERK: Gallagher.

 8                (No response.)

 9                CITY CLERK: Garodnick.

10                COUNCIL MEMBER GARODNICK: Here.

11                CITY CLERK: Gennaro.

12                COUNCIL MEMBER GENNARO: Here.

13                CITY CLERK: Gentile.

14                COUNCIL MEMBER GENTILE: Here.

15                CITY CLERK: Gerson.

16                COUNCIL MEMBER GERSON: Here.

17                CITY CLERK: Gioia.

18                COUNCIL MEMBER GIOIA: Here.

19                CITY CLERK: Gonzalez.
```

```
20              COUNCIL MEMBER GONZALEZ: Here.

21              CITY CLERK: Jackson.

22              COUNCIL MEMBER JACKSON: Here.

23              COUNCIL CLERK: James.

24              COUNCIL MEMBER JAMES: Here.

25              CITY CLERK: Katz.
```

                                                    17

```
1  STATED COUNCIL MEETING

2              COUNCIL MEMBER KATZ: Here.

3              CITY CLERK: Koppell.

4              COUNCIL MEMBER KOPPELL: Here.

5              CITY CLERK: Lanza.

6              COUNCIL MEMBER LANZA: Here.

7              CITY CLERK: Lappin.

8              COUNCIL MEMBER LAPPIN: Here.

9              CITY CLERK: Liu.

10             COUNCIL MEMBER LIU: Here.

11             CITY CLERK: Mark Viverito.

12             COUNCIL MEMBER MARK VIVERITO: Here.

13             CITY CLERK: Martinez.

14             (No response.)

15             CITY CLERK: McMahon.

16             COUNCIL MEMBER McMAHON: Here.

17             CITY CLERK: Mealy.

18             (No response.)

19             CITY CLERK: Mendez.
```

```
20                    COUNCIL MEMBER MENDEZ: Here.

21                    CITY CLERK: Monserrate.

22                    COUNCIL MEMBER MONSERRATE: Here.

23                    CITY CLERK: Nelson.

24                    COUNCIL MEMBER NELSON: Here.

25                    COUNCIL CLERK: Palma.
```

                                                              18

```
1    STATED COUNCIL MEETING

2                    COUNCIL MEMBER PALMA: Here.

3                    CITY CLERK: Recchia.

4                    COUNCIL MEMBER RECCHIA: Here.

5                    CITY CLERK: Reyna.

6                    COUNCIL MEMBER REYNA: Here.

7                    CITY CLERK: Sanders.

8                    COUNCIL MEMBER SANDERS: Here.

9                    CITY CLERK: Seabrook.

10                   COUNCIL MEMBER SEABROOK: Here.

11                   CITY CLERK: Sears.

12                   COUNCIL MEMBER SEARS: Here.

13                   CITY CLERK: Stewart.

14                   COUNCIL MEMBER STEWART: Here.

15                   CITY CLERK: Vacca.

16                   COUNCIL MEMBER VACCA: Here.

17                   CITY CLERK: Vallone.

18                   COUNCIL MEMBER VALLONE: Here.
```

19     CITY CLERK: Vann.

20     COUNCIL MEMBER VANN: Here.

21     CITY CLERK: Weprin.

22     COUNCIL MEMBER WEPRIN: Here.

23     CITY CLERK: White.

24     COUNCIL MEMBER WHITE: Here.

25     CITY CLERK: Yassky.


         19


1 STATED COUNCIL MEETING

2     COUNCIL MEMBER YASSKY: Here.

3     CITY CLERK: Lanza.

4     COUNCIL MEMBER LANZA: Here.

5     CITY CLERK:: Oddo.

6     COUNCIL MEMBER ODDO: Here.

7     CITY CLERK: Rivera.

8     COUNCIL MEMBER RIVERA: Here.

9     CITY CLERK: Speaker Quinn.

10     SPEAKER QUINN: Here.

11     PUBLIC ADVOCATE GOTBAUM: The

12 invocation will be read by the clerk, since Rabbi

13 Glass had to leave. He left his invocation.

14     All rise, please.

15     COUNCIL CLERK: Men and women of the

16 City Council, memory is more than just a function of

17 intellect, it literally defines who we are, both

18 individually and collectively; and this is why an

15          PUBLIC ADVOCATE GOTBAUM: So ordered.

16          COUNCIL CLERK: Recchia.

17          COUNCIL MEMBER RECCHIA: Aye.

18          COUNCIL CLERK: Oddo.

19          COUNCIL MEMBER ODDO: Yes.

20          COUNCIL CLERK: Rivera.

21          COUNCIL MEMBER RIVERA:  I vote aye.

22          COUNCIL CLERK: Speaker Quinn.

23          SPEAKER QUINN: Aye.

24          PUBLIC ADVOCATE GOTBAUM: All Land Use

25 Call-Ups are adopted by a vote of 47 in the


                                        28


1 STATED COUNCIL MEETING

2 affirmative and zero in the negative.

3          Communication from the Speaker.

4          SPEAKER QUINN: Thank you.

5          First, before I do formal

6 communications, I just want to make two

7 introductions.

8          We are joined today by a very special

9 guest. We are joined by Christina Gennaro. Jim

10 Gennaro's daughter. So, we want to welcome her.

11          We've set a terrible example for

12 getting to work on time, and starting on time, so do

13 what your father says, not what he does, Christina.

14  Go to work on time and start on time.

15          I also will introduce our new

16  Parliamentarian Barbara Butler, who is here at her

17  first Stated Meeting. So, if she doesn't call on you

18  right away or doesn't get your name right, bear with

19  her because it is her first couple of Stated

20  Meetings.

21          Now, I just want to comment on some

22  of the items that we're going to be voting on today,

23  and then call on the Chair of our Standards and

24  Ethics Committee, Council Member Inez Dickens, to

25  speak on a piece of legislation regarding financial

29

1  STATED COUNCIL MEETING

2  disclosures, and I want to thank Chair Dickens for

3  her very, very hard work on that legislation.

4          You know, today we are voting on a

5  number of very important matters.

6          First, I want to mention the taxi

7  legislation we are voting on today. For many, many

8  years, some would even say decades, there has been

9  heated discussion in this City about how to change

10  our taxis to clean air hybrid taxis, and how to make

11  our taxis accessible to disabled New Yorkers, and

12  today we are taking further steps forward in that

13  process. We are passing a piece of legislation that

14    requires that the upcoming sale of 308 medallions,

15    in that sale 254 will be hybrid clean air taxis, and

16    54 will be disabled accessible.

17            But we, in our action today,

18    recognize that those 54 are not even enough to get a

19    small enough percentage of the fleet to have a

20    reasonable pilot project out there to see what

21    models are the most durable, and obviously our

22    ultimate goal is to move beyond a pilot project or

23    very, very small percentages.

24            So, in an effort to make sure we have

25    a larger number and enough to truly do a pilot

30

1    STATED COUNCIL MEETING

2    sampling, the Mayor and the Council have committed

3    to go to Albany and see another medallion sale of

4    150 more medallions, all of which this law will

5    require will be disabled accessible when they are

6    sold.

7            I want to thank the disabled

8    community for their endless work on this issue and

9    the environmental community. I also want to thank

10   Mayor Bloomberg for his commitment to go to Albany

11   with the Council. We received tremendously positive

12   responses from State officials about our interest in

13  150 more medallions, and I also want to say that we

14  will be in the upcoming Stated Meetings doing an SLR

15  on this matter to lock in our message to Albany and

16  a Home Rule Message.

17          We are also today voting on a package

18  of legislation which comes out -- on taxis I want to

19  thank Chairperson John Liu for his tremendous amount

20  of work he did on this issue, Chairperson Jim

21  Gennaro from our Environmental Committee, and

22  Council Member Oliver Koppell for his work on this

23  issue as well.

24          We are also today voting on a package

25  of lobbying bills, and I want to thank the Chair of

31

1   STATED COUNCIL MEETING

2   our Gov Ops Committee, Simcha Felder, for his work

3   on lobbying, and Chairperson Diana Reyna for her

4   work on it as well, it went through both Committees.

5           The bills we are voting on today on

6   lobbying take a very, very important step forward in

7   making sure that New York City has the strongest

8   ethical infrastructure possible as it relates to

9   lobbyists and their interactions with elected

10  officials. And it puts a system in place that will

11  make sure that the scandals that have plagued other

12  legislative bodies in this country do not happen in

13    this building on in this House and the people of the
14    City of New York.
15                We spent a long time discussing these
16    bills, and I want to thank my colleagues for their
17    tremendous attention and support on this message.
18                They will add transparency to the
19    process and they will very importantly bring
20    sunlight in, which we all know is the best
21    disinfectant. And I think they sent a very important
22    message to New Yorkers that we work for them, not
23    for anyone else.
24                Also, as the hour indicates, based on
25    our long Rules Committee, and I want to give yet

                                                    32

1    STATED COUNCIL MEETING
2    another thank you to Council Member Diana Reyna, we
3    will be voting on the appointment of Margery
4    Perlmutter to the Landmarks Preservation Commission.
5    It was a heated, but yet thoughtful meeting that
6    occurred, and I hope my colleagues will vote in
7    support of her and in favor of all of the items that
8    I indicated.
9                I would like to call on the Chair of
10    our Standards and Ethics Committee, Council Member
11    Inez Dickens.

12                    COUNCIL MEMBER DICKENS: Thank you,

13   Madam Speaker, and thank you, Madam Public Advocate.

14                    I'm requesting permission to address

15   my colleagues on Intro. 165.

16                    Intro. 165 would amend the City's

17   Financial Disclosure Law in three very important

18   ways: First, and most importantly, it would bring

19   our City law into compliance with recent changes to

20   New York State law with regards to persons required

21   to file a Financial Disclosure Form.

22                    Second, it would clarify and codify

23   the longstanding practices of the Conflicts of

24   Interest Board.

25                    And thirdly, it would make several


                                                      33


 1   STATED COUNCIL MEETING

 2   technical changes that clarify the law, making it

 3   easier to understand and follow.

 4                    Intro. 165 makes many useful and

 5   necessary amendments to the City's Financial

 6   Disclosure Law, and I urge my colleagues to pass it

 7   today. Thank you.

 8                    PUBLIC ADVOCATE GOTBAUM: Discussion

 9   of General Orders.

10                    Council Member Monserrate.

11                    COUNCIL MEMBER MONSERRATE: Thank you,

12    Madam Chair.

13              I would like the opportunity to vote

14    aye on all. Thank you very much.

15              PUBLIC ADVOCATE GOTBAUM: So ordered.

16              Council Member Avella, I thought it

17    was later?

18              COUNCIL MEMBER AVELLA: Thank you,

19    Madam Public Advocate. I wanted to talk for a few

20    minutes about M 117 and the accompanying Reso 350,

21    which is the appointment of Margery Perlmutter to

22    the Landmarks Preservation Commission.

23              I find it fascinating that we have

24    this coincidence today that we are making these

25    changes improving the lobbying laws of the City of

                                              34

1     STATED COUNCIL MEETING

2     New York, and further restricting lobbyists in their

3     activities in relation to the City Council; yet, at

4     the same time, we're for the first time approving

5     the first lobbyist, the first registered lobbyist to

6     the Landmarks Preservation Commission.

7               Ms. Perlmutter is certainly

8     qualified, and I'm sure she's well intentioned, but

9     there is an old adage "You can't serve two masters,"

10    and considering that she works for Brian Kaye, which

11  is a development real estate firm, she is a

12  registered lobbyist, she will never, ever be able to

13  100 percent recuse herself from all the issues that

14  are involved.

15           I think it sends a very poor message

16  to the preservation community and the good

17  government community of the City that we're allowing

18  this nomination to go ahead.

19           I would urge my colleagues to vote

20  no. I certainly will.

21           Thank you, Madam Public Advocate.

22           PUBLIC ADVOCATE GOTBAUM: All right,

23  Council Member Gennaro. Sorry, Jim.

24           COUNCIL MEMBER GENNARO: Thank you,

25  Madam Public Advocate.

                                          35

1  STATED COUNCIL MEETING

2           I just wanted to thank the Speaker

3  regarding Intro. 339, the taxi medallion bill. I

4  would like to thank in a special way Council Member

5  Liu, Council Member Koppell and Council Member

6  Yassky, Mendez and all the other members who are

7  supporting this bill. This will be a great step

8  forward for the air of New York City, and it's also,

9  thanks to the Speaker's leadership, we're not going

10  to be leaving behind those that need taxis that need

11    to be accessible. So, we're getting the extra 150

12    medallions from Albany and having that sale

13    completely dedicated to the disabled community. This

14    bill represents a great step forward for that

15    community and for a breath of fresh air for all of

16    New Yorkers.

17              So, I thank the Speaker and all

18    involved, and I urge my colleagues to vote yes on

19    Intro. 339.

20              PUBLIC ADVOCATE GOTBAUM: Council

21    Member James.

22              COUNCIL MEMBER JAMES: May I be

23    excused to vote aye on the agenda, except for M 117

24    and Reso 350. I vote aye on everything else. And as

25    I leave, may Amber Sadiq, the eight-year-old girl

36

1    STATED COUNCIL MEETING

2    who was tragically killed in Crown Heights, may her

3    soul rest in peace.

4              Thank you.

5              PUBLIC ADVOCATE GOTBAUM: So ordered.

6              COUNCIL MEMBER JAMES: No on those two

7    items M 117 and 350.

8              PUBLIC ADVOCATE GOTBAUM: He didn't

9    hear.

10                    Anybody else?

11                    Seeing nobody else, Report of Special

12  Committees.

13                    COUNCIL CLERK: None.

14                    PUBLIC ADVOCATE GOTBAUM: Reports of

15  Standing Committees.

16                    COUNCIL CLERK: Report of the

17  Committee on Finance.

18                    Preconsidered Reso 339. Establishment

19  of the Bayridge Fifth Avenue Business Improvement

20  District.

21                    SPEAKER QUINN: Coupled on General

22  Orders.

23                    COUNCIL CLERK: Report of the

24  Committee on Governmental Operations.

25                    Intro. 190-A. Reporting of lobbyist

                                              37

1  STATED COUNCIL MEETING

2  activities.

3                    SPEAKER QUINN: Amended and coupled on

4  General Order with Message of Necessity.

5                    COUNCIL CLERK: Intro. 191-A. Gifts by

6  lobbyists.

7                    SPEAKER QUINN: Amended and coupled on

8  General Orders with the Message of Necessity.

9                    COUNCIL CLERK: Intro. 192-A. Campaign

10  contributions by lobbyists.

11              SPEAKER QUINN: Amended and coupled on

12  General Orders.

13              COUNCIL CLERK: Report of the

14  Committee on Land Use.

15              LU 68 and Reso 343, ULURP, Bronx.

16              SPEAKER QUINN: Coupled on General

17  Orders.

18              COUNCIL CLERK: LU 127 and Reso 344,

19  UDAAP, Brooklyn.

20              SPEAKER QUINN: Coupled on General

21  Orders.

22              COUNCIL CLERK: LU 136 and Reso 345.

23  UDAAP, Queens.

24              SPEAKER QUINN: Coupled on General

25  Order.


                                              38


1  STATED COUNCIL MEETING

2              COUNCIL CLERK: LU 143 and Reso 346.

3  Unenclosed sidewalk cafe, Brooklyn.

4              SPEAKER QUINN: Coupled to be filed,

5  pursuant to letter of withdrawal. That threw me for

6  a loop there.

7              COUNCIL CLERK: Preconsidered LU 160

8  and Reso 347. Tax exemption for property, Bronx.

9              SPEAKER QUINN: Thank God, back to

10   coupled on General Orders.

11              PUBLIC ADVOCATE GOTBAUM: We laugh at

12   the most simple things.

13              COUNCIL CLERK: Report of the

14   Committee on Rules, Privileges and Elections.

15              Preconsidered Reso 348. Limiting

16   access of lobbyists.

17              SPEAKER QUINN: Coupled on General

18   Orders.

19              COUNCIL CLERK: Preconsidered Reso

20   349. Membership changes to certain standing

21   committees.

22              SPEAKER QUINN: Coupled on General

23   Order.

24              COUNCIL CLERK: M 117 and Reso 350.

25   Appointment of Margery H. Perlmutter. New York City

39

1   STATED COUNCIL MEETING

2   Landmarks Preservation Commission.

3              SPEAKER QUINN: Coupled on General

4   Orders.

5              COUNCIL CLERK: Report of the

6   Committee on Standards and Ethics.

7              Intro. 165. Annual disclosure.

8              SPEAKER QUINN: Coupled on General

9   Orders.

10              COUNCIL CLERK: Report of the

11  Committee on Transportation.

12              Intro. 339-A. Additional taxicab

13  licenses.

14              SPEAKER QUINN: Amended and coupled on

15  General Orders with Message of Necessity.

16              PUBLIC ADVOCATE GOTBAUM: General

17  Order Calendar.

18              COUNCIL CLERK: Resolution appointing

19  various persons Commissioner of Deeds.

20              SPEAKER QUINN: Coupled on General

21  Orders.

22              And I now ask that roll call be

23  called on all coupled General Order items.

24              COUNCIL CLERK: Addabbo.

25              COUNCIL MEMBER ADDABBO: Aye.


                                        40


1   STATED COUNCIL MEETING

2               COUNCIL CLERK: Arroyo.

3               COUNCIL MEMBER ARROYO: Aye.

4               COUNCIL CLERK: Avella.

5               COUNCIL MEMBER AVELLA: Aye on all,

6   except M 117 and Reso 350, I vote no.

7               COUNCIL CLERK: Baez.

8                    COUNCIL MEMBER BAEZ: Aye.

9                    COUNCIL CLERK: Barron.

10                   COUNCIL MEMBER BARRON: May I be

11   excused to explain my vote?

12                   PUBLIC ADVOCATE GOTBAUM: So ordered.

13                   COUNCIL MEMBER BARRON: I vote aye on

14   all items, except M 117 and Reso 350. This, to me,

15   is an obvious conflict of interest. But evidently

16   people have some other interest in this happening,

17   but I think it is a conflict and I think we should

18   -- I vote no on that. Thank you.

19                   COUNCIL CLERK: Brewer.

20                   COUNCIL MEMBER BREWER: I vote aye on

21   all, except M 117 and Reso 350. I sat through most

22   of the hearing, I think that Margery Perlmutter is

23   certainly qualified on paper. I assume that she will

24   be given the opportunity to serve on the Landmarks

25   Preservation Commission, and I hope not only will

41

1    STATED COUNCIL MEETING

2    she respond to the concerns brought up today in

3    terms of conflicts, but make a huge, huge effort to

4    reach out to those who have been fighting in the

5    preservation field for many years, and whose voices

6    are often heard but not always listened to. So, I

7    vote, as I indicated, aye on all others. Thank you.

8                COUNCIL CLERK: Clarke.

9                COUNCIL MEMBER CLARKE: Aye on all.

10               COUNCIL CLERK: Comrie.

11               COUNCIL MEMBER COMRIE: Aye on all.

12               COUNCIL CLERK: DeBlasio.

13               COUNCIL MEMBER DEBLASIO: Aye on all.

14               COUNCIL CLERK: Dickens.

15               COUNCIL MEMBER DICKENS: Yes, I vote

16  aye on all, except for M 153.

17               COUNCIL CLERK: Dilan.

18               COUNCIL MEMBER DILAN: Madam Public

19  Advocate, may I have a brief moment to explain my

20  vote?

21               PUBLIC ADVOCATE GOTBAUM: So ordered.

22               COUNCIL MEMBER DILAN: Madam Public

23  Advocate, I want to comment specifically on Intro.

24  192-A, which is before us today.

25               192-A essentially states that

                                          42

1  STATED COUNCIL MEETING

2  contributions to anyone running for City office from

3  lobbyists who pay with a personal check wouldn't be

4  matched by the Campaign Finance Board.

5               While, Madam Public Advocate, I

6  intend to vote for this measure, I think that in

7    interest of keeping the rights of every New York

8    citizen, whether they be a lobbyist, reporter, a

9    doctor, a teacher, a Council Member, a Mayor, a

10   grandmother or they're retired, all rights of all

11   New Yorkers when it relates to Campaign Financing

12   should be exactly equal, and what we're doing here

13   is we're basically saying that these people, if they

14   pay out of their personal checking accounts, and

15   funds should be matched, that because of their

16   profession, that they are not allowed to have their

17   contribution matched.

18          Now, a doctor can easily weigh-in

19   without being a registered lobbyist on matters

20   before the Health Committee, and many other

21   professionals could do so before many other

22   committees, because we often seek professional

23   opinions on items before us.

24          I think that we are opening a

25   precedent that I hope doesn't continue to other

43

1    STATED COUNCIL MEETING

2    professionals. I think in this case, not as a

3    lobbyist, but as a citizen of the City of New York,

4    I believe it's fundamentally unfair, what's being

5    done to them as residents of this great City;

6    however, I understand the purpose of trying to clean

7  up the entire electoral process and lobby reform

8  process. But I think they also have rights as

9  citizens of the City of New York, and I think that

10  we are charged with protecting those rights.

11            So, I think we need to be very

12  careful in the future, should we look to take

13  measures such as this down the road.

14            But with that, Madam Public Advocate,

15  I vote aye on all items.

16            COUNCIL CLERK: Felder.

17            COUNCIL MEMBER FELDER: Aye.

18            COUNCIL CLERK: Fidler.

19            COUNCIL MEMBER FIDLER: May I be

20  briefly excused to explain my vote?

21            PUBLIC ADVOCATE GOTBAUM: So ordered.

22            COUNCIL MEMBER FIDLER: First I just

23  want to compliment Councilwoman Reyna for the

24  dignified manner in which you handled an

25  extraordinarily difficult hearing, a hearing that

44

1  STATED COUNCIL MEETING

2  probably shouldn't have had to have been as

3  difficult as it was, and I suggest that the

4  Administration, if they care about their appointees,

5  do just a little bit more ahead of time so that the

6  communication on some of the issues that were raised

7  today is better.

8              Second, I don't think it would be

9  fair or proper for us to vote on an issue regarding

10  disabled accessible taxicabs without mentioning the

11  name of Sister Margarita Lopez in this House, who is

12  certainly my conscience and is probably all our

13  conscience on this issue, and with Margarita in

14  mind, I vote aye on all.

15              COUNCIL CLERK: Foster.

16              COUNCIL MEMBER FOSTER: I vote aye on

17  all, except M 117 and Reso 350 I vote no.

18              COUNCIL CLERK: Gennaro.

19              COUNCIL MEMBER GENNARO: Pass.

20              COUNCIL CLERK: Gerson.

21              COUNCIL MEMBER GERSON: May I be

22  excused to briefly explain my vote?

23              PUBLIC ADVOCATE GOTBAUM: So ordered.

24              COUNCIL MEMBER GERSON: Thank you. I

25  vote aye on all.  With respect to the disposition of

45

1  STATED COUNCIL MEETING

2  taxi medallion, this is a step forward for cleaner

3  air and a more accessible fleet, but it should only

4  be viewed as a first step forward, an important step

5  forward for which I join in congratulating my

6   neighbor and predecessor, Margarita Lopez, our

7   Speaker Chris Quinn, and Council Members John Liu

8   and Jim Gennaro.

9           But we need to overcome the

10  technological hurdle, if you will, of this conflict

11  between clean air vehicles and fully accessible

12  vehicles.

13          In this day and age with

14  technological innovations coming on line at rapid

15  pace every day, we should be able, with a concerted

16  effort, to find a way to have it both ways, to have

17  clean air, fully accessible vehicles, and I urge

18  that this Council spearhead the technological

19  effort, make sure that it's undertaken, and this

20  points to the underlying need for us to do a better

21  job, an expanded job at integrating technology into

22  policy problem solving, with a greater role for

23  technological research, a government which does that

24  with an eye towards dealing with our urban problems

25  and policies.

46

1   STATED COUNCIL MEETING

2           With respect to the nomination of Ms.

3   Perlmutter, I vote aye on the basis of the record of

4   the hearing, the commitment to abide strictly to

5  conflict of interest guidelines and the recusal

6  statements made by the, by all accounts very

7  qualified nominee, in the context of recognition

8  that in order to have persons with her background,

9  we need to allow for such recusals.

10           And finally, with respect to lobbying

11  reform, I vote aye on all, with the caveat which I

12  made in the caucus, we must look toward greater

13  simplification of our ethics laws to keep them tied

14  to their underlying purposes of transparency,

15  openness and integrity.

16           I vote aye for all.

17           COUNCIL CLERK: Gonzalez.

18           COUNCIL MEMBER GONZALEZ: Aye on all.

19           COUNCIL CLERK: Jackson.

20           COUNCIL MEMBER JACKSON: Jackson. Aye

21  on all.

22           COUNCIL CLERK: Katz.

23           COUNCIL MEMBER KATZ: Aye on all. And

24  just to echo the words from Council Member Fidler, I

25  think the hearing was much more difficult today than

                                        47

1  STATED COUNCIL MEETING

2  it had to be. Up until yesterday, truly, we were

3  only hearing from the advocates, and I think that in

4  the future when there's a controversial candidate or

5   someone who folks are talking about weeks ahead of

6   time, it would be nice to get a lot of the issues

7   resolved beforehand, through meetings and phone

8   calls from the Administration, and we look forward

9   to those working with them on future applications in

10  that light.

11              I vote aye on all.

12              COUNCIL CLERK: Koppell.

13              COUNCIL MEMBER KOPPELL: Madam Public

14  Advocate, may I be excused from voting to explain my

15  reasons?

16              PUBLIC ADVOCATE GOTBAUM: Yes.

17              COUNCIL MEMBER KOPPELL: Thank you.

18              PUBLIC ADVOCATE GOTBAUM: Sorry.

19              COUNCIL MEMBER KOPPELL: The bill that

20  we have on the agenda that we're voting on right now

21  with respect to accessible and cleaner taxis relates

22  only to new medallions and the conditions with

23  respect to the issuance of new medallions.

24              As such, it is very limited and has

25  to be very limited. It's probably all we can do

                                                    48

1   STATED COUNCIL MEETING

2   today with respect to this issue. However, if you

3   look in today's agenda, you will see a series of

4    bills that have been introduced, a number of them by

5    me, as Chairman of the Committee that has the

6    responsibility over disability rights. And I also

7    will indicate that the staff have worked on another

8    bill to provide for the full phase-in of a

9    requirement that all taxicabs, as they are replaced,

10   be replaced with accessible vehicles over a period

11   of years.

12              The fact is that the cabs today,

13   yellow cabs, can only run for three years. They have

14   a relatively short cycle. And it allows us to do

15   more than simply require accessible or clean taxis

16   with respect to new medallions. It allows us to

17   reform the entire fleet within a short time, and I

18   want to say that I think this Council is committed

19   to doing that as quickly as possible.

20              And as I said before, necessity is

21   the mother of invention, and the industry out there

22   ought to be aware, this Council is moving toward

23   requiring that entire fleet to be accessible and

24   also to be environmentally sound.

25              And if the cars don't exist to

49

1    STATED COUNCIL MEETING

2    provide that today, they should exist soon, and the

3    world, if you will, or the industry, both those who

4     own cabs and those who build them, should be aware

5     that this is the direction in which we're going, and

6     I urge my colleagues to join us. I know that the

7     Transportation Committee will be holding hearings on

8     these other bills that deal with a much broader

9     universe than merely the relatively few cabs that

10    come on line because of the sale of new medallions.

11                    I withdraw my request. I vote aye on

12    all on the General Orders calendar.

13                    COUNCIL CLERK: Lanza.

14                    (No response.)

15                    COUNCIL CLERK: Lappin.

16                    COUNCIL MEMBER LAPPIN: Madam Public

17    Advocate, may I be excused to explain my vote?

18                    PUBLIC ADVOCATE GOTBAUM: So ordered.

19                    COUNCIL MEMBER LAPPIN: Over the past

20    couple of weeks I had many discussions and

21    deliberations regarding the nomination of Margery

22    Perlmutter for the Landmarks Preservation

23    Commission, and people who I respect greatly have

24    weighed in on different sides of the same issue. And

25    it became clear to me during the hearing today that

50

1     STATED COUNCIL MEETING

2     she is qualified to serve as a Commissioner. During

3  all the many hours of testimony we heard, there

4  wasn't debate about her resume or qualifications,

5  the debate centered around her record and potential

6  conflicts of interest. And the Municipal Arts

7  Society, who did a great deal of work examining her

8  record, did testify that her decisions were within

9  the mainstream and allayed the issue for me on that

10  front. In terms of conflict of interest, I will say

11  I'm not particularly comfortable about commissioners

12  who sit on one commission and being able to lobby

13  before other City agencies. And that said, the rules

14  are the way that they are, and considering that Ms.

15  Perlmutter is qualified and will not be compensated

16  for this position, I vote aye on all.

17              COUNCIL CLERK: Liu.

18              COUNCIL MEMBER LIU: Madam Public

19  Advocate, may I be excused to explain my vote?

20              PUBLIC ADVOCATE GOTBAUM: So ordered.

21              COUNCIL MEMBER LIU: I just want to

22  thank my colleagues for their support on Intro.

23  339-A, and the Speaker for taking on this issue,

24  convening a very large and substantial task force of

25  legislative counsels and various committees to study

51

1  STATED COUNCIL MEETING

2  the issues with regard to our accessibility to our

3   taxicabs, as well as making them more

4   environmentally friendly in our City. And I know

5   that the legislative counsels have put in a great

6   deal of time and effort in studying these issues

7   intensely and thoroughly so that we can proceed with

8   this bill that we're voting on today, and a package

9   of subsequent bills that will be introduced and

10  heard at a later date in the near future, as

11  described by Chairman and Council Member Oliver

12  Koppell.

13              I especially want to thank Rob Newman

14  for his insight and his work in making sure that

15  this moves quickly, and Phil Hom, the Legislative

16  Counsel to the Transportation Committee, and I hope

17  that we can have your support, my colleagues. Thank

18  you.

19              COUNCIL CLERK: Mark Viverito.

20              COUNCIL MEMBER MARK VIVERITO: Madam

21  Public Advocate, may I please be excused to explain

22  my vote?

23              PUBLIC ADVOCATE GOTBAUM: So ordered.

24              COUNCIL MEMBER MARK VIVERITO: I would

25  like to vote aye on all items coupled under General

52

1   STATED COUNCIL MEETING

2    Order, except M 117 and companion Reso 350. And I

3    just wanted to take the opportunity also to really

4    commend, Madam Speaker, and for her, the lobby

5    reform, the stewardship she demonstrated on the

6    lobby reform bills, which I greatly welcome, and I

7    thank her for that. So, having that, again, aye on

8    all, except M 117 and companion Reso 350.

9                     COUNCIL CLERK: Martinez.

10                    (No response.)

11                    COUNCIL CLERK: McMahon.

12                    COUNCIL MEMBER McMAHON: Aye on all.

13                    COUNCIL CLERK: Mealy.

14                    COUNCIL MEMBER MEALY: Aye on all

15    coupled General Orders. And with permission, aye on

16    all Land Use Call-Ups.

17                    PUBLIC ADVOCATE GOTBAUM: So ordered.

18                    COUNCIL CLERK: Palma.

19                    COUNCIL MEMBER PALMA: Aye on all,

20    except M 117 and companion Reso 350.

21                    COUNCIL CLERK: Recchia.

22                    COUNCIL MEMBER RECCHIA: Aye on all.

23                    COUNCIL CLERK: Reyna.

24                    COUNCIL MEMBER REYNA: I vote aye on

25    all.

1    STATED COUNCIL MEETING

2                    COUNCIL CLERK: Sanders.

3                    COUNCIL MEMBER SANDERS: Madam Public

4    Advocate, permission to explain my vote?

5                    PUBLIC ADVOCATE GOTBAUM: So ordered.

6                    COUNCIL MEMBER SANDERS: I wish that I

7    had been given more information about M 117 and

8    Resolution 350. However, I have to assume that the

9    Chair has led a thoughtful discussion. It was

10   certainly prolonged, so I will assume that it was

11   thoughtful and they were able to research the

12   issues.

13                   With that in mind, based on knowledge

14   of the Chair, I'm voting aye on all.

15                   COUNCIL CLERK: Seabrook.

16                   COUNCIL MEMBER SEABROOK: Yes, Madam

17   President, may I be excused to explain my vote,

18   please?

19                   PUBLIC ADVOCATE GOTBAUM: So ordered.

20                   COUNCIL MEMBER SEABROOK: Yes, I just

21   want to state a point to go on record that here

22   we're talking about the need to have these new

23   medallions for the taxi industry, to serve those who

24   have disabilities, and that certainly should be

25   applauded that this Council is doing that.

```
 1   STATED COUNCIL MEETING

 2                    But I would hope that people will

 3   understand that the disabilities on the other end

 4   that we need to serve, is that when we begin to

 5   issue medallions, there needs to be a sense of

 6   minority and women participation, because after all,

 7   the State Legislature and the Caucus members there

 8   who fought so diligently to assure that there would

 9   be medallions that would be put in use of the City

10   of New York, the opportunity for minority and

11   women-owned business should have an opportunity to

12   participate in this medallion sale. While the

13   drivers may look like me, the owners never do. And I

14   would hope that we would have the opportunity that

15   as we talk about these medallions that are going to

16   be in the future, that we will have, as Brother

17   Vallone, Council Member Vallone had indicated, that

18   these taxis will come into our neighborhoods as

19   well, be it a handicapped vehicle or a regular

20   yellow cab that never comes into our community, and

21   so that we should have a set aside of those

22   medallions, and those who have the guts and the

23   courage to come into our community, that they should

24   be afforded the opportunity to own medallions, and

25   that it should not just be issued to those who are
```

```
 1   STATED COUNCIL MEETING

 2   yellow, and as we know about the ones who weren't

 3   yellow and went everywhere throughout this City.

 4                    And, so, it is our hope that we could

 5   be courageous to implement a minority and

 6   women-owned set-aside provision that would allow

 7   those medallions to come into those neighborhoods

 8   where we don't ever see yellow cabs coming into our

 9   community, and I would hope that the disabled

10   community would have the opportunity to have as many

11   cabs as they desire, but I'd like to see one of

12   those yellow cabs roll up into my community some

13   time, and I can say truly that a person of color

14   owns medallions, and it is a part of the

15   accumulation of wealth that the father will own it

16   today, the son will own it tomorrow, the grandson

17   will own it thereafter. So, understand what we're

18   doing.

19                    So, with that, I withdraw my request

20   and vote aye.

21                    COUNCIL CLERK: Sears.

22                    COUNCIL MEMBER SEARS: Aye.

23                    COUNCIL CLERK: Stewart.

24                    COUNCIL MEMBER STEWART: Aye on all.

25                    COUNCIL CLERK: Vacca.
```

1    STATED COUNCIL MEETING

2                    COUNCIL MEMBER VACCA: Aye on all.

3                    COUNCIL CLERK: Vann.

4                    COUNCIL MEMBER VANN: Aye on all.

5                    COUNCIL CLERK: Weprin.

6                    COUNCIL MEMBER WEPRIN: Aye on all.

7                    COUNCIL CLERK: White.

8                    COUNCIL MEMBER WHITE: May I be

9    excused to vote on all Land Use Call-Ups, please?

10                    PUBLIC ADVOCATE GOTBAUM: So ordered.

11                    COUNCIL MEMBER WHITE: On all Land Use

12   Call-Ups I vote aye.  And on all coupled General

13   Orders, I echo the comments of my fellow Council

14   Member Seabrook, therefore, I vote aye on all.

15                    COUNCIL CLERK: Yassky.

16                    COUNCIL MEMBER YASSKY: Madam Public

17   Advocate, may I explain my vote?

18                    PUBLIC ADVOCATE GOTBAUM: So ordered.

19                    COUNCIL MEMBER YASSKY: First of all,

20   I vote very enthusiastically for the bill that will

21   put new clean fuel only medallions and accessible

22   only medallions out in the street. I think this is a

23   very good step forward.

24                    I think, though, we must not rest

25   with this step. We have many more steps to go on the

57

1   STATED COUNCIL MEETING

2   journey toward an accessible fleet and a clean air

3   fleet, and the way to do it is we've got to go back

4   and look at the rules that govern the 13,000 cabs

5   that are already driving around and get more of

6   those to be accessible, and get all of those to be

7   clean fuel so that we can, which in a City with one

8   out of eight kids suffering with asthma, I think

9   that's got to be the next step.

10                   So, I look forward to doing that.

11                   I also, on the appointment to the

12  Landmarks Preservation Commission, I will vote

13  against this confirmation, not because I have any

14  doubt about the quality of Ms. Perlmutter or whether

15  indeed she is committed to being fair, but I do

16  think that there is a conflict of interest in having

17  somebody who is so engaged in this field on a

18  day-to-day basis, representing clients.

19                   It's not so easy to separate out one

20  client, from the position that client stands for,

21  which will benefit other clients, and I think that

22  the precedent concerns me. And, so, in the interest

23  of preservation, I vote no on M 117 and Res 350, and

24  aye on all other matters. Thank you.

25                   COUNCIL CLERK: Gennaro.

58

1    STATED COUNCIL MEETING

2              COUNCIL MEMBER GENNARO: I vote yes on

3    all. And with respect to M 117 and Reso 350, I wish

4    to be associated with the remarks of Council Member

5    Lappin. So it's aye on all.

6              COUNCIL CLERK: Lanza.

7              COUNCIL MEMBER LANZA: Aye.

8              PUBLIC ADVOCATE GOTBAUM: Council

9    Member Gioia.

10             COUNCIL MEMBER GIOIA: Thank you,

11   Madam Public Advocate.

12             I would just like to clarify the

13   record. I will be voting yes today on all items,

14   with the exception of M 117, Resolution 350, which I

15   will be voting no on. Thank you.

16             COUNCIL CLERK: Oddo.

17             COUNCIL MEMBER ODDO: Can I be

18   temporarily excused to explain my vote and have a

19   little fun?

20             PUBLIC ADVOCATE GOTBAUM: Of course.

21             COUNCIL MEMBER ODDO: Thank you.

22             Today's agenda is full with lots of

23   serious things, but on today's agenda is humor

24   because if we don't have humor in this body, this

25   job is very difficult. And along those lines, there

59

1  STATED COUNCIL MEETING

2  is a reporter running around asking all of you who

3  the funniest Council member is, and we've already

4  conceded the race to Simcha Felder, but please find

5  it in your hearts to vote for me in second place.

6  It's one of the few things I have in my life.

7          COUNCIL MEMBER FELDER: Don't give him

8  anything.

9          COUNCIL MEMBER ODDO: How dare you.

10          I vote yes on all.

11          COUNCIL CLERK: Rivera.

12          COUNCIL MEMBER RIVERA:  I vote aye.

13          COUNCIL CLERK: Speaker Quinn.

14          SPEAKER QUINN: I'm laughing at a

15  retold Simcha joke. Just before I cast my vote, I

16  heard some people had me on a tie for two and three,

17  so it might be a show-down.

18          COUNCIL MEMBER FELDER: That wasn't

19  funny. That was not funny.

20          SPEAKER QUINN: But Staten Island will

21  probably win, so...

22          I vote aye on all.

23          PUBLIC ADVOCATE GOTBAUM: All items on

24  today's General Order calendar were adopted by a

25  vote of 49 in the affirmative, zero negative, zero

60

1    STATED COUNCIL MEETING

2    abstentions, with the exception of M 117 and Reso

3    350, which was adopted by a vote of 39 in the

4    affirmative, ten in the negative and zero

5    abstentions.

6                    Introduction and Reading of Bills.

7                    Discussion of Resolutions.

8                    I'm sorry. Go back. Sorry, Christine.

9                    SPEAKER QUINN: That's okay.

10                    All bills should be referred to the

11    committees as indicated on the agenda.

12                    PUBLIC ADVOCATE GOTBAUM: Discussion

13    of Resolutions.

14                    No resolutions.

15                    General Discussion.

16                    Here's an unusual one now, I'm going

17    to make a statement, and this is probably the first

18    time, I'm just talking about Intro. 359, which I

19    hope my colleagues --

20                    SPEAKER QUINN: If we could just have

21    quiet in the Chambers, please.

22                    PUBLIC ADVOCATE GOTBAUM: And Chris,

23    you can time me.

24                    SPEAKER QUINN: No. I'll let you go.

25                    PUBLIC ADVOCATE GOTBAUM: I just want

# ORIGINAL

1   UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------------------------X
    TOM OGNIBENE, YVETTE VELAZQUEZ BENNETT, VIVIANA
3   VAZQUEZ-HERNANDEZ, MARTIN DILAN, MARLENE TAPPER,
    LEROY COMRIE, ROBERT PEREZ, FRAN REITER, SHEILA
4   ANDERSEN-RICCI, MARTINA FRANCA ASSOCIATES, LLC,
    DENIS GITTENS, OSCAR PEREZ, MICHELE RUSSO,
5   THE KINGS COUNTY COMMITTEE OF THE NEW YORK STATE
    CONSERVATIVE PARTY, and THE NEW YORK STATE
6   CONSERVATIVE PARTY,

7                                       PLAINTIFFSs,

8                    -against-          Case No:
                                        08cv01335
9                                       (LTS)(TDK)

10  FREDERICK A.O. SCHWARZ, JR., in his
    official capacity as Chairman of New York
11  City's Campaign Finance Board; DALE C.
    CHRISTENSEN, JR., JOSEPH P. PARKES, S.J,
12  KATHERYN C. PATTERSON, and MARK S. PIAZZA,
    in their official capacities as Members of
13  New York City's Campaign Finance Board;
    MARK DAVIES, in his official capacity as
14  Executive Director of the New York City
    Conflicts of Interest Board; MONICA BLUM,
15  STEVEN ROSENFELD, ANDREW IRVING, ANGELA M.
    FREYRE, in their official capacity as
16  Members of New York City's Board of
    Conflicts of Interest; and MICHAEL
17  McSWEENEY, in his official capacity as
    Acting City Clerk of New York City,

18
                                        DEFENDANTS.
19  -------------------------------------------------X

20

21                       DATE:  June 18, 2008

22                       TIME:  3:10 P.M.

23

24         (Deposition of SHEILA ANDERSEN-RICCI)

25

1

2

3        DATE:    June 18, 2008

4        TIME:    3:10 P.M.

5

6

7                EXAMINATION BEFORE TRIAL of the Plaintiff,

8    SHEILA ANDERSEN-RICCI, taken by the Defendant, pursuant to

9    a Court Order and to the Federal Rules of Civil Procedure,

10    held at the office of Special Federal Litigation, New York

11    City Law Department, 100 Church Street, New York, New York

12    10007, before Charlene Fountaliotis, a Notary Public of the

13    State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3

 4    BOPP, COLESON & BOSTROM, ESQS.
           Attorneys for the Plaintiff
 5         SHEILA ANDERSEN-RICCI
           1 South Sixth Street
 6         Terre Haute, Indiana 47807
           BY:  JOE LA RUE, ESQ.
 7

 8    DAVIDOFF, MALITO & HUTCHER, LLP
           Attorneys for the Plaintiff
 9         SHEILA ANDERSEN-RICCI
           605 Third Avenue
10         New York, New York 10158
           BY:  CHARLES CAPETANAKIS, ESQ.
11

12
      MICHAEL A. CARDOZO, ESQ.
13    CORPORATION COUNSEL
           Attorneys for the Defendants
14         THE CITY OF NEW YORK
           100 Church Street
15         New York, New York 10007
           BY:  STEPHEN KITZINGER, ESQ.
16         File #:  2008-004838
           Control #:  III02260
17

18
      NEW YORK CITY CAMPAIGN FINANCE BOARD
19    DEPUTY GENERAL COUNSEL
           Attorneys for the Defendants(s)
20         NEW YORK CITY CAMPAIGN FINANCE BOARD
           40 Rector Street, Seventh Floor
21         New York, New York 10006
           BY:  HILLARY WEISMAN, ESQ.
22

23    ALSO PRESENT:
           Samantha Reid
24
                    *          *          *
25
```

4

S. ANDERSEN-RICCI

1    S H E I L A    A N D E R S E N   R I C C I, called as a

2    witness, having been first duly sworn by a Notary Public of

3    the State of New York, was examined and testified as

4    follows:

5    EXAMINATION BY

6    MR. KITZINGER:

7        Q.    Please state your name for the record.

8        A.    Sheila Andersen-Ricci.

9        Q.    Please state your address for the record.

10       A.    339 West 70th Street, New York, New York 10023.

11       Q.    Good afternoon, Mrs. Ricci.

12       A.    Good afternoon.

13       Q.    My name is Stephen Kitzinger.  I'm Assistant

14   Corporation Counsel in the office of Corporation Counsel in

15   the New York City Law Department.  I'm here to ask you a

16   series of questions today in a case that you along with a

17   series of other people brought against the Campaign Finance

18   Board challenging the Finance Bill.  Do you understand

19   that?

20       A.    Yes.

21       Q.    And have you ever been deposed before?

22       A.    No.

23       Q.    Do you know what a deposition is?

24       A.    Yes.

25       Q.    And how do you know what a deposition is?

S. ANDERSEN-RICCI

1    about you and your individual capacity, okay?

2    A.    Yes.

3    Q.    Have you ever made any contributions to any

4    candidates for political office in your lifetime?

5    A.    No.

6    Q.    And that's local, state, or federal?

7    A.    No.

8    Q.    Have you ever directed anyone to make any

9    contributions to any political candidates on your behalf?

10   A.    No.

11   Q.    Is there more than one managing member of Martina

12   Franca Associates?

13   A.    No.

14   Q.    And you are the sole managing member?

15   A.    Yes.

16   Q.    Are there any other members of the LLC known as

17   Martina Franca Associates?

18   A.    No.

19   Q.    Has Martina Franca Associates ever made a

20   contribution to a political candidate at any level?

21   A.    No.

22   Q.    Has Martina Franca Associates ever directed or

23   authorized anyone to make such a contribution on its

24   behalf?

25   A.    No.

S. ANDERSEN-RICCI

1    Q.    What organizations?

2    A.    The Rent Stabilization Association.

3    Q.    Any others?

4    A.    Small Property Owners of New York.

5    Q.    And what is that organization?

6    A.    It's a group of small owners who banded together

7    maybe 18 years ago to work for the benefit of small owners.

8    Q.    And any other organizations?

9    A.    No.

10   Q.    Now, could you repeat the name of that small --

11   A.    Small Property Owners of New York SPONY.

12   Q.    And are you in a leadership position in that

13   organization?

14   A.    No.

15   Q.    Do you know anyone who is in a leader position in

16   that organization?

17   A.    Yes.

18   Q.    Who is that?

19   A.    Roberta Bernstein.

20   Q.    Who is she?

21   A.    She is also a small owner.

22   Q.    And how do you know her?

23   A.    Because she was part of the group that banded

24   together to form this organization.

25   Q.    Were you part of that group also?

S. ANDERSEN-RICCI

1    A.    Yes.

2    Q.    And how long have you been married to your

3    husband?

4    A.    Twenty-seven years.

5    Q.    And does SPONY employ anybody?

6    A.    No.

7    Q.    Have you ever been in a leadership position with

8    Small Property Owners of New York?

9    A.    No.

10    Q.    Have you ever been in a leadership position with

11    The Rent Stabilization Association?

12    A.    No.

13    Q.    How did you get involved in this litigation?

14    A.    I understood that if you are married to a

15    lobbyist you are confined by certain laws as far as

16    donations go.

17    Q.    Donations to?

18    A.    To candidates or office.

19    Q.    How did you come to that understanding?

20    A.    I read about it.

21    Q.    And this concerned you based on what or did this

22    concern you this notation?

23    A.    Yes.

24    Q.    And what was the cause of the concern?

25    A.    Since my husband is a lobbyist we may have

S. ANDERSEN-RICCI

1    different opinions about certain candidates.

2        Q.    In last 27 years, have you had different opinions

3    with your husband that caused you to donate or contribute

4    to a campaign to which he did not contribute to?

5        A.    No.

6        Q.    Your husband is a  lobbyist for The Rent

7    Stabilization Association?

8        A.    Yes.

9        Q.    Would it be fair to say that his involvement in

10   The Rent Stabilization Association is what caused you to

11   become involved in this litigation?

12           MR. CAPETANAKIS:  Objection to the

13           characterization.

14       Q.    You still have to answer?

15       A.    Yes.

16           MR. KITZINGER:  And just for the record I'd

17           like if only one of you were to speak on the

18           record to interpose objections.  I have no

19           feeling about one way or the other which one of

20           you it will be, but I think it's appropriate that

21           the record only reflects one attorney speaking.

22           MR. LA RUE:  That's fine.

23       Q.    And was it your husband also who brought this

24   Campaign Finance Bill to your attention?

25       A.    Yes.

S. ANDERSEN-RICCI

1      Q.      And are you being compensated in any way for your

2   time that you are expending concerning this litigation?

3      A.      No.

4      Q.      You said your husband is a lobbyist?

5      A.      Yes.

6      Q.      Does he work for anybody or is he self-employed?

7      A.      He works for The Rent Stabilization Association.

8      Q.      He is a direct employee of the RSA?

9      A.      Yes.

10     Q.      And does he do anything other than lobby?

11     A.      Yes.

12     Q.      Let me clarify.  For the RSA, does he have any

13  responsibility other than lobbying?

14     A.      Yes.

15     Q.      What are those responsibilities?

16     A.      I don't know.

17     Q.      Do you know what his title is?

18     A.      I don't know that he has a specific title.

19     Q.      Do you know any of his responsibilities other

20  than lobbying?

21     A.      No.

22     Q.      Can you identify anybody that your husband has

23  lobbied in the past five years?

24     A.      No.

25     Q.      Do you know what your husband seeks to establish

S. ANDERSEN-RICCI

1    Q.    Have you ever contributed to any political action

2    committees?

3    A.    No.

4    Q.    How long have you lived at your current address?

5    A.    1978.

6    Q.    So for 30 years?

7    A.    Yes.

8    Q.    In 1978, did you purchase the structure?

9    A.    Yes.

10   Q.    And in what capacity did you purchase it, as an

11   individual?

12   A.    Yes.

13   Q.    And how long did you own the property in an

14   individual capacity?

15   A.    Always.

16   Q.    It's my understanding that the property is owned

17   by Martina Franca Associates.

18   A.    Yes, I don't remember exactly when that happened.

19   Q.    Do you think it was in the last ten years or so?

20   A.    Yes.

21   Q.    And do you recall why you changed the ownership

22   structure of the property to move it from your name to

23   Martina Franca Associates, LLC?

24   A.    Advice of an attorney.

25   Q.    Who was that attorney?

S. ANDERSEN-RICCI

1      Q.      So is it your understanding that by transferring

2      title to the property, the property being 339 West 70th

3      Street to the LLC, being Martina Franca Associates, your

4      personal assets are no longer at risk and you cannot be

5      held personally responsible for anything relating to the

6      property?

7      A.      Yes.

8      Q.      And would that be one of the reasons why you

9      converted ownership?

10     A.      Yes.

11     Q.      Do you recall if there were any other reasons?

12     A.      No.

13     Q.      Have you ever been involved in any political

14     campaigns in any capacity?

15     A.      Yes.

16     Q.      In what political campaigns?

17     A.      Jerry Bohn on the Upper East Side many years ago.

18     Q.      Do you know what he was running for?

19     A.      Not anymore I don't.

20     Q.      And how do you spell his last name?

21     A.      I think it was B-O-H-N.

22     Q.      I'm sorry going back to an answer that you gave

23     earlier, but you believe there are some tax benefits to the

24     LLC structure, what is your understanding of those

25     benefits, if any?

S. ANDERSEN-RICCI

1      A.      Yes.

2      Q.      How would you describe that interest?

3      A.      I feel they are not property owner friendly.

4      Q.      Other than Ms. Quinn and Mr. Otto, do you know

5    the identity of any other members of the City Counsel?

6      A.      No.

7      Q.      I'm going to mention some names and ask you if

8    you know who they are.  Do you know who Charles Barren is?

9      A.      Yes.

10     Q.      Who is Charles Barren?

11     A.      Charles Barren I believe is from Brooklyn.  And I

12   believe he has racist tendencies from what I read in the

13   papers, I do not know personally.

14     Q.      Have you ever had any contact with him?

15     A.      No.

16     Q.      Alan Gerson?

17     A.      No.

18     Q.      Simcha Felder?

19     A.      No.

20     Q.      Thomas White?

21     A.      No.

22     Q.      No, you never heard --

23     A.      I've heard of them.

24     Q.      You've heard of Simcha Felder?

25     A.      Yes.

S. ANDERSEN-RICCI

1    Q.    To the best of your understanding, who is Simcha

2  Felder?

3    A.    I don't know.

4    Q.    To the best of your understanding, who is Alan

5  Gerson?

6    A.    I don't know.

7    Q.    To the best of your understanding who is Thomas

8  White?

9    A.    I don't know.

10    Q.    Do you know how you've heard of these people?

11    A.    I read the paper.

12    Q.    Newspapers?

13    A.    Yes.

14    Q.    What newspapers do you read?

15    A.    The Post, The Sun and I don't read the political

16  part of The Times.

17    Q.    How come?

18    A.    They are too bias.

19    Q.    Do you know who Kendall Stewart is?

20    A.    No.

21    Q.    Does the name sound familiar at all?

22    A.    Yes.

23    Q.    What about Peter Vallone Junior?

24    A.    Yes.

25    Q.    Who is that?

S. ANDERSEN-RICCI

1     Q.     And would it be your belief that the more money

2     that such lobbyist would amass, the more contact that he or

3     she would be able to make with the candidate?

4               MR. LA RUE:  Objection to the

5               characterization.

6     A.     No.

7     Q.     Do you believe there's a public perception that

8     campaign contributions by a lobbyist may influence the

9     actions of elected officials?

10     A.     A public perception?

11     Q.     Yes.

12     A.     Yes.

13     Q.     Do you believe there's a public perception that

14     campaign contributions by family members of lobbyist may

15     influence the actions of elected officials?

16     A.     No.

17               MR. KITZINGER:  Let's take a brief recess.

18               (Recess taken.)

19     Q.     Mrs. Ricci, I remind you you are still under

20     oath.

21               During the break did you have an opportunity to

22     speak to anybody?

23     A.     Yes, I spoke to my attorneys and they reminded me

24     that Martina Franca might also want to contribute as well

25     as myself.

S. ANDERSEN-RICCI

1          MR. LA RUE:  Okay.

2          (Whereupon, at 4:19 p.m., the Examination of

3     this Witness was concluded.)

4

5

6

7

8                    _____
                        SHEILA ANDERSEN-RICCI
9

10

Subscribed and sworn to before me

11
this 26 day of July                 , 2008.

12

13    _____
           Notary Public

                                        MITCHELL L. POSILKIN
14                                      Notary Public, State of New York
                                          No. 02PO5074814
15                                        Qualified in Bronx County
                                       Commission Expires  2/5/ , 2011

16

17

18

19

20

21

22

23

24

25

S. ANDERSEN-RICCI

1                    C E R T I F I C A T E

2

3

4    STATE OF NEW YORK        )
                              : ss.
5    COUNTY OF NEW YORK       )

6

7                    I, CHARLENE FOUNTALIOTIS, a Notary Public

8    within and for the State of New York, do hereby certify:

9                    That the witness whose deposition is

10   hereinbefore set forth, was duly sworn by me and that such

11   deposition is a true record of the testimony given by the

12   witness.

13                   I further certify that I am not related to any

14   of the parties to this action by blood or marriage, and

15   that I am in no way interested in the outcome of this

16   matter.

17                   IN WITNESS WHEREOF, I have hereunto set my hand

18   this 27th day of June, 2008.

19

20                              *Charlene Fountaliotis*
                                CHARLENE FOUNTALIOTIS
21

22

23

24

25

ORIGINAL                    1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ---------------------------------------------X
      TOM OGNIBENE, et. al.,
 3
                                        PLAINTIFFS,
 4
                      -against-        CA. No:
 5                                     08CV0335(LTS)(TDK)

 6    SCHWARTZ, et. al.,

 7                                        DEFENDANTS
      ---------------------------------------------X
 8

 9

10                    DATE: June 19, 2008

11                    TIME: 3:00 p.m.

12

13         DEPOSITION of the Plaintiff, YVETTE VELAZQUEZ BENNETT,

14    taken by the Defendants, pursuant to a Court Order and the

15    Federal Rules of Civil Procedures, held at the offices of MICHAEL

16    A. CARDOZO, ESQ., Corporation Counsel, 100 Church Street, New

17    York, New York 10007, before KATE FRANCOMACARO, a Notary Public

18    of the State of New York.

19

20

21

22

23

24

25
```

2

1     A P P E A R A N C E S:

2

3          BOPP, COLESON & BOSTROM, ESQS.
                Attorneys for the Plaintiffs
4               1 South 6th Street
                Terre Haute, Indiana 47807-3510
5               BY: JOE LA RUE, ESQ.

6

7

          MICHAEL A. CARDOZO, ESQ.
8         CORPORATION COUNSEL
                Attorneys for the Defendants
9               CITY OF NEW YORK
                100 Church Street
10              New York, New York 10007
                BY: LISA GRUMET, ESQ.
11              File #: 2008004838
                Control #: III02268
12

13
     ALSO PRESENT:
14        HILLARY WEISMAN
          EUGENE MEYERS
15        CORINNE GENTILESCO

16             *              *              *

17

18

19

20

21

22

23

24

25

3

1  Y V E T T E    V E L A Z Q U E Z    B E N N E T T, called as a

2  witness, having been first duly sworn by a Notary Public of the

3  State of New York, was examined and testified as follows:

4  EXAMINATION BY

5  MS. GRUMET:

6      Q.    Please state your name for the record.

7      A.    Yvette Velazquez Bennett.

8      Q.    Where do you reside?

9      A.    At 1622 10th Avenue, Brooklyn, New York 11215.

10          MS. GRUMET:  I just want to state for the record

11  that this deposition is addressed to the claims raised in the

12  Plaintiff's preliminary injunction motion and that it's deemed

13  continuing for the purposes of the remainder of this litigation.

14      Q.    I am to go going to be asking you questions this

15  morning about your claims in this lawsuit.  Have you taken a

16  deposition before?

17      A.    No.

18      Q.    You are going to be answering the questions that I ask,

19  under the oath of the court reporter.  The court reporter

20  prepares a transcript of the deposition which you will have an

21  opportunity to review.  It's important that if I ask a question

22  that you don't understand, whether because you don't hear me or

23  the question is unclear, let me know and I will repeat or

24  rephrase the question.

25      A.    Yes.

BENNETT

6

1       A.    It's recruiting more people to get involved in

2  particular with the Republican Party.  As I am a Republican,

3  recruiting people to also work poll sites helping to build a

4  Party.  Also, when people get involved with the election process,

5  is gets them excited and willing to do more and that's part what

6  of I do, too.

7       Q.    And you made reference earlier to the Republican Party

8  platform?

9       A.    Yes.

10      Q.    Is there anything in that platform that relates at that

11 Republican campaign?

12      A.    No.

13      Q.    Did you work at the Republican national convention?

14      A.    I was a volunteer.

15      Q.    What were your responsibilities there?

16      A.    Site operations.  I worked with the secret service and

17 security detail at the convention site.

18      Q.    And what offices have you run for?

19      A.    I ran for City Council in 2005 and in 2006 I ran for

20 state assembly.

21      Q.    Are you currently running for office?

22      A.    Yes, for State Assembly now.

23      Q.    For 2008?

24      A.    Yes.

25      Q.    What are your claims in this litigation?

1        A.    My claims in this litigation is the way the new law or

2    the way it's written prevents key people from donating to my

3    campaign.   It prevents adequate funding for a campaign that would

4    be viable.   There is no way that I can run against an incumbent,

5    especially me without the proper finances for a campaign.

6        Q.    And what do you mean by "key people," when you say it

7    prevents key people from donating to your campaign?

8        A.    People involved with the City.   I have friends who work

9    with the City.   They would be unable to donate.

10        Q.    What do you mean by, "work with the City"?

11        A.    Contractors.   They may have worked with the City in the

12    past and are not currently working with the City.   I don't know

13    if I can really answer that any better.

14        Q.    What is your understanding of who is subject to lower

15    contribution limits under the Campaign Finance Law?

16        A.    Can you clarify that?

17        Q.    What is your understanding of who may be restricted in

18    the amount of money they can give you and the Campaign Finance

19    Law?

20        A.    When I ran last time, I had a tough time raising money

21    as it was my scope of potential donors.   Because my experience

22    now is greater, among those donors are people who -- let me make

23    sure I am answering this question correctly.   Can you repeat the

24    question again?

25        Q.    The people who are involved with the City.

BENNETT

8

1        A.    I am not sure I know how to answer that beyond that.

2   What I understand is they have contracts with the City.  It's

3   just that my scope of potential donors has grown.  I know more

4   neighbors now.  You walk down the street, you have people who are

5   involved with the City.

6        Q.    How did you become involved with this litigation?

7        A.    I was called by the Chairman of the Conservative Party

8   in Brooklyn and he explained this lawsuit to me and he indicated

9   that they were looking for Plaintiffs.  Is that the word, the

10  correct word?

11       Q.    Yes.

12       A.    And when we he explained it, I totally agreed with the

13  premise.  He asked me to think about it and then he contacted Mr.

14  Bopp's firm and Joe gave me a call and he explained the lawsuit

15  and I was on board.  From what I remember of our conversation, he

16  had made it clear that I was a good person to participate in this

17  process.

18       Q.    And who is the chair of the Conservative Party?

19       A.    Jerry Kassar.

20       Q.    And did he explain why he thought that you would be a

21  good person to be a Plaintiff in the lawsuit?

22       A.    I don't recall.

23       Q.    Do you know who is financing the lawsuit?

24       A.    I don't recall.  I remember seeing a list, but I don't

25  recall.

BENNETT

10

1  Campaign Finance Board to at least go back to the levels that I

2  experienced in 2005, with those restrictions.  They are much more

3  severe now.  I would like to see it better than that.

4         Q.    What do you mean when you say you would like to see it

5  better than that?

6         A.    I find the campaign finance rules restrictive.

7         Q.    How so?

8         A.    I find the filings, the detail required, to be

9  unnecessary in my opinion.  If I want to buy five dollars worth

10  of staples, I should be able to, I believe, to do that freely.

11         Q.    Do you intend to run in the 2009 election?

12         A.    No.

13         Q.    Why is that?

14         A.    The restrictions on the campaign finance is

15  prohibitive, too restrictive in terms of how much I can raise.  I

16  don't think I can adequately run a campaign with the small amount

17  of money I can raise.

18         Q.    Would there be an incumbent for the 2009 City Council

19  race for your district?

20         A.    I believe so, yes.

21         Q.    Who would that be?

22         A.    James Brennan.  Sorry.  Wrong race.  There will be no

23  incumbent.

24         Q.    Who is James Brennan?

25         A.    My current opponent.  I have James Brennan on the mind.

BENNETT

11

1     Q.    What has your fund-raising experience been like for

2     your current race and, just to clarify, for the 2008 Assembly

3     race?

4     A.    We are still gearing up.  I expect to have a

5     fund-raiser in another six to eight weeks.  I have some money in

6     a kitty from my prior race and that's what I am going using to

7     get that started.

8     Q.    And just in to clarify, why will there be no incumbent

9     for the 2009 Council race for your district?

10    A.    He is term limited out.

11    Q.    Who is the current incumbent?

12    A.    Bill Debrazzio.

13    Q.    Did you participate in public financing in the 2005

14    election?

15    A.    I did not raise enough.

16    Q.    Did you seek to participate in the public financing in

17    the 2005 election?

18    A.    Yes.

19    Q.    Why was that?

20    A.    Five thousand dollars was not going to be enough which

21    is what I figured I could raise at the time.  To run a race, if I

22    met that five thousand dollar threshold, I would have matched the

23    funds and have a better chance against the incumbent.

24    Q.    In your experience, does the possibility of matching

25    funds help you in raising funds from individuals?  I will

BENNETT

12

1    rephrase the question.   In your experience, are individuals more

2    likely to contribute to your campaign if they believe their funds

3    will be matched?

4         A.   Yes, in some cases.

5         Q.   Why is that?

6         A.   Some people think that they will be getting more bang

7    for their contributed dollar.

8         Q.   Does it help you to raise funds from people who donate;

9    does the possibility of matching funds, in your experience, help

10   you to raise money from individuals who cannot afford to

11   contribute a lot of money?

12        A.   Yes.   Can I clarify that?   It would be a small number

13   of people.

14        Q.   What do you mean by that?

15        A.   Many of the people wouldn't care whether there was

16   matching funds.   They are giving me something that they think is

17   a means of appreciating me, my campaign, whether it's matched or

18   not.   I would say a majority of people, but there are some.   If

19   there is some money being matched, they might feel their dollar

20   is worth more, but I wouldn't say a lot of them.

21        Q.   How do you go about raising funds for a campaign?

22        A.   I have used fund-raisers and I did one solicitation

23   letter.

24        Q.   What kind of fund-raisers?

25        A.   Usually at a restaurant or a neighborhood hall.   We

BENNETT

14

1      A.    Yes.

2      Q.    And how did you decide who to include in the document?

3      A.    My personal phonebook.

4      Q.    Do you know if any of the persons on the list that's

5   been identified as Exhibit G have business dealings with the City

6   of New York?

7      A.    I don't know.

8      Q.    Do you know if any of the persons on the list that's

9   been identified as Defendants' Exhibit G are lobbyists?

10     A.    Not to my recollection.

11     Q.    Who was your opponent in the 2005 election for council?

12     A.    Bill Debrazzio.

13     Q.    What was the outcome of the election?

14     A.    I don't recall.  I did not win.

15     Q.    So Mr. Debrazzio won?

16     A.    Yes.

17     Q.    In your opinion, why did he win the election?

18     A.    How much time do we have?  First and foremost, he is

19   the incumbent.  He has the luxury of being able to send out lots

20   of mailings of things that he is doing within the community.  You

21   need money to be able to counteract that.  I didn't have the

22   money to do.

23             (Whereupon, the aforementioned document was marked

24   as Defendants' Exhibit H for identification as of this date by

25   the Reporter.)

BENNETT

15

1     Q.    Do you recognize the document that's been marked as

2     Defendants' Exhibit H?

3     A.    Yes.

4     Q.    And what is that document?

5     A.    It's a fund-raising letter that I wrote and sent to

6     this list of people (indicating).

7     Q.    The list of people meaning Defendants' Exhibit G?

8     A.    That's correct.

9     Q.    I would like to direct your attention to the second

10    page of the document, Defendants' Exhibit H, and looking at the

11    fourth paragraph from the bottom, beginning "most importantly,"

12    and I am going to read that paragraph.

13              "Most importantly, all of the major players in the

14    Party are watching to see how much money I am able to raise in

15    the campaign to decide if they want to target me for assistance.

16    If they do, it will make a huge difference.  If they don't, I am

17    afraid all the special interest money bill Mr. Debrazzio will

18    spend will simply overwhelm me."

19              Did you write that paragraph?

20    A.    I certainly did.

21    Q.    What did you mean by "major players in the Party"?

22    A.    The chairman, the executive committee, they can make

23    recommendations for people to donate to my campaign.

24    Q.    And what do you mean, they can make recommendations for

25    people to donate?

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

BENNETT

16

1      A.    There is only so much money that the Party has.    They

2    have to be able to give it to the campaign that can best make use

3    of the money.    My goal was to show I was a good investment and

4    that they could trust to use their money on my campaign.

5      Q.    Did the Party provide financial assistance to your

6    campaign for City Council in 2005?

7      A.    No.

8      Q.    Did the Party provide assistance for your Assembly

9    campaign in 2006, financial assistance?

10     A.    Yes.

11     Q.    Do you know why they provided in 2006 and not in 2005?

12     A.    I believe there were two reasons.    One is, even though

13   I did not raise a lot of money for the City Council campaign, I

14   doubled the results of the prior Republican candidates running

15   for that seat and they were impressed.

16     Q.    And has the Republican Party provided financial

17   assistance for your current campaign for Assembly?

18     A.    I expect them to.

19     Q.    How much financial assistance would the Party

20   ordinarily provide for a Council race, to your knowledge?

21     A.    I don't know.

22     Q.    Going back to Defendants' Exhibit H, when you referred

23   to the special interest money Mr. Debrazzio will spend, what did

24   you mean by that?

25     A.    I am trying to think how to answer this question.    I

BENNETT

17

1    really don't know how to answer that question.  Give me a

2    moment.  I guess special interest money would be money from

3    organizations that would be contrary to my own interests.

4        Q.    Did Mr. Debrazzio raise more money than you did for

5    that campaign?

6        A.    Yes.

7        Q.    In your view, why was Mr. Debrazzio able to raise more

8    money than you were for the 2005 Council race?

9        A.    Because he would find donors to donate in one lump sum

10   more than I could raise for my entire campaign.

11       Q.    What do you mean by that?  Who was he able to find as

12   donors?

13       A.    I can't answer that question at this point.  That would

14   be public record, wouldn't it?

15       Q.    Do you know whether Bill Debrazzio had support from

16   persons who had business dealings with the City in his 2005

17   campaign?

18       A.    I don't know.

19       Q.    To your knowledge, did Bill Debrazzio have support from

20   lobbyists in his 2005 campaign?

21       A.    I don't know.

22       Q.    In your view, did Mr. Debrazzio's status as an

23   incumbent help him in raising funds for the 2005 Council race?

24       A.    Absolutely.

25       Q.    How so?

BENNETT

18

1       A.    I think I answered that question.   His access to

2  literature to send to the community.

3       Q.    Did that help him in raising funds?

4       A.    Yes.

5       Q.    Is there any other aspect of Mr. Debrazzio's incumbency

6  that you feel may have helped him raise funds in the 2005 Council

7  race?

8       A.    Incumbency also gives you access and visibility that I

9  did not have.

10      Q.    What do you mean by access?

11      A.    He gets the press releases from community events so

12 that he can be there.   I do not.

13            (Whereupon, a short recess was taken.)

14            MS. GRUMET: Nothing further.

15            MR. LA RUE: I would like her to clarify one

16 answer.

17      A.    You asked me about special interest money and you asked

18 me to explain special interests, to clarify.   Special interest

19 groups are groups that have used money outside of the

20 conservative ideology in my opinion.

21            MR. LA RUE: Do you want her to do another

22 clarification?

23            MS. GRUMET: Sure.

24      A.    The other clarification is I don't know for sure if

25 anybody that I solicited has business with the City.   However,

BENNETT

19

1   one person on the list, it's possible that he may have had

2   business with the City.  I don't know for sure.

3       Q.    And what kind of business with the City?

4       A.    He is a contractor and he also handles real estate and

5   I know he has bought foreclosed homes perhaps from the City.  I

6   am not sure where and then he fixes them up and resells them so I

7   don't know for sure if he has business with the City, but it's

8   possible.

9               MS. GRUMET: Thank you.  Nothing further.

10              (Whereupon, at 4:05 p.m., the Examination of this

11  Witness was concluded.)

12

13

14              YVETTE VELAZQUEZ BENNETT

15

16  Subscribed and sworn to before me

17

18  this 23 day of July 2008.

19                                    JACK STETCH
                                      NOTARY PUBLIC, STATE OF
20                                    NO. 02ST3841815
                                      QUALIFIED IN KINGS COUNTY
21                                    COMMISSION EXPIRES SEPT. 30, 20

22          NOTARY PUBLIC

23

24

25

BENNETT

21

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF NEW YORK        )
                                 :  SS.:
 4     COUNTY OF KINGS          )

 5

 6

 7              I, KATE FRANCOMACARO, a Notary Public for and within

 8     the State of New York, do hereby certify:

 9              That the witness whose examination is hereinbefore set

10     forth was duly sworn and that such examination is a true record

11     of the testimony given by that witness.

12              I further certify that I am not related to any of the

13     parties to this action by blood or by marriage and that I am in

14     no way interested in the outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto set my hand this

16     27th day of June, 2008.

17

18

19                         _Kate Francomacaro_
                              KATE FRANCOMACARO
20

21

22

23

24

25
```

**Diamond Reporting, Inc.**
## ERRATA SHEET

**Plaintiff(s):** Tom Ognibene, et. al.

**Defendant(s):** Schwartz, et. al.

| Page | Line No. | Error | Correction |
|------|----------|-------|------------|
| 11 | 12 | Debrazzio | De Blasio |
| 14 | 12-15 | Debrazzio | De Blasio |
| 15 | 17 | De brazzio | De Blasio |
| 16 | 23 | De brazzio | De Blasio |
| 17 | 4,7,15,9 | De brazzio | De Blasio |

JACK STETOH
NOTARY PUBLIC, STATE OF
NO. 02ST3841815
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES SEPT. 30, 20

**DATE:**

**NAME OF WITNESS:** Yvette Velazquez Bennett

**SIGNATURE:** Yvette V. Bennett

Subscribed and sworn to before me this 23 day of July, 2008.

NOTARY PUBLIC



# ORIGINAL

1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
    TOM OGNIBENE, et al.,
3

4                                    PLAINTIFFS,

5        -against-                   Case No.
                                     08cv013335
6                                    (LTS)(TDK)

7   SCHWARTZ, et al.,

8                                    DEFENDANTS.
    ------------------------------------------------X
9

10                          DATE:  June 20, 2008

11                          TIME:  9:22 A.M.

12

13

14              EXAMINATION BEFORE TRIAL of the Plaintiff,

15   SENATOR MARTIN MALAVE DILAN, taken by the Defendants,

16   pursuant to a Court Order, held at the office of Special

17   Federal Litigation, New York City Law Department, 100 Church

18   Street, New York, New York 10007-2601, before a Notary

19   Public of the State of New York.

20

21

22

23

24

25
```

2

1    A P P E A R A N C E S :

2

3

4    BOPP, COLESON & BOSTROM, ESQS.
            Attorneys for the Plaintiffs
5          The National Building
          1 South Sixth Street
6          Terre Haute, Indiana 47807-3510
          BY:   JOSEPH LA RUE, ESQ.
7

8

      MICHAEL A. CARDOZO, ESQ.
9    CORPORATION COUNSEL
      NEW YORK CITY LAW DEPARTMENT
10          Attorney for the Defendants
          100 Church Street
11          New York, New York 10007-2601
          BY:   JESSE I. LEVINE, ESQ.
12              Special Assistant Corporation Counsel
          FILE #:  2008004838
13          CONTROL #:  III0228

14

15

16

17          *              *              *

18

19

20

21

22

23

24

25

1    M A R T I N   M A L A V E   D I L A N, called as a witness,

2    having been first duly sworn by a Notary Public of the State

3    of New York, was examined and testified as follows:

4    EXAMINATION BY

5    MR. LEVINE:

6        Q.    Please state your name and business address for

7    the record.

8        A.    Senator Martin Malave Dilan, 786 Knickerbocker

9    Avenue, Brooklyn, New York 11207.

10        Q.    Good morning, Senator Dilan.

11        A.    Good morning.

12        Q.    My name is Jesse Levine.  I'm an Assistant

13    Corporation Counsel, and I'm here to ask you some questions

14    with respect to the action you brought challenging the

15    City's local law dealing with campaign finances.

16        A.    Right.

17        Q.    We're going to try to keep this short.  I'm

18    going to ask you questions only dealing with issues standing

19    and relating to the Motion for Preliminary Injunction that

20    you've made, your attorneys have made.  And you may be

21    deposed again down the road, but I'm not going to go into

22    much more than what we just talked about. All right?

23        A.    Okay.

24        Q.    Have you ever been deposed before?

25        A.    I don't recall.  I don't think so.

12

SENATOR DILAN

1    and even, let's say, if I would file a report, and we would

2    have 75 matchable contributions from the district, if you

3    forgot to put in a zip code, if you forgot to put in a phone

4    number or if they didn't put the title for occupation, the

5    Campaign Finance Board won't validate those.

6               We would have to go back and make corrections

7    or get more contributions, so it's very difficult to raise

8    money within a district like that.

9         Q.    So did you get any business contributions from

10   within the district?

11        A.    I would, yes, get from local businessmen, I

12   would get contributions.

13        Q.    Getting back to the litigation for a second.  Do

14   you receive support from the Rent Stabilization Association

15   in your campaigns?

16        A.    Yes, I have.

17        Q.    Did your relationship with the Rent

18   Stabilization Association play any role in your involvement

19   in this lawsuit?

20        A.    No.

21        Q.    Do you know who directs the strategy in this

22   lawsuit?

23        A.    No, I don't.

24        Q.    Do you control decision-making?

25        A.    No.

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com

SENATOR DILAN

1    figure, but I know that we used a firm, you know, we would

2    have someone who would print the letter to -- we would give

3    them the contact, they would print it and it would be sent

4    to a mail house.  It's expensive, that's all I remember.

5    It's expensive proposition, mailings.  That's where the bulk

6    of expenditures would go.

7        Q.    I assume, since you got over 80 percent of the

8    vote, you had a broad-base of support in your community?

9        A.    I would say that, yes.

10        Q.    And did you have support from businesses?

11        A.    For the City Council race?

12        Q.    Yes.

13        A.    I would say I had support from local individuals

14    because, in the campaign finance, we were precluded from

15    accepting money from corporations.  And if their proprietors

16    gave us a contribution, it would be a personal contribution.

17        Q.    What about from unions, did you ever get any

18    union support?

19        A.    From union PACs, yes.

20        Q.    Can you tell me, per election cycle, which ones

21    you got?

22        A.    I can't tell you per election cycle, but I could

23    tell you who, generally, I would expect would contribute.

24    It would be DC37, 32BJ, the hotel workers, UFT, CSA, 1199,

25    to name a few.

22

SENATOR DILAN

1    Q.    To name a few.  What about the uniform --

2    A.    Firefighters, yes.

3    Q.    Police?

4    A.    I don't know if I got, I may have gotten a

5    contribution from them.

6    Q.    Did you ever get one from the Police

7    Lieutenants' Association?

8    A.    It sounds familiar, yeah.

9    Q.    Okay.

10   A.    I can't recall all of them, but I know we got

11   pretty good support from union PACs.

12   Q.    In preparing for this deposition, did you review

13   any documents?

14   A.    No.

15   Q.    Have you, in preparation for this deposition,

16   reviewed the Public Disclosure Statements kept on file by

17   the Campaign Finance Board?

18   A.    No.

19   Q.    Have you ever reviewed those documents?

20   A.    Maybe years ago, when I was in the City Council,

21   perhaps I have.

22   Q.    So what I'm going to do is, in order to make

23   this relatively simple, I'm going to show you, for the

24   various cycles, ask you to take a look and indicate whether

25   you can tell from this certain of the contributors fit the

SENATOR DILAN

29

1    A.    Right.

2    Q.    To your knowledge, would his contribution be

3    prohibited under the new Campaign Finance Law, $100?

4    A.    If he's contributing, I believe my understanding

5    is that if he's contributing as an individual, I don't think

6    it would be precluded. Whether it would be matchable or not

7    because he's a City Marshal, I don't know the answer to that

8    either.

9    Q.    Have you solicited campaign contributions for

10   potential City Council running in the 2009 cycle?

11   A.    I have not decided, you know, fully that I'm

12   going to do it.  I'm contemplating it.  I have not filed any

13   papers with the Campaign Finance Board, so I have not

14   solicited any funds.

15   Q.    Have you identified any businesses or lobbyists

16   that you would target for solicitation?

17   A.    You're saying, have I formulated a list?

18   Q.    Yes.

19   A.    Not for that purpose, no.

20   Q.    Do you know of any potential contributors who

21   would be affected by the Campaign Finance Law, in the 2009

22   cycle?

23   A.    The only thing I would say is that I know

24   currently, with my current position, I may have a fundraiser

25   and people who will be situated in that situation have

33

SENATOR DILAN

1      A.     With City agencies, yes.

2      Q.     Okay.

3      A.     Yeah.

4      Q.     And were those dealings affected by the amount

5  of the contribution that your constituent gave you?

6      A.     No.

7      Q.     Did it matter to you whether a constituent

8  contributed or not?

9      A.     No.

10     Q.     Do you think that campaign contributions who

11 have business dealings with the City influence the actions

12 of elected officials?

13     A.     I don't think that they do, but at least, you

14 know, they have not with me.

15     Q.     Have you ever heard rumors of certain other City

16 Councilmen being affected by the contributions of people who

17 do business with the City?

18     A.     I have not had no conversations with anyone

19 regarding that, no.

20     Q.     Do you know whether there's a public perception

21 that it's a bad thing for --

22     A.     Well, I mean, I hear what advocate, you know,

23 advocate groups may say, you know, I hear the Women League

24 of Voters talk about it, I hear the media, the editorials,

25 the press.  From that respect, you know, I hear it all the

34

SENATOR DILAN

1    time.

2         Q.    Do incumbents have an advantage in obtaining

3    contributions from people who do business with the City?

4         A.    I would assume so.  I hear the same thing in the

5    media.  I think incumbents have a slight advantage.

6         Q.    When you were a councilman, did anybody who

7    contributed to your campaign ask you for your help in

8    getting business with the City?

9         A.    No.

10              MR. LEVINE:  Just give me one minute.

11         Off the record.

12              MR. LA RUE:  Sure.

13              (Whereupon, an off-the-record discussion

14         was held.)

15         Q.    I'm going to ask you a couple of more questions

16    based on the declaration that you previously signed.  Do you

17    want to take a moment to take a look at this?

18         A.    Okay.

19         Q.    Paragraph 5 says --

20              MR. LA RUE:  Excuse me, is this being

21         entered into evidence or -- and I'm not

22         telling you to, I just don't want to note

23         it, if it's not.

24              MR. LEVINE:  I'm going to have this

25         deemed marked as "J", I'll get a couple of

SENATOR DILAN

1      getting the democratic line in the general election is

2      tantamount to election.

3          Q.      And if you ran for City Council next year, would

4      you expect that the democrat would get the same percentage?

5          A.      Well, first you have to get past the primary.

6          Q.      Right.

7          A.      And if you win the primary, I would expect that,

8      in that council district, that the same rule would apply.

9          Q.      Do you know of any potential primary opponents?

10         A.      I know that there have been people indicating

11     that they plan to run, there have been people who, you know,

12     as a leader of the district, who have even called me to say

13     they want to sit down to talk about running for City

14     Council, I heard names of other individuals who are

15     considering to run, so I expect that there would be a

16     primary.

17         Q.      And again, have you made up your mind whether or

18     not you're going to run?

19         A.      I'm going to be making that decision later this

20     year.

21         Q.      Have you formed any committee to raise funds for

22     that potential race?

23         A.      Not at this time.

24         Q.      I'd like you to read paragraph 7. Read that into

25     the record, please.

SENATOR DILAN

40

1          MR. LA RUE:  What he means is, read it

2     out loud so that she could type it.

3          MR. LEVINE:  Sorry, I forgot.

4          MR. LA RUE:  That's fine.

5     A.     "Because candidates are currently raising funds

6     for the 2009 election, it is imperative that the court grant

7     relief immediately.  Every day that passes without judicial

8     relief is another day that my First Amendment and Fourteen

9     Amendment rights are impermissibly burdened."

10     Q.     Am I correct that your previous answer is that

11     you have not yet decided whether to run and you have not yet

12     begun fundraising?

13     A.     That's correct.

14          (Continued on next page to include

15          jurat.)

16

17

18

19

20

21

22

23

24

25

SENATOR DILAN

41

1    MR. LEVINE:  I have no further questions.

2    Thank you for your time, sir.

3         (Whereupon, the aforementioned document

4    was marked as Defendants' Exhibit J for

5    identification as of this date by the

6    reporter.)

7         (Whereupon, at 10:26 a.m., the

8    examination of this witness was concluded.)

9

10   _____
     SENATOR MARTIN MALAVE DILAN

11

12

13   Subscribed and sworn to before me

14   this___21___day of____JULY_____, 2008.

15

16   _____
     NOTARY PUBLIC

17

18   VICTOR W. VILLAMAR
     Notary Public, State of New York
     No. 24-5001778
     Qualified in Kings County
     Commission Expires Sept. 14, 2010

19

20

21

22

23

24

25

43

SENATOR DILAN

1

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF NASSAU         )

6

7

8

9              I, JoANN VANCOSKY, a Notary Public for and

10   within the State of New York, do hereby certify:

11             That the witness whose examination is

12   hereinbefore set forth was duly sworn and that such

13   examination is a true record of the testimony given by that

14   witness.

15             I further certify that I am not related to any

16   of the parties to this action by blood or by marriage and

17   that I am in no way interested in the outcome of this

18   matter.

19             IN WITNESS WHEREOF, I have hereunto set my hand

20   this 23rd day of June, 2008.

21

22

23                        *JoAnn Vancosky*

24                        JoANN VANCOSKY

25

ORIGINAL

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------------------------X
     TOM OGNIBENE, et al.,
 3
                                    PLAINTIFFS,
 4

 5            -against-        Case No:
                              08 CV 01335(LTS)(TDK)
 6

 7   SCHWARZ, et al.,

 8                                  DEFENDANTS.
     -------------------------------------------------X
 9

10                         DATE:  June 17, 2008

11                         TIME:  12:41 P.M.

12

13

14              EXAMINATION BEFORE TRIAL of the Plaintiff,

15   THOMAS V. OGNIBENE s/h/a TOM OGNIBENE, taken by the

16   Defendant(s), pursuant to Stipulation and to the Federal

17   Rules of Civil Procedure, held at the offices of Michael A.

18   Cardozo, Esq., New York City Law Department, 100 Church

19   Street, New York, New York 10007, before Cleo Shenkin, a

20   Notary Public of the State of New York.

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3   BOPP, COLESON & BOSTROM, ESQS.
           Lead Counsel for Plaintiff(s)
 4       TOM OGNIBENE, et al.
           The National Building
 5       1 South Sixth Street
           Terre Haute, Indiana 47807-3510
 6       BY:  JOE LA RUE, ESQ.

 7

 8
     MICHAEL A. CARDOZO, ESQ.
 9   CORPORATION COUNSEL
     NEW YORK CITY LAW DEPARTMENT
10       Attorney for Defendant(s)
           SCHWARZ, et al.
11       100 Church Street
           New York, New York 10007
12       BY:  LISA GRUMET, ESQ.
             SENIOR COUNSEL
13       File #:  2008004838
           Control #:  III02244
14

15

16   ALSO PRESENT:
           ASHLEY COMPTON
17

18              *         *         *

19

20

21

22

23

24

25
```

1    T H O M A S   V.   O G N I B E N E, called as a witness,

2    having been first duly sworn by a Notary Public of the

3    State of New York, was examined and testified as follows:

4    EXAMINATION BY

5    MS. GRUMET:

6        Q.    Please state your name for the record.

7        A.    Thomas V. Ognibene.

8        Q.    Where do you reside?

9        A.    64-82 83rd Street, Middle Village, New York

10    11379.

11             MS. GRUMET:  To start, just for record, I

12             wanted to make clear that this deposition is

13             addressed to the claims raised in the plaintiff's

14             preliminary injunction motion and is deemed

15             continuing for the purposes of the remainder of

16             the litigation.

17             And I also just wanted to make clear that

18             for the purposes of the deposition, if I'm asking

19             you questions about what you did in connection

20             with your runs for elective office, that I will

21             be referring to yourself and to anyone acting on

22             your behalf.

23             THE WITNESS:  Okay.

24        Q.    Have you ever taken a deposition before?

25        A.    Yes.

OGNIBENE

1    on the Conservative party line, in 2005, was not elected.

2            And then I ran again just recently in the special

3    election in the 30th Council District, in 2008, and was not

4    elected.

5        Q.    And what are your claims in this litigation?

6        A.    My claims in this litigation is that, although

7    I've been an experienced candidate and run with campaign

8    finance, under the newer laws that were passed by the City

9    Council, after I left, that they've become more restrictive

10   in terms of the opportunity for raising money and also for

11   raising money that will eventually become matched by

12   campaign finance.

13           Specifically the laws that I think make it

14   difficult for me as a candidate are the ones that limit the

15   opportunity to obtain campaign contribution from LLCs or

16   LLPs, uh, and also limiting contributions from persons who

17   either do business with the City or are part of a firm that

18   does business with the City to $250, and then also the fact

19   that those contributions are not matchable, seriously

20   impair my ability to raise funds to run for public office.

21       Q.    How did you become involved with the litigation?

22       A.    I was interested in running for public office and

23   at the time that I was contacting people who had been

24   supportive of me and they advised me, particularly people

25   with the Rent Stabilization Association, that it was very

OGNIBENE

1    difficult for them to support me, and they went through

2    the -- you know, a litany of explanations as to why they

3    would have more difficulty, explaining it to me.  I advised

4    them that I thought that that was outrageous and they said

5    that they were considering litigation at that time and

6    would I be interested in becoming a participant in that

7    litigation and I said certainly.

8        Q.    What was the Rent Stabilization Association's

9    position, as expressed to you, concerning the impact that

10   the changes in the campaign finance law would have on their

11   ability to help your campaign?

12       A.    Well, they said it would seriously impair their

13   ability to contribute, or at least assist with the matching

14   funds, because of the stricter new rules.

15       Q.    How so?

16       A.    Well, obviously many of the people that own

17   buildings do business under LLPs and LLCs, and so they

18   could not write, uh, checks from those organizations.

19            Uh, also, there was a limitation on the amount of

20   money that the packs could give.

21            And also, there were people that were part of

22   that that do business with the City of New York and they

23   wouldn't be eligible to give me funds that were matched.

24       Q.    So, does the Rent Stabilization Association

25   ordinarily collect contributions from its members?

OGNIBENE

1       A.      What they do is, they have a candidate come in

2   and meet with their board of directors and talk to them

3   about the issues of concern to the organization and they

4   decide whether or not they are going to either otherwise

5   support or endorse a candidate.  If they do, they encourage

6   their members to support the candidate financially.

7       Q.      Do they actually bundle the contributions from

8   their members?

9       A.      Yes, on occasions they act as intermediaries.

10      Q.      And could you explain what intermediaries means?

11      A.      An intermediary is a person who will collect

12  checks from various people and then deliver them to you and

13  you have to identify that person with Campaign Finance.

14          In other words, if the person sent a check to you

15  directly, you wouldn't have to, but if he gives it to a

16  third party, the third party collects them and brings them

17  to you, he's a bundler, or the correct terminology is

18  "intermediary," and then when you file those checks with

19  Campaign Finance, you have to notify them who was the

20  person who brought the checks to you or acted as an

21  intermediary.

22      Q.      Has the Rent Stabilization Association helped you

23  raise funds in the past?

24      A.      Absolutely.  Yes.

25      Q.      Did they help you raise funds for your 2005

OGNIBENE

1    Q.    And do you know how they knew to call you?

2    A.    Well, I had advised the Rent Stabilization

3    Association that I would be a willing participant.

4    Q.    Is the Rent Stabilization Association a plaintiff

5    in this case, to your knowledge?

6    A.    I, I don't think so.  I don't know.

7        I don't think so.  I think it's just individuals

8    who are candidates, it's my understanding.

9    Q.    Do you know why they are not participating

10   directly in this litigation --

11   A.    No.

12   Q.    -- as plaintiffs?

13       What would you like to see happen as a result of

14   this litigation?

15   A.    I think that I would like to see it be a more

16   level playing field when it comes to the ability to raise

17   funds.

18       Certainly exempting unions is very detrimental to

19   Republican Conservative candidates, because 99 percent, in

20   my estimation, of union contributions go to Democratic

21   candidates.

22       Also, the traditional organizations that fund

23   Republican candidates I think have been seriously impacted

24   by the new rules.

25       The only thing that I would like to see is a

OGNIBENE

1  level playing.

2      Q.    Would you be challenging the law if it covered

3  unions?

4      A.    Say that --

5      Q.    Would you be challenging the law if it covered

6  unions.

7      A.    I still think the limits are unfair.

8      Q.    And why is that?

9      A.    I can give you an example.

10         I had a person that I've known for twenty years

11  who gave me a fifty dollar check and I was notified by

12  Campaign Finance that she worked for the Henry Street

13  Settlement that does business for the City and they

14  disallowed the matching funds on it.

15      Q.    And other than the concerns you raised about

16  unions, how do you feel that the current campaign finance

17  law is unfair to Republicans?

18      A.    Because I think that, first of all, it did not --

19         People should be allowed to support candidates

20  that support their views and I think that, one, limiting

21  the contributions from people who do business with the City

22  to $250 and not matching it really does not have a sound

23  constitutional basis and it is unfair.

24         And someone like myself, who is an attorney, and

25  many attorneys would have loved to have supported me, they

OGNIBENE

1    would be much more comfortable writing a check from their

2    attorneys' account and most of them are LLPs, so that hurt

3    me a great deal.  They don't like to -- they feel more

4    comfortable doing it that way than with personal funds.

5         Many of the real estate owners, I've been very

6    supportive of their issues, they all own buildings as LLCs,

7    and they can't write check from the business account.

8         I don't see why there is any reason for that.

9    There is no rationale, from my point of view.  So, you are

10   limiting my access to a whole group of people who were

11   supportive of my candidacy.

12   Q.    Do you believe that the partnership restrictions

13   disproportionally favor Democrats?

14   A.    I, I --

15         That, I don't know.

16   Q.    How about the LLC restrictions?

17   A.    I couldn't give you an answer.

18         The only thing I could tell you is that it

19   limited my access.

20   Q.    How about the LLP restrictions?

21   A.    Same answer.

22   Q.    And how about the doing business restrictions?

23   A.    Probably it affects --

24         That, that would probably be an equal effect.  I

25   don't know if there's any vantages with doing business, as

OGNIBENE

1  percent, are supportive of Democratic candidates and not

2  supportive of Republican candidates.

3      Q.    Do you intend to run in the 2009 election?

4      A.    Yes, I do.

5      Q.    And for what office?

6      A.    City Council for the 30th Council District.

7      Q.    Do you intend to participate in public financing?

8      A.    I will, I will --

9            I'll be able to answer that more clearly after

10  this litigation is settled.

11     Q.    And what do you mean by that?

12     A.    That if this litigation is won, I likely won't;

13  if my litigation is lost, I would have to rethink.

14     Q.    And why do you say that?

15     A.    Well, because if the -- if my case is sustained,

16  it will open up access for financing from organizations

17  that are otherwise prevented or prohibited from

18  contributing to me under the current law.

19     Q.    Did you participate in public financing in the

20  special election?

21     A.    Yes, I did.

22     Q.    And why was that?

23     A.    We had a very short time frame and the ability to

24  go out and raise funds and plan fund-raisers and do the

25  kinds of things that are necessarily, there simply wasn't

OGNIBENE

1    A.    Well, one of the things that I was able to do was

2    go back to a list of people that had previously supported

3    me, contacted, called, met with people.  Uh, then you go

4    and you get your lists of people and you do, you do

5    mailings and you then phone them.

6         There's two types of list.  There's a small donor

7    list of people that you feel you can get up to fifty

8    dollars and you have some small fund-raisers for them and

9    then you have the major people, in which you go and sit

10   down with and talk to them about -- on a more direct and

11   personal level about raising funds.

12   Q.    Are there any differences in how you conduct a

13   campaign for Council or for mayor?

14   A.    Actually, it's, it's --

15        The only thing that changes is the response.

16   Q.    What do you mean?

17   A.    Running for Council, many, many people are very

18   supportive, because they think you have an opportunity to

19   win and they feel comfortable with your run.

20        For mayor, it was a little more different.

21   People were much more reluctant to donate money.  Not

22   because they didn't think that you were a decent,

23   hardworking person, they just didn't think that it was

24   viable, and people generally like to pick winners.

25   Q.    Okay.

1    legal field.

2        Q.    And are there persons who have business dealings

3    with the City who you expect to receive increased

4    contributions from, but for the limits?

5        A.    I definitely think that there are people out

6    there, lobbyist organizations that have interests in

7    litigation before the City Council, issues that are raised

8    in the City budget, that, you know, as a matter of policy,

9    make contributions to candidates that are supportive of

10   their position.

11       Q.    Have you ever received significant support from

12   lobbyists in past elections?

13       A.    I would say yes.

14       Q.    In your 2005 mayoral campaign, what portion of

15   your contributions came from lobbyists?

16       A.    Probably very little.

17       Q.    In your 1997 Council race, what portion of your

18   campaign contributions came from --

19       A.    Honestly, I can't recall.

20       Q.    -- lobbyist?

21             And for your earlier Council races?

22       A.    I really don't...

23       Q.    For your 2005 mayoral campaign, what portion of

24   your contributions came from persons who have business

25   dealings with the City, other than lobbyists?

OGNIBENE

1    A.    I don't think that anybody in their right mind

2    who was doing business with the City contributed to my

3    campaign.

4    Q.    Why do you say that?

5    A.    I honestly don't think that anybody wants to have

6    a problem with Michael Bloomberg.

7    Q.    Do you think that people who had business

8    dealings with the City might have been concerned that they

9    would lose their business if they supported your campaign?

10   A.    Well, I don't know if I would go that fair.

11         I think people didn't see me as particularly

12   viable, once I didn't get the Republican party line.  So,

13   everybody waited to see if I was going to be viable, and

14   once you lose that viability, there's just no interest in

15   supporting your campaign.

16   Q.    And why is that?

17   A.    I guess the same reason that some horses run at

18   ninety-nine to one and some go off at even.  People, you

19   know, feel much more comfortable supporting a winner and if

20   a person doesn't have an opportunity to win, there's less

21   of an interest in supporting them.

22   Q.    Why would someone who has business dealings with

23   the City want to support a winner?

24   A.    Well, I think that everybody -- you know, in our

25   society, everybody has an interest in having people in

OGNIBENE

1    office and in government who have views that are similar to

2    theirs or supportive of their ideas too.  That's the whole

3    American way.  That's why social service agencies support

4    Democratic candidates, that's why unions support Democratic

5    candidates.  And I suppose that that's why people that have

6    interest that coincide with my views would support me.

7        Q.     In your 1997 Council race, what portion of your

8    contributions were from persons with business dealings with

9    the City, other than lobbyists?

10       A.     I can't recall that.

11       Q.     In your 1997 Council race, what portion of your

12   contributions came from LLPs, LLCs or partnerships?

13       A.     I really can't recall.

14       Q.     Have you ever received support from unions?

15       A.     I received support in the current campaign from a

16   union member.  His union didn't endorse me, but the union

17   member himself was supportive of me.  So, the union itself

18   didn't support me.

19              So, I would have to say no, it was an individual

20   who supported me.

21       Q.     Have any unions ever supported you?

22       A.     You know, I don't think so.

23       Q.     Did the Sergeants Benevolent Association help

24   you --

25       A.     I'm sorry, yes.  Absolutely.  I apologize.  Yes,

OGNIBENE

1    the Sergeants Benevolent Association supported me.

2        Q.    And what kind of support did they provide?

3        A.    They called their members, uh, I think they -- I

4    think I received financial support from them also.

5        Q.    And when did they provide that support?

6        A.    Right after their contract negotiations with the

7    City stalled.

8        Q.    And for which campaign?

9        A.    2005 mayoral.

10        Q.    Did they support you for any other campaign?

11        A.    No.

12              You know what, let me go back.  Because I'm not

13    thinking.

14              The police unions have supported me over the

15    years, the PBA, firefighters and people like that.

16        Q.    And for which campaigns?

17        A.    Uh, I would think all, except the 2005 mayoral.

18    I think in all of my Council campaigns.  Most of the

19    uniformed services were supportive of my candidacy.

20        Q.    And which uniformed service supported your

21    campaign?

22        A.    PBA, uniformed fire officers, firefighters.

23              You know, uh, it's hard for me to remember.

24              I would say universally the uniformed forces were

25    supportive.

OGNIBENE

1   they feel a much closer infinity to Democratic candidates

2   than they do to Republican candidates.

3       Q.     Are there some unions that more commonly support

4   Republicans?

5       A.     Yeah.

6              And I think it's law enforcement and uniformed

7   services are much more willing to cross that line.

8       Q.     Are there any other unions that you are aware of

9   that more commonly support Republican candidates?

10      A.     No.

11             MS. GRUMET:  Do you want to take a

12             five-minute break?

13             MR. LA RUE:  Yeah, that would be fine.

14             (Whereupon, a short recess was taken.)

15             (Whereupon, Ms. Compton left the deposition

16             room and did not return.)

17      Q.     In your view, do campaign contributions by

18  persons who have business dealings with the City ever

19  influence the actions of elected officials?

20      A.     They didn't influence mine.

21             As for other elected officials, I can't answer.

22      Q.     In your view, is there a public perception that

23  campaign contributions by persons that have business

24  dealings with the City may influence the actions of elected

25  officials?

OGNIBENE

1    A.    Yes.

2    Q.    And what is the basis for your answer?

3    A.    Just, uh, you know, standing at a train station,

4    talking to people and campaigning, as they come walking,

5    the ones that usually throw it back in your face make a

6    comment.

7    Q.    And what do they say?

8    A.    You know, "You're all a bunch of crooks."

9          You know, people have a lot of angry things to

10    say.  So, my understanding is, just reading the papers,

11    with the slush fund issues and that, you get a general

12    sense that people think that people with money have a

13    greater influence than they do.

14    Q.    And what do you mean by the "slush fund issues"?

15    A.    Well, that was a City Council issue in which they

16    used nonexistent not-for-profits to park money, to be used

17    later.

18          The City Council did that.  Specifically, the

19    speaker.

20    Q.    In your view, do people who do business with the

21    City favor incumbent officials when making contributions?

22    A.    I would say that it's true of all people who

23    contribute.

24    Q.    And why do you say that?

25    A.    Again, I think people feel comfortable with

OGNIBENE

1    winners and they are reluctant to back people, uh, you

2    know, that, that they don't think can win.

3         And, you know, I experienced that in 2005, when

4    many people said, "we love you Mr. Ognibene, but can you

5    beet Mr. Bloomberg," and the answer was probably not.

6         But that was their rationale.  When my rationale

7    is if you vote for the person that you believe in, then,

8    you know, you are not a looser.

9         Unfortunately, people feel more comfortable with

10    winners.  Or potential winners.

11    Q.    In your view, do campaign contributions by

12    lobbyists ever influence the campaigns of elected

13    officials?

14    A.    Influence?  No.

15         Maybe allow maybe, maybe some more access.

16         Maybe.  But not influence.

17    Q.    And what do you mean by more access?

18    A.    Well, you can't answer every phone call that

19    comes into your office, but generally if it's somebody

20    that's, you know, a lobbyist, generally if they call you

21    about a specific major issue, that's -- they are probably

22    more tuned into what's going on in government, and so you

23    take their call.  But you can't take every call that comes

24    into your office.

25    Q.    So then, in your view, do contributions by

OGNIBENE

1    lobbyists help lobbyists get access to elected officials?

2         A.    You know, I'm not sure, I'm not sure.

3              And, you know, yeah, there's access.  But I think

4    it's because you think that they have a targeted issue, you

5    know, rather than some generalized conversation.

6              People call you sometimes to talk about things

7    that you can't change or have any influence over.

8    Generally, when a lobbyist calls, it's about something

9    specific that's before the City Council or legislation, so

10   it's a call, at least it's something that you can deal with

11   with a yes or no answer.

12             Whereas, you can't take every call from everyone,

13   because they may be talking about things on a national

14   level, that you can't deal with.

15        Q.    What is your view of the contribution limit

16   restrictions on lobbyist from the recent changes to the

17   campaign finance law?

18        A.    You know I, I'm kind of -- I'm not really --

19             I understand there have to be some restrictions.

20   You know, I don't have a problem with having limits on, on

21   the total amount.

22             But you are talking about lobby -- lobbyists per

23   se, rather than particular organizations that are not --

24        Q.    Yes, lobbyists.

25             MR. LA RUE:  Can we go off the record for

OGNIBENE

1            just a moment.

2                  (Whereupon, a short recess was taken.)

3      A.    So, it's different from the lobbyists, as opposed

4      to the people who are actually doing business with the

5      City, even though -- that's what I'm more opposed to.

6            Lobbyist, if you want to limit what a particular

7      lobbying organization itself can contribute, I understand

8      that.

9      Q.    So, in this litigation, are you personally

10     challenging the lower contribution limits that apply to

11     lobbyists?

12     A.    Not necessarily, no.

13                  MR. LA RUE:  Can we go off the record for

14            just a minute.

15                  MS. GRUMET:  Sure.

16                  MR. LA RUE:  Let me meet with him and then

17            you can revisit this question, if you will, and

18            probe all you want to.

19                  MS. GRUMET:  Okay, can we just note, for the

20            record, that we are taking a break, at the

21            request of plaintiffs' counsel to speak with his

22            client.

23                  MR. LA RUE:  Definitely.

24                  (Whereupon, the witness and his attorney

25            left the deposition room and returned shortly

OGNIBENE

 1     specifically.

 2              The answer is probably yes, there probably were

 3     some people who did.  But I can't be specific about it.

 4          Q.     Did you solicit contributions from officials from

 5     any organizations that you had assisted in your role as a

 6     Council member?

 7          A.     No.

 8          Q.     When you were a Council member, did anyone who

 9     had contributed to your campaign ever lobby you to help

10     them or their organizations in some way?

11          A.     Yes.

12          Q.     And who?

13          A.     You know, I'm -- I get lobbied --

14              Probably every Council member gets lobbied every

15     day from any -- so, you get calls for people that you have

16     contributed to.

17              Juniper Park Civic Association wanted to have the

18     park redone and so that's lobbying, when they come in and

19     say we need a new ball field.

20              But I don't think anybody ever lobbied on behalf

21     of themselves, they lobbied on behalf of the organization.

22              So, the answer is certainly, yes.

23          Q.     Were you lobbied by the Rent Stabilization

24     Association?

25          A.     Oh, absolutely.

OGNIBENE

1  a decision for what other people did.  I really couldn't

2  answer that question.

3        Q.      Okay.

4                What was the outcome of the special election?

5        A.      Uh, Anthony Como won by thirty-nine votes over

6  Elizabeth Crowley, and by some almost three hundred votes

7  over me, out of approximately seventy-sive hundred votes.

8                Anthony Como was the Republican organizational

9  candidate and Elizabeth Crowley was the Democratic

10 organizational candidate.  And there was another candidate,

11 Charles Ober, who was an insurgent Democrat.

12               And Elizabeth Crowley was ineligible for public

13 funds, and Mr. Ober was, but I don't think he qualified.

14 And he only received seven hundred and something votes.  He

15 finished a distant fourth.

16       Q.      And do you have any opinion as to the reason for

17 the outcome?

18       A.      Probably the organizational candidates had a

19 greater Election Day operation, in terms of being able to

20 get out the vote, which is phone calls, ringing door bells,

21 driving people to polls, et cetera.

22       Q.      Who is Ronald Lattanzio?

23       A.      Ron Lattanzio was a expeditor, who helped me

24 raise funds.  I think over the period that I knew him I

25 raised close to two hundred thousand, over four years, and

OGNIBENE

1

2      Q.      Have you spoken with any of the other plaintiffs

3  about this litigation?

4      A.      Probably briefly with Fran Reiter.  But just

5  causally, not formally.

6             I think when we signed some documents over at the

7  Manhattan law firm (indicating), she was going in and I was

8  coming out.

9      Q.      And did you speak with anyone from the

10  Conservative party about this litigation?

11     A.      No.

12             I didn't know they were part of it.  I hadn't

13  thought about it.

14             MS. GRUMET:  I have no further questions.

15             (Whereupon, at 2:00 P.M., the Examination of

16             this Witness was concluded.)

17

18             _____

19                   THOMAS V. OGNIBENE

20

21  Subscribed and sworn to before me

22  this _21_ day of _July_ , 200_8_.

23  _____
                NOTARY PUBLIC

24                                      MARGARET OGNIBENE
                                       COMMISSIONER OF DEEDS
25                                      NEW YORK CITY No. 4-4595
                                       TERM EXPIRES MARCH 1, 19
                                                       2009

OGNIBENE

1              C E R T I F I C A T E

2

3    STATE OF NEW YORK        )
                                  :  SS.:
4    COUNTY OF KINGS         )

5

6

7              I, CLEO SHENKIN, a Notary Public for and within

8    the State of New York, do hereby certify:

9              That the witness whose examination is

10   hereinbefore set forth was duly sworn and that such

11   examination is a true record of the testimony given by that

12   witness.

13             I further certify that I am not related to any

14   of the parties to this action by blood or by marriage and

15   that I am in no way interested in the outcome of this

16   matter.

17             IN WITNESS WHEREOF, I have hereunto set my hand

18   this 18th day of June, 2008.

19

20                    _Cleo Shenkin_

21                    CLEO SHENKIN

22

23

24

25

**Diamond Reporting, Inc.**
## ERRATA SHEET

**Plaintiff(s):**  Ognibene, et al.

**Defendant(s):**  Schwartz, et al.

| Page | Line No. | Error | Correction |
|------|----------|-------|------------|
| 36 | 9-10 | "twenty-five hundred fifty dollars" | two hundred fifty dollars ($250.00) |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | MARGARET OGNIBENE |
| | | | COMMISSIONER OF DEEDS |
| | | | NEW YORK CITY No. 4-4595 |
| | | | TERM EXPIRES MARCH 1, 19___ |
| | | | 2009 |

**DATE:** July 21, 2008

**NAME OF WITNESS:** Thomas V Ognibene

**SIGNATURE:**

Subscribed and sworn to before me this _21_ day of _July_, 2008.

_Margaret Ognibene_
NOTARY PUBLIC



ORIGINAL

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------------------X
     TOM OGNIBENE, et al.,
3
                                   PLAINTIFFS,
4

5              -against-        Case No:
                               08 CV 01335(LTS)(TDK)
6

7    SCHWARZ, et al.,

8                              DEFENDANTS.
     ------------------------------------------------X
9

10                      DATE:  June 17, 2008

11                      TIME:  9:22 A.M.

12

13

14            EXAMINATION BEFORE TRIAL of the Plaintiff,

15   ROBERT PEREZ, taken by the Defendant(s), pursuant to

16   Stipulation and to the Federal Rules of Civil Procedure,

17   held at the offices of Michael A. Cardozo, Esq., New York

18   City Law Department, 100 Church Street, New York, New York

19   10007, before Cleo Shenkin, a Notary Public of the State of

20   New York.

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3    BOPP, COLESON & BOSTROM, ESQS.
             Lead Counsel for Plaintiff(s)
 4    TOM OGNIBENE, et al.
             The National Building
 5    1 South Sixth Street
             Terre Haute, Indiana 47807-3510
 6    BY:  JOE LA RUE, ESQ.

 7

 8

      DAVIDOFF MALITO & HUTCHER LLP
 9           Local Counsel for Plaintiff(s)
             TOM OGNIBENE, et al.
10    605 Third Avenue, 34th Floor
             New York, New York 10158
11    BY:  SID DAVIDOFF, ESQ.

12

13

      MICHAEL A. CARDOZO, ESQ.
14    CORPORATION COUNSEL
      NEW YORK CITY LAW DEPARTMENT
15           Attorney for Defendant(s)
             SCHWARZ, et al.
16    100 Church Street
             New York, New York 10007
17    BY:  JESSE I. LEVINE, ESQ.
               SENIOR COUNSEL
18    File #:  2008004838
             Control #:  III02244
19

20

21

22                    *          *          *

23

24

25
```

1    R O B E R T   P E R E Z, called as a witness, having been

2    first duly sworn by a Notary Public of the State of New

3    York, was examined and testified as follows:

4    EXAMINATION BY

5    MR. LEVINE:

6        Q.    Please state your name for the record.

7        A.    Robert Perez.

8        Q.    Where do you reside?

9        A.    118 Malba Drive, Malba, New York 11357.

10       Q.    Good morning, Mr. Perez.  My name is Jesse

11   Levine.  I'm an assistant corporation counsel.

12           I'm going to be asking you some questions with

13   respect to the lawsuit of Ognibene against Schwarz, and you

14   are a plaintiff in this case; is that correct?

15       A.    Yes.

16       Q.    Have you ever been deposed before in a civil

17   action?

18       A.    No.

19       Q.    So, I will give you -- I'm sure your counsel has

20   advised you how this works, but basically I'm going to be

21   asking you questions about the allegations in your

22   declaration and some other materials related to the motion

23   for preliminary injunction that you filed.

24           And you may be deposed on something else down the

25   road, but I'm going to limit it today to the PI and

PEREZ

1    like you to do this, let's work it out?

2         A.    Before the job gets awarded, we have to see if we

3    comply and we send the City official from DDC we seeing if

4    we are going to hire minorities, black people, women or

5    whatever you needed, and if they -- it's not approved by

6    the City, now they go get somebody else they told you.

7         Q.    Okay.

8         A.    And that one is the negotiation, you keep talking

9    to their people.

10        Q.    But I'm talking about the initial bid, when you

11   are first approved, have you ever been approved for a City

12   contract other than by the process of a sealed competitive

13   bid?

14        A.    No.

15        Q.    Okay.

16        A.    No.

17        Q.    Have you ever had an emergency contract from the

18   City?

19        A.    No.

20        Q.    Approximately how many jobs have you had with the

21   City over the past twenty years?

22        A.    Counting the two corporations, close to $500

23   million.

24        Q.    Very nice.

25              And that's been over the last twenty years, about

PEREZ

```
 1    Q.    -- is that right?  Okay.

 2          Now, you are a plaintiff in this lawsuit; is that

 3   correct?

 4    A.    Yes.

 5    Q.    How did you get involved with the lawsuit?

 6    A.    Talking to Mr. Davidoff, I ask him, what are we

 7   going to do with this law, because it was all over the city

 8   that the guys that bidding city work or doing city work,

 9   they can only donate $200, or whatever the new, and I say

10   it's against me.

11          Like you can see on the records, last year I, I

12   giving money to Freddie Ferrer, which is Spanish like me,

13   and I like the guy, not because he got the same religion as

14   me, I would not put a money, or a dollar for the City

15   Council, uh, the manager of the City Council, because it's

16   against my religion.  I am Christian Catholic and I raised

17   in the Catholic church, she is lesbian, I cannot approve of

18   that.

19    Q.    All right.

20          Did you --

21    A.    I'm sorry.  I say the truth, you know, what I

22   thinking.

23          MR. LEVINE:  Of the record.

24          (Whereupon, an off-the-record discussion was

25          held.)
```

PEREZ

1    Q.    Did you speak with Mr. Davidoff in his capacity

2    as your lawyer?

3    A.    No.

4          As a friend.

5    Q.    As a friend, okay.

6    A.    As a friend.

7    Q.    Does his law firm represent you?

8    A.    In some cases, yes.

9    Q.    Does his firm do lobbying work for you?

10   A.    No.

11         He's doing -- not for me, for the corporation and

12   the, what do you call it, the -- he's doing chasing the

13   money, like us, like we do.

14   Q.    Chasing the money is very important.

15         Does he do lobbying work for Diamond Asphalt?

16   A.    Yes.

17   Q.    And what about for Perez Interboro?

18   A.    Years ago.

19   Q.    Okay.  Fair enough.

20         Now, do you believe that under the law, as you

21   understand it, you are prevented from giving a certain

22   amount of money, that you are limited by the terms of the

23   new law?

24   A.    For the guys that I like, the people that I like.

25         I told you the truth, I no like Obama or Hillary

PEREZ

1          (Whereupon, the aforementioned document

2          entitled, "Declaration of Robert Perez," three

3          pages was marked as Defendant(s)' Exhibit B for

4          identification as of this date by the Reporter.)

5    Q.    Okay, would you read to yourself paragraph two of

6  the declaration?

7    A.    (Witness complying.)

8    Q.    All right?

9    A.    Yes.

10    Q.    And do you see it has reference to a particular

11  section of the law in paragraph two?

12    A.    Yes.

13    Q.    All right, and could you tell me what section of

14  the law paragraph two refers to?

15    A.    3-702 Paragraph 18A.

16    Q.    Okay.

17          Now, I'm going to show you this page, which

18  contains the provisions 18A, 3-702(18)(a) of the code

19  (handing).

20          MR. LA RUE:  Jesse, can I interrupt for a

21          minute?

22          Can we stipulate that the declaration is in

23          fact wrong?

24          John and I have talked about this.  At the

25          time that the declaration was prepared, Mr. Perez

PEREZ

1     and our law firm understood that he had business

2     dealings with the City, where you are headed is,

3     he does not currently meet the definition.

4          MR. LEVINE:  That's correct.

5          MR. LA RUE:  And rather than going through

6     that, we are prepared to stipulate to that.

7          He does not currently meet the definition of

8     one having business dealings with the City.

9          MR. LEVINE:  That's fine.

10   Q.   So, I think you have --

11        MR. LEVINE:  Could you repeat the colloquy

12   that we just had while Mr. Perez was reading.

13        (Whereupon, the referred to colloquy was

14   read back by the Reporter.)

15        MR. LA RUE:  He does not currently meet the

16   definition of one that has business dealing with

17   the City is what we will stipulate to.

18   Q.   Do you understand the colloquy that we just had?

19   A.   Yes.

20   Q.   That you are not currently barred from making

21   contributions by this law; do you agree to that?

22   A.   I wish I got a copy of what you say now, because

23   when I bid a job, I can't talk to nobody, if they know that

24   I donate $500 to somebody, I wish you would be their

25   witness on my behalf.

PEREZ

```
 1    Q.    So, you are saying that the fact that you may
 2  have --
 3    A.    I hired a lawyer to go sue the City.
 4    Q.    I'm not sure we are on the same waive length
 5  right here.
 6    A.    I understand you.
 7    Q.    All right.
 8          But what I'm asking you is the following, based
 9  on the fact that your lawyer has now stipulated that you
10  are not -- your companies currently do not meet the
11  definition of a business that has business dealings with
12  the City, what is there that makes you believe that the law
13  prohibits you from making contributions as you did before?
14    A.    Again, it's what you guys are going to say, the
15  corporate counsel, when we are negotiating the change
16  order, when I ask, you say oh, you donate for so and so.
17    Q.    Well, has that ever happened to you --
18          MR. LA RUE:  Jesse, if I could interrupt.
19          Mr. Perez is not an attorney.
20          MR. LEVINE:  I understand.
21          MR. LA RUE:  We have stipulated, as his law
22          firm, that it does not affect him.  You are
23          asking him to draw legal conclusions that he's
24          not capable, or qualified, to draw.
25          I don't mean to be rude, but you've asked
```

PEREZ

1          that with John.

2                    MR. LA RUE:  Very good.

3      Q.     Does Diamond Asphalt have a political action

4   committee?

5      A.     No.

6      Q.     Did you ever consider forming one?

7      A.     No.

8      Q.     Do you know that political action committees can

9   make donations that businesses themselves can't?

10                    MR. DAVIDOFF:  We are getting into legal

11               interpretation.

12                    MR. LA RUE:  Yes, it's a legal question

13               here.

14                    MR. LEVINE:  Only if he knows.  I'm just

15               asking if he knows.

16                    MR. LA RUE:  You can answer the question, do

17               you know that.

18      A.     You have to see, Diamond Asphalt is a very close,

19   family corporation, we no are a General Motors or a Ford

20   Motor Company --

21                    MR. LA RUE:  Mr. Perez, I'm sorry, can I

22               interrupt you.

23                    Please don't take offence to what I am about

24               to do, but please just answer yes or no, are you

25               aware that you can form a pack and give more --

PEREZ

1          that it wouldn't be limited is what he's

2          asking --

3              THE WITNESS:  No.

4              MR. LA RUE:  Okay, he's not aware of that.

5              MR. LEVINE:  Okay.

6     Q.     When you contributed to Gifford Miller, did you

7     realize that he was running against Mr. Ferrer?

8     A.     Yes.

9     Q.     Okay, so how come you gave to both?

10    A.     I want to make it straight that Ferrer no owns me

11    and I no own Ferrer.

12    Q.     But you gave to Miller to use against Ferrer?

13    A.     Yeah.

14    Q.     Okay.

15          Did you ever give to the campaign of Betsy

16    Gotbaum?

17    A.     No.

18          I hate.

19    Q.     Okay.

20              MR. DAVIDOFF:  Off the record.

21              (Whereupon, an off-the-record discussion was

22          held.)

23              MR. LA RUE:  Can we go back to that question

24          and will you allow me to refresh the witness's

25          recollection?

PEREZ

1    Albany.

2        Q.    Okay.

3              And that is what allows to you negotiate

4    separately with the utilities, rather than a sealed bid

5    jointly with the City and the utilities; is that right?

6        A.    No.

7              That one is part of the --

8              Because the problem was Con Edison, it want the

9    City to pay their own work.

10       Q.    Okay, I don't think I'm quite clear.

11       A.    Okay.

12       Q.    What I'm saying is, I believe you testified

13   before that you entered into negotiated contracts with the

14   utilities?

15       A.    The utilities, yeah.

16       Q.    And is that a result of your lawsuit that you can

17   continue to do that?

18       A.    No.

19             We won.  Now, it's no more joint bidding.

20       Q.    So, you negotiate with the utilities --

21       A.    Every job you negotiate with the utilities.

22       Q.    And you submit sealed bids to the City, correct?

23       A.    Yeah.

24       Q.    Okay.

25             Now, you indicated that if the City called you,

PEREZ

1    you would be happy to negotiate a contract with them, under

2    what circumstances could it occur that you would do a

3    negotiated contract?

4         A.    For example, remember when the wall collapse up

5    in the Bronx, we no got no work, it was seven contractors,

6    they give it to a Jewish contractor, a guy that got a

7    rabbi.

8         Q.    Well, did you solicit the work?

9         A.    Nobody called us.

10        Q.    Was it an emergency contract?

11        A.    It was an emergency contract.

12        Q.    Okay.

13             Now, do you know that emergency contracts are not

14   considered doing business with the City?

15        A.    I don't know.

16        Q.    Remember we looked at the definition before --

17             MR. LA RUE:  He just answered the question,

18             he doesn't know.  And going beyond that, calls

19             for legal conclusions.

20             MR. LEVINE:  Well, I will ask him to read

21             the section again.

22             I mean, unless your stipulation that he does

23             not currently fit the definition of doing

24             business with the City also includes emergency

25             contracts?

PEREZ

1      MR. LA RUE:  Your question was, do you know

2  that emergency contracts don't meet the

3  definition, he just said I don't know.

4      MR. LEVINE:  Well, now I'm going to ask you,

5  sir, does your stipulation in that he does not

6  currently meet the definition of doing business

7  with the City include emergency contracts?

8      MR. LA RUE:  Our stipulation includes

9  anything that would give him -- anything that

10  would meet the definition of doing business with

11  the City, we are willing to stipulate to he does

12  not currently meet that definition.

13      MR. LEVINE:  Okay.

14      And that includes emergency contracts?

15      MR. LA RUE:  Yes.  Yes.

16      MR. LEVINE:  Okay, fine.  That's all I

17  wanted to know.

18      All right, give me just a couple of

19  minutes --

20      MR. LA RUE:  Sure.

21      MR. LEVINE:  -- to see what we have left.

22      MR. LA RUE:  Sure.

23      MR. LEVINE:  He certainly is a forthcoming

24  witness.

25      MR. LA RUE:  Would you please make sure that

PEREZ

1      Q.      And what kind of work does it do for you in terms

2      of lobbying?

3      A.      When they say --

4              Let's say when we got problems with the City

5      officials, we call Sid to go and straighten them out or

6      like go chase a payment, I don't know what he's doing.

7      Q.      Okay, so do you know what he specifically does in

8      terms of lobbying?

9      A.      I explained to you, he goes chase a payment as

10     part of the lobbying.

11     Q.      So, is it fair to say that if you have problems

12     with the City, you will ask Mr. Davidoff's firm to

13     intercede on your behalf; is that correct?

14     A.      Yeah.

15     Q.      Who is your local councilman?

16     A.      I don't know.

17     Q.      Have you ever contributed to a candidate --

18     A.      Yes.

19     Q.      -- in your local council --

20             MR. DAVIDOFF:  He just answered he doesn't

21             know, so he wouldn't know if he contributed to

22             his local council member.  It would have to be to

23             his local council member.

24             MR. LEVINE:  Well, I mean to anybody --

25             MR. DAVIDOFF:  How does he know if David

PEREZ

1    Q.    Do you have any other lobbyists besides

2    Mr. Davidoff's firm?

3    A.    No.

4          MR. LEVINE:  Okay, I have no further

5          questions.

6          MR. LA RUE:  Okay.

7          MR. LEVINE:  Subject to the resolution of

8          the issue with Mr. Pines.

9          (Whereupon, at 10:37 A.M., the Examination

10         of this Witness was concluded.)

11

12

13                              ROBERT PEREZ

14

15   Subscribed and sworn to before me

16   this 22 day of July, 2008.

17

18              NOTARY PUBLIC

19

20                              J. ROBERT ALESSI
                                Notary Public, State of New York
                                No. 01AL5077401
                                Qualified in Nassau County
21                              Commission Expires 5-5-2011

22

23

24

25

53

PEREZ

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        )
                                     :  SS.:
4    COUNTY OF KINGS          )

5

6

7            I, CLEO SHENKIN, a Notary Public for and within

8    the State of New York, do hereby certify:

9            That the witness whose examination is

10   hereinbefore set forth was duly sworn and that such

11   examination is a true record of the testimony given by that

12   witness.

13           I further certify that I am not related to any

14   of the parties to this action by blood or by marriage and

15   that I am in no way interested in the outcome of this

16   matter.

17           IN WITNESS WHEREOF, I have hereunto set my hand

18   this 18th day of June, 2008.

19

20

21                        _____
                                CLEO SHENKIN

22

23

24

25

ORIGINAL                    1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ---------------------------------------------X
     TOM OGNIBENE, et. al.,
3
                                    PLAINTIFFS,
4
                   -against-        CA. No:
5                                   08CV0335(LTS)(TDK)

6    SCHWARTZ, et. al.,

7                                   DEFENDANTS
     ---------------------------------------------X
8

9

10              .        DATE: June 19, 2008

11                       TIME: 12:45 p.m.

12

13              DEPOSITION of the Plaintiffs, FRAN REITER, taken by the

14   Defendants, pursuant to a Court Order and the Federal Rules of

15   Civil Procedres, held at the offices of MICHAEL A. CARDOZO, ESQ.,

16   Corporation Counsel, 100 Church Street, New York, New York 10007,

17   before KATE FRANCOMACARO, a Notary Public of the State of New

18   York.

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3         BOPP, COLESON & BOSTROM, ESQS.
                Attorneys for the Plaintiffs
 4              1 South 6th Street
                Terre Haute, Indiana 47807-3510
 5              BY: JOE LA RUE, ESQ.

 6

 7
           MICHAEL A. CARDOZO, ESQ.
 8         CORPORATION COUNSEL
                Attorneys for the Defendants
 9              CITY OF NEW YORK
                100 Church Street
10              New York, New York 10007
                BY: STEPHEN KITZINGER, ESQ.
11              File #: 2008004838
                Control #: III02268
12

13

14              *              *              *

15

16

17

18

19

20

21

22

23

24

25
```

3

1    F R A N    R E I T E R, called as a witness, having been first

2    duly sworn by a Notary Public of the State of New York, was

3    examined and testified as follows:

4    EXAMINATION BY

5    MR. KITZINGER:

6        Q.    Please state your name for the record.

7        A.    Fran Reiter.

8        Q.    Where do you reside?

9        A.    At 170 Second Avenue, #3D, New York, New York 10003.

10       Q.    Good morning.  My name is Steve Kitzinger.  I am an

11   Assistant Corporation Counsel in the New York City Law

12   Department.  I will be here taking your deposition today

13   concerning the lawsuit which you and a number of other people

14   brought against the campaign finance bill.  Have you ever been

15   deposed before?

16       A.    Yes.

17       Q.    So you understand what a deposition is?

18       A.    Yes.

19       Q.    And being New Yorkers, we typically tend to start

20   speaking before the other person stops speaking, which makes it

21   difficult for the court reporter, so I will ask you to let me

22   finish asking my question before you answer the question.  Is

23   that okay?

24       A.    That's fine.

25       Q.    Did you follow your typical daily routine today?

1    A.    Yes.

2    Q.    Other than NYU?

3    A.    Yes.

4    Q.    Which ones?

5    A.    Practice Housing Initiatives is a not-for-profit

6    organization engaged in providing supportive transitional housing

7    to people with AIDS, and they have relationships with the

8    department of HRA and the HRA provided transitional shelter and

9    supportive services for AIDS patients.  I have another client in

10   the same general business.  Their relationship is with the

11   Department of Homeless Services, providing service and

12   transitional housing to the mentally ill.

13   Q.    That client is?

14   A.    Sequoia Community Initiatives, NYU.  I don't know that

15   you would actually say that NYU does business with the City.  NYU

16   receives grants from the City for various things and, of course,

17   they have a relationship with Bellevue.

18         At the moment, the 4750 Company has a contract

19   relationship with the City of New York, with a bid.  Like all

20   bids, it allows them to assess their property owners a certain

21   amount per square foot of real property to provide funding for a

22   business improvement district.

23   Q.    Is Solo Reality one of their clients?

24   A.    They were.  Not now.

25   Q.    Do you know what their corporate structure was?

REITER

37

1        A.    The entity that we contracted with was an LLC.

2        Q.    What did you do for them?

3        A.    Advising them primarily on community relations issues

4    and some related issues around there.   Solo was seeking major

5    zoning changes via the Department of City Planning to the former

6    water site on the East River.   The project was going through the

7    ULURP process.

8        Q.    Is that around 57th Street?

9        A.    No, just south of the United Nations and that's going

10   through a process; ULURP is a legal process.   There was much

11   community opposition as to its effects when we were advising on

12   community issues engaged in getting support for the project to

13   counter opposition.   That was primarily it.

14       Q.    Did you actually engage or attempt to engage any

15   municipal officials on their behalf with regard to this project?

16       A.    I had one meeting with Daniel Graudnick on a variety of

17   issues.   The meeting was not specifically for this purpose, but

18   we certainly did discuss this project and I recall that my

19   partner -- this was a client that we were both working on behalf

20   of.   Sometimes we jointly represent a client.   More often than

21   not separately, but this was one where we were both playing a

22   role.   I believe we also had discussions with council member

23   Daniel Graudnick.

24       Q.    Did you did you know Mr. Graudnick prior to this point?

25       A.    I didn't.   My partner met and spoke with him,

REITER

38

1    certainly.

2        Q.    When did these meetings occur?

3        A.    I am going to guess.  Sometime in January, February or

4    early March of this year.  I do not remember the date of the

5    meeting, but it was after the first of the year and prior to the

6    decision on the zoning, so it was somewhere in that three-month

7    period.

8        Q.    Have you ever made any contributions to the Graudnick

9    campaign?

10       A.    I believe our LLC has.

11       Q.    When do you believe that occurred?

12       A.    I don't recall.

13       Q.    Would it have been prior to your meeting with him?

14       A.    Yes.

15       Q.    Significantly prior, more than a month?

16       A.    I think so.

17       Q.    More than six months?

18       A.    I don't recall.

19       Q.    Do you know whether or not your partner, Mr. Begun, has

20   made contributions to the Graudnick campaign?

21       A.    I don't know.

22       Q.    Did you have any difficulty engaging Mr. Graudnick with

23   regard to this or other issues?

24       A.    No.

25       Q.    How does the Campaign Finance Law affect you

REITER

41

1    part of my life.  Because of what I do for a living, this law

2    takes away from me the ability to support those candidates for

3    public office to the extent that my neighbor can contribute more

4    than me, and I think that does hurt me.

5        Q.   Does it limit you in any way other than your ability to

6    contribute money?

7        A.   No.

8        Q.   Does it limit your access to candidates in any way,

9    shape or form?

10       A.   No.

11       Q.   Why is that?

12       A.   Because I don't have trouble getting meetings from

13   people.  I mean, other than Mr. Doctoroff.

14       Q.   The answer is, no?

15       A.   The answer is, no.

16       Q.   Why do you believe you do not have trouble getting

17   meetings?

18       A.   I think I am respected, well-known.  I am a serious

19   person, and when I want to meet with someone, they tend to want

20   to meet with me.

21       Q.   Do you believe the inability to contribute to a

22   campaign, the inability to contribute money to a campaign, would

23   limit the ability of someone less well known and less well

24   respected to get a meeting with a candidate or candidate?

25       A.   In general, no, I don't believe that.  Candidates,

REITER

1    those of us who do business here in the City and represent an

2    array of clients, get meetings as a rule because of who we are,

3    and not because we contribute to campaigns.  I don't believe

4    that.

5        Q.    Do you believe that funding campaigns gives people

6    access to candidates or gets their voices heard to counterbalance

7    advocacy organizations' voices?

8        A.    I don't know.

9        Q.    Do you understand the question?

10       A.    Ask the question again.

11       Q.    Let me start again.  Do you believe that advocacy

12   organizations have a good deal of access to and candidates and

13   officials?

14       A.    Yes.

15       Q.    Do you believe that access is equal to or greater than

16   a typical individual would have?

17       A.    Than a typical individual?  Let me make sure I

18   understand what you are asking.  Do advocacy organizations have

19   greater access to officials than just an individual?

20       Q.    Yes.

21       A.    Yes, I believe that's true.

22       Q.    And how would you counsel an individual to be in a

23   better position to get access to candidates or officials to

24   counterbalance the official if that individual wished to do so?

25       A.    I don't know that I have any counsel for them.

1   at some point or another.

2       Q.   Do you remember how much money the campaign had to

3   return?

4       A.   No, I don't know.

5       Q.   Was it ten thousand?

6       A.   No.  I mean, it's in the public record.  This is a

7   well-known campaign finance case.  I don't remember the details

8   of it, but it was widely publicized at the time.

9       Q.   Do you recall whether or not you conveyed the response

10  of such individuals to the Mayor?

11      A.   I am sure I didn't.

12      Q.   Why are you sure you didn't?

13      A.   Because I didn't have those kinds of discussions with

14  the Mayor.

15      Q.   Did you ever have discussions with the Mayor as to the

16  identity of campaign contributors?

17      A.   I don't recall discussions like that.

18           (Whereupon, a short recess was taken.)

19      Q.   You are still under oath.

20      A.   Yes, I understand.

21      Q.   Do you believe there is a public perception that

22  campaign contributions by lobbyists may influence, or affect

23  their ability to influence, elected officials?

24      A.   Yes.

25      Q.   Do you think there is any validity to that perception?

1    held responsible for any obligations of Reiter, Begun?

2        A.    I don't know the answer to that.

3            MR. KITZINGER: Nothing further at this time. I

4    note this deposition was limited in scope for the purpose of

5    responding to the Motion for Preliminary Injunction and that the

6    deposition remains open and continuing for the purpose of the

7    litigation in general. Do you have any questions.

8            MR. LA RUE: No.

9            (Whereupon, at 2:20 p.m., the Examination of this

10   Witness was concluded.)

11

12

13                                          _____
                                                FRAN REITER
14

15   Subscribed and sworn to before me

16   this 15th day of July 2008.

17   _____
         NOTARY PUBLIC

18

```
NICHOLAS RATUSH
NOTARY PUBLIC, State of New York
No. 02RA6150794
Qualified in Kings County
Commission Expires August 7, 2010
```

19

20

21

22

23

24

25

REITER

69

```
 1              C E R T I F I C A T E

 2

 3    STATE OF NEW YORK        )

 4                                 :  SS.:

 5    COUNTY OF KINGS          )

 6

 7              I, KATE FRANCOMACARO, a Notary Public for and within

 8    the State of New York, do hereby certify:

 9              That the witness whose examination is hereinbefore set

10    forth was duly sworn and that such examination is a true record

11    of the testimony given by that witness.

12              I further certify that I am not related to any of the

13    parties to this action by blood or by marriage and that I am in

14    no way interested in the outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto set my hand this

16    27th day of June, 2008.

17

18

19                          _Kate Francomacaro_
                              KATE FRANCOMACARO
20

21

22

23

24

25
```

**Diamond Reporting, Inc.**
# ERRATA SHEET

**Plaintiff(s):** Ognibene, et al.

**Defendant(s):** Schwartz, et al.

| Page | Line No. | Error | Correction |
|------|----------|-------|------------|
| 7 | 9 | "15 percent" | "50 percent". My recollection is that I was asked, "Fair to say less than 50 percent?" My answer, "Yes", was in response to that question (regarding 50 percent). |
| 26 | 4 | "4750 Company" | "FORTY SEVENTH FIFTH Company" |
| 36 | 6 | "Practice Housing Initiatives" | "PRAXIS" |
| 36 | 18 / 19 | "4750 Company" and "with a bid" | "47th STREET BID" is a different client and the one to which I was referring in my answer regarding a client with a city contract. There is no bid (as in bidding for a contract) involved. |
| 36-37 | 23 + | "Solo" | Should be spelled "Solow." |
| 37 | 16, 24 | "Graudnick" | Should be spelled "Garodnick" |
| 38 | 8, 20, 22 | "Graudnick" | " " " "Garodnick" |

**DATE:** 7/15/08

**NAME OF WITNESS:** FRAN REITER

**SIGNATURE:**

Subscribed and sworn to before me this 15th day of July, 2008.

NOTARY PUBLIC

NICHOLAS RATUSH
NOTARY PUBLIC, State of New
No. 02RA6150784
Qualified in Kings County
Commission Expires August 7




ORIGINAL          1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------------X
      TOM OGNIBENE, et. al.,
 3
                                        PLAINTIFFS,
 4
                   -against-        CA. No:
 5                                  08CV0335(LTS)(TDK)

 6    SCHWARTZ, et. al.,

 7                                        DEFENDANTS
      ------------------------------------------------X
 8

 9                   DATE: June 19, 2008

10                   TIME: 9:45 a.m.

11

12          DEPOSITION of the Plaintiff, MICHELE RUSSO, taken by

13    the Defendants, pursuant to a Court Order and the Federal Rules

14    of Civil Procedures, held at the offices of MICHAEL A. CARDOZO,

15    ESQ., Corporation Counsel, 100 Church Street, New York, New York

16    10007, before KATE FRANCOMACARO, a Notary Public of the State of

17    New York.

18

19

20

21

22

23

24

25
```

2

```
 1    A P P E A R A N C E S:

 2

 3         BOPP, COLESON & BOSTROM, ESQS.
                Attorneys for the Plaintiffs
 4              1 South 6th Street
                Terre Haute, Indiana 47807-3510
 5              BY: JOE LA RUE, ESQ.

 6

 7

        MICHAEL A. CARDOZO, ESQ.
 8      CORPORATION COUNSEL
                Attorneys for the Defendants
 9              CITY OF NEW YORK
                100 Church Street
10              New York, New York 10007
                BY: JONATHAN PINES, ESQ.
11              File #: 2008004838
                Control #: III02268
12

13

14             *              *              *

15

16

17

18

19

20

21

22

23

24

25
```

3

1   M I C H E L E    R U S S O, called as a witness, having been

2   first duly sworn by a Notary Public of the State of New York, was

3   examined and testified as follows:

4   EXAMINATION BY

5   MR. PINES:

6        Q.    Please state your name for the record.

7        A.    Michele Russo.

8        Q.    Where do you reside?

9        A.    At 30A Jennifer Place, Staten Island, New York 10314.

10       Q.    Good morning.  My name is Jonathan Pines. I am from the

11   New York City Law Department.  We represent the Defendant in an

12   action that you brought.  Have you ever had your deposition taken

13   in the past?

14       A.    Never.

15       Q.    I will tell you, this is very much like a testimony

16   before a court.  It's given under oath, so please listen very

17   closely to the questions that I ask and answer the questions as

18   carefully and truthfully as you can.  If anything I ask you is

19   unclear, don't hesitate to ask me to clarify.  The purpose is not

20   to trick or trap you.  I am really looking for information.  You

21   can always ask to take a break.  If you find your mind wanders or

22   if you want to take a break for any reason, you are free to do

23   so.  I only ask that you answer any question that I ask you

24   before you take that break, unless there is something that you

25   need to talk to your lawyer about.

4

1           Is there any reason why you would not be able to

2    give complete and accurate answers this morning?

3        A.   No.

4        Q.   I am talking about if you are taking an allergy

5    medication that makes you feel drowsy.  You are perfectly ready

6    to go?

7        A.   Yes.

8           MR. LA RUE:  Make sure you speak your answer as

9    opposed to nodding.

10       Q.   I always say that.  In the last two depositions I

11   forgot.  It's very easy to do.  Where are you currently employed?

12       A.   Davidoff Malito.

13       Q.   In what position?

14       A.   I work for Mr. Davidoff as his assistant, legal

15   secretary.

16       Q.   What's his position?

17       A.   A senior partner.

18       Q.   What sort of work does he do?

19       A.   Governmental work, legal work.

20       Q.   When you say "governmental work," what does that mean?

21       A.   Deals with government agencies.

22       Q.   Does he do lobbying work?

23       A.   Yes.

24       Q.   Do you know on whose behalf he does lobbying work?

25       A.   No.

1      Q.   And Davidoff is one of the law firms bringing this
2  litigation, right?
3      A.   Yes.
4      Q.   What's your current salary?
5      A.   Sixty.
6      Q.   Sixty Thousand?
7      A.   Yes.
8      Q.   You reside in Staten Island?
9      A.   Yes.
10     Q.   And who is your City Council representative, if you
11  know?
12     A.   I have no idea.
13     Q.   Do you know your council district?
14     A.   No.  I live in Staten Island.  I do nothing there.  I
15  work, go to the City and come home.
16     Q.   I completely understand.  Do you have any particular
17  interest in any candidate on Staten Island or elsewhere in the
18  coming New York City race in the 2009 coming cycle?
19     A.   I might.
20     Q.   Anyone in particular you can name?
21     A.   The Staten Island Borough President.
22     Q.   Do you know at this point who is running in 2009?
23     A.   No.
24     Q.   Do you know who will be running for the New York
25  council district in 2009?

RUSSO

6

1       A.    I have no idea.

2       Q.    Nor do I.

3       A.    I don't know.  I don't even know what district I am in.

4       Q.    Any idea who is running for mayor in 2009?

5       A.    Bloomberg.  That's all I know.

6       Q.    You're talking about the current Mayor?

7       A.    Yes.

8       Q.    And how about for Comptroller, do you know who is

9    running for controller?

10      A.    No.

11      Q.    And Borough President in Staten Island, I guess I asked

12   you?

13      A.    Molinari, that's the president now.

14      Q.    And do you know if he is going to be running again?

15      A.    No.

16      Q.    How about public advocate in 2009, do you know who is

17   running for public advocate in 2009?

18      A.    No.

19      Q.    Have you ever contributed to any political office in

20   New York City for any campaign?

21      A.    No.

22      Q.    Why not?

23      A.    I didn't have the money.  I was a single parent.

24      Q.    Are you still?

25      A.    My children are grown.  I am a grandparent.

RUSSO

7

1    Q.    In the 2005 campaign, did you give any money?

2    A.    I wasn't in the position then to give. I may be now.

3    Q.    Was your financial position different in 2005?

4    A.    Sure.

5    Q.    Can you explain it?

6    A.    I was becoming a grandmother and giving baby showers

7    and marrying a daughter off and paying for giving gifts and

8    having grandchildren and buying gifts. There has been a lot of

9    family functions. That's where the money went to, let's just

10   say.

11   Q.    And based on my knowledge, that doesn't stop?

12   A.    No, it never does.

13   Q.    So have you contributed to any campaigns anywhere, not

14   only in the City, but at the federal or state level?

15   A.    No.

16   Q.    Do you have any idea if you are planning on

17   contributing in the coming election cycle?

18   A.    I might.

19   Q.    Do you know to whom?

20   A.    Probably for the Borough President, since I live there.

21   Q.    Any idea, again, just ballpark, how much money you

22   would set aside for that?

23   A.    I have no idea.

24   Q.    Even ballpark?

25   A.    I have no idea.

RUSSO

8

1    Q.    Are we talking hundreds or thousand?

2    A.    Not thousand, never.

3    Q.    Why would you contribute at this time and not other

4    times?

5    A.    I am more interested now in what's going on.

6    Q.    What particular things are you interested in?

7    A.    What goes on on the Island, the effects of what goes

8    on, the transportation, whatever.

9    Q.    Do you know what role the Borough President has in

10   that?

11   A.    No, but I am sure when you have a complaint or

12   something, I would send something to him and I am sure he would

13   look into something.

14   Q.    Have you ever done that in the past?

15   A.    Yes.

16   Q.    What have you done?

17   A.    We complained when they rerouted our buses.  I go

18   through Jersey and they made us go through Brooklyn and Manhattan

19   downtown and it was a horror.  It took over two hours and we

20   called them up every day and signed petitions.

21   Q.    To Molinari?

22   A.    We used to call him at 7:00 at night, because we were

23   sitting on a bridge at 7:00, on the Verrazano Bridge.

24   Q.    When you say we --

25   A.    The whole bus was hollering.

RUSSO

9

1    Q.   Do you know the contribution limits applicable to the

2   Borough President's office?

3    A.   No.

4    Q.   I just want to ask you a couple of questions about the

5   firm.  Does the firm encourage its employees to contribute to

6   campaigns?

7    A.   No.

8    Q.   Has the firm ever asked you to contribute to campaigns?

9    A.   No.

10   Q.   Do you know if the firm has collected money from

11  employees to contribute to campaigns?

12   A.   Not that I know of.

13   Q.   You are a Plaintiff in this lawsuit?

14   A.   Yes.

15   Q.   Why did you join the lawsuit?

16   A.   I didn't -- like, because I am registered, because I

17  work for Sid, I didn't know why I had to have a certain limit.

18   Q.   How did you learn about that there was a limit?

19   A.   I read about it.

20   Q.   Did he talk to you about it?

21   A.   No, I read the paper.

22   Q.   How did you come to join the lawsuit?

23   A.   I called the attorney.

24   Q.   And how did you even know about which attorney to call?

25   A.   I called Bopp's office.

RUSSO

10

1    Q.    How did you know about Bopp's office?

2    A.    Because I worked for Sid.

3    Q.    What is that connection?

4    A.    I knew there was going to be a lawsuit on it, so I said

5    I would be a good Plaintiff.  Maybe I want to give something.

6    When I found out I had to be registered, I didn't like it.

7    Q.    What, to your knowledge, is Mr. Davidoff's relationship

8    to Bopp, the Bopp firm?  How do they know each other?

9    A.    They were retained.  I don't know how it was done.

10   Q.    Who contacted whom?  In other words, did your firm

11   contact Mr. Bopp's firm?

12   A.    Mr. Bopp was contacted, interviewed.

13   Q.    How did the information get to you?

14   A.    I am his secretary.  I do the calling and make

15   appointments.

16   Q.    So you came to learn of it through that process?

17   A.    Of course, yes.

18   Q.    Did you ever talk to Mr. Davidoff about the case, about

19   why it would be important to be involved in it anything like?

20   A.    No, I just didn't like I was limited because of him.

21   Q.    What did you do to get involved?

22   A.    When he told me I was registered and I didn't know why

23   and he explained it to me and I said, "Really?  I want to have a

24   right to do what I want to do."

25   Q.    He did not ask you to join?

RUSSO

12

1          MR. LA RUE:  Objection.  It calls for a legal

2    conclusion.

3      A.   To me it was a burden because I work for him 9:00 to

4    5:00.  I don't live with him.  I do what I want.

5      Q.   If you can, only answer the question.

6    How were your First Amendment rights burdened?

7          MR. LA RUE:  Same objection.  You can answer.

8      A.   I want to do what I want to do, give what I want to

9    give.  It's my choice, not Sid's.

10     Q.   And your 14th Amendment rights?

11         MR. LA RUE:  Objection.  You may answer.

12     A.   I do what I want.

13         MR. PINES: That's it.  Nothing further.  Thank you

14   very much.

15         (Whereupon, at 10:00 a.m., the Examination of this

16   Witness was concluded.)

17

18

19                    _____
                              MICHELE RUSSO

20

     Subscribed and sworn to before me

21   this 21st day of July 2008.

22   _____

23        NOTARY PUBLIC

24

25

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

RUSSO

13

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        )

4                            :  SS.:

5    COUNTY OF KINGS          )

6

7            I, KATE FRANCOMACARO, a Notary Public for and within

8    the State of New York, do hereby certify:

9            That the witness whose examination is hereinbefore set

10   forth was duly sworn and that such examination is a true record

11   of the testimony given by that witness.

12           I further certify that I am not related to any of the

13   parties to this action by blood or by marriage and that I am in

14   no way interested in the outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto set my hand this

16   27th day of June, 2008.

17

18                    *Kate Francomacaro*

19                    KATE FRANCOMACARO

20

21

22

23

24

25

# ORIGINAL

1   UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
    TOM OGNIBENE, YVETTE VELAZQUEZ BENNETT, VIVIANA
3   VAZQUEZ-HERNANDEZ, MARTIN DILAN, MARLENE TAPPER,
    LEROY COMRIE, ROBERT PEREZ, FRAN REITER, SHEILA
4   ANDERSEN-RICCI, MARTINA FRANCA ASSOCIATES, LLC,
    DENIS GITTENS, OSCAR PEREZ, MICHELE RUSSO,
5   THE KINGS COUNTY COMMITTEE OF THE NEW YORK STATE
    CONSERVATIVE PARTY, and THE NEW YORK STATE
6   CONSERVATIVE PARTY,

7                                       PLAINTIFFSs,

8               -against-          Case No:
                                   08cv01335
9                                  (LTS)(TDK)

10  FREDERICK A.O. SCHWARZ, JR., in his
    official capacity as Chairman of New York
11  City's Campaign Finance Board; DALE C.
    CHRISTENSEN, JR., JOSEPH P. PARKES, S.J,
12  KATHERYN C. PATTERSON, and MARK S. PIAZZA,
    in their official capacities as Members of
13  New York City's Campaign Fiance Board;
    MARK DAVIES, in his official capacity as
14  Executive Director of the New York City
    Conflicts of Interest Board; MONICA BLUM,
15  STEVEN ROSENFELD, ANDREW IRVING, ANGELA M.
    FREYRE, in their official capacity as
16  Members of New York City's Board of
    Conflicts of Interest; and MICHAEL
17  McSWEENEY, in his official capacity as
    Acting City Clerk of New York City,

18
                                       DEFENDANTS.
19  ------------------------------------------------X

20

21              DATE:   June 18, 2008

22              TIME:   9:46 A.M.

23

24  (Caption continued on following page.)

25

```
 1                        DATE:   June 18, 2008

 2                        TIME:   9:46 A.M.

 3

 4

 5              EXAMINATION BEFORE TRIAL of the Plaintiff,

 6        MARLENE TAPPER, taken by the Defendants, pursuant

 7        to a Order and to the Federal Rules of Civil

 8        Procedure, held at the offices of Michael A.

 9        Cardozo, Esq., Corporation Counsel, New York City

10        Law Department, 100 Church Street, New York, New

11        York 10007-2601, before Shawn McCline, a Notary

12        Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

M. TAPPER

1    M A R L E N E    T A P P E R, called as a

2    witness, having been first duly sworn by a Notary

3    Public of the State of New York, was examined and

4    testified as follows:

5    EXAMINATION BY

6    MR. PINES:

7        Q.    Would you please state your name for

8    the record?

9        A.    Marlene Tapper.

10        Q.    Would you please state your address

11    for the record?

12        A.    25-11 89th Street, East Elmhurst, New

13    York 11369.

14        Q.    Good morning, Ms. Tapper.  My name is

15    Jonathan Pines.  I'm an attorney with the New York

16    City Law Department representing the Defendants in

17    the lawsuit that you and others have brought.

18            I just -- before I begin or as we

19    begin, I just want to ask you, have you ever given

20    a deposition in any other case?

21        A.    Yes.

22        Q.    So you're familiar with the process?

23        A.    Yes.

24        Q.    What was that case?

25        A.    Specific?

6

M. TAPPER

1        A.       Well, go ahead, I'm sorry.

2        Q.       What occupies your time?

3        A.       I ran for City Council in 2005.  Upon

4    completion of doing that my father was diagnosed

5    with leukemia and because I was the one that

6    wasn't currently working of the siblings and my

7    mom would not have been able to keep executive --

8    she works for the City of New York and she has

9    executive level benefits, so she would not be able

10   to keep those if she retired, so then I took on

11   the role.  I mean he was still good, but taking

12   him to the doctor, being supportive, so that's

13   what I did until he died.

14       Q.       Understood.

15                I understand from your Declaration

16   that you filed in this action that you are

17   politically active; that's correct, yes?

18       A.       One hundred fifty percent.

19       Q.       Can you give me your political

20   background, the various activities you've done in

21   the political arena?

22       A.       Do you want me to start from now

23   going back?

24       Q.       Sure.

25       A.       First campaign was Geraldine Ferraro

M. TAPPER

1    in 1984 in high school.  Last campaign just come

2    off of was Obama as a surrogate and delegate.

3         Q.    Are you still active in the Obama

4    campaign?

5         A.    No.

6         Q.    Do you plan to join the campaign

7    later?

8         A.    I'm running right now for office.

9         Q.    You are?

10        A.    Correct.

11        Q.    What position are you running for?

12        A.    Assembly.

13        Q.    For the State Assembly?

14        A.    Correct.

15        Q.    New York State?

16        A.    Correct.

17        Q.    We'll get to that in a moment.

18              So currently your political activity

19    is geared toward your campaign?

20        A.    Correct.

21        Q.    Have you been publicly announced at

22    this point?

23        A.    No.

24        Q.    Did any of the activities you did,

25    the political activities, involve fundraising

M. TAPPER

1    require that you know whether everything is

2    accurate, but what I will ask is that without

3    pouring through every document, if looking through

4    it you know that some person is missing because

5    you simply knew they contributed, add that name,

6    that's all.

7                    I'm more interested to know not that

8    there is any irregularity.  I just wanted to know

9    if the CFB record is missing something that you

10   can provide me.

11                   But as you'll see in the subsequent

12   questions I ask you, it's not really critical.

13   But as I said, I wanted to ask just to be on the

14   safe side.

15                   So let me just continue on.

16                   I take it from your prior statements

17   that in this list there are no LLPs, LLCs or

18   partnerships?

19       A.    None.

20       Q.    Now, how many of the people on this

21   list, if you could, if you know, would be people

22   who would be identified as doing business under

23   the current law with New York City?

24       A.    None.

25       Q.    So these are all individual

M. TAPPER

1      contributors who would not be prohibited under

2      current law?

3              A.      Correct.

4              Q.      Did you receive contributions from

5      any unions?

6              A.      Yes.

7              Q.      Can you identify those?

8              A.      The Carpenters and the Steamfitters.

9              Q.      Is it your position that unions

10     should not contribute under an ideal campaign

11     finance system?

12             A.      No.

13             Q.      You think they should be able to?

14             A.      Right.

15             Q.      Why is that?

16             A.      I think everyone should be able to.

17     I don't think one group should be allowed or

18     another one not.

19             Q.      So you think that basically all

20     organizations and individuals should be able to

21     give without any prohibitions?

22             A.      On equal standing.

23             Q.      And with no restrictions, whatsoever?

24             A.      I mean, that's a blanket statement,

25     so I can't agree to that.

M. TAPPER

1    have, I don't remember, but it was accepted.

2         Q.    Right, I'm not questioning, I was

3    just asking.  Actually, I was asking because I

4    thought there was a typo, I couldn't figure out.

5         A.    Probably it's Virginia.  It should be

6    Virginia.

7         Q.    How many contributions, looking over

8    this thing, over your disclosure statement,

9    Exhibit D, if you can give a ballpark or just look

10   through, how many contributions exceeded $250?

11              (Witness perusing the document.)

12   BY MR. PINES:

13        Q.    Actually, the record should reflect,

14   in fact, that you may see it, the copy that I

15   checked, I put placed checks marks on the right

16   side.

17        A.    Not including myself, right?

18        Q.    You know, we can indicate both, but?

19        A.    I don't know.  I don't think there is

20   five.

21        Q.    Just, again, let me just complete

22   this for the record.

23              The check marks on the right margin

24   were check marks that I placed in looking over

25   this based upon my review of contributions in

M. TAPPER

1    excess of 250.

2                    I'm not vouching that it's a hundred

3    percent accurate.  I might have missed one last

4    night, but...

5            A.      Where is your paralegal?

6                    (Witness perusing the document.)

7            A.      Seven including myself, you have

8    seven check marks, right?

9            Q.      Right.  I saw seven myself and you

10   and your family were three of them, right?

11           A.      I was three.

12           Q.      So you just gave -- they are three

13   because they were given at different times, you

14   put money in at different intervals?

15           A.      Yes.  Some them were loans which are

16   not indicated on this type of report.

17           Q.      They were loans then you paid them

18   back?

19           A.      Some were paid back.

20           Q.      I'm sorry, forgive me, I don't really

21   know the mechanics, how does that work?

22           A.      Because when you look at this report,

23   it doesn't give you the explanation of everything

24   that was done.  So it just gives you

25   contributions.  It doesn't let, you know, that,

M. TAPPER

1    public financing system?

2              A.      Except for staff, staff can't be

3    matched.

4              Q.      Is that the reason?

5              I just had a question, I think the

6    last contribution on the very last page, it

7    appears, and correct me if I'm wrong, my

8    understanding is that on the right-hand column

9    there are dollar figures, there is a dollar

10   figure.  There are two dollar figures.  There is a

11   dollar figure and underneath that there is another

12   one.

13             My understanding is that the one

14   underneath is how much was qualified for matching;

15   is that your understanding as well?

16             A.      I don't know.  I'm sorry, where are

17   you reading?

18             Q.      Looking at Dennis Zafrios, the last,

19   if you know?

20             A.      I don't remember.

21             Q.      I'm just noting that Zafrios it looks

22   like he gave 250 and it looks like zero was --

23             A.      Oh, he is out of state.  Out of state

24   can't match.

25             Q.      So the majority of your contributors,

M. TAPPER

1          though, am I correct, were basically eligible for

2          the 4-to-1 match for contributions up to 250?

3                    A.      Correct.

4                    Q.      To your knowledge, is it true that if

5          you were returning today with the same

6          contributions from the same people, they would

7          have been matched 6-to-1 up to $175?

8                    A.      That's what I've been told.  I have

9          not sat down and gone through the new CFB class.

10                   Q.      Do you know approximately how much

11         money you collected in your 2005 campaign?

12                   A.      How much I did?  No.

13                   Q.      You don't remember?

14                   A.      I mean, it's between 22 and 25.

15                   Q.      Okay, but you qualified for the

16         match?

17                   A.      Oh, yes.

18                   Q.      Which was the 21,6?

19                   A.      Correct, ballpark, right.

20                   Q.      Did you solicit contributions from

21         unions or neighborhood organizations?

22                   A.      Yes.

23                   Q.      How did you do that?

24                   A.      Unions, not neighborhood

25         organizations.

M. TAPPER

1    statement.   I don't know what that means.

2           Q.     Well, I'm just asking you whether you

3    feel that it's -- it would be preferable to have

4    all special interests have access to candidates to

5    contribute?

6           A.     Right.   Not knowing what the term

7    special interests is defined as from you, I think

8    that everyone should be on the same playing field.

9           Q.     Okay.

10           Similar question, based on your

11    experience as a political activist and as a

12    politician, is there a public perception, to your

13    knowledge, that campaign contributions by

14    lobbyists may influence the actions of elected

15    officials?

16           A.     Yes.

17           Q.     And do you think that's a good thing?

18           A.     No.

19           Q.     Do you believe that people who do

20    business with the City favor incumbent officials

21    when making contributions?

22           A.     Yes.

23           Q.     Do you think that's a good thing?   Do

24    you think it should be regulated in some way?

25           A.     Certain regulations, yes.

M. TAPPER

1          Q.     And can you describe what you think

2     would be appropriate regulation?

3          A.     At this time I'm not prepared to do

4     that.

5          Q.     What's your opinion of the fact that

6     public funding has been increased from the ratio

7     of 4-to-1 to 6-to-1 under the new system?

8          A.     It's not implemented correctly,

9     hasn't been, and I think it's going to be worse

10     now.

11          Q.     Why is that?

12          A.     Because the finance law stipulates

13     that if the person that you're running against out

14     spends you, you're supposed to be moved up to

15     5-to-1 or 6-to-1 from the 2005 race, which we're

16     talking about.

17          Q.     What do you mean 5-to-1 to 6-to-1

18     from the 2005 race?

19          A.     If they match you 4-to-1 in 2005, so

20     if the candidate that you're running against is a

21     Bloomberg, right, you get matched 6 to 1.

22               If it was someone who was a little

23     bit, you know, lower scale, you get matched 5 to

24     1, right.

25               There is no -- so there is no way to

M. TAPPER

1    prove to the Campaign Finance Board doesn't --

2    when you make an initial call to say this person

3    is spending A, B, C, D, E, they do not investigate

4    to find out if it should be given 5-to-1 or 6-to-1

5    matching based on the other candidates

6    expenditures.

7         Q.    What's the basis of your knowledge

8    about this?

9         A.    Excuse me?  Personal knowledge in my

10   campaign.

11        Q.    In your campaign when?

12        A.    When I ran in 2005.

13        Q.    Right.  But I'm asking you about the

14   6-to-1 match currently, how do you know that they

15   wouldn't give a 6-to-1 match?

16        A.    Because the campaign finance law

17   doesn't stipulate that they have to investigate

18   prior to the election if it's applicable.

19        Q.    But you haven't seen it applied yet;

20   is that correct?

21        A.    It wasn't applied in the 2005.  It

22   wasn't applied in the 2003 election.  So even

23   though they were being outspent 5 and 6-to-1, and

24   the law says they would receive matching funds for

25   5 and 6-to-1, the campaign finance law doesn't

66

M. TAPPER

1    provide a means for that to be done immediately.

2         Q.    To your knowledge, what you're saying

3    is that the current law does not give candidates a

4    6-to-1 match for every dollar they receive up to

5    $175?

6         A.    No, I can't say that because it

7    hasn't been done yet.  I'm talking about what has

8    been done in the past.

9         Q.    But I was asking you, you said --

10        A.    And I said that it's probably going

11   to be even more flawed now since it's gone up to

12   6-to-1 for $175.

13        Q.    But you're not basing it on any

14   knowledge of current practice under the new law;

15   is that correct?

16        A.    Well --

17        Q.    Isn't that correct?

18        A.    The current law hasn't been put into

19   practice.

20        Q.    Well, it was put into practice

21   actually already in the special election --

22        A.    With in --

23        Q.    In Tom Ognibene's former district?

24        A.    Right.

25        Q.    So it was put in practice in that

M. TAPPER

1          case, but you don't have knowledge about that, how

2          it was applied in that particular race; is that

3          correct?

4                    A.     No, I didn't follow their finance.

5                    Q.     So you haven't seen the 6-to-1

6          applied, you don't know anything about how the

7          6-to-1 match it being applied under the new law?

8                    A.     Right.   But it's under the new law.

9          If a person is outspending you 12-to-1 or

10         something, can you get additional funding?

11                   Q.     I'm not going to answer your

12         questions, it's my role to ask questions in this

13         deposition.

14                         But I just want to know the extent of

15         your knowledge of the 6-to-1 match.

16                         What you're saying is:  You haven't

17         seen it in operation, so you're basing your

18         statement on your experience with the prior one?

19                   A.     The 2005.

20                   Q.     That's fine.

21                         Are you aware of the term

22         "pay-to-play"?

23                   A.     Pay-to-play?

24                   Q.     Pay-to-play.

25                   A.     No.

M. TAPPER

1          Q.      Are you aware of the concept of

2     basically money buying access that people who want

3     favorable treatment from legislators contribute in

4     order to get the access they are looking for?

5          A.      I have no personal knowledge.

6          Q.      Okay.

7                  You have no awareness of the term or

8     the concept of pay-to-play as I've just described

9     it?

10         A.      No.

11         Q.      Do you think it would be a good idea

12    to limit the public appearance of pay-to-play, in

13    other words, paying money to get access to elected

14    officials?

15         A.      Using your definition, because I'm

16    not familiar with the term?

17         Q.      Yes.

18         A.      Yes.

19         Q.      Based, again, on your experience as a

20    political activist and Obama supporter, do you

21    think it's a good idea to provide incentives for

22    small contributions from individuals, for example,

23    by using public matching funds to multiply the

24    financial impact of individual contributions?

25         A.      Could you repeat that, please?

M. TAPPER

1       Q.      Sure.

2               Based on your experience as a

3   political activist and an Obama supporter, do you

4   think it's a good idea to incentivize small

5   contributions from individuals, for example, by

6   the multiplier, by the 6-to-1 match for individual

7   contributions?

8       A.      Yes, absolutely.

9       Q.      How did you become involved in this

10  litigation?

11      A.      I contacted them.

12      Q.      How did you learn of the litigation?

13      A.      *New York Times*.

14      Q.      Were you a member of the original

15  group of Plaintiffs in the case when the case was

16  first brought?

17      A.      I don't recollect the date that the

18  -- I don't know.  I don't remember.

19              MR. LA RUE:  She was.  We can

20          stipulate that she was.

21  BY MR. PINES:

22      Q.      So are you saying you read about the

23  lawsuit before the lawsuit was commenced?

24      A.      I read about the...

25      Q.      The lawsuit before it was commenced

M. TAPPER

1          A.     I don't know.   I would have to look

2     back at the specials that went on to see if

3     anybody was impacted.

4          Q.     But what you were testifying to just

5     previously, you were talking really about your

6     2005 election?

7          A.     Correct.

8          Q.     Okay.

9               MR. PINES:   I have nothing further.

10              MR. LA RUE:   Very good.

11

12              (Whereupon, at 11:19 a.m., the

13         Examination of this Witness was concluded.)

14

15

16     _____

                    MARLENE TAPPER

17

18     Subscribed and sworn to before me

19     this 22nd day of July, 2008.

20     _____

              NOTARY PUBLIC

21

22                    KAREN A. COLBOURNE-LITTLE
                      Notary Public, State of New York
23                    No. 04CO6179969
                      Qualified in Queens County
                      Commission Expires January 7, 20 12

24

25

M. TAPPER

C E R T I F I C A T E

STATE OF NEW YORK        )
                         :  SS.:
COUNTY OF NEW YORK       )

1

2

3

4

5    I, SHAWN McCLINE, a Notary Public for and

6    within the State of New York, do hereby certify:

7    That the witness whose examination is

8    hereinbefore set forth was duly sworn and that

9    such examination is a true record of the testimony

10   given by that witness.

11   I further certify that I am not related to

12   any of the parties to this action by blood or by

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15   IN WITNESS WHEREOF, I have hereunto set my

16   hand this 25th day of June, 2008.

17

18   _____

19                SHAWN McCLINE
     Registration #01MC6000688
20   Commission Expires 8/24/10

21

22

23

24

25

# ORIGINAL

1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
    TOM OGNIBENE, et al.,
3

4                                    PLAINTIFFS,

5        -against-               Case No.
                                 08cv013335
6                                (LTS)(TDK)

7   SCHWARTZ, et al.,

8                                    DEFENDANTS.
    ------------------------------------------------X
9

10                        DATE:  June 20, 2008

11                        TIME:  12:00 noon

12

13

14            EXAMINATION BEFORE TRIAL of the Plaintiff,

15   VIVIANA VAZQUEZ-HERNANDEZ, taken by the Defendants, pursuant

16   to a Court Order, held at the office of Special Federal

17   Litigation, New York City Law Department, 100 Church Street,

18   New York, New York 1007-2601, before JoAnn Vancosky, a

19   Notary Public of the State of New York.

20

21

22

23

24

25

2

1    A P P E A R A N C E S:

2

3

4    BOPP, COLESON & BOSTROM, ESQS.
          Attorneys for the Plaintiffs
5         The National Building
          1 South Sixth Street
6         Terre Haute, Indiana 47807-3510
          BY:   JOSEPH LA RUE, ESQ.
7

8

     MICHAEL A. CARDOZO, ESQ.
9    CORPORATION COUNSEL
     NEW YORK CITY LAW DEPARTMENT
10        Attorney for the Defendants
          100 Church Street
11        New York, New York 10007-2601
          BY:   ANDREW J. RAUCHBERG, ESQ.
12             -and-
          JESSE I. LEVINE, ESQ.
13        Special Assistant Corporation Counsel
     FILE #:  2008004838
14   CONTROL #:  III0228

15

16

17

     ALSO PRESENT:
18
          HILLARY WEISMAN, ESQ.
19        Deputy General Counsel
          New York City Campaign Finance Board
20            40 Rector Street, 7th Floor
              New York, New York 10006
21

22

23

24        *          *          *

25

1    V I V I A N A    V A Z Q U E Z- H E R N A N D E Z, called as

2    a witness, having been first duly sworn by a Notary Public

3    of the State of New York, was examined and testified as

4    follows:

5    EXAMINATION BY

6    MR. RAUCHBERG:

7        Q.    Please state your name for the record.

8        A.    Viviana Vazquez-Hernandez.

9        Q.    Where do you reside?

10       A.    138 23rd Street, apartment 1, Brooklyn, New York

11   11232.

12       Q.    All right.  Good morning.

13       A.    Good morning.

14       Q.    How do I pronounce your name, by the way?

15       A.    Viviana Hernandez, would be fine.

16       Q.    So it's Vazquez-Hernandez?

17       A.    But you can say Mrs. Hernandez, if you'd like,

18   I'm married and that's fine.

19       Q.    Mrs. Hernandez, okay.  I may use that, if I may.

20       A.    Sure.  Or Viviana would be fine.

21       Q.    Very good.

22             Well, my name is Andrew Rauchberg, and I'm an

23   attorney that represents the defendants in this matter, and

24   in the lawsuit that you guys have brought.  Have you ever

25   had your deposition taken before?

22

V. VAZQUEZ-HERNANDEZ

1    were doing business with the City of New York?

2        A.    Some of the people that I solicited campaign

3    contributions were from, I think there was one or two people

4    from sanitation.  There were other business leaders that I

5    solicited from.  At that time, I wasn't as known, so, you

6    know, it wasn't as forthcoming as it would be now, if I were

7    to run.

8        Q.    Now, you said people, if I understood you

9    correctly, who worked for sanitation?

10       A.    Yes, worked for sanitation.

11       Q.    That worked for the Sanitation Department or?

12       A.    Department, um-hum.

13       Q.    But not people who --

14       A.    No, no.

15       Q.    -- were principals in the companies who had

16   sanitation contracts with the City?

17       A.    No, no, no.

18            MR. RAUCHBERG:  And then you also said,

19            I'm sorry, the second half of that answer a

20            little while ago was something to do with

21            business leaders, can you read that portion

22            back, please?

23            (Whereupon, the requested portion of the

24            record was read back, by the reporter.)

25       A.    And that was, for example, from people, business

V. VAZQUEZ-HERNANDEZ

1    people on like Fifth Avenue, there were some -- there was

2    one particular individual that was part of the carpenters

3    union and they did contribute at the end of my campaign

4    $1,000, to the campaign.

5        Q.    Now, this was an individual who was a member of

6    the carpenters union or the carpenters union?

7        A.    He introduced me to the president of the

8    carpenters union that he worked for, the local, and I had an

9    interview and they endorsed me and gave me $1,000.

10       Q.    I'm going to return to that in a moment,

11   actually.  So if I understood correctly, during your 2005

12   campaign, did you not specifically identify or distinguish

13   individuals who you knew were doing business with the City,

14   your approach was --

15       A.    Mine was mostly grass roots.

16       Q.    Okay.

17       A.    Grass roots.

18            MR. RAUCHBERG:  Well, let me -- could you

19            mark this, please.

20            (Whereupon, the aforementioned document

21            was marked as Defendants' Exhibit K for

22            identification as of this date by the

23            reporter.)

24       Q.    So Mrs. Hernandez, actually I'll give you the

25   official copy so your attorney can consult that one.  I'm

33

V. VAZQUEZ-HERNANDEZ

1  that I don't remember his name. Anyway, he suggested, you

2  know, some of the format and then my husband and I, my

3  husband is a professional and he, you know, basically he and

4  I worked together on a fundraising letter that would

5  highlight my qualifications, my intentions, and solicit

6  money.

7       Q.    And who was the letter sent to?

8       A.    The people on this list, and throughout the

9  neighborhood and to friends and relatives.

10      Q.    Did you make any other fundraising efforts, in

11 2005?

12      A.    No.

13           MR. RAUCHBERG:  Can we take five minutes

14           for a moment?

15           (Whereupon, a short break was taken.)

16           MR. RAUCHBERG:  Back on the record.

17      Q.    Thank you.  And of course, you're still under

18 oath.

19      A.    Yes.

20      Q.    Very good.  So did you intend to run for City

21 Council in 2009, at any point in time?

22      A.    Not -- not now.

23      Q.    Not now.  But at one point in time you were

24 considering it?

25      A.    If I had the proper funding.

V. VAZQUEZ-HERNANDEZ

42

1    you recall what the percentage of the vote you received was?

2        A.    23 percent.

3        Q.    23 percent?

4        A.    Unheard of for a Republican in a Democratic

5    area.

6        Q.    Are you aware of any businesses within your

7    council -- well, which district did you run for in 2005?

8        A.    38th Council District.

9        Q.    And within the 38th Council District, do you

10   know of any businesses there that do business with the City,

11   as that term is defined in the Campaign Finance Law?

12                MR. LA RUE:   I'm going to object on the

13                record that it calls for a legal conclusion

14                under the law, but you may answer because he

15                asked, do you know.  Go ahead.

16       A.    I imagine there would be.

17       Q.    Do you know of any, in particular?

18       A.    At the present moment, I haven't identified any.

19       Q.    Let me ask you Mrs. Hernandez, then, please, do

20   you consider yourself a politician?

21       A.    A stateswoman.

22       Q.    A stateswoman.  Would you call yourself an

23   activist?

24       A.    Yes.

25       Q.    So based on your experience, as both an activist

43

V. VAZQUEZ-HERNANDEZ

1    and a stateswoman, do you feel there is a public perception

2    that campaign contributions by persons who have business

3    dealings with the City would be likely to influence the

4    actions of elected officials?

5            A.    In certain cases, they may, but I will tell you

6    this.  When I received the funding from the carpenters

7    union, I said I want this contribution given because you

8    feel that I would effectively represent you, not because

9    you're expecting any of my votes to go your way.  And I put

10   that on the line whenever I accept a contribution from

11   anyone.

12               Others, other people's, whether illegal

13   dealings or other motivations, shouldn't ruin it for people

14   like myself who is honest and who wants a fair chance.

15           Q.    So you make it clear to people who donate to

16   your campaigns that that donation is not the start of some

17   sort of a quid pro quo arrangement --

18           A.    Definitely.

19           Q.    -- to get them favorable treatment in the past?

20           A.    Sorry.  Yes.

21           Q.    I'm sorry, in the future, favorable treatment in

22   the future.  Thank you.

23               So then would you agree that such -- let me

24   say it this way.  Would you agree that a perception that

25   public officials can be influenced by donors is a bad thing?

V. VAZQUEZ-HERNANDEZ

44

1      A.    Definitely.

2      Q.    And based on your experience, do you also think

3  that there is a perception that campaign contributions from

4  lobbyists might influence the actions of elected officials?

5      A.    Yes.

6      Q.    Do you believe that people who do business with

7  the City favor incumbent officials when they make

8  contributions?

9      A.    Most that I've seen, yes.

10     Q.    Why do you think that is?

11     A.    Because they want influence. However, a person

12  wanting influence, it shouldn't be across the board to

13  affect other people.  So there has to be checks and

14  balances, but they have to be led out fairly.

15     Q.    Do you believe that campaign contributions by

16  lobbyists ever, in fact, influence the actions of elected

17  officials?

18     A.    I don't have personal knowledge, but I've heard

19  in the media that it does.

20     Q.    Do you have a sense of how that might happen,

21  how that influence might be wielded or only -- I'm sorry,

22  does that make any sense, how that influence might be

23  wielded?

24     A.    For the same reason, but that doesn't mean you

25  throw out the baby with the bath water.

V. VAZQUEZ-HERNANDEZ

45

1    Q.    What do you mean by that, when you say that, it
2    doesn't mean we should throw out the baby with the bath
3    water?

4    A.    To curtail contributions or eliminate matching
5    funds just on the basis that other people have done illegal
6    things or wielded influence is not fair.  So I'm saying,
7    you're throwing out the baby with the bath water.  You're
8    curtailing your client, or whoever you're representing,
9    wants to penalize everybody for the actions of, you know,
10   those who use these campaign funding mechanisms improperly.

11   Q.    Let me ask you this:  Are you familiar with the
12   term "paid to play"?

13   A.    Definitely, that's, you know, quid pro quo,
14   right.

15   Q.    So your understanding of paid to play is an
16   arrangement where -- actually, I don't want to put words
17   into your mouth.  Let's take the Latin out and tell me what
18   you mean by quid pro quo.

19   A.    If I were to -- what is it, if I were to give
20   money to your campaign and say that you owe me and you have
21   to legislate in my favor.

22   Q.    Would you agree that it is a good idea to at
23   least limit the fact or the appearance of pay to play in
24   electoral politics?

25   A.    Definitely.

51

V. VAZQUEZ-HERNANDEZ

1    $175 at a 6-to-1 ratio; is that correct?

2              MR. LA RUE:  Same objection.  Please

3          answer.

4    A.    From what I understand, yes. However, I will be

5    seeking other individuals and if the other individuals can't

6    give up to $2,500, they'll be, you know, limited to a lower

7    amount, then I won't be able to get the money.  I can't run

8    a campaign on $25,000 that's going to be effective.  I need

9    big donors and I want them to be able to donate a fair

10   amount, not in excess, but a fair amount, and 250 or lower

11   is not going to cut it for me.  It's going to cut my legs

12   from underneath me.

13             MR. RAUCHBERG:  I have nothing further.

14             THE WITNESS:  Thank you.

15             (Whereupon, at 1:43 p.m., the

16        examination of this witness was concluded.)

17

18

19                _Viviana Vazquez-Hernández_

20                VIVIANA VAZQUEZ-HERNANDEZ

21   Subscribed and sworn to before me

22   this 30h day of July              , 2008.

23                      JADWIGA T. KOSIAK
                        Notary Public, State of New York
                        No. 01K06137013
24   NOTARY PUBLIC     Qualified in Richmond and Kings County
                        Commission Expires Nov. 14

25

V. VAZQUEZ-HERNANDEZ

53

C E R T I F I C A T E

1
2
3
4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF NASSAU         )
6
7
8        I, JoANN VANCOSKY, a Notary Public for and
9    within the State of New York, do hereby certify:
10       That the witness whose examination is
11   hereinbefore set forth was duly sworn and that such
12   examination is a true record of the testimony given by that
13   witness.
14       I further certify that I am not related to any
15   of the parties to this action by blood or by marriage and
16   that I am in no way interested in the outcome of this
17   matter.
18       IN WITNESS WHEREOF, I have hereunto set my hand
19   this 23rd day of June, 2008.
20
21
22                    _JoANN Vancosky_____
23                         JoANN VANCOSKY
24
25

Queens Chronicle - News - 07/31/2008 - <font size=+2> Former City...   http://www.zwire.com/site/printerFriendly.cfm?brd=2731&dept_id...



**07/31/2008**

# Former City Councilman Leaves Politics Behind

**by Ben Hogwood , Assistant Editor**

Don't expect to see longtime Queens politician Tom Ognibene's name on the ballot this year. Or any other year, for that matter.

Tired of running without the support of the Queens County Republican Party, Ognibene is stepping away from politics to focus on his legal practice and dedicate more time to enjoying himself. "I'm playing a lot of golf," he said.

Without Ognibene, this leaves Republican Councilman Anthony Como without a primary challenger in the District 30 race this year. He will run against Democrat Elizabeth Crowley in November.

Ognibene previously served as councilman for the area – which consists of Ridgewood, Woodhaven, Middle Village, Glendale and parts of Richmond Hill – but left due to term limits. In 2005, he challenged Mayor Michael Bloomberg for the city's top seat, but the mayor's camp successfully knocked him off a primary ballot. He went on to run in the race on the Conservative Party ticket, but was defeated soundly by Bloomberg.

When he reappeared this year for the special election to replace former Councilman Dennis Gallagher, he did so without the backing of the party, which instead endorsed Como.

Ognibene said that backing is essential for a successful campaign. "If you don't have that, it's very hard to win," he noted, because the party can get 200 people out on the day of the election to knock on doors and get people to the polls.

Ognibene said he and the party were first set at odds in 2001 under what he called "unfortunate circumstances that were nonsense." He was referring to a guilty plea from his former neighbor, Ronald Latanzio, who pled guilty in 2001 to bribery and evidence tampering. During his plea, he told prosecutors he gave Ognibene bribes, including entertainment, tickets, vacation and campaign contributions, according to published reports. In return, Ognibene supposedly assisted in obtaining variances and jobs for Lattanzio's associates.

The Manhattan district attorney investigated Ognibene, but never pressed charges.

Ognibene also felt betrayed by the party when it encouraged him to run for mayor in 2005, then endorsed Bloomberg. Ognibene said his intent in running was to send a message to the mayor that he wasn't living up to the party's ideals, even though he knew he couldn't defeat Bloomberg in the race.

In the June special election, Ognibene finished third out of a field of four, in front of Democrat Charles Ober.

County GOP Chairman Phil Ragusa said he backed Como in the race before Ognibene expressed an interest. When he found out Ognibene was staging a return, Ragusa tried to talk him out of it. "I said please don't because we'd be shooting ourselves in the foot," he said.

The absence of Ognibene and Ober, who did not seek signatures for a spot on the ballot, leaves a clear path for a rematch between Como and Crowley, who lost the special election by just 41 votes.

So far she has a huge financial advantage on Como, having raised $14,975 to Como's $100.

She expects the presidential race to draw out thousands more voters, especially Democrats, increasing her chance of a victory. "People are coming out to vote for president. In the special election, people I believe, had to be pulled out to vote."

She doesn't believe Como's incumbency will have a large effect on the race.

Como, meanwhile, doesn't think the race is only about money. According to him the best way to get reelected is to do the job the best he can. "Once people see the job I'm doing, campaigning is secondary," he said.

He highlighted his success in securing over $3 million in discretionary funds for his district in the most recent city budget, despite having been in office for little more than a week. School principals, he said, are still calling him thanking him for the money he has brought in for educational needs.

He agreed the presidential race would bring out thousands more voters in November, but didn't see it hurting his chances.

"The voters of this district are very intelligent and smart people who know what they're doing. They know who the candidates are and who they're going to vote for," he said. "I don't believe for this coming election there's an opponent out there that can unseat me for this race."

Ognibene is now throwing his support behind Como and has made peace with the county party.

"I've healed all my wounds with the people of Queens," he said. "I just decided it was time to put all the anxiety and anger behind me. I decided in the interest of the party and in strengthening the party, I have to join the fold and become a productive party member."

*©Queens Chronicle 2008*