UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

TOM OGNIBENE, *et al.*,

                                 Plaintiffs,

                - against -

FREDERICK A. O. SCHWARTZ, JR., *et al.*,

                             Defendants.

------------------------------------------------------------------------x

**DECLARATION OF AMY LOPREST**

08 CV 01335 (LTS) (TDK)

**AMY LOPREST,** under penalty of perjury, declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

        1.       I am the Executive Director of the New York City Campaign Finance Board ("the Board"). As the Executive Director, I have the overall responsibility to ensure that the mission of the Board is accomplished. My responsibilities include overseeing and supervising: (a) legislative initiatives, agency regulations, and advisory opinions concerning the administration of the Campaign Finance Act ("CFA"); (b) the reviewing, processing and auditing of relevant documentation to determine candidates' compliance with contribution and expenditure limits, and all public disclosure and other requirements, as prescribed by the CFA; (c) all matters relating to the development, implementation, coordination and distribution of the New York City Voter Guide; and (d) all aspects of the New York City Debate Program. I was appointed Executive Director of the Board in 2006. I worked at the Board from 1990 to 1992, and 1999 through the present. I previously served in the positions of Assistant Executive Director, Deputy General Counsel, and Director of Campaign Finance Administration.

2.    I have been actively involved in developing and administering the new campaign contribution limits and matching funds restrictions that apply to individuals considered to be "doing business" with the City under the CFA, as amended by Local Laws 34 and 67 of 2007.    In this affidavit, I will explain the history of the CFA, how the Campaign Finance Program works, and how the Board discharged its duty under the New York City Charter to study the "doing business" issue and propose reforms to advance the spirit and intent of the CFA, which is to limit the potentially corrupting influence of large contributions on campaigns, enhance the power and importance of smaller contributions from individuals, and protect the integrity of the investment taxpayers make by funding covered campaigns with matching funds.

3.    In 1988, the City Council responded decisively to well-documented scandals at the local level by creating an innovative system of public financing that sought to lessen the influence of large contributions in City campaigns, amplified the voice of the individual New York City citizens, and enabled more New Yorkers to consider entering public service.    For 20 years, New York City's campaign finance system has been a work in progress that has benefited from continual refinement.    Indeed, the authors of the CFA wisely recognized that, to be effective, the Program must continually evolve to keep pace with the changing environment in which it operates.    Thus, the CFA requires the Board to review the performance of the Program following each election and to make recommendations to the Mayor and the City Council for changes in the law.    Administrative Code of the City of New York ("Admin. Code") § 3-717.    The Board now has the practical lessons derived from two decades of successfully administering the CFA.

4. The Board is charged with administering the City's campaign finance program, which has an overarching goal of reducing the influence of large private contributions

- 2 -

in the political process and increasing the influence of smaller donations from individuals. Since the first election conducted under the Campaign Finance Program in 1989, the Board has distributed more than $95 million to candidates for City office.

5. The New York City Campaign Finance Program is viewed as a model for the nation because of its vigilant stewardship of taxpayer funds. Because of our audit and enforcement expertise, Board officials have been invited to provide assistance to ethics agencies in foreign locations, including the United Kingdom, Bosnia, Nigeria, and Australia.

6. The City's efforts to reform its campaign finance system have been an ongoing process, taken in incremental steps after careful study of the issues, that extends back to 1988, through several City administrations and multiple Charter Revision Commissions, voter referendums, and amendments to the CFA. In short, it is a work in progress that strives to build a program based on the lessons learned from successive election cycles.

### The Campaign Finance Program Overview

7. The New York City Campaign Finance Program (the "Program") is a voluntary government reform program established in 1988 by the CFA. See Admin. Code §§ 3-701, et seq. See also New York City Charter (the "Charter") §§ 1051-52, 57; Campaign Finance Board Rules (the "Rules").

8. The Board administers the Program through which it provides public matching funds to candidates running for Mayor, Comptroller, Public Advocate, Borough President, and City Council member.

9. The Board has five members. Two members of the Board, who must each be from different political parties, are appointed by the Speaker of the City Council, and two more

(also from different political parties) are appointed by the Mayor. The Chair is appointed by the Mayor after consultation with the Speaker. Charter §1052(a)(1).

**General CFA Requirements.**

10. The CFA imposes the following requirements on all candidates, among others: (a) the filing of periodic financial disclosure statements that report the contributions received by the campaign, the campaign's expenditures, and other transactions; (b) limitations on the amount of contributions the campaign may receive from any single contributor; and (c) the obligation to respond to requests for documentation and information from the Board to verify the campaign's compliance with the requirements of the Program. Admin. Code §§ 3-701, *et seq.* Additionally, participating candidates must agree to limitations on the total amount of money the campaign may spend to promote the candidate's nomination or election.[1]

**Matching Funds.**

11. Public matching funds are paid to a participating candidate's campaign based upon contributions reported by the campaign as matchable contribution claims in its disclosure statements submitted to the Board. Private contributions of up to $175 from individuals who reside in New York City are matched at a rate of six dollars in public funds for every one dollar in private contributions (up to $1,050 in public funds per contributor). Thus, a $100 qualifying contribution to a participating candidate by a New York City resident will be matched with $600 in public funds. Admin. Code §§ 3-703, 3-705(1), (2).

---

[1] Candidates who seek to participate in the public financing system are called "participating candidates" or "participants." Candidates who are entirely privately funded are "nonparticipating candidates" or "nonparticipants." Admin. Code §§3-702, 3-703, 3-719. There are also "limited participating candidates" who do not receive public funding but who nevertheless agree to abide by the spending limit. Admin. Code §3-718.

- 4 -

12. Contributions from organizations, including unions and Political Action Committees ("PACs"), are not "matchable."[2] Additionally, as discussed in greater detail below, contributions from certain individuals considered to have business dealings with the City as defined in the law, as well as individuals identified on a lobbyist statement of registration, are not matched. Admin. Code §§ 3-702(3)(g), (h), 3-703(1-a).

13.    In order to qualify for public matching funds, candidates must demonstrate, *inter alia*, that they are on the ballot, are opposed by another candidate who is also on the ballot, and have adequate support from the public by meeting a "threshold" that sets minimum requirements for the amount of money raised and the number of resident individuals (not organizations) who have given monetary contributions to the campaign. Admin. Code § 3-703.

14.    For example, for the 2009 elections, to reach the threshold for eligibility for public financing, a Mayoral candidate must receive at least $250,000 in valid matchable contributions from individual New York City residents, in sums of up to $175 per contributor, and at least 1,000 contributions of $10 or more from New York City residents. Admin. Code §3-703(2)(a)(i).    The CFA sets different, and lesser, total contribution threshold amounts and

---

[2] Under Administrative Code section 3-702(3), a "matchable contribution" shall mean one or more contributions or any portion thereof, "made by a *natural person* resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of" the CFA.    Admin. Code § 3-702(3) (emphasis added).    Under the law, certain contributions are not considered "matchable," including loans, in-kind contributions of property, goods, or services; contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value; money order contributions from any one contributor that are, in the aggregate, greater than $100;   contributions from individuals under the age of eighteen years; and contributions from lobbyists.  Id. §3-702(3).

numbers of valid matchable contributions for the other elective offices covered by the CFA. *See* Admin. Code §3-703(2)(a).

15.    In addition to the requirement that candidates be on the ballot and demonstrate a threshold level of public support, campaigns are not eligible to receive public matching funds unless they demonstrate compliance with all applicable laws, rules and regulations.

**Contribution Limits.**

16. Currently the CFA generally imposes per-person contribution limits for all covered elections held in the same calendar year of $4,950 for the Citywide offices of Mayor, Comptroller or Public Advocate; $3,850 for borough president; and $2,750 for City Council.[3] Contributions exceeding these amounts by up to half the applicable limitation may be made under circumstances set forth in the law, including run-off primary elections and special elections. Admin. Code § 3-703(1)(f).

17. As discussed below, certain individuals who have "business dealings with the City" as defined in the law are subject to lower contribution limits. Additionally, certain types of organizations are not permitted to make any contributions.

**Spending Limits.**

18.    When candidates join the Campaign Finance Program, they agree to limit their overall spending as a condition of seeking public funds. Limits on the amount each campaign may spend reduce the need for candidates to engage in a never-ending chase for the large contributions that fuel the perception of corruption. This reduction in candidates' dependence on wealthy and politically connected contributors, made possible through a

---

[3] Pursuant to Administrative Code §3-703(7), these figures were increased in 2002 to reflect changes in the Consumer Price Index.

combination of public financing and expenditure limits, is one of the chief benefits the public receives for the investment of taxpayer dollars in the Campaign Finance Program.

19.     For the 2009 general election, candidates must abide by the following limits: $6,158,000 for Mayor; $3,850,000 for Public Advocate and Comptroller; $1,386,000 for Borough President; and $161,000 for City Council. Admin. Code § 3-706(1)(a). These limits apply separately to a primary election, special election, or general election, except in special circumstances set forth in the law. Id. If a participant runs against a well-financed non-participant, the spending limit for that election is increased or removed. Id. § 3-706(3).

**1998 Charter Revision Reforms.**

20.     The City's voters approved a Charter amendment through a referendum in the November 1998 election that imposed a mandatory ban on all corporate contributions for all participating candidates. See Charter §1052(a)(12). A ban on corporate contributions was later separately enacted by the City Council, and extended to non-participating candidates. Admin. Code § 3-703(l)(l).

21.     The ban on corporate contributions had a significant impact on increasing the role of individual contributor participation. For the 1997 election, 27 percent of all contributions came from corporations, and 62 percent came from individuals. For the 2001 election, fewer than 1 percent of all contributions came from corporations, and 87 percent came from individuals.

22.     The Charter amendment that was approved by voters in the November 1998 election also required that participating candidates disclose contributions received from "individuals and entities doing business with the city," and that the Board issue "such rules as it

deems necessary" to implement this provision and make the disclosed information available to the public. Additionally, the Charter amendment directed that the Board:

> promulgate such rules as it deems necessary to regulate the acceptance by candidates participating in the voluntary system of campaign finance reform of campaign contributions from individuals and entities doing business with the city, including rules that determine which business dealings shall be covered by such rules.

Charter § 1052(12)(a.)  In its consideration of possible rules, the Board was directed by the Charter to balance factors including (a) the effectiveness of the voluntary system of campaign finance reform; (b) the costs of such a system; and (c) the maintenance of a reasonable balance between the burdens of such a system and the incentives to candidates to participate in the system. Id. § 1052(12)(c).

**Studying "Doing Business" Contributions.**

23. Following the 1998 Charter amendment directing the Board to propose such rules as it deemed necessary  relating to this issue, the Board conducted research, and issued three alternative versions of "doing business" rules for public comment. The Board received limited response to its proposed rules, and no consensus could be reached as to an appropriate definition or how best to regulate these contributions.  There also were no information and resources readily available to use for enforcement purposes.  Thus, by November 2000, the Board concluded it had met its Charter obligations as of that time.

24. Subsequently, in 2004, a local bill was introduced that would have imposed new restrictions on campaign contributions from individuals having business dealings with the City.  This proposed legislation was not enacted.

25. Then, in 2005, two important information resources became available on-line – the Vendor Information Exchange System (VENDEX), containing information about City

vendors, and a database of lobbyists registered with the City Clerk's office. With those resources available, the Board resumed examining how to effectively regulate "doing business" contributions.

26. In 2005 and 2006, the Board held several public hearings relating to regulating campaign contributions by persons "doing business" with the City. The Board heard testimony from both supporters and opponents of further regulation in this area, including specific testimony relating to contractors, lobbyists, and land use, among other issues.

27. Additionally, the Board requested that research concerning "doing business" contributions be conducted by a team of students at the Wagner Graduate School of Public Service at New York University, using newly-available data available from the City's VENDEX and lobbying databases.

28. In 2006, the Board published its Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions ("Interim Report"), a copy of which is attached as Exhibit A. This report was based on the students' research and edited by the Board. The report used a "working definition" of "doing business" that included (1) firms or individuals who were principals of firms who had contracts with the City valued at $100,000 or more; and/or (2) registered lobbyists and lobbyist clients.[4]  Based on a sample of available data, the report found that contributions by "doing business" individuals or entities represented 27.5 percent of donations in the 2001 election cycle ($15.6 million out of $56.8 million donated) and 22.3 percent of donations in the 2005 election cycle ($9.4 million out of $42.3 million donated). (Interim Report at i, 12.)

---

[4] This definition, which was based on available data, differs from the "business dealings" definition that was enacted in Local Laws 34 and 67 in a number of respects.

29. The Interim Report also found that contributors who gave large amounts of money to campaigns were more likely to be "doing business" with the City than smaller contributors. In 2001, only 1.6 percent of persons contributing $250 or less were "doing business" with the City as defined in the Interim Report; in 2005, only 2.5 percent. Among contributors who gave $2,000 or more, in 2001 more than one in five (20.8 percent) were "doing business" with the City; in 2005, which was a less competitive election because there were more incumbents running for reelection, slightly less of these large contributors (16.8 percent) were "doing business."[5] (Interim Report at 7-8, 14.)

30. The report also included case studies of contributions by particular persons who had business interests with the City, including the following examples:

- The report looked at contributions by the concessionaire brothers George and Thomas Makkos, who media accounts indicated had business with the City worth $3 million, including 60 percent of pretzel carts in Central Park. In 2001, the brothers and one of their spouses gave a total of $16,850 in campaign contributions, including $4,350 that was intermediated (or "bundled") by George Makkos. Their business partners in Terrace on the Park restaurant in Queens contributed a combined total of $53,315 in the 2001 elections. (Interim Report at 29-30.)

- The report further noted that, in 2004, 18 of the 50 largest City contracts were held by 16 not-for-profit organizations, with a value of nearly $1.2 billion. The study found that of the officers, directors, trustees and highest-paid employees at those 16 agencies, 139 individuals, or nearly 24%, donated to a City political campaign in the 2001 election cycle. The donations totaled $314,926, for an average of $2,298 per donor. In the 2005 election cycle, 84 individuals, or 15%, donated to a City political campaign. Those donations totaled $201,545 for an average of $2,399 per donor. (Interim Report at 38-40.)

- The report looked at donation patterns by a prominent real estate developer, The Witkoff Group. Donations from Steven Witkoff, his immediate family, company officers, and Witkoff's LLCs totaled $49,750 for 2001 and $43.925 for 2005. In 2005, $7,000 was given to three members of the City Council's Land Use Committee. During this time,

---

[5] Term limits for local offices in New York City first took effect in 2001.

the developer had several pending discretionary land use issues before the Council and other entities involved in approving certain land use changes in the City. These projects included one that "carved out," or exempted, the developer's property from a rezoning of large parts of the West Village that otherwise would have prevented the Witkoff group from building a 200-foot tall tower it had planned for the property. Another developer that did not make campaign contributions did not receive a "carve out" from the rezoning. (Interim Report at 32-34.)

## 2006 Board Recommendations.

31. In its public post-election report on the 2005 elections, the Board made several recommendations for improving the CFA, based on its study and analysis of the law's implementation, and its inquiries into the question of regulating "doing business" contributions as described above. An excerpt from this report, titled Public Dollars for the Public Good: A Report on the 2005 Elections ("2005 Election Report"), is attached as Exhibit B.

32. One of the Board's recommendations was to ban all organizational contributions, including contributions from partnerships, limited liability companies ("LLCs"), political action committees ("PACs"), and unions. (2005 Election Report at 120.) The Board noted that organizational contributions tended to favor incumbents. (Id.) It also noted that in some circumstances, organizational contributions undermine the CFA's goals of transparency, as they "can be used to obscure the identity or business of the ultimate source of a contribution." (Id. at 121.) The Board noted that this is particularly the case for LLCs: "many are involved in city business (especially land use), yet often there is no information in the public record about a particular LLC's owners or principals." (Id.) It also noted that LLC contributions had increased from 2.8 percent of all contributions in 2001, to 6.2 percent of contributions in 2005; and that banning these contributions would be one way to reduce the influence of "doing business" contributors. (Id. at 120-21.)

33. The Board also recommended that the City enact legislation regulating "doing business" contributions. Id. at 122. The Board summarized the problems created by "doing business" contributions as follows:

> In creating any potential "doing business" regulation, the Board has a role to play to ensure city decisions are made with the best interests of the city in mind – rather than the best interests of a campaign contributor. "Doing business" contributions create inequalities (real and perceived) in the political marketplace as well, diluting the impact of individual contributors. Individuals or entities with hundreds of thousands of dollars of city business at stake do not have to think twice before making a maximum donation to a candidate. In addition, incumbents – who can exert influence on particular city decisions as elected officials – have much greater access to these large donations than do non-incumbent candidates.

Id.

34. Concerning the question of whom should be subject to "doing business" restrictions, the Board recommended including land use interests as well as contractors and lobbyists. With respect to land use interests, the Board explained:

> As much as – if not more than – contractors, real estate interests depend upon decisions by city boards or agencies regarding the disposition of city resources to generate profits for their businesses. For decades, studies of campaign giving have reflected this reality, consistently listing real estate interests among the top contributors to candidates for city office.[6]

Id. at 123.

---

[6] In a post-election report for the 2001 elections, the Board quoted from a New York Times article on the real estate industry and its pledge to raise campaign contributions for the four major Democratic mayoral candidates, in which Joseph Strasburg, president the Rent Stabilization Association, said of the organization's members, "They have to do business in New York regardless of who is mayor. If you give to all of them, then it's just the price of doing business." The Campaign Finance Board, An Election Interrupted . . . An Election Transformed: The Campaign Finance Program and the 2001 New York City Elections (2002), at 61 (available at http://www.nyccfb.info/PDF/per/2001_PER/Exec_summary_2001.pdf?zoom_highlight=1998+charter+te stimony).

**Local Laws 15, 16, and 17, of 2006.**

35. In 2006, the City concurrently enacted three local laws to strengthen the Administrative Code in relation to campaign contributions by lobbyists.[7]  Local Laws 15 and 16 created a mandatory electronic filing system for lobbyists, require full lobbyist disclosure for all fundraising and consulting activities, and ban all gifts from lobbyists to City officials.  The laws also strengthen enforcement and penalties for violation of the City's lobbying law.

36.  Local Law 17, which the Council passed by a vote of 49 to 0, amended the definition of "matchable contribution" in Administrative Code section 3-702(3) to exclude contributions from lobbyists or any other person required to be included in a statement of registration to be filed with the City Clerk pursuant to Administrative Code section 3-213(c)(1). Under the Local Law, the registration statement also had to include "a person affiliated with a lobbyist," meaning the spouse or domestic partner and unemancipated children of a lobbyist, when that lobbyist is a person, or any officer or employee of a lobbying organization "who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities," as well as that person's spouse, domestic partner and unemancipated children. Admin. Code  3-213(c)(1).  While those "affiliated" individuals listed in the lobbyist registration statement are excluded from the matching provisions of the CFA, they can still contribute up to the same maximum contribution limits applicable to other individuals.  Admin. Code §3-703(18)(a).[8]

---

[7] In accordance with Administrative Code section 3-211(a) and (c), a person or organization retained, employed or designated by any client to engage in "lobbying" is a "lobbyist."  That activity generally includes any attempt to influence the passage or defeat of a local law or resolution, or decisions regarding the procurement of goods or services, land use issues, franchises and concessions, administrative rule- or rate-making.  <u>See</u> Admin. Code § 3-211(c)(1)(i)-(viii).

[8] The CFA has a broader definition of "lobbyist" at § 3-702(16) that includes the lobbyist's spouse, domestic partner, and unemancipated children; however, section 3-702(18) -- the section defining those persons who are, or are legally deemed to be, engaged in "business dealings with the city" -- expressly

37. The law also authorized the Campaign Finance Board to rely on a computerized database maintained by the City Clerk, or on other sources known to the Board, to determine if a contribution is matchable.

**Local Laws 34 and 67 of 2007.**

38. Against this backdrop, and with the strong support of Mayor Michael Bloomberg and City Council Speaker Christine Quinn, the City Council passed, by a 44-4 margin, Local Law 34 of 2007, which was signed into law on July 3, 2007. The law specifically defines those financial transactions that do, and do not, constitute "business dealings with the City." Admin. Code §3-702(18)(a). The law also places new restrictions on contributions from those doing business with city government. Id. § 3-703(1-a).

39. Local Law 34 expands and strengthens the CFA by requiring disclosure of and limiting contributions from individuals who have business dealings with the City. The law (1) lowers contribution limits for covered offices from "any natural person who has business dealings with the City, as that term is defined in [Admin. Code. 3-702(18)]," to $400 for citywide campaigns, $320 for Borough President, and $250 for City Council (Admin. Code §3-703(1-a)(participating candidates); id. at §3-719(2)(b)(non-participating candidates)); (2) for participating candidates, makes those contributions ineligible for public matching funds (id. §§ 3-702(3)(h), 3-703(1-a)); and (3) for both participating and non-participating candidates, extends the pre-existing bans on corporate contributions to limited liability companies ("LLCs"), limited

---

incorporates the narrower definition of "lobbyist" set forth at §3-211, *not* the broader definition set forth at §3-702(16). While the CFB initially construed the Doing Business contribution limits as reaching "lobbyists" as defined by § 3-702(16), it has more recently clarified that, for purposes of those contribution limits, "lobbyist" shall have the narrower scope of §3-211(a). *See* Campaign Finance Board's "Frequently Asked Questions about Doing Business," available at http://www.nyccfb.info/candidates/candidates/doing_biz_faq.aspx?sm=candidates_51a (specifically, *see* answer to question, "What is included in the New York City lobbyist category and what is not?") (last visited on July 30, 2008).

liability partnerships ("LLPs"), and partnerships (id. § 3 703(1)(l) (participating candidates); id. at §3-719(2)(b) (non-participating candidates)).

40. The law is intended to encourage wide participation in the political process, including the participation of candidates in less affluent districts, by (a) limiting opportunities for those seeking favors from candidates from engaging in conduct raising the fact or appearance of impropriety, and (b) providing greater incentives for candidates to seek out the support of "everyday New Yorkers" by increasing public matching funds from 4:1 to 6:1 while simultaneously lowering the maximum matchable contribution from $250 to $175.

41. Individuals are considered to be doing business with the City based on the types of transactions business entities with which they are associated have with the City, as well as on their responsibilities in the entities. I am advised that the "business dealings" definition is described in detail in a declaration submitted by Jesse Schaffer.

42. To enforce the "doing business" limits, the law directed the creation of a specific database to capture information about defined categories of persons and entities doing business with the City, known as the "Doing Business Database," or "DBDB." The Board matches information from the DBDB against its own database of contributor information to identify contributions subject to the doing business contribution limits and to insure compliance with those limits.

43. The Board continues to take the necessary steps to implement this important reform. With the "Doing Business" database in place, the law requires the Board to enforce the restrictions, mandating expedited reviews of all contributions to ensure compliance with the new limits on "doing business" contributions.

**Measuring the results.**

44. For the 2009 election cycle, the number of contributors to all local campaigns through July 11, 2008 has increased 14.3 percent compared with the same point in the 2001 election cycle, the last election with a similar number of open-seat races. The total amount of money raised has increased 79 percent, to $34.3 million.

45. The Board found the magnitude of early fundraising "unprecedented." Since Local Law 34 of 2007 increased the matching formula from 4:1 for the first $250 to 6:1 for the first $175, contributions of $175 have risen substantially. Indeed, the Board's analysis of fundraising for the six-month period ending July 11, 2008, shows that candidates have turned their focus to raising funds in smaller contributions, suggesting that last year's reforms are taking hold.

46. During the last six months, approximately 72 percent of all contributors to city campaigns gave $250 or less, compared to only 57 percent of all contributors through January 11, 2008. The lower limits for the first phase of "doing business" contributions took effect on February 2, 2008. The Board is heartened by this apparent increase in small contributions, which can help to create a more active class of citizens who invest in the political process, and decrease the possibility or perception of corruption.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        New York, New York
              August 4, 2008

                                   AMY LOPREST



**Interim Report** *of the*
**New York City**
**Campaign Finance Board**
*on* **"Doing Business" Contributions**

June 19, 2006

# INTERIM REPORT OF THE NEW YORK CITY CAMPAIGN FINANCE BOARD ON "DOING BUSINESS" CONTRIBUTIONS

### June 19, 2006

Pursuant to New York City Administrative Code § 3-713, the Board reviews the results of each election and submits a report to the Mayor and the City Council in September of the year following the election, and "at such times as the Board deems appropriate." A separate mandate of the Board, under New York City Charter § 1052 (a) (12), is to consider rules regulating campaign contributions from those "doing business" with the City. The New York City Campaign Finance Board is issuing this interim report pursuant to these mandates and in anticipation of its September 2006 Post-Election Report to make public the first-ever attempt to quantify "doing business contributions" in New York City. The Board commissioned a team of graduate students in the Master's of Public Administration program at New York University's Wagner School of Public Service, participants in the school's Capstone Program, to analyze available databases and, to the extent possible, to quantify contributions to New York City candidates from those who "do business" with the City of New York. This report presents a comparison of the information available in the City's new on-line VENDEX and lobbyist databases with the information maintained in the CFB's Searchable Campaign Finance Database. The Board is in the process of independently reviewing the data. If necessary, any updates will be included in the Board's Post-Election Report published in September.

Among the initial findings of this study is the significant role that "doing business" contributors played in both the 2001 and 2005 election cycles. Specifically, the study preliminarily indicates that individuals or entities "doing business" with the City accounted for some 27.5 percent of donations in the 2001 election cycle ($15.6 million out of $56.8 million donated) and 22.3 percent of donations in the 2005 election cycle ($9.4 million out of $42.3 million donated).

## History of the "Doing Business" Issue and the New York City Campaign Finance Program

The Board has been engaged in this subject since a 1998 amendment to the Charter Commission required the Board to propose "rules as it deems necessary" to regulate campaign contributions from those "doing business" with the City. In its consideration of possible rules, the Board, as directed by the Charter, balanced factors including "(1) the effectiveness of the voluntary system of campaign finance reform, (2) the costs of such system, [and] (3) the maintenance of a reasonable balance between the burdens of such system and the incentives to candidates to participate in such system."

The Board conducted an extensive study of the issue and issued three alternative versions of "doing business" rules for public comment in the hopes of identifying an effective way to regulate this area. The Board, however, received very limited responses and no consensus on an approach. Board staff then met both with the Mayor's Office of Contracts and with the City Clerk's Office to determine the extent to which the information maintained by those agencies, as examples, could assist the

Board in the enforcement of such a rule. Unfortunately, the information collected by both these agencies was inadequate for the purposes of regulation. The Board concluded in November of 2000 that it had met its Charter obligations as of that time and that it would be useless to proceed further to consider promulgating rules without the means to enforce them effectively.

More recently, the current Administration has developed two public databases—one of VENDEX, containing information about who has contracts with the City, and one for lobbyists registered with the City Clerk's office. These databases were made available on-line in April and June of 2005 respectively, but they were not originally designed for the purposes of public disclosure or regulating "doing business" contributions. The Board has been and will continue to be assisting the Administration in the further development of these and other "doing business" databases to make them reliable, searchable, available to the general public, and, ultimately, compatible with the Board's searchable database. This effort will ultimately permit disclosure and possibly other restrictions on contributions from those doing business with the City. By itself, the development of these databases will be a major achievement and the Board hopes that further progress can be made by collaborative efforts among the Administration, the Council, the Board, and concerned citizens.

In April of this year, the Board held its 4th and final public hearing on the subject of campaign contributions from those who "do business" with the City. The hearing continued the Board's general examination of "doing business" contributions, while focusing on the issues of land use, franchises, concessions, revocable consents, and licenses. The testimony heard at this and previous hearings, as well as the findings of the Capstone Report and the Board's independent study of the issue, will inform the Board's future rule-makings and recommendations on the regulation of "doing business" contributions. The Board remains convinced that the best way to regulate these contributions is by legislation, rather than rule-making. Legislation can regulate, with a targeted approach, those who "do business" rather than addressing the candidates or contributors generally. This targeted approach was adopted by the SEC and has been implemented successfully in the instance of municipal board professionals, and it is also the approach adopted in New Jersey and Connecticut.

## Issues for Consideration

While the work and analysis that went into this report are an important beginning, certain constraints will require continued examination and comment:

1. The labor-intensiveness of the analysis due to the incompatibility of the VENDEX and lobbyist databases with the searchable Campaign Finance database, as well as the lack of quality assurance of the VENDEX and lobbyist data themselves, which are entirely self-reported, makes duplicating or expanding upon the exercise extremely difficult. Thus, any figures discussed in the report may be somewhat unreliable.

2. The analysis is drawn from a sample of available data and thus, while the numerical values are stated as absolute, they are actually subject to a range of variations, which is not reflected.

3.  Although it appears that a significant amount of total contributions came from "doing business" contributors, the quantitative analysis makes no attempt to identify how many "doing business contributions" were claimed as matchable. It is thus unclear how much in public matching funds may have been claimed or awarded based upon these contributions.

4.  The report indicates that contributions under $2,000 make up 95 percent of all contributions to municipal offices and that 75 percent of all contributors give contributions of $250 or less. Therefore, lowering contribution limits for all offices is a possible alternative that might more quickly and efficiently address perceived problems of undue influence through campaign contributions.

5.  Contributions from those who "do business" with the City account for a large portion of campaign funds. Diminishing the value of these contributions—including invalidating public matching funds for them—may seriously diminish candidates' resources. Solutions to the perceived problem may then require examination of other adjustments to account for potential losses in resources for candidates.

\*   \*   \*

*This interim report anticipates the Board's mandated post-election report, which will be submitted to the Mayor and City Council in September of 2006. This report is intended to make public important initial data analysis, which may be useful to other interested parties as they study ways in which to address this challenging subject.*

# Municipal Campaign Finance and "Pay-to-Play"
## An Analysis of *Doing Business* Contributors in New York City



**PREPARED FOR**
The New York City Campaign Finance Board


**BY**
NYU Wagner Graduate School of Public Service
CFB Capstone Team


Mary Fischietto
Eric Friedman
Kara Merrill Verma
Paul Nelson
Anat Tamir

# Executive Summary

Our Capstone team submits the enclosed final report to the New York City Campaign Finance Board. Our study speaks to the mandate of the 1998 City Charter revision that the CFB propose regulation of those entities and individuals who *do business* with the City. The following analysis builds upon the interim report submitted to the Board in January 2006. Our research addresses two main questions:

1. How can *doing business* with the City of New York be defined?
2. Is there a relationship between those entities making campaign contributions and those *doing business* with the City?

We have organized our study into two main parts: Part I focuses on our quantitative analysis, built around a working definition of *doing business* with the City. Part II uses a more qualitative approach to propose a broader definition for *doing business*.

## Part I: Quantitative Analysis

Section 1 of Part I describes the working definition of *doing business* that reflects the scope of our quantitative analysis. Section 2 explains the methodology used for our statistical study, along with descriptive statistics of all campaign contributions from the 2001 and 2005 election cycles. Using our working definition of *doing business*, we analyzed the 2001 and 2005 election cycles by drawing a random sample from the CFB's database of donors and looking at the giving trends among those *doing business* with the City – as captured in the VENDEX and New York City Lobbyist Search databases.

Section 3 lays out our findings. Our primary finding from the quantitative analysis is that *doing business* contributors played a significant role in both the 2001 and 2005 election cycles. Specifically, we found that individuals or entities *doing business* with the City accounted for:

- 27.5% of donations in the 2001 election cycle ($15.6 million out of $56.8 million donated); and,

- 22.3% of donations in the 2005 election cycle ($9.4 million out of $42.3 million donated).

Section 4 describes the limitations and technical constraints of the study's data sources.

## Part II: Qualitative Analysis

In Section 1 of Part II, we establish our proposed definition of *doing business*, which encompasses a broader range of *doing business* activities. To explore the issues and implications raised by this more comprehensive definition, we provide several subgroup analyses in Section 2. We first present a "Micro-Sample Analysis," probing a segment of the donors we studied in our larger sample. Here we attempted to capture those donors who *do business* with the City under our expanded definition with research in various sources outside the VENDEX and NYC Lobbyist Search databases, focusing on the 2005 mayoral and City Council campaigns, as well as intermediaries for the 2005 election cycle.

This exercise yielded a fairly marked disparity between our proposed definition and the working definition used in the random sample analysis:

- Under the working definition, we found that 5.4% of contributors to mayoral campaigns were *doing business* donors; under our proposed definition, we found that 14.0% of contributors to mayoral campaigns were *doing business* with the City.

- Under the working definition, we found that 4.0% of contributors to City Council were *doing business* donors; under our proposed definition, we found that 11.7% of contributors to City Council campaigns were *doing business* with the City.

- Under the working definition, we found that 23.1% of intermediaries were *doing business* with the City; under the proposed definition, we found that 41.2% of intermediaries were *doing business*.

We continue this more intensive analysis with three case studies, to help further illuminate the limits of the working definition used in our quantitative analysis. The studies also highlight some of the complexities and trade-offs that must be considered as part of any discussion of a broader *doing business* definition. Our first case study focuses on a company that holds a concession to sell pretzels via pushcarts in City parks. Our section on land use presents a pair of case studies, putting a spotlight on the campaign contributions of a large Manhattan development firm and an LLC formed to redevelop an abandoned industrial site in Brooklyn. Lastly, we look at the not-for-profit sector, which holds a significant number of large City contracts, examining the campaign contributions of not-for-profit board members and employees.

The information contained in this report does not in any way demonstrate a causal relationship between *doing business* and making campaign contributions, though our analysis shows an overlap between the two activities indeed exists.  In addition, our findings cannot demonstrate a causal relationship between making campaign contributions and receiving benefits from any particular City decision.  There is nothing in our data that allows us to conclude that contributions have influenced the awarding (or refusal) of any contract or other benefit.

As such, our data do not provide direct evidence of a "pay-to-play" culture in New York City, much less define its scope. Nevertheless, there are still citizens and businesspeople who believe that special interest donors wield undue influence over government officials, and that "pay-to-play" is the dominant *modus operandi*.  We believe this perception is corrosive in and of itself. While stricter rules on giving can close off potential loopholes and preempt wrongdoing, any *doing business* regulation we propose is meant, in large part, to help reverse those perceptions and restore the electorate's confidence in City government.

We must also note the limitations posed by data constraints. The records in VENDEX are not regularly audited or quality-assured, and some necessary information is incomplete, outdated or simply not collected.  This may have resulted in an underestimate of the overlap between *doing business* entities and campaign contributors.

# TABLE OF CONTENTS

Executive Summary ................................................................................................ i

Introduction ...................................................................................................... 2

Part I: Quantitative Analysis .................................................................................. 3

    Section 1: Working Definition of *Doing Business* ..................................................... 4

    Section 2: Methodology ................................................................................... 5

    Section 3: Findings ........................................................................................ 12

    Section 4: Technical Constraints and Recommendations .......................................... 18

Part II: Qualitative Analysis .................................................................................. 21

    Section 1: Proposed Definition of *Doing Business* .................................................. 22

    Section 2: Qualitative "Micro-Sample" Analysis .................................................... 25

    Section 3: Case Studies ................................................................................... 28

Conclusion ....................................................................................................... 41

Part III: Appendices ........................................................................................... 43

    Appendix A: Data Sources ................................................................................ 44

    Appendix B: Aggregation Process ...................................................................... 46

    Appendix C: Process for Searching VENDEX and Lobbyist Databases ......................... 49

    Appendix D: Data Cleaning Process .................................................................... 52

    Appendix E: Definitional Considerations .............................................................. 54

    Appendix F: Government Actors in Land Use Decisions ........................................... 60

Acknowledgements ............................................................................................. 61

# INTRODUCTION

As charged by the Campaign Finance Board in the fall of 2005, our Capstone team has attempted to define what it means to *do business* with the City of New York.  We have applied our definitions to existing data to highlight the relationship between those *doing business* with the City and those making political donations in City campaigns. This is more than a purely theoretical exercise.  We hope the study informs future efforts to regulate campaign contributions from *doing business* donors.

The New York City Campaign Finance Board and the Campaign Finance Program were created in the mid-1980s as a response to corruption scandals in City government.  Since then, City voters have supported charter revisions that strengthened the ability of the CFB to limit the influence of large donations from private sources.  The 1998 Charter Revision mandated the CFB specifically to propose rules to "regulate the acceptance by candidates...of campaign contributions from individuals and entities doing business with the city."[1]  This charge provides the rationale for our study.

---

[1] New York City Charter, §1052(11)(a).

# PART I: QUANTITATIVE ANALYSIS

## SECTION 1: WORKING DEFINITION OF *DOING BUSINESS*

### Working Definition

For the purpose of quantifying the frequency of *doing business* contributions in citywide elections, our working definition of *doing business* includes:

- Firms or individuals who are principals of firms who have contracts with the City valued at $100,000 or more; and/or
- Registered lobbyists and lobbyist clients.

For the quantitative analysis, our working definition was guided wholly by two factors: the availability of data from the VENDEX and NYC Lobbyist Search databases, and the lack of any other similarly comprehensive data source on individuals' business dealings with the City.  This practical, working definition provides a good start from which to examine the relationship between campaign contributors and those *doing business* with the City.  A firm with a City contract is clearly involved in a business relationship with New York City government, and for practical purposes, lobbyists and their clients represent a broad cross-section of interests seeking influence over policy decisions.

A report prepared in 2000 by the New York Public Interest Research Group (NYPIRG) on the City's top lobbying interests notes:

> "Most people associate lobbying with pending legislation and budgetary decisions… However, our review shows that it is real estate and land use concerns which dominate the agenda of these big spenders… A careful review of lobbyist disclosure forms reveals a good deal.  Topics and issues lobbied ranged from the Commercial Rent Tax, sound stages for Kaufman Astoria Studios, housing developments in Brighton Beach and the JFK Airport rail link."[2]

A similar analysis of expenditures on lobbyists over the past few years would find a comparable range of issues, from large retail firms seeking approval to develop a site for a new store to non-profit hospitals seeking capital funding.  There is some currency to the position that a regulation on lobbyist contributions would make a significant contribution towards lessening the influence of campaign money from "business-doers" who are not City contractors.

City policymakers share a concern for diminishing the influence of lobbyists on the policy process. In February, Mayor Bloomberg and City Council Speaker Christine Quinn introduced a set of reforms to New York City's lobbying laws, including a prohibition on matching funds for campaign contributions from lobbyists.[3]  With the VENDEX and NYC Lobbyist databases in place, enforcement is all the more feasible.  In terms of viability, this limited working definition is the most logical basis for an immediate, if preliminary, assessment of *doing business* regulation.

---

[2] NYPIRG, "The Big Apple's Big Spenders: The City's Top Lobby Interests."
http://www.nypirg.org/spenders/default.html
[3] This bill was unanimously passed into law by the City Council on May 24, 2006.

## SECTION 2: METHODOLOGY

### Overview

Our team conducted a statistical analysis of New York City campaign contributions from the 2001 and 2005 election cycles.[4] Using a database of information on donations and donors provided to us by the Campaign Finance Board, in conjunction with publicly available data on contributors' business dealings contained in the City's VENDEX and NYC Lobbyist Search databases, our analysis examines the magnitude of the "pay-to-play" phenomenon.  Given the constraints of these two data sources (which are described in detail in Section 4) the prevalence of "pay-to-play" may be considerably understated by our study.  A detailed description of each data source is available in Appendix A.

In conducting this analysis, our primary research question was: is there a relationship between individuals and entities that make municipal campaign contributions and entities that *do business* with the City?  More specifically, our study aimed to answer the following questions:

- What is the nature of that relationship and how strong is it?
- What proportion of campaign contributors *do business* with the City?
- Are certain municipal offices more likely to attract contributions from those who *do business* with the City than others?
- Are donors who contribute above a certain dollar amount more likely to be *doing business* with the City than smaller contributors?

In order to answer these questions, we designed and applied a random sampling methodology to analyze the 2001 and 2005 New York City election cycle campaign contributions. Our examination of contributions involved redefining the unit of analysis and performing three distinct analyses.[5]

### Unit of Analysis: Contribution vs. Contributor

In its database, the CFB keeps individual records for each individual campaign contribution. For example, if one individual gives one contribution each to three City Council candidates, the CFB database lists each of these transactions separately, for a total of three records. To better answer our research question, we aggregated these individual records so that only one record exists for each individual contributor who donated to candidates for each of the five levels of municipal office (Mayor, Public Advocate, Comptroller, Borough President and City Council).

The rationale for aggregating from individual contribution to individual contributor to municipal office is based largely on our research team's questions regarding the nature of the "pay-to-play" phenomenon. Because we are examining the relationship between campaign contributors and those who *do business* with the City, we focused on the individual contributor, not the individual contribution. In their original format, the data fail to capture the overall impact of an individual's campaign contributions. For example, suppose that Mary Martinez made four contributions of $1,000 each to three mayoral candidates during the 2001 election cycle. If we analyzed the campaign contribution data without aggregating them, our analysis would yield 12 individual contributions of $1,000 each. By aggregating the records to the level of individual

---

[4] The 2001 election cycle includes contributions given between January 12, 1998 and January 11, 2002. The 2005 election cycle includes contributions given between January 12, 2002 and January 11, 2006.

[5] Additional subgroup analyses, more qualitative in nature, were also conducted to explore in more detail the campaign contributions of certain entities that were not fully or partially observable in the VENDEX or Lobbyist databases.  These analyses are described in the Subgroup Analyses section of this report.

contributor to municipal office, however, our analysis focused on Mary Martinez and the $12,000 she contributed to mayoral candidates. Aggregating the data as such provides a more accurate picture of an individual contributor's giving behavior than the disaggregated data.

Furthermore, because we assumed that no individual contributor can truly know the outcome of an election before it takes place, we focused on the individual's total contributions to all candidates for a municipal office, rather than an individual's total contributions to a specific candidate. Not only did this allow our research team to examine differences in contribution trends among the five municipal offices, it further centered the analysis on the individual contributor (rather than on individual candidates). To return to the example of Mary Martinez, looking at three contributions of $4,000 to three individual mayoral candidates tells us less about her potential desire to gain influence than the fact that she donated a total of $12,000 to all mayoral candidates in the 2001 election cycle.

Finally, the aggregation process allowed our team to segregate donors by their total contribution amount. It was important to be able to provide solid data on the number of contributors who are giving at various levels to the five municipal offices. Specific details on how this aggregation was performed are available in Appendix B.

## Statistical Analyses

### 1. Population of 2001 and 2005 Election Cycle Contributors

In order to get a more complete sense of the universe of campaign contributors, we first conducted an analysis of the entire pool of 2001 and 2005 election cycle campaign contributors. Using our aggregated data, we segmented the 123,234 and 84,857 contributors from the 2001 and 2005 election cycles by the five municipal offices (Mayor, Public Advocate, Comptroller, Borough President and City Council). We then further segmented these data into three contribution categories. Those contributors who gave a total of $250 or less to a given municipal office in an election cycle were grouped into the low contribution category. Those who gave between $251 and $1,999 to a given municipal office in an election cycle were grouped into the medium contribution category, while those who gave $2,000 or more were grouped into the high contribution category.

This comprehensive quantitative analysis allowed our research team to get a better sense of the characteristics of campaign contributors and provided the lens through which we would examine the "pay-to-play" phenomenon.

### 2. *Doing Business* Sample of Contributors

Although the aggregation process described in the unit of analysis discussion above significantly reduced the number of individual records in the population, the number of 2001 and 2005 election cycle contributors to municipal office (208,091) was still too large to be able to analyze each individually. For this reason, we conducted our analysis of *doing business* campaign contributors using a stratified random sample of 2001 and 2005 election cycle campaign contributors. Samples of 50 were drawn from each giving category (low, medium and high) within each municipal office for both election cycles. Intermediary contributors, discussed in detail below, were excluded from this analysis and examined separately.

Drawing and cleaning the samples gave us a total random sample of 758 contributors for the 2001 election cycle and 760 contributors for the 2005 election cycle. We then searched the VENDEX and NYC Lobbyist Search databases to determine which of these randomly selected

contributors *do business* with the City.[6] For the purposes of this analysis, our definition of *doing business* – the "working definition" – was limited to the data available in the aforementioned sources. A contributor must therefore fulfill one of the following two conditions in order to be deemed as *doing business* with the City. They must be:

1) listed in the VENDEX database; or
2) listed as a lobbyist or client in NYC Lobbyist Search.

Given the paucity of publicly available data on individuals' and entities' business dealings with the City, this working definition is the most reasonable definition of *doing business* for the broad quantitative analysis.

### 3. *Doing Business* Sample of Intermediaries

According to the CFB's New York City Campaign Finance Handbook, intermediaries "are people who, or organizations that, solicit, collect, and deliver contributions to a campaign from other people or organizations."[7] Also called 'bundlers,' these contributors are subject to special reporting requirements by the CFB because of their potential to influence candidates. For this reason, we focused our statistical analysis on this group of donors as well.

To examine the extent to which intermediaries *do business* with the City, we performed a separate statistical analysis of intermediated contributions. For this study, all contributions that had a value in the "intermediary name" field of the CFB database were extracted and aggregated as described above. After aggregation only a small number of records remained (1,313 and 356 for the 2001 and 2005 cycles, respectively), and therefore a representative random sample was drawn for each election cycle from the entire aggregated population.[8] These records were then cleaned and researched in the VENDEX and Lobbyist databases using the same methods employed for the large sample.

### Population Statistics

The deletion and aggregation processes significantly reduced the number of individual records in the CFB 2001 and 2005 election cycle datasets (from 186,067 to 123,234 records for 2001, and from 122,205 to 84,857 records for 2005). The 123,234 contributors from the 2001 election cycle and the 84,857 contributors from the 2005 election cycle constituted the populations from which our research team conducted its comprehensive analysis of campaign contributions.

A total of 123,234 donors gave $47,368,202 to 299 candidates in the 2001 election cycle, and 84,857 donors contributed $40,212,516 to 192 candidates in the 2005 election cycle (see Tables 1 and 2). For purposes of this analysis, we excluded Mayor Michael Bloomberg's donations to his own campaign for the 2001 and 2005 election cycles, which totaled $73,000,000 and $78,655,868, respectively. Including these significant outliers in our sample would have skewed our population statistics.

The total dollar amount of contributions decreased slightly in the 2005 election cycle, while the number of candidates receiving those contributions dropped from 299 in the 2001 election cycle to 193 in the 2005 election cycle. When term limits took effect in 2001, many municipal office seats that had been held for years became vacant, giving rise to a competitive election

---

[6] Given the limitations of the data, it cannot be guaranteed that an entity or individual selected for the sample would be found in the VENDEX or Lobbyist databases. The processes used to clean the sample and determine if those individuals and entities randomly selected into the sample were in the VENDEX and/or the NYC Lobbyist Search databases are described in detail in Appendix D and C, respectively.

[7] New York City Campaign Finance Board, *New York City Campaign Finance Handbook*, New York, 2005, pp. 2-14.

[8] This method differed from that used for the large sample where entities and individuals were grouped by contribution category and office before sampling was performed.

that saw several challengers running for these open seats. In the 2005 election cycle, there were many more incumbents on the ballot, narrowing the number of challengers, the number of total candidates, the number of individual campaign contributors, and the total amount of money spent.

**TABLE 1**
**Number of Individual Contributors to Municipal Campaigns, by Office:**
**New York City, 2001 and 2005 Election Cycles**

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Number of Contributors | % of Total Contributors | Number of Contributors | % of Total Contributors |
| Mayor | 24,803 | 20.1 | 18,662 | 22.0 |
| Public Advocate | 10,308 | 8.4 | 6,054 | 7.1 |
| Comptroller | 5,239 | 4.3 | 3,227 | 3.8 |
| Borough President | 19,449 | 15.8 | 18,078 | 21.3 |
| City Council | 63,434 | 51.5 | 38,302 | 45.1 |
| Undeclared | 1 | 0.0 | 534 | 0.6 |
| Total | 123,234 | 100.0 | 84,857 | 100.0 |

**TABLE 2**
**Contribution Dollar Totals, by Office:**
**New York City, 2001 and 2005 Election Cycles**

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Total Contribution Amount in Dollars | % of Total Contribution Amount | Total Contribution Amount in Dollars | % of Total Contribution Amount |
| Mayor | 22,688,457 | 47.9 | 14,064,916 | 35.0 |
| Public Advocate | 4,472,960 | 9.4 | 2,324,483 | 5.8 |
| Comptroller | 3,117,100 | 6.7 | 4,004,761 | 10.0 |
| Borough President | 5,443,505 | 11.5 | 8,111,852 | 20.2 |
| City Council | 11,645,680 | 24.6 | 11,567,046 | 28.7 |
| Undeclared | 500 | 0.0 | 139,458 | 0.3 |
| Total | 47,368,202 | 100.0 | 40,212,516 | 100.0 |

Candidates for City Council (259 in 2001 and 153 in 2005) attracted the greatest number of contributors in both election cycles. However, in total dollar amount of contributions, they trailed candidates for Mayor by significant margins in both elections.

The vast majority of contributors still gave "small" donations in both election cycles. Approximately three-quarters of all contributors gave less than $250 to a municipal office in 2001 and 2005, and approximately 95% of all contributors gave less than $2,000 to a municipal office. Only the top 5% of contributors in both election cycles gave more than $2,000 to a municipal office in the 2001 and 2005 election cycles.

**TABLE 3**
**% Distribution of Contributors, by Contribution Category and Office:**
**New York City, 2001 and 2005 Election Cycles**

| Contribution Category | 2001 Election Cycle | | | | | |
|---|---|---|---|---|---|---|
| | Mayor | Public Advocate | Comptroller | Borough President | City Council | % of All Contributors |
| $0 - $250 | 11.7 | 6.3 | 2.8 | 12.6 | 45.2 | 78.8 |
| $251 - $1,999 | 5.4 | 1.5 | 1.0 | 2.7 | 5.6 | 16.3 |
| $2,000 and greater | 3.1 | 0.5 | 0.4 | 0.4 | 0.7 | 5.0 |
| % of All Contributors | 20.1 | 8.4 | 4.3 | 15.8 | 51.5 | 100.0 |

| Contribution Category | 2005 Election Cycle | | | | | |
|---|---|---|---|---|---|---|
| | Mayor | Public Advocate | Comptroller | Borough President | City Council | % of All Contributors |
| $0 - $250 | 14.0 | 5.8 | 1.5 | 15.4 | 37.2 | 74.0 |
| $251 - $1,999 | 5.4 | 1.0 | 1.4 | 4.6 | 6.5 | 19.0 |
| $2,000 and greater | 2.7 | 0.4 | 0.9 | 1.4 | 1.7 | 7.0 |
| % of All Contributors | 22.1 | 7.2 | 3.8 | 21.4 | 45.4 | 100.0 |

9

As would be expected, in terms of absolute dollar amounts, the largest donors (those giving $2,000 or more) account for a much greater share of the total dollars going to candidates for office than those giving up to $2,000. More than half of the total dollars contributed to municipal offices in the 2001 and 2005 election cycles came from donors giving $2,000 or more.

In three of the five municipal offices, the proportion of campaign dollars coming from the largest contributors increased dramatically between the 2001 and 2005 election cycles. Only 28.8% of all campaign dollars for the office of Borough President were contributed by those giving more than $2,000 in the 2001 election cycle. In the 2005 election cycle, that figure increased to 48.6%. Similar trends were recorded for the offices of Comptroller and City Council. Not only were there more donors giving in this largest contribution category, but they contributed a much greater proportion of the total dollar amounts going to municipal campaigns.

**TABLE 4**
**% Distribution of Contribution Totals, by Contribution Category and Office:**
**New York City, 2001 and 2005 Election Cycles***

| Municipal Office | 2001 Election Cycle | | | 2005 Election Cycle | | |
|---|---|---|---|---|---|---|
| | $0 - $250 | $251 - $1,999 | $2,000 and greater | $0 - $250 | $251 - $1,999 | $2,000 and greater |
| Mayor | 7.6 | 22.5 | 69.9 | 10.6 | 24.2 | 65.2 |
| Public Advocate | 19.6 | 29.4 | 51.0 | 24.7 | 25.9 | 49.4 |
| Comptroller | 16.8 | 31.0 | 52.1 | 5.3 | 23.6 | 71.1 |
| Borough President | 32.1 | 39.7 | 28.1 | 17.9 | 33.5 | 48.6 |
| City Council | 41.1 | 34.5 | 24.4 | 24.4 | 31.8 | 43.9 |
| All Offices | 20.4 | 28.6 | 51.0 | 16.3 | 28.3 | 55.4 |

*Contributions to "Undeclared" are excluded from this analysis: $500 in the 2001 election cycle and $139,458 in the 2005 election cycle

The number of intermediary contributors decreased dramatically (by more than 72%) in the 2005 election cycle. This decrease was coupled with a drop in the total dollars funneled to municipal candidates through intermediaries (see Tables 5 and 6).

**TABLE 5**
**Number of Intermediary Contributors to Municipal Campaigns, by Office:**
**New York City, 2001 and 2005 Election Cycles**

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Number of Intermediaries | % of Intermediaries | Number of Intermediaries | % of Intermediaries |
| Mayor | 666 | 50.7 | 111 | 31.2 |
| Public Advocate | 100 | 7.6 | 12 | 3.4 |
| Comptroller | 84 | 6.4 | 10 | 2.8 |
| Borough President | 95 | 7.2 | 110 | 30.9 |
| City Council | 368 | 28.0 | 103 | 28.9 |
| Undeclared | 0 | 0.0 | 10 | 2.8 |
| Total | 1,313 | 100.0 | 356 | 100.0 |

**TABLE 6**
**Intermediary Contribution Dollar Totals, by Office:**
**New York City, 2001 and 2005 Election Cycles**

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Intermediary Contribution Amount in Dollars | % of Total Intermediary Contribution Amount | Intermediary Contribution Amount in Dollars | % of Total Intermediary Contribution Amount |
| Mayor | 7,719,822 | 81.6 | 1,446,038 | 62.6 |
| Public Advocate | 437,550 | 4.6 | 41,835 | 1.8 |
| Comptroller | 659,827 | 7.0 | 53,425 | 2.3 |
| Borough President | 313,557 | 3.3 | 412,983 | 17.9 |
| City Council | 326,133 | 3.4 | 324,288 | 14.0 |
| Undeclared | 0 | 0.0 | 32,750 | 1.4 |
| Total | 9,456,889 | 100.0 | 2,311,319 | 100.0 |

## SECTION 3: FINDINGS

Under our working definition, individuals and entities that appear either in VENDEX or NYC Lobbyist Search are considered to be *doing business* with the City of New York. Based upon our analysis of the random sample of donors drawn from the entire population of donors described above, it is clear that *doing business* contributors played a significant role in both the 2001 and 2005 election cycles.

According to the results of our analysis:

- Of the $56,824,591[9] contributed in the 2001 election cycle, **27.5%** or **$15,647,574** was donated by individuals or entities deemed to be *doing business* with the City of New York.

- Of the $42,384,377[10] contributed in the 2005 election cycle, **22.3%** or **$9,433,261** was donated by individuals or entities deemed to be *doing business* with the City of New York.

These numbers reflect the total contributions of all *doing business* donors, both intermediaries and non-intermediated contributors (hereafter referred to as *contributors*). In order to glean more information on the giving trends of these two classes of donors, we examined them separately. Findings from these analyses are discussed in detail below.

### Analysis of 2001 and 2005 Election Cycle Contributors

The results of our statistical analysis of contributors show that while *doing business* subjects made up a relatively small percentage of the total number of contributors in both election cycles, they gave a disproportionately large percentage of the total dollars donated to candidates.

In the 2001 election cycle:

- **3.8%** of all contributors to office were *doing business* with the City;

- **25.2%** of the total dollars contributed were from *doing business* donors; and

- Of the $47,367,702 in contributions, **$11,931,017** was from *doing business* donors.

In the 2005 election cycle:

- **5.3%** of all contributors to office were *doing business* with the City;

- **21.5%** of the total contributions were from *doing business* donors; and

- Of the $40,073,058 in contributions, **$8,626,611** was from *doing business* donors.

---

[9] Our analysis of the 2001 election cycle campaign contributions excluded Mayor Michael Bloomberg's $73,000,000 contribution to his own campaign, as an outlier, as well as $500 designated as "undeclared."
[10] Our analysis of the 2005 election cycle campaign contributions excluded Mayor Michael Bloomberg's $78,655,868 contribution to his own campaign, as an outlier, as well as $139,458 designated as "undeclared."

**Chart 1:**
**% of Contributors *Doing Business* and Their Share of Total Dollars Contributed:**
**New York City, 2001 and 2005 Election Cycles**



In other words, 3.8% of contributors to office donated 25.2% of the money to candidates in the 2001 election cycle, while 5.3% of contributors to office donated 21.5% of the money to candidates in the 2005 election cycle. *Doing business* donors, though few in number, served as significant sources of money for candidates in both election cycles.

This trend holds across municipal office. For all offices, while *doing business* contributors represented a relatively small percentage of contributors, they contributed a disproportionately large percentage of the money to municipal campaigns. Perhaps nowhere is this trend more evident than in races for Borough President in the 2001 election cycle. Although only 8.0% of contributors to Borough President candidates were determined to be *doing business* with the City of New York, they contributed more than 81% of the money to campaigns for the office (see Chart 2a).

**Chart 2a:**
**% of Contributors *Doing Business* and Their Share of Total Dollars Contributed:**
**New York City, 2001 Election Cycle**

13

While the Borough President race in the 2001 election cycle is certainly exceptional, it follows the trend among offices across election cycles. In the 2005 election cycle races for City Council, for example, *doing business* contributors represented only 4.0% of total contributors to the office. However, these *doing business* donors gave 33.9% of the total dollars contributed to the race (see Chart 2b). This differential, consistent across all offices and across both election cycles, indicates that *doing business* contributors are an important source of campaign funds for all offices.

**Chart 2b:**
**% of Contributors *Doing Business* and Their Share of Total Dollars Contributed:**
**New York City, 2005 Election Cycle**



Given the differential between the small number of contributors and the significant amount of money they contribute, it is not surprising that among the three different contribution categories used in this analysis, the highest contribution categories in both election cycles contained the greatest number of *doing business* donors. While only 1.6% of donors in the lowest contribution category were *doing business* with the City of New York, a full 20.8% of donors in the high contribution category were found to be *doing business* in the 2001 election cycle.

**Chart 3a:**
**% of Contributors *Doing Business*, by Contribution Category:**
**New York City, 2001 and 2005 Election Cycles**



The difference between the number of *doing business* contributors in low and high contribution categories decreased slightly in the 2005 election cycle. Of the total dollars given by those donors in the highest contribution category, *doing business* contributors donated 26.1% and 19.5% of high contribution category campaign dollars in the 2001 and 2005 election cycles, respectively.



**Chart 3b:**
**% of Total Contributions from *Doing Business* Donors, by Contribution Category:**
**New York City, 2001 and 2005 Election Cycles**

The large majority of *doing business* contributors represented contractors with the City of New York. In both election cycles, approximately 70% of all *doing business* contributors were listed in VENDEX (see Chart 4a). In the 2001 election cycle, 25.1% of *doing business* contributors could be found in NYC Lobbyist Search, either as registered lobbyists or as clients of lobbyists. This number decreased slightly in the 2005 election cycle as more *doing business* donors (9.8% in 2005 as opposed to 5.8% in 2001) could be found in both VENDEX and NYC Lobbyist Search.



**Chart 4a:**
**% Distribution of *Doing Business* Contributors, by Type of *Doing Business*:**
**New York City, 2001 and 2005 Election Cycles**

Whether *doing business* contributors were in VENDEX or NYC Lobbyist Search, the relative amount of money they contributed to campaigns was consistent with the respective number of contributors in the *doing business* category. For example, the 70.6% of *doing business*

contributors who were in VENDEX in the 2005 election cycle contributed 71.2% of the total *doing business* dollars, while the 19.6% of *doing business* contributors found in NYC Lobbyist Search for the same election cycle contributed 20.5% of total *doing business* dollars.

**Chart 4b:**
**% Distribution of Total *Doing Business* Dollars, by Type of *Doing Business*:**
**New York City, 2001 and 2005 Election Cycle**



## Analysis of 2001 and 2005 Election Cycle Intermediaries

Among the intermediaries in our random sample, there was a much greater number of *doing business* donors than among non-intermediated contributors.

In the 2001 election cycle:

- **29.1%** of intermediary contributors were *doing business* with the City (as compared to 3.8% of non-intermediated contributors).

- **39.3%** of total intermediary contributions were made through *doing business* intermediaries; of the $9,456,889 donated through intermediaries, **$3,716,557** came from *doing business* intermediaries.

In the 2005 election cycle:

- **23.1%** of intermediary contributors were *doing business* with the City (as compared to 5.3% of non-intermediated contributors).

- **34.9%** of total intermediary contributions were made through *doing business* intermediaries; of the $2,311,319 donated through intermediaries, **$806,650** came from *doing business* intermediaries.

Our examination of intermediaries reveals a clear trend that developed between the 2001 and 2005 election cycles: lobbyists took a much more active role as intermediaries during the 2005 election cycle. While lobbyists represented only 28.1% of intermediary *doing business* donors in the 2001 election cycle, by 2005 they made up almost half of all *doing business* contributors (48.0%).



Chart 5a:
% Distribution of *Doing Business* Intermediaries, by Type of *Doing Business*:
New York City, 2001 and 2005 Election Cycles

The explosion in the proportion of intermediary contributors listed in NYC Lobbyist Search in the 2005 election cycle was also reflected in the amount of money contributed by these intermediaries. For the 2001 election cycle, lobbyists comprised 28.1% of the *doing business* intermediaries, and contributed only 24.1% of the total intermediary *doing business* dollars. However, in the 2005 election cycle, lobbyists represented 48% of the *doing business* intermediaries, and bundled almost 70% of the intermediated *doing business* dollars, a remarkable increase.



Chart 5b:
% Distribution of Intermediary *Doing Business* Dollars, by Type of *Doing Business*:
New York City, 2001 and 2005 Election Cycles

## SECTION 4: TECHNICAL CONSTRAINTS AND RECOMMENDATIONS

The goal of this analysis was to quantify the extent to which campaign contributors *do business* with the City of New York, insofar as it could be determined from the data contained in our three primary sources. Reliance on these databases for our analysis posed a number of difficulties because the data were limited, difficult to access and not fully representative of all the possible transactions that constitute *doing business*.

Some technical constraints and concerns are set forth below. To be implemented, each recommendation would require a different level of commitment and resources from various City agencies to address the constraints.  Clearly, additional research would need to be conducted to determine the true feasibility and priority of implementing any recommendation. Any changes should aim to effectively and efficiently increase the CFB's ability to more accurately and comprehensively determine–and monitor–those who *do business.*

### 1. Difficulty Accessing and Searching VENDEX Database

A limitation our team faced was an inability to perform broad-based searches. We were unable to obtain back-end VENDEX data (i.e. database tables) from the New York City Department of Information Technology and Telecommunications (DOITT), which limited the means available for matching data to the online access page. The online system, although inclusive of all data, allows searches by last name or entity name only.  The online search is cumbersome because it allows only one name or entity to be researched at a time, and requires that names be searched using last name only.  Some practical implications of this constraint are:

- ▪ You must enter the name of an entity exactly as it is recorded in the databases.  For instance, if you enter "Salvation Army," but the record is stored as "The Salvation Army," no data will be returned.  Therefore, each entity/individual selected in the sample must be entered individually in a variety of manners to ensure that, if it is in the databases, it is discovered.

- ▪ Because you cannot enter a first name, common last names return multiple pages of records.  For example if you enter Smith, 23 pages of records are returned that must be sorted through manually in order to find the record you are aiming to retrieve.

### 2. Difficulty Accessing and Searching Lobbyist Database

Our team was also unable to obtain back-end Lobbyist data from DOITT. However, unlike VENDEX, any part of an individual or entity's name may be entered to receive results in NYC Lobbyist Search.  Despite this capability, the Lobbyist database is flawed because many pages of material wholly unrelated to the name entered are often returned.

### 3. Inability to Reconcile Data in Multiple Databases

Data are stored differently in each of the three databases used in our study.  Therefore, performing a review of all contributors is extremely difficult because running queries between the CFB database and the VENDEX or Lobbyist databases is not currently possible.  For example, running a query between the CFB and VENDEX databases based on matching names would yield many incorrect results, because entity and individual names may be common or spelled in a variety of manners. The CFB noted this concern in an April 2005 press release:

> "The new VENDEX system – until it is 'cleaned up' – will yield both materially over-inclusive and materially under-inclusive results for those looking at overlaps between the

information VENDEX contains and the information in the Board's comprehensive, searchable database of campaign contributions. As a result, use of this system at this stage would create a high risk of error and potential embarrassment. Most important for the Board's purposes, the VENDEX system is not at this stage compatible with the Board's searchable database."

## 4. Limited Data Sources

Our review of the relationship between campaign contributors and *doing business* with the City was based upon a limited amount of publicly available data.  For instance, the VENDEX and Lobbyist databases do not capture all land use activities deemed *doing business* transactions. Similarly, if land use transactions are determined to constitute *doing business,* information from applications to land use boards will have to be compiled and stored in a database.  This clearinghouse of information could be referenced by campaigns, regulators, or the public to determine if a particular contributor *does business* with the City.

## 5. Validity and Comprehensiveness of Data Entered in City Databases

The process by which data are received and entered into the VENDEX and Lobbyist databases varies across agencies.  Because a wide variety of City agencies award contracts, it is difficult to determine if information is cleanly and comprehensively entered into VENDEX.  These concerns created some uncertainty about our ability to accurately capture all matches when searching the selected contributors in these databases.

Among unresolved questions are:

- Who is responsible for entering data?
- What, if any, protocol is followed to ensure these data are entered accurately?
- How often are entries made?
- How complete are the data that currently reside on the site?
- Could additional information be added to the databases?
- Does the information found in a sample of current paper contracts match the information stored in VENDEX?

Armed with this information, appropriate steps can be taken to strengthen data collection, entry and storage, which will in turn enhance capacity to recognize contributors that *do business* and enforce regulation.

## 6. Comprehensiveness and Accuracy of VENDEX Principal Listings

With regard to our analysis, the listing of principals is flawed in three manners. First, principals are not assigned to specific contracts, so it is not possible to determine whether the principal is associated with the listed contract. For example, when conducting a search using an individual's name in VENDEX yields one company with five contracts, it is not possible to determine if that individual is involved in those contracts. You may search for "John Doe," which returns one company name with a list of 20 other principals and 100 accompanying contracts.  From this list, you cannot determine if any of the 100 contracts are associated with the principal in question. Second, it is not required that all managers complete a VENDEX questionnaire. [11] Therefore, an individual who is a primary City contact for obtaining the contract and delivering the services may

---

[11] The principal questionnaire requires that all of the submitting vendor's principal owners and the three officers who exercise the most substantial degree of control over the submitting vendor submit a questionnaire. The City defines a principal as: An individual, partnership, joint venture or corporation that holds a ten (10) percent or greater ownership interest in a submitting vendor or subcontractor. An officer is defined as: Any individual who serves as or performs the functions of chief executive officer, chief financial officer, or chief operating officer of the submitting vendor, without regard to such individual's title, e.g., president, vice president, secretary, treasurer, board chairperson, trustee, (individual or entity who administers a trust) or their equivalents.

not be present in the system.  Finally, retired principals or persons no longer employed by the company may be listed in VENDEX, even if they are not associated with any contracts from the election cycle under study.

## 7. Small Contracts Unrecorded

Currently, VENDEX only captures contracts from companies that have $100,000 or more in business contracts.  It does not capture awards for smaller figures, which may be more likely to be granted through discretionary processes and could represent a large proportion of total revenue, especially for smaller companies. This limitation prevents the study of any of these entities that may be *doing business* with the City.

PART II: QUALITATIVE ANALYSIS

## SECTION 1: PROPOSED DEFINITION OF *DOING BUSINESS*

For the purpose of assessing the true nature of *doing business* in the City in its broadest possible sense, with the idea of discussing areas for future regulation, our proposed *doing business* definition is as follows:

### a) Contractors and prospective contractors
- Firms (including not-for-profits) that have contracts with a City agency totaling $100,000 or more in any given year;
- Firms that have submitted a bid for such a contract;
- Firms that have entered into a franchise or concession agreement with a City agency;
- Subsidiaries of such a firm, or subcontractors named in a qualified proposal whose portion of such contract is valued at $100,000 or more;
- Individuals who are chief executives, officers, owners of a ten percent share of such a firm, or any other individual who is authorized to represent the prospective contractor before the City;
- Political action committees formed by a regulated firm or individual;

### b) Parties to land use decisions
- Firms who submit an application to the City Planning Commission subject to the Uniform Land Use Review Process (ULURP), to the Board of Standards and Appeals (BSA), or the Landmarks Preservation Commission (LPC);
- Individuals who are chief executives, officers, owners of a ten percent share of such a firm;
- Professionals who are authorized to represent an applicant before these boards and commissions;
- Subsidiaries of or entities owned wholly by such a firm;

### c) Lobbyists
- Individuals registered as lobbyists with the City Clerk's office;
- Firms that hire a lobbyist.

It is self-evident to most any observer of government that influence-seeking is not limited to current City contractors and lobbyists. However, if there is any hope of enforcing a regime that will reduce influence-seeking donations from other sources, it is necessary to define these other sources with some precision.

We weighed several factors when considering whether a particular entity should be subject to a *doing business* regulation that restricts its ability to make campaign contributions:

- Would the donor receive financial benefit from a particular decision by a City board, commission or agency?
- Did the donor affirmatively participate in the decision-making process?
- Is it possible to easily and clearly identify the donor's participation in this decision-making process? (Is there a "paper trail"?)
- Is it possible to create an enforcement mechanism that would give campaigns an ability to identify those donors who are targeted by this regulation?
- Are 'false positives' likely? That is, how likely is it that this donor is not seeking influence, but is donating for partisan, personal or other reasons?
- Would restrictions on this donor place an unfair burden on the way he conducts his business?
- Would restrictions on this donor represent an undue limit on his right to participate in the political process?

- ▪ Is it likely this donor is giving to circumvent a regulation placed on another donor?

## Discussion

### Classes of Potential Donors Subject to Proposed Definition
#### *Contractors*
Individuals or firms who are party to a contract with the City are the easiest to include in our definition, for contracts clearly represent a financial benefit. Because the specifications of an RFP can be drawn to exclude or target particular firms, it is important that the definition include competitively bid as well as no-bid contracts. Regulation should be triggered by contracts totaling $100,000 because the identification mechanism, through VENDEX, is part of the way to being complete.

#### *Bidders*
Bidders are seeking the financial benefit of a contract. With the submission of a bid, their participation can be clearly identified. This may present challenges with RFPs that call for sealed bidding, but a requirement that prospective vendors complete a VENDEX form to respond to an RFP, or be included on an agency's Bidders List, could help establish a more complete bidders database to inform a regulation that would be triggered with the submission of a bid. We are inclined to follow the lead of other governments and release the losing bidders from *doing business* restrictions after a contract is awarded to another firm.

#### *Franchises and concessions*
Franchises and concessions are both types of agreements with the City for the use of City land for which the City receives fees. Franchises are grants by the City of the right to occupy City property to provide a public service such as bus transportation or cable television. Concessions are grants by the City for the private use of City-owned property, such as the use of a City park for a restaurant. Some franchises and concessions are subject to the ULURP process, while others are not. All should be subject to a *doing business* regulation. [Note: Section 3 provides a case study and further discussion of concessions.]

#### *Subcontractors, subsidiaries, LLCs and PACs*
Insofar as subcontractors are identified in a firm's response to an RFP, they should be covered by a *doing business* regulation, as should any subsidiary of a regulated firm, including limited liability corporations owned by a firm's principals, or political action committees associated with a firm. Potentially, a firm or donor could employ these as "end-around" methods to circumvent restrictions.

#### *Officers, owners and executives*
The definition includes chief executives, officers, owners (of a minimum ten percent stake, to match current VENDEX requirements), or any other individual who is authorized to represent the contractor before the City. That is, any individual who deals with City officials on behalf of his employer, in effect, acts as a lobbyist for that firm. To facilitate enforcement, this information should be required through VENDEX.

#### *Land use*
Applicants in most land use decisions are asking the City to grant them the ability to maximize the financial return on their investment. When developers ask for special dispensation to employ a piece of land in what they see as its most profitable use, we should take interest. The limited results of our "micro-sample" study (see Section 2) echo the conventional wisdom that land-use actors do regularly seek to influence the political process. For this reason, the definition focuses on applications subject to the Uniform Land Use and Review Process

(ULURP), which includes zoning changes, street modifications, sales of City land, designations of urban renewal projects; applications to the Board of Standards and Appeals (BSA), for zoning variances; and applications to the Landmarks and Preservation Commission (LPC), for permission to renovate or modify a landmark-designated building. These are decisions triggered by a landowner's application. One difficulty is the lack of a central, searchable database (like VENDEX) for land use applicants. While each keeps its own records, these boards and commissions must improve their accessibility if they are to participate in a *doing business* enforcement regime.

The focus on ULURP and on BSA and LPC is meant to draw a line between decisions that are discretionary, rather than ministerial (that is, subject to approval based solely on meeting certain conditions set by law), and on decisions whose impacts are individual, rather than diffuse. Nevertheless, these lines can be easily blurred, for example, in rezoning matters. Some rezonings are proposed by particular developers, while others are submitted by the City Planning Commission (CPC). While a CPC-sponsored plan may benefit a particular developer, it will likely be difficult to establish a paper trail that connects the developer to any request for that rezoning. A regulation that limits donations from all landowners within a particular rezoned area would be too broad, would present significant enforcement challenges, and likely create a problem of "false positives." For any reasonable enforcement regime, the decisive factor must be that an applicant asks for a particular decision and goes through the acts of supporting its case. [*Note: Section 3 provides case studies and a further discussion of land use issues.*]

### Not-for-profits

Not-for-profits (NFPs) hold some of the largest City contracts, many of which provide essential social services. They participate in the same bidding processes as other for-profit firms when competing for City business. As such, they should be equally regulated. While paid staff members and executives of a not-for-profit should be subject to the same treatment as those of for-profit firms, questions arise about possible exceptions for members of non-profit boards – both because the City may not wish to place a burden on people who choose to serve on the board of a not-for-profit, and because those who do serve often serve on more than one board, making it difficult to disentangle any relationship between a donor and a particular decision.[12] [*Note: Section 3 provides a case study and further discussion of not-for-profits.*]

### Lobbyists

Lobbyists are in business to influence City decisions on behalf of their clients. They are already registered with the City Clerk's office, which keeps a database online. Firms or individuals who hire lobbyists are also likely to be seeking business with the City, and they are similarly identified in the City Clerk's database. In this way, the NYC Lobbyist Search database captures influence-seeking activities that may not otherwise leave a paper trail. At the same time, many lobbyists are hired to influence policy decisions that are unrelated to contracting or land use matters. These might range from issues that are closely related to a specific firm's business interests (a company that makes cigars hiring a lobbyist to organize opposition to the smoking ban) to those that are more clearly in the public interest (a not-for-profit group hiring a lobbyist to advocate for better conditions for bicycle riders on City streets). Though issue advocacy is beyond the scope of this study, there is a compelling City interest in ensuring policy decisions are based on good policy, not on the influence money may have on the political process.

### Classes of Donors Excluded from Proposed Definition

For purposes of this study, spouses and dependents and unions were excluded from the proposed definition.

---

[12] It should be noted that this broader definition also does not include members of a board of directors of a for-profit enterprise.

## Section 2: Qualitative "Micro-Sample" Analysis

Our research shows that *doing business* donors are a significant source of funding for City political campaigns. Still, the working definition that informs our quantitative analysis limits our findings, providing a narrow view of the extent of the "pay-to-play" phenomenon. While no readily-available data source aggregates data about the various classes of donors identified by our proposed definition, anecdotal research employing a variety of sources reveals that the proportion of campaign donors who *do business* with the City under a broader definition is considerably larger than our quantitative research suggests.

To illuminate the distance between the working definition and our proposed definition, we performed a richer, more intensive analysis of *doing business* on a smaller, selected sample. In doing so, we re-examined our random sample of contributors from the 2005 election cycle races for Mayor and City Council across all categories of giving. We also re-examined the sample of intermediaries for the 2005 cycle. Our analysis reveals how many more current donors might be identified as *doing business* contributors under our more comprehensive definition.

### Findings

When the findings from the micro-sample analysis are weighted to reflect the same proportions as those used for the random sample, the data show that a considerably larger proportion of donors are captured by the proposed definition of *doing business* (see Chart 6).



Chart 6:
% of Contributors *Doing Business* Under Working and Proposed Definitions:
New York City, 2005 Election Cycle

**Mayor:** Under the **working definition** used in the random sample analysis, **5.4%** of contributors to Mayor were *doing business* with the City. With the **proposed definition**, the qualitative analysis found that **14.0%** of contributors to Mayor were *doing business* donors.

**City Council:** Under the **working definition** used in the random sample analysis, **4.0%** of contributors to City Council were *doing business* with the City. With the **proposed definition**,

the qualitative analysis found that **11.7%** of contributors to City Council were *doing business* donors.

**Intermediaries:** Under the **working definition** used in the random sample analysis, **23.1%** of intermediaries were *doing business* with the City. With the **proposed definition**, the qualitative analysis found that **41.2%** of intermediaries were *doing business* with the City of New York.

Additionally, donors who were *doing business* gave more, on average, than those who were not (see Chart 7):



**Chart 7:**
**Average Donations of Doing Business Contributors vs. Regular Contributors:**
**New York City, 2005 Election Cycle**

**Mayor:** Among the largest ($2,000 and over) donors in our random sample, those who were *doing business* donated an average of **$4,967**, while those who were not made an average donation of **$3,407**.

**City Council:** Among the largest ($2,000 and over) donors, those who were *doing business* donated an average of **$4,974**, while those who were not made an average donation of **$3,357**.

**Intermediaries:** Intermediaries who were *doing business* bundled an average of **$9,116** in donations, while those who were not bundled an average of **$4,576**.

## Discussion

We researched each of the names in these samples (152 mayoral donors, 157 City Council donors, and 109 intermediaries) to find links between donors and/or employers and City business (as defined in our proposed definition) using Google, Lexis-Nexis, and CityAdmin,[13] among other sources. Our research was supplemented by consultation with Peri Horowitz, Chief of Compliance and Investigations at the CFB, to help us identify and target donors in these samples who might be *doing business* with the City.

---

[13] CityAdmin is an online library of decisions made by New York City agencies maintained by the Center for New York City Law.

Without the same methodological rigor or reliability of the original analysis, it is unadvisable to rely on these numbers as the true proportion of donors who are *doing business* with the City. Indeed, there are several ways in which these numbers might still underestimate the true extent of the issue.  A firm might be applying to land use boards under the name of an LLC, while its principals donate to political campaigns, or vice versa.  Some donors may have familial connections to individuals who are *doing business* that were not identified in our Internet research. More exhaustive research of public records may have uncovered links we were unable to identify.  Still, these numbers give a general indication of how our primary quantitative analysis of donors likely underestimates the true extent of *doing business* contributions, and by what general magnitude.

## SECTION 3: CASE STUDIES

We continue our qualitative research with three case studies, looking more closely at classes of potential donors included in our more expansive proposed definition. The first case study examines the giving patterns of concessionaire brothers George and Thomas Makkos, known as "The Pretzel Kings" for their dominion over the pretzel pushcart business in City parks. This case study provides a look at how *doing business* can intersect with campaign contributions in New York City.  Particularly, it highlights some of the inadequacies of VENDEX in its current form.

Next, we put the spotlight on land use with a pair of case studies. Unlike concessions, which are already recorded in VENDEX, land use represents a range of City dealings that may elude a *doing business* definition based solely on existing datasets. We look at two New York City real estate development firms, The Witkoff Group and 160 Imlay Street LLC, both of which have achieved favorable decisions from City land use boards.  These case studies illustrate the difficulty of including land use in a *doing business* regulation.

And finally, we examine the scope of the City's partnership with the not-for-profit sector.  A study of the City's top not-for-profit contractors compels us to grapple with the delicate issue of regulating donations from wealthy and influential board members of these entities without discouraging philanthropic activity.

Each of these studies takes a different view of "pay-to-play" in New York City and helps build the case for the adoption of a more comprehensive definition of *doing business* that captures the spectrum of business activity beyond VENDEX and the NYC Lobbyist Search database. Along with our micro-sample analysis, these case studies help bridge the gap between our working and proposed definitions of *doing business*, and move us toward a more accurate reflection of the City's manifold business dealings. They also help demonstrate the tensions between curbing possible "pay-to-play" activity and preserving free speech rights, as well as the potential for broad regulations on campaign donations to chill contributions and desirable philanthropic activity.

## Case Study: Concessions

### "Pay-to-Play" and the Pretzel Kings: The Makkos Brothers

The New York City Charter defines concessions as "grant[s] made by an agency for the private use of city owned property," and treats them as types of contracts. According to Chapter 14, Section 375 of the Charter, when registering with the Comptroller, "the terms 'vendor' and 'contractor' shall be deemed to apply to the holders of…concessions." But unlike other city contracts, in which the city pays entities for goods and services, concessions represent money flowing *into* city coffers.

All concessions are reviewed by the Franchise and Concession Review Committee (FCRC), as empowered by the City Charter. The Committee consists of the Mayor, the City Comptroller, the Corporation Counsel, the Director of the Office of Management and Budget, the Borough President of each borough impacted by the decision, and an additional mayoral appointee. All concessions, except "major concessions,"[14] must be approved by the FCRC. Major concessions are subject to the Uniform Land Use Review Procedure (ULURP) instead.

This case study focuses on concessionaire brothers George and Thomas Makkos, whose business holdings include M&T Pretzel, Inc. (a pushcart company which sells pretzels baked by Makkos of Brooklyn, also owned by the brothers), Terrace on the Park in Flushing Meadows, Battery Wave in Battery Park, and the Central Park Carousel.[15] Through this case study, we intend to illustrate some of the inadequacies of VENDEX in its current form and to provide additional justification for the inclusion of concessionaires in our broader *doing business* definition.

Records of the brothers' business with the City appear in VENDEX, but these records are incomplete. For example, information about M&T Pretzel's pushcart contracts includes mostly contracts that have an "end date" of 1995, and thus appear to have expired. Indeed, based on the information available in VENDEX, it appears that M&T Pretzel's only active pushcart concession is valued at $1,005. Yet numerous media accounts indicate that the dollar value of M&T Pretzel's business with the City far exceeds the VENDEX figures, some estimating the total at $3 million per year.[16] The brothers own 60% of the carts in Central Park,[17] as well as the pushcarts in the coveted spot outside The Metropolitan Museum of Art – for which they paid a reported $536,100 in 2004.[18]

### *Campaign Contributions & Lobbyist Activity*

In the 2001 election cycle, Thomas gave $2,500, George gave $7,500 and his wife, Antonia—a self-identified "homemaker"—gave $2,500. George also intermediated $4,350 in contributions, bringing their combined total campaign contributions to $16,850. Of that, $15,850 was directed toward mayoral candidates, while the rest went to candidates for Borough President. By comparison, the Makkos brothers gave a *combined* $1,150 in the 2005 election cycle.

---

[14] The Charter defines major concession as "a concession that has significant land use impacts and implications, as determined by the [city planning] commission, or for which the preparation of an environmental impact statement is required by law."

[15] "Brothers to Buy Long Island, N.Y., Waterfront Restaurant," by Alan J. Wax, *Newsday*, August 24. 2004.

[16] Ibid.

[17] "Pushcart Vendors Gain Victory in a Labor Deal," by Steven Greenhouse, *The New York Times*, November 23, 2004.

[18] "Riches a la Cart," by Dan Kadison, *New York Post*, April 5, 2004.

We also examined the lobbying activity of the Makkos brothers. The concessionaires hired lobbying firm Bolton St. Johns, Inc. in 1999 and Greenberg Traurig in 2002, paying the firms $32,000 and $32,331.50 respectively. Their target in 1999 was the Parks Department, as well as a City Councilmember, in matters relating to M&T Pretzel, Inc. The NYC Lobbyist database does not list the target of the Makkos' lobbying in 2002. (M&T Pretzel, Inc. also employed Greenberg Traurig in 2003, but details of their transactions are not provided in the database.) None of the brothers' businesses is listed thereafter as a lobbyist client.

### Principals

We also investigated the principals of The Crystal Ball Group, which operates Terrace on the Park in Flushing Meadows. The principals listed in VENDEX (besides the Makkos brothers) are Charles, Vasilios and Konstantinos Marangoudakis, also owners of Marangos Construction Corporation. According to CFB records, the three gave a combined $53,315 and $24,300 in the 2001 and 2005 election cycles, respectively. (Included in the 2005 total is $250 contributed by Vasilios's wife, Athena, another self-identified "homemaker.")

Sixty-three percent of the two-cycle total was donated through intermediaries. While we cannot establish with certainty what aspect of their business the Marangoudakis family was seeking to influence, its extensive gifts are worth noting when discussing their business partners, the Makkos brothers.

### Spouses

Antonia Makkos gave $2,500 (or 14.8% of the Makkos' 2001 contributions), and Athena Marangoudakis gave $250 (or 1% of the Marangoudakis' 2005 contributions). Making a contribution through a spouse with the same last name is one potential way to circumvent donation limits while guaranteeing the contribution is associated with the family name. Because of the variability in their giving amounts, however, it would be impossible to ascertain the wives' true intentions. The danger of "false positives" suggests that the inclusion of spouses in a *doing business* definition may unfairly impinge on their First Amendment rights.

### Analysis

This case study provides further justification for including concessionaires, their business principals and lobbyists in a *doing business* definition. It also raises the question of whether spouses ought to be included, offering justification for inclusion in an ideal definition, but advising against inclusion in a more practical one. Finally, this study demonstrates the inadequacies of VENDEX, and the system's failure to capture some contracts worth upwards of $100,000.

## Case Study: Land Use

Ethics enforcement for the process that assigns City contracts is a public policy imperative because there are so many contracts to go around. New York City's budget is larger than that of any other American city *and* 48 of the 50 states.  At the same time, land use decisions in New York City may be even more important because of the scarcity of land.  The City must constantly make decisions about how to re-use already-developed land in order to ensure it is occupied by its highest and best use.  As CFB Chairman Frederick A.O. Schwarz, Jr. wrote in his account of the proceedings of the 1989 Charter Revision Commission, which he chaired, "Through City decisions about land use, communities can be created, fortunes can be made or lost, and the power of various political offices or agencies can wax or wane."[19]

With such concerns at stake, it comes as no surprise that the parties interested in land use decisions would be active in the political process.  The brief findings in this study are typical of previous observations about political activity by real estate entrepreneurs; developers have long been among the most generous sources of campaign donations to candidates for City office.  This is not a phenomenon unique to New York City. Indeed, most major candidates in local elections receive their largest contributions from property entrepreneurs.[20]

In a 1985 study of contributors to members of the Board of Estimate between 1981 and 1985, former State Senator Franz Leichter found that 16 of the top 25 donors had some matter of business pending before City government.  He cited ten specific instances where donors increased their political giving when they had decisions before the Board of Estimate; these included beneficiaries of variances, zoning changes, City leases, and the sale of City land.[21]

In a subsequent study, released in 1986, Leichter estimated that 60 percent of the 200 largest donors did some sort of business with the City.  Of the top 20 givers, 12 were "real estate giants whose projects frequently require Board of Estimate approval."[22]

When the 1989 Charter Revision Commission abolished the Board of Estimate, its power to decide certain land use decisions was spread among several actors.  To preserve a political voice in the land use process, the City Council was granted the power to review decisions as part of the Uniform Land Use Review Process (ULURP).

While contract decisions affect all New Yorkers generally, through the services the City provides and the taxes levied to pay for them, land use decisions can impact particular New Yorkers where they live, in their homes and neighborhoods.  While that is a compelling rationale for allowing a political review, allowing politics into the process has the potential to invite the influence of money as well.

The appointed City Planning Commission (CPC) is the gatekeeper for many land use decisions, certifying applications before they pass through ULURP.  Amendments to the zoning resolution, which places limits on the size and use of buildings, must go through ULURP, as do certain

---

[19] Schwarz, Jr., Frederick A.O. and Eric Lane.  "The Policy and Politics of Charter Making: The Story of New York City's 1989 Charter."  *The New York Law School Review*. Vol 42, 1998.
[20] Logan, John. *Urban Fortunes: The Political Economy of Place*.  University of California Press, 1987. p. 231.
[21] Kraus, Jeffrey. 2006. "Campaign Finance Reform Reconsidered: New York City's Public Finance Program After Fifteen Years", *The Forum*: Vol. 3: No. 4, Article 6.
http://www.bepress.com/forum/vol3/iss4/art6
[22] Connelly, Mary and Carlyle C. Douglas.  "City Vendors and Campaign Giving."  *The New York Times*, December 28, 1986.

special permits, site selection for capital projects, urban renewal designations, and many other projects. After applications are certified as complete by CPC, they pass first to the local community board and the Borough President for recommendations, then to the CPC, which approves or disapproves the application, and finally to the Council, which automatically reviews some decisions and can elect to review any decision.

Two other appointed boards make individual, discretionary decisions about what owners can do with their land. The Board of Standards and Appeals (BSA) can grant individual variances to the zoning codes. The Landmarks Preservation Commission (LPC) designates buildings or historic districts; owners must apply to the LPC to approve any modifications to a landmark building. [*See Appendix F for a breakdown of land use boards and commissions, and the decisions they are responsible for.*]

To be sure, there are several ways developers can exercise influence over the land use processes. Many members of boards are appointed because of a background or particular expertise in some aspect of the real estate industry, and may therefore be more sympathetic to developers. Some may desire jobs in the industry upon completing their service. And to the extent that major developers or their representatives have "repeat business" before the land use boards, they may develop personal relationships with their members that can influence their judgment.[23]

The following two case studies help illuminate the issues and difficulties with regulating donations from entities or individuals with pending land use decisions.

### The Witkoff Group

Steven C. Witkoff and his firm, The Witkoff Group, are among the most prominent real estate developers in the city. The group's current New York City holdings include a 398-foot, 37-floor mixed-use high rise at 6th Avenue and 26th Street, the Cipriani Club Residences, a 9-floor, 109-unit luxury condo complex on Wall Street, and the iconic Woolworth Building at 233 Broadway in downtown Manhattan.

### *Donations*

For the 2001 and 2005 campaign cycles, campaign donations to candidates for City office from Steven Witkoff, his immediate family, officers of the Witkoff Group, and Witkoff's LLCs totaled $93,675.

The amount of Witkoff-related donations was relatively consistent across cycles – $49,750 for 2001, and $43,925 for 2005 (there are no listed contributions for Witkoff dated earlier than 2001 in the CFB database). In the 2001 election cycle, Witkoff focused its giving entirely on mayoral candidates, putting together nine contributions for the maximum $4,500[24] to Mark Green, and two $4,500 contributions to Alan Hevesi.[25]

In the 2005 election cycle, Witkoff donated $22,425 to Council Speaker Gifford Miller's mayoral campaign, and $21,500 to candidates for City Council. Of those, $7,000 was given directly from Steven Witkoff and Witkoff Group LLCs to three members of the Land Use Committee. Councilmember Christine Quinn, who represents the West Village, was widely discussed prior to the 2005 election as a leading candidate for Council Speaker. Her campaign

---

[23] Ellickson, Robert and Vicki Been. *Land Use Controls*, third ed. Aspen Publishers, 2005. p. 306
[24] The maximum donation to mayoral candidates was raised to $4,950 for the 2005 election cycle.
[25] The remaining $250 was a donation by Witkoff principal Jeffrey Goldberger to an exploratory committee formed by Giuliani aide Fran Reiter, who was considering a run for mayor.

received maximum $2,750 donations from Witkoff, his wife, and two Witkoff executives, for a total of $11,000.

The Witkoff Group seems to have focused its political expenditures on campaign donations rather than lobbying; the Group's expenditures for lobbying total only $14,637.50 between 2000 and 2005. (The firm does not seem to have hired lobbyists through one of the LLCs they own.)

*Decisions*

In the course of their work, Witkoff and his partners must bring business before many of the City's land use boards and commissions. These are a selection:

Woolworth Building: After purchasing the Woolworth Building in 1998 through an LLC, 233 Broadway, Witkoff planned renovations and modifications, turning 27 floors atop what was once the world's tallest building into condos, building two glass-walled penthouses on the 29th floor, restoring ground-floor storefronts to their original condition, and adding a 100-car garage.[26] Since the building has landmark status, the modifications required approval by the Landmarks Preservation Commission. The plan was controversial. Though the community boards have no role in the landmark process, the local board voted unanimously to oppose the project, which they called "grotesquely inappropriate."[27] After a long review period, the LPC granted a Certificate of Appropriateness for the Witkoff plan on December 30, 2002. According to *Crain's*, the Witkoff Group sought access to tax-free Liberty Bond financing from the City for the project.[28]

1129-1133 York Avenue: In April 2005, under the name of Witkoff York LLC (incorporated in Delaware), Witkoff applied to the CPC for a zoning map amendment that would allow them to build a 26-story, mixed residential/retail tower at 1129-1133 York Avenue, and a special permit that would allow a 100-space public parking garage on the site. The applications were certified as complete by CPC on April 11, 2005 and referred to Manhattan Community Board 8, which approved both the zoning change and the special permit June 8. The Borough President's office gave its sanction July 12, the CPC on August 24, and the City Council voted its approvals on September 28.

866 Third Avenue: On March 16, 2004, the 866 3rd Next Generation Hotel LLC, another Witkoff-owned entity, applied to the BSA for a zoning variance to waive a rear yard-space requirement for a building that encompasses a Courtyard Marriott Hotel, retail establishments and a Memorial Sloan Kettering outpatient center. Attorney Jay Segal of Greenberg Traurig represented Witkoff before the BSA. Segal represents many clients with real estate interests; many of them are listed as his clients in the City Clerk's lobbyist database, though Witkoff does not claim Segal as a lobbyist.[29] Witkoff was granted its request on July 13.

West Village down-zoning: The Greenwich Village Society for Historic Preservation (GVSHP) led an 18-month-long battle to rezone parts of the West Village and restrict density, which culminated in a CPC rezoning proposal that was certified to begin its passage through the ULURP process on July 11, 2005. The plan drawn by the CPC included "carve-out" exemptions for two sites: the Superior Ink Factory site at West Street and W. 12th, and the Whitehall Storage warehouse site at 303 W. 10th Street, at the corner of Charles Street, owned by the Witkoff Group. While the buildings around the site would be limited to 70 or 80 feet, the plan allowed a 200-foot tall tower at the Whitehall site.[30]

On July 21, Community Board 2 approved the plan, with a request to reconsider including the two sites in the down-zoning plan. Borough President approval came August 29, echoing the comments of the Community Board. The plan, which nevertheless remained unchanged, was approved after a public hearing by the CPC September 26, and approved by the City Council on October 11.

---

[26] Dunlap, David W. "Condos to Top Vaunted Tower of Woolworth." *The New York Times*, November 2, 2000.
[27] Dunlap, David W. "Change the Woolworth? No Way, a Board Says." *The New York Times*, October 18, 2000.
[28] "New Projects Seek Liberty Bonds," *Crain's New York Business*, June 2, 2003.
[29] Segal's campaign donations between 2000-2005 total $6,505; of those, $4,400 were split between Miller, Quinn, and Land Use Committee chair Melinda Katz.
[30] Richels, Heather. "Rezoning Plan for Greenwich Village Waterfront Advances." *The New York Sun*, July 14, 2005. p. 10.

### 160 Imlay Street LLC

Along the Red Hook waterfront, overlooking the marine terminal, is a six-story concrete industrial building at 160 Imlay Street.  It had previously been a warehouse, and before its purchase by Industry City Associates in 2000, the building was used primarily for book storage. After trying to find industrial tenants, Industry City and its principal Bruce Federman entered into a partnership with residential developer Bruce Batkin and his partners under the corporate name of 160 Imlay Street LLC.[31]

#### *Donations*

Developers Batkin and Federman, both as individuals and through the 160 Imlay Street LLC, made $10,500 in campaign contributions during the 2005 campaign cycle.  Of those, $8,000 was given to candidates more than two years before the election, including two $2,500 donations to Council Speaker Gifford Miller's campaign for Mayor and a $2,750 donation to the re-election campaign of City Councilmember Melinda Katz, chair of the Council's Land Use Committee. All these contributions were made during the two months preceding a crucial BSA decision in December 2003.[32]

Before initiating their partnership to redevelop the 160 Imlay Street site, neither Batkin nor Federman were significant campaign donors.  Prior to the 2005 cycle, the CFB database lists only two contributions between them: a $1,000 donation by Federman in 2001 to Mark Green's mayoral campaign; and a $250 donation from Batkin to Rudy Giuliani's 1993 mayoral campaign.

The 160 Imlay Street LLC incurred more than $170,000 in lobbying expenses between 2002 and 2005, employing three separate firms – George Arzt Communications, LoCicero & Tan, and the Law Offices of Howard Goldman, the firm that represented the project before the BSA.

#### *Decision*

Their proposal for a renovation to offer two floors of retail and four floors of luxury condominiums required a variance from the area's industrial-only zoning.  The project was opposed by Brooklyn's Community Board 6, which is committed to preserving industrial uses on the waterfront, and by the Red Hook-Gowanus Chamber of Commerce, which feared the condos would "kill local business."[33]

160 Imlay Street applied to BSA for its zoning variance September 18, 2002.  After an exceptionally long deliberation including two hearings and a site visit, on December 23, 2003 BSA voted 3-1 to grant the variance for the retail/residential renovation.  Though opponents filed a lawsuit to prevent the 160 Imlay renovation, the court gave the developers a go-ahead last spring, and the renovation is proceeding.

### Analysis

It is true of the Witkoff Group – and of all large-scale developers – that it relies on City decisions to conduct its business and generate profits.

Looking at Witkoff's development activities, it is clear that in the interest of transparency, any regulation that includes a limit on donations related to land-use decisions should limit donations

---

[31] Vitullo-Martin, Julia. "Thinking about the Brooklyn Waterfront."  The Manhattan Institute, December 2004.
[32] After the decision was granted, Batkin and Federman gave $1,000 more between them to Miller's mayoral campaign in 2004, as well as $750 to Brooklyn borough president  Marty Markowitz, $500 to Councilman Eric Gioia, a member of the Land Use Committee, and $250 through their LLC to Comptroller William Thompson, Jr.
[33] Kolben, Deborah. "Red Hook Green Light." *New York Daily News*, May 13, 2005.

from all LLCs, or ban them altogether.[34]  Though none of the LLCs Witkoff employed in these transactions were used to fund campaign contributions, several were made under The Witkoff Group LLC.  These entities can be used to circumvent a restriction on a particular individual, or to mask the source of a contribution.

Included in the New York City Administrative Code definition of lobbying is: "the attempt to influence… [any] determination by elected officials, city planning commission, borough board, or community board concerning zoning or development or improvement of real property subject to city regulation."  However, the example of attorney Segal's failure to report Witkoff as a client suggests that if the Code does not require professionals who represent developers before such boards to register as lobbyists, any *doing business* regulation should include these advocates as well.

Decisions without an easily identifiable paper trail – like Witkoff's request for Liberty Bonds – represent a quandary for any regulation.  Interactions with quasi-governmental entities that lack transparency, like the NYC Economic Development Corporation, present a similar dilemma. Still, the scope of Witkoff's activities suggests that these larger developers are likely also to have identifiable projects pending that will trigger regulation.

Of particular interest to our study is the case of the West Village downzoning, which exposes a gap in our definition. We cannot say with certainty that the Witkoff Group even requested its "carve-out" from the CPC proposal; there is simply no paper trail to inform that theory.  Coalco, another development firm, purchased two buildings at 389-391 W. 12th Street, and planned a "modern, glass cluster of townhouses" for the site.  Then came the re-zoning plan:

> The managing partner of Coalco, Edward Baquero, said that the impending downzoning, which will limit building height to 80 feet, will lower property value by one-third and make development unfeasible.  "We paid up.  Suddenly, we lost a third of our rights," Mr. Baquero told The New York Sun.  "You say, 'Wait a minute, that doesn't happen in this country…'
>
> 'I do feel some sympathy for the Coalco folks,' [Andrew] Berman [of the GVSHP] said. 'Clearly they are not getting the same accommodation from the city as Related and Witkoff are getting.'"[35]

Coalco made no contributions to any candidates for City office.  They did spend $10,050 on lobbyists, hiring Greenberg Traurig only after the rezoning plan was introduced by the CPC. While the policy rationale behind the zoning "carve-out" is unknown, the *perception* that campaign donations can influence the land use process undermines public confidence in City government and fosters the notion that developers must indeed "pay to play" to be successful.

As the BSA comprises members appointed by the Mayor, there is no direct link between a BSA decision and donations to members of the City Council.   Still, given the Council's role in the land use process, there is no utility to be gained by drawing distinctions between candidates for different offices, or between decisions reviewed by the Council and those that are not.

A generous contribution puts a donor in the position to open a line of dialogue with a public official, or ask for a favor. However indirect this influence may be on any particular policy

---

[34] Though LLCs clearly owned by a regulated entity would be subject to restrictions on subsidiary entities, there is often no available information about LLCs or their ownership.  To ban LLCs from campaign giving, however, may require changes in State law.
[35] Lombino, David. "Developer seeks to Ease Restrictions in Far West Village." *The New York Sun*, September 19, 2005. p. 2.

decision, it is in the public interest to limit donations from these sources – and to end the expenditure of public funds that amplify their impact.  This suggests the necessity of an expansive regulation of donations from parties with pending land use decisions.

## Case Study: Not-For-Profit Organizations

### "Pay-to-Play" and Philanthropy: How to Regulate the Not-for-profit Sector

In 2004, 18 of the 50 largest City contracts were held by 16 not-for-profit organizations.[36] These contracts (some of them for multiple years of service) totaled nearly $1.2 billion, and were mainly social service contracts for foster care services and homeless shelters. (A large exception was the New York Public Library, which is discussed further below.) Section 501(c)(3) of the Internal Revenue Code bars not-for-profit organizations from giving directly to political campaigns.[37] However, individual officers, directors, and board members do not face such prohibitions. Theoretically, then, a not-for-profit entity seeking to *do business* with the City could curry favor with a particular candidate through donations from these individuals.

But precisely which individuals associated with a not-for-profit should be regulated? Ideally, we would regulate senior managers and decision-makers. To illuminate the sources of not-for-profit political gifts, we researched IRS 990 forms from 2004 for those 16 agencies to find the names of their highest paid employees, board members and trustees.[38] Along with these names, the 990 form requests that agencies detail the "compensation of the five highest-paid employees other than officers, directors, and trustees." These data helped us identify the most influential figures in the agencies regardless of title. We checked lists of board members against agency websites. Through this research, we identified 576 executives and persons of interest, and checked these names against the CFB database to examine their political giving.[39]

*2001:* Of the officers, directors, trustees and highest-paid employees at those 16 agencies, we found that **139** individuals, or nearly **24%**, donated to a City political campaign in the 2001 election cycle. (Only 2.8% of all contributors for the 2001 cycle were *doing business* by our working definition.) The donations totaled **$314,926**, for an average of $2,298 per donor.

*2005:* Of the officers, directors, trustees and highest-paid employees at those 16 agencies, we found that **84** individuals, or **15%**, donated to a City political campaign in the 2005 election cycle.[40] (Only 4.3% of contributors in the 2005 cycle were *doing business* by our working definition.) The donations totaled **$201,545** for an average of $2,399 per donor.

Though 990 forms list independent contractors as well, we did not analyze their political donations; a relationship with a contractor is most likely too tenuous to garner influence for a particular not-for-profit agency. IRS Code supports this decision, excluding independent contractors from consideration as key decision-makers in a not-for-profit.[41]

We considered contribution data from both the 2001 and 2005 election cycles. This period captures the period leading up to and immediately following the award for all of the contracts in this analysis (most started in 2003 and run through 2006). According to VENDEX, all of these agencies appear to have held contracts prior to 2004.

Given that the total amount of donations in an election year ranges in the tens of millions, the totals we found may appear negligible. However, from a relatively small group of individuals,

---

[36] *City Law*, November/December 2004.
[37] NFPs can engage in issue advocacy and can support political candidates or parties through associated PACs, however.
[38] One agency was missing its 990 form for 2004, so we used 2003 IRS data.
[39] Given the qualitative nature of this study, we advise that these figures be treated as approximations.
[40] We had to discard six names because we could not make a positive match in the CFB database for them.
[41] IRS Code Section 4958 (1996).

this sum shows a concerted effort to take part in political campaigns. We might be concerned that certain organizations are targeting specific candidates to gain influence. Our data do not permit us to draw such firm conclusions, but we can describe particular cases.

There are some trends among the top not-for-profit contracts that give pause. For example, we find that the Board President, Chair of the Executive Committee and three Board Members from the Jewish Board of Family and Children's Services made donations to mayoral candidates totaling $13,350 in the 2005 cycle. The organization had a contract totaling over $81 million in 2004.

To consider another case: as noted above, the New York Public Library is among the City's top 50 contractors, with a contract in excess of $38 million.  This organization's top employees and board members show substantial donor participation in City campaigns. Of the Library's 66 employees and board members, 25 (38%) made donations totaling $130,890 in the 2001 election cycle, while 22 (33%) made donations amounting to $99,287 in the 2005 cycle.  In the 2005 cycle, 21 of the 22 made aggregated donations of at least $250, and 15 made aggregated donations in excess of $1,000.  (The giving pattern was similar for the 2001 election cycle).

Meanwhile, the Chair of the New York Public Library's board wrote in the Library's 2004 Annual Report:

> At the end of fiscal year 2003, finalized agreements between the Mayor's office and the City Council resulted in a nearly complete restoration of proposed cuts for this year…We are pleased that the FY 2005 City budget did not include the proposed $5.4 million cut to the Library. In addition, $4.427 million was provided for the Branch and Research Libraries. We are deeply appreciative of the support given to us by Mayor Michael R. Bloomberg, Speaker A. Gifford Miller, and the members of the City Council. And we are especially grateful to everyone who served as extraordinary advocates for the Library, particularly our Trustees…

### Analysis

We are careful not to draw overly broad conclusions from this information. To take just one example, one of the largest campaign donors on the Library's board is Dorothy Cullman, who gave $11,150 to various campaigns during the 2005 cycle, and $18,000 during the 2001 cycle.  Ms. Cullman is a major philanthropist who serves on several other not-for-profit boards (including Human Rights Watch, Lincoln Center for the Performing Arts and others) and runs a foundation with her husband, Lewis.  It is impossible to say which of her affiliations she wished to highlight during her interactions with City officeholders—or if she wished to garner influence at all.  Of course, it is part of board members' duties to raise funds and advocate for their organization, so we should not necessarily attribute pernicious motivations to political contributions.

Admittedly, board members could make contributions to gain undue influence for their preferred charity.[42] It could be argued that board members often have longer tenures with an agency – and perhaps greater loyalty – than some senior staff, who often work for (relatively) lower pay than their for-profit counterparts, and may frequently move to other agencies for better salary.

The question arises whether there is a risk of false positives too great to warrant the regulation of board members and trustees. Many individuals who are asked to serve on boards are likely

---

[42] The term "board members" also refers to trustees serving as unpaid volunteers on a board of trustees.  In addition, the term "director" is used similarly by some not-for-profits.

to be both wealthy and community-minded, and may be likely to offer financial support to political candidates regardless of their not-for-profit activities. Further, such individuals might sit on several boards, may own a business, or may work with another firm involved in City business, so it may be difficult to discern which "hat" they wear when they make a contribution.

Similarly, a question arises whether undue burdens may be imposed on charities attempting to recruit individuals to serve on their boards. Such service is typically unpaid and can be valuable to the community, and therefore should not be discouraged. It is worthwhile to note here that unpaid board members, unlike for-profit boards, cannot take benefits privately from an agency's activities.

## CONCLUSION

Our quantitative analysis of campaign donations from the 2001 and 2005 election cycles showed convincing evidence that *doing business* contributors—as defined by the available data on contractors, lobbyists, and lobbyist clients—play a substantial role in financing campaigns for public office in New York City, accounting for more than one out of five dollars raised.  It is likely these findings understate the true proportion of donors who are *doing business* with the City.

Our qualitative research showed that a broader definition, encompassing a more comprehensive range of *doing business* activities, could be warranted.  Employing our proposed definition, qualitative research with a smaller sample of donors identified a considerably larger proportion as *doing business* donors.  Case studies helped illuminate some of the issues we considered as we created our proposed definition, as well as some of the challenges of enforcing any potential regulation.

Nothing in this report can show conclusively that any particular campaign donor has sought to influence City contracting or land use policy.  Still, a skeptical public may believe differently. We hope the report has shown that a regulation limiting contributions from *doing business* donors would help restore public confidence in City government and the way it does business.

# PART III: APPENDICES

## APPENDIX A: DATA SOURCES

To conduct this analysis, we relied on a variety of data sources, including the CFB's Searchable Campaign Finance Database, the New York City VENDEX online database, and the New York City Lobbyist Search online database. The CFB's Searchable Campaign Finance Database served as the primary source of information for all municipal campaign contributions. VENDEX and NYC Lobbyist Search provided information on business dealings that individuals and entities may have with the City of New York.

▪ **The CFB Searchable Campaign Finance Database**: The primary dataset used in all analyses was the CFB's Searchable Campaign Finance Database. The CFB's database contains records of all contributions to candidates for the offices of Mayor, Public Advocate, Comptroller, Borough President and City Council who participate in the campaign finance program. The data presented in the Searchable Campaign Finance Database were provided to the CFB as reported by campaign committees, and were subject to change as a result of ongoing audits or additional amendments to filings.

For the purposes of this analysis, data from the 2001 and 2005 citywide election cycles were used. The 2001 election cycle data contain records of 186,067 individual campaign contributions made to 299 candidates between January 1, 1997 and December 31, 2001. The 2005 election cycle data contain records of 122,025 individual campaign contributions made to 193 candidates between January 1, 2002 and December 31, 2005.

The data on 2001 and 2005 election cycle contributions were provided to our research team by the CFB in a *.dbf* file. Each record contains information on the contributor's name and address, the contributor's employer and address, the contribution amount, the amount matched by public funds, the candidate who received the contribution, as well as other information.

▪ **VENDEX**: The information presented in the New York City Vendor Search is derived from a subset of data from the City's Vendor Information Exchange System (VENDEX) system, which is maintained by the Mayor's Office of Contract Services (MOCS). The information available in this database is either self-reported by vendors through questionnaires that are submitted to MOCS or is captured by the City's financial management system. The questionnaires are not routinely independently verified by MOCS. VENDEX stores information for New York City franchises, concessions, and for many, but not all, contracts and subcontracts held by vendors who do over $100,000 in annual business with the City.[43]

▪ **NYC Lobbyist Search**: The information presented through the NYC Lobbyist Search is derived from the export of the lobbyist database maintained by the Office of the City Clerk. The information available in this database is self-reported by lobbyists and their clients through initial annual registration forms and quarterly reports that are submitted to the Office of the City Clerk. The reports are checked for accuracy by the Office of the City Clerk, but are not independently verified or certified by a third party. Although all attempts have been made to ensure the accuracy of these data, neither the City of New York nor the Office of the City Clerk assumes any liability resulting from any inaccuracies herein. In the event of any variance between these data and any printed compilation of lobbyist data published by the Office of the City Clerk since 2002, such

---

[43] Taken from the VENDEX website available at: http://slnx-prd-web.nyc.gov/cfb/cfbSearch.nyc?method=search

printed data will be controlling. Some data may have been subsequently amended, which may not be reflected in the database.[44]

---

## APPENDIX B: AGGREGATION PROCESS

For the 2001 and 2005 election cycles, the total number of contribution records in the data files provided to our research team by the CFB was 186,067 and 122,025, respectively. Steps were taken using Microsoft Access to format the data found in the CFB 2001 and 2005 election cycle *Cont.dbf* files. The purpose of these processes was to construct as accurate a population of campaign contributors as possible. Graphical representations of this process can be found below in Figures 1 and 2.  Please note that all of these steps, excluding step 2, were also performed to aggregate the intermediary data.

1. **Deletion of Refund Records.**  Under some circumstances, donations are refunded to donors. The CFB codes these donations as Schedule M.  Because these records are coded as positive amounts and do not represent actual donations, these funds were deleted.  In this step a total of 2,587 and 1,697 records were deleted from the 2001 and 2005 election cycle data, respectively.

2. **Separation of Donations Made Through Intermediaries.** Intermediaries were examined as part of a separate analysis. Therefore, these records were deleted from the data by running a query which eliminated any record where the intermediary name field was not null. The total number of records deleted in this step was 15,370 for 2001 election cycle and 4,600 for 2005 election cycle.

3. **Deletion of Donations from the CFB.**  Through the matching funds program, the CFB distributes public matching funds to candidates. For the 2001 election cycle only, three records were deleted from the donation file that showed reimbursement of public funds by the CFB.  This was completed by searching the donor name field for words such as the CFB, campaign, finance and board.

4. **Grouping of Records by Donor to Office and Summed Donation Amount.**  To aggregate the data to the unit of analysis described in the section above, a group-by query was performed.  This query grouped together all people with the same name contributing to the same office, as signified by the office code [Mayor (1), Public Advocate (2), Comptroller (3), Borough President (4), and City Council member (5), or undeclared (6)].  The query also summed the contributions amounts by each individual to each office.

**APPENDIX B, FIGURE 1: 2001 Election Cycle**



**APPENDIX B, FIGURE 2: 2005 Election Cycle**



## APPENDIX C: PROCESS FOR SEARCHING VENDEX AND LOBBYIST DATABASES

**Steps for VENDEX Look-up**
1. Go to the VENDEX web page: http://slnx-prd-web.nyc.gov/cfb/cfbSearch.nyc?method=search
2. Look up the name or entity
   a. For individuals: In the box on the left labeled "Search by Principal" enter the last name of the person in the white box and click search
   b. For entities: In the box on the right labeled "Search by Entity" enter the last name of the entity in white box and click search
      i. If data are returned proceed to step 4
      ii. If no data are returned proceed to step 5
3. Determine if match that was found is accurate
   a. To determine if the match found is accurate must answer yes to the following questions:
      i. For Individuals:
         1. Does the last name match the name in VENDEX?
         2. Does the first name match the name in VENDEX?
            a. Note:  When scanning the names in VENDEX examine common nicknames versions. For example, if the individual is named Jim search for James or if the individual is named Sue search for Susan.
            b. Note: Slight variations in names are considered a match if answers to questions 1 and 3 are also yes.
         3. Does the employer listed in the excel file match the employer in VENDEX?
            a. Answered yes to all three questions?
               i. Proceed to step 5
            b. Answered no to one or more questions?
               i. Proceed to step 4
      ii. For Entities:
         1. Does the entity name match the name in VENDEX? (Note: slight variations in names are considered a match if answers to questions 2 is also yes)
         2. Does the entity's address match the address in VENDEX?
            a. Answered yes to both questions?
               i. Proceed to step 5
            b. Answered no to either question?
               i. Proceed to step 4
4. Initial match not found
   a. Try to enter the name/entity differently for example by adding or dropping the word "the" or "A"
      i. If match found return to step 3 to determine accuracy

      ii. If no match is found enter "0" in the spreadsheet columns listed below and then return to step 1 for the next name on the spreadsheet

| VENDEX: DOES BUSINESS WITH NYC (N=0, Y=1) | VENDEX: CONTRACT 1/97 OR LATER (N=0, Y=1) | VENDEX: CONTRACT 1/01 OR LATER (N=0, Y=1) |
|---|---|---|

49

5. Initial match is found
   a. Click on business name  (Note: for entity search this step is not required)
   b. What is the answer under the heading "Business with NYC?"
      i. Yes:
         1. Enter "1" on Excel spreadsheet under "Does Business with NYC?"
         2. Click on "View Info"
         3. Review dates under "Registration/Approval Date" column
            a. Any date listed of 1/1/1997 or later?
               i. Yes
                  1. Enter "1" on Excel spreadsheet under "VENDEX contract from 1/97 or later"
               ii. No
                  1. Enter "0" on Excel spreadsheet under "VENDEX contract from 1/97 or later"
            b. Any date listed 1/1/2001 or later?
               i. Yes
                  1. Enter "1" on Excel spreadsheet under "VENDEX contract from 1/01 or later"
                  2. Begin at step 1 for next name on spreadsheet
               ii. No
                  1. Enter "0" on Excel spreadsheet under " VENDEX contract from 1/01 or later"
                  2. Begin at step 1 for next name on spreadsheet
      ii. No
         1. Enter "0" on Excel spreadsheet under:

| VENDEX: DOES BUSINESS WITH NYC (N=0, Y=1) | VENDEX: CONTRACT 1/97 OR LATER (N=0, Y=1) | VENDEX: CONTRACT 1/01 OR LATER (N=0, Y=1) |
|---|---|---|

         2. Begin at step 1 for next name on spreadsheet

**Steps for Lobbyist Look-up**
1. Copy the last name or entity name from the excel file that lists those in the sample
2. Go to the lobbyist web page: http://www.nyc.gov/lobbyistsearch/index.jsp
3. Look up the name or entity
   a. In the white box on the left labeled "Search by Name" enter the last name of the person, or the full entity name and click search.
4. Determine if match is found
   a. To determine if a match is present must answer yes to the following questions:
      i. Does the individual/entity name match the name in the Lobbyist database? (note: slight variations in names are considered a match if answers to question 2 is also yes)
      ii. Does the lobbyist address listed in the Lobbyist database match either the employer or home address listed in the excel file?
   b. Matching name or entity returned?

50

1. If, yes for a Lobbyist
   a. Enter "1" on Excel spreadsheet under "Listed as a lobbyist"
   b. Begin at step 1 for next name on spreadsheet
2. If, yes for a Client
   a. Enter "1" on Excel spreadsheet under "Listed as a lobbyist client"
   b. Begin at step 1 for next name on spreadsheet
3. If, no
   a. Enter "0" on Excel spreadsheet under "Listed as a lobbyist"
   b. Begin at step 1 for next name on spreadsheet

## APPENDIX D: DATA CLEANING PROCESS

1. Open database "Data Cleanse" which contains queries to check original donor and intermediary data
2. Copy the last name and first initial or entity name from the excel file that lists those in the sample. (Note: you will use this copied information in later in step 5 or 6)
3. Click on the appropriate query.
    a. To check individual name select appropriate query from this list:
        i. 2001 Donor Query for Individuals
        ii. 2005 Donor Query for Individuals
        iii. 2001 Intermediary Query for Individuals
        iv. 2005 Intermediary Query for Individuals
    b. To check entity name select appropriate query from this list:
        i. 2001 Donor Query for Entities
        ii. 2005 Donor Query for Entities
        iii. 2001 Intermediary Query for Entities
        iv. 2005 Intermediary Query for Entities
4. After you select one of these options the following box will appear.  In this box enter the identifying office code the race you are searching.



    a. For Mayor enter "1"
    b. For Public Advocate enter "2"
    c. For Comptroller enter "3"
    d. For Borough President enter "4"
    e. For City Council enter "5"
        i. Click "OK"

5. For any of the individual name queries the following box will appear



    a. In this box enter the last name of the person you are search followed by a comma and a space and their first initial.  Click "OK"
        i. For example, to search for Steven Fisher.  Enter "Fisher, S"
    b. Proceed to step 7

6.  For any of the entity name queries the following box will appear



    a.  In this box enter the most unique part of the entity name you are searching for. Click "OK"
        i.  Examples:
            1.  If the name is West L.L.C. enter "West"
            2.  If the name is The Salvation Army enter "Salvation"
            3.  If the name presented is abbreviated such as "Benev Assoc" do two searches one for "Benev" and another for  "Benevolent"
    b.  Proceed to step 7

*NOTE: These searches are NOT case sensitive.  Therefore the results when entering Fisher, S will be the same as fisher, s.*

7.  Are there multiple names listed for the entity/individual you are searching for?
    a.  No:  In the excel file in the column "Data Checked?" enter "1".  Begin at step one for the next name on the spreadsheet
    b.  Yes:  Use ONLY the address to determine if the aggregation was performed correctly.
        i.  Examples
            1.  If three records for Steven Fisher are present and they have the same address the aggregation was performed correctly. Proceed to step 7a
            2.  If three records have different addresses note the correct donation amount for the Steven Fisher on the Excel spreadsheet under the heading "New Amount" and under the heading "Corrected Amount?" enter "1" In this case the record will be removed from the sample and a new record will be randomly selected to take its place. This record will then be reviewed in the same fashion

## APPENDIX E: DEFINITIONAL CONSIDERATIONS

- Would the donor receive financial benefit from a particular decision by a City board, commission or agency?
- Did the donor affirmatively participate in the decision-making process?
- Is it possible to easily and clearly identify the donor's participation in this decision-making process?
- Is it possible to create an enforcement mechanism that would give campaigns an ability to identify those donors who are targeted by this regulation?
- Are 'false positives' likely? That is, how likely is it that this donor is not seeking influence, but is donating for partisan, personal or other reasons?
- Would restrictions on this donor place an unfair burden on the way he conducts his business?
- Would restrictions on this donor represent an undue limit on his right to participate in the political process?
- Is it likely this donor is giving to circumvent a regulation placed on another donor?

**CONTRACTORS**

| | |
|---|---|
| **Financial benefit?** | **YES**; proceeds of contract. |
| **Affirmative participation?** | **YES**; party to contract. |
| **Clear identification possible?** | **YES**; firms are identified through VENDEX. Identification of principals/officers not currently uniform, but could be standardized through regulation. |
| **Enforcement mechanism possible?** | **YES**; through VENDEX. |
| **False positives?** | **NO**; very unlikely. |
| **Unfair burden on business?** | **NO**.  Firms or individuals receive benefit for burden of disclosure or paperwork. |
| **Limit on right to participate?** | **NO**.  Firms or individuals receive benefit from City for giving up full right to donate. |
| **Used to circumvent regulation?** | **NO** |

**BIDDERS**

| | |
|---|---|
| **Financial benefit?** | **YES**.  Firms are seeking proceeds of contract. |
| **Affirmative participation?** | **YES**; submission of bid, response to RFP or request to be added to bidders list. |
| **Clear identification possible?** | **YES**. Bidding firms are not currently identified through VENDEX; however, new regulation would be required for enforcement. |
| **Enforcement mechanism possible?** | **YES**; through VENDEX. |
| **False positives?** | **NO**; very unlikely. |
| **Unfair burden?** | **NO**.  Firms or individuals receive benefit for burden of disclosure or paperwork. |
| **Limit on right to participate?** | **NO**.  Firms or individuals give up the right to participate fully in pursuit of a benefit.  If benefit is not procured (i.e. if bid is unsuccessful) then right to participate should be restored. |
| **Used to circumvent regulation?** | **NO** |

## FRANCHISES / CONCESSIONS

| | |
|---|---|
| **Financial benefit?** | **YES**. Concessionaires receive right to make money on city land; franchisees receive direct financial benefit from City. |
| **Affirmative participation?** | **YES**; both enter into a contract with City. |
| **Clear identification possible?** | **YES**. Concessionaires and franchisees should be listed in VENDEX, though there may be some that escape disclosure. |
| **Enforcement mechanism possible?** | **YES**; through VENDEX. |
| **False positives?** | **NO**; very unlikely. |
| **Unfair burden?** | **NO**. Firms or individuals receive benefit for burden of disclosure or paperwork. |
| **Limit on right to participate?** | **NO**. Firms or individuals receive benefit in exchange for giving up full right to donate. |
| **Used to circumvent regulation?** | **NO** |

## SUBCONTRACTORS/SUBSIDIARIES

| | |
|---|---|
| **Financial benefit?** | **YES**; firms receive some proceeds of contract. |
| **Affirmative participation?** | **YES**, to extent that subcontractors or subsidiaries are involved response to RFP. |
| **Clear identification possible?** | **YES**. Subcontractors currently must be identified in response to RFP; subsidiaries can be covered with additional regulation. |
| **Enforcement mechanism possible?** | **YES**; through VENDEX. |
| **False positives?** | **MAYBE**. Levels of coordination between parent firms and subsidiaries may vary. |
| **Unfair burden?** | **NO**; burden of disclosure falls on parent firm. |
| **Limit on right to participate?** | **NO**. Firms or individuals receive benefit in exchange for giving up full right to donate. |
| **Used to circumvent regulation?** | **MAYBE** |

**EMPLOYEES / OFFICERS / EXECUTIVES / PRINCIPALS**

| | |
|---|---|
| **Financial benefit?** | **MAYBE.** For principal owners or chief executives, the benefit is clear. For lower-level employees, there may be no direct benefit from a City contract. |
| **Affirmative participation?** | **MAYBE.** Again, the distinction is between principal owners, chief executives, and officers on one side and lower-level employees on the other. |
| **Clear identification possible?** | **YES**, if complete information on principal owners, executives and officers is collected through VENDEX. |
| **Enforcement mechanism possible?** | **YES**, through VENDEX. |
| **False positives?** | **NO**; unlikely. |
| **Unfair burden?** | **NO.** Burden of disclosure or paperwork is a condition of receiving benefit. |
| **Limit on right to participate?** | **NO.** For owners, officers or executives seeking City benefit, restriction on right to donate is a reasonable condition. |
| **Used to circumvent regulation?** | **MAYBE.** If executives or officers are restricted from donating in large amounts, lower-level employees could be encouraged to donate as a way to compensate. |

**DEVELOPERS WITH AN INTEREST IN LAND USE DECISIONS**

| | |
|---|---|
| **Financial benefit?** | **YES.** Applicants are looking for a decision that will affect the value of their land. |
| **Affirmative participation?** | **MAYBE.** For many decisions, such as map amendments, variances or special permits, a landowner must apply to appropriate board or commission. For others, such as larger-scale re-zonings, the action may originate with the Planning Commission. A landowner may not have officially requested the particular action, even if he stands to benefit. For yet others, such as DOB permitting decisions, a builder has no discretion about whether or not to seek approval. |
| **Clear identification possible?** | **MAYBE.** Currently, CPC and BSA documents do not systematically identify the landowner affected by a particular decision. While every piece of land has an owner attached to it, much development is done in the name of shell companies or LLCs meant to obscure the principals behind a particular transaction. |
| **Enforcement mechanism possible?** | **YES.** No infrastructure currently exists, however. Enforcement would require additional collection of data on landowners (and principals of development firms) from such applicants before relevant boards and commissions, as well as a database where information can be aggregated and examined by campaigns, the CFB and the public. |
| **False positives?** | **MAYBE.** The risk of false positives can be minimized by focusing on those decisions that are both discretionary (that is, a special permit as opposed to a building permit) and individual (that is, a zoning variance as opposed to a re-zoning) in nature. |
| **Unfair burden?** | **NO.** Enforcement would not require much in the way of additional paperwork; added burden of data collection and organization would fall primarily on boards and commissions. |
| **Limit on right to participate?** | **NO.** Entities would agree to limits on right to donate as a condition of asking for a particular benefit. |
| **Used to circumvent regulation?** | **MAYBE.** There is a potential LLCs can be used to obscure identities and protect the ability of principals to donate up to the full limits. |

**NOT-FOR-PROFITS**

| | |
|---|---|
| **Financial benefit?** | **YES.** While the financial imperative may not be as strong as it is in a for-profit enterprise, contracts with the City to provide social services – which in many cases are quite lucrative – provide a boost to an organization's bottom line, and enable them to grow. |
| **Affirmative participation?** | **YES.** Non-profits who receive contracts participate in the same competitive bidding processes as for-profit firms. |
| **Clear identification possible?** | **YES**, through VENDEX. Identification of principals is not uniform – board members do not have to be identified, for instance – but can be addressed through regulation. |
| **Enforcement mechanism possible?** | **YES**, through VENDEX. |
| **False positives?** | **MAYBE.** People who serve on not-for-profit boards often serve more than one not-for-profit. These individuals are likely the sort of well-off, civic-minded people who would participate by giving campaign donations regardless of their board service. |
| **Unfair burden?** | **MAYBE.** Not-for-profits may find it harder to attract people to serve on boards if their campaign donations are restricted. |
| **Limit on right to participate?** | **NO.** For directors or managerial decision-makers, limits on donations are a reasonable condition of gaining business. |
| **Used to circumvent regulation?** | **NO.** |

**LOBBYISTS**

| | |
|---|---|
| **Financial benefit?** | **YES.** Lobbyists earn fees from clients to access City officials or influence City decisions. |
| **Affirmative participation?** | **YES.** |
| **Clear identification possible?** | **YES.** Lobbyists must register with City Clerk's office, which maintains database that is published online. |
| **Enforcement mechanism possible?** | **YES**; through NYC Lobbyist database. |
| **False positives?** | **NO**; very unlikely. |
| **Unfair burden?** | **NO.** Lobbyists must already register; enforcement should provide no additional burden. |
| **Limit on right to participate?** | **NO.** Accepting limits on right to donate to campaigns should be acceptable price of access to lobbying profession. |
| **Used to circumvent regulation?** | **NO** |

**LOBBYIST CLIENTS**

| | |
|---|---|
| **Financial benefit?** | **MAYBE.** Many clients of lobbyists have financial interests before the city, while others are interested only in policy. Further study might illuminate what proportion of lobbyist clients are business-based or issue-based. |
| **Affirmative participation?** | **YES.** |
| **Clear identification possible?** | **YES.** Lobbyists must list their clients for the City Clerk's database. |
| **Enforcement mechanism possible?** | **YES**; through NYC Lobbyist database. |
| **False positives?** | **YES,** to the extent that it captures clients who have no financial interest in the policy decision they hope to affect. Crafting language to separate *doing business* clients from issue-advocacy clients would prove difficult. |
| **Unfair burden?** | **NO.** Enforcement should provide no additional burden. |
| **Limit on right to participate?** | **MAYBE.** The question of whether a particular firm or individual should be forced to give up his full right to participate financially when he hires a lobbyist may warrant further consideration. |
| **Used to circumvent regulation?** | **NO.** |

59

# APPENDIX F: GOVERNMENT ACTORS IN LAND USE DECISIONS

<table>
<tr><td rowspan="4">ULURP</td><td>1. Community Boards</td><td rowspan="4">Applications subject to ULURP include: changes to the City Map; maps of subdivisions and the platting of land into streets, avenues, etc.; zoning changes*; certain special permits under the jurisdiction of CPC; site selection for City capital projects; revocable consents, solicitations for franchises and major concessions; improvements in real property, the costs of which are payable other than by the City; housing and urban renewal plans and projects*; sanitary or waterfront landfills; disposition of city-owned real property*; acquisition of real property by the City (except office leases); certain other matters.<br><br>* = automatically reviewed by City Council</td><td>Appointed by Borough Presidents, half on recommendations from City Council members</td></tr>
<tr><td>2. Borough Presidents</td><td>Elected</td></tr>
<tr><td>3. City Planning Commission (CPC)</td><td>13 members: 7 appointed by Mayor, 1 appointed by each Borough President, 1 by Public Advocate</td></tr>
<tr><td>4. City Council</td><td>Elected; Land Use Committee (which acts before full Council on land use matters) has 21 members.</td></tr>
<tr><td rowspan="4">Other land use decisions</td><td>Board of Standards and Appeals (BSA)</td><td>Grants special permits and variances; can modify or revoke certificates of occupancy.</td><td>Five members, appointed by Mayor</td></tr>
<tr><td>Landmarks Preservation Commission</td><td>Designates buildings as a landmark or historic district; can prohibit work on landmark building or in historic district.</td><td>11 members, appointed by Mayor</td></tr>
<tr><td>Loft Board</td><td>Resolves regulation issues surrounding loft buildings converted to residential use; settles landlord-tenant disputes; enforces residential legalization deadlines set forth in the Loft Law; enforces maintenance standards.</td><td>Nine members, appointed by Mayor</td></tr>
<tr><td>Department of Buildings</td><td>Reviews construction and demolition plans and issues building permits; inspects buildings to ensure compliance with laws; licenses various construction trades; investigates complaints.</td><td>Commissioner appointed by Mayor</td></tr>
</table>

## ACKNOWLEDGEMENTS

Our Capstone team wishes to thank the members and staff of the New York City Campaign Finance Board for their ongoing assistance throughout this project. In particular, we would like to acknowledge Frederick A.O. Schwarz, Jr., Nicole Gordon, Erik Joerss, Peri Horowitz, Diana Kirby, Andrea Lynn and Kenneth O'Brien.

We would also like to thank the CFB Intern Mike Muller for his invaluable assistance in conducting the quantitative and qualitative analyses sections of the report.

Additionally, we would like to acknowledge the various experts who lent their time and expertise: Frank Barry of the New York City Mayor's Office, Greg J. Brooks and John Graham of the New York City Comptroller's Office, Martha Mahan Haines of the Securities Exchange Commission, Eric Lane of the Hofstra University School of Law, Harry Pozycki of Common Cause New Jersey, Gene Russianoff of New York Public Interest Research Group, and Paul Ryan of the Campaign Legal Center.

Finally, we would like to thank our Capstone advisor, Charles M. Brecher, Professor of Public and Health Administration at the NYU Wagner Graduate School of Public Service, for his support and guidance throughout the project.

20
05

A Report on the 20 05 Elections

PUBLIC DOLLARS *for the* PUBLIC GOOD

  

 NEW YORK CITY CAMPAIGN FINANCE BOARD

# PUBLIC DOLLARS *for the* **PUBLIC GOOD**

## A Report on the 2005 Elections

  

 NEW YORK CITY CAMPAIGN FINANCE BOARD

Copyright © 2006
New York City Campaign Finance Board
40 Rector Street
New York, New York 10006
All rights reserved.
Printed in New Jersey.

chapter 10

# Board Recommendations—
# Meeting the Goals

Since its inception in 1988, the Campaign Finance Program has done much to amplify the voice of individual New Yorkers, to keep them informed about candidates for public office, and to help bring corruption-free elections to their city. However, the 2005 elections exposed a still-considerable distance between political reality and the Program's ultimate goals.

Outside of a relatively small number of hotly contested races for open seats, the 2005 elections were marked by a distinct lack of competition. The elections repeated a phenomenon experienced through many election cycles; when no incumbent is involved, the Program has enabled more candidates to get involved in their community by running for public office, empowered many citizens to play a part in political campaigns, and provided voters with a wider range of choices. The Program has done so by providing money to candidates who would not otherwise have had access to the resources necessary to run an effective campaign.

But—as noted in the Board's post-election report following the 2003 elections—the Program cannot be judged a success if it helps create vibrant competition on an even playing field only in instances of open-seat races. In a perfect world, the Program would have the capacity to enable competitive races in any district, in every election.

Several other concerns came to the attention of the Board over the course of the 2005 campaign, from high-spending candidates who opt out of the Program, to the increasing cost of campaigns, to the potentially wasteful use of taxpayer funds.

The Campaign Finance Act wisely requires the Board to report to the mayor and the City Council after each citywide election* about the Program's effect on political campaigns, and to submit

---

* Or "at such other times as the Board deems appropriate." NYC Administrative Code §3-713.

recommendations to improve the Program. Each election, the Board conducts public hearings, distributes surveys to candidates, evaluates data compiled by staff, and receives formal and informal comments from candidates, government reform advocates, and others. In preparing its recommendations, the Board relies on information from those sources and on its 18 years of experience administering the Program.

The ultimate question driving this post-election report is whether the Program is meeting its fundamental goals as effectively as possible. The recommendations that follow are designed to suggest ways in which the Program might be improved to do so. The Board's goals include:

1. **Increasing the role of the individual donor.** Amplifying the voice of small, individual donors is the animating idea behind the provision of public matching funds to candidates. The $4-to-$1 matching grant to Program participants has made small contributions more valuable to candidates. However, large contributions still wield a disproportionate weight in city electoral politics. More can be done to mitigate their influence.

2. **Enhancing competition for elective municipal offices.** As noted throughout this report, the advantages of incumbency can result in inequities that few challengers find ways to overcome. But whether or not they are incumbents, some candidates have access to funds or opportunities that are simply unavailable to others. The Program should find more ways to equalize opportunities for serious candidates to run effective campaigns.

3. **Increasing public information about campaigns and local issues.** The Board's disclosure regime is easily among the most comprehensive and accessible anywhere. And the Board's efforts do not end with providing information on the sources and uses of campaign funds. With the Debate Program and the Voter Guide, the Board provides voters with opportunities to hear candidates speak for themselves in substantive, unbiased, nonpartisan forums, and the Board will continue to supply even more avenues to improve popular understanding of local issues.

4. **Further streamlining the Program.** To comply with the many requirements of the Act, campaigns must shoulder a considerable burden of recordkeeping and disclosure. Some campaigns may find themselves in violation for failures of comprehension instead of intent. It is incumbent on the Board to find ways to simplify the procedures necessary for compliance as best as it can, without sacrificing the integrity of the Program. To paraphrase Einstein, rules should be as simple as possible, but no simpler.

5. **Protecting taxpayer money from waste.** To maintain public support for the Program, the Board must ensure taxpayers get the best value for their public investment in the political process. This means finding ways to prevent the expenditure of public funds in cases in which those funds are spent inappropriately.

The Board's recommendations are organized under these headings. Separately, the chapter outlines a new program for City Council candidates. Other issues of concern to the Board, and issues that fall outside the Board's jurisdiction, are listed separately as well.

## RECOMMENDATIONS OF THE BOARD

### 1. Increasing the Role of the Individual Donor

#### *Lower Contribution Limits*

The Board has recommended a reduction in the contribution limits several times in the past. Occasionally, the Council has heeded those proposals; in 1998, the limits were lowered from $7,700 to $4,500 for citywide candidates, from $5,900 to $3,500 for borough president, and from $3,550 to $2,500 for Council.*

The Board recommends further reductions in the contribution limits—to $4,000 for citywide candidates, and to $3,000 for borough president. A separate set of reforms to the Program for Council candidates would lower the contribution limit for this office to $250. (See "Create a New Program for City Council Candidates" on page 132.)

It is foremost among the Board's priorities to moderate the influence of wealthy interests and large contributors in the political process through various means. This concern must always be balanced against preserving candidates' ability to wage competitive campaigns. Still, it is clear that high-end contributions play a disproportionate role in funding city campaigns.

For participating citywide campaigns, contributors who gave more than $4,000 were less than 6 percent of the candidates' aggregate total number of contributors. But those relatively few contributors were the source of 40 percent of the total funds raised by participants for the three citywide offices. It is clear that candidates with access to the wealthiest donors have a substantial advantage over opponents who do not. While this advantage is offset to a certain extent by the $4-to-$1 match, as long as the contribution limit is higher than the matchable amount, candidates have an incentive to chase after large contributions. Lowering the contribution limits would narrow this gap. (See also Chapter 4—Contributions.)

For purposes of comparison, the current individual contribution limit to a candidate for federal office is $2,100 per election, for a total of $4,200 for a primary and general election. So, under current law, a candidate for public advocate can raise $750 more per contributor than a candidate for president of the United States.

---

* These limits were adjusted for inflation in 2002 to $4,950, $3,850 and $2,750 respectively. As a measure intended to keep the growth of the limits in check, Local Law 58 of 2004 postponed any scheduled inflation adjustment in contribution limits until 2018.

*Chapter 10*

Lowering the contribution limits as recommended by the Board would not present a hardship to citywide candidates. For the 2005 elections, if all larger donations to participating candidates for mayor, public advocate, and comptroller were restricted to $4,000, those candidates would have lost only 8 percent of their total funding, in the aggregate. (The Board's recommendation for a new City Council program can be found on page 132.)

### Ban Organizational Contributions

An essential step toward renewing and affirming the central role of the individual contributor at the grassroots level in New York City politics is an amendment to the Act allowing only individuals to contribute to campaigns. A prohibition on all organizational contributions for all offices is a key, long-standing recommendation of the Board.[*]

In 1998, the New York City Charter Revision Commission proposed the ban on corporate contributions now written into the law. In doing so, it took special note of the potentially corrupting influence of corporate money in the political marketplace, and the corresponding erosion of confidence in the electoral system. With the ban, the Charter Revision Commission sought to eliminate the inequalities created by corporate contributions and enhance the value of citizen participation. Those same arguments and concerns apply to campaign contributions from partnerships, limited liability corporations (LLCs), and political action committees (PACs). Similar concerns are true of contributions from unions.

Though the corporate ban that took effect before the 2001 elections significantly decreased the proportion of organizational contributions among Program participants, since 2001 the percentage has started to rise again. In the 2001 elections, with many first-time candidates, 13 percent of funds raised came from organizations. In 2005, with more incumbents at all levels of city office, organizational contributions comprised 16 percent of total funds raised.[†] (See Chapter 4.)

Organizational contributions represent a particular and considerable advantage for incumbent candidates. In the 2005 elections, the average incumbent for a Council seat collected 78 contributions from organizations, totaling $43,500. His or her average challenger gathered only two contributions from organizations, totaling $1,800. Open-seat candidates did slightly better, averaging $9,500 from 10 organizational contributions.[‡] (See Figure 10.1.)

---

[*] San Diego and San Diego County, and other municipalities within San Diego county, ban campaign contributions from non-individuals. These laws, enacted in 1973, have never been challenged.

[†] In the 2003 Council-only elections, organizational contributions comprised 25 percent of all funds raised.

[‡] Organizational contributions made up 27 percent of all contributions for incumbents in 2005, and 7.5 percent for challengers. Candidates for open seats collected 15 percent of their contributions from organizations.

*Board Recommendations—Meeting the Goals*

**FIGURE 10.1:** Average Organizational Contributions to all Council Candidates by Campaign—2005*



* *Includes participants and non-participants.*

Disclosure of individual contributions provides a high level of transparency in the political process. Campaigns are required to collect and report information on contributor addresses, employers, and occupations. Little can be known about an organization, however, simply by looking at its name or address. Organization names can be used to obscure the identity or business of the ultimate source of a contribution. The Board's *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions* (provided as Appendix J) identified LLCs as a particular transparency problem; many are involved in city business (especially land use), yet often there is no information in the public record about a particular LLC's owners or principals. Indeed, LLCs are growing more active as a source of campaign funds; while they represented 2.8 percent of total contributions to participants in 2001, they gave 6.2 percent of all funds raised in 2005 by participants. Prohibiting these

contributions is one important way to minimize the impact of "doing business" contributors. (See also recommendation on "doing business" contributions below.)

A ban on organizational contributions would also represent a major simplification of the rules and reduction of paperwork for city campaigns. Instead of asking whether a PAC is registered with the CFB, or determining whether a particular business is a corporation or an LLC, campaigns would simply forgo any contribution that does not come from an individual.*

### Enact Legislation Regulating "Doing Business" Contributions

In 1998, the New York City Charter was amended to require the Board to propose rules to regulate campaign contributions from individuals and entities "doing business" with the city. In response, the Board conducted research and solicited public comment on the issue, and in 1999 proposed three sets of rules governing "doing business" contributions. Among the problems of implementing any regulation of "doing business" contributions was the lack of any usable city database(s) that would make compliance and enforcement feasible. Though these rules were not adopted, discussions have continued about how best to meet the mandate to disclose and regulate these contributions without placing new, unreasonable burdens on participating campaigns. In addition to the Board's work, the city has begun — but has not by any measure completed — database(s) that record those who might or should be included in the definition of doing business (the area of land use requires the most additional work).

In creating any potential "doing business" regulation, the Board has a role to play to ensure city decisions are made with the best interests of the city in mind — rather than the best interests of a campaign contributor.† "Doing business" contributions create inequalities (real and perceived) in the political marketplace as well, diluting the impact of individual contributors. Individuals or entities with hundreds of thousands of dollars of city business at stake do not have to think twice before making a maximum donation to a candidate. In addition, incumbents — who can exert influence on particular city decisions as elected officials — have much greater access to these large donations than do non-incumbent candidates.

In June 2006, the Board published its *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions* (provided as Appendix J), which suggested that up to 22 percent of funds raised by candidates in the 2005 election came from contractors, lobbyists, or lobbyist clients — who comprise only 5 percent of the number of contributors. (The proportion for the 2001 election was even higher: 25 percent of the funds from 4 percent of the contributors.) The research

---

* With an organizational ban, candidates would also not have to engage in the complex process of attributing partnership or LLC contributions greater than $2,500. See Rule 1-04(i).

† Of course, there are many regulations already in existence to safeguard the interests of the public, including extensive contracting procedures and open processes for land use decisions. (See official transcript of the Board's hearing on "doing business," April 18, 2006, available at www.nyccfb.info.)

---

suggests that most "doing business" donors are indeed large donors, and that many—especially lobbyists—play an active role as intermediaries.

This research was based on data available from the online VENDEX database of city contractors and the NYC Lobbyist Search database maintained by the City Clerk's office. Thus, the study's research definition was limited by the availability of data on entities involved in doing business with the city.

Several commentators have maintained, and the Board agrees, that any regulation to restrict "doing business" contributions would be incomplete without governing entities involved in land use decisions. As much as—if not more than—contractors, real estate interests depend upon decisions by city boards or agencies regarding the disposition of city resources to generate profits for their businesses. For decades, studies of campaign giving have reflected this reality, consistently listing real estate interests among the top contributors to candidates for city office. Indeed, preliminary research in the *Interim Report* showed that including land use actors in a regulation would increase the proportion of contributors defined as "doing business" considerably.

The next steps toward workable enforcement of a "doing business" regulation must include improvements to existing city databases that aggregate information about these entities. Data collection on contractors must be improved, standardized, and quality-controlled, and the VENDEX database modified so that its database is compatible with the CFB's own databases. Similarly, if land use actors are to be included in a "doing business" regulation, an extensive effort to collect and aggregate data on applicants to the appropriate city boards and agencies must be undertaken.

Such a data collection effort should be feasible if the legislative will is present. As part of the lobbying reform law enacted earlier this year (Local Laws 15, 16, and 17 of 2006), the City Council mandated that contributions from lobbyists are not eligible for matching funds. To enforce the new law, the lobbyist database will be redesigned to collect the information needed to determine which contributions are ineligible for matching funds, and to permit easy compatibility with the CFB disclosure databases. A similar legislative mandate could result in a similar transformation of the disclosure apparatus for city contracts, and the creation of a similar effort for land use applicants.

It is the Board's conviction that addressing the "doing business" issue would be best and most comprehensively achieved through legislation, rather than through CFB regulation. The model for a "doing business" restriction is the Securities and Exchange Commission (SEC) rule governing municipal securities brokers. Rule G-37 prohibits any dealer or broker from engaging in business with a municipality if that broker has made a donation to a public official in that municipality worth $250 or more.

The key to the SEC rule is that the burden of enforcement is on the bond professional seeking to do business. The rule encourages self-enforcement. Brokers who make prohibited contributions risk losing business. If an enforcement regime puts contractors or developers who violate the law at pain of losing a contract or other approval, they are far more likely to obey the law.

Conversely, regulation that places the burden entirely on campaigns and all their contributors would be unduly complicated. The vast majority of contributors are not "doing business" with the city, and enforcement of a regulation that requires verification of this fact would be more diffuse and less effective. Casting a wide net has the potential to discourage the individual contributor from lawfully participating in the political process and undermines one of the central purposes of the Act. According to the *Interim Report*, about five percent of contributors from the 2005 cycle are "doing business" with the city. In the Board's estimation, an effective regulation would target those five percent, rather than casting a net that encompasses the 95 percent of donors who are not.

Diminishing the influence of "doing business" contributions can also be achieved, of course, by lowering the contribution limits. In the 2005 election, 95 percent of all contributions were for $2,000 or less; 75 percent were $250 or less. Lowering the contributions limits for all offices, then, is a possible alternative that could more easily and efficiently address the perception of undue influence gained by large campaign contributions from all sources, including those who do business with the city.

In the absence of legislation implementing these recommended changes, the Board is likely to promulgate rules governing "doing business" contributions.

### Require Transition and Inauguration Entities (TIEs) to Conform to the Same Limits and Prohibitions on Contributions as Campaigns

The Act requires winning candidates to disclose the fundraising and expenditures associated with commencing their term in office. Rules for TIEs apply to all candidates for city office, whether or not they participate in the Program.

Although donations to TIEs are limited by the Act,[*] there is concern that transition and inauguration expenses are an avenue for donors to curry influence with elected officials above and beyond what the Program's campaign contribution limits allow. Indeed, a contribution to a TIE has a greater potential to influence its recipient, who is no longer a candidate for office, but now an elected official.

In addition, while campaigns have been prohibited from accepting contributions from corporations since 1998, TIEs may accept donations from any source. This has the effect of "rewarding" successful candidates with access to corporate dollars—and the potential influence-seeking that represents. Contributions to TIEs classified as "corporate" made up about 30 percent of all funds raised for transition and inauguration expenses in 2001, and rose to 35 percent in 2005.[†]

The Board recommends that the Act be amended to conform TIE contribution requirements to those for participating campaigns—specifically, that corporate contributions be prohibited, and

---

[*] $4,500 for mayor, public advocate, and comptroller; $3,500 for borough president; $2,500 for City Council.

[†] Only four officeholders formed TIEs following the 2003 election. The figures for 2001 and 2005 do not include Bloomberg, who funded a TIE with his own money after both elections.