UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

TOM OGNIBENE, *et al.*,

                              Plaintiffs,

- against -

FREDERICK A. O. SCHWARTZ, JR., *et al.*,

                              Defendants.

------------------------------------------------------------------------x

**DECLARATION OF MARLA G. SIMPSON**

08 CV 01335 (LTS) (TDK)

      **MARLA G. SIMPSON,** under penalty of perjury, declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

      1. I am the Director of the Mayor's Office of Contract Services ("MOCS"), and the City Chief Procurement Officer ("CCPO"). As the CCPO, pursuant to Executive Order No. 48 of 2004, I have authority to (among other things) perform all reviews, make all determinations and give all approvals and certifications to be performed, made or given by the Mayor pursuant to Chapter 13 of the Charter or the rules of the Procurement Policy Board ("PPB") (discussed below). I also perform these functions with respect to franchises and concessions. I also oversee MOCS, which is responsible for assisting City agencies in complying with procurement procedures and achieving their programmatic missions, overseeing compliance, improving contract management practices, and providing technical assistance. MOCS maintains data concerning City vendors. MOCS also provides support to the PPB and the Franchise and Concession Review Committee ("FCRC"), both of which are discussed below. Additionally, MOCS oversees the creation and administration of the "Doing Business Database"

used to record information about persons who have "business dealings" with the City as defined in the Campaign Finance Act ("CFA") as amended by Local Laws 34 and 67 of 2007.

2. This declaration discusses four categories of financial transactions that are included in the definition of "business dealings with the City" in the CFA, provided that certain criteria in the CFA are met:[1] (1) contracts for the procurement of goods, services and construction; (2) concessions; (3) franchises; and (4) grants.

### I.   Procurement Contracts

#### A.   Overview

3. New York City has a significant volume of procurement contracts. In Fiscal Year (FY) 2008, New York City agencies (not counting affiliated entities such as the New York City Department of Education, New York City Health and Hospitals Corporation and New York City Economic Development Corporation) completed nearly 53,000 procurements worth approximately $15.3 billion.[2]

4. In FY 2008 the City used procurements to obtain a wide range of goods and services, including approximately $4.5 billion (29 percent of the total) in human services, such as day care and foster care, homeless shelters, youth programs and home care; $4.4 billion (29 percent of the total) in construction services; $3 billion (19 percent of the total) in standardized services, including security, janitorial, transportation, plumbing and other services; $592 million (4 percent of the total) in professional services, including information technology, consulting,

---

[1] I am advised that more detail concerning the "business dealings" definition is included in a declaration submitted by Jesse Schaffer.

[2] Contracts have terms that range from instantaneous (for example, one-time-only goods contracts that are completed upon delivery) to decades. This figure represents the annualized procurement volume, which is the total value of contracts that were registered by the Comptroller in FY 2008. It includes contracts where the entire duration occurred within the reporting year, contracts for fixed multi-year terms, and construction contracts of undetermined duration.

accounting, legal and other services; $914 million (6 percent of the total) in goods; and $2 billion (13 percent of the total) in architecture and engineering services.[3]

5. As of June 30, 2008, City agencies (not counting affiliated entities) held a combined total of 19,578 open contracts worth approximately $55.4 billion.

6. City officials who may be directly involved in the procurement process include the Mayor and the relevant agencies; the Comptroller, who registers contracts, and who also has authority to audit contract performance, Charter §§ 93(b), (p), 328, 375; and Council members, Borough Presidents and the Public Advocate, who may designate individual contractors to receive discretionary funds or line item budget appropriations, with such designations subject to a determination by the relevant agency to award the contract.

7. The City's procedures for procurement of goods, services and construction are set forth in Chapter 13 of the New York City Charter, and the Rules of the Procurement Policy Board ("PPB") (Title 4 of the Rules of the City of New York). The PPB is a five-member board with three members appointed by the Mayor and two members appointed by the Comptroller, each of whom serves at the pleasure of the appointing official. Charter § 311; see also N.Y. Gen. Munic. Law § 104-b(1) (providing for PPB to develop procurement policies and procedures). The Charter provisions and the PPB rules apply to all agencies of the City of New York. Procurements by agencies affiliated with the City that are separately created under law, such as the Department of Education and the School Construction Authority, are governed by State law as well as those agencies' internal procedures. Procurements by other agencies affiliated with the City of New York are also governed by those agencies' internal procedures and in some cases by State law.

---

[3] These figures also represent the annualized procurement volume.

8. The City's procurement rules do not apply to collective bargaining with City unions, or to employer-employee relationships for non-unionized employees. Collective bargaining with City employee unions is a distinct process that is governed by State law; MOCS is not involved with this process. The procurement rules do, however, apply when a union competes for or receives a procurement contract to provide goods, services or construction.

**B.    Source Selection Requirements**

9. The Charter, the PPB rules and State law include certain requirements for "source selection," or choosing an entity for a contract award.

10. Some contracts must be awarded through competitive sealed bidding. State law generally mandates publicly advertised competitive sealed bidding for public works contracts. See N.Y. Gen. Munic. Law § 103(1). This process must be initiated through a publicly-advertised invitation for bids, and the contract awarded to the lowest responsible bidder. Id.; Charter § 313(b)(2); see also 4 R.C.N.Y. § 3-02 (PPB requirements concerning competitive sealed bidding).

11. In FY 2008, 42% percent of City agency contracts were awarded using competitive sealed bidding (total of $6.5 billion).

12. In accordance with State law, and pursuant to the PPB rules, a source selection method other than competitive sealed bidding may be appropriate where factors other than price should be taken into account, such as when "specifications cannot be made sufficiently definite and certain to permit selection based on bid price or evaluated bid price alone," or "judgment is required in evaluating competing proposals, and it is in the best interest of the City to require a balancing of price, quality, and other factors." 4 R.C.N.Y. § 3-01(d)(2).

13. Examples of alternative procurement methods set forth in the Charter and/or the PPB rules include competitive sealed proposals, which involves issuing a request for proposals that meet specified criteria and selecting the proposal that is most suited to the City's interests, see Charter § 319, 4 R.C.N.Y. § 3-03; and negotiated acquisition, which involves negotiating with qualified, interested vendors concerning a particular procurement, and may involve preliminary discussions with vendors before the negotiation process begins, see 4 R.C.N.Y. § 3-04.

14. As a general matter, contract awards made using alternative procurement methods involve more discretion by government officials in determining who should get the contract award than is the case with competitive sealed bid contracts. Also, in some cases, the process may involve negotiation between the prospective contractor and government officials prior to granting a contract award.

15. The City may also make emergency procurements in the case of a public emergency requiring immediate action. Gen. Munic. Law § 103(4). Emergency procurements must be made using "such competition as is practicable under the circumstances." Charter § 315. Approval of both the Comptroller and the Corporation Counsel is required in order to use emergency procurement procedures. Id.; 4 R.C.N.Y § 3-06.

16. Contract awards may also be made from line item appropriations or discretionary funds (commonly called "member items") to community-based not-for-profit or other public service organizations at the behest of elected City officials other than the Mayor or the Comptroller – that is, City Council members, borough presidents or the Public Advocate. These contracts are not subject to competitive sealed bidding requirements, or to other source selection requirements of the PPB rules. 4 R.C.N.Y. § 1-02(e).

## II.   Concessions

17. A "concession" is defined in the Charter as "a grant made by an agency for the private use of city-owned property for which the city receives compensation other than in the form of a fee to cover administrative costs." Charter § 362(a). Examples of concessions include food vendor or merchandise carts, restaurants and some recreational facilities in City parks; and certain uses of the City's intellectual property, such as T-shirts and souvenirs with City logos. In FY 2007, City agencies had 728 concession agreements, which generated approximately $48 million for the City.[4] The vast majority of concessions involving City agencies are with the Department of Parks and Recreation.

18. Concessions involving agencies of the City of New York are granted by City agencies in accordance with Chapter 14 of the Charter and rules establishing procedures for granting concessions promulgated by the FCRC. Charter § 374(a); see generally R.C.N.Y. title 12 (Concession Rules).

19. The FCRC includes two appointees of the Mayor, who serves as Chair, and one Mayoral appointee; the Director of the Office of Management and Budget; the Corporation Counsel; and the Comptroller. Charter § 373(a). In addition, the borough president from the borough where a franchise or concession would be located serves as a member of the FCRC; when more than one borough is involved, the borough presidents identify one person to serve on the FCRC for that purpose. Id.

20. Similar to City contracts, concessions may be awarded using competitive sealed bidding, 12 R.C.N.Y. § 1-12; competitive sealed proposals, 12 R.C.N.Y. § 1-13; negotiated concessions (similar to negotiated acquisition), 12 R.C.N.Y. § 1-14; small concessions (amounting to not more than $10,000 for the City over the course of the concession

---

[4] Concession and franchise revenue data for FY 08 is not yet available.

term, which may not exceed five years), 12 R.C.N.Y. § 1-15; or other procedures approved by the FCRC, 12 R.C.N.Y. § 1-16. Most concessions are awarded using competitive sealed bidding.

21. Before awarding a concession, a City agency must comply with the procedures set forth in the FCRC's concession rules or obtain its approval to use a different procedure. Charter § 374(a).

22. Additionally, a determination must be made as to whether a concession is a "major concession." Charter § 374(b). A "major concession" is one that has "significant land use impacts and implications" as determined pursuant to rules adopted by the City Planning Commission, or for which an environmental impact statement is required. Id.; see also 62 R.C.N.Y. §§ 7-01 – 7-03. Examples of uses that have been determined to be major concessions include a marina with more than 200 slips, and a permanent performance or spectator sport use with more than 2,500 seats. Id. § 7-02. Major concessions are subject to review through the City's Uniform Land Use Review Procedure ("ULURP"), which may involve review by local community boards, borough presidents, the City Planning Commission, and in some cases the City Council.

23. Concession agreements must be registered with the Comptroller. 12 R.C.N.Y. § 1-17.

### III.    Franchises

24. A "franchise" is defined as "a grant by an agency of a right to occupy or use the inalienable property of the city to provide a public service." Charter § 362(b). Examples of franchises include access to City property for providing cable television or other telecommunication services, or bus service. In FY 2007, City agencies had 47 franchise

- 8 -

agreements, which provided approximately $130 million in revenue to the City, of which $91 million consisted of cable television revenue.

25. A franchise may be awarded only after an initial determination of need is made by the agency identified by the Mayor as having the most expertise relating to the franchise. The agency must prepare an "authorizing resolution" for submission by the Mayor to the City Council. Charter § 363(a)-(c). The authorizing resolution must set forth "the nature of the franchise or franchises to be granted, the public service to be provided, the terms and conditions of the franchise or franchises, including any subsidies that will be given to a franchisee, the method by which proposals will be solicited for the franchise or franchises and the criteria to be used in evaluating the proposals submitted in response to such a solicitation." Id. § 363(b). The Council must hold a public hearing on the authorizing resolution within 90 days of receiving the resolution. The Council may approve, approve with modifications or disapprove the resolution; any approval with modifications or disapproval is subject to veto by the Mayor and override by Council. Id. § 363(c).

26. Additionally, the Department of City Planning must determine whether the proposed franchise would have significant land use impacts or implications; if so, the request for proposals or other solicitation must be reviewed and approved in accordance with ULURP. Id. § 363(e).

27. If the authorizing resolution is approved, and ULURP approval is unnecessary or is obtained, the agency may solicit proposals and choose a franchisee in accordance with the resolution. Id. § 363(e), (f).

- 9 -

28. The selection of a franchisee and any franchise agreement are subject to approval by the FCRC. Id. § 363(f). The votes of five FCRC members are required to approve a franchise agreement. Id. § 373(c).

## IV.    Grants

29. A "grant" is defined in the PPB rules as "[a] cash transfer made by a government entity to another government entity, a quasi-public entity, a private organization, or an individual, for use by the recipient in accomplishing objectives established by the recipient." 4 R.C.N.Y. § 1-01. The PPB rules further provide that a grant may be used "only to accomplish a public purpose authorized by federal, state, or City law." Id. Written agreements with the grantee are not considered procurements. Id.

30. Grants are generally given to non-profit entities such as cultural institutions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
           August 4, 2008

_____
MARLA G. SIMPSON