Index No.  08-CV-1335 (LTS)(TDK)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TOM OGNIBENE, *et al.*,

Plaintiffs,

- against -

FREDERICK A. O. SHWARTZ, JR., *et al.*,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR
INJUNCTIVE RELIEF AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT**

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel: Jonathan Pines*
*Tel:  (212) 788-0933*
*NYCLIS No. 2008-004838*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

ARGUMENT

    POINT I

        THE CONTRIBUTION RESTRICTIONS CHALLENGED
        BY PLAINTIFFS ARE CONSTITUTIONAL. ....................................... 3

           A.    The contribution limits at issue in this action
                 are more than sufficient to satisfy the
                 "relatively complaisant review under the
                 First Amendment" to which such regulations
                 are subject. ........................................................................3

               1.  The Doing Business contribution limits are
                    constitutional. ................................................................. 8

                   a.    The Doing Business contribution
                         limits are not overinclusive. ...............................14

                   b.    The Doing Business contribution
                           limits are not underinclusive ...............................17

                   c.    The Doing Business contribution
                           limits do not discriminate on the
                         basis of viewpoint. .............................................18

                   d.    The Doing Business contribution
                           limits meet the requirements of
                       *Randall v. Sorrell*. ............................................20

               2.  The expansion of the corporate contribution
                     ban to LLCs, LLPs, and partnerships
                     pursuant to Admin. Code § 3-
                     703(1)(l) is constitutionally
                     permissible. ................................................... 24

**Page**

    a.  The expanded corporate prohibition is not overinclusive....................................25

    b.  The expanded corporate prohibition is not underinclusive...................................29

    c.  The expanded corporate prohibition is not overbroad...............................................31

**POINT II**

THE DESIGNATION OF CONTRIBUTIONS FROM THOSE ENGAGED IN DOING BUSINESS WITH THE CITY AS NON-MATCHING IS CONSTITUTIONAL......................................... 33

  A.  The non-matching provision do not reduce "to a whisper" the voice of affected contributors ....................................................33

  B.  The CFA's non-matching provision is neither overinclusive nor underinclusive.......................................35

  C.  The non-matching provision is not overbroad, nor does it constitute viewpoint discrimination. ...............................................37

**POINT III**

PLAINTIFFS' AS APPLIED CHALLENGE IS PREMATURE OR IS OTHERWISE INFIRM AND SHOULD BE DENIED................................... 38

  A.  The Candidate-Plaintiffs have no present intention of subjecting themselves to the regulations challenged in this action, and have no basis other than pure conjecture that the challenged provisions will affect them adversely. .....................................................38

  B.  "Doing Business" Plaintiff Robert Perez is not, in fact, affected in any way by the Doing Business contribution limits, as plaintffs' counsel now concedes. ...................................39

CONCLUSION................................................................. 41

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                       <u>Pages</u>

Austin v. Michigan State Chamber of Commerce,
    494 U.S. 652 (1990)..................................................................................9, 23 26, 27, 28,
                                                                                      29, 30

Blount v. SEC,
    61 F.3d 938 (D.C. Cir. 1995)...........................................................9, 10, 13, 30, 31

Buckley v. Valeo,
    424 U.S. 1 (1976)...........................................................................3, 4, 5, 6, 7, 15
                                                              16, 20, 22, 23, 24,
                                                              29, 30, 38

Casino Association of La. v. State,
    820 So. 2d 494 ..........................................................................................10

City of Los Angeles v. Lyons,
    461 U.S. 95 (1983)....................................................................................40

Civil Service Commission v. Letter Carriers,
    413 U.S. 548, 37 L. Ed. 2d 796, 93 S. Ct. 28880 (1973).........................................6

Crawford v. Marion County Election Board,,
    -- U.S. -- 128 S. Ct. 1610 (2008) ....................................................................38

Daggett v. Commission on Governmental Ethics and Election Practices,
    205 F.3d 445 (1st Cir. 2000)......................................................................8, 12

In re: Earle Asphalt Co.,
    950 A.2d 918, 2008 N.J. Super. LEXIS 143
    (N.J.Super.Ct., App.Div. June 30, 2008) ....................................................21, 22, 24

Federal Election Commission v. National Conservative Political Action Committee,
    470 U.S. 480, 84 L. Ed. 2d 455, 105 S. Ct. 1459 (1985)..........................6, 8, 12, 28

Federal Election Commission v. National Right to Work Committee,
    459 U.S. 197, 74 L. Ed. 2d 364, 103 S. Ct. 552 (1982)................6, 8, 12, 14, 27, 28

Federal Election Commission v. Weinstein,
    462 F. Supp. 243 (S.D.N.Y. 1978) ....................................................................9

Federal Election Commission v. Beaumont,
    539 U.S. 146 (2003)...........................................5, 8, 9, 25, 27, 29, 31, 37

**Cases**                                                                                                          **Pages**

First National Bank of Boston v. Bellotti,
    435 U.S. 765, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978) ............................................................6

Gwinn v. State Ethics Commission,
    426 S.E.2d 890 (Ga. 1993).....................................................................................................10

Institute of Government Advocates v. Fair Political Practices Commission,
    164 F. Supp. 2d 1183 (ED Cal 2001)....................................................................................10

Katzenbach v. Morgan,
    384 U.S. 641 (1966)...............................................................................................................39

Kimbell v. Hooper,
    665 A.2d 44 (Vt. 1995) ..........................................................................................................10

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)...............................................................................................................40

McConnell v. FEC,
    540 U.S. 93 (2003).............................................................................................................4, 7

NCRL v. Bartlett,
    168 F.3d 705 ...........................................................................................................................10

National Council of La Raza v. Mukasey,
    2008 U.S. App. LEXIS 14129 (2d Cir. 2008) ......................................................................40

Nixon v. Shrink Missouri Government PAC,
    528 U.S. 377 (2000)................................................................................5, 7, 8, 12, 13, 15, 20

Police Department of the City of Chicago v. Mosely,
    408 U.S. 92 (1972).................................................................................................................20

Randall v. Sorrell,
    548 U.S. 230 (2006).................................................................................20, 21, 22, 24, 35

Renton v. Playtime Theatres, Inc.,
    475 U.S. 41 (1986).................................................................................................................14

Schiller Park Colonial Inn, Inc. v. Berz,
    349 N.E.2d 61 (Ill. 1976)........................................................................................................9

Soto v. State of New Jersey,
    565 A.2d 1088 (N.J. Super. Ct. App. Div. 1989)..................................................................10

**Cases**                                                                                                      **Pages**

State v. Alaska Civil Liberties Union,
    978 P.2d 597 (Ak. 1999)........................................................................................10

United States v. Automobile Workers,
    352 U.S. 567, 77 S. Ct. 529, 1 L. Ed. 2d 563 (1957)...........................................6

United States v. Harriss,
    347 U.S. 612 (1954)...............................................................................................10


**Statutes**

2 U.S.C. § 441b................................................................................................................31

§3-211.................................................................................................................................14

§ 3-211(a).................................................................................................................14, 15, 37

§ 3-213(c)(1)......................................................................................................................37

Admin. Code § 3-703(1-a)................................................................1, 14, 33, 34, 39, 40

Admin. Code §§ 12-302....................................................................................................17

Admin. Code § 3-213 (c)(1).............................................................................................36

Admin Code  §3-702..........................................................................................................14

Admin. Code § 3-702(3)..............................................................................................14, 34

Admin. Code § 3-702 (3)(e).............................................................................................35

Admin. Code § 3-702 (3)(g).......................................................................................15, 37

Admin. Code § 3-702 (8)...................................................................................................23

Admin. Code § 3-702(16)..................................................................................................15

Admin. Code § 3-702(18)............................................................................15, 23, 33, 34

Admin. Code § 3-702 (18)(a)...........................................................14, 16, 17, 24, 40

Admin. Code § 3-702 (20)................................................................................................34

Admin. Code §3-703(1)(l)................................................................................1, 24, 25, 29

**<u>Statutes</u>**                                                                                          **<u>Pages</u>**

Admin. Code § 3-719 (2)(b) ................................................................................14, 34

Admin. Code § 3-703 (1)(f) ...................................................................................15

Admin. Code § 3-702 (18)(b) .................................................................................16

Admin. Code § 3-705 (2)(a) ...................................................................................33

Admin. Code § 12-307 ...........................................................................................17

CFB Rule 1-04(k)(2) ..............................................................................................36

Rule 56.1 ...............................................................................................................2, 41

Rule G-37 ................................................................................................................9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

TOM OGNIBENE, *et al.*,

                                         Plaintiffs,

                    - against -                           08-CV-1335 (LTS) (TDK)
                                                          (Electronically Filed)
FREDERICK A. O. SHWARTZ, JR., *et al.*,

                                         Defendants.

-----------------------------------------------------------------x


### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT


### Preliminary Statement

        In plaintiffs' pending motion for injunctive relief, plaintiffs assert constitutional

challenges to two provisions regulating political contributions to candidates covered by the

Campaign Finance Act ("CFA"):  (i) Admin. Code § 3-703(1-a), which imposes upon "a natural

person who has business dealings with the [City of New York]" contribution limits lower than

those imposed upon other individual contributors ("Doing Business contribution limits"); and (ii)

Admin. Code § 3-703(1)(l), which extends the CFA's pre-existing prohibition on corporate

contributions to LLCs, LLPs, and partnerships ("expanded corporate prohibition").  Additionally,

plaintiffs challenge a provision of the CFA that limits its publicly funded matching program to

contributions from natural persons who are residents of New York City, thereby excluding from

public matching contributions not only organizations plaintiffs apparently favor, such as

corporations, limited liability companies ("LLCs"), limited liability partnerships ("LLPs"),

partnerships – but also other entities plaintiffs apparently do not, such as labor organizations and neighborhood associations.

Because plaintiffs do not, and cannot, establish that the CFA's Doing Business contribution limits, expanded corporate prohibition, or matching provisions are unconstitutional, their claims should be dismissed and defendants' cross-motion for summary judgment granted.

## STATEMENT OF FACTS

For a complete statement of the facts relevant to defendants' cross-motion, and to their opposition to plaintiffs' motion, defendants respectfully refer the Court to Defendants' Statement Pursuant to Local Rule 56.1, dated August 4, 2008.

# ARGUMENT

## POINT I

### THE CONTRIBUTION RESTRICTIONS CHALLENGED BY PLAINTIFFS ARE CONSTITUTIONAL.

**A.     The contribution limits at issue in this action are more than sufficient to satisfy the "relatively complaisant review under the First Amendment" to which such regulations are subject.**

Starting with the seminal case of *Buckley v. Valeo*, 424 U.S. 1 (1976), and consistently thereafter, the Supreme Court has made clear that restrictions imposed upon campaign contributions impose a lesser burden on First Amendment rights than restrictions on campaign expenditures, and, as a result, are to be accorded correspondingly greater latitude by reviewing courts. The contribution limits set forth in the CFA clearly meet or exceed constitutional requirements under the relatively deferential standards of review applied by *Buckley* and its progeny.

In *Buckley*, the Supreme Court identified three potential First Amendment interests implicated by contribution limits: the contributor's right of free speech; the candidate's right of free speech; and the contributor's right of association. As to the contributor's speech rights, the Court found the impact of contribution limits on such rights only "marginal":

> [A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political

3

> communication, for it permits the symbolic expression of support
> evidenced by a contribution but does not in any way infringe the
> contributor's freedom to discuss candidates and issues.

*Buckley*, 424 U.S. at 20-21 (footnote omitted).

Regarding the candidate's speech rights, the *Buckley* Court concluded that contribution limits are constitutionally permissible so long as they do not prevent candidates "from amassing the resources necessary for effective advocacy." *Id.* at 21. Finally, regarding freedom of association, the Court recognized that "making a contribution, like joining a political party, serves to affiliate a person with a candidate." *Id.* at 22. While the Court held that the infringement of associational freedom is entitled to the "closest scrutiny," it also held that even a "significant interference" in the exercise of that right will survive such scrutiny if the restriction advances a "sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.*

In establishing a lower standard of review for contribution limits as opposed to expenditure limits, *Buckley* specifically noted that contribution limits left donors free to "engage in independent political expression," to "associate actively through volunteering their services," and to "assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Buckley*, 424 U.S. 1, 28. The CFA similarly permits such alternative means of engaging in expression and association by excluding from the definition of "contribution" subject to regulation the donation of any money "or other thing of value" ... "if it is made, taken, or performed by a person or a political committee independent of the candidate" or his or her campaign. Admin. Code § 3-702(8).

Subsequent decisions of the Court continue to support *Buckley's* reasoning. *See, e.g., McConnell v. FEC*, 540 U.S. 93, 138, n.40 (2003) ("Since our decision in *Buckley*, we have

consistently applied less rigorous scrutiny to contribution restrictions aimed at the prevention of corruption and the appearance of corruption.") (collecting cases).    In *Federal Election Commission v. Beaumont*, 539 U.S. 146, 161 (2003), the Court set forth "the basic premise we have followed in setting First Amendment standards for reviewing political financial restriction":

> [T]he level of scrutiny is based on the importance of the political activity at issue to effective speech or political association. [Citations.]  Going back to *Buckley v. Valeo*, 424 U.S. 1 (1976), restrictions on political contributions have been treated as merely "marginal" speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression.

In *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000), the Supreme Court reaffirmed the soundness of *Buckley's* analysis, and held it "to be authority for comparable state regulation, which need not be pegged to *Buckley's* dollars." *Id.* at 382.  Surveying its post-*Buckley* cases, the Court concluded that, as compared to expenditure limits, "[i]t has, in any event, been plain ever since *Buckley* that contribution limits would more readily clear the hurdles before them." *Id.* at 387.  Thus, the Court held that contribution limits would be found constitutionally invalid only if they were "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Id.* at 387.

The Court then looked to *Buckley* and its progeny to assess the government interests held, in those cases, to be "sufficiently important" to surmount those comparatively lower constitutional "hurdles."  Because the constitutionality of the contribution limits enacted by the City Council in Local Law 34 turns on the government interests thereby advanced, the Court's articulation of those interests in *Shrink Missouri*, while somewhat lengthy, bears excerpting in full:

"The prevention of corruption and the appearance of corruption," was found [in *Buckley*] to be a "constitutionally sufficient justification," 424 U.S. at 25-26:

> "To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined . . . .

> "Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions . . . . Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.'"

424 U.S. at 27 (quoting *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 565, 37 L. Ed. 2d 796, 93 S. Ct. 2880 (1973)).

*See also Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 497, 84 L. Ed. 2d 455, 105 S. Ct. 1459 (1985) ("Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns"); *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 208, 74 L. Ed. 2d 364, 103 S. Ct. 552 (1982) (noting that Government interests in preventing corruption or the appearance of corruption "directly implicate 'the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process'" (quoting *United States v. Automobile Workers*, 352 U.S. 567, 570, 77 S. Ct. 529, 1 L. Ed. 2d 563 (1957)); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788, n. 26, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978) ("The importance of the governmental interest in preventing (corruption) has never been doubted").

In speaking of "improper influence" and "opportunities for abuse" in addition to "quid pro quo arrangements," we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the

> power of money "to influence governmental action" in ways less
> "blatant and specific" than bribery. *Buckley*, 424 U.S. at 28.

*Shrink Missouri*, 528 U.S. at 388-389.

In *McConnell*, a case upholding federal limits on "soft money," the Court repeated its concerns about the pernicious impact of more subtle forms of corruption, noting its harm to a "functioning democracy," even when it occurs "only occasionally":

> Just as troubling to a functioning democracy as classic *quid pro quo* corruption is the danger that officeholders will decide issues not on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions valued by the officeholder. Even if it occurs only occasionally, the potential for such undue influence is manifest. And unlike straight cash-for-votes transactions, such corruption is neither easily detected nor practical to criminalize. The best means of prevention is to identify and to remove the temptation.

*McConnell*, 540 U.S. 93, 153. As noted above, the Court in *McConnell* fully recognized the "almost equal" governmental interest in addressing the *perception* of the corruption among potential voters who might thereby be discouraged from participating in the political process through cynicism and apathy: "Take away Congress' authority to regulate the appearance of undue influence and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *McConnell, id.* at 143-44 (internal citations omitted).

The Court has also made clear that legislative efforts to combat both the fact and appearance of corruption through contribution limits should neither be second-guessed nor easily set aside by the judicial branch, given that the speech involved is far from the core of protected speech. *See, e.g., McConnell*, 540 U.S. at 137 ("*Buckley's* 'closely drawn' scrutiny shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it

enjoys particular expertise"); *Beaumont*, 539 U.S.at 155 ("[S]uch deference to legislative choice is warranted particularly when Congress regulates campaign contributions").

The First Circuit, surveying the Supreme Court's reluctance to second-guess legislative determinations addressed to the fact or appearance of corruption, made the following observation in rejecting speech and associational challenges to contributions limits:

> Cases referenced by *Shrink Missouri PAC* display the reluctance of the Court to second-guess legislative determinations, especially when corruption is the harm to be prevented. *See, e.g., Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 500 (1985) (recognizing the "proper deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized"); *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 210 (1982) ["*NRWC*"] ("Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared").

*Daggett v. Comm'n on Governmental Ethics and Election Practices*, 205 F.3d 445, 458 (1st Cir. 2000).

The contribution limits challenged by plaintiffs clearly embody the City Council's determination of a need for "prophylactic measures where corruption is the evil feared." *NRWC*, 459 U.S. at 210. As a consequence, the Constitution neither requires, nor even favors, this Court's second-guessing that determination.

### 1.    The Doing Business contribution limits are constitutional.

As of the close of FY 2007 (concluding on June 30, 2008), entities considered to have "business dealings" with the City of New York – *i.e.*, through contracts, concessions, or franchises with the City – were engaged in 4,581 transactions valued at approximately $55 billion. See Declaration of Jesse Schaffer, dated August 4, 2008 ("Schaffer Decl.") at ¶¶ 39, 41, and Schaffer Ex. A, annexed thereto. With so much money at stake, it is hardly surprising that

the City Council sought to address the inevitable attempts by prospective applicants seeking a share of that money to affect relevant government decisionmaking through campaign contributions.

Plaintiffs allege that, because the "Doing Business" contribution limits have been set by the City Council at a level lower than those applicable to individuals generally, [1] they are constitutionally infirm.  Plaintiffs urge the Court to substitute its judgment for that of the legislature, and, ignoring that body's stated concern with the fact and appearance of corruption inherent in "doing business" contributions, to invalidate the Doing Business contributions limits as unconstitutional.  There is no legal basis for the relief plaintiffs seek.

In addition to the Supreme Court's repeated upholding of federal and state prohibitions of corporate contributions, *see, e.g.*, *Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652 (1990); *FEC v. Beaumont, supra*, a number of federal and state courts have upheld the use of similar contribution limits specifically addressed to particular categories of contributors deemed by legislatures as posing greater opportunities for the fact or appearance of corruption (in most cases, imposing complete bans on such contributions, rather than merely more stringent limits, as here).  *See, e.g., Federal Election Comm'n v. Weinstein*, 462 F. Supp. 243, 249 (S.D.N.Y. 1978) (upholding Federal Election Campaign Act provision prohibiting political contributions by government contractors); *Blount v. SEC*, 61 F.3d 938, 944-948 (D.C. Cir. 1995) (upholding SEC Rule G-37 which prohibits contributions above $250 by municipal

---

[1] The Doing Business contribution limits are the following:  for Mayor, Public Advocate, and Comptroller:  $400; for Borough President:  $320; for City Council:  $250.  Admin. Code § 3-703(1-a).  The contribution limits applicable to individuals are $4,950 for Mayor, Public Advocate, and Comptroller; $3,850 for Borough President, and $2,750 for City Council.  *See* CFB website at http://www.nyccfb.info/candidates/candidates/limits/2009.htm (last visited August 4, 2008).

securities professionals to campaigns of state and local officials responsible for awarding government underwriting contracts); *Soto v. State of New Jersey*, 565 A.2d 1088 (N.J. Super. Ct. App. Div. 1989) (upholding ban on political contributions by casino owners and employees); *Casino Ass'n of La. v. State*, 820 So.2d 494, 497-509 (same); *Gwinn v. State Ethics Comm'n*, 426 S.E.2d 890 (Ga. 1993) (upholding ban on contributions by insurance companies to candidates for Insurance Commissioner); *Schiller Park Colonial Inn, Inc. v. Berz*, 349 N.E.2d 61 (Ill. 1976) (upholding ban on contributions from liquor industry employees).

Restrictions on lobbyists have also been upheld. *See, e.g Institute of Government Advocates v. Fair Political Practices Comm'n*, 164 F.Supp.2d 1183, 1191 (ED Cal 2001) (summary judgment granted denying constitutional challenge to prohibition on lobbyist contributions to lobbied officeholders); *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 617-20 (Ak. 1999) (upholding against First Amendment challenge state prohibition on out-of-district lobbyist contributions, finding that "lobbyists' contributions are especially susceptible to creating an appearance of corruption"); *NCRL v. Bartlett*, 168 F.3d 705 (upholding in-session contribution ban); *Kimbell v. Hooper*, 665 A.2d 44, 46-51 (Vt. 1995) (same). The Supreme Court long ago recognized the government interest in regulating lobbyists to combat corruption and protect governmental integrity. *See United States v. Harriss*, 347 U.S. 612 (1954) (dismissing First Amendment challenge to lobbying disclosure act).

As the First Circuit observed in *Blount*, sustaining against constitutional challenge an SEC regulation that targeted municipal securities brokers for lower contribution limits:

> Contributions and solicitation of contributions have two aspects. They may communicate support for a candidate and his ideas, but they may also be used as the cover for what is much like a bribe: a payment that accrues to the private advantage of the official and is intended to induce him to exercise his discretion in the donor's favor, potentially at the expense of the polity he serves.

*Blount*, 361 F.3d at 942.

The legislative record makes clear that the Doing Business restrictions are reasonably addressed to that very concern about the fact or appearance of corruption, and do not unconstitutionally burden the exercise of plaintiffs' speech and associational rights. *See* comments of Councilmember Daniel Garodnick, Recessed Stated Meeting of June 15, 2007, held on June 27, 2007, annexed to the Declaration of Jonathan Pines, dated August 4, 2008 ("Pines Decl.") as Pines Ex. O, at 64-65: "[V]ery significantly, [the proposed law] makes important changes to the contribution rules, limiting the potential influence of those doing business with the City of New York, and reducing any appearance [of] conflicts"; and Statement of Council Speaker Christine Quinn, at the signing ceremony for Local Law 34, on July 3, 2007, listing as the first of three goals of the latest legislative amendments to the Campaign Finance Law, "to come up with the strongest system possible to limit the perception of influence by those who … do or are trying to do business with the City of New York, as it relates to their campaign contributions." Ex. P to Pines Decl. In his own comments prior to signing the legislation into law, Mayor Michael Bloomberg made the following statement about the governmental interests – and, more fundamentally, the public interests – advanced by the legislation:

> This bill will strengthen the City's landmark Campaign Finance Program by placing strict restrictions on what are called "pay-to-play" contributors – the practice of giving large campaign contributions in order to influence government.
>
> The Campaign Finance Program was adopted in 1988 to reduce corruption and diminish the influence that special interests wield in city government. The law has been enhanced several times since 1988, and in 1998, voters passed a referendum requiring candidates to disclose, and allowing the Campaign Finance Board to restrict, "pay-to-play" contributions. Introductory [586-A] will finally fulfill the voters' mandate by requiring the disclosure of contributions from those who do business with the City, reduce the amounts that candidates may accept from such contributors, and eliminate public matching

> funds from such contributions.    These new provisions will
> strengthen the integrity of City government and enhance its
> transparency  –  two  critically  important  goals  of  our
> Administration.

*Id.*  As Mayor Bloomberg noted, in 1998, voters approved a referendum that, for the first time,

called for "disclosure and regulation of contributions by those doing business with the City of

New York." Pines Decl., Ex. F.  The Supreme Court has found that such voter referenda provide

sufficient evidence of the electorate's concerns about the fact and appearance of corruption to

support responsive regulation.  *See, e.g., Nixon v. Shrink Missouri Government PAC*, 528 U.S.

377, 394 (voter approval of a ballot initiative seeking to impose contribution limits "certainly

attested to the perception relied upon here: ... that contribution limits are necessary to combat

corruption and the appearance thereof"); *Daggett v. Comm'n on Governmental Ethics and

Election Practices*, 205 F.3d 445, 458 (1st Cir. 2000) (Maine voters' approval of referendum

imposing reduced contribution limits indicative of their perception of corruption).

Indeed, notwithstanding arguments made by their lawyers, many of the plaintiffs

themselves readily concede that pay-to-play contributes to a public perception of corrupt

practices and self-dealing on the part of elected officials and of those with a business interest in

their election.  *See, e.g.*, Deposition of Thomas V. Ognibene, dated June 17, 2008 ("Ognibene

Dep.") at 31-32, annexed to Pines Decl. as Pines Ex. JJ:

> Q:   In your view, is there a public perception that campaign
> contributions by persons that have business dealings with the City
> may influence the actions of elected officials?
>
> A:  Yes.
>
> Q:  And what is the basis for your answer?
>
> A:   Just … standing at a train station, talking to people and
> campaigning, as they come walking, the ones that usually throw it
> back in your face make a comment.

Q: And what do they say?

A: You know, "You're all a bunch of crooks."

Several of the plaintiffs readily concede that the contributions from lobbyists and others having business dealings with the City have a negative effect upon public perception of the political process and the integrity of governmental decisionmaking.[2]

Of course, the record contains other evidence aside from plaintiffs' admissions suggesting a need for legislation to address pay-to-play concerns. As one example, the Council had before it the Campaign Finance Board's report, entitled "Interim Report of the New York City Campaign Finance Board on 'Doing Business' Contributions," dated June 19, 2006, which analyzed the available data and found evidence of questionable pay-to-play contribution practices raising at least "appearance of impropriety" concerns, and suggesting a need for additional pay-to-play regulation.

However, the case law makes clear that a more detailed and comprehensive study is not required where, as here, "the risk of corruption is obvious and substantial," *Blount*, 61 F.3d at 945. Moreover, the Supreme Court has held that "[t]he First Amendment does not require a city, before enacting ... an ordinance, to conduct new studies or produce evidence independent of

---

[2] *See* Ognibene Dep. at 33; Deposition of Viviana Vazquez-Hernandez, dated June 20, 2008 ("Vazquez-Hernandez Dep.") at 42:25-43:5 (public perception that "doing business" contributions likely to influence elected officials' actions); 43:23-44:1 (agreeing that public perception that elected officials influenced by donors is a bad thing); 44:2-5 (acknowledging public perception that lobbyists' contributions might influence officials' actions); 44:6-9 ("doing business" contributors favor incumbents to gain political access); 45:22-25 ("definitely" a good idea to limit fact or appearance of "pay-to-play" in electoral politics); Deposition of Martin Malave Dilan, dated June 20, 2008 ("Dilan Dep.") at 33 (aware of media, editorials, press, advocates opinions about negative impact of "doing business" contributions); *id.* at 34 ("doing business" contributions favor incumbents); Deposition of Fran Reiter, dated June 19, 2008 ("Reiter Dep.") at 52 (recognizing public perception that lobbyists' campaign contributions may influence or affect their ability to influence elected officials); Deposition of Marlene Tapper, dated June 18, 2008 ("Tapper Dep.") at 63 (admitting public perception that lobbyists' contributions may influence actions of elected officials, and that is not a good thing); *id.* ("doing business" contributors favor incumbents in making contributions); *id.* at 68 (good idea to limit appearance of "pay-to-play").

that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Shrink Missouri*, 528 U.S. at 393, n.6 (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986)); *see also FEC v. Nat'l Right to Work Cttee*, 459 U.S. 197, 210 (1982) (Court will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared").

### a. The Doing Business contribution limits are not overinclusive.

Plaintiffs base their overinclusiveness argument in large part on their belief that the limit would restrict "contributions from such people as secretaries of lobbyists and their family members." Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, dated April 24, 2008 ("Pltfs' Mem.") at 15. As a threshold matter, plaintiffs appear to misapprehend the scope of the Doing Business contribution limits.

Administrative Code §§ 3-703(1-a) and 3-719(2)(b) prohibit participating and non-participating candidates, respectively, from accepting contributions from "a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter...." Thus, *entities* engaged in business dealings with the City are not subject to the Doing Business contribution limits.[3] With respect to lobbyists, § 3-702(18)(a) provides, in pertinent part, that "for purposes of this chapter a lobbyist *as defined in section 3-211 of this title* shall be deemed to be engaged in business dealings with the city of New York

---

[3] Such entities' contributions are excluded from public-fund matching, but in that regard they are no different from all other entities, all of whose contributions are excluded from matching as part of the CFA's general definition of a "matchable contribution" as one "made by a natural person." Admin. Code. § 3-702(3).

during all periods covered by a registration statement." At § 3-211(a), the term "lobbyist" is defined as "every person or organization retained, employed or designated by any client to engage in lobbying."[4] Thus, for purposes of the Doing Business contribution limits, the term "lobbyist" does not include a lobbyist's spouse, domestic partner, or unemancipated children. As a consequence, those persons are free to contribute to the maximum limits applicable to all other individuals under §3-703(1)(f),[5] so that plaintiffs' objections to the law as overinclusive on these grounds fail.

Plaintiffs also argue that the Doing Business contribution limits are overinclusive and overbroad because they reach "many persons and entities who meet the definition of those who have business dealings with the city, yet who have never, and would never give contributions in an attempt to secure a quid-pro-quo benefit." Pltfs' Mem. at 16. This argument would effectively read "appearance" out of *Buckley's* identification of both the fact *and appearance* of corruption as the twin concerns of constitutionally sound campaign finance regulation. Contribution restrictions upheld as properly addressed to the appearance of corruption will unavoidably reach "innocent" contributions which may nonetheless be viewed

_____

[4] The CFA has a broader definition of "lobbyist" at § 3-702(16) that includes the lobbyist's spouse, domestic partner, and unemancipated children; however, section 3-702(18) – the section defining those persons who are, or are legally deemed to be, engaged in "business dealings with the city" – expressly incorporates the narrower definition of "lobbyist" set forth at §3-211, *not* the broader definition set forth at §3-702(16). While the CFB initially construed the Doing Business contribution limits as reaching "lobbyists" as defined by § 3-702(16), it has more recently clarified that, for purposes of those contribution limits, "lobbyist" shall have the narrower scope of §3-211(a). *See* Campaign Finance Board's "Frequently Asked Questions about Doing Business," available at http://www.nyccfb.info/candidates/candidates_doing_biz_faq.aspx?sm=candidates_51a (specifically, *see* answer to question, "What is included in the New York City lobbyist category and what is not?") (last visited on July 30, 2008).

[5] However, as discussed more fully below, those persons' contributions, while not subject to the lower Doing Business contribution limits, are not matched, pursuant to § 3-702(3)(g).

with suspicion and cynicism by the public.  As the Supreme Court observed in *Shrink Missouri*, 528 U.S. at 390:

> While neither law nor morals equate all political contributions, without more, with bribes, we spoke in *Buckley* of the perception of corruption "inherent in a regime of large individual financial contributions" to candidates for public office as a source of concern "almost equal" to *quid pro quo* improbity.  The public interest in countering that perception was, indeed, the entire answer to the overbreadth claim raised in the *Buckley* case.

There are additional reasons for rejecting plaintiffs' "overinclusiveness" claim.  In both the transactions exempted from "business dealings" definition, and the timeframes applied to covered transactions, the Doing Business contribution limits, rather than being overinclusive, are closely drawn to advance the provision's specific governmental objectives in stemming the fact and appearance of corruption inherent in the practice of pay-to-play.

As a threshold matter, section 3-702(18)(a) exempts from its scope all contracts awarded through "publicly-advertised competitive sealed bidding," and all emergency contracts. Thus, that exemption alone covers the many contractors whose business derives from competitive bids – including plaintiff Robert Perez, whose construction company, Diamond Asphalt Company, does business with the City exclusively through such contracts.  Also excluded from the Doing Business contribution limits are those contracts below certain threshold dollar limits.  *See* Admin Code § 3-702(18)(a).

Additionally, Section 3-702(18)(b) sets forth the timeframes within which different categories of transactions with City agencies are to be deemed "business dealings with the city" for purposes of the Doing Business contribution limits.  The provision establishes different timeframes for the variety of ways that people engage in business dealings with the City, each timeframe narrowly drawn so as not to burden unduly the speech and associational rights of individuals subject to the Doing Business contribution limits.

b.     **The Doing Business contribution limits are not underinclusive**

Plaintiffs claim that the Doing Business contribution limits are underinclusive "because they fail to restrict contributions from other contributors, including labor organizations and neighborhood associations, even though they engage in the same types of activities and compete for the same types of contracts, grants, and concessions from the city as those individuals and entities which are subject to the lower limits." Pltfs' Mem. at 16. Plaintiffs again misread the CFA.

Nothing in the CFA exempts labor organizations or, with one minor exception, neighborhood associations[6] from the Doing Business contribution limits for, in plaintiffs' words, "the same types of contracts, grants, and concessions from the city as [others] subject to the lower limits." Like the officers of any other entity engaged in "business dealings with the city," as that term is defined at § 3-702(18)(a), the officers of any labor organization or neighborhood association engaging in "business dealings with the city" as that term is defined therein are covered by and subject to the Doing Business contribution limits.[7] *See* Schaffer Decl. at ¶¶ 9, 11, 15, 19, 23, 26, 28, 40 (unions engaged in any of the transactions covered in the Doing Business contributions limits treated as "engaging in business dealings," subjecting relevant

_____

[6] There is a narrow exception in the "business dealings" definition for rezoning applications by certain neighborhood associations, and also for any applications by owner-occupants of one, two, or three-family homes. The categories of applications thereby excepted affect the applicants' residences and, unlike most other privately-sponsored ULURP applications, are not pursued for a business purpose. *See* Declaration of David Karnovsky, dated August 4, 2008 ("Karnovsky Decl.") at ¶ 3.

[7] While plaintiffs may argue that all divisions of all municipal labor organizations should be deemed to be engaged in business dealings with the City of New York, there are altogether legitimate reasons for the City Council's having refrained from doing so. Municipal labor unions do not depend upon the City Council to be awarded employment contracts for their members, nor is the City Council responsible for setting municipal employees' wages. Wages are determined for the City's unionized labor force through negotiations with the City's Office of Labor Relations. Admin. Code §§ 12-302, 12-30.

union officials to Doing Business contribution limits); Declaration of David Karnovsky, dated August 4, 2008 ("Karnovsky Decl."), at ¶¶ 3, 37, 42 (unions similarly covered for applications regarding land use approval process).

Thus, plaintiffs claim of underinclusiveness as to unions and neighborhood associations is baseless and should be rejected by the Court.

### c.     The Doing Business contribution limits do not discriminate on the basis of viewpoint.

Plaintiffs further argue that the Doing Business contribution limits discriminate on the basis of viewpoint, because, they claim, "[t]he speech of neighborhood, community, and labor organizat ions has a significantly different viewpoint than the speech of owners of businesses and members of management." Pltfs' Mem. at 16-17. Plaintiffs offer no evidence in their motion papers supporting their claim, which essentially suggests that all labor organizations and neighborhood and community associations speak with one voice. However, plaintiffs own experience proves the contrary point. Plaintiff Thomas Ognibene, a Republican candidate, testified in his deposition that he received financial and other support from the Sergeants Benevolent Association in his 2005 mayoral campaign, and, over the years, from the Patrolmen's Benevolent Association, the Uniformed Firefighters' Association, and the Uniformed Fire Officers' Association, among others. Ognibene Dep. at 28:23-29:19; 29:18-25 (Pines Decl., Ex. JJ). He conceded that, in New York City, these unions commonly support Republican candidates, while others tend to support Democrats *Id.* at 31:3-7. Significantly, Ognibene suggested that, more than looking at a candidate's political orientation or viewpoint, donors base their financial decisions upon a practical assessment of a candidate's viability, and that, in Ognibene's 2005 mayoral bid, his campaign lost its viability when he failed to win the

Republican party line. "Once you lose that viability, there's just no interest in supporting your campaign." *Id.* at 27:11-15.

Similarly, Candidate-Plaintiffs Marlene Tapper and Viviana Vazquez-Hernandez, both Republican candidates – received financial support from labor organizations during their past campaigns for City Council seats. *See* Tapper Dep. at 19:4-8 (Pines Decl., Ex. NN); Vazquez-Hernandez Dep. at 22:18-23:9 (Pines Decl., Ex. OO).

Moreover, the Doing Business Database includes organizations, including many non-profits, from a wide spectrum of viewpoints and interests, who are engaged in business dealings with the City. *See* Schaffer Decl. at ¶¶ 38, 39 and Schaffer Ex. A, annexed thereto. Additionally, there are several unions or union-affiliated entities that have procurement contracts with the City or with an affiliated agency that are deemed "business dealings" under the law. *Id.* at ¶ 40.

Further, with respect to lobbyists, plaintiffs' argument is even more tenuous, as lobbyists clearly represent clients of all interests and viewpoints. Included in the Doing Business Database are a wide spectrum of organizations and entities engaging in lobbying activities. The Database includes registered lobbyists from such diverse entities such as lobbying firms, law firms who lobby on behalf of their clients, unions, not-for-profit entities, neighborhood groups and unincorporated associations. *See* Declaration of Arnie Wolsky, Deputy Counsel to the City Clerk and Director of the Lobbying Bureau in the City Clerk's Office, dated August 4, 2008, at ¶¶ 10 & 21.

Thus, plaintiffs' counsel's argument that the Doing Business contribution limits discriminate on the basis of viewpoint is baseless as a matter of law, and is belied by the experience of plaintiffs themselves. As a consequence, it should be rejected by this Court.[8]

### d.    The Doing Business contribution limits meet the requirements of *Randall v. Sorrell.*[9]

Plaintiffs' final argument against the Doing Business contribution limits is that they are "very similar" to the limits that were invalidated in *Randall v. Sorrell*, 548 U.S. 230 (2006). Pltfs' Mem. at 17. As a threshold matter, the Court has made clear that there is no "magic number," applicable in all cases and contexts, separating permissible and impermissible regulation. In *Shrink Missouri*, the Court noted that "[i]n *Buckley*, we specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate." *Id.* at 397.

_____

[8] While plaintiffs assert an Equal Protection Clause challenge as well as a speech/associational challenge under their viewpoint discrimination claim, their Equal Protection challenge fails for the reasons given above. In fact, as discussed more fully above, plaintiffs do not, as they cannot, establish that the challenged provisions, either facially or as applied, work any form of viewpoint discrimination whatsoever. Therefore, plaintiffs' reliance on *Police Department of the City of Chicago v. Mosely*, 408 U.S. 92 (1972) and similar cases is unavailing, as plaintiffs have failed to establish that the defendants have provided a "forum" for some groups, and closed it to others, "based on content alone." *Id.* at 96; *see also Buckley v. Valeo*, 424 U.S. at 93-96 (distinguishing ballot access cases requiring strict scrutiny standard under Equal Protection from cases challenging campaign financing regulations, where more relaxed standard requiring only "sufficiently important governmental interest" is appropriate).

[9] Plaintiffs have represented to this Court, in prior appearances, that they are not asserting, in connection with their pending motion, any *Randall*-based claims regarding their ability or inability to raise sufficient funds to mount competitive campaigns. As a consequence, defendants object to plaintiffs' assertion of a *Randall*-based argument about the amount of the Doing Business contribution limits, as this argument implicitly incorporates an argument that the limit is too low to permit competitive campaigning. To the extent the Court permits plaintiffs to assert a limited *Randall*-based claim positing the existence of a "bright-line" number separating constitutional and unconstitutional regulation, defendants address that argument, below. Defendants ask the Court, in light of plaintiffs' prior representations and in light of the correspondingly limited discovery undertaken to date, to defer to another day its consideration of any "as applied" challenge based upon plaintiffs' claimed inability to mount competitive campaigns under the CFA's challenged provisions.

Moreover, in comparing *Randall's* analysis of Vermont's low generally applicable contribution limits with the CFA's Doing Business contribution limits, plaintiffs are comparing apples and oranges. *Randall* involved a challenge to Vermont's generally applicable contribution limits of $400 and below for a range of statewide offices. While the Court concluded that those limits were "too restrictive" to pass constitutional muster, *id.* at 253, it was clearly evaluating those limits in an entirely different, and distinguishable, context. Unlike Vermont's contribution limits, the comparable contribution limits generally applicable under the CFA range from $2,750 for City Council, to $4,950 for the mayor, public advocate, and comptroller – in other words, limits that are approximately seven to ten times higher than the highest contributions limits under consideration in *Randall*. Clearly, the Court's concerns about Vermont's contribution limits being "substantially lower than both the limits we have previously upheld and comparable limits in other States," *id.* at 253, are utterly inapposite in the context of the CFA's much higher limits.[10]

A similar argument based upon *Randall* was made, and rejected, in connection with a recent challenge to New Jersey's pay-to-play contribution limits. *In re: Earle Asphalt Co.*, 950 A.2d 918, 2008 N.J. Super. LEXIS 143 (N.J.Super.Ct., App.Div. June 30, 2008). In *Earle*, the plaintiff, a State contractor, challenged New Jersey's pay-to-play law, which barred any state agency from awarding a contract with a value over $17,500 to a business entity that had contributed more than $300 during the preceding eighteen months to the Governor, a candidate

---

[10] Another factor distinguishing the CFA from Vermont's system is the CFA's provision of public matching funding to candidates electing to participate in that program at the rate of 6:1 for qualifying contributions from individuals up to $175 per person (*i.e.*, $1,050 in public funding). This matching program, increased from 4:1 to 6:1 by the same law that enacted pay-to-play restrictions, is a mitigating factor minimizing the impact on candidates of the Doing Business contribution limits applicable to a mere subset of contributors under the CFA.

for Governor, or any State or county political party committee. The court's reasoning in rejecting the *Randall*-based argument applies with equal force to plaintiffs' similar argument in their pending motion:

> [A]ppellant argues that the $300 limit on political contributions by State contractors is so low that it threatens to inhibit effective advocacy by political candidates and parties. In support of this argument, appellant relies upon *Randall v. Sorrell*, 548 U.S. 230, which invalidated a Vermont statute that imposed a $400 limit on contributions to a candidate for governor and an even lower limit on contributions to candidates of the state legislature. The Court in *Randall* noted the absence of any "special justification" for such low limits on campaign contributions. *See id.* at 244. However, in this case, the particular danger that contractors' campaign contributions may influence the discretionary decisions of State contracting officials or create a public perception of such influence establishes the "special justification" for the contribution limits imposed by Chapter 51 [the New Jersey pay-to-play provision] that the Court found lacking in *Randall*. Furthermore, since Chapter 51 only imposes limitations on campaign contributions by State government contractors and their principals, gubernatorial candidates and political committees may solicit contributions of more than $300 from any business or individual that does not engage in business with the State.

*Earle*, *id.* at *19-*20. The court's conclusion is equally on point:

> In sum, the State's interest in insulating the negotiation and award of State contracts from political contributions that pose the risk of improper influence, purchase of access, or the appearance thereof, is a "sufficiently important interest" to justify a limitation upon political contributions. *Buckley*, 424 U.S. at 25. New Jersey's $300 limitation on contributions to gubernatorial candidates and political committees by businesses and the principals of businesses who enter into substantial State contracts constitutes a means of protecting this interest that is "closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* Therefore, Chapter 51 is constitutional.

*Id.* at *21 (some internal quotations omitted).

As the decision in *Earle* suggests, plaintiffs' *Randall*-based argument is wanting in both logic and legal foundation. First, as distinguished from the Vermont contribution limits at issue in *Randall*, which imposed across-the-board limits of $400 and below for a range of statewide offices, New York City's Doing Business contribution limits in that dollar range are limited to and targeted at only specifically identified individuals associated with entities defined as engaged in "business dealings with New York City."[11] Finally, as a practical matter, the universe of those engaged in such business dealings *with* the City is hardly coextensive with the universe of entities who do business *in* the City. Plaintiffs are free to seek contributions from the officials and employees associated with the latter category of businesses free of the Doing Business contribution limits, as well as from contractors whose business dealings with the City derive from competitively bid sealed contracts (including from plaintiff Robert Perez); as well as from contracts of less than the amounts set forth in Admin. Code § 3-702(18).

To the extent that plaintiffs are arguing that they should be able to take more money from covered individuals associated with the subset of businesses engaged in business dealings with the City whose contributions would carry with them the fact or appearance of favor-seeking, defendants respond that plaintiffs' desire to make and receive such payments, coupled with the electorate's clearly expressed concerns about such "business dealings" relationships, is precisely why the targeted Doing Business contribution limits have been put in place. As the Court first recognized in *Buckley* thirty years ago: "To the extent that large

---

[11] Moreover, even those covered by the Doing Business contribution limits have alternate means of contributing to candidates of their choosing. Those entities are free to establish PACs and to contribute to campaigns through them if they wish (so long as the PACs register with the Campaign Finance Board and agree not to accept money from entities otherwise barred under the Doing Business contribution limits). Admin. Code § 3-702(8). *See, e.g., Austin v. Michigan Secretary of State*, 494 U.S. 652 (1990) (upholding corporate ban that permitted contribution through segregated fund).

contributions are given to secure political quid pro quo's from current and potential office holders, the integrity of our system of representative democracy is undermined … [but] [o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." 424 U.S. at 26-27.

In upholding the pay-to-play limits at issue in *Earle* – limits that in reaching competitively bid contracts, went substantially further than New York's Doing Business contribution limits, the court found that the challenged regulation was closely drawn to advance a substantial government interest:  "New Jersey's $300 limitation on contributions to gubernatorial candidates and political committees by businesses and the principals of businesses who enter into substantial State contracts constitutes a 'means' of protecting this interest [in insulating the negotiation and award of State contracts from the risk of improper influence] that is 'closely drawn to avoid unnecessary abridgment of associational freedoms.'"  *Earle*, *id*. at *21 (citing *Buckley*, 424 U.S. at 25).

The CFA's Doing Business contribution limits, which exclude such contracts awarded through competitive sealed bids along with other excluded transactions set forth at § 3-702(18)(a), and which impose relatively short timeframes tailored to the particular transactions involved, *id*. at subd. (18)(b), are *a fortiori* even more closely drawn to advance the same substantial government interests, and therefore meet the requirements of *Randall*.

2.     **The expansion of the corporate contribution ban to LLCs, LLPs, and partnerships pursuant to Admin. Code § 3-703(1)(l) is constitutionally permissible.**

Plaintiffs do not challenge the constitutionality of the CFA's prohibition of contributions from corporations, no doubt in recognition of the fact that, "[w]ithin the realm of

.     24

contributions generally, corporate contributions are furthest from the core of political expression," *FEC v. Beaumont*, 538 U.S. 146, 161, n.8 (2003); and that the Supreme Court has opined that an analogous challenge to the federal corporate prohibition would "go[ ] against the current of a century of congressional efforts to curb corporations' potentially 'deleterious influences on federal elections." *Id.* at 152. (Citation omitted.) Rather, plaintiffs challenge only the CFA's recent expansion of its corporate prohibition to cover limited liability companies ("LLCs"), limited liability partnerships ("LLPs") and partnerships – a provision codified at Admin. Code § 3-703(1)(l) ("expanded corporate prohibition"). As they did in their challenge to the Doing Business contribution limits, plaintiffs again assert that the expanded corporate prohibition is overinclusive, underinclusive, and overbroad. All three characterizations are inaccurate and unwarranted.

### a.  The expanded corporate prohibition is not overinclusive.

Plaintiffs Martina-Franca Associates, LLP, and Reiter/Begun Associates, LLP (collectively, "LLP Plaintiffs") allege that, because LLPs do not share all of the "special advantages" conferred upon corporations under state law, the Constitution prohibits their being subject to a ban on political contributions previously applicable only to corporations. Plaintiffs' argument is without legal support: They cite no case holding, or even suggesting, that LLCs, LLPs, and partnerships are constitutionally protected from regulations such as those at issue in the instant litigation.[12]

---

[12] The closest plaintiffs come to identifying any such authority is their citation to a provision of the Federal Election Commission's rules that merely implement Congress' enactment of a ban on corporate and labor organization contributions. Pltfs' Mem. at 12-13. Congress did not prohibit LLC/LLP/partnership contributions, so it would have been beyond the scope of FEC's regulating authority to do so in promulgating its rules, and citation to an FEC rule for the proposition that a ban of larger scope is unconstitutional is entirely unwarranted.

Certainly *Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652 (1990), the case most extensively relied upon by plaintiffs for their challenge to the expanded corporate prohibition, provides negligible support. In *Austin*, the Court upheld a Michigan law prohibiting corporations from making independent expenditures in connection with state candidate elections.[13]  The plaintiff in *Austin* – the Austin Chamber of Commerce – challenged the corporate ban on contributions on First and Fourteenth Amendment grounds, alleging that the prohibition burdened the exercise of free speech, and that it treated similar entities unequally. *Id.* at 656, 666. The Court rejected both claims.

While the Court identified certain earmarks of corporate entities – "such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets," *id.* at 658-659, at least some features of which are shared by limited liability companies, limited liability partnerships, and partnerships – as factors "that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments," those factors were only the starting point for the Court's assessment of the "deleterious influences on ... elections" posed by corporate contributions.

The Court identified two fundamental concerns:  (1) corporations "use resources amassed in the economic marketplace to obtain an unfair advantage in the political marketplace,"

---

Moreover, in *Austin*, the Supreme Court made clear that federal agency rules in this area do not necessarily delineate constitutional limits.  For example, while the Court noted that the federal regulation prohibiting corporate contributions also applied to unions, it nonetheless upheld against an "underinclusive" challenge a state law corporate contribution prohibition that excluded labor organizations. *Austin*, 494 U.S. at 665, n.4.

[13] In fact, the Michigan law, like the CFA's provision permitting contributions by registered PACs (Admin. Code §3-702(8) & (16), permitted corporations to make political contributions from a fund segregated from the corporations general fund, to insure that the PAC was not being used as a conduit for impermissible corporate contributions. *Id.* at 655-656.

*id.* at 659 (internal citations omitted); and, relatedly, (2) "the resources in the treasury of a business corporation ... are not an indication of popular support for the corporation's political ideas." *Id.* Because a corporation's wealth is not necessarily proportionate to the popularity of its political views, the Court had elsewhere concluded that such wealth "associated with the corporate form of organization should not be converted into political 'war chests' which could be used to incur political debts from legislators." *FEC v. National Right to Work Cttee*, 459 U.S. 197, 207 (1982) (cited in *FEC v. Beaumont*, 539 U.S. 146, 154 (2003)).

In addition to these harms, which prompted the earliest prohibitions on corporate political contributions at the beginning of the last century, the Court has identified a new danger that has arisen with the establishment of contribution limits on individuals: the temptation of such individuals to circumvent the new restrictions by funneling money through businesses with which they are associated. The Court described the problem in *Beaumont*, as follows:

> Quite aside form war-chest corruption ... however, another reason for regulating corporate electoral involvement has emerged with restrictions on individual contributions, and recent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for circumvention of (valid) contribution limits. To the degree that a corporation could contribute to political candidates, the individuals who created it, who own it, or whom it employs, could exceed the bounds imposed on their own contributions by diverting money through the corporation. ... [E]xperience demonstrates how candidates, donors, and parties test the limits of the current law, and it shows beyond serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced.

539 U.S. at 155.

It is these three dangers – of commercial strength being transformed into political influence; of money being used in an unrepresentative fashion, without the assent, or even the knowledge, of those providing the money (problems the *Austin* Court described as "the distortion

caused by corporate spending," 494 U.S. at 660); and the circumvention of individual contribution limits – that are the concerns addressed by what have historically been corporate prohibitions.

In evaluating the City's expanded corporate prohibition, the question should not be whether LLCs, LLPs, and partnerships are identical in every regard to corporations, but whether political contributions from these business entities pose similar dangers to the political process. Without question, the answer to that question is that they do.[14] To the extent that the LLP plaintiffs might claim that they do not have the wealth typically associated with large corporate entities, the Supreme Court has made clear that wealth is not determinative: "Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process. This potential for distortion justifies [the challenged corporate ban]'s general applicability to all corporations." *Austin*, 494 U.S. at 661. Again, while the Court noted to the particular characteristics of corporations that created the potential for distortion of the political process, it explicitly focused on the "potential for distortion," and not the identifying features of corporations, in finding the regulation constitutionally permissible.[15]

---

[14] Indeed, the ban would be justified even if LLCs, LLPs, and partnerships did not exhibit all of the dangers presented by the "typical" corporation. *See*, e.g., *FEC v. National Conservative Political Action Cttee*, 470 U.S. 480, 495 (1985) (reaffirming prior ruling in *FEC v. National Right to Work Cttee*, 459 U.S. 197 (1982) that "Congress might include [as part of a corporate ban] membership corporations, though contributions by [such corporations] might not exhibit all of the evil that contributions by traditional economically organized corporations exhibit").

[15] As noted by CFB Executive Director Amy Loprest, organizational contributions can thwart the CFA's goal of transparency, as they can be used to obscure the identity or business of the ultimate source of a contribution. This is particularly true of LLCs, many of which are involved in land use transactions and other City business, yet as to

LLCs, LLPs, and partnerships all have the ability to "use resources amassed in the economic marketplace to obtain an unfair advantage in the political marketplace," *Austin, id.* at 659; all can convert their wealth into "political 'war chests' which could be used to incur political debts from legislators," *Beaumont, id.* at 154; and all are constituted of "individuals who ... could exceed the bounds imposed on their own contributions by diverting money," *Beaumont, id.* at 155, through the business entities with which they are associated.

As the Court noted in *Buckley*, because corruption "can never be reliably ascertained," all that is required is that the threat not be "illusory." 424 U.S. at 27. Clearly, the threat posed by contributions from corporations, LLCs, LLPs, and partnerships is not illusory, and the expanded corporate prohibition is sufficiently closely drawn to pass constitutional muster.

    **b.**  **The expanded corporate prohibition is not underinclusive.**

Plaintiffs argue that the expanded corporate prohibition is underinclusive because it "exempt[s] contributions from doctors, lawyers, and CPAs from scrutiny to determine whether their source is one of the prohibited business models." Pltfs' Mem. At 13. Yet again, plaintiffs have misread the law. Admin. Code. § 3-703(1)(l) provides, in pertinent part, that "where a contribution is from a contributor whose name is followed by a professional designation including but not limited to 'M.D.,' 'Esq.' and 'C.P.A.' the board shall not treat such contribution as coming from a corporation, limited liability company, limited liability partnership or partnership in the absence of further indicia that such contribution is from such an

---

which there is often no publicly available information about the entities' owners or principals. *See* Declaration of Amy Loprest, dated August 4, 2008, at ¶ 32.

entity."    Notwithstanding plaintiffs' contrary assertion, this provision simply reflects a

reasonable presumption that many doctors, lawyers, and accountants add their professional titles

to their non-business personal checking accounts and that such professional titles do not indicate

any particular legal business structure (*e.g.*, corporation, LLC, LLP, partnership).    The

Constitution does not require that such contributions be restricted in the name of "inclusiveness,"

merely because of a common practice among many professionals of placing their professional

titles on personal checking accounts.

      Moreover, even if this Court were to find this provision underinclusive, a finding

of unconstitutionality should not follow.    As the Court observed in *Buckley* with regard to

underinclusiveness:

> The governing principle was stated in *Katzenbach v. Morgan*, 384
> U.S. 641, 657 (1966):  "(I)n deciding the constitutional propriety
> of the limitations in such a reform measure we are guided by the
> familiar principles that a statute is not invalid under the
> Constitution because it might have gone farther than it did, that a
> legislature need not strike at all evils at the same time, and that
> reform may take one step at a time, addressing itself to the phase of
> the problem which seems most acute to the legislative mind.")

*Buckley*, 424 U.S. at 105.

      In *Blount*, the First Circuit rejected a claim that SEC Rule G-37, prohibiting

municipal securities brokers and dealers from engaging in municipal securities business for two

years after contributing more than $250 to state officials from whom they obtain business, was

*fatally* underinclusive, even if it failed to reach all the ways that municipal bond traders could

possibly "curry favor." 61 F.3d at 946.  As the Circuit noted,

> [A] regulation is not fatally underinclusive simply because an
> alternative regulation, which would restrict *more* speech or the
> speech of *more* people, could be more effective.    The First
> Amendment does not require the government to curtail as much
> speech as may conceivably serve its goals.  ... Because the primary

> purpose of underinclusiveness analysis is simply to "ensure that
> the proffered state interest actually underlies the law," *Austin*, 494
> U.S. at 677 (Brennan, concurring), a rule is struck for
> underinclusiveness only if it cannot "fairly be said to advance any
> genuinely substantial governmental interest...."

*Blount, id.* (Emphasis in original.)    Thus, the expanded corporate prohibition is not

unconstitutionally underinclusive.

### c. **The expanded corporate prohibition is not overbroad.**

Plaintiffs claim that the expanded corporate prohibition is overbroad because it

"burdens substantially more associational and speech rights than are justified by the anti-

corruption interest." Pltfs' Mem. at 13. To the contrary, the regulation is closely drawn to meet

the government's interest in addressing the fact or appearance of corruption and undue influence.

In addition to the argument set forth above, defendants note that the expanded corporate

prohibition is not, in fact, a complete ban on the affected entities' speech and associational rights.

The CFA permits the use of political action committees (defined in the CFA as "political

committees"), consistent with its provisions and related CFB Rules addressed to circumvention

concerns. Admin. Code § 3-702(8) & (16); CFB Rule 1-04(h). As the Court observed in

*Beaumont*, which upheld the application of a federal corporate contribution prohibition (2 U.S.C.

§ 441b), to nonprofit advocacy organizations:

> [Plaintiff] is simply wrong in characterizing § 441b as a complete
> ban.   As we have said before, the section permits some
> participation of unions and corporations in the federal electoral
> process by allowing them to establish and pay the administrative
> expenses of (PACs).  The PAC option allows corporate political
> participation without the temptation to use corporate funds for
> political influence, quite possibly at odds, with the sentiments of
> some shareholders or members, and it lets the government regulate
> campaign activity through registration and disclosure ... without
> jeopardizing the associational rights of advocacy organizations'
> members....

*Id.* at 162-163.  (Citations and internal quotations omitted.)

In addition, the expanded corporate prohibition does not bar officials or employees of corporations, LLCs, LLPs, and partnerships from contributing to covered campaigns, but only the entities themselves.

Thus, the expanded corporate prohibition is closely drawn to address only those concerns about the fact or appearance of corruption and the resulting distortion of the political process that courts have long identified as legitimate when historically applied to corporations, and is no less closely drawn when applied to address identical concerns raised by these three additional business entities.

## POINT II

## THE DESIGNATION OF CONTRIBUTIONS FROM THOSE ENGAGED IN DOING BUSINESS WITH THE CITY AS NON-MATCHING IS CONSTITUTIONAL.

As discussed above, for those candidates who choose to participate in the public financing program, the CFA provides a 6:1 match for contributions from individuals up to a maximum contribution of $175 per person per candidate. Admin. Code § 3-705(2)(a). However, the CFA does not match contributions from individuals defined as engaging in "business dealings with the city, as that term is defined in [§3-702(18)]." Admin. Code. § 3-703(1-a) ("non-matching provision"). Plaintiffs allege that the non-matching provision is unconstitutional on the grounds that it enhances some speech while quieting others; that it is both over- and under-inclusive; that it is overbroad; and that it constitutes viewpoint discrimination. As discussed more fully below, plaintiffs' claims are without merit.

**A.    The non-matching provision do not reduce "to a whisper" the voice of affected contributors .**

As noted above, the legislative record makes abundantly clear that the City Council enacted the CFA's pay-to-play provisions to address the public perception that money buys access, and that money and access influence political decision-making and deal-making in a manner that individual voters, with less monetary and lobbying power, cannot match. *See* City Council legislative record, annexed to Pines Decl. as Exs. H, I, J, L, M, N, O, P, S, T, U, V, W, X, and Y. As noted above, several plaintiffs have readily admitted their own awareness of the public's perception that money corrupts the political process. *See* fn. 2, above.

The City Council saw fit to address this appearance of corruption in two ways: by reducing the contribution limits applicable to those individuals engaged in business dealings with the City including lobbyists; and by deeming political contributions from those individuals to be

33

non-matchable.  Admin. Code. §3-703(1-a).  While plaintiffs may disagree with this legislative response to the appearance of corruption prompting the challenged pay-to-play reforms – a problem of public perception that plaintiffs themselves acknowledge – they cannot plausibly argue that a governmental interest in addressing that perception is beyond the scope of permissible regulation.

To the extent that plaintiffs' argument is premised on a belief that contributions from labor organizations engaged in business dealings with the City (as defined at Admin. Code. § 3-702(18)) are matched, while contributions from other "entities defined as having business dealings with the City [are] unmatchable" (Pltfs' Mem. at 18), that premise is simply erroneous. As discussed above, in connection with the Doing Business contribution limits, the CFA only provides for the matching of contributions "made by a natural person resident in the city of New York." Admin. Code. § 3-702(3).  Thus, *no* contributions from organizations or entities, whether from labor organizations, community groups, or entities doing business with the City, are matchable under the CFA public financing program.

Further, as discussed above in connection with the Doing Business contribution limits, officials associated with unions that are engaged in "business dealings with the City," as defined at Admin. Code. §3-702(18), are obligated to be registered with the Doing Business Database, in the same way as are similar categories of individuals associated with all other entities engaged in such business dealings, pursuant to Admin. Code. § 3-702(20), and are as bound by the Doing Business contribution limits and the non-matching provision of § 3-703(1-a) as are all other such "persons" associated with a "business dealings" entities.

Thus, plaintiffs are incorrect in their assertion that the CFA's non-matching provision "makes contributions from persons or entities defined as having business dealings with

the City unmatchable, while … match[ing] contributions from labor unions' officers, employees, and members." Pltfs' Mem. at 19. They are also, as a practical matter, incorrect in suggesting that the "Candidate Plaintiffs" are prejudiced because they are supported only by affected business interests and not by labor organizations. *See* discussion of plaintiffs' "viewpoint discrimination" claim at Point A.1.c, above (demonstrating that many of the Candidate-Plaintiffs, in past campaigns, had the financial support of unions).

Thus, as a matter of law and undisputed fact, the non-matching provision does not amplify the speech of some at the expense of others to the degree found constitutionally objectionable in *Randall*.

**B.    The CFA's non-matching provision is neither overinclusive nor underinclusive.[16]**

Plaintiffs allege that the scope of the non-matching provision as applied to lobbyists is overinclusive because it reaches lobbyists' spouses, certain of their employees, and unemancipated children of those employees. The scope of the provision is altogether reasonable. First, to the extent plaintiffs challenge the non-matching of lobbyist employees' unemancipated children, the CFA does not match the contributions of *any* "individuals under the age of eighteen years." Admin. Code. § 3-702(3)(e).

Regarding the remaining lobbyist employees and their spouses, the law properly addresses a legitimate legislative concern about circumvention of individual contribution limits. *See* discussion of circumvention, above, at Point A.2.a, pp. 27-29.

Indeed, for evidence of the problem, the Court need look no further than to the plaintiffs – presumably a group of individuals who were carefully vetted by their counsel and

---

[16] Plaintiffs' "underinclusive" argument is addressed in the immediately preceding section.

selected with an eye to advancing plaintiffs' rather than defendants' interests. Yet, plaintiff Sheila Andersen-Ricci provides an example of the concerns underlying the non-matching provision. In 2005, Ms Andersen-Ricci and her husband, Frank Ricci, a registered lobbyist (Declaration of Sheila Andersen-Ricci, executed on April 10, 2008, at ¶ 2), jointly signed a check payable to "Friends of Tom White, Jr., in the amount of $500.[17] Given the fact that, at that time, lobbyists' contributions were matchable and not subject to the Doing Business contribution limits, this $500 contribution would have been treated as two contributions of $250 from each contributor, each fully matchable at 4:1 up to the then applicable $250 limit – making that joint $500 contribution worth $2,500 to the candidate. *See* CFB Rule 1-04(k)(2) (unless otherwise indicated, check from two contributors drawn on joint account will be apportioned equally). Significantly, however, in her deposition, Ms Andersen-Ricci had no awareness of who Tom White, Jr. was, nor had she any recollection of contributing to White's, or indeed anyone's, campaign. Deposition of Sheila Andersen-Ricci, June 18, 2008 at 8:3-10, 8:19-25, 32:20-21, 33:7-9, annexed to the Pines Decl. as Pines Ex. GG.

Whatever the motivation of plaintiff Andersen-Ricci and her husband, a nominally "joint" political contribution in the form of a check made out by a lobbyist for $500 – twice the matchable individual amount then in effect, that became fully matchable with the signature of the lobbyist's wife, who claims no knowledge of the candidate or the campaign, and no recollection of the contribution – is precisely the kind of transaction that raises the circumvention concerns identified by the Court in *Beaumont*, 539 U.S. at 155 ("[R]ecent cases

---

[17] While defendants do not profess expertise in handwriting analysis, even a cursory review of the check, a photocopy of which is appended to the Declaration of Peri Horowitz ("Horowitz Decl.") as Horowitz Ex. A, suggests strongly that Mr. Ricci made out the check, which he and his wife then co-signed.

have recognized that restricting contributions by various organizations hedges against their use as conduits for circumvention of valid [individual] contribution limits").

Similar concerns about circumvention of individual contribution limits justify the range of persons associated with lobbyists whose contributions are subject to the CFA's non-matching provision.[18]  While contributions from this larger range of persons are excluded from matching, neither are they subject to the Doing Business contribution limits applicable to lobbyists themselves.  The CFA's Doing Business contribution limits pertaining to lobbyists apply only to contributions from those persons who meet the narrower definition of "lobbyist" set forth in § 3-211(a), namely a person "retained, employed, or designated by any client to engage in lobbying."  Admin. Code. §3-702(3)(g); Admin. Code § 3-211(a).  Thus, the varying scope of the CFA's restrictions on lobbyists and those whose association with them raise the possibility of circumvention are closely drawn to advance a "sufficiently important interest" by implementing limits on contributions and on the scope of public fund matching tailored to the category of persons affected.

## C.    The non-matching provision is not overbroad, nor does it constitute viewpoint discrimination.

Defendants previously addressed plaintiffs' challenges based on overbreadth and viewpoint discrimination in connection with the discussion of the Doing Business contribution limits, above.  Those discussions are applicable to plaintiffs' similar challenges to the non-matching provision and are incorporated by reference.

----

[18] The non-matching provision applies to "lobbyists or other persons required to be included in a statement of registration filed pursuant to § 3-213(c)(1)," which, in turn, covers a lobbyist, his/her spouse or domestic partner, and, if the lobbyist is an organization, any officer or employee of the lobbyist who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities, along with those persons' spouses or domestic partners.

## POINT III

## PLAINTIFFS' AS APPLIED CHALLENGE IS PREMATURE OR IS OTHERWISE INFIRM AND SHOULD BE DENIED.

**A.      The Candidate-Plaintiffs have no present intention of subjecting themselves to the regulations challenged in this action, and have no basis other than pure conjecture that the challenged provisions will affect them adversely.**

The Candidate-Plaintiffs as-applied challenge to the challenged CFA provisions is not ripe and should be dismissed on that ground. *See, e.g., Buckley*, 424 U.S. at 103-104 ("Any risk of harm to minority interests is speculative due to our present lack of knowledge of the practical effects of public financing and cannot overcome the force of the governmental interests against use of public money to foster frivolous candidacies, create a system of splintered parties, and encourage unrestrained factionalism."); *Crawford v. Marion County Election Board*, --- U.S. ---, ---, 128 S.Ct. 1610, 1621 (2008) ("Given the fact that petitioners have advanced a broad attack on the constitutionality of SEA 483, seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion. Only a few weeks ago, we held that the Court of Appeals for the Ninth Circuit had failed to give appropriate weight to the magnitude of that burden when it sustained a preelection facial attack on a Washington statute regulating that State's primary election procedures.").

There is currently no Candidate Plaintiff who, in fact, currently plans to run in the upcoming 2009 election cycle. Moreover, no plaintiff has engaged in any analysis, or even the most elemental surveying of potential constituents and supporters, to assess the challenged CFA provisions will have any negative impact upon their campaigns. In the majority of cases, Candidate-Plaintiffs prior campaigns focused almost exclusively on individual contributions up to the maximum amount allowable for public matching funds.

According to one report, lead plaintiff Thomas Ognibene has abandoned his plans to run for further political office and has decided to leave politics altogether. *See Queens Chronicle* article, dated July 31, 2008, entitled "Former City Councilman Leaves Politics Behind," annexed to the Pines Decl. as Pines Exhibit PP. Candidate Plaintiff Marlene Tapper is currently running for the State Assembly and has indicated that she has no plans to run for the City Council. Tapper Dep. at 7:8-16, *id.,* Pines Ex. NN. Candidate-Plaintiff Vazquez-Hernandez is not intending to run for City Council in 2009. Vazquez-Hernandez Dep. at 33, *id.,* Pines Ex. OO. Candidate-Plaintiff Yvette Velazquez Bennett is planning a run for State Assembly in 2008, and not for City Council in 2009. Velazquez Bennett Dep. at 6, 10, *id.,* Pines Ex. HH. Candidate-Plaintiff Martin Malave Dilan, currently a State Senator, is considering a run for the City Council in 2009, but has not yet decided whether, in fact, he will do so, and has not begun fund-raising, Deposition of Martin Malave Dilan, dated June 20, 2008 ("Dilan Dep.") at 40, *id.,* Pines Ex. II, even though, at paragraph 7 of his declaration, dated April 14, 2008, previously submitted to this Court, Mr. Dilan alleged that, "[b]ecause candidates are currently raising funds for the 2009 election, it is imperative that the Court grant relief immediately. Every day that passes without judicial relief is another day that my First and Fourteenth Amendment rights are impermissibly burdened."

**B.    "Doing Business" Plaintiff Robert Perez is not, in fact, affected in any way by the Doing Business contribution limits, as plaintffs' counsel now concedes.**

"Doing Business" Plaintiff Robert Perez does not have standing to assert an as-applied challenge to the Doing Business contribution limits set forth at Admin. Code § 3-703(1-a). To establish standing, a plaintiff must have suffered an "injury in fact," or an "invasion of a legally protected interest" which is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992) (internal citations omitted). "Particularized" means that the injury must affect the plaintiff in a "personal and individual way." *Id.*, n.1. Here, plaintiff Perez purports to challenge the Doing Business contribution limits and asserted in his declaration, submitted in the support of plaintiffs' pending motion, that he was covered by the those limits. Declaration of Robert Perez, dated April 21, 2008, at ¶ 3. However, Mr. Perez later conceded during his deposition that Diamond Asphalt, his company, only enters into contracts with the City through the submission of competitive sealed bids. Deposition of Robert Perez, dated June 17, 2008 ("Perez Dep."), at 13:14 (Pines Decl., Ex. KK). Such contracts are expressly omitted from the definition of "business dealings with the City," and no contribution limitations are placed on officers of companies that only enter into such contracts. Ad. Code §§ 3-702(18)(a), 3-703(1-a). Indeed, at the deposition plaintiffs' counsel interrupted questioning of Mr. Perez to state that the declaration was "wrong" and that Mr. Perez "does not currently meet the definition of one that has business dealings with the City." Perez Dep. at 21:22-23, 22:15-17 (Pines Decl., *id.*). Shortly thereafter, plaintiffs' counsel made clear that counsel was stipulating that the Doing Business contribution limits do not "affect" Mr. Perez. Perez Dep. at 24:21-22 (Pines Decl., *id.*). As Mr. Perez is not subject to the "Doing Business" contribution limitations and the limitations do not affect him, he cannot claim to have suffered, as a result of these limitations, a particularized injury, or one that affects him in a personal or individual way. *Lujan*, 504 U.S. at 560; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983) (holding that plaintiff must show that he or she "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct") (internal citations omitted); *Nat'l Council of La Raza v. Mukasey*, 2008 U.S. App. LEXIS 14129, at * 4 (2d Cir. 2008) (affirming dismissal on standing grounds

where plaintiffs failed to adequately plead the injury element). Accordingly, Mr. Perez has no standing in this proceeding to assert an as-applied (or even a facial) challenge.

## CONCLUSION

For the foregoing reasons, and based upon the material facts set forth in the Defendants' Statement Pursuant to Local Rule 56.1, and supplemented with the accompanying declarations and exhibits, defendants should be granted summary judgment, dismissing the claims asserted in plaintiffs' pending motion for injunctive relief in their entirety, together with such other relief as this Court may deem appropriate.

Dated:     New York, New York
           August 4, 2008

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
New York City Law Department
100 Church Street, Rm. 2-178
New York, New York  10007

Jonathan Pines
Jane L. Gordon
Lisa F. Grumet
Andrew J. Rauchberg
Assistant Corporation Counsel