UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

TOM OGNIBENE, *et al.*,

                                        Plaintiffs,

            - against -

FREDERICK A. O. SCHWARTZ, JR., *et al.*,

                                        Defendants.

-----------------------------------------------------------------------x

**DEFENDANTS' LOCAL
CIVIL RULE 56.1
STATEMENT OF
UNDERSPUTED FACTS**

08 CV 01335 (LTS) (TDK)


            Pursuant to Rule 56.1 of the Local Civil Rules of this Court, defendants submit

that the following material facts are undisputed:

**Overview**

            1.   New York City has thousands of procurement contracts that are together

worth billions of dollars.  (Declaration of Marla Simpson ("Simpson Decl.") ¶¶ 3-5; see also

Declaration of Jesse Schaffer ("Schaffer Decl.") ¶ 41.)   It is the site of large-scale private

development projects that require several layers of review and approval by elected and appointed

government officials.  (Declaration of David Karnovsky ("Karnovsky Decl.") ¶¶ 3-30.)   City

officials are the target of lobbying by numerous entities representing a broad range of interests.

(Declaration of Arnie Wolsky ("Wolsky Decl.") Ex. A.)

            2.   In 2007, in the interest of "reduc[ing] the appearance of undue influence

associated with contributions from individuals doing business with the City," and eradicating the

perception "that such individuals have a higher level of access to the City's elected officials," the

New York City Council enacted Local Laws 34 and 67.  (New York City Council, Report of the

Governmental Affairs Division, Committee on Governmental Operations, for Int. No. 586-2007, Declaration of Jonathan Pines ("Pines Decl.") Ex. H, at 24.)

3.   Local Laws 34 and 67 lowered contribution limits and disallowed matching funds for contributions by certain individuals who have "business dealings with the City" as defined in the Campaign Finance Act ("CFA") ("doing business provisions").   (Declaration of Amy Loprest ("Loprest Decl.") ¶ 39; Pines Decl. Exs. A & B.)

4.   Additionally, Local Laws 34 and 67 barred contributions from partnerships, Limited Partnerships ("LLPs") and Limited Liability Companies ("LLCs").   (Loprest Decl. ¶ 39; Pines Decl. Exs. A & B.)

5.   This legislation builds on a 1998 Charter amendment adopted by the City's voters that a) approved a ban on corporate contributions for candidates participating in the City's campaign finance program, and b) directed the Campaign Finance Board ("the Board") to promulgate rules relating to disclosure and contributions by persons "doing business" with the City.   It also builds on the New York City Campaign Finance Board's more than 20 years of experience in the area of campaign finance reform.   (Loprest Decl. ¶¶ 3, 6, 20-34, 38).

**I.    The Campaign Finance Program**

6.   The New York City Campaign Finance Program (the "Program") is a voluntary government reform program established in 1988 by the CFA.   *See* Admin. Code §§ 3-701, et seq.   See also New York City Charter (the "Charter") §§ 1051-52, 57; Campaign Finance Board Rules (the "Rules").   (Loprest Decl. ¶ 7.)

7.   The Board administers the Program and provides public matching funds to candidates running for Mayor, Comptroller, Public Advocate, Borough President, and City Council member.   (Loprest Decl. ¶ 8.)

8.   The Board has five members.  Two members of the Board, who must each be from different political parties, are appointed by the Speaker of the City Council, and two more (also from different political parties) are appointed by the Mayor.  The Chair is appointed by the Mayor after consultation with the Speaker.  Charter §1052(a)(1).  (Loprest Decl. ¶ 9.)

### A.      General CFA Requirements

9.   The CFA imposes the following requirements on all candidates, among others:  (a) the filing of periodic financial disclosure statements that report the contributions received by the campaign, the campaign's expenditures, and other transactions; (b) limitations on the amount of contributions the campaign may receive from any single contributor; and (c) the obligation to respond to requests for documentation and information from the Board to verify the campaign's compliance with the requirements of the Program.  Admin. Code §§ 3-701, *et seq*. Additionally, participating candidates must agree to limitations on the total amount of money the campaign may spend to promote the candidate's nomination or election.[1]  (Loprest Decl. ¶ 10.)

### B.      Matching Funds

10.  Public matching funds are paid to a participating candidate's campaign based upon contributions reported by the campaign as matchable contribution claims in its disclosure statements submitted to the Board.  Private contributions of up to $175 from individuals who reside in New York City are matched at a rate of six dollars in public funds for every one dollar in private contributions (up to $1,050 in public funds per contributor).  Thus, a $100 qualifying

---

[1] Candidates who seek to participate in the public financing system are called "participating candidates" or "participants."  Candidates who are entirely privately funded are "nonparticipating candidates" or "nonparticipants."  Admin. Code §§3-702, 3-703, 3-719.  There are also "limited participating candidates" who do not receive public funding but who nevertheless agree to abide by the spending limits.  Admin. Code §3-718.

contribution to a participating candidate by a New York City resident will be as matched with $600 in public funds.  Admin. Code §§ 3-703, 3-705(1), (2).  (Loprest Decl. ¶ 11.)

   11. In order to qualify for public matching funds, candidates must demonstrate that they have met certain requirements specified in the law.  (Loprest Decl. ¶¶ 13-15.)

   12. Contributions from organizations, including unions and Political Action Committees ("PACs"), are not "matchable."  Additionally, contributions from certain individuals considered to have business dealings with the City as defined in the law, as well as individuals identified on a lobbyist statement of registration, are not matched.  Admin. Code §§ 3-702(3)(g), (h), 3-703(1-a).  (Loprest Decl. ¶ 12.)

### C. Contribution Limits

   13. Currently the CFA generally imposes per-person contribution limits for all covered elections held in the same calendar year of $4,950 for the Citywide offices of Mayor, Comptroller or Public Advocate; $3,850 for Borough President; and $2,750 for City Council.[2]  Contributions exceeding these amounts by up to half the applicable limitation may be made under circumstances set forth in the law, including run-off primary elections and special elections.  Admin. Code § 3-703(1)(f).  (Loprest Decl. ¶ 16.)

   14. Certain individuals who have "business dealings with the City" as defined in the law are subject to lower contribution limits.  Additionally, certain types of organizations are not permitted to make any contributions.  (Loprest Decl. ¶ 17.)

---

[2] Pursuant to Administrative Code §3-703(7), these figures were increased in 2002 to reflect changes in the Consumer Price Index.  (Loprest Decl. ¶ 16 n.3.)

## II.    1998 Charter Revision Reforms.

17.    In 1998, a Charter Revision Commission made a series of recommendations relating to campaign finance reform.  First, the Commission concluded that corporate contributions were "inherently problematic and should be banned outright." (1998 REPORT OF THE NEW YORK CITY CHARTER REVISION COMMISSION (August 20, 1998) ("CRC Report"), Pines Decl. Ex. F, at 15.)  It found, "[t]here are obvious inequities that result from a system that allows corporations to pour money into political campaigns.  .  .  . Corporate contributions erode confidence in the democratic process [because] corporations have financial, not ideological reasons to participate in the political process." (*Id.*) It further found that, "[t]o the extent politicians take positions to ensure corporate donations, those contributions impair the ability of public officials to make independent political judgments." (*Id.*)

18.    The Commission characterized the outright ban on corporate contributions as "a step toward solving" the problem of "doing business" contributions.  (CRC Report, Pines Decl. Ex. F, at 17.)  Toward that end, the Commission proposed that "contributions by anyone – associations, partnerships or individuals – who does business with the City should be subject to regulation." (*Id.*)  That was because  donations intended for "securing access to, or influence over" elected officials were "inherently harmful" due to the opportunity for corruption and because such donations "erode public trust and confidence in government." (*Id.* at 18-19.)  The Commission specifically identified concerns relating to contributions by contractors and lobbyists:

> The news is replete with stories raising questions about donations by contractors to candidates for office at all levels of government and in all political parties. Commission staff collected a sampling of over fifty such incidents in New York State between 1994 and 1998 alone.  Similarly, donations by registered lobbyists and their principals can create the appearance of an attempt to purchase influence . . .

> Generally there is no evidence that these campaign contributions actually
> influence the award of a particular contract or passage of a bill. The contributions
> appear to be consistent with current law, which does not prohibit contributions by
> entities doing business with the government. There is, however, no doubt that
> these contributions have a negative impact on the public because they promote the
> perception that one must "pay to play."

*(Id.* at 19.)

19.     The Commission put forth the following ballot question that was presented

to New York City voters:

Question 1 – Campaign Finance Reform

Shall the changes relating to the voluntary campaign finance system, including (1)
prohibiting corporate contributions, (2) requiring disclosure and regulation of contributions by
those doing business with the City of New York and regulation of indirect campaign
expenditures . . . be adopted?[3]

(Charter Revision Commission Report Exhibit B, Pines Decl. Ex. F.)

20.     The City's voters approved the Charter amendment at the November 1998

election.  See Charter §1052(a)(12).    A ban on corporate contributions was later separately

enacted by the City Council, and extended to non-participating candidates.    Admin. Code § 3-

703(l)(l).  (Loprest Decl. ¶¶ 20-22.)

21.     The ban on corporate contributions had a significant impact on increasing

the role of individual contributor participation.  For the 1997 election, 27 percent of all

contributions came from corporations, and 62 percent came from individuals. For the 2001

election, fewer than 1 percent of all contributions came from corporations, and 87 percent came

from individuals.  (Loprest Decl. ¶ 21.)

22.     The Charter amendment that was approved by voters in the November

1998 election also required that participating candidates disclose contributions received from

"individuals and entities doing business with the city," and that the Board issue "such rules as it deems necessary" to implement this provision and make the disclosed information available to the public. Additionally, the Charter amendment directed that the Board:

> promulgate such rules as it deems necessary to regulate the acceptance by candidates participating in the voluntary system of campaign finance reform of campaign contributions from individuals and entities doing business with the city, including rules that determine which business dealings shall be covered by such rules.

Charter § 1052(12)(a.)  In its consideration of possible rules, the Board was directed by the Charter to balance factors including (a) the effectiveness of the voluntary system of campaign finance reform; (b) the costs of such a system; and (c) the maintenance of a reasonable balance between the burdens of such a system and the incentives to candidates to participate in the system. Id. § 1052(12)(c). (Loprest Decl. ¶ 22.)

## III.    Campaign Finance Board Study of "Doing Business" Contributions.

15. Following the 1998 Charter amendment directing the Board to propose such rules as it deemed necessary  relating to this issue, the Board conducted research, and issued three alternative versions of "doing business" rules for public comment. The Board received limited response to its proposed rules, and no consensus could be reached as to an appropriate definition or how best to regulate these contributions.  There also were no information and resources readily available to use for enforcement purposes.  Thus, by November 2000, the Board concluded it had met its Charter obligations as of that time.  (Loprest Decl. ¶ 23.)

23.    Subsequently, in 2004, a local bill was introduced that would have imposed new restrictions on campaign contributions from individuals having business dealings with the City.  This proposed legislation was not enacted.  (Loprest Decl. ¶ 24.)

---

[3] The ballot question also proposed establishing a special budget process and a procedure for

24.    Then, in 2005, two important information resources became available on-line – the Vendor Information Exchange System (VENDEX), containing information about City vendors, and a database of lobbyists registered with the City Clerk's office.    With those resources available, the Board resumed examining how to effectively regulate "doing business" contributions.  (Loprest Decl. ¶ 25.)

25.    In 2005 and 2006, the Board held several public hearings relating to regulating campaign contributions by persons "doing business" with the City.  The Board heard testimony from both supporters and opponents of further regulation in this area, including specific testimony relating to contractors, lobbyists, and land use, among other issues.  (Loprest Decl. ¶ 26.)

26.    Additionally, the Board requested that research concerning "doing business" contributions be conducted by a team of students at the Wagner Graduate School of Public Service at New York University, using newly-available data available from the City's VENDEX and lobbying databases.  (Loprest Decl. ¶ 27.)

27.    In 2006, the Board published its Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions ("Interim Report").    (Loprest Decl. Ex. A.)  This report was based on the students' research and edited by the Board.  The report used a "working definition" of "doing business" that included (1) firms or individuals who were principals of firms who had contracts with the City valued at $100,000 or more; and/or (2) registered lobbyists and lobbyist clients.[4]    Based on a sample of available data, the report found that contributions by "doing business" individuals or entities represented 27.5 percent of

---

filling vacancies for the Board.

[4] This definition, which was based on available data, differs from the "business dealings" definition that was enacted in Local Laws 34 and 67 in a number of respects.

donations in the 2001 election cycle ($15.6 million out of $56.8 million donated) and 22.3 percent of donations in the 2005 election cycle ($9.4 million out of $42.3 million donated). (Interim Report at i, 12, Loprest Decl. Ex. A.) (Loprest Decl. ¶ 28.)

28.    The Interim Report also found that contributors who gave large amounts of money to campaigns were more likely to be "doing business" with the City than smaller contributors.    In 2001, only 1.6 percent of persons contributing $250 or less were "doing business" with the City as defined in the Interim Report; in 2005, only 2.5 percent.    Among contributors who gave $2,000 or more, in 2001 more than one in five (20.8 percent) were "doing business" with the City; in 2005, which was a less competitive election because there were more incumbents running for reelection, slightly fewer of these large contributors (16.8 percent) were "doing business."[5]  (Interim Report at 7-8, 14, Loprest Decl. Ex. A.) (Loprest Decl. ¶ 29.)

29.    The report also included case studies of contributions by particular persons who had business interests with the City, including the following examples:

- The report looked at contributions by the concessionaire brothers George and Thomas Makkos, who media accounts indicated had business with the City worth $3 million, including 60 percent of pretzel carts in Central Park.    In 2001, the brothers and one of their spouses gave a total of $16,850 in campaign contributions, including $4,350 that was intermediated (or "bundled") by George Makkos.    Their business partners in Terrace on the Park restaurant in Queens contributed a combined total of $53,315 in the 2001 elections.  (Interim Report at 29-30, Loprest Decl. Ex. A.)

- The report further noted that, in 2004, 18 of the 50 largest City contracts were held by 16 not-for-profit organizations, with a value of nearly $1.2 billion.    The study found that of the officers, directors, trustees and highest-paid employees at those 16 agencies, 139 individuals, or nearly 24%, donated to a City political campaign in the 2001 election cycle. The donations totaled $314,926, for an average of $2,298 per donor.    In the 2005 election cycle, 84 individuals, or 15%, donated to a City political

---

[5] Term limits for local offices in New York City first took effect in 2001.

campaign.  Those donations totaled $201,545 for an average of $2,399 per donor.  (Interim Report at 38-40, Loprest Decl. Ex. A.)

- The report looked at donation patterns by a prominent real estate developer, The Witkoff Group.  Donations from Steven Witkoff, his immediate family, company officers, and Witkoff's LLCs totaled $49,750 for 2001 and $43.925 for 2005.  In 2005, $7,000 was given to three members of the City Council's Land Use Committee.  During this time, the developer had several pending discretionary land use issues before the Council and other entities involved in approving certain land use changes in the City.  These projects included one that "carved out," or exempted, the developer's property from a rezoning of large parts of the West Village that otherwise would have prevented the Witkoff Group from building a 200-foot tall tower it had planned for the property.  Another developer that did not make campaign contributions did not receive a "carve out" from the rezoning.  (Interim Report at 32-34, Loprest Decl. Ex. A.)

(Loprest Decl. ¶ 30.)

## IV.    2006 Campaign Finance Board Recommendations

30.    In its public post-election report on the 2005 elections, the Board made several recommendations for improving the CFA, based on its study and analysis of the law's implementation, and its inquiries into the question of regulating "doing business" contributions as described above.  (Loprest Decl. ¶ 31.)

31.    One of the Board's recommendations was to ban all organizational contributions, including contributions from partnerships, limited liability companies ("LLCs"), political action committees ("PACs"), and unions.  (2005 Election Report at 120, Loprest Decl. Ex. B.)  The Board noted that organizational contributions tended to favor incumbents.  (Id.)  It also noted that in some circumstances, organizational contributions undermine the CFA's goals of transparency, as they "can be used to obscure the identity or business of the ultimate source of a contribution."  (Id. at 121.)  The Board noted that this is particularly the case for LLCs: "many are involved in city business (especially land use), yet often there is no information in the public

record about a particular LLC's owners or principals." (<u>Id.</u>) It also noted that LLC contributions had increased from 2.8 percent of all contributions in 2001, to 6.2 percent of contributions in 2005; and that banning these contributions would be one way to reduce the influence of "doing business" contributors. (<u>Id.</u> at 120-21.) (Loprest Decl. ¶ 32.)

      32.    The Board also recommended that the City enact legislation regulating "doing business" contributions. (2005 Election Report at 122, Loprest Decl. Ex. B.) The Board summarized the problems created by "doing business" contributions as follows:

> In creating any potential "doing business" regulation, the Board has a role to play to ensure city decisions are made with the best interests of the city in mind – rather than the best interests of a campaign contributor. "Doing business" contributions create inequalities (real and perceived) in the political marketplace as well, diluting the impact of individual contributors. Individuals or entities with hundreds of thousands of dollars of city business at stake do not have to think twice before making a maximum donation to a candidate. In addition, incumbents – who can exert influence on particular city decisions as elected officials – have much greater access to these large donations than do non-incumbent candidates.

(<u>Id.</u>) (Loprest Decl. ¶ 33.)

      33.    Concerning the question of whom should be subject to "doing business" restrictions, the Board recommended including land use interests as well as contractors and lobbyists. With respect to land use interests, the Board explained:

> As much as – if not more than – contractors, real estate interests depend upon decisions by city boards or agencies regarding the disposition of city resources to generate profits for their businesses. For decades, studies of campaign giving have reflected this reality, consistently listing real estate interests among the top contributors to candidates for city office.

(<u>Id.</u> at 123.) (Loprest Decl. ¶ 34.)

## V.    Local Laws 15, 16, and 17, of 2006.

34.    In 2006, the City concurrently enacted three local laws to strengthen the Administrative Code in relation to campaign contributions by lobbyists.[6]  Local Laws 15 and 16 created a mandatory electronic filing system for lobbyists, require full lobbyist disclosure for all fundraising and consulting activities, and ban all gifts from lobbyists to City officials.  The laws also strengthen enforcement and penalties for violation of the City's lobbying law.  (Loprest Decl. ¶ 35; Local Laws 15, 16, & 17, Pines Decl. Exs. C-E.)

35.    In its committee report for Local Law 15, the City Council's Committee on Governmental Operations pointed to recent lobbying scandals on the state and federal level in noting how they had reduced the public's trust in its elected officials and had raised "serious questions of impropriety." NEW YORK CITY COUNCIL, REPORT OF THE GOVERNMENT AFFAIRS DIVISION, PROPOSED INT. NO. 190 (2006), at 2.  The Council stated that the 2006 amendments "seek to reduce the impact of lobbying culture and special interests in City Hall and strengthen the integrity, transparency, and accessibility of city government for its constituents."  (Pines Decl. Ex. AA.)

36.    Local Law 17, which the Council passed by a vote of 49 to 0, amended the definition of "matchable contribution" in Administrative Code section 3-702(3) to exclude contributions from lobbyists or any other person required to be included in a statement of registration to be filed with the City Clerk pursuant to Administrative Code section 3-213(c)(1). Under the Local Law, the registration statement also had to include "a person affiliated with a

---

[6] In accordance with Administrative Code section 3-211(a) and (c), a person or organization retained, employed or designated by any client to engage in "lobbying" is a "lobbyist."  That activity generally includes any attempt to influence the passage or defeat of a local law or resolution, or decisions regarding the procurement of goods or services, land use issues, franchises and concessions, administrative rule- or rate-making.  See Admin. Code § 3-211(c)(1)(i)-(viii).

lobbyist," meaning the spouse or domestic partner and unemancipated children of a lobbyist, when that lobbyist is a person, or any officer or employee of a lobbying organization "who engages in any lobbying activities or who is employed in an organization's division that engages in lobbying activities," as well as that person's spouse, domestic partner and unemancipated children. Admin. Code 3-213(c)(1). While those "affiliated" individuals listed in the lobbyist registration statement are excluded from the matching provisions of the CFA, they can still contribute up to the same maximum contribution limits applicable to other individuals. Admin. Code §3-703(18)(a). (Loprest Decl. ¶ 36.)

37.    The law also authorized the Board to rely on a computerized database maintained by the City Clerk, or on other sources known to the Board, to determine if a contribution is matchable.  (Loprest Decl. ¶ 37.)

## VI.    Local Laws 34 and 67 of 2007

38.    Against this backdrop, and with the strong support of Mayor Michael Bloomberg and City Council Speaker Christine Quinn, the City Council passed, by a 44-4 margin, Local Law 34 of 2007, which was signed into law on July 3, 2007.  Additional technical amendments to this legislation were enacted in Local Law 67 on December 31, 2007.  (Loprest Decl. ¶ 38; Pines Decl. Exs. A, B.)

39.    Local Law 34 requires disclosure of and limits contributions from individuals who have "business dealings with the City" as defined in the CFA.  The law (1) lowers contribution limits for covered offices from "any natural person who has business dealings with the City, as that term is defined in [Admin. Code. 3-702(18)]," to $400 for citywide campaigns, $320 for Borough President, and $250 for City Council (Admin. Code §3-703(1-a)(participating candidates); id. at §3-719(2)(b)(non-participating candidates)); (2) for

participating candidates, makes those contributions ineligible for public matching funds (id. §§ 3-702(3)(h), 3-703(1-a)); and (3) for both participating and non-participating candidates, extends the pre-existing bans on corporate contributions to LLCs, LLPs, and partnerships (id. § 3 703(1)(l) (participating candidates); id. at §3-719(2)(b) (non-participating candidates)).  (Loprest Decl. ¶ 39.)

       40.     With respect to the "doing business" provisions of the law, the Council Committee Report referenced the Board's Interim Report, and stated:

> While there is nothing intrinsically wrong with contributions from those doing business with the City, the ability of such individuals to contribute could create a perception, regardless of whether such perception is accurate, that such individuals have a higher level of access to the City's elected officials.   It is important to eradicate this perception and reduce the appearance of undue influence associated with contributions from individuals doing business with the City.

((New York City Council, Report of the Governmental Affairs Division, Committee on Governmental Operations, for Int. No. 586-2007, at 24, Pines Decl. Ex. H.)

       41.     With respect to the ban on contributions by LLCs, LLPs and partnerships, the Council Committee Report stated:

> The Act prohibits participants and non-participants from accepting corporate contributions.  However, there is a loophole in the law that permits similarly structured business entities, such as limited liability companies ("LLC"), limited liability partnerships ("LLP") and partnerships are still permitted to contribute up to the full contribution limit. Although contributions from these entities are not matchable with public funds, permitting these business entities to contribute has been a way to subvert the contribution limits because the Board rules only require that organizational contributions be attributed to the partner or owners where the contribution is greater than two thousand five hundred dollars.
>
> Section fifteen of the bill would close this loophole by expressly preventing LLCs, LLPs and partnerships from making contributions to participating or non-participating candidates from the business entity itself.  This restriction would not prevent an individual owner of an LLC, LLP or partnership from making a contribution in his or her individual name.

((New York City Council, Report of the Governmental Affairs Division, Committee on Governmental Operations, for Int. No. 586-2007, at 29, Pines Decl. Ex. H.)

## VII.   Definition of "Business Dealings with the City"

42.    The phrase "business dealings with the city" ("business dealings") is defined to include certain transactions that fall into the following categories:  (i) contracts for the procurement of goods, services and construction, including contracts for the underwriting of the City's debt and debt-related contracts; (ii) concessions and franchises; (iii) grants; (iv) economic development agreements; (v) contracts for the investment of pension funds;  (vi) real property acquisitions or dispositions; and (vii) applications for land use approvals or zoning text amendments. Additionally, there are separate rules concerning "actions, transactions and agreements providing affordable housing." Finally, lobbyists are deemed to be engaged in business dealings with the city.  *See* Admin. Code § 3-702(18).  (Schaffer Decl. ¶ 4.)

43.    The transactions covered include those with the City, and agencies or entities "affiliated with the City of New York."  Agencies or entities that are considered "affiliated with the City of New York" ("affiliated entities") include "the city school district of the city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials." Admin. Code § 3-702(18).  (Schaffer Decl. ¶ 5.)

44.    The doing business provisions do not apply to organizations.  They apply to a "natural person" who fits in one of the following categories for an entity that has business dealings with the City or an affiliated agency: "any chief executive officer, chief financial officer

- 15 -

and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity." Admin. Code §§ 3-702(20), 3-703(1-a), 3-719(2)(b).  The CFA defines "senior managerial capacity" to include "high level supervisory capacity, either by virtue of title or duties, in which substantial discretion and oversight is exercised over the solicitation, letting or administration of business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals." *Id.* § 3-702(20).  Additionally, the doing business provisions apply to individuals who are "lobbyists" as defined in section 3-211 of the Administrative Code. *Id.* §§ 3-702(18), 3-703(1-a), 3-719(2)(b).  (Schaffer Decl. ¶ 6.)

## A.    Procurement Contracts

45.    New York City has a significant volume of procurement contracts.  In Fiscal Year (FY) 2008, New York City agencies (not including affiliated entities) completed nearly 53,000 procurements worth approximately $15.3 billion.[7]  (Simpson Decl. ¶ 3.)

46.    In FY 2008 the City used procurements to obtain a wide range of goods and services, including approximately $4.5 billion (29 percent of the total) in human services, such as day care and foster care, homeless shelters, youth programs and home care;  $4.4 billion (29 percent of the total) in construction services; $3 billion (19 percent of the total) in standardized services, including security, janitorial, transportation, plumbing and other services; $592 million ( four percent of the total) in professional services, including information

---

[7] Contracts have terms that range from instantaneous (for example, one-time-only goods contracts that are completed upon delivery) to decades.  This figure represents the annualized procurement volume, which is the total value of contracts that were registered by the Comptroller in FY 2008.  It includes contracts where the entire duration occurred within the

technology, consulting, accounting, legal and other services; $914 million ( six percent of the total) in goods; and $2 billion (13 percent of the total) in architecture and engineering services.[8] (Simpson Decl. ¶ 4.)

47. As of June 30, 2008, City agencies (excluding affiliated entities) held a combined total of 19,578 open contracts worth approximately $55.4 billion. (Simpson Decl. ¶ 5.)

48. City officials who may be directly involved in the procurement process include the Mayor and the relevant mayoral agencies; the Comptroller, who registers contracts and who also has authority to audit contract performance, Charter §§ 93(b), (p), 328, 375; and Council members, Borough Presidents and the Public Advocate, who may designate individual contractors to receive discretionary funds or line-item budget appropriations, with such designations subject to a determination by the relevant mayoral agency to award the contract. (Simpson Decl. ¶¶ 6, 16.)

49. The "business dealings" definition includes contracts with City agencies or affiliated entities that meet the following description:

> any contract (other than an emergency contract or a contract procured through publicly-advertised competitive sealed bidding) which is for the procurement of goods, services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York and is valued at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code, or, with respect to a contract for construction, at or above five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter,[9] and shall include any contract for the underwriting of the

---

reporting year, contracts for fixed multi-year terms, and construction contracts of undetermined duration. (Simpson Decl. ¶ 3 n.2.)

[8] These figures also represent the annualized procurement volume. (Simpson Decl. ¶ 4 n.3.)

[9] The second reference to emergency contracts is an apparent drafting error that resulted when the Local Law 34 language was changed in Local Law 67. Local Law 34 excluded emergency contracts from the "business dealings" definition. Local Law 67 added the first reference to the emergency contract

> debt of the city of New York  or  any  agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel  or  underwriter's counsel in connection therewith.

Administrative Code § 3-702(18)(a)(i).

50.    In FY 2008, 42% percent of City agency contracts were awarded using competitive sealed bidding (total of $6.5 billion).  (Simpson Decl. ¶ 11.)

51.    As a general matter, contract awards made using procurement methods other than competitive sealed bidding involve more discretion by government officials in determining who should get the contract award.  Also, in some cases, the process may involve negotiation between the prospective contractor and government officials prior to granting a contract award.  (Simpson Decl. ¶¶ 10, 12-14.)

52.    Contracts valued at $5,000 or less are excluded from any calculation of "business dealings."  Id. § 3-702(18)(a).  With respect to dollar value, procurement contracts for goods and services are considered to be "business dealings" if the combined total of all current goods or services contracts for the contractor and all goods or services contracts awarded to the contractor in the previous 12 months (other  than  emergency  contracts  or  contracts procured through  publicly-advertised  competitive  sealed  bidding)  amounts  to  $100,000  or  more. Procurement contracts for construction are considered to be "business dealings" if the combined total of all current construction contracts for the contractor and all construction contracts awarded to the contractor in the previous 12 months (other  than  emergency  contracts  or contracts procured through publicly-advertised competitive sealed bidding) amounts to $500,000 or more.  (Schaffer Decl. ¶ 8.)

---

exclusion, but left in language from Local Law 34 that, taken out of context, would suggest that emergency contracts are covered.  The law is interpreted as not covering emergency contracts.  (Schaffer Decl. ¶ 8 n.1.)

53.     Additionally, the CFA specifies timeframes for when covered contracts or bids and proposals on contracts are considered "business dealings."  Covered contracts are generally considered "business dealings" throughout the term of the contract, and for 12 months afterward.  If the contract does not have a term, it is considered a "business dealing" for one year from the date of purchase and for twelve months afterward.  If a contract award comes from a line-item budget appropriation, or from discretionary funds from an elected official other than the Mayor or Comptroller, the transaction is considered a "business dealing" from the date when the budget is adopted that includes the appropriation, until 12 months after the end of the term of the contract.   Administrative Code § 3-702(18)(b).   Additionally, bids and proposals for procurement contracts are considered "business dealings" from the date when the bid or proposal is submitted or the date of the public advertisement for the contract opportunity (whichever is later) until one year after the date of the submission or advertisement.  *Id.*  (Schaffer Decl. ¶ 10.)

54.     The City's procurement rules do not apply to collective bargaining with City unions, or to employer-employee relationships for non-unionized employees.  Collective bargaining with City employee unions is a distinct process that is governed by State and City law; MOCS is not involved with this process.  The procurement rules do, however, apply when a union competes for or receives a procurement contract to provide goods, services or construction.  (Simpson Decl. ¶ 8; see N.Y. Civil Service Law §§ 200 et seq; Charter §§ 1170 et seq.; 61 R.C.N.Y. §§ 1-01 et seq.)

55.     If a labor union or neighborhood association were to seek or be granted a contract for the procurement of goods, services or construction that met these requirements, the transaction would be considered a "business dealing" in the same way as any other procurement

contract.  The organization's officers who meet the definition of "person" under the CFA would be subject to the doing business provisions.  (Schaffer Decl. ¶ 1.)

**B.      Concessions and Franchises**

### 1.      Concessions

56.    A "concession" is defined in the Charter as "a grant made by an agency for the private use of city-owned property for which the city receives compensation other than in the form of a fee to cover administrative costs."  Charter § 362(a). Examples of concessions include food vendor or merchandise carts, restaurants and some recreational facilities in City parks; and certain uses of the City's intellectual property, such as T-shirts and souvenirs with City logos.  In FY 2007, City agencies had 728 concession agreements, which generated approximately $48 million for the City.[10]  The vast majority of concessions involving City agencies are with the Department of Parks and Recreation.  (Simpson Decl. ¶ 17.)

57.    Concessions involving City agencies are granted by those agencies in accordance with Chapter 14 of the Charter and rules promulgated by the Franchise and Concession Review Committee ("FCRC").   Charter § 374(a); *see generally* R.C.N.Y. title 12 (Concession Rules).  (Simpson Decl. ¶ 18.)

58.    The FCRC includes two appointees of the Mayor, who serves as Chair, and one Mayoral appointee; the Director of the Office of Management and Budget; the Corporation Counsel; and the Comptroller.  Charter § 373(a).  In addition, the Borough President from the borough where a franchise or concession would be located serves as a member of the FCRC; when more than one borough is involved, the Borough Presidents identify one person to serve on the FCRC for that purpose. *Id.*  (Simpson Decl. ¶ 19.)

---

[10] Concession and franchise revenue data for FY 08 is not yet available.

59.     Before awarding a concession, a City agency must comply with the procedures set forth in the FCRC's concession rules or obtain its approval to use a different procedure.  Charter § 374(a).  Additionally, a determination must be made as to whether a concession is a "major concession."  Charter § 374(b).  A "major concession" is one that has "significant land use impacts and implications" as determined pursuant to rules adopted by the City Planning Commission, or for which an environmental impact statement is required.  Id.; see also 62 R.C.N.Y. §§ 7-01 – 7-03.  Examples of uses that have been determined to be major concessions include a marina with more than 200 slips, and a permanent performance or spectator sport use with more than 2,500 seats.  Id. § 7-02.  Major concessions are subject to review through the City's Uniform Land Use Review Procedure ("ULURP"), which may involve review by local community boards, borough presidents, the City Planning Commission, and in some cases the City Council.  (Simpson Decl. ¶¶ 20-22.)

60.     Concession agreements must be registered with the Comptroller.  12 R.C.N.Y. § 1-17.  (Simpson Decl. ¶ 23.)

**2.     Franchises**

61.     A "franchise" is defined as "a grant by an agency of a right to occupy or use the inalienable property of the city to provide a public service."  Charter § 362(b).  Examples of franchises include access to City property for providing cable television or other telecommunication services, or bus service.  In FY 2007, City agencies had 47 franchise agreements, which provided approximately $130 million in revenue to the City, of which $91 million consisted of cable television revenue.  (Simpson Decl. ¶ 24.)

62.     A franchise may be awarded only after an initial determination of need is made by the agency identified by the Mayor as having the most expertise relating to the

franchise. The agency must prepare an "authorizing resolution" for submission by the Mayor to the City Council. Charter § 363(a)-(c). The authorizing resolution must set forth "the nature of the franchise or franchises to be granted, the public service to be provided, the terms and conditions of the franchise or franchises, including any subsidies that will be given to a franchisee, the method by which proposals will be solicited for the franchise or franchises and the criteria to be used in evaluating the proposals submitted in response to such a solicitation." Id. § 363(b). The Council must hold a public hearing on the authorizing resolution within 90 days of receiving the resolution. The Council may approve, approve with modifications or disapprove the resolution; any approval with modifications or disapproval is subject to veto by the Mayor and override by Council. Id. § 363(c). (Simpson Decl. ¶ 25.)

63. Additionally, the Department of City Planning must determine whether the proposed franchise would have significant land use impacts or implications; if so, the request for proposals or other solicitation must be reviewed and approved in accordance with ULURP. Id. § 363(e). (Simpson Decl. ¶ 26.)

64. If the authorizing resolution is approved, and ULURP approval is unnecessary or is obtained, the agency may solicit proposals and choose a franchisee in accordance with the resolution. Id. § 363(e), (f). (Simpson Decl. ¶ 27.)

65. The selection of a franchisee and any franchise agreement are subject to approval by the FCRC. Id. § 363(f). The votes of five FCRC members are required to approve a franchise agreement. Id. § 373(c). (Simpson Decl. ¶ 28.)

### 3. "Business Dealings" definition for franchises and concessions

66. The "business dealings" definition includes "any concession (other than a concession awarded through publicly-advertised competitive sealed bid) or any franchise from

the city of New York or any agency or entity affiliated with the city of New York which has an estimated annual value at or above the dollar value defined in subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2 of the administrative code." Admin. Code § 3-702(18)(iv). With respect to dollar value, concessions are considered to be "business dealings" if the combined estimated annual value of all current concessions held by the concessionaire or awarded to the concessionaire in the past year (other than concessions awarded through publicly-advertised competitive sealed bid) amounts to $100,000 or more. Franchises are considered to be "business dealings" if the combined estimated annual value of all franchises awarded to the franchisee in the past year amounts to $100,000 or more. As is true with procurement contracts, no franchises or concessions in the amount of $5,000 or less are considered when calculating this aggregate total. *See* Admin. Code §§ 3-702(18). (Schaffer Decl. ¶ 13.)

     67. Bids or proposals for franchises and concessions are considered "business dealings" from the time of their submission until one year afterward. Concessions are considered "business dealings" for their duration and one year afterward. Franchises are considered "business dealings" for the first year in which they are in effect and the first year after any renewal of the franchise. Admin. Code § 3-702(18)(b). (Schaffer Decl. ¶ 14.)

     68. If a labor union or neighborhood association were to seek or be granted a concession or franchise that met these requirements, the transaction would be considered a "business dealing" in the same way as any other concession or franchise. The organization's officers who meet the definition of "person" under the CFA would be subject to the doing business provisions. (Schaffer Decl. ¶ 15.)

**C.    Grants**

69.    A "grant" is defined in the PPB rules as "[a] cash transfer made by a government entity to another government entity, a quasi-public entity, a private organization, or an individual, for use by the recipient in accomplishing objectives established by the recipient." 4 R.C.N.Y. § 1-01.  The PPB rules further provide that a grant may be used "only to accomplish a public purpose authorized by federal, state, or City law." Id.    Written agreements with the grantee are not considered procurements. *Id.* (Simpson Decl. ¶ 29.)

70.    Grants are generally given to non-profit entities such as cultural institutions.  (Simpson Decl. ¶ 30.)

71.    Grants are considered to be "business dealings" if the combined total value of any grants awarded to the grantee in the past year amounts to $100,000 or more.  No grants in the amount of $5,000 or less are considered when calculating this aggregate total.  *See* Admin. Code § 3-702(18)(a).  (Schaffer Decl. ¶ 17.)

72.    Grants are considered "business dealings" for a period of one year after the grant is made.  Admin. Code § 3-702(18)(b).  (Schaffer Decl. ¶ 18.)

73.    Grants to neighborhood associations or unions that meet these requirements would be considered "business dealings" under the CFA.  The organizations' officers who meet the definition of "person" under the CFA would be subject to the doing business provisions.  (Schaffer Decl. ¶ 19.)

**D.    Economic Development Agreements**

74.    The "business dealings" definition also includes "economic development agreements," which are defined as "any contract or agreement in which financial incentives including, but not limited to, tax incentives, payments in lieu of taxes and financing are offered

in return for the development, attraction or retention of business." Admin. Code § 3-702(19). The CFA clarifies that the term does not include financial incentives "given to a person who qualifies for such incentive by operation of law." *Id.* (Schaffer Decl. ¶ 21.)

75.    Economic development agreements are considered "business dealings" from the time an application is submitted for an agreement until one year after the term of the agreement ends. Admin. Code § 3-702(18)(b). (Schaffer Decl. ¶ 22.)

76.    If a union or neighborhood association held an economic development agreement as defined in the CFA, the agreement would be considered a "business dealing," and the organization's officers who meet the definition of "person" under the CFA would be subject to the doing business provisions. (Schaffer Decl. ¶ 23.)

**E.    Contracts for Investment of Pension Funds**

77.    The "business dealings" definition also includes "any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants." Admin. Code § 3-702(18). (Schaffer Decl. ¶ 24.)

78.    These contracts, which are awarded by the Comptroller, are considered business dealings "from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier," until one year after the end of the term of the contract. Admin. Code § 3-702(18)(b). (Schaffer Decl. ¶ 25.)

79.    If any such contract were ever awarded to a labor union or neighborhood association, it would be considered a "business dealing" under the CFA, and the organization's officers who meet the definition of "person" under the CFA would be subject to the doing business provisions. (Schaffer Decl. ¶ 26.)

**F.      Land Use Approvals, Zoning Text Amendments and Section 195 Approvals**

80.     The "business dealings" definition also includes certain requests for land use approvals and zoning text amendments pursuant to sections 197-c and 201 of the City Charter, as well as "any application for approval sought from the city of New York pursuant to the provisions of section 195 of the charter." Admin. Code § 3-702(18)(a)(iii). (Schaffer Decl. ¶ 29.) Section 197-c sets forth the City's Uniform Land Use Review Procedure ("ULURP"). (Karnovsky Decl. ¶ 2 & n.1.)

81.     ULURP is a public review process that provides a means for participation by community boards, borough boards, borough presidents, the CPC, City Council members and the Mayor in decisions pertaining to the use, development or improvement of real property, including privately-sponsored development projects that typically involve significant financial investments. (Karnovsky Decl. ¶¶ 3, 8-27 .)

82.     ULURP is required for "applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation." Charter § 197-c(a). Specifically, ULURP applies to the following categories of land use actions, whether they are initiated by City agencies or by private parties (section and chapter citations are to other provisions of the Charter):

> (1) Changes in the city map pursuant to section one hundred ninety-eight and section one hundred ninety-nine;
>
> (2) Maps of subdivisions or plattings of land into streets, avenues or public places pursuant to section two hundred two;
>
> (3) Designations of zoning districts under the zoning resolution, including conversion from one land use to another land use, pursuant to sections two hundred and two hundred one;

(4) Special permits within the jurisdiction of the city planning commission under the zoning resolution, pursuant to sections two hundred and two hundred one;

(5) Site selection for capital projects pursuant to section two hundred eighteen;

(6) Revocable consents pursuant to section three hundred sixty-four, requests for proposals and other solicitations for franchises pursuant to section three hundred sixty-three, and major concessions as defined pursuant to section three hundred seventy-four;

(7) Improvements in real property the costs of which are payable other than by the city pursuant to section two hundred twenty;

(8) Housing and urban renewal plans and projects pursuant to city, state and federal housing laws;

(9) Sanitary or waterfront land-fills pursuant to applicable charter provisions or other provisions of law;

(10) Sale, lease (other than the lease of office space), exchange, or other disposition of the real property of the city, including the sale or lease of land under water pursuant to section sixteen hundred two, chapter fifteen, and other applicable provisions of law;

(11) Acquisition by the city of real property (other than the acquisition of office space for office use or a building for office use), including acquisition by purchase, condemnation, exchange or lease and including the acquisition of land under water pursuant to section sixteen hundred two, chapter fifteen, and other applicable provisions of law; and

(12) Such other matters involving the use, development or improvement of property as are proposed by the city planning commission and enacted by the council pursuant to local law.

Charter § 197-c(a); 62 R.C.N.Y. § 2-01(a)-(k), (n).  (Karnovsky Decl. ¶ 4.)

83.    ULURP review is frequently required for large-scale private developments that may involve significant amounts of investment.  Rezonings and special permits may be required, for example, in order to construct large residential or office towers, or to expand hospital and university complexes.  (Karnovsky Decl. ¶ 5.)

84.    ULURP applications that were approved in the past year include, among others:

- an application by Columbia University to rezone 35 acres of land to allow for the expansion of Columbia's campus as well as mixed-use development and other changes in the Manhattanville section of West Harlem;

- a series of applications by West Street Development, LLC for special permits and other changes to facilitate development of a 63-story mixed-used commercial and residential building at 47-50 West Street in Lower Manhattan, including a 140 to 180 room hotel, approximately 300 residential condominiums, and ground floor retail space;

- applications by 400 Fifth Realty LLC and 401 Fifth LLC for special permits and other changes to facilitate development of a 57-story mixed use building at 400-404 Fifth Avenue in Midtown, that would include approximately 389 residential units and 200 hotel rooms, as well as 28,707 square feet of retail space; and

- applications by First Realty Company, LLC, for special permits, rezoning, and other approvals to facilitate the development of a large-scale mixed-use project at former Con Edison sites along First Avenue between East 38th Street and East 41st Street in Manhattan.  The project would include six mostly residential towers with more than 3,000 dwelling units, one commercial tower with approximately 1.14 million square feet of space, a public plaza, and more than 70,000 square feet of retail space.

(Karnovsky Decl. ¶ 7.)

85.    If a project requires changes to the regulations applicable within a particular zoning district, an application may be submitted for an amendment to the text of the Zoning Resolution.  All of the land use projects listed above required zoning text amendments, in addition to ULURP approvals.  (Karnovsky Decl. ¶ 28.)

86.    Under section 201 of the Charter, zoning text amendments may be submitted by a taxpayer, community board, borough board, borough president or the Mayor, or by the Land Use Committee of the City Council if the application is supported by two-thirds of its members.  Charter § 201.  (Karnovsky Decl. ¶ 29.)

87.     Before taking action, the CPC must refer the application to the affected community boards or borough boards for a public hearing and recommendation.   Charter § 201(a).  Following the CPC review, the zoning text amendment is then reviewed and acted upon by the City Council in the same manner as for ULURP applications.   Charter § 197-d(b)(1). (Karnovsky Decl. ¶ 30.)

88.     The timeframe when ULURP transactions are considered "business dealings" for the purposes of the CFA is usually less than a year because of time frames in the Charter for completing the ULURP process.  In cases where the Council reviews the ULURP application, the application is only considered a "business dealing" from the time when the application is certified by the Department of City Planning until 120 days after the Council's action is filed with the Mayor or, in cases of Mayor disapproval of Council action, 120 days after the expiration of the period for a Council override.  If there is no Council review, the application is considered a "business dealing" only from the time of certification until 140 days after the CPC decision is filed with the Council.  Admin. Code § 3-702(18)(b)(iii).  In the case of a zoning text amendment, the period of "doing business" begins from the time the application is referred for public review until 120 days after the Council's action is filed with the Mayor or, in cases of Mayoral disapproval of the Council action, 120 days after the expiration of the period for Council override.  (Karnovsky Decl. ¶¶ 8-30, 32.)

89.     There are two categories of ULURP or zoning text amendments applicants whose transactions are not covered by the "business dealings" definition, when seeking ULURP or zoning text amendments.  (Karnovsky Decl. ¶ 33.)

90.    First, owner-occupants of one, two and three family homes are not considered applicants for the purpose of the land use provisions of the "business dealings" definition.  Administrative Code § 3-702(18)(a)(iii).  (Karnovsky Decl. ¶ 34.)

91.    Second, the doing business database does not include individuals from "a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis," that has applied for rezoning of its local neighborhood.  Admin. Code § 3-702(20); Charter §§ 197-c(a)(3).   This is a limited exception that only applies to applications of this nature, and not to any other ULURP applications.  DCP has received fewer than 20 of these applications in the past ten years.  (Karnovsky Decl. ¶ 35.)

92.    Generally, the categories of applications that are excluded from the "business dealings" definition affect the applicants' residences and local neighborhoods and, unlike most other privately-sponsored land use applications, are not pursued for a business purpose.  (Karnovsky Decl. ¶ 36.)

93.    If a union were a ULURP applicant (for example, if it sought zoning changes relating to its headquarters), the transaction would be treated as a "business dealing," and senior union officials would be subject to the lower contribution limits and non-matching provisions of the CFA.  (Schaffer Decl. ¶ 37.)

**G.    Real Property Transactions**

94.    The "business dealings" definition also includes "any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program)."  Admin. Code § 3-702(18)(a)(ii).  (Schaffer Decl. ¶ 27.)

95.     As noted above, when a City agency engages in the "[s]ale, lease (other than the lease of office space), exchange, or other disposition of the real property of the city," or when the City acquires real property other than "office space for office use or a building for office use," the land use implications of the transaction are subject to ULURP review. See Charter § 197-c(a)(10)-(11), 384(b)(5).  (Karnovsky Decl. ¶ 39.)

96.     The "business dealing" definition also includes "any application for approval sought from the city of New York pursuant to the provisions of section 195 of the charter."  Section 195 governs "acquisitions by the city of office space or existing buildings for office use, whether by purchase, condemnation, exchange or lease."   Ad. Code § 3-702(18)(a)(iii).  These applications must also be approved by the CPC, and may be reviewed by the community board, the borough presidents and the Council.  (Karnovsky Decl. ¶ 40-41.)

97.     If a union or neighborhood association were involved in a real property transaction that is covered under the CFA, the transaction would be treated as a "business dealing," and the organization's senior officials who meet the definition of "person" under the CFA would be subject to the doing business provisions.  (Schaffer Decl. ¶ 28.)

## H.     Affordable Housing

98.     The CFA requires that the Department of Housing Preservation and Development ("HPD") issue rules identifying "which categories of actions, transactions and agreements providing affordable housing shall and shall not constitute" business dealings. Admin. Code § 3-702(18)(a).  In making this determination, HPD is required to "consider the significance of the affordable housing program and the degree of discretion by city officials."  Id. HPD recently published proposed rules implementing this provision.  The CFA makes clear that housing assistance payment contracts between landlords and HPD or the New York City

Housing Authority relating to Section 8 rent subsidies (under Section 8 of the United States Housing Act of 1937) are not covered. *Id.* (Schaffer Decl. ¶ 30.)

**I.    Lobbyists**

99.    In addition to individuals associated with the transactions described above, lobbyists (as defined in section 3-211 of the Administrative Code) are deemed to be engaged in "business dealings" for the purposes of the CFA "during any period covered by a registration statement". Admin. Code § 3-702(18).  (Schaffer Decl. ¶ 31.)

100.    The Administrative Code defines "lobbyist" as "every person or organization retained, employed or designated by any client to engage in lobbying."[11]    Admin. Code § 3-211(a).  (Wolsky Decl. ¶ 7.)

101.    "Lobbying," or "lobbying activities," is defined to mean "any attempt to influence:

> i.    the passage or defeat of any local law or resolution by the city council,
>
> ii.    the approval or disapproval of any local law or resolution by the mayor,
>
> iii.    any determination made by an elected city official or an officer or employee of the city with respect to the procurement of goods, services or construction, including the preparation of contract specifications, or the solicitation, award or administration of a contract, or with respect the solicitation, award or administration of a grant, loan, or agreement involving the disbursement of public monies,

---

[11] This definition explicitly excludes "any officer or employee of the city of New York, the State of New York, any political subdivision of the State, or any public corporation, agency or commission, or the United States" acting in his or her official capacity.

iv.  any determination made by the mayor, the city council, the city planning commission, a borough president, a borough board or a community board with respect to zoning or the use, development or improvement of real property subject to city regulation,

v.  any determination made by an elected city official or an officer or employee of the city with respect to the terms of the acquisition or disposition by the city of any interest in real property, with respect to a license or permit for the use of real property of or by the city, or with respect to a franchise, concession or revocable consent,

vi.  the adoption, amendment or rejection by an agency of any rule having the force and effect of law,

vii.  the outcome of any rate making proceeding before an agency, or

viii.  any determination of a board or commission." [12]

Admin. Code § 3-211(c)(1). (Wolsky Decl. ¶ 8.)

102.  There are certain persons and organizations that are excluded from the definition of "lobbying," based on the types of activities in which they engage, such as newspapers, witnesses, persons who appear before an agency in an adjudicatory proceeding, or persons who prepare or submit a response to a request for information or comments by the City Council, the Mayor or another elected city official or an agency. Admin. Code § 3-211(c)(3). (Wolsky Decl. ¶ 9.)

103.  The lobbying laws apply to all lobbyists in the same manner. The definition of the term "lobbyist" includes diverse entities such as lobbying firms, law firms who

---

[12] The definition does not apply to any determination in an "adjudicatory proceeding."  Ad. Code 3-211(c)(2).

lobby on behalf of their clients, unions, not-for-profit entities, neighborhood groups and unincorporated associations. (Wolsky Decl. ¶ 10.)

104.    A wide range of organizations, both for-profit and non-profit, have registered and filed reports with the Lobbying Bureau. (*See* Wolsky Decl. ¶¶ 12-16.) These include a wide array of unions that engage in lobbying on their own behalf, including 1199 SEIU United Healthcare Workers East, the Association of Legal Aid Attorneys UAW 2325, Communications Workers of America, AFL-CIO, District Council 37, International Union of Painters and Allied Trades DC 9, Local 32BJ SEIU, and the United Federation of Teachers. Additionally, lobbyists retained by unions include Bolton-St. Johns, Inc. (retained by Local 338 RWDSU), Cozen O'Connor (retained by International Union of Operating Engineers Local 14-14B AFL CIO), Davidoff Malito & Hutcher LLP (retained by Council of School Supervisors and Administrators), Heather Beaudoin (retained by Joint Council 16, IBT), Montalbano Initiatives, Inc. (retained by Teamsters Local 237), Pitta, Biship, Del Giorno & Dreier LLP (retained by Uniformed Sanitationmen's Association, Local 831), and Robert A. Ungar Associates, Inc. (retained by Local 246, SEIU). (Wolsky Decl. ¶¶ 12-16, 21 & Ex. A.)

## VIII.   Doing Business Database

105.    The CFA requires the creation of a "Doing Business Database" that contains information concerning persons who are subject to the doing business provisions. Admin. Code § 3-702(20). This database is being created in three phases, consistent with timelines set forth in section 37 of Local Law 67. (Schaffer Decl. ¶ 32.)

106.    Information concerning all of the individuals covered by the doing business provisions, other than lobbyists, is being collected by the relevant agencies using a "Doing Business Data Form." These forms are required for new transactions covered by the

"business dealings" definition; forms have also been collected from many entities that already had procurement contracts or other covered agreements in place at the time when the doing business provisions took effect.  (Schaffer Decl. ¶ 33.)

107.    Information concerning lobbyists is maintained by the City Clerk. (Schaffer Decl. ¶ 34.)

108.    The first implementation phase, which went into effect on February 2, 2008, covers procurement contracts, concessions, franchises and lobbyists, with the exception of persons serving in a "senior managerial capacity."  For City agencies, some information concerning entities holding contracts, franchises or concessions was already included in two databases that pre-dated Local Law 34:  the Vendor Information Exchange System (VENDEX), which contains information concerning vendors that have certain business transactions with the City, and the Financial Management System, which contains information concerning certain transactions with the City.  (Schaffer Decl. ¶ 35.)

109.    The second phase, which went into effect on July 31, 2008, covers bids and proposals for contracts, concessions and franchises; grants; economic development agreements; contracts for the investment of pension funds; and senior managers for all covered transaction types.  (Schaffer Decl. ¶ 36.)

110.    The third phase, which is expected to go into effect on or before December 3, 2008, covers real property transactions and land use actions.  (Schaffer Decl. ¶ 37.)

**IX.    Data from the Doing Business Database**

111.    As of June 30, 2008, 4,581 entities were considered to have "business dealings" with the City in the first phase of implementation of the doing business provisions. (Schaffer Decl. ¶ 39 & Ex. A.)

112.    Of these entities, 1,612 are recorded as non-profit organizations; 2,365 are recorded as for-profit organizations; and 604 have no indicator in that regard.  (Schaffer Decl. ¶ 39 & Ex. A.)

113.    A wide range of non-profits are represented, including the 116th Street Block Association, Inc., the Association to Benefit Children, the Brooklyn Botanic Garden Corporation, the Cathedral Church of St. John the Divine, the Institute for Labor and the Community, the Mount Sinai School of Medicine, New York University, the Southeast Bronx Neighborhood Center, Inc., The Legal Aid Society, United Way of New York City, the Urban Justice Center, and a number of other health and social services providers, day care centers, youth programs, educational and cultural institutions, religious organizations, community organizations, advocacy organizations, and others.  (Schaffer Decl. ¶ 39 & Ex. A.)

114.    There are several labor unions or union-affiliated entities that have procurement contracts with the City or an affiliated agency that are considered "business dealings" under the law:  the United Federation of Teachers, which represents teachers employed by the City Department of Education; Local 28 Sheet Metal Workers ETER Fund; and DC-1707, Local-95 HSEWF.  (Schaffer Decl. ¶ 40 & Ex. A.)

115.    The combined total value of the contracts, concessions and franchises for these entities is approximately $55 billion.  (Schaffer Decl. ¶ 41 & Ex. A.)

## X.      Measuring the Results

116.    For the 2009 election cycle, the number of contributors to all local campaigns through July 11, 2008 has increased 14.3 percent compared with the same point in the 2001 election cycle, the last election with a similar number of open-seat races.   The total amount of money raised has increased 79 percent, to $34.3 million.  (Loprest Decl. ¶ 44.)

117.     The Board found the magnitude of early fundraising "unprecedented." Since Local Law 34 of 2007 increased the matching formula from 4:1 for the first $250 to 6:1 for the first $175, contributions of $175 have risen substantially.  Indeed, the Board's analysis of fundraising for the six-month period ending July 11, 2008, shows that candidates have turned their focus to raising funds in smaller contributions, suggesting that last year's reforms are taking hold.  (Loprest Decl. ¶ 45.)

118.     During the last six months, approximately 72 percent of all contributors to city campaigns gave $250 or less, compared to only 57 percent of all contributors through January 11, 2008.  The lower limits for the first phase of "doing business" contributions took effect on February 2, 2008.   (Loprest Decl. ¶ 46.)

## XI.     Facts Concerning Plaintiffs

### Sheila Andersen-Ricci

119.     Plaintiff Sheila Andersen-Ricci is the sole proprietor of plaintiff Martina-Franca Associates, an LLC that rents apartments and is a member of the Rent Stabilization Association ("RSA").  (Andersen-Ricci Dep., at 8, 11).  She has testified that neither she nor her company has ever contributed to any candidates for political office, though she says her company intends to contribute to political candidates sometime in the future. (*Id.* at 8-9).  In fact, Andersen-Ricci and her husband, Frank Ricci, a lobbyist employed by the RSA, contributed $500 to the campaign of Thomas White, Jr., a candidate for New York City Council in Council District 28 in the 2005 elections. (Decl. of Peri Horowitz, ¶ 4).

120.     Additionally, Ricci is a bundler of contributions who, from 1997 to 2008, collected 186 contributions worth $96,691 to various political campaigns (*Id.* at ¶7).   Included among those transactions are $18,225 in contributions to the unsuccessful 2008 special election

campaign of plaintiff Thomas V. Ognibene.  (*Id.* at ¶8).  Ricci also bundled $7,250 in contributions to Councilmember Erik Martin Dilan, the son of plaintiff Martin Malave Dilan. (*Id.*).

121.    By its own description, the RSA is "the largest trade association in New York City representing 25,000 property owners/agents responsible for approximately one million units of housing."  RSA website, www.rsanyc.net/about.html (last visited August 1, 2008).  RSA lobbies on behalf of its members before various governmental entities, including the City Council.  (*Id.*).  RSA president Joseph Strasburg acted as the intermediary for 293 contributions to candidates' campaigns, in amounts totaling $117,780, all contributed during the 2001 election cycle to two candidates:  $113,280 to Peter Vallone's successful campaign for City Council; and $4,500 Betsy Gotbaum's successful campaign for Public Advocate.  (Decl. of Peri Horowitz at ¶10).   Additionally, the RSA bundled and conveyed sixteen contributions totaling $7,000 to two campaigns:  $250 to Herbert Berman's unsuccessful run for Comptroller in 2001; and $6,750 to Nelson Denis's unsuccessful campaign for City Council in 2005.  (*Id.* at ¶11).

122.    It was because of her husband's involvement with the RSA that Andersen-Ricci became a plaintiff in this litigation.  (*Id.* at 20-21).  She believes that there is a public perception that campaign contributions by a lobbyist may influence the actions of elected officials.  (*Id.* at 38).

### State Senator Martin Malave Dilan

123.    Plaintiff Martin Malave Dilan is a New York State Senator representing the 17th Senatorial District in Brooklyn, New York. (Dilan Dep., at 5).  His current terms expires in December, and he intends to run for re-election.  (*Id.* at 7).  He is also considering running for the City Council in 2009 to fill a seat now held by his son, though he has not formed any

committees to raise money yet and will not even make that decision until later this year. (*Id.* at 7, 39). He receives campaign contributions from the RSA, from unions, and particularly, from union PACs. (*Id.* at 12, 21).

124.    Senator Dilan acknowledges there is a public perception that it is wrong for council members to accept "doing business" contributions. (*Id.* at 33). Nevertheless, he would expect to receive a substantial portion of his campaign funds from those who do business with the City, even though that is not based on his past fundraising experiences and he believes that incumbents have an advantage in that regard. (*Id.* at 35).

**Fran Reiter**

125.    Plaintiff Fran Reiter's consulting practice is plaintiff Reiter-Begun Associates, an LLC that derives more than 10 percent, but less than 50 percent, of its revenue from lobbying activities. (Reiter Dep., at 5, 7). A former Deputy Mayor under Mayor Rudolph Giuliani, Reiter was lobbied "daily" while she held that post. (*Id.* at 24). Her firm made contributions to the campaign of City Council member Daniel Garodnick prior to meeting with him regarding client matters, including a pending application by real estate developer Solow Realty to make zoning changes to a site on the East River in Manhattan. (*Id.* at 36-38). She believes there is a public perception that campaign contributions by lobbyists may influence elected officials. (*Id.* at 52).

**Robert Perez**

126.    Plaintiff Robert Perez and his company, Diamond Asphalt, submit sealed bids for City contracts. (Perez Dep. at 10, 42). Because he only submits sealed bids, he concedes he is not subject to the "doing business" restrictions at issue in this lawsuit. (*Id.* at 22, 44). His

lobbyist, Davidoff Malito & Hutcher, is local counsel in this lawsuit and intercedes on his behalf when a problem with the City arises. (*Id.* at 17).

**Michelle Russo**

127.    Plaintiff Michelle Russo is employed as a legal secretary by Davidoff Malito & Hutcher, local counsel for this lawsuit. (Russo Dep., at 4).  She has never contributed to any local, state, or federal political race, but she believes she may do so in 2009. (*Id.* at 5, 7). She joined the lawsuit because she might contribute to a campaign in 2009 and did not like having to register as a lobbyist. (*Id.* at 10).

**Marlene Tepper**

128.    Plaintiff Marlene Tepper ran for City Council in 2005, when she participated in the public financing program and focused on small contributions from individuals. (Tepper Dep. at 6, 11, 13, 19).  In that race, there were no contributions to her campaign from LLCs, LLPs, partnerships, or those doing business with the City, though she did receive union support. (*Id.* at 18-19).  No more than seven contributors gave more than $250, and that included three loans from Tepper to her own campaign.  (*Id.* at 23-24).

129.    Tepper is currently planning an run for a seat in the State Assembly. (*Id.* at 7).  She believes there is a  public perception that campaign contributions by lobbyists may influence elected officials and that it would be a good idea to change that perception and create incentives for smaller contributions from individuals. (*Id.* at 63, 68).  She nevertheless believes that "doing business" contributions favor incumbents. (*Id.* at 63).

**Viviana Vasquez-Hernandez**

130.    Plaintiff Viviana Vasquez-Hernandez has held various appointed positions and mounted unsuccessful campaigns for City Council in 2005 and State Senate in 2006

(Vasquez-Hernandez Dep. at 8-9, 17, 19). In her 2005 race, she participated in public financing, and nearly all the contributions she received were matched at a rate of $4 to $1. (*Id.* at 19, 30). None of that money came from lobbyists, LLPs, LLCs, partnerships, or those doing business with the City, though she anticipates that she would receive those kinds of contributions in the future because she would retain a campaign manager to pursue them. (*Id.* at 31, 39). She does not expect to run in 2009 and, in fact, declined an invitation from party officials to run. (*Id.* at 33-35). She also believes doing business contributors favor incumbents because they seek influence. (*Id.* at 44).

131.    She agrees there is a public perception that campaign contributions by lobbyists may influence elected officials, and that it is "definitely" a good idea to limit the fact or appearance of "pay to play" in electoral politics. (*Id.* at 44-45). She was recruited to join the litigation by a Brooklyn Conservative Party official and joined because she believes her access to matching funds is at risk. (*Id.* at 46).

**Yvette Velazquez Bennett**

132.    Plaintiff Yvette Velazquez Bennett is a State Republican Party official who ran unsuccessfully for the City Council in 2005 against Bill DiBlasio, and unsuccessfully for the State Assembly in 2006. (Bennett Dep., at 6). In 2005, she failed to raise enough to qualify for matching funds and contends that matching funds are not a big incentive to her contributors. (*Id.* at 11, 12). She does not believe her contributors had business dealings with the City or were lobbyists. (*Id.* at 14). She does not know if DiBlasio, her adversary in the 2005 City Council race, had the financial support of lobbyists or those doing business with the City, though he did have the advantage of incumbency. (*Id.* at 17-18).

133.    She is currently running for the State Assembly. (*Id.* at 6).   She was recruited to join this litigation by a Brooklyn Conservative Party leader and believes the amendments to the law prevents her key supporters, including contractors, from donating to her campaign and makes a candidacy against an incumbent difficult. (*Id.*. at 7-8).

### Thomas V. Ognibene

134.    Blaming a lack of support from the Republican Party, plaintiff Thomas V. Ognibene has announced that he is resigning from politics in order to focus on his legal practice. http://www.zwire.com/site/index.cfm?newsid=19881208&BRD=2731&PAG=461&dept_id=574 908&rfi=8 (last accessed August 4, 2008).   Most recently, he ran in a June 2008 special election, for which he received public funding, finishing third out of a field of four. (*Id.*, Ognibene Dep. at 16-17)   He had served in public office in many capacities since 1976 and ran an unsuccessful campaign for Mayor in 2005. (*Id.* at 5).   During that time, he received significant support from lobbyists and also several of the uniformed unions. (*Id. at* 26, 28-29).

135.    Ognibene was recruited to join this litigation and did so because of his interest in running for office; he was concerned that his regular group of contributors, which includes the RSA and other real estate interests doing business as LLPs and LLCs, would be unable to contribute to his campaign. (*Id.* at 6-8, 11, 13-14, 34-35).   Based on his experiences, the "doing business" restrictions would not favor one political party over another. (*Id.* at 11-15). Matching funds, he testified, "makes it easier for people who aren't very wealthy" because they can make a contribution for $10 or $20 "knowing that it can generate a substantial amount of funds" for a candidate. (*Id.* at 17-18).

136.    Ognibene believes there is a public perception that campaign contributions by those who do business with the City may influence elected officials and agrees that a

lobbyist's campaign contribution may allow for more "access." (*Id.* at 31-33).  Ognibene says he "probably" earmarked Council discretionary funds, known as member items, to contributors to his campaigns, was 'definitely" lobbied by contributors, and supported contributor RSA members 99 percent of the time. (*Id.* at 41). He's been told that politicians are "all a bunch of crooks." (*Id.*).


Dated:          New York, New York
                August 4, 2008

                          MICHAEL A. CARDOZO
                          Corporation Counsel of the
                                City of New York
                          Attorney for Defendants
                          100 Church Street, Room 2-178
                          New York, New York 10007
                          (212) 788-0933

          By:    _____
                 Jonathan Pines
                 Assistant Corporation Counsel