UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

TOM OGNIBENE, et al.,

                         Plaintiffs,                    No. 08-CV-1335 (LTS)(TDK)

                                                  *Electronically Filed*

        against -

JOSEPH P. PARKES, S.J., et al.,

                      Defendants.

------------------------------------------------------------- x

## MEMORANDUM OF LAW OF *AMICI CURIAE* CITY COUNCIL CANDIDATES BRAD LANDER AND MARK WINSTON GRIFFITH IN SUPPORT OF DEFENDANTS' OPPOSITION AND CROSS-MOTION

Paul M. Smith
Luke P. McLoughlin
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, New York  10022-3908
Telephone: (212) 891-1600
Facsimile:  (212) 891-1699
*Counsel for* Amici Curiae *City Council Candidates Brad Lander and Mark Winston Griffith*

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION.................................................................................................3

II.  THE STRUCTURAL FEATURES OF NEW YORK CITY'S SYSTEM PROMOTE
     ROBUST COMPETITION FOR PUBLIC OFFICE .............................................4

III. EMPIRICAL EVIDENCE SHOWS ENHANCED COMPETITION FOR CITY
     COUNCIL SEATS AND A SHIFT FROM DOING-BUSINESS CONTRIBUTIONS TO
     SMALL INDIVIDUAL DONATIONS ................................................................6

IV.  NEW YORK CITY'S CAMPAIGN FINANCE SYSTEM IS A CONSTITUTIONAL
     FRAMEWORK THAT ENABLES CANDIDATES TO AMASS RESOURCES
     NECESSARY TO RUN COMPETITIVE RACES ...............................................9

     A.  Organizational Restrictions ............................................................10

     B.  Doing-Business Limitations.............................................................11

     C.  Matching Contributions ..................................................................16

V.   CONCLUSION ...............................................................................................20

# TABLE OF AUTHORITIES

Page(s)

CASES

*Austin v. Mich. Chamber of Commerce,*
    494 U.S. 652 (1990)................................................................................................14

*Buckley v. Valeo,*
    424 U.S. 1 (1976)................................................................................................12, 15, 18

*Crawford v. Marion County Election Bd.,*
    128 S. Ct. 1610 (2008)................................................................................................10

*FEC v. Beaumont,*
    539 U.S. 146 (2003)................................................................................................14

*Gen. Motors Corp. v. Romein,*
    503 U.S. 181 (1982)................................................................................................18

*In re Earle Asphalt Co.,*
    950 A.2d 918 (N.J. Super. Ct. App. Div. 2008)................................................13

*LULAC v. Perry,*
    548 U.S. 399 (2006)................................................................................................18

*McConnell v. FEC,*
    540 U.S. 93 (2003)................................................................................................14, 19

*Nixon v. Shrink Mo. Gov't PAC,*
    528 U.S. 377 (2000)................................................................................................12, 17

*Purcell v. Gonzalez,*
    127 S. Ct. 5 (2006)................................................................................................10, 11

*Randall v. Sorrell,*
    548 U.S. 230 (2006)................................................................................................12-16

*Rodriguez v. Pataki,*
    No. 01-618, 2002 U.S. Dist. LEXIS 9272 (S.D.N.Y. May 24, 2002) ................5, 15

STATUTES

2 U.S.C. § 441a(a)(1), (6) ................................................................................................5

Admin. Code § 3-702(3) ................................................................................................3

Admin. Code § 3-703 .................................................................................................7

Admin. Code § 3-703(1)(1) .......................................................................................5

Admin. Code § 3-703(1-a) .........................................................................................5

Admin. Code, § 3-706(1)(a) ...................................................................................3, 7

Admin. Code § 7-302(18) ..........................................................................................9

Admin. Code § 7-302(20) .......................................................................................3, 9

Admin. Code § 305(7)(a) .........................................................................................10

## OTHER AUTHORITIES

New York City Campaign Finance Board, *CFB Analysis: Fundraising Shows New Focus on Small Contributions During 2008,* July 23, 2008 ................................................8

*Demographic Profile--New York City 2003 Council Districts, 2000 Census SF1* .......................5

New York City Campaign Finance Board, *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions* (2006) ...........................6, 7

New York State Board of Elections, *New York State Voter Enrollment by County, Party Affiliation and Status* (2008) .......................................................................4

Paul S. Ryan, *A Statute of Liberty: How New York City's Campaign Finance Law Is Changing the Face of Local Elections (2003)* .....................................................12

The New York City Council, http://council.nyc.gov/html/about/about.shtml ...............................6

INTEREST OF AMICI

*Amici* Brad Lander and Mark Winston Griffith are candidates for New York City Council (Districts 36 and 39 respectively) who are running for office under New York City's campaign finance system. *Amici* believe that New York City's current system improves the quality of New York's political campaigns and its representative government by broadening candidates' ability to mount competitive campaigns for office, enhancing the impact of small donors, and moving city government away from a "pay-to-play" culture.

*Amici* are declared candidates for open City Council seats and are participating in New York City's voluntary public financing program. *Amici* would not have chosen to run nor have had a realistic chance of competing for the City Council seats without New York City's system.

Brad Lander is running for City Council in Brooklyn's 39th District, which includes the neighborhoods of Cobble Hill, Carroll Gardens, Park Slope, Windsor Terrace, Kensington, and Borough Park. Mr. Lander directs the Pratt Center for Community Development, which works for a sustainable city for all New Yorkers by empowering communities to plan and realize their futures. He also teaches community planning, housing, and urban policy in Pratt's graduate City Planning Department. Mr. Lander has spent his life standing up for affordable, livable, and sustainable communities in Brooklyn and throughout New York City. As one of New York's leading voices for community-based development, Mr. Lander has run programs and helped to change city and state laws that have created and preserved thousands of units of affordable housing, strengthened local small businesses, and helped hundreds of low-income New Yorkers find living-wage jobs.

Mr. Lander serves as the Housing Chair of Brooklyn's Community Board 6, on the board of directors of the Jewish Funds for Justice, and as a little league coach in the 78th Precinct

Youth Council.  He is a graduate of the University of Chicago, University College London, and the Pratt Institute.  Mr. Lander lives in Park Slope with his wife and their two children.

Mark Winston Griffith is running for the open seat in the 36th Council District, which includes parts of Bedford-Stuyvesant and Crown Heights.  Mr. Griffith is the Senior Fellow for Economic Justice at the Drum Major Institute for Public Policy.  Mr. Griffith is a community economic justice activist and journalist with a lifelong record of working for social and economic justice and community empowerment.  A graduate of Brown University, Mr. Griffith has been a Columbia University Revson Fellow, a Rockefeller Foundation Next Generation Leadership Fellow, and an Open Society Institute Community Fellow.  Mr. Griffith's articles have appeared in the *New York Times*, *Essence*, the *Nation*, the *New York Daily News*, the *Village Voice*, *Mother Jones,* the *Source*, and *Spin Magazine*.  Mr. Griffith is also a columnist with the *Gotham Gazette*, a board member of Free Speech TV, and a board member of City Futures.

From 2005 to 2007, Mr. Griffith was co-director of the Neighborhood Economic Development Advocacy Project, a leading economic justice advocacy group.  Prior to 2005, Mr. Griffith served for twelve years as the founding executive director of the Central Brooklyn Partnership, a grassroots economic self-determination organization, and was the founding board chair of the Central Brooklyn Federal Credit Union.

I.    INTRODUCTION

New York City's campaign finance system is a comprehensive regime closely drawn to its dedicated aims of enhancing the integrity of and public confidence in New York City's government and promoting access to the political process by all citizens, regardless of their financial circumstances.

Plaintiffs seek an order permanently enjoining three aspects of New York City's system: (i) the cap on contributions to candidates by those entities doing business with the City (the "doing-business limitations"),[1] Admin. Code § 3-703(1-a); (ii) the absence of matching funds for such doing-business contributions, Admin. Code § 3-702(3); and (iii) the limits on contributions to candidates by LLCs, LLPs, and partnerships ("the organizational restrictions"), Admin. Code § 3-703(1)(1).  Plaintiffs have alleged that the doing-business limitations are not "closely drawn" to the aim of reducing New York City's pay-to-play culture.  (Am. Compl. ¶ 162.)  They seek an injunction barring enforcement of that limitation based on their claim that it threatens the ability of candidates to run effective campaigns.   (Pls.' Mem. 17; Am. Compl. ¶¶ 10-14, 155, 160-65, 205.)  Plaintiffs also seek to have "doing-business" contributions ordered matchable under the public campaign program and to enjoin the organizational restrictions, but offer no argument regarding the ability of candidates to run effective campaign under these provisions. (Pls.' Mem. 7-20.)

The request for a permanent injunction should be denied.  Of the three aspects of the City's system challenged by Plaintiffs, only the doing-business limitations are claimed to unconstitutionally prevent candidates from amassing the funds necessary to run competitive races.  Plaintiffs do not contend in their motion for a permanent injunction that either the

---

[1] By "entities" *amici* refer to all persons and natural persons covered by the law.  Admin. Code § 3-703(1-a), (20).

organizational restrictions or the absence of matching contributions for doing-business contributions will unconstitutionally prevent candidates from amassing funds necessary to compete. Plaintiffs press this point only with regard to the doing-business limitations (*see* Pls.' Mem. 17), but in fact the doing-business limitations enhance the independence and integrity of the City Council by capping (not eliminating) one source of contributions. Moreover, the generally applicable contribution limit for City Council races is higher than that for U.S. Senate general election races, and the public campaign program, which matches the first $175 of a contribution at a ratio of six-to-one, brings unprecedented amounts of campaign money *into* the system. Put simply, New York City's campaign finance system enhances the ability of candidates to amass necessary resources and encourages robust competition for elected offices in New York by challengers and open-seat candidates.

II.    THE STRUCTURAL FEATURES OF NEW YORK CITY'S SYSTEM
       PROMOTE ROBUST COMPETITION FOR PUBLIC OFFICE

New York City has one of the most competition-enhancing campaign finance systems in the country. The interaction between the City's term limits law, the doing-business contribution limits, and the voluntary public financing program widens access to the political marketplace and enhances the ability of candidates to compete, particularly those candidates who are not incumbents.

New York City's term limits law, which limits Council members to no more than two four-year terms from a single district, provides the City with a built-in anti-entrenchment mechanism. In 2009 alone, more than 70% of the City's 51 council members will step down from their current offices, creating 36 open Council seats.[2]

---

[2] As registered Democrats outnumber Republicans by more than five-to-one in New York City, competition for office typically takes place in primary elections. *See New York State Voter*

New York City's campaign finance system enhances this anti-incumbent effect even further and ensures that any candidate can amass the resources necessary to run a competitive campaign. The targeted contribution limits for doing-business entities, which apply regardless of whether candidates participate in the public financing program, enhance the competitiveness of non-incumbents who lack ready access to the levers of power frequently used to generate doing-business contributions. In addition to this targeted cap ($250 for City Council campaigns), the individual contribution limit for City Council seats is set at $2750, an amount *higher* than what a federal candidate could raise from a contributor if running in the general election for one of New York's seats in the United States Senate.[3]  Thus, while the pay-to-play problem is targeted via the doing-business limitation, candidates (especially challengers) may easily amass the funds necessary to run competitive races.

For those candidates (such as *amici*) participating in the public campaign program, individual contributions are matched at a ratio of six-to-one for the first $175 contributed.[4]  By offering a six-to-one match on the first $175 of contributions, New York City expands the marketplace of candidates beyond those with access to high-dollar and doing-business

---

*Enrollment by County, Party Affiliation and Status* 8, *available at* http://www.elections.state.ny.us/NYSBOE/enrollment/county/county_mar08.pdf.

[3] 2 U.S.C. § 441a(a)(1), (6) (2000). The population of the average City Council district was roughly 157,000 in 2000. *See Demographic Profile--New York City 2003 Council Districts, 2000 Census SF1*, at 1, *available at* http://home2.nyc.gov/html/dcp/pdf/census/cncl03profile.pdf. In 2000, the State of New York's population was calculated as 18,976,457. *See Rodriguez v. Pataki*, No. 01-618, 2002 U.S. Dist. LEXIS 9272, at *17 (S.D.N.Y. May 24, 2002) (three-judge court). Contributions to candidates for City Council--whether the candidates are participating in the public financing system or not--are limited to $2750 to person. Admin. Code § 3-703. These limits are not challenged by Plaintiffs.

[4] By participating in the public campaign program, *amici* accept a voluntary spending cap of $161,000 for the 2009 primary. Admin. Code, § 3-706(1)(a). Participating candidates may spend a smaller amount on the primary during 2008. The six-to-one match is limited to contributions by New York City residents who are neither lobbyists nor doing business with the City.

contributors and encourages the accumulation of funds necessary to run a competitive campaign. Moreover, this amplification of individual contributions is robust and competition-enhancing: a participating candidate who would have sought to obtain $1475 from a doing-business entity and now receives $250 faces no shortfall under New York City's system if the candidate obtains a *single* $175 contribution from an individual.[5]  New York City's system thereby encourages the amassing of candidate resources, while simultaneously addressing pay-to-play concerns.  In short, New York City's is a model system aimed at enhancing competition at the ballot box, enhancing the influence of small donors, and ending a deleterious pay-to-play culture.

III.    EMPIRICAL EVIDENCE SHOWS ENHANCED COMPETITION FOR CITY COUNCIL SEATS AND A SHIFT FROM DOING-BUSINESS CONTRIBUTIONS TO SMALL INDIVIDUAL DONATIONS

The City Council is the chief lawmaking body in New York City.  It controls a budget of over $59 billion, the largest of any city in the United States and larger than 48 of 50 states.[6]  In particular, the Council retains the power to "review land use issues and approve zoning changes, housing and urban renewal plans, community development plans and the disposition of city-owned property. This power gives the Council the most significant voice in the growth and development of our city."[7]

The City's campaign system reflects the aims of combating a pay-to-play culture on the Council.  Prior to Local Law 34, candidates for office frequently relied on a small segment of donors often with business before the City.  A June 2006 analysis by the Campaign Finance

---

[5] A $175 individual contribution is matched by $1050 in public dollars, which, added to a $250 doing-business contribution, equals $1475.
[6] *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions*, at 31, *available at* http://www.nyccfb.info/PDF/issue_reports/Doing-Business-White-Paper.pdf.
[7] The New York City Council, http://council.nyc.gov/html/about/about.shtml (last visited August 8, 2008).

Board reported that while "three quarters of all contributors gave less than $250 to a municipal office in 2001 and 2005" and "95% of all contributors gave less than $2,000 to a municipal office," "[m]ore than half of the total dollars contributed to municipal offices in the 2001 and 2005 election cycles came from donors giving $2,000 or more."[8]  For City Council candidates, contributions of $2000 or more accounted for 24.4% of all funds in 2001; that proportion increased to 43.9% in 2005.[9]

In 2001 and 2005, doing-business contributions accounted for 26.1% and 19.5% of contributions $2000 and above.[10]  While accounting for roughly 5% of all contributors to City races, doing-business contributors were responsible for 21.5% of all contributions in 2005.[11] The pervasiveness of doing-business contributions was even more exaggerated in races for City Council, the final arbiter of private development in the City.  In 2005, doing-business contributors represented 4% of total City Council contributors, yet accounted for **34%** of total contributions.[12]  Moreover, doing-business contributions had obvious beneficiaries: incumbent lawmakers.[13]  Nevertheless, the City Council--after increased public outcry over the deleterious effects of this pay-to-play practice--enacted the doing-business limits and organizational restrictions.

---

[8] *Interim Report*, *supra*, at 9-10.

[9] *Id*. at 10.

[10] This percentage was calculated by the New York City Campaign Finance Board using what was in many ways a narrower definition of "doing business" than was enacted by Local Law 34. *Compare Interim Report*, *supra*, at 6-7 (describing reliance on VENDEX and NYC Lobbyist Search databases), *with* Admin. Code § 7-302(18) (defining "business dealings with the city" to include dealings involving, *inter alia*, certain city contracts, acquisitions or dispositions of real property, city approvals, concessions, grants, and economic development agreements).  *See als*o *Interim Report*, *supra*, at 5 ("Given the constraints of these two data sources . . . the prevalence of 'pay-to-play' may be considerably understated by our study.").

[11] *Interim Report*, *supra*, at 12.

[12] *Id*. at 14.

[13] *See* Defs.' Mem. 13 n.2 (collecting deposition testimony by Plaintiffs stating that doing-business contributions favor incumbents).

The effects of the new rules are already on display in New York. Due to term limits, only 30% of Council seats will have an incumbent running for office in 2009. The doing-business limitation further enhances that anti-incumbent effect by augmenting the chances of challengers and open-seat candidates who lack access to the City's purse strings. Filings with the New York City Campaign Finance Board confirm that City Council races are flush with funds and competition. Filings for fundraising activity between January 12 and July 11, 2008 show that "more contributors gave money to City campaigns during the past six months than in any of the previous filing periods, suggesting that small contributors are starting to play a greater role in City campaigns."[14] The Board's data indicate that 72% of contributors gave $250 or less. And yet candidates for office had received more money than *ever before*: "candidates for City office in the 2009 elections are raising funds at an unprecedented rate."[15] Far from hindering candidates, the City's system has led to a boom in matchable donations. The City is enjoying robust primary competition in 2008 due precisely to New York City's campaign finance system.

The experiences of *amici* candidates confirm this trend. *Amici* candidates are currently running grassroots campaigns that raise money primarily from community residents and small donors.[16] These campaigns focus on reaching out to voters through community networking, local civic organizations, and local canvassing. The candidates use funds raised to run classic neighborhood-based campaigns: to conduct outreach and communicate with voters; to coordinate volunteers to knock on doors; to talk to people at subways; to reach out to civic groups; to send mail about their candidacies to voters throughout the districts; and to hold events which offer a chance to meet with voters.

---

[14] *CFB Analysis: Fundraising Shows New Focus on Small Contributions During 2008,* at 2, (2008), *available at* http://www.nyccfb.info/press/news/press_releases/2008-07-24.pdf.
[15] *Id.* at 1.
[16] Both seats are open seats created by term limits.

As noted, contributions by doing-business entities to candidates for City Council are limited to $250 and are not matchable by public funds. Other contributors to City Council candidates may donate up to $2750. *Amici* intend to raise tens of thousands of dollars for the primary election to be held in September 2009 and to have sufficient matchable contributions to obtain the maximum amount of matching dollars for the election (approximately $88,550).[17] They expect to have several hundred donors, the majority of whom will contribute less than $175.

Without the six-to-one contribution match and cap on doing business contributions, it would be much more difficult for *amici* to run for office as open-seat candidates, particularly candidates running for the first-time. *Amici* have spent their careers working in not-for-profit, community-based organizations and have sought to halt predatory lending and advance the goals of affordable housing. As non-incumbent candidates, they lack the levers of power that attract high-dollar contributions and doing-business contributions. Nor do *amici* have access to a wide array of wealthy individuals able to make contributions of several thousand dollars. Instead, *amici* will be able to rely on a larger number of smaller contributions from community residents, the six-to-one match, and the anti-incumbent effects of the doing-business limits. In short, the new rules will allow them to run competitive races.

IV.     NEW YORK CITY'S CAMPAIGN FINANCE SYSTEM IS A CONSTITUTIONAL FRAMEWORK THAT ENABLES CANDIDATES TO AMASS RESOURCES NECESSARY TO RUN COMPETITIVE RACES

Plaintiffs filed a 19-count Complaint attacking the City's comprehensive system on February 11, 2008. They followed that submission with a 20-count Amended Complaint on

---

[17] Under New York City's system, the amount of matching dollars available to a participating City Council candidate increases to $88,550 from one-fourth of that amount when another participating candidate is in the race. *See* Admin. Code § 305(7)(a).

February 27, 2008.  Plaintiffs then waited two months, until April 24, 2008, before filing a motion for an injunction seeking to have the Court immediately enjoin the rules for the upcoming elections.  Despite their delay, and despite offering scant objective evidence to support their demand, Plaintiffs would have this Court upset the settled expectations of all City candidates for office in direct contravention of Supreme Court commands regarding election disputes.  *See Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1623 (2008) ("A facial challenge must fail where the statute has a plainly legitimate sweep." (quotations omitted)); *Purcell v. Gonzalez*, 127 S. Ct. 5, 8 (2006) (Stevens, J., concurring) ("Allowing the election to proceed without enjoining the statutory provisions at issue will provide the courts with a better record on which to judge their constitutionality.").  Even with regard to their as-applied claims, Plaintiffs offer nothing concrete to suggest that the ability to wage an effective campaign has been unconstitutionally diminished.

Plaintiffs now ask that three aspects of the City's system be immediately enjoined. Plaintiffs attack (1) the organizational restrictions, (2) the doing-business limitations, and (3) the absence of matching funds for doing-business contributions.  Each of Plaintiffs' challenges is without merit.

A.     Organizational Restrictions

Plaintiffs attack the organizational restrictions on a variety of levels in their permanent injunction motion but choose to omit the contention made in their Amended Complaint that candidate Plaintiffs "believe that the prohibition against accepting contributions from limited liability companies, limited liability partnerships, and partnerships . . . will prevent them from amassing the resources necessary to mount an effective campaign."  (Am. Compl. ¶ 205.)  No allegation or evidence to this effect is included in Plaintiffs' memorandum in support of the

motion for permanent injunction. (*See* Pls.' Mem. 11-14.) Accordingly, this claim is not before the Court and merits no further discussion.

B.      Doing-Business Limitations

Plaintiffs contend that the doing-business limitations must be enjoined because they will prevent Plaintiffs from amassing the resources necessary to run effective City Council campaigns.[18] This contention is plainly without merit.

No specifics about their putative Council campaigns or their financing plans were submitted by Candidate Plaintiffs in their Amended Complaint or in the papers submitted in support of their request for a permanent injunction. Instead, the Court received boilerplate statements that certain candidates would like to run--one as a non-participant in the public financing system and certain others as participants--but believe "that the changes imposed by Local Law No. 34 impede [their] ability to amass the resources necessary to mount . . . effective campaign[s]."[19] The Court is asked to enjoin a City-wide law based on little more than bare assertions that "Candidate Plaintiffs want to accept contributions from those having business dealings with the City at the higher . . . levels." (Pls.' Mem. 5.) Aside from failing to meet the standard for a permanent injunction, enjoining election rules based on such a thin, pre-election record is directly contrary to the Supreme Court's jurisprudence in this area. *See, e.g.*, *Purcell*, 127 S. Ct. at 5.

Plaintiffs contend, as they do in the Amended Complaint, that non-participating candidates "believe that the limits imposed . . . will unconstitutionally prevent them from

---

[18] *See* Pls.' Mem. 17; *see also* Am. Compl. ¶¶ 10(1), 11(1), 12(1). While Plaintiffs have apparently expressed doubts about the appropriateness of their *Randall* claim at this stage, (Defs.' Mem. 20 n.9), Plaintiffs have chosen not to amend their injunction demand to that effect.
[19] Am. Compl. ¶ 10(1); *see also id.* ¶¶ 11(1), 12(1) (same).

amassing the resources necessary to mount an effective campaign."[20]  But no data or objective

evidence is put forward regarding the putative campaign of the sole non-participating City

Council candidate, Tom Ognibene.[21]  No attempt is made to explain how targeted doing-business

caps "drive the sound of a candidate's voice below the level of notice," *Nixon v. Shrink Mo.*

*Gov't PAC*, 528 U.S. 377, 397 (2000), when candidates may still raise up to $2750 per person

and record funds are being amassed across the City.[22]

The presence of any campaign finance limit at all means that some additional amount of

money could theoretically have been raised.  But it does not follow that any and every limit

therefore is an unconstitutional impediment on a candidate's ability to amass necessary

resources.  Indeed, Supreme Court precedent is directly to the contrary: most limits are presumed

to be constitutional.  *See Randall v. Sorrell*, 548 U.S. 230, 262 (2006) ("[M]any, though not all,

campaign finance regulations impose certain . . . burdens to some degree. We also understand the

legitimate need for constitutional leeway in respect to legislative line-drawing."); *Nixon*, 528

U.S. at 398 (upholding a $1075 limit for state auditor races); *Buckley v. Valeo*, 424 U.S. 1 (1976)

(upholding $1,000 limit for presidential and congressional elections).  Ordinary limits in place

across the country, such as the limits in New York, fall well within constitutional boundaries and

appropriately deserve judicial deference.  *See Randall*, 548 U.S. at 248 ("[W]e have no scalpel to

---

[20] *Id.* ¶ 155; *see also* Pls' Mem. 17.  Notably, the non-participant's *Randall* challenge at this stage is only to the limit on doing-business contributions, not to their non-matchability.  *See* Pls.' Mem. 18-20.

[21] It appears that Tom Ognibene has stated that he is participating in the City's public financing program.  *See* Defs.' Mem. 38-39.  If so, the universe of "Candidate Plaintiffs" in the instant case only includes candidates who are participating in the program, and any challenge by non-participating candidates is not before the Court.

[22] *See* Paul S. Ryan*, A Statute of Liberty: How New York City's Campaign Finance Law Is Changing the Face of Local Elections* 53 (2003), *available at* http://cgs.org/images/publications/nycreport.pdf ("New York City's contribution limits are the highest local government contribution limits in the nation among jurisdictions with public campaign financing programs.").

probe each possible contribution level.  We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives.  In practice, the legislature is better equipped to make such empirical judgments, as legislators have particular expertise in matters related to the costs and nature of running for office." (citations and quotations omitted)).

By contrast, only extreme restrictions limiting *all* of the funds a candidate may receive have been invalidated.  In *Randall*, a blanket restriction limiting to $400 *all* contributions a candidate for governor could receive was rejected as outside constitutional bounds.  *See Randall*, 548 U.S. at 253 ("Act 64's contribution limits are substantially lower than both the limits we have previously upheld and comparable limits in other States."); *id.* at 250 ("[C]onsidered as a whole, Vermont's contribution limits are the lowest in the Nation.").  The *Randall* Court accordingly found "danger signs" that Vermont's system of contribution limits fell "outside tolerable First Amendment limits" and proceeded to assess whether the contribution limits were "closely drawn" to Vermont's interests.  *Id.*  But no such danger signs are present in New York City's system, and accordingly judicial deference is appropriate.[23]

Plaintiffs' statement that the doing-business limitations "are substantially lower than the lowest limit the Supreme Court has ever found constitutional and are not *large* enough to give rise to a legitimate suspicion of corruption" (Am. Compl. ¶ 161 (emphasis in original)) is of course incorrect.  In fact, the Supreme Court has held for decades that corporations (including non-profit advocacy corporations) may be barred from contributing *any* money to political campaigns or expending treasury funds on behalf of candidates.  *See FEC v. Beaumont*, 539 U.S.

---

[23] The Court accordingly need not even reach the question of whether the limits are so low as to be warranted by a special justification.  *Cf.  In re Earle Asphalt Co.*, 950 A.2d 918, 2008 N.J. Super. LEXIS 143, at *19 (N.J. Super. Ct. App. Div. 2008).

146, 152 (2003) ("Any attack on the federal prohibition of direct corporate political contributions goes against the current of a century of congressional efforts to curb corporations' potentially deleterious influences on federal elections, which we have canvassed a number of times before." (quotation omitted)); *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 658-659 (1990). Moreover, the Supreme Court found constitutionally permissible an outright ban on *any* soft money contributions by individuals to political parties.  *See McConnell v. FEC*, 540 U.S. 93, 156 (2003).  In short, the Court has upheld contribution limits of zero dollars, even in the case of contributions by individuals, where it is clear that other channels of funds may be drawn upon.

If Plaintiffs mean to argue that $250 is lower than the limits on candidate contributions the Supreme Court has upheld, that argument is also incorrect because it erroneously suggests that $250 is the limit for *all* contributors to City Council candidates.  The limit for non-doing-business contributions for City Council candidates is $2750 and remains unchallenged by Plaintiffs.  Unlike the contribution limits in *Randall*, which capped contributions by *all* individuals to candidates, New York's system targets a slice of the contributions that present the most concern.  The attempt to call the $250 limit "substantially lower than the lowest limit the Supreme Court has ever found constitutional" asks the Court to draw a bizarre comparison, and to turn a blind eye to the funds raised in amounts raised up to the general limit of $2750.  These amounts, as seen by the interim report on the 2008 campaign filings, show incredibly robust fundraising.

Plaintiffs tellingly omit any reference to the ability of candidates to mount competitive campaigns via contributions up to the maximum of $2750, and Plaintiffs offer the Court no indication of whether a candidate's coffers should be expected to diminish on account of the caps on doing-business contributions.  This is no doubt because, as the data reflect, the doing-business

14

limitations and the six-to-one match have led to an *influx* of money into City campaigns.[24] Moreover, aside from their partial comparison to the limits in *Randall*, Plaintiffs eschew providing the Court any comparative data on City Council campaigns. And for good reason: the $2750 individual cap for the 51 New York City Council races is greater than the amount Congressional candidates may seek from individuals ($2300) when competing in a general election to represent areas encompassing *several* City Council districts[25] and greater than the amount ($2300) that New York's U.S. Senate candidates may seek when campaigning across the *entire state* in a general election. Little more need be said about Plaintiffs' contention that candidates will not be able to amass necessary resources under New York City's system.

Plaintiffs also contend that the fact that there are higher limits for non-doing-business contributions means that "the city declared its judgment that contributions below those limits are non-corrupting." (Pls.' Mem. 15.) This one-size-fits-all view of politics is the exact opposite of what the Supreme Court has held. *See Buckley*, 424 U.S. at 58 (upholding a $1000 limit for contributions by individuals to candidates and a $5000 limit for contributions by political action committees to candidates). Additionally, Plaintiffs unintentionally undermine their own claim by failing to challenge the varying contribution limits for races for Mayor, Borough President, and City Council. By Plaintiffs' logic, the $2750 limit for City Council candidates (and the $3850 limit for Borough President candidates) should be deemed unconstitutional by the Court because the contribution limit for Mayor is $4950, and the city has "declared" that to be the level

---

[24] Nor, contrary to *Randall*'s admonition, do Plaintiffs offer any evidence regarding the costs of competitive campaigns. *See Randall*, 548 U.S. at 255.

[25] The population of New York's congressional districts is more than four times the size of New York City's Council districts. *See Rodriguez v. Pataki*, No. 01-618, 2002 U.S. Dist. LEXIS 9272, at *17 (S.D.N.Y. May 24, 2002) (three-judge court) ("Based upon the 2000 census, the total population of the State of New York is 18,976,457 and, therefore, the ideal population size of each of the 29 [congressional] districts is 654,360.6.").

beneath which no corruption occurs.  Of course, Plaintiffs make no such claim (despite submitting an Amended Complaint including no less than 20 separate attacks on the City's system) because it suffers from the same defect as their claim regarding doing-business contributions.  There is nothing forbidding legislatures from encouraging robust campaigning via generous contribution limits and matching funds while at the same time addressing pay-to-play practices.

In sum, Plaintiffs have failed to show that a permanent injunction suspending the doing-business restrictions is warranted on *Randall*-based grounds.  New York City's system has brought more money into candidate coffers, not less.  It has made campaigns more, not less, competitive.  There has been no showing by Plaintiffs that New York City's system is anything other than a strongly pro-competition and anti-incumbent system.  For all of these reasons, Plaintiffs' motion must be denied.

C.      Matching Contributions

The attempt to have the Court order the doing-business contributions matchable is also without merit.  Paralleling the omission of any *Randall* challenge to the organizational restrictions, Plaintiffs omit any claim in their permanent injunction memorandum that the absence of matching for doing-business contributions prevents candidates from amassing resources necessary to wage competitive campaigns.  (*See* Pls.' Mem. 18-20.)  Such an argument, therefore, need not be addressed here.

However, Plaintiffs' demand that the Court order the doing-business contributions matchable underscores the fact that Plaintiffs' overall challenge is not appropriate for the injunction setting, and the City's finance rules are properly the subject of judicial deference. Plaintiffs attack the public financing system in their Amended Complaint as too expansive and influential.  Plaintiffs claim that the matching-funds program harms a non-participant because

16

"his tax dollars will be taken by the Program and placed in the Fund to be given to his

opponent." (Am. Compl. ¶ 147.) The program's trigger provisions are so robust, Plaintiffs

claim, that they chill political speech by non-participants. (*Id.* ¶ 250.) And the program's debate

provisions are "coerci[ve]," according to Plaintiffs, and must be voided. (*Id.* ¶ 282.)

Nevertheless, Plaintiffs now demand that the Court issue a permanent injunction

*expanding the public campaign program further*, by allowing matching of doing-business

contributions. Apparently, Plaintiffs would like the program to become temporarily more

attractive to participants before Plaintiffs insist that the Court dismantle the program altogether.

Plaintiffs' contradictory requests make clear that the injunction demand should be denied. There

is no reason for the Court to be whipsawed while Plaintiffs debate internally how they would

have chosen to design the campaign finance system.

In the end, this request for an injunction, like the various claims put forward by Plaintiffs,

is at odds with the uncontroverted facts and with Plaintiffs' own arguments about the system.

This underlines that this is a case where deference to legislative judgments is appropriate.

*Nixon,* 528 U.S. at 395-98. Plaintiffs contend that doing-business contributions are unfairly

targeted and limited; yet if all contributions were set at $250, surely Plaintiffs would complain

that those limits were too low. (Plaintiffs already suggest that candidates cannot mount

competitive campaigns, despite being able to raise $2750 per contributor.) Plaintiffs demand

that doing-business contributions be matched with public funds, but surely a Court order to that

effect would enhance the attractiveness of the public financing system Plaintiffs call coercive.

Plaintiffs suggest that any doing-business contribution limit lower than $2750 for City Council is

too low, but say nothing about the higher contribution levels for Mayor and Borough President,

which are based on similar legislative judgments. Perhaps Plaintiffs would be satisfied with an

entirely deregulated political marketplace in New York City; they are welcome to obtain it legislatively if they are able. But having lost in the legislature (or having never tried), the judiciary is no place to turn. *See Gen. Motors Corp. v. Romein*, 503 U.S. 181, 192 (1982) ("Having now lost the battle in the . . . Legislature, petitioners wished to continue the war in court. Losing a political skirmish, however, in itself creates no ground for constitutional relief.").

\*       \*       \*

Plaintiffs' demand for a permanent injunction is plainly without merit. All of the facts available at this stage show that New York's system serves its purposes: it deters a pay-to-play culture, it encourages donor and candidate participation in the political marketplace, and it enhances competition. Plaintiffs' constitutional challenges are misplaced.

In certain circumstances, the judiciary must be distrustful of legislative enactments pertaining to the rules of campaigns and elections. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 441 (2006) (finding practice of excluding Latino voters from district to protect incumbent not justifiable). But the Supreme Court more than 30 years ago declared that "the central purpose of the Speech and Press Clauses was to assure a society in which uninhibited, robust, and wide-open public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish. *Legislation to enhance these First Amendment values is the rule, not the exception*." *Buckley*, 424 U.S. at 93 n.127 (quotation omitted) (emphasis added). "[T]o say that Congress is without power to pass appropriate legislation to safeguard . . . an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection." *McConnell*, 540 U.S. at 223-24 (quoting

18

*Burroughs v. United States*, 290 U.S. 534, 545 (1934)).  It is that power, hard won, that Plaintiffs would have this Court remove from the people of New York.

V.    CONCLUSION

For the foregoing reasons, *amici* respectfully submit that Plaintiffs motion should be

denied and Defendants' motion be granted.


Dated: New York, New York
       August 13, 2008.


                                        Respectfully submitted,

                                        PAUL M. SMITH


                                        By:    s/ Paul M. Smith
                                               Paul M. Smith

                                        Luke P. McLoughlin
                                        Jenner & Block LLP
                                        919 Third Avenue, 37th Floor
                                        New York, New York  10022-3908
                                        Telephone: (212) 891-1600
                                        Facsimile:  (212) 891-1699

## <u>CERTIFICATE OF SERVICE</u>

I, Luke P. McLoughlin, hereby certify that on August 13, 2008, I caused to be served the within Memorandum of Law of *Amici Curiae* City Council Candidates Brad Lander and Mark Winston Griffith in Support of Defendants' Opposition and Cross-Motion upon all counsel in this action action via the Court's electronic case filing system.

Respectfully submitted,

<u>s/ Luke P. McLoughlin</u>
Luke P. McLoughlin
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, New York  10022-3908
Telephone: (212) 891-1651
Facsimile:  (212) 891-1699

21