UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

TOM OGNIBENE, et al.                          :
                                              :
        Plaintiffs,                           :        No. 08-CV-1335 (LTS) (TDK)
                                              :
        v.                                    :
                                              :        **DECLARATION OF**
JOSEPH P. PARKES, S.J., et al.,               :        **JOHN H. SNYDER**
                                              :
        Defendants.                           :
                                              :

---

        John H. Snyder, an attorney duly admitted to practice law declares under penalty of

perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

        1.      I am an associate with Proskauer Rose LLP, pro bono counsel for amici curiae

Citizens Union, New York Public Interest Research Group, and Common Cause/NY ("Amici").

        2.      I make this declaration in support of Amici's brief in opposition to plaintiffs'

motion for a preliminary injunction and in support of defendants' cross-motion for summary

judgment, for the purpose of placing before the Court certain publicly available documents cited

in Amici's brief.

        3.      Attached as Snyder Exhibit A is an electronic copy of a New York Times article

dated January 6, 2006.  The article was obtained from the Lexis Nexis database.

        4.      Attached as Snyder Exhibit B is an electronic copy of a New York Times article

dated March 23, 1987.  The article was obtained from the Lexis Nexis database.

        5.      Attached as Snyder Exhibit C is an electronic copy of a New York Times article

dated March 28, 1997.  The article was obtained from the Lexis Nexis database.

6.      Attached as Snyder Exhibit D is an electronic copy of a New York Times article dated November 9, 1988.  The article was obtained from the Lexis Nexis database.

7.      Attached as Snyder Exhibit E is an electronic copy of a New York Times article dated December 4, 1988.  The article was obtained from the Lexis Nexis database.

8.      Attached as Snyder Exhibit F is an electronic copy of a New York Law Journal article dated July 17, 2007.  The article was obtained from the Westlaw database.

9.      Attached as Snyder Exhibit G is the 2005 Report on Elections issued by the New York City Campaign Finance Board.

10.      Attached as Snyder Exhibit H is the Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions, dated June 19, 2006.

11.      Attached as Snyder Exhibit I is the official text of Local Law 34, approved on July 3, 2007.

12.      Attached as Snyder Exhibit J is the official text of Local Law 67, approved on December 31, 2007.

13.      Attached as Snyder Exhibit K is the Report of the Committee on Governmental Operations, dated June 12, 2007.

14.      Attached as Snyder Exhibit L is an electronic copy of a New York Times article dated September 26, 1998.  The article was obtained from the Lexis Nexis database.

15.      Attached as Snyder Exhibit M is Advisory Opinion 1999-4 issued by the New York City Campaign Finance Board on January 15, 1999.

Dated:      New York, New York
            August 13, 2008

John H. Snyder

# EXHIBIT A

Copyright 2006 The New York Times Company
The New York Times

January 6, 2006 Friday
Late Edition - Final

**SECTION:** Section A; Column 1; Editorial Desk; Pg. 21

**LENGTH:** 907 words

**HEADLINE:** The End Of Influence

**BYLINE:** By Michael Waldman.

Michael Waldman is the executive director of the Brennan Center for Justice at New York University School of Law.

**BODY:**

THERE are shivers running through official Washington, and it's not just the January cold. The plea bargain by the lobbyist Jack Abramoff threatens to ensnare key lawmakers in scandal and potential legal troubles, including some Congressional leaders. The case, with its luxury skyboxes, politicians shilling for gambling interests and lobbyists stealing from Indian tribes, symbolizes Washington's extreme cash-for-policy culture. But what can we do to ensure that, when the dust clears, things won't just go back to politics as usual?

In the long struggle to strengthen democracy, reform sometimes follows scandal, but not always. Often appalling corruption has produced a yawn rather than a shriek. True progress comes only from rare "reform moments," when accumulated public outrage combines with potent policy changes.

In the late 1800's, everybody knew that campaigns were financed by patronage appointees, but it took the assassination of President James A. Garfield in 1881 by a spurned job-seeker to spur civil service reform.

At the beginning of the last century, the rise of corporations bred new corruption, tainting even President Theodore Roosevelt. After it was revealed that Roosevelt had received large donations from the insurance industry in 1904, he felt his honor had been besmirched. "Sooner or later, unless there is a readjustment, there will come a riotous, wicked, murderous day of atonement," he told a reporter, and eventually he won passage of the first federal law banning corporate campaign gifts.

A 1906 muckraking article in Cosmopolitan magazine called "The Treason of the Senate" exposed how corrupt state legislatures controlled the senators they appointed and sent to Washington. Public outcry was so fierce and sustained that the Constitution was amended in 1913 to provide direct election of senators.

Another great wave of reform came in the 1970's. After Watergate, Congress established public financing and voluntary spending limits for presidential races. It even imposed spending limits on legislative contests, though that provision was struck down by the Supreme Court. Scandal begat reform locally, too. New York City's landmark public financing system, under which candidates receive matching public funds, was enacted not because of vague good-government sentiments but in response to the 1980's scandals that led to party leaders being imprisoned and a former Queens Borough president, Donald Manes, committing suicide.

Unfortunately, just as often scandals lead merely to cynicism and fatigue, from Teapot Dome in the 1920's to the Abscam criminal convictions of Congressmen in the 1970's. The savings and loan collapse of the 1980's produced the memorable image of the Keating Five senators testifying in shame before Congress. A new president, Bill Clinton, whom I served as a political reform adviser, proposed reform. But House Democratic leaders soon got what Lincoln diagnosed in his generals as "the slows." I will never feel more frustrated than I did standing in the Senate antechamber as reform was filibustered to death.

The End Of Influence The New York Times January 6, 2006 Friday

Intriguingly, the most recent campaign finance law passed without the spur of a specific scandal. Yes, the public was aware of the rising role of soft money, and stories of big donors staying in the Lincoln Bedroom got wide attention. But the bipartisan campaign reform act introduced by Senators Russell Feingold and John McCain passed only after six years of patient organizing.

So, can the Abramoff mess become a true tipping point? It depends on the boldness of the reform proposals. Yes, measures to tighten disclosure for lobbyists, like those proposed by Senator McCain and Representative Marty Meehan, are no doubt needed. But voters should insist on a stronger system to transform campaign finance at the same time.

For example, last year Connecticut passed a full public-financing system for legislative and statewide elections after a series of scandals, including one that forced the resignation of Gov. John Rowland and his guilty plea to a conspiracy charge. Another approach would be a matching funds system for Congressional races similar to New York City's system.

Just as important, the public must be persuaded that change will truly bring accountability. Reform must not be presented simply as a matter of political hygiene, but as a way to bolster voters' voices in the legislative process. Mr. Abramoff was central to the Republicans' so-called K Street Project, in which the Congressional majority sought to create a political machine tying Republican politicians to business lobbyists. A century ago muckrakers educated the public about such networks; perhaps today's bloggers can play a similar role.

Finally, the reform moment will arrive when politicians, in their own self-interest, press for change. There are hopeful signs. Democrats, finally shedding their incumbent mindsets after a decade in the minority, have now made political reform a central plank. Republicans are far more implicated in the current scandal, which may give their rank and file new reasons to turn to Senator McCain for leadership.

Jack Abramoff's football stadium skybox may never become a symbol as potent as the parking garage where the cinematic Deep Throat whispered, "Follow the money." But even a jaded public can reach a tipping point. As the scandal unfolds, let's hope it leads not just to lurid headlines but lasting change.


**URL:** http://www.nytimes.com

**GRAPHIC:** Drawing (Drawing by Craig Frazier)

**LOAD-DATE:** January 6, 2006

# EXHIBIT B

Copyright 1987 The New York Times Company
The New York Times

March 23, 1987, Monday, Late City Final Edition

**SECTION:** Section B; Page 4, Column 1; Metropolitan Desk

**LENGTH:** 875 words

**HEADLINE:** THE CORRUPTION SCANDALS: WHAT WENT WRONG AND THEIR IMPACT ON THE SYSTEM

**BYLINE:** By MICHAEL ORESKES

**BODY:**

It is more than a year since Donald R. Manes, the Queens Borough President, killed himself after being implicated in a bribery ring. The furor that followed has been an enduring one, as new revelations about the inner workings of the city's political structure continue to emerge.

Some of these revelations are of corruption: envelopes of money passed in men's rooms. Others have been of the lowgrade sort that in a more tolerant era were labeled "honest graft": no show jobs and political influence peddling.

New Yorkers have been inundated with reports of graft, proven and unproven; stories of conflicts of interest, real or apparent, and avowals of integrity, heartfelt or obligatory. Some of the episodes were closely related. Others share only the common thread that they occurred at Democracy's most delicate point: the intersection of politics and government.

Now there are the first glimmers of an effort to understand where this "fit of morality," as Lord Byron described the British public's view of scandal, fits into the city's history.

Roots of the Scandals

"Scandals are commonplace in American urban politics," wrote Martin Shefter, a professor of government at Cornell University. "They should not, however, be taken at face value. Rather, scandals should be recognized as political events - an important technique in the struggle for power in American cities."

Professor Shefter is one of a number of people who find the roots of the current scandals in the fiscal crisis of the 1970's.

The city's brush with bankruptcy reshaped its politics. Bankers, reform groups, newspapers and others drove an organization Democrat, Abraham D. Beame, from the Mayor's office. A rather obscure Manhattan reformer, Representative Edward I. Koch, was elected Mayor. He came with no particular power base.

The powers that helped remove Mr. Beame created an elaborate structure for controlling city spending, but no particular system for governing within the financial limits. The indignation over the fiscal crisis had almost no effect on the influence of organization politics over local and borough offices.

Efficiency, Not Honesty

To win and to govern, Mr. Koch, the Greenwich Village reformer, allied himself with Democratic Party leaders: Meade H. Esposito , Donald R. Manes and Stanley M. Friedman.

' "Certainly, in the aftermath of the fiscal crisis, the emphasis was very much on efficiency in government, not honesty,"said Professor Richard Netzer of New York University's School of Public Administration.

Trying to do more for less, the city laid off workers and turned to the private sector with millions of dollars in contracts that, in some cases, were ideal vehicles for both patronage and corruption.

THE CORRUPTION SCANDALS: WHAT WENT WRONG AND THEIR IMPACT ON THE SYSTEM The New York Times March 23, 1987, Monday, Late City Final Edition

Soaring revenues at the Parking Violations Bureau, brought in by private contractors, were the perfect screen for thievery. As long as the money flowed in, questions were not raised about how contracts were awarded.

The prime responsibility of Inspectors Generals appointed by Mayor Koch was to scold slackers, not catch wrongdoers.

Democratic Clout

To many, the distinctions between machine and reform politics are of fading significance. It is Professor Shefter's thesis that there is still an ebb and flow of politics that helps to explain both the fiscal crisis and the scandals that erupted a decade later.

"Historically," Professor Shefter wrote, "allegations of municipal corruption were used by chambers of commerce, newspaper publishers and civic notables to descredit mass-based party organizations that they were unable to defeat in electoral combat."

The Democratic Party organizations, which have been at the heart of the current scandals, are hardly mass-based political organizations any more in a world where money has replaced manpower as the mother's milk of politics.

But the scandals highlighted a central fact of New York politics. While the political organizations no longer had much influence over city and statewide elections, they still had considerable bases of power in local races that gave them great influence at levels up to the City Council and Board of Estimate, an influence largely unshaken by the fiscal crisis.

Proposals for Reform

"The quest for corruption." Professor Shefter wrote, was joined last year after Mr. Manes's exposure "by institutions whose power is enhanced by municipal scandal." This included a zealous Republican prosecutor, a dozen other investigatory authorities and the city's major newspapers, he said.

One of the major proposals for reform is to interdict the power of party leaders by barring them from public office or, in other cases, from doing business with government.

It is not clear whether the scandals have changed attitudes sufficiently to compel politicians to enact such changes.

It is clear that attitudes toward government have shifted. Contracts are harder to issue. Auditing has been stepped up and Inspectors Generals are concentrating all their efforts on corruption fighting.

"One of the prices the scandal will enact," said Professor Netzer, "is that we will be left with a legacy of control that in the name of honesty will make it harder for city government to work efficiently."

# EXHIBIT C

Copyright 1997 The New York Times Company
The New York Times

March 28, 1997, Friday, Late Edition - Final

**SECTION:** Section A; Page 28; Column 6; Editorial Desk

**LENGTH:** 133 words

**HEADLINE:** Improper 'Pay to Play'

**BODY:**

To the Editor:

Your March 21 editorial in support of a proposal by the New York City bar association to restrict campaign contributions by lawyers to government finance officials struck a responsive chord.

The New York State Commission on Government Integrity, which I was privileged to lead, uncovered numerous examples of contributions going from the legal, financial and real estate communities to municipal officials with whom they did business.

This creates a substantial appearance of a "pay to play" practice, damaging confidence in government.

Such an appearance of impropriety should be eliminated.

It is to be hoped that New York's administrative board of courts adopts the rule proposed by the city's bar association.

JOHN D. FEERICK
New York, March 27, 1997

**LOAD-DATE:** March 28, 1997

# EXHIBIT D

Copyright 1988 The New York Times Company
The New York Times

November 9, 1988, Wednesday, Late City Final Edition

**SECTION:** Section B; Page 4, Column 4; Metropolitan Desk

**LENGTH:** 711 words

**HEADLINE:** THE 1988 ELECTIONS: NEW YORK CITY CHARTER;
Rules on Mayoral Succession And Anti-Corruption Voted

**BYLINE:** By MICHEL MARRIOTT

**BODY:**

Voters in New York City overwhelmingly approved a wide range of amendments to the City Charter yesterday.

With 97 percent of the vote counted shortly after 1 A.M. today, support for the five amendments was slightly more than 8 to 2.

The amendments - from measures to strengthen the city's campaign financing law to encouraging greater voter participation in future elections - received about the same support in each borough. And 58 percent of the voters who turned out for the Presidential election also voted on the charter revisions. The high rate surprised some city officials, who had said anything above 30 percent would be a good turnout on the charter.

"The indications that I have show that it was a high vote," said Richard Ravitch, chairman of the Charter Revision Commission, which developed the proposals. "I think this is terrific for the city because people are showing that they care about city reform, a more open and efficient government."

Credits Army of Volunteers

Noting that the proposals represented "complicated issues" to the public, Mr. Ravitch credited a small army of volunteers for successfully getting out the vote.

"I think New Yorkers want clean elections and honest public officials," said Gene Russianoff, staff lawyer for the New York Public Interest Research Group, one of the groups Mr. Ravitch credited. "That's why they voted so strongly for these anti-corruption proposals."

The vote was the first in 13 years in which New Yorkers had an opportunity to make comprehensive changes in the City's Charter, the 90-year-old framework that precisely spells out how government is to work.

The amendments mandated changes in how local campaigns are financed, tighted conflict-of-interest limits on former government employees and encouraged greater voter participation in the political system. The proposals also called for requiring city administrators to make plans for regular maintenance of New York City's badly aging infrastructure of roadways, bridges, parks and buildings, as well as determine what should be done if the mayor becomes disabled.

Two Proposals Drew Criticism

Two of the proposals proved somewhat contentious when the Charter Revision Commission first proposed them in August.

Proposal No. 6 drew fire from the leadership of the New York City Council because it was thought that the amendment would unnecessarily force the administration to keep its own promise to finance the city's eight-month-old campaign financing law.

THE 1988 ELECTIONS: NEW YORK CITY CHARTER;Rules on Mayoral Succession And Anti-Corruption Voted
The New York Times November 9, 1988, Wednesday, Late City Final Edition

The charter amendment would require the city to appropriate enough matching funds required for the candidates who join the program by limiting their campaign contributions. But the requirement would apply only to next year's city election.

Particularly troubling to some city employees is Proposal No. 2, which would rework and strengthen the city's Board of Ethics into a Conflict of Interest Board. Under the revision, the board would become more independent by restructuring its membership to exclude the city's corporation counsel and director of city personnel, who are now part of the board and serve at the pleasure of the mayor.

The board members, to include three citizens with no ties to political parties or government, would be selected by the mayor. For the first time, the Council would be required to approve the appointments.

But what proved especially controversial was the amendment's "perpetual" ban on all former city employees from any involvement with city boards and agencies on matters they were involved in as public servants. Some Koch administration officials criticized the proposal, saying it was too general and could needleesly prohibit former city employees from doing business with the city.

The charter revision was initiated after a Federal court found that the Board of Estimate violated the one man, one vote principle of the Constitution. But last April's decision by the United States Supreme Court to hear the case next spring forced the 15-member commission to concentrate on other aspects of the charter.

Eric Lane, the commission's executive director and counsel, noted that the prohibitions are structured to permit many former city employees to do some business - with restrictions -with the city.

# EXHIBIT E

Copyright 1988 The New York Times Company
The New York Times

December 4, 1988, Sunday, Late City Final Edition

SECTION: Section 1; Part 2, Page 54, Column 3; Metropolitan Desk

LENGTH: 1512 words

HEADLINE: Flaws Cited in New York Campaign Finance Law

BYLINE: By JOYCE PURNICK

BODY:

New York City's new campaign finance law was intended to cure the ills of influence-peddling by the wealthy in city campaigns, but experts who have studied the new law cite loopholes and ambiguities that may permit major circumventions.

As the landmark legislation approaches its first test in next year's municipal elections, these experts point to nettlesome flaws and weaknesses in the law, the kind likely to tempt some candidates into evading its intent.

They predict that candidates will use at least three strategies to exceed the new spending limits:

* Taking out loans and failing to pay them back on time. The law allows unlimited loans, but they are supposed to be paid back by Election Day.

* Benefiting from "independent expenditures" by individuals or political action committees that are independent in name only.

* Saying that a political expense is really job-related, not campaign-related. The law and a proposed rule interpreting it could open that option.

'It's Angelic'

Mayor Koch and others who fought for the bill's passage last February defend it as a vast improvement over the state law, which effectively has no limits on contributions or spending.

"I'm not going to tell you this is a perfect law, but it's angelic compared to existing state legislation," Mr. Koch said.

But others say that the measure, Local Law 8, could turn into New York City's version of the Federal Election Law, which was skirted - some said flouted - during this year's Presidential campaigns.

Whether the equivalent will happen in New York City is something only next year will tell. That it could happen is the conclusion of many lawyers and strategists who have been studying the laws' ins and outs.

Spending Limits

"People who want to put their money into the system are still going to put their money into the system," predicted Thomas J. Schwarz, special counsel to the State Commission on Government Integrity. "There is no reason that, say, investment bankers or people in the real-estate community won't do in New York exactly what's done in the Federal arena."

Under the city law, approved last February, candidates who agree to accept public funds - and most if not all are expected to do so - must conform to spending and contribution limits. Mayoral candidates can spend no more than $3 million in the primary, the same in the general election and $1.5 million in a primary runoff. Limits on contributions for mayoral candidates are $3,000 in each election (the primary, runoff and general).

Flaws Cited in New York Campaign Finance Law The New York Times December 4, 1988, Sunday, Late City Final
Edition

But there are exemptions. Loans and loan guarantees are exempt until the day of the primary or the election. Also exempt are independent expenditures - spending by individuals, organizations or political action committees that are purported to be independent of the campaign they are supporting.

Provisions in Federal Law

"The independent expenditures are the biggest potential loophole," said Harold Ickes, a politically active lawyer. "It seems to me that if a person or group wanted to take advantage of that, they could spend an unlimited amount of money under the theory that the expenditures are independent of any campaign. It takes some organizational effort, but we've seen it on the Federal level."

The Federal election law prohibits individuals from contributing directly to Presidential candidates in the general election, but there is no Federal limit on the amount of money that can be raised by political parties. Nor is there a Federal limit on the amount an individual or organization can spend independent of a campaign. The United States Supreme Court has ruled that prohibiting independent political spending violates the Constitution.

In the Presidential campaign, as much money was raised in private contributions as the candidates received in public money. For example,the Willie Horton television commercial, which blamed Michael S. Dukakis after a convicted murderer escaped from a Massachusetts prison furlough program and raped a Maryland woman and stabbed her fiance, was sponsored by an independent political action committee that supported George Bush. Though his campaign eventually disavowed the commercial, the independent committee said it had the tacit support of Mr. Bush's campaign.

'Power of Public Opinion'

In New York, political parties cannot legally spend money for candidates in primaries. But there is nothing to prohibit independent spending, and it will be difficult to detect when such spending is actually for a campaign.

"There is a national analogy, in which case we expect it," said the Rev. Joseph A. O'Hare, chairman of the new Campaign Finance Board, which is to regulate compliance with the law. "The only way to even limit it," he added, "is through the power of public opinion."

He is not alone in anticipating public censure of such behavior next year, but in the past, abuses by candidates have drawn no discernible public outrage.

Independent spending takes careful planning, and it is also possible that contributors will welcome the chance to save money by citing the law's restrictions. Father O'Hare's board is empowered to determine what is really an independent expense.

But in a city where contributors have gone to such extremes as forming dummy corporations to serve as conduits for contributions, restraint does not seem likely.

"The question is what if a union or a business group wants to promote someone's candidacy?" Harold Ickes asked. "Under the law, that group could make unlimited expenditures promoting that candidate, as long as they are considered 'independent expenditures.' "

It is even possible that a candidate's relative (though not a spouse or child) could make independent expenditures.

Low Spending Limits

Mr. Schwarz and others favor reducing temptation by raising the spending limits. They say the limits are too low, help incumbents, hurt challengers and will encourage some candidates to stretch the law.

Mr. Koch, who advocated higher ceilings but had to compromise with the Council, spent more than $5 million in his 1985 primary - more than twice the law's limit on primary spending. The State Commission on Government Integrity argues in a report that the $60,000 spending limit for Council candidates is so low it will "almost certainly" discourage challengers.

That report also criticizes the law's rules on loans, which can be unlimited until the date of the election. Then they are deemed to be contributions, subject to the $3,000 limitation. Candidates can be prosecuted if they do not pay them back on time. But many experts consider that highly unrealistic.

Flaws Cited in New York Campaign Finance Law The New York Times December 4, 1988, Sunday, Late City Final
Edition

"What if someone violates the law and nobody knows about it until after the election?" asks one possible mayoral
candidate, Richard Ravitch. A champion of public campaign financing, he says he is worried about what he sees as
defects in the law. A candidate who fails to repay loans on time "can say: 'My accountant made a mistake. It was not
intentional. It's a misdemeanor, but the hell with you, I'm elected,' " Mr. Ravitch said.

No Amendments Expected

What's more, even if the loans are paid back on time, the candidate would already have benefited from them.
Supporters of the provision say that it benefits poorly financed challengers who need large loans to jump-start their
campaigns.

The State Commission recommends that loans be subject to the same limitations as contributions. But the City
Council has no intention of making any amendments to Local Law 8 now, says its majority leader, Peter F. Vallone.

The Campaign Finance Board just adopted a rule stating that failing to repay a loan on time would be a "knowing
violation" of the law - meaning the candidate could be prosecuted. The board approved another regulation intended to
prevent multiple contributions from corporations and is considering yet another rule that, some argue, would create a
new loophole.

Under that proposed rule, to be debated at a board hearing on Dec. 20, money spent by incumbents "for acts
undertaken in an official capacity" -in other words, spending that a candidate says is connected to his government job,
not to his campaign - would be exempt from the spending limits.

For instance, Mr. Koch pays his political consultant, Daniel Wolf, from campaign funds. Lawrence Mandelker, Mr.
Koch's campaign treasurer, says that the $5,000 paid to Mr. Wolf each month should be exempt from the campaign
spending limits because the Wolf job is in government, not politics.

Others dispute that and reject the proposed rule altogether.

"I think it's a mistake to allow unlimited spending for officeholders, which is basically what this is," said Gene
Russianoff, staff attorney to the New York Public Interest Research Group. But Mr. Russianoff, who lobbied hard for
passage of the law, continues to support it. Local Law 8, he contends, is a step forward.

"You know, we had to decide whether to support the law, because it's so flawed," he said. "The question was, is it
better than having no law?"

# EXHIBIT F

Westlaw.

7/17/2007 NYLJ 4, (col. 4)                                                                                    Page 1
7/17/2007 N.Y.L.J. 4, (col. 4)

New York Law Journal
Volume 238
Copyright 2007 ALM Properties, Inc. All rights reserved.

Tuesday, July 17, 2007

OUTSIDE COUNSEL

City Revamps Campaign Finance Law

Laurence D. **Laufer** and Jisha S. Vachachira

On July 3, Mayor Michael Bloomberg signed into law a bill that overhauls the nearly 20-year-old New York City campaign finance law and for the first time introduces 'pay-to-play' restrictions. The bill, cosponsored by City Council Speaker Christine Quinn and 28 other Council members in conjunction with the mayor, passed the Council on June 27 by a 44-4 margin.

When initially adopted in 1988, the New York City Campaign Finance Act was characterized as the most 'fundamental reform of the political process ever enacted by the city.' [FN1] In vivid contrast to the continuing failure to enact reforms at the state level, the city's law was amended early and often over the years. Frequent revision has been found necessary to maintain an effective reform, one that continues to be hailed as a national model. This article summarizes the latest revisions.

Pay-to-Play Regulation

Beginning in the 1980s, proposals were floated to restrict the perception of 'pay-to-play' in the financing of city election campaigns. This term reflects the notion that political contributions are given to obtain favor in the pursuit of government contracts, land use determinations, and other discretionary actions. Under state law, special contribution limitations once applied to persons with matters before the city's former Board of Estimate, but these limits were repealed following that board's demise. [FN2]

In 1998, voters passed a New York City Charter revision requiring the New York City Campaign Finance Board (CFB) to propose 'rules as it deems necessary' to regulate campaign contributions from those 'doing business' with the city. [FN3] In 2000, however, the CFB concluded that it could not promulgate rules without the means to effectively regulate them. [FN4] More than two years ago the CFB resumed inquiry into how to implement the 1998 Charter referendum but continued to urge superseding legislation. The City Council has now answered that call.

The law restricts the acceptance of contributions by candidates for mayor, public advocate, comptroller, borough president and City Council from persons deemed to be 'doing business' with the city, imposing limits of $400 for citywide campaigns, $320 for borough president, and $250 for City Council. The amount of each 'doing business limit' is less than 10 percent of the limit otherwise applicable to contributions to such candidates, which are $4,950, $3,850, and $2,750, respectively. Notably, the restriction applies to the acceptance, but not the making, of the contribution.

The doing business limits apply regardless of whether the candidate seeks public financing. Both contributions accepted directly and 'by transfer' are covered. These limits do not apply to contributions made by the recipient-candidate and his or her relatives. Contributions subject to the doing business limits are not 'matchable' with public funds.

7/17/2007 NYLJ 4, (col. 4)                                    Page 2
7/17/2007 N.Y.L.J. 4, (col. 4)

With certain exceptions, the bill defines 'business dealings' to include:

1. Contracts for the procurement of goods, services or construction (other than those procured through sealed bidding) of over $100,000 for goods or services and over $500,000 for construction. These include contracts for the underwriting of city debt, retention of bond counsel, disclosure counsel and underwriter's counsel. The limits will generally commence 12 months from the date of the submission of a bid or public advertisement, whichever is later, and, for the contract recipient, continue through the term of the contract plus 12 months thereafter.

2. Real property transactions (acquisition and disposition), other than public auctions and competitive sealed bids. This includes leases where the city is lessee for the first year of the lease and dispositions from submission of proposal, through term of agreement and one year thereafter.

3. Office space acquisitions; ULURP and zoning text amendment applications  (Charter §§195, 197-c, 201) (with an exception for owner-occupants of 1 - 3 family homes). ULURP (Uniform Land Use Review Procedure) coverage runs from the certification of application through 120 days after filing of Council action or during specified time periods where the Council takes no action or Council action is disapproved by the mayor.

4. Concessions and franchises of more than $100,000 per fiscal year, from submission of the bid until 12 months thereafter, during the term of concession plus 12 months thereafter, and for the first year of the term of a franchise.

5. Grants totaling not more than $100,000, for one year after the grant is made. (This exclusion of larger grants appears to be an oversight.)

6. Economic development agreements. These include contracts with financial incentives, such as tax incentives and PILOTS (payments in lieu of taxes), provided that financial incentives given to a person 'who qualifies by operation of law' are not deemed to be pursuant to an economic development agreement. The limits apply from submission of application, during the term of agreement and one year thereafter.

7. Pension fund investment, including investments in a private equity firm and contracts with investment related consultants. The limits apply from presentation of investment opportunity or submission of proposal, whichever is earlier, during the term of the contract, and 12 months thereafter.

8. Lobbyists, as defined under the City Lobbying Law, N.Y.C. Administrative Code §3-211 et al., are deemed to be engaged in business dealings with the city during all periods covered by a registration statement.

The definition extends to business dealings with city-affiliated agencies and entities, i.e., the city School District and any public authority, public benefit corporation or not-for-profit corporation, the majority of whose members are officials of the city or appointed by city officials.

For each of the above categories, the limit first takes effect 30 days after such persons have been certified as listed in a 'doing business' database to be developed and maintained by the office of the mayor. These persons will include: (i) the entities that have business dealings; (ii) their chief executive officers, chief financial officers and/or chief operating officers; (iii) persons employed in a senior managerial capacity regarding such entities; and (iv) persons with a greater than 10 percent interest in such entities.

The new law directs that the following components of the database be certified:

•Within six months: contracts, franchises and concessions

Copyright © 2008 The New York Law Pub. Co.

7/17/2007 NYLJ 4, (col. 4)                                                                                                     Page 3
7/17/2007 N.Y.L.J. 4, (col. 4)

•Within one year: bids for contracts, bids for franchises and concessions, grant recipients, investment of pension funds, economic development agreements

•Within 16 months: real property transactions and land use approvals.

If a component of the database is not certified by Dec. 1, 2008, that component will not be certified before Nov. 30, 2009 (and thus not in effect for the 2009 election cycle).

City candidates must inquire of every contributor, lender or guarantor giving more than the doing business limit whether such person has had business dealings, and, if so, the name of the relevant city agency and an appropriate type or category for the business dealings. This information is then reported to the CFB. In turn, the CFB must check each contribution against the doing business database and notify the campaign whether any exceed the doing business contribution limit. The CFB must give this notification within stated time periods; notification triggers a duty to refund within 20 days. CFB failure to notify means that the contribution is acceptable, although it would remain not matchable.

The city has entered into an arena that will be full of twists and turns for donors, recipients and administrators. While other jurisdictions such as New Jersey, Connecticut, and the city of Philadelphia have also recently enacted pay-to-play reforms, [FN5] those laws take a different approach in placing the burden of compliance mainly on the business entities -- rather than candidates -- to disclose and/or limit certain contributions when they seek or win government contracts.

Campaign Finance Reforms

The new law also overhauls other Campaign Finance Act requirements. These provisions take effect on Jan. 1, 2008, and will apply in future elections for the five covered city offices. The following describes some of the most significant changes.

•Contributions by Entities. The new law prohibits the acceptance of contributions from limited liability companies, limited liability partnerships and other partnerships, in addition to the current prohibition of contributions from corporations.

•Public Funding. Under current law, contributions from New York City residents may be matched with public funds at a rate of 4:1, up to $1,000 in public funds for a $250 contribution. To increase the importance of small contributions, the matching funds formula is revised to 6:1 for contributions up to $175, yielding as much as $1,050 in public funds for the contribution. On the other hand, the law is intended to limit the distribution of public funds in 'non-competitive elections.' To be eligible for the maximum public funds allotment, participating candidates must demonstrate that an opposing candidate not meeting specified financial criteria meets a different objective condition of competitiveness, as specified in the law.

• Intermediaries. The definition of intermediary is broadened from persons who deliver contributions to also include persons who solicit contributions, where such solicitation is known to the candidate or authorized committee. City candidates must report intermediaries to the CFB.

•Expenditure Limits. The new law raises the spending limits for campaigns participating in the matching funds program. This will also have the effect of increasing maximum public funds payments in the 2009 City elections. The tradeoff for increased spending limits is a narrowing of the longstanding exemption for 'compliance costs'.

•Campaign Expenditures. For the first time, the City law draws a distinction between permissible and impermissible uses of campaign funds. New restrictions on the use of public funds are added. The law also extends to candidates, but not treasurers, personal liability under specified circumstances when public funds are not used for qualified campaign expenditures. These revisions address recent appellate decisions in the First Department which had struck down CFB interpretations of personal liability and restrictions on the use of public funds. [FN6]

Copyright © 2008 The New York Law Pub. Co.

7/17/2007 NYLJ 4, (col. 4)                                                                                     Page 4
7/17/2007 N.Y.L.J. 4, (col. 4)

•Audits and Enforcement. For candidates in recent years, CFB post-election audits have become almost as certain and unpleasant as death and taxes. Many provisions of the new law concern the efficiency, fairness and effectiveness of the program's administration. These include:

• Requiring candidates, campaign managers, treasurers and others to attend CFB training seminars.

• Directing the Council and the mayor, in conjunction with the CFB, to create a curriculum to be used to train CFB members and staff on the issues and problems confronted by campaigns.

• Requiring the mayor and Council speaker to consider campaign and program experience in making appointments to the board.

• Establishing deadlines for CFB completion of draft and final audit reports.

• Requiring that CFB audits be performed in accordance with generally accepted government auditing standards.

• Mandating separation of CFB staff investigatory and adjudicative functions.

• Providing that public funds repayment claims and allegations of violation be adjudicated by the board with adherence to the due process requirements of the city Administrative Procedure Act (Charter §1046), unless such procedures are waived by the candidate or committee.

Conclusion

Does the new law go too far -- or not far enough? Some advocate for extending contribution prohibitions to labor unions. Others advocate supplanting the matching funds program with full public financing. In any event, the new law certainly creates many new challenges for compliance and imposes greatly increased demands on its administrators. Indeed, the CFB has preliminarily identified a need for an increase in its fiscal year 2009 budget of as much as 50 percent to enable it to administer the new requirements.

But, if nothing else, the new law underscores that the city of New York rather fearlessly continues down a path of constant reform. While the city's pace remains brisk, the state has yet to take its first steps.

Laurence D. **Laufer** is a partner at Genova, Burns & Vernoia where he heads the corporate political activity law group. Jisha S. Vachachira is an associate in that practice group. Both represented the private parties in 'New York City Campaign Finance Board v. Ortiz,' 826 NYS2d 244 (N.Y.A.D. 1st Dept. 2006) and ' Mossa v. New York City Campaign Finance Board,' NYS2d, 2007 WL 1674211 (N.Y.A.D. 1st Dept. 2007).

FN1. Friedlander, Louis, **Laufer,** 'The New York City Campaign Finance Act, ' 16 Hofstra Law Review 345 (1988).

FN2. See 1986 N.Y. Laws 689, adding Election Law §14-100(9), repealed by 1997 N.Y. Laws 128.

FN3. New York City Charter §1052(a)(12).

FN4. Interim Report of the New York City Campaign Finance Board on 'Doing Business' Contributions (June 19, 2006).

FN5. See, e.g., N.J.S.A. 19:44A-20.13, et seq., N.J.S.A. 19:44A-20.3, et seq.; C.G.S.A. § 9-612, et seq.; Philadelphia Code §17-1400 et seq.

Copyright © 2008 The New York Law Pub. Co.

7/17/2007 NYLJ 4, (col. 4)                                                      Page 5
  7/17/2007 N.Y.L.J. 4, (col. 4)


FN6. <u>New York City Campaign Finance Board v. Ortiz, 826 N.Y.S.2d 244  (N.Y.A.D. 1st Dep't 2006); Mossa v. New York City Campaign Finance Board, N.Y.S.2d, 2007 WL 1674211 (N.Y.A.D. 1st Dep't 2007).</u>

7/17/2007 NYLJ 4, (col. 4)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.

# EXHIBIT G – PART I

20
05

A Report on the **20 05** Elections

PUBLIC DOLLARS *for the* **PUBLIC GOOD**





 NEW YORK CITY CAMPAIGN FINANCE BOARD

# PUBLIC DOLLARS *for the* PUBLIC GOOD

## A Report on the 2005 Elections



NEW YORK CITY CAMPAIGN FINANCE BOARD

Copyright © 2006
New York City Campaign Finance Board
40 Rector Street
New York, New York 10006
All rights reserved.
Printed in New Jersey.

The members and staff of the New York City Campaign Finance
Board wish to dedicate this report to their Executive Director,

*Nicole A. Gordon*

who has guided the agency from its inception in 1988,
successfully creating a program that through her dedication
has become a model for the country; developing a reputation
as tough but fair; and maintaining an unmatched level of
quality, nonpartisanship, and independence.

We wish her well in her future endeavors.

NYC Campaign Finance Board

# Board Members and Staff

Frederick A. O. Schwarz, Jr. | Chairman
Dale C. Christensen, Jr. | Board Member
Katheryn C. Patterson | Board Member
Mark S. Piazza | Board Member
Joseph Potasnik | Board Member


Nicole A. Gordon | Executive Director
Carole Campolo | Deputy Executive Director
Amy M. Loprest | Assistant Executive Director
Sue Ellen Dodell | General Counsel
Man Wai Gin | Director of Administrative Services
Erik Joerss | Chief of Candidate Services
Diana Lundy | Chief of Data Operations
Kenneth O'Brien | Director of Systems Administration
Julius Peele | Director of Auditing and Accounting
Elizabeth A. Upp | Director of Communications

**Administrative Services**

Eric Armstead
Elizabeth Bauer
Patricia Cadreau
Ashaki Gooden
James Graham
Lillie Holley

**Auditing and Accounting**

Daniel Cho
Helen Crick
Peri Horowitz
Larry Katzman
Melody Lee
Annette Moore
Tonya Ruffin
Steven Townsend

**Candidate Services**

Christopher Giza
Amanda Hulsizer
John Westhoff

**Campaign Finance Administration**

Eric Friedman
Mary Young

**Communications**

Crystal Choy
Donald Ferracci
Winnie Ng

**Data Operations**

Rhonda Gaskins
Gail Pickett
Nicole Romano

**Executive Staff**

Cathy Calandra
Susan DiMuria

**Legal**

Joanne Bianco
Ryan Gee
Jennifer Handler
Tara Malloy
Christopher Oldenburg
Beth Rotman
Julia Tomassetti

**Press**

Kate Schachern

**Systems Administration**

Marina Bardash
Marc Bratman
Shawn Crawford
Ruslan Gendelman
Edgar Gorodetsky
Anne Guo
Christopher Johnson
Suzanne Kizis
Cheryl Laner
Jeffrey M. Levy
Viktoriya Lyubeznik
Simon Wu

## Preface

This report is the New York City Campaign Finance Board's comprehensive mandated report to the mayor and the speaker of the City Council on the effect of the New York City Campaign Finance Program on the 2005 elections. Detailed data are provided as Appendices on a compact disc, which is attached to the back cover of this volume. The Report, including the Appendices, is also available in .pdf format on the Board's website, www.nyccfb.info.

## Report Team

**Editors**
Eric Friedman
Amy M. Loprest
Elizabeth A. Upp

**Art Director**
Winnie Ng

**Production**
Crystal Choy

**Appendices CD**
Shawn Crawford
Donald Ferracci
Edgar Gorodetsky

**Writers/Fact Checkers**
Daniel Cho
Eric Friedman
Ryan Gee
Christopher Giza
Peri Horowitz
Amanda Hulsizer
Erik Joerss
Larry Katzman
Tara Malloy
Christopher Oldenburg
Beth Rotman
Kate Schachern
Julia Tomassetti
Elizabeth A. Upp
John Westhoff

# Foreword

Despite a seemingly lackluster election season due to the small number of open seats and record-low voter turnout, the 2005 elections, the fifth citywide election conducted under the New York City Campaign Finance Program, represented a significant milestone for Campaign Finance Board and its staff.

For the first time in the Program's history, every current elected city officeholder, with the exception of Mayor Bloomberg, has participated in the Program and received public funds for at least one city election.



**Frederick A. O. Schwarz, Jr.**
Chairman of the
NYC Campaign Finance Board

As a result of new legislation that went into effect for the 2005 elections, candidates who chose not to participate in the Program had to abide by the same contribution limits and disclosure requirements as participants. This new requirement helped level the playing field and allowed the CFB to provide complete and nearly instantaneous public disclosure of financial information for all municipal candidates.

For the second consecutive mayoral election, Mayor Michael Bloomberg's unprecedented levels of spending—more than $73 million in 2001 and almost $85 million in 2005—challenged the Program's ability to level the playing field for all candidates. Although this exceptional phenomenon became a prominent topic of debate throughout the 2005 election season, the Program continues to enhance the ability of serious candidates to conduct meaningful campaigns for public office, while successfully reducing the influence of private money in the city's political process.

New laws increased the availability of public matching funds to participants facing high-spending non-participants by providing bonus matching funds at a rate of up to $6-to-$1, determined by the non-participant's spending. The new "limited participant" candidate category also attempted to level the playing field by encouraging self-funded candidates to rein in their expenditures voluntarily.

More importantly, however, the 2005 elections will be remembered as the culmination of an era to many at the Campaign Finance Board and throughout New York City. Following the election, Nicole A. Gordon, the CFB's long-time executive director, annouced that she would be leaving the CFB after 18 years to become vice president of a philanthropic foundation.

Ms. Gordon has been a creative, committed, and steady leader of the Board's staff since its founding in 1988, when she took on the formidable task of creating a new city agency with an ambitious mandate. Since then, she has assembled a remarkable group of public servants who have worked with her to cultivate and administer the strongly independent and nonpartisan agency the city knows today. Under Ms. Gordon's leadership and vision, the CFB has established itself as a nationally- and internationally-recognized nonpartisan model for reform. Thanks to Ms. Gordon, the Program has also been at the forefront of reform and is widely regarded as one of the country's leading municipal campaign finance systems. It is through her work and the work of the staff that the Program has become an integral part of political life here in New York City.

Ms. Gordon leaves behind a legacy of good-government reform, nonpartisanship, and dedication to the law that will be difficult, if not impossible, to replace. I know that I speak for my fellow Board members, Dale C. Christensen, Jr., Katheryn C. Patterson, Mark S. Piazza, and Joseph Potasnik, as well as my predecessor as chairman, Joseph A. O'Hare, S.J., and all former Board members in congratulating and thanking Ms. Gordon for her service, dedication, and contributions to this agency and to the betterment of New York City. We wish her great success in her new endeavor.

Frederick A. O. Schwarz
*Chairman*
September 1, 2006

# Table of Contents

## CHAPTER

1   Setting the Stage . . . . . . . . . . . . . . . . . . . . 1

2   At the Races—
    The Program in Action in 2005 . . . . . . . . . . . . .13

3   Public Disclosure—
    Getting Better All the Time . . . . . . . . . . . . . . .27

4   Contributions—
    The Incumbency Effect. . . . . . . . . . . . . . . . . .33

5   Expenditures—
    Where Does the Money Go? . . . . . . . . . . . . . . .55

6   Public Funds—
    Money with No Strings Attached. . . . . . . . . . . . .73

7   Debates 2005—
    Public Discourse Enhances Democracy. . . . . . . . . .87

8   The Voter Guide—
    Voter Education Gets a Makeover . . . . . . . . . . . .95

9   Enforcement—
    Protecting Public Dollars . . . . . . . . . . . . . . . . 107

10  Board Recommendations—
    Meeting the Goals . . . . . . . . . . . . . . . . . . . 117

**FIGURES**

4.1   Average Total Funds Raised by Incumbents vs. Challengers vs.
      Open Seat Candidates — 2005 (City Council Only) . . . . . . . . . . . . .40

4.2   Average, Median, Mode Contribution Sizes — 1997–2005 . . . . . . . . . . 42

4.3   Percentage of Funds Raised by Contribution Amount at the
      City Council Level — 2005 (All Candidates) . . . . . . . . . . . . . . . . .43

4.4   Percent of Total Contributions Received by Statement Date —
      2005 Incumbents vs. Their Challengers (City Council Participants Only) . . . 44

4.5   Contributions by Type of Contributor as a % of Total Contributions
      and in Dollars — 1997, 2001, 2005 (Participants Only) . . . . . . . . . . . 46

5.1   Spending by Council Incumbents, Challengers, and
      Open Seat Candidates — 2005 (Participants Only) . . . . . . . . . . . . . .57

6.1   Public Funds as a Percentage of Total Dollars Available to
      City Council Candidates — 1997–2005 . . . . . . . . . . . . . . . . . . . .75

7.1   Primary Debates Advertisement . . . . . . . . . . . . . . . . . . . . . . .89

8.1   The Old Voter Guide Design . . . . . . . . . . . . . . . . . . . . . . . .96

8.2   Redesigned 2005 Voter Guide . . . . . . . . . . . . . . . . . . . . . . . .99

8.3   The New Mailing Label . . . . . . . . . . . . . . . . . . . . . . . . . . .99

8.4   Candidate Profile Pages . . . . . . . . . . . . . . . . . . . . . . . . . 100

8.5   The City Ballot Proposals Section . . . . . . . . . . . . . . . . . . . . 101

8.6   A Candidate Profile in the Online Guide . . . . . . . . . . . . . . . . . 105

10.1  Average Organizational Contributions to all
      Council Candidates by Campaign — 2005 . . . . . . . . . . . . . . . . . . 121

**TABLES**

4.1    Total Contributions to Participants by Office — 1997–2005 . . . . . . . . . . 34

4.2    "The Class of 2001" — Contributions to Council Members
       Elected to First Term in 2001, Re-Elected in 2005 . . . . . . . . . . . . . . 38-39

4.3    City Council Races with the Most Money Raised (Top 15) — 2005 . . . . . . .41

4.4    Top 10 Contributors to All Participating Candidates — 2005 . . . . . . . . . .47

4.5    Top 10 Contributors to City Council Candidates Only — 2005 . . . . . . . .47

4.6    Contributions by Borough to Citywide Candidates —
       2001 & 2005 (Participants Only) . . . . . . . . . . . . . . . . . . . . . . . .48

4.7    Contributions to Citywide Candidates from Top 10 NYC
       Zip Codes — 2001 & 2005 (Participants Only) . . . . . . . . . . . . . . . . .49

4.8    Contributions to Mayoral Candidates from Top 5
       Zip Codes — 2005 (Participants Only) . . . . . . . . . . . . . . . . . . . . .50

4.9    2005 Top 10 Intermediaries . . . . . . . . . . . . . . . . . . . . . . . . . . .51

4.10   Top 10 Recipients of Intermediated Contributions . . . . . . . . . . . . . . .52

5.1    Top 10 Vendors — 2005 (Participants Only) . . . . . . . . . . . . . . . . . . .59

5.2    Top 10 Vendors to Bloomberg Campaign — 2005 . . . . . . . . . . . . . . . .60

5.3    Top 10 Vendors to City Council Campaigns — 2005 (Participants Only) . . . . .61

5.4    Spending by Unopposed Incumbents . . . . . . . . . . . . . . . . . . . . . . 64

6.1    Public Funds Cap in Races with Minimal Opposition and Intended Savings . . .78

10.1   A New City Council Program . . . . . . . . . . . . . . . . . . . . . . . . . 133

**FACT SHEETS**

1.1   Program Participants on Ballot and Elected to Office Over Time . . . .   3-5

1.2   Two-Tiered Bonus for Participants Facing a High-Spending Opponent . .   9

4.1   Contribution Limits by Office — 1997–2005 . . . . . . . . . . . . .   35

5.1   Expenditure Limits Over Time . . . . . . . . . . . . . . . . . . .   67

5.2   Expenditure Factoids . . . . . . . . . . . . . . . . . . . . . . .   71

6.1   Threshold Chart . . . . . . . . . . . . . . . . . . . . . . . . .   81

6.2   Public Funds Disbursed by Election . . . . . . . . . . . . . . .   84-85

chapter 1

# Setting the Stage

The mission of the independent, nonpartisan Campaign Finance Board (CFB) is to reduce the influence of private money in politics and to increase opportunities for citizen participation. The voluntary Campaign Finance Program (the Program) provides matching funds to qualified candidates for mayor, public advocate, comptroller, borough president, and City Council who agree to abide by strictly enforced spending and contribution limits and other Program requirements, including full public disclosure of all financial transactions and rigorous auditing by the Board.

The Campaign Finance Act (the Act) requires the CFB to review the performance of the Program after each municipal election and make recommendations to the mayor and City Council for legislative improvements.

The Program has brought fundamental changes to New York City politics since its inception in 1988, and has indeed been successful at meeting some of its most basic, central goals. The Program has limited the size of contributions that candidates for city office may accept, easing the political influence the wealthiest donors may wield. The Program forbids contributions from some sources, including corporations. CFB requirements bring a high level of transparency to the political process, giving the public complete access to financial information disclosed by all candidates for office in New York City.

New bonus provisions implemented for the 2005 elections helped to close the financial gap for Program participants facing extremely high-spending non-participants. Even more encouraging, the 2005 elections marked a significant milestone for the Campaign Finance Program. For the first time in the Program's history, *every current elected City officeholder, with the exception of Mayor Bloomberg, has participated in the Program and received public funds in at least one City election.* Of the 59 current officeholders in New York City, 53 (or 90 percent) participated in the Program for the 2005 elections.

*Chapter 1*

Also in 2005, for the first time, candidates who chose not to participate in the Program were required to abide by its contribution limits and disclosure requirements. The new requirements, enacted in 2004, allow for complete and immediate disclosure of financial information for **all** candidates for municipal office, not just for Program participants. Public disclosure in New York City municipal elections is among the most comprehensive in the nation.

Still, there are challenges ahead. In the post-election report issued after the 2003 City Council elections, the Board stated:

> The Campaign Finance Program cannot be fully effective if it is only in the instance of open seats that it helps to create vibrant competition on an even playing field. In the best of worlds, the Program should have the potential to yield competitive races in any district in all regularly scheduled elections.[1]

For the 2001 (citywide) and 2003 (Council-only) elections, there was a distinct lack of competition except in races for "open" seats (offices for which no incumbent is seeking re-election). Both elections saw a significant disbursement of public funds to candidates who did not face meaningful opposition and consequently won their elections by large margins. From 2001, there were questions whether the Program adequately addressed situations in which a participant faced an extraordinarily high-spending non-participant. However, both elections were anomalous in some respects—2001 for its unprecedented levels of Program participation and competitive open seat races due to the implementation of term limits and the $4-to-$1 public funds matching rate, and 2003 for its dearth of open seats and virtual absence of competitive races.

The Board believed that incremental changes implemented by the Council for the 2005 elections could conceivably encourage competition, limit wasteful spending of public dollars, and simplify the Program. Therefore, rather than proposing new legislative changes after the 2003 elections, the Board decided to wait for data on the 2005 elections. That year's post-election report focused on changes suggested after the 2001 elections that had not yet been implemented by the Council. Still, the Board also presented a package of significant and possibly radical improvements to the Program, particularly at the Council level, that it felt would be worthy of exploration should these negative trends persist.

Now that the 2005 election data have been analyzed, it is apparent that undesirable trends have continued. As discussed in detail in this report, competition remains low or nonexistent in most races in which an incumbent seeks re-election. Meanwhile, many candidates who face little opposition and are elected by huge margins at the polls continue to qualify for and accept significant amounts of public funds, notwithstanding legislation enacted by the City Council which was intended to limit the disbursement of public funds in these races. (See Chapter 6—Public Funds.)

An overview of the races, a discussion of Program participation, and a synopsis of legislative changes affecting the 2005 elections follows. These topics are covered in more detail starting with Chapter 2.

---

*Setting the Stage*

## OVERVIEW OF THE RACES

The Program saw 187 candidates join for the 2005 elections; an additional 82 candidates ran as non-participants. (See Fact Sheet 1.1.) Of the 187 participants in 2005, 155 (or 83 percent) appeared on the ballot for a primary or general election. Altogether, Program participants comprised 73 percent of all candidates on the ballot.

| FACT SHEET 1.1 | | | | | |
|---|---|---|---|---|---|
| **PROGRAM PARTICIPANTS ON BALLOT AND ELECTED TO OFFICE OVER TIME** | | | | | |
| Office | Number of Participants | Participants on Ballot | Total Number of Candidates on Ballot | Participants as a % of all Candidates on Ballot | Number of Participants Elected to Office |
| **2005** | | | | | |
| Mayor | 8 | 5 | 13 | 38% | 0 |
| Public Advocate | 7 | 5 | 8 | 63% | 1 |
| Comptroller | 2 | 1 | 4 | 25% | 1 |
| Borough President | 18 | 18 | 23 | 78% | 5 |
| City Council | 152 | 126 | 163 | 77% | 46 |
| **Total** | **187** | **155** | **211** | **73%** | **53** |
| **2003*** | | | | | |
| City Council | 133 | 102 | 137 | 74% | 47 |
| **Total** | **133** | **102** | **137** | **74%** | **47** |
| **2001** | | | | | |
| Mayor | 17 | 10 | 14 | 71% | 0 |
| Public Advocate | 10 | 7 | 10 | 70% | 1 |
| Comptroller | 2 | 2 | 6 | 33% | 1 |
| Borough President | 22 | 20 | 27 | 74% | 5 |
| City Council | 301 | 241 | 298 | 81% | 47 |
| Undeclared | 1 | – | – | – | – |
| **Total** | **353** | **280** | **355** | **79%** | **54** |

Chapter 1

The Democratic mayoral primary election featured six candidates, four of whom were Program participants. Fernando Ferrer narrowly avoided a runoff against Anthony Weiner and went on to face the incumbent, Michael Bloomberg, in the general election. Because Mayor Bloomberg, as a non-participant, spent an unprecedented sum of his own money on his campaign, Ferrer benefited from the newly created $6-to-$1 bonus matching funds rate. Although Ferrer's campaign spending was dwarfed by Bloomberg's $85 million outlay, Ferrer nevertheless had overall positive comments about the Program and his participation in it.[2]

| FACT SHEET 1.1 (continued) | | | | | |
|---|---|---|---|---|---|
| PROGRAM PARTICIPANTS ON BALLOT AND ELECTED TO OFFICE OVER TIME | | | | | |
| Office | Number of Participants | Participants on Ballot | Total Number of Candidates on Ballot | Participants as a % of all Candidates on Ballot | Number of Participants Elected to Office |
| 1997 | | | | | |
| Mayor | 10 | 6 | 9 | 67% | 1 |
| Public Advocate | 3 | 3 | 6 | 50% | 1 |
| Comptroller | 3 | 3 | 6 | 50% | 1 |
| Borough President | 22 | 15 | 27 | 56% | 4 |
| City Council | 138 | 114 | 181 | 63% | 36 |
| Undeclared | 14 | – | – | – | – |
| Total | 190 | 141 | 229 | 62% | 43 |
| 1993 | | | | | |
| Mayor | 5 | 4 | 7 | 57% | 1 |
| Public Advocate | 11 | 6 | 9 | 67% | 1 |
| Comptroller | 3 | 3 | 7 | 43% | 1 |
| Borough President | 11 | 7 | 15 | 47% | 4 |
| City Council | 136 | 87 | 132 | 66% | 38 |
| Undeclared | 20 | – | – | – | – |
| Total | 186 | 107 | 170 | 63% | 45 |

4

Public Dollars for the Public Good

In the race for public advocate, Program participant and incumbent Betsy Gotbaum soundly defeated her opponents in both the primary and general elections. Comptroller William C. Thompson, Jr. faced almost no opposition during his successful re-election campaign.

Due to term limits, C. Virginia Fields could not run for re-election as Manhattan borough president in 2005. Thirteen candidates vied for this open seat, 11 of whom were Program participants. Participant Scott Stringer defeated eight other candidates in the Democratic primary election, receiving a plurality of 26 percent, and won the general election over four opponents. He received a total of almost $709,000 in public funds.

At the Council level, 127 of the 163 City Council candidates on the ballot (78 percent) joined the Program in 2005, compared with 114 (63 percent) in 1997, 241 (81 percent) in 2001, and 102 (or 74 percent) in 2003. Forty-six Program participants were elected to Council seats, but they did not all receive or accept public funds. (See Chapter 6.)

| **FACT SHEET 1.1 (continued)** | | | | | |
|---|---|---|---|---|---|
| **PROGRAM PARTICIPANTS ON BALLOT AND ELECTED TO OFFICE OVER TIME** | | | | | |
| **Office** | **Number of Participants** | **Participants on Ballot** | **Total Number of Candidates on Ballot** | **Participants as a % of all Candidates on Ballot** | **Number of Participants Elected to Office** |
| **1991*** | | | | | |
| City Council | 256 | 136 | 239 | 57% | 31 |
| **Total** | **256** | **136** | **239** | **57%** | **31** |
| **1989** | | | | | |
| Mayor | 10 | 5 | 11 | 45% | 1 |
| City Council President | 0 | 0 | 6 | 0% | 0 |
| Comptroller | 5 | 4 | 10 | 40% | 1 |
| Borough President | 7 | 6 | 15 | 40% | 5 |
| City Council | 34 | 33 | 97 | 34% | 19 |
| Undeclared | 1 | – | – | – | – |
| **Total** | **57** | **48** | **139** | **35%** | **26** |
| * *The 1991 and 2003 elections were for City Council seats only.* | | | | | |

*Chapter 1*

## WHY CANDIDATES PARTICIPATE

Legislative changes to the Campaign Finance Act in 2004 subject *all* candidates—whether or not they choose to participate in the Program—to contribution limits, financial disclosure, and other Program requirements, including auditing by the Board.[3] Some candidates join the Program but do not accept public funds. It is worth asking: why do large numbers of candidates continue to join the Program?

The most common reason why candidates join the Program is the opportunity to receive public funds, particularly at the Council level. The contribution and expenditure limits encourage community participation, while public funds provide many candidates with limited access to financial resources with the means to run for office. The two-tier bonus matching funds rate system introduced for the 2005 elections (discussed in more detail below and in Chapter 6) further increases the amount of public funds available to candidates who face high-spending non-participants.

Another reason candidates join the Program is to demonstrate a commitment to good government and, especially, to limiting the influence of money in politics. For many candidates, declining to join the Program generates negative press and editorial attention.

Since 1996, participating candidates for citywide office (mayor, public advocate, and comptroller) have been required to participate in debates before both the primary and general elections. The law is intended to ensure that candidates face each other in nonpartisan forums for substantive discussions of the issues. These debates help educate voters and allow modestly funded candidates to reach a wider and more diverse audience. (See Chapter 7—Debates 2005.) The public exposure offered by the CFB debates and the opportunity to appear on equal footing with potentially better-known opponents is a compelling motivation for citywide candidates to join the Program.

Some candidates may decline to join the Program because they prefer not to submit to its requirements. Participation in the Program has increased, however, despite oft-repeated warnings from candidates who vow not to join the Program if the Board continues its vigorous enforcement. Now that non-participants are required to comply with many of the same requirements as participants, including financial disclosure, contribution limits, and Board audits, fewer candidates may choose to "opt out" in the future.

Candidates with significant personal resources may have the least incentive to join the Program, because participants are limited to contributing three times the applicable contribution limit to their own campaigns. Under decisions by the U.S. Supreme Court, non-participants have no limits on the amount they can contribute to their own campaigns, and thus can use their personal wealth to self-finance their races and avoid the time-consuming process of fundraising.[4]

*Setting the Stage*

## LEGISLATIVE CHANGES TO THE PROGRAM

In 2004, the New York City Council passed legislation implementing important changes that affected Program participants and non-participants alike.

### Disclosure, Audits, and Penalties

The 2005 elections were the first for which all candidates, participants and non-participants alike, were required to disclose all campaign activity to the CFB.[*] Previously, only candidates who certified as participants had to file disclosure statements, comply with contribution limits and restrictions, submit to the CFB audit process, and face financial penalties for violations. State Election Law has always required all candidates to file financial disclosure statements manually with the New York City Board of Elections (BOE), but the New York City BOE has not provided public access to disclosure information on the Internet in the past.[†]

The new city law gave non-participants the same dual disclosure obligations as participants and made it possible for the CFB to provide to the public, via its website, important information about non-participants, including the incumbent mayor and six incumbent Council members.[‡] The new law also holds non-participants to the same post-election audit standards as participants, eliminating a possible disincentive to joining the Program.

One negative consequence of this legislation was that many candidates who raised or spent very little money were subjected to additional burdens. Most of these candidates met the standard to file as "small campaigns" (they raised or spent less than three times the applicable contribution limit). Although small campaigns are not required to provide details of their finances to the CFB, they must provide statements on the same disclosure schedule as other candidates certifying that they are small campaigns. This limited disclosure offers little public benefit, but is burdensome for the candidates who periodically must file these statements, and for the CFB, which must process them — particularly considering that these small campaigns are rarely serious contenders to win their races.

---

[*] The February 2005 special election in Council district #17 was the first election to which the new law applied.

[†] In November 2005, the State Election Law was amended to require all local candidates who file with the New York City BOE and who raise or spend (or expect to raise or spend) more than $1,000 in a calendar year to file their mandated campaign finance statements electronically with the State BOE (which makes them available on the Internet), while continuing to file, in paper or electronic format, with the City BOE. The new law went into effect in January 2006. Municipal candidates are now required to file in three places: the Campaign Finance Board, the New York City BOE (on paper), and the New York State BOE. (See Chapter 3 — Public Disclosure.)

[‡] Michael R. Bloomberg, Leroy G. Comrie, Simcha Felder, Allan W. Jennings, Jr., Melinda R. Katz, Miguel Martinez, and James J. Sanders, Jr. Without the new legislation, information about these candidates would not have been immediately available to the public.

*Chapter 1*

## The "Bonus Situation"

After the 2001 elections, the City Council considered ways to address the challenges posed to the Program by the disparities created when a participant faces an extremely high-spending non-participant, as in the 2001 mayoral election. (See the Board's white paper, *The Impact of High-Spending Non-Participants on the Campaign Finance Program*, which will be available at www.nyccfb.info.) Legislation was introduced that would have increased the bonus matching rate from the then-maximum $5-to-$1 rate to as high as $8-to-$1 in certain extraordinary circumstances.[5] The proposed $8-to-$1 match—doubling the regular match and providing up to $2,000 in public funds per contributor—would have been applied only in cases in which a non-participant raised or spent three times the spending limit.[6] Critics of the proposal maintained that increasing the rate in this way would be too costly for the taxpayers.[7] Instead, the City Council passed Local Law 58 of 2004, which provides for two major changes to the Program: a two-tiered bonus matching rate system, and a new optional candidate category of "limited participant."

The two tiers for disbursing bonus matching funds to candidates facing high-spending non-participants are based on the amount raised or spent by a non-participating opponent. Tier 1 is triggered when a non-participant raises or spends over 50 percent of the applicable spending limit. It provides a $5-to-$1 matching rate; increases the maximum amount in public funds available to the participating candidate from 55 percent to two-thirds of the spending limit; and increases the spending limit by one-half. Tier 2 is triggered when a non-participant raises or spends over 300 percent of the applicable spending limit. Under Tier 2, the match is increased to $6-to-$1, providing up to $1,500 in public funds per contributor. The maximum amount in public funds available to the participant increases to 125 percent of the spending limit, and the expenditure limit is entirely removed. (See Fact Sheet 1.2.)

The two-tiered bonus matching rate has the potential to increase greatly the total amount in public matching funds available to candidates facing extraordinarily high-spending non-participants. But, the bonus situation is relatively rare: in 2005, the Tier 1 bonus was triggered in two City Council races; the Tier 2 bonus was triggered in one City Council race and in the mayoral general election. (See Chapter 6.)

## "Limited Participants"

Without the authority to compel a self-financed candidate to curb his or her spending, under Local Law 58 the City Council created a new candidate category called "limited participant" for the 2005 elections. As noted above, self-financed candidates have a disincentive to join the Program due to the limits on contributions by candidates to their own campaigns. Self-financed candidates can give freely to their own campaigns with no limit on their expenditures if they decline to join the Program. Depending on their level of spending, these candidates can trigger the bonus situation for their participating opponents. Under the new law, entirely self-financed "limited participants" agree to abide by the Program's expenditure limits *without* giving up the ability to contribute freely to their

*Setting the Stage*

| FACT SHEET 1.2 | | | | |
|---|---|---|---|---|
| **TWO-TIERED BONUS FOR PARTICIPANTS FACING A HIGH-SPENDING OPPONENT** | | | | |
| | **Matching Rate** | **Trigger (Percentage of Spending Limit Raised or Spent)** | **Maximum Public Funds (Amount of Regular Spending Limit)** | **Spending Limit (Percentage of Regular Spending Limit)** |
| No Bonus | 4:1 | n/a | 55% | n/a |
| Tier 1 | 5:1 | 50% | 66% | 150% |
| Tier 2 | 6:1 | 300% | 125% | no limit |
| **BONUS AS APPLIED BY OFFICE** | | | | |
| Mayor | | | | |
| No Bonus | 4:1 | n/a | $3,150,400 | $5,728,000 |
| Tier 1 | 5:1 | $ 2,864,001 | $3,818,667 | $8,592,000 |
| Tier 2 | 6:1 | $17,184,001 | $7,160,000 | no limit |
| Public Advocate/Comptroller | | | | |
| No Bonus | 4:1 | n/a | $1,969,550 | $3,581,000 |
| Tier 1 | 5:1 | $ 1,790,501 | $2,387,333 | $5,371,500 |
| Tier 2 | 6:1 | $10,743,001 | $4,476,250 | no limit |
| Borough President | | | | |
| No Bonus | 4:1 | n/a | $ 708,950 | $1,289,000 |
| Tier 1 | 5:1 | $ 644,501 | $ 859,333 | $1,933,500 |
| Tier 2 | 6:1 | $3,867,001 | $1,611,250 | no limit |
| City Council | | | | |
| No Bonus | 4:1 | n/a | $ 82,500 | $150,000 |
| Tier 1 | 5:1 | $75,001 | $100,000 | $225,000 |
| Tier 2 | 6:1 | $450,001 | $187,500 | no limit |

*Chapter 1*

own campaigns.* In exchange, limited participants are allowed to participate in the CFB's official Debate Program and, more importantly, they do not trigger the bonus situation for their opponents, which may be appealing for self-financed candidates who would seek to minimize the expenditure of public funds. The new category attempts to bring candidates who do not want to accept contributions into the Program on some basis. The end result can level the playing field for all candidates.

No candidate at any level, however, opted to join the Program as a "limited participant" for the 2005 elections. Despite calls to do so,[8] Mayor Bloomberg declined to curb his spending voluntarily or to join the Program as a participant or limited participant.

### Use of Government Resources

In an effort to limit the already considerable advantage of incumbency during an election year, and to prevent the misuse of taxpayer dollars for the purposes of electioneering, the limits on the use of government resources during an election year were strengthened for the 2005 elections.

The blackout period prohibiting public servants running for office from sending mass mailings at government expense was extended from 30 days prior to the election to 90 days. An exception is made for one mailing on the executive budget sent within 21 days of its passage. The law specifically exempts "standard communications in response to inquiries or requests"; "ordinary communications between elected officials and their constituents"; and "communications necessary to safeguard public health and safety."[9]

The new legislation also gave the CFB authority to assess whether a proposed mailing was allowable under the specified exceptions, and to enforce the provision through potential penalties. The CFB received approximately 15 requests for advice during the election cycle from officeholders asking whether distribution of assorted newsletters, invitations to community events, holiday greetings, and other announcements were permissible. Although the CFB advised that many proposed communications were consistent with the law, others appeared to exceed its limits. For example, one incumbent sought to redistribute a constituent newsletter *en masse* during the blackout period by hand, but the blackout period restrictions are not based upon the mode of delivery. The CFB also received several complaints about City Council Speaker A. Gifford Miller's expenditure of $1.6 million on mass mailings that reached voters in the midst of his mayoral bid for the Democratic Party nomination. The CFB determined that it did not have jurisdiction under the law over these mailings because they were mailed just prior to the 90-day blackout deadline. (See Chapter 2—At the Races, Chapter 5—Expenditures, and Chapter 9—Enforcement.)

---

* Limited participants cannot accept contributions from anyone other than themselves, and may not accept any loans.
  In addition, they are ineligible to receive public funds. New York City Administrative Code §3-718.

*Setting the Stage*

## REFERENCES

1   New York City Campaign Finance Board, *2003 City Council Elections: A Report by the Campaign Finance Board* (hereafter *2003 City Council Elections*), September 2004, Vol.1, 44.

2   Fernando Ferrer, special edition of "Road to City Hall," NY1, November 6, 2005.

3   Local Law 59 of 2004.

4   Joe Mahoney, "Only the Megarich Can Afford It," *Daily News*, November 4, 2005, 4.

5   Intro. No. 382-A of 2003.

6   *Ibid.*

7   Editorial, "Giffie's Grab," *New York Post*, December 4, 2003, 30.

8   See, e.g., Editorial, "An Endorsement for Mayor," *New York Times*, October 24, 2005, WK11; Gene Russianoff and Rachel Leon, "Joint Statement of Position on Mayor Michael Bloomberg's Campaign Spending," October 12, 2005; Michael Montalvo, "Common Cause/NY Asks Bloomberg to Run on His Record," *The Activist*, Vol. 8, No. 2, September 2005, 6; Editorial. "A Campaign on the Money," *New York Times*, August 14, 2005, CY4.

9   NYC Charter §1136.1(2)(b).

Public Dollars for the Public Good

chapter 2

# At the Races—
# The Program in Action in 2005

- Very few noteworthy races in 2005
- Incumbency proved to be a major factor
- There was record low voter turn-out
- New record high was spent in the mayoral race

Although 187 candidates joined the Program for the 2005 elections, it was a quieter election season than 2001, when term limits produced a record number of open seats. The 2005 election season brought just seven open Council seats, plus the Manhattan borough presidency—and record-low voter turnout. The mayoral race, however, proved newsworthy in some respects, most notably the record-breaking $84.6 million spent by the incumbent, Mayor Bloomberg, for his successful re-election campaign. What follows is an overview of the three citywide races, as well as selected boroughwide and City Council races that demonstrate how the Campaign Finance Program operated during the 2005 election cycle.

## MAYOR

### The Primary Election

As in 2001, four well-known candidates contended for the 2005 Democratic mayoral nomination: Fernando Ferrer, a former Bronx borough president and 2001 mayoral candidate; C. Virginia Fields, the term-limited Manhattan borough president; A. Gifford Miller, the term-limited City Council speaker; and Congressman Anthony Weiner, representing the 9th Congressional District in Brooklyn/

*Chapter 2*

Queens.* Thomas Ognibene, a former City Council member, failed to qualify for the Republican primary ballot, leaving Mayor Michael Bloomberg unopposed for the Republican nomination.

The four Democrats—all Program participants—raised more than $2 million in matchable contributions and received more than $7 million in public funds for the primary election. Fields received the least—less than $1.5 million—while Miller received the most, almost $2.5 million. Ferrer and Weiner received about $1.7 million each.

Various factors other than money play a large role in swaying voters on election day. Early in the race, the Fields campaign drew unwanted media attention with a campaign flyer entitled "Virginia Fields, Democrat, A Mayor for All New Yorkers." The flyer included a picture of Fields speaking at a campaign event amid a multi-ethnic group of supporters. Several newspapers pointed out that the picture included images of individuals who had not actually attended the event. The campaign had digitally added their faces to depict a campaign event featuring a diverse base of supporters. Negative reaction to the flyer led to public recriminations between the campaign and Joseph Mercurio, a veteran political consultant who worked with the campaign. After generating significant media attention, Mercurio and the campaign parted company, although neither side accepted public blame.[1]

Although Miller was the leading fundraiser, his support in the polls waned after a controversy emerged over his use of Council funds for a mass mailing. Voters in more than 40 different neighborhoods received targeted, glossy color brochures featuring Miller with their local City Council member, while another citywide mailing focused on Miller's proposal for decreasing class sizes. According to an article in the *New York Sun*, Miller's campaign claimed the mailing was a routine dissemination of information about the city's budget, and Miller's Council office at first estimated that it cost $37,000.[2] Through a Freedom of Information Law request, the *New York Sun* soon discovered that the actual cost of the mailing was $1.6 million in taxpayer money.[3]

These campaign-like mass mailings received a blitz of press coverage and criticism from colleagues, government watchdog groups, and political opponents, and dealt a significant setback to Miller's mayoral hopes. On July 16, 2005, the *New York Times* reported:

> City Council Speaker Gifford Miller faced intense criticism yesterday following reports that his office spent $1.6 million in Council funds on a series of mailings to millions of households around the city, far more than the $37,000 figure previously released. The mailings, sent out during the heat of the mayoral campaign, raised anew concerns that Mr. Miller was using taxpayer money to promote his bid for City Hall.[4]

---

* Two other candidates, Christopher X. Brodeur and Arthur Piccolo, also appeared on the Democratic primary ballot, but raised and spent minimal amounts of money.

Closer to the primary election, the *Times* reported, "Mr. Miller is trying to recover from some of his own blunders, most notably the revelation that his Council office sent out mailings, which included praise for his Council work, that cost taxpayers $1.6 million."[5] A host of editorials also criticized the mailings, referring to them variously as "Flier-gate flap,"[6] "larceny,"[7] and a "self-serving raid on taxpayer funds."[8] Dick Dadey, Executive Director of Citizens Union, a government watchdog group, remarked that the mailings were "clearly out of the bounds of fair play."[9] Council Member Tony Avella, who appeared in a photo with Miller on one of the pieces of literature, noted, "I didn't ask for it," and that the piece "does look like campaign material."[10] C. Virginia Fields remarked that the money spent on the mailings "would have gone a long way in terms of providing over 30,000 meals for seniors."[11] Some of the criticism was accompanied by calls for Miller to reimburse the city for the cost of the mailings. A staff editorial in the *New York Sun* commented:

> Taking advantage of his position as the speaker of the City Council, Mr. Miller has dipped into council coffers to mail out a thinly veiled piece of campaign literature...No ordinary New Yorker would want to spend his or her tax money to mail out this kind of political boilerplate. It has no other purpose than to save Mr. Miller's campaign from using its own money....The appropriate thing for him to do at this point would be to use some of those funds to pay back the city for this mailing.[12]

The Board received several complaints alleging that these publicly funded mailings were thinly disguised campaign literature. However, as the brochures were mailed just before the beginning of the 90-day blackout period, it was consistent with the letter of the law. Though voters received the literature in the height of the election season, the Board did not have the authority to take action. (See Chapter 1—Settting the Stage and Chapter 9—Enforcement.)

The Miller campaign also ran into trouble with a CFB rule on exempt expenditures (see Chapters 5 and 9 for more detail). On September 1, 2005, the Board determined that expenditures for petition-gatherers who also distributed campaign literature for Stephen B. Kaufman's campaign for district 13 in the Bronx were not wholly exempt from the expenditure limit. On September 2, in response to the determination, the "Miller for New York" Committee filed a request for Board guidance with respect to "whether expenditures for ballot petitioning carriers are 100 percent exempt, when those carriers have used literature as an aid in persuading voters to sign ballot petitions."[13] The Board issued an Advisory Opinion on September 6, 2005 stating the Board would not accept a 100 percent exempt allocation for Miller's "Smaller Class Size" party ballot petitioning.[14] At this point the campaign faced a serious risk of exceeding the primary expenditure limit and the Board suspended further public funds payments, declaring in a September 9 statement that the Miller campaign "has not shown to date that it is in compliance with the Program."[15] The Board also noted that it had not made a finding of violation, and that the Board would not make a final determination until after completion of the audit process.

*Chapter 2*

## The Almost-Runoff

In the initial primary vote tally, Ferrer received 39.9 percent of the vote, followed by Weiner with 29 percent. Fields received 16 percent, and Miller received only 10 percent. Two other candidates, Christopher Brodeur, an outspoken artist, and Arthur Piccolo, chairman of the Bowling Green Association in Lower Manhattan, garnered 4 percent and 1 percent of the total vote, respectively.

This put Ferrer just short of the 40 percent of the vote required to prevent a runoff against Weiner.* Nevertheless, on September 16 Weiner conceded the election to Ferrer to ensure party unity and avoid a costly (approximately $12 million) runoff election. The New York City Board of Elections commented that the only way to stop a runoff, short of an official tally showing Ferrer had reached the mandated 40 percent, would be a court order. That same day, lawyers from the Public Advocacy Group sued to stop the runoff, claiming the uncontested election would violate the state's Constitution and Election Law. This lawsuit became moot when a tally of absentee and affidavit paper ballots and a recount of the original ballots by the BOE showed Ferrer to have slightly more than the necessary 40 percent. His three former major Democratic opponents then announced they were unified behind Ferrer.[16]

## The General Election

Mayor Bloomberg, a self-financed billionaire, spent $84.6 million in his bid for re-election—surpassing the $73.9 million he spent in 2001. Although Bloomberg previously had indicated he did not expect to spend as much money as he had in 2001,[17] he did say that he would "do what's necessary to get [his] message out."[18] He eventually spent $112 per vote to defeat Ferrer by almost 20 percentage points (approximately 250,000 votes). By comparison, Bloomberg spent $98 per vote in 2001 to defeat Mark Green, narrowly, by only 2.5 percentage points. Green and Ferrer spent about $23 and $18 per vote, respectively, in their campaigns against Bloomberg.†

Bloomberg's spending triggered the Program's new Tier 2 bonus matching rate, allowing the Ferrer campaign to receive public funds at a $6-to-$1 rate. Ferrer received $1.3 million in bonus matching funds, bringing his total public funds to $3.9 million.‡ However, he raised less than $5.3 million in contributions. As a result, Ferrer spent less than $9.2 million on his campaign, despite having

---

* New York City is required to hold a runoff primary election when no candidate for citywide office (mayor, public advocate, or comptroller) receives 40 percent of the vote, per New York Election Law §6-162. In late June of 2005, the "Fields for New York" and "Miller for New York" committees requested that the Board issue an advisory opinion authorizing them to raise funds for a potential runoff election. On July 7, 2005 the Board determined that a runoff election in the Democratic mayoral primary election was reasonably anticipated and that candidates could begin fundraising for a runoff election (Advisory Opinion No. 2005-02). This meant that in addition to the original $4,500 contribution limit, mayoral candidates could raise another $2,250 per contributor.

† An increasing cost per vote can reflect a decreasing number of voters as well as rising expenditures. BOE data show that mayoral general election vote counts have substantially declined since 1989. Bloomberg's spending also increased.

‡ Ferrer's figures are for the primary and general elections combined. (See also Chapter 6—Public Funds.)

no expenditure limit (under the bonus provisions) for the general election. Even with the $6-to-$1 bonus in place, Ferrer received less public funds in 2005 than Green did in 2001 under a $5-to-$1 bonus matching rate, because Ferrer raised less in matchable contributions in 2005 than Green did in 2001. In fact, Ferrer raised about $127,000 *less* in contributions in 2005 than he did during his own 2001 campaign, and spent only about $450,000 more on the primary and general elections combined in 2005 than he did for the primary and runoff elections in 2001.

Public interest, or lack of it, was also a factor in the 2005 mayoral election. By July 2005, polls were predicting that Bloomberg would soundly defeat any of the Democratic challengers in the general election.[19] Editorial and news coverage by the city's major newspapers reflected generally favorable reactions to the incumbent. One critic claimed that the press outlets had turned "their predictable editorial endorsements of Bloomberg into a campaign-long splurge of double-standard news coverage."[20] Overall, Bloomberg's incumbency, his popularity among many influential Democrats, and his campaign's deluge of campaign advertisements and literature made it difficult for Ferrer to raise campaign contributions and diminished his ability to compete.[21] Observers of the 2005 election cited Ferrer's failure to connect with voters and to raise money—even when Bloomberg's public support was low—as major problems during his campaign.[22] The 2005 elections produced the lowest voter turnout—1.3 million out of nearly 4 million eligible voters—in recent New York City history.

The Program came under fire from a number of sources for its failure to neutralize Bloomberg's financial advantage.[23] On the other hand, as Bloomberg's lead grew, the Program's alleged "giveaway" of taxpayer money also drew criticism.[24] This topic is extensively analyzed in the Board's forthcoming white paper: *The Impact of High-Spending Non-Participants on the Campaign Finance Program*, which will be available at www.nyccfb.info.

## PUBLIC ADVOCATE

In 2005, Public Advocate Betsy Gotbaum faced five challengers in the Democratic primary in her bid for re-election. Four of these candidates joined the Program, including former New York Civil Liberties Union Executive Director Norman Siegel, who had waged an unsuccessful campaign for public advocate four years earlier, losing to Gotbaum in a runoff election by an almost two-to-one margin.

As in 2001, Gotbaum had an early lead in contributions. By mid-July, she had raised over $1.4 million, and added another $200,000 later in the campaign. The other candidates lagged far behind. Siegel raised $271,000, and businessman Andrew Rasiej, whose campaign platform included a plan to provide wireless Internet access to all New Yorkers, raised $209,000. Only these three candidates qualified for public matching funds. For the primary, Gotbaum received over $1.1 million in public funds, while Siegel and Rasiej received approximately $729,000* and $775,000, respectively.

---

\* Part of this total—$66,292—was paid after the election as part of Siegel's post-election audit.

---

*Chapter 2*

Questions about the role of the public advocate in city politics became the key issue in the race. Gotbaum's opponents claimed she had failed to use her office effectively in the four years since she was elected.[25] Gotbaum responded with a "political pep rally" of prominent politicians and labor leaders to support her re-election campaign and promote the accomplishments of her first term, including her opposition to building the West Side Stadium advocated by Mayor Bloomberg.[26] Still, each candidate presented a different view of how the office of public advocate should function to serve the people of New York, including one candidate who argued that the position should be abolished entirely: Libertarian candidate Jim Lesczynski claimed that if he were elected, "the first thing I would do is fire the staff, padlock the door, and return the salary."[27]

Gotbaum was endorsed by a long roster of elected officials, community organizations, unions, and both the *New York Times* and the *Daily News*. Although Siegel also gathered endorsements from more than two dozen local political clubs, unions, and neighborhood publications, Gotbaum won the primary election soundly, with 49 percent of the vote to Siegel's 30 percent. No other candidate received more than 9 percent of the vote.* Gotbaum went on to win the general election with 90 percent of the vote.

## COMPTROLLER

As has been historically true for the office, incumbent Comptroller William Thompson, Jr., did not have a primary opponent, nor did he face significant opposition in the general election. He easily won a second term with 93 percent of the general election vote. Thompson joined the Program and met the threshold requirements, but did not accept public funds.

## BOROUGH PRESIDENT

The four incumbent borough presidents were easily re-elected to office in 2005. Queens Borough President Helen Marshall and Bronx Borough President Adolfo Carrion, Jr. did not have primary opponents and faced minimal opposition in the general election. There were no public funds payments in these borough president races. In Brooklyn, Borough President Marty Markowitz declined to accept matching funds. His general election opponent, Green Party candidate Gloria Mattera, received just under $200,000 in public funds. Staten Island Borough President James Molinaro had no primary, but faced Democratic challenger John Luisi in the general election. Both candidates qualified for public funds: Molinaro received about $597,000, and Luisi received just under $108,000. Molinaro went on to win the general election with 59 percent of the vote to Luisi's 41 percent.

---

* This included Rasiej, who received approximately 5 percent.

## Manhattan

The only open borough president seat attracted a long and diverse list of hopefuls. The Manhattan borough presidency has always been an interesting and important office. In recent years, the seat often has served as a launching pad for mayoral ambitions, from David Dinkins to Ruth Messinger to C. Virginia Fields. Nine candidates faced off in the 2005 Democratic primary to succeed Fields. The candidates, described by the *Amsterdam News* as "an embarrassment of riches,"[28] consisted of Council Members Margarita López, Eva Moskowitz, and Bill Perkins; former Council Member Stanley Michels; State Assembly Members Adriano Espaillat, Scott Stringer, and Keith Wright; former community school board President Brian Ellner, and Democratic District Leader Carlos Manzano. In addition to including "some of the most talented politicians in the city,"[29] the Democratic primary field was also among the city's most diverse, comprising two openly gay candidates, two African-Americans, three Hispanics, and two women from neighborhoods across the borough, including the East Village, Chelsea, the Upper East Side, the Upper West Side, Harlem, and Washington Heights.[30]

Although the candidates for Manhattan borough president were diverse, they agreed on the major issues facing their borough, citing a lack of affordable housing as the most immediate and pressing concern. Other issues raised include: the lack of progress at Ground Zero, Columbia University's campus expansion plan in Manhattanville, traffic in downtown streets and on the city's highways, healthcare, high rates of HIV and AIDS among borough residents, homeland security, and education.[31] Most of the candidates campaigned by reminding voters of their political experience, as well as their ethnic, personal, and socioeconomic backgrounds, in an effort to stand out from the pack. Lopez, Espaillat, and Manzano described immigrating to the United States and learning to speak English.[32] Perkins cited his childhood growing up on public assistance in Harlem.[33] Ellner appeared in a televised campaign commercial with his male partner, which he claimed was the city's first campaign commercial featuring an openly gay politician with his same-sex partner.[34]

All nine candidates participated in the Program and qualified for public funds. More than $4.4 million in public funds was disbursed for the primary election. Stringer and Ellner both received the maximum $708,950 in public funds. Moskowitz, Manzano, and Espaillat received totals of $625,788, $544,152, and $498,338, respectively. Lopez received $453,745. Perkins and Michels received $418,334 and $296,716, respectively, while Wright trailed the group with $173,090.

As the primary election approached, Stringer and Moskowitz emerged as the front-runners, leading the field in both fundraising and endorsements.[35] By early September, Stringer and Moskowitz had both raised over $900,000. Among the others, Espaillat stood out with $518,133 in contributions. Stringer picked up key endorsements from the *New York Times* and several large unions, including the United Federation of Teachers, and also received strong backing from the Working Families Party. On the eve of the primary election, Moskowitz filed a complaint with the CFB, asking it to halt any further spending by the Stringer campaign in light of the Working Families Party's expenditures, which she estimated at over $300,000, including costs for five mailings and a series of telephone calls supporting Stringer. The Stringer campaign stated that it had no knowledge of

these expenditures and that there was no coordination between the Working Families Party and his campaign.* No further action was taken before the primary and the complaint became a part of the post-election audit process, which is still in progress.

Stringer won the primary election with a 26 percent plurality, followed by Moskowitz with 17 per-cent.† The remaining candidates each received less than 15 percent of the vote. Stringer went on to win the general election against five candidates with 78 percent of the vote.


## CITY COUNCIL

As discussed in Chapter 1, the 2005 elections drew far fewer Council candidates than 2001. (See Chapter 1—Setting the Stage.) Historically, races for open seats have attracted larger numbers of candidates, and more political newcomers, than those in which an incumbent is seeking re-election. The scarcity of open seats in 2005—only seven at the Council level—resulted in far fewer candi-dates and slightly lower Program participation at the City Council level, although the participation was higher than in 1997 and 2003 than in 2001. (See Figure 1.1.) Five of the seven open Council seats were in Manhattan; this may account for the fact that races for open Council seats in 2005 were actually *more* crowded than they were four years earlier: the average number of participating candidates for an open Council seat increased from five in 2001 to seven in 2005.

With the exception of Council Member Allan Jennings, every City Council incumbent was easily re-elected. In fact, seven incumbents did not face an opponent in either the primary or the general election. Although this did not make for a very exciting year for City Council elections, there were a few competitive races that captured the public's attention.


### Council District 8—Manhattan/East Harlem, Mott Haven, Port Morris, Upper West Side

Council Member Philip Reed was term limited and his open seat drew the interest of six Democratic primary hopefuls, all of whom joined the Program. Four of these candidates—Joyce Johnson, Felipe Luciano, Edwin Marcial, and Melissa Mark-Viverito—were participants in a previous election. Endorsed by the *New York Times* and *El Diario*, Mark-Viverito, a community activist and employee of healthcare union 1199 SEIU, was the front-runner and the only candidate to run on a second line (Working Families Party). Both Mark-Viverito and Johnson, director of a charter school in the Bronx, received the $82,500 maximum in public funds for the primary election. Media commen-tator Luciano received $81,280 in public funds. Democratic district leader John Ruiz and former

---

* The Program does not restrict spending by third parties on behalf of a candidate as long as the spending is done independently, i.e., there is no coordination between the third party and the campaign. If the Board determines that spending by a third party is not independent, however, the expenditure is considered to be a contribution to and an expenditure by the candidate subject to the contribution and spending limits.

† Only in citywide primary races is a runoff held when no candidate receives at least 40 percent of the vote.

Assembly Member Nelson Denis received $76,556 and $70,500, respectively. Edwin Marcial, a community activist, was not eligible for public funds. Mark-Viverito's ties to a number of union organizations, including 1199 SEIU, SEIU 32BJ, and United Food and Commercial Workers, as well as endorsements from groups such as Citizens Union and ACORN, enhanced her front-runner status. Despite immense union support behind Mark-Viverito, the Democratic primary came down to the wire between Mark-Viverito and Luciano. The race was decided by only 167 votes in Mark-Viverito's favor. Mark-Viverito was unopposed in the general election.

### Council District 9—Manhattan/Central Harlem, Morningside Heights, Upper West Side, East Harlem

The race to succeed term-limited Council Member Bill Perkins in Upper Manhattan was one of the city's most competitive races. Eight candidates appeared on the ballot for the open seat, six of whom chose to participate in the Program. The early favorite in the race was Inez Dickens, a Democratic district leader for the 70th Assembly District and daughter of the late State Assembly member Lloyd Dickens. In the spring of 2005, members of Harlem's political elite, including former Mayor David Dinkins, Representative Charles Rangel, and former Borough President Percy Sutton, together with Council Members Robert Jackson and Leroy Comrie attended a rally at City Hall to endorse Dickens for the 9th Council District seat. The overwhelming support for Dickens' campaign inspired State Senate Minority Leader David Paterson to ask, "Do I hear a motion to suspend the election and make it unanimous?"[36]

These early endorsements may have aided Dickens' efforts; by the mid-July filing, she had collected $126,256 in contributions. Yasmin Cornelius, district manager for Community Board 10 in Harlem and producer and co-host of public access radio show "Harlem 411," reported the second highest contributions at this point in the race, $70,916. The four remaining participants—Rodney Carroll, Cynthia Doty, Woody Henderson, and Virginia Montague—each reported less than $28,000 in contributions on the mid-July filing (Statement 10). Not surprisingly, Dickens was the only candidate to qualify for the maximum amount of public funds on the first payment date. As the primary election neared, however, Dickens' opponents picked up speed: ultimately, Cornelius and Montague both received the maximum $82,500 in primary public funds while Carroll and Doty received totals of $72,420 and $65,044, respectively.

The candidates focused their campaigns on education, economic development, affordable housing, health, and the environment, and called for "responsible development" in construction projects throughout the area, criticizing plans to develop a Marriott Hotel and a proposal to expand Columbia University's campus. Despite Dickens' early lead, Cornelius gained ground in the weeks leading up to the primary election, receiving key endorsements from the *New York Times* and the *Daily News*. Although Dickens won, her election was not the landslide victory many had predicted earlier in the year. Dickens won the primary with a plurality of 29 percent of the vote, followed by

*Chapter 2*

Cornelius with 21 percent, Doty with 17 percent, Montague with 13 percent, and Carroll with 9 percent. Dickens won the general election with an overwhelming 81 percent of the vote.

**Council District 13 — Bronx/Morris Park, Pelham Bay, Throgs Neck, City Island**

One of the most highly publicized races for City Council in 2005 was the race to succeed Madeline Provenzano in the northeast Bronx. Five candidates, all of whom participated in the Program, were on the primary ballot in the 13th Council District. The early front-runner was James Vacca, long-time district manager of Bronx Community Board 10, who reported over $128,191 in contributions by the mid-July filing deadline. His closest opponents, former Assembly Member Stephen Kaufman and Joseph McManus, Bronx coordinator for Steamfitters Local 638, both had raised approximately $90,000 by the July deadline.

The biggest issue in the 13th district—which in many places resembles a suburb with tree-lined residential streets and grassy front lawns—was overdevelopment. All seven primary candidates weighed in on the importance of preserving the unique character of the district through the creation and enforcement of building restrictions and other "down-sizing" legislation. Although Vacca remained the favorite heading into the Democratic primary, his opponents gained enough support to qualify for large public funds payments: McManus, like Vacca, received the maximum $82,500 in public funds; Ismael Betancourt received $79,160; and Kaufman received $63,528.

It was not the candidates' fundraising abilities, however, that made headlines in the weeks leading up to the Democratic primary. On September 1, the Board determined that approximately half the $16,560 in petitioning expenses claimed by the Kaufman campaign as exempt expenditures was not in fact exempt from the campaign's spending limit. The decision was based on the fact that Kaufman's petition-gatherers distributed campaign literature (which is not an exempt expenditure purpose) while collecting petition signatures. This determination put Kaufman at risk of violating the expenditure limit and curtailed his ability to spend money in the waning days of the election. Moreover, it raised important questions concerning the definition of exempt expenditures, which had serious implications for mayoral candidate Gifford Miller as well (see above, and Chapters 5 and 9).

Vacca won the primary election with 38 percent of the vote to Kaufman's 26 percent and McManus' 21 percent. Republican Phil Foglia, also a Program participant, seemed poised to be a formidable adversary in the general election. Backed by Mayor Bloomberg, Council Member Provenzano, and former Mayor Giuliani, Foglia waged one of the city's few competitive general election campaigns. Both candidates received the maximum $82,500 in public funds for the general election, bringing Vacca's total amount of public funds received for the 2005 election cycle to $165,000. Vacca went on to win the general election with 64 percent of the vote to Foglia's 36 percent.

### Council District 28 — Queens/Richmond Hill, Rochdale Village, South Jamaica

The race for Council District 28 was notable for a number of reasons. The most sensational involved two primary election candidates — Albert Baldeo and Robby Mahadeo — who not only accused one another of wrongdoing during the initial stages of the campaign, but ultimately filed criminal charges against each other.

Incumbent Allan Jennings, who opted not to join the Program, had not yet escaped the negative attention he attracted during 2001, when both his personal and professional behavior had been labeled as "irrational" and "embattled."[*][37] A $5,000 fine had been imposed by the City Council after several staffers complained of harassment and discrimination by Jennings. The Board also assessed penalties against Jennings' 2001 campaign for violations of the Act, including taking contributions from an unregistered political committee, inadequate disclosure of financial transactions, and failure to provide requested documentation. The CFB also determined that the Jennings campaign had obligations to repay public funds. The violations resulted in assessed penalties totaling $8,374 and $29,471 in public funds repayments owed to the CFB. (See Chapter 9.)

Jennings' opponent, former district 28 Council Member Thomas White (who was term-limited out of office in 2001) was also no stranger to negative media coverage during the 2005 elections. Articles in the press emerged about White's possible misuses of state and federal monies allegedly used to purchase personal items.[38] The only candidates to receive public funds in district 28 were Baldeo and White, who each received the maximum. In the end, White emerged the winner. White won the primary by a little more than 700 votes (42 percent of the vote to Jennings' 31 percent) and went on to win the general election, becoming the first Council member to regain his seat after being term limited out of office, and making Jennings the only incumbent City Council member to lose a bid for re-election in 2005.

---

[*] Jennings opposed then-Council Speaker Gifford Miller's 18 percent property tax increase and was stripped of his committee leadership positions, then compared his troubles to the sufferings of Jesus Christ. He placed ads in Asian-language newspapers professing his love for his current Chinese girlfriend and criticizing his Taiwanese ex-wife. He released the names, job titles, and badge numbers of undercover policemen in a City Council hearing. He was also videotaped throwing a piece of metal at a FOX news reporter outside of his home.

*Chapter 2*

### Council District 41 — Brooklyn/Bedford Stuyvesant, Ocean Hill-Brownsville, East Flatbush

The city's most crowded Council race was to succeed term-limited Council Member Tracy Boyland. Ten candidates competed in the Democratic primary election, including Boyland's father, former State Assembly Member William Boyland, Sr."[39]

Of the nine candidates who faced off against Boyland for Brooklyn's only open seat, political new-comer Darlene Mealy—community activist and a longtime employee of the New York City Transit Authority—emerged as the toughest challenger to the Boyland dynasty. Advocating affordable housing and public safety improvements, Mealy spoke out against the Boylands, who she claimed had become beholden to developers and out of touch with district residents. Although Mealy—a Program participant—was considered a long shot at first, her campaign quickly picked up steam as she received key endorsements from an array of unions, politicians, and political groups, including strong backing from the Working Families Party.†[40] Mealy was also endorsed by the *Daily News* and the *New York Times*, the latter describing her as "a ball of fire" with "the makings of a dragon slayer."[41]

Mealy was one of eight participating candidates in the race. Two other candidates, William Boyland, Sr. and Alicka Ampry-Samuel, a former Democratic district leader and former aide to Tracy Boyland, chose not to join the Program. As a non-participant, Boyland was not eligible to receive public funds, but he was required to disclose his campaign finance activity to the Board. He failed to do so, and on August 25 the Mealy campaign cited Boyland's non-disclosure in support of her application for a bonus determination. The Mealy campaign argued that Boyland had raised or spent more than $75,000—one-half the spending limit for City Council candidates—thereby triggering the Tier 1 bonus matching funds rate for his opponents. Based on the evidence available and the Boyland campaign's failure to provide complete and timely disclosure statements, the Board declared the bonus, making qualified Program participants in the 41st district eligible to receive public matching funds at a $5-to-$1 bonus rate and increasing their spending limit by 50 percent, to $225,000. Ultimately, only four candidates qualified for public funds for the primary: Mealy received the maximum, $100,000; Royston Antoine received $59,900; Stanley Kinard received $58,700; and Danny King received $39,623.

---

\* The Boylands are regarded as a Brooklyn political dynasty. For nearly 30 years, a member of the Boyland family has represented central Brooklyn in political office. William F. Boyland, Sr. has served the longest, beginning his career in 1982 by filling the State Assembly seat of his brother, Thomas, who died unexpectedly after five years in office. William Boyland, Sr. served as a State Assembly member for nearly 20 years. He resigned before the end of his term in 2003, and the seat was subsequently filled by his son, William Boyland, Jr. His retirement, however, was short-lived. Faced with the loss of his daughter's Council seat to term limits, Boyland, Sr. decided to run for the 41st district seat himself. When asked about the motives behind this decision, Boyland compared his family dynasty to that of the Kennedys and stated, "I ran out of children," and the seat "needs to stay in the family."

† The Mealy campaign paid over $111,000 to the Working Families Party over the course of the 2005 election cycle for campaign and consulting services. The Working Families Party was clearly heavily involved with her campaign.

*At the Races—The Program in Action in 2005*

In a solid victory over one of Brooklyn's longest-enduring political dynasties, Mealy won the Democratic primary election with 47 percent of the vote to Boyland's 19 percent. Mealy went on to win overwhelmingly in the general election, receiving 91 percent of the vote.

## CONCLUSION

In 2005, all nine newly elected office holders were participants in the Campaign Finance Program and received public funding to help them wage competitive campaigns. Of course, incumbency still remains the surest predictor of success, and all but one incumbent won re-election. Most notably, this is the first time in the Program's history that every current elected city officeholder, with the exception of Mayor Bloomberg, has participated in New York City's Campaign Finance Program and has received public funds in at least one election.

## REFERENCES

1   See, e.g., "Fields Fires an Advisor. He Fires Back." *New York Times*, July 9, 2005; "Fields Axes Campaign Big Over Pix," *Daily News*, July 9, 2005; "Fields' Fired Aide Tells His Side," *Newsday*, July 9, 2005; "Doctored Flier, Flying Daggers," *New York Post*, July 9, 2005.

2   Jill Gardiner, "Probe Sought of Miller Mailing," *New York Sun*, June 15, 2005, 1.

3   Jill Gardiner, "Miller's Mailings Cost Taxpayers $1.6 Million-Not $37,000," *New York Sun*, July 15, 2005.

4   Nicholas Confessore and Diane Cardwell, "Fierce Criticism of Miller Erupts After Mailings," *New York Times*, July 16, 2005, B1.

5   Patrick D. Healy and Nicholas Confessore, "Miller Hopes a Late Push Can Force a Runoff," *New York Times*, August 8, 2005, B1.

6   "Miller's Mendacity," *New York Post*, July 20, 2005, 28.

7   "Gifford Miller's Million-Dollar Ripoff," *Daily News*, July 16, 2005, 16.

8   Wayne Barrett, "Statistics Still Do Lie," *Village Voice*, August 24, 2005, 21.

9   Nicholas Confessore and Diane Cardwell, "Fierce Criticism of Miller Erupts After Mailings," *New York Times*, July 16, 2005, B1.

10  Jill Gardiner, "Miller Mailing from Council Office Comes at Opportune Time," *New York Sun*, June 8, 2005, 3.

11  Meghan Clyne, "Democrats Vie for 2nd Place and a Runoff," *New York Sun*, August 22, 2005, 3.

12  "Give it Back, Gifford," *New York Sun*, June 8, 2005, 10. *See also* "Gifford Miller's Million-Dollar Ripoff," *Daily News*, July 16, 2005, 16.

13  Marshall Miller, "Letter to Campaign Finance Board Chairman re: Miller for New York Exempt Petitioning Costs Application for Immediate Guidance," September 2, 2005.

14  Advisory Opinion No. 2005-3 (September 6, 2005).

15  Statement of Campaign Finance Board, September 9, 2005.

16  Nicholas Confessore, "As Weiner Begs Off Ballot, Analysis Finds Ferrer at 40 percent," *New York Times*, September 17, 2005, 1.

17  Michael Saul, "Outsider? No, Just an Outspender," *Daily News*, May 22, 2005, 19.

*Chapter 2*

18    Winnie Hu, "Mayor Vetoes Bill to Expand Public Funds in Certain Races," *New York Times*, November 25, 2004, B3.

19    7/22/05 Marist Poll.

20    Wayne Barrett, "The 2005 Wacko Awards," *Village Voice*, November 15, 2005.

21    Michael Goodwin, "Good Law Gone Bad," *Daily News*, November 2, 2005, 35.

22    Julia Levy, "With Ferrer Lagging, Political Class Asks How He Fell Behind," *New York Sun*, November 2, 2005, 1.

23    See, e.g., "Give Freddy a Break," *New York Post*, October 13, 2005, 28; Davidson Goldin, "Encouraging Self-Restraint," *New York Sun*, October 31, 2005, 7.

24    Michael Goodwin, "Good Law Gone Bad," *Daily News*, November 2, 2005, 35.

25    Jonathan P. Hicks, "Rivals for Public Advocate Go After Gotbaum in First Debate," *New York Times*, August 24, 2005, B5; Patrick Arden, "Gotbaum Gang-up in Advocate Debate," *Metro*, August 24, 2005, 3.

26    Jonathan P. Hicks, "Amid Heavy Fire of Rivals, Gotbaum Rallies Supporters," *New York Times*, August 23, 2005, B6.

27    "The Race for Public Advocate," *Gotham Gazette*, July 22, 2005.

28    "Amsterdam News Endorses Wright," *Amsterdam News*, September 1, 2005.

29    *Ibid.*

30    *Ibid.*

31    Gail Robinson, "Can This Island Be Saved?" *Gotham Gazette*, July 18, 2005.

32    *Ibid.*

33    *Ibid.*

34    Jim Rutenberg, "Openly Gay Politician is Openly Paired in Ad," *New York Times*, August 29, 2005.

35    Beth Fertig, "Fierce Race for Manhattan Borough President," *WNYC*, September 13, 2005.

36    David Greenhouse, "Local Leaders Publicly Support Dickens' Bid for City Council," *Columbia Spectator*, April 8, 2005.

37    David Seifman, "Jennings 'Said He Had Power and He Could Do Anything He Wanted'," *New York Post*, April 18, 2005; Jonathan Hicks, "As Rivals Circle, Embattled Councilman Seems Unworried," *New York Times*, August 2, 2005.

38    Jose Martinez, "Queens Voters Say It's Send in the 'Clowns,'" *Daily News*, September 11, 2005.

39    Jonathan Hicks, "Family Name in Brooklyn Loses Clout with Defeat," *New York Times*, September 15, 2005; "Two for Brooklyn," *Daily News*, September 10, 2005.

40    Jarrett Murphy, "Two Blows in Brooklyn Council Battle," *Village Voice*, August 25, 2005.

41    "City Council Endorsements," *New York Times*, August 28, 2005.

chapter 3

# Public Disclosure—
# Getting Better All the Time

- The searchable database is the CFB website's most widely used feature
- Candidates can now file disclosure statements via the Internet
- Real time disclosure provides immediate and accessible candidate compliance
  and financial information to the press, public, and campaigns
- C-SMART enhanced to meet City and State BOE filing requirements

The 2005 elections reflected groundbreaking changes in public disclosure. In 2004, legislation was passed mandating that all campaigns for the five offices covered by the Program, regardless of Program participation, must disclose their financial records to the CFB. This detailed disclosure has been a boon for good government in the City of New York. Even before non-participants were required to make disclosure to the CFB, the Center for Governmental Studies found:

> [T]he electronic filing and disclosure component of the campaign finance program is a resounding success. Candidates, voters, journalists and scholars are able to access candidate contribution and expenditure information almost instantaneously when it is filed with the Campaign Finance Board. The level of disclosure detail required by the city is far greater than that required by the state of New York. Electronic disclosure has revolutionized the dissemination of campaign finance information in New York City elections.[1]

What was missing in 2003, when these words were written, was the ability to compare "apples to apples" when a participating candidate was opposed by a non-participating candidate. For example, when non-participating candidate Michael Bloomberg ran in 2001, he was only required to file campaign finance disclosure statements manually with the New York City BOE on forms used

statewide. These New York State BOE forms are less comprehensive than CFB forms as they do not, for example, include fields for contributors' employers or occupations. In addition, New York State BOE forms filed by city candidates were only recently made available online. Thus, anyone wishing to compare the 2001 Bloomberg campaign's finances with those of his participating opponents would have to go to the New York City BOE to look at the Bloomberg filings on paper, but would have access over the Internet to his opponents' filings on the CFB's website, as his opponents were Program participants. For the 2005 elections, the press and public could see financial data for every campaign on the CFB's website.

Another advance was made in public disclosure beginning with the 2005 elections: the Board introduced two new disclosure statement deadlines, in mid-March and mid-May of the election year.

These additional disclosure statements offered two concrete benefits. By submitting matching claims earlier, candidates had the opportunity to correct compliance problems and to review and correct invalid matching claims in advance of their July 15th filing, increasing the likelihood that they would meet threshold and receive a public funds payment on the first payment date. (See Chapter 6—Public Funds.)

The press and the public benefited as well. Until 2005, there was little verifiable information about candidates' fundraising during the election year until just a few weeks before the primary election. With the advent of these two new spring disclosure statements, the public had access to information about their candidates' fundraising activities and expenditures much earlier in the election season.

The CFB always looks to enhance public disclosure. Effective disclosure of campaign finances is a hallmark of the Program, and one of the ways in which the Program has been a consistent and unqualified success.

## DATA ON THE CFB'S WEBSITE

The Campaign Finance Board's website, www.nyccfb.info, provides a wealth of data for anyone interested in city politics. It is a one-stop shop for candidate information, providing access to the searchable campaign finance database, the online Voter Guide, and final audit reports. The CFB makes continual updates to its website to ensure the site provides the detailed level of current data upon which candidates, reporters, and the public have come to rely, in an easily accessible and comprehensible fashion.

Just prior to the primary election and continuing until the general election, the website saw a surge in activity, experiencing a nearly 50 percent increase in daily traffic, with roughly 3,500 daily visitors. The online Voter Guide was particularly successful. (See Chapter 8—The Voter Guide.)

The searchable campaign finance database remains the most widely used resource on the CFB website. The searchable database allows the public to "follow the money" across election cycles, offering

in-depth information about candidates' public and private funding going back to 1989. Users can search for information regarding candidates' contributions, expenditures, transfers, loans, intermediaries, and other transactions.* No other jurisdiction in the country—at any level—provides this magnitude of searchable, computerized, and quality-assured campaign finance information. The CFB ultimately audits all candidates, which enhances the reliability of the data contained in the searchable database. For those who want to perform in-depth analyses with more flexibility than is possible using the web-based searchable database, the entire database can also be purchased on CD-ROM.

## DISCLOSURE AND THE MEDIA

The real-time disclosure offered by the CFB provides immediate access to candidate compliance and financial information online. On campaign filing days, the CFB updates the site several times throughout the day to reflect the most up-to-date information on candidates' finances.

For the 2005 election cycle, the CFB created an on-line "Press Room" for its homepage. The goal was to create a centralized information section for reporters covering the 2005 municipal races. The Press Room contains agency contact information, press releases, scripts of testimony given by the Board and CFB staff, "frequently asked questions," and important CFB dates, as well as a tip sheet for using the campaign finance searchable database. The CFB began holding training seminars in April of 2005 for interested members of the media to help them make the most effective use of the searchable database. Representatives from more than 16 different media outlets—including broadcast and print media, national and local media, and English-language and foreign-language media—attended these trainings.

Candidates often use the searchable database for information on their opponents' contributions and spending. Before the primary election, candidate Stanley Michels ran newspaper advertisements listing contributions made by employees and officers of developers to the campaign of fellow candidate Scott Stringer, claiming that "Landlords... are Stringer's biggest contributors!"† The advertisement cited the CFB as a source.

---

\* Private information about contributors, such as addresses, is not made available publicly.

† For further discussion of campaign contributions from sources—such as developers—who may have business before city boards, agencies, or officials, see also the *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions*, released in June 2006, attached as Appendix J.

*Chapter 3*

## C-SMART

As of the 2005 elections, all candidates for mayor, public advocate, comptroller, borough president, and City Council member are required by law to disclose their financial information to the CFB, regardless whether they join the Program. As a result, the CFB's Candidate Software for Managing and Reporting Transactions, or C-SMART, has become a fixture in all New York City campaigns. C-SMART was developed by the CFB to organize and track campaign finances while allowing easy transfer of data for public disclosure. C-SMART contains numerous features to help candidates comply with the requirements of the Act and to manage the vast amount of campaign data collected during a typical election. Since 1993, C-SMART has been distributed free to all campaigns. The software is updated continually, with major improvements made for each new election cycle. Revisions to C-SMART are informed by candidate surveys and focus groups that help the CFB better address the needs of campaigns with each new version.

Beginning in 2005, the new C-SMART Internet delivery system enabled candidates to submit disclosure statements over the Internet. Backup documentation for matchable contributions or loan documentation must still be hand-delivered or mailed to the CFB by the due date. The new Internet filing feature makes financial disclosure even easier for candidates, and also allows data to be uploaded onto the website and made available almost instantaneously.

In November 2005, State Election Law was amended to require all local candidates who file with the New York City BOE and who raise or spend (or expect to raise or spend) more than $1,000 in a calendar year, to file their mandated campaign finance statements electronically with the New York State BOE, while continuing to file, in paper or electronic format, with the New York City BOE. The new law went into effect in January 2006. Thus, city candidates must now file in *three* places: the New York City Campaign Finance Board, the New York City BOE, and the New York State BOE.

C-SMART has always assisted candidates with their BOE filing requirements by allowing them to print out the manual forms required by the New York City BOE directly from C-SMART. After numerous campaigns voiced their concerns about re-entering their campaign data into a new and distinct New York State BOE electronic filing system, the CFB created and issued an update to C-SMART 7.0 that allowed candidates to file their mandated disclosure statement for the 2005 cycle directly with the New York State BOE using C-SMART, saving city candidates significant time and effort.

# EXHIBIT G – PART 2

*Public Disclosure—Getting Better All the Time*

## PUBLIC DISCLOSURE OF VIOLATIONS AND PENALTIES

The Board discloses public funds disbursements as they are approved, and also discloses information about candidates who fail to comply with the Act and the Rules. The Board issues press releases, which are posted on the website after each meeting, to alert the public to these actions, and also posts candidates' final audit reports, as well as the names of candidates with outstanding penalties, on the website.

During the 2005 election cycle, the Board began to post the names of candidates who filed their disclosure statements late, or failed to file at all. This practice significantly improved campaigns' compliance with the Board's disclosure deadlines, and enhanced an already extremely useful online resource for voters.

## REFERENCES

1    Paul S. Ryan, "A Statute of Liberty," *Center for Governmental Studies*, 2003, 27.

chapter 4

# Contributions—
# The Incumbency Effect

---

- Incumbents raised significantly more than non-incumbents
- Average contribution size increased slightly
- Incumbents raised more money early in the election cycle

---

The results of the 2005 elections are consistent with the theory that holds that incumbency is the most reliable predictor of electoral success.[*] Beyond the advantages incumbents enjoy in terms of voter recognition, media attention, and community visibility, incumbency also attracts money. Incumbents, in general, receive more in contributions than do challengers. Moreover, when an incumbent is seeking re-election, far fewer challengers enter the race. In many cases, the presence of incumbents discourages potential candidates from running and decreases the likelihood that there will be competitive races.[†] Those challengers who do run often find that not only is public interest lower in these races, but so is the flow of contributions to their campaigns.

Unlike 2001, when term limits first went into effect, resulting in 44 open seats citywide, there were only eight open seats in 2005. As one would expect, the 187 participants who joined the Program in 2005 raised less money, in total, than was raised by the 353 participants in 2001. But while the number of candidates dropped by half, the decrease in total funds raised was only 35 percent. The presence of incumbents in all three citywide elections (mayor, public advocate, and comptroller) as well as 44 of the 51 Council districts, made it unlikely that total fundraising would reach its 2001

---

[*] Council Member Allan W. Jennings, Jr. in district 28 was the only incumbent at any level of city office in 2005 to fail in his bid for re-election; this race is covered in more detail in Chapter 2—At the Races.

[†] In New York City, politics is dominated by the Democratic Party, so Democratic primary winners usually face little opposition in the general election.

---

*Chapter 4*

levels. But incumbents are raising more, and insurgent candidates are finding it harder to mount serious challenges; data from the 2005 elections show a large disparity between incumbents and challengers in their respective ability to raise private campaign funds.

## CHALLENGES TO FUNDRAISING

In 2005, total contributions received by participating candidates for all offices decreased by 28 percent to $39.6 million from $54.9 million in 2001 (the most recent citywide election for all covered offices prior to 2005). The total amount of contributions raised by participants in 2005 is closer to the totals in 1997 and 1993, when $29.3 million and $30.7 million were raised, respectively, than to the 2001 totals. (See Table 4.1.)

### Contributions in the Mayoral Race

At the mayoral level, there was a decrease in total funds raised by participating candidates from $29.2 million in 2001 to $15.1 million in 2005. Although the number of major candidates in the race was the same as four years earlier, funds raised decreased by 48 percent. Michael R. Bloomberg's advantages as an incumbent, his high job approval rating, and the broad range of endorsements he received from key civic unions and political figures—both Democrat and Republican—likely contributed to the lower levels of donor interest in the other mayoral candidates, including the Democratic frontrunner, Fernando Ferrer. Before the 2005 primary, a report in the *New York Times* observed that "statements from the high rollers of Democratic Party politics are sending chills through local party leaders, who are seeing many of their biggest donors publicly supporting the mayor this campaign year—and keeping their money in the bank."[1] Rather, total fundraising in

| TABLE 4.1 | TOTAL CONTRIBUTIONS TO PARTICIPANTS BY OFFICE—1997–2005 | | | |
|---|---|---|---|---|
| Office | 1997 | 2001 | 2003 | 2005 |
| Mayor | $14,856,779 | $29,150,517 | n/a | $15,113,813 |
| Public Advocate | $ 2,016,977 | $ 4,829,248 | n/a | $ 2,366,238 |
| Comptroller | $ 1,959,275 | $ 3,670,474 | n/a | $3,844,371 |
| Borough President | $ 5,135,627 | $ 5,668,251 | n/a | $ 8,447,551 |
| City Council | $ 5,378,986 | $11,546,648 | $6,405,680 | $ 9,850,053 |
| **Total** | **$29,347,644** | **$54,865,138** | **$6,405,680** | **$39,622,026** |

*Contributions—The Incumbency Effect*

| FACT SHEET 4.1 | | | | |
|---|---|---|---|---|
| **CONTRIBUTION LIMITS BY OFFICE — 1997–2005** | | | | |
| **Office** | **1997** | **2001** | **2003\*** | **2005** |
| Mayor | $7,700 | $4,500 | n/a | $4,950 |
| Public Advocate | $7,700 | $4,500 | n/a | $4,950 |
| Comptroller | $7,700 | $4,500 | n/a | $4,950 |
| Borough President | $5,900 | $3,500 | n/a | $3,850 |
| City Council | $3,550 | $2,500 | $2,750 | $2,750 |
| \* *The 2003 elections were for City Council only.* | | | | |

the 2005 mayor's race was roughly the same as 1997, when there was also an incumbent mayor and participating candidates running for mayor raised about $14.7 million in total.\*

Bloomberg's Democratic challengers individually and collectively raised far less than the candidates who ran in the 2001 Democratic primary. In 2001, the four major participating candidates vying for the Democratic nomination collectively raised $23.3 million through the primary election, and $28.6 million for the entire cycle.† In 2005, the four contenders raised $14 million through their primary, and finished the electoral cycle having raised $15 million as a group.‡

In 2001, Democratic nominee Mark Green raised a total of $11.2 million, while in 2005 Ferrer was able to raise only $5.3 million. Even more surprising, Ferrer raised $127,000 *more* in contributions in 2001 than he did in 2005, yet in 2001 Ferrer was neither the frontrunner in the primary election nor the Democratic nominee for the general election. In 2005, he was both—and polling as late as March of the election year suggested that Ferrer would beat Bloomberg in the general election.[2] (See also the Board's white paper: *The Impact of High-Spending Non-Participants on the Campaign Finance Program*, which will be available at www.nyccfb.info.)

Contribution patterns in other races tend to support the hypothesis that incumbency can be the most reliable predictor of electoral success.

---

\* In 1997, Democratic challenger Ruth Messinger faced Republican incumbent Mayor Rudolph Giuliani after winning a five-way Democratic primary and narrowly avoiding a runoff against Reverend Al Sharpton.

† An additional participant, George Spitz, raised $6,029 in contributions.

‡ There was a runoff election for the Democratic nomination in 2001; a runoff was averted in 2005. (See Chapter 2.)

---

*Chapter 4*

## Public Advocate

Another story about the privileges of incumbency unfolds in an analysis of the race for public advocate; donors simply seem to have less interest in making contributions to a candidate running against an incumbent. Contribution totals from the past few cycles bear this out: while $4.8 million was raised by all candidates for the open-seat public advocate race to succeed Mark Green in 2001, only $2.4 million was raised by all candidates for the 2005 campaign.

As one of several candidates for a vacant position, Betsy Gotbaum raised $1.8 million to win the job in the 2001 election, out-raising her nearest challenger (then-Assemblyman Scott Stringer) by $600,000. Three other candidates in the 2001 race raised more than $500,000 to compete for the office in a spirited campaign. In 2005, while Gotbaum raised some $200,000 less—about $1.6 million—for her re-election campaign, it was enough to surpass the fundraising total of her nearest challenger (Norman Siegel) by $1.3 million.

## Borough President

With four incumbents on the ballot in 2005, and a wide-open race to succeed term-limited C. Virginia Fields in Manhattan, fundraising was up considerably at the borough president level from 2001.

Most of those gains were driven by the competitive race in Manhattan. More funds were raised by the 11 candidates contesting the Manhattan race than in the other boroughs combined, some $4.9 million. That total dwarfed the analogous total for any open-seat race in 2001 (the highest: Brooklyn, $1.9 million). In 2001, there were ten candidates across the five boroughs who raised more than $250,000 to run for borough president; in 2005, there were eight in Manhattan alone. The winning candidate, Scott Stringer, raised almost twice as much as had any winning candidate in 2001 (the highest: Marty Markowitz, Brooklyn, $590,000). Certainly, the numbers from this race would seem to reinforce Manhattan's primacy among the boroughs as a source of campaign funds.

Analysis of the races in other boroughs suggests the relative ease incumbents have in raising campaign money. The incumbents (Markowitz in Brooklyn, Adolfo Carrion, Jr. in the Bronx, Helen M. Marshall in Queens, and James P. Molinaro in Staten Island) raised far more on the average ($870,000) than did their challengers ($42,000).* Markowitz, who raised $590,000 to be elected in 2001, raised almost $1.7 million for his re-election. Similarly, Carrion raised $520,000 for his 2001 race; for his re-election, he raised over $1 million. Interestingly, both Marshall and Molinaro raised less for their 2005 re-election than they had in 2001. Still, none faced a primary, and all four were re-elected handily, with margins ranging from 59 percent (Molinaro) to 81 percent (Markowitz).

---

* Three challengers raised no money at all; when they are included in the calculation, the average amount raised by challengers in the borough president races drops to just under $21,000.

---

## INCUMBENCY CONTINUES TO RULE—CITY COUNCIL

At the City Council level in 2005, with 44 incumbents running for re-election in 51 districts, the up-hill battle for challengers proved virtually insurmountable. Of the $9.8 million in total contributions raised by the 126 participating Council candidates in 2005, over half—$5.5 million— was raised by the 38 incumbents who joined the Program. In other words, the incumbents, who comprise 30 percent of the Program's participants, raised well over half (56 percent) of the total contributions raised by participants at the Council level.

When *all* City Council candidates in 2005 are considered (participants and non-participants), the gap widens: 61 percent of total contributions went to incumbents ($7.1 million out of $11.7 total). When the numbers are analyzed by district, the disparity widens further: of the 21 incumbents with head-to-head campaigns (in either the primary or general election), 19 raised more than three times as much as their challengers. Of the seven incumbents with multiple challengers, five raised 50 percent or more of the total funds raised by all the candidates in their races. Another 16 incumbents were unopposed entirely. These figures suggest the political prowess of incumbents and their capacity to raise disproportionate amounts of funds compared to their challengers, which could even serve to discourage possible opponents from running at all.

In summarizing the fundraising of the 35 members of City Council elected to their first term in 2001, Table 4.2 illustrates the natural fundraising advantages often enjoyed by incumbents. All but one were re-elected in 2005. Of the 35 members of the "Class of 2001," 26 raised more money for their 2005 race.[*] Some raised considerably more; nine more than doubled their fundraising between the 2001 and 2005 election cycles. (See Table 4.2.)

With term limits in effect, the imbalance between incumbents and challengers is not a chronic problem; as these members are blocked from running for re-election again in 2009, we should expect another season of wide-open races in a majority of Council districts. But in the 2005 election campaign, the playing field was clearly tilted in favor of incumbents.

The average incumbent Council member raised $161,000 for his or her 2005 re-election campaign. Candidates for open seats were unable to compete with those totals—but then, they did not have to compete against incumbents. Fifty-three candidates ran in seven open seat races (districts 2, 4, 5, 8, 9, 13, and 41) in 2005. While not nearly as prolific as incumbents, the average candidate running for an open seat was still able to raise over $61,000. The average challenger taking on an incumbent, on the other hand, raised less than $31,000. (See Figure 4.1.) This may be the most clear-cut example of the effect incumbency has on the fundraising of insurgents. A breakdown by district of the total amount of contributions given to participants running for City Council places these seven open-seat districts competitively near the top 15 list of most monies raised per district out of 51. (See Table 4.3.)

---

[*] Among the nine who raised less in 2005, eight lacked opponents in the primary, general, or both elections.

*Chapter 4*

| TABLE 4.2 | "THE CLASS OF 2001" — CONTRIBUTIONS TO COUNCIL MEMBERS ELECTED TO FIRST TERM IN 2001, RE-ELECTED IN 2005" | | | |
|---|---|---|---|---|
| **District** | **Incumbent** | **2001** | **2005** | **% Change** |
| 33 | David Yassky | $ 86,429 | $ 567,483 | 556.6% |
| 29 | Melinda R. Katz[†] | $ 156,378 | $ 723,320 | 362.5% |
| 26 | Eric N. Gioia | $ 122,677 | $ 554,936 | 352.4% |
| 23 | David I. Weprin | $ 124,139 | $ 507,316 | 308.7% |
| 44 | Simcha Felder[†] | $ 88,010 | $ 287,862 | 227.1% |
| 31 | James J. Sanders, Jr.[†] | $ 49,685 | $ 162,462 | 227.0% |
| 27 | Leroy G. Comrie[†] | $ 87,570 | $ 211,624 | 141.7% |
| 47 | Domenic M. Recchia | $ 60,864 | $ 140,530 | 130.9% |
| 21 | Hiram Monserrate | $ 88,606 | $ 185,352 | 109.2% |
| 25 | Helen Sears | $ 72,300 | $ 139,885 | 93.5% |
| 24 | James F. Gennaro | $ 115,341 | $ 214,792 | 86.2% |
| 10 | Miguel Martinez[†] | $ 104,605 | $ 183,817 | 75.7% |
| 28 | Allan W. Jennings, Jr.[*†] | $ 19,113 | $ 32,610 | 70.6% |
| 30 | Dennis P. Gallagher | $ 77,588 | $ 122,806 | 58.3% |
| 45 | Kendall B. Stewart | $ 56,075 | $ 87,818 | 56.6% |
| 14 | Maria Baez | $ 58,346 | $ 90,110 | 54.4% |
| 42 | Charles Barron | $ 47,285 | $ 65,854 | 39.3% |
| 11 | G. Oliver Koppell | $ 74,275 | $ 102,186 | 37.6% |

[*] *Allan W. Jennings, Jr. (district 28) was the only incumbent to lose his 2005 campaign for re-election.*
[†] *Non-participant in 2005.*

*Contributions—The Incumbency Effect*

| TABLE 4.2 | "THE CLASS OF 2001" — CONTRIBUTIONS TO COUNCIL MEMBERS ELECTED TO FIRST TERM IN 2001, RE-ELECTED IN 2005  (continued) | | | |
|---|---|---|---|---|
| **District** | **Incumbent** | **2001** | **2005** | **% Change** |
| 22 | Peter F. Vallone, Jr. | $ 135,385 | $ 186,110 | 37.5% |
| 34 | Diana Reyna | $ 70,895 | $ 96,227 | 35.7% |
| 51 | Andrew J. Lanza | $ 43,185 | $ 58,315 | 35.0% |
| 40 | Yvette D. Clarke | $ 68,933 | $ 89,166 | 29.4% |
| 39 | Bill de Blasio | $ 173,453 | $ 205,458 | 18.5% |
| 7 | Robert Jackson | $ 73,149 | $ 83,065 | 13.6% |
| 20 | John C. Liu | $ 210,650 | $ 230,384 | 9.4% |
| 12 | Larry B. Seabrook | $ 40,381 | $ 42,717 | 5.8% |
| 19 | Tony Avella | $ 139,000 | $ 133,307 | -4.1% |
| 16 | Helen Diane Foster | $ 97,618 | $ 92,902 | -4.8% |
| 6 | Gale A. Brewer | $ 139,952 | $ 111,118 | -20.6% |
| 1 | Alan J. Gerson | $ 174,192 | $ 137,651 | -21.0% |
| 49 | Michael E. McMahon | $ 179,450 | $ 138,823 | -22.6% |
| 37 | Erik Martin Dilan | $ 50,629 | $ 37,165 | -26.6% |
| 46 | Lewis A. Fidler | $ 76,106 | $ 43,013 | -43.5% |
| 32 | Joseph P. Addabbo | $ 119,156 | $ 47,430 | -60.2% |
| 36 | Albert Vann | $ 80,151 | $ 23,280 | -71.0% |
| **Totals** | | **$3,361,571** | **$6,136,894** | **82.6%** |

*Chapter 4*

**FIGURE 4.1:** Average Total Funds Raised by Incumbents vs. Challengers vs. Open Seat Candidates—2005 (City Council Only)



## CONTRIBUTION SIZE

The total amount of contributions declined from 2001, but the size of the average contribution increased, although not significantly beyond inflation. (See Figure 4.2.) The average contribution amount for Program participants across all offices in 2005 was $440 per contributor, compared to $386 in 2001 and $409 in 1997. Proportionately, contributions received from New York City residents reflected this pattern. In 2005, the average contribution size from a New York City resident was $255 for all offices, compared to $228 in 2001 and $189 in 1997.

Small donors, however, still comprise a majority among political givers. The median contribution size across all offices remained steady at $100 in 2005 and, among mayoral candidates, it remained steady at $250. Contributions of $250, the cut-off for availability of public funds, continue to be extremely common among contributors to candidates for citywide office. In both 2003 and 2005, the median contribution size at the Council level was $100, compared with $75 in 2001 and $60 in 1997. (See Figure 4.2.)

*Contributions — The Incumbency Effect*

| TABLE 4.3 | | CITY COUNCIL RACES WITH MOST MONEY RAISED (TOP 15) — 2005 | | | | |
|---|---|---|---|---|---|---|
| Rank | District | Total $ Amount Raised | Amount Raised by Incumbent | % of Total Amount Raised by All Candidates | Incumbent | Total Number of Candidates (PE and GE) |
| 1 | 29 | $742,056 | $723,320 | 97% | Melinda R. Katz | 2 |
| 2 | 4 | $631,678 | — | — | no | 5 |
| 3 | 33 | $567,483 | $567,483 | 100% | David Yassky* | 2 |
| 4 | 26 | $565,335 | $554,936 | 98% | Eric N. Gioia* | 3 |
| 5 | 13 | $527,672 | — | — | no | 6 |
| 6 | 23 | $507,316 | $507,316 | 100% | David I. Weprin* | 1 |
| 7 | 2 | $503,104 | — | — | no | 9 |
| 8 | 5 | $487,879 | — | — | no | 5 |
| 9 | 9 | $420,793 | — | — | no | 10 |
| 10 | 41 | $338,973 | — | — | no | 12 |
| 11 | 8 | $335,590 | — | — | no | 6 |
| 12 | 28 | $328,319 | $ 32,610 | 10% | Allan W. Jennings, Jr.† | 7 |
| 13 | 24 | $302,699 | $214,792 | 71% | James F. Gennaro | 4 |
| 14 | 44 | $287,862 | $287,862 | 100% | Simcha Felder* | 1 |
| 15 | 3 | $274,528 | $274,528 | 100% | Christine C. Quinn* | 1 |

☐ *open seat districts*

* *There was no Primary Election for this district.*
† *Only incumbent to lose 2005 race.*

*Chapter 4*

Conversely, at the mayoral level the average contribution size decreased to $728 in 2005 from $871 in 2001 and $788 in 1997. (See Figure 4.2.) The decrease is consistent with other races in which challengers had difficulty raising funds to run against incumbents. This decrease in 2005 may be attributable to lack of interest in the race, as was discussed previously, rather than any discernible trend in fundraising for this office. (See also Chapter 2 and *The Impact of High-Spending Non-Participants on the Campaign Finance Program*, which will be available at www.nyccfb.info.)

**FIGURE 4.2:** Average, Median, Mode Contribution Sizes—1997–2005



\* *The 2003 elections were only for City Council.*

Public Dollars for the Public Good

*Contributions—The Incumbency Effect*

## CONTRIBUTIONS GROWING LARGER?

Increases in the average contribution size can be partly explained by the presence of so many incumbents on the ballot in 2005. Certainly on the Council level, incumbents relied much more heavily on large contributions than challengers, while challengers are much more dependent on contributions up to the matchable limit of $250. (See Figure 4.3.)

## TIMING IS CRUCIAL

The timing of contributions, as well as their amount, is critical to campaigns. Contributions received early on, especially prior to the election year, can give campaigns flexibility and help propel a candidate past his or her opponents. Raising significant funds early allows candidates to focus on campaigning rather than fundraising closer to the election. Early money can discourage opponents, and gets a message out to voters before an opposing campaign has the ability to respond. Fundraising can also spur media coverage for campaigns that disclose significant activity early in the cycle. As one would expect, incumbents tend to have the advantage when it comes to raising funds early.

**FIGURE 4.3:** Percentage of Funds Raised by Contribution Amount at the City Council Level—2005 (All Candidates)



\* *Excludes donations from candidates to their own campaigns.*

$1 – $250          $251 – $2,000          $2,001 – $2,750

*Chapter 4*

**FIGURE 4.4:** Percent of Total Contributions Received by Statement Date—2005
Incumbents vs. Their Challengers (City Council Participants Only)



Public Dollars for the Public Good

As of January 11, 2005, the 38 participating City Council incumbents had already raised 42% of their money. By that same date, their challengers had only raised about 8 percent. By July 11, 2005, these incumbents had raised 82 percent of their total contributions, on average, while their challengers had raised an average of only 52 percent. (See Figure 4.4.)

These figures support the conclusion that incumbents have a considerable advantage when it comes to fundraising—not only in the amount of money they are able to raise, but also in how early they are able to raise it and, thus, have it available to spend. (See Chapter 10—Board Recommendations.)

## SOURCES OF CONTRIBUTIONS

A central goal of the Program—and a continuing effect—is to encourage the participation of individual residents through contributions. The source of contributions has always been a topic of interest, especially after the 1997 election cycle, when a ban on corporate contributions was passed. Other organizations, however, including political action committees (PACs), limited liability companies (LLCs), limited liability partnerships (LLPs), and unions are still permitted to contribute. Individual contributions are, by a large margin, the main source of campaign funds, ranging from 77 percent of total contributions for Council candidates to almost 92 percent of total contributions for candidates running for public advocate. For the 2005 election cycle, the percentage of contributions that came from individuals (in terms of total dollars) decreased slightly to 84 percent across all offices, compared to not quite 87 percent in 2001. Compared to 2001, direct union contributions also decreased slightly, from 1.5 percent in 2001 to 1.3 percent in 2005.* (See Figure 4.5.) At the Council level, individual contributions as a percentage of total contributions decreased from 83 percent in 2001 to 77 percent in 2005.

This decreased reliance on individual contributions—as well as the increased average contribution size—runs contrary to Program goals. The increase in "independent" spending by unions on behalf of specific candidates may also serve to dilute the influence of the small, individual donor in city elections. (See also Chapter 5—Expenditures).

Moreover, although organizational contributions comprised less than 25 percent of total funds available to Council candidates (and less than 10 percent of total funds for all offices) in 2005, a different story emerges as far as net contributions are concerned. The top 10 contributors to participants in the 2005 election cycle were all organizations, both across all offices and specifically at the Council level. (See Tables 4.4 and 4.5.)

---

* However, this figure does not include contributions from union-controlled PACs, which are relatively much more significant, and therefore does not accurately reflect the role unions play in city elections.

*Chapter 4*

**FIGURE 4.5:** Contributions by Type of Contributor as a % of Total Contributions and in Dollars—
1997, 2001, 2005 (Participants Only)

**As a Percentage of Total Contributions***



**Dollar Amount**



partnerships/LLC

political committees

employee organizations

corporations†

individuals

\* *May not add up to 100% because of rounding and "unknown contributions" for 1997 and 2001.*
† *After the 1997 elections, corporate corporations were banned.*

*Contributions — The Incumbency Effect*

| TABLE 4.5 | TOP 10 CONTRIBUTORS TO ALL PARTICIPATING CANDIDATES — 2005 | |
|---|---|---|
| **Rank** | **Contributor Name** | **Net Contributions** |
| 1 | 1199 SEIU | $143,150 |
| 2 | Local 6/New York Hotel Trades Council | $132,100 |
| 3 | NYC District Council of Carpenters | $101,800 |
| 4 | NYS Laborers PAC | $ 91,525 |
| 5 | Plumbers Local Union #1 | $ 83,500 |
| 6 | New Yorkers for Katz/Katz 2003 | $ 79,685 |
| 7 | Leonard Litwin | $ 72,075 |
| 8 | Uniformed Firefighters Association Political Action Committee | $ 70,150 |
| 9 | Muss Development Co./Muss Family | $ 68,433 |
| 10 | Local 32BJ SEIU NY/NJ American Dream Fund | $ 66,175 |

| TABLE 4.5 | TOP 10 CONTRIBUTORS TO CITY COUNCIL CANDIDATES ONLY — 2005 | |
|---|---|---|
| **Rank** | **Contributor Name** | **Net Contributions** |
| 1 | 1199 SEIU | $101,000 |
| 2 | Local 6/New York Hotel Trades Council | $ 83,100 |
| 3 | NYC District Council of Carpenters | $ 81,200 |
| 4 | NYS Laborers PAC | $ 73,625 |
| 5 | Plumbers Local Union #1 | $ 64,250 |
| 6 | New Yorkers for Katz/Katz 2003 | $ 61,000 |
| 7 | Taxpayers for an Affordable New York | $ 52,400 |
| 8 | Local 32BJ SEIU NY/NJ American Dream Fund | $ 46,425 |
| 9 | Uniformed Firefighters Association Political Action Committee | $ 40,780 |
| 10 | New Yorkers for David Weprin | $ 35,750 |

*Chapter 4*

## CONTRIBUTION GEOGRAPHY

One of the most important aims of the Campaign Finance Program is to increase the participation and influence of New York City residents in the political process. As Manhattan residents comprise a disproportionate percentage of total contributions in every election year, another aim is to increase participation from the other boroughs.

Looking at contributions to major candidates for citywide office, the data still show that Manhattan residents contribute the overwhelming majority of political dollars raised in New York City.[*] While the proportion has dropped somewhat from 2001, more than $3 of every $5 raised locally for citywide races comes from Manhattan. (See Table 4.6.) But Manhattan's influence is felt disproportionately in Council races as well; with less than 20 percent of the seats on the City Council, Manhattan contributes almost 40 percent of the money raised by Council candidates.

Even within Manhattan, the Upper East and Upper West Sides are dominant. The well-off neighborhoods along either side of Central Park have long attracted solicitations from candidates for local, state, and national office, and they dominate the list of the most generous city zip codes to candidates for citywide office as well. (See Table 4.7.) Analysis of fundraising by the four participating candidates in the Democratic primary for Mayor in 2005 shows the Upper East and Upper West Sides were a main focus of their efforts, with several zip codes making repeat appearances in candidates' Top 5. (See Table 4.8.)

| TABLE 4.6 | CONTRIBUTIONS BY BOROUGH TO CITYWIDE CANDIDATES[*] — 2001 & 2005 (PARTICIPANTS ONLY) | | | |
|---|---|---|---|---|
| **Borough** | **2001** | | **2005** | |
| Manhattan | $16,383,994 | 68.7% | $ 8,432,645 | 63.5% |
| Brooklyn | $ 2,871,428 | 12.0% | $ 2,434,424 | 18.3% |
| Queens | $ 2,955,937 | 12.4% | $ 1,564,460 | 11.8% |
| Bronx | $ 1,003,012 | 4.2% | $ 550,320 | 4.2% |
| Staten Island | $ 645,648 | 2.7% | $ 293,558 | 2.2% |
| **Total** | **$19,888,320** | **100%** | **$11,105,451** | **100%** |

[*] *Contributions from individuals only to candidates who raised at least $250,000; excludes contributions that were reported without borough or zip code information.*

---

[*] This analysis focuses only on citywide offices to diminish the impact that incumbency or other factors may have on patterns of giving across neighborhoods and/or boroughs. For example, overall fundraising for 2005 Council candidates may have been particularly high in Manhattan because there were several competitive races for open seats, but lower than usual in Queens because there were no open seat races. The geographic conditions in citywide races do not change year to year.

*Contributions—The Incumbency Effect*

| TABLE 4.7 | CONTRIBUTIONS TO CITYWIDE CANDIDATES FROM TOP 10 NEW YORK CITY ZIP CODES* — 2001 & 2005 (PARTICIPANTS ONLY) | | | |
|---|---|---|---|---|
| **2001 ELECTIONS** | | | | |
| | **Zip** | **Borough** | **Neighborhood** | **Total** |
| 1 | 10021 | Manhattan | Upper East Side | $3,661,013 |
| 2 | 10028 | Manhattan | Upper East Side | $1,291,738 |
| 3 | 10023 | Manhattan | Upper West Side | $1,110,697 |
| 4 | 10024 | Manhattan | Upper West Side | $1,090,871 |
| 5 | 10128 | Manhattan | Upper East Side | $ 998,924 |
| 6 | 10022 | Manhattan | Sutton Place/Midtown East | $ 965,751 |
| 7 | 10025 | Manhattan | Upper West Side | $ 582,233 |
| 8 | 10003 | Manhattan | Greenwich Village | $ 439,787 |
| 9 | 10019 | Manhattan | Midtown West/Hell's Kitchen | $ 381,782 |
| 10 | 10011 | Manhattan | Midtown | $ 377,363 |
| **2005 ELECTIONS** | | | | |
| | **Zip** | **Borough** | **Neighborhood** | **Total** |
| 1 | 10021 | Manhattan | Upper East Side | $1,767,570 |
| 2 | 10128 | Manhattan | Upper East Side | $ 560,845 |
| 3 | 10024 | Manhattan | Upper West Side | $ 539,256 |
| 4 | 10023 | Manhattan | Upper West Side | $ 517,372 |
| 5 | 10028 | Manhattan | Upper East Side | $ 494,575 |
| 6 | 10022 | Manhattan | Sutton Place/Midtown East | $ 447,995 |
| 7 | 11223 | Brooklyn | Gravesend | $ 375,525 |
| 8 | 11230 | Brooklyn | Ocean Parkway/Midwood | $ 281,951 |
| 9 | 10025 | Manhattan | Upper West Side | $ 255,494 |
| 10 | 10011 | Manhattan | Midtown | $ 228,818 |

\* *Contributions from individuals only to candidates who raised at least $250,000; excludes contributions that were reported without zip code information.*

*Chapter 4*

| | | Zip | Borough | Neighborhood | Total |
|---|---|---|---|---|---|
| **TABLE 4.8** | | | | **CONTRIBUTIONS TO MAYORAL CANDIDATES FROM TOP 5 ZIP CODES\* — 2005 (PARTICIPANTS ONLY)** | |
| Ferrer | 1 | 10021 | Manhattan | Upper East Side | $285,541 |
| | 2 | 10024 | Manhattan | Upper West Side | $109,508 |
| | 3 | 10023 | Manhattan | Upper West Side | $ 76,036 |
| | 4 | 10028 | Manhattan | Upper East Side | $ 68,030 |
| | 5 | 10463 | Bronx | Riverdale | $ 65,670 |
| Fields | 1 | 10021 | Manhattan | Upper East Side | $121,101 |
| | 2 | 10128 | Manhattan | Upper East Side | $ 55,015 |
| | 3 | 10025 | Manhattan | Upper West Side | $ 49,930 |
| | 4 | 10024 | Manhattan | Upper West Side | $ 43,955 |
| | 5 | 10023 | Manhattan | Upper West Side | $ 43,100 |
| Miller | 1 | 10021 | Manhattan | Upper East Side | $597,006 |
| | 2 | 10128 | Manhattan | Upper East Side | $197,668 |
| | 3 | 10028 | Manhattan | Upper East Side | $172,919 |
| | 4 | 10024 | Manhattan | Upper West Side | $159,170 |
| | 5 | 10023 | Manhattan | Upper West Side | $158,991 |
| Weiner | 1 | 11223 | Brooklyn | Gravesend | $212,219 |
| | 2 | 11234 | Brooklyn | Marine Park/Mill Basin | $128,432 |
| | 3 | 11230 | Brooklyn | Ocean Parkway/Midwood | $127,583 |
| | 4 | 10021 | Manhattan | Upper East Side | $ 88,060 |
| | 5 | 11235 | Brooklyn | Sheepshead Bay/Manhattan Beach | $ 82,811 |

\* *Contributions from individuals only to candidates who raised at least $250,000; excludes contributions that were reported without zip code information.*

*Contributions—The Incumbency Effect*

When candidates are done raising money in Manhattan, many next turn their focus beyond the five boroughs altogether; in 2005 candidates raised 31 percent of all funds outside New York City (a proportion near its 2001 level).

## INTERMEDIARIES

In the 2005 election cycle, 346 reported intermediaries* delivered contributions to 38 campaigns totaling about $2.2 million, or 5.5 percent of the total contributions for the election cycle. This is a steep drop from 2001, when intermediated contributions comprised 17 percent of total contribu-

| TABLE 4.9 | | 2005 TOP 10 INTERMEDIARIES* | | | | |
|---|---|---|---|---|---|---|
| Rank | Intermediary Name | Employer | Number of Transactions | Amount Intermediated | Average Intermediated Contribution | Recipient(s) |
| 1 | Leo Hindery | HL Capital, Inc. | 90 | $230,050 | $2,556 | Ferrer |
| 2 | Suri Kasirer | Kasirer Consulting | 95 | $ 83,750 | $ 882 | de Blasio; A. G. Miller; Stringer |
| 3 | William Wachtel | Wachtel & Masyr | 36 | $ 81,350 | $2,260 | Ferrer; Quinn |
| 4 | Patricia Belair | St. Barnabas Hospital | 153 | $ 73,575 | $ 481 | Ferrer |
| 5 | Lillian Carino | 1199 SEIU | 312 | $ 58,277 | $ 187 | Ferrer |
| 6 | Judith Rubin | Self-Employed | 49 | $ 54,600 | $1,114 | A. G. Miller; Moskowitz |
| 7 | José Velazquez | Tri-Line Contracting | 25 | $ 50,550 | $2,022 | Carrion; Ferrer |
| 8 | Keith Miller | FASS | 61 | $ 47,825 | $ 784 | López |
| 9 | Bill White | Interpid Museum Foundation | 13 | $ 46,450 | $3,573 | Gotbaum; Katz; A. G. Miller |
| 10 | Marc Schur | Orbit Industries, LLC | 10 | $ 44,800 | $4,480 | Ferrer |
| *Data on intermediaries are often both under-and over-reported by campaigns.* | | | | | | |

* An intermediary, or "bundler," is a person who solicits, collects, and delivers contributions to a campaign.

*Chapter 4*

tions (about $9.4 million). In 1997, 13 percent of total contributions were intermediated, or about $3.7 million. This decrease could be a reflection of an overall theme of this election—with so many incumbents and so few truly competitive races, even intermediated contributions decreased in 2005. The top 10 intermediaries for the 2005 elections are shown in Table 4.9. The top recipients of intermediated contributions for the 2005 elections are shown in Table 4.10.

The CFB's *Interim Report on "Doing Business" Contributions*, released in June 2006, estimated that 23 percent of all intermediaries for candidates in the 2005 election were either lobbyists or city contractors, representing 35 percent of all intermediated contributions ($2.3 million). This was a decrease from 2001, when 29 percent of intermediaries were "doing business," representing 39 percent of all intermediated contributions ($3.7 million).

It is interesting to note, however, that the role of lobbyists as intermediaries grew considerably between 2001 and 2005. While lobbyists accounted for 28 percent of intermediaries reported by campaigns in 2001 (and 24 percent of intermediated contributions), in 2005 lobbyists represented half of all intermediaries (and 70 percent of intermediated contributions).

| TABLE 4.10 | | TOP 10 RECIPIENTS OF INTERMEDIATED CONTRIBUTIONS | | | | |
|---|---|---|---|---|---|---|
| Rank | Candidate Name | Office | Number Of Transactions Intermediated | Amount Intermediated | Average Intermediated Contribution | Average Non-Intermediated Contribution |
| 1 | Ferrer | Mayor | 1295 | $935,030 | $722 | $ 642 |
| 2 | Miller | Mayor | 480 | $339,432 | $707 | $ 699 |
| 3 | Weiner | Mayor | 299 | $164,116 | $549 | $ 622 |
| 4 | Stringer | Borough President | 181 | $149,726 | $827 | $ 397 |
| 5 | López | Borough President | 615 | $115,517 | $188 | $ 290 |
| 6 | Murphy | City Council | 222 | $ 76,355 | $3441 | $ 323 |
| 7 | Carrion | Borough President | 79 | $ 69,180 | $876 | $ 708 |
| 8 | Thompson | Comptroller | 134 | $ 56,290 | $420 | $1,119 |
| 9 | Katz | City Council | 72 | $ 52,550 | $730 | $ 725 |
| 10 | Moskowitz | Borough President | 45 | $ 41,300 | $918 | $ 614 |

*Contributions—The Incumbency Effect*

## USE OF THE INTERNET—A CONSIDERATION FOR THE FUTURE

At least 88 candidates published websites for the 2005 elections. These sites allowed candidates to spread their messages, and many campaigns solicited contributions through the sites. Website contributions were matchable in this past election if certain verifications were made according to Program rules. As the technology improves, issues regarding the acceptance and matchability of online contributions will certainly be revisited for the 2009 elections, to make it even easier for campaigns to solicit and receive contributions electronically.

## REFERENCES

1    Jim Rutenberg, "Rich and Influential Democrats are Lining Up With the Mayor," *New York Times*, July 26, 2005, A1.

2    Quinnipiac University press release, March 30, 2005, "Fields is Up, Ferrer Down Among Dems in Diallo Flap, Quinnipiac University Poll Finds: Miller, Weiner Trail in Dem Primary Race."

Public Dollars for the Public Good

chapter 5

# Expenditures—
# Where Does the Money Go?

- Incumbents significantly outspent non-incumbents
- Spending on consultants up; spending on fundraising down
- Exempt and independent expenditures both at issue in 2005 campaigns

The attention focused on the $84.6 million spent by Michael Bloomberg on his self-financed 2005 re-election campaign overshadowed other candidates' activities. In fact, Bloomberg's expenditures were more than the combined spending of the remaining 192 candidates who appeared on the ballot for the five offices covered by the Program and who filed disclosure statements with the Board.* Most of the $63 million-plus expended by the remaining candidates was spent by the 155 Program participants. Program participants spent just under $61 million during the 2005 elections; only about $2.3 million was spent by non-participants (excluding Bloomberg).

In non-inflation adjusted numbers, the $61 million spent by participants for the 2005 elections is only about 64 percent of the $94.6 million spent by participants during the 2001 election cycle. But in 2005, there were about half as many participants as in 2001; thus, per-candidate spending actually increased.† The 2005 figure also represents an increase of 65 percent over the $37 million spent by the 141 participants during the 1997 election cycle. These conclusions hold even when the numbers are adjusted for inflation.

---

\* These data are based on disclosure statements filed by all participating and non-participating candidates in the Program. Non-participants filed disclosure statements with the CFB for the first time in 2005. (See Chapter 1 — Setting the Stage.) Some candidates who appeared on the ballot and were required to file with the CFB failed to do so.

† The 2001 spending total also includes spending for the Democratic mayoral and public advocate runoffs, each of which comes with a special public funds grant and its own expenditure limit.

*Chapter 5*

Program participants spent $24.6 million in the mayor's race. In raw numbers, total spending by participants for mayor and City Council declined from 2001 levels. Spending by mayoral participants in 2001 was about $38.5 million, or 36 percent higher than 2005 levels, notwithstanding similarities between the groups of candidates in each election. Both elections saw four established political figures vying for the Democratic Party nomination in the primary, all of whom held or had held public office. With Mayor Rudolph Giuliani term limited, however, the four 2001 participants* were able to raise significantly more in contributions in seeking the Democratic nomination in a wide-open race for the mayor's office. These contributions generated more in matching claims for public funds, and more in actual public funds from the taxpayers. In contrast, the 2005 mayoral participants competed in the Democratic primary to face a popular incumbent mayor, making it difficult to raise funds from historically active Democratic donors (see Chapter 4—Contributions). Thus, the 2001 mayoral participants simply had more money available to spend than the 2005 participants did.

Looking at other offices, $5 million was spent by participating public advocate candidates, $13.3 million was spent by participating candidates for borough president, and $15.5 million was spent by City Council candidates in the Program.† In 2005, participants running for City Council spent about 41 percent less than the $26 million spent by their 2001 counterparts. But because of the much larger number of candidates running in 2001, this actually reflects an *increase* in per-candidate spending. Some of the decrease in total spending can be understood in light of the large number of incumbents seeking re-election; the presence of an incumbent generally leads to a smaller number of candidates (both participants and non-participants). Knowing that term limits will force an incumbent to vacate a seat gives potential challengers a reason to wait until the seat is open. But, the effect of incumbency on overall campaign spending is mixed. Some incumbents have a lot of money available to spend and spend much of it in marginally competitive races. Other incumbents spend little, regardless of who their opponent is or whether they have one at all. (See Figure 5.1.)

While spending limits, the availability of public funds, and many other aspects of the Program and New York City politics have changed since the start of the Program, overall spending at the City Council level adjusted for inflation has remained essentially flat. In 1989, the first elections under the Program, approximately 33 Council participants spent under $3 million dollars.‡ The increase in the number of active City Council participants between the 1989 and 2005 elections is approximately 282 percent, while the inflation-adjusted increase in overall spending between the two election cycles is approximately 255 percent.

---

* Then-Bronx Borough President Fernando Ferrer, then-Public Advocate Mark Green, then-City Comptroller Alan Hevesi, and then-City Council Speaker Peter Vallone.

† The only participating candidate for comptroller, William C. Thompson, Jr., spent $2.4 million.

‡ Data for 1989 spending and number of active participants are less precise than data for more recent election cycles.

Public Dollars for the Public Good

*Expenditures — Where Does the Money Go?*

**FIGURE 5.1:** Spending by Council Incumbents, Challengers, and Open Seat Candidates—2005 (Participants Only)



$5,999,626    $6,164,640

$3,351,781

incumbent    challengers    open seat candidates

## SPENDING PURPOSES*

Candidates must identify the purpose of each expenditure in their disclosure statements.† Spending on television advertising totaled about $14.5 million—over $4 million more than the next largest category of spending. Television advertising constituted 23.5 percent of the total expenditures by participants. Eighty percent of television advertising dollars were spent by mayoral participants, who need to reach a citywide audience of voters. Television costs in the New York City market are among the most expensive in the nation, and television advertising has consistently been the highest category of spending in citywide elections since the Program's inception in 1989. Although spending on television is dominated by candidates in citywide races, this year's participating borough president participants, mostly from Manhattan, spent almost as much ($1.2 million) on television advertising as participants in the public advocate's race ($1.4 million).

---

* This analysis of spending purposes only includes participants unless otherwise noted because of the lack of reliable data for non-participants for previous election cycles. This analysis does not consider expenditure refunds.

† A given expenditure could be categorized in multiple ways, but the campaigns must choose one category per transaction. This can lead to some reporting inconsistencies. Where one campaign might report a mailing as one transaction in the category of "campaign mailing" to a single vendor, another might break the mailing into its component parts and report a "consultant" expenditure for the design firm that prepared the piece, a "campaign mailing" expenditure for the printing, and a "postage" expenditure for the purchase of postage.

*Chapter 5*

Overall media spending (including television advertising, radio advertising, newspaper advertising, and campaign mailings and literature) constituted 46.8 percent of total spending by participants. This represents a decline in the percentage of total spending from 2001, when media spending constituted 52.3 percent of total spending. Overall media spending by participants in real dollars declined as well in 2005, totaling $28.8 million, compared to $50 million in 2001.

Spending on consulting and professional services[*] by participants rose to 22.7 percent of total spending in 2005, part of a marked trend across election cycles. In 2001, 18.2 percent of total spending fell in these combined categories, and in 1997, it was only 13.9 percent. Although some of these "professional" or "consulting" services are not performed by individuals who make this their ordinary business, the number of large vendors who were paid hundreds of thousands of dollars by Program participants gives credence to the theory that New York City campaigns are supporting the growth of an industry. (See Table 5.1.)

A different pattern appears to be developing in the area of fundraising costs. As a percentage of participants' spending, fundraising declined from 10.8 percent in 1997, to 3.3 percent in 2001, and to 4.3 percent in 2005. From anecdotal evidence, it appears that campaigns are relying more on house parties and small gatherings instead of staging more large elaborate events to raise funds. Possibly, technology is cutting the costs associated with fundraising; for example, more candidates may be using electronic mail and the Internet in place of traditional mail, which costs more. In addition to saving campaigns money, smaller gatherings tend to foster the Program's goal of increasing participation in the process by individual New York City residents. Without question, many campaigns solicit contributions on their websites, which serve multiple purposes, and most of the campaigns that solicit contributions on their websites also have the capacity to accept donations online.[†] Internet contributions did not exist in 1997, and only a handful of participants accepted online contributions in 2001.

Compared with 1997, participant spending on fundraising for 2005 decreased for borough president, City Council, and most notably for mayor; fundraising expenditures by participating mayoral candidates dropped from 8.9 percent in 1997 to 2.7 percent in 2001, and 3.0 percent in 2005. All three of these election cycles saw similar numbers of major participating mayoral candidates (defined as candidates who raised and spent at least $250,000): four in 1997, five in 2001, and four in 2005.

---

[*] There is often overlap in the use of these two separate codes by campaigns; sometimes a campaign uses these codes interchangeably to describe the same services provided by the same vendor at different times.

[†] Since websites serve multiple purposes, spending associated with a campaign's internet presence may not necessarily be reported as a fundraising expense.

Public Dollars for the Public Good

*Expenditures—Where Does the Money Go?*

The marked decline in fundraising expenditures at the mayoral level could indicate that campaigns are seeking to lower fundraising expenses to maximize their spending on visible campaign activity like television advertising while trying to abide by the expenditure limit. Mayoral expenditures for rent and office expenses also have decreased markedly since 1997: $1.9 million in 1997, $1.3 million in 2001, and $1.2 million in 2005, despite rising overhead costs for businesses in New York City over the same period. It is also possible, however, that fundraising costs have simply been absorbed into the categories "professional services" and "consulting," as discussed above.

| TABLE 5.1 | TOP 10 VENDORS — 2005 (PARTICIPANTS ONLY) | |
|---|---|---|
| | Vendor | Total[†] |
| 1 | GMMB | $3,058,000 |
| 2 | Abar Hutton Media, LLC | $2,716,000 |
| 3 | LUC Media[*] | $2,302,000 |
| 4 | Mirram Group/Mirram Global/Global Strategies | $2,292,000 |
| 5 | Sheinkopf Communications[*] | $1,931,000 |
| 6 | Mission Control | $1,824,000 |
| 7 | Squier Knapp Dunn Communications/Knickerbocker SKD | $1,413,000 |
| 8 | United States Postal Service[*] | $1,353,000 |
| 9 | Ad Crafters, Inc. | $1,042,000 |
| 10 | The Advance Group | $ 891,000 |
| | | $18,822,000 |

[*] *appeared on 2001 Top 10 Vendors list*
[†] *Figures are rounded to the nearest thousand dollars. Figures are understated to the extent that they do not include subcontracted work performed by these vendors and they are overstated to the extent that these vendors have subcontracted work to other vendors.*

*Chapter 5*

## TOP 10 VENDORS

The top 10 vendors received about $18.8 million dollars from 2005 participants, representing about 30 percent of participants' total spending. The top 10 vendors in 2001 received about $36 million dollars, about 38 percent of the total spending by participants for that election. The top vendor on the 2001 list was, by far, the firm that served as Mark Green's media buyer for the primary, runoff, and general elections.[1] Similarly, six of the top 10 firms in 2005 produced and/or bought air time for television and radio ads for the four major Democratic mayoral candidates, confirming the role that television plays in dominating the cost of a citywide election in New York. (See Table 5.1.)

Squier Knapp Dunn Communications (SKD), a Washington-based firm with a New York division, number seven on the top 10 vendors list for participants, also served as a major vendor for the Bloomberg campaign. With Bloomberg's spending added, SKD is the single largest vendor for the entire 2005 election. In addition to the $1.4 million in expenditures made to it by participants, SKD received over $40 million dollars for its services to the Bloomberg campaign. (See Table 5.2.) As one

| TABLE 5.2 | TOP 10 VENDORS TO BLOOMBERG CAMPAIGN — 2005 | |
|---|---|---|
| | **Vendor** | **Total*** |
| 1 | Squier Knapp Dunn Communications | $40,508,000 |
| 2 | Penn, Schoen, and Berland Associates | $17,272,000 |
| 3 | The Baughman Company, Inc. | $ 4,904,000 |
| 4 | Campaign Research Association, LLC | $ 1,786,000 |
| 5 | Connections Media, LLC | $ 1,705,000 |
| 6 | Geller & Company, LLC | $ 1,460,000 |
| 7 | The Garth Group, Inc. | $ 1,000,000 |
| 8 | Dimension Data | $ 920,000 |
| 9 | TrizecHahn Ave. of the America | $ 741,000 |
| 10 | Kevin Sheekey | $ 679,000 |
| | | **$70,975,000** |

\* *Figures are rounded to the nearest thousand dollars. Figures are overstated to the extent that these vendors have subcontracted work to other vendors.*

measure of the sheer magnitude of Bloomberg's spending, his next two largest vendors after SKD were also paid more money than any vendor on the participants top 10 vendors list.

Nine of the top 10 vendors for participating City Council candidates in 2005 appear on the list of top 10 vendors to participating Council candidates in 2003.[2] Six of the nine also appeared on the overall 2001 top 10 list.[3] In the 2005 elections, these top ten vendors accounted for $3.8 million, or about 24 percent of total spending by Council participants, compared to $2.8 million (25 percent) in 2003 and $7.5 million (28 percent) in 2001. (See Table 5.3.) Approximately 17 vendors received more than $100,000 from participating Council candidates in 2005.

| TABLE 5.3 | TOP 10 VENDORS TO CITY COUNCIL CAMPAIGNS — 2005 (PARTICIPANTS ONLY) | |
|---|---|---|
| | Vendor | Total[‡] |
| 1 | The Parkside Group[*†] | $748,000 |
| 2 | Squier Knapp Dunn Communications/Knickerbocker SKD[†] | $469,000 |
| 3 | Mark Guma Communications[†] | $459,000 |
| 4 | Branford Communications[*†] | $428,000 |
| 5 | United States Postal Service[*†] | $412,000 |
| 6 | Genova, Burns & Vernoia/Laurence Laufer[*†] | $375,000 |
| 7 | Promotional Strategies[†] | $289,000 |
| 8 | The Advance Group[*†] | $218,000 |
| 9 | Mission Control | $216,000 |
| 10 | Astoria Graphics[*†] | $173,000 |
| | | $3,787,000 |

[*] *appeared on 2001 Top 10 Council Vendors list*
[†] *appeared on 2003 Top 10 Council Vendors list*
[‡] *Figures are rounded to the nearest thousand dollars. Figures are understated to the extent that they do not include subcontracted work performed by these vendors and they are overstated to the extent that these vendors have subcontracted work to other vendors.*

---

[*] For the purposes of this comparison, the firm Genova, Burns and Vernoia stands in the place of the 2003 entry for Laurence Laufer/Run, Inc. Mr. Laufer is now with the firm Genova, Burns, and Vernoia.

The overlap between entities providing both campaign consulting services and lobbying was partially at the root of the recent lobbying reform legislation.[4] In general, when the same person is "wearing two hats," it is difficult to distinguish where one function ends and the other begins (discussed in more detail below). The Parkside Group, the largest City Council vendor by far, also ranked third on the list of recipients of lobbying fees, according to the New York City Clerk's office, which publishes a report on lobbying activity every year.[5] The firm brought in about $772,000 from participating candidates, mostly from participating Council candidates, and $2.2 million in lobbying fees. Said Evan Stavisky of the Parkside Group, "Because of the more frequent changes of faces at City Hall, unions and non-profit groups and other clients feel they have to have continuity in their presence at City Hall."[6] None of the other top 10 lobbying firms on the City Clerk's list made it onto the top 10 vendors list for participating candidates in 2005, but the number one-ranked lobbying firm, Kasirer Consulting, was paid just under $450,000 by the re-election campaign of Comptroller William Thompson.* Two other large lobbying firms, Greenberg Traurig LLP and Constantinople Consulting, were paid minimal amounts by participating candidates.

## INCUMBENT/NON-INCUMBENT SPENDING IN CITY COUNCIL ELECTIONS

Just as incumbents raise more money (see Chapter 4), they also spend more than non-incumbents. In the 2005 elections, 38 participating incumbent Council candidates spent slightly less than $6.2 million dollars, while 88 non-incumbent Council participants spent slightly less than $9.4 million dollars. Thus, without considering primary challenges or opposition in the general election, participating incumbents on average spent $162,000, while participating non-incumbents on average spent $106,000, or only 65 percent of what the incumbents spent.† By comparison, in 2003, 45 participating incumbents spent about $6.7 million, or an average of $149,000, while 57 participating non-incumbents spent $4.6 million, or an average of about $81,000—54 percent of incumbents' spending.‡ The larger number of open seat races in 2005 compared to 2003 (seven versus two), in which there was significant spending by multiple non-incumbents, likely shifted the ratio of non-incumbent to incumbent spending.

---

\* About $428,000 of the just under $450,000 paid by the Thompson campaign was reported as consulting services. The explanations for these transactions suggest that Kasirer Consulting was paid regular monthly fees for fundraising services. (See discussion on spending purposes above.)

† This average includes 14 participants who spent less than $20,000. Three of the 14 reported no spending at all, and only two reported spending between $10,000 and $20,000. The lowest spending incumbent participant Council candidate reported spending just under $26,000. Without those 14 campaigns, the non-incumbents' average spending rises to just over $125,000, still only 77 percent of participant incumbents' average spending.

‡ When the 14 participating non-incumbent campaigns who spent less than $20,000 are excluded, the non-incumbent average rises to $103,000, or 69 percent of what participant incumbents spent.

---

Public Dollars for the Public Good

*Expenditures—Where Does the Money Go?*

Seventeen incumbents (13 participants and four non-participants) faced primary challenges. Those candidates spent about $2.3 million dollars during the primary period, an average of $137,000 per candidate.* The 25 opponents running against those 17 incumbents in the primary spent about $1.9 million, an average of about $76,000 per challenger.† Candidates for open seats spent more than candidates facing incumbents, but less than incumbents. The 52 candidates competing in primaries in districts with open seats spent over $4.5 million on their races,‡ an average of $86,000 per candidate.§

The most expensive primary race in 2005 was for the open seat in Council District 2, where seven Democrats spent amounts ranging from $24,000 to $192,000 for a total of $870,000.¶ Primaries in the seven districts with open seats constituted seven of the eight most expensive primaries. The final primary race to rank among the most expensive was in district 28, where controversial incumbent (and non-participant) Allan W. Jennings, Jr. was opposed by former Council member (and eventual 2005 winner) Thomas White, Jr. and three other participants. The least expensive primary race was in district 36, where incumbent Albert Vann accounted for all $26,000 in spending.

Seven incumbent candidates did not face primaries and had no opposition on the ballot in the general election. Nonetheless, these seven candidates spent about $1.1 million dollars, an average of $153,000 per candidate. (See Table 5.4.) About $205,000 of the total, or 21 percent, was used for political contributions to other campaigns, party committees, and clubs, in addition to thousands of dollars donated to various local community organizations—Leroy Comrie, Christine Quinn, and David Weprin—were seeking the Council speakership, and they accounted for 94 percent of the political contributions made by this group.

## OPEN SEAT SPENDING IN THE MANHATTAN BOROUGH PRESIDENT'S RACE

The Democratic primary race to succeed C. Virginia Fields as Manhattan borough president was noteworthy for the number of candidates and the amount of money spent. (See also Chapter 2—At the Races.) Nine Democratic candidates received about $4.4 million in public matching funds, and spent more than $8.8 million dollars in the primary, or an average of $979,000 per campaign, and a median of $799,000. The 1997 Manhattan borough president's race had previously been the

---

* For the purpose of this analysis, spending during the primary period is defined as spending reported through the first post-primary disclosure statement, due on September 23, 2005, covering the period through September 19, 2005.

† There were six candidates with less than $20,000 in spending—four of whom reported no spending at all. When they are excluded, the average rises to $100,000 per challenger.

‡ This includes one race, district 41, where a tier one bonus was declared and the spending limit was increased from $150,000 to $225,000.

§ Twelve candidates spent less than $20,000. If they are not considered, average spending by a candidate in a primary for an open seat rises to $111,000.

¶ Total includes spending prior to the year of the primary, which is subject to separate limits.

*Chapter 5*

most expensive borough president's contest in Program history, with six participants in a hotly contested Democratic primary for an open seat spending over $2.5 million, averaging about $417,000 per candidate.[7] Even adjusted for inflation, the 1997 average is only half the spending for the average candidate in the 2005 race. The increase can be attributed in part to the increased availability of public funds from the $4-to-$1 match. Another factor is television advertising, which was barely used by borough president candidates in 1997, whereas five of the nine Manhattan borough president candidates aired television advertisements at a total cost of over $700,000 in 2005. In both 1997 and 2005, overall borough president spending was dominated by the Manhattan race. In 2005, all major categories of expenditures rose compared with 1997 expenditures—with the exception of expenditures with the purpose code for fundraising.

## SPENDING LIMITS AND EXEMPT EXPENDITURES

Only certain specified expenditures are exempt from the spending limits: spending to comply with the Program or New York State election law (including costs to circulate and file designating and nominating petitions), petition litigation, the canvassing of election results, and debt payments for a previous election.[8] Under amendments to the Campaign Finance Act meant to simplify the Program, passed prior to the 2003 elections,[9] candidates who limit their total exempt expenditures to

| TABLE 5.4 | SPENDING BY UNOPPOSED INCUMBENTS | | |
|---|---|---|---|
| **Incumbent Candidate** | **District** | **Total Spending**[*] | **Spending on Political Contributions**[*] |
| Alan Gerson (P) | 1 | $143,000 | n/a |
| Christine Quinn (P) | 3 | $190,000 | $65,000 |
| David Weprin (P) | 23 | $227,000 | $90,000 |
| Leroy Comrie (NP) | 27 | $199,000 | $36,000 |
| Dennis Gallagher (P) | 30 | $121,000 | $ 6,000 |
| Joseph Addabbo (P) | 32 | $ 27,000 | $ 2,000 |
| Simcha Felder (NP) | 44 | $106,000 | $ 9,000 |
| | **Totals** | **$1,074,000** | **$206,000** |
| [*] *Figures are rounded to the nearest $1,000.* | | *(P) Participant* | *(NP) Non-Participant* |

less than 7.5 percent of the applicable spending limit need not provide detailed records demonstrating that their claims are truly exempt. However, if exempt claims exceed 7.5 percent of the applicable spending limit, the campaign is required to submit contemporaneous detailed records showing that each expenditure claimed as exempt actually was exempt. This 7.5 percent "safe harbor" is higher than the 6.8 percent average of expenditures claimed as exempt by 2001 Council candidates who made such claims.*[10]

In 2005, expenditures reported as exempt from the Program's spending limits by participating campaigns totaled over $4.8 million, representing 7.9 percent of participants' total spending. In 2001, exempt expenditures constituted about $3.9 million, or 4.1 percent of total spending. In the previous two election cycles, 1997 and 1993, the percentage of expenditures reported as exempt was constant at about 10 percent.†

The concept of exempt expenditures poses a critical dilemma for the Program because it has a direct impact on the expenditure limit, the single most critical component of the Program. Other violations can be remedied; for example, the various contribution prohibitions, if violated, can be corrected by refunding an illegal contribution. Campaigns can give back a contribution, but they cannot take back an expenditure. Once breached, an expenditure limit violation cannot be undone. The playing field is made fundamentally unequal because the spending has occurred and provided an advantage for the spender. Throughout the history of the Program, the Board has always taken a strict approach to issues that affect the expenditure limit. Indeed, the Act, in recognition of the heightened importance of expenditure limit violations, sets a higher penalty scale—up to three times the amount by which the limit is exceeded—for violations of the spending limit.

There were few expenditure limit violations in the early years of the Program. Since the advent of the $4-to-$1 public funds matching formula, the frequency of expenditure limit violations has risen significantly. (See also Chapter 9—Enforcement.) In particular, the increased public funds cap for City Council has given more campaigns the ability to spend far greater amounts of money, seemingly facilitating spending at or even above the spending limit. (See Fact Sheet 5.1.) From the start of the Program in 1989 until just before these changes took effect for the 2001 elections (three citywide elections, one Council election, and eight special or off-year elections), there were only seven expenditure limit violations by Council candidates. In the short period of time since the change in the matching formula (one citywide election, one Council election, and six special or off-year elections, not including the 2005 elections), there have been 17 expenditure limit violations at the Council level.‡

---

* Out of almost 250 candidates for Council in 2001, only 112 claimed any exempt expenditures.

† Data for these earlier election cycles are less precise than for more recent election cycles.

‡ This includes an expenditure limit violation in the 1999 special election, the first election in which the $4-to-$1 public funds matching factor was applied. As of this writing, the Board has not made any final determinations regarding any potential expenditure limit violations in 2005, which were the second citywide elections since the change in the matching formula.

---

*Chapter 5*

The increase in expenditure limit violations has been accompanied by a measurable increase in exempt expenditure claims at the Council level. In 1997, when the maximum amount of public funds available to a City Council candidate was $40,000 (about 32 percent of the applicable expenditure limit) and matching claims were matched at a $1-to-$1 rate (up to $1,000), exempt expenditures constituted about $290,000, or 4 percent of total Council spending. In 2001, the percentage rose slightly, to 4.4 percent. In 2003, however, with the 7.5 percent safe harbor option in effect, exempt expenditure claims jumped to 8.1 percent of participating Council candidates' total spending, and in 2005, the percentage increased even further, to 10.2 percent.

Most of these exempt expenditures were reported as "compliance" costs—almost 80 percent. Most of the remainder—17.6 percent—were claimed for petitioning purposes. Over time, compliance costs are constituting a significantly greater proportion of total Council spending. In 1997, exempt compliance costs were 1.5 percent of Council participants' total spending. The percentage of exempt compliance costs has been steadily rising since then: 3.1 percent in 2001, 5.9 percent in 2003, and 8.1 percent in 2005. This more than fivefold increase cannot be explained by any other change in the Act, Rules, or State Election Law.*

Exempt expenditures for petitioning have also increased noticeably as a share of total spending by participating Council candidates—an increase that, again, cannot be attributed to any change in State Election Law, which over time has become somewhat less burdensome, not more. In 1997, exempt claims for petition expenditures constituted 0.7 percent of Council participants' total spending. This increased to 1.1 percent in 2001, 1.5 percent in 2003, and 1.8 percent in 2005. Thus, as a share of Council candidates' total spending, petitioning costs claimed as exempt have more than doubled since 1997. The increase in these exempt claims seems directly related to the greater amount in public funds that is available, which gives candidates more money to spend, including on exempt services that previously may have been performed by volunteers. Under the $4-to-$1 matching rate, it is not that uncommon for City Council participants to have access to significantly more money, in contributions and public funds combined, that they can spend under the cap. This creates an incentive to classify more and more spending in the exempt category.

It thus appears that the attempt to simplify the Program by creating the 7.5 percent "safe harbor" has had the unintentional consequence of creating more exempt claims, particularly at the Council level, where other changes to the Program have resulted in a significant increase in available funds and, potentially, the incentive to stretch the spending caps by broadening what is classified as exempt. (See Chapter 10—Board Recommendations.)

---

* The only significant changes in compliance requirements to affect City Council candidates was the outright ban on corporate contributions and the requirement that political committees must register before contributing to participating candidates. These changes have been in effect since 1998, and could not account for a dramatic increase in compliance costs.

*Expenditures—Where Does the Money Go?*

| FACT SHEET 5.1 | | | | |
|---|---|---|---|---|
| **EXPENDITURE LIMITS OVER TIME\*** | | | | |
| **Office** | **1989‡** | **1993** | **1997** | **2001** | **2005** |
| Mayor | $3,000,000 | $4,000,000 | $4,732,000 | $5,231,000 | $5,728,000 |
| Public Advocate† | $1,750,000 | $2,500,000 | $2,958,000 | $3,270,000 | $3,581,000 |
| Comptroller | $1,750,000 | $2,500,000 | $2,958,000 | $3,270,000 | $3,581,000 |
| Borough President | $ 625,000 | $ 900,000 | $1,065,000 | $1,177,000 | $1,289,000 |
| City Council | $ 60,000 | $ 105,000 | $ 124,000 | $ 137,000 | $ 150,000 |

\* *Limits are per office and apply separately to the primary and general elections in the election year. Separate "out-year" limits also apply to the first three years of the election cycle.*

† *Replaced the office of City Council President after the 1989 elections.*

‡ *In addition to the expenditure limit, participants were also permitted a fundraising allowance. For mayor, the allowance was $600,000, for City Council president and comptroller it was $350,000, for borough president it was $125,000, and for City Council member it was $20,000.*

Shortly before the Democratic primary in September, exempt expenditures became a major focus of the Board's attention. In the routine course of monitoring campaigns' compliance with the expenditure limit as the primary approached, Board staff advised the campaign of Stephen Kaufman (district 13) that his campaign appeared to have exceeded the limit, and asked the campaign to submit documentation to substantiate its exempt claims, which exceeded the 7.5 percent safe-harbor level. After a review of the campaign's response, it still appeared the campaign had spent more than the applicable $150,000 spending limit. Board staff rejected certain exempt expenditure claims because the documentation supplied indicated that some non-exempt functions were being carried out in conjunction with exempt functions, although the campaign had claimed the expenditures as wholly exempt.

At its September 1, 2005 meeting, the Board ruled that the paid staff time of Kaufman's petition workers could not be wholly exempt because in addition to gathering petition signatures, the campaign's own records demonstrated that the petition workers' duties included distributing campaign literature, a non-exempt campaign activity. The Board determined that the division was more appropriately 50 percent exempt and 50 percent non-exempt. Using this ratio, the Kaufman campaign no longer appeared to have exceeded the spending limit.

The Board's decision precipitated a request a day later from the Miller campaign for mayor, seeking guidance on "whether expenditures for ballot petitioning carriers are 100 percent exempt, when those carriers have used literature as an aid in persuading voters to sign ballot petitions."[11] At the same time

*Chapter 5*

as the Miller campaign submitted its request for guidance, the campaign filed its last pre-primary disclosure statement. Including the expenditures reported in that filing, the Miller campaign reported over $1 million dollars in exempt expenditures related to petitioning, with just over $800,000 of that for the payment of workers.

The Miller campaign engaged in two petition efforts: designating petitions to appear on the Democratic ballot, and independent nominating petitions to appear on a second "Smaller Class Size" ballot line. The campaign provided samples of literature distributed by petition gatherers while collecting signatures for the "Smaller Class Size" petitions. The handouts included information about the date of the Democratic primary, but made no mention of petitioning. According to its reporting, the Miller campaign made just under $200,000 in exempt claims for petition workers through July 11, 2005, the first day for filing designating petitions for the Democratic primary, and more than $600,000 on petition workers during the period to collect signatures for the "Smaller Class Size" line.

On September 6, 2005, the Board issued Advisory Opinion 2005-3, summarized as follows:

> As the Miller Campaign's petition-gatherers were distributing campaign material while they were getting signatures for an independent nominating line, the Board concludes that this effort appears disproportionate to petitioning purposes, and the Board does not accept a 100 percent exempt allocation in light of (1) the magnitude of the costs; (2) the timing of the petition drive; and (3) the fact that the literature distributed refers to the Democratic Party primary date, which is irrelevant in the context of a petition process for the general election ballot.

> In the case of the Democratic Party petitioning activity, the Board declines at this time to respond to the Miller request to accept a 100 percent exempt allocation in light of allegations by other campaigns that activities presented as petitioning should be treated as part of a campaign field operation.

As a result of the Board's ruling, and a New York State Supreme Court ruling in favor of the Board,[12] the Miller campaign—which was close to the spending limit—cancelled several hundred thousand dollars of planned television advertising in the days before the primary that would otherwise have counted toward the expenditure limit.[13] (See also Chapter 9.)

During the 2005 elections, 12 campaigns were questioned by Board staff because they appeared to have violated the primary election expenditure limit. Many of these preliminary findings were at least partially (and in some cases, wholly) related to issues about improper claims and/or inadequate documentation of exempt expenditures. While some campaigns were able to respond satisfactorily to the preliminary findings, the Board is engaged in ongoing audits of these and all campaigns for compliance with all applicable limits.

The Board's experience with exempt expenditures during the 2005 elections, as well as the increases in exempt expenditure claims over several election cycles, serve to underscore the Board's previous and continuing recommendations regarding the restriction of exempt expenditures to the specific, narrow purpose of defending challenges to petitions. (See Chapter 10.)

## SPENDING LIMITS AND INDEPENDENT EXPENDITURES

Expenditures made by an "independent" entity in coordination with a participating campaign represent another threat to the integrity of Program spending limits. These non-independent expenditures are treated as in-kind contributions to a campaign, subject to Program limits on spending and contributions.* It can be difficult, however, to substantiate a case of suspected coordination, and sometimes problematic to assign a value to non-independent activities against the limits.

During the 2005 campaign, there were more, and broader, allegations of non-independent expenditures than were made in previous elections. Some allegations came in the form of formal complaints filed with the Board; others were brought to the Board's attention through more informal means, while yet others were identified by Board staff during the course of routine reviews. While audits are ongoing in all potential instances of non-independent activity, a few cases became matters of public record during the election.

At its meeting on September 1, 2005, the Board heard presentations regarding a formal complaint filed by the campaign of Nelson Denis (district 8) against an opponent, Melissa Mark-Viverito, alleging non-independent spending (mostly in the form of phone banking) by Service Employees International Union Local 1199, where Mark-Viverito had formerly been employed. The Board directed the Mark-Viverito campaign to answer additional questions from the staff and from the Denis campaign, but deferred making a decision on the merits of the complaint.

On the day before the primary, the campaign of Eva Moskowitz for Democratic nomination for Manhattan borough president filed a formal complaint against the campaign of Scott Stringer, alleging that expenditures for literature and recorded phone calls by the Working Families Party were not independent, and should be reported as in-kind contributions and charged against Stringer's primary election spending limit. In addition to implicating Board rules regarding in-kind contributions by a party to its "nominee," these expenditures also raised questions about State Election Law provisions limiting political party activity during the primary.†

During the general election period, the press and the Bloomberg campaign raised questions about possible non-independent activity on behalf of Ferrer's mayoral campaign.[14] To date, the Board has

---

* See Board Rule 1-08(f) for a list of the factors the Board considers in determining whether an expenditure is independent.

† Two recent court rulings place in question New York State's longstanding prohibition against party spending in primary elections. (See Chapter 10.)

---

*Chapter 5*

not issued final determinations in these or any other case of allegedly non-independent spending; these matters are under review as part of post-election audits of expenditure limit compliance.

## QUALIFIED EXPENDITURES

Program participants who receive public funds are constrained in how they may spend them. "Qualified expenditures" are expenditures by a participant's principal committee to further the participant's nomination or election.[15] To be considered qualified, the expenditure must be timely and accurately reported, and the campaign must be able to demonstrate the expenditure is qualified through the maintenance and submission of documentation. Certain categories of expenditures are not qualified, including cash payments and payments made to candidates, their family members, or businesses in which they have a significant ownership stake. If a participant cannot show that his or her public funds were used for qualified expenditures, the participant must return to the public treasury the difference between the amount of public funds received and the amount of qualified expenditures documented by the campaign.

In response to campaigns seeking guidance, and with the hope of reducing the number of campaigns required to return public funds because of lack of documentation, the Board made a concerted effort prior to the 2005 elections to increase education about qualified expenditures, and explain the importance of recordkeeping to substantiate them. Treatment of qualified expenditures was expanded in candidate training sessions, and the 2005 candidate handbook provided sample forms for timesheets and contracts. Nevertheless, a preliminary review of documentation for expenditures for the 2005 elections indicates ongoing problems, particularly at the Council level, with campaigns' recordkeeping in support of qualified expenditures, as well as some underlying problems with the nature of the expenditures, e.g., being paid to family members, being advanced, or being made in cash. As noted in the Board's 2003 post-election report, this ongoing problem suggests that the current level of public funds available to campaigns — in proportion to an unnecessarily high expenditure limit — may not be in the best interests of the taxpayers.[16] (See also Chapter 6 — Public Funds and Chapter 10.)

## CONCLUSION

As far as expenditures are concerned, the biggest story of the 2005 elections is the historic spending by Michael Bloomberg on his re-election campaign. At the City Council level, the story of spending in the 2005 elections is driven largely by incumbents. Incumbents, on average, outspent their challengers. Open seats attracted more candidates, but they too, on average, were outspent by incumbents. Meanwhile, an ever-greater portion of the increased spending total is being claimed as exempt from the spending limits, and the spending limits are being approached and breached with greater frequency.

*Expenditures—Where Does the Money Go?*

Disclosure requirements for non-participants, in effect for the first time in 2005, have resulted in a far better picture of overall spending and will allow for much more detailed comparisons in future elections. In addition, improvements to disclosure provisions for participants give the public more information about how campaign money is being spent.

| FACT SHEET 5.2 |
| --- |
| **EXPENDITURE FACTOIDS** |
| Expenditure by participants to "petty cash" or "cash" totaled $140,000. |
| Participants reported 190 $1 transactions. |
| Participants reported 2,826 transactions in the amount of $10 or less. |
| The single largest transaction reported by a participant was a $1,717,881 media buy by the Ferrer campaign.* |
| The single largest transaction reported by any candidate was a $2,517,072 payment by the Bloomberg campaign for voter list development. † |
| The median transaction amount for all reported expenditures by participants was $182. |
| The average transaction amount for all reported expenditures by participants was $1,268. |
| Participating campaigns reported a total of $650,000 in advances, of which just under $230,000 was advanced by the candidate him- or herself. |
| Incumbents' campaigns reported $410,000 in advances, out of a total $760,000 reported by all 2005 campaigns. Bloomberg's campaign reported $88,000 in advances. |
| Twenty-four participating campaigns reported over $5.5 million in subcontracted expenditures. No non-participating campaign reported the use of subcontractors by its vendors. |
| Participants reported spending about $48,000 in payments to the New York City Environmental Control Board and the Department of Finance for violations including illegal postering and parking tickets. |
| * *This does not necessarily mean that this was the largest media buy overall. As discussed, campaigns break down expenditures in different ways.* |

*Chapter 5*

## REFERENCES

1   *An Election Interrupted…An Election Transformed*, New York City Campaign Finance Board, September 2002 (hereafter "*An Election Interrupted…*"), Vol. 1, 81.

2   *2003 City Council Elections*, Vol. 1, 28.

3   *An Election Interrupted…*, Vol. 1, 81.

4   Local Laws 15, 16, and 17 of 2006.

5   The City of New York Office of the City Clerk, *Lobbyist Annual Report 2005*, May 17, 2006, 8.

6   Frank Lombardi, "Lobbying Pays Off," *Daily News*, June 3, 2006, 4.

7   *A Decade of Reform 1988-1998*, New York City Campaign Finance Board, September 1999 (hereafter "*A Decade of Reform*"), Vol. 1, 51.

8   New York City Administrative Code §3-706(4).

9   Local Law 12 of 2003.

10  *2003 City Council Elections*, Vol. 1, 29.

11  Marshall Miller, "Letter to Campaign Finance Board Chairman re: Miller for New York Exempt Petitioning Costs Application for Immediate Guidance," September 2, 2005.

12  *Miller for New York v. N.Y. City Campaign Fin. Bd.*, Index No. 112409/2005 (N.Y. Sup. Ct. Sept. 14, 2005).

13  Winnie Hu, "Miller Cancels More Ads In Dispute On Spending," *New York Times*, September 9, 2005, B6.

14  Jim Rutenberg and Diane Cardwell, "Volunteers of Big Union Come to Aid of Ferrer Drive, *New York Times*, October 22, 2005, B2; William Murphy, "Board Warns Party Helping Ferrer," *Newsday*, November 3, 2005, A8.

15  New York City Administrative Code §3-704 and Campaign Finance Board Rule 1-08(g).

16  *2003 City Council Elections*, Vol. 1, 27.

chapter 6

# Public Funds—
# Money with No Strings Attached

- Incumbents becoming more reliant on larger and/or non-matchable contributions
- Law going further to level the playing field
- Protecting the taxpayers' dollars
- New requirements, old results

Public funds, the foundation of the Campaign Finance Program and the fundamental reason that most candidates join, help to level the playing field by providing eligible candidates with the financial resources to get their messages out to the voters. Public funding reduces the need for candidates to spend time fundraising, and provides campaigns with "clean money"—money the public can be sure comes with no strings attached. Public funds also enhance public participation in the political process by matching contributions made by New York City residents with public tax dollars. Each dollar a New York City resident contributes is matched with four dollars of public funds, up to a maximum of $1,000 in public funds for a $250 contribution.* Contributions from other sources are not matched, but are permitted.† As previously mentioned, all current officeholders except the Mayor have received public funds from the CFB for at least one of their elections—a first in the Program's history. (The amount of public funds disbursed in each election since the inception of the Program is provided as Fact Sheet 6.2 at the end of this chapter.)

Public funds may be spent only on certain specified "qualified expenditures." Public funds may not be spent on ballot litigation, payments to candidates or their relatives, and other expenses not

---

\* The matching rate increased after the 1997 elections, from a $1-to-$1 match up to the first $1,000 contributed by a New York City resident to a $4-to-$1 match of the first $250 in 2001.

† Contributions from political action committees (PACs) that have not registered with the CFB and contributions from corporations are banned.

*Chapter 6*

directly related to campaigning, such as contributions or loans to other candidates or political committees. If a campaign receives public funds, any money it has left over after the election must be returned to the public up to the total amount received. Campaigns must also document that public funds were spent only on qualified expenditures, and return any funds that were not. (See Chapter 5—Expenditures.)

## DISBURSEMENT OF PUBLIC FUNDS

Just over $24 million in public funds was disbursed to participating candidates in the 2005 citywide elections: $19 million for the primary, and another $5 million for the general election.[*] Of the 155 participating candidates who appeared on the primary and/or general election ballot, 108 of them (70 percent) received public funds. Sixteen participants received public funds for both a primary and general election campaign; 47 participants did not receive any public funds.[†]

Vigilant auditing by CFB staff may have saved the taxpayers approximately $10 million.[‡] Had all the matching claims submitted by participants in 2005 been matched in full, including those submitted by candidates who failed to qualify for public funds because they did not meet threshold or did not fully comply with Program requirements, approximately $34 million in public matching funds would have been disbursed.

The amount of public funds disbursed for a particular office is related to the number of candidates running, which increases with the number of open seats. This is most interesting at the City Council level. In the 2005 elections, the average payment per Council district was $152,000, only a little more than half the 2001 average of $279,000, but still higher than the 2003 average of $100,000. An average of 1.75 Council candidates per district received public funds in 2005; again, less than the 3.5 average in 2001 but more than the 1.5 average in 2003. The decline in both the average number of candidates receiving funds and the average amount they received seems to reflect the lack of competitive races. In 2005 and 2003, races in which incumbents faced minimal opposition to re-election were the rule, unlike the 2001 elections, which had many more open seats. In the seven open City Council seats (districts 2, 4, 5, 8, 9, 13, and 41) in 2005, public funds payments accounted for almost half the $6.5 million in public funds disbursed at the City Council level. Thirty-six of the 47 participants appearing on the ballot in the primary and/or general election in these districts received public funds. In these races for open seats, an average of 5.14 candidates per district received public matching funds, compared with an average of only 1.75 per district where an incumbent was seeking re-election.

[*] These funds were disbursed to 75 candidates for the primary and 51 for the general election. The total amount will likely increase slightly as final audits are concluded and some candidates receive post-election payments to cover outstanding liabilities.

[†] Of these, five were unopposed, nine declined to accept matching funds, 29 failed to meet minimum threshold requirements, and five failed to comply with other Program requirements.

[‡] This figure includes some funds that were declined by participating incumbents.

Public Dollars for the Public Good

*Public Funds—Money with No Strings Attached*

At the Council level, public matching funds as a percentage of the total dollars available to candidates increased from 26 percent of total funds available in 1997 to 55 percent in 2001,* and then dropped to 44 in 2003 and to 36 percent in 2005.†

Incumbents have always been less reliant on public matching funds than non-incumbents.‡ (See Figure 6.1.) In 2005, participating incumbents received an average of $45,000 in public funds, while non-incumbents received an average of $52,000. Participating incumbents raised a total of



**FIGURE 6.1:** Public Funds as a Percentage of Total Dollars Available to City Council Candidates — 1997–2005



---

\* In 1997, participating Council candidates could receive a maximum of $40,000 in public funds, which equaled about 32 percent of the spending limit. In 2001, the maximum amount of public funds at the City Council level was changed to 55 percent of the spending limit to conform with all other offices covered by the Program.

† Public funds as a percentage of total dollars available to candidates for all offices has varied over time as well, from 19 percent in 1997 to 43 percent in 2001 and 37 percent in 2005.

‡ With the possible exception of the 2001 elections, when the small number of incumbents running appear to have taken full advantage of changes in the law that allowed all participants to receive more public funds. (See also Chapter 4—Contributions.)

---

# EXHIBIT G – PART 3

*Chapter 6*

$5.5 million in contributions (an average of $142,000 per participating incumbent) and received a total of $1.8 million in public funds, making public funds just 24 percent of their total available funds.* Non-incumbent participants running for City Council, on the other hand, raised $4.4 million in contributions (an average of $49,000 per participating challenger) but received $4.7 million in public funds—so matching funds made up more than half their total funds available.

Incumbents are generally better able to raise very large contributions, at or near the maximum of $2,750, than their challengers. While a $250 contribution from a New York City resident is worth $1,250 to a campaign, that sum still cannot compete with a (Council maximum) $2,750 contribution, regardless whether it is from a matchable source. This gap undermines the Program's goal of encouraging smaller contributions from a larger number of the constituents candidates are seeking to represent. The Board is therefore recommending a sizable reduction in the contribution limit at the City Council level. (See Chapter 10—Board Recommendations.)

## WHAT'S NEW

### The Five Percent Reserve

In previous elections, many candidates received the maximum in public matching funds by the first or second payment, and then had little incentive to file timely subsequent disclosure statements. This impeded the Board's ability to audit and publicly disclose these candidates' activity during the rest of the election. Changes in the law for 2005 allowed the CFB to hold a five percent reserve from each candidate's public funds payments until the final payment before each election day. The reserve accomplished its goal in two important ways: first, almost every campaign filed its required disclosures on time; second, it encouraged more complete compliance with CFB regulations. The CFB saved the taxpayers $143,000 in public funds withheld from campaigns ruled ineligible for payments because of compliance problems.

Even though the reserve affords some protection to the public, it may be advisable to increase the percentage of public funds held in reserve, particularly at the Council level, where the dollar amount of the reserve is especially small—a maximum of $4,125.

### Electronic Funds Payment

In all previous elections, candidates who received public funds were paid by check. Candidates had to pick up their checks, deposit them, and wait for the check to clear before they had access to these funds. For the 2005 elections, the CFB arranged for campaigns to sign up for payment by Electronic Funds Transfer (EFT), a process similar to the direct deposit of paychecks. The response to this volun-

---

* These figures include participating incumbents who declined to accept public funds.

tary offering was overwhelming: 95 of the 108 participants who received public funds signed up. Electronically transferred public matching funds were available within a few hours of Board approval of payment, rather than a few days.

As in past years, the due date for the final primary disclosure statement fell on the Friday before Labor Day weekend, and therefore the final payment occurred only days before the primary was held. Payment by EFT gave candidates access to the funds for those critical last few days before the primary election.

EFT not only vastly improved service to the candidates who signed up and received their payments more quickly and easily, but also alleviated administrative burdens on CFB staff, who otherwise had to process the checks, document their manual distribution, and pursue campaigns that were not picking up their checks. The Board will consider making EFT mandatory in the future.

### Conflicts of Interest Board Filings

New legislation for the 2005 election cycle required that candidates who wished to receive public funds produce a receipt from the Conflicts of Interest Board (COIB) certifying that they had submitted their personal Financial Disclosure Statement, which is a filing required of all elected officials, candidates, and policy-making city employees.[*]

The City Council concluded that withholding public funds until participants filed with the COIB would strengthen the COIB's disclosure requirement. Unfortunately, this requirement caused a great deal of confusion for candidates. On numerous occasions, candidates brought the wrong documentation and were required to return to the COIB for the correct document, thus jeopardizing their campaigns' timely receipt of public funds.[†]

In the end, one primary and one general election payment were delayed and one general election payment was not disbursed in part because of failure to submit COIB documentation by the relevant deadlines. At the time of publication, 16 participants still had not filed their COIB receipts with the CFB.

The burden of the new requirement fell most heavily on non-incumbents. Incumbents had the advantage of familiarity with the annual COIB disclosure requirement, and could file their forms as elected officials through their elective offices, while non-incumbents were less likely to know about the requirement, and could not use government staff to file.

---

[*] The Campaign Finance Board opposed this legislation because when the enforcement of other admittedly important legal requirements is tied to the receipt of public funds this can unfairly burden those candidates who choose to participate in the Program and who most need the public funds.

[†] The law requires candidates to submit a document showing that they are in compliance with the COIB disclosure requirements (called a "certification" by the COIB). The CFB could not legally accept the dated cover sheet routinely issued by the COIB as a receipt. Unless candidates specifically asked the COIB for the "certification," it was not provided.

*Chapter 6*

## PUBLIC FUNDS FOR REAL RACES

### Statements of Need and The 25 Percent Cap

After the 2001 elections, there was widespread concern that some participants were receiving and spending public funds unnecessarily when faced with little or no opposition, as evidenced by huge margins of victory.[1] In addition, there was concern that some candidates might be taking advantage of the funds available to them to increase their name recognition for future campaigns, rather than using what was needed to run the current election and returning the rest.[2] In its report following the 2001 elections, the Board stated, "it seems wasteful of government resources to provide public matching funds to candidates who have only minimal opposition and therefore need not expend much to become elected."[3] The Board stated that it could not apply a subjective standard in disbursing funds, and that the Program had historically relied on self-policing by participants and pressure from the public and the media to deter the wasteful use of taxpayer money. Finally, the Board urged the City Council to consider what levels of opposition should trigger the outlay of public funds.

In response to that invitation, the City Council passed an amendment to the Act in 2003 that set such a standard. The amendment provides that participants are limited to receiving 25 percent of the maximum amount of public funds unless they have an opponent who raises or spends at least 20 percent of the expenditure limit, or who qualifies to receive public funds under the Program.[4] (See Table 6.1.) The new law, however, allows participants whose opponents do not meet those standards to submit "Statements of Need," which entitles them to receive public funds up to the maximum — even if their opponent(s) fail to meet either of those criteria. Statements of Need must be signed by the candidates themselves and contain language acknowledging that the submission of the Statement will cause the additional disbursement of public funds. All Statements of Need are disclosed publicly on the CFB's website.

| TABLE 6.1 | PUBLIC FUNDS CAP IN RACES WITH MINIMAL OPPOSITION AND INTENDED SAVINGS | | | |
|---|---|---|---|---|
| Office | Trigger (20% of Expenditure Limit) | Maximum Public Funds Payment | 25% of Maximum Payment | Potential Savings to the Taxpayers (per candidate) |
| Mayor | $1,145,600 | $3,150,400 | $787,600 | $2,362,800 |
| Public Advocate & Comptroller | $ 716,200 | $1,969,950 | $492,488 | $1,477,462 |
| Borough President | $ 257,800 | $ 708,950 | $177,238 | $ 531,712 |
| City Council | $ 30,000 | $ 82,500 | $ 20,625 | $ 61,875 |

*Public Funds—Money with No Strings Attached*

The 2005 elections showed that the majority of candidates who face any opposition meet one or more of the criteria set in the law to receive the full amount of public funds for which they qualified, even though many of them continued to win with large margins of victory. For the primary election, only five participants[*] filed Statements of Need with the CFB, and only one—Charles Barron—would have been limited to 25 percent under the new amendment had he not filed a Statement. The other four faced opposition that eventually triggered full disbursement of public matching funds for these candidates (some time after they had filed their Statements of Need). Nonetheless, by filing the Statements, these candidates were able to receive public funds earlier than they would have otherwise.

Ten candidates filed Statements of Need for the general election.[†] Of these, five—Barron, Fidler, Mendez, Oddo, and Seabrook—would have been limited by the 25 percent cap without a Statement of Need; the other five candidates faced opposition that ultimately triggered the full disbursement of funds. Four candidates (Barron, Mendez, Oddo, and Seabrook) received a combined $170,827 in taxpayer funds that would not have been disbursed without a Statement of Need.[‡]

Three candidates with minimal opposition in the general election did not file Statements of Need and received only 25 percent of the maximum public funds: Helen Diane Foster (district 16), Oliver Koppell (district 11), and Darlene Mealy (district 41). This resulted in savings to the taxpayers of $67,742.[§]

In the 2003 elections, seven candidates ultimately were limited to the 25 percent cap, which saved the taxpayers approximately $135,000. Five incumbent Council members[¶] who each submitted a Statement of Need would go on to win their elections with more than 75 percent of the vote; their requests resulted in the disbursement of more than $240,000 in public funds.

Some media outlets accessed the Statements of Need published on the Board's website to review candidates' justifications for requesting the maximum amount of public funds. In 2005, the *New York Post* chose to focus on three participants who filed Statements of Need despite minimal fundraising reported by their opponents.[5] A recap of the election in the *Gotham Gazette* focused on the trend toward larger campaign war chests, and highlighted some races for which Statements of Need were

---

[*] Charles Barron (district 42), Lewis A. Fidler (district 46), Letitia James (district 35), Diana Reyna (district 34), and Kendall B. Stewart (district 45).

[†] Barron (district 42), Fidler (district 46), Erlene J. King (district 45), Andrew J. Lanza (district 51), Michael E. McMahon (district 49), Rosie Mendez (district 2), Michael C. Nelson (district 48), James S. Oddo (district 50), Domenic M. Recchia (district 47), and Larry B. Seabrook (district 12).

[‡] Fidler qualified for and received $12,092 for the general election, which is less than the 25 percent cap; therefore his Statement of Need did not result in any additional funds being disbursed for the general election.

[§] Koppell and Mealy were not subject to the 25 percent cap for the primary election. Foster did not have a primary and, during the post election audit process, she returned the public matching funds she did receive.

[¶] Barron (district 42), Lanza (district 51), Nelson (district 48), Oddo (district 50), and Sara Gonzalez (district 38).

---

*Chapter 6*

filed by candidates who clearly did not need the additional taxpayer money.[6] Because the current law has not resulted in meaningful savings to the Public Fund, and considering the continued wide-spread concern about nominal opposition, the Board is making recommendations to further limit the disbursement of public funds in races with minimal opposition. (See Chapter 10.)

**Sure Winners**

A significant amount in public funds was disbursed to candidates (primarily incumbents) who won their races easily. Although public funds account for a smaller percentage of incumbents' total available funds compared with non-incumbents, the total amount of public funds disbursed to these "sure winners" in dollars and as a percentage of funds disbursed is quite substantial. In the 28 contested City Council races during the 2005 general election, 10 candidates won with more than 80 percent of the vote (five of them in three-way races). Six additional candidates won with 70–79 percent of the vote (three of them in three-way races), and six more won with 60–69 percent of the vote (two of them in three-way races). These 22 Council candidates who won with 60 percent of the vote, or more, received $1.1 million in public matching funds, or 52 percent of all public funds disbursed to City Council candidates for the general election.*

In the 24 contested City Council primary races, two candidates won with 80–85 percent of the vote; six candidates won with 70–79 percent of the vote (one of them in a three-way race); and two candidates won with 60–69 percent of the vote (both in three-way races). These 10 candidates— all incumbents—received $761,732 in public matching funds.

**A Truly Objective Standard**

Even before the enactment of New York City's landmark program, and indeed, a concern voiced nationwide during debate on the value of public funding, is whether it amounts to another form of "incumbent protection."

The Board has long believed that without a truly objective measure for determining when to distribute full public funds to candidates, the public may lose confidence in the Program. Rather than simply allowing candidates to send in a letter asking for additional public funds, there should be a more authoritative measure of a participant's need for the maximum amount of public funds. The Board recommends multiple tiers for paying additional public funds to candidates based on their opponents' levels of fundraising and spending, similar to the way bonuses are triggered by non-participants. (See Chapter 10.)

At the Council level, the current system triggers a full payment of public funds to any participant whose opponent: (a) qualifies for public funds under the Program; or (b) spends as little as $30,000 as a non-participant. In other words, a "nominal" participating candidate raising as little as $5,000

---

* At the Council level, 45 participants received public funds in the general election.

*Public Funds — Money with No Strings Attached*

in matchable contributions and receiving $20,000 (or less) in public funds triggers disbursement of up to the maximum $82,500 in public funds to his or her opponent, who will likely have a far larger amount of private money to spend on top of these public funds. The low trigger set by current law can serve to exacerbate the inequities between incumbents and insurgents, instead of helping to level the playing field, as the law intended.

## PARTICIPANTS WHO WERE NOT PAID

### Threshold Issues

Public funds are one of the means by which the Program helps to level the playing field. In order to be eligible for public funds, candidates must join the Program by the deadline and then must meet a two-part threshold which consists of (1) raising a specific amount of money from individual New York City residents, and (2) collecting a specific number of contributions of $10 or more from individuals within the area they seek to represent. (See Fact Sheet 6.1.) The purpose of the threshold requirements is to ensure that candidates who receive public funds can show that they have significant support in their communities.

| FACT SHEET 6.1 | | |
| --- | --- | --- |
| **THRESHOLD CHART** | | |
| **Office** | **Dollar Amount**[*] | **Number of Contributors**[†] |
| Mayor | $250,000 | 1,000 New York City Residents |
| Public Advocate | $125,000 | 500 New York City Residents |
| Comptroller | $125,000 | 500 New York City Residents |
| Borough President<br>Bronx<br>Brooklyn<br>Manhattan<br>Queens<br>Staten Island | <br>$26,653[‡]<br>$49,307[‡]<br>$30,744[‡]<br>$44,588[‡]<br>$10,000 | <br>100 Bronx Residents<br>100 Brooklyn Residents<br>100 Manhattan Residents<br>100 Queens Residents<br>100 Staten Island Residents |
| City Council Member | $ 5,000 | 75 Residents from the District |

[*] *Including all matchable contributions from New York City residents in amounts of up to $1,000.*
[†] *Each must have given a matchable contribution of $10 or more.*
[‡] *These amounts are based on 2000 Census figures for the population in each borough.*

*Chapter 6*

To receive public funds, participants also must be in compliance with the Program's other require-ments, such as filing timely and complete disclosure statements. Finally, participants can only qualify for public matching funds if they are opposed by at least one other candidate on the ballot.

In December 2004, the City Council increased from 50 to 75 the number of valid matchable contributions of $10 or more from district residents required of Council candidates to meet the threshold for receiving public funds. To quantify the effects of changing the threshold requirement, it is interesting to see how quickly candidates have been able to achieve it. In previous Council elections, roughly half of all candidates who received public funds for the primary qualified for funds by the first payment date (48 percent in 2001, and 47 percent in 2003). After the rules for qualifying changed for the 2005 elections, it is clear there has been no adverse effect; in fact, for the 2005 election, 65 percent of all primary candidates who qualified for public funds did so by the earliest possible date.

In each election, there will be candidates who are unable to meet the threshold requirements because they do not have sufficient support in their communities. There appears to be another category of City Council candidates who do not qualify, composed of candidates who concentrate on larger contributions from non-matchable sources, such as political committees and non-incorporated busi-nesses, and have focused less on gathering contributions from residents within their districts. These candidates may be making a calculation that they can raise more money with larger donations than by qualifying for public matching funds. Four Council candidates, all incumbents, exceeded the dollar amount required to meet the threshold—some raised as much as three times the threshold dollar amount—but did not raise the required 75 contributions from district residents and thus did not qualify for matching funds.*

**Participants Who Decline Public Funds**

Some candidates decline matching funds even though they have met the requirements to receive them. In these cases, either the candidate does not need the funds, or the candidate has raised so much in contributions that he or she will be forced to return funds after the election in accordance with the Act, which requires the return of unspent funds up to the amount of public funds received. These candidates have raised, or will raise, more than enough private money to run an effective campaign. In fact, many could not spend public dollars without exceeding the spending limit.

Other candidates face minimal opposition, and do not plan to spend a large amount. Some can-didates, instead of affirmatively declining public funds, choose not to claim any matchable funds in their disclosure statements, or return the public funds to the Board immediately after receiving them. In some instances, candidates appear on the ballot who are not actively campaigning and therefore are not spending money on qualified expenditures. This sometimes occurs when a candi-

---

* Maria del Carmen Arroyo (district 17), Maria Baez (district 14), Erik Dilan (district 37), and Joel Rivera (district 15).

date loses the primary election, but runs on a second line in the general election. Finally, a candidate may have unresolved compliance issues, and may defer responding to Board inquiries by declining public funds.

## HIGH-SPENDING NON-PARTICIPANTS

In 2005, City Council legislation created a two-tiered bonus system that increases the amount of public funds available to participants who have an extremely high-spending non-participating opponent.[7] The legislation also makes it mandatory for all candidates for city elections—even those not participating in the Program—to file disclosure statements with the CFB. Both the two-tiered bonus and the non-participant filing requirements furthered the goals of the Act: first, by leveling the playing field with additional public funding in extreme cases; and second, by providing equally detailed, timely, and accessible financial disclosure to the public for *all* City campaigns. (See Fact Sheet 1.2.)

For a detailed analysis of the issues surrounding high-spending non-participants, see the Board's white paper, *The Impact of High-Spending Non-Participants on the Campaign Finance Program,* which will be available at www.nyccfb.info.

### Tier 1

The Tier 1 bonus is triggered when a non-participant raises or spends at least 50 percent of the applicable spending limit. For other candidates in the race, the CFB matches up to $250 contributed by a New York City resident at a rate of $5-to-$1 (rather than the standard $4-to-$1), for a total of up to $1,250 per contributor. The maximum amount of public funds available to participants is increased from 55 percent to two-thirds of the spending limit. The spending limit for participating candidates also increases by 50 percent.

In 2005, Tier 1 bonuses were triggered by high-spending non-participants in two City Council Democratic primaries: Council Member Sanders in district 31 and William F. Boyland, Sr. in district 41.* After Sanders' financial disclosure was received, the Board declared the bonus and his sole opponent, David Hooks, Jr., became eligible to receive matching funds at the $5-to-$1 bonus rate. Boyland's participating opponents—Royston Antoine, Pamela Junior, Stanley Kinard, Danny King, Darlene Mealy, David Miller, and Maryam Samad—became eligible for the bonus once Boyland submitted a missing statement. Only Antoine, Kinard, and Mealy received additional public funds, as they were the only candidates who met threshold and were in compliance with the Program at the time the bonus was triggered.

---

* Both non-participants failed to file required disclosure statements in a timely manner, which hampered the Board in making bonus determinations in these two districts. Sanders filed his first disclosure statements with the CFB only 12 days before the primary election; Boyland failed to file one disclosure statement in a timely fashion, but it was the statement that would ultimately trigger the bonus. (See also Chapter 9—Enforcement.)

---

*Chapter 6*

| FACT SHEET 6.2 | | |
|---|---|---|
| **PUBLIC FUNDS DISBURSED BY ELECTION** | | |
| **Year** | **Office** | **Total Payment** |
| 1989 | Mayor | $ 2,779,508 |
| | Public Advocate | N/A |
| | Comptroller | $   421,665 |
| | Borough President | $   421,665 |
| | City Council | $   421,665 |
| | **Total** | **$4,508,155** |
| 1990 | Staten Island/1st Council District* | $     10,155 |
| 1991 | City Council † | $ 2,660,514 |
| | Brooklyn/29th Council District* ‡ | $   137,650 |
| | Queens/22nd Council District* ‡ | $            0 |
| | **Total** | **$2,798,164** |
| 1993 | Mayor | $ 3,262,250 |
| | Public Advocate | $   947,189 |
| | Comptroller | $ 1,066,802 |
| | Borough President | $     64,956 |
| | City Council | $ 1,142,559 |
| | **Total** | **$6,483,756** |
| | Manhattan/4th Council District* ‡ | $   132,146 |
| 1994 | Staten Island/51st Council District* | $     30,677 |
| | Staten Island/51st Council District* ‡ | $     60,339 |
| | **Total** | **$     91,016** |
| 1996 | Manhattan/5th Council District* | $     81,375 |
| | Manhattan/5th Council District* ‡ | $     63,208 |
| 1997 | Mayor | $ 3,431,133 |
| | Public Advocate | $   427,575 |
| | Comptroller | $   247,054 |
| | Borough President | $   968,208 |
| | City Council | $ 1,877,410 |
| | **Total** | **$6,951,380** |
| | Bronx/17th Council District* ‡ | $            0 |

* *Off-year election to fill a vacancy.*
† *City Council redistricting election (in 1991, the City Council was expanded from 35 seats to 51 seats).*
‡ *Denotes special election.*

*Public Funds—Money with No Strings Attached*

| FACT SHEET 6.2 (continued) | | |
|---|---|---|
| **PUBLIC FUNDS DISBURSED BY ELECTION** | | |
| **Year** | **Office** | **Total Payment** |
| 1999A | City Council ‡ | $    788,554 |
| 1999 | City Council | $    272,961 |
| 2001A | City Council ‡ | $      91,388 |
| 2001 | Mayor<br>Public Advocate<br>Comptroller<br>Borough President<br>City Council<br>**Total** | $12,862,667<br>$ 5,435,250<br>$ 2,673,219<br>$ 7,063,563<br>$14,217,206<br>**$42,251,905** |
| 2002A | City Council ‡ | $      62,224 |
| 2003A | City Council ‡ | $    475,948 |
| 2003 | City Council † | $ 5,110,863 |
| 2005A | City Council ‡ | $      68,947 |
| 2005 | Mayor<br>Public Advocate<br>Comptroller<br>Borough President<br>City Council<br>**Total** | $ 9,530,299<br>$ 2,674,456<br>$            0<br>$ 5,472,804<br>$ 6,495,579<br>**$24,173,138** |
| | **Sum of all Total Payments** | **$94,415,283** |

* *Off-year election to fill a vacancy.*
† *City Council redistricting election (in 1991, the City Council was expanded from 35 seats to 51 seats).*
‡ *Denotes special election.*

*Chapter 6*

### Tier 2

The Tier 2 bonus is triggered if a non-participating opponent raises or spends more than 300 percent of the applicable spending limit, at which point up to $250 contributed by a New York City resident is matched at a rate of $6-to-$1, up to $1,500 per contributor. The maximum amount in public funds a participant can receive is increased to 125 percent of the spending limit, and the spending limit is lifted completely. Both Mayor Michael Bloomberg and Council Member Melinda Katz (district 29) triggered the Tier 2 bonus in the 2005 election. Katz had accumulated a war chest of over $300,000 by the July before primary election, which triggered the Tier 2 bonus for her opponent, community activist Joseph Nocerino, as soon as he qualified for public matching funds. Nocerino received an additional $25,000 in matching funds as a result of the bonus. Katz, who garnered 82 percent of the vote in the primary, ultimately raised the most money of any City Council candidate—despite running unopposed in the general election.

As of the July 15, 2005 filing, Mayor Bloomberg reported contributions he made to his own campaign totaling $23.7 million, which exceeded the Tier 2 trigger of $17,184,000. As a result, his general election opponent, Fernando Ferrer, was therefore eligible to receive the Tier 2 bonus, and ultimately received an additional $1.3 million in public funds. While the additional public funds Ferrer received equaled only 1.5 percent of Bloomberg's total spending, his campaign did receive a significant benefit as a result of the bonus system. The new bonus matching rate notwithstanding, it was clear that neither of the candidates in the Tier 2 bonus situation would be able to compete with their opponents' spending.

### REFERENCES

1   *An Election Interrupted...*, 159.

2   Michael Goodwin, "Good Law Gone Bad," *Daily News*, November 2, 2005, 35.

3   *2003 City Council Elections*, 35.

4   Local Law 12 of 2003.

5   David Seifman, "Council Pols' $6.5M Public-Purse 'Snatch,'" *New York Post*, November 14, 2005, 2.

6   "Campaign 2005: Elections Themselves are Issues", *Gotham Gazette*, August 25, 2005.

7   Local Law 58 of 2004.

chapter 7

# Debates 2005 —
# Public Discourse Enhances Democracy

- For the first time, debates broadcast in Spanish, Chinese, and Korean
- New "lightning rounds" posed provocative "yes" or "no" questions
- Bloomberg bows out of Apollo Theater debate

New York City's Debate Program arose from public frustration during the 1993 mayoral campaign, when Rudy Giuliani and then-Mayor David Dinkins failed to debate one another because they could not agree on terms.* Editorial page reaction was strong, especially since the two candidates had received more than $3 million in public matching funds.[1] In 1996, the Campaign Finance Act was amended to establish mandatory debates for citywide candidates who join the Campaign Finance Program,[2] to ensure that citizens would hear from citywide candidates in forums promoting substantive discussion of the issues—at least when these candidates are receiving public funds. By law, the Debate Program is administered by the CFB, but the individual debates are sponsored by various media, educational, and civic groups and broadcast citywide.

Based on lessons learned from the 1997 and 2001 Debate Programs, the CFB made recommendations in its 2001 Post-Election Report for changes in the debate law, including: permitting debate sponsors to limit participants to those who meet a minimum threshold of public support; limiting the second primary debate to "leading contenders"; eliminating one of the two primary runoff

---

* The disagreement was over whether to include George Marlin, a third-party general election candidate, in a debate between the two major candidates. Dinkins refused to participate in a debate that excluded Marlin, while Giuliani refused to participate in a debate that included him. The Debate Program, as eventually established, struck a compromise between the two positions by relying on a lower threshold for Program participants for Citywide office to qualify to appear in the first of two mandatory debates, while reserving the second debate for "leading contenders." In 2005, for example, the Debate Program's criteria allowed for the inclusion of Conservative Party candidate Thomas Ognibene in the first mayoral general election debate and his exclusion—due to inadequate levels of financial and public support—from the second mayoral general election "leading contenders" debate.

---

*Chapter 7*

debates; and removing the provision in the law requiring debate sponsors to indemnify the city.[3] The first three recommendations were passed into law in 2004.[4] The recommended change in the indemnification provision was not.

Under the amended law, which applies both to contested primary and to general elections, city-wide candidates are required to participate in one debate prior to each election if they (a) join the Program; (b) appear on the ballot; (c) have raised or spent at least 20 percent of the monetary threshold to receive public funds; and (d) have satisfied any other nonpartisan, objective criteria set by the sponsors in advance.[5] A second debate is also required of Program participants who are determined to be "leading contenders."[6] Uniform, objective criteria for determining leading contenders are proposed by the debate sponsors and may include additional financial criteria or criteria such as polling results.[7] Debate sponsors are now also permitted to invite non-participants who satisfy the pre-set criteria to take part in any debate.[8]

## SELECTION OF DEBATE SPONSORS

The CFB solicits debate sponsor applications by writing to hundreds of academic, civic, community, and news organizations and issuing a press release announcing the application guidelines. In 2005, the CFB received six applications from 11 organizations, some of which applied jointly.

After a period of intense review, the CFB selected NY1 News, WNYC, and *Newsday* to sponsor the first primary and general election debates and WNBC-TV to sponsor the second (or "leading contender") primary and general election debates.[*]

## REACHING THE VOTERS

The CFB advertised the debates in the same four languages in which the Voter Guide is published: English (see Figure 7.1), Spanish, Chinese, and Korean. Subway and bus signs were posted throughout the city and in a number of widely read Spanish, Chinese, and Korean newspapers. For the first time, the CFB employed Google AdWords, which ensured that a prominent link to the CFB's website appeared whenever "NYC Debates," "NYC elections," "NYC Mayor," or other related phrases were entered into Google's search engine.

Each sponsor worked with foreign-language media to provide foreign-language access to the debates. NY1, WNYC, and *Newsday* provided simultaneous translation of the debates in Spanish on the television station NY1 Noticias, and rebroadcast the debates translated into Chinese and Korean

---

[*] A selection committee comprised of CFB staff members and Board Chairman Frederick A.O. Schwarz, Jr., as well as an outside consultant—former Federal Election Commission Chairman Trevor Potter—interviewed each organization to discuss proposed question formats, accommodation for foreign language coverage, and promotional plans.

*Debates 2005—Public Discourse Enhances Democracy*



**FIGURE 7.1:**
Primary Debates
Advertisement

on New Tang Dynasty and The Korean Channel, respectively. WNBC-TV worked with its sister station, Telemundo47, to broadcast in Spanish and with SinoVision and The Korean Channel for Chinese and Korean airings of the debates. Each broadcast featured information about the Voter Guide, alerting viewers that it would be coming to them in the mail before the election.

As it has since the inception of the Debate Program, WNYC aired all the CFB-administered debates live on its radio stations, and provided detailed information about the CFB, the debates, and the Voter Guide on its website.

## THE DEBATES

### Mayoral Primary

The first mayoral primary debate was heavily promoted by the sponsors: NY1 News, WNYC, and *Newsday.* NY1 News' corporate owner, Time Warner, provided Jazz at Lincoln Center as the site for the first mayoral Democratic primary debate on Tuesday, August 16, 2005. The debate included the four Democratic primary candidates who were Program participants: Fernando Ferrer, C. Virginia Fields, A. Gifford Miller, and Anthony Weiner.

The highlight of the debate was the "lightning round"—a series of provocative questions that had to be answered with a simple "yes" or a "no." The lightning round, the large live audience, and the

political supporters thronging Columbus Circle injected vitality into a debate some had predicted would be lackluster. According to one report:

> What had been a fairly colorless, sometimes plodding contest among the four Democrats … seemed more like a lively political race yesterday in the wake of the debate. According to the rival camps and independent political analysts, the televised debate evinced more flashes of personality than the candidates typically show, along with a telling gaffe or two and some political points.[9]

The second primary debate was held in sponsor WNBC-TV's Manhattan studios one week before the primary. WNBC's pre-set criteria limited the debate to those candidates who had raised or spent a minimum of $250,000 and had polled at least 10 percent (minus the margin of error) among NYC registered voters. All four Democratic candidates who had participated in the first debate qualified.

Gabe Pressman moderated, and four political reporters from WNBC and Telemundo47 posed a number of wide-ranging questions to the candidates. WNBC-TV also sent reporters to each borough to allow residents to voice concerns about problems specific to their neighborhoods.

## Mayoral General Election

In what was sometimes described as a sluggish election, the Debate Program provided a spark of controversy—in this case because of the site of the debate rather than its content.[10]

The NY1 News-sponsored first mayoral general election debate was to be held at Time-Warner's historic Apollo Theater in the first week in October. Three candidates qualified to participate: Democratic candidate Ferrer, Republican candidate and incumbent Bloomberg, and Conservative Party candidate Thomas Ognibene. Bloomberg's campaign announced six days beforehand he would not be attending the debate.[11] Bloomberg instead decided to attend the annual fall dinner for the Empire State Pride Agenda and to receive an award from the Turkish-American Education Foundation.[12] The decision to forgo the "Apollo debate" set off a controversy. Bloomberg's campaign questioned the debate's "lightning round" format; cited the precedent of Mark Green's reluctance to debate during the 2001 campaign*; and argued that the debates he chose to participate in were closer to election day and would be broadcast to a wider audience.[13] The Bloomberg campaign also referred to its objection to the inclusion of third-party candidate Ognibene in the first debate.[14]

The Ferrer campaign and others, however, focused on the racial symbolism of the debate's location. Skipping a debate held at the Apollo Theater was seen by some as a slight.[15] Other observers suggested that the Mayor's decision was a political judgment, and that participating only in later

---

* In 2001, Bloomberg pressed his mayoral general election opponent Mark Green to participate in four debates; Green agreed to two.

debates would not only deny Ferrer an early opportunity to raise his profile,[16] but would also prevent the Mayor from committing any gaffes could potentially benefit Ferrer. Furthermore, when the Mayor held an emergency press conference announcing a potential terrorist threat to the New York City subway system just hours before the Apollo debate, some critics questioned the timing of the announcement.[17] The sponsors placed an empty podium on the debate stage, underscoring Bloomberg's absence.

A number of editorial boards and community groups focused on the fact that the Bloomberg campaign bypassed this CFB debate (despite the change in the debate law allowing qualified non-participants to participate in all the debates).[18] Good-government groups criticized the Bloomberg campaign for participating in only two debates both held within a week of the election,[19] one of which was not a part of the city's Debate Program. Newspaper editorials argued that Bloomberg's refusal to debate in the first CFB debate undermined the Program, claiming his money allowed him to "buy his way" out of the debate.[20]

Ultimately, Bloomberg's absence generated publicity for the remaining CFB-administered debates, but any impact it may have had on the Debate Program is unclear. He did participate in the CFB's second leading contender general election debate on November 1st, sponsored by WNBC-TV. To qualify for this debate, candidates needed to have raised or spent at least $250,000 and received 15 percent (minus the margin of error) of public support in the polls, which limited the debate to Ferrer and Bloomberg.

As in the primary election leading contender debate, the candidates answered questions from a panel of WNBC and Telemundo47 political reporters, as well as taped questions from reporters stationed in the five boroughs. Both candidates addressed a host of topics affecting New York City, as well as questions relating to national and international issues. Despite a large gap between these candidates in the polls, this first match-up between the two leading candidates garnered heightened public interest due to the political fallout from the Apollo Theater debate.

**Public Advocate Debates**

NY1, WNYC, and *Newsday* sponsored the first primary election debate on Tuesday, August 23rd. WNBC-TV broadcast the leading contender primary election debate on Sunday, August 28th. The law set the financial threshold for qualification at a minimum of $25,000 raised or spent and, because no polling was available and no changes were made to the monetary criteria set by the debate sponsors, the same four candidates—Betsy Gotbaum, Norman Siegal, Andrew Rasiej, and Jay Golub—appeared in both primary debates.

The general election debates were held on Tuesday, October 11th and Sunday, October 23rd, with NY1 News, WNYC, and *Newsday* sponsoring the first, and WNBC-TV holding the second, leading contender debate. Because the same financial threshold was applied as for the primary debates,

*Chapter 7*

Democratic primary winner Gotbaum—a candidate who raised over a $1 million in contributions—debated Golub, who ran on the Conservative line and raised a little over $50,000 (most of which came in the form of loans by Golub to his own campaign).

## CONCLUSION

The CFB's experience with the Debate Program this year was, overall, very positive. The changes made to the debate law by the City Council in 2004 resulted in substantive, engaging debates among viable candidates and significant press coverage. Questions remain, however, about how much control debate sponsors should be allowed to exercise in: (1) choosing the format for the debates in order to produce engaging and newsworthy events; and (2) making subjective judgments about who should be allowed to participate. The role of sponsoring news organizations must be balanced with the need to ensure these government-mandated debates remain fair, objective, non-partisan, and non-discriminatory.

The 2005 comptroller debates highlighted the need to permit sponsors, in consultation with the Board, to determine whether to shorten a debate or cancel it altogether. The law currently mandates sponsors to produce debates for a minimum of one hour, commercial-free. Applying the standard for participation in the debates, the CFB and the sponsors were left with only one participant in the general election for comptroller in 2005, incumbent Bill Thompson. To hold a one-man debate would have presented a significant financial burden for the sponsor organizations, with questionable benefit to voters. Under the law, the debate could not be canceled without the agreement of the one qualifying candidate, who fortunately agreed with the Board's and sponsors' wishes. The language of the law should be modified to require approval only by the Board and sponsors to cancel or shorten a debate under these circumstances.

Mayor Bloomberg's decision not to participate in the Apollo Theater debate revealed the need to find additional means to encourage a non-participating candidate, who is not required to appear in any CFB debates, to take part. (See Chapter 10—Board Recommendations.)

*Debates 2005—Public Discourse Enhances Democracy*

## REFERENCES

1   Gail Collins, "They're Still Acting Like Babies," *Newsday*, October 21, 1993, 4; October 22, 1993, 7; October 23, 1993, 6; October 25–27, 1993, 5; and October 28, 1993, 6.

2   Local Law No. 90 of 1996.

3   *"An Election Interrupted...,"* 155–156.

4   Local Law No. 58 of 2004.

5   New York City Administrative Code §§3-709.5(1)(a), (5)(b)(i).

6   New York City Administrative Code §3-709.5(5)(b)(i).

7   New York City Administrative Code §3-709.5(5)(b)(i).

8   New York City Administrative Code §3-709.5(5)(b)(ii).

9   Patrick Healy, "Suddenly, An Exciting Race," *New York Times*, August 18, 2005 Metro, B5.

10  Stephan C. Friedman, "Miffed Bloomberg nixed TV debate in feud with NY1," *New York Post*, October 5, 2005, 10; Diane Cardwell, "Debate in Harlem Remains Contentious Issue," *New York Times*, October 4, 2005, B5; Dave Evans, "Bloomberg Tangles with Press Over Apollo," *WABC*, October 6, 2005; Stephanie Gaskell, "Vacant Spot to Stand in for Bloomy As He Skips Debate to Fete Gays And Turks," *New York Post*, October 6, 2005, 4; Celeste Katz and Michael Saul, "No-show Bloomy is bashed at debate," *Daily News*, October 7, 2005, 39.

11  Bloomberg Campaign 2005, "Statement by Bloomberg 2005 Senior Advisor William Cunningham," September 30, 2005.

12  Stephanie Gaskill, "Vacant Spot to Stand in for Bloomy as He Skips Debate to Fete Gays and Turks," *New York Post*, October 6, 2005, 4.

13  Lisa L. Coglangelo, "Mike Hits Back in Debate Flap," *Daily News*, October 3, 2005, 14; Dan Janison, "He's Adamant: Two is Enough!" *Newsday*, October 7, 2006, A4; Bloomberg 'Not Afraid' to Debate in Harlem," *wnbc.com*, October 5, 2005; Bloomberg Campaign 2005, "Statement by Bloomberg 2005 Senior Advisor William Cunningham," September 30, 2005; Jill Gardiner, "Bloomberg Pins Blame for Skipping Debate on Former Opponent," *New York Sun*, October 3, 2005, 3.

14  Stefan Friedman, "Miffed Bloomberg Nixed TV debate in feud with NY1," *New York Post*, October 3, 2005, 10.

15  Scott Michels, Veronika Belenkaya, Celeste Katz, "Reverend Al Rips Mayor Over Debate Snub," *Daily News*, October 2, 2005, 19.

16  Nicholas Confessore, "Ferrer Attacks Bloomberg for Skipping Harlem Debate," *New York Times*, October 2, 2005, 37; Frankie Edozien, "No Mike at Forum," *New York Post*, October 1, 2005, 4.

17  Dave Seifman, " 'Freddy Cops' Slam Mike's Subway Alert," *New York Post*, October 12, 2005, 2.

18  See, e.g., Editorial, "A gift from Bloomberg," *Newsday*, October 6, 2005, A50.

19  "Statement by Civic Groups on Mayoral Debates," Citizens Union Foundation, Common Cause NY, and New York Public Interest Research Group, Tuesday, October 4, 2005.

20  Editorial, "The Shunned Debate," *New York Times*, October 9, 2005, CY11.

chapter 8

# The Voter Guide—
# Voter Education Gets a Makeover

- More than 6.6 million Voter Guides distributed
- Distributed in English, Spanish, Chinese, and Korean
- New format, color graphics and photos, and voter's district printed on the mailing label
- Online users can personalize the format for district-specific information

For 17 years, the Campaign Finance Board has produced and distributed the official New York City Voter Guide before each regularly scheduled municipal election. The Voter Guide provides information about candidates running for the five offices covered by the Program as well as general voting information and coverage of local ballot proposals. The Guide is mailed to the millions of households with registered voters citywide in numerous language- and district-specific editions. For the 2005 elections, more than 2.7 million primary Guides were produced and mailed in 12 editions, and more than 3.6 million general election Guides were mailed in 24 editions. In addition, approximately 370,000 Guides were provided to community organizations, libraries, colleges, and other distribution sites.

All candidates who are planning to run for these offices are encouraged to submit a profile for inclusion in the nonpartisan Voter Guide. The CFB sends hundreds of letters to political clubs, community board leaders, district leaders, party leaders, civic groups, and elected officials in the spring of each municipal election year, alerting them to the upcoming Voter Guide and the submission requirements. To help candidates prepare their submissions, the CFB developed a simple software application, the **Voter Guide Wizard,** which allows candidates to view, edit, and print a draft of their profiles, and provides assistance to help them produce error-free submissions that meet the requirements for publication.

The Guide is a tremendous resource for candidates, because it provides them with a free opportunity to reach their targeted constituency. All candidates benefit from appearing in the only official non-

*Chapter 8*

partisan Voter Guide covering New York City elections. For candidates with limited funds, publication in the Guide may be their best opportunity to reach the widest possible pool of potential voters.

Clearly the Guide is a valuable tool for candidates, but its main purpose is civic in a more general sense: the Guide was mandated by law in order to provide clear, concise, nonpartisan information about municipal elections to New York City voters. In addition to candidate profiles, the Guide provides answers to common questions about voting, describes how and when to be in contact with the Board of Elections (BOE), outlines voters' rights, and illustrates how to use the voting machine.

Moreover, the Guide provides comprehensive, nonpartisan coverage of local ballot proposals. This coverage includes plain-language summaries; arguments for and against each proposal, based on information gathered at public hearings, in the press, and from submitted public commentary; and excerpts of public commentary for or against each proposal, as space permits. In 2005, for the first time, the CFB included the same information for two state ballot proposals as well. This was a change from previous practice of including only the official text and summary for state issues. The Guide is produced in English and Spanish as mandated by the Charter. A second edition, translated into Chinese and/or Korean, is mailed to voters in targeted election districts consistent with the federal Voting Rights Act.

## 2004 SURVEY: HOW ARE WE DOING SO FAR?

The Voter Guide has always provided valuable election information in multiple languages in a convenient package. But, its black-and-white booklet-size format (see Figure 8.1) did not lend itself to much in the way of design or eye-catching graphics. Inside the brightly colored cover, the interior was tightly packed text on newsprint. With full citywide elections, and especially when there were complex ballot proposals, the Guide sometimes appeared a bit daunting to readers.



As the 2003 elections approached, the CFB contracted with the Peter Harris Research Group to determine whether the voters were reading the Guide, what they liked and did not like about it, what changes they would like to see made to the Guide, and, for those who had not been reading it, what changes could entice them to start. The Peter Harris Research Group began the Voter Guide survey project by conducting focus groups with registered city voters of different educational levels. The first group was composed of voters with relatively less education (a high school diploma or less); the second group was composed of voters with relatively higher education ("some college education" up to "post-graduate degree").

**FIGURE 8.1:** The Old Voter Guide Design

The less well-educated group of voters seemed to have only a passing familiarity with the Guide. After taking a brief look at a recent copy—which most in this group failed to recognize, even though they would have received it in the mail—they expressed little interest in reading a document that they felt looked boring, contained legalistic language, was published on cheap-looking paper, and contained uninspiring graphics, with little to capture their attention or make them quickly understand the value of exploring the contents.

The better-educated group seemed to be more aware of the Guide and generally had a greater appreciation of its value. More of these voters occasionally or regularly read the Guide, but they also had a somewhat muted enthusiasm for it. These voters felt generally unmotivated to read a Guide they felt was visually unappealing and poorly organized. They could not understand why the candidate information was not up front and why they had to receive information about candidates outside their districts. Other than information on candidates, most of the group was generally unfamiliar with the specific contents of the Guide.

After examining a 2003 Guide more closely, several voters in the less-educated group expressed surprise that the Voter Guide contained more and better information than they had thought. Some seemed more inclined to consider reading it in the future; one noted that the information would be helpful for "other" voters. Many in the higher-educated group were more interested in the information in the Guide and indicated they would be more likely to read it if it was better organized and made more visually appealing, with its purpose, importance, and contents communicated more clearly to voters. Both groups felt that the Voter Guide could be transformed into a far more inviting and engaging document.

Suggestions for improvements included: making the Guide bigger, like a magazine; using a larger typeface; adding color photos and graphics; putting candidate profiles up front; and having simpler and much less text. When told that many of these changes would raise the cost of the taxpayer-funded Voter Guide, most focus group members said it would be worth spending the extra money.

The focus groups also revealed considerable alienation among voters toward politicians and the political process, particularly among less-educated voters. Some expressed interest in having candidates answer questions about specific local issues so that voters could have a public record of candidates' positions to hold elected officials accountable for their actions.

A telephone survey confirmed high levels of voter alienation, but indicated slightly more familiarity with the Guide and substantially more support for it. Over 800 randomly selected registered voters were polled throughout the five boroughs.

*Chapter 8*

The survey found that:

- Nearly 70 percent of NYC registered voters had read the Guide at least once.

- The vast majority of respondents (89 percent) thought the Guide is a good idea and the city should continue to publish it*; 87 percent agreed that the Guide is "good for democracy."

- 72 percent *disagreed* that "you already know enough about candidates and issues without reading the Voter Guide."†

- 35 percent of Latino voters and 33 percent of African-American voters rated the Guide a "10" (out of 10) on its importance in helping them decide which candidates to vote for, suggesting the Guide is particularly important amongst historically underrepresented voting groups.

- Regular Guide readers were more likely to vote in every election.

- Regular Guide readers were more likely to feel very well-informed about mayoral candidates, and *twice as likely* as non-readers to say they feel very well-informed about non-mayoral candidates.

- Voters found *all* the information in the Guide to be important (at least a 70 percent positive response for every section), but they ranked the candidate profiles and ballot proposal section most important.

- Nearly 80 percent of registered voters say the Guide was useful for making more informed decisions about both candidates and ballot proposals, but less than 45 percent rated it *very* useful. Likewise, while 75 percent indicated they were satisfied with the Guide, only one-third were *very* satisfied. These figures indicated that while the Guide was fulfilling its mandate, there was significant room for improvement.‡

The results of the 2004 focus groups and phone survey indicated that the Campaign Finance Board should undertake a redesign of the Voter Guide, using the criticisms, concerns, and reading patterns of the voters learned during the study.

---

\* This rises to 93 percent for Latinos, African-Americans, *and* foreign-born voters.

† 60 percent of prime voters (those who say they vote in most elections and follow politics closely) and 83 percent of less-avid voters *disagreed* that they know enough without the Guide, indicating that even the most involved and active group of voters need the Guide to be well informed about local elections.

‡ Another clear indication that the Guide could be improved is that fact that 50 percent of voters said that when the Guide arrived in the mail, they "put it aside for later"; of those, 62 percent said they rarely or never got around to reading it after they put it aside. A disheartening 16 percent reported that they just throw the Guide away. Conversely, those who most frequently read the Guide were the most likely to find it very useful and very important.

*The Voter Guide—Voter Education Gets a Makeover*

## THE 2005 REDESIGN

CFB staff studied the results of the 2004 survey and also considered a variety of comments and suggestions that had been made over the years by voters, good government groups, and CFB staff. The staff developed prototypes that added color, reduced and reorganized the standard text, and in some cases changed the size and layout of the Guide. A new focus group was held with a number of high-level New York City print and packaging designers. This group did not make specific recommendations, but seemed to agree that while the prototypes improved upon the current Guide specifications, what the CFB really needed to do was start from scratch with a completely new concept.

At this point, CFB staff met with the company under contract with the Board to provide design and formatting services for the Guide. D-Zine, Inc. was given the prototypes and a synopsis of the survey results, and asked to bring in at least three new concepts that incorporated the best of these changes. The result: a dramatic redesign for the 2005 Voter Guide. (See Figure 8.2.)

The new Guide is a full-color, news magazine-style publication with color photos and brightly colored images on a lightweight, magazine-style paper stock. The Guide has grown from its original 4.25 x 11 inch booklet size to an oversized 11 x 15 inch publication (folded in half to fit in city mailboxes), but instead of 64 pages in each language, it now has a mere 14.



**FIGURE 8.2:** Redesigned 2005 Voter Guide

Inside, black and white text has given way to colorful graphics and color blocks highlighting important information. Outside, highlights of the contents are the main focus of the striking cover, which set theme for this year's Guide: "Educate Yourself & Vote." On mailed copies, the council district, assembly district, and election district numbers for the intended recipient are printed prominently on the address label area (see Figure 8.3), making it easier for voters to find their candidates in the Guide, and to choose the correct polling booth on election day.



**FIGURE 8.3:**
The New
Mailing Label

*Chapter 8*

The new concept represents a dramatic change in size, materials, and the "look and feel" of the Guide, but it embodies more than cosmetic changes. The information that had always been provided in the Guide was rewritten, reorganized, and reformatted in more eye-catching and reader-friendly ways.

### Targeted Editions

The first NYC Voter Guide, covering the 1989 citywide elections, was produced in five bilingual editions before the primary and again before the general election: one edition per borough. By 2001, this was no longer feasible; far too many candidates were running for office, and the larger boroughs required several editions each.

The 2005 redesign efforts took into account, to the degree possible, the voters' desire to read only about the people running in their council district, for their borough presidency, and for citywide office. It proved infeasible to produce a separate edition for each of the city's 51 Council districts. However, it was possible to limit most editions to just two or three Council districts, greatly mini-

**FIGURE 8.4:** Candidate Profile Pages



*The Voter Guide—Voter Education Gets a Makeover*

mizing the amount of extraneous information each voter received. Council district numbers were made prominent in the interior of the Guide so readers could easily skip past districts of no interest to them.

**Candidate Information**

The new design has space for four candidate profiles on a single page, in many cases allowing all the candidates for one office to be viewed without turning the page. Large, vibrant artwork on the opening page for each office helped draw attention to the description of that office and the list of candidates on the ballot at press time. As voters requested, profiles now begin in the front of the Guide, on page 4.

Rather than providing a single, lengthy statement, candidates answered three questions in their profiles, which allowed voters to compare opposing candidates' responses. Biographical information was set apart in a colorful box that also highlighted the campaign's email and/or website address, so voters could contact the campaigns directly for more information. (See Figure 8.4.)

**FIGURE 8.5:** The City Ballot Proposals Section



*Chapter 8*

### Ballot Proposals

The ballot proposal section was streamlined and refitted. In the old booklet style, coverage of ballot proposals could run 20 pages or longer. Research suggested most readers only looked at the first few pages, and may not even have noticed the "pro" and "con" arguments or public commentary. The solution: a single 2-page spread covering local proposals (with an additional two-page spread for statewide proposals). Plain-language summaries were provided on the left, with the official text of each proposal "as it will appear on the ballot" highlighted in a sidebar. The right-hand page was devoted to "Reasons to Vote YES/Reasons to Vote NO" on each proposal, along with brief excerpts of statements submitted by elected officials, good government groups, and interested citizens. (See Figure 8.5.)

### General Voting Information

Contact information for the BOE, a list of voters' rights, the election date, and other vital information were presented on the first page opposite a "Welcome" section outlining the improvements made to the Guide. Broadcast information for the CFB's Debate Program received its own page, while colorful banners and mini "advertisements" sprinkled through the Guide reminded readers about the election date, poll site hours, and how to find their council district, and provided the CFB and BOE website addresses.

"Questions and Answers" and the pictorial "How to Use the Voting Machine" sections were pared down, rewritten, made more vibrant, and moved to the end of the Guide, along with information about the Campaign Finance Program and the Board, based on the order in which respondents ranked these sections.

## WHAT DO YOU THINK OF US NOW?

Considering the dramatic changes made to the Guide, the Board felt it was important to conduct a second survey after its release, to gauge public response. Peter Harris Research Group was again selected to conduct a phone survey and focus groups on the new design. The preliminary results of the phone survey are quite encouraging. The draft report on the 2005 phone survey indicated that, among readers of the 2005 Guide:

- 92 percent were satisfied with the 2005 Guide—including 50 percent who were very satisfied.

- 91 percent gave the 2005 Guide an overall positive rating of either excellent (36 percent) or good (55 percent).

*The Voter Guide—Voter Education Gets a Makeover*

- 86 percent said it was easy to understand the descriptions of this year's ballot proposals.

- 90 percent gave a positive rating for "how easy it is to read the Voter Guide in terms of the print size and layout."

- 88 percent gave a positive rating for "how easy and comfortable it is to hold and look through the Voter Guide."

- 81 percent thought the design and appearance of the Guide made people "feel like looking through it" and that the new organization made it easy to find information.

- 79 percent thought that voters were more likely to read the redesigned Guide.[*]

- 78 percent found the specific questions asked of candidates useful.

- 69 percent of those who also read the Guide in previous years said the larger print and new layout of the 2005 Guide made it easier to read.[†]

- 59 percent of those who read the Guide in previous years said they found it easier to understand the information in the 2005 Voter Guide. This increased to 70 percent amongst voters who had a copy of the 2005 Guide to refer to during the interview.

These responses appear to demonstrate that many of the goals of the redesign effort—to attract new readers, to make it easier to find the information each reader seeks, and to draw attention to sections readers may have skipped in previous Guides—were achieved.

Long before the survey was conducted, however, the CFB had quite a bit of anecdotal evidence that the new Guide was well received by the public. For the first time since the publication of the very first official NYC Voter Guide in 1989, the CFB was overwhelmed by letters, phone calls, and emails in praise of the new Guide. One email received by the Board stated:

> Your 2005 Primary Guide is EXCELLENT. The new larger format, with color photos and larger print is certainly going to catch the eye of the electorate.

---

[*] Only 6 percent thought voters were less likely to read it, while 9 percent thought the redesign didn't make any difference. The remaining 6 percent were not sure.

[†] This increased to 83 percent among those who still had the Voter Guide in their homes to refer to during the interview.

*Chapter 8*

In many cases, the correspondent appeared to believe the Guide was a new initiative, suggesting that the redesign had garnered new readership—a key goal of the redesign efforts. An email received after the general election Guide was mailed to voters stated:

> I just wanted to let you know that I found your 2005 voters guide INCREDIBLY helpful in understanding the candidates' viewpoints on different issues, as well as the pros & cons on some of the key questions facing the city. I usually go to the voting booths incredibly confused and only educated on the top candidates who are spending the most on advertising or get the most media time. This year, I was happy to get some insight into the people running for city council in my district, the Borough Presidents, Public Advocates etc. In addition, the "question" section was very helpful and allowed me to form an opinion on key issues that are up for debate. Thank you for putting together a one stop spot for me to obtain valuable information and for making my voting experience much easier. Please keep this coming for 2006 and beyond!

The new and improved 2005 Guide afforded each New York City voter the opportunity to "Educate Yourself & Vote," fulfilling one of the CFB's most important mandates and enhancing the democratic election process in New York City. Bigger, better, and by most accounts, much appreciated by the public, the 2005 Guide continued to serve voters and candidates successfully—as it has since 1989—at minimal cost to the taxpayer: about 48 cents per copy plus postage.

## THE ONLINE VOTER GUIDE

In 1998, the CFB published its first online version of the Voter Guide, and in 2001, an important interactive feature was added: visitors to the CFB's website could type in their address to find out their Council district and view a personalized Guide onscreen.

The 2005 online Guide was redesigned and updated in concert with the printed version and made it even easier for visitors to find the election information they sought. Voters could go directly to any section of the Guide using the menus at the top of each screen. With one click, a visitor could jump to the list of candidates for any office, or skip directly to ballot proposals, Debate Program information, or any other section that interested them.

The candidate profile layout was designed to complement that of the printed Guide, and provided a brand-new feature: when you viewed a profile, pictures of each of that candidate's opponents were

*The Voter Guide—Voter Education Gets a Makeover*

displayed to the left as icons that linked to *their* profiles.* (See Figure 8.6.) This allowed voters to easily navigate amongst all the candidates for any particular race.

The CFB publicized both the printed and online versions of the Guide on subway and bus posters, in newspaper ads, and with public service announcements. Google search words were also purchased, so that if someone entered, for example, "NYC Voter Guide" in the Google search engine, a link to the CFB's online Guide would appear prominently onscreen.

Altogether, the online Guide received 216,426 visits in the days leading up to each election, more than an eleven-fold increase over the 2003 online Guide, and in the week before each election, the online Guide was one of the 10 most popular pages on the CFB's website.

In 2005, voters had a new source of information in the video voter guide, produced by the New York City Voter Assistance Commission (VAC). Candidates taped 2–4 minute statements that aired on NYC-TV 74, New York City's official network. The taped statements were also made available



**FIGURE 8.6:**
A Candidate Profile in the Online Guide

---

* The names of candidates who failed to submit a profile, or did not submit it in time for inclusion in the Guide, were displayed without photos, and with a link to a footnote to that effect.

*Chapter 8*

on the Internet as streaming video. The Board provided links in its online Guide to the video voter guide's homepage, and provided information about the video voter guide in each edition of the Board's printed 2005 Voter Guides.

## FOR THE FUTURE

Although the CFB is extremely pleased with the public's reaction to the redesigned Voter Guide, there is still more work to be done.

One area being investigated by the staff concerns the mailing to registered voters. Both anecdotal evidence and preliminary data from the 2005 telephone survey indicate a significant percentage of registered voters say they did not receive a copy of the Guide; in fact, non-receipt is the most frequent reason cited in the survey why a respondent did not read the Guide. The CFB is looking into ways to obtain the most up-to-date mailing data possible from the New York City BOE, and to work even more closely with post offices to make sure they understand the importance of this critical mailing and deliver it expeditiously. Part of the problem, however, could be a lack of recognition; so much election-oriented mail is received by the average voter—not to mention ordinary "junk" mail—the Guide may simply get lost in the mix.

For example, only a tiny percentage of respondents in the telephone survey could correctly describe the Voter Guide subway poster, despite a 4-week campaign of advertisements prior to each election. The ads featured the same artwork printed on the cover, so if voters didn't notice the ads, it is possible that they didn't recognize the Guide when it arrived. According to preliminary analysis of the telephone survey, increasing voter recognition of the Guide should have a positive impact on readership.

The CFB plans to focus its efforts on revamping the Voter Guide promotional campaign in the hopes of significantly increasing recognition and readership for the 2009 elections. In addition, the CFB will work closely with its vendors to refine and improve the next edition, with the goal of attracting and educating even more voters.

## ACKNOWLEDGMENTS

Numerous agencies and organizations provided assistance to the CFB's Voter Guide project. The New York City BOE has provided the CFB with specially prepared registered voter mailing tapes before each election since 1989, and its website, www.vote.nyc.ny.us, has been a valuable resource for election information for this and other CFB projects over the last several years. NYPIRG's CMAP Project provided borough maps for both the print and online Voter Guides, as they have for the past several elections, and also provided the underlying technology for the find-your-district capability featured in the online Voter Guide.

chapter 9

# Enforcement—
# Protecting Public Dollars

- Contemporaneous penalty proceedings had a positive effect on compliance
- Issues arise regarding the 90-day blackout period on officeholder mailings
- Enforcement efforts recoup public dollars

One of the hallmarks of the New York City Campaign Finance Program has been vigorous enforcement. A strong enforcement practice that evolves in response to new challenges is crucial to achieving the important goals of the Program. Without highly effective enforcement, well-intentioned campaign finance reform can easily devolve into mere "welfare for politicians."

The CFB provides comprehensive education to help candidates avoid violations that arise out of mistakes or ignorance of the law and rules. All campaigns are advised at the outset that they will be audited by the Board. Most campaigns do a creditable job adhering to the Act and the Rules. Despite this advance caution, however, the Board's audits continue to uncover the full range of campaign omission, error, and, unfortunately, even criminal wrongdoing.

In furtherance of its efforts to obviate and help campaigns avoid violations, the Board also issues advisory opinions to clarify matters of general interest. These preventive measures, of course, are supplemented by continuing evaluation of campaigns' compliance before, during, and after the election. Timely public disclosure of campaign finances, compliance visits during the campaign season, and requests for information before the election are part of this evaluation. The Board also conducts comprehensive post-election audits of every campaign to bring to light irregularities and possible violations. Audits require detailed review of documents as well as extensive communications between the CFB and the campaigns. At times, this process may be lengthy. These audits are followed, if necessary, by penalty proceedings and findings of violations and assessments of penalties by the Board. Penalty determinations are published in routine press releases and on the CFB website.

*Chapter 9*

Public funds that were improperly used by campaigns, inadequately documented, or simply left over at the end of the campaign are brought to the campaign's attention and recouped for the public. The Board pursues litigation, if required, to compel satisfaction of penalty or repayment obligations. New enforcement initiatives instituted during the 2005 election cycle include litigation in the Small Claims Part of the New York City Civil Court and the expanded use of post-judgment enforcement processes, such as property liens and wage garnishment.

The CFB's enforcement efforts have been successful in finding minor and serious violations of the Act and Rules and protecting the public fund through the collection of penalties and public funds repayments. In connection with the 2001 citywide elections, the Board has collected $904,021 in repaid public funds from 71 participants and $711,545 in outstanding penalties from 186 participants. In connection with the 2003 City Council elections, the Board has collected $308,843 in repaid public funds from 36 participants and $103,348 in outstanding penalties from 46 participants.[*]

Even as the CFB's enforcement practices have become more varied and sophisticated, however, a small number of campaigns continue to commit serious violations of the Act and Rules. In some cases, these violations lead to a finding of breach of certification. In 2000, the Board adopted a rule that states that certain very serious violations such as fraud may be found to constitute a breach of the certification a candidate signs to join the Program. The consequence of a finding of breach is that a campaign is not entitled to receive public funds and must return all public funds already received. In the 2001 elections, four participants were found in breach of certification: two borough president candidates (Sheldon Leffler and Pedro Espada, Jr.)[†] and two City Council candidates (Margarita López and George Martinez). In 2003, three of 102 City Council participants on the ballot were found in breach (Geoffrey Davis, Anthony Herbert, and David Miller). As of publication of this report, penalty proceedings that may result in findings of breach of certification are pending against one additional 2001 campaign and two additional 2003 campaigns. Because the 2005 post-election audits are still in progress, the number of 2005 campaigns that may be found to have violated the Act and Rules is not yet known.

In the 2001 elections, misrepresentation or fraud-related violations were found in connection with six of 280 campaigns,[‡] four of which were Council campaigns. In the 2003 elections, such violations were found in connection with six of 102 Council campaigns.[§] As of publication of this report, penalty proceedings in which fraud and/or misrepresentation are alleged are pending against two additional 2003 campaigns and one additional 2001 campaign.

---

[*] These figures for total collection amounts are current as of June 13, 2006.

[†] Leffler was convicted of fraud and forgery in criminal court. Several individuals connected to the Espada, Jr. campaign were convicted of, or pled guilty to, larceny, scheme to defraud, and/or perjury, although Espada, Jr. himself was not charged.

[‡] These were the City Council campaigns of López, Martinez, Elizabeth Crowley, and Kendall Stewart, and the borough president campaigns of Espada, Jr. and Leffler.

[§] These were the City Council campaigns of Davis, Herbert, Miller, Maria Baez, Omar Boucher, and Samuel Tait.

Over time, campaigns have also violated the expenditure limit. In the 1993 elections, three of 107 participating campaigns and, in the 1997 elections, three of 141 participating campaigns, were found to have exceeded the expenditure limits. In the 2001 elections, however, the number increased to 14 of 280 participating campaigns. In the 2003 elections, four of 102 participating campaigns exceeded the expenditure limit. (See Chapter 5—Expenditures.)

These serious compliance problems may result from a willingness on the part of certain campaigns to violate or at least "bend" the Act and Rules in high-pressure and competitive races. The $4-to-$1 public funds matching rate may be the most important temptation for non-compliance. Regardless of the causes, however, violations of the Act and Rules represent a continued challenge to the integrity of the Program.

## PENALTY PROCESS IN THE 2005 ELECTIONS

Most penalty proceedings are initiated after the elections have taken place, as part of the post-election audits. In certain circumstances, however, contemporaneous, "real time" enforcement during the election is appropriate to preserve a level playing field as much as possible, to alert the public to potential violations of the Act, and to prevent more serious violations or inequities.

### Failure to File Timely Disclosure Statements

In 2005, for the first time, the Board published on its website—in advance of any finding of violation—a list of all candidates who failed to file disclosure statements by the due dates. In most cases, penalties for any late filings will be considered in the post-election audit process. During the 2005 primary election, however, the Board initiated penalty proceedings against the campaigns of two non-participants whose failure to provide timely disclosure hampered the Board in making accurate bonus determinations during the election based on the non-participants' spending.

On August 17, 2005, in district 41, Darlene Mealy submitted a request for a bonus determination based on the spending of William F. Boyland, Sr. The Boyland campaign had failed to file the most recent disclosure statement. Board staff issued a notice recommending a penalty for the missing statement and informed the campaign that if it filed the statement promptly, the penalty might be reduced. The campaign filed the statement in response to the notice, and the Board assessed a lower penalty. According to the new filing, the Boyland campaign had triggered the bonus, and the Board granted the bonus petition. (See also Chapter 2—At the Races, and Chapter 6—Public Funds.)

In the second case, James J. Sanders, Jr. in district 31 had failed to file his disclosure statements, which deprived the Board of information needed to determine the amount of public funds due to his opponent, David Hooks, Jr. On the first primary election payment date, Hooks' public funds payment was limited to the 25 percent cap because Sanders had not filed and the Board could not determine whether he had raised or spent more than one-fifth the amount of the expenditure limit.

*Chapter 9*

On the next payment date, the Board lifted the 25 percent cap for Hooks because campaign activity indicated that Sanders was running a full-fledged campaign. In response to the notice of recommended penalties, the Sanders campaign filed the missing statements; the Board assessed a reduced penalty and declared a bonus situation for Hooks. (See also Chapter 2.)

### Penalties for the Failure to Respond to the Initial Requests for Campaign Records

Contemporaneous penalty proceedings are also useful in the immediate post-election period when a campaign fails to respond to the Board's initial request for campaign records, because prompt enforcement encourages the submission of such records and allows an effective audit.

Even as the victors celebrate and the defeated quietly close up shop, campaigns are apt to forget that their responsibilities under the Campaign Finance Act do not end with the election. Campaigns must participate in a comprehensive post-election audit, including a full response to the Board's request for campaign records, so the Board can fulfill its mandate to verify compliance with the Act. Failure to respond to the Board's requests for documentation is a serious violation of the Act, particularly when a campaign has received public funds. It also delays the post-election audit process. The Board rules require that, to the extent practicable, the Board issue draft audit reports by the end of the year after the elections. One frequent request from campaigns is that the Board conduct an expeditious audit, but this cannot be accomplished when campaigns are not responsive.

In furtherance of the Board's goal of conducting prompt and thorough audits, if a campaign fails to respond to the request for campaign records, CFB staff immediately refer the campaign to the Board for consideration of penalties. These penalty referrals remind campaigns that their ongoing and prompt cooperation is necessary throughout the post-election audit. Usually, the penalty proceedings spur the campaigns to provide the requested documentation. In the 2005 post-election period, immediate penalty proceedings were initiated against 18 campaigns that had failed to respond to the initial request for audit documentation. Fourteen campaigns ultimately submitted the necessary documentation as a result of the pending proceeding but before a penalty was assessed, resulting in far lower penalty assessments. In 2003, these proceedings were initiated against four campaigns.

## EMERGING ISSUES IN THE 2005 ELECTION

### Use of Public Resources by Incumbents for Campaigning Purposes

The use of government resources by public officials running for re-election poses another challenge to the Program's goal of leveling the playing field. During the 2005 elections, several officeholders used public resources to distribute constituent literature in the midst of their re-election campaigns. Even though the literature did not explicitly refer to the incumbent's candidacy, the potential value of getting the incumbent's name out during an ongoing campaign was clear. The Board's jurisdiction in this area, however, extends only to enforcing the 90-day "blackout period" before the election,

during which a public servant who is a candidate in the election may not use government resources for mass mailings.[1]

The most dramatic instance of a taxpayer-funded mass mailing was that of City Council Speaker Gifford Miller, who spent an estimated $1.6 million in City Council funds to distribute over five million pieces of mail, just before the onset of the 90-day period. (See Chapter 2.) Because of the timing, the mailing was consistent with the letter of the 90-day blackout period, even though voters were receiving the literature at the height of the election season.[*] The crescendo of public concern over what may be a technically legal use of public resources in the midst of a heated election has brought the efficacy of the 90-day blackout period into question. (See Chapters 2 and 5.) A 90-day blackout period may be insufficient to ensure a level playing field and to prevent the distribution of significant amounts of literature at public expense at a time when this results, or appears to result, in private political gain.

Before the City Council amended the Charter in December 2004, the blackout provision covered only a 30-day period prior to an election. Expanding the blackout period to 90 days was a step in the right direction. The large-scale mailings of Miller and other incumbents, however, has led some to question whether the blackout period should be further extended and whether other restrictions should be placed on the use of public resources prior to elections.

In addition to the Miller case, the Board reviewed numerous proposed and actual expenditures of public resources by incumbent candidates during the 2005 election season that tested and clarified the scope of the Charter's blackout provision. Over a dozen office holders asked the Board whether expenditures on assorted newsletters, holiday greetings, invitations to community events, informational pamphlets, advertisements, and other announcements would be permissible during the blackout period. The Board also investigated several expenditures of government resources on its own initiative.

The Board found certain uses and proposed uses of public resources to be consistent with the law because of their timing, volume, or content. For instance, the blackout provision does not limit "ordinary communications between elected officials and their constituents" or "communications necessary to safeguard public health and safety."[†] The Board determined that other uses of public resources by incumbents, however, such as a holiday mass mailing, could not be reconciled with the blackout provision. In another example, a City Council member inquired whether it would be

---

[*] Other Charter provisions not within the Board's jurisdiction include a prohibition on the spending of public resources by public servants on electioneering messages, and violations of this provision may be prosecuted as a misdemeanor. Charter §2604(b)(2) also prohibits public servants from having interests or engaging in activities that conflict with their official duties, and Charter §2604(b)(3) forbids public servants from using their positions for personal gain. Jurisdiction over Charter §§2604(b)(2) and (3) lies with the New York City Conflicts of Interest Board.

[†] Charter §1136.1(3)(a) also specifically exempts "standard communications in response to inquiries or requests," and §1136.1(2)(b) exempts one mailing on the executive budget sent within 21 days of its passage.

*Chapter 9*

permissible to use government resources to reprint and redistribute *by hand* a budget-related constituent newsletter that she had already mailed to constituents. The Board determined that the proposed distribution was not permitted under the Charter, given that the blackout period was not limited to mass mailings delivered through the postal service. Further, limiting the blackout provision to items sent in the mail would reduce its value in leveling the playing field and preventing the misuse of taxpayer resources.

## 2005 ELECTION-RELATED LITIGATION

### A. Gifford Miller

Approximately one week before the September 13, 2005 Democratic Party primary election, the Board received a request for an advisory opinion from Miller's Democratic mayoral campaign raising the question "whether expenditures for ballot petitioning carriers are 100 percent exempt, when those carriers have used literature as an aid in persuading voters to sign ballot petitions."* On September 6, 2005, the Board issued an advisory opinion stating that the Board could not consider all $560,000 spent by the campaign on independent nominating petitions to be exempt from the expenditure limit. Consistent with the Board's prior guidance and its current and past treatment of exempt petitioning claims submitted by other campaigns, the Board explained that, at some point, "what was labeled petitioning was in reality campaigning."[†]2 (See Chapter 5.)

The same day the Board issued the advisory opinion, the Miller campaign sued the Board and requested a preliminary injunction in New York State Supreme Court prohibiting the Board from not accepting as exempt all the campaign's expenses for independent nominating petition carriers. On September 14, 2005, the Court denied the campaign's request for a preliminary injunction. The Court found that the Miller campaign had failed to show that the Board had "not adhered to its own prior precedents or that the Board's construction of the Act [was] irrational or unreasonable."[3] Citing the Board's advisory opinion, the Court reiterated the importance of the expenditure limit in helping to level the playing field, "especially when a candidate exceeds the [spending] limit in the final days prior to an election." The Court noted that Miller had voluntarily agreed to abide by the Program's rules in exchange for accepting public funds, and "[i]f he did not understand its rules or found them to be ambiguous, his remedy was to seek clarification in a timely manner, rather than to proceed at his own risk." The Miller campaign discontinued its litigation against the Board following the Court's decision.

---

* Although Program participants are subject to an expenditure limit, expenditures necessary to comply with state election law, including the costs of circulating designating and nominating petitions, are exempt from the expenditure limit. (See Chapter 5.) Campaigning expenditures, such as literature distribution, are not necessary to comply with state election law, however, and thus are never exempt under the Act.

† Board member Dale C. Christensen, Jr. issued a separate opinion, which was published as an exhibit to the Board's advisory opinion and can be viewed at www.nyccfb.info.

---

*Enforcement—Protecting Public Dollars*

**Challenges to Program Requirements**

The 2005 election cycle brought a series of lawsuits filed by candidates who missed the deadline for joining the Program, or chose not to join the Program, but nonetheless sought public funds or participation in the Debate Program. In the 1997 elections, candidate Roland Rogers filed an action of this kind in New York federal district court, as did candidate Sonya Ostrom in the 1999 elections. Both actions were dismissed. In 2005, Arthur Piccolo brought suit, claiming that the Program deadline and the Voter Guide deadline violated his constitutional rights; Jimmy McMillan, the mayoral candidate of "The Rent Is Too Damn High" party in the 2005 general election, challenged the Board's requirements for participation in the Program and the debates. In the Piccolo case, the Court denied the request for preliminary relief enjoining the enforcement of the Board's June 1, 2005 deadline for joining the Program, stating that "because the deadline is content neutral, race neutral and neutral in every other respect, the deadline is valid because it furthers governmental interests, such as the promotion of good government reforms." The court also upheld the Voter Guide deadline. Both actions were dismissed.*

## PRE-BOARD DETERMINATION COURT CHALLENGES

In 2005, a number of campaigns from various election cycles have attempted to avoid Board penalty proceedings by resorting to litigation. Rather than responding in writing or in person to the Board's notice of alleged violations and recommended penalties, and then (potentially) challenging the Board determination in court, these campaigns turned to the courts to enjoin the Board's proceedings prior to any determination by the Board.

Under New York law, a party subject to the authority of a city administrative agency such as the Campaign Finance Board may not appeal to the courts until the agency has reached a final determination or action in its case and the party has exhausted all possibilities of obtaining relief at the administrative level. In apparent contravention of this settled New York law, the 2001 campaigns of Miguel Martinez and Arthur Cheliotes and the 2003 campaign of Annabel Palma sought temporary restraining orders to block Board penalty proceedings, which were granted in the Martinez and Palma cases. Such attempts to circumvent the Board's hearing and penalty proceedings are a direct challenge to the Program.

## BOARD ENFORCEMENT ACTIONS

If a campaign does not repay public funds or pay penalties owed to the Board, the Board will bring an enforcement action to collect these monies. The Board has a strong record of winning these enforcement actions.

---

* Piccolo filed an amended complaint, adding a claim for $2.5 million in monetary damages. This case is still pending.

*Chapter 9*

In 2004, for example, the New York State Supreme Court held that the 2001 City Council campaign of Edward J. Lewis had to pay $356 in penalties and repay $19,226 in public funds to the Board pursuant to final Board penalty and repayment determinations. In 2005, the Court upheld final Board determinations against the 2001 City Council campaign of Jean Vernet and held that the Vernet campaign must pay $10,874 in penalties to the Board and repay $43,215 in public funds. In both of these cases, the Court also imposed significant *additional penalties* against the campaigns for their conduct.

## Using Small Claims Court

In February 2004, the Board began initiating lawsuits in the Small Claims Part of the New York City Civil Court against candidates owing smaller amounts of public funds and/or penalties from the 1997, 2001, and 2003 election cycles. The Board's efforts have been extremely successful, resulting, to date, in recovery of a total of $50,679 from 42 campaigns and one agent of a campaign. The success of these enforcement efforts affirms the Board's "zero-tolerance" policy towards non-payment of outstanding public funds and penalties, even in the case of relatively small amounts of money.

### Small Claims Action against the Advance Group

One of the defendants the Board sued in Small Claims Court was the Advance Group, a political consulting firm that represented 2001 City Council candidate John Fratta. In 2003, the Board—for the first time in its history—found a campaign's agent, the Advance Group, in violation of the Campaign Finance Act pursuant to section 3-711(1) of the Act. The Advance Group explicitly accepted responsibility for the violations found against the Fratta campaign. The Advance Group went to court, challenging the Board's determination that the Advance Group could be held liable for violations of the Campaign Finance Act as an "agent" of a campaign. The Court ruled in the Board's favor. Ultimately the Board had to turn to Small Claims Court to collect the $3,424.50, including penalties and court-imposed interest, that the Advance Group owed. On November 3, 2004, after appearing before an arbitrator, the Board received a judgment in its favor. The Advance Group then remitted payment.

### Small Claims Action against Kenny Kramer

The Board brought a notable small claims action to collect $2,193 in penalties owed by Kenny Kramer, the Libertarian Party candidate for Mayor in the 2001 general elections, who is widely acknowledged as the real-life inspiration for the character "Kramer" on the popular sitcom "Seinfeld." Kramer, proceeding *pro se*, responded to this action by demanding a jury trial. The request for a jury trial was ultimately denied, and Kramer complied with the Court's order to remit the $2,193 in penalties to the Board.

*Enforcement—Protecting Public Dollars*

## POST-JUDGMENT COLLECTION EFFORTS

Even after the Board obtains a favorable judgment requiring a campaign to satisfy its debt, not all debtors will pay of their own accord. The Board has compelled payment successfully from a number of recalcitrant campaigns by initiating a range of post-judgment enforcement proceedings, such as entering the judgment as a lien against the debtor's real property, issuing information subpoenas, and restraining the debtor's assets. For instance, in 2005, for the first time in the history of the Program, the Board garnished the wages of an incumbent City Council member. After Allan W. Jennings, Jr. refused to satisfy a $45,383 judgment[4] voluntarily, the Board successfully garnished Jennings' City Council wages.* In an effort to collect fines it had levied against Jennings, the City Council also attempted to garnish Jennings' Council wages. However, Jennings' term of office ended before the Council could collect any of the monies owed.

## 2005 CHALLENGE TO THE PROGRAM'S CONSTITUTIONALITY

James Lesczynski, Jr., the Libertarian Party candidate for Public Advocate, brought a constitutional challenge to the Program. Lesczynski argued that giving public matching funds to candidates forced him to fund political speech to which he vehemently objected, in violation of his free speech rights.[5] The Court dismissed Lesczynski's lawsuit, holding that Lesczynski lacked standing to challenge the Program's constitutionality.

## REFERENCES

1    New York City Charter §1136.1(2)(b).

2    A.O. No. 2005-3 (September 6, 2005).

3    *Miller for New York v. NYC Campaign Finance Board*, Index No. 112409/2005 (N.Y. Sup. Ct. Sept. 7, 2005) (Silberman, J.).

4    *NYC Campaign Finance v. Jennings, Jr., et al.*, Index No. 402998/2003 (N.Y. Sup. Ct. May 23, 2005) (Lebedeff, J.).

5    *Lesczynski v. Bloomberg*, Index No. 102751/2005 (N.Y. Sup. Ct. Nov. 18, 2005) (Feinman, J.).

---

* So far the Board has received approximately $5,000 in repayments through the garnishment.

Public Dollars for the Public Good

chapter 10

# Board Recommendations—
# Meeting the Goals

Since its inception in 1988, the Campaign Finance Program has done much to amplify the voice of individual New Yorkers, to keep them informed about candidates for public office, and to help bring corruption-free elections to their city. However, the 2005 elections exposed a still-considerable distance between political reality and the Program's ultimate goals.

Outside of a relatively small number of hotly contested races for open seats, the 2005 elections were marked by a distinct lack of competition. The elections repeated a phenomenon experienced through many election cycles; when no incumbent is involved, the Program has enabled more candidates to get involved in their community by running for public office, empowered many citizens to play a part in political campaigns, and provided voters with a wider range of choices. The Program has done so by providing money to candidates who would not otherwise have had access to the resources necessary to run an effective campaign.

But—as noted in the Board's post-election report following the 2003 elections—the Program cannot be judged a success if it helps create vibrant competition on an even playing field only in instances of open-seat races. In a perfect world, the Program would have the capacity to enable competitive races in any district, in every election.

Several other concerns came to the attention of the Board over the course of the 2005 campaign, from high-spending candidates who opt out of the Program, to the increasing cost of campaigns, to the potentially wasteful use of taxpayer funds.

The Campaign Finance Act wisely requires the Board to report to the mayor and the City Council after each citywide election* about the Program's effect on political campaigns, and to submit

---

* Or "at such other times as the Board deems appropriate." NYC Administrative Code §3-713.

*Chapter 10*

recommendations to improve the Program. Each election, the Board conducts public hearings, distributes surveys to candidates, evaluates data compiled by staff, and receives formal and informal comments from candidates, government reform advocates, and others. In preparing its recommendations, the Board relies on information from those sources and on its 18 years of experience administering the Program.

The ultimate question driving this post-election report is whether the Program is meeting its fundamental goals as effectively as possible. The recommendations that follow are designed to suggest ways in which the Program might be improved to do so. The Board's goals include:

1. **Increasing the role of the individual donor.** Amplifying the voice of small, individual donors is the animating idea behind the provision of public matching funds to candidates. The $4-to-$1 matching grant to Program participants has made small contributions more valuable to candidates. However, large contributions still wield a disproportionate weight in city electoral politics. More can be done to mitigate their influence.

2. **Enhancing competition for elective municipal offices.** As noted throughout this report, the advantages of incumbency can result in inequities that few challengers find ways to overcome. But whether or not they are incumbents, some candidates have access to funds or opportunities that are simply unavailable to others. The Program should find more ways to equalize opportunities for serious candidates to run effective campaigns.

3. **Increasing public information about campaigns and local issues.** The Board's disclosure regime is easily among the most comprehensive and accessible anywhere. And the Board's efforts do not end with providing information on the sources and uses of campaign funds. With the Debate Program and the Voter Guide, the Board provides voters with opportunities to hear candidates speak for themselves in substantive, unbiased, nonpartisan forums, and the Board will continue to supply even more avenues to improve popular understanding of local issues.

4. **Further streamlining the Program.** To comply with the many requirements of the Act, campaigns must shoulder a considerable burden of recordkeeping and disclosure. Some campaigns may find themselves in violation for failures of comprehension instead of intent. It is incumbent on the Board to find ways to simplify the procedures necessary for compliance as best as it can, without sacrificing the integrity of the Program. To paraphrase Einstein, rules should be as simple as possible, but no simpler.

5. **Protecting taxpayer money from waste.** To maintain public support for the Program, the Board must ensure taxpayers get the best value for their public investment in the political process. This means finding ways to prevent the expenditure of public funds in cases in which those funds are spent inappropriately.

The Board's recommendations are organized under these headings. Separately, the chapter outlines a new program for City Council candidates. Other issues of concern to the Board, and issues that fall outside the Board's jurisdiction, are listed separately as well.

## RECOMMENDATIONS OF THE BOARD

### 1. Increasing the Role of the Individual Donor

#### *Lower Contribution Limits*

The Board has recommended a reduction in the contribution limits several times in the past. Occasionally, the Council has heeded those proposals; in 1998, the limits were lowered from $7,700 to $4,500 for citywide candidates, from $5,900 to $3,500 for borough president, and from $3,550 to $2,500 for Council.*

The Board recommends further reductions in the contribution limits—to $4,000 for citywide candidates, and to $3,000 for borough president. A separate set of reforms to the Program for Council candidates would lower the contribution limit for this office to $250. (See "Create a New Program for City Council Candidates" on page 132.)

It is foremost among the Board's priorities to moderate the influence of wealthy interests and large contributors in the political process through various means. This concern must always be balanced against preserving candidates' ability to wage competitive campaigns. Still, it is clear that high-end contributions play a disproportionate role in funding city campaigns.

For participating citywide campaigns, contributors who gave more than $4,000 were less than 6 percent of the candidates' aggregate total number of contributors. But those relatively few contributors were the source of 40 percent of the total funds raised by participants for the three citywide offices. It is clear that candidates with access to the wealthiest donors have a substantial advantage over opponents who do not. While this advantage is offset to a certain extent by the $4-to-$1 match, as long as the contribution limit is higher than the matchable amount, candidates have an incentive to chase after large contributions. Lowering the contribution limits would narrow this gap. (See also Chapter 4—Contributions.)

For purposes of comparison, the current individual contribution limit to a candidate for federal office is $2,100 per election, for a total of $4,200 for a primary and general election. So, under current law, a candidate for public advocate can raise $750 more per contributor than a candidate for president of the United States.

---

* These limits were adjusted for inflation in 2002 to $4,950, $3,850 and $2,750 respectively. As a measure intended to keep the growth of the limits in check, Local Law 58 of 2004 postponed any scheduled inflation adjustment in contribution limits until 2018.

---

*Chapter 10*

Lowering the contribution limits as recommended by the Board would not present a hardship to citywide candidates. For the 2005 elections, if all larger donations to participating candidates for mayor, public advocate, and comptroller were restricted to $4,000, those candidates would have lost only 8 percent of their total funding, in the aggregate. (The Board's recommendation for a new City Council program can be found on page 132.)

### Ban Organizational Contributions

An essential step toward renewing and affirming the central role of the individual contributor at the grassroots level in New York City politics is an amendment to the Act allowing only individuals to contribute to campaigns. A prohibition on all organizational contributions for all offices is a key, long-standing recommendation of the Board.[*]

In 1998, the New York City Charter Revision Commission proposed the ban on corporate contributions now written into the law. In doing so, it took special note of the potentially corrupting influence of corporate money in the political marketplace, and the corresponding erosion of confidence in the electoral system. With the ban, the Charter Revision Commission sought to eliminate the inequalities created by corporate contributions and enhance the value of citizen participation. Those same arguments and concerns apply to campaign contributions from partnerships, limited liability corporations (LLCs), and political action committees (PACs). Similar concerns are true of contributions from unions.

Though the corporate ban that took effect before the 2001 elections significantly decreased the proportion of organizational contributions among Program participants, since 2001 the percentage has started to rise again. In the 2001 elections, with many first-time candidates, 13 percent of funds raised came from organizations. In 2005, with more incumbents at all levels of city office, organizational contributions comprised 16 percent of total funds raised.[†] (See Chapter 4.)

Organizational contributions represent a particular and considerable advantage for incumbent candidates. In the 2005 elections, the average incumbent for a Council seat collected 78 contributions from organizations, totaling $43,500. His or her average challenger gathered only two contributions from organizations, totaling $1,800. Open-seat candidates did slightly better, averaging $9,500 from 10 organizational contributions.[‡] (See Figure 10.1.)

---

[*] San Diego and San Diego County, and other municipalities within San Diego county, ban campaign contributions from non-individuals. These laws, enacted in 1973, have never been challenged.

[†] In the 2003 Council-only elections, organizational contributions comprised 25 percent of all funds raised.

[‡] Organizational contributions made up 27 percent of all contributions for incumbents in 2005, and 7.5 percent for challengers. Candidates for open seats collected 15 percent of their contributions from organizations.

Public Dollars for the Public Good

# EXHIBIT G – PART 4

*Board Recommendations—Meeting the Goals*

**FIGURE 10.1:** Average Organizational Contributions to all Council Candidates by Campaign—2005*



* *Includes participants and non-participants.*

Disclosure of individual contributions provides a high level of transparency in the political process. Campaigns are required to collect and report information on contributor addresses, employers, and occupations. Little can be known about an organization, however, simply by looking at its name or address. Organization names can be used to obscure the identity or business of the ultimate source of a contribution. The Board's *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions* (provided as Appendix J) identified LLCs as a particular transparency problem; many are involved in city business (especially land use), yet often there is no information in the public record about a particular LLC's owners or principals. Indeed, LLCs are growing more active as a source of campaign funds; while they represented 2.8 percent of total contributions to participants in 2001, they gave 6.2 percent of all funds raised in 2005 by participants. Prohibiting these

contributions is one important way to minimize the impact of "doing business" contributors. (See also recommendation on "doing business" contributions below.)

A ban on organizational contributions would also represent a major simplification of the rules and reduction of paperwork for city campaigns. Instead of asking whether a PAC is registered with the CFB, or determining whether a particular business is a corporation or an LLC, campaigns would simply forgo any contribution that does not come from an individual.[*]

### Enact Legislation Regulating "Doing Business" Contributions

In 1998, the New York City Charter was amended to require the Board to propose rules to regulate campaign contributions from individuals and entities "doing business" with the city. In response, the Board conducted research and solicited public comment on the issue, and in 1999 proposed three sets of rules governing "doing business" contributions. Among the problems of implementing any regulation of "doing business" contributions was the lack of any usable city database(s) that would make compliance and enforcement feasible. Though these rules were not adopted, discussions have continued about how best to meet the mandate to disclose and regulate these contributions without placing new, unreasonable burdens on participating campaigns. In addition to the Board's work, the city has begun—but has not by any measure completed—database(s) that record those who might or should be included in the definition of doing business (the area of land use requires the most additional work).

In creating any potential "doing business" regulation, the Board has a role to play to ensure city decisions are made with the best interests of the city in mind—rather than the best interests of a campaign contributor.[†] "Doing business" contributions create inequalities (real and perceived) in the political marketplace as well, diluting the impact of individual contributors. Individuals or entities with hundreds of thousands of dollars of city business at stake do not have to think twice before making a maximum donation to a candidate. In addition, incumbents—who can exert influence on particular city decisions as elected officials—have much greater access to these large donations than do non-incumbent candidates.

In June 2006, the Board published its *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions* (provided as Appendix J), which suggested that up to 22 percent of funds raised by candidates in the 2005 election came from contractors, lobbyists, or lobbyist clients—who comprise only 5 percent of the number of contributors. (The proportion for the 2001 election was even higher: 25 percent of the funds from 4 percent of the contributors.) The research

---

[*] With an organizational ban, candidates would also not have to engage in the complex process of attributing partnership or LLC contributions greater than $2,500. See Rule 1-04(i).

[†] Of course, there are many regulations already in existence to safeguard the interests of the public, including extensive contracting procedures and open processes for land use decisions. (See official transcript of the Board's hearing on "doing business," April 18, 2006, available at www.nyccfb.info.)

suggests that most "doing business" donors are indeed large donors, and that many—especially lobbyists—play an active role as intermediaries.

This research was based on data available from the online VENDEX database of city contractors and the NYC Lobbyist Search database maintained by the City Clerk's office. Thus, the study's research definition was limited by the availability of data on entities involved in doing business with the city.

Several commentators have maintained, and the Board agrees, that any regulation to restrict "doing business" contributions would be incomplete without governing entities involved in land use decisions. As much as—if not more than—contractors, real estate interests depend upon decisions by city boards or agencies regarding the disposition of city resources to generate profits for their businesses. For decades, studies of campaign giving have reflected this reality, consistently listing real estate interests among the top contributors to candidates for city office. Indeed, preliminary research in the *Interim Report* showed that including land use actors in a regulation would increase the proportion of contributors defined as "doing business" considerably.

The next steps toward workable enforcement of a "doing business" regulation must include improvements to existing city databases that aggregate information about these entities. Data collection on contractors must be improved, standardized, and quality-controlled, and the VENDEX database modified so that its database is compatible with the CFB's own databases. Similarly, if land use actors are to be included in a "doing business" regulation, an extensive effort to collect and aggregate data on applicants to the appropriate city boards and agencies must be undertaken.

Such a data collection effort should be feasible if the legislative will is present. As part of the lobbying reform law enacted earlier this year (Local Laws 15, 16, and 17 of 2006), the City Council mandated that contributions from lobbyists are not eligible for matching funds. To enforce the new law, the lobbyist database was redesigned to collect the information needed to determine which contributions are ineligible for matching funds, and to permit easy compatibility with the CFB disclosure databases. A similar legislative mandate could result in a similar transformation of the disclosure apparatus for city contracts, and the creation of a similar effort for land use applicants.

It is the Board's conviction that addressing the "doing business" issue would be best and most comprehensively achieved through legislation, rather than through CFB regulation. The model for a "doing business" restriction is the Securities and Exchange Commission (SEC) rule governing municipal securities brokers. Rule G-37 prohibits any dealer or broker from engaging in business with a municipality if that broker has made a donation to a public official in that municipality worth $250 or more.

The key to the SEC rule is that the burden of enforcement is on the bond professional seeking to do business. The rule encourages self-enforcement. Brokers who make prohibited contributions risk losing business. If an enforcement regime puts contractors or developers who violate the law at pain of losing a contract or other approval, they are far more likely to obey the law.

Chapter 10

Conversely, regulation that places the burden entirely on campaigns and all their contributors would be unduly complicated. The vast majority of contributors are not "doing business" with the city, and enforcement of a regulation that requires verification of this fact would be more diffuse and less effective. Casting a wide net has the potential to discourage the individual contributor from lawfully participating in the political process and undermines one of the central purposes of the Act. According to the *Interim Report*, about five percent of contributors from the 2005 cycle are "doing business" with the city. In the Board's estimation, an effective regulation would target those five percent, rather than casting a net that encompasses the 95 percent of donors who are not.

Diminishing the influence of "doing business" contributions can also be achieved, of course, by lowering the contribution limits. In the 2005 election, 95 percent of all contributions were for $2,000 or less; 75 percent were $250 or less. Lowering the contributions limits for all offices, then, is a possible alternative that could more easily and efficiently address the perception of undue influence gained by large campaign contributions from all sources, including those who do business with the city.

In the absence of legislation implementing these recommended changes, the Board is likely to promulgate rules governing "doing business" contributions.

### Require Transition and Inauguration Entities (TIEs) to Conform to the Same Limits and Prohibitions on Contributions as Campaigns

The Act requires winning candidates to disclose the fundraising and expenditures associated with commencing their term in office. Rules for TIEs apply to all candidates for city office, whether or not they participate in the Program.

Although donations to TIEs are limited by the Act,[*] there is concern that transition and inauguration expenses are an avenue for donors to curry influence with elected officials above and beyond what the Program's campaign contribution limits allow. Indeed, a contribution to a TIE has a greater potential to influence its recipient, who is no longer a candidate for office, but now an elected official.

In addition, while campaigns have been prohibited from accepting contributions from corporations since 1998, TIEs may accept donations from any source. This has the effect of "rewarding" successful candidates with access to corporate dollars—and the potential influence-seeking that represents. Contributions to TIEs classified as "corporate" made up about 30 percent of all funds raised for transition and inauguration expenses in 2001, and rose to 35 percent in 2005.[†]

The Board recommends that the Act be amended to conform TIE contribution requirements to those for participating campaigns—specifically, that corporate contributions be prohibited, and

---

[*] $4,500 for mayor, public advocate, and comptroller; $3,500 for borough president; $2,500 for City Council.

[†] Only four officeholders formed TIEs following the 2003 election. The figures for 2001 and 2005 do not include Bloomberg, who funded a TIE with his own money after both elections.

that all other restrictions contemplated for contributions to campaigns, including lower contribution limits and a prohibition on organizational giving, apply to TIEs as well.

## 2. Enhancing Competition for Elective Municipal Offices

### *Restrict Contributions Eligible to be Matched with Public Funds to the Same Year as an Election*

As noted earlier in this report (see Chapter 4), early fundraising represents a significant advantage for incumbents. Most officeholders have access to political donors throughout their term in office—whether they are hoping to remain visible and active among their constituency, or are dealing with lobbyists in the course of their duties. The same holds true for current officeholders looking to run for a new position at the end of their current term.[*]

Challengers, on the other hand, are often limited to gathering contributions much closer to the election date—that is, if other candidates decide to enter the race at all. Incumbents who raise massive "war chests" early in a campaign cycle are often able to scare off potential competition. Candidates who challenge incumbents find themselves playing catch-up from the start, as early expenditures on media and other forms of campaigning help incumbent candidates define themselves to voters and promote their message long before challengers have the ability to do so.

The Board recommends limiting eligibility for matching funds to contributions made in the calendar year in which the election will be held. The Board understands that such a restriction may only encourage some candidates to pursue larger contributions or organizational contributions (if not banned) earlier in the election cycle, potentially increasing the imbalances created by those sources of revenue. Still, limiting matching funds to the final year of an election cycle could help to diminish the fundraising advantages held by incumbent officeholders and is an experiment worth implementing.

### *Institute Flat Grants for Runoff Elections*

In the case of a runoff election, current law provides that candidates receive public funds payments equal to 25 percent of the matching funds their campaigns received for the original election. There were no runoff elections in 2005. Two situations from the 2001 election, however, exposed a possible inequity perpetuated by the 25 percent rule.

Mark Green, the second-place finisher in the 2001 Democratic mayoral primary, received $712,000 in public funds for the runoff, while Fernando Ferrer received only $574,000. Similarly, Betsy Gotbaum, the first-place finisher in the Democratic primary for public advocate the same year, was

---

[*] As an illustration, 25 candidates submitted disclosure statements on the July 17, 2006 filing date—the first for the 2009 city election cycle—having raised a total of $3.7 million, mostly for "undeclared" offices. Of those, 21 are current officeholders, accounting for 98 percent of the funds raised: 18 are prevented by term limits from running for re-election to their seat; two more are first-term members of City Council, and another is a member of the State Assembly. The filings contained almost $587,000 in potential matching claims in total.

*Chapter 10*

far and away the leading fundraiser in her race, and was granted $303,000. Norman Siegel, certified as the second-place finisher, qualified for a payment of only $114,000. In the compressed time period between an election and a runoff (about two weeks), these inequities in public funds disbursements exacerbate the financial advantage one candidate has over another.

In the interest of leveling the playing field, the Board recommends instituting a flat grant for runoff candidates equal to 40 percent of the runoff election spending cap.* Under this proposal, Green and Ferrer would have each received $1,046,200 for their 2001 runoff, and Gotbaum and Siegel would each have received $654,000. With more substantial, equal grants to campaigns before a runoff, candidates can spend less of their scarce time fundraising, and more time communicating with the public.

### 3. Increasing Public Information about Campaigns and Local Issues

#### *Refine the Definition of "Intermediaries"*

The Act currently requires participating candidates to disclose intermediaries and the contributions they solicit and actually deliver. Responding to the way the law is written, campaigns may under- or over-report their use of intermediaries. (See Chapter 4.) To clarify the requirement and provide fuller, more comprehensive disclosure of so-called "bundling" activity, the Board recommends expanding the current definition of "intermediary" to include not only individuals or entities who deliver contributions to a candidate, but also those known to the campaign to have successfully solicited contributions for the candidate—excluding professional fundraisers and campaign staff workers.

#### *Strengthen the Threshold for Eligibility in Program Debates*

Changes to the debate law passed in 2004 provided some objective criteria to help limit the presence of so-called "fringe" candidates, including a minimum threshold of support for debate participants, and limited the second debate to "leading contenders." (See Chapter 7—Debates 2005.) Still, the Board must constantly weigh the imperative to provide a broad and inclusive range of perspectives on the issues against the obligation to produce events that will best help illuminate the choices that voters must make on Election Day.

The current criteria generally limit the debates to viable candidates.† Still, in 2005, one candidate exploited a loophole and qualified for primary and general election debates by loaning personal funds

---

* The expenditure cap for runoff elections is set at one-half the applicable limit for the primary and general election. See NYC Administrative Code §3-706(b)(i).

† In addition to financial thresholds, the law provides that sponsors may apply additional pre-determined, objective, nonpartisan and non-discriminatory criteria to determine eligibility for debates—including polling data, as some sponsors did in 2005. Not all polls are created equal, however. The methods and reliability of polls are often called into question; some polls excluded potential debate candidates, and few citywide polls included the comptroller's or public advocate's races. This is a topic for future study and discussion between the Board and debate sponsors.

---

*Board Recommendations—Meeting the Goals*

to his campaign, allowing him to meet the threshold of $25,000 "raised or spent."[*] While he satisfied the letter of the law, he undermined its intent: to ensure that significant levels of community support establish a participating candidate's viability and eligibility to debate.

The Board therefore recommends the minimum financial threshold used to determine debate eligibility should be raised for all offices, especially for the "leading contender" debates. Furthermore, the Board proposes to address the loophole by changing the law to require candidates to have "raised *and* spent" this increased financial threshold to determine eligibility, ensuring citywide debates are limited to truly viable candidates.

### Keep the Current Number of Debates

One real success of the Debate Program has been its ability to provide both lesser-known candidates and leading contenders with a forum to reach the largest possible audience of voters.[†] The Board recommends maintaining the current number and type of debates.

There are several reasons to do so. Some groups that are uninterested in committing to the debate law requirements have hosted their own debates, as have groups not chosen through the Board's sponsor selection process. Increasing the number of CFB-administered debates could hamper these other organizations from scheduling debates in an already crowded pre-election calendar.[‡] These other groups have greater freedom to tailor the topics, participants, and audiences of their debates or forums, and perform an important public service in doing so.

Increasing the number of CFB-administered debates could also discourage sponsors from applying to host the debates. Sponsors must adhere to stringent legal guidelines in staging debates; while assuring the debates will be fair and nonpartisan, these requirements also limit the pool of sponsors willing to bear the potentially large financial and logistical burdens. It would be harmful to the Program if qualified sponsors opted out of the process.

### Provide Better Incentives for Non-Participants to Take Part in Program Debates

Mayor Bloomberg's decision to forgo the Board-sponsored debate at the Apollo Theater during the general election campaign revealed the need to find additional means to encourage a non-participating candidate—who is not otherwise required to appear in any debates—to take part in Board-sponsored debates. One presenter at the CFB's post-election hearings suggested providing flat grants or

---

[*] Jay Golub, a candidate in both the Democratic primary and on the Conservative Party line in the general election for public advocate.

[†] The success of the Debate Program has led to the occasional suggestion that the law should be expanded to include City Council and borough president offices. There has not traditionally been, however, a record of failure for candidates at these levels to participate in debates, nor a lack of forums in which they may do so.

[‡] The CFB—and all potential debate sponsors—must remain sensitive to the needs of the public and candidates and, therefore, has to exclude federal and religious holidays, and dates conflicting with major sporting events, among other concerns, when determining the debate schedule.

increased bonuses for Program participants who take part in a Board-sponsored debate where a non-participant fails to appear.[1] The Board supports this proposal.

### *Indemnify Debate Sponsors against Debate-Related Litigation*

Sponsors have repeatedly questioned the logic of a debate law that requires sponsors to limit participation and to bear the burden of legal action related to this requirement. Some have cited their lack of legal protection under the law as a disincentive to sponsoring a debate. The threat of lawsuits brought by disgruntled candidates is a potential burden many sponsors are loath to incur.

Only a few marginal candidates sued sponsors to protest their exclusion from the 2005 debates, but any litigation can be draining for a civic group to bear. Sponsor applications declined in both 2001 and 2005 compared to 1997, particularly from smaller civic organizations—exactly the types of organizations that should be encouraged to sponsor debates, but are least able to shoulder the potential cost of defending against a frivolous lawsuit.

The Board renews its recommendation to repeal the debate law's requirement that sponsors indemnify the city for any liability arising from any acts or omissions of the sponsors. Instead, the city should extend legal protection to sponsors, indemnifying them against any acts or omissions that may arise from the debate law's requirements.

### *Allow the Board to Cancel or Shorten Debates Featuring Only a Single Participant*

The 2005 comptroller's race highlighted the necessity of allowing sponsors, in consultation with the Board, to shorten or cancel a debate under certain circumstances. (See Chapter 7.) The law mandates sponsors to produce one-hour (minimum), commercial-free debates. With only one qualifying candidate in the general election for comptroller, these requirements would have presented a significant financial burden for the sponsor organizations, with questionable benefit to voters. Under current law, the debate could not be canceled without the agreement of the candidate, who fortunately agreed. The Board proposes modifying the law to require approval only by the Board and sponsors to cancel or shorten a debate when only one person qualifies.

### 4. Further Streamlining the Program

### *Eliminate Most Exempt Expenditures*

Expenditure limits for participating candidates are a core feature of the Program, and an inviolable condition for receiving public matching funds. The spending caps exist to help level the playing field. After the recent changes to the law mandating that non-participating candidates must join Program participants in complying with contribution limits and full disclosure, the expenditure limits are arguably the principal benefit the public receives from the disbursement of public funds to candidates.

Certain expenditures are exempt from the spending limits. The Act, as amended in 2002, provides a "safe harbor" for campaigns that keep their exempt spending at or below 7.5 percent of the spending limit. Since the creation of the safe harbor, however, campaigns have claimed a growing proportion of expenditures as exempt. The Board, in its report following the 2003 elections, suggested that "certain types of exempt expenditures, such as petitioning…can double as an electioneering message, and may even have electioneering as a primary purpose."[2] Indeed, in 2005, some participating campaigns came under close scrutiny over their reporting of exempt expenditures (See Chapter 5—Expenditures, and Chapter 9—Enforcement). Allowing these claims to stand can create a further advantage for well-funded campaigns.

The Board recommends, as it has in the past, eliminating exempt expenditures for all offices.[3] A lone exception would be made for legal fees incurred challenging and defending ballot petitions, which can be an unpredictable expense. This proposal would eliminate a confusing gray area for campaigns, greatly simplify the Program, decrease the waste of taxpayer funds, and further help level the playing field between small and large campaigns.

To compensate for counting previously exempt expenditures against the spending cap, the Board recommends that spending limits be increased by five percent, so that candidates remain able to incur necessary and reasonable compliance expenses without hampering their ability to run an effective campaign.

There are alternative measures the Board could suggest if a complete elimination of exempt expenditures is not adopted. One such proposal would be to make spending reported as exempt ineligible to be counted as part of a campaign's qualified expenditures.[*] Campaigns may spend public funds only on qualified expenditures—essentially, expenditures that are related directly to the business of getting a candidate elected. While compliance with local and state law is important for any campaign, the Board believes it is reasonable to expect that taxpayer money is expended wholly on those functions contemplated by the purposes of the Program—that is, directly related to electioneering.

### Establish Guidelines Governing Spending for a "Reasonably Anticipated Primary"

Board rules allow for participating campaigns to spend money under the expenditure limit for a primary election if a primary is "reasonably anticipated," meaning that this spending is permitted even if the candidate ultimately does not face primary opposition. Without an objective standard or authority to govern this determination, it is difficult for the Board to conclude otherwise when candidates essentially decide for themselves that a primary is reasonably anticipated. Such a determination essentially doubles a participating candidate's expenditure limits. While the Board recognizes that there are situations that clearly require such a provision, being able to expend funds "in expectation of" having an opponent represents a considerable advantage for incumbent or party-supported

---

[*] Further, the Board would recommend that taxes paid on investment income be made exempt from the spending cap.

*Chapter 10*

candidates over potential challengers in both the primary and general election, at a time when challengers may only be just starting to consider a run for office and have not yet begun to raise funds or organize a committee.

To allow expenditures for a primary election prior to the certification of a challenger, the Board recommends instituting a procedure similar to that for reasonable anticipation of a runoff election. Before accepting contributions for a runoff election, a candidate must first demonstrate that a runoff is reasonably anticipated. The burden of proof rests with the participating candidate, who is not asked to show that a runoff is probable, only that is reasonably anticipated.

In requesting a determination that a primary is reasonably anticipated, the formation of a candidate committee by a challenger, along with evidence of specific activities or accounts of activities by a presumed challenger, would be considered by the Board. A more objective process like this one would serve to further level the playing field between incumbents and challengers, and protect the wasteful use of public funds.

### Require Candidates to Establish Eligibility for Public Matching Funds Prior to Election Day

To become eligible for public matching funds, candidates must meet a threshold that demonstrates they have a minimum of community support by raising a baseline amount of money from New York City residents, and collecting a baseline number of contributions (of $10 or more) from within the area they are hoping to represent. In December 2004, the Council voted to raise the threshold standard for Council candidates from 50 in-district contributions to 75 (See Chapter 6—Public Funds).

Still, there is no deadline by which candidates must meet the threshold to receive public matching funds—indeed, some do not become eligible for payments until after the votes are cast. The Board recommends instituting a deadline for meeting threshold some time prior to the appropriate election. One possible deadline is by the 32-day pre-election disclosure statement (due August 12, 2005 for the 2005 elections) for the earliest election for which the candidate appears on the ballot.* As the overwhelming majority of Council candidates who met threshold in 2005 did so by the July 15 disclosure statement, this requirement would not be overly burdensome. (See Chapter 6.)

Requiring campaigns to achieve eligibility for public funds before the election would help ensure that public money is indeed spent for its intended purpose—directly advocating for the election of participating candidates. It would also help ensure that public funds are distributed only to serious candidates. This requirement would benefit campaigns by providing incentive to qualify for, receive, and spend public funds before election day.

---

* Reports (or amendments to reports) submitted after the deadline showing a candidate had indeed reached the threshold prior to the deadline date would be acceptable to establish eligibility for public funds.

---

### 5. Protecting Taxpayer Money from Waste

*Limit the Amount of Public Money Available in "Sure Winner" Races*

To many political observers, one of the most troubling aspects of the Program is the fact that public funds are spent to subsidize the campaigns of "sure winners." To prevent the unnecessary expenditure of taxpayer funds in races in which a heavily favored candidate faces minimal opposition, the Council amended the Act in 2003 to limit public funds payments to 25 percent until an opponent meets certain campaign finance benchmarks.* (See Chapter 6.)

Despite this reform, two significant problems with the current system remain. As suggested earlier in this report, the Board believes the current trigger is too low to justify the maximum payment of public matching funds to a candidate who is likely to win his or her race by a lopsided margin. In addition, for cases in which an opponent has not triggered full payment, candidates may submit Statements of Need — which are posted on the Board's website — to release the full payment of public funds for which they would otherwise qualify. (See complete discussion of Statements of Need in Chapter 6.)

To ensure that excessive amounts of taxpayer dollars are not spent in races without serious competition, the Board recommends revising the Program to eliminate Statements of Need and create escalating tiers for the disbursement of public funds.

Instead of a single trigger that removes the 25 percent cap and enables a maximum payment, the Board's proposal contemplates a series of campaign fundraising or spending benchmarks; each would trigger a successively higher disbursement of public funds to a participating campaign until the maximum payment is reached. This proposal would also include a process through which candidates can petition the Board to address issues that fall outside this framework, such as facing an opponent with significant name recognition or celebrity whose spending still falls well short of the threshold for maximum payment.

A more objective system like this would help achieve two important Program goals. It would help level the playing field by decreasing the amount of public matching funds available to well-funded "favorites" in races against long-shot challengers, and it would protect taxpayers by withholding public money from races in which payments only reinforce inequities between candidates, or help boost a candidate's name recognition for future contests.[†]

---

* Currently, a campaign can access full payment of public funds when (a) its opponent qualifies for public funds, (b) when its opponent spends one-fifth of the applicable expenditure limit (for Council, $30,000; for borough president, $322,250; for comptroller and public advocate, $895,250; for mayor, $1,432,000), or (c) when it files a Statement of Need.

† Initial CFB analysis suggests that the savings for the 2005 election cycle from such a multi-tiered system would have been in the hundreds of thousands.

---

*Chapter 10*

### *Raise the Tier 1 Bonus Trigger for Candidates Running against High-Spending Non-Participants*

The bonus system for candidates who run against high-spending non-participants provides candidates with an improved matching formula ($5-to-$1), a higher maximum public funds payment (up to two-thirds of the spending limit), and an increased spending limit (by 50 percent) when a non-participant opponent raises or spends at least 50 percent of the applicable spending limit.[*]

Evidence from the past few elections suggests the 50 percent spending bonus "trigger" may be too low. Of 11 Council races where a bonus determination was granted in the 1999, 2001, 2003, and 2005 election cycles, seven featured "high-spending" non-participants who were, in actuality, significantly outspent by a participant.[†]

To maintain public confidence in the Program, it is important the Council take measures to protect the expenditure of taxpayer funds. Where public matching funds do not help further the Program's aims, there should be stricter limits on their use. The Board recommends that the Council consider raising the Tier 1 bonus trigger from 50 to 75 percent of the applicable spending limit.

## CREATE A NEW PROGRAM FOR CITY COUNCIL CANDIDATES

After the 2003 elections, the Board contemplated a proposal that would re-shape the Program's approach to City Council campaigns, with a very different set of limits on expenditures, contributions, and public funds than are contained in current law.[4] Council races are materially different from citywide or boroughwide races. Contribution and spending limits are lower, reflecting the smaller geographic area — and narrower range of interests — a Council member represents. These material differences generate a set of concerns specific to Council campaigns.

In the wake of the 2003 Council-only elections, the Board cited several of these concerns. Among them were: the lack of vibrant competition in seats for which an incumbent ran for re-election; the appearance that the availability of public funds was driving up the cost of campaigns; the expenditure of public funds by experienced candidates in races in which the opposing candidate was not a serious threat; and the possibility that campaigns were "springing up just to be in the business of collecting matching funds."[5]

The Board outlined a set of reforms to be reviewed against the experience of the 2005 elections. Data from the 2005 elections only reinforce the Board's concerns from the previous campaign year, suggesting the modifications proposed in 2003 are still relevant.

---

[*] In 2005, the Council added a second tier bonus, triggered when a non-participant spends 300 percent of the spending limit. (See Chapter 6.)

[†] This includes both primary and general elections.

Therefore, the Board recommends the creation of a new City Council program, which would be marked by substantially reduced contribution and expenditure limits and a reduced public funds maximum commensurate with a lower spending limit. Combined with changes proposed for candidates at all levels, including the ban on organizational contributions, eliminating matching funds for contributions raised prior to the year of the election, and eliminating exempt expenditures, these changes should simplify the Program, make it easier to navigate, and foster a return to grassroots campaigning on the City Council level. Further reforms simplifying reporting requirements and refining Program requirements would clarify the purposes for which candidates can spend public funds, and provide a clear framework for documenting these expenditures. These recommendations are made as a package. It must not be assumed that the Board would advocate any individual recommendation on its own.

### Lower the Contribution Limit

The contribution limit for City Council should be significantly lowered from the current limit of $2,750. As part of a package of reforms, a contribution limit of $250 would be an effective way to lessen the influence of large donations on Council elections and lessen the fundraising advantage of incumbents and well-connected candidates.[*]

Because of the $4-to-$1 match, $250 is already the most frequent contribution size. In the three elections since the matching formula was changed prior to 2001, the vast majority—four out of five—of contributors to Council candidates have been small donors, giving $250 or less. In 2001, 89 percent of contributions to participating Council candidates were for $250 or less. In 2003 and

| TABLE 10.1 | A NEW CITY COUNCIL PROGRAM | |
|---|---|---|
| | **Current** | **Proposed** |
| Contribution Limit | $ 2,750 | $ 250 |
| Spending Limit | prior to year of election: $ 40,000<br>Primary: $150,000<br>General: $150,000 | Primary: $100,000<br>General: $100,000 |
| Maximum Public Funds per election | $82,500 | $55,000 |

---

[*] The U.S. Supreme Court recently struck down Vermont's contributions limits as too restrictive in the context of that state's election system in *Randall v. Sorrell*, 126 S.Ct. 2479 (2006). A $250 contribution limit for New York City Council races would still be far larger than Vermont's lowest limits (measured relative to the size of the constituency), without taking into account public matching funds. (For further discussion of the Court's decision in *Randall*, see the Board's white paper, *The Impact of High-Spending Non-Participants on the Campaign Finance Program*, which will be available at www.nyccfb.info.)

*Chapter 10*

2005, 84 and 83 percent of contributors respectively gave $250 or below. Lowering the contribution limit to this level would enhance the relative value of individual New York City residents' participation in the political process and eliminate the disparate impact of large contributions.

That impact favors incumbents over challengers. Incumbents, on the average, raised 5 times as much as their challengers for the 2005 election. Lowering the limit could help narrow these wide gaps in funding. In the 2005 election cycle, challengers raised more than half (53 percent) of their funds in small contributions of $250 or less. Incumbents, on the other hand, raised about one-fourth (27 percent) of contributions in sums of $250 or below. Candidates for open seats, meanwhile, raised 36 percent of their funds from small contributors. (See Chapter 4.)

The $4-to-$1 match has made smaller contributions more valuable and has thus empowered both small contributors and candidates of lesser means. It has strengthened the connection between New York City residents, their political system, and their government, as candidates reached out to expand their base of contributors and take advantage of the matching rate. These trends would be reinforced if all contributors are given essentially equal weight and importance by limiting contributions to Council candidates to $250.

### Reduce the Spending Limit

When complemented by the generous amounts of public funds available to participating candidates, the high spending limit has helped fuel the rising cost of Council campaigns. The current maximum of $150,000 is an extraordinarily large amount of money to communicate with approximately 71,000 voters per Council district.[*]

The average amount spent on a City Council primary campaign, as adjusted for inflation, more than doubled between 1993 and 2005.[†] Yet campaigns are run essentially the same way now that they were a decade ago, with few real innovations. It is unnecessary for Council campaigns, covering a small geographic area, to speak to voters through television advertisements; candidates still rely on less expensive, more targeted, grassroots-oriented media. But many functions that might previously have been accomplished with volunteers are now routinely performed by paid employees, and spending on "consultants" and professional services has consistently increased. (See Chapter 5.)

---

[*] March 1, 2004 enrollment figures from the New York City Board of Elections. If anything, the average number of voters per district considerably overstates the actual number of people a campaign is trying to reach. The number of registered voters varies somewhat from district to district, and only certain subsets of the total registered voting population within a district can participate in party primaries. For example, the average number of voters registered with the Democratic Party per Council district is 49,000, and the average number of registered Republicans is 8,700. Additionally, Council candidates often target their campaign efforts to likely, sympathetic voters rather than focusing their efforts on all registered voters within a district.

[†] In constant 2005 dollars, the average spending on a Council campaign in 1993 was $55,000; in 2005, the average spending was $117,000.

*Board Recommendations—Meeting the Goals*

The availability of public funds seems to be driving up the cost of campaigns. Spending may have actually been too low through the 1990s. But with the advent of the $4-to-$1 match in 2001, spending on Council campaigns increased dramatically, to a point where it is almost certainly too high. Lowering the spending limit from $150,000 to $100,000 per election would effectively address this concern. This would include eliminating the pre-election year spending limit, so that all spending prior to the year of the election would be counted against the limit for the coming election, whether it is a primary or general election.

To help mitigate the impact of a reduced spending limit (and a reduced maximum public funds payment) on Council campaigns, the Board recommends that the Program provide participating Council candidates who meet the existing threshold for public funds with postage for a single mailing to all registered voters in their respective districts. A "franked" mail piece would increase candidates' opportunities to communicate with voters, especially those who are not often targeted by political campaigns.

### Reduce the Maximum Public Funds Payment

Currently, City Council candidates can receive a maximum in public funds of $82,500 (55 percent of the $150,000 spending limit) per election. In 2005, 35 Council candidates (59 percent of the Council candidates who received public funds) received the maximum in public funds for the primary, and 14 (32 percent) received the maximum for the general election.[*] Three received the maximum payment in both the primary and general elections. These proportions have risen only slightly since the introduction of the $4-to-$1 match; in the wide-open 2001 elections, 82 Council candidates (53 percent) received the maximum for the primary, and 25 (27 percent) received the maximum for the general election.

In 1997, the last election with a $1-to-$1 match (up to $1,000), by contrast, only six candidates (11 percent) received the then-maximum $40,000 for the primary and only four (nine percent) for the general election. The increased matching formula has clearly enabled more candidates to receive the maximum payment of public funds, which is now more than double.

Although a primary purpose of the Program is to limit the influence of wealthy contributors by providing candidates with "clean" money to run their campaigns, the taxpayers must also be protected from the waste of their public dollars. Under the proposed Council program, the public funds maximum would remain at 55 percent of the spending limit, but with a reduction in the spending limit from $150,000 per election to $100,000 per election, the maximum allowable public funds would be reduced from the current $82,500 to $55,000.

---

[*] Candidates who came within 2 percent of receiving the maximum in public funds are included in these figures, as they had the capacity to receive the maximum but did not due to minor withholdings. One candidate (Mealy, district 41) received $100,000 in public matching funds after a Tier 1 bonus was declared in her race.

## Place Additional Limits on Qualified Expenditures

Currently, the Act provides that public funds may be "used only for expenditures...to further the participating candidate's nomination for election or election."[6] The Act contains a number of prohibitions on the use of public funds. As part of its audit process, the Board requires candidates to document that public funds have been spent appropriately. While most candidates for citywide or boroughwide office can easily document an appropriate amount of qualified spending on the costs of media alone, accounting for the proper expenditure of public funds in Council campaigns can often be a frustrating exercise.

The Board recommends amending the Act to provide for Council candidates a finite, affirmative list of expenditures that can be made with public funds. Of course, candidates would still be required to document these expenditures, but explicit purposes for qualified spending would allow the Board to provide strict, circumscribed guidelines for documenting the expenditures, simplifying a process that has to date proved difficult for some Council candidates. To protect the taxpayers, certain types of expenditures would be flatly prohibited. These would continue to include, for example, expenditures made in cash and payments made to the candidate or to his or her family members. Public funds would be available to be spent only on "hard" goods. Allowable expenditures would be: printing; television, print, and radio advertisements; mailing costs; and rent. Because a certain level of personal involvement is necessary to produce literature or advertisements, candidates would be permitted to spend 10 percent of their public funds on personnel and consulting costs.

## Simplify Reporting

As part of a new Council program, the Board believes the elimination of certain reporting requirements should be considered. These may provide important public information about candidates for higher office, but are not widely used to examine candidates at the Council level, thus imposing burdensome and unnecessary paperwork burdens on campaigns. The daily contemporaneous disclosure requirement for Council candidates in the two weeks preceding the election for certain large receipts and expenditures would be eliminated. Reductions in the contribution and expenditure limits would make it unlikely that Council candidates would trigger the requirement for a contemporaneous pre-election disclosure statement, in any event.* Further, the rule that requires Council candidates to disclose when a vendor has paid a subcontractor more than $5,000 is often disregarded by campaigns. The Board feels the elimination of this complex rule should be considered.

---

* Contributions or loans of $1,000 or greater from a single source, or single expenditures of $20,000 or more.

## OTHER ISSUES OF CONCERN TO THE BOARD

### Durable Goods

In 2002, a bill was introduced into the City Council to require all participants in the Program to return to the Board any durable goods, such as computer equipment, purchased during the campaign. The Department of Citywide Administrative Services was to warehouse those goods and resell them to the City.[7] While the policy objective behind the proposed legislation—defraying the cost of the public matching funds program, and making use of reusable goods—is laudable, the administrative problems attendant on such a program are enormous and probably of greater cost to implement than any net gain to the city. The Board does recommend, however, that durable goods bought late in the election cycle be presumed to be for non-campaign purposes, and that public funds not be permitted to be used for such purchases.

### Candidate Misrepresentations

Several participating candidates have raised concerns about false statements made by candidates in campaign literature. These include misrepresentations of a candidate's own educational or professional experience, endorsements from public figures, or of another candidate's positions. Certainly, it is regretful and inappropriate that some public funds are used in this manner, and the Board understands candidates' frustration at opponents who exercise these tactics. The implications of a law that restricts candidates' speech, however, make it unlikely any such law would survive a constitutional challenge. Any such law would place an enormous burden on the agency asked to "fact-check" candidates' messages, on the courts, and on the candidates themselves. A better solution may be a voluntary certification with a civic organization that candidates will refrain from dishonesty or personal attacks.[8]

### Questionable Uses of Public Funds

Several trends in campaign expenditures have proven troubling to the Board. Although legal, they raise serious concerns whether campaigns are spending public funds wastefully. These include: payments to vendors contingent on the receipt of public funds; bonuses to contractors or consultants written into contracts in advance; campaigns' failure to seek the best prices for goods or services; purchases of durable goods late in the election cycle; and a marked increase in payments to family members. The Board will continue seeking ways to minimize these occurrences and maximize the proper use of taxpayer money.

### Transfers

The Act's provisions on transferring campaign funds from a non-city political committee were designed to protect the integrity of the Program; the accounting requirements mandated by the Act should ensure that prohibited contributions permitted by other jurisdictions are kept out of

a city candidate's campaign, and that the contribution limits on individuals are not exceeded. As amended in 2004, the law includes a requirement that a candidate who transfers money from another committee must obtain the permission of each contributor. While the law ensures contributors who give to campaigns are not unknowingly supporting candidates' campaigns other than those for which the donations were explicitly given, the Board is concerned that this requirement is overly onerous for campaigns. A total ban on all "war chests" would lessen the unfair competitive advantages enjoyed by candidates who have money remaining from previous elections. The Board recommends a prohibition on participating candidates and their committees from using any such surplus funds in future elections.

## ISSUES OF CONCERN OUTSIDE THE JURISDICTION OF THE BOARD

### Free Postage for Voter Guides

The Board recommends that New York City band together with other localities that publish non-partisan voter guides to request free postage from the federal government to deliver this informative resource to voters. In New York City, with 3.8 million active registered voters, this is not an inconsiderable expense; this assistance would be a valuable investment in providing voters with the information they need to actively participate in the political process.

### Laxity of State Election Law on Expenditure Purposes

A persistent complaint about New York State Election Law is its laxity when it comes to the purposes of campaign expenditures. A news story quoted a spokesman for the New York State BOE on what the law will allow: "Unless you out-and-out stick it in your pocket and walk away, everything's legal."[9] The permissiveness of state law regarding campaign expenditures places the state at cross-purposes with the Program's restrictions on spending by city candidates. The Board supports legislation that has been introduced in Albany to define the acceptable uses of campaign funds in more explicit detail.

### Party Spending During a Primary

Two recent court rulings place in question New York State's long-time prohibition against party spending in primary elections.[10] City elections have often featured a nominee of one party running in the primary of another. In 2005, as the endorsed candidate of the Working Families Party (WFP) for Manhattan borough president, Scott Stringer was the beneficiary of WFP expenditures promoting his candidacy before the Democratic primary, and one of his opponents protested to the Board about what she believed to be a coordinated expenditure. The court decisions could open the door for parties to affect one another's primary elections. As the Board resolves the Stringer matter, and reviews the recent court rulings, it will determine what remedies are available. (See also Chapter 2—At the Races and Chapter 5.)

*Board Recommendations—Meeting the Goals*

**Increase Disclosure and Regulation on Contributions to and Spending by Political Parties**

The Board recommends that state law be amended to address possible "soft money" problems by lowering the limit on contributions to political parties and by improving accounting and disclosure requirements for party spending on behalf of candidates.

**Restrictions on the Use of Governmental Funds**

The Board recommends that current law on the use of government resources for political purposes be strengthened by banning the use of government funds to distribute gifts that promote an office-holder's candidacy. The Board further recommends that the Conflicts of Interest Board be granted explicit authority to investigate and determine whether violations of this ban have occurred, and, if a violation has been detected, that the Board be given the authority to investigate and determine whether a prohibited use of government resources also violates the Act.

**Stricter Penalties for "Nominee" Contributions**

The Board recommends increasing the penalties for violating Section 14-120 of New York State Election Law, which prohibits candidates from accepting contributions made in the name of another person, or so-called "nominee" contributions.[11] The lack of serious criminal consequences discourages enforcement of the statute, as most prosecutors decline to spend their limited time and resources on cases without significant penalties.

**Disclosure for Not-For-Profit (NFP) Organizations Run by Elected Officials**

While not explicitly for electioneering purposes, organizations associated with particular officials can be used as a vehicle to curry influence with those officials, by making contributions to these organizations not subject to, and potentially in excess of, the contribution limits applicable to candidates. The Fund for Public Advocacy, a NFP founded by Betsy Gotbaum to fund programs in the public advocate's office in a time of budget cutbacks, is only one example; the Gracie Mansion Conservancy is another. The Conflicts of Interest Board mandates disclosure statements for officials' NFPs, but the disclosure contains little detail, and is not easily accessible to the public. The Board believes that mandating more complete information and easier access for NFP disclosure would help the public better understand the relationships that exist between elected officials and the groups they support.

**Earlier Primary Date**

The Board recommends shifting the primary date from September to June. There are several reasons for an earlier primary: it gives voters more time between a primary and general election to learn about the candidates and the issues; it allows for more time for a runoff election, if necessary; it gives the Board of Elections longer to plan successive elections within a particular election year.

This recommendation would also allow candidates who participate in the Program to receive public funds earlier in the year.

**Runoffs for Non-Citywide Races**

Current law provides for runoff elections for citywide primary races *only*, if no candidate in a multi-candidate field receives 40 percent of the vote. Though there were none in 2005, there were runoffs for mayor and for public advocate in 2001. This creates some illogical and undemocratic situations in races for lower office. For instance, Scott Stringer, the current Manhattan borough president, was elected the Democratic nominee in a nine-candidate field with 26 percent of the vote. It can undermine public confidence in the Program when taxpayer funds are spent to subsidize a race that produces a winner with the support of less than two-fifths of the voters. The Board believes a change in State law to allow for runoff elections in borough president and City Council races is a necessary one.

**Term Limits**

A topic of much discussion in political circles is the possibility that the City Council will move to change the existing term limits law before the terms of current Council members are up. Indeed, several of the candidates for Speaker made the repeal a central issue in their appeals to their colleagues.[12] The Board takes no official position on term limits, but notes a pattern is emerging with one election made up of mostly wide-open races and many candidates, and the next with few open seats and drastically fewer candidates. While over time this trend may adjust itself, the Board has made recommendations that ensure the Program meets its goals in any election.

## CONCLUSION

One might be tempted to view the list of recommendations that accompany this report as a critique. In truth, New York City's landmark Campaign Finance Program successfully performs many valuable functions within the city's political system. More candidates are empowered to run for office than otherwise would be able. Those candidates are better able to run competitive campaigns, and are less reliant on so-called "special interests" for campaign funds than they would be without the Program. More citizens can participate fully and knowledgeably in the electoral process, each with the assurance his or her voice does indeed count.

Indeed, it is a measure of the Program's success that each of these benefits has been accepted as part of the New York City political landscape, as a matter of course. Yet each election cycle highlights new challenges for the Program, and 2005 was no different. It is the uniquely experimental nature of our democratic political system that demands citizens continually try to perfect the institutions they create, and it is the Board's hope to meet those challenges with the same spirit and urgency that animated the Program's creation.

*Board Recommendations—Meeting the Goals*

## REFERENCES

1  Dan Forman, WNBC-TV, Post-Election Hearings Transcript, December 13, 2005.

2  *2003 City Council Elections*, Vol. 1, 49.

3  *An Election Interrupted...*, Vol. 1, 150-151.

4  *2003 City Council Elections*, Vol. 1, 43.

5  *Ibid.*, 44.

6  Administrative Code §3-704(1).

7  Intr. No. 125 of 2002.

8  See, e.g., Ethical Campaign Practices Ordinance, Section 2-11.1.1 of the Code of Miami-Dade County, Florida.

9  Jennifer Medina, "State Campaign Finance Rules Need Tightening, Study Says," *New York Times*, May 26, 2006, B4.

10  *Kermani v. New York State Board of Elections*, Index No. 106-CV-0589 (N.D.N.Y. July 25, 2006);
    *Avella v. Batt*, Index No. 98847 (N.Y. App. Div. 3d Dept. July 20, 2006).

11  *An Election Interrupted...*, Vol. 1, 158.

12  Editorial, "There Are Limits, City Council," *Daily News*, December 19, 2005.

# EXHIBIT H – PART 1



**Interim Report** *of the*
**New York City**
**Campaign Finance Board**
*on* **"Doing Business" Contributions**

June 19, 2006

# INTERIM REPORT OF THE NEW YORK CITY CAMPAIGN FINANCE BOARD ON "DOING BUSINESS" CONTRIBUTIONS

### June 19, 2006

Pursuant to New York City Administrative Code § 3-713, the Board reviews the results of each election and submits a report to the Mayor and the City Council in September of the year following the election, and "at such times as the Board deems appropriate." A separate mandate of the Board, under New York City Charter § 1052 (a) (12), is to consider rules regulating campaign contributions from those "doing business" with the City. The New York City Campaign Finance Board is issuing this interim report pursuant to these mandates and in anticipation of its September 2006 Post-Election Report to make public the first-ever attempt to quantify "doing business contributions" in New York City. The Board commissioned a team of graduate students in the Master's of Public Administration program at New York University's Wagner School of Public Service, participants in the school's Capstone Program, to analyze available databases and, to the extent possible, to quantify contributions to New York City candidates from those who "do business" with the City of New York. This report presents a comparison of the information available in the City's new on-line VENDEX and lobbyist databases with the information maintained in the CFB's Searchable Campaign Finance Database. The Board is in the process of independently reviewing the data. If necessary, any updates will be included in the Board's Post-Election Report published in September.

Among the initial findings of this study is the significant role that "doing business" contributors played in both the 2001 and 2005 election cycles. Specifically, the study preliminarily indicates that individuals or entities "doing business" with the City accounted for some 27.5 percent of donations in the 2001 election cycle ($15.6 million out of $56.8 million donated) and 22.3 percent of donations in the 2005 election cycle ($9.4 million out of $42.3 million donated).

## History of the "Doing Business" Issue and the New York City Campaign Finance Program

The Board has been engaged in this subject since a 1998 amendment to the Charter Commission required the Board to propose "rules as it deems necessary" to regulate campaign contributions from those "doing business" with the City. In its consideration of possible rules, the Board, as directed by the Charter, balanced factors including "(1) the effectiveness of the voluntary system of campaign finance reform, (2) the costs of such system, [and] (3) the maintenance of a reasonable balance between the burdens of such system and the incentives to candidates to participate in such system."

The Board conducted an extensive study of the issue and issued three alternative versions of "doing business" rules for public comment in the hopes of identifying an effective way to regulate this area. The Board, however, received very limited responses and no consensus on an approach. Board staff then met both with the Mayor's Office of Contracts and with the City Clerk's Office to determine the extent to which the information maintained by those agencies, as examples, could assist the

i

Board in the enforcement of such a rule. Unfortunately, the information collected by both these agencies was inadequate for the purposes of regulation. The Board concluded in November of 2000 that it had met its Charter obligations as of that time and that it would be useless to proceed further to consider promulgating rules without the means to enforce them effectively.

More recently, the current Administration has developed two public databases—one of VENDEX, containing information about who has contracts with the City, and one for lobbyists registered with the City Clerk's office. These databases were made available on-line in April and June of 2005 respectively, but they were not originally designed for the purposes of public disclosure or regulating "doing business" contributions. The Board has been and will continue to be assisting the Administration in the further development of these and other "doing business" databases to make them reliable, searchable, available to the general public, and, ultimately, compatible with the Board's searchable database. This effort will ultimately permit disclosure and possibly other restrictions on contributions from those doing business with the City. By itself, the development of these databases will be a major achievement and the Board hopes that further progress can be made by collaborative efforts among the Administration, the Council, the Board, and concerned citizens.

In April of this year, the Board held its 4th and final public hearing on the subject of campaign contributions from those who "do business" with the City. The hearing continued the Board's general examination of "doing business" contributions, while focusing on the issues of land use, franchises, concessions, revocable consents, and licenses. The testimony heard at this and previous hearings, as well as the findings of the Capstone Report and the Board's independent study of the issue, will inform the Board's future rule-makings and recommendations on the regulation of "doing business" contributions. The Board remains convinced that the best way to regulate these contributions is by legislation, rather than rule-making. Legislation can regulate, with a targeted approach, those who "do business" rather than addressing the candidates or contributors generally. This targeted approach was adopted by the SEC and has been implemented successfully in the instance of municipal board professionals, and it is also the approach adopted in New Jersey and Connecticut.

## Issues for Consideration

While the work and analysis that went into this report are an important beginning, certain constraints will require continued examination and comment:

1.  The labor-intensiveness of the analysis due to the incompatibility of the VENDEX and lobbyist databases with the searchable Campaign Finance database, as well as the lack of quality assurance of the VENDEX and lobbyist data themselves, which are entirely self-reported, makes duplicating or expanding upon the exercise extremely difficult. Thus, any figures discussed in the report may be somewhat unreliable.

2.  The analysis is drawn from a sample of available data and thus, while the numerical values are stated as absolute, they are actually subject to a range of variations, which is not reflected.

3.  Although it appears that a significant amount of total contributions came from "doing business" contributors, the quantitative analysis makes no attempt to identify how many "doing business contributions" were claimed as matchable. It is thus unclear how much in public matching funds may have been claimed or awarded based upon these contributions.

4.  The report indicates that contributions under $2,000 make up 95 percent of all contributions to municipal offices and that 75 percent of all contributors give contributions of $250 or less. Therefore, lowering contribution limits for all offices is a possible alternative that might more quickly and efficiently address perceived problems of undue influence through campaign contributions.

5.  Contributions from those who "do business" with the City account for a large portion of campaign funds. Diminishing the value of these contributions—including invalidating public matching funds for them—may seriously diminish candidates' resources. Solutions to the perceived problem may then require examination of other adjustments to account for potential losses in resources for candidates.

\*   \*   \*

*This interim report anticipates the Board's mandated post-election report, which will be submitted to the Mayor and City Council in September of 2006. This report is intended to make public important initial data analysis, which may be useful to other interested parties as they study ways in which to address this challenging subject.*

# Municipal Campaign Finance and "Pay-to-Play"
## An Analysis of *Doing Business* Contributors in New York City



PREPARED FOR
The New York City Campaign Finance Board

BY
NYU Wagner Graduate School of Public Service
CFB Capstone Team

Mary Fischietto
Eric Friedman
Kara Merrill Verma
Paul Nelson
Anat Tamir

Our Capstone team submits the enclosed final report to the New York City Campaign Finance Board. Our study speaks to the mandate of the 1998 City Charter revision that the CFB propose regulation of those entities and individuals who *do business* with the City. The following analysis builds upon the interim report submitted to the Board in January 2006. Our research addresses two main questions:

1. How can *doing business* with the City of New York be defined?
2. Is there a relationship between those entities making campaign contributions and those *doing business* with the City?

We have organized our study into two main parts: Part I focuses on our quantitative analysis, built around a working definition of *doing business* with the City. Part II uses a more qualitative approach to propose a broader definition for *doing business*.

## Part I: Quantitative Analysis
Section 1 of Part I describes the working definition of *doing business* that reflects the scope of our quantitative analysis. Section 2 explains the methodology used for our statistical study, along with descriptive statistics of all campaign contributions from the 2001 and 2005 election cycles. Using our working definition of *doing business*, we analyzed the 2001 and 2005 election cycles by drawing a random sample from the CFB's database of donors and looking at the giving trends among those *doing business* with the City -- as captured in the VENDEX and New York City Lobbyist Search databases.

Section 3 lays out our findings. Our primary finding from the quantitative analysis is that *doing business* contributors played a significant role in both the 2001 and 2005 election cycles. Specifically, we found that individuals or entities *doing business* with the City accounted for:

- 27.5% of donations in the 2001 election cycle ($15.6 million out of $56.8 million donated); and,

- 22.3% of donations in the 2005 election cycle ($9.4 million out of $42.3 million donated).

Section 4 describes the limitations and technical constraints of the study's data sources.

## Part II: Qualitative Analysis
In Section 1 of Part II, we establish our proposed definition of *doing business*, which encompasses a broader range of *doing business* activities. To explore the issues and implications raised by this more comprehensive definition, we provide several subgroup analyses in Section 2. We first present a "Micro-Sample Analysis," probing a segment of the donors we studied in our larger sample. Here we attempted to capture those donors who *do business* with the City under our expanded definition with research in various sources outside the VENDEX and NYC Lobbyist Search databases, focusing on the 2005 mayoral and City Council campaigns, as well as intermediaries for the 2005 election cycle.

This exercise yielded a fairly marked disparity between our proposed definition and the working definition used in the random sample analysis:

- Under the working definition, we found that 5.4% of contributors to mayoral campaigns were *doing business* donors; under our proposed definition, we found that 14.0% of contributors to mayoral campaigns were *doing business* with the City.

- Under the working definition, we found that 4.0% of contributors to City Council were *doing business* donors; under our proposed definition, we found that 11.7% of contributors to City Council campaigns were *doing business* with the City.

- Under the working definition, we found that 23.1% of intermediaries were *doing business* with the City; under the proposed definition, we found that 41.2% of intermediaries were *doing business*.

We continue this more intensive analysis with three case studies, to help further illuminate the limits of the working definition used in our quantitative analysis. The studies also highlight some of the complexities and trade-offs that must be considered as part of any discussion of a broader *doing business* definition. Our first case study focuses on a company that holds a concession to sell pretzels via pushcarts in City parks. Our section on land use presents a pair of case studies, putting a spotlight on the campaign contributions of a large Manhattan development firm and an LLC formed to redevelop an abandoned industrial site in Brooklyn. Lastly, we look at the not-for-profit sector, which holds a significant number of large City contracts, examining the campaign contributions of not-for-profit board members and employees.

The information contained in this report does not in any way demonstrate a causal relationship between *doing business* and making campaign contributions, though our analysis shows an overlap between the two activities indeed exists. In addition, our findings cannot demonstrate a causal relationship between making campaign contributions and receiving benefits from any particular City decision. There is nothing in our data that allows us to conclude that contributions have influenced the awarding (or refusal) of any contract or other benefit.

As such, our data do not provide direct evidence of a "pay-to-play" culture in New York City, much less define its scope. Nevertheless, there are still citizens and businesspeople who believe that special interest donors wield undue influence over government officials, and that "pay-to-play" is the dominant *modus operandi*. We believe this perception is corrosive in and of itself. While stricter rules on giving can close off potential loopholes and preempt wrongdoing, any *doing business* regulation we propose is meant, in large part, to help reverse those perceptions and restore the electorate's confidence in City government.

We must also note the limitations posed by data constraints. The records in VENDEX are not regularly audited or quality-assured, and some necessary information is incomplete, outdated or simply not collected. This may have resulted in an underestimate of the overlap between *doing business* entities and campaign contributors.

# TABLE OF CONTENTS

Executive Summary ................................................................................................ i

Introduction ........................................................................................................... 2

Part I: Quantitative Analysis.................................................................................. 3

    Section 1: Working Definition of *Doing Business* ....................................... 4

    Section 2: Methodology ................................................................................. 5

    Section 3: Findings...................................................................................... 12

    Section 4: Technical Constraints and Recommendations ........................... 18

Part II: Qualitative Analysis ............................................................................... 21

    Section 1: Proposed Definition of *Doing Business* .................................. 22

    Section 2: Qualitative "Micro-Sample" Analysis ...................................... 25

    Section 3: Case Studies .............................................................................. 28

Conclusion............................................................................................................ 41

Part III: Appendices ........................................................................................... 43

    Appendix A: Data Sources ......................................................................... 44

    Appendix B: Aggregation Process.............................................................. 46

    Appendix C: Process for Searching VENDEX and Lobbyist Databases ...... 49

    Appendix D: Data Cleaning Process........................................................... 52

    Appendix E: Definitional Considerations .................................................. 54

    Appendix F: Government Actors in Land Use Decisions ........................... 60

Acknowledgements .............................................................................................. 61

# INTRODUCTION

As charged by the Campaign Finance Board in the fall of 2005, our Capstone team has attempted to define what it means to *do business* with the City of New York. We have applied our definitions to existing data to highlight the relationship between those *doing business* with the City and those making political donations in City campaigns. This is more than a purely theoretical exercise. We hope the study informs future efforts to regulate campaign contributions from *doing business* donors.

The New York City Campaign Finance Board and the Campaign Finance Program were created in the mid-1980s as a response to corruption scandals in City government. Since then, City voters have supported charter revisions that strengthened the ability of the CFB to limit the influence of large donations from private sources. The 1998 Charter Revision mandated the CFB specifically to propose rules to "regulate the acceptance by candidates...of campaign contributions from individuals and entities doing business with the city."[1] This charge provides the rationale for our study.

---

[1] New York City Charter, §1052(11)(a).

# PART I: QUANTITATIVE ANALYSIS

SECTION 1: WORKING DEFINITION OF *DOING BUSINESS*

**Working Definition**

For the purpose of quantifying the frequency of *doing business* contributions in citywide elections, our working definition of *doing business* includes:

- Firms or individuals who are principals of firms who have contracts with the City valued at $100,000 or more; and/or
- Registered lobbyists and lobbyist clients.

For the quantitative analysis, our working definition was guided wholly by two factors: the availability of data from the VENDEX and NYC Lobbyist Search databases, and the lack of any other similarly comprehensive data source on individuals' business dealings with the City. This practical, working definition provides a good start from which to examine the relationship between campaign contributors and those *doing business* with the City. A firm with a City contract is clearly involved in a business relationship with New York City government, and for practical purposes, lobbyists and their clients represent a broad cross-section of interests seeking influence over policy decisions.

A report prepared in 2000 by the New York Public Interest Research Group (NYPIRG) on the City's top lobbying interests notes:

> "Most people associate lobbying with pending legislation and budgetary decisions... However, our review shows that it is real estate and land use concerns which dominate the agenda of these big spenders... A careful review of lobbyist disclosure forms reveals a good deal. Topics and issues lobbied ranged from the Commercial Rent Tax, sound stages for Kaufman Astoria Studios, housing developments in Brighton Beach and the JFK Airport rail link."[2]

A similar analysis of expenditures on lobbyists over the past few years would find a comparable range of issues, from large retail firms seeking approval to develop a site for a new store to non-profit hospitals seeking capital funding. There is some currency to the position that a regulation on lobbyist contributions would make a significant contribution towards lessening the influence of campaign money from "business-doers" who are not City contractors.

City policymakers share a concern for diminishing the influence of lobbyists on the policy process. In February, Mayor Bloomberg and City Council Speaker Christine Quinn introduced a set of reforms to New York City's lobbying laws, including a prohibition on matching funds for campaign contributions from lobbyists.[3] With the VENDEX and NYC Lobbyist databases in place, enforcement is all the more feasible. In terms of viability, this limited working definition is the most logical basis for an immediate, if preliminary, assessment of *doing business* regulation.

---

[2] NYPIRG, "The Big Apple's Big Spenders: The City's Top Lobby Interests."
http://www.nypirg.org/spenders/default.html
[3] This bill was unanimously passed into law by the City Council on May 24, 2006.

4

SECTION 2: METHODOLOGY

## Overview

Our team conducted a statistical analysis of New York City campaign contributions from the 2001 and 2005 election cycles.[4] Using a database of information on donations and donors provided to us by the Campaign Finance Board, in conjunction with publicly available data on contributors' business dealings contained in the City's VENDEX and NYC Lobbyist Search databases, our analysis examines the magnitude of the "pay-to-play" phenomenon.  Given the constraints of these two data sources (which are described in detail in Section 4) the prevalence of "pay-to-play" may be considerably understated by our study.  A detailed description of each data source is available in Appendix A.

In conducting this analysis, our primary research question was: is there a relationship between individuals and entities that make municipal campaign contributions and entities that *do business* with the City?  More specifically, our study aimed to answer the following questions:

- What is the nature of that relationship and how strong is it?
- What proportion of campaign contributors *do business* with the City?
- Are certain municipal offices more likely to attract contributions from those who *do business* with the City than others?
- Are donors who contribute above a certain dollar amount more likely to be *doing business* with the City than smaller contributors?

In order to answer these questions, we designed and applied a random sampling methodology to analyze the 2001 and 2005 New York City election cycle campaign contributions. Our examination of contributions involved redefining the unit of analysis and performing three distinct analyses.[5]

## Unit of Analysis: Contribution vs. Contributor

In its database, the CFB keeps individual records for each individual campaign contribution. For example, if one individual gives one contribution each to three City Council candidates, the CFB database lists each of these transactions separately, for a total of three records. To better answer our research question, we aggregated these individual records so that only one record exists for each individual contributor who donated to candidates for each of the five levels of municipal office (Mayor, Public Advocate, Comptroller, Borough President and City Council).

The rationale for aggregating from individual contribution to individual contributor to municipal office is based largely on our research team's questions regarding the nature of the "pay-to-play" phenomenon. Because we are examining the relationship between campaign contributors and those who *do business* with the City, we focused on the individual contributor, not the individual contribution. In their original format, the data fail to capture the overall impact of an individual's campaign contributions. For example, suppose that Mary Martinez made four contributions of $1,000 each to three mayoral candidates during the 2001 election cycle. If we analyzed the campaign contribution data without aggregating them, our analysis would yield 12 individual contributions of $1,000 each. By aggregating the records to the level of individual

---

[4] The 2001 election cycle includes contributions given between January 12, 1998 and January 11, 2002. The 2005 election cycle includes contributions given between January 12, 2002 and January 11, 2006.
[5] Additional subgroup analyses, more qualitative in nature, were also conducted to explore in more detail the campaign contributions of certain entities that were not fully or partially observable in the VENDEX or Lobbyist databases.  These analyses are described in the Subgroup Analyses section of this report.

5

contributor to municipal office, however, our analysis focused on Mary Martinez and the $12,000 she contributed to mayoral candidates. Aggregating the data as such provides a more accurate picture of an individual contributor's giving behavior than the disaggregated data.

Furthermore, because we assumed that no individual contributor can truly know the outcome of an election before it takes place, we focused on the individual's total contributions to all candidates for a municipal office, rather than an individual's total contributions to a specific candidate. Not only did this allow our research team to examine differences in contribution trends among the five municipal offices, it further centered the analysis on the individual contributor (rather than on individual candidates). To return to the example of Mary Martinez, looking at three contributions of $4,000 to three individual mayoral candidates tells us less about her potential desire to gain influence than the fact that she donated a total of $12,000 to all mayoral candidates in the 2001 election cycle.

Finally, the aggregation process allowed our team to segregate donors by their total contribution amount. It was important to be able to provide solid data on the number of contributors who are giving at various levels to the five municipal offices. Specific details on how this aggregation was performed are available in Appendix B.

## Statistical Analyses

### 1. Population of 2001 and 2005 Election Cycle Contributors

In order to get a more complete sense of the universe of campaign contributors, we first conducted an analysis of the entire pool of 2001 and 2005 election cycle campaign contributors. Using our aggregated data, we segmented the 123,234 and 84,857 contributors from the 2001 and 2005 election cycles by the five municipal offices (Mayor, Public Advocate, Comptroller, Borough President and City Council). We then further segmented these data into three contribution categories. Those contributors who gave a total of $250 or less to a given municipal office in an election cycle were grouped into the low contribution category. Those who gave between $251 and $1,999 to a given municipal office in an election cycle were grouped into the medium contribution category, while those who gave $2,000 or more were grouped into the high contribution category.

This comprehensive quantitative analysis allowed our research team to get a better sense of the characteristics of campaign contributors and provided the lens through which we would examine the "pay-to-play" phenomenon.

### 2. *Doing Business* Sample of Contributors

Although the aggregation process described in the unit of analysis discussion above significantly reduced the number of individual records in the population, the number of 2001 and 2005 election cycle contributors to municipal office (208,091) was still too large to be able to analyze each individually. For this reason, we conducted our analysis of *doing business* campaign contributors using a stratified random sample of 2001 and 2005 election cycle campaign contributors. Samples of 50 were drawn from each giving category (low, medium and high) within each municipal office for both election cycles. Intermediary contributors, discussed in detail below, were excluded from this analysis and examined separately.

Drawing and cleaning the samples gave us a total random sample of 758 contributors for the 2001 election cycle and 760 contributors for the 2005 election cycle. We then searched the VENDEX and NYC Lobbyist Search databases to determine which of these randomly selected

6

contributors *do business* with the City.[6]  For the purposes of this analysis, our definition of *doing business* – the "working definition" – was limited to the data available in the aforementioned sources. A contributor must therefore fulfill one of the following two conditions in order to be deemed as *doing business* with the City. They must be:

1) listed in the VENDEX database; or
2) listed as a lobbyist or client in NYC Lobbyist Search.

Given the paucity of publicly available data on individuals' and entities' business dealings with the City, this working definition is the most reasonable definition of *doing business* for the broad quantitative analysis.

### 3. *Doing Business* Sample of Intermediaries

According to the CFB's New York City Campaign Finance Handbook, intermediaries "are people who, or organizations that, solicit, collect, and deliver contributions to a campaign from other people or organizations."[7] Also called 'bundlers,' these contributors are subject to special reporting requirements by the CFB because of their potential to influence candidates. For this reason, we focused our statistical analysis on this group of donors as well.

To examine the extent to which intermediaries *do business* with the City, we performed a separate statistical analysis of intermediated contributions. For this study, all contributions that had a value in the "intermediary name" field of the CFB database were extracted and aggregated as described above. After aggregation only a small number of records remained (1,313 and 356 for the 2001 and 2005 cycles, respectively), and therefore a representative random sample was drawn for each election cycle from the entire aggregated population.[8] These records were then cleaned and researched in the VENDEX and Lobbyist databases using the same methods employed for the large sample.

### Population Statistics

The deletion and aggregation processes significantly reduced the number of individual records in the CFB 2001 and 2005 election cycle datasets (from 186,067 to 123,234 records for 2001, and from 122,205 to 84,857 records for 2005). The 123,234 contributors from the 2001 election cycle and the 84,857 contributors from the 2005 election cycle constituted the populations from which our research team conducted its comprehensive analysis of campaign contributions.

A total of 123,234 donors gave $47,368,202 to 299 candidates in the 2001 election cycle, and 84,857 donors contributed $40,212,516 to 192 candidates in the 2005 election cycle (see Tables 1 and 2). For purposes of this analysis, we excluded Mayor Michael Bloomberg's donations to his own campaign for the 2001 and 2005 election cycles, which totaled $73,000,000 and $78,655,868, respectively. Including these significant outliers in our sample would have skewed our population statistics.

The total dollar amount of contributions decreased slightly in the 2005 election cycle, while the number of candidates receiving those contributions dropped from 299 in the 2001 election cycle to 193 in the 2005 election cycle. When term limits took effect in 2001, many municipal office seats that had been held for years became vacant, giving rise to a competitive election

---

[6] Given the limitations of the data, it cannot be guaranteed that an entity or individual selected for the sample would be found in the VENDEX or Lobbyist databases.  The processes used to clean the sample and determine if those individuals and entities randomly selected into the sample were in the VENDEX and/or the NYC Lobbyist Search databases are described in detail in Appendix D and C, respectively.

[7] New York City Campaign Finance Board, *New York City Campaign Finance Handbook*, New York, 2005, pp. 2-14.

[8] This method differed from that used for the large sample where entities and individuals were grouped by contribution category and office before sampling was performed.

that saw several challengers running for these open seats. In the 2005 election cycle, there were many more incumbents on the ballot, narrowing the number of challengers, the number of total candidates, the number of individual campaign contributors, and the total amount of money spent.

**TABLE 1**
Number of Individual Contributors to Municipal Campaigns, by Office:
New York City, 2001 and 2005 Election Cycles

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Number of Contributors | % of Total Contributors | Number of Contributors | % of Total Contributors |
| Mayor | 24,803 | 20.1 | 18,662 | 22.0 |
| Public Advocate | 10,308 | 8.4 | 6,054 | 7.1 |
| Comptroller | 5,239 | 4.3 | 3,227 | 3.8 |
| Borough President | 19,449 | 15.8 | 18,078 | 21.3 |
| City Council | 63,434 | 51.5 | 38,302 | 45.1 |
| Undeclared | 1 | 0.0 | 534 | 0.6 |
| Total | 123,234 | 100.0 | 84,857 | 100.0 |

**TABLE 2**
Contribution Dollar Totals, by Office:
New York City, 2001 and 2005 Election Cycles

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Total Contribution Amount in Dollars | % of Total Contribution Amount | Total Contribution Amount in Dollars | % of Total Contribution Amount |
| Mayor | 22,688,457 | 47.9 | 14,064,916 | 35.0 |
| Public Advocate | 4,472,960 | 9.4 | 2,324,483 | 5.8 |
| Comptroller | 3,117,100 | 6.7 | 4,004,761 | 10.0 |
| Borough President | 5,443,505 | 11.5 | 8,111,852 | 20.2 |
| City Council | 11,645,680 | 24.6 | 11,567,046 | 28.7 |
| Undeclared | 500 | 0.0 | 139,458 | 0.3 |
| Total | 47,368,202 | 100.0 | 40,212,516 | 100.0 |

Candidates for City Council (259 in 2001 and 153 in 2005) attracted the greatest number of contributors in both election cycles. However, in total dollar amount of contributions, they trailed candidates for Mayor by significant margins in both elections.

The vast majority of contributors still gave "small" donations in both election cycles. Approximately three-quarters of all contributors gave less than $250 to a municipal office in 2001 and 2005, and approximately 95% of all contributors gave less than $2,000 to a municipal office. Only the top 5% of contributors in both election cycles gave more than $2,000 to a municipal office in the 2001 and 2005 election cycles.

**TABLE 3**
% Distribution of Contributors, by Contribution Category and Office:
New York City, 2001 and 2005 Election Cycles

| Contribution Category | 2001 Election Cycle | | | | | |
|---|---|---|---|---|---|---|
| | Mayor | Public Advocate | Comptroller | Borough President | City Council | % of All Contributors |
| $0 - $250 | 11.7 | 6.3 | 2.8 | 12.6 | 45.2 | 78.8 |
| $251 - $1,999 | 5.4 | 1.5 | 1.0 | 2.7 | 5.6 | 16.3 |
| $2,000 and greater | 3.1 | 0.5 | 0.4 | 0.4 | 0.7 | 5.0 |
| % of All Contributors | 20.1 | 8.4 | 4.3 | 15.8 | 51.5 | 100.0 |

| Contribution Category | 2005 Election Cycle | | | | | |
|---|---|---|---|---|---|---|
| | Mayor | Public Advocate | Comptroller | Borough President | City Council | % of All Contributors |
| $0 - $250 | 14.0 | 5.8 | 1.5 | 15.4 | 37.2 | 74.0 |
| $251 - $1,999 | 5.4 | 1.0 | 1.4 | 4.6 | 6.5 | 19.0 |
| $2,000 and greater | 2.7 | 0.4 | 0.9 | 1.4 | 1.7 | 7.0 |
| % of All Contributors | 22.1 | 7.2 | 3.8 | 21.4 | 45.4 | 100.0 |

9

As would be expected, in terms of absolute dollar amounts, the largest donors (those giving $2,000 or more) account for a much greater share of the total dollars going to candidates for office than those giving up to $2,000. More than half of the total dollars contributed to municipal offices in the 2001 and 2005 election cycles came from donors giving $2,000 or more.

In three of the five municipal offices, the proportion of campaign dollars coming from the largest contributors increased dramatically between the 2001 and 2005 election cycles. Only 28.8% of all campaign dollars for the office of Borough President were contributed by those giving more than $2,000 in the 2001 election cycle. In the 2005 election cycle, that figure increased to 48.6%. Similar trends were recorded for the offices of Comptroller and City Council. Not only were there more donors giving in this largest contribution category, but they contributed a much greater proportion of the total dollar amounts going to municipal campaigns.

**TABLE 4**
**% Distribution of Contribution Totals, by Contribution Category and Office:**
**New York City, 2001 and 2005 Election Cycles\***

| | 2001 Election Cycle | | | 2005 Election Cycle | | |
|---|---|---|---|---|---|---|
| Municipal Office | $0 - $250 | $251 - $1,999 | $2,000 and greater | $0 - $250 | $251 - $1,999 | $2,000 and greater |
| Mayor | 7.6 | 22.5 | 69.9 | 10.6 | 24.2 | 65.2 |
| Public Advocate | 19.6 | 29.4 | 51.0 | 24.7 | 25.9 | 49.4 |
| Comptroller | 16.8 | 31.0 | 52.1 | 5.3 | 23.6 | 71.1 |
| Borough President | 32.1 | 39.7 | 28.1 | 17.9 | 33.5 | 48.6 |
| City Council | 41.1 | 34.5 | 24.4 | 24.4 | 31.8 | 43.9 |
| All Offices | 20.4 | 28.6 | 51.0 | 16.3 | 28.3 | 55.4 |

\*Contributions to "Undeclared" are excluded from this analysis: $500 in the 2001 election cycle and $139,458 in the 2005 election cycle

The number of intermediary contributors decreased dramatically (by more than 72%) in the 2005 election cycle. This decrease was coupled with a drop in the total dollars funneled to municipal candidates through intermediaries (see Tables 5 and 6).

**TABLE 5**
**Number of Intermediary Contributors to Municipal Campaigns, by Office:**
**New York City, 2001 and 2005 Election Cycles**

| | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| Municipal Office | Number of Intermediaries | % of Intermediaries | Number of Intermediaries | % of Intermediaries |
| Mayor | 666 | 50.7 | 111 | 31.2 |
| Public Advocate | 100 | 7.6 | 12 | 3.4 |
| Comptroller | 84 | 6.4 | 10 | 2.8 |
| Borough President | 95 | 7.2 | 110 | 30.9 |
| City Council | 368 | 28.0 | 103 | 28.9 |
| Undeclared | 0 | 0.0 | 10 | 2.8 |
| Total | 1,313 | 100.0 | 356 | 100.0 |

10

**TABLE 6**
**Intermediary Contribution Dollar Totals, by Office:**
**New York City, 2001 and 2005 Election Cycles**

| Municipal Office | 2001 Election Cycle | | 2005 Election Cycle | |
|---|---|---|---|---|
| | Intermediary Contribution Amount in Dollars | % of Total Intermediary Contribution Amount | Intermediary Contribution Amount in Dollars | % of Total Intermediary Contribution Amount |
| Mayor | 7,719,822 | 81.6 | 1,446,038 | 62.6 |
| Public Advocate | 437,550 | 4.6 | 41,835 | 1.8 |
| Comptroller | 659,827 | 7.0 | 53,425 | 2.3 |
| Borough President | 313,557 | 3.3 | 412,983 | 17.9 |
| City Council | 326,133 | 3.4 | 324,288 | 14.0 |
| Undeclared | 0 | 0.0 | 32,750 | 1.4 |
| Total | 9,456,889 | 100.0 | 2,311,319 | 100.0 |

11

## SECTION 3: FINDINGS

Under our working definition, individuals and entities that appear either in VENDEX or NYC Lobbyist Search are considered to be *doing business* with the City of New York. Based upon our analysis of the random sample of donors drawn from the entire population of donors described above, it is clear that *doing business* contributors played a significant role in both the 2001 and 2005 election cycles.

According to the results of our analysis:

- Of the $56,824,591[9] contributed in the 2001 election cycle, **27.5%** or **$15,647,574** was donated by individuals or entities deemed to be *doing business* with the City of New York.

- Of the $42,384,377[10] contributed in the 2005 election cycle, **22.3%** or **$9,433,261** was donated by individuals or entities deemed to be *doing business* with the City of New York.

These numbers reflect the total contributions of all *doing business* donors, both intermediaries and non-intermediated contributors (hereafter referred to as *contributors*). In order to glean more information on the giving trends of these two classes of donors, we examined them separately. Findings from these analyses are discussed in detail below.

### Analysis of 2001 and 2005 Election Cycle Contributors

The results of our statistical analysis of contributors show that while *doing business* subjects made up a relatively small percentage of the total number of contributors in both election cycles, they gave a disproportionately large percentage of the total dollars donated to candidates.

In the 2001 election cycle:

- **3.8%** of all contributors to office were *doing business* with the City;

- **25.2%** of the total dollars contributed were from *doing business* donors; and

- Of the $47,367,702 in contributions, **$11,931,017** was from *doing business* donors.

In the 2005 election cycle:

- **5.3%** of all contributors to office were *doing business* with the City;

- **21.5%** of the total contributions were from *doing business* donors; and

- Of the $40,073,058 in contributions, **$8,626,611** was from *doing business* donors.

---

[9] Our analysis of the 2001 election cycle campaign contributions excluded Mayor Michael Bloomberg's $73,000,000 contribution to his own campaign, as an outlier, as well as $500 designated as "undeclared."
[10] Our analysis of the 2005 election cycle campaign contributions excluded Mayor Michael Bloomberg's $78,655,868 contribution to his own campaign, as an outlier, as well as $139,458 designated as "undeclared."

**Chart 1:**
**% of Contributors *Doing Business* and Their Share of Total Dollars Contributed:**
**New York City, 2001 and 2005 Election Cycles**

In other words, 3.8% of contributors to office donated 25.2% of the money to candidates in the 2001 election cycle, while 5.3% of contributors to office donated 21.5% of the money to candidates in the 2005 election cycle. *Doing business* donors, though few in number, served as significant sources of money for candidates in both election cycles.

This trend holds across municipal office. For all offices, while *doing business* contributors represented a relatively small percentage of contributors, they contributed a disproportionately large percentage of the money to municipal campaigns. Perhaps nowhere is this trend more evident than in races for Borough President in the 2001 election cycle. Although only 8.0% of contributors to Borough President candidates were determined to be *doing business* with the City of New York, they contributed more than 81% of the money to campaigns for the office (see Chart 2a).



**Chart 2a:**
**% of Contributors *Doing Business* and Their Share of Total Dollars Contributed:**
**New York City, 2001 Election Cycle**

While the Borough President race in the 2001 election cycle is certainly exceptional, it follows the trend among offices across election cycles. In the 2005 election cycle races for City Council, for example, *doing business* contributors represented only 4.0% of total contributors to the office. However, these *doing business* donors gave 33.9% of the total dollars contributed to the race (see Chart 2b). This differential, consistent across all offices and across both election cycles, indicates that *doing business* contributors are an important source of campaign funds for all offices.

**Chart 2b:**
**% of Contributors *Doing Business* and Their Share of Total Dollars Contributed:**
**New York City, 2005 Election Cycle**



Given the differential between the small number of contributors and the significant amount of money they contribute, it is not surprising that among the three different contribution categories used in this analysis, the highest contribution categories in both election cycles contained the greatest number of *doing business* donors. While only 1.6% of donors in the lowest contribution category were *doing business* with the City of New York, a full 20.8% of donors in the high contribution category were found to be *doing business* in the 2001 election cycle.

**Chart 3a:**
**% of Contributors *Doing Business*, by Contribution Category:**
**New York City, 2001 and 2005 Election Cycles**



The difference between the number of *doing business* contributors in low and high contribution categories decreased slightly in the 2005 election cycle. Of the total dollars given by those donors in the highest contribution category, *doing business* contributors donated 26.1% and 19.5% of high contribution category campaign dollars in the 2001 and 2005 election cycles, respectively.

**Chart 3b:**
**% of Total Contributions from *Doing Business* Donors, by Contribution Category:**
**New York City, 2001 and 2005 Election Cycles**



The large majority of *doing business* contributors represented contractors with the City of New York. In both election cycles, approximately 70% of all *doing business* contributors were listed in VENDEX (see Chart 4a). In the 2001 election cycle, 25.1% of *doing business* contributors could be found in NYC Lobbyist Search, either as registered lobbyists or as clients of lobbyists. This number decreased slightly in the 2005 election cycle as more *doing business* donors (9.8% in 2005 as opposed to 5.8% in 2001) could be found in both VENDEX and NYC Lobbyist Search.

**Chart 4a:**
**% Distribution of *Doing Business* Contributors, by Type of *Doing Business*:**
**New York City, 2001 and 2005 Election Cycles**



Whether *doing business* contributors were in VENDEX or NYC Lobbyist Search, the relative amount of money they contributed to campaigns was consistent with the respective number of contributors in the *doing business* category. For example, the 70.6% of *doing business*

15

contributors who were in VENDEX in the 2005 election cycle contributed 71.2% of the total *doing business* dollars, while the 19.6% of *doing business* contributors found in NYC Lobbyist Search for the same election cycle contributed 20.5% of total *doing business* dollars.



**Chart 4b:**
**% Distribution of Total *Doing Business* Dollars, by Type of *Doing Business*:**
**New York City, 2001 and 2005 Election Cycle**

## Analysis of 2001 and 2005 Election Cycle Intermediaries

Among the intermediaries in our random sample, there was a much greater number of *doing business* donors than among non-intermediated contributors.

In the 2001 election cycle:

- **29.1%** of intermediary contributors were *doing business* with the City (as compared to 3.8% of non-intermediated contributors).

- **39.3%** of total intermediary contributions were made through *doing business* intermediaries; of the $9,456,889 donated through intermediaries, **$3,716,557** came from *doing business* intermediaries.

In the 2005 election cycle:

- **23.1%** of intermediary contributors were *doing business* with the City (as compared to 5.3% of non-intermediated contributors).

- **34.9%** of total intermediary contributions were made through *doing business* intermediaries; of the $2,311,319 donated through intermediaries, **$806,650** came from *doing business* intermediaries.

Our examination of intermediaries reveals a clear trend that developed between the 2001 and 2005 election cycles: lobbyists took a much more active role as intermediaries during the 2005 election cycle. While lobbyists represented only 28.1% of intermediary *doing business* donors in the 2001 election cycle, by 2005 they made up almost half of all *doing business* contributors (48.0%).



**Chart 5a:**
**% Distribution of *Doing Business* Intermediaries, by Type of *Doing Business*:**
**New York City, 2001 and 2005 Election Cycles**

The explosion in the proportion of intermediary contributors listed in NYC Lobbyist Search in the 2005 election cycle was also reflected in the amount of money contributed by these intermediaries. For the 2001 election cycle, lobbyists comprised 28.1% of the *doing business* intermediaries, and contributed only 24.1% of the total intermediary *doing business* dollars. However, in the 2005 election cycle, lobbyists represented 48% of the *doing business* intermediaries, and bundled almost 70% of the intermediated *doing business* dollars, a remarkable increase.



**Chart 5b:**
**% Distribution of Intermediary *Doing Business* Dollars, by Type of *Doing Business*:**
**New York City, 2001 and 2005 Election Cycles**

## SECTION 4: TECHNICAL CONSTRAINTS AND RECOMMENDATIONS

The goal of this analysis was to quantify the extent to which campaign contributors *do business* with the City of New York, insofar as it could be determined from the data contained in our three primary sources. Reliance on these databases for our analysis posed a number of difficulties because the data were limited, difficult to access and not fully representative of all the possible transactions that constitute *doing business*.

Some technical constraints and concerns are set forth below. To be implemented, each recommendation would require a different level of commitment and resources from various City agencies to address the constraints. Clearly, additional research need to be conducted to determine the true feasibility and priority of implementing any recommendation. Any changes should aim to effectively and efficiently increase the CFB's ability to more accurately and comprehensively determine—and monitor—those who *do business*.

### 1. Difficulty Accessing and Searching VENDEX Database

A limitation our team faced was an inability to perform broad-based searches. We were unable to obtain back-end VENDEX data (i.e. database tables) from the New York City Department of Information Technology and Telecommunications (DOITT), which limited the means available for matching data to the online access page. The online system, although inclusive of all data, allows searches by last name or entity name only. The online search is cumbersome because it allows only one name or entity to be researched at a time, and requires that names be searched using last name only. Some practical implications of this constraint are:

- You must enter the name of an entity exactly as it is recorded in the databases. For instance, if you enter "Salvation Army," but the record is stored as "The Salvation Army," no data will be returned. Therefore, each entity/individual selected in the sample must be entered individually in a variety of manners to ensure that, if it is in the databases, it is discovered.

- Because you cannot enter a first name, common last names return multiple pages of records. For example if you enter Smith, 23 pages of records are returned that must be sorted through manually in order to find the record you are aiming to retrieve.

### 2. Difficulty Accessing and Searching Lobbyist Database

Our team was also unable to obtain back-end Lobbyist data from DOITT. However, unlike VENDEX, any part of an individual or entity's name may be entered to receive results in NYC Lobbyist Search. Despite this capability, the Lobbyist database is flawed because many pages of material wholly unrelated to the name entered are often returned.

### 3. Inability to Reconcile Data in Multiple Databases

Data are stored differently in each of the three databases used in our study. Therefore, performing a review of all contributors is extremely difficult because running queries between the CFB database and the VENDEX or Lobbyist databases is not currently possible. For example, running a query between the CFB and VENDEX databases based on matching names would yield many incorrect results, because entity and individual names may be common or spelled in a variety of manners. The CFB noted this concern in an April 2005 press release:

> "The new VENDEX system – until it is 'cleaned up' – will yield both materially over-inclusive and materially under-inclusive results for those looking at overlaps between the

information VENDEX contains and the information in the Board's comprehensive, searchable database of campaign contributions. As a result, use of this system at this stage would create a high risk of error and potential embarrassment. Most important for the Board's purposes, the VENDEX system is not at this stage compatible with the Board's searchable database."

### 4. Limited Data Sources

Our review of the relationship between campaign contributors and *doing business* with the City was based upon a limited amount of publicly available data. For instance, the VENDEX and Lobbyist databases do not capture all land use activities deemed *doing business* transactions. Similarly, if land use transactions are determined to constitute *doing business,* information from applications to land use boards will have to be compiled and stored in a database. This clearinghouse of information could be referenced by campaigns, regulators, or the public to determine if a particular contributor *does business* with the City.

### 5. Validity and Comprehensiveness of Data Entered in City Databases

The process by which data are received and entered into the VENDEX and Lobbyist databases varies across agencies. Because a wide variety of City agencies award contracts, it is difficult to determine if information is cleanly and comprehensively entered into VENDEX. These concerns created some uncertainty about our ability to accurately capture all matches when searching the selected contributors in these databases.

Among unresolved questions are:

- Who is responsible for entering data?
- What, if any, protocol is followed to ensure these data are entered accurately?
- How often are entries made?
- How complete are the data that currently reside on the site?
- Could additional information be added to the databases?
- Does the information found in a sample of current paper contracts match the information stored in VENDEX?

Armed with this information, appropriate steps can be taken to strengthen data collection, entry and storage, which will in turn enhance capacity to recognize contributors that *do business* and enforce regulation.

### 6. Comprehensiveness and Accuracy of VENDEX Principal Listings

With regard to our analysis, the listing of principals is flawed in three manners. First, principals are not assigned to specific contracts, so it is not possible to determine whether the principal is associated with the listed contract. For example, when conducting a search using an individual's name in VENDEX yields one company with five contracts, it is not possible to determine if that individual is involved in those contracts. You may search for "John Doe," which returns one company name with a list of 20 other principals and 100 accompanying contracts. From this list, you cannot determine if any of the 100 contracts are associated with the principal in question. Second, it is not required that all managers complete a VENDEX questionnaire. [11] Therefore, an individual who is a primary City contact for obtaining the contract and delivering the services may

---

[11] The principal questionnaire requires that all of the submitting vendor's principal owners and the three officers who exercise the most substantial degree of control over the submitting vendor submit a questionnaire. The City defines a principal as: An individual, partnership, joint venture or corporation that holds a ten (10) percent or greater ownership interest in a submitting vendor or subcontractor. An officer is defined as: Any individual who serves as or performs the functions of chief executive officer, chief financial officer, or chief operating officer of the submitting vendor, without regard to such individual's title, e.g., president, vice president, secretary, treasurer, board chairperson, trustee, (individual or entity who administers a trust) or their equivalents.

not be present in the system. Finally, retired principals or persons no longer employed by the company may be listed in VENDEX, even if they are not associated with any contracts from the election cycle under study.

## 7. Small Contracts Unrecorded

Currently, VENDEX only captures contracts from companies that have $100,000 or more in business contracts. It does not capture awards for smaller figures, which may be more likely to be granted through discretionary processes and could represent a large proportion of total revenue, especially for smaller companies. This limitation prevents the study of any of these entities that may be *doing business* with the City.

PART II: QUALITATIVE ANALYSIS

## SECTION 1: PROPOSED DEFINITION OF *DOING BUSINESS*

For the purpose of assessing the true nature of *doing business* in the City in its broadest possible sense, with the idea of discussing areas for future regulation, our proposed *doing business* definition is as follows:

a) **Contractors and prospective contractors**
   - Firms (including not-for-profits) that have contracts with a City agency totaling $100,000 or more in any given year;
   - Firms that have submitted a bid for such a contract;
   - Firms that have entered into a franchise or concession agreement with a City agency;
   - Subsidiaries of such a firm, or subcontractors named in a qualified proposal whose portion of such contract is valued at $100,000 or more;
   - Individuals who are chief executives, officers, owners of a ten percent share of such a firm, or any other individual who is authorized to represent the prospective contractor before the City;
   - Political action committees formed by a regulated firm or individual;

b) **Parties to land use decisions**
   - Firms who submit an application to the City Planning Commission subject to the Uniform Land Use Review Process (ULURP), to the Board of Standards and Appeals (BSA), or the Landmarks Preservation Commission (LPC);
   - Individuals who are chief executives, officers, owners of a ten percent share of such a firm;
   - Professionals who are authorized to represent an applicant before these boards and commissions;
   - Subsidiaries of or entities owned wholly by such a firm;

c) **Lobbyists**
   - Individuals registered as lobbyists with the City Clerk's office;
   - Firms that hire a lobbyist.

It is self-evident to most any observer of government that influence-seeking is not limited to current City contractors and lobbyists. However, if there is any hope of enforcing a regime that will reduce influence-seeking donations from other sources, it is necessary to define these other sources with some precision.

We weighed several factors when considering whether a particular entity should be subject to a *doing business* regulation that restricts its ability to make campaign contributions:

- Would the donor receive financial benefit from a particular decision by a City board, commission or agency?
- Did the donor affirmatively participate in the decision-making process?
- Is it possible to easily and clearly identify the donor's participation in this decision-making process? (Is there a "paper trail"?)
- Is it possible to create an enforcement mechanism that would give campaigns an ability to identify those donors who are targeted by this regulation?
- Are 'false positives' likely? That is, how likely is it that this donor is not seeking influence, but is donating for partisan, personal or other reasons?
- Would restrictions on this donor place an unfair burden on the way he conducts his business?
- Would restrictions on this donor represent an undue limit on his right to participate in the political process?

22

- Is it likely this donor is giving to circumvent a regulation placed on another donor?

## Discussion

**Classes of Potential Donors Subject to Proposed Definition**

*Contractors*

Individuals or firms who are party to a contract with the City are the easiest to include in our definition, for contracts clearly represent a financial benefit. Because the specifications of an RFP can be drawn to exclude or target particular firms, it is important that the definition include competitively bid as well as no-bid contracts. Regulation should be triggered by contracts totaling $100,000 because the identification mechanism, through VENDEX, is part of the way to being complete.

*Bidders*

Bidders are seeking the financial benefit of a contract. With the submission of a bid, their participation can be clearly identified. This may present challenges with RFPs that call for sealed bidding, but a requirement that prospective vendors complete a VENDEX form to respond to an RFP, or be included on an agency's Bidders List, could help establish a more complete bidders database to inform a regulation that would be triggered with the submission of a bid. We are inclined to follow the lead of other governments and release the losing bidders from *doing business* restrictions after a contract is awarded to another firm.

*Franchises and concessions*

Franchises and concessions are both types of agreements with the City for the use of City land for which the City receives fees. Franchises are grants by the City of the right to occupy City property to provide a public service such as bus transportation or cable television. Concessions are grants by the City for the private use of City-owned property, such as the use of a City park for a restaurant. Some franchises and concessions are subject to the ULURP process, while others are not. All should be subject to a *doing business* regulation. [Note: Section 3 provides a case study and further discussion of concessions.]

*Subcontractors, subsidiaries, LLCs and PACs*

Insofar as subcontractors are identified in a firm's response to an RFP, they should be covered by a *doing business* regulation, as should any subsidiary of a regulated firm, including limited liability corporations owned by a firm's principals, or political action committees associated with a firm. Potentially, a firm or donor could employ these as "end-around" methods to circumvent restrictions.

*Officers, owners and executives*

The definition includes chief executives, officers, owners (of a minimum ten percent stake, to match current VENDEX requirements), or any other individual who is authorized to represent the contractor before the City. That is, any individual who deals with City officials on behalf of his employer, in effect, acts as a lobbyist for that firm. To facilitate enforcement, this information should be required through VENDEX.

*Land use*

Applicants in most land use decisions are asking the City to grant them the ability to maximize the financial return on their investment. When developers ask for special dispensation to employ a piece of land in what they see as its most profitable use, we should take interest. The limited results of our "micro-sample" study (see Section 2) echo the conventional wisdom that land-use actors do regularly seek to influence the political process. For this reason, the definition focuses on applications subject to the Uniform Land Use and Review Process

23

(ULURP), which includes zoning changes, street modifications, sales of City land, designations of urban renewal projects; applications to the Board of Standards and Appeals (BSA), for zoning variances; and applications to the Landmarks and Preservation Commission (LPC), for permission to renovate or modify a landmark-designated building. These are decisions triggered by a landowner's application. One difficulty is the lack of a central, searchable database (like VENDEX) for land use applicants. While each keeps its own records, these boards and commissions must improve their accessibility if they are to participate in a *doing business* enforcement regime.

The focus on ULURP and on BSA and LPC is meant to draw a line between decisions that are discretionary, rather than ministerial (that is, subject to approval based solely on meeting certain conditions set by law), and on decisions whose impacts are individual, rather than diffuse. Nevertheless, these lines can be easily blurred, for example, in rezoning matters. Some rezonings are proposed by particular developers, while others are submitted by the City Planning Commission (CPC). While a CPC-sponsored plan may benefit a particular developer, it will likely be difficult to establish a paper trail that connects the developer to any request for that rezoning. A regulation that limits donations from all landowners within a particular rezoned area would be too broad, would present significant enforcement challenges, and likely create a problem of "false positives." For any reasonable enforcement regime, the decisive factor must be that an applicant asks for a particular decision and goes through the acts of supporting its case. [*Note: Section 3 provides case studies and a further discussion of land use issues.*]

## Not-for-profits
Not-for-profits (NFPs) hold some of the largest City contracts, many of which provide essential social services. They participate in the same bidding processes as other for-profit firms when competing for City business. As such, they should be equally regulated. While paid staff members and executives of a not-for-profit should be subject to the same treatment as those of for-profit firms, questions arise about possible exceptions for members of non-profit boards – both because the City may not wish to place a burden on people who choose to serve on the board of a not-for-profit, and because those who do serve often serve on more than one board, making it difficult to disentangle any relationship between a donor and a particular decision.[12] [*Note: Section 3 provides a case study and further discussion of not-for-profits.*]

## Lobbyists
Lobbyists are in business to influence City decisions on behalf of their clients. They are already registered with the City Clerk's office, which keeps a database online. Firms or individuals who hire lobbyists are also likely to be seeking business with the City, and they are similarly identified in the City Clerk's database. In this way, the NYC Lobbyist Search database captures influence-seeking activities that may not otherwise leave a paper trail. At the same time, many lobbyists are hired to influence policy decisions that are unrelated to contracting or land use matters. These might range from issues that are closely related to a specific firm's business interests (a company that makes cigars hiring a lobbyist to organize opposition to the smoking ban) to those that are more clearly in the public interest (a not-for-profit group hiring a lobbyist to advocate for better conditions for bicycle riders on City streets). Though issue advocacy is beyond the scope of this study, there is a compelling City interest in ensuring policy decisions are based on good policy, not on the influence money may have on the political process.

## Classes of Donors Excluded from Proposed Definition
For purposes of this study, spouses and dependents and unions were excluded from the proposed definition.

---

[12] It should be noted that this broader definition also does not include members of a board of directors of a for-profit enterprise.

24

### Section 2: Qualitative "Micro-Sample" Analysis

Our research shows that *doing business* donors are a significant source of funding for City political campaigns. Still, the working definition that informs our quantitative analysis limits our findings, providing a narrow view of the extent of the "pay-to-play" phenomenon. While no readily-available data source aggregates data about the various classes of donors identified by our proposed definition, anecdotal research employing a variety of sources reveals that the proportion of campaign donors who *do business* with the City under a broader definition is considerably larger than our quantitative research suggests.

To illuminate the distance between the working definition and our proposed definition, we performed a richer, more intensive analysis of *doing business* on a smaller, selected sample. In doing so, we re-examined our random sample of contributors from the 2005 election cycle races for Mayor and City Council across all categories of giving. We also re-examined the sample of intermediaries for the 2005 cycle. Our analysis reveals how many more current donors might be identified as *doing business* contributors under our more comprehensive definition.

### Findings
When the findings from the micro-sample analysis are weighted to reflect the same proportions as those used for the random sample, the data show that a considerably larger proportion of donors are captured by the proposed definition of *doing business* (see Chart 6).

**Chart 6:**
**% of Contributors *Doing Business* Under Working and Proposed Definitions:**
**New York City, 2005 Election Cycle**



Mayor: Under the **working definition** used in the random sample analysis, **5.4%** of contributors to Mayor were *doing business* with the City. With the **proposed definition**, the qualitative analysis found that **14.0%** of contributors to Mayor were *doing business* donors.

City Council: Under the **working definition** used in the random sample analysis, **4.0%** of contributors to City Council were *doing business* with the City. With the **proposed definition**,

the qualitative analysis found that **11.7%** of contributors to City Council were *doing business* donors.

Intermediaries: Under the **working definition** used in the random sample analysis, **23.1%** of intermediaries were *doing business* with the City. With the **proposed definition**, the qualitative analysis found that **41.2%** of intermediaries were *doing business* with the City of New York.

Additionally, donors who were *doing business* gave more, on average, than those who were not (see Chart 7):



**Chart 7:**
**Average Donations of Doing Business Contributors vs. Regular Contributors:**
**New York City, 2005 Election Cycle**

Mayor: Among the largest ($2,000 and over) donors in our random sample, those who were *doing business* donated an average of **$4,967**, while those who were not made an average donation of **$3,407**.

City Council: Among the largest ($2,000 and over) donors, those who were *doing business* donated an average of **$4,974**, while those who were not made an average donation of **$3,357**.

Intermediaries: Intermediaries who were *doing business* bundled an average of **$9,116** in donations, while those who were not bundled an average of **$4,576**.

## Discussion

We researched each of the names in these samples (152 mayoral donors, 157 City Council donors, and 109 intermediaries) to find links between donors and/or employers and City business (as defined in our proposed definition) using Google, Lexis-Nexis, and CityAdmin,[13] among other sources. Our research was supplemented by consultation with Peri Horowitz, Chief of Compliance and Investigations at the CFB, to help us identify and target donors in these samples who might be *doing business* with the City.

---

[13] CityAdmin is an online library of decisions made by New York City agencies maintained by the Center for New York City Law.

Without the same methodological rigor or reliability of the original analysis, it is unadvisable to rely on these numbers as the true proportion of donors who are *doing business* with the City. Indeed, there are several ways in which these numbers might still underestimate the true extent of the issue.  A firm might be applying to land use boards under the name of an LLC, while its principals donate to political campaigns, or vice versa.  Some donors may have familial connections to individuals who are *doing business* that were not identified in our Internet research. More exhaustive research of public records may have uncovered links we were unable to identify.  Still, these numbers give a general indication of how our primary quantitative analysis of donors likely underestimates the true extent of *doing business* contributions, and by what general magnitude.

## SECTION 3: CASE STUDIES

We continue our qualitative research with three case studies, looking more closely at classes of potential donors included in our more expansive proposed definition. The first case study examines the giving patterns of concessionaire brothers George and Thomas Makkos, known as "The Pretzel Kings" for their dominion over the pretzel pushcart business in City parks. This case study provides a look at how *doing business* can intersect with campaign contributions in New York City. Particularly, it highlights some of the inadequacies of VENDEX in its current form.

Next, we put the spotlight on land use with a pair of case studies. Unlike concessions, which are already recorded in VENDEX, land use represents a range of City dealings that may elude a *doing business* definition based solely on existing datasets. We look at two New York City real estate development firms, The Witkoff Group and 160 Imlay Street LLC, both of which have achieved favorable decisions from City land use boards. These case studies illustrate the difficulty of including land use in a *doing business* regulation.

And finally, we examine the scope of the City's partnership with the not-for-profit sector. A study of the City's top not-for-profit contractors compels us to grapple with the delicate issue of regulating donations from wealthy and influential board members of these entities without discouraging philanthropic activity.

Each of these studies takes a different view of "pay-to-play" in New York City and helps build the case for the adoption of a more comprehensive definition of *doing business* that captures the spectrum of business activity beyond VENDEX and the NYC Lobbyist Search database. Along with our micro-sample analysis, these case studies help bridge the gap between our working and proposed definitions of *doing business*, and move us toward a more accurate reflection of the City's manifold business dealings. They also help demonstrate the tensions between curbing possible "pay-to-play" activity and preserving free speech rights, as well as the potential for broad regulations on campaign donations to chill contributions and desirable philanthropic activity.

Case Study: Concessions

**"Pay-to-Play" and the Pretzel Kings: The Makkos Brothers**
The New York City Charter defines concessions as "grant[s] made by an agency for the private use of city owned property," and treats them as types of contracts. According to Chapter 14, Section 375 of the Charter, when registering with the Comptroller, "the terms 'vendor' and 'contractor' shall be deemed to apply to the holders of...concessions." But unlike other city contracts, in which the city pays entities for goods and services, concessions represent money flowing *into* city coffers.

All concessions are reviewed by the Franchise and Concession Review Committee (FCRC), as empowered by the City Charter. The Committee consists of the Mayor, the City Comptroller, the Corporation Counsel, the Director of the Office of Management and Budget, the Borough President of each borough impacted by the decision, and an additional mayoral appointee. All concessions, except "major concessions,"[14] must be approved by the FCRC. Major concessions are subject to the Uniform Land Use Review Procedure (ULURP) instead.

This case study focuses on concessionaire brothers George and Thomas Makkos, whose business holdings include M&T Pretzel, Inc. (a pushcart company which sells pretzels baked by Makkos of Brooklyn, also owned by the brothers), Terrace on the Park in Flushing Meadows, Battery Wave in Battery Park, and the Central Park Carousel.[15] Through this case study, we intend to illustrate some of the inadequacies of VENDEX in its current form and to provide additional justification for the inclusion of concessionaires in our broader *doing business* definition.

Records of the brothers' business with the City appear in VENDEX, but these records are incomplete. For example, information about M&T Pretzel's pushcart contracts includes mostly contracts that have an "end date" of 1995, and thus appear to have expired. Indeed, based on the information available in VENDEX, it appears that M&T Pretzel's only active pushcart concession is valued at $1,005. Yet numerous media accounts indicate that the dollar value of M&T Pretzel's business with the City far exceeds the VENDEX figures, some estimating the total at $3 million per year.[16] The brothers own 60% of the carts in Central Park,[17] as well as the pushcarts in the coveted spot outside The Metropolitan Museum of Art – for which they paid a reported $536,100 in 2004.[18]

*Campaign Contributions & Lobbyist Activity*
In the 2001 election cycle, Thomas gave $2,500, George gave $7,500 and his wife, Antonia—a self-identified "homemaker"—gave $2,500. George also intermediated $4,350 in contributions, bringing their combined total campaign contributions to $16,850. Of that, $15,850 was directed toward mayoral candidates, while the rest went to candidates for Borough President. By comparison, the Makkos brothers gave a *combined* $1,150 in the 2005 election cycle.

---

[14] The Charter defines major concession as "a concession that has significant land use impacts and implications, as determined by the [city planning] commission, or for which the preparation of an environmental impact statement is required by law."
[15] "Brothers to Buy Long Island, N.Y., Waterfront Restaurant," by Alan J. Wax, *Newsday*, August 24. 2004.
[16] Ibid.
[17] "Pushcart Vendors Gain Victory in a Labor Deal," by Steven Greenhouse, *The New York Times*, November 23, 2004.
[18] "Riches a la Cart," by Dan Kadison, *New York Post*, April 5, 2004.

We also examined the lobbying activity of the Makkos brothers. The concessionaires hired lobbying firm Bolton St. Johns, Inc. in 1999 and Greenberg Traurig in 2002, paying the firms $32,000 and $32,331.50 respectively. Their target in 1999 was the Parks Department, as well as a City Councilmember, in matters relating to M&T Pretzel, Inc. The NYC Lobbyist database does not list the target of the Makkos' lobbying in 2002. (M&T Pretzel, Inc. also employed Greenberg Traurig in 2003, but details of their transactions are not provided in the database.) None of the brothers' businesses is listed thereafter as a lobbyist client.

*Principals*
We also investigated the principals of The Crystal Ball Group, which operates Terrace on the Park in Flushing Meadows. The principals listed in VENDEX (besides the Makkos brothers) are Charles, Vasilios and Konstantinos Marangoudakis, also owners of Marangos Construction Corporation. According to CFB records, the three gave a combined $53,315 and $24,300 in the 2001 and 2005 election cycles, respectively. (Included in the 2005 total is $250 contributed by Vasilios's wife, Athena, another self-identified "homemaker.")

Sixty-three percent of the two-cycle total was donated through intermediaries. While we cannot establish with certainty what aspect of their business the Marangoudakis family was seeking to influence, its extensive gifts are worth noting when discussing their business partners, the Makkos brothers.

*Spouses*
Antonia Makkos gave $2,500 (or 14.8% of the Makkos' 2001 contributions), and Athena Marangoudakis gave $250 (or 1% of the Marangoudakis' 2005 contributions). Making a contribution through a spouse with the same last name is one potential way to circumvent donation limits while guaranteeing the contribution is associated with the family name. Because of the variability in their giving amounts, however, it would be impossible to ascertain the wives' true intentions. The danger of "false positives" suggests that the inclusion of spouses in a *doing business* definition may unfairly impinge on their First Amendment rights.

**Analysis**
This case study provides further justification for including concessionaires, their business principals and lobbyists in a *doing business* definition. It also raises the question of whether spouses ought to be included, offering justification for inclusion in an ideal definition, but advising against inclusion in a more practical one. Finally, this study demonstrates the inadequacies of VENDEX, and the system's failure to capture some contracts worth upwards of $100,000.

# EXHIBIT H – PART 2

# Case Study: Land Use

Ethics enforcement for the process that assigns City contracts is a public policy imperative because there are so many contracts to go around. New York City's budget is larger than that of any other American city *and* 48 of the 50 states. At the same time, land use decisions in New York City may be even more important because of the scarcity of land. The City must constantly make decisions about how to re-use already-developed land in order to ensure it is occupied by its highest and best use. As CFB Chairman Frederick A.O. Schwarz, Jr. wrote in his account of the proceedings of the 1989 Charter Revision Commission, which he chaired, "Through City decisions about land use, communities can be created, fortunes can be made or lost, and the power of various political offices or agencies can wax or wane."[19]

With such concerns at stake, it comes as no surprise that the parties interested in land use decisions would be active in the political process. The brief findings in this study are typical of previous observations about political activity by real estate entrepreneurs; developers have long been among the most generous sources of campaign donations to candidates for City office. This is not a phenomenon unique to New York City. Indeed, most major candidates in local elections receive their largest contributions from property entrepreneurs.[20]

In a 1985 study of contributors to members of the Board of Estimate between 1981 and 1985, former State Senator Franz Leichter found that 16 of the top 25 donors had some matter of business pending before City government. He cited ten specific instances where donors increased their political giving when they had decisions before the Board of Estimate; these included beneficiaries of variances, zoning changes, City leases, and the sale of City land.[21]

In a subsequent study, released in 1986, Leichter estimated that 60 percent of the 200 largest donors did some sort of business with the City. Of the top 20 givers, 12 were "real estate giants whose projects frequently require Board of Estimate approval."[22]

When the 1989 Charter Revision Commission abolished the Board of Estimate, its power to decide certain land use decisions was spread among several actors. To preserve a political voice in the land use process, the City Council was granted the power to review decisions as part of the Uniform Land Use Review Process (ULURP).

While contract decisions affect all New Yorkers generally, through the services the City provides and the taxes levied to pay for them, land use decisions can impact particular New Yorkers where they live, in their homes and neighborhoods. While that is a compelling rationale for allowing a political review, allowing politics into the process has the potential to invite the influence of money as well.

The appointed City Planning Commission (CPC) is the gatekeeper for many land use decisions, certifying applications before they pass through ULURP. Amendments to the zoning resolution, which places limits on the size and use of buildings, must go through ULURP, as do certain

---

[19] Schwarz, Jr., Frederick A.O. and Eric Lane. "The Policy and Politics of Charter Making: The Story of New York City's 1989 Charter." *The New York Law School Review.* Vol 42, 1998.
[20] Logan, John. *Urban Fortunes: The Political Economy of Place.* University of California Press, 1987. p. 231.
[21] Kraus, Jeffrey. 2006. "Campaign Finance Reform Reconsidered: New York City's Public Finance Program After Fifteen Years", *The Forum:* Vol. 3: No. 4, Article 6. http://www.bepress.com/forum/vol3/iss4/art6
[22] Connelly, Mary and Carlyle C. Douglas. "City Vendors and Campaign Giving." *The New York Times,* December 28, 1986.

special permits, site selection for capital projects, urban renewal designations, and many other projects. After applications are certified as complete by CPC, they pass first to the local community board and the Borough President for recommendations, then to the CPC, which approves or disapproves the application, and finally to the Council, which automatically reviews some decisions and can elect to review any decision.

Two other appointed boards make individual, discretionary decisions about what owners can do with their land. The Board of Standards and Appeals (BSA) can grant individual variances to the zoning codes. The Landmarks Preservation Commission (LPC) designates buildings or historic districts; owners must apply to the LPC to approve any modifications to a landmark building. [*See Appendix F for a breakdown of land use boards and commissions, and the decisions they are responsible for.*]

To be sure, there are several ways developers can exercise influence over the land use processes. Many members of boards are appointed because of a background or particular expertise in some aspect of the real estate industry, and may therefore be more sympathetic to developers. Some may desire jobs in the industry upon completing their service. And to the extent that major developers or their representatives have "repeat business" before the land use boards, they may develop personal relationships with their members that can influence their judgment.[23]

The following two case studies help illuminate the issues and difficulties with regulating donations from entities or individuals with pending land use decisions.

**The Witkoff Group**
Steven C. Witkoff and his firm, The Witkoff Group, are among the most prominent real estate developers in the city. The group's current New York City holdings include a 398-foot, 37-floor mixed-use high rise at 6th Avenue and 26th Street, the Cipriani Club Residences, a 9-floor, 109-unit luxury condo complex on Wall Street, and the iconic Woolworth Building at 233 Broadway in downtown Manhattan.

*Donations*
For the 2001 and 2005 campaign cycles, campaign donations to candidates for City office from Steven Witkoff, his immediate family, officers of the Witkoff Group, and Witkoff's LLCs totaled $93,675.

The amount of Witkoff-related donations was relatively consistent across cycles – $49,750 for 2001, and $43,925 for 2005 (there are no listed contributions for Witkoff dated earlier than 2001 in the CFB database). In the 2001 election cycle, Witkoff focused its giving entirely on mayoral candidates, putting together nine contributions for the maximum $4,500[24] to Mark Green, and two $4,500 contributions to Alan Hevesi.[25]

In the 2005 election cycle, Witkoff donated $22,425 to Council Speaker Gifford Miller's mayoral campaign, and $21,500 to candidates for City Council. Of those, $7,000 was given directly from Steven Witkoff and Witkoff Group LLCs to three members of the Land Use Committee. Councilmember Christine Quinn, who represents the West Village, was widely discussed prior to the 2005 election as a leading candidate for Council Speaker. Her campaign

---

[23] Ellickson, Robert and Vicki Been. *Land Use Controls*, third ed. Aspen Publishers, 2005. p. 306
[24] The maximum donation to mayoral candidates was raised to $4,950 for the 2005 election cycle.
[25] The remaining $250 was a donation by Witkoff principal Jeffrey Goldberger to an exploratory committee formed by Giuliani aide Fran Reiter, who was considering a run for mayor.

received maximum $2,750 donations from Witkoff, his wife, and two Witkoff executives, for a total of $11,000.

The Witkoff Group seems to have focused its political expenditures on campaign donations rather than lobbying; the Group's expenditures for lobbying total only $14,637.50 between 2000 and 2005. (The firm does not seem to have hired lobbyists through one of the LLCs they own.)

*Decisions*
In the course of their work, Witkoff and his partners must bring business before many of the City's land use boards and commissions. These are a selection:

Woolworth Building: After purchasing the Woolworth Building in 1998 through an LLC, 233 Broadway, Witkoff planned renovations and modifications, turning 27 floors atop what was once the world's tallest building into condos, building two glass-walled penthouses on the 29th floor, restoring ground-floor storefronts to their original condition, and adding a 100-car garage.[26] Since the building has landmark status, the modifications required approval by the Landmarks Preservation Commission. The plan was controversial. Though the community boards have no role in the landmark process, the local board voted unanimously to oppose the project, which they called "grotesquely inappropriate."[27] After a long review period, the LPC granted a Certificate of Appropriateness for the Witkoff plan on December 30, 2002. According to *Crain's*, the Witkoff Group sought access to tax-free Liberty Bond financing from the City for the project.[28]

1129-1133 York Avenue: In April 2005, under the name of Witkoff York LLC (incorporated in Delaware), Witkoff applied to the CPC for a zoning map amendment that would allow them to build a 26-story, mixed residential/retail tower at 1129-1133 York Avenue, and a special permit that would allow a 100-space public parking garage on the site. The applications were certified as complete by CPC on April 11, 2005 and referred to Manhattan Community Board 8, which approved both the zoning change and the special permit June 8. The Borough President's office gave its sanction July 12, the CPC on August 24, and the City Council voted its approvals on September 28.

866 Third Avenue: On March 16, 2004, the 866 3rd Next Generation Hotel LLC, another Witkoff-owned entity, applied to the BSA for a zoning variance to waive a rear yard-space requirement for a building that encompasses a Courtyard Marriott Hotel, retail establishments and a Memorial Sloan Kettering outpatient center. Attorney Jay Segal of Greenberg Traurig represented Witkoff before the BSA. Segal represents many clients with real estate interests; many of them are listed as his clients in the City Clerk's lobbyist database, though Witkoff does not claim Segal as a lobbyist.[29] Witkoff was granted its request on July 13.

West Village down-zoning: The Greenwich Village Society for Historic Preservation (GVSHP) led an 18-month-long battle to rezone parts of the West Village and restrict density, which culminated in a CPC rezoning proposal that was certified to begin its passage through the ULURP process on July 11, 2005. The plan drawn by the CPC included "carve-out" exemptions for two sites: the Superior Ink Factory site at West Street and W. 12th, and the Whitehall Storage warehouse site at 303 W. 10th Street, at the corner of Charles Street, owned by the Witkoff Group. While the buildings around the site would be limited to 70 or 80 feet, the plan allowed a 200-foot tall tower at the Whitehall site.[30]

On July 21, Community Board 2 approved the plan, with a request to reconsider including the two sites in the down-zoning plan. Borough President approval came August 29, echoing the comments of the Community Board. The plan, which nevertheless remained unchanged, was approved after a public hearing by the CPC September 26, and approved by the City Council on October 11.

---

[26] Dunlap, David W. "Condos to Top Vaunted Tower of Woolworth." *The New York Times*, November 2, 2000.
[27] Dunlap, David W. "Change the Woolworth? No Way, a Board Says." *The New York Times*, October 18, 2000.
[28] "New Projects Seek Liberty Bonds," *Crain's New York Business*, June 2, 2003.
[29] Segal's campaign donations between 2000-2005 total $6,505; of those, $4,400 were split between Miller, Quinn, and Land Use Committee chair Melinda Katz.
[30] Richels, Heather. "Rezoning Plan for Greenwich Village Waterfront Advances." *The New York Sun*, July 14, 2005. p. 10.

**160 Imlay Street LLC**
Along the Red Hook waterfront, overlooking the marine terminal, is a six-story concrete industrial building at 160 Imlay Street. It had previously been a warehouse, and before its purchase by Industry City Associates in 2000, the building was used primarily for book storage. After trying to find industrial tenants, Industry City and its principal Bruce Federman entered into a partnership with residential developer Bruce Batkin and his partners under the corporate name of 160 Imlay Street LLC.[31]

*Donations*
Developers Batkin and Federman, both as individuals and through the 160 Imlay Street LLC, made $10,500 in campaign contributions during the 2005 campaign cycle. Of those, $8,000 was given to candidates more than two years before the election, including two $2,500 donations to Council Speaker Gifford Miller's campaign for Mayor and a $2,750 donation to the re-election campaign of City Councilmember Melinda Katz, chair of the Council's Land Use Committee. All these contributions were made during the two months preceding a crucial BSA decision in December 2003.[32]

Before initiating their partnership to redevelop the 160 Imlay Street site, neither Batkin nor Federman were significant campaign donors. Prior to the 2005 cycle, the CFB database lists only two contributions between them: a $1,000 donation by Federman in 2001 to Mark Green's mayoral campaign; and a $250 donation from Batkin to Rudy Giuliani's 1993 mayoral campaign.

The 160 Imlay Street LLC incurred more than $170,000 in lobbying expenses between 2002 and 2005, employing three separate firms – George Arzt Communications, LoCicero & Tan, and the Law Offices of Howard Goldman, the firm that represented the project before the BSA.

*Decision*
Their proposal for a renovation to offer two floors of retail and four floors of luxury condominiums required a variance from the area's industrial-only zoning. The project was opposed by Brooklyn's Community Board 6, which is committed to preserving industrial uses on the waterfront, and by the Red Hook-Gowanus Chamber of Commerce, which feared the condos would "kill local business."[33]

160 Imlay Street applied to BSA for its zoning variance September 18, 2002. After an exceptionally long deliberation including two hearings and a site visit, on December 23, 2003 BSA voted 3-1 to grant the variance for the retail/residential renovation. Though opponents filed a lawsuit to prevent the 160 Imlay renovation, the court gave the developers a go-ahead last spring, and the renovation is proceeding.

**Analysis**
It is true of the Witkoff Group – and of all large-scale developers – that it relies on City decisions to conduct its business and generate profits.

Looking at Witkoff's development activities, it is clear that in the interest of transparency, any regulation that includes a limit on donations related to land-use decisions should limit donations

---

[31] Vitullo-Martin, Julia. "Thinking about the Brooklyn Waterfront." The Manhattan Institute, December 2004.
[32] After the decision was granted, Batkin and Federman gave $1,000 more between them to Miller's mayoral campaign in 2004, as well as $750 to Brooklyn borough president Marty Markowitz, $500 to Councilman Eric Gioia, a member of the Land Use Committee, and $250 through their LLC to Comptroller William Thompson, Jr.
[33] Kolben, Deborah. "Red Hook Green Light." *New York Daily News*, May 13, 2005.

from all LLCs, or ban them altogether.[34]  Though none of the LLCs Witkoff employed in these transactions were used to fund campaign contributions, several were made under The Witkoff Group LLC.  These entities can be used to circumvent a restriction on a particular individual, or to mask the source of a contribution.

Included in the New York City Administrative Code definition of lobbying is: "the attempt to influence... [any] determination by elected officials, city planning commission, borough board, or community board concerning zoning or development or improvement of real property subject to city regulation."  However, the example of attorney Segal's failure to report Witkoff as a client suggests that if the Code does not require professionals who represent developers before such boards to register as lobbyists, any *doing business* regulation should include these advocates as well.

Decisions without an easily identifiable paper trail – like Witkoff's request for Liberty Bonds – represent a quandary for any regulation.  Interactions with quasi-governmental entities that lack transparency, like the NYC Economic Development Corporation, present a similar dilemma.  Still, the scope of Witkoff's activities suggests that these larger developers are likely also to have identifiable projects pending that will trigger regulation.

Of particular interest to our study is the case of the West Village downzoning, which exposes a gap in our definition. We cannot say with certainty that the Witkoff Group even requested its "carve-out" from the CPC proposal; there is simply no paper trail to inform that theory.  Coalco, another development firm, purchased two buildings at 389-391 W. 12th Street, and planned a "modern, glass cluster of townhouses" for the site.  Then came the re-zoning plan:

> The managing partner of Coalco, Edward Baquero, said that the impending downzoning, which will limit building height to 80 feet, will lower property value by one-third and make development unfeasible.  "We paid up.  Suddenly, we lost a third of our rights," Mr. Baquero told The New York Sun.  "You say, 'Wait a minute, that doesn't happen in this country...'
>
> 'I do feel some sympathy for the Coalco folks,' [Andrew] Berman [of the GVSHP] said.  'Clearly they are not getting the same accommodation from the city as Related and Witkoff are getting.'"[35]

Coalco made no contributions to any candidates for City office.  They did spend $10,050 on lobbyists, hiring Greenberg Traurig only after the rezoning plan was introduced by the CPC.  While the policy rationale behind the zoning "carve-out" is unknown, the *perception* that campaign donations can influence the land use process undermines public confidence in City government and fosters the notion that developers must indeed "pay to play" to be successful.

As the BSA comprises members appointed by the Mayor, there is no direct link between a BSA decision and donations to members of the City Council.   Still, given the Council's role in the land use process, there is no utility to be gained by drawing distinctions between candidates for different offices, or between decisions reviewed by the Council and those that are not.

A generous contribution puts a donor in the position to open a line of dialogue with a public official, or ask for a favor. However indirect this influence may be on any particular policy

---

[34] Though LLCs clearly owned by a regulated entity would be subject to restrictions on subsidiary entities, there is often no available information about LLCs or their ownership.  To ban LLCs from campaign giving, however, may require changes in State law.
[35] Lombino, David. "Developer seeks to Ease Restrictions in Far West Village." *The New York Sun*, September 19, 2005. p. 2.

decision, it is in the public interest to limit donations from these sources – and to end the expenditure of public funds that amplify their impact.  This suggests the necessity of an expansive regulation of donations from parties with pending land use decisions.

.

## Case Study: Not-For-Profit Organizations

**"Pay-to-Play" and Philanthropy: How to Regulate the Not-for-profit Sector**
In 2004, 18 of the 50 largest City contracts were held by 16 not-for-profit organizations.[36]
These contracts (some of them for multiple years of service) totaled nearly $1.2 billion, and
were mainly social service contracts for foster care services and homeless shelters. (A large
exception was the New York Public Library, which is discussed further below.) Section
501(c)(3) of the Internal Revenue Code bars not-for-profit organizations from giving directly to
political campaigns.[37] However, individual officers, directors, and board members do not face
such prohibitions. Theoretically, then, a not-for-profit entity seeking to *do business* with the
City could curry favor with a particular candidate through donations from these individuals.

But precisely which individuals associated with a not-for-profit should be regulated? Ideally, we
would regulate donations from senior managers and decision-makers. To illuminate the sources
of not-for-profit political gifts, we researched IRS 990 forms from 2004 for those 16 agencies
to find the names of their highest paid employees, board members and trustees.[38] Along with
these names, the 990 form requests that agencies detail the "compensation of the five highest-
paid employees other than officers, directors, and trustees." These data helped us identify the
most influential figures in the agencies regardless of title. We checked lists of board members
against agency websites. Through this research, we identified 576 executives and persons of
interest, and checked these names against the CFB database to examine their political giving.[39]

*2001:* Of the officers, directors, trustees and highest-paid employees at those 16 agencies, we
found that **139** individuals, or nearly **24%**, donated to a City political campaign in the 2001
election cycle. (Only 2.8% of all contributors for the 2001 cycle were *doing business* by our
working definition.) The donations totaled **$314,926**, for an average of $2,298 per donor.

*2005:* Of the officers, directors, trustees and highest-paid employees at those 16 agencies, we
found that **84** individuals, or **15%**, donated to a City political campaign in the 2005 election
cycle.[40] (Only 4.3% of contributors in the 2005 cycle were *doing business* by our working
definition.) The donations totaled **$201,545** for an average of $2,399 per donor.

Though 990 forms list independent contractors as well, we did not analyze their political
donations; a relationship with a contractor is most likely too tenuous to garner influence for a
particular not-for-profit agency. IRS Code supports this decision, excluding independent
contractors from consideration as key decision-makers in a not-for-profit.[41]

We considered contribution data from both the 2001 and 2005 election cycles. This period
captures the period leading up to and immediately following the award for all of the contracts in
this analysis (most started in 2003 and run through 2006). According to VENDEX, all of these
agencies appear to have held contracts prior to 2004.

Given that the total amount of donations in an election year ranges in the tens of millions, the
totals we found may appear negligible. However, from a relatively small group of individuals,

---

[36] *City Law*, November/December 2004.
[37] NFPs can engage in issue advocacy and can support political candidates or parties through associated PACs,
however.
[38] One agency was missing its 990 form for 2004, so we used 2003 IRS data.
[39] Given the qualitative nature of this study, we advise that these figures be treated as approximations.
[40] We had to discard six names because we could not make a positive match in the CFB database for them.
[41] IRS Code Section 4958 (1996).

this sum shows a concerted effort to take part in political campaigns. We might be concerned that certain organizations are targeting specific candidates to gain influence. Our data do not permit us to draw such firm conclusions, but we can describe particular cases.

There are some trends among the top not-for-profit contracts that give pause. For example, we find that the Board President, Chair of the Executive Committee and three Board Members from the Jewish Board of Family and Children's Services made donations to mayoral candidates totaling $13,350 in the 2005 cycle. This organization had a contract totaling over $81 million in 2004.

To consider another case: as noted above, the New York Public Library is among the City's top 50 contractors, with a contract in excess of $38 million. This organization's top employees and board members show substantial donor participation in City campaigns. Of the Library's 66 employees and board members, 25 (38%) made donations totaling $130,890 in the 2001 election cycle, while 22 (33%) made donations amounting to $99,287 in the 2005 cycle. In the 2005 cycle, 21 of the 22 made aggregated donations of at least $250, and 15 made aggregated donations in excess of $1,000. (The giving pattern was similar for the 2001 election cycle).

Meanwhile, the Chair of the New York Public Library's board wrote in the Library's 2004 Annual Report:

> At the end of fiscal year 2003, finalized agreements between the Mayor's office and the City Council resulted in a nearly complete restoration of proposed cuts for this year...We are pleased that the FY 2005 City budget did not include the proposed $5.4 million cut to the Library. In addition, $4.427 million was provided for the Branch and Research Libraries. We are deeply appreciative of the support given to us by Mayor Michael R. Bloomberg, Speaker A. Gifford Miller, and the members of the City Council. And we are especially grateful to everyone who served as extraordinary advocates for the Library, particularly our Trustees...

## Analysis

We are careful not to draw overly broad conclusions from this information. To take just one example, one of the largest campaign donors on the Library's board is Dorothy Cullman, who gave $11,150 to various campaigns during the 2005 cycle, and $18,000 during the 2001 cycle. Ms. Cullman is a major philanthropist who serves on several other not-for-profit boards (including Human Rights Watch, Lincoln Center for the Performing Arts and others) and runs a foundation with her husband, Lewis. It is impossible to say which of her affiliations she wished to highlight during her interactions with City officeholders—or if she wished to garner influence at all. Of course, it is part of board members' duties to raise funds and advocate for their organization, so we should not necessarily attribute pernicious motivations to political contributions.

Admittedly, board members could make contributions to gain undue influence for their preferred charity.[42] It could be argued that board members often have longer tenures with an agency – and perhaps greater loyalty – than some senior staff, who often work for (relatively) lower pay than their for-profit counterparts, and may frequently move to other agencies for better salary.

The question arises whether there is a risk of false positives too great to warrant the regulation of board members and trustees. Many individuals who are asked to serve on boards are likely

---

[42] The term "board members" also refers to trustees serving as unpaid volunteers on a board of trustees. In addition, the term "director" is used similarly by some not-for-profits.

to be both wealthy and community-minded, and may be likely to offer financial support to political candidates regardless of their not-for-profit activities.  Further, such individuals might sit on several boards, may own a business, or may work with another firm involved in City business, so it may be difficult to discern which "hat" they wear when they make a contribution.

Similarly, a question arises whether undue burdens may be imposed on charities attempting to recruit individuals to serve on their boards.  Such service is typically unpaid and can be valuable to the community, and therefore should not be discouraged. It is worthwhile to note here that unpaid board members, unlike for-profit boards, cannot take benefits privately from an agency's activities.

## CONCLUSION

Our quantitative analysis of campaign donations from the 2001 and 2005 election cycles showed convincing evidence that *doing business* contributors—as defined by the available data on contractors, lobbyists, and lobbyist clients—play a substantial role in financing campaigns for public office in New York City, accounting for more than one out of five dollars raised. It is likely these findings understate the true proportion of donors who are *doing business* with the City.

Our qualitative research showed that a broader definition, encompassing a more comprehensive range of *doing business* activities, could be warranted. Employing our proposed definition, qualitative research with a smaller sample of donors identified a considerably larger proportion as *doing business* donors. Case studies helped illuminate some of the issues we considered as we created our proposed definition, as well as some of the challenges of enforcing any potential regulation.

Nothing in this report can show conclusively that any particular campaign donor has sought to influence City contracting or land use policy. Still, a skeptical public may believe differently. We hope the report has shown that a regulation limiting contributions from *doing business* donors would help restore public confidence in City government and the way it does business.

# PART III: APPENDICES

## APPENDIX A: DATA SOURCES

To conduct this analysis, we relied on a variety of data sources, including the CFB's Searchable Campaign Finance Database, the New York City VENDEX online database, and the New York City Lobbyist Search online database. The CFB's Searchable Campaign Finance Database served as the primary source of information for all municipal campaign contributions. VENDEX and NYC Lobbyist Search provided information on business dealings that individuals and entities may have with the City of New York.

- **The CFB Searchable Campaign Finance Database:** The primary dataset used in all analyses was the CFB's Searchable Campaign Finance Database. The CFB's database contains records of all contributions to candidates for the offices of Mayor, Public Advocate, Comptroller, Borough President and City Council who participate in the campaign finance program. The data presented in the Searchable Campaign Finance Database were provided to the CFB as reported by campaign committees, and were subject to change as a result of ongoing audits or additional amendments to filings.

  For the purposes of this analysis, data from the 2001 and 2005 citywide election cycles were used. The 2001 election cycle data contain records of 186,067 individual campaign contributions made to 299 candidates between January 1, 1997 and December 31, 2001. The 2005 election cycle data contain records of 122,025 individual campaign contributions made to 193 candidates between January 1, 2002 and December 31, 2005.

  The data on 2001 and 2005 election cycle contributions were provided to our research team by the CFB in a *.dbf* file. Each record contains information on the contributor's name and address, the contributor's employer and address, the contribution amount, the amount matched by public funds, the candidate who received the contribution, as well as other information.

- **VENDEX:** The information presented in the New York City Vendor Search is derived from a subset of data from the City's Vendor Information Exchange System (VENDEX) system, which is maintained by the Mayor's Office of Contract Services (MOCS). The information available in this database is either self-reported by vendors through questionnaires that are submitted to MOCS or is captured by the City's financial management system. The questionnaires are not routinely independently verified by MOCS. VENDEX stores information for New York City franchises, concessions, and for many, but not all, contracts and subcontracts held by vendors who do over $100,000 in annual business with the City.[43]

- **NYC Lobbyist Search:** The information presented through the NYC Lobbyist Search is derived from the export of the lobbyist database maintained by the Office of the City Clerk. The information available in this database is self-reported by lobbyists and their clients through initial annual registration forms and quarterly reports that are submitted to the Office of the City Clerk. The reports are checked for accuracy by the Office of the City Clerk, but are not independently verified or certified by a third party. Although all attempts have been made to ensure the accuracy of these data, neither the City of New York nor the Office of the City Clerk assumes any liability resulting from any inaccuracies herein. In the event of any variance between these data and any printed compilation of lobbyist data published by the Office of the City Clerk since 2002, such

---

[43] Taken from the VENDEX website available at: http://slnx-prd-web.nyc.gov/cfb/cfbSearch.nyc?method=search

printed data will be controlling. Some data may have been subsequently amended, which may not be reflected in the database.[44]

---

[44] Taken from the Lobbyist Search website available at: http://www.nyc.gov/lobbyistsearch/index.jsp

# APPENDIX B: AGGREGATION PROCESS

For the 2001 and 2005 election cycles, the total number of contribution records in the data files provided to our research team by the CFB was 186,067 and 122,025, respectively. Steps were taken using Microsoft Access to format the data found in the CFB 2001 and 2005 election cycle *Cont.dbf* files. The purpose of these processes was to construct as accurate a population of campaign contributors as possible. Graphical representations of this process can be found below in Figures 1 and 2. Please note that all of these steps, excluding step 2, were also performed to aggregate the intermediary data.

1. **Deletion of Refund Records.** Under some circumstances, donations are refunded to donors. The CFB codes these donations as Schedule M. Because these records are coded as positive amounts and do not represent actual donations, these funds were deleted. In this step a total of 2,587 and 1,697 records were deleted from the 2001 and 2005 election cycle data, respectively.

2. **Separation of Donations Made Through Intermediaries.** Intermediaries were examined as part of a separate analysis. Therefore, these records were deleted from the data by running a query which eliminated any record where the intermediary name field was not null. The total number of records deleted in this step was 15,370 for 2001 election cycle and 4,600 for 2005 election cycle.

3. **Deletion of Donations from the CFB.** Through the matching funds program, the CFB distributes public matching funds to candidates. For the 2001 election cycle only, three records were deleted from the donation file that showed reimbursement of public funds by the CFB. This was completed by searching the donor name field for words such as the CFB, campaign, finance and board.

4. **Grouping of Records by Donor to Office and Summed Donation Amount.** To aggregate the data to the unit of analysis described in the section above, a group-by query was performed. This query grouped together all people with the same name contributing to the same office, as signified by the office code [Mayor (1), Public Advocate (2), Comptroller (3), Borough President (4), and City Council member (5), or undeclared (6)]. The query also summed the contributions amounts by each individual to each office.

**APPENDIX B, FIGURE 1:  2001 Election Cycle**



**APPENDIX B, FIGURE 2:  2005 Election Cycle**



## APPENDIX C: PROCESS FOR SEARCHING VENDEX AND LOBBYIST DATABASES

**Steps for VENDEX Look-up**
1. Go to the VENDEX web page: http://slnx-prd-web.nyc.gov/cfb/cfbSearch.nyc?method=search
2. Look up the name or entity
   a. For individuals: In the box on the left labeled "Search by Principal" enter the last name of the person in the white box and click search
   b. For entities: In the box on the right labeled "Search by Entity" enter the last name of the entity in white box and click search
      i. If data are returned proceed to step 4
      ii. If no data are returned proceed to step 5
3. Determine if the match that was found is accurate
   a. To determine if the match found is accurate must answer yes to the following questions:
      i. For Individuals:
         1. Does the last name match the name in VENDEX?
         2. Does the first name match the name in VENDEX?
            a. Note:  When scanning the names in VENDEX examine common nicknames versions. For example, if the individual is named Jim search for James or if the individual is named Sue search for Susan.
            b. Note: Slight variations in names are considered a match if answers to questions 1 and 3 are also yes.
         3. Does the employer listed in the excel file match the employer in VENDEX?
            a. Answered yes to all three questions?
               i. Proceed to step 5
            b. Answered no to one or more questions?
               i. Proceed to step 4
      ii. For Entities:
         1. Does the entity name match the name in VENDEX? (Note: slight variations in names are considered a match if answers to questions 2 is also yes)
         2. Does the entity's address match the address in VENDEX?
            a. Answered yes to both questions?
               i. Proceed to step 5
            b. Answered no to either question?
               i. Proceed to step 4
4. Initial match not found
   a. Try to enter the name/entity differently for example by adding or dropping the word "the" or "A"
      i. If match found return to step 3 to determine accuracy

      ii. If no match is found enter "O" in the spreadsheet columns listed below and then return to step 1 for the next name on the spreadsheet

| VENDEX: DOES BUSINESS WITH NYC (N=0, Y=1) | VENDEX: CONTRACT 1/97 OR LATER (N=0, Y=1) | VENDEX: CONTRACT 1/01 OR LATER (N=0, Y=1) |
|---|---|---|
| | | |

5. Initial match is found
   a. Click on business name  (Note: for entity search this step is not required)
   b. What is the answer under the heading "Business with NYC?"
      i. Yes:
         1. Enter "1" on Excel spreadsheet under "Does Business with NYC?"
         2. Click on "View Info"
         3. Review dates under "Registration/Approval Date" column
            a. Any date listed of 1/1/1997 or later?
               i. Yes
                  1. Enter "1" on Excel spreadsheet under "VENDEX contract from 1/97 or later"
               ii. No
                  1. Enter "0" on Excel spreadsheet under "VENDEX contract from 1/97 or later"
            b. Any date listed 1/1/2001 or later?
               i. Yes
                  1. Enter "1" on Excel spreadsheet under "VENDEX contract from 1/01 or later"
                  2. Begin at step 1 for next name on spreadsheet
               ii. No
                  1. Enter "0" on Excel spreadsheet under " VENDEX contract from 1/01 or later"
                  2. Begin at step 1 for next name on spreadsheet
      ii. No
         1. Enter "0" on Excel spreadsheet under:

| VENDEX: DOES BUSINESS WITH NYC (N=0, Y=1) | VENDEX CONTRACT 1/97 OR LATER (N=0, Y=1) | VENDEX CONTRACT 1/01 OR LATER (N=0, Y=1) |
| --- | --- | --- |
| | | |

         2. Begin at step 1 for next name on spreadsheet

**Steps for Lobbyist Look-up**
1. Copy the last name or entity name from the excel file that lists those in the sample
2. Go to the lobbyist web page: http://www.nyc.gov/lobbyistsearch/index.jsp
3. Look up the name or entity
   a. In the white box on the left labeled "Search by Name" enter the last name of the person, or the full entity name and click search.
4. Determine if match is found
   a. To determine if a match is present must answer yes to the following questions:
      i. Does the individual/entity name match the name in the Lobbyist database? (note: slight variations in names are considered a match if answers to question 2 is also yes)
      ii. Does the lobbyist address listed in the Lobbyist database match either the employer or home address listed in the excel file?
   b. Matching name or entity returned?

50

1. If, yes for a Lobbyist
   a. Enter "1" on Excel spreadsheet under "Listed as a lobbyist"
   b. Begin at step 1 for next name on spreadsheet
2. If, yes for a Client
   a. Enter "1" on Excel spreadsheet under "Listed as a lobbyist client"
   b. Begin at step 1 for next name on spreadsheet
3. If, no
   a. Enter "0" on Excel spreadsheet under "Listed as a lobbyist"
   b. Begin at step 1 for next name on spreadsheet

## APPENDIX D: DATA CLEANING PROCESS

1. Open database "Data Cleanse" which contains queries to check original donor and intermediary data
2. Copy the last name and first initial or entity name from the excel file that lists those in the sample. (Note: you will use this copied information in later in step 5 or 6)
3. Click on the appropriate query.
   a. To check individual name select appropriate query from this list:
      i. 2001 Donor Query for Individuals
      ii. 2005 Donor Query for Individuals
      iii. 2001 Intermediary Query for Individuals
      iv. 2005 Intermediary Query for Individuals
   b. To check entity name select appropriate query from this list:
      i. 2001 Donor Query for Entities
      ii. 2005 Donor Query for Entities
      iii. 2001 Intermediary Query for Entities
      iv. 2005 Intermediary Query for Entities
4. After you select one of these options the following box will appear.  In this box enter the identifying office code the race you are searching.



   a. For Mayor enter "1"
   b. For Public Advocate enter "2"
   c. For Comptroller enter "3"
   d. For Borough President enter "4"
   e. For City Council enter "5"
      i. Click "OK"

5. For any of the individual name queries the following box will appear



   a. In this box enter the last name of the person you are search followed by a comma and a space and their first initial.  Click "OK"
      i. For example, to search for Steven Fisher.  Enter "Fisher, S"
   b. Proceed to step 7

52

6. For any of the entity name queries the following box will appear



   a. In this box enter the most unique part of the entity name you are searching for. Click "OK"
      i. Examples:
         1. If the name is West L.L.C. enter "West"
         2. If the name is The Salvation Army enter "Salvation"
         3. If the name presented is abbreviated such as "Benev Assoc" do two searches one for "Benev" and another for "Benevolent"
   b. Proceed to step 7

*NOTE: These searches are NOT case sensitive.  Therefore the results when entering Fisher, S will be the same as fisher, s.*

7. Are there multiple names listed for the entity/individual you are searching for?
   a. No:  In the excel file in the column "Data Checked?" enter "1".  Begin at step one for the next name on the spreadsheet
   b. Yes:  Use ONLY the address to determine if the aggregation was performed correctly.
      i. Examples
         1. If three records for Steven Fisher are present and they have the same address the aggregation was performed correctly. Proceed to step 7a
         2. If three records have different addresses note the correct donation amount for the Steven Fisher on the Excel spreadsheet under the heading "New Amount" and under the heading "Corrected Amount?" enter "1" In this case the record will be removed from the sample and a new record will be randomly selected to take its place. This record will then be reviewed in the same fashion

## APPENDIX E: DEFINITIONAL CONSIDERATIONS

- Would the donor receive financial benefit from a particular decision by a City board, commission or agency?
- Did the donor affirmatively participate in the decision-making process?
- Is it possible to easily and clearly identify the donor's participation in this decision-making process?
- Is it possible to create an enforcement mechanism that would give campaigns an ability to identify those donors who are targeted by this regulation?
- Are 'false positives' likely? That is, how likely is it that this donor is not seeking influence, but is donating for partisan, personal or other reasons?
- Would restrictions on this donor place an unfair burden on the way he conducts his business?
- Would restrictions on this donor represent an undue limit on his right to participate in the political process?
- Is it likely this donor is giving to circumvent a regulation placed on another donor?

**CONTRACTORS**

| | |
|---|---|
| Financial benefit? | **YES**; proceeds of contract. |
| Affirmative participation? | **YES**; party to contract. |
| Clear identification possible? | **YES**; firms are identified through VENDEX. Identification of principals/officers not currently uniform, but could be standardized through regulation. |
| Enforcement mechanism possible? | **YES**; through VENDEX. |
| False positives? | **NO**; very unlikely. |
| Unfair burden on business? | **NO**. Firms or individuals receive benefit for burden of disclosure or paperwork. |
| Limit on right to participate? | **NO**. Firms or individuals receive benefit from City for giving up full right to donate. |
| Used to circumvent regulation? | **NO** |

**BIDDERS**

| | |
|---|---|
| Financial benefit? | **YES**. Firms are seeking proceeds of contract. |
| Affirmative participation? | **YES**; submission of bid, response to RFP or request to be added to bidders list. |
| Clear identification possible? | **YES**. Bidding firms are not currently identified through VENDEX; however, new regulation would be required for enforcement. |
| Enforcement mechanism possible? | **YES**; through VENDEX. |
| False positives? | **NO**; very unlikely. |
| Unfair burden? | **NO**. Firms or individuals receive benefit for burden of disclosure or paperwork. |
| Limit on right to participate? | **NO**. Firms or individuals give up the right to participate fully in pursuit of a benefit. If benefit is not procured (i.e. if bid is unsuccessful) then right to participate should be restored. |
| Used to circumvent regulation? | **NO** |

54

## FRANCHISES / CONCESSIONS

| | |
|---|---|
| **Financial benefit?** | **YES.** Concessionaires receive right to make money on city land; franchisees receive direct financial benefit from City. |
| **Affirmative participation?** | **YES;** both enter into a contract with City. |
| **Clear identification possible?** | **YES.** Concessionaires and franchisees should be listed in VENDEX, though there may be some that escape disclosure. |
| **Enforcement mechanism possible?** | **YES;** through VENDEX. |
| **False positives?** | **NO;** very unlikely. |
| **Unfair burden?** | **NO.** Firms or individuals receive benefit for burden of disclosure or paperwork. |
| **Limit on right to participate?** | **NO.** Firms or individuals receive benefit in exchange for giving up full right to donate. |
| **Used to circumvent regulation?** | **NO** |

## SUBCONTRACTORS/SUBSIDIARIES

| | |
|---|---|
| **Financial benefit?** | **YES;** firms receive some proceeds of contract. |
| **Affirmative participation?** | **YES,** to extent that subcontractors or subsidiaries are involved response to RFP. |
| **Clear identification possible?** | **YES.** Subcontractors currently must be identified in response to RFP; subsidiaries can be covered with additional regulation. |
| **Enforcement mechanism possible?** | **YES;** through VENDEX. |
| **False positives?** | **MAYBE.** Levels of coordination between parent firms and subsidiaries may vary. |
| **Unfair burden?** | **NO;** burden of disclosure falls on parent firm. |
| **Limit on right to participate?** | **NO.** Firms or individuals receive benefit in exchange for giving up full right to donate. |
| **Used to circumvent regulation?** | **MAYBE** |

**EMPLOYEES / OFFICERS / EXECUTIVES / PRINCIPALS**

| | |
|---|---|
| Financial benefit? | **MAYBE.** For principal owners or chief executives, the benefit is clear. For lower-level employees, there may be no direct benefit from a City contract. |
| Affirmative participation? | **MAYBE.** Again, the distinction is between principal owners, chief executives, and officers on one side and lower-level employees on the other. |
| Clear identification possible? | **YES,** if complete information on principal owners, executives and officers is collected through VENDEX. |
| Enforcement mechanism possible? | **YES,** through VENDEX. |
| False positives? | **NO;** unlikely. |
| Unfair burden? | **NO.** Burden of disclosure or paperwork is a condition of receiving benefit. |
| Limit on right to participate? | **NO.** For owners, officers or executives seeking City benefit, restriction on right to donate is a reasonable condition. |
| Used to circumvent regulation? | **MAYBE.** If executives or officers are restricted from donating in large amounts, lower-level employees could be encouraged to donate as a way to compensate. |

## DEVELOPERS WITH AN INTEREST IN LAND USE DECISIONS

| Financial benefit? | **YES.** Applicants are looking for a decision that will affect the value of their land. |
|---|---|
| Affirmative participation? | **MAYBE.** For many decisions, such as map amendments, variances or special permits, a landowner must apply to appropriate board or commission. For others, such as larger-scale re-zonings, the action may originate with the Planning Commission. A landowner may not have officially requested the particular action, even if he stands to benefit. For yet others, such as DOB permitting decisions, a builder has no discretion about whether or not to seek approval. |
| Clear identification possible? | **MAYBE.** Currently, CPC and BSA documents do not systematically identify the landowner affected by a particular decision. While every piece of land has an owner attached to it, much development is done in the name of shell companies or LLCs meant to obscure the principals behind a particular transaction. |
| Enforcement mechanism possible? | **YES.** No infrastructure currently exists, however. Enforcement would require additional collection of data on landowners (and principals of development firms) from such applicants before relevant boards and commissions, as well as a database where information can be aggregated and examined by campaigns, the CFB and the public. |
| False positives? | **MAYBE.** The risk of false positives can be minimized by focusing on those decisions that are both discretionary (that is, a special permit as opposed to a building permit) and individual (that is, a zoning variance as opposed to a re-zoning) in nature. |
| Unfair burden? | **NO.** Enforcement would not require much in the way of additional paperwork; added burden of data collection and organization would fall primarily on boards and commissions. |
| Limit on right to participate? | **NO.** Entities would agree to limits on right to donate as a condition of asking for a particular benefit. |
| Used to circumvent regulation? | **MAYBE.** There is a potential LLCs can be used to obscure identities and protect the ability of principals to donate up to the full limits. |

**NOT-FOR-PROFITS**

| Financial benefit? | YES. While the financial imperative may not be as strong as it is in a for-profit enterprise, contracts with the City to provide social services – which in many cases are quite lucrative – provide a boost to an organization's bottom line, and enable them to grow. |
|---|---|
| Affirmative participation? | YES. Non-profits who receive contracts participate in the same competitive bidding processes as for-profit firms. |
| Clear identification possible? | YES, through VENDEX. Identification of principals is not uniform – board members do not have to be identified, for instance – but can be addressed through regulation. |
| Enforcement mechanism possible? | YES, through VENDEX. |
| False positives? | MAYBE. People who serve on not-for-profit boards often serve more than one not-for-profit. These individuals are likely the sort of well-off, civic-minded people who would participate by giving campaign donations regardless of their board service. |
| Unfair burden? | MAYBE. Not-for-profits may find it harder to attract people to serve on boards if their campaign donations are restricted. |
| Limit on right to participate? | NO. For directors or managerial decision-makers, limits on donations are a reasonable condition of gaining business. |
| Used to circumvent regulation? | NO. |

**LOBBYISTS**

| Financial benefit? | YES. Lobbyists earn fees from clients to access City officials or influence City decisions. |
|---|---|
| Affirmative participation? | YES. |
| Clear identification possible? | YES. Lobbyists must register with City Clerk's office, which maintains database that is published online. |
| Enforcement mechanism possible? | YES; through NYC Lobbyist database. |
| False positives? | NO; very unlikely. |
| Unfair burden? | NO. Lobbyists must already register; enforcement should provide no additional burden. |
| Limit on right to participate? | NO. Accepting limits on right to donate to campaigns should be acceptable price of access to lobbying profession. |
| Used to circumvent regulation? | NO |

**LOBBYIST CLIENTS**

| | |
|---|---|
| Financial benefit? | **MAYBE.** Many clients of lobbyists have financial interests before the city, while others are interested only in policy. Further study might illuminate what proportion of lobbyist clients are business-based or issue-based. |
| Affirmative participation? | **YES.** |
| Clear identification possible? | **YES.** Lobbyists must list their clients for the City Clerk's database. |
| Enforcement mechanism possible? | **YES;** through NYC Lobbyist database. |
| False positives? | **YES,** to the extent that it captures clients who have no financial interest in the policy decision they hope to affect. Crafting language to separate *doing business* clients from issue-advocacy clients would prove difficult. |
| Unfair burden? | **NO.** Enforcement should provide no additional burden. |
| Limit on right to participate? | **MAYBE.** The question of whether a particular firm or individual should be forced to give up his full right to participate financially when he hires a lobbyist may warrant further consideration. |
| Used to circumvent regulation? | **NO.** |

# APPENDIX F: GOVERNMENT ACTORS IN LAND USE DECISIONS

| | | | |
|---|---|---|---|
| **ULURP** | **1. Community Boards** | Applications subject to ULURP include: changes to the City Map; maps of subdivisions and the platting of land into streets, avenues, etc.; zoning changes*; certain special permits under the jurisdiction of CPC; site selection for City capital projects; revocable consents, solicitations for franchises and major concessions; improvements in real property, the costs of which are payable other than by the City; housing and urban renewal plans and projects*; sanitary or waterfront landfills; disposition of city-owned real property*; acquisition of real property by the City (except office leases); certain other matters.<br><br>* = automatically reviewed by City Council | Appointed by Borough Presidents, half on recommendations from City Council members |
| | **2. Borough Presidents** | | Elected |
| | **3. City Planning Commission (CPC)** | | 13 members: 7 appointed by Mayor, 1 appointed by each Borough President, 1 by Public Advocate |
| | **4. City Council** | | Elected; Land Use Committee (which acts before full Council on land use matters) has 21 members. |
| **Other land use decisions** | **Board of Standards and Appeals (BSA)** | Grants special permits and variances; can modify or revoke certificates of occupancy. | Five members, appointed by Mayor |
| | **Landmarks Preservation Commission** | Designates buildings as a landmark or historic district; can prohibit work on landmark building or in historic district. | 11 members, appointed by Mayor |
| | **Loft Board** | Resolves regulation issues surrounding loft buildings converted to residential use; settles landlord-tenant disputes; enforces residential legalization deadlines set forth in the Loft Law; enforces maintenance standards. | Nine members, appointed by Mayor |
| | **Department of Buildings** | Reviews construction and demolition plans and issues building permits; inspects buildings to ensure compliance with laws; licenses various construction trades; investigates complaints. | Commissioner appointed by Mayor |

## ACKNOWLEDGEMENTS

Our Capstone team wishes to thank the members and staff of the New York City Campaign Finance Board for their ongoing assistance throughout this project. In particular, we would like to acknowledge Frederick A.O. Schwarz, Jr., Nicole Gordon, Erik Joerss, Peri Horowitz, Diana Kirby, Andrea Lynn and Kenneth O'Brien.

We would also like to thank the CFB Intern Mike Muller for his invaluable assistance in conducting the quantitative and qualitative analyses sections of the report.

Additionally, we would like to acknowledge the various experts who lent their time and expertise: Frank Barry of the New York City Mayor's Office, Greg J. Brooks and John Graham of the New York City Comptroller's Office, Martha Mahan Haines of the Securities Exchange Commission, Eric Lane of the Hofstra University School of Law, Harry Pozycki of Common Cause New Jersey, Gene Russianoff of New York Public Interest Research Group, and Paul Ryan of the Campaign Legal Center.

Finally, we would like to thank our Capstone advisor, Charles M. Brecher, Professor of Public and Health Administration at the NYU Wagner Graduate School of Public Service, for his support and guidance throughout the project.

# EXHIBIT I

# LOCAL LAWS
## OF
## THE CITY OF NEW YORK
### FOR THE YEAR 2007

---

**No. 34**

---

Introduced by The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo Jackson, Garodnick, Gentile, Gerson, Gioia, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia, Reyna, Seabrook, Stewart, Vacca, Weprin, White Jr., Liu, Mendez and The Public Advocate (Ms. Gotbaum) (in conjunction with the Mayor)

## A LOCAL LAW

**To amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance.**

*Be it enacted by the Council as follows:*

Section 1.  Subdivision 3 of section 3-702 of the administrative code of the city of New York, as amended by local law number 17 for the year 2006, is amended, and three new subdivisions 18, 19 and 20 are added, to read as follows:

3. The term "matchable contribution" shall mean (i) a contribution, (ii) contributions or (iii) a portion of a contribution or contributions, not greater than the applicable contribution limitation set forth in paragraph (f) of subdivision one of section 3-703 for all covered elections held in the same calendar year, made by a natural person resident in the city of New York to a participating candidate which has been reported in full to the campaign finance board in accordance with subdivision six of section 3-703 by the candidate's principal committee and has been contributed on or before December thirty-first in the year of such election that may be matched by public funds in accordance with the provisions of this chapter. Any contribution, contributions, or a portion of a contribution determined to be invalid for matching funds by the board may not be treated as a matchable contribution for any purpose. A loan may not be treated as a matchable contribution.  The following contributions are not matchable:

1

(a)    in-kind contributions of property, goods, or services;

(b)    contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value;

(c)    contributions in the form of the purchase price paid for or otherwise induced by a chance to participate in a raffle, lottery, or similar drawing for valuable prizes;

(d)    money order contributions from any one contributor that are, in the aggregate, greater than $100;

(e)    contributions from individuals under the age of eighteen years;

(f)    contributions from individual vendors to whom the participating candidate or his or her principal committee makes an expenditure, in furtherance of the nomination for election or election covered by the candidate's certification, unless such expenditure is reimbursing an advance; *[and]*

(g)    contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1) or section 3-213-d.  The board shall rely on the database maintained by the city clerk pursuant to section 3-221 or such other information known to the board to determine whether a contribution is not matchable based on the contributor's status as a lobbyist or person required to be included in a statement of registration filed pursuant to section 3-213*[.]; and*

*(h)    contributions from contributors subject to the limitations of subdivision one-a of section 3-703 of this chapter.*

*18.    a.    The term "business dealings with the city" shall mean (i) any contract for the procurement of goods or services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York (other than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than   the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code, or for construction totaling not more than five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter), and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; (ii) any acquisition or disposition of real property (other than a public auction or competitive*

2

*sealed bid transaction or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii) any application for approval sought from the city of New York pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter, and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter; provided, however that for purposes of this clause, with respect to section 195 an applicant shall include the lessor of an office building or office space, and with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for which a city agency or local development corporation is the applicant and provided, further, however, that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or (iv) one or more concessions (other than concessions awarded through competitive sealed bid) or franchises from the city of New York or any agency or entity affiliated with the city of New York with estimated aggregate payments to the city of more than the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code per fiscal year; or (v) one or more grants totaling not more than the dollar value set forth in section 6-116.2(i)(3)(a) of the administrative code, received from the city of New York or any agency or entity affiliated with the city of New York; or (vi) any economic development agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York; or (vii) any contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants. In addition, for purposes of this chapter a lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the city of New York during all periods covered by a registration statement. For purposes of clauses (i), (iv) and (v) of this subdivision, all contracts, concessions, franchises and grants that are five thousand dollars or less in value shall be excluded from any calculation as to whether a contract, concession, franchise or grant is a business dealing with the city. For purposes of clauses (ii) and (iii) of this subdivision, the department of city planning, in consultation with the board, may promulgate rules to require the submission by applicants to the city of information necessary to implement the requirements of subdivisions 1-a and 1-b of section 3-703 of this chapter as they relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for purposes of inclusion in the doing business*

3

*database established pursuant to subdivision (20) of this section. For purposes of this subdivision, actions, transactions, and agreements for the purpose of providing affordable housing pursuant to the Private Housing Finance Law or the General Municipal Law or any other city, state or federal program, including but not limited to actions, transactions and agreements for such purposes which involve land dispositions, loans, grants, real property tax exemptions, zoning bonuses, low income housing tax credits, rent subsidies, or agreements imposing limitations on the incomes of residents or on the rents or other charges to be paid by such residents, shall not constitute business dealings with the city of New York. For purposes of this subdivision, "agency or entity affiliated with the city of New York" shall mean the city school district of the city of New York and any public authority, public benefit corporation or not for profit corporation, the majority of whose board members are officials of the city of New York or are appointed by such officials.*

*b. Business dealings with the city as defined in this subdivision shall be limited as follows: for purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the procurement of goods, services, or construction shall only constitute business dealings with the city of New York for the period from the later of the submission of the bid or proposal or the date of the public advertisement for the contract opportunity until twelve months after the date of such submission or advertisement, and contracts for the procurement of goods, services or construction shall only constitute business dealings with the city of New York during the term of such contract and for twelve months after the end of such term, provided, however that where such contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in which the city of New York is the proposed lessee, shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of*

4

*paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business dealing with the city from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter or in the case of a decision of the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section;  for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of New York for the period from the submission of the bid or proposal until twelve months after the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall  constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.*

*c.    Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or*

*construction or who has submitted bids or proposals for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a determination that said person should not be included in the database.*

*d.    A person, as defined by subdivision 20 of section 3-702, shall be considered to have business dealings with the city as of the date the person's name is entered in the doing business database, as such date is indicated in such database or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.*

*19.    The term "economic development agreement" means any contract or agreement in which financial incentives including, but not limited to, tax incentives, payments in lieu of taxes and financing are offered in return for the development, attraction or retention of business; provided, however that no financial incentives which are given to a person who qualifies for such incentive by operation of law shall be deemed to be pursuant to an economic development agreement for purposes of this chapter.*

*20.    The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city. Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than once a month. Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city. For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a*

6

*senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent company or an affiliated company of an entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city.*

§2. Section 3-703 of the administrative code of the city of New York is amended by adding two new subdivisions 1-a and 1-b to read as follows:

*1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may accept, either directly or by transfer, a contribution or contributions for a covered election from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for such election does not exceed:  (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; (iii) for member of the city council two hundred fifty dollars.  Any contribution made pursuant to this section shall not be a matchable contribution.  For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city. Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person*

7

*who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.*

*1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines. If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation provided, however, that no such contribution shall be matchable. Such principal*

*committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor.  No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein.  Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds. For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer  of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity.  For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a supervisory capacity, either by virtue of title or duties, in which substantial discretion is exercised over the solicitation, letting or administration of any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city. Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.*

§3.  Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 12 for the year 2003, is amended to read as follows:

(i) the [first] *tenth* day of June in the year of the covered election, or such other later date as the board shall provide, *provided, however that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;*

§4.  Section 3-705 is amended by adding two new subdivisions 9 and 10 to read as follows:

*9.    If a participating candidate endorses or publicly supports his or her opponent for election, such candidate shall not be eligible for public funds.*

9

10.    *Participating candidates who lose in the primary election but remain on the ballot for the general election must certify to the board that they will actively campaign for office by including, but not limited to, raising and spending funds, seeking endorsements and broadly soliciting votes before receiving public funds.*

§5.    Paragraph (d) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 59 for the year 2004, is amended to read as follows:

(d) obtain and furnish to the campaign finance board and his or her principal committee or authorized committees must obtain and furnish to the board any information it may request relating to his or her campaign expenditures or contributions and furnish such documentation and other proof of compliance with this chapter as may be requested by such board, *provided, however, that the board shall accept such required documentation through an electronically scanned transmission*;

§6. Section 3-703 of the administrative code of the city of New York is amended by adding a new subdivision 15 to read as follows:

15.    *Participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign shall be required to attend a training provided by the campaign finance board concerning compliance with the requirements of the campaign finance program and use of the campaign finance program software.*

§7. Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:

4.    The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election. *The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election.  For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any*

*non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the event that the board denies such petition then it shall immediately notify the candidate of its right to appeal to appeal pursuant to article 78 of the civil practice law and rules.*

§8. Subdivision 8 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws numbered 58, 59 and 60 for the year 2004, is amended to read as follows:

8. The board shall have the authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of this chapter. The board shall promulgate regulations concerning the form in which contributions and expenditures are to be reported, the periods during which such reports must be filed and the verification required. The board shall require the filing of reports of contributions and expenditures for purposes of determining compliance with paragraph (f) of subdivision one of section 3-703, section 3-706, *subdivision 1-a of section 3-703,* section 3-718, and section 3-719 in accordance with the schedule specified by the state board of elections for the filing of campaign receipt and expenditure statements.

§9. Paragraphs (a) and (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as added by local law 58 for the year 2004, are amended, and a new subdivision 12 is added to read as follows:

(a) The written application shall:

(i)  demonstrate that the organization and any proposed co-sponsor meet the criteria of subdivision four of this section;

(ii)  specify the election and office for which the organization seeks to sponsor the debate;

(iii)  set forth the date, time, duration, and location of the debate and the specific and exclusive circumstances under which the date or time may be changed, together with a provision for when the rescheduled debate would be held;

11

(iv)     provide a detailed description of the format and ground rules for the debate;

(v)     verify that the staging, promotion, and coverage of the debate shall be in conformance with all applicable laws;

(vi)     include an agreement to indemnify the city for any liability arising from the acts or omissions of the sponsor; and

(vii)     set forth plans for publicity and for broadcast and other media coverage for the debate; and

(viii) set forth the criteria for determining which candidates are eligible to participate in each debate the organization seeks to sponsor, in accordance with paragraph (b) of this subdivision.

(b)     (i)     Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, [either] (I) spent, contracted, or obligated to spend, [or] *and* (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held

12

contained in subdivision two of section 3-703; *provided however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703;* provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board.  Nothing in this provision is intended to limit the debates to the two major political parties.

(ii)      If a debate sponsor has determined that a non-participating candidate has met all the non-partisan, objective, and non-discriminatory criteria applicable to participating candidates or limited participating candidates for access to any of the primary, general, or special election debates, the sponsor may invite that candidate to participate in such debate.  In the case of a run-off primary election or a run-off special election, the sponsor may invite a non-participating candidate to participate in such debate.  However, if a non-participating candidate does not accept such invitation to debate or does not appear at such debate, the debate shall go forward as scheduled; provided, however, if there is only one participating candidate or limited participating candidate participating in any such debate, [upon agreement by the debate sponsor, the board and the potential debater,] such debate [may] *shall* be canceled.

   *12. The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate, held pursuant to this section 3-709.5.*

13

§10.  Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 69 for the year 1990, is amended to read as follows:

b.  If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such *candidate and* committee of the amount so disqualified and such *candidate and* committee shall pay to the board an amount equal to such disqualified amount; *provided, however that in considering whether or not a participating candidate shall be required to pay to the board such amount or an amount less than the entire disqualified amount, the board shall act in accordance with the following:  (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; (ii) where there is an absence of credible documentation for each qualified campaign expenditure,  the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.*

§11.  Paragraph b of subdivision 1 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall comply with the same requirements as a participating candidate who files a certification pursuant to paragraph (c) of subdivision one of section 3-703 of this chapter as provided in paragraphs (d) and (g) of such subdivision, *subdivision one-b of section 3-703,*  and subdivisions six, six-a and eight of section 3-703 of this chapter.

§12.  Paragraph b of subdivision 2 of section 3-719 of the administrative code of the city of New York, as added by local law 60 for the year 2004, is amended to read as follows:

(b) A non-participating candidate, and the authorized committees of such a non-participating candidate, shall only accept contributions as limited by the provisions of paragraphs (f) and (l) of subdivision one of section 3-703, [and] *subdivision 1-a of section 3-703, and* subdivision ten of section 3-703 of this chapter. Notwithstanding any contribution limitations in paragraphs (f) and (h) of subdivision one of section 3-703 *and subdivision 1-a of section 3-703,* a non-participating candidate may contribute to

14

his or her own nomination for election or election with his or her personal funds or property, in-kind contributions made by the candidate to his or her authorized committees with the candidate's personal funds or property, and advances or loans made by the non-participating candidate with the candidate's personal funds or property. A candidate's personal funds or property shall include his or her funds or property jointly held with his or her spouse, domestic partner, or unemancipated children.

§13.  Paragraph 1 of subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended to read as follows:

§ 1052. Campaign finance board. a. 1. There shall be a campaign finance board consisting of five members.  Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker.  The members shall first be appointed to serve as follows:

    (a)  one member appointed by the speaker for a term of one year;

    (b)  one member appointed by the mayor for a term of two years;

    (c)  one member appointed by the speaker for a term of three years;

    (d)  one member appointed by the mayor for a term of four years; and

    (e)  the chairperson for a term of five years.

Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment. Upon expiration of the term of a member, if the mayor or the speaker, as appropriate, shall fail to appoint a member within one hundred twenty days of the expiration of such term, the member whose term has expired shall be deemed appointed for an additional term of five years, provided, however, that if the expiration of such term occurs in a year in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, the member whose term has expired shall be deemed appointed for an additional term of five years if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of the expiration of such term.  In case of a vacancy in the office of

15

a member, a member shall be appointed to serve the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. If the mayor or the speaker, as appropriate, shall fail to appoint a member within one hundred eighty days of such vacancy, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, provided, however, that if such vacancy occurs in a year, or within ninety days prior to a year, in which elections, except special elections, covered by the voluntary system of campaign finance reform are scheduled, then a member shall be appointed by the board to serve for the remainder of the unexpired term, if additional time remains in such term, if the mayor or the speaker, as appropriate, shall fail to appoint a member within ninety days of such vacancy. Except for the chairperson, such member shall not be enrolled in the same political party as the other member appointed by the official who failed to so appoint. Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president, or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to any local law establishing a voluntary system of campaign finance reform. No member shall serve as an officer of a political party, or be a candidate, or participate in any capacity in a campaign by a candidate, for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 of the administrative code and the employees of such lobbyists shall not be eligible to be members of the board. *In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be required to undergo training developed pursuant to paragraph 14 of this section.*

§14. Subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended by adding a new paragraph 14 to read as follows:

*14 a. The council and the mayor, in conjunction with the campaign finance board, shall develop a curriculum to be used to train members of the campaign finance board and staff. Such curriculum shall*

*include the issues and problems confronted by campaigns for covered office and how the application and enforcement of the city's campaign finance laws impacts these campaigns.*

§15. Paragraph 5 of subdivision a of section 1052 of chapter 46 of the New York city charter, as amended by vote of the electors of the city of New York at a general election held on November 3, 1998, is amended to read as follows:

5. The board shall have the power to investigate all matters relating to the performance of its functions and any other matter relating to the proper administration of any voluntary system of campaign finance reform established by local law and for such purposes shall have the power to require the attendance and examine and take the testimony under oath of such persons as it shall deem necessary and to require the production of books, accounts, papers and other evidence relative to such investigation. *Notwithstanding any other provision of law, the investigative and adjudicatory powers and functions of the staff to the board shall be separate and no staff member of the board shall perform both investigative and adjudicatory tasks or functions.*

§16. Subdivision 12 of section 3-702 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows:

12. The term "intermediary" shall mean an individual, corporation, partnership, political committee, employee organization or other entity which, *(i)* other than in the regular course of business as a postal, delivery or messenger service, delivers any contribution from another person or entity to a candidate or other authorized committee*; or (ii) solicits contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee. For purposes of clause (ii) of this subdivision only persons clearly identified as the solicitor of a contribution to the candidate or his or her authorized committee shall be presumed to be known to such candidate or his or her authorized committee.* "Intermediary" shall not include spouses, domestic partners, parents, children or siblings of the person making such contribution, or any fundraising agent, as such term is defined in the rules of the board *or any hosts of a campaign sponsored fundraising event paid for in whole or in part by the campaign. Where there are multiple individual hosts for a non-campaign sponsored event, the hosts shall designate one such host as the intermediary.*

17

§17. Section 3-702 of the administrative code of the city of New York is amended by adding a new subdivision 19 to read as follows:

19.    a. For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter pursuant to sections 3-706 and 3-712. In addition, there shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however that the presumptions contained in this subdivision shall not apply to an expenditure made when the expenditure is to a person or entity associated with the candidate making such expenditure or on whose behalf such candidate's committee made such expenditure; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure. For purposes of this subdivision a person or entity associated with a candidate includes a spouse, domestic partner, child, parent, sibling, or a person with whom the candidate has a business or other financial relationship:

1.    Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

2.    Contributions to candidates and political committees subject to the provisions of section 3-705(8);

3.    Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

4.    Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

5.    Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

18

6.      *Legal defense of a non-criminal matter arising out of a political campaign;*

7.      *Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;*

8.      *A post-election event for staff, volunteers and/or supporters held within thirty days of the election;*

9.      *Payment of non-criminal penalties or fines arising out of a political campaign;*

10.     *Costs incurred in demonstrating eligibility for the ballot, public funds payments or defending against a claim that public funds must be repaid;*

11.     *Food and beverages provided to campaign workers and volunteers; and*

b.    *Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign.  Expenditures not in furtherance of a political campaign for elective office include the following:*

1       *Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate, or any other individual except for the provision of such expenses for professional staff as part of a compensation package;*

2.      *Any residential, or household items, supplies or expenditures;*

3.      *Clothing, haircuts and other personal grooming;*

4.      *Funeral, cremation, or burial expenses including any expenses related to a death within a candidate's or officeholder's family;*

5.      *Automobile purchases;*

6.      *Tuition payments, childcare costs;*

7.      *Dues, fees, or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;*

8.      *Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;*

19

9. *Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and*

10. *Gifts, except for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.*

§18. Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as separately amended by local laws 58 and 60 for the year 2004, is amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, *limited liability company, limited liability partnership, or partnership* other than a corporation, *limited liability company, limited liability partnership, or partnership* that is a political committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, *provided, however, that where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company or limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity;*

§19. Subdivision 1 of section 3-703 of the administrative code of the city of New York is amended by adding a new paragraph (o) to read as follows:

*(o) agree that expenditures by his or her principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election shall be subject to the contribution and expenditure limitations applicable in such covered election.*

§20. Paragraphs (g) and (h) of subdivision 2 of section 3-704 of the administrative code of the city of New York, paragraph (g) as added by local law 60 for the year 1990 and paragraph (h) as amended by local

law 12 for the year 2003, are amended, and new paragraphs (i), (j) and (k) are added to such section to read as follows:

(g) gifts, except brochures, buttons, signs and other printed campaign material; [or]

(h) any expenditure to challenge or defend the validity of petitions of designation or nomination, or of certificates of nomination, acceptance, authorization, declination, or substitution, and expenses related to the canvassing of election results, made pursuant to subdivision four of section 3-706[.];

*(i) an expenditure made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, other than expenditures made also to further the participating candidate's nomination for election or election;*

*(j) payment of any penalty or fine imposed pursuant to federal, state or local law;*

*(k) payments made through advances, except in the case of individual purchases in excess of two hundred fifty dollars.*

§21. Paragraph (a) of subdivision (2) of section 3-705 of the administrative code of the city of New York, as amended by local law 58 for the year 2004, is amended to read as follows: If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of [four] *six* dollars for each one dollar of matchable contributions, up to one thousand *fifty* dollars in public funds per contributor (or up to five hundred *twenty-five* dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

§22. Paragraph a of subdivision (7) of section 3-705 is REPEALED and paragraph c of subdivision (7) of section 3-705 of the administrative code of the city of New York, as added by local law 12 for the year 2003, is amended to read as follows:

(c) the participating candidate has submitted  a *certified* signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time such additional public funds are paid, including on the board's internet website. *Such statement must certify that (i) one or more of the following conditions applies and provide documentation in support of such condition and (ii) that such condition or conditions reasonably demonstrates the need for such public funds.*

21

(1) the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2) the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name in television, radio or print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4) the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child hold or have held elective office in an area encompassing all or part of the area that is the subject of the current election in the past ten years.

*The board shall be authorized to verify the truthfulness of any certified statement submitted*

*pursuant to this paragraph and of any supporting documentation and shall post such certifications and*

*supporting documentation on its website.*

*(d)  the participating candidate is opposed in a primary or special election for an office for*

*which no incumbent is seeking re-election.*

If any of the conditions described in paragraphs (a), (b), [or] (c) *or (d)* occur in such

election, the board shall pay any and all additional public funds due to the participating candidate

up to the maximum total payment applicable in such election under subdivisions two or six of this

section or subdivision three of section 3-706 of this chapter.

§23.  Subdivisions 1, 2 and 4 of section 3-706 of the administrative code of the city of New York,

as added by local law 58 for the year 2004, are amended to read as follows:

1.  The following limitations apply to all expenditures made by a candidate and his or her principal

committee on or after the first day of January preceding the election for which such candidate chooses to

participate in the public funding provisions of this chapter and to expenditures made at any time prior to

such date for services, materials, facilities, advertising or other things of value received, rendered,

published, distributed or broadcast on or after such date:

(a)      Except as provided in paragraph (b) of this subdivision, in each primary election, in each

special election to fill a vacancy, and in each general election, expenditures by a participating candidate or

a limited participating candidate and his or her principal committee for one of the following offices shall

not exceed the following amounts:

| | |
|---|---|
| mayor: | [$4,000,000] *$6,157,600* |
| public advocate or comptroller: | [$2,500,000] *$3,849,575* |
| borough president: | [$900,000] *$1,385,675* |
| member of the city council: | [$105,000] *$161,250* |

(b)      (i)      The expenditure limitation in a run-off primary election held pursuant

to section 6-162 of the New York state election law or a run-off special election

held to fill a vacancy shall be one half the amount of the applicable limitation

23

provided for an election for such office pursuant to the provisions of paragraph (a) of this subdivision.

(ii)    The board shall promulgate rules to provide for a separate expenditure limit applicable to campaign expenditures for an additional day for voting held pursuant to section 3-108 of the New York state election law, an election held pursuant to court order, or a delayed or otherwise postponed election.

(c)    Expenditures by participating or limited participating candidates in a primary election made prior to or on the date of such primary election shall be deemed to have been made for such primary election.

(d)    The campaign finance board shall, pursuant to section 3-713, submit a report to the mayor and the council on or before September first, nineteen hundred ninety, containing its recommendations whether the expenditure limitations provided by this sub-division should be modified.  Such report shall set forth the amount of, and reasons for, any modifications it recommends.

(e)    Not later than the first day of March in the year two thousand [eighteen] *ten* and every fourth year thereafter the campaign finance board shall (i) determine the percentage difference between the average over a calendar year of the consumer price index for the metropolitan New York-New Jersey region published by the United States bureau of labor statistics for the twelve months preceding the beginning of such calendar year and the average over the calendar year two thousand [fifteen] *seven* of such consumer price index; (ii) adjust each expenditure limitation applicable *either* pursuant to this subdivision *or subdivision 2 of this section* by the amount of such percentage difference to the nearest thousand dollars; and (iii) publish such adjusted expenditure limitation in the City Record.  Such adjusted expenditure limitation shall be in effect for any election held before the next such adjustment.

2.   The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited

24

participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years. Such expenditures by a participating or limited participating candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

| | |
|---|---|
| mayor, public advocate or comptroller: | [$270,000] *$290,250* |
| borough president: | [$120,000] *$129,000* |
| member of the city council: | [$40,000] *$43,000* |

4.    (a) Expenditures made for the purpose of [complying with the provisions of this chapter or the election law, including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures,]: *(i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status, (ii)* expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results, *and (iii) expenses related to the post-election audit* shall not be limited by the expenditure limitations of this section.

(b)    [In reviewing claims that expenditures are exempt from expenditure limitations by reason of paragraph (a) of this subdivision, the board shall not require the participating candidate or principal committee to provide detailed documentation substantiating such exempt expenditure claims unless the board has reason to believe that expenditures have been erroneously or falsely claimed to be exempt in disclosure reports.

(c) Notwithstanding paragraph (b) above, a] *A* participating candidate shall be required to provide detailed documentation substantiating all exempt expenditure claims made pursuant to this subdivision [if the aggregate exempt expenditure claims made by the participating candidate exceed an amount equal to seven and one-half percent of the participating candidate's applicable expenditure limitation].

§24.    Subdivision 1 of section 3-708 of the administrative code of the city of New York, as amended by local law 48 for the year 1998, is amended to read as follows:

1. There shall be a campaign finance board consisting of five members. Two members of the board shall be appointed by the mayor, provided that not more than one such member shall be enrolled in any one political party, and two members shall be appointed by the speaker of the council, provided that not more than one such member shall be enrolled in any one political party, and one member, who shall be the chairperson, shall be appointed by the mayor after consultation with the speaker. The members shall first be appointed to serve as follows:

    (a)  one member appointed by the speaker for a term of one year;

    (b)  one member appointed by the mayor for a term of two years.

    (c)  one member appointed by the speaker for a term of three years;

    (d)  one member appointed by the mayor for a term of four years; and

    (e)  the chairperson for a term of five years.

(b) Each term shall commence on April first, nineteen hundred eighty-eight. Thereafter, each member shall be appointed for a term of five years by the mayor or the speaker, according to the original manner of appointment.

In case of a vacancy in the office of a member, a member shall be appointed to serve for the remainder of the unexpired term by the mayor or the speaker, according to the original manner of appointment. In the case of a vacancy in the office of a member for which a member is holding over after expiration of the term for which the member was appointed, an appointment to such office made after June 1 in a year in which covered elections are scheduled shall not take effect prior to December 1 of that calendar year. Each member shall be a resident of the city, registered to vote therein. Each member shall agree not to make contributions to any candidate for nomination for election, or election, to the office of mayor, public advocate, comptroller, borough president or member of the council which in the aggregate are in excess of the maximum contribution applicable to such office pursuant to paragraph (f) of subdivision one of section

26

3-703. No member shall serve as an officer of a political party or be a candidate or participate in any capacity in a campaign by a candidate for nomination for election or election to the office of mayor, public advocate, comptroller, borough president or member of the city council. Officers and employees of the city or any city agency, lobbyists required to file a statement of registration under section 3-213 and the employees of such lobbyists shall not be eligible to be members of the board. *In appointing members to the board, the mayor and the speaker shall consider campaign experience in general and particularly campaign experience with the New York city campaign finance system. Members of the board shall be required to undergo training developed pursuant to paragraph 14 of subdivision a of section 1052 of the charter.*

§25. Paragraph (b) of subdivision 7 of section 3-708 of the administrative code of the city of New York, as separately amended by local laws 58. 59. and 60 for the year 2004, is amended to read as follows:

(b) The board shall develop a program for informing candidates and the public as to the purpose and effect of the provisions of this chapter. The board shall prepare and make available educational materials, including compliance manuals and summaries and explanations of the purposes and provisions of this chapter. These materials shall be prepared in plain language. The board shall prepare and make available materials, including, to the extent feasible, computer software, to facilitate the task of compliance with the disclosure and record-keeping requirements of this chapter. When disclosure reports are generated by use of the board's disclosure software, the board shall provide an opportunity for candidates to test their electronic filings on any of the three business days prior to the deadline for the filing of such disclosure reports. *Any disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005.*

§26. Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York, as separately amended by local laws 58, 59 and 60 for the year 2004, is amended to read as follows:

§ 3-710 Examinations and audits; repayments. 1. The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code. *The*

*board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall issue rules regarding what documentation is sufficient in demonstrating financial activity.* These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, *provided that:*

*a. Any draft audit, the subject of which is a participating, limited participating, or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating, or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races; and (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;*

*b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, (i) within fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races; and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate (i) within sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races; and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.*

c. Any advice provided by board staff to participating, limited participating, or non-participating candidates with regard to an action shall be presumptive evidence that such action taken in reliance on such advice should not be subject to a penalty or repayment obligation where such candidate, or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, that describes the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

d. Notwithstanding the provisions of paragraphs a and b of this section, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section. If a committee has responded to a request for information made by board auditors but such response is inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days until an adequate response is provided, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, (b) the commencement of the tolling period pursuant to this section and (c) the detailed reasons why the original response was inadequate.

e. Notwithstanding any provision of law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall not apply in cases where the audit raises issues involving potential campaign-related fraud, potential other criminal activity, activity that may constitute a breach of certification pursuant to rules of the board, or potential significant violations of the limits set forth in section 3-706.

*f. Notwithstanding any provision of the law to the contrary, the deadlines provided in subdivisions a and b of this section for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with provisions a and b.*

§27.  Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 69 for the year 1990, is amended to read as follows:

2. (c)  *(i)*  If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election.  [Such reimbursement shall be made not later than ten days after all liabilities have been paid and in any event, not later than either the closing date of the final disclosure report, or the day on which the campaign finance board issues its final audit report for such participating committee, for such covered election, as shall be set forth in rules promulgated by the campaign finance board.]  No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§28.  Section 3-710 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

*4.  ~~(a)~~ No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to the all of the requirements of subdivision one of this section, and a reasonable opportunity to appear before the board.  Any such repayment claim shall be based on a final determination to be issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee.  Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination~~.~~*

30

§29. Section 3-710.5 of the administrative code of the city of New York, as separately amended by local laws 58, 59 and 60 for the year 2004 is hereby amended to read as follows:

§ 3-710.5 Findings of violation [or] infraction; *adjudications; or final determinations. (i)* The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

*(ii)* The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction before assessing any penalty for such action. *Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit required pursuant to subdivision one of section 3-710. In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election in the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit. Alleged violations and proposed penalties shall be subject to resolution by adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature of such pre-election adjudications. The board shall issue a final determination within thirty days of the conclusion of the adjudication proceeding.*

*(b) The board shall include in every final determination: (i) notice of the respondents' right to bring a special proceeding challenging the board's final determination in New York State supreme court brought pursuant to article 78 of the civil practice law; and (ii) notice of the commencement of the four-*

31

*month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law.*

§30. Section 3-711 of the administrative code of the city of New York is amended by adding a new subdivision 4 to read as follows:

*4. Notwithstanding any provision of law, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who commit any violation of this chapter or any rules promulgated hereunder and who take all steps necessary to correct such violation prior to receiving notice from the board of the existence of the potential violation pursuant to section 3-710.5 shall not be subject to any penalty for such violation.*

§ 31. Paragraph (b) of subdivision 1 of section 3-718 of the administrative code of the city of New York, as separately added by local laws 58, 59 and 60 for the year 2004, is amended to read as follows:

(b) A limited participating candidate and his or her principal committee shall comply with the provisions of paragraphs (d), (e), (g), [and] (i)*, and (o)* of subdivision one, and subdivisions six, six-a, eight, nine, ten, and twelve of section 3-703 of this chapter.

§32. Chapter 7 of title 3 of the administrative code of the city of New York is amended by adding a new section 3-720 to read as follows:

*§3-720. Tolling of time for notice of violations or penalties.. If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.*

§33. Paragraphs (b) and (c) of subdivision 2 of section 3-801 of the administrative code of the city of New York, paragraph (b) as amended by and paragraph (c) as added by local law 58 for the year 2004, are amended, and a new paragraph (d) is added to read as follows:

32

(b) not accept any donation or donations of money, goods, or services from any individual, [corporation, partnership,] political committee, employee organization, or entity which in the aggregate exceeds:

(i) four thousand five hundred dollars, in the case of a candidate elected to the office of mayor, public advocate, or comptroller;

(ii) three thousand five hundred dollars, in the case of a candidate elected to the office of borough president; or

(iii) two thousand five hundred dollars, in the case of a candidate elected to the office of member of the city council; [and]

(c) not incur any liabilities after January thirty-first in the year following the election, nor accept any donations after all liabilities are paid[.];*and*

(d)  *not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city to a transition or inaugural committee where such donation is from the candidate-elect, or from the candidate-elect's parent,  spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.*

§34. Paragraph a of subdivision 3 of section 3-706 is amended by adding a new subparagraph (iii) to read as follows:

*(iii) with regard to contributions raised on or after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run off election shall receive public funds for such election pursuant to subdivision five of*

*section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provide for such  office in subdivision one of this section.*

§35.  Paragraph b of subdivision 3 of section 3-706 is amended by adding a new subparagraph (iii) to read as follows:

*(iii) with regard to contributions raised on or after January first, two thousand eight for elections occurring after such date, the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation provide for such  office in subdivision one of this section.*

§36.  Each city agency with which any person who has business dealings with the city conducts such business shall, provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that rules shall not be provided to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section twenty-six of this local law.

§37.  Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows: (i) all of the

provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) all of the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of entities that have submitted bids seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, applications for approvals sought pursuant to the provisions of section 195 or certified pursuant to section 197-c of the New York city charter shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with such a real property transaction or land use approval pursuant to clause (ii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with

35

an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (v) all of the provisions of this local law concerning any bid or proposal for a franchise or concession shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that such database includes, available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of entities with a bid or a proposal for such a franchise or concession; (vi) all of the provisions of this local law concerning a recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is a recipient of a grant pursuant to clause (v) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) all of the provisions of this local law concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (viii) all of the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that

36

there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity regarding an entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants  pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and (ix) all of the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through (viii) of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the Mayor and the Council an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the Mayor and the Council an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i) and (iv) shall be six months from the effective date of this local law; the deadline for certification of this section in relation to clauses (ii),  (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii)

shall be sixteen months from the effective date of this local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§38.  Sections twenty-one,thirty-fourand thirty-five of this local law shall take effect thirty days after the campaign finance board and department of information technology and telecommunications have certified to the mayor and council one component of the doing business database pursuant to section thirty-seven of this local law.

§39.  With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database.  Such report shall contain the status of each of the components enumerated in clauses (i) through (viii) of section thirty-three of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law.  If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect.  Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§40. The mayor, the council and the campaign finance board shall form a task force to study the feasibility of including spouses, domestic partners, and unemancipated children in the restrictions on contributions from persons doing business with the city.

§41.  Sections three through seven, nine, ten, thirteen through twenty, and twenty-two through thirty-three thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date.

The City of New York, Office of the City Clerk, s.s.:

I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on June 27, 2007 and approved by the Mayor on July 3, 2007.

Michael McSweeney, First Deputy City Clerk
Acting City Clerk of the Council.

CERTIFICATION PURSUANT TO MUNICIPAL HOME RULE LAW $27
Pursuant to the provisions of Municipal Home Rule Law $27, I hereby certify that the enclosed Local Law (Local Law 034 of 2007, Council Int. No. 586-A) contains the correct text and:

Received the following vote at the meeting of the New York City Council on June 27, 2007:
44 For, 4 Against, 0 Not Voting
Was signed by the Mayor on July 3, 2007
Was returned to the City Clerk on July 3, 2007.

Jeffrey D. Friedlander, Acting Corporation Counsel.

# EXHIBIT J

# LOCAL LAWS
## OF
## THE CITY OF NEW YORK
### FOR THE YEAR 2007

---

### No. 67

---

Introduced by Council Members Felder and Sears (by request of the Mayor)

### A LOCAL LAW

### To amend the administrative code of the city of New York, in relation to campaign finance.

*Be it enacted by the Council as follows:*

Section 1. Subdivisions 18 and 20 of section 3-702 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, are amended to read as follows:

18. a. The term "business dealings with the city" shall mean (i) any contract *(other than an emergency contract or a contract procured through publicly-advertised competitive sealed bidding) which is* for the procurement of goods, [or] services or construction that is entered into or in effect with the city of New York or any agency or entity affiliated with the city of New York [[(other than a contract procured through competitive sealed bidding, or one or more contracts with a single person or entity for the procurement of goods or services totaling not more than] *and is valued at or above* the dollar value [set forth] *defined* in [section 6-116.2(i)(3)(a)] *subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2* of the administrative code, or, [for construction totaling not more than] *with respect to a contract for construction, at or above* five hundred thousand dollars, or an emergency contract awarded pursuant to section 315 of the charter[)], and shall include any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith; *or* (ii) any acquisition or disposition of real property (other than a public auction or competitive sealed bid transaction or the acquisition of property pursuant to the department of environmental protection watershed land acquisition program) with the city of New York or any agency or entity affiliated with the city of New York; or (iii)

1

any application for approval sought from the city of New York pursuant to the provisions of section 195 of

the charter, any application for approval sought from the city of New York that has been certified pursuant

to the provisions of section 197-c of the charter, and any application for a zoning text amendment that has

been certified pursuant to section 201 of the charter; provided, however, that for purposes of this clause,

with respect to section 195 an applicant shall include the lessor of an office building or office space, and

with respect to section 197-c an applicant shall include a designated developer or sponsor of a project for

which a city agency or local development corporation is the applicant and provided, further, however, that

owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this

clause; or (iv) [one or more concessions] *any concession* (other than [concessions] *a concession* awarded

through *publicly-advertised* competitive sealed bid) or [franchises] *any franchise* from the city of New

York or any agency or entity affiliated with the city of New York [with] *which has an* estimated [aggregate

payments to the city of more than] *annual value at or above* the dollar value [set forth] *defined* in [section

6-116.2(i)(3)(a)] *subparagraph (a) of paragraph (3) of subdivision i of section 6-116.2* of the

administrative code [per fiscal year]; or (v) [one or more grants totaling not more than] *any grant that is

valued at or above* the dollar value [set forth] *defined* in [section 6-116.2(i)(3)(a)] *subparagraph (a) of

paragraph (3) of subdivision i of section 6-116.2* of the administrative code, received from the city of New

York or any agency or entity affiliated with the city of New York; or (vi) any economic development

agreement entered into or in effect with the city of New York or any agency or entity affiliated with the city

of New York; or (vii) any contract for the investment of pension funds, including investments in a private

equity firm and contracts with investment related consultants. In addition, for purposes of this chapter a

lobbyist as defined in section 3-211 of this title shall be deemed to be engaged in business dealings with the

city of New York during all periods covered by a registration statement. For purposes of clauses (i), (iv)

and (v) of this subdivision, all contracts, concessions, franchises and grants that are five thousand dollars or

less in value shall be excluded from any calculation as to whether a contract, concession, franchise or grant

is a business dealing with the city. For purposes of clauses (ii) and (iii) of this subdivision, the department

of city planning, in consultation with the board, may promulgate rules to require the submission by

applicants to the city of information necessary to implement the requirements of subdivisions 1-a and 1-b

of section 3-703 of this chapter as they relate to clauses (ii) and (iii) of paragraph (a) of this subdivision for

2

purposes of inclusion in the doing business database established pursuant to subdivision [(20)] *20* of this

section. [For purposes of this subdivision, actions, transactions, and agreements for the purpose of

providing affordable housing pursuant to the Private Housing Finance Law or the General Municipal Law

or any other city, state or federal program, including but not limited to actions, transactions and agreements

for such purposes which involve land dispositions, loans, grants, real property tax exemptions, zoning

bonuses, low income housing tax credits, rent subsidies, or agreements imposing limitations on the incomes

of residents or on the rents or other charges to be paid by such residents, shall not constitute business

dealings with the city of New York.]    For purposes of this subdivision, "agency or entity affiliated with

the city of New York" shall mean the city school district of the city of New York and any public authority,

public benefit corporation or not for profit corporation, the majority of whose board members are officials

of the city of New York or are appointed by such officials. *The department of housing preservation and*

*development shall promulgate rules setting forth which categories of actions, transactions and agreements*

*providing affordable housing shall and shall not constitute business dealings with the city of New York for*

*purposes of this subdivision.  The department shall consider the significance of the affordable housing*

*program and the degree of discretion by city officials in determining which actions, transactions and*

*agreements shall and shall not constitute such business dealings.  Notwithstanding any provision of this*

*subdivision, a housing assistance payment contract between a landlord and the department of housing*

*preservation and development or the New York city housing authority relating to the provision of rent*

*subsidies pursuant to Section 8 of the United States Housing Act of 1937, 42 USC 1437 et., seq., shall not*

*constitute business dealings with the city of New York for the purposes of this subdivision.*

     b.  Business dealings with the city as defined in this subdivision shall be [limited] as follows: for

purposes of clause (i) of paragraph (a) of this subdivision, bids or proposals on contracts for the

procurement of goods, services, or construction shall only constitute business dealings with the city of New

York for the period from the later of the submission of the bid or proposal or the date of the public

advertisement for the contract opportunity until twelve months after the date of such submission or

advertisement, and contracts for the procurement of goods, services or construction shall only constitute

business dealings with the city of New York during the term of such contract *(or in the case of purchase*

*contracts for goods, from the date of such purchase)* and for twelve months [after the end of such term]

3

*thereafter*, provided, however that where such contract award is made from a line item appropriation and/or discretionary funds made by an elected official other than the mayor or the comptroller, such contract shall only constitute business dealings with the city from the *date of* adoption of the budget in which the appropriation of such contract is included until twelve months after the end of the term of such contract; for purposes of clause (ii) of paragraph a of this subdivision, leases in which the city of New York is the proposed  lessee[,] shall only constitute business dealings with the city from the date the application for acquisition is filed pursuant to section 195 or the date of the certification of such application pursuant to section 197-c to a period of one year after the commencement of the lease term or after the commencement of any renewal and, where the city or any city affiliated entity is disposing of any real property interest, shall only constitute business dealings with the city from the date of the submission of a proposal and during the term of any agreement and one year after; for purposes of clause (iii) of paragraph (a) of this subdivision, applications for approval sought from the city of New York pursuant to the provisions of sections 197-c or 201 of the charter, except for applications for leases as described in clause (ii), shall only constitute business [dealing] *dealings* with the city from the date of the certification of such application to the date that is one hundred twenty days after the date of filing by the council with the mayor of its action pursuant to subdivision e of section 197-d of the charter or, in the case of a decision of the city planning commission for which the council takes no action pursuant to paragraph (3) of subdivision (b) of section 197-d of the charter, the date which is twenty days following the filing of such decision with the council pursuant to subdivision a of section 197-d of the charter, provided, however, that in the case of a disapproval of a council action by the mayor pursuant to subdivision e of section 197-d of the charter, such date shall be one hundred twenty days after expiration of the ten day period for council override pursuant to such section;  for purposes of clause (iv) of paragraph (a) of this subdivision, bids or proposals for franchises and concessions shall only constitute business dealings with the city of New York for the period from the submission of the bid or proposal until twelve months after the date of such submission, concessions shall only constitute business dealings with the city of New York during the term of such concession and for twelve months after the end of such term, and franchises shall only constitute business dealings with the city of New York for the period of one year after the commencement of the term of the franchise or after the commencement of any renewal; for purposes of clause (v) of paragraph (a) of this

4

subdivision, grants shall constitute business dealings with the city of New York for one year after the grant is made; for purposes of clause (vi) of paragraph (a) of this subdivision, economic development agreements shall  constitute business dealings with the city from the submission of an application for such agreement and during the term of such agreement and for one year after the end of such term; and for purposes of clause (vii) of paragraph (a) of this subdivision, contracts for the investment of pension funds, including the investments in a private equity firm and contracts with investment related consultants shall constitute business dealings with the city from the time of presentation of investment opportunity or the submission of a proposal, whichever is earlier, and during the term of such contract and for twelve months after the end of such term.

     c.    Notwithstanding anything in this subdivision, a person, as defined by subdivision 20 of section 3-702, who has submitted bids or proposals on contracts for the procurement of goods, services or construction or who has submitted bids or proposals for franchises or concessions that are no longer being considered for an award or a person who for any other reason believes he or she should not be on the database may apply to the city chief procurement officer or other person designated by the mayor for removal from the doing business database and shall be removed from the database upon a determination that said person should not be included in the database. *The city chief procurement officer may promulgate rules for a process by which a person, as defined by subdivision 20 of section 3-702, may apply to the city chief procurement officer for a waiver from inclusion in the doing business database as defined by such subdivision in instances in which such person is providing essential goods, services or construction such as those necessary for security or other essential government operations. Such rules shall provide that the city chief procurement officer shall transmit to the board a copy of any application for a waiver and any such waiver may not be granted prior to the expiration of ten days from the date such application is received by the board. Such rules shall also provide that any such waiver may be granted only after substantial efforts have been made by the city chief procurement officer to obtain the information required by this law. Such rules shall also provide that the city chief procurement officer may grant the waiver only upon a finding that it is in the best interests of the city, which finding shall only be made upon a determination that (i) there is a compelling need to obtain such essential goods, services or construction from the person seeking the exemption and (ii) no other reasonable alternative exists in light of such*

*considerations as cost, uniqueness and the critical nature of such goods, services or construction to the accomplishment of the purchasing agency's mission. Such rules may also provide that a waiver may be granted when a person is doing business with the city by virtue of the city's exercise of its powers of eminent domain. Any grant of a waiver shall be posted on the city's and the board's website in locations that are accessible by the public.*

      d.    A person, as defined by subdivision 20 of section 3-702, shall be considered to have business dealings with the city as of the date the person's name is entered in the doing business database, as such date is indicated in such database, or the date the person began doing business with the city, as such date is indicated in such database, whichever is earlier, except that the date on which the person is considered doing business with the city shall not be earlier than thirty days before the date the person's name is entered into such database.

      20.  The term "doing business database" means a computerized database accessible to the board that contains the names of persons who have business dealings with the city; provided, however, that for purposes of this chapter the doing business database shall not be required to contain the names of any person whose business dealings with the city are solely of a type for which the board has not certified that such database includes the names of those persons engaged in such type of business dealings with the city. Such database shall be developed, maintained and updated by the office of the mayor in a manner so as to ensure its reasonable accuracy and completeness; provided, however, that in no event shall such database be updated less frequently than once a month. Such computerized database shall contain a function to enable members of the public to determine if a given person is in the database because such person has business dealings with the city. For purposes of this definition, the term "person" shall include an entity that has business dealings with the city, any chief executive officer, chief financial officer and/or chief operating officer of such entity or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity, provided, however, that "entity" for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to subsection (3) of subdivision (a) of section 197-c of the charter or pursuant to section 201 of the charter or is a parent

company or an affiliated company of an entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a *high level* supervisory capacity, either by virtue of title or duties, in which substantial discretion *and oversight* is exercised over the solicitation, letting or administration of [any contract, franchise or concession, grant or economic development agreement with the city or application for any land use approval from the city] *business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals.*

§2. Subdivisions 1-a and 1-b of section 3-703 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

1-a.    Notwithstanding any inconsistent provision of this section, a participating candidate or his or her principal committee may *not* accept, either directly or by transfer, [a] *any* contribution or contributions for a covered election *in which he or she is a participating candidate* from a natural person who has business dealings with the city, as that term is defined in subdivision eighteen of section 3-702 of this chapter, if the aggregate of such contributions to such candidate from such person for [such election does not exceed] *all covered elections in the same calendar year exceeds*: (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred twenty dollars; *and* (iii) for member of the city council two hundred fifty dollars; *provided that a participating candidate or his or her principal committee may accept additional contributions which do not exceed one half the amount of the applicable limitation for any run-off primary election, additional day for voting held pursuant to section 3-108 of the New York state election law, special election to fill a vacancy, run-off special election to fill a vacancy, delayed or otherwise postponed election, or election held pursuant to court order which is a covered election and in which the candidate seeks nomination for election or election.* Any contribution made pursuant to this section shall not be a matchable contribution. For purposes of this subdivision, "person" shall include any chief executive officer, chief financial officer and/or chief operating officer of an entity which has business dealings with the city, any person employed in a senior managerial capacity regarding such an entity, or any person with an interest in such an entity which exceeds ten percent of the entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a *high level* supervisory capacity, either by virtue of title or duties, in which

7

substantial discretion *and_oversight* is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] *business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements and applications for land use approvals.* Notwithstanding any provision of this subdivision, the limitations on contributions contained herein shall not apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the contributor's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

1-b. Individuals and organizations having business dealings with the city of New York. a. Each participating candidate and his or her principal committee shall inquire of every individual or entity making, a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in subdivision 1-a of section 3-703, through a question, in a form prescribed by the campaign finance board, as to whether such individual, corporation, partnership, political committee, employee organization or other entity has business dealings with the city, as that term is defined in this chapter, and, if so, the name of the agency or entity with which such business dealings are or were carried on and the appropriate type or category of such business dealings. Such form shall contain in prominent typeface and in a prominent location the statement "If a contributor has business dealings with the City as defined in the campaign finance act, such contributor may contribute only up to two hundred fifty dollars for city council, three hundred twenty dollars for borough president and four hundred dollars for mayor, comptroller or public advocate." Upon receipt of the response to such inquiry (including any failure to respond), the principal committee shall keep a copy in its records and shall report each contribution to the board on the next applicable filing deadline in accordance with the board's disclosure schedule. The board shall check each contribution against the doing business database and shall notify the principal committee within twenty days of the reporting of such contribution if a contribution exceeding the doing business contribution limitation set forth in subdivision 1-a of section 3-703 is subject to such limitations of this subchapter or if a contribution is not matchable pursuant to such subdivision. Notwithstanding any provision in this subdivision, in the six weeks preceding the covered election the board shall provide such notification to the

8

principal or authorized committee within three business days of the reporting of such contribution to the board in accordance with applicable reporting deadlines. If the board fails to notify the principal committee that a contribution is in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter in accordance with this subdivision, any such contribution shall be deemed valid for purposes of such limitation, provided, however, that no such contribution shall be matchable. Such principal committee shall have twenty days from the date of any such notification to return the amount of any contribution in excess of the limitations set forth in subdivision 1-a of section 3-703 to the contributor. No violation shall issue and no penalty shall be imposed where such excess amount is postmarked or delivered within twenty days of such notification by the board and the board shall not designate a candidate as having accepted a contribution in excess of such limitations where such excess has been returned in accordance with the time limitations set forth herein. Failure to return such excess amount in accordance with the provisions herein shall not result in the board withholding public funds for which the participating candidate's principal committee is otherwise eligible pursuant to section 3-705 of this chapter; provided, however, that the board may deduct an amount equal to the total unreturned contributions in excess of the limitations set forth in subdivision 1-a of section 3-703 of this chapter from such payment of public funds. For purposes of this section, "individual" shall include any chief executive officer, chief financial officer, and/or chief operating officer of an entity or persons serving in an equivalent capacity, any person in a senior managerial capacity regarding an entity, or any person with an interest in an entity, which exceeds ten percent of the entity. For purposes of this subdivision, the phrase "senior managerial capacity" shall mean a *high level* supervisory capacity, either by virtue of title or duties, in which substantial discretion *and oversight* is exercised over the solicitation, letting or administration of [any contract, franchise, or concession, grant or economic development agreement with the city or application for any land use approval from the city] *business transactions with the city, including contracts, franchises, concessions, grants, economic development agreements, and applications for land use approvals.* Notwithstanding any other provision of this section, no participating candidate shall be liable for any fine or penalty for the failure of any contributor to respond to any such request or for any erroneous response.

§3. Subparagraph (i) of paragraph c of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

9

(i) the tenth day of June in the year of the covered election, or such other later date as the board shall provide, provided, however, that any candidate who files such written certification prior to such date shall be permitted to rescind such certification in writing on or before such date;

§4. Subdivision 10 of section 3-705 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

10.    [Participating candidates] *A participating candidate* who [lose] *loses* in the primary election but [remain] *remains* on the ballot for the general election must certify to the board *before receiving public funds* that [they] *he or she* will actively campaign for office; [by including,] *such campaign activity shall include,* but not *be* limited to, raising and spending funds, seeking endorsements, and broadly soliciting votes [before receiving public funds].

§5. Subdivision 4 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

4. The campaign finance board shall make possible payment within four business days after receipt of reports of matchable contributions, or as soon thereafter as is practicable, but not earlier than the earliest dates for making such payments as provided in subdivisions five and six of section 3-709; provided, however, that the board shall withhold up to five percent of all public funds payments to participating candidates until the final pre-election payment for any given election. The board shall schedule a minimum of three payment dates within the thirty days prior to a covered election. For purposes of such payment dates, the board shall provide each candidate with a written determination specifying the basis for any non-payment. The board shall provide candidates with a process by which they may immediately upon receipt of such determination petition the board for reconsideration of any such non-payment and such reconsideration shall occur within five business days of the filing of such petition. In the event that the board denies such petition then it shall immediately notify the candidate of [its] *his or her* right to [appeal to appeal] *bring a special proceeding* pursuant to article 78 of the civil practice law and rules.

§6. Subparagraph (i) of paragraph (b) of subdivision 5 of section 3-709.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, and subdivision 12 of section 3-709.5 of the administrative code of the city of New York, as added by local law 34 for the year 2007, are amended to read as follows:

10

(b)(i)    Except as otherwise provided in subparagraph (ii) below, each debate for a primary, general or special election shall include only those participating candidates or limited participating candidates the sponsor of each such debate has determined meet the non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board; provided, however, that the criteria for the first debate for a primary, general, or special election shall provide, among other criteria, (A) that a participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, (I) spent, contracted, or obligated to spend, and (II) received in contributions, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703, and (B) that a limited participating candidate shall be eligible to participate in such debate if he or she has, by the last filing date prior to such debate, spent, contracted, or obligated to spend, an amount equal to or more than twenty percent of the threshold for eligibility for public funding applicable to participating candidates seeking the office for which such debate is being held contained in subdivision two of section 3-703; provided, however, that for the purpose of determining whether a candidate has met the financial criteria to be eligible to participate in such debate, only contributions raised and spent in compliance with the act shall be used to determine whether the candidate has raised and spent twenty percent of the threshold for eligibility for public funding applicable to participating candidates contained in subdivision two of section 3-703; provided, further, that the second debate for a primary, general, or special election shall include only those participating candidates or limited participating candidates who the sponsor has also determined are leading contenders on the basis of additional non-partisan, objective, and non-discriminatory criteria set forth in any agreement between the sponsor and the board.  Nothing in this provision is intended to limit the debates to the two major political parties.

12. The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate[,] held pursuant to this section 3-709.5.

§7. Paragraph b of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

11

b.  If the board determines that any portion of the payment made to a principal committee of a participating candidate from the fund was used for purposes other than qualified campaign expenditures, it shall notify such candidate and committee of the amount so disqualified and such candidate and committee shall pay to the board an amount equal to such disqualified amount; provided, however, that in considering whether or not a participating candidate shall be required to pay to the board such amount or an [amountless] amount less than the entire disqualified amount, the board shall act in accordance with the following:  (i) where credible documentation supporting each qualified campaign expenditure exists but is incomplete, the board shall not impose such liability for such expenditure; *and* (ii) where there is an absence of credible documentation for each [qualified campaign] *qualified campaign* expenditure,  the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls.

§8.  Subdivision 19 of section 3-702 of the administrative code of the city of New York, as added by section 17 of local law 34 for the year 2007, is renumbered as subdivision 21 and amended to read as follows:

[19] *21.*  a.  For purposes of campaigns that accept public funds pursuant to section 3-705 of this chapter, the terms "expenditure" and "campaign expenditure" shall include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures and expenditures subject to or exempt from the expenditure limitations of this chapter [pursuant to sections 3-706 and 3-712.  In addition, there]. *There* shall be a rebuttable presumption that the following expenditures are in furtherance of a political campaign for elective office; provided, however, that the presumptions contained in this subdivision shall not apply to an expenditure [made when the expenditure is] to a person or entity associated with the candidate [making such expenditure or on whose behalf such candidate's committee made such expenditure]; and provided further that in rebutting any such presumption the campaign finance board may consider factors including the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure.  For purposes of this subdivision a person or entity associated with a candidate [includes] *shall include the candidate's* spouse, domestic partner, child, parent, *or* sibling[,] or a person *or entity* with whom *or with which* the candidate has a business or other financial relationship:

12

1.    Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

2.    Contributions to candidates and political committees subject to the provisions of section 3-705(8);

3.    Community events including, but not limited to, events hosted by civic [associations] and neighborhood [association] *associations*; provided, however, that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

4.    Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

5.    Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however, that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

6.    Legal defense of a non-criminal matter arising out of a political campaign;

7.    Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

8.    A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

9.    Payment of non-criminal penalties or fines arising out of a political campaign;

10.    Costs incurred in demonstrating eligibility for the ballot[,] *or* public funds payments or defending against a claim that public funds must be repaid; *and*

11.    Food and beverages provided to campaign workers and volunteers[; and].

b. Campaign funds shall not be converted by any person to a personal use which is unrelated to a political campaign. Expenditures not in furtherance of a political campaign for elective office include the following:

13

1.      Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate[,] or any other individual except for the provision of such expenses for professional staff as part of a compensation package;

2.      Any residential[,] or household items, supplies or expenditures;

3.      Clothing, haircuts and other personal grooming;

4.      Funeral, cremation[,] or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

5.      Automobile purchases;

6.      Tuition payments[,]*and* childcare costs;

7.      Dues, fees[,] or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

8.      Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

9.      Expenditures for non-campaign related travel, food, drink or entertainment; if a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the [person] *candidate* benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

10.      Gifts, except for brochures, buttons, signs and other campaign materials and token gifts valued at not more than fifty dollars that are for the purpose of expressing gratitude, condolences or congratulations.

§9. Paragraph (l) of subdivision 1 of section 3-703 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(l) not accept and his or her principal committee or authorized committees must not accept, either directly or by transfer, any contribution, loan, guarantee, or other security for such loan from any corporation, limited liability company, limited liability partnership[,] or partnership, other than a corporation, limited liability company, limited liability partnership[,] or partnership that is a political

committee as defined in subdivision eleven of section 3-702 of this chapter, for all covered elections held in the same calendar year in which he or she is a participating or non-participating candidate, provided, however, that where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company [or], limited liability partnership or partnership in the absence of further indicia that such contribution is from such an entity;

§10. Paragraph (j) of subdivision 2 of section 3-704 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(j) payment of any penalty or fine imposed pursuant to federal, state or local law;_or_

§11. Paragraph (a) of subdivision 2 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a) If the threshold for eligibility is met, the participating candidate's principal committee shall receive payment for qualified campaign expenditures of six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred [twenty-five] _twenty-two_ dollars in public funds per contributor in the case of a special election), obtained and reported to the campaign finance board in accordance with the provisions of this chapter.

§12. Subdivision 7 of section 3-705 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:    7. Notwithstanding any provision of this section to the contrary, the amount of public funds payable a participating candidate on the ballot in any covered election shall not exceed one quarter of the maximum public funds payment otherwise applicable under subdivision two of this section, unless:

[(b)]_(a)_ the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount which, in the aggregate, exceeds one-fifth of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

[(c)]_(b)_ the participating candidate has submitted a certified signed statement attesting to the need and stating the reason for additional public funds in such election, in which case the board shall

publish such statement at the time such additional public funds are paid, including on the board's internet website. Such statement must certify that (i) one or more of the following conditions [applies and provide documentation in support of such condition] *apply* and (ii) [that] such condition or conditions reasonably [demonstrates] *demonstrate* the need for such public funds[.], *and the participating candidate must provide documentation demonstrating the existence of such condition or conditions:*

(1)  the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2)  the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (ii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iii) endorsements of one or more membership organizations with a membership of over 250 members;

(3)  the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election.  For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name [in] *on* television[,] *or* radio *in the area of the covered election* or *in* print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however, that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4)  the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar *to the candidate's* so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child [hold or have held] *holds or has held* elective office in an area encompassing all or part of the area [that is the subject] of the [current] *covered* election in the past ten years.

The board shall be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and shall post such [certifications] *certified statements* and supporting documentation on its website.

[(d)]*(c)* the participating candidate is opposed in a primary or special election for an office for which no incumbent is seeking re-election.

If any of the conditions described in paragraphs (a), (b), *or* (c) [or (d)] occur in such election, the board shall pay any and all additional public funds due to the participating candidate up to the maximum total payment applicable in such election under subdivisions two or six of this section or subdivision three of section 3-706 of this chapter.

§13. Paragraph (a) of subdivision 1 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

(a)     Except as provided in paragraph (b) of this subdivision, in each primary election, in each special election to fill a vacancy, and in each general election, expenditures by a participating candidate or a limited participating candidate and his or her principal committee for one of the following offices shall not exceed the following amounts:

| | |
|---|---|
| mayor: | [$6,157,600] *$6,158,000* |
| public advocate or comptroller: | [$3,849,575] *$3,850,000* |
| borough president: | [$1,385,675] *$1,386,000* |
| member of the city council: | [$161,250] *$161,000* |

§14. Subdivision 2 of section 3-706 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

2. The following limitations apply to all expenditures made by a participating or limited participating candidate and his or her principal committee in the three calendar years preceding the year of the election for which such candidate chooses to file a certification as a participating or limited participating candidate pursuant to this chapter and to expenditures made at any time prior to such date for

17

services, materials, facilities, advertising or other things of value received, rendered, published, distributed or broadcast in such calendar years. Such expenditures by a participating or limited participating candidate for one of the following offices and his or her principal committee shall not exceed the following amounts:

| | |
|---|---|
| mayor, public advocate or comptroller: | [$290,250] *$290,000* |
| borough president: | $129,000 |
| member of the city council: | $43,000 |

§15. Subdivision 1 of section 3-710 of chapter 7 of title 3 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

1. The campaign finance board is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code. The board shall conduct its campaign audits in accordance with generally accepted government auditing standards, and shall [issue] *promulgate* rules regarding what documentation is sufficient in demonstrating financial activity. These audit and examination powers extend to all participating candidates, limited participating candidates, and non-participating candidates, and the principal and authorized committees of all participating, limited participating, and non-participating candidates, provided that:

a. Any draft audit, the subject of which is a participating, limited participating[,] or non-participating candidate, or the principal and/or authorized committees of any participating, limited participating[,] or non-participating candidate shall be completed within (i) eight months after the submission of the final disclosure report for the covered election for city council races and borough-wide races[;], and (ii) ten months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time;

b. The campaign finance board shall provide each candidate a final audit, which shall contain the final resolution of all issues raised in the draft audit; such final audit shall be provided to the candidate, where such candidate or such candidate's campaign manager or treasurer has completed audit training provided by the board, *within* (i) [within] fourteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) sixteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time. Where such candidate or such candidate's

18

campaign manager or treasurer has not completed audit training provided by the campaign finance board, such final audit shall be provided to such candidate *within* (i) [within] sixteen months after the submission of the final disclosure report for the covered election, for city council races and borough-wide races[;], and (ii) eighteen months after the submission of the final disclosure report for the covered election for citywide races, unless the subject of such audit consents in writing to a longer period of time.  Provided, however, that where the issuance of such final audit is preceded by a notice of violations and recommended penalties and/or a notice of repayment of public funds, such notice or notices shall include all potential penalties and/or repayment obligations and a notice of a candidate's right to a hearing pursuant to section 3-710.5 or section 3-710(4) of this chapter and shall be provided to the candidate according to the deadlines applicable to final audits as set forth in this paragraph.

      c. Any advice provided by board staff to a participating, limited participating, or non-participating [candidates] *candidate* with regard to an action shall be presumptive evidence that such action, *if* taken in reliance on such advice, should not be subject to a penalty or repayment obligation where such candidate[,] or such candidate's committee has confirmed such advice in a writing to such board staff by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt, [that describes] *describing* the action to be taken pursuant to the advice given and the board or its staff has not responded to such written confirmation within seven business days disavowing or altering such advice, provided that the board's response shall be by registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt.

      d.  Notwithstanding the provisions of paragraphs a and b of this [section] *subdivision*, if a committee has failed to respond to a request for information made by board auditors during the post-election audit process, the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: [(a)] *(i)* the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested[,]*;* and [(b)] *(ii)* the commencement of the tolling period pursuant to this section. If a committee has responded to a request for information made by board auditors but such response is inadequate, the time period for completing the draft and final audits shall be tolled and extended by the number of days

until an adequate response is provided, provided that the committee has received timely written notice of: [(a)]*(i)* the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested[,]; [(b)]*(ii)* the commencement of the tolling period pursuant to this section; and [(c)]*(iii)* the detailed reasons why the original response was inadequate.

e. Notwithstanding any provision of law to the contrary, the deadlines provided in [subdivisions] *paragraphs* a and b of this [section] *subdivision* for the completion of draft and final audits shall not apply in cases where the audit raises issues involving potential campaign-related fraud, potential other criminal activity, *or* activity that may constitute a breach of certification pursuant to rules of the board[,] or potential significant violations of the limits set forth in section 3-706.

f. Notwithstanding any provision of the law to the contrary, the deadlines provided in [subdivisions] *paragraphs* a and b of this [section] *subdivision* for the completion of draft and final audits shall not apply in the event that board operations are interrupted due to a catastrophic emergency such as a natural disaster or criminal event, provided that once board operations resume, the board shall within two weeks announce new deadlines for the completion of draft and final audits consistent with [provisions] *paragraphs* a and b.

§16. Paragraph (c) of subdivision 2 of section 3-710 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

2. (c)[ *(i)*] If the total of contributions, other receipts, and payments from the fund received by a participating candidate and his or her principal committee exceed the total campaign expenditures of such candidate and committee for all covered elections held in the same calendar year or for a special election to fill a vacancy such candidate and committee shall use such excess funds to reimburse the fund for payments received by such committee from the fund during such calendar year or for such special election. No such excess funds shall be used for any other purpose, unless the total amount of the payments received from the fund by the principal committee has been repaid.

§17. Subdivision 4 of section 3-710 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4. [[(a)]] No claim for the repayment of public funds shall be made against any candidate or committee without written notice to such candidate or committee, issued in a timely manner pursuant to

20

[the] all of the requirements of subdivision one of this section, and [a reasonable] *an* opportunity to appear before the board. Any such repayment claim shall be based on a final determination [to be] issued by the board following an adjudication before the board consistent with the procedures set forth in section 1046 of the charter unless such procedures are waived by the candidate or principal committee. Such final determination shall be included in and made part of the final audit which shall be issued within thirty days of such determination[-].

§18. Section 3-710.5 of the administrative code of the city of New York, as amended by local law 34 for the year 2007, is amended to read as follows:

§ 3-710.5 Findings of violation or infraction; adjudications; [or] final determinations. (i) The board shall determine whether a participating candidate, his or her principal committee, principal committee treasurer or any other agent of a participating candidate has committed a violation or infraction of any provision of this chapter or the rules promulgated hereunder, for which the board may assess a civil penalty pursuant to section 3-711 of this chapter. The board shall promulgate rules defining infractions, and such definitions shall include, but not be limited to, failures to comply with the provisions of this chapter or the rules promulgated hereunder that are limited and non-repetitive.

(ii)*(a)* The board shall give written notice and the opportunity to appear before the board to any participating, limited participating or non-participating candidate, his or her principal committee, authorized committee, committee treasurer or any other agent of such candidate, if the board has reason to believe that such has committed a violation or infraction before assessing any penalty for such action. Any such written notice of alleged violations shall be issued in a timely manner pursuant to all of the requirements of subdivision one of section 3-710 and shall precede the issuance of the final audit required pursuant to subdivision one of section 3-710. In the case of a written notice issued prior to the date of a covered election, or after the date of a covered election in[_]the case of a notice regarding an alleged failure to respond to a request for audit documentation, such notice may be issued prior to the issuance of a draft audit. Alleged violations and proposed penalties shall be subject to resolution by adjudication before the board consistent with the procedures of section 1046 of the charter, unless such procedures are waived by the candidate or principal committee; provided, however, that in the case of adjudications conducted prior to the date of a covered election, the board shall use the procedures of section 1046 of the charter only to the extent practicable, given the expedited nature

21

of such pre-election adjudications. The board shall issue a final determination within thirty days of the conclusion of the adjudication proceeding.

(b) The board shall include in every final determination: (i) notice of the [respondents'] *respondent's* right to bring a special proceeding challenging the board's final determination in New York State supreme court [brought] pursuant to article 78 of the civil practice law *and rules*; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law *and rules*.

§19. Subdivision 4 of section 3-711 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

4. Notwithstanding any provision of law *to the contrary*, any participating or limited participating candidate and his or her principal committee or any non-participating candidate and his or her authorized committees or any other person who [commit] *commits* any violation of this chapter or any rules promulgated hereunder and who [take] *takes* all steps necessary to correct such violation prior to receiving *written* notice from the board of the existence of the potential violation [pursuant to section 3-710.5] shall not be subject to any penalty for such violation.

§20. Section 3-720 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

§3-720. Tolling of time for notice of *alleged* violations [or penalties.] *and/or notice of repayment of public funds*. If a committee has failed to respond to a request for information made by board auditors or has inadequately responded during the post-election audit process and the board has satisfied the provisions of subdivision 1 of section 3-710, the time period for serving notice shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section.

§21. Paragraph (d) of subdivision 2 of section 3-801 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(d) not accept any donation or donations of money, goods, or services from any corporation, limited liability company, limited liability partnership or partnership not permitted to contribute pursuant to paragraph (l) of subdivision 1 of section 3-703 or from any person whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation *to a transition or inauguration entity authorized pursuant to subdivision one of this section* made by a natural person who has business dealings with the city [to a transition or inaugural committee] where such donation is from the candidate-elect[,] or from the candidate-elect's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage.

§22.  Subparagraph (iii) of paragraph a of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law 34 for the year 2007, is amended to read as follows:

(iii) [with regard to contributions raised on or] *for elections occurring* after January first, two thousand eight [for elections occurring after such date], the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand two hundred fifty dollars in public funds per contributor (or up to six hundred twenty five dollars in public funds per contributor in the case of special election); provided, however, that (A) participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding two-thirds of the expenditure limitation [provide] *provided* for such  office in subdivision one of this section.

§23.  Subparagraph (iii) of paragraph b of subdivision 3 of section 3-706 of the administrative code of the city of New York, as added by local law number 34 for the year 2007, is to read as follows:

(iii) [with regard to contributions raised on or] *for elections occurring* after January first, two thousand eight [for elections occurring after such date], the campaign finance board shall promulgate rules to provide that the principal committees of such participating candidates shall receive payment for qualified campaign expenditures that will provide the highest allowable matchable contribution to be matched by an amount up to one thousand five hundred dollars in public funds per contributor (or up to seven hundred fifty dollars in public funds per contributor in the case of special election); provided, however, that (A)

23

participating candidates in a run-[ ]off election shall receive public funds for such election pursuant to subdivision five of section 3-705 and shall not receive any additional public funds pursuant to this section, and (B) in no case shall a principal committee receive in public funds an amount exceeding [two-thirds] *one_hundred twenty-five percent* of the expenditure limitation [provide] *provided* for such office in subdivision one of this section.

§24. Paragraph (a) of subdivision 2 of section 3-703 of the administrative code of the city of New York, as amended by local law 58 of the year 2004, is amended to read as follows:

(a) The threshold for eligibility for public funding for participating candidates in a primary or general election, or special election to fill a vacancy, shall be in the case of:

(i) mayor, not less than two hundred fifty thousand dollars in matchable contributions comprised of sums up to [two hundred fifty]*one hundred seventy-five* dollars per contributor including at least one thousand matchable contributions of ten dollars or more;

(ii) public advocate and comptroller, not less than one hundred twenty-five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]*one hundred seventy-five* dollars per contributor including at least five hundred matchable contributions of ten dollars or more;

(iii) borough president, an amount equal to the number of persons living in such borough as determined by the last census multiplied by two cents in matchable contributions comprised of sums of up to [two hundred fifty]*one hundred seventy-five* dollars per contributor including at least one hundred matchable contributions of ten dollars or more from residents of the borough, or ten thousand dollars comprised of sums of up to [two hundred fifty]*one hundred seventy-five* dollars per contributor, whichever is greater.

(iv) member of the city council, not less than five thousand dollars in matchable contributions comprised of sums of up to [two hundred fifty]*one hundred seventy-five* dollars per contributor including at least seventy-five matchable contributions of ten dollars or more from residents of the district in which the seat is to be filled.

§25. Section 38 of local law 34 for the year 2007 is REPEALED, section 39 of local law 34 for the year 2007 is renumbered section 38, and sections 36, 37, and 38 of local law 34 for the year 2007 are amended to read as follows:

§36. Each city agency with which any person who has business dealings with the city conducts such business shall[,] provide appropriate assistance in developing the doing business data base and shall take such steps as necessary to collect such information as required pursuant to this local law. Each city agency with which any person who has business dealings with the city conducts such business shall, at the board's request, provide appropriate assistance to the board in publicizing this local law and the rules of the board in connection with contributions of persons who have business dealings with the city; provided, however, that *the* rules shall not be [provided] *applied* to persons in categories of doing business activities before such categories are certified by the campaign finance board in accordance with section [twenty-six] *thirty-seven* of this local law.

§37.  Sections one, two, eight, eleven, twelve and forty of this local law shall take effect immediately provided that the implementation of such sections shall take effect as follows:  (i) [all of] the provisions of such sections concerning the holding of contracts for the procurement of goods, services or construction shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] *and* persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding] of an entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (ii) [all of] the provisions of this local law concerning any bid or proposal for a contract for the procurement of goods, services or construction, *and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city contract pursuant to clause (i) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law* shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, *and* persons with an interest in an entity which exceeds ten percent of the entity *that has submitted a bid or proposal seeking such a contract,* and persons employed in

25

a senior managerial capacity of [entities that have submitted bids] *any entity holding such a contract or that has submitted a bid or proposal* seeking such a contract; (iii) the provisions of this local law concerning acquisition or disposition of real property, [applications for approvals] *any application for approval* sought pursuant to the provisions of section 195 [or] *of the charter, any application for approval sought from the city of New York that has been* certified pursuant to section 197-c of the [New York city] charter *and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter* shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity of an entity with [a real property transaction or land use approval] *an acquisition or disposition of real property or an application for approval sought pursuant to the provisions of section 195 of the charter, any application for approval sought from the city of New York that has been certified pursuant to section 197-c of the charter and any application for a zoning text amendment that has been certified pursuant to section 201 of the charter* pursuant to [clause] *clauses* (ii) *and (iii)* of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (iv) the provisions of this local law concerning franchises and concessions shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity[,] *and* persons with an interest in an entity which exceeds ten percent of the entity [and persons employed in a senior managerial capacity regarding an entity] with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (v) [all of] the provisions of this local law concerning any bid or proposal for a franchise or concession, *and the provisions regarding persons employed in a senior managerial capacity with respect to any entity with a city franchise or concession pursuant to clause (iv) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law,* shall take effect thirty days after the campaign finance

26

board and the department of information technology and telecommunications have certified to the mayor and council that such database [includes,] *identifies* available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, *and* persons with an interest in an entity which exceeds ten percent of the entity *that has submitted a bid or proposal seeking such a franchise or concession,* and persons employed in a senior managerial capacity [of entities with] *with respect to any entity holding such a franchise or concession or that has submitted* a bid or a proposal for such a franchise or concession; (vi) [all of] the provisions of this local law concerning a recipient of a grant shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] *with respect to any* entity that is a recipient of a grant pursuant to clause (v) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (vii) [all of] the provisions of this local law concerning a party to an economic development agreement shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] *with respect to any* entity that is an applicant for or a party to an economic development agreement pursuant to clause (vi) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; (viii) [all of] the provisions of this local law concerning a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies available information regarding chief executive officers, chief financial officers and/or chief operating officers or persons serving in an equivalent capacity, persons with an interest in an entity which

exceeds ten percent of the entity and persons employed in a senior managerial capacity [regarding an] *with respect to any* entity that is an applicant for or a party to a contract for the investment of pension funds, including investments in a private equity firm and contracts with investment related consultants pursuant to clause (vii) of paragraph (a) of subdivision 18 of section 3-702 of the code as added by section one of this local law; and (ix) [all of] the provisions of this local law concerning lobbyists shall take effect thirty days after the campaign finance board and the department of information technology and telecommunications have certified to the mayor and council that there is a doing business database that identifies lobbyists; and shall be applicable to all receipts, expenditures, and public funds claims after such effective dates for elections held after such effective dates; provided that, upon enactment of this local law, the campaign finance board shall take all necessary steps, including but not limited to the promulgation of forms and rules, to ensure the prompt implementation of this local law upon its effective date. Notwithstanding any provision of law to the contrary, the campaign finance board and the department of information technology and telecommunication may certify any component of the doing business database enumerated in clauses (i) through [(viii)] *(ix)* of this section as complete when it has determined that each component identifies such persons with reasonable completeness and accuracy. Notwithstanding any provision of law to the contrary, immediately upon certification of each component of the doing business database pursuant to this section, the department of information technology and telecommunications shall provide to the [Mayor]*mayor* and the [Council]*council* an analysis of the steps taken to compile the component of the database certified and the campaign finance board shall provide to the [Mayor]*mayor* and the [Council]*council* an analysis of the steps taken to ensure and test for reasonable completeness and accuracy. Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed. The deadline for certification of this section in relation to clauses (i), [and] (iv), *and (ix)* shall be six months from the effective date of this local law; the deadline for certification of this section in relation to clauses (ii), (v), (vi), (vii) and (viii) shall be one year from the effective date of this local law; and the deadline for certification of this section in relation to clause (iii) shall be sixteen months from the effective date of this

28

local law; provided, however, that any component of the doing business database that has not been certified on or before December 1, 2008 may not be certified until on or after November 30, 2009.

§[39] *38*. With its 2009 post-election report, the campaign finance board shall submit a report to the council on the status of the doing business database. Such report shall contain the status of each of the components enumerated in clauses (i) through [(viii)] *(ix)* of section [thirty-three] *thirty-seven* of this local law and whether each such component has been certified, for those components that have not been certified, if any, what the status is of the development of such component of the database and the expected timeline for such component's certification. The campaign finance board shall provide the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of this local law. If such proposals are submitted by the board, and such proposals are accepted by the council, or if the council fails to take action on such proposals within sixty days, such proposals shall take effect. Rejection of such proposals by resolution, or action by the council on amendments to the definition of business dealings with the city different from those contained in such proposals shall constitute action on such proposals.

§26. Section forty of local law 34 for the year 2007 is renumbered section 39 and section forty-one of local law 34 for the year 2007 is renumbered and amended to read as follows:

[§41] *§40*. Sections three through seven, nine, ten, thirteen through [twenty, and twenty-two through thirty-three] thirty-six and thirty-nine of this local law shall take effect on January 1, 2008; provided, however that such sections shall apply only to elections held on or after such effective date and shall be applicable to all public funds claims for elections held on or after such effective date, regardless of whether the claim for public funds was submitted prior to the effective date.

§ 27. This local law shall take effect immediately.

The City of New York, Office of the City Clerk, s.s.:

I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on December 19, 2007 and approved by the Mayor on December 31, 2007.

Michael McSweeney, First Deputy City Clerk
Acting City Clerk of the Council.

CERTIFICATION PURSUANT TO MUNICIPAL HOME RULE LAW §27

Pursuant to the provisions of Municipal Home Rule Law §27, I hereby certify that the enclosed Local Law (Local Law 67 of 2007, Council Int. No. 651-A) contains the correct text and:

Received the following vote at the meeting of the New York City Council on December 19, 2007:
41 For, 5 Against, 0 Not Voting
Was signed by the Mayor on December 31, 2007
Was returned to the City Clerk on December 31, 2007.

Jeffrey D. Friedlander, Acting Corporation Counsel.

# EXHIBIT K

DeNora M. Johnson, Esq.
Counsel to the Committee

Israel Rodriguez
Policy Analyst

Corinne Rivers
Policy Intern

Aaron Walker
Policy Intern



## THE COUNCIL

### REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION

Robert Newman, Legislative Director

Alix Pustilnik, Deputy Director, Governmental Affairs

### COMMITTEE ON GOVERNMENTAL OPERATIONS

Hon. Simcha Felder – Chair

**INT. NO. 586-2007:**    By The Speaker (Council Member Quinn) and Council Members Felder, Rivera, Comrie, Fidler, de Blasio, Dickens, Arroyo, Jackson, Garodnick, Gentile, Gerson, Gioia, Gonzalez, James, Lappin, Mark-Viverito, McMahon, Nelson, Recchia Jr., Reyna, Seabrook, Sears, Stewart, Vacca, Weprin, White Jr., Liu and Mendez (in conjunction with the Mayor)

**TITLE:**    A Local Law to amend the New York city charter and the administrative code of the city of New York, in relation to campaign finance.

## I.    INTRODUCTION

On Tuesday, June 12, 2007, the Committee on Governmental Operations, chaired by Council

Member Simcha Felder, will consider Introduction Number 586-2007 (the "bill"), the comprehensive campaign finance reform bill introduced by Council Speaker Christine Quinn and Chairman Simcha Felder in conjunction with Mayor Michael Bloomberg.  The bill would amend and add certain sections of the New York city charter ("Charter") and the administrative code of the city of New York ("Code") in relation to campaign finance to accomplish three goals:  (1) protect candidates by improving fairness, timeliness and responsiveness of the New York City Campaign Finance Board ("Board") and its staff; (2) make all rules clear, consistent and fair so candidates can easily comply with the New York City Campaign Finance Act ("Act") and the New York City Campaign Finance Program ("Program"); and (3) reduce the appearance of undue influence associated with contributions from those doing business with the City

        Specifically, the bill would:  (1) establish clear, hard deadlines for the completion of Board audits and fair procedures for candidates challenging Board determinations; (2) reduce the contribution limits for persons doing business with the city; (3) ban contributions from business entities, such as limited liability companies and partnerships; (4) expand the definition of intermediary; (5) rein in matching funds in non-competitive elections; and (6) encourage smaller contributions and provide a greater voice to everyday New Yorkers by implementing a 6-to-1 public matching fund ratio for contributions up to $175.

        Those invited to testify at this hearing include the Administration, Board, good government and advocacy groups, election attorneys and other interested parties.

## II.    BACKGROUND

        The Program was established in 1988 to increase participation in the electoral process regardless of access to wealth, and to reduce undue influence by small concentrations of large contributors and special interests.[1]  Since the Program's inception, it has proven to be a successful campaign finance program and a model for the nation.

        Pursuant to Charter section 1052, the Board is composed of five members,[2] who are

responsible for administering the Program in accordance with the Act, which is contained in Chapter 7 of Title 3 of the Code. The Board's powers are enumerated in subdivisions (5) through (12) of section 1052 of the Charter and throughout the Act. The Board's powers include, among other things, the power "to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of this code."[3]

## III.   ENCOURAGE PARTICIPATION AND FAIRNESS

In order to encourage participation and fairness, the bill seeks to: (i) improve due process for candidates in Board adjudications; (ii) establish audit safeguards and deadlines for ordering the return of public funds; (iii) increase the matchability of smaller contributions; and (iv) protect candidates in numerous other ways.

### A.  Due Process in Adjudications

Currently, when the Board issues a determination that public funds must be repaid, a candidate may not be aware of his or her ability to appear before the Board and be heard regarding the determination, and if they do choose to appeal, the process of doing so may be unclear, and can involve ex parte communication between Board staff, who serve an investigatory role, and the Board members themselves, who should be considering impartially the charges.
Section twenty-five of the bill would remedy part of this problem by specifying that the Board cannot issue a claim for repayment of public funds against any candidate or authorized committee without prior written notice to such candidate or committee and a reasonable opportunity to be heard by the Board.

Further, in order to ensure that the Board's conduct of hearings conforms with the due process protections afforded by the Citywide Administrative Procedure Act ("CAPA") as codified in chapter 45 of the Charter[4], section twenty-five of the bill would require that all repayment claims must be adjudicated before the Board in accordance with CAPA, unless the candidate waives the conduct of a formal hearing. Also, the Board would have to adjudicate all claims for the repayment of public funds within thirty days of its issuance of a notice of violations and recommended penalties, which would accompany a final audit.

Section twelve of the bill would ensure the Board's compliance with CAPA by creating a necessary firewall between the investigative and adjudicatory powers and functions of the Board's staff

and requiring that such divisions of the Board's staff must be separate and no staff member of the Board shall perform both investigative and adjudicatory tasks or functions.

## B.  Audit Safeguards & Deadlines for Returning Public Funds

According to the Board, as of February 26, 2007, approximately thirteen months from the final disclosure report due after the 2005 general election, the Board had completed only 53% of the 200 outstanding final audits.[5]  Further, as of May 10, 2007, the Board had only completed 65% of the outstanding 200 final audits from the 2005 election cycle.[6]  To the extent candidates are complying in a timely manner with Board requests for documents necessary to complete the audit in a timely manner, this lack of a deadline for completing Board audits is unacceptable because it does not provide candidates with closure about the audits from the previous election cycle in a reasonable time.

The bill would address this issue by amending several provisions of the Act and creating new provisions to impose obligations on the Board and candidates to reduce the time it takes the Board to complete audits.  The Board would also be required to provide candidates with timely resolution of repayment obligations and violations, if any, regarding past election cycles.  In creating such standards it is important to ensure that the Board may still fully audit campaigns to ensure compliance with the Act and recoup public funds in cases of violation.

First, in order to ensure that Board audits are compliant with the standards applied to other governmental audits, which could also reduce the time necessary to complete audits of campaigns. The bill would require the Board to conduct audits of campaigns in accordance with generally accepted government auditing standard ("GAGAS").  Some of the requirements of GAGAS as published by the United States General Accounting Office are:

1. Audit organizations performing audits in accordance with GAGAS must have an external peer review of their auditing practices at least once every three years by reviewers independent of the audit organization.

2. Auditors using GAGAS need to maintain their professional competence through continuing professional education by completing at least 80 hours of continuing professional education every 2 years.

3. Each audit organization performing audits using GAGAS should have an appropriate internal

quality control system to ensure compliance with GAGAS.

4.   Auditors should use a sample of expenses as documented by reasonable documentation to determine if further investigation of a category of expenses is warranted.[7]

Second, the bill would establish firm deadlines by which the Board must complete draft audits for participating, limiting participating, or non-participating candidates, which would be:

1. For City Council and borough wide races – eight months after the submission of the final disclosure for the covered election

2. For citywide races – ten months after the submission of the final disclosure for the covered election for citywide races.

If the candidate or their campaign manager participates in the Board's audit training, then the Board must complete the final audit for such participating, limited participating and non-participating candidate within the following timeframes, unless the subject of the audit consents to a longer period of time in writing:

1. For City Council and borough-wide races – fourteen months after the final disclosure for the covered election; and

2. For citywide races – sixteen months after the submission of the final disclosure for the covered election.

However, if the candidate or their committee does not participate in audit trainings, the final audit timeframe would be extended by an additional two months.  Further, if a committee fails to respond to the Board's request for additional information during the post-election audit process, the Board's time for completing the draft and final audits would be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, so long as "the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section."  In cases where the candidate or committee has provided Board auditors with an inadequate documentation relating to the post-election audit, "the time period for completing the draft and final audits shall be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response, provided that the committee has received

timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, (b) the commencement of the tolling period pursuant to this section and (c) the detailed reasons why the original response was inadequate." Finally, the aforementioned deadlines for the Board's completion of draft and final audits would not apply in cases involving potential violation of the expenditure limits contained in the Act, alleged campaign-related fraud, other criminal issues, or issues that may constitute a breach of certification Board rules.

The final audit would have to include the final resolution of all issues raised in the draft audit, except that where such final audit contains notice of violations and recommended penalties, the Board would also have to provide notice of a hearing in accordance with the requirements of CAPA.

Third, section twenty-six of the bill would require that if the Board determines that a participating candidate or his or her principal committee has committed a violation or infraction of the Act or Board rules, "[s]uch determination shall only be made pursuant to a notice of violation and recommended penalties accompanying a timely issued final audit following a timely issued draft audit." The Act currently requires the Board to provide the candidate written notice and the opportunity to appear before the Board before assessing any penalty for such action.[8] Section twenty-six of the bill would require that the Board send the candidate/committees formal notice of such right to appear before the Board when the Board sends the candidate or principal committee the final audit, unless such formal hearing is waived by the candidate or principal committee.

If the Board conducts a hearing regarding such allegations of violation and proposed penalties, the board must make its final determination within thirty days after the conclusion of the hearing. The final determination must provide the candidate with a final audit and any notice claiming repayment of public funds. In addition, the Board must include in every final determination: "(i) notice of the respondents' right to bring a special proceeding challenging the board's final determination in New York State supreme court brought pursuant to article 78 of the civil practice law and rules; and (ii) notice of the commencement of the four-month period during which such a special proceeding may be brought pursuant to article 2 of the civil practice law and rules."

Fourth, in order to provide campaigns with timely resolution with respect to any potential

violations issued pursuant to section 3-710.5 of the Act, section twenty-nine of the bill would add a requirement that any notice of violation or recommended penalties issued to a candidate must accompany the final audit.   But, if a candidate or committee has failed to respond to a request for information made by Board auditors or has inadequately responded during the post-election audit process, the Board's time for service notice would "be tolled and extended by the number of days by which the committee has exceeded the original deadline for a response," so long as "the committee has received timely written notice of: (a) the original deadline to provide the information, which shall not have been less than thirty days from the date such information was requested, and (b) the commencement of the tolling period pursuant to this section."

Finally, section 3-710 of the Act requires a candidate to use any excess funds to reimburse the campaign finance fund not later than ten days after all liabilities have been paid.[9]  Section twenty-four would remove the requirement that such reimbursement must be made "not later than ten days after all liabilities have been paid and in any event, not later than either the closing date of the final disclosure report, or the day on which the campaign finance board issues its final audit report for such participating committee, for such covered election, as shall be set forth in rules promulgated by the campaign finance board."  However, removing this specific payment date would not mean that candidates would not be responsible for reimbursing the campaign finance fund.

## C.  Increase Matchability of Smaller Contributions

Currently if a participating candidate meets the requisite threshold for eligibility, the participant will receive "payment for qualified campaign expenditures of four dollars for each one dollar of matchable contributions, up to one thousand dollars in public funds per contributor…"[10]  However, statistics show that small contributions from everyday New Yorkers are the majority of political donors. [11]  In attempting to eliminate the appearance of undue influence associated with contributions from "doing business" persons, and to equalize the voice of everyday New Yorkers in the political process, it is necessary to ensure that smaller contributions from average New Yorkers are important to candidates and to encourage candidates to seek those contributions.  It is also important to ensure that candidates from less affluent districts throughout the city still have access to sufficient funding to run successful

campaigns and are not discouraged from participating in the Program.

One way the bill would address these goals would be to increase the matchability ratio for smaller contributions of up to one hundred seventy five dollars. Section eighteen of the bill would amend the Act to provide that if the participating candidate meets the eligibility threshold, the principal committee would receive payment for qualified expenditures of "six dollars for each one dollar of matchable contributions, up to one thousand fifty dollars in public funds per contributor (or up to five hundred twenty-five dollars in public funds per contributor in the case of a special election)." Under the six to one matching ratio, the maximum matchable portion of the contribution would remain close to the current maximum of one thousand dollars; however, smaller contributions would earn a higher matching rate, which would incentivize such smaller contributions. While the full fiscal impact of this change is still being analyzed, it does not seem to be a substantial additional cost to the Program.

### D.  Other Candidate Protections

The Act currently requires that candidates that seek to participate in the Program must file a certification of intention to abide by the Act and Board Rules by the first day of June in the year of the covered election, or such other date as the Board shall provide by rule.[12]  However, there is no provision in the Act that permits a candidate that has filed a certification to subsequently rescind such certification and withdraw from the Program (and the necessity of complying with the stricter rules for participating candidates) because the candidate has determined he/she faces no opponent or decides that he/she will not need public funding.

Section three of the bill would address this problem in two ways.  First, it would extend the deadline by which a candidate has to file a certification of intention to participate in the Program to June tenth of the year of the covered election. This would allow candidates to determine whether they face a challenger in petitioning. Second, to the extent a candidate files a certification in advance of the June tenth deadline, such candidate can rescind such certification in writing to the Board on or before such date.  Both of these amendments would permit candidates to have more time to determine the competitive nature of their race and whether participating in the Program and accepting public funding is necessary.

Expenditures in the final days preceding an election can be the most crucial to a campaign and

the ability to budget properly and have final resolution about the amount of public funds that a participating candidate is entitled to and will receive is a vital part of that equation. Section five of the bill would attempt to provide campaigns with more clarity about whether they will receive public funds and establish a fairer system for challenging the Board's determination of non-payment of public funds.

Specifically, subdivision four of section 3-705 of the Act would be amended to require the Board to: (1) schedule at least three dates for the payment of public funds to eligible participating candidates in the thirty days prior to the covered election; and (2) issue a written final determination specifying the basis for any decision of non-payment of public funds to which the candidate believes he/she is entitled. Further, the bill would require the Board to allow candidates to petition the Board for reconsideration of any such non-payment determination, which shall occur within five business days of the filing of such petition. If the Board denies the participating candidate's petition, the Board must "immediately notify the candidate of its right to appeal to appeal pursuant to article 78 of the civil practice law and rules."

The bill would encourage candidates to be diligent and correct any errors they have made prior to submitting filings to the Board and protect candidates from punishment for such diligence by providing that if a candidate commits a violation of the Act or Board rules and takes all steps necessary to correct such violation prior to the issuance of a notice of a potential violation by the Board, the Board may not subject the candidate to any penalty for such self-corrected violation.

Each participating candidate is assigned a Board staff person, also known as a candidate service liaison ("CSL"), to assist the campaign with questions relating to compliance with the Program. However, candidates have often complained that the CSLs provide contradictory advice or incorrect advice, which the campaign may rely on and that may subsequently subject the campaign to penalty for following such advice. It is important that the Board is not discouraged from providing oral, informal advice to campaigns and is not be obligated to put all advice provided to campaigns in an official advisory opinion because that would be too burdensome. Campaigns, however, must be able to reasonably rely on oral advice provided by CSLs. The bill would protect both of these interests by specifying that if a CSL gives a candidate an oral opinion and the candidate confirms such opinion in writing to the CSL (via registered or certified mail to the correct address, or by electronic or facsimile transmission with evidence of receipt) describing the action to be taken and the advice provided by the

CSL and the Board or its staff does not respond to such writing within seven days disavowing or altering such advice, the candidate's reliance on the CSL's advice is lawful.

In order to make it easier for campaigns to comply with the disclosure requirements of the Act and the New York State Election Law, section twenty-two of the bill would require that "[a]ny disclosure software issued by the board on or after January 1, 2008 shall enable users to meet their electronic disclosure obligations under this chapter and under article 14 of the election law, as amended by chapter 406 of the laws of 2005".

Section four of the bill would require that participating candidates, their campaign managers, treasurers or persons with significant managerial control over a campaign attend a training provided by the Board explaining how to comply with the requirements of the Program and use of the Program software. Requiring such training would enable campaigns to be more familiar with the Board's practices and policies and make compliance easier.

## E.  Exempt Expenditures

Currently, the law provides that expenditures to comply with the Act or state election law, "including legal fees, accounting fees, the cost of record creation and retention, and other necessary compliance expenditures, and expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing of election results" are exempt from expenditure limits.[13] Since the list of exempt expenditures included broad categories, such as general compliance costs and costs relating to petition expenditures, it caused a lack of clarity for campaigns about whether the Board would ultimately determine that certain expenditures made by the campaign were not exempt expenditures. Further, it has allowed some candidates with an ability to raise additional funds outside the cap to do so, and claim as exempt, expenditures their opponent, who may not have the same ability to raise outside the expenditure limit, cannot make.

Therefore, section twenty of the bill would amend paragraph (a) of subdivision four of section 3-706 to narrow the definition of what constitutes a permissible exempt expenditure to:

(i) bringing or responding to any action, proceeding, claim or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or

with respect to election law or other law or regulation governing candidate or political committee activity or ballot status,

(ii) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results, shall not be limited by the expenditure limitations of this section, and

(iii) expenses related to the post-election audit.

It is not intended that exempting "expenses related to the post-election audit," however, would permit campaigns to continue to include all compliance related expenditures as exempt. Instead campaigns would be permitted to exempt solely those expenditures related directly to a campaign's preparation for a post-election Board audit.

The Act provides that if a candidate spends less than seven and one-half percent in exempt expenditures then the candidate/committee is not required to provide detailed documentation of such exempt expenditures ("safe-harbor").[14] Since the bill would severely reduce permissible exempt expenditures, it is important to ensure that campaigns would be able to pay for all expenditures that were previously, but will no longer be, considered exempt, for example general petitioning costs. Section twenty of the bill would amend subdivisions one and two of section 3-706 to increase the applicable expenditure limits by the safe-harbor amount for participants and limited participants in the primary and general elections and in the three years preceding the election. Candidates would be required to submit to the Board detailed documentation for all exempt expenditures regardless of what percentage of the campaign's expenditures is claimed as exempt.

## F.  Requirements for the Board

When the Board hears a case or issues a determination affecting a campaign, it is important for the legitimacy of the process that the Board members understand the complexities of elections and how the requirements of the Act and the Program affect campaigns, especially during peak times in the election cycle. The bill would provide Board members with this essential knowledge in two ways. First, sections nine and twenty one, which are identical sections of the bill that amend the Charter and the Code, respectively, would require that when the mayor and the speaker make appointments to the Board, they "shall consider campaign experience in general and particularly campaign experience with the New

York city campaign finance system."

In addition, members of the Board and staff would be required to undergo training. The mayor and the council, in conjunction with the Board, would develop the training to include the issues and problems confronted by campaigns for covered office and how the application and enforcement of the Act impacts these campaigns.

## IV.    CLARIFICATION AND SIMPLIFICATION OF THE PROGRAM

The bill would clarify and simplify the Program in several ways. Specifically, by: (i) improving the definition of "non-competitive elections;" (ii) specifying permissible campaign expenditures; (iii) creating standards for candidate liability; and (iv) clarifying among other things, the definition of intermediary.

### A.  Non-Competitive Elections & Statement of Need

Under the Act, a participating candidate on the ballot in the covered election is only eligible to receive one quarter (or 25%) of the maximum public funds payment, unless the participating candidate can demonstrate:

(a) the participating candidate is opposed by another participating candidate who has qualified to receive public funds in such election; or

(b) the participating candidate is opposed by a candidate and the board has determined that such other candidate and his or her authorized committees have spent or contracted or have obligated to spend, or received in loans or contributions, or both, an amount, which in the aggregate, exceeds one-fifth (or twenty percent) of the applicable expenditure limit for such office fixed by subdivision one of section 3-706 of this chapter for participating candidates; or

(c) the participating candidate has submitted a signed statement ("Statement of Need") attesting to the need and stating the reason for additional public funds in such election, in which case the board shall publish such statement at the time of such additional public funds are paid, including on the board's internet website.[15]

However, candidates have submitted the Statement of Need in cases where there may have been no real need or in the converse not submitted the Statement of Need in elections that were legitimately competitive. Either way, the issue has been subject to public scrutiny and editorial boards, good government groups and the Board have called for stricter standards for receipt of the public funds in so called "non-competitive elections."[16] Unfortunately, the question of when elections are competitive

and therefore should trigger public financing is a difficult issue to address legislatively. While it is important to protect the public fisc from paying public funds to "frivolous" campaigns, it is also important to acknowledge that elections may be made competitive based on more than just the spending of an opponent.

The first way that the bill would address this issue is by repealing paragraph (a) of subdivision 7 of section 3-705 and removing the automatic trigger of full public funds for a participating candidate in the case where such participating candidate's opponent has qualified for public funds.

Secondly, the bill would strengthen the requirements for what the candidate must attest to in the Statement of Need in order to trigger the full public funding for which the candidate is eligible. The candidate would be required to submit a *certified* signed statement indicating such need and certifying that: (i) one or more of the following conditions applies and provide documentation supporting the applicability of such condition; and (ii) such condition or conditions reasonably demonstrates the need for such public funds. The conditions that the participating candidate would be required to demonstrate are:

(1) the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance;

(2) the participating candidate is opposed by a candidate who has received (i) the endorsement of a citywide or statewide elected official or a federal elected official representing all or a portion of the area covered by the election; (iii) two or more endorsements from other city elected officials who represent all or a part of the area covered by the election; or (iv) endorsements of one or more membership organizations with a membership of over 250 members;

(3) the participating candidate is opposed by a candidate who has had significant media exposure in the twelve months preceding the election. For purposes of this paragraph, significant media exposure shall mean appearance of the opponent or his or her name in television, radio or print media in general circulation in the area of the covered election at least twelve times in the year preceding the covered election; provided, however that the listing of names of candidates or potential candidates for a covered election without additional information concerning the opponent shall not constitute an appearance for purposes of this paragraph;

(4) the participating candidate is opposed by a candidate who has received twenty-five percent or more of the vote in an election for public office in an area encompassing all or part of the area that is the subject of the current election in the last eight years preceding the election;

(5) the participating candidate is opposed by a candidate whose name is substantially similar so as to result in confusion among voters, as determined by the board;

(6) the participating candidate in a city council or borough-wide race is opposed by a candidate who is a chairman or president of a community board or district manager of a community board; or

(7) the participating candidate is opposed by a candidate whose spouse, domestic partner, sibling, parent or child hold or have held elective office in an area encompassing all or part of the area that is the subject of the current election in the past ten years.

Upon the submission of the such Statement of Need to the Board, the Board would be authorized to verify the truthfulness of any certified statement submitted pursuant to this paragraph and of any supporting documentation and shall post such certifications and supporting documentation on its website.

The bill would also provide that any primary or special election for which there is no incumbent would be deemed competitive for purposes of triggering full public funding under the Act.

## B.  Permissible Expenditures for Private & Public Money

In order to qualify for public funds, a participating candidate must meet a threshold of eligibility in a primary or general election, or special election to fill a vacancy.[17]  However, the law is currently silent on how authorized committees may permissibly spend their privately raised campaign funds.  If the Board determines that an expenditure was non-campaign related, it could result in an obligation to repay public funds under the Act.[18]  Board advisory opinions have attempted to clarify permissible expenditures for the privately raised money, however, the substantial amount of time it takes the Board to issue such advisory opinions and the lack of clarify of such opinions can be troublesome to a campaign in the final days before an election.

Section fourteen of the bill, therefore, would insert necessary clarity in the Act for campaigns that accept public funds by defining "expenditure" or "campaign expenditure" to "include all payments and liabilities in furtherance of a political campaign for covered office, including, but not limited to, all qualified campaign expenditures."  Further, there would be a *rebuttable presumption* that the list of "expenditures" or "campaign expenditures" is "in furtherance of a political campaign for elective office."  However, the presumption that the expenditure is valid would not apply "to an expenditure made when the expenditure is to a person or entity associated with the candidate making such expenditure or on whose behalf such candidate's committee made such expenditure."  A person or entity

associated with the candidate would include "a spouse, domestic partner, child parent or sibling; a person with whom the candidate has a business or other financial relationship." The Board would also be able to rebut such presumption by considering factors including "the timing of the expenditure and whether the campaign had an unusually high amount of spending on a particular type of expenditure."

The bill enumerates the following expenditures as presumptively valid:

(a)  Contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the internal revenue code;

(b)  Contributions to candidates, registered political committees subject to the provisions of section 3-705(8);

(c)  Community events including, but not limited to, events hosted by civic associations and neighborhood association; provided, however that this presumption shall not apply to sporting events, concerts, theater or other entertainment events which shall be subject to the provisions of paragraph b;

(d)  Ballot proposal advocacy where there are indicia that the expenditure relates to the candidate;

(e)  Travel related solely and exclusively to a political campaign for a covered office or the holding of public office; provided, however that any travel not related solely and exclusively to a political campaign or the holding of public office shall be subject to the provisions of paragraph b;

(f)  Legal defense of a non-criminal matter arising out of political campaign;

(g)  Computer hardware, software and other office technology purchased more than two weeks before the date of a primary election, in the case of a candidate who is opposed in the primary election, or two weeks before the date of a general election, in the case of a candidate who was not opposed in a primary election;

(h)  A post-election event for staff, volunteers and/or supporters held within thirty days of the election;

(i)  Payment of non-criminal penalties or fines arising out of a political campaign; and

(j)  Costs incurred in demonstrating eligibility for the ballot, public funds payments or defending against claim that public funds must be repaid.

The bill also would clarify that participants, limited participants and non-participants cannot convert campaign funds to a personal use, which is unrelated to a political campaign, and the following expenditures would not be in furtherance of a political campaign for elective office:

(1)  Expenditures to defray the normal living expenses of the candidate, immediate family of the candidate, or any other individual except for the provision of such expenses for

professional staff as part of a compensation package;

(2)    Any residential, or household items, supplies or expenditures;

    (3)    Clothing, haircuts and other personal grooming;

(4)    Funeral, cremation, or burial expenses including any expenses related to a death within a candidate's or officeholder's family;

    (5)    Automobile purchases;

(6)    Tuition payments, childcare costs;

(7)    Dues, fees, or gratuities at a country club, health club, recreational facility or other nonpolitical organization unless part of a specific fundraising event that takes place on the organization's premises;

(8)    Admission to a sporting event, theater, concert or other entertainment event not part of a specific campaign activity;

(9)    Expenditures for non-campaign related travel, food, drink or entertainment; If a candidate uses campaign funds to pay expenses associated with travel that involves both personal activities and campaign activities, the incremental expenses that result from the personal activities shall be considered for personal use unless the person benefiting from the use reimburses the campaign account within thirty days for the full amount of the incremental expenses; and

    (10)    Gifts, except brochures, buttons, signs and other campaign materials.

Section sixteen of the bill would clarify that participating candidates must agree that expenditures for purposes of "advocating a vote for or against a proposal on the ballot in an election that is also a covered election shall be subject to the contribution and expenditure limitations applicable in such covered election." Section twenty-eight of the bill would make sure that this requirement is applicable to limited participating requirements by including such provisions in section 3-718 of the Act.

Section seventeen of the bill would add two new paragraphs to subdivision 2 of section 3-704 of the Act to specify that public funds may not be used for:

an expenditure made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, other than expenditures made also to further the participating candidate's nomination for election or election; and payment of any penalty or fine imposed pursuant to federal, state or local law.

## C.  Candidate Liability for Repayment of Public Funds

Currently, pursuant to section 3-710(2)(b) of the Act, candidates are not held personally liable for repaying public funds in cases where the Board determines that "any portion of the payment made to a principal committee of a participating candidate from the [New York City election campaign finance] fund was used for purposes other than qualified expenditures."[19]   In those cases, "[the Board] it shall notify such committee of the amount so disqualified and such *committee* shall pay to the board an amount equal to such disqualified amount" *(emphasis added)*.[20]   The candidate may, however, be subject to a civil penalty up to $10,000 for such violation of the Act.[21]   However, when a candidate decides to participate in the Program, the Board requires that the candidate and the treasurer sign a certification that includes provisions that a candidate can be held personally liable for repaying public funds that the Board determines were not spent for purposes of qualified expenditures pursuant to sections 3-710 and 3-711 of the Act.[22]

Edwin Ortiz, a participating candidate, challenged the Board's authority to hold participating candidates personally liable pursuant to section 3-710(2)(b) of the Act.[23]   The Supreme Court, New York County, held in favor of the Board and awarded a judgment. Ortiz and other defendants appealed this decision to the New York State Appellate Division for the First Department, which in overturning the lower court decision took the opportunity to call on the City Council to address the apparent loophole in the law regarding candidate liability.[24]

The bill would address this issue in section seven of the bill to provide for participating candidate personal liability for repaying public funds not spent on qualified expenditures.  "[W]here there is an absence of credible documentation for each expenditure, the board may impose liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to trained staff, internal procedures to follow published board guidelines and procedures to follow standard financial controls." However, "where credible documentation supporting each expenditure exists but is incomplete."  This provision would balance two very important concerns:  (1) that the public fisc be protected to ensure that when participating candidates impermissibly spend public funds there is a way to recoup such impermissibly spent public funds; and (2) that participating candidates not be discouraged from participating in the Program for fear that they will be held personally liable for repaying public funds if they make an honest mistake or  rely

on information provided to them by Board staff.

The bill, however, would not provide for treasurer liability because treasurers are often volunteers that assist a campaign due to a relationship with the participating candidate. If liability were extended to them, we fear it would discourage treasurers from volunteering for such campaigns.

## D.  Definition of Intermediary

Section thirteen of the bill would amend subdivision twelve of section 3-702 to expand the definition of intermediary. Currently, participating or limited participating and non-participating candidates must report contributions to the Board that were **delivered** through an intermediary.[25] The Act defines an intermediary as "an individual, corporation, partnership, political committee, employee organization or other entity which, other than in the regular course of business as a postal, delivery or messenger services, delivers any contribution from another person or entity or other authorized committee."[26] However, under the current definition, unless the intermediary actually delivers the contribution to the candidate or political committee, the campaign does not have to disclose that the person is an intermediary.

The bill would expand the definition of intermediary to cover the aforementioned persons that "solicit contributions to a candidate or other authorized committee where such solicitation is known to such candidate or his or her authorized committee." The candidate or authorized committee would be presumed to know that a person was a solicitor of the contribution if this information was clearly identified to the candidate or his or her authorized committee. This expansion of the definition would ensure that the law covers scenarios such as when a person solicits contributions, but does not personally deliver such solicited contributions. The bill would also "hosts of a campaign sponsored fundraising event" to the exemptions already in the law so that they would not be included in the definition of intermediary. The bill would also clarify that for non-campaign sponsored fundraising events, if there are multiple individual hosts, the hosts must only designate one such host as the intermediary.

## V.    REDUCE APPEARANCE OF UNDUE INFLUENCE

The bill would reduce the appearance of undue influence associated with certain contributions in several ways: (i) regulate contributions from those with business dealings with the City; (ii) ban contributions from businesses such as LLCs and partnerships; and (iii) conform the rules for transition

and inaugural entities (TIE) to those of campaign committees.

### A.   Contributions from those Doing Business with the City

Charter section 1052(11)(a) authorizes the Board to issue rules regulating contributions "from individuals and entities doing business with the city, including rules that determine which business dealings shall be covered by such rules."[27]   In studying this issue, the Board issued a report in 2006 titled "Interim Report of the New York City Campaign Finance Board on 'Doing Business' Contributions" ("Doing Business Report").[28] Based on the Board's analysis of contribution information available via the VENDEX and lobbying databases, the Doing Business Report concluded that contributions from those doing business with the City accounted for at least twenty percent of all contributions in the 2001 and 2005 cycles.

While there is nothing intrinsically wrong with contributions from those doing business with the City, the ability of such individuals to contribute could create a perception, regardless of whether such perception is accurate, that such individuals have a higher level of access to the City's elected officials. It is important to eradicate this perception and reduce the appearance of undue influence associated with contributions from individuals doing business with the City.

Section two of the bill would accomplish this goal by adding two new subdivisions to section 3-703, 1-a and 1-b to regulate contributions from those with business dealings with the city." Subdivision 1-a of section 3-703 would provide that "a participating candidate or his or her principal committee may accept, either directly or by transfer, a contribution or contributions for a covered election from a natural person who has or within the past twelve months (or in the case of an application for land use approval within one hundred and twenty days from the date of the final action on such application) has had business dealings with the city…if the aggregate of such contributions to such candidate from such person for such election does not exceed: (i) for the office of mayor, public advocate or comptroller four hundred dollars; (ii) for borough president three hundred dollars; (iii) for city council two hundred fifty dollars." Such contributions would not be matchable with public funds.  For purposes of this subdivision the persons that would be covered by the above contribution limits would include "any officer of an entity which has or within the past twelve months has had any business dealings with the city, any person employed in a managerial capacity regarding such an entity, or any person with an

interest in such an entity which exceeds ten percent of the entity." However, such contribution limits would not "apply to any contribution made by a natural person who has business dealings with the city to a participating candidate or his or her principal committee where such participating candidate is the contributor, or where such participating candidate is the parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage."

Sections eight and nine of the bill would amend paragraph (b) of subdivision 1 of section 3-719 and paragraph (b) of subdivision 2 of section 3-719 of the Act, respectively, to require that the restrictions on accepting contributions from those with "business dealings with the city" also apply to non-participating candidates. It is vital to the Program that the restrictions on accepting contributions from those with "business dealings with the city" apply in the same manner to participants and non-participants to ensure that there is a level playing field. Thus, to the extent that such restrictions did not apply to non-participants in the Program, such restrictions would not apply to participants in the Program.

Section one of the bill defines "business dealings with the city" to mean:

(i) any contract for the procurement of goods or services or construction, with the city or any agency or entity affiliated with the city (other than a competitively sealed bid contract), entered into in the last twelve months totaling more than one hundred thousand dollars, or for capital projects totaling at least one million dollars, including any contract for the underwriting of the debt of the city of New York or any agency or entity affiliated with the city of New York and the retention of any bond counsel, disclosure counsel or underwriter's counsel in connection therewith and any contract for the related to the investment or consulting services of a private equity firm;

(ii) any real property transaction (other than a public auction or competitive sealed bid transaction) with the city of New York or any agency or entity affiliated with the city of New York, provided, however that in the case of leases in which the city of New York or any agency or entity affiliated with the city of New York is the lessee, the lessor shall only be deemed to be doing business for a period of one year after the commencement of the lease term; or

(iii) any application for approval sought from the city of New York that has been certified pursuant to the provisions of section 197-c of the charter; provided, however that owner-occupants of one, two and three family homes shall not be considered applicants pursuant to this clause; or

(iv) any concession or franchise from the city of New York or any agency or entity affiliated with the city of New York with payments to the city of more than one hundred thousand dollars per year, or

(v) one or more grants totaling more than one hundred thousand dollars received from the city of New York; or

(vi) any economic development agreement entered into or in effect with the city of New York, as such term is defined in section one of the bill which creates a new subdivision nineteen of section 3-702.

Section one of the bill defines "business dealings with the city" to include "capital projects totaling at least one million dollars." It is the intent of the Council that the threshold for capital projects would be five hundred thousand dollars. The Council intends to amend the bill to reflect this.

Section one of the bill also defines the "doing business database" to mean "a computerized database accessible to the board that contains the names of all persons who have business dealings with the city," except such components of the database that the Board has not yet certified as complete pursuant to section thirty-two of the bill. The Mayor would be required to develop, maintain and update such database at least once monthly to ensure its accuracy and completeness.

Section two of the bill also requires candidates to ask each contributor on a contribution card, the form of which would be developed by the Board, whether such contributor etc. "has or within the past twelve months has had business dealings with the city," and if so, indicate the applicable contribution limits as specified by section two of the bill. The candidate would be required to keep a record of such inquiry and response in its records and report each contribution to the Board at the next required filing. The Board would be required to check each contribution against the doing business database and notify the committee within twenty days of the reporting of such contribution if a contribution exceeds the doing business contribution limitation. In the six weeks preceding the election, the Board would be required to issue such response to the candidate within three business days. However, if the Board does not notify the candidate of such excess contribution in such timeframe, then "any such contribution shall be deemed valid for purposes of such limitation provided, however, that no such contribution shall be matchable."    If the Board notifies a candidate of a doing business contribution, the candidate would have twenty days to return the amount in excess of the contribution limits applicable to persons with "business dealings with the city." However, no violation or penalty would issue to a candidate if such excess amount was postmarked or delivered within such twenty-day period.

The candidate's failure to return such excess contribution would not result in "the board withholding public funds for which the participating candidate's principal committee is otherwise

eligible." However, the Board would be permitted to "deduct an amount equal to the total unreturned contributions in excess of the doing business limitations" from such payment of public funds.

Section six of the bill authorizes the Board to issue rules to implement the doing business restrictions contained in section two of the bill.

Section thirty-one of the bill provides that each city agency having business dealings with campaign contributors shall at the Board's request, provide appropriate assistance to the Board in developing the doing business database and in publicizing the bill and the rules of the Board in connection with doing business contributions. However, the Board would not be responsible for distributing rules regarding categories that of doing business activities that have not yet been certified as complete.

Section thirty-three of the bill specifies that twenty-four months after the enactment of the bill, the Board "shall submit a report to the council on the status of the doing business database." The report must contain the status of each of the doing business database components enumerated in clauses (i) through (viii) of section thirty-two of the bill and whether each such component has been certified. For those components that have not been certified, if any, the report must state the status of the development of each such component and the expected timeline for such component's certification.

Moreover, the Board would be required to provide "the council and the mayor with recommendations, if any, for exempting certain types of transactions, applications or agreements from the definition of business dealings with the city as defined in section one of the bill." If the Board submits its proposals to the council and the council accepts the proposals, or if the council fails to take action on such proposals within sixty days, such proposals would take effect.

Section thirty-four of the bill would require the mayor, the council and the Board to develop a task force "to study the feasibility of including spouses, domestic partners, and unemancipated children in the restrictions on contributions from persons doing business with the city."

## B.  Organizational Contributions & Permissible Contributors

The Act prohibits participants and non-participants from accepting corporate contributions.[29] However, there is a loophole in the law that permits similarly structured business entities, such as limited liability companies ("LLC"), limited liability partnerships ("LLP") and partnerships are still

permitted to contribute up to the full contribution limit. Although contributions from these entities are not matchable with public funds,[30] permitting these business entities to contribute has been a way to subvert the contribution limits because the Board rules only require that organizational contributions be attributed to the partner or owners where the contribution is greater than two thousand five hundred dollars.[31]

Section fifteen of the bill would close this loophole by expressly preventing LLCs, LLPs and partnerships from making contributions to participating or non-participating candidates from the business entity itself. This restriction would not prevent an individual owner of an LLC, LLP or partnership from making a contribution in his or her individual name.

_____ Section fifteen of the bill would also clarify that "where a contribution is from a contributor whose name is followed by a professional designation including but not limited to "M.D.", "Esq." and "C.P.A." the board shall not treat such contribution as coming from a corporation, limited liability company or partnership in the absence of further indicia that such contribution is from such an entity."

## C.  Contributions to Transition and Inaugural Entities

Under the Act, TIEs are permitted to accept contributions from corporations although campaign committees are not permitted to do so.[32] The bill would rectify this problem and create a standard that is clear and consistent for both campaign committees and TIEs by banning corporate contributions to TIEs and clarifying that TIEs cannot accept contributions from LLCs, LLPs partnerships, and persons doing business with the city except for "any donation made by a natural person who has business dealings with the city to transition or inaugural committee where such donation is from the candidate-elect, or from the parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage."

## VI.    EFFECTIVE DATE PROVISIONS

Section thirty-two of the bill provides that all of the restrictions on contributions from those doing business with the city contained in sections one, two, six, nine, thirty-one, thirty-three and thirty-four of the bill would become effective sixty days after the Board and the Department of Information Technology and Telecommunications ("DOITT") certify to the mayor and the council that the doing

business database identifies "officers, persons with an interest in an entity which exceeds ten percent of the entity and persons employed in a managerial capacity regarding such entity" for each category of doing business activities as previously enumerated.[33] The Board may certify that any component of the doing business database is complete "when it has determined that each component identifies such persons with reasonable completeness and accuracy."

Once the Board makes such a certification, DOITT must immediately provide to the mayor and the council a report containing "an analysis of the steps taken to compile the component of the database certified" and the Board must provide a report with "an analysis of the steps taken to ensure and test for reasonable completeness and accuracy." "Such report shall also demonstrate the process by which the department of information technology and telecommunications and the campaign finance board shall update the doing business database and ensure that names of persons no longer doing business with the city are removed."

Section thirty-two also mandates firm deadlines by which components of the doing business database must be certified. Specifically, the deadline for certification with respect to clauses:

(i) the holding of contracts for the procurement of goods, services or construction;
(iv) franchises and concessions; and
(viii) lobbyists

shall be six months from the effective date of the bill.

The deadline for certification with respect to clauses:

(ii) any bid for a contract for the procurement of goods, services or construction;
(v) a franchise or concession that is pending or that has been made;
(vi) recipients of a grant; and
(vii) party to an economic development agreement.

shall be one year from the effective date of the bill.

The bill currently provides that the deadline for certification with respect to clause (iii) the provisions of this local law concerning real property transactions or land use approvals certified pursuant to section 197-c of the New York city charter would be eighteen months from the effective date of the law.

In order to ensure that the bill would not take effect too close to the 2009 elections and cause unnecessary chaos in the Program, if any component of the doing business database has not been

certified on or before November 1, 2008, it may not be certified until on or after November 30, 2009. However, it is the intent of the Council that every component of the doing business database be operative for the 2009 election cycle. Therefore, the Council intends to amend the deadlines for certification of the real property transactions or land use approvals component of the database and the final date by which any component of the doing business database can be certified for applicability during the 2009 election cycle to reflect such intention.

Section thirty-five of the bill outlines that sections three, four, five, seven, and ten through thirty, provisions not relating to those in the doing business database, of the bill would take effect on January 1, 2008; "provided, however, that such sections shall apply only to elections held on or after such effective date."

---

[1] *See* Proceedings of the Council of the City of N.Y., Int. No. 906-A of 1987, enacted as Local Law 8 of 1988 (codified as N.Y.C. Charter, ch. 46 and N.Y.C. Admin. Code, title 3, ch. 7).

[2] *See* New York City Charter §1052 (2005).

[3] *See* Administrative Code of the City of New York §3-710(1) (2005).

[4] *See generally,* chapter 46 of the charter (2007).

[5] *See* Proceedings of the Council of the City of N.Y., transcript of Governmental Operations Committee hearing February 26, 2007.

[6] *See* Proceedings of the Council of the City of N.Y., transcript of Governmental Operations Committee hearing May 10, 2007.

[7] *See generally,* United States General Accounting Office, *Government Auditing Standards 2003 Revision*

[8] *See* Administrative Code §3-710.5 (2007).

[9] *See* Administrative Code §3-710(2)(c)

[10] *See* Administrative Code §3-705(2)(a) (2007).

[11] *See,* New York City Campaign Finance Board, Public Dollars for the Public Good: A Report on the 2005 Elections at page 40 (September 1, 2006) [hereinafter Report].

[12] *See* Administrative Code §3-703(1)(c)(i) (2007).

[13] *See* Administrative Code §3-706(4).

[14] *Id.*

[15] *See* Administrative Code §3-706(7)(2007).

[16] See Report at p. 131.

[17] *See* Administrative Code §3-703(2)(a) (2007).

[18] *See* Administrative Code §3-710 (2007).

[19] *See* Administrative Code §3-710(2)(b) (2007).

[20] *See* Administrative Code §3-710(2)(b)(2007).

[21] *See* Administrative Code §3-711 (2007).

[22] See administrative code §3-703(1)(c)(2007); see also Board Handbook available at www.nyccfb.info

[23] See Ortiz decision 2006 NY Slip Op 09532 (December 12, 2006) at page 1.

[24] Id. at 4.

[25] See administrative code §3-702(12).

[26] Id.

[27] See charter §1052(11)(a) (2007).

[28] *See generally,* Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions, dated June 19, 2006.

[29] See administrative code section 3-703(1)(l) (2007).

[30] *See* Administrative Code §3-702(3) (2007).

[31] *See* 52 RCNY 1-04 (2007).

[32] *See* Administrative Code §3-801(2)(b) (2007).

[33] *See* supra section 5A of this paper and supporting text for further specification on doing business categories.

# EXHIBIT L

Copyright 1998 The New York Times Company
The New York Times

September 26, 1998, Saturday, Late Edition - Final

**SECTION:** Section B; Page 4; Column 3; Metropolitan Desk

**LENGTH:** 747 words

**HEADLINE:** Mayor Vetoes Bill to Tighten Limits on Campaign Giving

**BYLINE:** By CLIFFORD J. LEVY

**BODY:**

Mayor Rudolph W. Giuliani vetoed a bill yesterday that seeks to curb the influence of money in municipal elections, but the move was largely symbolic because the leadership of the City Council has pledged a speedy override.

The bill would revamp New York City's campaign finance system for the first time since it was set up in the late 1980's, tightening limits on contributions and increasing the size of subsidies that the city would give candidates for their campaigns. With these provisions in place, candidates could spend less time raising money and wealthy interests would have less influence over the process, the bill's backers say.

In his veto message to the City Council, Mr. Giuliani said the bill was flawed when compared with the campaign finance measure proposed by his Charter Revision Commission. "The City Council has missed a real opportunity for significant reform," the Mayor wrote.

The Council Speaker, Peter F. Vallone, and the Public Advocate, Mark Green, who have both championed the bill, lashed out at Mr. Giuliani, calling his Charter commission a sham. The Speaker's aides said the Council, which passed the bill last month, 42 to 5, would easily override the veto in the next few weeks. The Democratic-controlled Council needs 34 votes to override.

Advocacy groups that support overhauling the campaign finance regulations quickly lined up against the Mayor. They lauded the Council bill and said the Charter commission's proposed referendum would have little impact.

The Mayor set up the commission to forestall an effort by Mr. Vallone to put a referendum on the ballot in November that could bar the city from spending money for a stadium for the Yankees in Manhattan. After considering a range of sweeping proposals for a referendum, the commission settled on a less ambitious one that would prohibit candidates from accepting campaign contributions from corporations.

The Council's bill -- which would change city law, not the Charter -- would encourage candidates participating in the city's voluntary campaign finance system to refuse corporate contributions by giving them more city aid if they did; but it would not ban the contributions outright. In his veto message, Mr. Giuliani said that while the bill had some worthy ideas, it was defective over all because the corporate contribution provision did not go far enough.

If the Charter proposal is approved by voters in November, it is unclear what will happen to the new rules approved by the Council. The discrepancies would probably have to be reconciled in court.

While the Mayor has said banning corporate contributions would be an important change, many campaign finance experts disagree. They point out that executives of corporations could still donate as individuals, and note that many large donations in city elections come from political action committees, as well as from law and real estate firms and other partnerships, which would not be barred from giving.

Mr. Vallone, the Democratic candidate for governor, has sought to use the legislation to contrast the city's campaign finance laws with the more lax state laws.

Mayor Vetoes Bill to Tighten Limits on Campaign Giving The New York Times September 26, 1998, Saturday, Late
Edition - Final

In a statement, he linked the veto to his opponent, Gov. George E. Pataki, and to Senator Alfonse M. D'Amato. "Mayor Giuliani's veto of a needed improvement to the nation's model campaign finance law is a disgrace," Mr. Vallone said. "But it is consistent with his new-found allegiance to the D'Amato-Pataki money machine." Deputy Mayor Joseph J. Lhota called Mr. Vallone's comments "disgusting," saying that he was being reckless because his campaign was struggling.

Mr. Giuliani's aides said he did sign two other bills that were approved by the Council. One would require that the committees that candidates set up for inaugurations and transitions abide by the same limits and disclosure rules as in campaigns. The other would prohibit city officials from appearing in advertisements sponsored by the city in election years.

Those two bills are considered far-reaching, but they were overshadowed by the debate over the veto of the campaign finance bill. Mr. Lhota said the Mayor was "trying to move campaign finance law to a higher level."

Two advocacy groups, Common Cause New York and the New York Public Interest Research Group, called the Mayor a hypocrite. "A decade ago, Mayor Giuliani was one of the city's leading political reformers," the public interest group said in a statement. "Today, he forfeits that title."

**LOAD-DATE:** September 26, 1998

# EXHIBIT M

 New York City Campaign Finance Board

| candidates | press | public |

**home / about us / contact us / site map / site search**

Advisory Opinion 1999-4 (January 15, 1999)

**SUMMARY**

Candidates participating in the Campaign Finance Program may accept contributions from limited liability companies.

**FULL TEXT**

Re: Administrative Code §3-703(1) (f), (1-a), (6); Charter §1052(a) (12); Op. No. 1999-4

An advisory opinion has been requested on whether candidates participating in the voluntary Campaign Finance Program may accept contributions from limited liability companies ("LLC's")[1]. Two recently adopted laws prohibit participating candidates from accepting contributions from corporations. New York City Administrative Code §3-703(1-a); New York City Charter §1052(a) (12). See Advisory Opinion No. 1998-2 (October 23, 1998) and Advisory Opinion No. 1999-3 (January 7, 1999).

In examining whether LLC's are subject to the corporate contribution limit of New York State Election Law §14-116, the State Board of Elections held that LLC's are not corporations. State Board of Elections 1996 Opinion No. 1 (October 30, 1996)[2]. There is no indication that either the City Council or the Charter Revision Commission intended to treat contributions from an unincorporated organization, such as an LLC, in the manner prescribed for contributions from corporations.

Thus, the Board concludes that LLC's are not corporations under Administrative Code §3-703(1-a) and Charter §1052(a) (12). Participating candidates may accept contributions from LLC's subject to the contribution limits and disclosure requirements of

New York City Campaign Finance Board: Campaign Finance Law: Advisory Opinion 1999-4

the Campaign Finance Act. See Administrative Code §3-703(1) (f), (6).

# NEW YORK CITY CAMPAIGN FINANCE BOARD[3]

[1] The request was made by Isaac Schwartz, on behalf of City Council candidate Joseph Dweck, by letter dated January 8, 1999.

[2] The Federal Election Commission ("FEC") has also addressed whether LLC's are corporations. See, e.g., FEC Advisory Opinions No. 1998-11 and No. 1998-15 (both September 3, 1998); also 63 Fed. Reg. 243 (December 18, 1998) (proposed regulations).

[3] Newly-appointed Boardmember Dennis Mehiel did not participate in the deliberation on this Advisory Opinion.

Return to Advisory Opinions by Year

To get copies of Advisory Opinions or to be placed on a mailing list for all Advisory Opinions issued by the Campaign Finance Board, please contact the Board's Candidate Services Unit at (212) 306-7128/31.

submit          site search

©2008 NYC Campaign Finance Board \ Privacy Statement \ Accessibility