# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

OGNIBENE, *et al.*,

       *Plaintiffs*,

   -against-      C.A. No. 08 CV 01335 (LTS) (TDK)

PARKES, *et al.*,

       *Defendants*.

## PLAINTIFFS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION
## CONSOLIDATED BY THE COURT WITH THE MERITS
## AS TO COUNTS II, III, IV, VI, VII, VIII, AND IX

### –AND–

## RESPONSE MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
  * Admitted pro hac vice for this case
on May 7, 2008 by order of the Honorable
Laura T. Swain, District Court Judge.

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Procedural Posture of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Plaintiffs Have Standing, And Their Claims Are Ripe . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    Plaintiffs Are Entitled To Final Judgment on the Merits As To Counts
        II, III, IV, VI, VII, VIII, and IX of Their Complaint . . . . . . . . . . . . . . . . . . . . 5

        A.    The City Has No "Sufficiently Important Interest" to Justify the
            Contribution Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    To Justify the Challenged Contribution Limits, Corruption Must
                Be Real—Not Imagined Or Assumed . . . . . . . . . . . . . . . . . . . . . . 7

            2.    Defendants Have Not Shown Any Examples of Actual
                Corruption Such As Would Be Necessary To Justify The
                Challenged Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                a.    "General Distrust of Politicians" Is Not Enough to Justify
                      The Infringement of Constitutional Guarantees . . . . . . . . 9

                b.    A Media-Created Boogeyman Is Not Enough To Justify
                      The Infringement of Constitutional Guarantees . . . . . . . . 9

                c.    The 1998 Referendum Vote Cannot Justify The
                      Challenged Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                d.    The City Admits It Has No "Special Corruption Problem"
                      That Would Justify These Limits and Prohibitions . . . . . 12

            3.    Since The City Does Not Have a Constitutionally Permissible
                  Interest To Justify the Challenged Laws, Plaintiffs Are Entitled to
                  Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.    The Laws Are Not Closely Drawn . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    The Laws Are Not Needed, and So Are Not Closely Drawn . . . . 16

            2.    The Laws Are Overinclusive, Underinclusive, And Overbroad . 17

C.  The Contribution Limits Fail The *Randall* Test . . . . . . . . . . . . . . . . . . . 21

D.  The Laws Discriminate on the Basis of Viewpoint . . . . . . . . . . . . . . . . 21

E.  Plaintiffs Are Entitled to Judgment on the Merits . . . . . . . . . . . . . . . . . 22

II.  Defendants' Motion For Summary Judgment Should Be Denied . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . 11 n.10

*Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 14-15

*California Prolife Council PAC v. Scully*, 989 F.Supp. 1282 (E.D. Cal. 1998),
*aff'd*, 164 F.3d 1189 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278 (2001) . . . . . . . . . . . . . . . . . . 18

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1983) . . . . . . . . . . . . . . . . . . . . . . 18

*Colorado Republican Federal Campaign Comm. v.
Fed. Election Comm'n*, 518 U.S. 604 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 23

*Davis v. Federal Election Comm'n*, 128 S. Ct. 2759 (2008) . . . . . . . . . . . . . . . . . . . . . 6, 15, 17

*Democratic Party of United States v. National Conservative Political Action Committee*,
578 F.Supp. 797 (D. Pa. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11 n.10

*Engquist v. Oregon Dept. of Agriculture*, 128 S.Ct. 2146 (2008) . . . . . . . . . . . . . . . . . . . . . . 22

*Fed. Elec. Comm'n v. Nat'l Conservative PAC*, 470 U.S. 480 (1985) . . . . . . . . . . . . . . 9, 13, 15

*Florida Star v. B. J. F.*, 491 U.S. 524 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hunter v. Erickson*, 393 U.S. 385 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Earle Asphalt Co.*, 950 A.2d 918 (N.J. App. Div. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Landell v. Sorrell*, 406 F.3d 159 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lucas v. Colorado General Assembly*, 377 U.S. 713 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McConnell v. FEC*, 540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, (2000) . . . . . . . . . . . . . . . . . . 6, 7, 8, 13, 15, 17

*Northeastern Fla. Chapter of the Associated Gen'l Contractors of Am. v. City of Jacksonville,* 508 U.S. 656 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Police Dept. of Chicago v. Mosely*, 408 U.S. 92 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21-22

*Randall v. Sorrell*, 548 U.S. 230, 261 (2006) . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 14, 15, 17, 21

*Reitman v. Mulkey*, 387 U.S. 369 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Russell v. Burris*, 146 F.3d 563 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 n.10

*Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) . . . . . . . . . . . . . . . . . 20

*Sheppard v. Beerman*, 317 F.3d 351 (2d Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Dodd*, 561 So. 2d 263, 266-67 (Fla. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 n.10

*Turner Broadcasting System, Inc. v. Fed. Elec. Comm'n*, 512 U.S. 622 (1994) . . . . . . . . . . . 7, 20

*United States v. W. T. Grant Co.,* 345 U.S. 629 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## **Constitutional Provisions**

U.S. CONST., amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. CONST., amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## **United States Code Sections**

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

**New York City Administrative Code Sections**

Admin. Code § 3-702(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 22, 23

Admin. Code § 3-702(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Admin. Code § 3-703(1)(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19, 22, 23

Admin. Code § 3-703(1-a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19, 21, 22, 23

Admin. Code § 3-703(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Secondary Sources**

James Cavallaro, *Public Enemy Number Two?: Rising Crime and Human Rights Advocacy in Transitional Societies*, 18 HARV. HUM. RTS. J. 139 (2005) . . . . . . . . . . . . . . 10 n.8

Sara Beale, *The News Media's Influence on Criminal Justice Policy: How Market-driven News Promotes Punitiveness*, 48 WM. & MARY L. REV. 397 (2006) . . . . . . 10 n.8

Kay L. Levine, *The External Evolution of Criminal Law*, 45 AM. CRIM. L. REV. 1039 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 n.8

Nathaniel Persily and Kelli Lammi, *Perceptions of Corruption and Campaign Finance: When Public Opinion Determines Constitutional Law*, 153 U. PENN L. REV. 119 (2004) . . . . . . 10 n.7

Louis S. Rulli & Jason A. Leckerman, *Unfinished Business: The Fading Promise of ADA Enforcement in the Federal Courts under Title I and its Impact on the Poor*, 8 JOURNAL OF GENDER, RACE AND JUSTICE 595, 648 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 10 n.8

Bradley A. Smith, *Campaign Finance Reform: Searching for Corruption in All the Wrong Places*, CATO SUPREME COURT REVIEW 187, 200 (2002-2003) . . . . . . . . . . . . . . . . . . . . . . . 10

Andrew E. Taslitz, *Fortune-telling and the Fourth Amendment: Of Terrorism, Slippery Slopes, and Predicting the Future*, 58 RUTGERS L. REV. 195, 231 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 n.9

Eric K. Yamamoto, *White (House) Lies: Why the Public must Compel the Courts to Hold the President Accountable for National Security Abuses*, 68 SPG LAW & CONTEMP. PROBS. 285 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 n.8

# Introduction

On a database at City Hall, and on the World Wide Web for all to see, is a list of citizens of New York City who, the City says, cannot be trusted. They are so untrustworthy, according to the City, that their rights have been reduced by more than ninety percent as compared with the rights of the average citizen. It has not been alleged—much less proven—that *anyone* on this list has done anything improper which would justify treating them this way. The City has simply chosen to blacklist these individuals and say to the world that, of all the people in the world, it is *they*, most of all, who cannot be trusted. It is they who are most likely to try to corrupt government (even though there is no evidence that they ever have). And so it is they who must have their rights taken away.

Nearly 12,000 of New York City's citizens are on this list. They are "civic leaders with positions at museums, universities, hospitals, law firms, nonprofits, churches, yeshivas, and banks."[1] Included on this list are such notables as Lee Bollinger, the president of Columbia University, Paul LeClerc, the president of the New York Public Library, and Donna Lieberman, the director of the New York Civil Liberties Union.[2] They are 'fingered,' much like the sex offenders on Megan's List. Yet, unlike those on Megan's List, they have not been charged with a crime, much less convicted of one. Nor have they been afforded due process. They have simply been blacklisted. Their names have been smeared, as the 'especially untrustworthy.'

The irony is that the City does not place the names of those who have *actually* been alleged to have engaged in 'pay-to-play' on this list of people who are most corrupt and whose political contributions are most untrustworthy. Joe Citizen could actually *be convicted* of bribing an official,

---

[1] Joseph Goldstein, "City Blacklist Limits Giving By 12,000," THE NEW YORK SUN (August 14, 2008), at http://www.nysun.com/new-york/city-blacklist-limits-giving-by-12000/83868/?print=6284719121 (last visited August 19, 2008).

[2] *Id.*

and he would not be listed. Rather, it is people like Mr. Bollinger and Ms. Lieberman—people who presumably have never and would never engage in 'pay-to-play'—who are blacklisted.

The City could have created a list of those who had been found to have actually made quid-pro-quo contributions. The City could have created a list of those officials who were engaged in 'pay-to-play' politics. The City chose to create neither of those lists. Rather, they created a list populated with people who have never been charged with any wrongdoing with regard to their contributions, and reduce the amount of money they can give to support their chosen candidates by over 90 percent. This is just wrong. It should not happen to innocent people in America. Yet, it has happened in New York City.

### A.    Procedural Posture of This Case.

Because the Court consolidated plaintiffs' motion for preliminary injunction with the trial on the merits,[3] plaintiffs ask for a final judgment against laws which:

(1)    Single out one class of citizens for disparate treatment by blacklisting them and subjecting them to drastically lower contribution limits than everyone else is allowed, even though it has never been shown that they have done anything wrong.  Admin. Code § 3-703(1-a);

(2)    Prohibit the matching of contributions made by that class of citizens, even though everyone else's contributions may be matched. Admin. Code § 3-702(3);

(3)    Prohibit contributions from certain business entities, even though they do not possess the state conferred benefits which are necessary to justify such bans. Admin. Code § 3-703(1)(l); and

(4)    Prohibit candidates from soliciting and accepting contributions they would like to solicit and accept, up to the 'regular' contribution limits, Admin. Code §§ 3-703(1)(l), 3-703(1-a), and prevent candidates from having certain of their contributions matched through the public financing system. Admin. Code § 3-702(3).

Purposely, the plaintiffs have here raised only those claims in their underlying lawsuit which

---

[3] The Court announced this decision at the Interim Pretrial Conference held on May 16, 2008.

are purely legal in nature; namely, those claims associated with counts II, III, IV, VI, VII, VIII, and IX of their Amended Complaint.[4] Only those claims were consolidated, and only those claims are currently before the Court. Plaintiffs reserved their other claims, which are fact-intensive, for a future trial should one be necessary.[5] Thus, claims such as whether the challenged laws allow candidates to amass the necessary resources to mount an effective campaign—are not before the Court.[6]

## B.    The Plaintiffs Have Standing, And Their Claims Are Ripe.

Defendants assert, "There is currently no Candidate Plaintiff who, in fact, currently plans to run in the upcoming 2009 election cycle." Def. Mem., at 38. This is not correct: Tom Ognibene

---

[4] **Count II** alleges that the contribution limits imposed by section 3-703(1-a)(the "business dealing contribution limit") are unconstitutional both facially and as applied. **Count III** alleges that the contribution limits imposed by section 3-703(1-a) unconstitutionally burden the speech and associational rights of family members and employees of lobbyists. **Count IV** alleges that the contribution limits imposed by section 3-703(1-a) impermissibly discriminate on the basis of viewpoint, and so infringe rights guaranteed by both the first and fourteenth amendment. **Count VI** alleges that the contribution limits imposed by section 3-703(1-a) impermissibly burden the first amendment right to lobby by imposing upon lobbyists lower contribution limits. **Count VII** alleges that the prohibition against contributions imposed by section 3-703(1)(l) (the prohibition against contributions from LLCs, LLPs, and partnerships) is unconstitutional both facially and as applied. **Count VIII** alleges that the designation of some contributions as "unmatchable" by section 3-702(3) is unconstitutional both facially and as applied.  **Count IX** alleges that the designation of some contributions as "unmatchable" by section 3-702(3) impermissibly discriminates on the basis of viewpoint, and so infringes rights guaranteed by both the first and fourteenth amendment.

[5] **Count I** alleges that the campaign finance program as set forth in sections 3-705 and 3-709 of the act is unconstitutional. **Count V** alleges that the contribution limits imposed by section 3-703(1-a) impermissibly force plaintiffs to choose between constitutionally guaranteed rights in violation of the "doctrine of unconstitutional conditions."**Count X** alleges that the reporting requirements imposed by section 3-213 are unconstitutional both facially and as applied. **Count XI** alleges that the triggering provision provided by section 3-705(7) impermissibly chills the political speech of candidates and the speech and associational rights of contributors. **Count XII** alleges that the triggering provision provided by section 3-705(7) is impermissibly vague. **Count XIII** alleges that the triggering provisions provided by section 3-706(3) impermissibly chills the political speech of candidates and the speech and associational rights of contributors. **Count XIV** alleges that the triggering provisions provided by section 3-706(3) is impermissibly vague. **Count XV** alleges that section 3-709.5 impermissibly compels participation in public financing. **Count XVI** alleges that the reporting requirement imposed by section 3-703(6) is unconstitutional both facially and as applied. **Count XVII** alleges that sections 3-702(3), 3-703(1-a), and 3-703(1)(l) impermissibly violate the rights of protected minority voters under section 2 of the voting rights act, and also unconstitutionally infringe upon their fourteenth amendment rights. **Count XVIII** alleges that sections 3-702(3), 3-703(1-a), and 3-703(1)(l) impermissibly violate the rights of protected minority candidates under section 2 of the voting rights act, and also unconstitutionally infringe upon their fourteenth amendment rights. **Count XIX** alleges that the reporting requirements imposed by section 3-216.1 are unconstitutionally vague. **Count XX** alleges that the prohibition against giving gifts imposed by section 3-225 is unconstitutional both facially and as applied.

[6] Thus, the arguments of Amici Lander and Griffith ("LG") that candidates can still amass enough funds to mount an effective campaign under the current law are irrelevant to the disposition of this motion. Similarly, the statement made by amici Citizens Union, Common Cause/NY, and New York Public Interest Research Group ("CU"), that "the Doing Business restrictions will be pro-challenger and not pro-incumbent," CU, at 14, is not only unsupported by evidence but also has no bearing on the disposition of this motion.

**PLAINTIFFS' REPLY BRIEF**                3

intends to run for office in 2009. "Amended Ognibene Decl.," Doc. 33, at ¶ 7. Defendants rely upon a news article for their assertion that Mr. Ognibene is through with politics. Yet, Mr. Ognibene has only indicated that he does not plan to run in November 2008, which has no bearing at all on whether he will run in 2009. As his declaration states, he intends to run, and would like to run as a non-participating candidate, if the law limiting contributions from business people is overturned. Ognibene Decl., (Filed August 20, 2008), at ¶¶ 6-8.

Similarly, plaintiffs Bennett, Valazquez-Hernandez, and Tapper have each stated that they would like to run for city council again, but will not run so long as the challenged laws are in place. "Bennett Decl.," Doc 19, at ¶¶ 3, 7; "Tapper Decl.," Doc 26, at ¶¶ 3, 6; and "Vazquez-Hernandez Decl.," D. 27, at ¶¶ 3, 6. Plaintiff Dilan has stated that he is exploring a run for City Council in 2009, but is concerned that the challenged laws will infringe on his constitutional rights. Dilan Decl., Doc. 20, at ¶ 3. All these plaintiffs want to be able to solicit and accept contributions in excess of $250 from those having business dealings with the city; solicit and accept contributions from limited liability companies, limited liability partnerships, and partnerships; and, receive matching funds for these contributions. Doc. 19, at ¶4; Doc. 20, at ¶4; Doc. 26, at ¶4; Doc. 27, at ¶4. The fact that they want to run but will not so long as the challenged laws remain in place, and/or assert that the laws will deprive them of their constitutional rights, render their claim ripe for adjudication. They are being harmed *right now* by these laws. The fact that Ms. Bennett and Ms. Tapper have chosen to run for state office in 2008, Def. Mem., at 39, has no bearing on their claims in this suit: They would like to run for city council in 2009, and would run, but for these challenged laws.

The defendants have also challenged the standing of plaintiff Perez. Def. Mem., at 39. Plaintiff Perez does not currently qualify as one doing business with the city, because he currently only has contracts with the city which were received as a result of competitive sealed bids. Still, Mr.

Perez has the threat of enforcement of this law continually upon him. He is a contractor who enters into contracts with the city. Should he ever receive a contract other than through a sealed bid, the challenged laws will apply to him. When asked whether he "planned to seek City work other than by sealed competitive bid," Mr. Perez answered, "If they call me, I be glad to provide my service to the City of New York." La Rue Decl., Ex. A, "Perez Dep.," at 41:13-17. It is simply wrong to say, as defendants do, Def. Mem., at 40, that the business dealing limitations do not affect Mr. Perez. Their ominous shadow hangs over him every day. Because he is a contractor who seeks city contracts, he is in "imminent" danger of having his first and fourteenth amendment rights trampled upon by the challenged laws, which both gives him standing and makes his claims ripe. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

## Argument

### I.    PLAINTIFFS ARE ENTITLED TO FINAL JUDGMENT ON THE MERITS AS TO COUNTS II, III, IV, VI, VII, VIII, AND IX OF THEIR COMPLAINT.

Laws which limit contributions must be "closely drawn" to a "sufficiently important interest." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam). When laws differentiate between citizens, they must be supported by an appropriate interest which is suitably furthered by the disparate treatment. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). The laws must not discriminate on the basis of the viewpoint of the speaker; otherwise, they are impermissible under both the first and fourteenth amendments. *Mosley*, 408 U.S. at 95-96. The challenged laws fail *all* these requirements. There is no sufficiently important interest to justify them; they are not closely drawn to the proffered interest; and, the laws discriminate on the basis of viewpoint. Thus, plaintiffs are entitled to final judgment on the merits as to Counts II, III, IV, VI, VII, VIII, and IX.

A.     **The City Has No "Sufficiently Important Interest" to Justify the Contribution Limits.**

'Corruption' or 'the appearance of corruption' are the only interests which can justify limiting political contributions.  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 389 (2000) ("*Shrink*"). The 'appearance of corruption,' however, must be tied to "the perception of undue influence of *large* contributors to a candidate," *Shrink,* 528 U.S. at 393 (emphasis added), because of a "threat from politicians too compliant with the wishes of *large* contributors." *Id*. at 389 (emphasis added). Thus, the corruption interest articulated by the Supreme Court has two elements: (1) the contribution must be large enough to give rise to a legitimate suspicion of corruption, and (2) there must be a bona fide "suspicion that [the] large contributions are corrupt." *Id*. at 389-395.

While the courts have "no scalpel to probe" whether a slightly different limit would better serve the anti-corruption interest, *Buckley*, 424 U.S. at 30, they do have constitutional yardsticks by which to measure challenged limits. One such yardstick, when limits are especially low, as these limits are, or treat citizens disparately, as these limits do, is whether there is any *special* justification which might warrant them. The *Randall* Court used this yardstick when it invalidated the extremely low limits before it. The Court observed, "[W]e have found nowhere in the record any special justification that might warrant a contribution limit so low or so restrictive ...." *Randall v. Sorrell*, 548 U.S. 230, 261 (2006). Similarly, the *Davis* Court used this yardstick when it invalidated what amounted to disparate contribution limits. *Davis v. Federal Election Comm'n*, 128 S. Ct. 2759, 2771 (2008). The Court noted that "[n]o such justification is present" which would justify different contribution limits for different people. *Id*. at 2772.

While the amount of evidence necessary to justify a contribution limit may "vary up or down with the novelty and plausibility of the justification raised," *Shrink*, 528 U.S. at 391, there must be *some* evidence. "Mere conjecture" has never been accepted as adequate to justify infringing on first

amendment rights. *Id.*, at 392; *see also Turner Broadcasting System, Inc. v. Fed. Elec. Comm'n*, 512 U.S. 622, 664 (1994) (plurality opinion) (*reh'g denied*, 512 U.S. 1278 (1994)) (recited harms must be "real," not "merely conjectural"); *Colorado Republican Federal Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 616 (1996) (the government must demonstrate a real risk of corruption when imposing limits on political speech and association).

In other words, if the city of New York wishes to single out a class of citizens and treat their contributions differently from others by (1) imposing drastically low limits on them, and (2) prohibiting the matching of their contributions (even though everyone else's may be matched); and, (3) if the city wants to prohibit contributions altogether from LLC plaintiffs; and, (4) prevent candidate plaintiffs from soliciting and accepting certain contributions, then, the city *must* advance a justifying reason which passes constitutional muster. This is especially true where, as here, the City has *already* eliminated large contributions, as it did when it enacted the 'regular' contribution limits in 1988. Those limits eliminated "the perception of undue influence of *large* contributors to a candidate," *Shrink,* 528 U.S. at 393 (emphasis added), because they eliminated large contributions.

### 1. To Justify The Challenged Contribution Limits, Corruption Must Be Real—Not Imagined Or Assumed.

If there were individuals who might want to buy influence, they have already been rendered powerless to do so by New York City's regular contribution limits. Thus, in order to justify discriminating against one class of citizens by burdening their first and fourteenth amendment rights, as these laws do, the city must have some "special justification" (*Randall*) to justify the laws. Such justification requires the City to "do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broadcasting*, 512 U.S. at 664 (internal citations omitted). When, as here, "the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, . . . . *It must demonstrate that the recited harms are real, not merely conjectural ....*" *Id*, at

664 (emphasis added).

The defendants have not done this. Rather, they rely on *Shrink*'s assertion that the city need not demonstrate actual corruption in its locale when it relies on studies from other cities and believes those to be relevant to the problem it seeks to address. (Def. Mem., at 13-14). *Randall*'s declaration that "we have found nowhere in the record any special justification that might warrant a contribution limit so low or so restrictive" strongly suggests this is not acceptable when the limits in question are extremely low, as these limits are. 548 U.S. at 261. Regardless, *Shrink*'s pronouncement does not apply for the simple reason that *Shrink* involved a challenge to contribution limits that applied across the board, to everybody. In other words, *Shrink* would apply if a group of plaintiffs sought to challenge New York City's regular contribution limits which, like the limits in *Shrink*, are set at a relatively high level and apply across the board.

This case, though, is different. Plaintiffs have not challenged the regular contribution limits, but rather the much lower business dealing limits. The City singles out a group of its citizens for disparate treatment, muzzles their political voices and stifles their political association, while amplifying the voices of everyone else by matching their contributions. The City must demonstrate that this group of citizens' contributions are so corrupting that disparate treatment is necessary.

### 2.    Defendants Have Not Shown Any Examples of Actual Corruption Such As Would Be Necessary To Justify The Challenged Laws.

The defendants offer no such evidence. In their forty-eight page brief and almost fifteen hundred pages of exhibits, they do not identify a single example of corruption associated with New York City after 1988, when the 'regular' contribution limits were enacted. Rather, they appeal to the general distrust that people have of political actors and contributors, as well as to newspaper articles which are critical of money in politics. Neither of these is sufficient to justify the challenged laws.

**PLAINTIFFS' REPLY BRIEF**                                    8

a.    **"General Distrust of Politicians" Is Not Enough to Justify The Infringement of Constitutional Guarantees.**

The defendants highlight the fact that some plaintiffs acknowledged in their depositions that there is a public perception that contributions can buy influence with politicians. *See* Def. Mem., at 12-13. However, such general distrust of political actors and contributors "is not sufficient" and is "irrelevant to the critical elements to be proved: corruption of candidates or public perception of corruption of candidates." *Fed. Elec. Comm'n v. Nat'l Conservative PAC*, 470 U.S. 480, 499 (1985) ("*NCPAC*"). What is needed is some example of actual corruption which would justify the limits, or else justify the public's distrust. As has long been recognized,

> Corruption is a subversion of the political process.   Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns.   The hallmark of corruption is the financial quid pro quo: dollars for political favors.

*Id.* at 497. Yet, such corruption (as well as the appearance of corruption) was already eliminated in 1988 when New York City enacted the regular contribution limits. The defendants have not identified a single incident of corruption in New York City after 1988. Surely if there were one, the defendants and amici would have noted it. The plaintiffs cannot prove that such corruption does not exist, nor do they have to. The burden is on the defendants to justify the challenged laws by showing some type of corruption or appearance of corruption, and then show that their law is closely drawn to their interest in preventing corruption. Yet, they have not done so.

b.    **A Media-Created Boogeyman Is Not Enough To Justify The Infringement of Constitutional Guarantees.**

The defendants and amici rely on news articles to raise the specter of the boogeyman. Yet, the mere fact that an article alleging that the public associates contributions with corruption and influence-peddling does not prove that it has actually occurred or that a reasonable perception of such corruption actually exists.

> If we were to allow the charges of journalists automatically to create a presumption that corruption exists or that people believe corruption exists, a group of writers, no matter how unlikely the tales they tell, could rescue statutes otherwise abridging the free speech of those not employed by traditional, established media outlets. This cannot be the law.

*Democratic Party of United States v. National Conservative Political Action Committee*, 578 F.Supp. 797, 831 n.47 (D. Pa. 1983). *See* also Bradley A. Smith, *Campaign Finance Reform: Searching for Corruption in All the Wrong Places*, CATO Supreme Court Review 187, 200 (2002-2003) (opining that, if newspaper articles alone suffice to show a problem with corruption or even the appearance of corruption, then "the appearance of corruption is not merely a blank check, but an endlessly refilled bank account for those who seek greater regulation"). If news articles and editorials were sufficient to establish the interest necessary to impose contribution limits, false perceptions would justify the abridgement of first amendment freedoms. This must not be the case.

News accounts and editorials often reflect the bias of their authors.[7] Numerous studies have demonstrated that these media biases tend to create public opinion, rather than reflecting it. In fact, "More than 350 empirical studies conducted worldwide support the media's power to set the public's agenda."[8] Yet, it must be remembered that media is a for-profit business, and "[m]arket share turns

---

[7] *See* Nathaniel Persily and Kelli Lammi, *Perceptions of Corruption and Campaign Finance: When Public Opinion Determines Constitutional Law*, 153 U. PENN L. REV. 119, 130 (2004) (observing that "editorials signify that someone is perceiving corruption: namely, the editorial boards.").

[8] Sara Beale, *The News Media's Influence on Criminal Justice Policy: How Market-driven News Promotes Punitiveness*, 48 WM. & MARY L. REV. 397, 441 (2006). *See also* James Cavallaro, *Public Enemy Number Two?: Rising Crime and Human Rights Advocacy in Transitional Societies*, 18 HARV. HUM. RTS. J. 139, 147 (2005) (media-created "perception of insecurity" "does not track a corresponding increase in crime"); Kay L. Levine, *The External Evolution of Criminal Law*, 45 AM. CRIM. L. REV. 1039, 1089 (2008) (media claims that tax dollars went to "the undeserving poor" led to public outcry against welfare); Louis S. Rulli & Jason A. Leckerman, *Unfinished Business: The Fading Promise of ADA Enforcement in the Federal Courts under Title I and its Impact on the Poor*, 8 JOURNAL OF GENDER, RACE AND JUSTICE 595, 648 (2005) (media-created public perception of litigation explosion under the ADA does not square with the actual dockets of the courts); Eric K. Yamamoto, *White (House) Lies: Why the Public must Compel the Courts to Hold the President Accountable for National Security Abuses*, 68 SPG LAW & CONTEMP. PROBS. 285, 308 (opining that the government uses the media to create public perceptions).

on news that is gripping and entertaining."[9]  The perception being created is often the one that will

sell newspapers—not necessarily the one that reflects the actual situation. Talk of corruption in

government is more "gripping and entertaining" than talk of all being well at City Hall.

     A number of courts have observed the unreliable nature of news accounts when evaluating

whether there is an actual corruption interest.[10] This is especially important in a case such as this one,

in which the government already has contribution limits in place to stop corruption and the

appearance of corruption, and now seeks to subject some—but only some—people and entities to

more stringent limits—and prohibit some from making contributions at all.

     The fact that defendants or amici cite to this journalist or that editor who opine that New

York City is rampant with political corruption proves nothing without some actual example of

corruption. That is the evidence the defendants need to justify the challenged limits, which are lower

than the limits they already enacted to deal with corruption and the appearance of corruption.

      **c.**       **The 1998 Referendum Vote Cannot Justify the Challenged Laws.**

     The defendants make much of the fact that the citizens of New York City voted in favor of

the 1998 Referendum, which encouraged the City Council to legislate against pay-to-play politics.

*See*, Def. Mem., at 11-12. Yet, that by itself cannot make the challenged laws constitutional;

otherwise, citizens could, by majority vote, enact the most horrible abridgments of constitutional

guarantees. Thankfully, when voters have attempted to deprive their fellow citizens of their

---

    [9]Andrew E. Taslitz, *Fortune-telling and the Fourth Amendment: Of Terrorism, Slippery Slopes, and Predicting the Future*, 58 RUTGERS L. REV. 195, 231 (2005).

    [10] *See, e.g., Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1010 n.8 (9th Cir. 2003) (finding that news articles conveying regret over the level of negative campaigning were insufficient to establish the appearance of corruption needed to justify the regulation of PACs); *Russell v. Burris*, 146 F.3d 563, 569 (8th Cir. 1998) (finding that the public's view of corruption was not "objectively reasonable"); *Democratic Party of the United States v. Nat'l Conservative PAC*, 578 F. Supp. 797, 829-30 & n.47 (E.D. Pa. 1983) (applying a "reasonable person standard in evaluating whether press reports can give rise to a belief that corruption exists," and striking down the challenged law as not justified by the corruption interest); *State v. Dodd*, 561 So. 2d 263, 266-67 (Fla. 1990) (striking down a ban on contributions despite the news media's accounts showing a "crisis of confidence" in state government).

constitutional rights, the courts have refused to let them.

In *Hunter v. Erickson*, 393 U.S. 385 (1969), the Supreme Court held unconstitutional an amendment of a city charter, enacted by popular vote, which discriminated against minority citizens. In finding it constitutionally impermissible, the Court stated that "the implementation of this change through popular referendum [does not] immunize it." The Court struck it down. *Id.* at 392. *See also Lucas v. Colorado General Assembly*, 377 U.S. 713, 736 (1964) (declaring that an apportionment scheme cannot be saved merely because it was approved by majority vote); *Reitman v. Mulkey*, 387 U.S. 369 (1967) (affirming decision of California Supreme Court that an article of the state constitution which allowed citizens to discriminate on the basis of race could not be saved, even though it was enacted by popular vote).

Majority vote, without a sufficiently important interest (in this case, a sufficiently important *corruption* interest), cannot be allowed to overcome constitutional impermissibility. Otherwise, the majority can trample upon the rights of the minority, as has happened in New York City. Today, in the complete absence of evidence, those who do business with the city are labeled as 'bad' and their contributions are judged especially corrupting. If the City is allowed to do this to this group, who will they do this to next? Which racial group, which ideology, which gender, which occupation, which religious association will be the next group that the voters decide is 'bad,' with absolutely no evidence, and decree must be silenced?

> **d.     The City Admits It Has No "Special Corruption Problem" That Would Justify These Limits and Prohibitions.**

One simply cannot underscore enough the fact that in nearly *fifteen hundred pages* of exhibits, the defendants were unable to cite a single case of corruption occurring after the regular contribution limits were instituted in 1988. Rather, the exhibits the defendants offer in support of their motion actually undercut it, by proving that the City lacks the necessary corruption interest.

*The Council Report of the Governmental Affairs Division*, Pines Decl., Ex. H, is a good example. In this Report, the City Council's Committee on Governmental Operations affirms:

> While there is nothing intrinsically wrong with contributions from those doing business with the City, the ability of such individuals to contribute *could* create a perception, *regardless of whether such perception is accurate*, that such individuals have a higher level of access to the City's elected officials.

*Id*. at 24-25 (emphasis added). "*Could* create" "*regardless*" of any basis in fact, is the "mere conjecture" which is cannot justify infringing on first amendment rights. *See Shrink*, 528 U.S. at 392. It is the 'general distrust' of political actors and contributors that "is not sufficient" and is "irrelevant to the critical elements to be proved: corruption of candidates or public perception of corruption of candidates." *NCPAC*, 470 U.S. at 499. As such, it is not sufficient to justify the challenged laws.

Tellingly, the New York City Charter Revision Commission has stated that "there is no evidence that these campaign contributions actually influence the award of a particular contract or passage of a bill." Pines Decl, Ex. F, at 19. The Commission continues: "There is, however, no doubt that these contributions have a negative impact on the public because they promote the perception that one must 'pay to play.'" *Id*. If there is no evidence that anyone is paying to play, how the Commission can assert that allowing these contributions has a negative impact on the public? The Commission offers no evidence for its assertion, but rather relies on its pronouncement that "[t]here is . . . no doubt." This is the 'general distrust' and 'mere conjecture' which has repeatedly been held insufficient to justify these types of infringement on constitutional guarantees.

In the transcript of the *Public Hearing on Proposed Local Laws* (Pines Decl., Ex P), Council Speaker Quinn explains that the purpose of the challenged laws was "to limit the perception of influence by those who are trying—who do or are trying to do business with the City of New York." *Id*. at 3. Yet, Speaker Quinn never identified an example of corruption that might cause the public to perceive that these contributions are corrupting. Instead, she opined, "*[T]he truth is there is no*

*city or state in the country, once this law goes into effect, that will have a system as strict and as restrictive as this law will be*, as it relates to those who are doing business with the City and their ability to give contributions." *Id.* (emphasis added).

Because these laws are the most restrictive in the country, New York City *must* offer *special* justification for them. In *Randall*, the Court refused to accept Vermont's contribution limits, which were at that time the most restrictive in the nation, 548 U.S. at 250, without a showing of "*special* justification that might warrant*" them. *Id.* at 261 (emphasis added).

Yet, New York City has no *special* justification for trampling on the first and fourteenth amendment rights of its citizens. Rather, Speaker Quinn asserts that "in the City of New York, we don't have any scandals," Pines Decl., Ex. BB, at 43:22-23, which explains why in their *nearly fifteen hundred pages* of exhibits the defendants have not been able to identify any actual corruption. The Campaign Finance Board itself acknowledges, "There is *nothing* in our data that allows us to conclude that contributions have influenced the awarding (or refusal) of any contract or other benefit." *Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions*, Loprest Decl., Ex. A, at ii (emphasis added).[11] The City offers no example of corruption for a good reason: In 1988, they imposed contribution limits, which eliminated corruption and the culture of pay-to-play. These new, super-restrictive limits are simply not needed.

Similarly, the City has no special justification for its prohibition on matching funds. The Supreme Court has said that "the concept that government may restrict the speech of some elements

---

[11] Ms. Loprest cites to this Report for a case study about one developer, who made contributions and received a benefit, while another did not. Loprest Decl, at ¶ 30 (citing Interim Report, at 32-34). Far from proving corruption, the Report acknowledges that no conclusions can be drawn. There is no evidence the developer who received the benefit even applied for it. Loprest Decl, Ex A, at 36. The Report also acknowledges that "the policy rationale behind the zoning 'carve-out' is unknown." *Id.* Tellingly, the Report earlier stated that it has no examples of corruption. *Id.* at ii. Thus, the examples cited by Ms. Loprest in ¶ 30 of her declaration, drawn from this Report, must be understood to reflect the fact that people of all stripes—including business people—support candidates for office. They should *not* be understood as evidence of corruption, which the Report itself says it does not have.

of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 649. That is exactly what the City does. Currently, a citizen with no business dealings can contribute up to $2,750 to a candidate for city council, and the first $175 will be matched with $1,050 of public funds. This allows him to contribute up to $3,800 to a candidate for city council. The citizen defined as having business dealings, meanwhile, can only contribute up to $250. The City hushes some voices, while amplifying others. This is not constitutionally permissible.

> **3.    Since The City Does Not Have a Constitutional Permissible Interest To Justify the Challenged Laws, Plaintiffs Are Entitled to Final Judgment.**

Absent some special justification (which the City does not have), the challenged laws simply cannot pass constitutional muster. They are too low, without the requisite justification, in violation of *Randall*. They treat contributions from different citizens differently, without the requisite justification, in violation of *Davis*. They rely on 'general distrust' and 'mere conjecture,' in violation of *NCPAC* and *Shrink*. The City simply has no "sufficiently important interest" to justify the challenged limits and prohibitions affecting contributions. The Court should grant plaintiffs final judgment on the merits.

> **B.    The Laws Are Not Closely Drawn.**

A second constitutional yardstick courts use to determine whether contribution limits impermissibly infringe upon the free expression guarantee of the first amendment is a consideration of whether the limit is "closely drawn" to a "sufficiently important" corruption interest. If it is not closely drawn, it is unconstitutional. *Buckley*, 424 U.S. at 25. As noted above, New York City has not presented any evidence of corruption or the appearance of corruption, which leads to the obvious question: what does New York City purport that these laws are closely drawn to? Plaintiffs assert that they are closely drawn to nothing, and so they cannot pass constitutional scrutiny.

### 1.    The Laws Are Not Needed, and So Are Not Closely Drawn.

Because New York City already has its regular contribution limits in place to prevent corruption and corruption's appearance, these drastically lower limits cannot be closely drawn. Simply put, they are not needed. The only justification for contribution limits is the prevention of corruption or the appearance of corruption, which the City accomplished in 1988 with the enactment of the regular contribution limits. Those limits were *designed to eliminate corruption*. Thus, the City made a policy decision that contributions up to the limits are not corrupting and do not give the appearance of corruption, while those above the limits either are corrupting or have that appearance. Where, as here, the government has "manifested its judgment that the higher limitations are not unacceptably corrupting, . . . . the lower limits are not closely drawn." *California Prolife Council PAC v. Scully*, 989 F.Supp. 1282, 1296 (E.D. Cal. 1998), *aff'd*, 164 F.3d 1189 (9th Cir. 1999).

Amici Citizens Union *et al.* attempt to distinguish *Scully* by asserting that it did not involve contributors "who created a high risk of corruption." Citizens Union Brief ("CU"), at 17. Plaintiffs respond that the situations are identical. No one has yet demonstrated that in New York City, plaintiffs and those like them are especially 'bad,' or that their contributions are especially corrupting. Thus, it is unjustified—and perhaps bigoted—to assert that the plaintiffs in this case create a high risk of corruption, absent evidence to support the claim. Further, no one has yet shown that New York City faces a corruption problem that its regular limits cannot control. Indeed, City officials have testified that New York City does not have a corruption problem;[12] and, neither the defendants nor the amici have identified one. Thus, the two-tiered system cannot be justified.

The defendants and amici both appeal to *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) to justify two-tier limits such as New York City employs. *Blount* is distinguishable, though, on two

---

[12] *See supra*, at section I.A.2.d. (pp. 12-15)

grounds. First, unlike here, there was actual evidence of corruption among the contributors targeted. *Id*. at 939. Second, to the extent that the *Blount* decision seems to indicate that a showing of corruption was unnecessary, it is important to remember that it was decided in 1995. This was prior to the Supreme Court's *Shrink*, *Randall*, and *Davis* decisions, which made plain that some showing of evidence is needed when contribution limits are too novel, low, or treat contributors disparately. Thus, for the Court to rely on *Blount*, it must ignore recent Supreme Court precedent.

Defendants and amici also appeal to the recent decision by the New Jersey Court of Appeals, *In re Earle Asphalt Co.*, 950 A.2d 918 (N.J. App. Div. 2008), to rebut plaintiffs' contention that some actual evidence is necessary to justify the challenged laws. This case by a state appellate court goes against U.S. Supreme Court precedent. This Court should follow the Supreme Court, and not a New Jersey appellate court.

**2.      The Laws Are Overinclusive, Underinclusive, And Overbroad.**

The Campaign Finance Law states:

> The term 'lobbyist' shall mean a lobbyist as defined in subdivision (a) of section 3-211 of this title *and the spouse or domestic partner ... and any ... employee of such lobbyist who ... is employed in an organization's division that engages in lobbying activities ... and the spouse or domestic partner and unemancipated children of such ... employees*.

Admin. Code § 3-702(16). The Campaign Finance Board ("CFB") initially construed this to mean that a secretary of a lobbyist (such as plaintiff Michele Russo) and the spouse of a lobbyist (such as plaintiff Sheila Andersen-Ricci) were subject to the lower contribution limits. Def. Mem., at 15 n.4.[13]

The defendants now say that for purposes of the lower contribution limits, "lobbyist" shall only mean those who actually engage in lobbying activities. Def. Mem., at 15 n.4. However, the

---

[13] The City Council thought that the bill they were passing imposed the lower contribution limits on the spouses of lobbyists. Council Member Koppell objected on the day the vote was taken to approve the law that, if approved, it would create a situation where "[Y]ou can't contribute if you're the spouse of a lobbyist." (Pines Decl., Ex. O, at 66:24).

voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. "If it did, courts would have to leave defendants to return to their old ways." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (*quoting City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.10 (1983)); *see also Northeastern Fla. Chapter of the Associated Gen'l Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 661-62 (1993); *United States v. W. T. Grant Co.,* 345 U.S. 629, 632 (1953) (collecting cases). Indeed, "the general rule that voluntary cessation of a challenged practice rarely moots a federal case . . . traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278, 284 n.1 (2001) (citations omitted).

Lobbyists' spouses and employees are still subject to the prohibition against matching their contributions. Admin. Code § 3-702(3); Def. Mem., at 15 n.5. Yet, neither spouses nor secretaries of lobbyists engage in lobbying activities. Even more remote from lobbying activities are the spouses and domestic partners of the secretaries and other employees—yet, their contributions are unmatchable as well. Admin Code § 3-702(3) (noting that the prohibition against matching applies to *all* who must be listed on a lobbyist registration statement).

The lower contribution limits, and prohibition against matching, are thus overinclusive: they interfere with the expressive rights of too many.

These laws are also underinclusive because they exempt labor organizations, neighborhood associations, and their officers. Neighborhood associations can engage in the same activities and compete for the same types of contracts, grants, and concessions from the city as those individuals and entities which are subject to the lower limits.

The City now says that, although the law does not apply to municipal unions, Def. Mem., at

**PLAINTIFFS' REPLY BRIEF**                    18

17 n.7, it does apply to other unions. Def. Mem., at 17-18. What the City means, though, is that if those unions were to compete for contracts, concessions, and grants as businesses do, they too would be subjected to the lower contribution limits. Unions, however, do not do those things—yet, they have both the potential and the incentive to engage in the 'pay-to-play' politics the City says it wants to eliminate. Municipal unions (which the defendants acknowledge are exempt from the challenged restrictions) engage in collective bargaining with the government. Service, trade, and construction unions have incentive to see that the businesses they do work for get contracts and concessions from the City. Either way, unions depend on government spending for their very existence, and so have incentive to engage in quid-pro-quo arrangements with public servants. Yet, neither these unions nor their officials are subject to the lower business dealing limits of section 3-703(1-a), let alone prohibited from contributing by section 3-703(1)(l). Nor are their officials' contributions prohibited from being matched.

The City claims that its desire in enacting the challenged laws was to curb pay-to-play and eliminate the public's perception that politicians were corrupted by contributions. Yet, they have not included all those with the influence and incentive to engage in pay-to-play. The laws are therefore underinclusive. When regulations are underinclusive, such as these are, it makes belief that they are designed to serve the proffered anti-corruption interest "a challenge to the credulous." *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002), because it diminishes "the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). Such underinclusive laws cannot pass constitutional muster. *Republican Party of Minnesota*, 536 U.S. 765 (2002); *Florida Star v. B. J. F.*, 491 U.S. 524 (1989); *City of Ladue v. Gilleo*, 512 U.S. 43 (1994).

The challenged laws are also unconstitutionally overbroad because they burden substantially

more associational and speech rights than are justified by the corruption interest. Plaintiffs believe that, in spite of the CFB's current position, the limits reach even the speech and associational rights of such people as far removed from business dealings with the City as the secretary of a lobbyist, the spouse of a lobbyist, and the spouse of an employee of a lobbyist, the unemancipated children of the spouse of a lobbyist, and the unemancipated children of the spouse of an employee of a lobbyist, none of whom engage in business dealings with the city. Similarly, they prohibit matching the contributions from these same people.

Similarly, these laws restrict or prohibit contributions from many individuals and entities which would never contemplate attempting to buy influence. The Supreme Court has opined that in first amendment, political-speech and association contexts, when government wants to prevent fraudulent activity, it should ban the fraud, not ban legitimate activity. *Turner Broadcasting*, 512 U.S. at 682-83 (citing *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980)). Yet, that is precisely what the City has done: in attempting to root out corruption (of which they offer no evidence), the City has banned and restricted much legitimate activity. The laws are thus overbroad.

Defendants acknowledge that the prohibition against matching contributions reaches far more people than actually do business with the City. Def. Mem., at 35. They seek to justify this far reach by noting that plaintiff Andersen-Ricci, who is a spouse of a lobbyist, did not recall in her deposition that she gave a $250 contribution in 2005 to a candidate. Def. Mem., at 36. They imply that the Ms. Andersen-Ricci was used by her lobbyist-husband to funnel extra money to a candidate. *See* Def. Mem., at 35-36. Yet, there is a much more likely explanation: after 3 years, Ms. Andersen-Ricci simply forgot that she had made that contribution. Indeed, she was never shown the check at her deposition, nor did deposing counsel make any attempt to refresh her memory to be certain that she did not recall the contribution.

**PLAINTIFFS' REPLY BRIEF**                                      20

Under New York City law spouses are allowed to each make a contribution by each signing a check drawn on a joint checking account. Thus, neither Ms. Andersen-Ricci, nor her husband, did anything wrong. This appeal to 'anti-circumvention' cannot pass constitutional muster without some evidence of a corruption problem—which the City has not provided. As *Landell v. Sorrell* explained, "Anti-circumvention is not an independent state interest." 406 F.3d 159, 169 (2d Cir. 2005) (Walker, J., dissenting from the denial of rehearing and request for rehearing *en banc*) (citing *McConnell v. FEC*, 540 U.S. 93, 161 (2003)). There must be some evidence of wrongdoing to justify thing more: Yet, just as defendants offer no evidence of corruption, so they offer no evidence of circumvention.

Thus, the laws are overinclusive, underinclusive, and overbroad, without the necessary justification. They cannot pass constitutional scrutiny. Plaintiffs are therefore entitled to final judgment on the merits.

### C. The Contribution Limits Fail The *Randall* Test.

While most of the *Randall* test is fact-intensive, and so is not applicable to the matter before the Court, one part of the *Randall* test is purely legal in nature. *Randall* asserts that constitutionally permissible contribution limits will be indexed for inflation. 548 U.S. at 261. While New York City's regular contribution limits are indexed, Code, § 3-703(7), but the lower, challenged limits are not indexed. They are therefore not constitutionally permissible. Plaintiffs are therefore entitled to final judgement on the merits with regard to counts II, III, IV, and VI (the counts having to do with section 3-703(1-a) of the Code (the lower, business dealing contribution limits)).

### D. The Laws Discriminate on the Basis of Viewpoint.

"Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95. Likewise, differentiating between citizens on the basis of their viewpoint runs afoul of the Equal

Protection Clause. *Id.* at 96. "When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference ...." *Engquist v. Oregon Dept. of Agriculture*, 128 S.Ct. 2146, 2153 (2008).

Under the requirements of both the first and fourteenth amendments, the City cannot discriminate on the basis of viewpoint. Yet, the speech of neighborhood, community, and labor organizations has a significantly different viewpoint than the speech of owners of businesses and members of management. They, however, are subject to the lower contribution limits, while these organizations and their officers are not. Defendants offer no appropriate interest which is suitably furthered by treating differently the speech of these various groups who engage in the same business-dealings activities. The only basis for making the distinction is the viewpoint of the speech of the various groups, which renders the distinction unconstitutional.

Because the City cannot offer any such justification for treating unions differently from those defined as having business dealings with the City, when they both engage in the same types of activities, it follows that the City made its decision on the basis of the viewpoints of the two groups. Such a choice is constitutionally impermissible.

### E.    Plaintiffs Are Entitled to Judgment on the Merits.

For the foregoing reasons, plaintiffs are entitled to final judgment on the merits.

WHEREFORE, Plaintiffs respectfully pray the Court to:

(1)    Declare Code, §§ 3-702(3); 3-703(1)(l), and 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(2)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

(3)    Grant Plaintiffs such other relief as may be just and equitable.

## II.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.

In the Second Circuit, as elsewhere, "Summary judgment is appropriate only if it can be established 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' *Sheppard v. Beerman*, 317 F.3d 351, 354-55 (2d Cir.2003) (quoting Fed. R. Civ. Pro. 56(c)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

Defendants are not entitled as a matter of law to summary judgment. As demonstrated in this brief and in plaintiffs' previous court filings, the challenged laws impermissibly violate the plaintiffs' first and fourteenth amendment rights. Summary judgment for defendants is inappropriate. Even if the defendants *were* entitled to summary judgment, which they are not, there are genuine issues of material fact which would make summary judgment inapplicable. *See* Plaintiffs' Rule 56.1 Statement of Facts.

## Conclusion

For the foregoing reasons, this Court should:

(1)    Grant plaintiffs final judgment on the merits;

(2)    Declare Code, §§ 3-702(3); 3-703(1)(l), and 3-703(1-a) facially unconstitutional and unconstitutional as applied;

(3)    Grant Plaintiffs their costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and any other applicable authority;

(4)    Grant Plaintiffs such other relief as may be just and equitable; and

(5)    Deny Defendants request for summary judgment.

Dated: August 20, 2008

Respectfully Submitted,


Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
email:  jboppjr@aol.com
       jlarue@bopplaw.com
*Lead Counsel for the Plaintiffs*
      * Admitted pro hac vice for this case
on May 7, 2008 by order of the Honorable
Laura T. Swain, District Court Judge.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on Defendants' counsel via email and first class mail, postage pre-paid.

Jonathan Pines, Esq.
The City of New York
Law Department
100 Church Street
New York, NY 10007
jpines@law.nyc.gov
*Counsel for Defendants*

John H. Snyder
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299
jsnyder@proskauer.com
*Counsel for Amici Citizens Union,*
*Common Cause/NY and*
*New York Public Interest Research Group*

Luke P. McLoughlin
Jenner & Block LLP
919 Third Avenue
37th Floor
New York, NY 10022-3908
LmcLoughlin@jenner.com
*Counsel for Amici Brad Lander and*
*Mark Winston Griffith*

Dated: August 20, 2008

_____
James Bopp, Jr. (JB 0781)