Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
     * Admitted pro hac vice for this case
on May 7, 2008 by order of the Honorable
Laura T. Swain, District Court Judge.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**OGNIBENE,** *et al.,*

**Plaintiffs,**

-against-

**PARKES,** *et al.,*

**Defendants.**

**C.A. No. 08 CV 01335 (LTS) (TDK)**

## DECLARATION OF JOE LA RUE
## IN SUPPORT OF PLAINTIFFS' REPLY BRIEF
## AND LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Joe La Rue, an attorney duly admitted to practice law, and admitted by this Court to

practice pro hac vice in the above-titled case, declares under penalty of perjury and pursuant to

28 U.S.C. § 1746 that the following is true and correct:

1.      I am an associate with the law firm of Bopp, Coleson & Bostrom, which is lead

counsel for the plaintiffs in this matter.

2.      Attached to this declaration as La Rue Ex. A are pages excerpted from the

deposition of plaintiff Robert Perez, dated June 17, 2008.

3.     Attached to this declaration as La Rue Ex. B is the Official Text of the Charter Revision Commission's Proposal on Campaign Finance Reform (at http://www.nyccfb.info/public/voter-guide/ballot_98/charter.htm?sm=public_&zoom_highlight= 1998+charter+amendment#text (last visited August 18, 2008).

4.     Attached to this declaration as La Rue Ex. C is Joel Siegel, "Unions Make A Power Play Seek bigger political voice," New York Daily News (April 29, 2001), at http://www.nydailynews.com/archives/news/2001/04/29/2001-04-29_unions_make_a_power_pla y__se.html (last visited August 18, 2008).

5.     Attached to this declaration as La Rue Ex. D is Jay Golub, "NYC's Rigged 'Reforms,'" New York Post (Feb 22, 2007), at http://www.nypost.com/php/pfriendly/print.php?url=http://www.nypost.com/seven/02222007/po stopinion/opedcolumnists/nycs_rigged_reforms_opedcolumnists_jay_golub.htm (last visited August 18, 2008).

6.     Attached to this declaration as La Rue Ex. E is Ray Rivera, "New Campaign Finance Rules Skip Unions," New York Times, (June 28, 2007), at http://www.nytimes.com/2007/06/28/nyregion/28labor.html?_r=1&sq=unions%20contribution% 20limits&st=cse&scp=6&pagewanted=print (last visited August 18, 2008).

7.     Attached to this declaration as La Rue Ex. F is Winnie Hu, "Council Bill Eases Restriction On Union Political Donations," New York Times, (Nov. 17, 2005), at http://query.nytimes.com/gst/fullpage.html?res=9803E3DB113EF934A25752C1A9639C8B63&s ec=&spon=&pagewanted=print (last visited August 19, 2008).

8.     Attached to this declaration as La Rue Ex. G is Winnie Hu, "Higher Limits on Donations From Unions to Take Effect," New York Times, (Dec. 15, 2005), at

http://www.nytimes.com/2005/12/15/nyregion/metrocampaigns/15unions.html?sq=contribution %20limits&pagewanted=print (last visited August 19, 2008).

9.    Attached to this declaration as La Rue Ex. H is Abraham Riesman, "Number of Small Campaign Contributors Soars," The New York Sun, (July 25, 2008), at http://www.nysun.com/new-york/number-of-small-campaign-contributors-soars/82634/?print=34 59219121 (last visited August 19, 2008).

10.    Attached to this declaration as La Rue Ex. I is Grace Rauh, "Scramble Set for Council," The New York Sun, (Feb 26, 2008), at http://www.nysun.com/new-york/scramble-set-for-council/71826/?print=9950319121 (last visited August 19, 2008).

11.    Attached to this declaration as La Rue Ex. J is Joseph Goldstein, "City Blacklist Limits Giving By 12,000," The New York Sun (August 14, 2008), at http://www.nysun.com/new-york/city-blacklist-limits-giving-by-12000/83868/?print=628471912 1 (last visited August 19, 2008).

Dated: August 20, 2008

_____
Joseph E. La Rue

STATE OF INDIANA  )
                  : SS
COUNTY OF VIGO    )

Before me, Barry A. Bostrom, a Notary Public in and for said County and State, personally

appeared Joe La Rue who acknowledged the execution of the foregoing instrument.

Witness my hand and notarial seal on August 20, 2008.


My Commission Expires                    Printed: Barry A. Bostrom
November 11, 2008                        Notary Public
                                         Resident of Vigo County, Indiana

This instrument was prepared by Barry A. Bostrom, attorney at law, BOPP, COLESON &
BOSTROM, 1 South 6th Street, Terre Haute, Indiana 47807-3510.

# La Rue Declaration
# Ex. A

ORIGINAL

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  -------------------------------------------------X
   TOM OGNIBENE, et al.,
3
                              PLAINTIFFS,
4

5              -against-      Case No:
                              08 CV 01335(LTS)(TDK)
6

7  SCHWARZ, et al.,

8                             DEFENDANTS.
   -------------------------------------------------X
9

10                  DATE:  June 17, 2008

11                  TIME:  9:22 A.M.

12

13

14             EXAMINATION BEFORE TRIAL of the Plaintiff,

15  ROBERT PEREZ, taken by the Defendant(s), pursuant to

16  Stipulation and to the Federal Rules of Civil Procedure,

17  held at the offices of Michael A. Cardozo, Esq., New York

18  City Law Department, 100 Church Street, New York, New York

19  10007, before Cleo Shenkin, a Notary Public of the State of

20  New York.

21

22

23

24

25

PEREZ

1          MR. LA RUE:  Off the record.

2          (Whereupon, an off-the-record discussion was

3     held.)

4     A.     In order to get jobs, I hope you understand me --

5     and I go against my lawyer and the two lawyers I got

6     here -- you have to have a connection, I no got

7     connections.

8     Q.     And do you think you can get a connection by

9     making --

10    A.     No.

11    Q.     -- political contributions?

12    A.     I no want it.

13    Q.     So, I will go back to my other question, do you

14    plan to seek City work other than by sealed competitive

15    bid?

16    A.     If they call me, I be glad to provide my service

17    to the City of New York.

18    Q.     Okay.

19          Have you ever started litigation that challenged

20    the denial of a bid?

21    A.     Yeah, I think it was when the -- not they denied

22    to Diamond Asphalt, uh, it was when the City tried to do

23    the joint bidding with the utilities, and Con Edison,

24    telephone, Brooklyn Union, et cetera.

25          And we won the case in the Supreme Court, in

PEREZ

```
1      Q.    Do you have any other lobbyists besides

2   Mr. Davidoff's firm?

3      A.    No.

4            MR. LEVINE:  Okay, I have no further

5            questions.

6            MR. LA RUE:  Okay.

7            MR. LEVINE:  Subject to the resolution of

8            the issue with Mr. Pines.

9            (Whereupon, at 10:37 A.M., the Examination

10           of this Witness was concluded.)

11

12

13                  ─────────────────────────
                         ROBERT PEREZ
14

15   Subscribed and sworn to before me

16   this 22 day of July, 2008.

17   ─────────────────────────
18            NOTARY PUBLIC

19                              J. ROBERT ALESSI
                              Notary Public, State of New York
20                                 No. 01AL5077401
                               Qualified in Nassau County
21                           Commission Expires 5-5-2011

22

23

24

25
```

# La Rue Declaration
# Ex. B

**OFFICIAL TEXT**
**Charter Revision Commission's Proposal on Campaign Finance Reform**

At press time, the official language to be placed on the ballot (in the event this proposal does appear on the ballot) is as follows:

Shall the changes related to the voluntary campaign finance system, including (1) prohibiting corporate contributions, (2) requiring disclosure and regulation of contributions by those doing business with the City of New York and regulation of indirect campaign expenditures, (3) establishing a special budget process for the Campaign Finance Board, and (4) establishing a procedure for filling vacancies on the Campaign Finance Board, proposed as amendments to Chapter 46 of the City Charter, be adopted?

Downloaded from:

http://www.nyccfb.info/public/voter-guide/ballot_98/charter.htm?sm=public_&zoom_highlight=1998+charter+amendment#text (last visited August 18, 2008).

# La Rue Declaration
# Ex. C

UNIONS MAKE A POWER PLAY Seek bigger political voice



Get the latest News, Sports and Gossip
delivered to your home

Sign Up | Manage Account

**DAILY●NEWS | News**

REGISTER   LOGIN

HOME  AUTOS  REAL ESTATE  JOBS  CLASSIFIEDS  IN PRINT  TICKETS  CONTESTS

Search

| NEWS | SPORTS | GOSSIP | ENTERTAINMENT | NY LOCAL | OPINIONS | VIDEO | BLOGS | LIFESTYLE | MONEY | LATINO | SERVICES |

NY CRIME   POLITICS   US/WORLD NEWS   HEADLINES/ARCHIVES   COLUMNISTS   BLOGS   PHOTOS

## UNIONS MAKE A POWER PLAY Seek bigger political voice

BY JOEL SIEGEL DAILY NEWS SENIOR POLITICAL CORRESPONDENT

Sunday, April 29th 2001, 2:21AM

Musicians Local 802, whose 10,000 members play in venues from bar mitzvahs to Broadway, was never ever a bit player in city elections - until now.

This year, the union has peppered candidates with questionnaires and for the first time is interviewing City Council hopefuls to make endorsements.

"We've had 70 in so far, one every 15 minutes," boasted Heather Beaudoin, the local's political director. "We want our local to have some muscle."

With term limits remaking City Hall, labor unions are mobilizing to play an unprecedented role in this fall's municipal elections, seeking to maintain and even increase their influence over city government for years to come.

By one estimate, twice as many unions are working to elect candidates this year than in any other municipal election. And their help is more extensive and coordinated than ever before, with unions offering such assistance as election lawyers, printing, specialized voter lists and even campaign strategy on top of the manpower and money typically bestowed on anointed candidates.

"What we're doing, it's unparalleled," said Brian McLaughlin, president of the Central Labor Council, an umbrella group representing 1.3 million workers.

The unions are putting extra weight behind candidates for six open City Council seats who are themselves union officials or members, labor leaders said.

The goal is to create a core of new Council members strongly loyal to the labor movement, giving the unions a voice in naming a new Council speaker and a hand in choosing new committee chairmen, labor leaders said.

"Essentially, they would be a 'sixth borough' who would work with us," said Ed Ott, the Central Labor Council's chief of public policy.

The breadth of union involvement is beginning to sound alarms in the business community, which fears the playing field is tilting too much toward labor. "From our perspective, this could be a disaster," said a business lobbyist who asked not to be identified.

Labor's increased activism is undisputed.

Four years ago, the 15,000-member Mason Tenders District Council, which represents laborers and Catholic school teachers, did nothing in the municipal elections beyond backing Councilman Sal Albanese for mayor.

"And it was just a paper endorsement," said Michael McGuire, the political director.

This year, the union plans to take sides in the races for mayor, controller, 20 City Council seats and four borough presidents, then place 500 to 750 volunteers at the disposal of its candidates. It opened a political action committee and will give up to $50,000 in donations, McGuire said.

United Food and Commercial Workers Local 1500, which represents 10,000 supermarket workers, played no role in local elections until this year. It hired a political director, Anthony Speelman, and hopes to provide 400 volunteers and $30,000 in contributions.

"The key right now is to elect people who are friendly to union positions," Speelman said. One of its big issues: stopping nonunion megastores like Costco from opening.

Even the 125,000-member District Council 37, one of the biggest political players in town, will do more. The municipal union put 1,300 volunteers on the streets for Hillary Rodham Clinton's 2000 Senate bid; it hopes to double that for this year's races.

"We have an opportunity to, essentially, elect our employer - the mayor, the City Council, the Council speaker. We are going to take complete advantage of that," said DC37 chief Lee Saunders.

Lacking a consensus in the hard-to-handicap mayoral race, many of the unions are focusing on the City Council for now. Under one scenario, many will steer clear of the mayoral contest and the expected Democratic primary runoff, when their ability to affect the outcome will be greater.

A driving force behind the unions' mobilization is term limits, which assures the election of a new mayor, 35 Council members and a Council speaker in 2001. "It would be malpractice for the unions to let this opportunity go by," said Evan Stavisky, a Central Labor Council consultant.

Another factor is a 1998 change in the city's campaign finance law that further capped top contributions and mandated that the city give $4, instead of $2, for every $1 raised. That dampened the influence of developers and other big-money interests - and boosted the relative clout of labor, whose power has always been in providing

Print   Email



| Digg | Del.icio.us | Newsvine |
| Reddit | Furl | Stumble |

Most Read   Most Discussed   Most Emailed

1.  Business man shoots wife, self in East Hampton vacation home
2.  Hunt for coward who preys on elderly
3.  Thug caught on camera beating 85-year-old Brooklyn woman
4.  Little to Big Foot claim
5.  Reputed mobster Jackie Nose gets 2-year term
6.  Losing our shirts - and our homes
7.  Slain Bronx boxer clearly a 'champ' as a kid
8.  Tot brutally slain over soiled pants
9.  Vital warnings were ignored at Deutsche Bank
10. Mario 'helped' target of probe



CAN YOU DRINK MILK AFTER THE EXPIRATION DATE?

GET THE ANSWER

NEED ANSWERS? JUST Ask



··Mobile·

my

Unlimited calling
to your 5 favorite people.

$39 99/mo

Newsletter Signup

Get the latest Updates.

SIGN UP NOW

UNIONS MAKE A POWER PLAY seek bigger political voice

volunteers and turning out its members to vote.

**ADS BY YAHOO!**

Focus Dailies Contact Lenses
Focus Dailies as low as $28.95 after $40 rebate. Free shipping.
*(www.ShopMyContacts.com)*

US$29.99 - Daily Complete Liquid Vitamin
Order Daily Complete, 211 Vitamins, Minerals, Antioxidants & more.
*(www.Luanne-AwarenessLife.com)*

Daily Express
Find Old Newspapers In The World's Largest Newspaper Archive.
*(NewspaperArchive.com/archives)*

Organic Daily Complete Vitamins, Save
Join & Save 15% to 35% on ORGANIC DAILY COMPLETE VITAMINS.
*(www.Ken.AwarenessLife.com)*



RSS headlines

Newsletter Signup

Send your story tips

Place an ad

News
Sports
Entertainment
Gossip
NY Local
Opinions
Lifestyle
Money
Latino
Services
Blogs
Autos
Jobs
Real Estate
Shop
Tickets
Contests
Customer Service
Advertising/Media Kit
Contact Us
Site Map

Use of this website signifies your agreement to the Terms of Service and Privacy Policy
© Copyright 2007 NYDailyNews.com. All rights reserved.

# La Rue Declaration
# Ex. D



# NYC'S RIGGED 'REFORMS'

By JAY GOLUB



*February 22, 2007* -- CITY Council Speaker Chris tine Quinn has announced that, "for now," she's not taking campaign donattions from "big time" lobbyists. Her aides are sending back some checks, even telling certain people that they're no longer welcome at her fund-raisers.

With Gov. Spitzer having put ethics at the forefront of local political debate, Quinn's move seems pretty smart. But don't expect her to *really* change the culture of City Hall - by, say, proposing a ban on *all* special-interest contributions.

That would infuriate her members - most of whom are counting on millions from special-interest groups for their future races.

But the hypocrisy goes further. For a decade or more, the Campaign Finance Board has asked the council to pass such a ban. Instead, in 1998, the Democrat-dominated council banned *some* special-interest contributions - but only *corporate* ones, which favor Republicans. Donations from (Democrat-leaning) labor unions and from lobbyists (who naturally focus on the power-wielding majority, which is also the Democrats) remain kosher.

The significant support Rudy Giuliani received from businesses and corporations helped him beat Mayor David Dinkins in 1993. That won't happen again, thanks to the City Council's "campaign reform."

Sure, Mike Bloomberg outspent every special-interest group for the last two election cycles, allowing him to beat union-backed Democrats. But even New York doesn't have that many billionaires.

Otherwise, this defunding of Republicans has worked pretty well. In a city that's elected GOP mayors for the last 16 years, the 51-seat council now has just three Republicans.

Even that's not the whole story: Democrats suffer, too, if they don't please the unions. Once big labor gets behind a candidate, its support invariably makes that candidate the frontrunner - and, with no other major funding options available, victory in the Democratic primary becomes a forgone conclusion.

Even the Campaign Finance Board is often blind to the inequities: It gives unions a pass when examining the corrupting influence of campaign gifts.

Look at the CFB's latest report on contributions from "entities that do business with the city." Now, many unions depend *solely* on government spending for their existence - yet the report doesn't even cover the hundreds of thousands they give to campaigns to buy influence at City Hall.

Why did unions get left out, I asked the board's spokesperson. The answer: "They weren't part of the data set used." Well, why not? "They just weren't."

The injustice is made worse by the city's generous campaign-finance system, which matches each "private" dollars with $4 in taxpayer funds. No, it doesn't match the union cash *directly* - but money is pretty easy to "wash." A $2,750 gift from a union will enable a candidate to hire a top fund-raising consultant or to throw a high-profile campaign event - and so raise at least $2,750 from "private" individuals. Then *that* money gets matched with $11,000 of public funds.

It's no wonder that of the $24 million given out in public funds in 2005, an amazing $22 million went to Democrats.

All this makes it nearly impossible for anyone who can't self-finance his campaign to be competitive in any race, from City Council to mayor.

In the end, the result of the 1998 "reforms" is a council full of pawns of organized labor - and an election system that is completely non-competitive, with incumbents and union-supported candidates winning every time. This is demonstrated by the fact that of the 60 primary and general election races an incumbent had to face in 2005, only one race was lost, and that was the scandal-plagued Allen Jennings race.

The racket could go statewide. Gov. Spitzer, in his State of the State Address, talked of bringing a similar public-financing program to elections in all of New York. This makes correcting the errors of 1998 more important than ever.

So, if Speaker Quinn really wants to earn the reformer stamp, she'll need to produce something like "equal treatment of special interests." Anything else is just posturing.

*Jay Golub is executive director of the Gotham Legal Foundation. A candidate for public advocate in 2005, he has participated in the city Campaign Finance Program since 2001.*

Home
_____

NEW YORK POST is a registered trademark of NYP Holdings, Inc. NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM
are trademarks of NYP Holdings, Inc.
Copyright 2008 NYP Holdings, Inc. All rights reserved.

# La Rue Declaration
# Ex. E

**The New York Times**



June 28, 2007

# New Campaign Finance Rules Skip Unions

By RAY RIVERA

The new law would crack down on donations from lobbyists, strictly limit contributions from contractors who do business with the city, and allow developers to give only a fraction of what they once could.

But there is one group that would be untouched by the major overhaul of the campaign finance law approved by the City Council yesterday: the city's powerful labor unions.

The unions, which have given millions to city candidates and provide critical backing in Council races, were excluded from the bill, which is expected to be signed into law by the mayor. The bill would go into effect over staggered periods as the city builds the needed databases to track people doing business with the city.

The changes have received broad support from government watchdog groups, who say the new campaign finance law will be among the most stringent in the country, sharply limiting influence and the appearance of influence of special-interest money on government policy.

Excluding labor groups from the restrictions illustrates the considerable strength unions retain in New York City politics, at a time when union power is waning elsewhere in the country. The new restrictions, political analysts say, will only magnify their power.

The City Council speaker, Christine C. Quinn, the daughter of a retired union electrician who was first elected in 1999, has received a total of nearly $70,000 in union contributions. One of her top aides, Maura Keaney, is the former political director for Unite Here, which represents hotel, restaurant and apparel workers.

Ms. Quinn has repeatedly drawn a distinction between a union negotiating with the city for better pay and benefits, and developers and corporations vying for lucrative land deals or government contracts.

"The situation here is to require that everyone gets treated the same way," she said yesterday. "A union or a PAC can give one contribution, whatever the maximum is for the office in question. Someone who did business with the City of New York prior to this could have every person in the business give a contribution of the maximum level allowed to that office. So I think this in fact much more levels the playing field."

If a union does get involved in a land-use application or a contract that is not labor related, she said, it would be bound by the same contribution restrictions.

Only four council members voted against the bill, citing concerns that the contribution limits would give an unfair advantage to wealthy candidates while restricting the speech of certain groups.

"The fact that we're leaving out interest groups — unions in this particular case — at the expense of the rest of

the city is questionable at best," Councilman Vincent Ignizio, a Staten Island Republican who voted against the bill. "The government is determining which speech ought to be heard loudest."

Under the bill, people who do business with the city could donate a maximum of $250 to City Council candidates and $400 to mayoral candidates. That cap would apply to lobbyists, developers, people with land-use and zoning applications pending before the city, and those with city contracts worth $100,000 or more. Union limits would remain the same as ordinary contributors at $2,750 in Council races and $4,950 in mayoral races.

A review of campaign finance contributions shows that unions give far less to candidates than do lobbyists, contractors and other groups who would be bound by the bill's "pay-to-play" restrictions.

In the 2001 and 2005 elections, for example, groups defined as "doing business" with the city that would be bound by the new restrictions gave a total of about $25 million to citywide candidates. Unions and labor-related political action committees gave about 16 percent of that total, or about $4.1 million.

Under the new restrictions, contributions from groups doing business with the city would be reduced to 10 percent of their present levels, amplifying the effect of union dollars.

That increase in monetary influence would come on top of the already considerable influence the unions have in manpower, get-out-the-vote efforts and endorsements.

"In comparison, the unions don't give that much money, so this kind of equalizes their power — that's No. 1," said Hank Sheinkopf, a longtime Democratic consultant. "No. 2, they're still powerful in that they can bring resources to bear in particular districts and in particular campaigns."

Evidence of that power can be seen in how the bill was put together. Mayor Michael R. Bloomberg had been calling for stricter pay-to-play restrictions since his first term, including limits to union giving. When negotiations on the current bill began late last year, there was little or no talk of putting restrictions on unions, according to people close to the negotiations.

Councilman Simcha Felder, a Democrat of Brooklyn and chairman of the Council's Governmental Operations Committee, was one of the lead negotiators on the Council side. He said the bill would never have passed without the union exclusion.

But even with the union exception, Mr. Felder praised the bill.

"I think we have to be practical," he said. "I think that this deal with all the restrictions is a very significant improvement over what exists."

The new restrictions come as more than two-thirds of the 51 council members will be forced out of office in 2009 by term limits, including Ms. Quinn.

Ms. Quinn is frequently mentioned as a possible mayoral candidate, and some analysts and critics of the bill said that now would be a bad time for her to anger the unions. Her chief rivals for the office, City Comptroller William C. Thompson Jr. and Representative Anthony D. Weiner, Democrat of Queens, also enjoy broad

union support. Mr. Thompson has received nearly $170,000 in union contributions since 2001, more than any other current city office holder.

Ms. Keaney, the speaker's deputy chief of staff, said the union exception has nothing to do with Ms. Quinn's strong ties to labor.

"She has a strong relationship," Ms. Keaney said, "but you could also say that she has strong relationships with the business community and developers."

Councilman Bill de Blasio, who also has strong ties to labor and has received about $153,000 from unions since 2001, supported the exclusion.

"There's no question about the business community's ability to defend itself," Mr. de Blasio said before yesterday's vote. "The only balance when it comes to working people's interests is labor, and anyone who argues that we should ban labor contributions is basically ceding the playing field to businesses and the wealthy."

Critics of the bill, mainly lobbyists and developers most affected by it, say placing restrictions on some groups but not on unions is tantamount to discrimination. Some have threatened a lawsuit challenging it on constitutional grounds.

Critics also say the restrictions will give more power not only to the unions but also to the very rich who can finance their own campaigns.

"Communicating with the electorate is very expensive these days," said Norman Adler, president of Bolton-St. Johns, the city's second-largest lobbying firm in terms of revenue last year. "My view is it's anti-democratic."

*Diane Cardwell, Michael M. Grynbaum and Jo Craven McGinty contributed reporting.*

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# La Rue Declaration
## Ex. F

The New York Times

November 17, 2005

# Council Bill Eases Restriction On Union Political Donations

By WINNIE HU; JIM RUTENBERG CONTRIBUTED REPORTING FOR THIS ARTICLE.

The City Council pushed through a bill yesterday that would allow labor unions to greatly increase their donations to political candidates, the most significant loosening of contribution limits since the city's campaign finance program was established in 1988.

In doing so, the Council overruled the Campaign Finance Board, the independent agency charged with enforcing the city's campaign finance rules; and all but ignored government watchdog groups' pleas that it wait for the normal review process that follows every city election. The Council's approval also ran against the wishes of Mayor Michael R. Bloomberg.

By a vote of 44 to 3 with one abstention, the Council approved a bill that would allow different local chapters of the same union to be counted as distinct sources of contributions, under specific conditions. Currently, no single source may contribute more than $2,750 to Council candidates, or $4,950 to candidates in citywide races.

"It's undermining the whole campaign finance program," said Gene Russianoff, a senior lawyer for the New York Public Interest Research Group, who testified against the bill yesterday. "It's completely unnecessary, and it's a sign that when the unions say jump, the Council leaps."

The campaign finance bill gained wide support among council members at a time when unions and their lobbyists have increasingly become a force in city elections as well as in Council politics. All seven council members vying to become the next speaker signed on to sponsor the bill.

Council members have a more antagonistic relationship with the Campaign Finance Board, which has often fined them for various violations.

The campaign finance bill has become a post-election test for Mr. Bloomberg, who has portrayed himself as philosophically opposed to any measure giving outside interests more influence in government through political donations. That was before Mr. Bloomberg was re-elected this month with the support of dozens of unions. Council and labor leaders have been watching closely to see whether he will soften his position by allowing the bill to pass, in a nod to his new union allies.

Yesterday, Mr. Bloomberg announced that he would veto the bill, but at the same time he expressed sympathy with the unions' position. He said he would veto it only because he believed that the Council had a conflict of interest in legislating on campaign finance.

"The City Council should not be passing a law where they are the direct beneficiaries -- the conflict is insurmountable," Mr. Bloomberg said. "They just should not be going there at all."

But, the mayor also said emphatically, "Conceptually, I think that each individual local union should be able to give money to whomever they want and not be restricted by what another part of the amalgamation or conglomeration of unions does."

Council leaders said they expected to have the 34 votes needed to override the mayoral veto.

Frederick A. O. Schwarz Jr., the chairman of the Campaign Finance Board, testified yesterday that the bill would create a loophole that would enable unions to exceed contribution limits. He repeatedly urged the Council not to pass the bill, saying there was no rush because there would not be another citywide election for four years.

Last winter, the Campaign Finance Board proposed a rule that contributions from a union's local chapters or affiliated organizations would be presumed to be from a single source. The officials said the rule merely clarified what they had been doing all along.

They agreed to withdraw the rule after council members and union officials objected.

Brian M. McLaughlin, president of the Central Labor Council, said yesterday that the bill would prevent the Campaign Finance Board from imposing "a restrictive rule that completely undermines democracy and free speech by denying a voice to working men and women."

Councilwoman Madeline Provenzano of the Bronx said she voted against the bill because it would not be fair to exempt only unions from contribution limits. Ms. Provenzano said unions had become more influential than lobbyists in the Council.

"I think most of them voted yes because they are courting the unions and because they're going to need them in future elections, you know, whatever their plans are," she said. "Unions have a big influence. I've always been pro-union, but in this case, they're wrong."

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

# La Rue Declaration
# Ex. G

**The New York Times**

December 15, 2005

# Higher Limits on Donations From Unions to Take Effect

By WINNIE HU

In a reversal, Mayor Michael R. Bloomberg will allow a law to take effect today under which labor unions can sharply increase their donations to political candidates. It would be the most significant loosening of contribution limits since the city's campaign finance program was set up in 1988.

Aides to Mr. Bloomberg confirmed yesterday that he would not veto the law despite saying last month that he opposed it while at the same time being sympathetic to the interests of unions. He had harshly criticized the City Council, saying it was "passing a law where they are the direct beneficiaries," and adding that, "the conflict is insurmountable."

The mayor will allow the legislation to become law because he does not see the point of vetoing a bill he agrees with conceptually, especially since it would be overridden by the Council, said Ed Skyler, the mayor's director of communications. "His objection has always been to the City Council changing the rules in such a self-serving manner."

The law will change the practice under which large unions with many locals were limited to giving no more than $2,750 to Council candidates and no more than $4,950 to candidates for citywide races.

Under the new law, money from different locals of the same union will now be counted as distinct sources of contributions under specific conditions. That would allow local unions affiliated with S.E.I.U., such as 1199/S.E.I.U. United Healthcare Workers East, for instance, to give tens of thousands of dollars combined to single candidates.

The Campaign Finance Board, the independent agency that enforces the city's campaign finance rules, and government watchdog groups had vigorously opposed the legislation, contending that it would effectively create a loophole for unions to vastly increase their influence over the city's elected officials. "The law's a stinker," said Gene Russianoff, a senior lawyer for the New York Public Interest Research Group. "It will allow the same decision-maker to make multiple contributions. Whether the mayor's name is on it or not, he's not doing the right thing."

But the campaign finance legislation has quickly gained support among council members as unions and their lobbyists have increasingly exerted their force in city politics. All seven council members vying to become the next speaker signed on to sponsor the bill.

Steve Sigmund, a spokesman for the current speaker, Gifford Miller, said, "We're pleased that the mayor won't veto this bill to allow working people to participate in the electoral process."

The legislation placed Mr. Bloomberg in a difficult position. He has portrayed himself as generally opposed to the idea of outside interests gaining influence in government through political donations, but was re-elected last month with the support of dozens of unions.

In recent weeks, these unions have sought to increase pressure on the mayor to support the legislation, and at least two union officials have said that they were led to believe by the mayor's campaign staff that he would not veto it.

Carolyn Daly, a spokeswoman for the New York Central Labor Council, said yesterday that the campaign finance legislation had been a priority. "There was a fundamental misunderstanding of how New York City labor unions are set up," she said. "We are thankful that the mayor does understand. I think his decision not to veto this legislation says a lot."

Frederick A. O. Schwarz Jr., chairman of the Campaign Finance Board, had argued that there was no need to rush through the campaign finance legislation because there would not be another citywide election for four years. But in the end, his pleas failed to sway either council members or Mr. Bloomberg.

"The board is very disappointed and does not believe that the administration has fully appreciated the ramifications," Mr. Schwarz said.

Copyright 2005The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map |

# La Rue Declaration
# Ex. H



Section: New York > Printer-Friendly Version

# Number of Small Campaign Contributors Soars

By **ABRAHAM RIESMAN**, Special to the Sun | July 25, 2008
http://www.nysun.com/new-york/number-of-small-campaign-contributors-soars/82634/

THE NUMBER OF PEOPLE MAKING SMALL CONTRIBUTIONS TO CITYWIDE ELECTORAL
campaigns has soared in the past six months, largely due to campaign finance reforms, according to a
report issued yesterday by the city's campaign finance board.

As of January 11, only 57% of all donors to citywide campaigns gave sums of $250 or less, which is the
board's definition of a "small donor," the report stated. But during the six months following that date,
about 72% of all donors gave small contributions.

If that upward trend continues, the 2009 election cycle could have the highest proportion of small
donors in the past decade, according to data issued in the report.

The board attributed the shift to recent legislation that encourages small donations by placing more
restrictions on donors who have business dealings with the city and by providing matching funds for
the first $175 of any contribution from a city resident.

In the same six months, however, overall fund-raising slowed by about 15%, according to data from
the board database.

# La Rue Declaration
# Ex. I



**The New York Sun**

Section: New York > Printer-Friendly Version

# Scramble Set for Council

More Than 300 Seen Making Bids in 2009

By GRACE RAUH, Staff Reporter of the Sun | February 26, 2008
http://www.nysun.com/new-york/scramble-set-for-council/71826/

WITH 36 MEMBERS OF THE CITY COUNCIL BEING FORCED OUT OF OFFICE NEXT YEAR DUE TO term limits, the election of 2009 could be the biggest and most expensive to hit New York.

At least 45 New Yorkers already are amassing campaign war chests to run for council seats and many more are expected to enter races in the coming months. One political consultant who is advising council candidates says he has identified more than 300 candidates he expects to run in 2009.

The early start to council campaigning and fund-raising efforts mirrors the early start to this year's presidential race, with local candidates saying they want to put fund raising behind them so they can focus on campaigning as the city election nears.

"Put on your helmets and put on your seat belts: It's going to be like a demolition derby," a former aide and campaign strategist to Mayor Bloomberg, William Cunningham, said. "People are running around, banging into each other, and then four years from now all of those people pretty much get a free ride for re-election. That's pretty much how it's worked out."

The last time a wave of candidates ran for seats on the council was in 2001, when another large class of members was removed from office by term limits.

More than 18 months before the primary, one council candidate said he has already finished fund raising. David Greenfield, who is running to succeed Council Member Simcha Felder in Brooklyn, has raised more than $170,000, more than any other council candidate in the city so far, according to the New York City Campaign Finance Board's records.

"It's a way to show people early on that you have a lot of support and a lot of momentum and that you are a competitive candidate," Mr. Greenfield, 29, said. "It allows you to get the fund-raising out of the way and focus on the race."

Mr. Greenfield, the executive vice president of the Sephardic Community Federation in Brooklyn, said he plans to accept public matching funds for his campaign, and therefore would have to abide by a spending cap set by the city's Campaign Finance Board.

Once he receives public funds, he will have enough in his account to spend at the limit of $161,000

during the primary and $161,000 during the general election, he said.

Another likely candidate, Elizabeth Crowley, the cousin of Rep. Joseph Crowley, has raised more than $70,000 to run for a council seat and spent more than $20,000, according to records from the board. She has not yet declared her candidacy, but said that after losing a race in 2001 to Council Member Dennis Gallagher, who represents Middle Village, Glendale, and Ridgewood in Queens, she launched her latest fund-raising push much earlier.

"Not only did I learn a lesson from '01 — to get involved early — but it helps letting other people who are maybe interested in filling the position that you are really interested and not just talking about it," she said.

The Campaign Finance Board will give candidates who participate in its program $6 for every $1 collected, up to $175. A $175 donation, for example, will bring in $1,050 in public funds from the board, but $1,050 is the maximum amount granted by the board for any contributor.

The board gave council candidates $14.2 million of the approximately $42 million in public funding spent during the 2001 election, and about $6.6 million of the approximately $24 million spent in 2005.

The fund-raising onslaught more than 18 months before the primary and the number of candidates expected to run for the council in 2009 is in many ways a product of the city's term limit law, which restricts city officials from holding a public office for more than two consecutive terms.

Critics of the term limit law say it means that every eight years a new wave of inexperienced lawmakers arrive at City Hall and spend the first year or two learning the ways of city government.

Council Member Lewis Fidler, who is opposed to term limits, said that even before a new class of council members is sworn in, he is concerned about another set of lawmakers: the council members on their way out of office, many of whom are already running for their next political job.

"The ability of the speaker to maintain some kind of cohesion and discipline in the body is going to dissipate, and that will make the council a weaker counterpoint to a mayor and a charter that is executive-centric already," Mr. Fidler, who represents parts of Brooklyn, said. "If you love Mike Bloomberg, that doesn't bother you, but if you don't like the next mayor, that might be a huge concern."

Some 2009 races are heating up very early in the process. There are at least five Brooklyn Democrats looking to succeed Council Member Bill de Blasio, who is running for president of Brooklyn in 2009, while at least four candidates, one of whom, Paul Vallone, is the younger brother of Council Member Peter Vallone Jr., are running to replace Council Member Tony Avella, who represents parts of Queens and is a candidate for mayor.

Assemblyman Michael Gianaris, a Democrat of Astoria, is speculated to be considering a run for the council with the intention of becoming the next speaker.

A race to replace Council Member Alan Gerson in Lower Manhattan is providing political junkies with an early dose of campaign intrigue, with a fight over Internet domain names under way between a likely candidate who is chairwoman of Community Board 1, Julie Menin, and a retired firefighter and former police officer running for the open seat, Peter Gleason.

Mr. Gleason purchased the domain names juliemenin.com, juliemenin.net, and juliemenin.org and plans to post information about his anticipated opponent on them, prompting Ms. Menin to hire an attorney to help her get control of the sites. The dispute was first reported in the Villager newspaper.

"These kinds of things shouldn't happen," Ms. Menin said in an interview with The New York Sun. "It's just not an honest way to do things."
Mr. Gleason said Ms. Menin should have known to purchase her own domain names.

"I think the voters are going to have to determine whether or not they want to vote for somebody who doesn't have a certain level of foresight," he said.

# La Rue Declaration
# Ex. J



Section: New York > Printer-Friendly Version

# City Blacklist Limits Giving by 12,000

Bollinger, Thain, LeClerc 'Get Their Megaphones Taken Away'

By JOSEPH GOLDSTEIN, Staff Reporter of the Sun | August 14, 2008
http://www.nysun.com/new-york/city-blacklist-limits-giving-by-12000/83868/

A LITTLE-KNOWN BLACKLIST, STILL BEING COMPILED UNDER THE TERMS OF THE CITY'S NEW campaign finance law, is threatening to block thousands of New York's wealthiest and most distinguished citizens from participating fully in the political life of the city.

The list already carries about 12,000 names, including civic leaders with positions at museums, universities, hospitals, law firms, nonprofits, churches, yeshivas, and banks. Those on it are forbidden from contributing to the city's political campaigns in the amounts other citizens are permitted.

View and search the city's database of lobbyists.
View and search the city's database of people with "business dealings" with the city.

Among those on the list are the president of Columbia University, Lee Bollinger; the president of Lincoln Center, Reynold Levy; the CEO of Merrill Lynch, John Thain, and the president of the Metropolitan Museum of Art, Emily Rafferty. Also listed among many others are the president of the New York Public Library, Paul LeClerc, and the director of the New York Civil Liberties Union, Donna Lieberman.

The city's regulations seem to be heading to where "only the people involved in the most pedestrian concerns could participate in government," a lawyer who is challenging the list in federal court, James Bopp, said in a telephone interview.

The city is drawing up the list to enforce a 2007 law that limits campaign contributions from lobbyists as well as those who have "business dealings" with the city. The aim of the law was to prevent corruption in city politics, or at least the appearance of corruption.

Court documents in the lawsuit have not yet turned up any evidence that campaign contributions from those on the list had been linked to corruption in the past.

"Part of the public perception is that the giving of large contributions could be a way to curry favor with politicians," the executive director of the city's Campaign Finance Board, Amy Loprest, said in a telephone interview. "Whether that perception is real, the whole purpose of the law is to improve the public's faith in the electoral system."

But Mr. Bopp said that the list simply "scooped up tens of thousands of people" without good reason.

"It's pretty troubling that the government is blacklisting people and identifying them as particularly risky threats of corruption when they've done nothing," Mr. Bopp, who has won cases challenging campaign finance regulations before the U.S. Supreme Court, said in a phone interview. "They have been presumed guilty instead of innocent just because of their prominence in the community," Mr. Bopp said of the people on the list.

The length of the list is attributable to the law's broad definition of what it means to have "business dealings" with the city. The list does not only include lobbyists or businessmen who count the city as a customer, such as, say, the owner of a gravel company. Any nonprofit that receives city help for operating costs, such as the Metropolitan Museum of Art or the American Museum of Natural History, is also considered to have "business dealings" with the city, and members of their top management are placed on the list.

In all, corporate officers from 1,612 different nonprofit organizations are listed as doing business with the city. Several are churches and synagogues that provide city-funded day care, counseling, or other services. For instance, the dean of the Cathedral Church of St. John the Divine, the Very Reverend James Kowalski, is on the list.

The city is currently in the process of adding to the list the management of companies or institutions that have a zoning variance request before the city. Also being added are corporate officials whose companies are receiving economic development packages that include benefits from the city. When the list is finished, which is expected to occur in December, it could also include the publisher of the New York Times, Arthur Sulzberger Jr., whose paper had not, as of a year ago, used up the sales tax credit it received from the city for building a new headquarters.

"Is it over-inclusive? I would say 'no,'" a senior city lawyer who is defending the law against Mr. Bopp's lawsuit, Jonathan Pines, said of the list. "There are a tremendous number of ways in which an individual or entity can be engaged in business dealings with the city. And it was an enormous undertaking to come up with a definition."

Limits on campaign contributions have long been a contentious issue. Critics of the limits say the donations are a form of speech protected by the First Amendment, while proponents say the limits are needed to protect against corruption and favoritism.

In New York, campaign contribution limits generally restrict people to contributing up to $4,950 to a mayoral candidate and $2,750 to a City Council candidate. Under the new law, those on the list are now limited to giving less than 10% that amount: up to $400 to mayoral candidates and $250 to council candidates. The law is in effect for the 2009 election and will likely result in campaigns having to return contributions.

A second provision of New York's campaign finance limits prevents the city from matching any contributions by people on the list. Campaign contributions by other citizens, up to the first $175, are matched by six times that amount by city funds. The effect is that those not on the blacklist can give $2,750 to a council candidate, bolstered by $1,050 in matching funds, for a total of $3,800, while

those on the blacklist can only give up to $250.

It is the ban against matching the donations by people on the list that is most vulnerable to being struck down by a court, some legal experts say.

"That strikes me as utterly irrational and has got to go," a law professor at New York University, Burt Neuborne, said. "They're essentially saying that if you do business with the city the value of your money should be lessened. Those people get their megaphones taken away while everyone else gets government amplification."

Mr. Neuborne also said that some might consider membership on the list to be a perk: It presents a handy excuse against campaign solicitations.