Charles Capetanakis (CC 1120)
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
Phone: (212) 557-7200
Fax: (212) 286-1884
*Local Counsel for the Plaintiffs*

James Bopp, Jr. (JB 0781)*
Joe La Rue (JL 2423)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
*Lead Counsel for the Plaintiffs*
        * Admitted pro hac vice for this case
on May 7, 2008 by order of the Honorable
Laura T. Swain, District Court Judge.

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

**OGNIBENE, *et al.*,**

                        ***Plaintiffs*,**

          -against-                      **C.A. No. 08 CV 01335 (LTS) (TDK)**

**PARKES, *et al.*,**

                  ***Defendants*.**

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## STATEMENT OF UNDISPUTED FACTS

### —AND—

## PLAINTIFFS' LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 56.1, plaintiffs respond to the defendants' statement of undisputed facts as follows:

<u>Overview</u>

**1.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments

made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

2.      Without agreeing with the truth of the statements in this paragraph, Plaintiffs ADMIT that the City Council enacted Local Laws 34 and 67, and claimed that they were doing so for the reasons stated in this paragraph. Plaintiffs **DENY** the Council's assertion, however, that the enactment of these laws would in any way reduce the appearance of undue influence associated with contributions from those doing business with the City. Plaintiffs assert that the City already accomplished that goal when it enacted the 'regular' contribution limits in 1988. *See* Admin. Code 3-703(1)(f).

3.      Plaintiffs ADMIT the facts contained in this paragraph.

4.      Plaintiffs ADMIT the facts contained in this paragraph.

5.      Plaintiffs **DENY** the facts contained in this paragraph.

Defendants allege that Local Laws 34 and 67, which bar contributions from partnerships, limited liability partnerships, and limited liability companies, "builds on a 1998 Charter amendment adopted by the city's voters." Yet, by the Defendants' own admission, the 1998 Charter adopted by the City's voters approved a ban on *corporate* contributions. Loprest Decl. ¶20; *see also* "OFFICIAL TEXT: Charter Revision Commission's Proposal on Campaign Finance Reform", La Rue Decl. Ex. B. It is questionable whether banning contributions from limited liability companies were authorized by the charter amendment approved by the voters. It is certain that banning contributions from *partnerships* and *limited liability partnerships* was not authorized. To say that banning these contributions "builds on" what the voters authorized is a stretch. Plaintiffs contend that it goes far beyond what the voters authorized.

2

**I.        The Campaign Finance Program**

**6.**     Plaintiffs ADMIT that the Campaign Finance Program (the "Program") was established in 1988 by the CFA. Plaintiffs **DENY** that the Program, as administered now, is a voluntary program.

Plaintiff Tom Ognibene recently ran in the 2008A Special Election for City Council District 30. Because it was a Special Election, he had limited time to raise funds. He would have liked to have run as a non-participating candidate. However, because he was not allowed to solicit contributions above $250 from those defined as having business dealings with the City, as well as prohibiting him from accepting contributions from LLCs, LLPs, and partnerships, he reasonably believed he would be unable to raise sufficient money to mount an effective campaign without participating in the City's matching Program. Mr. Ognibene therefore felt forced to enter the Program.  Furthermore, he plans to run for City Council for District 30 in 2009. He would like to run as a non-participating candidate. However, he reasonably believes that he will not be able to raise the money necessary for an effective campaign because of the challenged laws. He is therefore considering running as a participating candidate. Mr. Ognibene asserts that because of the challenged laws, the Program is not voluntary. Rather, the challenged laws are forcing candidates into the Program in order to have any chance to raise the funds necessary to mount an effective campaign. Ognibene Decl., ¶¶ 3-10.

**7.**     Plaintiffs ADMIT the averments made in this paragraph.

**8.**     Plaintiffs ADMIT the averments made in this paragraph.

**A.        General CFA Requirements**

**9.**     Plaintiffs ADMIT the averments made in this paragraph.

**B.        Matching Funds**

10.    Plaintiffs ADMIT that NYC employs a 6 to 1 ratio for matching contributions.

Plaintiffs **DENY**, however, defendants' statement that "[p]rivate contributions of up to $175

from individuals who reside in New York City are matched ...." Many private contributions from

those who reside in NYC are **_not_** matched. For instance, NYC will not match contributions from

lobbyists, their spouses or domestic partners, their employees, and their employees' spouses or

domestic partners.  Admin. Code § 3-702(3)(g).  Similarly, NYC will not match contributions

from those defined as having business dealings with the City.  Admin. Code § 3-702(3) (h).  This

includes any CEO, CFO, and/or COO of businesses defined as having business dealings with the

City, as well as those with "senior managerial capacity" or greater than ten percent ownership in

such businesses. Admin. Code §§ 3-702(20); 3-703(1-a).

11.    Plaintiffs ADMIT the averments made in this paragraph.

12.    Plaintiffs ADMIT the averments made in this paragraph.

### C.    Contribution Limits

13.    Plaintiffs ADMIT the averments made in this paragraph.

14.    Plaintiffs ADMIT the averments made in this paragraph: certain individuals are

subject to lower contribution limits, and certain types of organizations are prohibited from

contributing at all.[1]

## II.    1998 Charter Revision Reforms.

17.    Plaintiffs ADMIT that in 1998, a Charter Revision Commission made a series of

recommendations relating to campaign finance reform, and that the Commission concluded that

corporate contributions were "inherently problematic and should be banned outright."

Plaintiffs **DENY** defendants' assertion that the Commission "found" that

---

[1] Defendants' Statement of Undisputed Facts does not include numbers 15 and 16.

corporate contributions create inequities and impair the ability of public officials to do their jobs.

Plaintiffs note that the Commission Report indicates that the Commission originally did not intend to ban corporate contributions. Rather, they intended to ban contributions from those with business dealings with the City. However, after circulating that proposal, many commentators suggested that the City could achieve their goals more efficiently by banning corporate contributions instead. The Report states, "The Commission continued to believe it was important to regulate contributions by those who do business with the City but, after discussion, decided to recommend that corporate contributions be prohibited as well." "CRC Report", Pines Decl. Ex. F, at 16. To attribute a self-described 'decision' as a "finding" seems to violate the meaning of that term.

18.     Plaintiffs ADMIT that the Commission characterized banning corporate contributions as "a step toward solving" the problem of "doing business" contributions. Plaintiffs also AGREE that the Commission proposed regulating contributions from those who do business with the City.

Plaintiffs **DENY** the defendants' assertion that donations intended for "securing access to, or influence over" elected officials are "inherently harmful" due to the opportunity for corruption. Plaintiff Tom Ognibene, who was Minority Leader of the City Council from 1991 through 2001, has explained that people contributed money to his and others' political campaigns for any number of reasons. Regardless, when he was a member of City Council, he never granted access to anyone or voted in favor or against a proposal, because someone contributed or did not contribute to his campaign. Ognibene Decl., ¶¶ 11-12.

Plaintiffs ADMIT that the Commission identified concerns relating to contributions by contractors and lobbyists. However, because the Commission acknowledged

that there is no evidence that the questioned contributions actually influenced anyone. "CRC Report", Pines Decl. Ex. F, at 19) (quoted in Defendants' Statement of Undisputed Facts, ¶ 18), Plaintiffs **DENY** the Commission's statement (quoted with approval by the defendants) that"[t]here is, however, no doubt that these contributions have a negative impact on the public."

19.    Plaintiffs ADMIT the averments made in this paragraph.

20.    Plaintiffs ADMIT the averments made in this paragraph.

21.    Plaintiffs **DENY** the contention that "the ban on corporate contributions had a significant impact on increasing the role of individual contributor participation." The fact that 87 percent of contributions came from individuals, and only 1 percent from corporations, in 2001 (compared with 62 percent from individuals and 27 percent from corporations in 1997) proves nothing about whether *more* individuals contributed in 2001 (as defendants allege). To prove the allegation, one would have to analyze how many individuals contributed in 1997 and 2001, *not* what percentage of contributors were individuals. Of course, if one eliminates corporate contributions, the percentage of individual contributors will rise. The facts the defendants cite do not prove their assertion. Plaintiffs therefore DENY that it is proven.

22.    Plaintiffs ADMIT the averments made in this paragraph.

**III.    Campaign Finance Board Study of "Doing Business" Contributions.**

15. [2]    Plaintiffs **DENY** the facts contained in this paragraph. Defendants allege that the CFB "conducted research, and issued three alternative versions of 'doing business' rules for public comment." They further aver that the Board received "limited response" to the proposals, and could not reach consensus for how to proceed. The defendants state that the Board therefore

---

[2] Paragraph 15 appears here in the defendants' statement of facts, between paragraphs 22 and 23.

concluded it had met its obligations.

The defendants cite to Ms. Loprest's declaration as support for these factual averments. Ms. Loprest does indeed make these statements in her declaration. However, plaintiffs have been unable to verify the accuracy of Ms. Loprest's averments. Plaintiffs were unable to find any independent record that the CFB conducted research, issued three different doing business rules prior to November 2000, or concluded that it had met its obligations. Neither the defendants nor Ms. Loprest cite to any individual record of these happenings. Plaintiffs therefore DENY these allegations.

23.    Plaintiffs **DENY** the statements in this paragraph. Plaintiffs have assumed that when defendants stated that "a local bill was introduced," they mean an Introduction that, if passed, would become a local law. Plaintiffs have therefore looked at the Introductions introduced in 2004, available on the City Council's website, and have been unable to locate one matching the defendants' description. Plaintiffs therefore DENY this averment.

24.    Plaintiffs ADMIT the averments made in this paragraph.

25.    Plaintiffs ADMIT that the CFB held public hearings relating to regulating campaign contributions, but **DENY** whether opponents of regulation were heard. Plaintiffs are unaware of any testimony heard by the CFB that was from *opponents* of further regulation of campaign contributions, as defendants allege. The documents turned over to plaintiffs in response to their discovery requests only contain testimony from those who supported further regulation.

26.    Plaintiffs ADMIT the averments made in this paragraph.

27.    Plaintiffs ADMIT the averments made in this paragraph.

28.    Plaintiffs ADMIT the averments made in this paragraph.

29.    Plaintiffs ADMIT that the Report included case studies as reported in these bullet-points. Plaintiffs **OBJECT, however, because the information here is so incomplete as to be misleading.** Neither the Report (nor the defendants) alleged that the Makkos brothers or the non-profits did anything wrong. All these two case studies show is that the Makkos brothers and the certain individuals associated with non-profits were politically active. Defendants did not allege (and the Court should not infer) that anything improper was done by any of the people or groups referenced in the first two bullet-points. Therefore, plaintiffs **DENY** these averments if defendants are averring that these case studies suggest influence peddling (or that there is evidence of influence-peddling or other pay-to-play, quid pro quo arrangements in NYC).

Plaintiffs also **OBJECT to the statements in the third bullet-point** as being so incomplete as to be misleading. Plaintiffs therefore **DENY** them. Defendants omit the fact that the Report itself stated that the Report acknowledges that no conclusions can be drawn about *why* the Witkoff Group received their "carve out." The Report even says that there is no evidence the developer who received the benefit even applied for it. The Report also acknowledges that "the policy rationale behind the zoning 'carve-out' is unknown." Interim Report, Loprest Decl., Ex A, at 36. Tellingly, the Report stated that it has no examples of corruption. *Id*. at ii. Yet, the statement in the third bullet-point seems to imply that the Witkoff Group used its contributions to gain influence and gain a carve-out, or that the carve-out was given because the Witkoff Group contributed. There is simply no evidence to substantiate that implication; and, that implication runs counter to the plain statement of the Report that there was no evidence of wrong-doing.

Plaintiffs further note that the developer who did not receive a "carve out" used one of New York City's most prominent lobbyists. Interim Report, Loprest Decl., Ex A, at 36.

8

IV.        2006 Campaign Finance Board Recommendations

**30.**    Plaintiffs ADMIT the averments made in this paragraph.

**31.**    Without agreeing that the statements are true, Plaintiffs ADMIT that the CFB made the statements averred to have been made by them in this paragraph.

Plaintiffs, however, **DENY** the that "organizational contributions" tend to benefit incumbents.  Plaintiffs assert that expert study is needed to determine the truth or falsehood of this statement.

Plaintiffs also **DENY** the truth of the CFB's contention that "banning [LLC] contributions would be one way to reduce the influence of 'doing business' contributors." This statement assumes that the LLCs which contribute to political campaigns are 'doing business' with the City. Yet, there is nothing in the record to suggest that the CFB made that determination.

**32.**    Without agreeing with any of the statements, Plaintiffs ADMIT that the CFB made the statement quoted in this paragraph. Plaintiffs **DENY**, however, the accuracy of the statement. The CFB assumes, for example, that contributions from those who do business with the City "dilute the impact of individual contributors." Yet, the City had a limit in place for *all* contributors. Admin. Code § 3-703(f). If the City allowed those with business dealings to give however much they wanted, while restricting the contributions of non-business dealings contributors, there might well be the "dilution" of which the City complains. Similarly, if the City still allowed unlimited contributions (as they did prior to 1988), there might be a problem with "dilution." But, when the City allows everyone to make the same, reasonable contribution (say, $2,750 for candidate for city council, as was the case prior to Local Law No. 34), the dilution argument becomes very weak.

Plaintiffs also **DENY** that incumbents automatically have "much greater access"

to contributions from those who do business with the City. *See* Plaintiffs response above in para. 31.

Plaintiffs also **DENY** whether business-dealing individuals "do not have to think twice before making a maximum donation." This statement assumes that those with business dealings with the City do not have any financial worries or difficulties of their own. Plaintiffs assert this assumes too much.

33.    Without agreeing with the truth of the statements, Plaintiffs ADMIT that the CFB made the statements contained in this paragraph. Plaintiffs **DENY**, however, that the statements in this paragraph logically follow from one another. The CFB has not proven what it asserts; namely, that real estate interests are attempting to buy influence. That some real estate interests are "among the top contributors" does not prove anything other than the fact that some real estate interests make political contributions. Yet, it is this fact—that some real estate interests are "among the top contributors"—that the CFB relied upon as 'proof' for its assertion that real estate interests attempt to buy influence.

**V.    Local Laws 15, 16, and 17, of 2006**

34.    Plaintiffs ADMIT the general averment of this paragraph regarding what LL No. 15, 16, and 17 *do*. Plaintiffs **OBJECT to the characterization that the effect of these local laws was to "strengthen" the Administrative Code. This is misleading.** Plaintiffs therefore **DENY** this statement. To "strengthen" something is generally understood as "to make it stronger and therefore better." Yet, Local Law No. 16 of 2006 took away the right of lobbyists, their spouses or domestic partners, their employees, and their employees' spouses or domestic partners to give any gift to a public servant. *See* Reiter Decl., at ¶¶ 2-6. Plaintiffs have asserted in their amended complaint that this provision violates the first and fourteenth amendment, both

10

facially and as applied. Amended Complaint, ¶¶ 314-17.

Plaintiffs further **DENY** defendants' contention that these laws only apply to those defined as lobbyists by Administrative Code 3-211(a) and (c). That definition is quite narrow, and is restricted to those who actually engage in lobbying activities. Local Law No. 16 of 2006 (the "Gift Law"), however, affirmatively states that applies to those who are "required to be listed on a statement of registration pursuant to section 3-213(c)(1) of subchapter 2 of this chapter." Local Law No. 16, Pines Decl. Ex. D. That statement is required to contain the lobbyist and his or her spouse or domestic partner; and, if the lobbyist is an organization, the names of all officers and employees of any division that engages in lobbying. Admin. Code § 213(c)(1).

35.     Without admitting the truth of the statements averred, Plaintiffs ADMIT that the City Council's Committee on Governmental Operations made the statements alleged in this paragraph.  Plaintiffs **OJBECT, however, that the statement regarding "recent lobbying scandals on the state and federal level" leaves out facts and is therefore misleading.** Plaintiffs therefore **DENY** this statement.

Plaintiffs note as an initial matter that the Committee had to appeal to scandals *on the state and federal level* – they could not find one scandal in NYC to appeal to in order to justify severely burdening citizens' first and fourteenth amendment rights. Perhaps this is because, as Speaker Quinn asserted, "in the City of New York, we don't have any scandals." Pines Decl., Ex. BB, at 43:22-23.  Yet, defendants' characterization makes it appear that the Committee sought to eradicate scandals in NYC by enacting the laws which the plaintiffs now challenge. That is simply not the case.

36.     Plaintiffs ADMIT everything in this paragraph up to the final sentence. Plaintiffs **DENY** the assertion that "those 'affiliated' individuals listed in the lobbyist registration

statement . . . can still contribute up to the same maximum contribution limits applicable to other individuals." (The 'affiliated' individuals are those required to be listed on lobbyists' registration statement, such as the spouse or domestic partner of lobbyists, their employees, and their employees' spouses or domestic partners).

Plaintiffs remind the Court that, up until very recently, the CFB construed the law as subjecting these individuals to the doing business contribution limits. Def. Memo, at 15 n.4. Indeed, this was (and is) a legitimate reading of the law, since the campaign finance act states:

"For purposes of this chapter, the following terms shall have the following meanings: ***

16.    The term 'lobbyist' shall mean a lobbyist as defined in subdivision (a) of section 3-211 of this title and the spouse or domestic partner and unemancipated children of the lobbyist, and if the lobbyist is an organization, the term 'lobbyist' shall mean only that division of the organization that engages in lobbying activities and any officer or employee of such lobbyist who engages in lobbying activities of the organization or is employed in an organization's division that engages in lobbying activities of the organization and the spouse or domestic partner and unemancipated children of such officers or employees."

Admin. Code, § 3-702(16).

Because this definition is found in the definition section of the Act, and attaches to "lobbyist" "for purposes of this chapter;" and, because up until very recently the CFB interpreted "lobbyists" very broadly for purposes of contribution limits, decreeing that the spouses, domestic partners, and employees of lobbyists were subject to the lower limits, plaintiffs assert that the meaning of "lobbyists" within this chapter is in dispute.

Plaintiff Michele Russo wants to contribute up to the limit set by section 3-703(1)(f) of the Code (which defendants now say she may do). "Declaration of Michele Russo," D. No. 25, at ¶ 4. Yet, if she does, she risks the CFB *changing again* their interpretation, making the law apply to her, and subjecting her chosen candidate(s) to penalties for accepting contributions above the allowed amount. Admin. Code § 3-711.

Plaintiffs also remind the Court that the CFB is free to interpret the law such as to subject the 'affiliated' individuals to the lower contribution limits as soon as this lawsuit has been concluded. This is thus a legal issue, turning on whether it is constitutionally permissible for the CFB to subject people such as Ms. Russo to the doing-business contribution limits. Plaintiffs therefore **DENY** whether it is accurate to say that "affiliated individuals" can give as much as other citizens. They cannot—not without a ruling from the Court preventing the CFB from construing the law against them again. Otherwise, the effect of this law is to chill the expressive rights of Plaintiff Michele Russo and others like her.

37.     Plaintiffs ADMIT the averments made in this paragraph.

## VI.     Local Laws 34 and 67 of 2007

38.     Plaintiffs ADMIT the averments made in this paragraph.

39.     Plaintiffs ADMIT the averments made in this paragraph.

40.     Without admitting the truth of the statement averred, the plaintiffs ADMIT that the Council Committee Report made the statement attributed to them in this paragraph. However, plaintiffs **DENY** the statement made by the Council, that it is preferable to trample plaintiffs' constitutional rights, rather than risk the *possibility* that someone might think that somebody gained undue influence due to a campaign contribution, irrespective of whether such perceptions actually exist or are anchored in fact.  The Council itself admitted that "there is nothing

intrinsically wrong with contributions from those doing business with the City." The Council continued by stating its belief that it is important to eradicate a perception that those who do business with the City might make contributions in order to have influence over elected officials, irrespective of whether there really was such a perception, and "regardless of whether such perception is accurate." *See*, "New York City Council, Report of the Governmental Affairs Division, Committee on Governmental Operations, for Int. No. 586-2007," at 24, Pines Decl. Ex. H. In other words, the Council believes it is preferable to trample on plaintiffs' constitutional rights, rather than risk a *possible* perception that someone might *someday* have (but maybe no one currently has), that maybe possibly someone might gain influence they ought not to have by making a contribution.

    **41.**    Without admitting the truth of the statement averred, the plaintiffs ADMIT that the Council Committee Report made the statement attributed to them in this paragraph. Plaintiffs further AGREE that the law banning contributions from LLCs, LLPs, and partnerships works as it is described in this paragraph. Plaintiffs **DENY**, however, with the characterization that these business entities are structured "similarly" to corporations, and that allowing them to contribute to political campaigns creates a "loophole" in the ban on corporate contributions.

        Plaintiffs assert that in many important ways, LLCs, LLPs and partnerships are *not* "similar" to corporations. They lack the "state conferred benefits" that are typical of corporations. These business models do not have the same "unique state-conferred corporate structure," nor can they receive the same "favorable treatment of the accumulation and distribution of assets" as corporations. They lack the "state-conferred advantages of the corporate structure." It was *these* attributes that the Supreme Court recognized justified a ban on corporate contributions. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–59, 665 (1990); Reiter Decl., at ¶ 7.

Plaintiffs assert that because LLCs, LLPs, and partnerships are not "similar" to contributions, allowing them to contribute does *not* create a "loophole" to the ban on corporate contributions.

## VII.    Definition of "Business Dealings with the City."

**42.**    Plaintiffs ADMIT the averments made in this paragraph.

**43.**    Plaintiffs ADMIT the averments made in this paragraph.

**44.**    Plaintiffs ADMIT all the averments contained in this paragraph, except the final sentence. Plaintiffs ADMIT that the final sentence is an accurate statement of how the CFB *currently* defines who is a lobbyist for purposes of the lower business dealing contribution limits. Plaintiffs **DENY**, however, that this definition may be relied upon. Rather, Plaintiffs assert that because the CFB until very recently interpreted "lobbyists" very broadly; and, because the law is written in such a way that it is legitimate to interpret "lobbyists" very broadly, plaintiffs cannot rely upon this definition and so their speech is chilled. *See supra*, at ¶ 36.

### A.    Procurement Contracts

**45.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**46.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**47.**    Plaintiffs have no independent knowledge as to whether the statements in this

paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**48.**    Plaintiffs ADMIT the averments made in this paragraph.

**49.**    Plaintiffs ADMIT the averments made in this paragraph.

**50.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**51.**    Plaintiffs ADMIT that "in some cases," contracts awarded through a process of procurement "***may*** involve negotiation between the prospective contractor and government officials prior to granting a contract award." (Emphasis added). Plaintiffs **OBJECT, though, if defendants are implying on the basis of this statement that such contracts *do* involve negotiation.** Lots of things *may* happen in life; but, that does not mean that what *may* happen actually does happen. Neither the statement offered as proof, nor anything in the record, substantiates that implication (if in fact the defendants mean to imply it). Consequently, Plaintiffs **DENY** such an implication, as there is no factual basis to substantiate it.

Plaintiffs have no independent knowledge as to whether the statement, "As a general matter, contract awards made using procurement methods other than competitive sealed bidding involve more discretion by government officials in determining who should get the contract award" is correct. Pursuant to Local Rule 56.1(c), the Court should consider the averment ADMITTED for purposes of the defendants' motion for summary judgment.

**52.**    Plaintiffs ADMIT the averments made in this paragraph.

**53.**       Plaintiffs ADMIT the averments made in this paragraph.

**54.**       Plaintiffs ADMIT that the City's procurement rules do not apply to collective

bargaining with City unions, or to employer-employee relationships for non-unionized

employees. Plaintiffs further ADMIT that collective bargaining is governed by State and City

law. Plaintiffs **OBJECT** to the misleading nature, however, of the final sentence in this

paragraph. Plaintiffs therefore **DENY** it because it is misleading. What defendants are saying in

this paragraph is that if a union were structured just like a business, and acted just like a business,

and competed just like a business, it would be treated just like a business. This may (or may not)

actually be true. We will never know for sure; for, unions are not structured like businesses, nor

do they act like businesses. Yet, many unions depend on government spending for their very

existence, just as those with business dealings depend on contracts, concessions, and grants from

the government for their existence—yet, one group is subject to the lower limits, while the other

is not. *See* "NYC's Rigged 'Reforms," La Rue Decl., Ex. D.

           Plaintiffs dispute whether it is not proper to characterize unions as "influence-

peddlers," as much as (or more than) it is proper to characterize those with business dealings

(including lobbyists) as "influence peddlers;" and, if so, whether choosing to subject the officers

of businesses to the contribution limits, and prohibit matching of their contributions, while

allowing officers of these unions to contribute up to the regular contribution limits, and matching

their contributions, and otherwise treating unions and their officers "differently" (such as

allowing different locals of the same union to make separate contributions, thereby greatly

increasing the amount a union is able to contribute to a candidate), amounts to impermissible

viewpoint discrimination. *See* Reiter Decl., at ¶ 8-13; "Unions Make A Power Play," La Rue

Decl., Ex C.; Jay Golub, "NYC's Rigged 'Reforms,'" La Rue Decl., Ex. D; "New Campaign

Finance Rules Skip Unions," La Rue Decl., Ex. E. *See also* Admin. Code § 3-703(1)(f) (providing that contributions from different locals of the same union shall not be treated as coming from the same contributor, thereby allowing unions to maximize their contributions in ways not permissible to others).

55.    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since unions do not "seek ... a contract for the procurement of goods, services or construction." Thus, we will never know how the CFB would treat unions who met these requirements, since no union will ever meet them. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

### B.    Concessions and Franchises

#### 1.    Concessions

56.    Plaintiffs ADMIT that the definition and examples of a "concession" are correct. Plaintiffs have no independent knowledge as to whether the statements regarding the total number of concession agreements the City had in 2007 are correct. Nor do plaintiffs have any independent knowledge as to whether most concessions involving City agencies are with the Department of Parks and Recreation. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

57.    Plaintiffs ADMIT the averments made in this paragraph.

58.    Plaintiffs ADMIT the averments made in this paragraph.

59.    Plaintiffs ADMIT the averments made in this paragraph.

**60.**     Plaintiffs ADMIT the averments made in this paragraph.

## 2.        Franchises

**61.**     Plaintiffs ADMIT the averments made regarding the definition and examples of a "franchise." Plaintiffs have no independent knowledge as to whether the statements in remainder of the paragraph, regarding how many franchise agreements City agencies had and how much revenue they produced, are correct. Pursuant to Local Rule 56.1(c), the Court should consider these averments ADMITTED for purposes of the defendants' motion for summary judgment.

**62.**     Plaintiffs ADMIT the averments made in this paragraph.

**63.**     Plaintiffs ADMIT the averments made in this paragraph.

**64.**     Plaintiffs ADMIT the averments made in this paragraph.

**65.**     Plaintiffs ADMIT the averments made in this paragraph.

## 3.     "Business Dealings" definition for franchises and
## concessions

**66.**     Plaintiffs ADMIT the averments made in this paragraph.

**67.**     Plaintiffs ADMIT the averments made in this paragraph.

**68.**     Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since unions do not "seek ... a concession or franchise." Thus, we will never know how the CFB would treat unions (and their officers) who met these requirements, since no union will ever meet them. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

## C.       Grants

**69.**     Plaintiffs ADMIT the averments made in this paragraph.

**70.**     Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**71.**     Plaintiffs ADMIT the averments made in this paragraph.

**72.**     Plaintiffs ADMIT the averments made in this paragraph.

**73.**     Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since unions do not seek grants. Thus, we will never know how the CFB would treat unions (and their officers) who met these requirements, since no union will ever meet them. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

## D.       Economic Development Agreements

**74.**     Plaintiffs ADMIT the averments made in this paragraph.

**75.**     Plaintiffs ADMIT the averments made in this paragraph.

**76.**     Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since unions do not enter into economic development agreements. Thus, we will never know how the CFB would treat unions (and their officers) who met these requirements, since no union will ever meet them. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the

defendants' motion for summary judgment.

### E.    Contracts for Investment of Pension Funds

**77.**    Plaintiffs ADMIT the averments made in this paragraph.

**78.**    Plaintiffs ADMIT the averments made in this paragraph.

**79.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since unions do not enter into contracts for the investment of pension funds. Thus, we will never know how the CFB would treat unions (and their officers) who met these requirements, since no union will ever meet them. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

### F.    Land Use Approvals, Zoning Text Amendments and Section 195 Approvals

**80.**    Plaintiffs ADMIT the averments made in this paragraph.

**81.**    Plaintiffs ADMIT the averments made in this paragraph.

**82.**    Plaintiffs ADMIT the averments made in this paragraph.

**83.**    Plaintiffs ADMIT the averments made in this paragraph.

**84.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**85.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments

made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**86.**    Plaintiffs ADMIT the averments made in this paragraph.

**87.**    Plaintiffs ADMIT the averments made in this paragraph.

**88.**    Plaintiffs ADMIT the averments made in this paragraph.

**89.**    Plaintiffs ADMIT the averments made in this paragraph.

**90.**    Plaintiffs ADMIT the averments made in this paragraph.

**91.**    Plaintiffs ADMIT the averment made in the first sentence of this paragraph: "the doing business database does not include individuals from 'a neighborhood, community, or similar association consisting of local residents or homeowners organized on a non-profit basis' ...." Plaintiffs also ADMIT the averment made in the second sentence of this paragraph. Plaintiffs **OBJECT** to the third sentence, however, as being misleading. Because the sentence is misleading, plaintiffs **DENY** the statement.

Defendants seem to suggest that if it is true that there have been fewer than 20 applications from neighborhood or community associations for rezoning, as they allege, it is of no import that the doing business database does not include them. Plaintiffs respond that if the City is discriminating among applicants on the basis of viewpoint, it does not matter how few are receiving preferential treatment: it is constitutionally impermissible to engage in viewpoint discrimination. Ognibene Decl., at ¶¶ 14-15.

**92.**    Plaintiffs OBJECT to the characterization in this averment and **DENY** it because it is misleading. Defendants imply that it is acceptable for them to discriminate between some entities, which pursue land use approvals and zoning text amendments, on the one hand, and neighborhood associations pursuing the exact same things, on the other. They suggest that such

discrimination is acceptable because neighborhood associations generally do not pursue their approvals and amendments for independent business purposes. However, Plaintiffs again assert that the City is engaging in viewpoint discrimination, and such discrimination is never constitutionally permissible. Ognibene Decl., ¶¶ 14-15.

Plaintiffs also **DENY** the factual averment itself. Defendants state that the neighborhood associations "generally" do not pursue their transactions for a business purpose. Yet, the CFA provides exemptions from the business dealing restrictions imposed by the challenged laws when the neighborhood association "is the parent company or an affiliated company of an entity" which secures the land use approvals and zoning text amendments. This calls into question the accuracy of the claim that neighborhood associations do not pursue their transactions for a business purpose. Admin. Code § 3-702(20). Ognibene Decl., ¶ 16.

93.     Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since it is unlikely that a union would ever be a ULURP applicant. Thus, we will never know how the CFB would treat unions (and their officers) who met these requirements, since no union will ever meet them. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

### G.     Real Property Transactions

94.     Plaintiffs ADMIT the averments made in this paragraph.

95.     Plaintiffs ADMIT the averments made in this paragraph.

96.     Plaintiffs ADMIT the averments made in this paragraph.

97.     Plaintiffs have no independent knowledge as to whether the statements in this

paragraph are correct. It is likely that no one will ever know whether the statements in this paragraph are correct, since it is unlikely that a union or neighborhood association would ever be involved in a real property transaction that would be covered under the CFA. Thus, we will never know how the CFB would treat unions and neighborhood associations (and their officers) who met these requirements. That said, pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

<b>H.  Affordable Housing</b>

**98.** Plaintiffs ADMIT the averments made in this paragraph.

<b>I.  Lobbyists</b>

**99.** Plaintiffs ADMIT the averments made in this paragraph.

**100.** Plaintiffs DENY the averment in this paragraph. It is true that the CFB has recently stated that, for purposes of the business-dealing contribution limits, they will interpret "lobbyists" narrowly, as provided in section 3-211 of the Code. However, up until very recently, the CFB was of the opinion that "lobbyists" should be interpreted more expansively, to include all those required to be listed on the lobbyists' registration statements. This would include the spouses and domestic partners of lobbyists. It would also include, if the lobbyist was an organization, all the employees of any division which engaged in lobbying, as well as the spouses and domestic partners of those employees, regardless of whether the employees actually engaged in lobbying activities or not. Indeed, this was (and is) a legitimate reading of the law, since the campaign finance act states:

  "For purposes of this chapter, the following terms shall have the following meanings: ***

    16. The term 'lobbyist' shall mean a lobbyist as defined in subdivision (a) of

24

section 3-211 of this title and the spouse or domestic partner and

unemancipated children of the lobbyist, and if the lobbyist is an

organization, the term 'lobbyist' shall mean only that division of the

organization that engages in lobbying activities and any officer or

employee of such lobbyist who engages in lobbying activities of the

organization or is employed in an organization's division that engages in

lobbying activities of the organization and the spouse or domestic partner

and unemancipated children of such officers or employees."

Admin. Code § 3(16).

Because this definition is found in the definition section of the Act, and attaches

to "lobbyist" "for purposes of this chapter;" and, because up until very recently the CFB

interpreted "lobbyists" very broadly for purposes of contribution limits, decreeing that the

spouses, domestic partners, and employees of lobbyists were subject to the lower limits, plaintiffs

assert that the meaning of "lobbyists" within this chapter is in dispute.

Plaintiff Michele Russo wants to contribute up to the limit set by section 3-

703(1)(f) of the Code (which defendants now say she may do). "Declaration of Michele Russo,"

D. No. 25, at ¶ 4. Yet, if she does, she risks the CFB *changing again* their interpretation, making

the law apply to her, and subjecting her chosen candidate(s) to penalties for accepting

contributions above the allowed amount. Admin. Code § 3-711.

Plaintiffs also remind the Court that the CFB is free to interpret the law such as to

subject the 'affiliated' individuals to the lower contribution limits as soon as this lawsuit has

been concluded. This is thus a legal issue, turning on whether it is constitutionally permissible

for the CFB to subject people such as Ms. Russo to the doing-business contribution limits.

Plaintiffs therefore **DENY** whether it is accurate to say that "affiliated individuals" can give as much as other citizens. They cannot—not without a ruling from the Court preventing the CFB from construing the law against them again. Otherwise, the effect of this law is to chill the expressive rights of Plaintiff Michele Russo and others like her.

    **101.** Plaintiffs ADMIT the averments made in this paragraph.

    **102.** Plaintiffs ADMIT the averments made in this paragraph.

    **103.** Plaintiffs ADMIT the averments made in this paragraph.

    **104.** Plaintiffs ADMIT the averments made in this paragraph.

## VIII.    Doing Business Database

    **105.** Plaintiffs ADMIT that the CFA requires the creation of a "Doing Business Database." Plaintiffs have no knowledge as to whether defendants will be able to meet the timeline required by the CFA, nor whether the database will ultimately be phased in in three phases, consistent with the timelines set forth in section 37 of Local Law 67. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

    **106.** Plaintiffs ADMIT the averments made in this paragraph.

    **107.** Plaintiffs ADMIT the averments made in this paragraph.

    **108.** Plaintiffs ADMIT the averments made in this paragraph.

    **109.** Plaintiffs ADMIT the averments made in this paragraph.

    **110.** Plaintiffs ADMIT the averments made in this paragraph.

## IX.    Data from the Doing Business Database

    **111.** Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments

made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**112.**    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

**113.**    Plaintiffs ADMIT the averments made in this paragraph.

**114.**    Plaintiffs ADMIT the averments made in this paragraph.

**115.**    Plaintiffs ADMIT the averments made in this paragraph.

## X.    Measuring the Results

**116.**    Plaintiffs **DENY** the averments in this paragraph, because they are incomplete and misleading.

Plaintiffs assert that while fundraising for 2009 may be up as compared with fundraising in 2001, as defendants allege, that only tells part of the story. Fundraising since the business-dealings contribution limits took effect is actually *down* about fifteen percent (15%). This indicates that the challenged laws are actually *reducing* the amount of money that would otherwise be available to candidates.

Plaintiffs also assert that one factor contributing to the massive increase in fundraising today, as compared with fundraising in 2001, is the fact that in 2005 the City Council enacted a law allowing individual locals of the same union to contribute up to the maximum contribution limit to candidates, instead of having their contributions aggregated together as was previously the case. This enabled unions to contribute far more money than they previously could. *See* Ognibene Decl., ¶¶ 17-19. *See also* "Number of Small Campaign Contributors Soars,"

La Rue Decl., Ex. H.

117.    Plaintiffs **DENY** the averments in this paragraph, because they are so incomplete as to be misleading. The fact that "candidates have turned their focus to raising funds in smaller contributions," even if true, does not demonstrate that "last year's reforms are taking hold" (whatever that may mean). Rather, it demonstrates that the business-dealing community, who used to be able to contribute up to the regular contribution limits applicable to all other citizens, found in section 3-703(1)(f) of the Code, are no longer able to do so. Of course candidates have turned their focus to raising contributions in smaller denominations: that is all the business community, who tend to be involved politically, are able to contribute because of the challenged laws. Similarly, even if it were true that contributions of $175 "have risen substantially," as defendants aver, it would not follow that this is because of the new 6:1 matching formula. Rather, it could be because the business-dealing community is restricted by the challenged laws to giving lower contributions. Finally, that the Board "found the magnitude of early fundraising ' unprecedented'" is not surprising at all: commentators noted how after passing the challenged laws, but prior to when they took effect, the members of City Council amassed huge sums of money in preparation for 2009. The statistic that really matters, though, is that fundraising is down 15% since the challenged laws took effect. Ognibene Decl., ¶¶ 17-19.

118.    Plaintiffs ADMIT the averments made in this paragraph.

## XI      Facts Concerning Plaintiffs

### Sheila Andersen-Ricci

119.    Plaintiffs ADMIT the averments made in this paragraph.

120.    Plaintiffs have no independent knowledge as to whether the statements in this paragraph are correct, nor can they say for certain that the CFB's electronic records are accurate.

Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

    121.    Plaintiffs ADMIT the first two sentences in the paragraph.

    Plaintiffs have no independent knowledge regarding the averment made about Joseph Strasburg, nor do they have any independent knowledge regarding the averment made about bundling the RSA did. Pursuant to Local Rule 56.1(c), the Court should consider the averments made in this paragraph ADMITTED for purposes of the defendants' motion for summary judgment.

    122.    Plaintiffs **OBJECT** to the characterization of Ms. Andersen-Ricci's response in her deposition testimony as being inaccurate. Plaintiffs therefore **DENY** the averments in this paragraph.

    Ms. Ricci testified that it was her husband who brought the Campaign Finance Bill to her attention. Andersen-Ricci Deposition Testimony, Pines Decl., Ex. GG, at 20:23-25. Defendants have characterized her testimony as if she said that she was only part of the lawsuit because of her husband, as if she could not decide to be part of this lawsuit herself. That is simply not an accurate reflection of what Ms. Ricci said. It is in that sense that it is true to say that "because of her husband's involvement with the RSA ... Andersen-Ricci became a plaintiff in this litigation," as defendants do: her husband is politically aware, because of his job, and he alerted her to the danger of the challenged laws. Ms. Ricci's testimony does *not* indicate, however, that she is only part of the lawsuit because her husband works for the RSA, as if she were not capable of deciding to be a plaintiff in this lawsuit on her own accord.

### State Senator Martin Malave Dilan

    123.    Plaintiffs ADMIT the averments made in this paragraph.

**124.** Plaintiffs ADMIT that Senator Dilan expects to receive a substantial portion of his campaign funds from those who do business with the city. Plaintiffs **DENY** the remaining averments in this paragraph.

Defendants allege that Senator Dilan "acknowledges there is a public perception that it is wrong for council members to accept "doing business" contributions, and then cite to his deposition testimony. This is not what Senator Dilan said at all. Rather, his testimony was as follows:

Q:    Have you ever heard rumors of certain other City Councilmen being affected by the contributions of people who do business with the City?

A.    I have not had no conversations with anyone regarding that, no.

Q:    Do you know whether there's a public perception that it's a bad thing for –

A:    Well, I mean, I hear what advocate, you know, advocate groups may say, you know, I hear the Women League of Voters talk about it, I hear the media, the editorials, the press. From that respect, you know, I hear it all the time.

Senator Dilan thus stated that he hears what "advocate groups" and "the media" say. Indeed, plaintiffs have asserted that the media have, to a large extent, created the paranoia surrounding contributions from those with business dealings from the City. *See* Plaintiffs' Reply in Support of Their Motion for Summary Judgment. However, Senator Dilan did *not* state that there is a public perception that it is wrong for council members to accept contributions from those defined as having business dealings with the City. Rather, when asked directly whether he had heard any rumors of council members being affected by business-dealing contributions, his response was definitive: "No." It is inaccurate to characterize this as acknowledging that there is a public perception that some council members may be 'on the take.'

**Fran Reiter**

**125.**    Plaintiffs **OBJECT** to the misleading characterization of statements in this

paragraph. Because they are misleading, Plaintiffs **DENY** them.

Defendants state that Ms. Reiter's firm gave contributions to Council Member

Garodnick prior to when she lobbied him on behalf of a client. This implies that her contribution

was designed to influence the meeting, or could have had that affect (whether it was designed for

that purpose or not). Yet, the reality is that Ms. Reiter could not recall for certain whether her

LLC had made a contribution to Mr. Garodnick or not. Reiter Depo, Pines Decl., Ex. LL, at

38:10 (she stated, "I *believe* our LLC has" made a contribution). When asked whether that

contribution would have been "significantly prior" to the meeting with Mr. Garodnick, Ms.

Reiter responded, "I think so." *Id*. at 38:15-16. When asked to pin down exactly how long before

the meeting the contribution occurred, Ms. Reiter answered that she did not recall. *Id*. at 38:18.

Ms. Reiter's deposition testimony made plain that was unsure about whether her

firm had given a contribution to Mr. Garodnick. It is incorrect to state, as defendants do, that she

said that her firm had made such a contribution. Plaintiffs therefore deny this statement.

**Robert Perez**

**126.**    Plaintiffs ADMIT the first sentence in this paragraph. Plaintiffs **DENY** the

second sentence: Mr. Perez does not concede he is not subject to the "doing business"

restrictions. Rather, Mr. Perez only concedes that he is not *currently* subject to the restrictions.

When Mr. Perez When asked whether he "planned to seek City work other than by sealed

competitive bid," Mr. Perez answered, "If they call me, I be glad to provide my service to the

City of New York." Perez Dep., La Rue Decl., Ex. A, at 41:13-17. This indicates that Mr. Perez

could be subject to the business dealing contribution limits at any time.

127.    Plaintiffs ADMIT that Ms. Russo stated she is employed as a legal secretary and has never contributed to a political race. Plaintiffs **DENY** the remaining averments in this paragraph because it is so incomplete as to be misleading.  Ms. Russo has previously indicated that she intends to contribute to the candidate of her choice in 2009. "Declaration of Michele Russo," D. No. 25, at ¶ 4.  Furthermore, Ms. Russo testified in her deposition that she joined the lawsuit because "I just didn't like I was limited because of him [i.e., because of working for a lobbyist]", Russo Dep., Pines Decl. Ex. MM, at 10:20, and because " I want to have a right to do what I want to do." *Id*. at 10:23-24. To the extent that Defendants imply or aver that Ms. Russo joined the lawsuit for any other reason, plaintiffs deny their averment.

### Marlene Tapper[3]

128.    Plaintiffs ADMIT the averments made in this paragraph.

129.    Plaintiffs ADMIT that Ms. Tapper is currently planning a run for State Assembly and that she believes it is a good idea to create incentives for smaller contributions from individuals. Like a number of the other plaintiffs, Ms. Tapper acknowledged that there is a perception that contributions from lobbyists *may* influence elected officials. Plaintiffs **OBJECT** to the way this is characterized, as it is so incomplete as to be misleading. Plaintiffs therefore **DENY** this averment.

Ms. Tapper was not asked the question that needed to be asked: namely, whether there is a public perception that contributions from lobbyists are actually corrupting officials. The fact that Ms. Tapper acknowledged that some people may think that contributions from lobbyists *may* influence elected officials proves nothing. Some people believe that contributions from *everyone* may influence officials. The question should have been, 'Is there a public perception

---

[3] Plaintiffs note that Ms. Tapper's name is spelled "Tapper," not 'Tepper.'

that contributions from lobbyists are corrupting elected officials?' That question was never asked.

###        Viviana Vazquez-Hernandez

**130.**    Plaintiffs ADMIT the first two sentences in this paragraph. Plaintiffs **DENY** the third statement, because it is so incomplete as to be misleading. Ms. Vazquez-Hernandez has testified that she will not run for city council so long as the challenged provisions are in place. "Declaration of Viviana Vazquez-Hernandez," D. No. 27, at ¶¶ 3, 6. The only reason "she does not expect to run in 2009" (as defendants word it) is because of the challenged laws.

**131.**    Plaintiffs **DENY** that Ms. Vazquez-Hernandez "agrees that there is a public perception that campaign contributions from lobbyists may influence elected officials." Ms. Vazquez-Hernandez testified as follows:

> Q:    Do you believe that campaign contributions by lobbyists ever, in fact, influence the actions of elected officials?
>
> A:    I don't have personal knowledge, but I've heard in the media that it does.

Vazquez-Hernandez Dep., Pines Decl. Ex. OO, at 44:15-19. Far from indicated that Ms. Vazquez-Hernandez agrees that there is a public perception, this indicates that (1) she doesn't have personal knowledge of such a perception; but, (2) the media claims that one exists.

Plaintiffs also **OBJECT** to the characterization that Ms. Vazquez-Hernandez sees a pay-to-play problem in electoral politics that must be limited, and the implication that it should be limited through legislation such as the challenged laws. To the extent that defendants imply that, plaintiffs **DENY** this averment. Ms. Vazquez-Hernandez actually objected to the challenged laws. She stated, "To curtail contributions or eliminate matching funds just on the basis that other people have done illegal things or wielded influence is not fair." *Id*. at 45:4-6.

Plaintiffs also **DENY** that Ms. Vazquez-Hernandez joined the lawsuit because she believes that her access to matching funds is at risk. Ms. Vazquez-Hernandez has testified that:

> I would like to solicit and accept contributions in excess of $250 from those having business dealings with the city, but cannot because of section 3-703(1-a) of the Code.  I would also like to solicit and accept contributions from limited liability companies, limited liability partnerships, and partnerships, but cannot because of section 3-703(1)(l) of the Code.  I would also like to receive matching funds for these contributions, but cannot under section 3-702(3) of the Code. ***
> Sections 3-702(3), 3-703(1-a), and 3-703(1)(l) deprive me of my constitutional rights under the First and Fourteenth Amendments to the United States Constitution.  I will suffer irreparable harm if their enforcement is not enjoined.  I have no adequate remedy at law.

"Declaration of Viviana Vazquez-Hernandez," D. No. 27, at ¶¶ 4, 7.  It is incorrect to characterize her reasons for joining this lawsuit as anything but those which she stated.

### Yvette Velazquez Bennett

132.    Plaintiffs ADMIT the averments made in this paragraph.

133.    Plaintiffs ADMIT the averments made in this paragraph.

### Thomas V. Ognibene

134.    Plaintiffs **DENY** the statement that Mr. Ognibene is "resigning from politics." Ognibene Decl., at ¶ 6; Ognibene Dep., Pines Decl. Ex. JJ, at 16:3-4. Plaintiffs ADMIT the other averments in this paragraph.

34

135.    Plaintiffs **DENY** the averment in the first sentence of this paragraph. Mr.

Ognibene was not 'recruited' for this lawsuit. Rather, he was told about changes in the law which

made it difficult for his supporters to contribute to him, and he "thought it was outrageous." He

told his contacts his feelings, at which point they told him that they were contemplating a lawsuit

and asked him whether he would be interested in being a plaintiff. Mr. Ognibene said "certainly."

To characterize this as "Ognibene was recruited to join this litigation and did so because of his

interest in running for office," as defendants do, is incorrect. Ognibene Dep., Pines Ex. JJ, at 6:21

- 7:7.

Plaintiffs **DENY** the averment that based on Mr. Ognibene's experiences, the

"doing business" restrictions would not favor one political party over another. This statement is

incomplete, and therefore misleading. Rather, Mr. Ognibene affirmed that "the traditional

organizations that fund Republican candidates I think have been seriously impacted by the new

rules." *Id*. at 12:22-24. He also stated, "Certainly exempting unions is very detrimental to

Republican Conservative candidates, because 99 percent, in my estimation, of union

contributions go to Democratic candidates." *Id*. at 12:18-21.

Plaintiffs ADMIT the remaining statements in this paragraph.

136.    Plaintiffs **DENY** the averment that Mr. Ognibene believes that there is a public

perception that campaign contributions by those who do business with the City may influence

elected officials. Mr. Ognibene was asked whether, in his view, there is a public perception that

campaign contributions by persons that have business dealings with the City may influence the

actions of elected officials. Mr. Ognibene replied, "Yes."  He was then asked, "And what is the

basis for your answer?" *Id*. at 32:2. What Mr. Ognibene actually said in response was that he

hears people say, referring to politicians, "You're all a bunch of crooks." *Id*. at 32:8. This is the

type of general distrust of political actors and contributors "is not sufficient" and is "irrelevant to the critical elements to be proved: corruption of candidates or public perception of corruption of candidates." *Fed. Elec. Comm'n v. Nat'l Conservative PAC*, 470 U.S. 480, 499 (1985) ("*NCPAC*"). It does not, then, establish that Mr. Ognibene believes that there is a public perception of corruption. It merely establishes that he believes that the public doesn't trust politicians.

Plaintiffs **DENY** the averment that Mr. Ognibene "agrees" that a lobbyist's campaign contributions may allow for more access. Mr. Ognibene testified as follows:

> Q:    In your view, do campaign contributions by lobbyists ever influence the campaigns of elected officials?
>
> A:    Influence? No. Maybe allow maybe, maybe some more access. Maybe. But not influence.

*Id*. at 33:11-16. It is a mis-characterization to assert that Mr. Ognibene "agrees" that a lobbyist may get "more access" on the basis of making a contribution. Mr. Ognibene was indecisive in his response.

Plaintiffs **DENY** that Mr. Ognibene indicated that he "probably earmarked Council discretionary funds." Mr. Ognibene testified as follows:

> Q:    Did you designate member items for any organization with officers or board members who contributed to your campaign?
>
> A:    I, I can't answer that.
>
> Q:    Because you don't recall or –
>
> A:    I, I really – I really don't recall specifically. The answer is probably yes, there probably were some people who did. But I can't be specific about it.

*Id*. at 39:20 - 40:3. The fact that Mr. Ognibene said that he cannot recall, but the answer is

"probably yes," should not be construed to indicate that Mr. Ognibene "probably" earmarked

council discretionary funds. He stated that he could not recall.

Plaintiffs ADMIT the remaining averments in this paragraph.

Dated: August 20, 2008                                      Respectfully Submitted,

Charles Capetanakis (CC 1120)                       James Bopp, Jr. (JB 0781)*
DAVIDOFF MALITO & HUTCHER LLP                        Joe La Rue (JL 2423)*
605 Third Avenue, 34th Floor                        BOPP, COLESON & BOSTROM
New York, NY 10158                                  1 South 6th Street
Phone: (212) 557-7200                               Terre Haute, IN 47807
Fax: (212) 286-1884                                 Phone: (812) 232-2434
*Local Counsel for the Plaintiffs*                  Fax: (812) 235-3685
                                                    email:  jboppjr@aol.com
                                                            jlarue@bopplaw.com
                                                    *Lead Counsel for the Plaintiffs*
                                                           * Admitted pro hac vice for this case
                                                    on May 7, 2008 by order of the Honorable
                                                    Laura T. Swain, District Court Judge.

37

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served on Defendants' counsel via email and first class mail, postage pre-paid.

Jonathan Pines, Esq.
The City of New York
Law Department
100 Church Street
New York, NY 10007
jpines@law.nyc.gov
*Counsel for Defendants*

John H. Snyder
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299
jsnyder@proskauer.com
*Counsel for Amici Citizens Union,*
*Common Cause/NY and*
*New York Public Interest Research Group*

Luke P. McLoughlin
Jenner & Block LLP
919 Third Avenue
37th Floor
New York, NY 10022-3908
LmcLoughlin@jenner.com
*Counsel for Amici Brad Lander and*
*Mark Winston Griffith*


Dated: August 20, 2008

_____
James Bopp, Jr. (JB 0781)