Index No. 08-CV-1335 (LTS)(THK)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TOM OGNIBENE, *et al.*,

                 Plaintiffs,

- against -

JOSEPH P. PARKES, S.J., *et al.*,

                 Defendants.

**DEFENDANTS' REPLY MEMORANDUM**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Jonathan Pines*
*Tel: (212) 788-0933*
*NYCLIS No. 2008-004838*

# TABLE OF CONTENTS

**Page**

1. In defending the constitutionality of the Doing Business contribution limits, defendants need not prove actual corruption, or even that the threat of corruption is "real," but only that the regulation is addressed to the fact or appearance of corruption, and that the government's concern for corruption is "not illusory." ... 1

2. The 1998 Referendum constitutes persuasive evidence of the electorate's demand for appropriate pay-to-play regulation. ... 4

3. The Campaign Finance Board's recent change in its interpretation of the appropriate scope of contribution limits as applied to lobbyists is not an example of "voluntary cessation" as that term is used by the courts. ... 5

4. Officials associated with municipal labor unions, like those associated with all other unions and all other business entities, are covered by the Doing Business contribution limits so long as they are "engaged in business dealings with the City of New York." ... 6

5. Rather than being a "blacklist," the doing business database is central to the CFA's goals of eliminating the fact or appearance of corruption and of increasing government transparency. ... 9

6. Additional mischaracterizations made in plaintiffs' Memorandum in Opposition require correction in passing. ... 10

CONCLUSION ... 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

TOM OGNIBENE, *et al.*,

                                    Plaintiffs,

            - against -

JOSEPH P. PARKES, S.J., *et al.*,

                                  Defendants.

08-CV-1335 (LTS) (THK)
(Electronically Filed)

------------------------------------------------------------------x

## DEFENDANTS' REPLY MEMORANDUM

Defendants submit this reply memorandum to address certain misstatements of law and mischaracterization of facts set forth in plaintiffs' submission in opposition to defendants' cross-motion for summary judgment.[1]

1. **In defending the constitutionality of the Doing Business contribution limits, defendants need not prove actual corruption, or even that the threat of corruption is "real," but only that the regulation is addressed to the fact or appearance of corruption, and that the government's concern for corruption is "not illusory."**

In their Memorandum in Opposition ("Pltfs' Opp. Mem."),[2] plaintiffs repeatedly assert that, in order for contribution limits to withstand constitutional challenge, they must be

---

[1] Most of plaintiffs' arguments in reply and opposition are sufficiently addressed in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Injunctive Relief and in Support of Defendants' Cross-Motion for Summary Judgment, dated August 4, 2008 ("Defendants' Memorandum" or "Defts' Mem.") and in the papers filed in support of the cross-motion. Rather than being repeated, those factual statements and legal arguments are incorporated by reference.

[2] Defendants will designate as Plaintiffs' Memorandum in Opposition the document entitled "Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Preliminary Injunction Consolidated by the Court with the Merits as to Counts II, III, IV, VI, VII, VIII, and IX and Response Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment," dated August 20, 2008.

rooted in a current pattern of actual corruption. Building upon that flawed premise, they repeatedly claim an entitlement to injunctive relief because defendants have not adduced evidence to that effect. *See, e.g.,* Pltfs' Opp. Mem. at 7 ("To justify the challenged contribution limits, corruption must be real – not imagined or assumed.")

More than being simply wrong, plaintiffs' argument flies in the face of thirty years of federal case law establishing the contrary thesis – namely, that it is not only the fact, but "[o]f almost equal concern … the appearance of corruption" that provides constitutionally sufficient justification for such regulation. *Buckley v. Valeo*, 424 U.S. 1, 27 (1976); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 388-389 (2000). Because corruption "can never be reliably ascertained," all that is required is that the threat not be "illusory." *Buckley, id.*

Plaintiffs would counsel legislators to wait until corruption had taken root before enacting prophylactic measures; fortunately, the federal courts have consistently counseled otherwise. The Supreme Court observed that "the *danger*" – not the proven fact – "that officeholders will decide issues not only on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions" is "just as troubling to a functioning democracy as classic *quid pro quo* corruption." *McConnell v. FEC*, 540 U.S. 93, 153 (2003) (emphasis added). The Court held that, precisely because "such corruption is neither easily detected nor practical to criminalize … [t]he best means of prevention is to identify and to remove the temptation." *Id.* By definition, "prevention" can only occur if the identification and removal of pay-to-play temptations are in place before, not after, corruption has tainted the political process.

Even plaintiffs admit the existence of conditions in which the potential for corruption is substantial – namely, that the City has (i) "business dealings" contracts,

2

concessions, and franchises worth approximately $55 billion (Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated August 4, 2008 ("Defts' Rule 56.1 Statement") at ¶ 115); (ii) private development projects that require the review and approval of elected and appointed government officials (*id.* at ¶ 1); and (iii) 4,581 entities considered to have "business dealings" with the City, as defined in the Campaign Finance Act ("CFA") at Admin. Code § 3-702(18) (*id.* at ¶ 111).[3]

Unlike other areas in which the government engages in regulation implicating First Amendment interests, campaign finance reform is particularly focused upon the appearance of corruption, and its disenfranchising impact upon the voting public. As the Court noted in *McConnell*: "Take away Congress' authority to regulate the *appearance* of undue influence, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." 540 U.S. at 143-44 (emphasis added; internal citations omitted). Because either the fact or the appearance of corruption could discourage voters from participating in the political process, *Buckley* and its progeny have placed fact and appearance on an "almost equal" footing, as valid justifications for contribution restrictions. *Buckley*, 424 U.S. at 27.

To support their claim that proof of "actual corruption" is required, plaintiffs rely heavily on *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622 (1994) – a case having nothing to do with corruption concerns and the resulting dangers of voter apathy. *Turner* involved a challenge, on First Amendment grounds, to the FCC's "must-

---

[3] Except as otherwise indicated, all paragraphs of Defendants' Rule 56.1 Statement referred to in this memorandum are to paragraphs admitted by plaintiffs in correspondingly numbered paragraphs of Plaintiffs' Response to Defendants' Statement of Undisputed Facts, dated August 20, 2008.

3

The FCC asserted that the rule was necessary because (1) if not mandated to do so, cable carriers would not include such stations; and (2) if denied carriage, such stations would deteriorate or fail. The Court held that the government had not adduced sufficient evidence to prove that the claimed harm to local broadcasters was more than conjectural, and remanded the case for further development of the record. In doing so, the Court made no mention of the "fact or appearance of corruption" or the impact of such concerns on the public for the simple reason that the "must-carry" rules, unlike pay-to-play regulations, were not addressed to issues where a concern for public perception was germane.

Therefore, plaintiffs' assertion, grounded in *Turner*, that the Constitution requires defendants to prove "actual corruption" in order to justify prophylactic pay-to-play legislation finds absolutely no support in the relevant case law, and should be rejected by this Court.

2. **The 1998 Referendum constitutes persuasive evidence of the electorate's demand for appropriate pay-to-play regulation**

Plaintiffs suggest that defendants seek to use the 1998 referendum – which required candidates to disclose, and the Campaign Finance Board ("CFB") to restrict, "pay-to-play" contributions – to insulate the provisions of the CFA at issue in this lawsuit from constitutional challenge. Pltfs' Opp. Mem. at 11-12. This is, of course, untrue. Defendants cite to that referendum, as the courts have done with referenda in other jurisdictions,[4] as evidence of voters' concerns about pay-to-play corruption and the need for prophylactic regulation, not as a means of insulating the challenged provisions from judicial review. In that connection, it is

---

[4] *See, e.g., Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 394 (voter approval of a ballot initiative seeking to impose contribution limits "certainly attested to the perception relied upon here: ... that contribution limits are necessary to combat corruption and the appearance thereof"); *Daggett v. Comm'n on Governmental Ethics and Election Practices*, 205 F.3d 445, 458 (1st Cir. 2000) (Maine voters' approval of referendum imposing reduced contribution limits indicative of their perception of corruption).

4

interesting that plaintiffs disparage defendants' claimed reliance on news articles (*Id.* at 9-11) as unreliable evidence of the legitimacy of corruption concerns (even though defendants, in fact, submitted none in support of this motion[5]), yet equally disparage the most direct evidence of the electorate's concerns about pay-to-play as manifested by the approval of the 1998 referendum.

   3. **The Campaign Finance Board's recent change in its interpretation of the appropriate scope of contribution limits as applied to lobbyists is not an example of "voluntary cessation" as that term is used by the courts.**

   As discussed in Defendants' Memorandum at 15 n.4, while the CFB initially construed the Doing Business contribution limits as reaching "lobbyists" as defined by Admin. Code § 3-702(16) – namely, including lobbyists, their family members, and certain employees of lobbyists and their family members – it more recently clarified that, for purposes of those contribution limits, "lobbyist" shall have the narrower scope of §3-211(a). Section 3-211(a) excludes from the definition of "lobbyist" the lobbyist's family members, employees, and employees' family members, defining "lobbyist" as "every person or organization retained, employed or designated by any client to engage in lobbying."

   Plaintiffs have mischaracterized the change as the "voluntary cessation of a challenged practice" engaged in by defendants for the purpose of mooting a federal case. *See* Pltfs' Opp. Mem. at 18. In the majority of cases cited by plaintiffs, the notion of voluntary

---

[5] While *amicus curiae* Citizens Union, Common Cause/NY, and New York Public Interest Research Group did submit certain news articles in support of their positions, such materials are altogether appropriate. Courts have consistently relied upon such materials as credible evidence of public concern about corruption in the political sphere. *See, e.g., Shrink Missouri*, 528 U.S. at 393 (news accounts "supporting inferences of impropriety" relating to contributions); *Daggett v. Comm'n on Governmental Ethics and Election Practices*, 205 F.3d 445, 457 (1st Cir. 2000); *Blount v. SEC*, 61 F.3d 938, 945 (D.C.Cir. 1995) (citing SEC's reliance on news accounts of possible, but not proven, examples of "pay-to-play," and concluding that "[a]lthough the record contains only allegations, no smoking gun is needed where, as here, the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic").

cessation occurs when the government is, in effect, writing on a regulatory blank slate, where there is nothing to constrain the government, post-litigation, from "return[ing] to their old ways." *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000)). Unlike those cases, however, the CFB's change is directly tied to, and cabined by, express statutory language which the CFB cannot peremptorily disregard.

Specifically, Admin. Code § 3-702(18) provides that a lobbyist "as defined in section 3-211 of this title" shall be deemed to be engaged in business dealings with the city of New York," and § 3-703(1-a) applies the Doing Business contribution limits to every "natural person who has business dealings with the city, as that term is defined in [§ 3-702(18)]," including, in other words, the narrower definition of "lobbyist" set forth "in section 3-211 of this title."

Given this statutory framework, plaintiffs are wrong to characterize the CFB's recent clarification of the scope of the Doing Business contribution limits as the kind of purely discretionary "voluntary cessation" of challenged conduct to moot litigation. Rather, the clarification was made in conformity with specific statutory language incorporating, for the purpose of the Doing Business contribution limits the narrower of two statutory definitions of "lobbyist." Thus, the CFB's clarification is grounded in express statutory language, and cannot reasonably be characterized, nor should it be judicially set aside, as a mere litigation stratagem.

4. **Officials associated with municipal labor unions, like those associated with all other unions and all other business entities, are covered by the Doing Business contribution limits so long as they are "engaged in business dealings with the City of New York."**

Plaintiffs assert that officials associated with municipal labor unions and neighborhood associations are somehow exempt from the Doing Business contribution limits when they "engage in the same activities and compete for the same types of contracts, grants,

6

and concessions from the city as those individuals and entities which are subject to the lower [Doing Business] limits. Pltfs' Opp. Mem. at 18. The assertion is simply wrong, as plaintiffs elsewhere readily concede. *See* Defts' 56.1 Statement at ¶ 114, admitted by plaintiffs ("There are several labor unions or union-affiliated entities that have procurement contracts with the City ... that are considered "business dealings" under the law."); and at ¶¶ 99, 103, 104 (for purposes of the doing business database and contribution limits, the definition of "lobbyist" includes unions, among many other entities).[6]

Officials associated with municipal labor organizations and, with one minor exception,[7] neighborhood associations are covered to the same extent as all other individuals associated with entities engaged in similar transactions with the City of New York. Admin. Code § 3-702(18)(a). In any contracts for services, concessions, or franchises, officials associated with municipal and non-municipal labor organizations, as well as those associated with for-profit and not-for-profit entities, are treated similarly under the Doing Business contribution limits. *Id.*

Plaintiffs similarly misread § 3-702(20) as it pertains to neighborhood associations, claiming erroneously that that provision exempts from the Doing Business contribution limits land use approvals and zoning text amendments "when the neighborhood association 'is the parent company or an affiliated company of an entity.'" Plaintiffs' Rule 56.1

---

[6] While plaintiffs claim, without supporting evidence, that unions would not seek procurements nor enter into economic development agreements, they concede that unions are covered under the CFA for contracts (Defts' Rule 56.1 Statement at ¶ 55), concessions and franchises (*id.* at ¶ 68); grants (*id.* at ¶ 73); economic development agreements (*id.* at ¶ 76); pension fund investments (*id.* at ¶ 79; and ULURP applications (*id.* at ¶ 93).

[7] There is a narrow exception in the "business dealings" definition for rezoning applications by certain neighborhood associations, and also for any applications by owner-occupants of one-, two-, or three-family homes, which are generally not pursued for a business purpose. *See* Defts' Mem. at 17 n.6.

Statement at ¶ 92, p. 23. In fact, Administrative Code § 3-702(20), which defines "person" for purposes of the creation of a "doing business database," provides that entities are deemed "persons" for purposes of inclusion in the database,[8] with the following narrow exception:

> "[E]ntity for purposes of this definition shall not include a neighborhood, community or similar association consisting of local residents or homeowners organized on a non-profit basis where such association is the applicant pursuant to [New York City Charter § 197-c(a)(3)] or pursuant to section 201 of the charter *or is a parent company or an affiliated company of an entity.*

Thus, the exception pertaining to "a parent company or an affiliated company of an entity" is not limited to neighborhood associations, but is applicable to any and all entities associated with a parent or affiliated company, which latter companies are to be excluded from the doing business database pursuant to this exception.[9]

As a consequence, plaintiffs' argument that officials associated with municipal labor organizations and neighborhood associations are exempt from the Doing Business contribution limits is simply without legal or factual basis, and plaintiffs' claims based upon that false premise should be dismissed as a matter of law.

---

[8] Entities engaged in business dealings with the City of New York are thus included in the doing business database even though the Doing Business contribution limits apply only to "natural person[s] who ha[ve] business dealings with the city," pursuant to the provisions of Admin. Code. § 3-703(1-a). The inclusion of such entities in the database, even while they are exempt from the Doing Business contribution limits, permits greater transparency to the public, while at the same time more narrowly circumscribing the application of those limits.

[9] For a fuller discussion of the land use approval process relevant to the Doing Business contribution limits, *see* Defts' 56.1 Statement, dated August 4, 2008, at ¶¶ 80 *et seq.*, and Declaration of David Karnovsky, dated August 4, 2008, at ¶¶ 2-5, previously filed in support of defendants' cross-motion.

8

5.  **Rather than being a "blacklist," the doing business database is central to the CFA's goals of eliminating the fact or appearance of corruption and of increasing government transparency.**

In implementing the CFA, the City has now made publicly available a list of persons who have "business dealings" with the City as defined in the law. The "doing business database" is a critical component that serves the anti-corruption purposes of the law. Plaintiffs attempt to attack the database by characterizing it as a "blacklist" and criticizing the inclusion of individuals from prominent non-profit institutions. *Id* at 1 & n.1.[10] Contrary to plaintiffs' claims, the broad scope of individuals and entities covered by the database is a testament to its fairness and comprehensiveness, as all who have business dealings with the City are treated similarly.[11]

Of course, like the long-standing federal prohibition on corporate contributions, the doing business database and contribution limits are neither intended to stigmatize covered entities or individuals, nor do they do so. Such regulations are not targeted to "out" specific entities and individuals as corrupt or unethical, or to prevent them from engaging in any commercial activity. Rather, their purpose, as explained in *Buckley* and its progeny, is to insulate the political process as a whole from even the appearance of quid pro quo dealing, in derogation of the public interest. Plaintiffs' "blacklist" claim should therefore be rejected as logically irreconcilable with the "current of a century of congressional efforts to curb

---

[10] Grasping at available arguments regardless of their coherence with plaintiffs' other claims, plaintiffs purport to lament the inclusion of certain notable officers of non-profit entities in the database; yet plaintiffs would presumably be the first to decry their exclusion from the database as favoritism and viewpoint discrimination.

[11] Plaintiffs suggest that the database should be limited to those "actually alleged to have engaged in 'pay-to-play'...". Pltfs' Opp. Mem. at 1 (emphasis omitted). Putting aside the impossibility of divining who has been "actually alleged" (but presumably not convicted) of such wrongdoing, plaintiffs fail to show how limiting the doing business database to such persons, or even to those convicted of bribery, would advance as effectively (or, indeed, at all) the interests in corruption prevention and government transparency that are advanced by the database in its current form.

9

corporations' potentially deleterious influences on federal elections." *See FEC v. Beaumont*, 538 U.S. 146, 152 (2003).

    6.    **Additional mischaracterizations made in plaintiffs' Memorandum in Opposition require correction in passing.**

Plaintiffs, citing *Randall v. Sorrell*, 548 U.S. 230, 261 (2006), suggest that the absence of indexing for inflation in the Doing Business contribution limits is, alone, a sufficient basis for a finding of unconstitutionality. Pltfs. Opp. Mem. at 21. Plaintiffs far overstate *Randall's* holding, and relevance, in that regard. The *Randall* Court identified five separate factors that supported the invalidation of Vermont's across-the-board contribution limits of $400 and lower for statewide offices, of which inflation indexing was only one. As the Court explained, "five factors *together* lead us to this decision." 548 U.S. at 253 (emphasis added).

    Plaintiffs continue to give mixed signals about their intentions in their injunction motion. On the one hand, they note that they "have here raised only those claims in their underlying lawsuit which are purely legal in nature. ... Thus, claims such as whether the challenged laws allow candidates to amass the necessary resources to mount an effective campaign are not before the Court." Pltfs' Opp. Mem. at 2-3. Yet one of those claims – namely, Count II – alleges that plaintiffs "believe that the [Doing Business contribution] limits imposed by ... the Code will unconstitutionally prevent them from amassing the resources necessary to mount an effective campaign," Amended Complaint at ¶ 61; and that the limits "prevent candidates from amassing the resources necessary to mount an effective campaign and also magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." *Id.* at ¶ 65. Such allegations are directly at odds with plaintiffs' stated intention of limiting their motion to claims amenable to disposition exclusively as a matter of law. As a

consequence, the Court should either dismiss plaintiffs' *Randall*-based claims as a legal matter, or decline to reach them to the extent they require the development of a factual record.

## **CONCLUSION**

For the foregoing reasons, and based upon the material facts set forth in the Defendants' Statement Pursuant to Local Rule 56.1, and supplemented with the accompanying declarations and exhibits, defendants should be granted summary judgment, dismissing the claims asserted in plaintiffs' pending motion for injunctive relief in their entirety, together with such other relief as this Court may deem appropriate.

Dated:      New York, New York
            August 27, 2008

>                   MICHAEL A. CARDOZO
>                   Corporation Counsel of the City of New York
>                   Attorney for Defendants
>                   New York City Law Department
>                   100 Church Street, Rm. 2-178
>                   New York, New York  10007
>
>                   _____
>                   Jonathan Pines
>                   Jane L. Gordon
>                   Lisa F. Grumet
>                   Andrew J. Rauchberg
>                   Assistant Corporation Counsel